1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
2

3    ------------------------------X
                                   :
4    UNITED STATES OF AMERICA,     :
                                   :   14-CR-399 (ENV)
5              v.                  :
                                   :   July 23, 2014
6    ABRAXAS J. DISCALA,           :   Brooklyn, New York
                                   :
7                   Defendant.     :
                                   :
8    ------------------------------X

9
            TRANSCRIPT OF CRIMINAL CAUSE FOR ARRAIGNMENT
10           BEFORE THE HONORABLE JOAN M. AZRACK
                 UNITED STATES MAGISTRATE JUDGE
11

12   APPEARANCES:

13

     For the Government:      UNITED STATES ATTORNEY
14                            BY:  WALTER NORKIN, ESQ.
                                   SHANNON JONES, ESQ.
15                            ASSISTANT U.S. ATTORNEYS

16   For Defendant Discala:   JOSEPH TACOPINA, ESQ.
                              Law Offices of Joseph Tacopina, PC
17                            275 Madison Avenue, 35th Floor
                              New York, New York 10016
18

     For Defendant Wexler:    CRAIG CARPENITO, ESQ.
19                            Alston & Bird, LLP
                              90 Park Avenue, 15th Floor
20                            New York, New York 10016

21

     Court Transcriber:       MARY GRECO
22                            TypeWrite Word Processing Service
                              211 N. Milton Road
23                            Saratoga Springs, NY 12866

24

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service

1   (Proceedings began at 11:17 a.m.)

2   (Poor audio quality throughout hearing.)

3            THE CLERK:  Criminal Cause for Arraignment, case

4   number 04-CR-399, <u>The United States v. Abraxas Discala and Marc</u>

5   <u>Wexler</u>.  Counsel, please state your name for the record.

6            MS. JONES:  Walter Norkin and Shannon Jones for the

7   United States.  Good morning, Your Honor.

8            THE COURT:  Good morning.  Appearances for Mr.

9   Discala?  Mr. Tacopina, is that you?

10           MR. TACOPINA:  Yes, Your Honor.  I'm sorry.  I was

11  just listening to this.  For Mr. Discala, Joseph Tacopina and

12  Chad Siegal, my partner.

13           MR. SIEGAL:  Good morning, Your Honor.

14           THE COURT:  Good morning.

15           MR. CARPENITO:  On behalf of Marc Wexler, Craig

16  Carpenito of Alston and Bird, LLP.

17           THE COURT:  Carpenito?

18           MR. CARPENITO:  Yes.

19           THE COURT:  All right.  So this is the defendants'

20  first appearance here in the Eastern District, is that correct?

21           MR. TACOPINA:  Yes, Your Honor.

22           THE COURT:  And Mr. Discala, have you reviewed the

23  charges in the indictment with your lawyer?

24           DEFENDANT DISCALA:  (No audible response.)

25           THE COURT:  What plea do you want to enter for him?

3

1          MR. TACOPINA:  Not guilty, Your Honor.

2          THE COURT:  Not guilty?

3          MR. TACOPINA:  Not guilty.

4          THE COURT:  And you waive a formal reading, Mr.

5    Tacopina?

6          MR. TACOPINA:  Yes, I do, Your Honor.

7          THE COURT:  And Mr. Wexler, do you understand what

8    the charges are?

9          DEFENDANT WEXLER:  Yes, Your Honor.

10          THE COURT:  And what plea do you want to enter on

11    your client's behalf?

12          MR. CARPENITO:  Not guilty, Your Honor.

13          THE COURT:  And you waive a formal reading?

14          MR. CARPENITO:  We do, Your Honor.

15          THE COURT:  Now, let's deal first with the

16    application for excludable delay.

17          Mr. Discala and Mr. Wexler, listen carefully.  You

18    have a right to be charged -- well, this is a speedy trial

19    waiver, right?

20          MR. CARPENITO:  Correct.

21          THE COURT:  And have you cleared it with Judge

22    Vitaliano?

23          MR. CARPENITO:  Yes, Your Honor.

24          THE COURT:  You have a right to a trial within 70

25    days.  That's what's called your speedy trial right.  If the

4

1   Government doesn't give you a trial within 70 days, your

2   lawyers could ask that the charges be dismissed as a violation

3   of that speedy trial right.

4          The application before me is to exclude, to stop the

5   70 day clock today and keep it stopped from today, July 23rd,

6   through August 15th.  So no time will run towards the 70 days

7   for your trial clock between today and August 15th, and that's

8   so that your counsel and the Government can discuss how to

9   perhaps resolve your case.

10         Do you understand that, Mr. Wexler?

11         DEFENDANT WEXLER:  Yes, Your Honor.

12         THE COURT:  Is that agreeable to you?

13         DEFENDANT WEXLER:  Yes, Your Honor.

14         THE COURT:  And what about you, Mr. Discala?

15         DEFENDANT DISCALA:  Yes.

16         THE COURT:  So I'll approve this exclusion.  Okay.

17  Now, with regard to bail --

18         MR. CARPENITO:  Your Honor, we have an agreed upon

19  bond for Mr. Wexler if we can handle him first.  And if we can

20  take just a couple of minutes for [inaudible].

21         THE COURT:  Is that the bond I have before me?

22         MR. CARPENITO:  Yes, Your Honor.

23         THE COURT:  All right.  So Mr. Wexler, listen

24  carefully.  This is a $1 million personal recognizance bond.  I

25  understand no property, is that correct?

1          MR. CARPENITO:  No.  There are two -- I'm sorry,

2    there's one property that will be filed as an asset with the

3    bond.

4          THE COURT:  So there'll be some kind of lien on that

5    property.

6          MR. CARPENITO:  Correct.

7          THE COURT:  Okay.  I think you --

8          MR. CARPENITO:  And a confession of judgment to be

9    filed by August 6th.  I believe that's on there on the bottom.

10          THE COURT:  We didn't put the address.  We'll get

11   back to those conditions in a minute.

12          MR. CARPENITO:  Sorry, Your Honor.

13          THE COURT:  That's okay.

14                    [Pause in proceedings.]

15          THE COURT:  Is he here?

16          MR. CARPENITO:  He is not here, Your Honor.  We

17   agreed with the Government that he will be able to go down

18   within the next ten days and sign in the District of New

19   Jersey.

20          THE COURT:  That's fine.

21          MR. CARPENITO:  Thank you, Your Honor.

22          THE COURT:  So it's his name on the deed?

23          MR. CARPENITO:  It is, Your Honor.  He owns the

24   property.

25          THE COURT:  All right.  So getting back to the bail

6

1  conditions, Mr. Wexler, it's a $1 million personal recognizance

2  bond and it is secured by it appears the property that your

3  father owns at 298 Glouster Court in Aberdeen?

4          DEFENDANT WEXLER:  Yes, Your Honor.

5          THE COURT:  Do you understand if you don't come back

6  to court and you flee, there's going to be a lien on that

7  property.  The Government will seize that property if you don't

8  come back to court.  If it can't be sold for $1 million,

9  there'll be a judgment against your dad.  And is Mr. Abramson

10 here?

11         MR. CARPENITO:  No, Your Honor.

12         THE COURT:  That's somebody else that's going to

13 sign?

14         MR. CARPENITO:  Same situation, Your Honor.

15         THE COURT:  Okay.  All right.  Do you understand

16 that?

17         DEFENDANT WEXLER:  Yes, Your Honor.

18         THE COURT:  In addition, if you don't come back to

19 court you can be charged with bail jumping which is a separate

20 crime.  Do you understand?

21         DEFENDANT WEXLER:  Yes, Your Honor.

22         THE COURT:  In addition, if you commit any crimes at

23 all while you're out on this bond, that would obviously be a

24 violation of your bail conditions, but it's also a separate

25 crime in and of itself to violate the law when you're out on a

7

1    bond.  Do you understand that?

2              DEFENDANT WEXLER:  Yes, Your Honor.

3              THE COURT:  Now, your travel while this case is

4    pending is going to be restricted to the Eastern District of

5    New York, the Southern District of New York, and the District

6    of New Jersey.  If you have to go outside of those areas for

7    any reason, you need to get permission from Pre-trial Services

8    before you do so.  Do you understand that?

9              DEFENDANT WEXLER:  Yes, Your Honor.

10             THE COURT:  You are to have no contact or association

11   with any of your codefendants in this case unless it's in the

12   presence of counsel.  Do you understand that?

13             DEFENDANT WEXLER:  Yes, Your Honor.

14             THE COURT:  You have a passport?

15             DEFENDANT WEXLER:  I handed it in.

16             THE COURT:  Okay.  All right.  So that's already been

17   surrendered.  You will be subject to random visits by Pre-trial

18   Services where you live or where you work, and you must report

19   to Pre-trial Services as they direct you to.  So they'll tell

20   you how to report, where to report, and when to report.  Do you

21   understand that?

22             DEFENDANT WEXLER:  Yes, Your Honor.

23             THE COURT:  Just one second.

24                     [Pause in proceedings.]

25             THE COURT:  Is it the Government's position that the

8

1    mental health evaluation is necessary?

2           MR. NORKIN:  Yes, Your Honor, based on Pre-trial's

3    assessment.  [Inaudible].

4           THE COURT:  All right.  I'm going to indicate it and

5    then if it becomes unnecessary and you want to make a

6    subsequent application to the court, you may.  It's not as if

7    it's an onerous condition.

8           MR. CARPENITO:  Okay.

9           THE COURT:  Mr. Wexler, do you have any questions

10   about what your obligations are on the bond?

11          DEFENDANT WEXLER:  No, Your Honor.

12          THE COURT:  Okay.  Here you go.  Do you have a date

13   for when you come back to court?  Is that the August date?

14          MR. CARPENITO:  Yes, Your Honor, August 15th before

15   Judge Vitaliano.

16          THE COURT:  Oh, here it is.  Okay.  You're all set.

17   Thank you.

18          MR. CARPENITO:  Thank you.

19          MR. NORKIN:  Can we just have a minute?

20          THE COURT:  Yes.

21          MR. CARPENITO:  Thank you, Your Honor.  May we --

22          THE COURT:  You're all set.  Thank you.

23          MR. CARPENITO:  Thank you.

24                   [Pause in proceedings.]

25          THE COURT:  Okay.  Now, with regard to bail, Mr.

9

1  Norkin, is there an agreed to bail package?

2          MR. NORKIN:  We have agreement on a large percentage

3  of it.  There's one thing in dispute --

4          THE COURT:  Okay.

5          MR. NORKIN:  -- and Your Honor, that is in portion

6  the crux of the bond agreement which is why it was taking a

7  while.

8          THE COURT:  Okay.

9          MR. NORKIN:  The bail package that's proposed is a $2

10  million bond secured by two properties including -- and

11  cosigned by three suretors.  There are travel restrictions.

12  There are restrictions for the defendant not to communicate

13  with other codefendants except in the presence of counsel,

14  subject to random drug testing.

15          And the issue that's really in dispute between the

16  parties is electronic monitoring.  The Government had

17  originally put in a detention memo seeking -- I'm sorry, a

18  detention letter seeking to detain the defendant because we

19  believe he's a flight risk for a variety of reasons; the

20  strength of the case, his assets, ties abroad.

21          We have been attempting to negotiate terms for

22  electronic monitoring which we think with this bond would

23  sufficiently allow -- would give us confidence the defendant

24  would be coming back to court.

25          The concern is that the defendant would like to be

1   out of the home for a substantial period of the day and the

2   work that our understanding in his interview is in the

3   financial sector and we have concerns that this is effectively

4   a continuation of the fraud.

5           THE COURT:  So what is it that you're seeking?

6           MR. NORKIN:  We're seeking for a more limited period

7   outside the home where he seeks employment with a company where

8   he can be supervised as opposed to self-employed doing his own

9   deals so to speak with no supervision.

10          THE COURT:  All right.  Let me hear from the

11  defendant and then I'll probably hear from you again but --

12          MR. TACOPINA:  Just take it from there.  There's a

13  problem with that.  He's not very employable right now.  I mean

14  they've got a press release that the world seems to have read

15  regarding his charges.  They release snippets, just snippets of

16  audio tape recordings, further cement the presumption of guilt.

17  And someone who's going to be, based on this agreement, wearing

18  a bracelet on his ankle -- so I don't really know where they

19  expect him to get employment now.  He still has a right to earn

20  a living pre-trial.  And let me just explain, they did file a

21  detention letter but Mr. Discala was arrested in Las Vegas.  He

22  went before a federal judge there who released him without any

23  conditions.  He immediately flew home, sent his passport in.

24  He has a seven-week old newborn child.  He's hired counsel.

25  Came home and he's here and submitted his passport as required

1  immediately I think within an hour of that request being made.

2  And we thought we had an agreement --

3          THE COURT:  What are you suggesting?

4          MR. TACOPINA:  I'm suggesting what we walked in here

5  believing.

6          THE COURT:  Well, I don't know what that was.  Tell

7  me.

8          MR. TACOPINA:  Which is $2 million bond was okay

9  cosigned by three sureties, one who's [indiscernible].  We

10  agreed to alleviate the need to argue that detention letter.

11  We agreed to a bracelet even though based on the Pre-trial

12  report they don't find it necessary, but we did agree to it and

13  we're willing to stick by that agreement, but we also agreed to

14  a curfew that excluded him from allowing him to be out of the

15  house I should say from 7 a.m. to 8 p.m. for work.

16          THE COURT:  What does that mean now for him?  Tell me

17  what that means now.  Where does he mean he's going?

18          MR. TACOPINA:  He has meetings with companies and I

19  don't want to list the names of the companies.  I could do it

20  if Your Honor wants.  I explained to the Government who they

21  are but I don't necessarily want them recorded.

22          THE COURT:  But it wouldn't --

23          MR. TACOPINA:  But he's working on an opportunity on

24  a deal that has nothing to do with investors.

25          THE COURT:  But wait, but it wouldn't involve him

12

1  traveling outside of say Connecticut, southern --

2         MR. TACOPINA:  No.  Within the district.  Within the

3  district only.  Not every day, by the way.  I'm not saying it

4  would be every day, but I don't want to be, you know, every day

5  having to write a letter to the Government and Pre-trial he has

6  a meeting in [inaudible], he has a meeting in Manhattan, he has

7  a meeting in the Bronx.

8         THE COURT:  Well, what do you expect his schedule is

9  likely to be in terms of say any given week?

10         MR. TACOPINA:  I believe --

11         THE COURT:  Is he going to be out of the home -- is

12  he going to be -- is his office at his home?

13         MR. TACOPINA:  His office is at the home now.

14         THE COURT:  Okay.

15         MR. TACOPINA:  His office.

16         THE COURT:  So that will be the main place he is.

17         MR. TACOPINA:  Yes.

18         THE COURT:  And then he will leave there to go to

19  meetings?

20         MR. TACOPINA:  Various meetings in the district that

21  he's allowed to travel in, mostly Manhattan.

22         THE COURT:  But do you expect that he's going to be

23  out every day?

24         MR. TACOPINA:  No, I don't expect him to be out every

25  day, but what I don't want to do is be held to three times a

13

1  week or four times a week [inaudible] require his presence at

2  this meetings in Manhattan more than others.  I think it's

3  going to be cumbersome for everyone to have to write a letter

4  every time there's a meeting in the district.

5      THE COURT: Well, let me just ask the Government

6  something.  Is your objection to him working at all or is your

7  concern not knowing where he is?  Because what you could do is

8  he can be on EM or location monitoring and he could also,

9  without a letter to the court, simply have as a condition of

10  release to advise Pre-trial Services of his schedule every day.

11      MR. NORKIN:  And we're not opposed to that.  That

12  would alleviate the problem of keeping track of where he was.

13  The issue is --

14      THE COURT:  Well, you'd have the location monitoring.

15      MR. NORKIN:  Right.  The issue is what he's doing

16  during that period.  We listened to a wiretap for two months.

17  There was no legitimate business being transacted.  The same

18  way the defense counsel argues that it would be hard for him to

19  be employed at this point by another company that would

20  supervise him, well who's going to engage in continuing

21  transactions with him?  These are people who are similarly

22  involved in fraudulent activity.

23      THE COURT:  But what does that mean you're

24  suggesting?

25      MR. NORKIN:  I'm suggesting that to the extent he

14

1  needs to leave home for work, he find employment at a firm

2  where he is supervised, not doing his own deals without any

3  kind of supervision.

4         I would note for the record he has a $7 million trust

5  fund so it's hardly the fact that work is necessary for the

6  defendant.  We are --

7         THE COURT:  But your concern is is him out of the

8  house even if he's on LM doing meetings about deals where you

9  say the track record is none of these deals could be

10 legitimate.

11        MR. NORKIN:  Correct.

12        THE COURT:  And you have no way to monitor him.

13        MR. NORKIN:  Right.  There's that concern and then

14 there's the flight risk issue with monitoring for long periods.

15        Your Honor pointed out correctly that we'd be okay if

16 --

17        THE COURT:  I mean if he's on LM I mean in terms of

18 his business meetings, Mr. Tacopina said that he would agree to

19 Connecticut, souther, eastern, maybe even New Jersey.  But what

20 if he submitted his weekly schedule to Pre-trial and be subject

21 to [indiscernible] as well?

22        MR. NORKIN:  That would alleviate that part of the

23 concern as far as the flight risk and part of the reason we're

24 seeking monitoring.  But the other part of the concern is that

25 he's going to continue to engage in fraud --

1            MR. TACOPINA:  Well, I mean --

2            MR. NORKIN:  -- if he's not supervised.

3            THE COURT:  But supervised how?

4            MR. NORKIN:  Employed by some other firm that had

5    supervision over the deals that he's involved in.

6            MR. TACOPINA:  If they can help him get a job, we'll

7    gladly take him up on their offer, but I don't think he's very

8    employable right now by a firm other than the --

9            THE COURT:  Yes.  I mean I think that's unrealistic

10   but --

11           MR. NORKIN:  But then that's --

12           THE COURT:  But I don't -- I agree with you that on

13   meetings where he's out there sort of in the market putting

14   deals together is probably not a good idea and it's probably

15   fair for you to suggest you want a monitor.  So what do you

16   have in mind?

17           MR. TACOPINA:  A couple of things.  One, there's no

18   $7 million trust.  He just stated there was a 7 -- there's

19   nothing like that, so --

20           MR. NORKIN:  This is in the Pre-trial report.

21           MR. TACOPINA:  No, it doesn't.  What it is says is

22   his net worth is approximately $7 million including some real

23   estate, trusts, business equity.  These are some --

24           THE COURT:  But Mr. Tacopina, why can't he, given the

25   nature of the charges and the fact that they are prepared to

1  agree to him being out, why can't you just let them know

2  exactly what he's doing and let them pass on it.  And then if

3  you think you're being unreasonable, you come back to the

4  court.  I don't think it's --

5            MR. TACOPINA:  By Mr. Discala notifying Pre-trial

6  every day.

7            THE COURT:  Well, no, submit a weekly schedule to

8  Pre-trial of exactly what meetings he was going to have and

9  with whom.  And the Government would get to see it.  And if

10  they had any issues with it, they could say yes, no, maybe.  I

11  mean --

12            MR. NORKIN:  It would be very challenging for us.

13  We'd be here all the time because a lot of these would be  --

14            THE COURT:  You think he's really going to be out

15  there?  I mean given the publicity surrounding this case that

16  they're -- I mean --

17            MR. NORKIN:  Well, that begs the question --

18            THE COURT:  -- he's going to have that many business

19  opportunities?

20            MR. NORKIN:  But that begs the question of who's

21  taking the meetings with an indicted individual?

22            MR. TACOPINA:  Oh God forbid someone takes a meeting

23  with --

24            THE COURT:  Well, this is sort of -- I mean in a way

25  this is like an organized crime case where you pass on who the

1   visitors are.

2           MR. TACOPINA:  Right.  Well, let me list some of

3   them.  How about Google, Microsoft, AT&T to name a few.  Those

4   are some of the meetings he'd take and I think those people are

5   not allegedly members of some crime family or some financial

6   scheme now.

7           MR. NORKIN:  They're --

8           MR. TACOPINA:  No problem.  Can I finish, please?

9           MR. NORKIN:  Sorry.

10          MR. TACOPINA:  I have no problem [inaudible] he tells

11  Pre-trial where his meetings are and where he's going.

12          THE COURT:  Yes, but I think the Government should

13  get to review what the weekly schedule is.  I do.  Given the

14  nature of the charges and what I've read in the detention memo

15  and the indictment I think it's fair.  I'll listen to you about

16  whether you think that's workable or not.  But I mean I think

17  we can start with that.  How many meetings do you think he's

18  going to have?

19          MR. NORKIN:  I don't know.  I'm not opposed to

20  starting.  But I think all the companies that defense counsel

21  mentioned, although they are legitimate, I think the deal that

22  they're discussing is something that involves another company

23  that we believe is part of fraudulent conduct overheard on the

24  wire.  That's the concern.  So it would be not just who he's

25  meeting but what is being discussed.  And I think based on my

1  knowledge of the wiretapping and these companies that he

2  mentioned that the deal being discussed involves another

3  company that we think is part of the fraud.

4         MR. TACOPINA:  He's not charged with any other fraud

5  outside [inaudible].

6         MR. NORKIN:  Yes.

7         MR. TACOPINA:  [Inaudible].  Okay, yeah, in the Pre-

8  trial letter where they seem to want to put everything in

9  there.  They didn't mention that deal.  So I just, you know --

10 this is a deal that some very substantial companies --

11        THE COURT:  Well, how any deals are out there right

12 now where he needs to have meetings?

13        MR. TACOPINA:  It's one massive deal that does not

14 deal with potential investing or anything like that.  This is a

15 situation where [inaudible] deal with these major companies

16 involved [inaudible] --

17        THE COURT:  Yes, but the Government's already

18 objecting to that deal.

19        MR. TACOPINA:  Well, just now for the first time.  I

20 mean we had an agreement with them walking in here.  Look, Pre-

21 trial has no problem with the [indiscernible].  Pre-trial

22 doesn't think he needs a bracelet, quite frankly.  You know, we

23 can put --

24        THE COURT:  Yes, but this isn't about the bracelet.

25 This is really more about their concern about what kind of

1  business he continues to do and their ability to supervise and

2  monitor it.

3          MR. TACOPINA:  But if he didn't have a bracelet he

4  could do any business he wants.  Obviously, he can't commit any

5  additional fraud but no one --

6          THE COURT:  Well, even if I said no bracelet, I could

7  still require him to tell Pre-trial exactly where he's going

8  every day.  I mean the bracelet is not really the issue here.

9  The bracelet is not the issue.  It's the nature of what you

10 want him to be out there doing.

11          So Mr. Norkin, what you're saying is if this

12 particular deal that Mr. Tacopina just referred to was the

13 first deal on the list, you'd say no --

14          MR. NORKIN:  That's correct.

15          THE COURT:  -- because you already have some evidence

16 that gives you cause for concern.

17          MR. NORKIN:  That's correct.

18          MR. TACOPINA:  Well, I mean --

19          THE COURT:  Well, if you're prepared to let him

20 submit that schedule and for the Government to veto meetings --

21          MR. TACOPINA:  I mean subject to review by the court,

22 right?

23          THE COURT:  Well if -- what?

24          MR. TACOPINA:  I mean if they start vetoing meetings

25 that they haven't charged him --

1          THE COURT:  Yes.  Unreasonably -- you could walk back

2    into court and say I think they're being unreasonable.  But you

3    know, on the other hand, I could also see a situation where a

4    court or another judge would say no meetings, no business.  You

5    know, all of your business is potentially, according to the

6    Government, nothing but fraud so no business while this case is

7    pending.  So you know, this is a compromise.

8          MR. TACOPINA:  I understand that.  That's pretty

9    [inaudible], Your Honor.

10          THE COURT:  Well, he'd be free --

11          MR. TACOPINA:  I mean with all respect --

12          THE COURT:  -- he'd be in Connecticut, he'd have a

13    bracelet, he could travel.

14          MR. TACOPINA:  Can't earn a living, he can't work.

15    He has to just sit there.

16          THE COURT:  That's on his own account I guess.  I

17    don't know.  I don't feel it's so onerous to say he can't work.

18    I'm trying to strike a compromise here, but the compromise is

19    going to involve full disclosure to them of who he's meeting

20    with and what he's meeting about.  So those are the options.

21          MR. TACOPINA:  Right.  Well, if we're going to do

22    that then, would there really even be a need for a bracelet at

23    that point unless the Government really -- if he's going to

24    have to disclose every single location he goes to at that

25    point, I mean if you want to ask Pre-trial their position, but

1    I'm fine with that, Your Honor.

2              THE COURT:  Yes.

3              MR. NORKIN:  Yes, there's still a need for the

4    bracelet because it's 24 hour monitoring.  The alternative to

5    this is detention.

6              THE COURT:  Yes.  If his travel restrictions were

7    Connecticut, eastern, souther, New Jersey, and you've been

8    listening so you know what the -- I mean what do you think

9    about a bracelet?

10             MALE SPEAKER:  I mean logistically it would be

11   difficult especially if the Government has to approve certain

12   meetings.  We have to go into the system and generate schedules

13   on a daily basis [inaudible] waiting for a response from the

14   Government on whether it's appropriate.  We don't have officers

15   at the duty station every day waiting for a schedule.  We're

16   out in the field and --

17             THE COURT:  Well, this could be done -- they could

18   look at his weekly schedule and they would decide --

19             MALE SPEAKER:  Yeah, in advance and we have more time

20   but we're talking about [inaudible] two days --

21             THE COURT:  No.  He'd submit the schedule -- this is

22   the way I would see it playing out.  He'd submit the schedule

23   by Friday at 5 o'clock.  The Government would look it over.

24   The Government would Pre-trial Services, you know, by say 9

25   a.m. on Monday of what they approve and then --

1          MALE SPEAKER:  I mean if the turnaround is that quick

2    it may work out.

3          THE COURT:  No, oh yes, the turnaround would

4    definitely be that quick.

5          MALE SPEAKER:  You know, if that's --

6          THE COURT:  You wouldn't need more than two days to

7    review the schedule, right?

8          MR. NORKIN:  Well, depending on who he was meeting

9    with we might need a little bit of time to look into that.  But

10   again, the only meetings that the defendant has mentioned so

11   far involve this deal that we'd veto.

12         THE COURT:  Well, I understand that already we know

13   you don't approve.

14         MALE SPEAKER:  Right.  I mean we still are going by

15   our position that this general supervision, even intense

16   supervision [inaudible] bracelet.

17         THE COURT:  Okay.

18         MALE SPEAKER:  [Inaudible] --

19         THE COURT:  So why do you see the necessity for a

20   bracelet if his travel was restricted and he had this kind of

21   reporting and disclosure to you?

22         MR. NORKIN:  The defendant is still a flight risk for

23   all the reasons we mentioned in the detention memo.  There's a

24   whole series of white collar cases mentioned at the end of the

25   detention letter.

1          THE COURT:  I know, I read it.

2          MR. NORKIN:  So the electronic monitoring is the most

3    effective means that we have outside of detention for

4    monitoring the defendant.  That's the only reason we have

5    agreed not to seek detention.

6          THE COURT:  Even Pre-trial is saying it's so

7    impractical.  It's going to be so hard to do.

8          MR. NORKIN:  That's because the defendant wants to

9    work.  It would be more practical -- most people who are on

10   electronic monitoring have home detention and that is more

11   appropriate for this defendant particularly because the thing

12   that he wants to do is something that the Government objects

13   to.

14         MR. TACOPINA:  [Inaudible], Your Honor, you know, we

15   came in here with an agreement that would include a curfew

16   carving out 7 a.m. to 8 p.m. and a bracelet.  We agreed to

17   that.  [Inaudible] Pre-trial doesn't think a bracelet's

18   necessary.  Despite that, and normally --

19         THE COURT:  Well, only under these particular

20   circumstances --

21         MR. TACOPINA:  Yes, of course.

22         THE COURT:  -- because you want him to be able to go

23   out and work.

24         MR. TACOPINA:  Right.  And so, you know, he was

25   released by one federal judge without any conditions.  But we

 1    made an agreement and I want them to honor that agreement and

 2    not say okay, Pre-trial doesn't think the bracelet is

 3    necessary, but they made an agreement too.  This is for work.

 4              THE COURT:  Yes.  But you know what I think?  I think

 5    that we should -- if you can agree on this reviewing his

 6    schedule I think we should try the LM and if it becomes, you

 7    know, totally impracticable, then you come back, or we see if

 8    maybe the Government at some point is persuaded it's not

 9    necessary.  But I think we try it but on the condition that you

10    know by 9 a.m. Monday morning what the schedule is.  And

11    really, I can't imagine that you anticipate he's going to be

12    out every day.

13              MR. TACOPINA:  No.

14              THE COURT:  In fact, to the extent that it makes it

15    easier for the location monitoring people, he does a meeting

16    one day a week, business -- maybe two days a week.  But I mean

17    --

18              MR. TACOPINA:  I know but I mean [inaudible] --

19              THE COURT:  Even you said you don't anticipate him

20    being out every day.

21              MR. TACOPINA:  I don't, but I can't now start

22    limiting it to one day a week.  One week may have five meetings

23    in three days and one week can have none.  I don't want to

24    start saying one day a week.

25              MR. NORKIN:  Your Honor, the -- I'm sorry.

1            MR. TACOPINA:  And then the other thing --

2            THE COURT:  But you understand these meetings, the

3    schedule is subject to the Government reviewing it.

4            MR. TACOPINA:  Well yes, but if they veto it, I think

5    the burden should be on them to -- I mean I don't want to have

6    to --

7            THE COURT:  Well, they've already said -- they have

8    said with regard to this one meeting that you suggest, the deal

9    he's involved in, they are opposed to it and Mr. Norkin can

10   tell us why.

11           MR. NORKIN:  And if I may recommend, because this

12   deal seems to be the subject of what happens here, if I may

13   recommend that we table this discussion as far as a schedule

14   for now, just put Mr. Discala on electronic monitoring, we'll

15   brief this with the district court.  We'll provide the

16   information and the district court can decide on whether these

17   meetings should take place or not because if the district court

18   decides the meeting shouldn't take place, then I think we're

19   looking at home detention, electronic monitoring, and nobody

20   has a problem with it, right?

21           MR. TACOPINA:  I'll have a problem but they won't

22   have a problem.  I mean I think they should come in here and

23   argue for reasonable bail package.

24           THE COURT:  Well, the best I can do for you is say if

25   he wants to continue to do any kind of business at all, he has

1  to submit a schedule of what his proposed meetings are to the

2  Government by Friday at 5 o'clock the week before.  They get to

3  look at it, they get to review it, and if they object to any --

4          MR. NORKIN:  Can we change the dates to not Friday to

5  Monday because it's very hard to put together a briefing and

6  research whether we're concerned about --

7          THE COURT:  Thursday.

8          MR. TACOPINA:  Briefing?  What briefing?  [Inaudible]

9  --

10          THE COURT:  Well actually, it wouldn't be -- I would

11  anticipate you just, if you had an objection, you'd call

12  counsel, you'd tell counsel why, and counsel probably would

13  withdraw the request unless he thought he could come into court

14  and persuade a judge that that meeting needed to go forward and

15  was not something that the court ought to be concerned about.

16          MR. TACOPINA:  Unless they start vetoing every single

17  request.  I mean I can't disprove a negative, right?  I don't

18  know why they would disapprove it unless they --

19          THE COURT:  I think they have legitimate concerns,

20  Mr. Tacopina.  And if you can't live with those concerns, we're

21  just going to have EM and no meetings, so --

22          MR. TACOPINA:  I just want to know what they are.

23          THE COURT:  I think you know what they are.

24          MR. NORKIN:  That's why I would recommend that we

25  just put in for a limited period just electronic monitoring and

27

1  home detention.  We'll brief this with the district court and

2  the district court can decide whether the defendant could

3  attend these meetings.

4          THE COURT:  Fine.  All right.  So we'll do a bond

5  with electronic monitoring.

6          MR. NORKIN:  Home detention, and we'll seek to brief

7  it this week.

8          MR. TACOPINA:  The time being at least let's

9  implement a system that Your Honor suggested.

10          MR. NORKIN:  The time being is three, four days.  The

11  defendant can't stay at home for three or four days while this

12  gets briefed?

13          THE COURT:  Yes, he can stay home for three or four

14  days.

15          MR. TACOPINA:  Your Honor, look, I mean I can see

16  we're at the end of the road so I'll [inaudible].  I just don't

17  appreciate the fact that there was an agreement in place that

18  he could be out from 7 to 8 for work.  That was what the

19  Government had written.

20          THE COURT:  Well, I don't know --

21          MR. TACOPINA:  As a matter of fact, they wrote that

22  on the document you have in front of you initially and then

23  they crossed it out.

24          THE COURT:  I don't have a document in front of me.

25          MR. TACOPINA:  Well, but the bottom line is, you

28

1    know, we came forward with an agreement.  We decided to abide

2    by it.  I just don't appreciate on the record in front of Your

3    Honor all of a sudden we have a change in circumstances where

4    now -- I mean they didn't seem to have a problem with it the

5    other day.  They didn't ask what the work was or what the

6    meetings were.  Now we're up here and all of a sudden, you

7    know, everything's a fraud that he's ever been involved in I

8    guess.

9               THE COURT:  Well, I don't think that's quite what

10   they're saying.

11              MR. TACOPINA:  Well, a meeting with Google I don't

12   think they [inaudible] --

13              THE COURT:  But let's -- well, you've already heard

14   they would have a problem with that deal.  All right.  Mr.

15   Discala, let's go over what your bail conditions are so that

16   you can be released on this bond.

17              Now, do you object to him being released before the

18   property is posted?

19              MR. NORKIN:  No, Your Honor.

20              THE COURT:  And are any suretors here?

21              MR. TACOPINA:  One, Your Honor.

22              THE COURT:  Okay.  Have that suretor come up.  Well,

23   so we're taking out this permitting --

24              THE CLERK:  Can you raise your right hand?

25              THE COURT:  -- the defendant to work outside his

29

1   home.

2              (Thomas Comalin, Suretor, Sworn.)

3         THE CLERK:  Can you state your name for the record?

4         MR. COMALIN:  Thomas Comalin [Ph.].

5         THE CLERK:  Thank you.

6         THE COURT:  You're -- what is it?

7         MR. COMALIN:  Comalin.

8         THE COURT:  Comalin.  Okay.  All right.  Okay.  Let's

9   go over these.  Do you own any of the properties?  You're just

10  signing the bond?  Is he just --

11        MR. TACOPINA:  One of the properties.  One of the

12  two.

13        THE COURT:  Oh, which one?

14        MR. TACOPINA:  The one located in Killingworth,

15  Connecticut, 5 Clarkson Lane property, Your Honor.

16        THE COURT:  Okay.  And what's the face amount of the

17  bond?

18        MR. NORKIN:  $2 million.

19        THE COURT:  All right.  So Mr. Comalin, this is a $2

20  million personal recognizance bond.  If you sign it, you agree

21  to be a suretor for Mr. Discala's appearance and you agree to

22  post this property at 5 Clarkson Lane in Killingworth,

23  Connecticut.  If he doesn't come back to court, the property,

24  which will have some form of a lien on it, will belong to the

25  Government and if it can't be sold for $2 million, you would

30

1   have a judgment against you for the balance.  Do you understand

2   that?

3           MR. COMALIN:  I do.

4           THE COURT:  Are you prepared to take that risk for

5   him?

6           MR. COMALIN:  I do.

7           THE COURT:  All right.  Mr. Discala, $2 million

8   personal recognizance bond cosigned by Mr. Comalin, is it Ms.

9   Zowick [Ph.] and is it Ms. Van Pelkin [Ph.]?  Is that it?

10          DEFENDANT DISCALA:  Mrs.

11          THE COURT:  Mrs. Van Pelkin.  All right.  If you

12  don't come back -- and are any of the properties -- do any of

13  the properties belong to Mr. Discala?  Okay.

14          If you don't come back to court, these people will be

15  ruined financially.  They'll all have a judgment against them

16  in the amount of $2 million and these properties will belong to

17  the Government.

18          In addition, if you don't come back to court, you can

19  be charged with bail jumping.  Do you understand that?

20          DEFENDANT DISCALA:  [Inaudible].

21          THE COURT:  If you commit any crimes at all while

22  you're out on this bond, that would be a violation of your bail

23  conditions, but it's also a crime to violate the law while

24  you're out on a bond.

25          Now, on this bond you're going to be on home

31

1   detention with electronic bracelet.  You'll be permitted to

2   meet with your lawyer, come to court, deal with a medical

3   emergency.  Those are the only reasons you can leave your home

4   at this point under this bond.  Do you understand that?

5           DEFENDANT DISCALA:  Yeah, I do, Your Honor.

6           THE COURT:  All right.  Do you have a passport?  Or

7   somebody has the passport?  The court has the passport?

8           MR. TACOPINA:  They have it already.  It was sent to

9   Pre-trial in Nevada.

10          THE COURT:  All right.  Don't apply for a passport

11  while this case is pending.  Do not have any association or

12  contact with your codefendants unless it's in the presence of

13  counsel.  Do you understand that?

14          DEFENDANT DISCALA:  Yes, I do, Your Honor.

15          THE COURT:  That means text, phone, anything.  You

16  understand?

17          DEFENDANT DISCALA:  Yes, I do, Your Honor.

18          THE COURT:  All right.  So for purposes of today,

19  that's it?  Confined to home, electronic monitoring.  Okay.

20          Do you have any questions about what your bail

21  conditions are?

22          DEFENDANT DISCALA:  I do not.

23          THE COURT:  All right.  And in the meantime, Pre-

24  trial Services could also come and check on you.  You'll have

25  to report to them as they direct you to, and you'll have to

32

1   participate in any kind of drug testing or treatment they

2   indicate for you.  Do you understand that?

3               DEFENDANT DISCALA:  I do.

4               THE COURT:  Here you go.

5               THE CLERK:  Okay.  You sign that, sir.  [Inaudible].

6               MR. TACOPINA:  Correct.

7               THE CLERK:  Okay.  [Inaudible].

8               THE COURT:  And when are the other suretors going to

9   be signing?

10              MALE SPEAKER:  By August 6th, Your Honor.

11              THE COURT:  And they're going to sign here or

12  someplace else?

13              MALE SPEAKER:  In different states, different courts,

14  different states.

15              THE COURT:  All right.  Thank you.

16              MR. NORKIN:  Thank you, Your Honor.

17              MR. TACOPINA:  Thank you, Your Honor.

18  (Proceedings concluded at 12:01 p.m.)

19                         *  *  *  *  *  *

20

21

22

23

24

25

33

1     I certify that the foregoing is a court transcript from an

2  electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5  _____

6                              Mary Greco

7  Dated:  July 25, 2014

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25