

SEALED

**Office of the United States Attorney**
District of Nevada
333 Las Vegas Boulevard, Suite 5000
Las Vegas, Nevada 89101
(702) 388-6336



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

SC:SCJ
F. #2013R01203

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 17, 2014

<u>By Facsimile and ECF</u>

The Honorable Robert M. Levy
United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201
Fax: 718-613-2345

      Re:    United States v. Abraxas Discala, <u>et al</u>.
                <u>Criminal Docket No. 14-399 (ARR)</u>

Dear Judge Levy:

        The government respectfully submits this letter in connection with the arraignment of Abraxas Discala, also known as AJ Discala. Discala, a resident of Norwalk, Connecticut, was arrested earlier today in Los Vegas, Nevada. The government respectfully submits that Discala should be removed in custody from the District of Nevada to this district,[1] and the Court should enter a permanent order of detention upon his appearance in this district because there appears to be no attainable combination of conditions that could be imposed on Discala that would reasonably assure his presence in court. <u>See</u> 18 U.S.C. §§ 3142(b). There is a substantial risk of flight due to the overwhelming nature of the evidence against Discala, the lengthy jail term Discala faces if convicted, Discala's international ties and the millions of dollars in fraud proceeds earned by Discala.

        As discussed in more detailed below, Discala was arrested for his role in coordinating the manipulation of several publicly traded stocks and has been indicted in the Eastern District of New York for conspiring to commit securities, wire and mail fraud and wire fraud, in violation of Title 18, United States Code, Sections 371, 1341, 1343 and 1349, Title 15, United States Code, Sections 78j(b) and 78ff. A status conference is schedule

---

      [1]      The government will provide this letter to the magistrate judge who handles Discala's removal proceeding in the District of Nevada.

before the Hon. Eric N. Vitaliano, United States District Judge for the Eastern District of New York, on August 15, 2014, at 10:00 a.m.

## I.    Background of the Investigation

Discala has been indicted for his role in organizing the unlawful manipulation of publicly-traded stocks by artificially controlling the price and volume of traded shares in the manipulated stocks through, inter alia: (a) false and misleading press releases; (b) false and misleading SEC filings; (c) fraudulently concealing co-conspirators' ownership interests in the manipulated public companies; (d) generating concocted trading volume in the stock; and (e) unauthorized purchases of stock in accounts of unwitting investors. Discala is the Chief Executive Officer of OmniView Capital Advisors LLC ("OmniView"), and he was assisted in his fraudulent scheme by a group of financial professionals who acted in concert with insiders and shareholders of the companies whose publicly-traded stock is being manipulated (collectively, the "Co-conspirators"), including co-defendants Marc Wexler, Ira Shapiro, Matthew Bell, Craig Josephberg, Kyleen Cane and Victor Azrak.

### A.    Manipulation of CodeSmart ("ITEN")

As described in the indictment, one of the stocks manipulated by the Co-Conspirators is that of CodeSmart Holdings, Inc. ("CodeSmart"), trading under the ticker symbol ITEN. However, the Co-conspirators have manipulated and were continuing to manipulate other publicly traded stocks, including the stocks of: (i) Cubed, Inc. ("Cubed"), trading under the symbol CRPT; (ii) StarStream Entertainment Inc. ("StarStream"), trading under the ticker symbol SSET; and (iii) The Staffing Group, Ltd. ("Staffing Group"), trading under the ticker symbol TSGL.

The scheme to manipulate the stock of CodeSmart began before CodeSmart became a publicly traded company. First Independence Corporation ("First Independence"), a public shell company, sold its entire lot of 3,000,000 shares to twenty-four shareholders in January 2013 for $0.0115 per share, raising $34,500 for the company. On May 3, 2013, First Independence acquired CodeSmart in a reverse merger. Following the reverse merger, the new company operated under the CodeSmart name. Also in May 2013, the First Independence shareholders sold all 3,000,000 shares to individuals and entities connected to Discala and his co-defendant Marc Wexler for a purchase price of $0.023 per share (exactly double the purchase price for the original shareholders). First Independence changed its name to CodeSmart Group Holdings, Inc., and later changed its ticker symbol to "ITEN." Thus, CodeSmart, a private company, effectively took over First Independence, a publicly-traded company, in a way that enabled CodeSmart to become a publicly-traded company.

After gaining control of CodeSmart's unrestricted shares, Discala, Wexler, along with CodeSmart CEO Ira Shapiro, and brokers Matt Bell and Craig Josephberg, fraudulently inflated CodeSmart's share price and trading volume and then sold the unrestricted CodeSmart stock at a profit when the share price reached desirable levels. Such a scheme is commonly referred to as a "pump and dump."

In furtherance of the CodeSmart stock manipulation scheme, the Co-Conspirators, with others, coordinated their trading activity with the issuance of company press releases, a number of which contained false and misleading information which made CodeSmart appear to the public to be more successful than it was in actuality. In the period between May 13, 2013 and July 12, 2013, CodeSmart issued press releases at the approximate rate of one press release every three days and in that period the stock price of CodeSmart rose by 291 percent. On July 12, 2013, CodeSmart publicly filed with the SEC an amended Form 8-K, which stated, "We estimate about $10 million in revenues over the following 12 months from the date of this Report." On the date of that filing, CodeSmart's share price peaked, closing at $6.94 per share. Over the next month, the share price rapidly decreased, such that by August 19, 2013, the company was valued at $2.50 per share. In fact, on August 19, 2013, CodeSmart filed a Form 10-Q with the SEC stating that the company did "not have sufficient funds to fully implement [its] business plan" and that, if they did not obtain the funds, CodeSmart "may need to curtail or cease [its] operations until such time as [it has] sufficient funds." Thus, in the span of one month, CodeSmart's revenue forecast went from $10 million to ceasing operations.

Three days later, however, on August 22, 2013, CodeSmart issued another positive press release. A few days after that, on August 26, 2013, at a time when CodeSmart's stock was rising and closed at $3.10 per share, CodeSmart issued a letter to its shareholders that stated, in part: "If we continue on the track we are on, I believe we will achieve our revenue and profit goals that were previously disclosed for 2013 and beyond." On August 27, 2013, CodeSmart filed with the SEC a Form 8-K, signed by co-defendant Shapiro, in which CodeSmart announced that Shapiro, its Chief Executive Officer, had purchased 25,000 shares of the company's stock from the public market at the market value of $3.21 per share for a cost of $80,250. In this SEC filing, Shapiro extolled his purchase of CodeSmart stock and stated that his "stock purchase [was] symbolic of [his] confidence in the Company and its mission." In reality, Shapiro did not pay for the 25,000 CodeSmart shares purchased in his brokerage account. On September 4, 2013, the same day that Shapiro paid $81,278 from his personal bank account to his brokerage firm for the 25,000 shares of CodeSmart, Discala transferred $81,278 to Shapiro's personal bank account. Between August 21, 2013 and August 30, 2013, CodeSmart's share price more than doubled, rising from $2.19 to $4.60. CodeSmart's share price then went into a rapid decline, dropping to $2.13 by September 20, 2013.

The fraudulent manipulation of CodeSmart's stock is further evident from an examination of the economic reality. At a stock price of $6.94, a price reached on July 12, 2013, CodeSmart's market capitalization was $86,347,800. However, that same day, CodeSmart filed with the SEC an amended Form 10-K, signed by Shapiro, in which CodeSmart listed only $6,000 in total assets, $7,600 in revenue and a net loss of $103,141. By December 30, 2013, CodeSmart's stock was trading at $0.66 per share, and on July 9, 2014, CodeSmart's stock closed at $0.01 per share. This chart shows the rise and fall of CodeSmart's stock price.



Between May 13, 2013 and September 20, 2013, Discala and his Co-conspirators coordinated the trading of their unrestricted shares with press releases and SEC filings issued by Shapiro to maintain a market in CodeSmart and sell their considerable holdings in CodeSmart at substantial profits.

Transfer agent records revealed that Discala, Wexler, Bell and Josephberg controlled the vast majority of CodeSmart's "freely trading" float, which they attempted to conceal through entities and other individuals. Both Bell and Josephberg received unrestricted shares of CodeSmart for pennies in exchange for investing certain of their customer base in CodeSmart. When trading started in earnest on May 13, 2013, Discala and Wexler flooded the market with CodeSmart's shares. Discala and his Co-conspirators used Bell's and Josephberg's clients' accounts to dump their CodeSmart shares. The below chart illustrates how Bell's and Josephberg's clients purchased CodeSmart stock at the same time that the co-defendants were dumping their stock.

Case 1:14-cr-00399-ENV   Document 71-8   Filed 06/05/14   Page 6 of 16 PageID #: 416
Case 1:14-mj-00405-CW   Document 32   SEALED   Filed 07/14   Page 6 of 15



CodeSmart  (ITEN) Trading - Defendants Compared to Victims
(May 2013 - June 2013)

This fraudulent manipulation scheme was highly profitable for Discala, Wexler, Bell and Josephberg.  Discala made approximately $3 million trading CodeSmart, including $600,000 in profit in an account held in his assistant's name but controlled by Discala.   Discala's Co-conspirators also profited significantly from this pump and dump. Wexler made over $2.2 million, Josephberg made approximately $750,000, and Bell made approximately $550,000. Although Shapiro did not receive unrestricted stock, he was paid a salary of $225,000.  In addition, as detailed above, Shapiro received 25,000 shares of CodeSmart that were paid for by Discala.

5

## B.      Manipulation of Cubed ("CRPT")

Another stock manipulated by Discala is that of Cubed. Inc. ("Cubed).  A private company, Crackpot, Inc., engineered a merger in fact with a publicly traded shell company, Northwest Resources Inc. ("NWRS").  NWRS acquired all of Crackpot's intellectual property for approximately $350,000, changed its name to "Cubed, Inc." and changed its ticker symbol to "CRPT."  Although the morphing of Crackpot into NWRS/Cubed through an asset purchase agreement was not a reverse merger, the end result was that Crackpot, a private company, effectively became Cubed, a publicly-traded company.

On March 28, 2014, 200 shares of Cubed were sold at $5 per share.  On April 22, 2014, after 15 days of no trading activity, Cubed's stock began trading in earnest at a price of $5.25 (the stock closed at $5.20).  From April 22, 2014 through April 30, 2014, Discala, Wexler, Bell, and Josephberg, along with co-defendants Kyleen Cane and Victor Azrak, together with others (the "Cubed Co-Conspirators"), were responsible for manipulating the vast majority of the trading activity in Cubed.  For example: (i) Dounya Discala (Discala's wife) bought 6,100 shares and sold 700 shares; (ii) Joseph Discala (Discala's father) bought 1,500 shares; (iii) Bell bought 4,450 shares; (iv) Victor Azrak bought 500 shares; and (v) Ruben Azrak, Victor Azrak's father, bought 3,000 shares.

As demonstrated below, the investigation has revealed that Discala and his Co-conspirators set the $5 share price and controlled the trading in Cubed.  From April 22, 2014 through May 22, 2014, Cubed's share price gradually increased from a close of $5.20 to $5.42.  Then on May 23, 2014, Cubed's share price skyrocketed to a high of $7.05 before closing at $6.30.  From May 23, 2014 through July 2, 2014, Cubed's stock has been steady and fluctuated between $6.30 and $6.70.  This gradual but significant price increase from $5.00 per share on March 28, 2014 to $6.70 on July 2, 2014 – a significant increase of 34% for no apparent reason – further demonstrates the manipulation by Discala and his Co-conspirators.  This chart reflects Cubed's gradual and steady increase in price, with the exception of a dramatic jump in price on May 23, 2014, described in more detail below.



Cubed's stock's valuation does not reflect the underlying economics of the company.   At $6.58 per share, Cubed's market capitalization is approximately $170 million. However, in a 10-Q filed for the period ending February 28, 2014, Cubed reported less than $1,500 in cash, negative stockholders equity, a loss of $15,000, and accrued professional fees of $131,824.  On June 23, 2014, Cubed reached its highest closing price of $6.75 per share. At $6.75 per share, Cubed's market capitalization was approximately $200 million.

### C.        The Co-Conspirator's Communications

The government obtained a limited number of text messages for telephones subscribed to by Bell and Wexler,  and, pursuant to a court-authorized wiretap, also intercepted Discala's calls and texts between May 2, 2014 and June 29, 2014.  These communications, including some of those described below, show that the Cubed Co-Conspirators, and others, fraudulently manipulated Cubed's stock by artificially controlling the price and volume of Cubed's stock through, inter alia, match trades and wash trades.[2]

---

[2]        The government hereby provides notice to the defendant pursuant to 18 U.S.C § 2518(9) of its intent to rely on wiretap interceptions at the detention hearing in this case.  In

Rather than generating significant market interest and causing a quick pump and dump that would elicit regulators' scrutiny, the Cubed Co-Conspirators engaged in a scheme that gradually increased the price of Cubed's stock to give it the appearance of a legitimate company with genuine and steady market demand for the security. The evidence shows that Discala was able to exercise control of this process through a number of corrupt brokers and investors and by placing by the vast majority of Cubed's stock into one or more escrow accounts controlled by Cane. For the text messages and calls described below, not all relevant portions of such communications have been described. To the extent that quotations are used from intercepted conversations in the descriptions below, the quoted segments are based on line sheets and drafts transcripts of the recordings and not final transcripts.

On May 12, 2014, Discala and Azrak discussed over the telephone how Craig Josephberg dumped unprofitable stocks into his client's accounts:

Discala:     He's not going to get someone else to buy it. He means he'll stuff it in someone else's account. …, he's got this one [client] …. Poor guy's probably down eight—

Azrak:      [That client's] in Texas, right? ... That's a nice guy. We should start sending [Josephberg] morons, by the way. We could trade for free, you know, send him a moron, you know, a guy you don't know and then we'll just buy stocks and if they don't go up by the end, we'll buy, like, options—Twitter options—that expire in, like, a day. Either we'll make like twenty times or we'll just give him the stock. [Laughing]

Discala:     So, by the way—so—you're not getting it, that's what Jobo does. … It's exactly—no, no this is what he does. He does it with the firm, and then he's like, "Aw, fuck, I lost on this one." If he wins he keeps the money, and if he loses—

Azrak:      If he loses, the guy gets shtupped, yeah, I know.

Discala:     Exactly. It's like going to the casino with their chips. [Laughs]

Azrak:      [Laughs] I never heard of such a thing.

                                        ***

Discala:     We got to get him more clients, if we get him more clients, we're going to be rolling in it. [Laughing]

_____

order to preserve the integrity and confidentiality of the government's investigation, notice of the wiretap interceptions to the defendant prior to his arrest was not feasible.

Azrak:         [Laughing] That's what I'm thinking. We need to do [U/I], that's what we need to do, get him clients. [U/I] fifty-fifty on the shtup. We're going to buy Twitter—

Discala:       No, no, no, no, no! That's wrong—see, you still don't know the game! I'm teaching you, listen. OK listen, I'm Yoda, you're Obi-Wan, OK? ... You don't get him clients and look for the shtup on the ten thousand, OK? You fucking take things out, and let him buy the shit out of 'em, OK? … And that's how you make money.

On May 13, 2014, Bell texted Discala, "Does cube know that you and I raised the money?" Discala responded by text, "It's a screaming steal."

On May 17, 2014, during a telephone conversation, Discala told Wexler about a planned purchase of software from Cubed so that it would look like Cubed was generating business:

Discala:       And we're gonna, we're gonna pay, we're gonna buy a piece of software from the Cube…so we look like … In May; so we're cash flow positive…. So our deal is going to pay the Cube two-fifty, because these guys can't generate revenue, so I'm going to generate it myself.

On May 20, 2014, the following text message exchange took place between Discala and Josephberg, during which Discala instructed Josephberg to buy Cubed stock, and Josephberg agreed to purchase stock in his clients' accounts:

Josephberg:    I spoke [to Kyleen Cane] she awesome

Discala:       I KNOW. BEEN TELLING YOU THAT. BUY CRPT. GOING NUTS

Josephberg:    Why [is] no[] one buying? I am going to buy more for clients...meet tomorrow?
               I just need to get my hands on some liquidity...
               And more clients lol

On May 21, 2014, the following telephone conversation took place between Discala and Cane, during which Cane informed Discala that her investor relations/public relations ("IR/PR") contacts would assist with the marketing of Cubed, she had lined up two short-term investors ("interim money"), and Discala asked Cane to have her associate bid $5.42 for Cubed stock:

Cane:          And, and I think, uh, I just got a great call, um, with my, uh, IR/PR guys that are gonna be doing the, the basically, the brokerage market, for us  and um Cubed, um — … You know they're going to be doing it and I also just talked to two people that are gonna probably going to put

9

in another half a million into Cubed for some interim, interim money. Do you want me to have them go through you for this? Or do you want me to just—

Discala:    No, I don't care. Just do it. No, no, I don't, I—there's no pride of authorship. We're a team. I think it's wonderful you should take the credit.

Cane:    No, I [U/I] … I would much rather you take the credit. [Laughs] … I'll just tell them—I'll just tell them it's, uh, you know, part of the team.

Discala:    Yeah, that's exactly right. I have no problems, no issues. Can you just do, do me a favor? Can you go—can you just make a quick call and go 5 4 2 [on Cubed]? … it's just sitting there. It just looks like, it just looks crazy. I'm trying to lift 'em.

Cane:    Wait who?

Discala:    Just go 5 4 2. Have [your associate] go 5 4 2, not 5 4 0. … It just looks like it's so deep. You gotta just—he's gotta move it around a little bit. It just looks stupid.

Cane:    OK, all right. Wait, why does it look stupid?

Discala:    Because it just — he just sits there and we go in a thousand, five hundred, a thou— I mean it just sits there, it looks like it's the, the abyss.

Cane:    OK. All right, I don't know if we want, if we want to keep it, you know, here, uh 'cause I think that [U/I]

Discala:    Go 5 4 1, 5 4 1, 5 4 1 is fine.

Cane:    OK. All right.  I'll, um, I'll ask him to move it up a little.

On May 20, 2014, the following telephone conversation took place between Discala and Azrak, during which Discala explained that he controlled the stock price of Cubed ("I'm the fucking brake and the gas"):

Azrak:    How high does [the price] really go?

Discala:    Which one?

Azrak:    CRPT.

| Discala: | I think [$]55. |
|---|---|
| Azrak: | [U/I] Give me a real number, over-under. |
| Discala: | 55… |

***

| Discala: | By the way, by the way you're a fucking idiot. … You're an idiot… No, no, no. You're just an idiot, by the way. |
|---|---|
| Azrak: | Why? You said 55 bucks. |
| Discala: | Right, because I'm the fucking brake and the gas, jackass. If I take my foot off the brake it's 55 [dollars] tomorrow [Laughter] |

On May 22, 2014, Discala spoke to Josephberg over the telephone and instructed Josephberg to buy 200 Cubed shares in Azrak's account. Discala and Josephberg then had the following exchange:

| Josephberg: | But who else is buying? |
|---|---|
| Discala: | It's—ok, you gotta slow the fuck—I'm telling you, you gotta, things are happening. Did you not talk to Kyleen? Did you not— |
| Josephberg: | Then who else is buying today? I don't want to be the only one buying today. I heard it looks very bad for a broker to be the only one buying, that's what I heard. |
| Discala: | You heard—ok, now you're worried about being, ok, I will, I will buy, I wi—is my dad there, does my dad have any in there? |

On May 23, 2014, due to poor coordination with a co-conspirator, Discala briefly lost control of his manipulation of Cubed's share price, which caused it to surge from the previous day's closing price of $5.42 to an intraday high of $7.05 per share. However, as reflected in the intercepted calls, Discala was able to regain control that same day and brought the share price back down to have it close at $6.30 per share. During a telephone call that morning, Discala and Cane discussed the jump in Cubed's price to $7 per share, and Cane stated, in part, "We need to keep it back down now. We need to keep it back down." Discala stated, in part, "[Y]ou want me to go - you want me to bring this to 6.05? This is, I mean, it's gonna ruin the chart, it's like, it kills me, it just kills me that they did this. [.] …You let me know [what to do], I mean, I can, I can go down, I can, I can get it to where you [want], I mean, I can do what you want me to do, is what I'm telling you. …You just tell me what to do." Later that day, during a telephone call between Discala and Azrak, Discala stated, in part, "I'm bringing it back to 635. I didn't want the big jump. …What

11

happened was, OK, it shouldn't have gone up the way it did. What happened was it was a mistake, right? … I talked to Kyleen, and we, we don't want this. We would want 635 today, 630 something like that and then let, let news rip it next week." Finally, Discala also called Wexler to explain the trading in Cubed's share price, and stated, in part, "Yeah like…it just looks stupid! It went up, and up, and then it came back, you know – it's like, look, if we ended at 6.30, we're good. I want to bring it back up to 6.55; 6.55 on Tuesday, which I can, with some news, right? And just keep stepping it."

        On May 29, 2014, during a text message exchange between Discala and Wexler about Cubed stock, Wexler texted, in part, "…[N]o ones really buying for their own account. Except for MMs." "MMs" likely stands for market makers.

        On June 6, 2014, Wexler and Discala discussed the manipulation of Cubed's stock price and Cane's efforts during a telephone call, and Wexler stated the following:

> I know what [Cane is] trying to do. She's trying to make it look like [Cubed] ain't going up every fucking day, that's what she's trying to do. … And I was like, listen, I know… fucking doesn't look good or whatever. We don't need to go up every fucking day, but the bottom line is, you know, we're fucking supporting the stock….

        On June 12, 2014, Discala and Azrak discussed Discala's prior manipulation of the CodeSmart stock:

| Azrak: | That's a shame, you could have really had fun with [CodeSmart] for a long time if this guy had a half decent company in there, [U/I] beautiful. Holy shit you could have had a lot of fun with that man, think about what you could have done with that, I mean, there's no cap structure, 1 dollar and there's no market cap. You know? … Stock goes to 3, 4 dollars and it's fucking 50, 60 million dollar market cap, that's a shame. |
|---|---|
| Discala: | I structured it perfectly. |
| Azrak: | I know, that's beautiful. By the way that's, that stock is in the hall of fame, you know that? (Laughing) |
| Discala: | It should be in the hall of shame, but at one point it was in the hall of fame. |
| Azrak: | Oh no, come on, let me tell you something, that's how I even found you, you know. That's how I even knew who you were [U/I], this AJ he's in stock, I never heard of it, CodeSmart…. It goes up every day. [Laughing] |

| Discala: | Oh my god, it was unbelievable. |
| Azrak: | By the way, you gotta look at that chart one day again, it's hysterical. |

On June 23, 2014, Cubed reached its highest closing price of $6.75 per share. At $6.75 per share, Cubed's market capitalization was approximately $200 million. On April 21, 2014, however, Cubed filed with the SEC a Form 10-Q and reported less than $1,500 in cash, negative stockholders equity, a net loss of $15,000 and accrued professional fees of $131,824. On July 9, 2014, Cubed's stock price closed at $6.60 per share, which indicates that it is still in the controlled pump phase of the fraudulent manipulation scheme orchestrated by the Cubed Co-Conspirators.

## III.    A Permanent Order of Detention Is Appropriate

When seeking pre-trial detention of a defendant pursuant to 18 U.S.C. § 3142, the government first must establish by a preponderance of the evidence that the defendant, if released, presents a risk of flight. See United States v. Sabhnani, 493 F.3d 63 (2d Cir. 2007)(citing United States v. Berrios-Berrios, 791 F.2d 246, 250 (2d Cir. 1986)). If so, the government must then demonstrate by a preponderance of the evidence that no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court. Id.

As is evident from the investigation discussed above, the government's case against Discala is remarkably strong, with evidence consisting of unassailable wiretap recordings, text messages, financial records and information provided by multiple confidential sources. Discala is facing a substantial term of imprisonment if convicted. The government currently estimates that the applicable sentencing range for Discala under the advisory United States Sentencing Guidelines (U.S.S.G.) is 324 to 405 months, assuming Discala falls within Criminal History Category One.[3]

Discala has ties to foreign countries through his wife, who is a German citizen and previously lived in France. Since 2010, Discala has left the United States over a dozen times, traveling primarily to Europe, Canada and Mexico. Within the last two months, Discala and his wife had their first child, and, over the wiretap, Discala stated that he planned

---

[3] This sentencing range assumes a total offense level of 41, based on a base offense level of 7 (U.S.S.G. § 2B1.1(a)(1)), plus 28 levels for an intended loss of over $200,000,000, (U.S.S.G § 2B1.1(b)(1)(M)), plus 4 levels for 50 or more victims (U.S.S.G. § 2B1.1(b)(2)(B)), plus 2 levels for the use of sophisticated means. (U.S.S.G. § 2B1.1(b)(10)(C)). The intended loss based on the market capitalization of all four stocks exceeds $300 million.

13

to be in Europe for five weeks starting August 8, 2014.  Under these circumstances, it is clear that Discala presents a serious risk of flight.

Furthermore, it seems unlikely that Discala will be able to put together a sufficient bail package, secured by property and financially responsible suretors not connected to the charged crimes, which would assure his appearance in court.  Discala's personal assets are subject to forfeiture and his closest family members, including his wife and father, are unsuitable suretors because their trading accounts were used to further Discala's stock manipulation schemes.  In addition, Discala's wife, although not charged in the pending indictment, is listed as a member of OmniView's management team and assisted Discala in his business activities.

Finally, it should be noted that Discala profited handsomely from his fraudulent activities, the government estimates that he made approximately $3 million in profit from the CodeSmart scheme alone and much of that money has yet to be traced.  Discala thus likely has the means to flee and hide if released on bail.  In this district, there have been several notable white-collar cases where individuals charged with financial crimes fled either shortly before or after their arrest.  For example, Aubrey Lee Price, who operated a Ponzi-type investment scheme, disappeared in June 2012 after faking his suicide shortly before a warrant was issued for his arrest, and Price remained a fugitive for over a year while living under an assumed name.  13 CR 58 (SLT).  In 2009, Julian Tzolov, a former Credit Suisse banker charged with fraud, cut his electronic bracelet and jumped bail shortly before his trial, and Tzolov remained a fugitive for over a month before he was arrested in Spain. 08 CR 370 (JBW).  Thomas Qualls, a currency trader, jumped bail in 2008 during his trial and fought extradition from Canada for approximately four years before he was returned to this district.  07 CR 14 (DLI).  Jacob Alexander, also known as Kobi Alexander, who was charged in 2006 in connection with a fraudulent backdating stock options scheme, fled to Namibia before his arrest and remains there today. 06 CR 628 (NGG).  And, finally, Aleksander Efrosman, who was involved in a $5 million investment fraud scheme, fled the United States in 2005 and remained a fugitive until he was arrested in Poland in 2010.  06 CR 95 (NGG).  These cases illustrate the very troubling reality that individuals charged with white-collar crimes can be substantial flight risks because they have the financial means and connections to fund a life as a fugitive and an unwillingness to serve the jail terms they are facing.

## IV.    **Conclusion**

        For these reasons, the government respectfully requests that Your Honor enter a permanent order of detention for Abraxas Discala.

                   Respectfully submitted,

                   LORETTA E. LYNCH
                   United States Attorney

By:            /s/
                   Winston M. Paes
                   Walter M. Norkin
                   Shannon C. Jones
                   Assistant U.S. Attorneys
                   (718) 254-6379 (Jones)

cc: Defense counsel