SC:WMN
F.#2013R01203

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                         :
IN THE MATTER OF AN APPLICATION OF       :    AFFIDAVIT
THE UNITED STATES OF AMERICA FOR AN      :
ORDER AUTHORIZING THE INTERCEPTION OF    :    14-MISC-_____
WIRE AND ELECTRONIC COMMUNICATIONS       :
OVER A MOBILE TELEPHONE ASSIGNED NUMBER  :    M19-97
914-255-7892, WITH IMSI NUMBER           :
310410688816809, SUBSCRIBED TO           :
ABRAXAS J. DISCALA, 30 EAST 21ST         :
STREET, APARTMENT 7B, NEW YORK,          :
NEW YORK 10010                           :
                                         :
----------------------------------------X
SOUTHERN DISTRICT OF NEW YORK, SS:

        I, MICHAEL C. BRACONI, Special Agent with the Federal

Bureau of Investigation ("FBI"), being duly sworn, depose and

state that:

        1.    I am a Special Agent with the FBI.  I have been

employed by the FBI for approximately four years.  I am

responsible for conducting and assisting in investigations into

the activities of individuals and criminal groups responsible

for securities fraud, wire fraud and other white collar crimes.

        2.    I am an investigative or law enforcement officer

within the meaning of Title 18, United States Code, Section

2510(7), that is, an officer of the United States who is

empowered by law to conduct investigations and to make arrests

1

for offenses enumerated in Title 18, United States Code, Section 2516.

3.    During my tenure with the FBI, I have participated in numerous white collar fraud investigations and have participated in all aspects of investigations, including conducting surveillance, executing search warrants, debriefing defendants and informants, interviewing witnesses, reviewing and analyzing recorded conversations, and analyzing telephone toll information.  During the course of these investigations, I have served as the lead investigator in the investigation and prosecution of persons involved in wire fraud, mail fraud and securities fraud.  I am aware that white collar criminals commonly use electronic means of communication in furtherance of their criminal activities, including but not limited to telephones and electronic mail.  As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

## PURPOSE OF AFFIDAVIT

4.    This Affidavit is being submitted in support of an application for an order authorizing the interception of wire

2

and electronic communications as they are sent to or received by cellular telephone number 914-255-7892, with IMSI number 310410688816809, subscribed to Abraxas J. DiScala, 30 East 21st Street, Apartment 7B, New York, New York 10010 (hereinafter "TARGET TELEPHONE").

5.   The authorization requested is intended to apply not only to the TARGET TELEPHONE number listed above, but also to any other telephone number or telephone accessed through the above-referenced IMSI number, and to any other IMSI number accessed through the TARGET TELEPHONE number referenced above, within the thirty day period.   The authorization is also intended to apply to the TARGET TELEPHONE number referenced above regardless of service provider.

6.   I have personally participated in the investigation of the offenses discussed below.   I am familiar with the facts and circumstances of this investigation from: (a) my personal participation in this investigation, (b) reports made to me by other law enforcement and regulatory authorities, (c) information obtained from confidential sources of information, (d) interviews with witnesses and victims, and (e) review of certain emails, and other records and reports.[1]   On the

---

[1]   Any conversations and email communications described below

3

basis of this familiarity, and on the basis of other information that I have reviewed and determined to be reliable, I allege the facts to show that:

    a.    there is probable cause to believe that Abraxas DiScala, Marleen Goepel, Matthew Bell, Max Khan, Ira Shapiro, Marc Wexler, Craig Josephberg, Jeffrey Auerbach, William Coons, Joseph White, Stephen White, Douglas Shinsato (hereinafter collectively referred to as "Target Subjects") and others as yet unknown have committed and continue to commit the crimes of (a) wire fraud, (b) mail fraud, (c) securities fraud, (d) conspiring to commit these offenses, and (e) aiding and abetting these offenses, all in violation of Title 18, United States Code, Sections 1341, 1343, 1348, 1349, and 2, as well as Title 15, United States Code, Sections 78j(b) and 78ff (hereinafter collectively referred to as "Target Offenses").[2]

    b.    the particular wire and electronic communications of the Target Subjects and others yet unknown (hereinafter the "Target Interceptees") concerning these

---

have been described in substance and in part.

[2]  Aiding and abetting an offense against the United States, in violation of 18 U.S.C. § 2, and securities fraud, in violation of 18 U.S.C. § 1348 and 15 U.S.C. § 78, are not predicate offenses upon which the interception of wire communication can be authorized under 18 U.S.C. § 2516.

4

EDNY-ITEN-000000722

offenses will be obtained through the interception of the TARGET TELEPHONE;

        c.    evidence of the Target Offenses, including (1) the nature, extent and methods of operation of the scheme of the Target Interceptees; (2) the identities and roles of accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities; (3) the transfer of the money involved in those activities; (4) the existence and location of records; (5) the existence, location, and source of resources used to finance their illegal activities; (6) the existence, location, and disposition of the proceeds from those activities; and (7) the existence and locations of items used in furtherance of those activities, will be obtained through the interception of electronic communication occurring over the TARGET TELEPHONE, which has been and is being used by Target Interceptee Abraxas J. DiScala in the commission of those offenses.  The requested orders are sought for a period of time until the interceptions fully reveal the manner in which the above-described offenses are being committed, or for a period of 30 days, whichever occurs first, pursuant to Title 18, United States Code, Section 2518.

EDNY-ITEN-000000723

7.    It is anticipated that during the requested wire and electronic surveillance, all monitoring will be performed or supervised by Special Agents of the FBI or other law enforcement officers assigned to this investigation, or employees or individuals operating under a contract with the government, all of whom will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interceptions.  It is requested that, if necessary, certain other individuals be authorized to assist in conducting this wire and electronic surveillance and to receive disclosure of intercepted communications.

## BASIS OF KNOWLEDGE

8.    I personally participated in the investigation of the offenses referred to in paragraph 6 above, and from my personal participation in this investigation and from reports made to me by other Special Agents, investigators with the Securities and Exchange Commission ("SEC") and other regulatory entities, and confidential informants, I am familiar with the facts and circumstances of this investigation.  Except where otherwise noted, the information set forth in this Affidavit has been provided to me by other Special Agents, investigators with the SEC and other regulatory entities, or confidential

6

informants.  Because this Affidavit is being submitted for the
limited purpose of seeking authorization for the interception of
wire and electronic communications, I have not set forth each
and every fact learned during the course of this investigation,
but simply those facts which I believe are necessary to
establish probable cause to conduct the requested wire and
electronic surveillance.  Based upon this knowledge, I allege
the facts contained in the paragraphs below to support the
following statements.

### SUBJECTS AND OFFENSES

9.   There is probable cause to believe that the
Target Interceptees and others yet unknown, have committed, are
committing and will continue to commit the following offenses:
(a) wire fraud, (b) mail fraud, (c) securities fraud, (d)
conspiring to commit these offenses, and (e) aiding and abetting
these offenses, all in violation of Title 18, United States
Code, Sections 1341, 1343, 1348, 1349, and 2, as well as Title
15, United States Code, Sections 78j(b) and 78ff.

### THE TARGET TELEPHONE

10.   There is probable cause to believe that the
Target Interceptees and others whose identities are presently
unknown will be communicating during the period of interception

7

over the TARGET TELEPHONE in furtherance of, in connection with,
to facilitate, to accomplish and to commit the offenses
described in paragraph 6 above.

## OBJECTIVES

11.    There is probable cause to believe that the
interception of wire and electronic communications, the
authorization for which is sought herein, will reveal: (1) the
nature, extent and methods of operation of the scheme of the
Target Interceptees; (2) the identities and roles of
accomplices, aiders and abettors, co-conspirators, and
participants in their illegal activities; (3) the transfer of
the money involved in those activities; (4) the existence and
location of records; (5) the existence, location, and source of
resources used to finance their illegal activities; (6) the
existence, location, and disposition of the proceeds from those
activities; and (7) the existence and locations of items used in
furtherance of those activities.   In addition, these wire and
electronic communications are expected to constitute admissible
evidence of the commission of the above-described offenses.

## PRIOR APPLICATIONS

12.    On April 18, 2014, the electronic surveillance
indices of the FBI, U.S. Immigration and Customs Enforcement

EDNY-ITEN-000000726

Homeland Security Investigations, and the Bureau of Alcohol,

Tobacco, Firearms, and Explosives were checked.  On April 29,

2014, the electronic surveillance indices of the Drug

Enforcement Administration were checked.  No prior applications

for wire, electronic and oral interception relating to the

TARGET TELEPHONE or Target Subjects were found.

      13.  Although no prior applications for wire,

electronic and oral interception relating to the TARGET

TELEPHONE or Target Subjects were found, agents believe that

Target Interceptee Abraxas J. DiScala, while not listed as a

Target Subject in any application or order, was in fact

intercepted approximately three times over a wiretap of

telephone number 917-579-7722, which interception was first

authorized on October 23, 2012, by the Hon. Colleen McMahon,

United States District Judge for the Southern District of New

York.  Interception for that telephone was re-authorized several

times and ended on March 16, 2013.

**FACTS ESTABLISHING PROBABLE CAUSE**

I.  Background

      14.  The FBI is currently investigating potential

wire, mail and securities fraud through, among other things, the

unlawful manipulation of publicly-traded stock by (1) false and

9

misleading statements to the public and (2) fraudulent sales of shares to the public. The scheme is being perpetrated by a group of financial professionals – namely, securities brokers, traders and promoters -- acting in concert with officers, directors, employees and shareholders of the companies whose publicly-traded stock is being manipulated (collectively, the "Co-conspirators"). This fraudulent scheme came to the attention of the FBI when agents noticed unusual share price fluctuations in shares of CodeSmart Group and its affiliated companies (hereinafter collectively "CodeSmart"). However, as discussed in more detail below, CodeSmart shares are not the only securities manipulated and agents believe that the Co-conspirators are currently manipulating another stock, namely that of Cubed, Inc. ("Cubed"), trading under the symbol CRPT. Based on my training, experience and knowledge of this investigation, as discussed in more detail below, I believe that the Co-conspirators are using, among other things, text message communications and calls via cellular telephones to accomplish this unlawful activity.

A.    The Role of Securities Traders in
       Share Price Manipulation Schemes

       15.  Based on my training and experience, I know that, typically, in a fraudulent securities scheme involving the

10

EDNY-ITEN-000000728

issuance of false corporate information to the public, insiders or those with significant holdings of that company's shares, who disseminated the false information initially, usually sell their shares of the company after the company's share price has peaked (often as a result of the false corporate information). Typically, in such fraudulent schemes, the sale of shares by those insiders causes the market to be saturated with a supply of stock, which ultimately leads to a rapid decline in the share price. As explained more fully below, such a precipitous decline occurred with CodeSmart shares twice. Notably, after building up for a month to a dramatic peak on July 12, 2013, the share price dropped by 68 percent by August 21, 2013. The price then spiked again just two weeks later, on August 30, 2013, and quickly dropped more than 50 percent by September 20, 2013. This level of volatility, based on my training and experience, is a possible sign of securities fraud and, in turn, of wire fraud and the unlawful monetary transactions that typically accompany securities fraud, as wire communications and money transfers are usually necessary to accomplish and reap the benefits of securities fraud.

16. Based on my training, experience and knowledge of this investigation, I know that company insiders who engage in

11

share price manipulation and make false statements to the public often enlist the aid of promoters and stock brokers to achieve the goals of their unlawful scheme. Promoters disseminate and promote the false statements and upbeat predictions about a company so as to induce unwitting members of the public to purchase the company's shares. Stock brokers advocate the purchase of the company's stocks to their clients, often misleading their clients in order to secure their acquiescence in the purchase. The voluminous trading that results from the promoters' and stock brokers' efforts makes the securities appear both highly desirable and highly liquid (a term meaning that an asset is easy to buy or sell), which in turn causes even more members of the public to purchase the stock. In this way, insiders and their co-conspirator promoters and brokers cause spikes in the company's share price. Based on my training, experience and knowledge of this investigation, I know that the promoters and stock brokers who aid in this scheme are typically compensated with free-trading shares of company stock. Those promoters and brokers then usually sell the shares when the share price peaks.

EDNY-ITEN-000000730

B.   The Financial Professionals Involved in the Scheme

i.   Abraxas J. DiScala

17.   Abraxas J. DiScala is a securities trader and dealer in New York, New York, and is the Chief Executive Officer ("CEO") of Omniview Capital Advisors ("Omniview") and The Broadsmoore Group.  He is the registered user of the TARGET TELEPHONE.

18.   In or about March 2014, I debriefed a confidential source ("CS1") who explained how DiScala operated the scheme.  Although CS1 has not had direct contact with DiScala for approximately nine months, CS1 worked with DiScala in the past, has recently had contact with other employees of Omniview, and has in the past been compensated by DiScala with, among other things, free-trading shares of stock of the companies on whose transactions CS1 has worked.  CS1 has been charged in another federal district with conspiring to commit securities fraud and is cooperating with law enforcement in an effort to secure leniency at sentencing.  The information CS1 has provided has proved accurate and has been corroborated by independent evidence.[3]

_____

[3]  It should be noted that, although CS1 has admitted to engaging in certain acts of securities fraud, agents do not believe that CS1 has been fully truthful in admitting all of his/her past

EDNY-ITEN-000000731

19. Based on CS1's past work with DiScala and CS1's more recent interactions with employees of Omniview, CS1 stated, in sum and substance, that DiScala seeks out small companies that he can turn into publicly-traded corporations. CS1 further stated, in sum and substance, that in exchange for turning a company into a publicly-traded corporation (often referred to as "taking the company public"), DiScala receives compensation in the form of free-trading shares of stock of the newly public corporation. More specifically, CS1 explained, in sum and substance, DiScala requires the compensation to equal 40 percent ownership of the new corporation.[4]  CS1 stated, in sum and

unlawful conduct. However, other than the present charge, CS1 has no criminal record and the information CS1 provided regarding other individuals' criminal conduct has proved accurate and has been corroborated by independent evidence. In the present case, as noted below, the information provided by CS1 has been corroborated by trading records, public filings, telephone toll records, victim statements, statements by other confidential sources of information, and the independent investigations of other agencies.

[4]  Based on my training, experience and knowledge of this investigation, I believe that most owners would be loath to give up 40 percent of their company. Thus, I believe that owners that agree to this arrangement are co-conspirators in the scheme because they do not value the company highly and seek to profit by selling shares of their remaining 60 percent ownership at the expected inflated share price. As a correlation, based on my training, experience and knowledge of this investigation, I do not believe that owners who are willing to part with 40 percent of their company are in need of the type of financing that would be generated through a public offering of stock.

14

EDNY-ITEN-000000732

substance, that DiScala and his co-conspirators (who DiScala
enlists in the scheme by giving them some of the free-trading
shares he has acquired) then inflate the share price of the
company so that they can sell the shares for a large profit.
CS1 further stated, in sum and substance, that DiScala utilizes
a network of brokers, including at least one in Texas, who
either convince their clients to buy shares at the inflated
price or buy those shares for clients who have authorized the
broker to trade stocks on the clients' behalf.

        20.   Trading records show that DiScala, as well as
certain individuals associated with him and his companies,
received a significant amount of free-trading CodeSmart shares
when the price of the shares was low and sold a large amount of
the shares at times the price peaked. Based on my training,
experience and knowledge of this investigation, I believe that
DiScala and his associates are insiders with respect to
CodeSmart. This belief is corroborated by the fact that DiScala
had direct access and regular communications with CodeSmart's
CEO, Ira Shapiro, from the time that CodeSmart became a publicly
traded company and throughout the relevant time of CodeSmart
share fluctuations.

        21.   Notably, in the days leading up to CodeSmart's

EDNY-ITEN-000000733

public filings with the positive revenue forecasts discussed below -- the July 12, 2013 Amended 8-K and the August 26, 2013 letter to shareholders -- DiScala exchanged a number of cellular telephone text messages with Shapiro.  Specifically, DiScala exchanged seven text messages with Shapiro on July 11, 2013, and three additional messages on July 12, 2013.  DiScala exchanged ten messages with Shapiro on August 23, 2013, the Friday prior to the Monday, August 26, 2013 release of the letter to shareholders.

22.   These exchanges with Shapiro occurred over a cellular telephone with number 646-309-1549, which was registered to DiScala at the same address as the TARGET TELEPHONE (the "Prior Telephone").  DiScala used the Prior Telephone not only to communicate with Shapiro but also to communicate via text message with almost all the Target Interceptees.  Then, on or about August 31, 2013, DiScala activated the TARGET TELEPHONE.  He switched to using the TARGET TELEPHONE to communicate with Target Interceptees beginning on or about September 30, 2013, after the CodeSmart shares concluded their dramatic drop from the second price peak.  According to telephone records, DiScala did not disconnect the Prior Telephone, but the usage of that telephone greatly

16

decreased and (as discussed in more detail below) he began using the TARGET TELEPHONE rather than the Prior Telephone to contact the Target Interceptees.[5]

---

5 Agents learned of DiScala's use of the Prior Telephone from the SEC, as well as information received from subpoenas showing the subscriber information for the Prior Telephone. However, agents noted that the level of communications between the Prior Telephone and the telephones used by co-conspirators Matthew Bell and Marleen Goepel (both discussed below) began to decline in the fall of 2013 and eventually stopped entirely. Agents then noted that Bell and Goepel toll records showed both co-conspirators communicating with a new telephone, namely the TARGET TELEPHONE. Although this new telephone number was not the only number that both Bell and Goepel had in common, agents subpoenaed records for this new telephone (the TARGET TELEPHONE) and saw that it was communicating with many of the same telephone numbers that were also in contact with the Prior Telephone. The records also showed that the TARGET TELEPHONE had the same address as the Prior Telephone. Moreover, the records showed that as use of the Prior Telephone declined, use of the TARGET TELEPHONE increased. For example, telephone records show Bell and DiScala, using the Prior Telephone, exchanged text messages as early as November 2012. Bell's last communications with the Prior Telephone occurred on October 1, 2013. On that day, Bell and DiScala, using the Prior Telephone, exchanged one text message. After October 1, 2013, Bell ceased communicating with the Prior Telephone. On September 25, 2013, Bell communicated for the first time with DiScala over the TARGET TELEPHONE, exchanging two text messages. Another two text messages were exchanged between Bell and DiScala, using the TARGET TELEPHONE, on September 30, 2013. Thereafter, all the communication between Bell and DiScala occurred over the TARGET TELEPHONE. For example, on October 1, 2 and 3, 2013, Bell and DiScala, using the TARGET TELEPHONE, exchanged 11, 27 and 37 text messages, respectively. Finally, as noted below, agents were able to definitively confirm that DiScala was using the TARGET TELEPHONE when they obtained the content of text messages though a search warrant.

17

### ii.  Marleen Goepel

23.  Marleen Goepel is an employee of Omniview and works under DiScala.  Goepel is the registered user of a cellular telephone with the number 347-939-9495 (the "Goepel Telephone"), subscribed in her name and to her home address in Staten Island, New York, which is within the Eastern District of New York.  Goepel used the Goepel Telephone to communicate via text message with DiScala and other Target Interceptees.

24.  Like her boss, DiScala, Goepel received a significant amount of free-trading CodeSmart shares when the price of the shares was low and sold a large amount of the shares at times the price peaked.  Based on my training, experience and knowledge of this investigation, I believe that Goepel, like DiScala, is an insider with respect to CodeSmart.

### iii.  Marc Wexler

25.  Marc Wexler is the president of Omniview. He is the registered user of a cellular telephone with the number 732-261-6430 (the "Wexler Telephone"), subscribed in his name and to an address at a private post office box.  Wexler used the Wexler Telephone to communicate via text message with DiScala and other Target Interceptees.  Trading records showed that he was a net seller of CodeSmart.  Based on my training, experience and

EDNY-ITEN-000000736

knowledge of this investigation, I believe that Wexler, like DiScala and Goepel, is an insider with respect to CodeSmart.

iv.  Matthew Bell

26.  Matthew Bell is a stock broker and, more specifically, until December 2013 was a Senior Vice President at Alamo Asset Advisors ("Alamo") in San Antonio, Texas.  Bell is the registered user of a cellular telephone with the number 210-380-6634 (the "Bell Telephone"), subscribed in his name and to his home address in Helotes, Texas.

27.  Based on my training, experience and knowledge of this investigation, including the events described in more detail below, I believe that Bell, like DiScala and Goepel, is an insider with respect to CodeSmart.  He also received a significant amount of free-trading CodeSmart shares when the price of the shares was low and sold a large amount of the shares at times the price peaked.  Bell sometimes used his business email address to communicate with his clients and business associates, including DiScala and Goepel.  Bell also used the Bell Telephone to communicate with Goepel and DiScala, who was using the Prior Telephone before September 30, 2013, and the TARGET TELEPHONE after that date.

19

C.    The Fraudulent Manipulation of CodeSmart's Share Price

    i.    The Reverse Merger of CodeSmart

28.    First Independence Corporation ("First Independence") was founded in Florida in February 2012 as a public corporation, and as such was able to be traded publicly under the ticker symbol "FICF." However, from the time of its founding, there was no public trading of FICF shares, and thus it was considered a low value "penny stock." That changed on May 3, 2013, after First Independence acquired CodeSmart, a company that, according to a May 14, 2013 press release available on its website (www.codesmartgroup.com), "is a premier national subject matter expert for ICD-10 education and compliance" and offers a product called "CodeSmart University," which "is an on-line program of study for existing coders, new coders, clinicians, and healthcare roles of all types."[6] The

---

6  The International Classification of Diseases ("ICD") is a list of medical codes published by the World Health Organization designed to promote international comparability in the collection, processing, classification, and presentation of mortality statistics. Among other uses, ICD codes are used by medical care providers to communicate with insurance companies to denote which services a patient has received for which ailments, and that in turn determines the payments the medical care providers receive through insurance claims processing, as well as the amounts for which patients are responsible. As part of the recently enacted Affordable Care Act, Congress compelled medical care providers and insurance companies to adopt ICD-10 for all their communications and processing.

EDNY-ITEN-000000738

acquisition made CodeSmart a subsidiary of First Independence, a publicly-traded corporation.  Based on my training, experience and knowledge of this investigation, I believe that First Independence was a shell corporation that CodeSmart used to execute a reverse merger and avoid the rigors and disclosures necessary for a typical initial public offering ("IPO").

29.  Although the merger appeared to have First Independence subsume CodeSmart, by an amendment in its articles of incorporation executed that same month by Chief Executive Officer ("CEO") Ira Shapiro (who was not the CEO of First Independence before the merger), First Independence changed its name to CodeSmart Group Holdings, Inc., and later changed its ticker symbol to "ITEN."  Thus, CodeSmart, a private company, effectively took over First Independence, a publicly-traded company, in a way that enabled CodeSmart to become a publicly-traded company.

30.  As explained in a SEC Investor Bulletin, publicly available online at http://www.sec.gov/investor/alerts/reversemergers.pdf (hereinafter "Investor Bulletin"), "[i]n a reverse merger transaction, an existing public 'shell company,' which is a public reporting company with few or no operations, acquires a

21

EDNY-ITEN-000000739

private operating company[.]"  Id. at 1.  The Investor Bulletin
explains that "[a]lthough the public shell company survives the
merger, the private operating company's shareholders [take over]
the public shell company [and] the private operating company's
management takes over the board of directors and management of
the public shell company."  Id.  While a reverse merger is not
by itself unlawful and may be done because it provides "a
quicker and cheaper way of 'going public' than an [IPO,] . . .
there have been instances of fraud and other abuses involving
reverse merger companies."  Id. at 1-2.  One reason for this is
because in a reverse merger "there are no registration
requirements under the Securities Act of 1933 as there would be
for an IPO."  Id. at 1.  Thus, the newly public company provides
less public disclosure and experiences less scrutiny than it
would under a normal IPO.  The Investor Bulletin further notes
that "[i]n recent months, the SEC has suspended trading in a
number of reverse merger entities" and cautions investors about
purchasing shares in such corporations.  Id. 3-5.

        31.  Although by itself the reverse merger is not
definitive proof of unlawful behavior, based on my training,
experience and knowledge of this investigation, including the
false statements and rapid increases in CodeSmart's share price

EDNY-ITEN-000000740

described below, I believe that this reverse merger is an
indicator that securities fraud, wire fraud and unlawful
monetary transactions have occurred.

    ii.   False Statements by CodeSmart Insiders and
        the Corresponding Share Price Fluctuations

    32.   Shortly after the reverse merger, on May 28,
2013, CodeSmart issued a press release stating that "[t]he
CodeSmart Group Inc. . . . announces today that its CodeSmart
University product is the exclusive strategic partner for ICD-10
education and consulting services to Binghamton University, part
of the State University of New York ('SUNY') system, which will
exclusively market and provide CodeSmart University products to
their students in the School for Continuing Education."  The
press release included a quote from CEO Ira Shapiro, stating
"Binghamton University has already begun to offer CodeSmart
University programs for both experienced coders and new coders
[and] will serve as the distribution channel to all SUNY schools
throughout New York State."  Based on my conversations and email
communications with representatives of Binghamton University, I
have determined that this press release was not authorized by
Binghamton University and contained multiple material false
statements.  First, CodeSmart was not the "exclusive strategic
partner" for ICD-10 education courses at Binghamton University,

23

as Binghamton University also offered courses through other providers, and Binghamton University had no plans to exclusively market CodeSmart University to its students. Second, contrary to Shapiro's quote that made it appear as if many students had taken the CodeSmart University course, Binghamton University had been offering the CodeSmart course for some time but only one person had ever registered to take the course.

33. The above-described false statements made CodeSmart appear to the public to be more successful than it was in actuality. Based on my training and experience, I know that material false statements to the public in favor of a company's business can have the effect of artificially increasing the share price of that company's stock. On May 28, 2013, the date of the press release involving Binghamton University, the volume of CodeSmart shares traded jumped significantly -- approximately triple the volume traded the trading day before the press release -- and the price of CodeSmart shares increased from $5.02 per share to $5.26 per share.

34. In the period between May 13, 2013 and July 12, 2013, the stock price of CodeSmart rose by 291 percent. In fact, on July 12, 2013, CodeSmart publicly filed with the SEC an amended Form 8-K, which on page 12, under a section titled "Plan

24

of Operations," stated, "We estimate about $10 million in revenues over the following 12 months from the date of this Report." On the date of that filing, CodeSmart's share price peaked, closing at $6.94 per share. Based on my training and experience, I know that a rise of 291 percent is an unusually rapid rise and an unusually high rate of share price increase.

35. Over the next month after the July 12, 2013 peak, the share price rapidly declined, such that by August 19, 2013, the company was valued at $2.50 per share. In fact, on August 19, 2013 -- approximately one month after the company's $10 million revenue forecast -- CodeSmart filed a Form 10-Q with the SEC stating that the company did "not have sufficient funds to fully implement [its] business plan" and that, if they did not obtain the funds, CodeSmart "may need to curtail or cease [its] operations until such time as [it has] sufficient funds." Thus, in the span of one month, CodeSmart's revenue forecast went from $10 million to ceasing operations, effectively a $0 revenue forecast.

36. A few days later, on August 26, 2013, CodeSmart reversed course from its gloomy forecast of August 19, 2013 and issued a letter to its shareholders that stated, in part: "If we continue on the track we are on, I believe we will achieve our

25

revenue and profit goals that were previously disclosed for 2013 and beyond.  We believe we have access to a large market of potential students which we estimate to be over 40 million people looking for careers at any given time."

37.  Between August 21, 2013 and August 30, 2013, CodeSmart's share price more than doubled, rising from $2.19 to $4.60.  CodeSmart's share price then went into a rapid decline, dropping to $2.13 by September 20, 2013.  All of the above-noted facts, as well as my training and experience, support my belief that individuals associated with CodeSmart disseminated false statements in an effort to artificially inflate the price of CodeSmart shares.

iii.  CodeSmart Losses for Victims 1 and 2

38.  According to Victim 1 and Victim 2, a senior citizen husband and wife who reside in Texas, in or about June 2013, Bell persuaded Victim 1 and 2 to purchase CodeSmart shares.

39.  Because penny stocks such as CodeSmart are "speculative investments" that are "difficult to sell[,]" it is very risky for an investor to own penny stocks: "investors in penny stocks should be prepared for the possibility that they may lose their whole investment[.]"  See "Penny Stock Rules,"

26

EDNY-ITEN-000000744

publicly available at http://www.sec.gov/answers/penny.htm. In fact, because penny stocks are very risky investments, the Securities Exchange Act of 1934 and the rules thereunder require brokers, among other things, to furnish customers a specific disclosure document before executing a trade for the client.

40. According to Victims 1 and 2, Bell did not provide them the required disclosure document nor warn them of the risks in purchasing CodeSmart shares or penny stocks in general.

41. On or about August 13, 2013, Victim 1 emailed Bell to complain about the falling value of his stock portfolio, noting that "in retirement, [he] cannot afford the volatile situation" and money loss. Victim 1 requested a meeting with Bell and that meeting was set for August 21, 2013.

42. In the days leading up to the meeting, there was a spike in text message communications between the Bell Telephone and the Prior Telephone used by DiScala. Specifically, while Bell and DiScala, using the Prior Telephone, exchanged on average 39 text messages per day the week before the meeting (from August 12 to August 16, 2013), on August 19 and 20, 2013, they exchanged 85 and 100 messages, respectively. Based on my training, experience and knowledge of this

27

investigation, I believe that in those two days, DiScala and Bell discussed what Bell should tell Victims 1 and 2 at their upcoming meeting in light of CodeSmart's falling share price, which had started to decline steeply since the peak of July 12, 2013, and hatched a plan to allow Victims 1 and 2 to recuperate their losses.

43.  On or about August 21, 2013, Victims 1 and 2 met with Bell and Willard Golightly, an Alamo compliance officer. At the meeting, in response to their complaints about Bell's lack of disclosure and the declining value of the portfolio, Bell offered to sell Victims 1 and 2 an additional 30,000 shares of CodeSmart for 14 cents per share.  That day, the stock closed at $2.19 per share.  Thus, as Bell noted to Victims 1 and 2, in sum and substance, purchasing those shares at the discounted price and selling them at the publicly-traded price would allow Victim 1 and 2 to profit such that they would recoup the value of their portfolio.

44.  Notably, on the date of the meeting, Bell and DiScala, using the Prior Telephone, exchanged 73 text messages. Seventy of these messages occurred prior to start of the meeting, which was 2:15 p.m. Central Time (or 3:15 p.m. Eastern Time).  In fact, for the almost one-and-a-half hours immediately

28

preceding the meeting (from 12:54 p.m. Central Time until the
start of the meeting), with the exception of one text message
exchanged between the Bell Telephone and the Goepel Telephone,
the Prior Telephone was the only telephone with which Bell
exchanged text messages.  In that time, Bell and DiScala
exchanged approximately 55 messages.  Then, for approximately
one hour, while the meeting progressed, the Bell Telephone did
not send or receive any text messages.  Immediately after the
meeting concluded, at approximately 3:18 p.m. Central Time, the
Bell Telephone exchanged a text message with the Goepel
Telephone.  Minutes after that message, Bell and DiScala, using
the Prior Telephone, exchanged three text messages.  Based on my
training, experience and knowledge of this investigation, I
believe that in these exchanges, DiScala and Bell again
discussed Bell's meeting with Victims 1 and 2, as well as the
plan to allow Victims 1 and 2 to recuperate their losses.

        45.  Despite Bell and DiScala's plan to allow Victims
1 and 2 to recuperate their losses, on or about August 26, 2013,
Victim 1 emailed Bell, stating, "This is to notify you that we
are terminating our client/advisor relationship with you and
Alamo Asset Advisors, effective immediately[.]"  Bell responded
to Victim 1, stating, "Ok.  I have your stock certificates for

29

CodeSmart. Please let me know what you would like me to do."
In another email later that day, Bell told Victim 1, "as of
Friday the certificates were valued at 90,000."

46.  On or about August 27, 2013, Bell told Victim 1
via email, "We are placing your [CodeSmart] stock certificates
in the mail [to you]." The next day, Victim 1 received in the
mail the CodeSmart stock certificates: 30,000 shares at 14 cents
per share, a price well below the publicly-traded value of over
$3 per share. The stock purchase agreement provided by Bell
indicated that the original owner of the shares, who had sold
these shares at the below-market value to Victims 1 and 2, was
DiScala.

47.  Based on my training, experience and knowledge of
this investigation, I believe that Bell's ability to access and
sell to Victims 1 and 2 a large amount of unrestricted CodeSmart
shares for a price significantly less than the publicly-traded
price indicates that he either had a close connection to an
insider, was being compensated for advocating the purchase of
CodeSmart shares, or was himself an insider who owned low-valued
CodeSmart shares. Based on my training, experience and
knowledge of this investigation, I also believe that, when Bell
mailed the stock certificates to Victims 1 and 2, he, together

30

EDNY-ITEN-000000748

with Goepel and DiScala, committed mail fraud.

48. On August 29, 2013, the day before CodeSmart
shares reached their second peak, Bell again contacted Victim 1.
In this email, Bell stated, "While I do not have access to your
accounts anymore, knowing what I know of your positions and the
closing value of the investments you own [which now include the
low-valued CodeSmart shares], you should be at or near $400,000
a combined value. [sic] This would match the high point of any
value the accounts were ever at."

49. Notably, although Victims 1 and 2 lost money from
investing in CodeSmart stock, Bell earned money. In yet another
sign that Bell was an insider who assisted the market
manipulation scheme, he sold CodeSmart shares that he owned
while buying CodeSmart shares on behalf of his clients. In
other words, while advocating to his clients that CodeSmart was
a good investment and that they should purchase and hold
CodeSmart shares in their accounts, Bell did the exact opposite,
selling CodeSmart shares that he had in his personal trading
account. Specifically, from June 2013 through October 2013,
Bell purchased at least 123,000 shares of CodeSmart stock on
behalf of his clients while selling at least 99,000 shares of
CodeSmart that were in his personal trading account. For

31

example, on June 27, 2013, Bell bought 1,500 shares of CodeSmart for Victim 1 and 2's account and sold 5,000 shares of CodeSmart from his own personal trading account. Thus, while Bell profited from the sale of shares from his own trading account, Victims 1 and 2 were on the "losing" end of those transaction, forced to buy and hold shares Bell knew were declining in value.[7]

II.   Use of the TARGET TELEPHONE to Further the Fraud Scheme

A.   CodeSmart Losses for Victims 3 and 4

50.   According to Victim 3 and Victim 4, another elderly couple who reside in Texas, in or about June 2013, Bell purchased CodeSmart shares for them. Victims 3 and 4 had heard Bell's brokerage services being advertised on a faith-based

---

[7] CodeSmart is not the only penny stock manipulated by DiScala, Goepel, Bell and their co-conspirators. Trading records show that DiScala, Goepel, Bell and their co-conspirators have profited from selling a number of penny stocks -- including Soul & Vibe Interactive Inc., Location Based Technologies Inc., and Mojo Organics Inc. -- that experienced dramatic spikes and declines in their market value, and that the ultimate "purchasers" of these stocks, who ended up holding shares in these corporations, were unsuspecting individuals, like Victims 1 and 2, who had allowed brokers like Bell to trade stocks on their behalf. In fact, Soul & Vibe Interactive Inc. ("Soul") provides another salient example of a fraudulent scheme executed by DiScala and Bell. Between July 22, 2013 and July 26, 2013, the price of Soul shares rose 640 percent, closing at $4.44. From that peak, Soul began a rapid decline, ending less than a month later on August 20, 2013, at 54 cents per share. That price represented a drop of 88 percent. On July 24 and 29, 2013, Bell purchased shares of Soul for the account of Victims 1 and 2. Despite buying shares for Victims 1 through 2, he later sold shares that he owned.

EDNY-ITEN-000000750

radio station and hired him to be their investment advisor,
including giving him authority to buy and sell stocks on their
behalf without having to consult them first.

51.   According to Victims 3 and 4, Bell did not
provide them with the required disclosure document nor warn them
of the risks in purchasing CodeSmart shares or penny stocks in
general.

52.   On or about October 7, 2013, Victim 3 emailed
Bell to complain about the falling value of their stock
portfolio, noting, "I am 61 yrs old now, with seeing our value
on investments shrinking very badly the last (3) months, I need
to stop the bleeding."  Victim 3 went on to say, "[I d]o not
want to be in any 'high reward' 'high risk' investments.  I need
to understand what's going on."

53.   On or about October 9, 2013, Victims 3 and 4 met
with Bell.  At the meeting, in response to their complaints
about the declining value of the portfolio, according to Victims
3 and 4, Bell claimed, in sum and substance, that the drop in
the value was being caused by the federal government's
sequestration budget.  Bell stated, in sum and substance, that
he expected an upswing in the spring.

54.   Similar to what occurred the date of the meeting

EDNY-ITEN-000000751

with Victims 1 and 2, on the date Bell met with Victims 3 and 4, he exchanged a number of text messages with DiScala, who was now using the TARGET TELEPHONE.  Also similar to the pattern exhibited with Victims 1 and 2, the Bell Telephone and the TARGET TELEPHONE exchanged a number of text messages in the two days following the meeting with Victims 3 and 4.  Based on my training, experience and knowledge of this investigation, I believe that in these text messages following the meeting with Victims 3 and 4, Bell and DiScala discussed the substance of the complaints and what, if anything, should be done given the state of CodeSmart shares.

55.  Victims 3 and 4 scheduled another meeting with Alamo for Tuesday, December 10, 2013.  On the morning of the meeting, Bell and DiScala, using the TARGET TELEPHONE, exchanged another 21 text messages by 9:05 a.m. Central Standard (Texas) Time.  During the meeting, Victim 3 met with Golightly, the chief compliance officer at Alamo.  By this point, Bell had left employment with Alamo.  At the meeting Victim 3 told Golightly, in sum and substance, how unhappy Victim 3 was with Bell's choices of stocks and inquired how Golightly was going to fix the situation.  Golightly responded, in sum and substance, that it would be illegal to remedy the situation by offering money or

34

EDNY-ITEN-000000752

other compensation to Victims 3 and 4.

56.   On the date of that meeting, Golightly and Bell exchanged approximately 16 text messages.  Based on my training, experience and knowledge of this investigation, I believe that in these text messages, Golightly informed Bell regarding the substance of the meeting between him and Victims 3 and 4.

57.   On or about December 12, 2013, Victim 3 and Victim 4 sent Golightly a letter stating, "July 1, 2013 Fidelity statement shows a value of $102,722.92.  Our Current statement ending 11-30-2013 shows a value of $30,854.24.  This huge loss in value happened due to improper investments made in 'very high risk penny stock.'  These type of investments were done without our knowledge or approval.  We had made it clear to our advisor Matt Bell from the beginning that we wanted mostly low risk investments made, with a small amount of approximately 20 percent made with a moderate risk."

58.   Similar to what happened with Victims 1 and 2, Bell again profited while Victims 3 and 4 lost money.  For example, on June 25, 2013, Bell bought 400 shares of CodeSmart for Victims 3 and 4's account and the very next day Bell sold 5,000 shares of CodeSmart from his own personal account.[8]

---

8  Also similar to what happened with Victims 1 and 2, on July

35

B.   DiScala's Use of the TARGET TELEPHONE to Communicate
     Regarding Cubed in Furtherance of His Unlawful Scheme

59.  According to CS1, DiScala's next step in the scheme involves making another small company publicly traded and manipulating the share price of that company, similar to the manipulation of CodeSmart stock.  CS1 stated in sum and substance that he/she believed the company was called "Crackpot" or something similar.

60.  This information was corroborated by another confidential source ("CS2") who I have debriefed.  Based on my understanding and knowledge of this investigation, CS1 and CS2 do not know each other (except that they may be aware of each other's existence in the financial industry) and neither CS1 nor CS2 knows that the other is cooperating with law enforcement. CS2 works in the financial industry and has been a source of information for approximately two years.  CS2 is not a target of any investigation and originally became a source of information when he/she complained about certain practices by other individuals in the financial industry.  CS2 does not have any criminal record and is cooperating with law enforcement in the

---

29 and August 7, 2013, Bell purchased shares of Soul for the account of Victims 3 and 4.  Bell sold 100,000 shares of Soul from his own account on August 8, 2013, earning $104,000 and effectively taking that money from the victims.

36

EDNY-ITEN-000000754

hope that his/her cooperation will lead to better practices in the financial industry. Importantly, the information CS2 has provided has proved accurate and been corroborated by independent evidence.

61. In a recent interview, CS2 stated in sum and substance that DiScala was planning to manipulate the share price of another company. CS2 stated in sum and substance that he/she believed the company was called "Crackpot Cube" or something similar. CS2 further stated in sum and substance that DiScala received shares of that company at a price of 50 to 75 cents per share. CS2 stated in sum and substance that he/she obtained this information from another individual who is a business associate of DiScala.

62. The information provided by CS1 and CS2 has been corroborated by my own investigation. On or about April 3, 2014, I reviewed a web page with the following address: www.crackpotcube.com/events. The page announced that Crackpot Inc. ("Crackpot") had a conference on January 22 through 24, 2014, to "present the achievements of our 3D technology and our product 'CrackpotCube' which includes the amazing platform and mobile apps coming out soon on the market." The web page also proclaimed that the conference was "where all of our investors

EDNY-ITEN-000000755

that contributed and will continue to contribute hundreds of
thousands of dollars" could "meet all of the team members in
person."  Below that proclamation, eight individuals were
featured, including: (1) DiScala, described as the CEO of
Omniview; (2) Max Khan, described as the President of Omniview;[9]
(3) Stephen White, described as a founder and the CEO of
Crackpot; (4) Joseph White, described as a founder and the Chief
Operating Officer ("COO") and Chief Creative Officer of
Crackpot; (5) Doug Shinsato, described as a board member of
Crackpot; and (6) Darren Ofsink, described as a corporate lawyer
and someone who I know from my own investigation handles
Omniview's corporate deals.  Based on my training, experience
and knowledge of this investigation, I believe this information
shows that Crackpot (and its officers) made a deal with Omniview
(and its officers).  More specifically, I believe that Omniview
agreed to turn Crackpot into a public company and to inflate the
price of the newly public company's shares (thereby increasing
the wealth of Crackpot's officers, who would also be
shareholders of the newly public company) and that in exchange
DiScala and his co-conspirators would receive payment in the

---

9  Although the Cubed website lists Khan as the President of
Omniview, Omniview's website, which I reviewed on April 21,
2014, listed Khan as a managing director of the company and
Wexler as the President.

38

EDNY-ITEN-000000756

form of a large volume of the public company's shares (thereby also enriching the Omniview co-conspirators).

63.   In addition to the website corroborating the information from CS1 and CS2, I reviewed telephone records from the TARGET TELEPHONE and those records similarly corroborated the information.   The records showed that telephone number 509-528-9444, a telephone subscribed to Joseph White (hereinafter, the "White Telephone"), had numerous contacts with the TARGET TELEPHONE, with the first text messages exchanged on December 4, 2013.

### i.   The Morphing of Northwest Resources Inc. into Cubed

64.   Northwest Resources Inc. ("Northwest") was incorporated in Nevada on May 21, 2010, and filed a Form S-1 Registration Statement with the SEC on December 23, 2010. Attached to that filing was a Prospectus explaining that Northwest was a "development stage mineral exploration company[.]"   See Prospectus, Summary at 5, available at http://www.sec.gov/Archives/edgar/data/1507718/000150771810000003/mainbody.htm.   For the next several years, Northwest continued to make public filings with the SEC in due course as it pursued its mining exploration business.

65.   On February 12, 2014, Northwest filed a Form 10-K

39

EDNY-ITEN-000000757

that covered the period ending November 30, 2013.   The filing

noted that Northwest was still "an exploration stage company

engaged in the exploration of mineral properties" and detailed

the efforts that the company had made over the covered period.

See Form 10-K at 2-6, available at

http://www.sec.gov/Archives/edgar/data/1507718/00015077181400000

2/mainbody.htm.  However, despite those efforts and the fact

that Northwest's company stock was publicly traded under the

symbol "NWRS," the Form 10-K explained that "an active trading

market has not developed for our securities" and the securities

were considered penny stocks.  Id. at 7.  Moreover, the Form 10-

K noted that Northwest did "not have any arrangements for

financing [additional operations,]" "had not earned any revenues

since the inception of [the] current business operations[,]" had

losses over $150,000 that far exceeded any assets and thus had

"substantial doubt[s] about [their] ability to continue" as a

functioning corporation.  Id. at 9-10.  Note 7 of the Financial

Statements attached to the Form 10-K stated, "the Company has

analyzed its operations subsequent to November 30, 2013 to the

date these financial statements were issued, and has determined

that it does not have any material subsequent events to disclose

in these financial statements."  Id. at F-8.

EDNY-ITEN-000000758

66.   Thus, although the Form 10-K only covered the
period until November 30, 2013, as of the February 12, 2014
filing date of the Form 10-K, Northwest's financial situation
had not changed.  Northwest had losses that greatly exceeded any
assets and its stock was not actively traded.  Similar to the
status of First Independence before the machinations of DiScala
and CodeSmart, though Northwest was technically an existing
corporation whose stock and ticker symbol were registered and
able to be traded on the public market, it was effectively just
a shell of a company.  That began to change on March 6, 2014.

67.   According to a Form 8-K that Northwest filed with
the SEC on March 6, 2014 (and dated March 4, 2014), Northwest's
board of directors appointed Douglas Shinsato as the company's
new President, Secretary, Treasurer, CEO and Chief Financial
Officer ("CFO").  The Form 8-K stated that prior to his posts at
Northwest, Shinsato was the President and COO of Crackpot, a
company that develops "mobile-first information communications
technology that offers users a digital platform for the creation
of content that combines text, images, audio, and video."  See
Form 8-K at 1, available at
http://www.sec.gov/Archives/edgar/data/1507718/00012552941400013
9/mainbody.htm.  Thus, similar to what occurred with CodeSmart

41

and First Independence, the leading officer in the public entity was replaced with an officer from the private entity. The Form 8-K also noted that the company was changing its address and telephone number. Id.

68. Approximately one week later, on March 14, 2014, the company filed another Form 8-K explaining that Northwest had changed its name to "Cubed, Inc." and was in the process of changing its ticker symbol to "CRPT." See Form 8-K, available at http://www.sec.gov/Archives/edgar/data/1507718/000125529414000186/mainbody.htm. Another Form 8-K filed on March 24, 2014, stated that Cubed had entered into an Intellectual Property Purchase Agreement with Crackpot, buying Crackpot's "mobile-first platform[,]" and related intellectual property such as patents, trademarks, and internet domain names. See Form 8-K ("March 24, 2014 Form 8-K"), available at http://www.sec.gov/Archives/edgar/data/1507718/000125529414000221/mainbody.htm. Thus, the new company called Cubed now had (1) Crackpot's former officer at the helm, (2) Crackpot's business through the intellectual property and (3) Crackpot's theoretical goodwill and name recognition through its new ticker symbol CRPT. Although the morphing of Crackpot into Cubed through an

EDNY-ITEN-000000760

asset purchase agreement is not identical to a reverse merger, just like with CodeSmart and First Independence, Crackpot, a private company, effectively became Cubed, a publicly-traded company, in a way that avoided the financial disclosures that accompany a typical IPO.  Crackpot fully completed morphing into the newly created publicly-traded corporation called Cubed just days later, on March 26, 2014 (with a Form 8-K filed on March 27, 2014), when Cubed's board of directors appointed Joseph White ("White") as the new CEO and President, replacing Shinsato.  See http://www.sec.gov/Archives/edgar/data/1507718/00012552941400023 7/mainbody.htm.  Notably, White was an original founder of Crackpot and an even higher level officer than Shinsato.  See id.; see also "Up Your Virtual Presence With Crackpot.Cube," by Will Schmidt, available at http://tech.co/up-your-virtual-presence-with-crackpot-cube-2013-07; www.crackpotcube.com/events.

69.  As noted above, while a reverse merger or making a company public via an asset purchase agreement like this, by itself, is not definitive proof of unlawful behavior, based on my training, experience and knowledge of this investigation, including the events described below, I believe these

43

EDNY-ITEN-000000761

machinations are an indicator that securities fraud, wire fraud and unlawful monetary transactions have occurred and will continue occurring. This belief is corroborated by the public valuation that occurred on March 28, 2014, as explained below.

70. As a preliminary matter, like a reverse merger, taking a company public through an asset purchase agreement affords less public disclosure and less scrutiny than would occur under an IPO. But, based on my training, experience and knowledge of this investigation, including conversations with SEC attorneys and staff, I know that Cubed evaded scrutiny further in the particular way it reported the asset purchase to the SEC. Significant asset purchases are supposed to be filed under a specific SEC regulation. Such a filing typically triggers additional scrutiny by the SEC and usually leads to the company having to file a new Form 10-K, with a thorough accounting of its financial performance and position. In the present case, Cubed reported the asset purchase under a different SEC regulation, which governs any entry by a company into a material agreement. Filings reporting a material agreement are very common and thus do not trigger SEC scrutiny the way the reporting of a significant asset purchase does. While this misdirected filing could be explained as simply

44

negligence, based on my training, experience and knowledge of this investigation, I believe the misfiling was done on purpose to avoid SEC scrutiny.  My belief is corroborated by the apparent public valuation of Cubed that occurred on March 28, 2014, as explained below.

71.  Importantly, per the terms of the Intellectual Property Purchase Agreement, Crackpot was compensated by Cubed with $350,000 and 2,537,455 shares of Cubed common stock, all of which was due to be paid in installments starting in mid-April 2014.  See March 24, 2014 Form 8-K.  Since at the time of the agreement Cubed common stock was just a penny stock (attached to a company that had no assets at all), the terms of the contract indicated that the intellectual property assets were actually worth $350,000 or at best just slightly more than that amount. That amount also reflected the value of Cubed, since those assets effectively were all that Cubed possessed.  Moreover, since payment did not have to commence until mid-April and even then would be paid only in installments, the value of Cubed and its stock going forward took on particular significance.  If the stock were valued highly, Cubed could sell a small amount of shares in the future and easily pay off the $350,000.  In addition, the stock Crackpot received as compensation would then

EDNY-ITEN-000000763

suddenly also become valuable.

72.    On March 28, 2014, Morning Star, a ratings agency and provider of market information, reported that 200 shares of Cubed had been privately sold for a price of $5 per share. Although the amount of shares traded was small, because there was limited public information on the new company, Morning Star extrapolated from the $5 sales price that Cubed had a market capitalization of $148.85 million.  In other words, the company Cubed was worth almost $150 million.  Yahoo Finance, another website that reports market information, similarly valued Cubed on March 28, 2014, at almost $150 million.  The disparity between these valuations and the $350,000 value reflected in the Intellectual Property Purchase Agreement corroborate my belief that Cubed purposely misfiled the March 24, 2014 Form 8-K under an incorrect SEC regulation to avoid SEC scrutiny.  Furthermore, based on my training, experience and knowledge of this investigation, including events discussed in more detail below, I believe that two Cubed insiders made the 200 share trade at an inflated price of $5 in order to cause the inflated valuation of Cubed.  Based on my training, experience and knowledge of this investigation, I also believe this inflated valuation marks the beginning of false information disseminated to the public by

46

EDNY-ITEN-000000764

Cubed insiders to fraudulently inflate the value of Cubed stock.

73.   Based on my training, experience and knowledge of this investigation, I believe that Cubed when this fraudulent valuation occurred, Cubed was positioned similarly to where CodeSmart was positioned in early May 2013, right before CodeSmart shares started being actively publicly traded (and manipulated) and right before CodeSmart started issuing false public statements to further manipulate its share price.

74.   In or about the week of April 21, 2014, Cubed shares started being publicly traded and by the end of the week had increased in price to $5.29 per share.  Based on my training, experience and knowledge of this investigation, I believe that Cubed shares will start being more actively publicly traded in the near future and that Cubed, as well as insider associates of DiScala, will start issuing false public statements and promoting Cubed (as was done with CodeSmart) in an effort to make Cubed appear more profitable and successful than it is in actuality.  As noted above, the false statements have effectively already commenced with the private trade and resulting valuation by Morningstar and Yahoo Finance, but I believe the frequency and number of false statements will increase such that the share price will climb rapidly, partly as

EDNY-ITEN-000000765

a result of these statements. Furthermore, based on my training, experience and knowledge of this investigation, I believe that DiScala and the other Target Interceptees will often trade Cubed shares among themselves (as was done with CodeSmart) to increase the volume of shares trading so as to make it falsely appear to the public that Cubed stocks are more valuable because they are both highly desirable by investors and very liquid. This type of trading, coupled with the false public statements and the actions of brokers like Bell who place shares into the portfolios of unwitting clients, drives the rapid share price increase. Based on my training, experience and knowledge of this investigation, I also believe that DiScala and other insiders, namely the Target Interceptees, will sell their shares of Cubed stock (as they did with CodeSmart) when the price sufficiently increases, thereby earning a substantial profit from their scheme and causing the share price to plunge, leaving the non-insider investors with substantial losses. Many of these beliefs have already been corroborated, as discussed below, by the text messages exchanged between DiScala, using the TARGET TELEPHONE, and Bell on April 11, 2014.

48

EDNY-ITEN-000000766

ii.   DiScala's Use of the TARGET
      TELEPHONE to Communicate with Co-Conspirators

75.   On March 5, 2014 -- the day before Northwest filed the Form 8-K declaring Shinsato the new CEO and initiating the morphing process -- White, using the White Telephone, and DiScala, using the TARGET TELEPHONE exchanged 12 text messages, a large increase from the prior week.  (Between February 25 and March 4, 2014, DiScala and White only exchanged an average of one text message per day.)  Based on my training, experience and knowledge of this investigation, I believe that during the span of that spike of 12 text messages, DiScala and White discussed the plan to turn Northwest into Cubed and begin the fraudulent share price manipulation process, starting with placing Shinsato and the CEO of the publicly-traded shell company.

76.   On March 14, 2014, Northwest filed an 8-K stating it changed its name to Cubed and was changing its ticker symbol. In the days leading up to that filing, there was a consistent increase in text messages between DiScala, using the TARGET TELEPHONE, and White.  Specifically, on the four days between March 10 and March 13, 2014, they exchanged 2, 2, 7 and 8 messages, respectively.  Based on my training, experience and knowledge of this investigation, I believe that in that continuous increase of text messages, DiScala and White

EDNY-ITEN-000000767

discussed the plan to morph Northwest into Cubed; including
changing the publicly-traded company's name and ticker symbol,
and to execute the fraudulent share price manipulation process.

77.   On Monday, March 24, 2014, Cubed filed an 8-K
stating they had agreed to purchase Crackpot's Intellectual
Property.  On March 22, 2014, the Saturday before the Monday
filing, White, using the White Telephone, and DiScala, using the
TARGET TELEPHONE, exchange 17 text messages, far exceeding the
amount of messages they exchanged on any one day in the prior
four days.  (In fact, during the month of March 2014 up to that
date, the average number of text messages exchanged between them
was 5 per day.)  On the date of the filing, White and DiScala,
using the TARGET TELEPHONE, exchanged another 13 text messages.
Based on my training, experience and knowledge of this
investigation, I believe that in these two spikes of text
messages, DiScala and White further discussed the plan to have
Cubed effectively become Crackpot and to execute the fraudulent
share price manipulation process.  Furthermore, based on my
training, experience and knowledge of this investigation, I
believe that there were more text messages exchanged in relation
to this filing because the asset purchase agreement was more
complicated than simply changing the name of the company or

50

appointing a new officer and thus more communications between DiScala, using the TARGET TELEPHONE, and White were needed.

78.  On April 2, 2014, DiScala, using the TARGET TELEPHONE, exchanged a number of text messages with Bell, who was using the Bell Telephone.  At approximately 12:34 p.m. Eastern Standard Time, Bell sent a text message to the TARGET TELEPHONE, stating "I got buyers in the market in California for cube. Do u know when it is live to buy[?]"[10]  DiScala, using the TARGET TELEPHONE, responded: "Waiting with baited breathe[.]"  A few minutes later, Bell asked, "What's the hold up?" adding "I put an order in just to see and it [was] rejected[.]"  DiScala, using the TARGET TELEPHONE, replied: "Dtc."  Based on my training, experience and knowledge of this investigation, I believe that in this conversation, Bell stated that he readied individuals in California to buy Cubed stock and inquired of DiScala when Cubed would start actively trading ("I got buyers in the market in California for cube. Do u know when it is live to buy").  Based on my training, experience and knowledge of this investigation, I believe that this conversation shows that

---

10  These text messages, as well as the messages between DiScala and Wexler discussed below, were obtained pursuant to a search warrant provided to Verizon Wireless and authorized by the Hon. Marilyn D. Go, United States Magistrate Judge for the Eastern District of New York.  Verizon Wireless is the service provider for the Bell Telephone and the Wexler Telephone.

EDNY-ITEN-000000769

Bell and DiScala are co-conspirators in the unlawful stock manipulation scheme about to take place with Cubed and that the referenced individuals in California are either investors that Bell has duped (like Victims 1 through 4) or additional insiders who will help in the scheme by trading shares and making it appear as if there is an active public market for Cubed shares. Based on my training, experience and knowledge of this investigation, I further believe that during this conversation Bell inquired why active public trading of Cubed had not commenced ("What's the hold up?"), explaining that he had already tried unsuccessfully to trade the stock ("I put an order in just to see and it rejected"). Based on my training, experience and knowledge of this investigation, I believe that DiScala explained to Bell that the Depository Trust Company, which acts as a clearing house for penny stocks, had not yet approved trading ("Dtc"). These beliefs are corroborated by a text message conversation described below between DiScala and Wexler during the evening of this same day.

79. Later that day, at approximately 2:12 p.m., DiScala, using the TARGET TELEPHONE, exchanged several messages about Cubed with Wexler, who was using the Wexler Telephone. The conversation proceeded as follows:

EDNY-ITEN-000000770

| | |
|---|---|
| Wexler: | You see Glendale go off the Bid for NWRSD? |
| DiScala: | What?  Wtf. |
| Wexler: | There's only 2 bids on bid side now? Does that mean anything? |
| DiScala: | There [sic: they're] back.  Maybe going on ask. |
| Wexler: | Nevermind.  Back up.  Thought something going on.  That's what I was hoping. |
| DiScala: | I'll call |
| Wexler: | Probably nothing |

Based on my training, experience and knowledge of this investigation, I believe that in this conversation "Glendale" is a reference to Glendale Securities Inc., a small, several-person brokerage firm in California and one of a number of brokerage firms that DiScala uses for trading stocks from his personal account.  Based on my training, experience and knowledge of this investigation, I further believe that DiScala and co-conspirator Wexler were using Glendale to further their share-price manipulation scheme by having Glendale publicly issue requests to buy and sell Cubed stock, which although not yet publicly trading could be bought or sold privately, and thus create the appearance that there was a ready market for the stock.  More

EDNY-ITEN-000000771

specifically, in this conversation, I believe that Wexler
pointed out to DiScala that Glendale had for some unknown reason
stopped issuing a request to buy Cubed stock, which was still
denominated by Northwest's ticker symbol at the time ("You see
Glendale go off the Bid for NWRSD" and "only 2 bids on bid side
now"), and DiScala expressed shock and dismay at that
possibility ("What? Wtf [what the fuck]"). DiScala then
responded that the public request to buy Cubed shares had
reappeared ("there back") and that perhaps Glendale had moved to
promoting a request to sell rather than buy Cubed stock ("Maybe
going on ask"). Wexler agreed that the request to buy stock had
reappeared ("Nevermind. Back up") and confessed that he too
thought that Glendale had moved to creating a trading market by
offering to sell shares ("That's what I was hoping"). Based on
my training, experience and knowledge of this investigation,
given that DiScala has direct access to White and thus
information about everyone who owned Cubed shares, I believe
that DiScala would have no reason to publicly advertise a desire
to buy stock except to create the appearance of a market and
false demand for Cubed shares. Based on my training, experience
and knowledge of this investigation, I further believe that
DiScala concluded the conversation by stating that he would call

54

Glendale to ensure that they were following his directions in the market manipulation scheme.[11]

     80. That evening, at approximately 7:08 p.m. Eastern Standard Time, DiScala, using the TARGET TELEPHONE, exchanged several text messages with Wexler, who was using the Wexler Telephone, regarding Bell's involvement in the scheme. DiScala stated, among other things, "I was on phone with bell had to get off" and Wexler responded, among other things, "Bell getting anything ? Little guy s[.]" DiScala then replied, among other things, "Lil brother[.]" Based on my training, experience and knowledge of this investigation, I believe that in this conversation, DiScala explained that he had been talking to Bell earlier but had to end their conversation ("I was on the phone with bell had to get off"). Based on my training, experience and knowledge of this investigation, I further believe that Wexler inquired whether Bell was contributing significantly to the planned scheme to manipulate Cubed shares ("Bell getting anything ? Little guy s") and that DiScala replied that Bell was helping but that it was not an overwhelming contribution to the scheme ("Lil brother").

11 Based on my knowledge of this investigation, including a review of toll records, I believe that DiScala did call Glendale regarding this matter but placed the call from a different telephone than the TARGET TELEPHONE.

EDNY-ITEN-000000773

81.   My beliefs about this conversation, as well as Bell's involvement in the scheme, is corroborated by the fact that earlier in the day, prior to this text message exchange, DiScala and Bell had three telephone conversations -- at approximately 9:47 a.m. Eastern Time, 6:58 p.m. Eastern Time and 7:00 p.m. Eastern Time -- that lasted a total of approximately three minutes.[12]   Thus, DiScala's statement to Wexler that he was on the telephone with Bell but had to end their conversation was in fact accurate.

82.   Approximately 30 minutes after the text message conversation regarding Bell's involvement in the scheme, DiScala, using the TARGET TELEPHONE, exchanged several text messages with Wexler, who was using the Wexler Telephone, regarding a co-conspirator whom they believed was harmful to their scheme.   The conversation started at approximatelt 7:46 p.m. Eastern Standard Time and proceeded as follows:

> DiScala:   Dude stop talking to Chris he called me
>             explaining the 8m shares using stupid words
>             man.   He's really dangerous.   Call u in 20.
>             Sitting to eat

---

12   These calls, and other telephone calls referenced herein that were made by or received on the TARGET TELEPHONE, were verified through toll records.

EDNY-ITEN-000000774

Wexler:    I ain't talkin to him about nothn but raisin

           money.  He Nows [sic: knows] about

           everything bro , I didn't say a word to him

           man

Wexler:    He said you told to go swell telemedicine

           and make commish ??? Not me brotha

DiScala:   He just said I just talked to mark and

           kyleens a genius our 8m shares we control.

           I'm like what the funk are you talking

           about.  We only got 5.5m and gave

DiScala:   a lot back from there.  And NO ONE CONTORLS

           NOTHING.  THE DUDES SCARY BRO.  EVEN THOUGH

           WE DO IT ALL RIGHT HE FREAKS ME OUT

Wexler:    He's frozen with me now.  Fucjjin wash women

           sociopath

Wexler:    He's makin shit up at this point begging for

           money a[nd] fuckin shares.  Let's both

           freeze him the Hells out.  He's done.

DiScala:   agreed.  I told him you ever hear ame talk

           about technology?  NO.  CAUSE I DON'T KNOW

           ANYTHING.  JUST LIKE U DON'T KNOW SHIT ABOUT

           FINANCE.  WOW.

EDNY-ITEN-000000775

DiScala:   He's nuts bro.

At this point, a telephone call occurred for over 7 minutes between Wexler and DiScala using the TARGET TELEHONE.  Then the text message conversation resumed at approximately 8:06 p.m. Eastern Standard Time, with Wexler telling DiScala, who was using the TARGET TELEHONE, "I know.  I'm I'll freeze him out tomorrow. . . ."

83.  Based on my training, experience and knowledge of this investigation, I believe that, during the telephone conversation DiScala, using the TARGET TELEPHONE, told Wexler to stop talking to a co-conspirator ("stop talking to Chris") because that co-conspirator was talking too openly about their fraudulent share price manipulation scheme ("he called me explaining the 8m shares using stupid words man.  He's really dangerous").  DiScala then said that he would call Wexler in 20 minutes ("Call u in 20"), but based on my training, experience and knowledge of this investigation, I believe that Wexler denied talking to the co-conspirator about the scheme ("I ain't talkin to him about nothn but raisin money" and "I didn't say a word to him man") and explained the co-conspirator was already aware of it ("He Nows about everything bro").  Based on my training, experience and knowledge of this investigation, I

EDNY-ITEN-000000776

believe that DiScala responded that the co-conspirator discussed DiScala and Wexler's plan to control the shares of a company and inflate the share price ("I just talked to mark . . . our 8m shares we control"), and that DiScala tried to dissuade the co-conspirator from thinking that DiScala controlled that many shares ("I'm like what the funk are you talking about.  We only got 5.5m and gave a lot back from there.  And NO ONE CONTORLS NOTHING").  Based on my training, experience and knowledge of this investigation, I believe that DiScala emphasized that although their unlawful market manipulation plan was working well, he was very concerned about a co-conspirator talking so openly ("THE DUDES SCARY BRO.  EVEN THOUGH WE DO IT ALL RIGHT HE FREAKS ME OUT").  Based on my training, experience and knowledge of this investigation, I believe that DiScala and Wexler then ageed to cut the co-conspirator out of their scheme ("Let's both freeze him the Hells out" and "agreed") and not to provide him any money or shares of stock ("begging for money a[nd] fuckin shares").  Following that exchange, a telephone call occurred between Wexler and DiScala, who was using the TARGET TELEPHONE, and based on my training, experience and knowledge of this investigation, I believe that during the telephone conversation Wexler and DiScala discussed what should be done about the

EDNY-ITEN-000000777

untrustworthy co-conspirator.  My belief that this was discussed
is corroborated by the fact that prior to the call DiScala
stated via text messages his intention to call and discuss this
topic and that even after the telephone conversation ended,
Wexler and DiScala continued communicating about this subject by
text message.

84.  The next day, on April 3, 2014, Wexler again
texted DiScala, who was using the TARGET TELEPHONE, about Cubed,
writing, "Forgot this part he investment on the message board
calling the cube a complete scam and calling out the peooke
involved as criminals I m going to e mail you the chain[.]"
Based on my training, experience and knowledge of this
investigation, I believe that, in this text message, Wexler
informed DiScala, who was using the TARGET TELEPHONE, that
someone had learned about the imminent public trading of Cubed
and posted a warning on an internet message board advising
investors not to buy shares because the company was so grossly
overvalued as to be a scam ("he investment on the message board
calling the cube a complete scam and calling out the peooke
involved as criminals").

85.  On April 8, 2014, DiScala, using the TARGET
TELEPHONE, and Wexler, who was using the Wexler Telephone,

60

EDNY-ITEN-000000778

exchanged a number of text messages regarding Cubed's changing ticker symbol. An excerpt from the conversation, which started at approximately 10:14 a.m. Eastern Standard Time, occurred as follows:

Wexler:   I think symbol change TOMORROW bro.  Omg, no trading yet tho and we have no launch. Nice.

DiScala:  trade tomorrow.  Maybe ur right.

Wexler:   …Yeah I hope friggin so I think we need to get news ready to launch even if it s just an intro type situation

Wexler:   I think it s really important everyone s will be looking And hopefully buying

DiScala:  We have it

       *    *    *

Wexler:   Should we get a news release moved along to coincide w symbol change ?

DiScala:  No.  Next Tuesday.  We need a landing page irpr on website. Etc etc

Wexler:   Got it , do you know when they are launching product?

DiScala:  No.

EDNY-ITEN-000000779

Based on my training, experience and knowledge of this investigation, I believe that in this conversation Wexler informed DiScala that Cubed's ticker symbol would change from Northwest's original symbol to CRPT ("I think symbol change TOMORROW") and both lamented that Cubed was still not being publicly traded ("no trading yet tho" and "trade tomorrow"). Based on my training, experience and knowledge of this investigation, I further believe that in this conversation, although both DiScala and Wexler were well aware that Cubed had no actual product ("we have no launch[,]" "know when they are launching product?" and "No"), they nonetheless debated issuing a press release ("I think we need to get news ready" and "Should we get a news release moved along") to fraudulently entice the public into buying the stock ("everyone s will be looking And hopefully buying") although they ultimately decided not to make a public statement yet because the investor relations or public relations page on the Cubed website was not ready ("We need a landing page irpr on website").

86.   On April 10, 2014, DiScala, using the TARGET TELEPHONE, and Wexler, who was using the Wexler Telephone, exchanged a number of text messages and had a 13-minute telephone call in the middle of the text message exchange. The

EDNY-ITEN-000000780

communications occurred as follows, starting at approximately
8:37 a.m. Eastern Standard Time:

> Wexler:   POPs pick up!!!  Man.  Pick up.  Big news
> bro !!!
>
> Wexler:   Check our [sic: out] NWRSD !!!
>
> Wexler:   Qwick.  They about to fuck up, the ASK is
> $2000.
>
> Wexler:   Holy shit
>
> Wexler:   Poppppppppppyyyyyyy

At this point, a telephone call occurred for 13 minutes between
Wexler and DiScala using the TARGET TELEHONE.  Then the text
message conversation resumed at approximately 9:04 a.m. Eastern
Standard Time:

> Wexler:   Bro I wanna buy 1 share of CUBE at 2000
>
> DiScala:  No way.  Call gp. \n\n
>
> Wexler:   Texted GP.  Just to give her a heads up on
> ASK
>
> DiScala:  Cool

Based on my training, experience and knowledge of this
investigation, I believe that, in this conversation, "NWRSD" was
a reference to the original ticker symbol for Cubed and that the
text message conversation started with Wexler urgently trying to

63

EDNY-ITEN-000000781

alert DiScala ("POPs pick up!!!  . . . Big news bro !!!") that
their co-conspirators in the Cubed share price manipulation
scheme were messing up the scheme by publicly requesting to sell
Cubed shares at an unreasonably high price of $2,000 per share
("They about to fuck up, the ASK is $2000").  Based on my
training, experience and knowledge of this investigation, I
believe this conversation shows that DiScala, Wexler and their
co-conspirators ("They") were heavily involved in creating the
false appearance of an active market for Cubed stock and that
DiScala and Wexler were very concerned the co-conspirators, by
offering to sell at an unreasonably high price, would reveal to
the public that the perceived demand for the stock, as well as
the share price, was being unlawfully manipulated.  Notably, as
discussed above, based on my training, experience and knowledge
of this investigation, I believe the shares were already over-
valued when they were presented to the public on March 28, 2014,
as worth $5 per share with the resulting $150 million valuation
of the company.  Thus, at $2,000, any veneer of accuracy for the
valuation of the shares and the company would disappear.  Based
on my training, experience and knowledge of this investigation,
I believe that, during the 13-minute telephone conversation
Wexler and DiScala, using the TARGET TELEPHONE, discussed what

EDNY-ITEN-000000782

should be done about the unreasonably high offer to sell that
their co-conspirators were posting.  My belief that this was
discussed is corroborated by the fact that prior to the call
Wexler stated via text messages his intention to discuss this
topic and that even after the conversation ended, Wexler and
DiScala continued communicating about this subject by text
message.  Based on my training, experience and knowledge of this
investigation, when the text message between DiScala and Wexler
resumed, I believe that Wexler, greedily eyeing what his shares
as an insider in the company would be worth if the stock were
valued at $2,000 per share, stated that he wanted to purchase
one share at that price to cause the public valuation to falsely
increase as it did when just 200 shares were purchased (likely
by co-conspirators) for $5 per share ("Bro I wanna buy 1 share
of CUBE at 2000").  Based on my training, experience and
knowledge of this investigation, I believe that DiScala rejected
that idea, concluding that such manipulation would be
transparent to the public ("No way"), and instead directed
Wexler to contact a female co-conspirator to remedy the unusual
price ("Call gp").  Based on my training, experience and
knowledge of this investigation, I believe that Wexler replied
to DiScala that he had already done that ("Texted GP.  Just to

EDNY-ITEN-000000783

give her a heads up on ASK"). Agents have not identified the
female referenced as "GP."

87. On April 11, 2014, DiScala, using the TARGET
TELEPHONE, exchanged a number of text messages with Wexler, who
was using the Wexler Telephone. Starting at approximately 12:31
p.m., Wexler wrote: "Call me please very important re ITEN and
my taxes. Bad situation I think[,]" continuing later with "88k
in state taxes. I'm I'll [sic: ill] All from codeshit[.]"
DiScala responded, "88m. Next yr from cube. Better move in[.]"
Based on my training, experience and knowledge of this
investigation, I believe that in this conversation "ITEN" and
"codeshit" were references to CodeSmart and that Wexler was
complaining that he earned so much profit from the manipulation
of CodeSmart shares that he had to pay $88,000 in New York state
taxes alone ("ITEN and my taxes" and "88k in state taxes . . .
All from codeshit"). Based on my training, experience and
knowledge of this investigation, I believe that DiScala
responded that the manipulation of Cubed shares will be even
more successful and Wexler should expect to pay $88 million in
New York state taxes next year from that part of the scheme
("88m. Next yr from cube").

88. Later that day, DiScala, using the TARGET

EDNY-ITEN-000000784

TELEPHONE, exchanged a number of text messages with Bell, who was using the Bell Telephone. At approximately 4:14 p.m. Eastern Standard Time, Bell sent a text message to the TARGET TELEPHONE, stating "FedEx send you money for cube on Monday. Made out to Omniview" and DiScala, using the TARGET TELEPHONE, responded "Great[.]" Several minutes later, Bell sent another text message to the TARGET TELEPHONE: "I'm excited about Monday. Cube start the trade." DiScala, using the TARGET TELEPHONE, replied: "Yes sir[.]" Based on my training, experience and knowledge of this investigation, I believe that in this conversation, Bell stated that he was sending to DiScala via FedEx a check made out to Omniview, DiScala's company, for the purchase of Cubed shares ("FedEx send you money for cube on Monday. Made out to Omniview"). Based on my training, experience and knowledge of this investigation, I further believe that this purchase of shares by Bell is part of the manipulation scheme, along with the related commission of mail fraud by using FedEx, with Bell officially becoming an insider as to Cubed and obtaining free-trading Cubed stock at a price per share that is significantly below the price at which Bell expects to sell the stock once the manipulation scheme gets fully underway and the price of Cubed stock spikes. Based on my

EDNY-ITEN-000000785

training, experience and knowledge of this investigation, I also believe that in this conversation Bell stated that he was excited for the next stage of the scheme, when Cubed stock was supposed to start trading publicly on April 14, 2014 ("I'm excited about Monday. Cube start the trade").

89.  As noted above, Cubed shares started publicly trading the week of April 21, 2014.  Based on my training, experience and knowledge of this investigation, I believe that as this scheme to manipulate the price of Cubed shares unfolds, DiScala, using the TARGET TELEPHONE, will continue having text message communications and voice telephone calls with White in furtherance of the scheme, including spikes of both kinds of communications surrounding events like public statements by Cubed.  However, based on my training, experience and knowledge of this investigation, given that the stage of the scheme has moved from converting a private company into a public company without an IPO (as discussed above) to the point where manipulation of the share price will be the focus, I believe that, going forward, the spikes in communications will more often involve text messages and telephone calls between DiScala, using the TARGET TELEPHONE, and brokers, promoters and other financial industry professionals rather than company insiders

68

like White.  Company insiders like White were more necessary than brokers, promoters and other financial industry professionals to complete the SEC filings that converted the company, changed its name and ticker symbol.  For that reason, there were spikes of communication between DiScala, using the TARGET TELEPHONE, and White around the times of the SEC filings. Based on my training, experience and knowledge of this investigation, I believe the current stage will be punctuated more by spikes of communications between DiScala and those who can affect the Cubed share price, just as happened during the manipulation of CodeSmart shares, which revealed a spike in communications between DiScala and Bell during the time the stock was actively trading rather than communications between DiScala and Shapiro.  My beliefs are corroborated by the text messages between Bell and the TARGET TELEPHONE on April 11, 2014, discussed above.

     iii.  The Continued Use of the TARGET TELEPHONE

     90.  All of the above-referenced companies, including CodeSmart, are still publicly traded and the shares can again be manipulated by the Target Interceptees.  Based on my training, experience and knowledge of this investigation, I believe that the Target Interceptees are continue to be involved in

69

manipulating the share prices of penny stocks and in turn engaging in wire and mail fraud.

91. Based on my training, experience and knowledge of this investigation, I know that insiders who are involved in a market manipulation scheme routinely communicate by telephone and text messages with individuals associated with third parties, such as promoters and securities brokers.

92. Furthermore, based on my training, experience and knowledge of this investigation, I know that individuals who publicize companies often use text messages and telephone calls to communicate to the press, analysts, promoters, stock traders and with wire services that distribute the press releases to the public.

93. Based on my training, experience and knowledge of this investigation, I further believe that the interception of text messages and telephone calls made or sent and received by the TARGET TELEPHONE will provide fruits and evidence of wire fraud, mail fraud and securities fraud, including information about who is publicizing the company, who is recommending the purchase of company securities and who is drafting press releases. In addition, I believe that the interception of text messages and telephone calls made or sent and received by the

70

EDNY-ITEN-000000788

TARGET TELEPHONE will provide information about other brokers and other securities used by DiScala and Goepel, as well as information about other victims who purchased shares in CodeSmart, Soul, Cubed and other penny stocks.

### Analysis of Toll and Pen Register Records
### For the TARGET TELEPHONE

94. Based on subpoenas and pen registers, I have received toll records related to the TARGET TELEPHONE from February 26, 2014, to April 28, 2014 (the "covered period"). The toll records revealed that the TARGET TELEPHONE made and/or received 21,670 electronic communications, specifically "SMS" or "text" messages, and 5,215 wire communications, specifically voice telephone calls, during the covered period.

### 917-806-7404

95. Toll records for the TARGET TELEPHONE reflect that during the covered period, the TARGET TELEPHONE has sent or received 144 "SMS" or "text" messages and 19 telephone calls to/from telephone number 917-806-7404 (the "7404 Telephone"). The most recent electronic communication occurred on April 2, 2014; the most recent wire communication occurred on April 24, 2014.

96. The 7404 Telephone is registered to Jeffrey Auerbach, is subscribed to his home address, and is believed to

71

EDNY-ITEN-000000789

be used by him.  Auerbach is a securities trader who until November 2013 was employed by Kuhns Brothers National Securities in New York City.  According to another confidential source ("CS3"), who knows Auerbach through their mutual work in the financial industry, Auerbach is still involved in the financial industry but now is acting independently and not as part of a securities firm.[13]  According to CS3, Auerbach has been friends with DiScala for a number of years and Auerbach helped DiScala utilize the First Independence shell corporation to take over and publicly trade CodeSmart shares.  Trading records showed that Auerbach was a net seller of CodeSmart.  The pattern of text messages between the 7404 Telephone and the telephones used by DiScala, namely the Prior Telephone and the TARGET TELEPHONE,

---

13  CS3 is not a target of any investigation and originally became a source of information when he/she complained about certain practices by other individuals in the financial industry.  CS3 does not have any criminal record but admitted to agents that he/she has outstanding traffic fines and a warrant in another state pursuant to those fines.  CS3 has stated that he/she is trying to resolve those matters.  FBI agents have contacted the relevant state authorities to inquire whether the they wanted CS3 to be arrested by FBI and brought to court; the state authorities declined that assistance.  CS3 has been providing information for approximately two years.  During the course of providing information, CS3 was given financial compensation by agents.  The information CS3 has provided has proved accurate and been corroborated by independent evidence. Notably, apart from potentially knowing about CS1 and CS2 being part of the financial industry, CS3 is otherwise not associated with CS1 or CS2 and does not know of their cooperation.

EDNY-ITEN-000000790

show that the communications are being used in furtherance of unlawful schemes.

97.  Telephone records show that there was a four-fold increase in text messages between DiScala, using the Prior Telephone, and Auerbach, using the 7404 Telephone, in the days between September 16 and 20, 2013.  (September 20, 2013, was one of the two dates when CodeSmart shares hit bottom after a peak.) Corresponding to that increase in communications, Auerbach began selling CodeSmart shares.  On September 16, 2013, and the days that followed, Auerbach sold at least 18,800 shares for $47,527. There was another increase in communications -- more than double the amount of text messages as the week before -- between DiScala, using the Prior Telephone, and Auerbach, using the 7404 Telephone, in the couple days starting September 30, 2013. Then, on October, 1, 2013, Auerbach again sold shares of CodeSmart, specifically at least 15,629 shares of CodeSmart for $36,151.  Based on my training, experience and knowledge of this investigation, I believe the increase in communications between DiScala and Auerbach on those two occasions reflected DiScala's direction or advice to Auerbach to sell CodeSmart shares as part of their coordinated effort to unlawfully manipulate the share price.

73

EDNY-ITEN-000000791

98.   Telephone records also show that there was a jump in text messages between DiScala, using the TARGET TELEPHONE, and Auerbach, using the 7404 Telephone, shortly before Auerbach sold large numbers of CodeSmart shares in November 2013.  For example, on Friday, November 1, 2013, DiScala and Auerbach exchanged 61 text messages, and on Monday, November 4, 2013, and Tuesday, November, 5, 2013, Auerbach sold a total of 6,000 shares of Codesmart.  On November 6 and 7, 2013, DiScala and Auberbach exchanged an additional 38 text messages, and, during the following week, Auerbach sold an additional 13,800 shares of CodeSmart.  Notably, from November 11 to 15, the trading volume in CodeSmart shares tripled (from 300,800 shares traded the prior week to 914,300 shares traded) and the price of CodeSmart stock plummeted 41 percent.  Based on my training, experience and knowledge of this investigation, I believe the increase in communications between DiScala and Auerbach reflected DiScala's direction or advice to Auerbach, and others, to sell CodeSmart shares as part of their coordinated effort to unlawfully manipulate the share price.

<u>917-922-6939</u>

99.   Toll records for the TARGET TELEPHONE reflect that during the covered period, the TARGET TELEPHONE has sent or

EDNY-ITEN-000000792

received 25 "SMS" or "text" messages and 4 telephone calls
to/from telephone number 917-922-6939 (the "6939 Telephone").
The most recent electronic communication occurred on April 2,
2014; the most recent wire communication occurred on March 28,
2014.

100. The 6939 Telephone is registered to William Coons
and is subscribed to his home address.  Coons is a securities
trader employed by Hallmark Investment Inc. in New York City.
Coons is the broker for Kimberly Josephberg (the wife of Craig
Josephberg, discussed below), Marleen Goepel and Marc Wexler
(also discussed below).  The pattern of text messages between
the 6939 Telephone and the telephones used by DiScala, namely
the Prior Telephone and the TARGET TELEPHONE, show that the
communications are being used in furtherance of unlawful
schemes.

101. Telephone records show that there was a jump in
text messages between DiScala, using the TARGET TELEPHONE, and
Coons, using the 6939 Telephone, between November 6 and 8, 2013,
when they exchanged a total of 80 messages compared with just
seven messages in the three days before.  That week and the
following week, Coons's client Josephberg sold a large number of
CodeSmart shares.  Notably, the week after the spike in text

EDNY-ITEN-000000793

messages between Coons and the TARGET TELEPHONE -- from November 8 to 15, the trading volume in CodeSmart shares tripled (from 300,800 shares traded the prior week to 914,300 shares traded) and the price of CodeSmart stock plummeted 41 percent.  Based on my training, experience and knowledge of this investigation, I believe the increase in communications between DiScala, using the TARGET TELEPHONE, and Coons, using the 6939 Telephone, reflected DiScala's direction or advice to Coons to sell CodeSmart shares as part of their coordinated effort to unlawfully manipulate the share price.

### 917-327-8411

102. Toll records for the TARGET TELEPHONE reflect that during the covered period, the TARGET TELEPHONE has sent or received 2,537 "SMS" or "text" messages and 526 telephone calls to/from telephone number 917-327-8411 (the "8411 Telephone"). The most recent electronic communication occurred on April 28, 2014; the most recent wire communication occurred on April 28, 2014.

103. Based on my training, experience and knowledge of this investigation, I believe that Craig Josephberg is the user of the 8411 Telephone.  Indeed, Josephberg listed the 8411 Telephone on bank account records requiring his contact

76

EDNY-ITEN-000000794

information.  However, the 8411 Telephone is registered to JG Capital, with an address at 41 Milton Court, Port Chester, New York.[14]  Josephberg is a securities trader and registered broker currently employed by Meyers Associates LP in New York City. Josephberg was employed at Halcyon Cabot Partners Ltd. until October 2013 and served as DiScala's broker during that time. Trading records showed that he was a net seller of CodeSmart though his wife's company.[15]  The pattern of text messages between the 8411 Telephone and the telephones used by DiScala, namely the Prior Telephone and the TARGET TELEPHONE, show that the communications are being used in furtherance of unlawful schemes.

104. Telephone records show that there was an increase in the volume of text messages between DiScala, using the TARGET TELEPHONE, and Josephberg, using the 8411 Telephone, starting on October 12, 2013 and that the volume stayed elevated until mid-

---

[14]  Based on my knowledge of this investigation, I believe this is the address of Josephberg's parents.

[15]  In brokerage account documents, Kimberly Josephberg is listed as the contact for Garper LLC, a company whose address is the home address of Craig and Kimberly Josephberg.  The shares of CodeSmart that were sold were listed as being owned by Garper LLC.  Based on my training, experience and knowledge of this investigation, I believe that Josephberg was the true owner of these shares but sold them through his wife and a shell limited liability corporation to distance himself from the unlawful scheme.

EDNY-ITEN-000000795

November 2013.  Shortly after that increase in communications,
on October 16, 2013, Josephberg started selling a large number
of CodeSmart shares.  In fact, between October 16, 2013, and
November 14, 2013, Josephberg sold 65,780 shares for
approximately $148,501, and in that last week including November
14, 2013, the price of CodeSmart stock plummeted 41 percent.
Based on my training, experience and knowledge of this
investigation, I believe the increase in communications between
DiScala, using the TARGET TELEPHONE, and Josephberg, using the
8411 Telephone, reflected DiScala's direction or advice to
Josephberg to sell CodeSmart shares as part of their coordinated
effort to unlawfully manipulate the share price.

        105. Telephone records show that there was a continual
increase in the volume of text messages between DiScala, using
the TARGET TELEPHONE, and Josephberg, using the 8411 Telephone,
approaching the March 28, 2014 date when Morning Star and Yahoo
Finance estimated Cubed's value to be approximately $150
million.  Specifically, between March 25 and March 28, 2014,
DiScala and Josephberg exchanged 20, 45, 115 and 88 text
messages, respectively.  Based on my training, experience and
knowledge of this investigation, I believe the increase in
communications between DiScala, using the TARGET TELEPHONE, and

EDNY-ITEN-000000796

Josephberg, using the 8411 Telephone, reflected DiScala's discussion with Josephberg about the manipulation of Cubed's shares as part of their coordinated effort to unlawfully manipulate the share price.

### 732-261-6430

106. Toll records for the TARGET TELEPHONE reflect that during the covered period, the TARGET TELEPHONE has sent or received 4,045 "SMS" or "text" messages and 471 telephone calls to/from telephone number 732-261-6430 (the "6430 Telephone"). The most recent electronic communication occurred on April 28, 2014; the most recent wire communication occurred on April 27, 2014.

107. The 6430 Telephone is registered to Marc Wexler with an address at a private post office box. Wexler is a managing director at Omniview. Trading records showed that he was a net seller of CodeSmart. The pattern of text messages between the 6430 Telephone and the telephones used by DiScala, namely the Prior Telephone and the TARGET TELEPHONE, show that the communications are being used in furtherance of unlawful schemes.

108. Telephone records show that there was a jump in text messages between DiScala, using the TARGET TELEPHONE, and

EDNY-ITEN-000000797

Wexler, using the 6430 Telephone, between November 6 and 8, 2013, when they exchanged a total of 192 messages compared with just one message in the four days before. Then, the week after the spike in text messages between Wexler and the TARGET TELEPHONE -- from November 11 to 15, 2013, the trading volume in CodeSmart shares tripled (from 300,800 shares traded the prior week to 914,300 shares traded) and the price of CodeSmart stock plummeted 41 percent. Based on my training, experience and knowledge of this investigation, I believe the increase in communications between DiScala, using the TARGET TELEPHONE, and Wexler, using the 6430 Telephone, reflected DiScala advising Wexler not to purchase shares until November 15, 2013, because DiScala would be coordinating an increase in volume of trading and a corresponding share price drop in the week between November 11 and November 15, 2013. Notably, Wexler in fact did not purchase any CodeSmart shares until November 15, 2013. On that day, he bought a large number of shares in small increments. Another spike in text messages between DiScala, using the TARGET TELEPHONE, and Wexler occurred on November 18, 2013, when they exchanged 80 text messages (compared with 50 the day before). Notably, on November 19, 2013, Wexler sold all the shares he had bought on November 15, but did so at much larger

EDNY-ITEN-000000798

increments than when he was buying, contributing to the stock

drop of another 22 percent.  Based on my training, experience

and knowledge of this investigation, I believe the increase in

communications on November 18, 2013, between DiScala, using the

TARGET TELEPHONE, and Wexler, using the 6430 Telephone,

reflected DiScala's direction or advice to Wexler to sell

CodeSmart shares on November 19, 2013, as part of their

coordinated effort to unlawfully manipulate the share price.

<u>917-749-9542</u>

109.  Toll records for the TARGET TELEPHONE reflect

that during the covered period, the TARGET TELEPHONE has sent or

received 258 "SMS" or "text" messages and 47 telephone calls

to/from telephone number 917-749-9542 (the "9542 Telephone").

The most recent electronic communication within the covered

period occurred on April 28, 2014; the most recent wire

communication occurred on April 27, 2014.

110.  The 9542 Telephone is registered to Alliance

Global Finance, Inc. ("Alliance"), a company that is associated

with Max Khan.  More specifically, on his Linkedin web page,

Khan describes himself as the president of Alliance.  Moreover,

on April 8, 2014, Bell sent a text message to DiScala, who was

using the TARGET TELEPHONE, asking, "Do you have Maxs phone

81

EDNY-ITEN-000000799

number[,]" to which DiScala responded, "917-749-9542[.]"  As discussed above, Khan was the listed as one of Omniview's officers highlighted as attending the Cubed conference and Omniview's web site on April 21, 2014, named Khan as a managing director.  Based on my training, experience and knowledge of this investigation, including the fact that Bell is asking DiScala for Khan's telephone number, I believe that Khan is involved in the unlawful manipulation of Cubed share price, along with the related wire and mail fraud.  The pattern of text messages between the 9542 Telephone and the TARGET TELEPHONE used by DiScala show that the communications are being used in furtherance of unlawful schemes.

<u>509-528-9444</u>

111. Toll records for the TARGET TELEPHONE reflect that during the covered period, the TARGET TELEPHONE has sent or received 266 "SMS" or "text" messages and 150 telephone calls to/from telephone number 509-528-9444, which as noted above is the White Telephone.  The most recent electronic communication within the covered period occurred on April 26, 2014; the most recent wire communication occurred on April 28, 2014.

112. White is the registered user of the White Telephone, subscribed in his name.  White's is the listed CEO of

EDNY-ITEN-000000800

Cubed and his participation in the unlawful manipulation of
Cubed share price, along with the related wire and mail fraud,
is discussed more fully above.  The pattern of text messages
between the White Telephone and the TARGET TELEPHONE used by
DiScala show that the communications are being used in
furtherance of unlawful schemes.

### 210-380-6634

113. Toll records for the TARGET TELEPHONE reflect
that during the covered period, the TARGET TELEPHONE has sent or
received 645 "SMS" or "text" messages and 47 telephone calls
to/from telephone number 210-380-6634, which as noted above is
the Bell Telephone.  The most recent electronic communication
occurred on April 28, 2014; the most recent wire communication
occurred on April 28, 2014.

114. Bell is the registered user of the Bell
Telephone, subscribed in his name and to his home address in
Helotes, Texas.  Bell's participation in the unlawful
manipulation of CodeSmart share price, along with the related
wire and mail fraud, is discussed more fully above.  The pattern
of text messages between the Bell Telephone and the telephones
used by DiScala, namely the Prior Telephone and the TARGET
TELEPHONE, show that the communications are being used in

83

furtherance of unlawful schemes. Although Bell is no longer
with Alamo, he continues to communicate with DiScala via the
TARGET TELEPHONE and based on my training, experience and
knowledge of this investigation, I believe he will play a role
in the unlawful manipulation of Cubed stock.

## LOCATION DATA

115. This application also seeks a search warrant for
location data, including cell-site information and E-911 Phase
II data (or other precise location information) for the TARGET
TELEPHONE (the "Requested Location Information"), pursuant to
Federal Rule of Criminal Procedure 41.

## ALTERNATIVE INVESTIGATIVE TECHNIQUES HAVE BEEN TRIED AND FAILED OR APPEAR REASONABLY UNLIKELY TO SUCCEED IF TRIED

116. The goals of this investigation are set forth
above.  Several investigative techniques have been tried and
have failed, reasonably appear likely to fail to achieve all the
goals of this investigation, or are too dangerous to employ.

## Confidential Sources

117. Agents have spoken to a number of confidential
sources in the financial industry, including those working
outside of New York City and those operated by agents outside of
the group investigating the present case.  To date, only three

84

confidential sources, namely CS1, CS2 and CS3 discussed above, have provided useful information.[16]   While agents have three confidential informants who know of the Target Interceptees, the informants cannot help us meet all the goals of this investigation.   There are currently no informants who are in a position to directly interact with the Target Interceptees, much less to discuss the securities at issue in this investigation, without arousing the suspicion of the Target Interceptees.   As a result, the informants do not have full access to the workings of the group of co-conspirators, its activities, or its membership.

118. Similarly, while agents have received information from victims of the fraud scheme, at the present time, none of the victims are in a position to directly interact with the Target Interceptees, much less to discuss the securities at issue in this investigation, without arousing the suspicion of the Target Interceptees.   Furthermore, the victims do not have full access to the workings of the group of co-conspirators, its activities, or its membership.

---

16  Other confidential sources either did not know of the Target Interceptees or, might have heard of them, but otherwise had little information about them or their work in the financial industry.

EDNY-ITEN-000000803

119. In addition, neither the informants nor the victims are in a position to penetrate the close circle of co-conspirators fully or identify all of its members, brokers, dealers and promoters. Based upon my training and experience, I know that, in general, securities industry professionals who are engaged in fraud often compartmentalize aspects of their operations so as to impede law enforcement's ability to identify and dismantle their fraudulent enterprise. Based upon my knowledge of this case and this particular group of co-conspirators, I believe that the confidential sources utilized to date cannot enable law enforcement to uncover the full scope of the criminal conspiracy. Full participation of the confidential sources in the criminal activity does not at present appear likely, and we can only use the confidential sources to gather information to a limited degree to prevent the Target Interceptees from suspecting that the confidential sources are acting at the behest of the law enforcement agents.

120. Further, the confidential informants have all indicated that they are, at present, not willing to testify regarding the information they have provided. Therefore, even if the informants were able to fully penetrate the group of co-conspirators, any information they collected would need to be

EDNY-ITEN-000000804

confirmed by some other form of evidence that would be admissible in court.

## Undercover Agents

121. Based on the circumstances as I know them, I believe that it would not be feasible for an undercover agent to penetrate the conspiracy in any meaningful way that would in itself achieve the goals of the investigation. In general, it has been my experience in investigating these types of fraud schemes that securities industry professionals are apprehensive and extremely cautious about conducting business with persons other than trusted associates. In my opinion, members of this conspiracy group are cautious and careful about possible law enforcement activity and hence an undercover agent will not penetrate very far into the group. The same reasons that make it unfeasible for an informant to infiltrate the group at this time, make it unreasonable to expect an undercover agent to do so.

122. Moreover, no informant or victim is currently in a position to introduce an undercover agent to the group of co-conspirators. Based on my training and experience, I believe that members of the conspiracy would instead keep the undercover at arm's length for a significant period of time. Furthermore,

EDNY-ITEN-000000805

if it were possible to infiltrate this operation for sufficient time to achieve the objectives stated previously in this affidavit, this would place the undercover agent in the awkward position where he or she would be allowing victims to lose money during the investigation.  The undercover agent would obviously try to prevent victims from losing money and, as a result, the organization could easily determine that the undercover agent was working with law enforcement.  Therefore, penetration of this group by an undercover agent is unlikely.

### Physical Surveillance

123. Although agents have taken steps to identify the co-conspirators, including their home and business addresses, agents have not conducted surveillance on the Target Interceptees because surveillance, in and of itself, even if highly successful, rarely succeeds in gathering comprehensive evidence of the criminal activities under investigation.  It is an investigative technique that is used to confirm meetings and other suspected, criminal activity between alleged participants but often leaves the investigators with insufficient evidence to prove the purpose of the meetings and other activity.

124. When physical surveillance is used in conjunction with court-authorized interception of electronic communications,

EDNY-ITEN-000000806

however, the purpose of meetings takes on a new significance and may constitute admissible, persuasive evidence of criminal activity. Based on my training and experience I do not expect that surveillance will provide detailed evidence regarding the fraudulent operation in question, such as the identity and role of all accomplices, aiders and abettors, co-conspirators and other participants in the operation, unless the surveillance is done in conjunction with the monitoring of electronic communications occurring over the TARGET TELEPHONE.

125. Furthermore, based upon my experience investigating wire fraud, mail fraud and securities fraud cases and my familiarity with this investigation, I believe that the transactions engaged in by the Target Interceptees will occur in a covert manner through the use of computers and telephones, such that physical surveillance of those activities would be extremely difficult or, even if successful, would likely disclose the existence of this investigation to the Target Subjects and their associates. Surveillance can identify participants in meetings between the Target Subjects but is unlikely to disclose any criminal activity.

EDNY-ITEN-000000807

## Search/Arrest Warrants, Grand Jury and/or Witness Interviews

126. Agents have obtained several search warrants for emails, and have received email evidence from victims and state regulatory agencies. However, the evidence from these emails has not been sufficient to accomplish the goals of this investigation. The Subject Interceptees have showed that they are cautious when communicating via email and do not discuss the financial transactions at issue in this investigation. Notably, in one email dated May 3, 2012, from CodeSmart CEO Shapiro to business associates who were discussing plans to gain investors into CodeSmart, Shapiro explicitly states, "We need to put an end to long emails[;] phone conversations are better", thus confirming his reluctance to discuss anything related to financial transactions via email.

127. In addition, as mentioned above in describing the text messages between Bell, Wexler and DiScala, agents obtained a search warrant for text messages for two of the telephones involved in the scheme, namely the Bell Telephone and the Wexler Telephone. However, searches of text messages have not been sufficient to accomplish the goals of this investigation. As a preliminary matter, some telephone service providers do not store any text message. Such is the case with New Cingular

90

Wireless PCS, LLC (an affiliate of AT&T), which is the service provider for the TARGET TELEPHONE. Thus, no text message search warrant would detail all the communications between DiScala and the co-conspirators. Moreover, the service providers that do store text messages do not have a consistent policy on storage and have explained to agents that although there may sometimes be text messages stored from a few days, there is no guarantee that the messages will in fact be stored nor that the message data is complete. Thus, text messages may be missing even if some text messages are stored and available for searching. Given these storage challenges, search warrants for text messages would not allow agents to uncover the entirety of the scheme, identify all the co-conspirators, or provide sufficient evidence to build a strong case against the co-conspirators.

128. Furthermore, the results of both text and email search warrants are not received by agents in a sufficiently timely manner so as to allow agents to conduct a proactive investigation. The text message information is received at best over a week after agents provide a search warrant to service providers, and in the case of email the evidence is often received a month later. Since this fraud involves stock that is traded every day, receiving information over a week (at best)

EDNY-ITEN-000000809

after an event has occurred limits agents' abilities to decipher the actions of the co-conspirators.

129. Beyond the email and text message searches identified above, I believe the use of search warrants, investigative grand juries and interviews of the Target Inteceptees is premature. Moreover, arrest and/or search warrants would not likely result in the identification of all the other members of the conspiracy or the discovery of the full nature and extent of the illegal activities of the Target Subjects and their co-conspirators. Thus, I believe that it would be premature to seek arrest warrants at this time.

130. Based upon your affiant's experience and conversations with Assistant United States Attorneys Walter Norkin, Winston Paes and Shannon Jones, who have experience prosecuting violations of criminal law, your affiant believes that subpoenaing persons believed to be involved in this conspiracy and their associates before a Federal Grand Jury would not be completely successful in achieving the stated goals of this investigation. If any principals of this conspiracy, their co-conspirators and other participants were called to testify before the Grand Jury, they would most likely be uncooperative and invoke their Fifth Amendment privilege not to

EDNY-ITEN-000000810

testify. It would be unwise to seek any kind of immunity for
these persons, because the granting of such immunity might
foreclose prosecution of the most culpable members of this
conspiracy and could not ensure that such immunized witnesses
would provide truthful testimony. Additionally, the service of
Grand Jury subpoenas upon the principals of the conspiracy or
their co-conspirators would only alert them to the existence of
this investigation, causing them to become more cautious in
their activities, to flee to avoid further investigation or
prosecution, to threaten the lives of the informants, or to
otherwise compromise the investigation.

### Trash Searches

131. Given that this fraudulent scheme is effectively
perpetrated through the use of telephones and computers, I do
not believe that searches of the trash of Subject Interceptees
would yield significant evidence of the criminal activity.

132. Furthermore, trash searches are not effective in
fully identifying the participants and scope of a fraud
conspiracy. Although trash searches might reveal a telephone
number of some co-conspirators, or the occasional writing
related to the finances behind a particular transaction, they
will not fulfill the goals of this investigation.

93

## Location Data

133. Although agents have utilized judicial applications to obtain historical location data for the several of the telephones in connection with this investigation, such data has not yet been received despite being requested from service providers over a month ago (which highlights one of the difficulties in utilizing such data to advance the investigation) and in any case will likely be insufficient to fully identify all the participants and the scope of a fraud conspiracy. Such data by itself (without a corresponding wiretap revealing the content of communications) is unlikely to fulfill the goals of this investigation because this fraudulent scheme is effectively perpetrated through the use of telephones and computers.

134. Thus, like physical surveillance, location data will at best aid the investigation in identifying members of the conspiracy and confirming meetings between members but will not disclose any criminal activity occurring at those meetings.

## Pen Registers, Trap and Trace Devices, Toll Analysis and Subscriber Information

135. Court orders have been issued authorizing the installation and use of a pen register and trap and trace device on the TARGET TELEPHONE and several other phones used by members

EDNY-ITEN-000000812

of the conspiracy.  FBI agents will continue to use pen registers, trap and trace devices and toll record analysis during this investigation.  Pen register and toll information provide frequency and identifying information regarding calls made from a particular telephone.  This technique, however, will only provide agents with a list of numbers called and will not establish the identities of all the persons called or the contents of the conversations.

136. A trap and trace device is simply a complement of a pen register device.  It identifies the telephone number of any telephone that has dialed the TARGET TELEPHONE, but it is also subject to the same limitations as a pen register.  For all the reasons stated above, pen register and trap and trace devices and toll analysis are all valuable investigative tools, but will not by themselves achieve the goals and objectives of the government's investigation.

### Mail Cover Requests

137. "Mail covers" are a service provided by the United States Postal Service whereby a list of all the sender and receiver names and addresses on each piece of mail received at a particular location is obtained.  The list is compiled by the mail carrier who delivers the mail to a target location, and

95

then the list is provided to a United States Postal Inspector, who in turn provides the list to FBI special agents.

138. Based on my training, experience and knowledge of this investigation, I do not believe that mail covers will fulfill the goals of the investigation because this fraudulent scheme is perpetrated mainly through the use of telephones and computers.

### Criminal Database Checks

139. Fellow agents, analysts and I have run the names of the targets through various databases. For example, as noted above, we have run all the names of the Target Interceptees through the Drug Enforcement Administration, FBI and Homeland Security Investigations wire surveillance indices. Moreover, those names have been run through other databases, such as NADDIS, CLEAR, UTILITIES, NCIC and DMV. While database checks are useful in that they inform us of past investigations and to some extent the history of the Target Interceptees, to date, database checks, standing alone, are not sufficient to allow the FBI to achieve all of its objectives of the new investigation. Database checks alone cannot be expected to achieve all the goals of the instant investigation, such as identifying the

96

employees, customers, brokers, promoters, and locations where these individuals are currently located.

### Parallel Investigations

140. The SEC is presently conducting an investigation into the DiScala and other co-conspirators to determine whether the co-conspirators have manipulated penny stocks, cheated investors and violated SEC regulations.  We have also learned that the Texas State Securities Board, having received complaints from victims in Texas, is investigating Bell.  Both of those regulatory agencies have provided information to the FBI that has been helpful in furthering this investigation and the FBI has in some instances shared certain information with the regulatory agencies.  For example, these regulatory agencies have tracked down and interviewed some of the victims of the scheme, namely Victims 1 through 4 discussed above.  The SEC has also provided some documentation showing who was buying or selling certificates in penny stocks such CodeSmart, as well as records showing telephone contacts between certain co-conspirators while CodeSmart was actively trading during the summer of 2013.  The SEC has further helped the FBI analyze the financial information in Form 8-K, 10-K and 10-Q filings by CodeSmart and Cubed, and helped agents better understand the

97

nuances of SEC regulations.  However, to date, although such information has been helpful, it has not provided sufficient information to obtain arrest warrants or even additional email search warrants.  This information has been useful in identifying potential targets but it has been insufficient to show any criminal intent by the targets.  Moreover, evidence that the FBI has obtained and been able to share with the SEC regarding Cubed has sometimes caused the SEC to consider using their regulatory authority to simply shut down trading of Cubed. Such an action by the SEC at this time would prevent the FBI from achieving the goals of this investigation and thus, apart from other prohibitions that restrict the sharing of information, there is a limit to how much the FBI and the SEC can help each other on the parallel investigations.  Based on my training, experience and knowledge of this investigation, I do not believe that these parallel investigations by regulatory agencies will fulfill the goals of this investigation.

## CONCLUSION

Request for Permission to Intercept.  Based on the allegations set forth in this affidavit and on the application of Assistant U.S. Attorney Walter Norkin, attached, the affiant requests this Court to issue an order pursuant to the power

EDNY-ITEN-000000816

conferred upon it by Section 2518 of Title 18, United States Code, authorizing the FBI to intercept wire and electronic communications to and from the above-described TARGET TELEPHONE until such intercepted communications reveal the manner in which the Target Subjects, and others as yet unknown, participate in the Target Offenses and reveal the identities of their coconspirators, places of operation, and nature of the conspiracy, or for a period of thirty (30) days measured from the day on which investigative or law enforcement officers first begin to conduct an interception under this order or ten (10) days after this order is entered, whichever is earlier.

Authorization to Intercept. WHEREFORE, IT IS REQUESTED THAT THE COURT ORDER that FBI special agents, FBI analysts, and any such federal and local law enforcement officers participating in the investigation are authorized, pursuant to an application authorized by a duly designated official of the Criminal Division, United States Department of Justice, pursuant to the power delegated to that official by special designation of the Attorney General and vested in the Attorney General by Section 2516 of Title 18, United States Code, to intercept wire and electronic communications to and from the TARGET TELEPHONE.

EDNY-ITEN-000000817

Period of Interception. IT IS REQUESTED FURTHER THAT THE COURT ORDER that such interception shall not terminate automatically after the first interception that reveals the manner in which the Target Subjects, and others as yet unknown, conduct their illegal activities, but may continue until all communications are intercepted which reveal fully the manner in which the Target Subjects, and others as yet unknown, are committing the Target Offenses, and which reveal fully the identities of their confederates, their places of operation, and the nature of the conspiracy involved therein, or for a period of thirty (30) days measured from the day on which investigative or law enforcement officers first begin to conduct an interception under this order or ten (10) days after this order is entered, whichever is earlier.

Portability. IT IS REQUESTED FURTHER THAT THE COURT ORDER the authorization given is intended to apply not only to the TARGET TELEPHONE number listed above, but also to any other telephone number or telephone accessed through the above-referenced IMSI number, and to any other IMSI number accessed through the TARGET TELEPHONE number referenced above, within the thirty day period. The authorization is also intended to apply to the TARGET TELEPHONE number referenced above regardless of

EDNY-ITEN-000000818

service provider. Accordingly, it is requested that the Court's
Order be binding on any subsequent service provider which
provides service to the TARGET TELEPHONE upon service of a
certified copy of the Court's Order, without further Order of
this Court required, including but not limited to: Sprint Nextel
Communications, Nextel Communications, Verizon New York, Inc.,
Verizon New Jersey, Inc., AT&T, AT&T Wireless, New Cingular
Wireless PCS, LLC (an affiliate of AT&T), Verizon Wireless, MCI
Telecommunications Corp., T-Mobile, MCI WorldCom, Cingular
Wireless, and metroPCS (hereafter referred to collectively as
the "Other Relevant Providers"). The United States will advise
the Court of the change of service provider in the periodic
progress reports submitted to this Court.

IT IS REQUESTED FURTHER THAT THE COURT ORDER that in
the event any of the wire and electronic communications are
conducted in a language other than English and/or are in code,
and there is not reasonably available during the interception
period an expert in the foreign language or code, minimization
shall be accomplished as soon as practicable after such
interception.

IT IS REQUESTED FURTHER THAT THE COURT ORDER that the
authorization apply to background conversations intercepted in

101

EDNY-ITEN-000000819

the vicinity of the Target Telephone while the Target Telephone is off the hook or otherwise in use.

Transfer of the TARGET TELEPHONE Outside the Southern District of New York. IT IS REQUESTED FURTHER THAT THE COURT ORDER that, pursuant to 18 U.S.C. § 2518(3), in the event that the TARGET TELEPHONE is transferred outside the territorial jurisdiction of this Court, interceptions may continue within the Southern District of New York where interceptions will first be heard or read and minimized.

Providing Technical and Other Assistance. IT IS REQUESTED FURTHER THAT THE COURT ORDER that, pursuant to Section 2518(4) of Title 18, United States Code, the Service Provider and the Other Relevant Providers shall furnish and continue to furnish FBI with all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services that such providers are according the person whose communications are to be intercepted, and to ensure an effective and secure installation of electronic devices capable of intercepting wire and electronic communications over the above described telephones.

EDNY-ITEN-000000820

Compensation.  IT IS REQUESTED FURTHER THAT THE COURT
ORDER that the Service Provider and the Other Relevant Providers
shall be compensated by the FBI for reasonable expenses incurred
in providing such facilities or assistance.

Disclosure.  IT IS REQUESTED FURTHER THAT THE COURT
ORDER that in order to avoid prejudice to this criminal
investigation, the Service Provider, the Other Relevant
Providers and their agents and employees shall not disclose or
cause a disclosure of this Court's Orders or the request for
information, facilities, and assistance by FBI or the existence
of the investigation to any person other than those of their
agents and employees who require this information to accomplish
the services requested.  In particular, the Service Provider,
the Other Relevant Providers and their agents and employees
shall not make such disclosure to a lessee, telephone
subscriber, or any interceptee or participant in the intercepted
communications.

Subscriber and Toll Record Information.  IT IS FURTHER
REQUESTED THAT THE COURT ORDER that, pursuant to Title 18,
United States Code, Section 2703(c)(1)(B), the Service Provider
and the Other Relevant Providers shall disclose to the applicant
and FBI all published and non-published subscriber information

103

EDNY-ITEN-000000821

and toll records and information relevant to this investigation, that is, all such information pertaining to the telephone numbers associated with telephones, digital display devices, and mobile telephones which send messages to or receive messages from the TARGET TELEPHONE, within 24 hours of said request, including weekends and holidays, there being reason to believe that the contents of the information sought are relevant and material to a legitimate law enforcement inquiry as set forth more fully above.

Pen, Register Cell Site and E911 Information.  IT IS FURTHER REQUESTED THAT THE COURT ORDER that New Cingular Wireless PCS, LLC, an affiliate of AT&T, and the Other Relevant Providers shall enter the TARGET TELEPHONE number into a pen register, pursuant to Title 18, United States Code, Sections 3122 and 3123.

IT IS FURTHER REQUESTED, pursuant to Federal Rule of Criminal Procedure 41 and Title 18, United States Code, Section 2703(d), that the Court issue an Order directing New Cingular Wireless PCS, LLC (an affiliate of AT&T) and the Other Relevant Service Providers to supply originating and terminating cell site information to assist agents of FBI by providing all information, facilities and technical assistance needed to

EDNY-ITEN-000000822

ascertain the physical location of the TARGET TELEPHONE,
including but not limited to data indicating the specific
latitude and longitude (or other precise location information
including E911 concerning) of the TARGET TELEPHONE (the
"Requested Location Information"), for a period of thirty (30)
days measured from the day on which investigative or law
enforcement officers first begin to conduct an interception
under this order or ten (10) days after this order is entered,
whichever is earlier.

As explained in more detail in the Affidavit, there is
probable cause to believe that the location of the TARGET
TELEPHONE at times determined by investigators will constitute
or lead to evidence of the Target Offenses.

In light of the above, the government requests that
this Court direct New Cingular Wireless PCS, LLC (an affiliate
of AT&T) or the other Relevant Providers to disclose the
Requested Location Information concerning the TARGET TELEPHONE,
and to initiate a signal to determine the location of the TARGET
TELEPHONE on the service provider's network or with such other
reference points as may be reasonably available and at such
intervals and times as directed by the law enforcement agent
serving the proposed order, and to furnish the technical

EDNY-ITEN-000000823

assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the user(s) of the TARGET TELEPHONE, at any time of day or night, owing to the potential need to locate the TARGET TELEPHONE outside of daytime hours.

IT IS FURTHER REQUESTED that, pursuant to 18 U.S.C. Section 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize delayed notice of the acquisition of the Requested Location Information for this application until such time as the inventory required under 18 U.S.C. Section 2518(8)(d) is served.

Notification of Change. IT IS REQUESTED FURTHER THAT THE COURT ORDER that the Service Provider and the Other Relevant Providers shall notify the applicant immediately if and when the IMEI or telephone number for the TARGET TELEPHONE changes or is supplied to another service provider.

Minimization and Period of Authorization. IT IS REQUESTED FURTHER THAT THE COURT ORDER that its Orders shall be executed as soon as practicable after they are signed and that all monitoring of wire and electronic communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those

EDNY-ITEN-000000824

communications relevant to the pending investigation, in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code. All individuals conducting the interception will be instructed concerning the steps they must take to avoid infringing upon any attorney-client privilege or other recognized privilege. The interception of wire and electronic communications authorized by this Order must terminate upon attainment of the authorized objectives or, in any event, at the end of thirty (30) days measured from the day on which investigative or law enforcement officers first begin to conduct an interception under this order or ten (10) days after this order is entered, whichever is earlier.

Monitoring of communications will immediately terminate when it is determined that the communication is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code. Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If the

EDNY-ITEN-000000825

conversation is minimized, the monitoring agent shall spot check to insure that the conversation has not turned to criminal matters.  Special attention shall be given to minimize all privileged conversations.  However, should an intercepted conversation be in a code or a foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception pursuant to Title 18, United States Code, Section 2518(5).

Each text message will be reviewed over a secure system, and based on the identities of the sender and recipient and the content of the message, monitoring personnel will determine as soon as practicable after interception whether the text message appears to be relevant to the investigation or otherwise criminal in nature.  If the message is not criminal in nature, the message will be marked "minimized" and not accessed by other members of the investigative team.  If the message appears to be privileged, it will be marked "privileged" and secured from access by other members of the investigative team. If a text message appears to be relevant to the investigation or otherwise criminal in nature, it will be marked "non-minimized" and may be shared with the other agents and monitors involved in

EDNY-ITEN-000000826

the investigation.  If a text message is marked "minimized" or "privileged," it will not be disseminated to members of the investigative team.  All intercepted text messages will be sealed with the court upon the expiration of the court's order authorizing the interception.  It is anticipated that the monitoring location will not be staffed at all times, but will be staffed at regular hours, at which time intercepted communications will be monitored and read (including those intercepted at hours when the location was not staffed).  However, even when unmanned, the monitoring location will be kept secured with access limited to only authorized monitoring personnel and their supervising agents.

       Progress Reports.  IT IS REQUESTED FURTHER THAT THE COURT ORDER that an Assistant U.S. Attorney familiar with the facts of the case shall provide the Court with a report on or about the tenth and twentieth days following the commencement of interception under this order or ten (10) days after this Order is entered, whichever is earlier, showing what progress has been made toward achievement of the authorized objectives and the need for continued interception.  If any of the aforementioned reports should become due on a weekend or holiday, it is

EDNY-ITEN-000000827

requested further that such report become due on the next business day thereafter.

Service of Inventory/Return.  IT IS REQUESTED FURTHER THAT THE COURT ORDER that no inventory or return of the results of the foregoing surveillance and interception is required to be made, other than the above-required reports, before 90 days from the date of the expiration of the Court's Order, or any extension of the Court's order.  It is requested further that, upon an ex parte showing of good cause to a judge of competent jurisdiction, the service of the above inventory or return may be postponed for a further reasonable period of time.

Sealing.  IT IS REQUESTED FURTHER THAT THE COURT ORDER that the application, affidavit, Orders, and all interim reports filed with the Court with regard to this matter be sealed until further order of this Court, except that copies of the Orders, in full or redacted form, may be served on the FBI, the Service

EDNY-ITEN-000000828

Provider and the Other Relevant Providers as necessary to
effectuate the Court's Orders.

_____
Michael C. Braconi
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me,
this ___ day of May, 2014,

_____
THE HONORABLE P. KEVIN CASTEL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

111

EDNY-ITEN-000000829