SC:WMN
F.#2013R01203

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :     FIRST EXTENSION
IN THE MATTER OF AN APPLICATION OF      :     AFFIDAVIT
THE UNITED STATES OF AMERICA FOR AN     :
ORDER AUTHORIZING THE INTERCEPTION OF   :
WIRE AND ELECTRONIC COMMUNICATIONS      :
OVER A MOBILE TELEPHONE ASSIGNED NUMBER :
914-255-7892, WITH IMSI NUMBER          :
310410688816809, SUBSCRIBED TO          :
ABRAXAS J. DISCALA, 30 EAST 21ST        :
STREET, APARTMENT 7B, NEW YORK,         :
NEW YORK 10010                          :
                                        :
----------------------------------------X
SOUTHERN DISTRICT OF NEW YORK, SS:

        I, MICHAEL C. BRACONI, Special Agent with the Federal

Bureau of Investigation ("FBI"), being duly sworn, depose and

state that:

        1.    I am a Special Agent with the FBI.  I have been

employed by the FBI for approximately four years.  I am

responsible for conducting and assisting in investigations into

the activities of individuals and criminal groups responsible

for securities fraud, wire fraud and other white collar crimes.

        2.    I am an investigative or law enforcement officer

within the meaning of Title 18, United States Code, Section

2510(7), that is, an officer of the United States who is

empowered by law to conduct investigations and to make arrests

1

EDNY-ITEN-000000830

for offenses enumerated in Title 18, United States Code, Section 2516.

3.    During my tenure with the FBI, I have participated in numerous white collar fraud investigations and have participated in all aspects of investigations, including conducting surveillance, executing search warrants, debriefing defendants and informants, interviewing witnesses, reviewing and analyzing recorded conversations, and analyzing telephone toll information.  During the course of these investigations, I have served as the lead investigator in the investigation and prosecution of persons involved in wire fraud, mail fraud and securities fraud.  I am aware that white collar criminals commonly use electronic means of communication in furtherance of their criminal activities, including but not limited to telephones and electronic mail.  As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

## PURPOSE OF AFFIDAVIT

4.    This Affidavit is being submitted in support of an application for an order authorizing the continued

EDNY-ITEN-000000831

interception of wire and electronic communications as they are sent to or received by cellular telephone number 914-255-7892, with IMSI number 310410688816809, subscribed to Abraxas J. DiScala, 30 East 21st Street, Apartment 7B, New York, New York 10010 (hereinafter "TARGET TELEPHONE" or "SUBJECT TELEPHONE").[1]

5.    The authorization requested is intended to apply not only to the TARGET TELEPHONE number listed above, but also to any other telephone number or telephone accessed through the above-referenced IMSI number, and to any other IMSI number accessed through the TARGET TELEPHONE number referenced above, within the thirty day period.  The authorization is also intended to apply to the TARGET TELEPHONE number referenced above regardless of service provider.

6.    I have personally participated in the investigation of the offenses discussed below.  I am familiar with the facts and circumstances of this investigation from: (a) my personal participation in this investigation, (b) reports made to me by other law enforcement and regulatory authorities, (c) information obtained from confidential sources of information, (d) interviews with witnesses and victims, and (e)

---

1  On or about May 1, 2014, the Honorable P. Kevin Castel of the United States District Court for the Southern District of New York authorized the interception of the TARGET TELEPHONE.

EDNY-ITEN-000000832

review of certain emails, and other records and reports.[2]  On the basis of this familiarity, and on the basis of other information that I have reviewed and determined to be reliable, I allege the facts to show that:

a.    there is probable cause to believe that Abraxas DiScala, Marleen Goepel, Matthew Bell, Max Khan, Ira Shapiro, Marc Wexler, Craig Josephberg, Jeffrey Auerbach, William Coons, Joseph White, Stephen White, Douglas Shinsato, Kyleen Cane, Michael Wehrs, Victor Azrak, Ruben Azrak, Andrew Prichard, John Turino, David Skriloff, FNU LNU 1, FNU LNU 2 (hereinafter collectively referred to as "Target Subjects") and others as yet unknown have committed and continue to commit the crimes of (a) wire fraud, (b) mail fraud, (c) securities fraud, (d) narcotics violations, (e) conspiring to commit these offenses, and (f) aiding and abetting these offenses, all in violation of Title 18, United States Code, Sections 1341, 1343, 1348, 1349, and 2, and Title 21, United States Code, Sections 841, 843 and 846, as well as Title 15, United States Code, Sections 78j(b) and 78ff (hereinafter collectively referred to

---

[2]  Any conversations and email communications described below have been described in substance and in part.

4

as "Target Offenses").[3]

       b.  the particular wire and electronic communications of the Target Subjects and others yet unknown (hereinafter the "Target Interceptees") concerning these offenses will be obtained through the interception of the TARGET TELEPHONE;

       c.  evidence of the Target Offenses, including (1) the nature, extent and methods of operation of the fraud scheme of the Target Interceptees; (2) the nature, extent and methods of operation of the narcotics offenses of the Target Interceptees; (3) the identities and roles of accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities; (4) the transfer of the money involved in those activities; (5) the existence and location of records; (6) the existence, location, and source of resources used to finance their illegal activities; (7) the existence, location, and disposition of the proceeds from those activities; (8) the existence and locations of sources for and storage of the unlawfully obtained prescription drugs; and (9) the existence

---

[3]  Aiding and abetting an offense against the United States, in violation of 18 U.S.C. § 2, and securities fraud, in violation of 18 U.S.C. § 1348 and 15 U.S.C. § 78, are not predicate offenses upon which the interception of wire communication can be authorized under 18 U.S.C. § 2516.

EDNY-ITEN-000000834

and locations of items used in furtherance of those activities, will be obtained through the interception of electronic communication occurring over the TARGET TELEPHONE, which has been and is being used by Target Interceptee Abraxas J. DiScala in the commission of those offenses. The requested orders are sought for a period of time until the interceptions fully reveal the manner in which the above-described offenses are being committed, or for a period of 30 days, whichever occurs first, pursuant to Title 18, United States Code, Section 2518.

7. It is anticipated that during the requested wire and electronic surveillance, all monitoring will be performed or supervised by Special Agents of the FBI or other law enforcement officers assigned to this investigation, or employees or individuals operating under a contract with the government, all of whom will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interceptions. It is requested that, if necessary, certain other individuals be authorized to assist in conducting this wire and electronic surveillance and to receive disclosure of intercepted communications.

## BASIS OF KNOWLEDGE

8. I personally participated in the investigation of

EDNY-ITEN-000000835

the offenses referred to in paragraph 6 above, and from my personal participation in this investigation and from reports made to me by other Special Agents, investigators with the Securities and Exchange Commission ("SEC") and other regulatory entities, and confidential informants, I am familiar with the facts and circumstances of this investigation.  Except where otherwise noted, the information set forth in this Affidavit has been provided to me by other Special Agents, investigators with the SEC and other regulatory entities, or confidential informants.  Because this Affidavit is being submitted for the limited purpose of seeking authorization for the interception of wire and electronic communications, I have not set forth each and every fact learned during the course of this investigation, but simply those facts which I believe are necessary to establish probable cause to conduct the requested wire and electronic surveillance.  Based upon this knowledge, I allege the facts contained in the paragraphs below to support the following statements.

### SUBJECTS AND OFFENSES

9.    There is probable cause to believe that the Target Interceptees and others yet unknown, have committed, are committing and will continue to commit the following offenses:

7

EDNY-ITEN-000000836

(a) wire fraud, (b) mail fraud, (c) securities fraud, (d) narcotics violations, (e) conspiring to commit these offenses, and (f) aiding and abetting these offenses, all in violation of Title 18, United States Code, Sections 1341, 1343, 1348, 1349, and 2, and Title 21, United States Code, Sections 841, 843 and 846, as well as Title 15, United States Code, Sections 78j(b) and 78ff.

## THE TARGET TELEPHONE

10.   There is probable cause to believe that the Target Interceptees and others whose identities are presently unknown will be communicating during the period of interception over the TARGET TELEPHONE in furtherance of, in connection with, to facilitate, to accomplish and to commit the offenses described in paragraph 6 above.

## OBJECTIVES

11.   There is probable cause to believe that the interception of wire and electronic communications, the authorization for which is sought herein, will reveal: (2) the nature, extent and methods of operation of the narcotics offenses of the Target Interceptees; (3) the identities and roles of accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities; (4) the transfer of

8

EDNY-ITEN-000000837

the money involved in those activities; (5) the existence and location of records; (6) the existence, location, and source of resources used to finance their illegal activities; (7) the existence, location, and disposition of the proceeds from those activities; (8) the existence and locations of sources for and storage of the unlawfully obtained prescription drugs; and (9) the existence and locations of items used in furtherance of those activities.  In addition, these wire and electronic communications are expected to constitute admissible evidence of the commission of the above-described offenses.

## PRIOR APPLICATIONS

12.  On May 27, 28, and 29, 2014, the electronic surveillance indices of the FBI, U.S. Immigration and Customs Enforcement Homeland Security Investigations, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and the Drug Enforcement Administration were checked.  No prior applications for wire, electronic and oral interception relating to the TARGET TELEPHONE or Target Subjects were found, except that:

i.    On or about May 1, 2014, the Honorable P. Kevin Castel of the United States District Court for the Southern District of New York authorized the interception of the TARGET TELEPHONE.  Interception under this order occurred from

9

EDNY-ITEN-000000838

May 2, 2014 and continues to the present.  Interception is expected to cease on June 1, 2014.  The following individuals were listed as subjects in the application to intercept: Abraxas DiScala, Marleen Goepel, Matthew Bell, Max Khan, Ira Shapiro, Marc Wexler, Craig Josephberg, Jeffrey Auerbach, William Coons, Joseph White, Stephen White and Douglas Shinsato.

       ii.    On or about February 13, 2009, July 13, 2009, and September 18, 2009, different judges in the Southern District of Florida authorized the interception of four telephones (one in February, two in July and one in September) as part of one investigation by the FBI that listed John Turino as a target interceptee.  Turino was not the user of any of the subject telephones.  The latest wiretap ceased interception on or about October 17, 2009.  Turino was not arrested as part of that investigation.

       13.  Although no prior applications for wire, electronic and oral interception relating to the TARGET TELEPHONE or Target Subjects were found other than the above-referenced interceptions, agents believe that Target Interceptee Abraxas J. DiScala, while not listed as a Target Subject in any application or order, was in fact intercepted approximately three times over a wiretap of telephone number 917-579-7722,

EDNY-ITEN-000000839

which interception was first authorized on October 23, 2012, by the Hon. Colleen McMahon, United States District Judge for the Southern District of New York. Interception for that telephone was re-authorized several times and ended on March 16, 2013.

## FACTS ESTABLISHING PROBABLE CAUSE

I.   Introduction and Background of the Investigation

14.   On or about May 1, 2014, the government filed the Affidavit of Michael Braconi (the "First Braconi Affidavit"), attached hereto as Exhibit 1 and incorporated herein by reference, in support of its application for an order authorizing the interception of wire and electronic communication over the TARGET TELEPHONE. As explained more fully in the First Braconi Affidavit, the FBI is currently investigating potential wire, mail and securities fraud through, among other things, the unlawful manipulation of publicly-traded stock by (1) false and misleading statements to the public and (2) fraudulent sales of shares to the public. The scheme is being perpetrated by a group of financial professionals -- namely, securities brokers, traders and promoters -- acting in concert with officers, directors, employees and shareholders of the companies whose publicly-traded stock is being manipulated (collectively, the "Co-conspirators"). Among the identified Co-

EDNY-ITEN-000000840

conspirators are:

      i.  Abraxas J. DiScala -- a securities trader and dealer in New York, New York, and the Chief Executive Officer ("CEO") of Omniview Capital Advisors ("Omniview") and The Broadsmoore Group.  He is the registered user of the TARGET TELEPHONE.

      ii.  Marleen Goepel -- an employee of Omniview who works or worked under DiScala.

      iii.  Ira Shapiro -- the CEO of CodeSmart Group and its affiliated companies (hereinafter collectively "CodeSmart"), a small publicly-traded company that offers online training courses on medical codes used by doctors and insurance companies.

      iv.  Marc Wexler -- the president and managing director of Omniview.

      v.  Matthew Bell -- a stock broker and investment advisor based in Texas.

      vi.  Max Khan -- a managing director of Omniview and president of Alliance Global Finance, Inc.

      vii.  Stephen White, Joseph White and Douglas Shinsato -- officers of Cubed, Inc. (hereinafter "Cubed"), a small technology company that recently became a publicly-traded

12

EDNY-ITEN-000000841

corporation.

        viii.  Jeffrey Auerbach -- a securities trader formerly employed by Kuhns Brothers National Securities in New York City.

        ix.  William Coons -- a securities trader employed by Hallmark Investment Inc. in New York City.

        x.  Craig Josephberg -- a securities trader and registered broker currently employed by Meyers Associates LP in New York City.

        xi.  Victor Azrak -- the vice-president of Excel Corp. and a broker at Omniview.

        xii.  Andrew Prichard -- appears to be an investor in DiScala's deals.

        xiii.  John Turino -- appears to be an advisor to Cubed and its officers.

        xiv.  Kyleen Cane -- a lawyer based in Las Vegas, Nevada who has business dealings with DiScala, as discussed in more detail below.[4]

---

4  To date, while it appears that DiScala has paid Cane money and Cane has set up an escrow account and is preparing legal documents related to DiScala's and others investment in a company called Scanbuy, it is unclear who Cane represents in a legal capacity.  After Cane was identified as a lawyer, agents initially minimized all calls between Cane and DiScala on the grounds that they might be covered by the attorney-client

EDNY-ITEN-000000842

xv.   David Skriloff -- appears to be a Portfolio

Manager at MKM Capital Advisors in New York City.

xvi. Michael Wehrs -- the CEO of Scanbuy, a

company that purportedly markets a product called ScanLife,

which is used by brands, agencies, and retailers to manage

customer engagement, increase sales, extend advertising and

marketing campaigns, and develop greater loyalty among

consumers.

See First Braconi Affidavit ¶¶ 17-27, 29, 62, 95-114 (discussing

privilege.  However, after intercepted communications between
DiScala and other co-conspirators indicated that Cane was
involved in DiScala's fraudulent efforts to manipulate the price
of securities, see calls discussed below, agents began
intercepting pertinent conversations between Cane and DiScala on
or about May 21, 2014, with the approval of the Honorable Sidney
H. Stein, United States District Judge for the Southern District
of New York, who was briefed on the matter by letter dated May
23, 2014.   The intercepted conversations show that Cane is
involved in the effort to manipulate the share price of Cubed.
See id.  To the extent that it appears that DiScala and Cane are
discussing privileged matters that do not involve Cane assisting
in the stock manipulation scheme, agents have been minimizing
and will continue to minimize those portions of the
conversations.  However, to the extent any privileged
communications may be intercepted, agents in consultation with
Assistant U.S. Attorneys believe the crime-fraud exception to
the attorney-client privilege applies.  Therefore, as there is
probable cause to believe that Cane is involved in unlawful
activities, including violations of 18, United States Code,
Sections 1341, 1343, 1348, 1349, and 2, as well as Title 15,
United States Code, Sections 78j(b) and 78ff, we request
permission to continue intercepting wire and electronic
communications between DiScala and Cane over the SUBJECT
TELEPHONE.

EDNY-ITEN-000000843

DiScala, Goepel, Shapiro, Wexler, Bell, Khan, J. White, S. White, Shinsato, Auerbach, Coons and Josephberg; Azrak, Cane, Prichard, Turino, Skriloff and Wehrs were not discussed in the First Braconi Affidavit because they were not identified as co-conspirators at the time).

15.   This fraudulent scheme came to the attention of the FBI when agents noticed unusual share price fluctuations in shares of CodeSmart.  However, as agents learned, CodeSmart shares are not the only securities that have been manipulated and agents believe that the Co-conspirators are currently manipulating other stocks, including the shares of Cubed, trading under the symbol CRPT.  See First Braconi Affidavit ¶¶ 59-89.  Based on my training, experience and knowledge of this investigation, as discussed in more detail below, I believe that the Co-conspirators are using, among other things, text message communications and calls via cellular telephones to accomplish this unlawful activity.

16.   Based on my training and experience, I know that, typically, in a fraudulent securities scheme involving the issuance of false corporate information to the public, insiders or those with significant holdings of that company's shares, who disseminated the false information initially, usually sell their

EDNY-ITEN-000000844

shares of the company after the company's share price has peaked (often as a result of the false corporate information). Typically, in such fraudulent schemes, the sale of shares by those insiders causes the market to be saturated with a supply of stock, which ultimately leads to a rapid decline in the share price. Such a precipitous decline occurred with CodeSmart shares twice. Notably, after building up for a month to a dramatic peak on July 12, 2013, the share price dropped by 68 percent by August 21, 2013. The price then spiked again just two weeks later, on August 30, 2013, and quickly dropped more than 50 percent by September 20, 2013. See First Braconi Affidavit ¶¶ 28-37. This level of volatility, based on my training and experience, is a possible sign of securities fraud and, in turn, of wire fraud and the unlawful monetary transactions that typically accompany securities fraud, as wire communications and money transfers are usually necessary to accomplish and reap the benefits of securities fraud.

17. Based on my training, experience and knowledge of this investigation, I know that company insiders who engage in share price manipulation and make false statements to the public often enlist the aid of promoters and stock brokers to achieve the goals of their unlawful scheme. Promoters disseminate and

16

EDNY-ITEN-000000845

promote the false statements and upbeat predictions about a company so as to induce unwitting members of the public to purchase the company's shares. Stock brokers advocate the purchase of the company's stocks to their clients, often misleading their clients in order to secure their acquiescence in the purchase. The voluminous trading that results from the promoters' and stock brokers' efforts makes the securities appear both highly desirable and highly liquid (a term meaning that an asset is easy to buy or sell), which in turn causes even more members of the public to purchase the stock. In this way, insiders and their co-conspirator promoters and brokers cause spikes in the company's share price. Based on my training, experience and knowledge of this investigation, I know that the promoters and stock brokers who aid in this scheme are typically compensated with free-trading shares of company stock. Those promoters and brokers then usually sell the shares when the share price peaks. Based on my training, experience and knowledge of this investigation, I believe this happened in the case of CodeSmart. See First Braconi Affidavit ¶¶ 32-37 (discussing CodeSmart's false statements), 38-58, 95-114 (discussing losses to victims and sales of stock by promoters, brokers and other insiders).

17

EDNY-ITEN-000000846

18.  As discussed more fully in the First Braconi Affidavit, agents learned how DiScala operated the scheme. Specifically, DiScala seeks out small companies that he can turn into publicly-traded corporations.  In exchange for turning a company into a publicly-traded corporation (often referred to as "taking the company public"), DiScala receives compensation in the form of free-trading shares of stock of the newly public corporation.  DiScala requires the compensation to equal a large percentage of the ownership of the new corporation.[5]  DiScala and his co-conspirators (who DiScala enlists in the scheme by giving them some of the free-trading shares he has acquired) then inflate the share price of the company so that they can sell the shares for a large profit.  DiScala utilizes a network of brokers, who either convince their clients to buy shares at the inflated price or buy those shares for clients who have authorized the broker to trade stocks on the clients' behalf.

---

[5]  Based on my training, experience and knowledge of this investigation, I believe that most owners would be loath to give up a large percentage of their company.  Thus, I believe that owners that agree to this arrangement are co-conspirators in the scheme because they do not value the company highly and seek to profit by selling shares of their remaining percentage ownership at the expected inflated share price.  As a correlation, based on my training, experience and knowledge of this investigation, I do not believe that owners who are willing to part with a large percentage of their company are in need of the type of financing that would be generated through a public offering of stock.

EDNY-ITEN-000000847

See First Braconi Affidavit ¶¶ 18-22, 59-74. This information was corroborated by the conversations intercepted over the wiretap of the TARGET TELEPHONE, as discussed below.

19.    As noted above, agents believe that the Co-conspirators are presently attempting to manipulate the share price of Cubed. However, as discussed more fully below, the conversations intercepted over the prior 30 days indicate that the Co-conspirators are also attempting to manipulate the share price of companies in addition to Cubed. Furthermore, the intercepted conversations reveal that some of the Co-conspirators are engaged in a narcotics distribution conspiracy, including reimbursing Co-conspirators with prescription pills in the event they lose money on a stock purchase.

II.    Pertinent Calls and Text Messages

20.    On May 2, 2014 at approximately 5:26 p.m., Victor Azrak called DiScala, who was using the SUBJECT TELEPHONE. During the conversation, Azrak stated, among other things, "Jobo is so bad he can even make the Cube go down[,]" adding "you know what bothered me, he ruined our streak." DiScala responded, "No, I'm fine with it, it was a penny, remember I had a penny down in ITEN[.]" Azrak then inquired, "You did?" DiScala responded, "One yeah, one penny." Based on my training,

19

EDNY-ITEN-000000848

experience and knowledge of this investigation, I believe that "Jobo" is a reference to co-conspirator Craig Josephberg and that "ITEN" is a reference to CodeSmart, a company with the ticker symbol ITEN and whose shares the co-conspirators had previously manipulated. Based on my training, experience and knowledge of this investigation, I further believe that, in this conversation, Azrak complained that Josephberg was not properly coordinating with the rest of the co-conspirators ("Jobo is so bad") and thus caused the share price of Cubed to drop when they were trying to inflate it ("he can even make the Cube go down" and "he ruined our streak"). Based on my training, experience and knowledge of this investigation, I believed that DiScala tried to assure Azrak that Josephberg's error was not grave ("No, I'm fine with it"), causing only a small drop in the price ("it was a penny") and that DiScala had experienced similar errors with CodeSmart and yet CodeSmart still worked out well ("remember I had a penny down in ITEN" and "One yeah, one penny"). These beliefs are corroborated by the fact that, while Cubed shares climbed between April 21, 2014 until May 1, 2014 from a price of $5 per share to $5.30 per share, on May 2, 2014 the price per share dropped by one cent to $5.29.

21.    On May 5, 2014, DiScala, using the SUBJECT

EDNY-ITEN-000000849

TELEPHONE, engaged in a text message conversation with an unknown male ("FNU LNU 1"), who was using a telephone with number (516) 698-6887. In that conversation, at approximately 1:48 p.m., FNU LNU 1 wrote, "Rumor has it you hooked Reds with some yellows…wtf…I thought I was your boy…is this an Italian thing?" DiScala responded, among other things, "I got you yell as   buy a Lil crpt and lots of yellows. Lol. I'll bring Wednesday[.]" Later in the conversation, FNU LNU 1 asked, "where can you buy this thing?" and "And how much is there for sale?" DiScala responded, "800. Atdf. I think anywhere" and later clarified "800 shares." FNU LNU 1 then replied, "I bought 1000 at 5.30," later adding "I'll go in for more[.]" DiScala concluded, "Your awesome. Ty" and "Your great." Based on my training, experience and knowledge of this investigation, I believe that "yellows" is a reference to prescription pills and that "crpt" is a reference to Cubed shares, which trade under the ticker symbol CRPT. Based on my training, experience and knowledge of this investigation, I further believe that in this conversation, FNU LNU 1 asked DiScala why he had provided prescription pills to someone other than FNU LNU 1 ("you hooked Reds with some yellows…wtf…I thought I was your boy…is this an Italian thing?") and that DiScala responded that he would

EDNY-ITEN-000000850

provide FNU LNU 1 with prescription pills on Wednesday, May 7 ("I got you yell as [yellows]" and "I'll bring Wednesday") and implored FNU LNU 1 to buy Cubed shares ("buy a Lil crpt"). Based on my training, experience and knowledge of this investigation, I also believe that FNU LNU 1 confirmed that he bought 1000 shares of Cubed for $5.30 per share ("I bought 1000 at 5.30") and that he planned to buy more ("I'll go in for more"), for which DiScala thanked FNU LNU 1 ("Ty [thank you]") and complimented FNU LNU 1 ("You['] r[e] awesome" and "You['] r[e] great"). Based on my training, experience and knowledge of this investigation, I believe that, these communications evidence DiScala's and his co-conspirators' attempt to manipulate the share price of Cubed stock as well as engaging in narcotics violations involving prescription pills.

22. That same day at approximately 2:14 p.m., DiScala, using the SUBJECT TELEPHONE, again engaged in a text message conversation with the same unknown male, FNU LNU 1. DiScala stated, "Go 529 bid. If u get hit I'll get you 10 more yellows[,]" a few minutes later adding "I'm going 528. How many you want for reelz. I got tons[.]" FNU LNU 1 responded, "As many as you want to give up. I'll give you loot." DiScala then wrote, "Not worried. I'll bring 30[.]" FNU LNU 1 replied,

22

EDNY-ITEN-000000851

"Xoxo[.]" Based on my training, experience and knowledge of this investigation, I believe that in this conversation, DiScala told FNU LNU 1 to by Cubed shares at a price of $5.29 per share ("Go 529 bid") and promised FNU LNU 1 that if FNU LNU 1 lost money, DiScala would reimburse FNU LNU 1 for the loss with 10 prescription pills ("If u get hit I'll get you 10 more yellows"). Based on my training, experience and knowledge of this investigation, I further believe that DiScala then asked FNU LNU 1 how many pills FNU LNU 1 wanted ("How many you want for reelz"), to which FNU LNU 1 responded that he would take as many as DiScala had available ("As many as you want to give up") and promised to pay cash for the pills ("I'll give you loot"). DiScala then replied that he was not worried about FNU LNU 1 paying for the pills ("Not worried") and that DiScala would provide FNU LNU 1 with 30 pills ("I'll bring 30"). Based on my training, experience and knowledge of this investigation, I believe that, these communications evidence DiScala's and his co-conspirators' attempt to manipulate the share price of Cubed stock as well as engaging in narcotics violations involving prescription pills.

23. On May 6, 2014, starting at approximately 9:52 am, DiScala, using the SUBJECT TELEPHONE, contacted a number of

EDNY-ITEN-000000852

individuals through text message. First, DiScala contacted Matthew Bell, texing, "Let's get a Lil buys in crpt[.]" Several minutes later, DiScala contacted a telephone registered to Victor Azrak, writing, "Buy 500 crept please. Jobo messed up. ASAP[.]" At approximately, 10:40 a.m., DiScala sent text messages to a telephone registered to Craig Josephberg, writing "MOVE UP. PLEASE" and "Go 531. Please[.]" In these text messages, based on my training, experience and knowledge of this investigation, I believe that DiScala contacted three individuals to coordinate their buying Cubed shares ("Let's get a Lil buys in crpt" and "Buy 500 crept please") and to fraudulently inflate the share price of the stock ("MOVE UP" and "Go 531"). Based on my training, experience and knowledge of this investigation, I further believe that, among other things, these communications evidence DiScala's and his co-conspirators' attempt to manipulate the share price of Cubed stock.

24. Later that day, at approximately 3:16 p.m., DiScala, using the SUBJECT TELEPHONE, called a telephone registered to John Turino. In that conversation, DiScala stated, among other things, "By the way this is what I also told them, well if the company succeeds, you know what I told them, JT would be proud, you not betting on the company boys, you're

24

EDNY-ITEN-000000853

betting on me.  Because we'll be out of these before the fucking company will even see if the Cube works, ok?"  Based on my training, experience and knowledge of this investigation, I believe that in this conversation, DiScala was relating to Turino what DiScala told the co-conspirators who had contributed money to DiScala's scheme ("this is what I also told them").  Based on my training, experience and knowledge of this investigation, I further believe that DiScala explained to the co-conspirators that they were not investing in Cubed but rather in DiScala's ability to manipulate the share price of Cubed stock ("you not betting on the company boys, you're betting on me") because DiScala and the co-conspirators would sell their stock at an inflated price before Cubed had a functioning product to market ("Because we'll be out of these before the fucking company will even see if the Cube works").

25.  Later that same day, at approximately 6:09 p.m., DiScala, using the SUBJECT TELEPHONE, called a telephone registered to Paul Lane.  In that conversation, DiScala stated, among other things, "CRPT, the Cube up."  Lane responded, "Really?" and "Wow, what's it at?  6?"  DiScala replied, among other things, "it's 5 thirty something.  But it will be, it's gonna, there's some news coming[,]" adding "I have a funny

EDNY-ITEN-000000854

feeling it's going to be double digits very soon." Based on my training, experience and knowledge of this investigation, I believe that in this conversation, DiScala bragged that Cubed shares were increasing in price ("CRPT, the Cube up") and that he was aware of news that would come out later that would further increase the price ("there's some news coming"), soon reach over $10 per share ("double digits very soon"). Based on my training, experience and knowledge of this investigation, I further believe that, among other things, these communications evidence DiScala's and his co-conspirators' manipulation of the share price of Cubed stock.[6]

    26.  On May 13, 2014, DiScala, using the SUBJECT TELEPHONE, received a call at approximately 2:29 p.m. from Andrew Prichard, who was using a telephone with number 215-983-6348. During this call, Prichard said, "I just looked at Starstream, holy shit, nice work man." DiScala replied, "It's going to 2 bucks, it'll be 2 bucks soon. I gotta let it rest,

---

6  Lane is not listed above as one of the Co-conspirators or Target Interceptee for this wiretap application because the investigation to date has not yielded sufficient evidence to conclude that Lane is in fact a knowing participant of the conspiracy scheme.  This conversation evidences criminal activity by DiScala as he reveals inside information about Cubed and the expected share price that will be achieved but it is not clear that Lane is knowingly involved in helping to achieve such market manipulation as opposed to simply being the recipient of DiScala's boasts.

EDNY-ITEN-000000855

cause the shorts will come after me if I go too fast too far."
A few moments later, Prichard said, "I just read your email, you
needed stuff by 1 o'clock." DiScala reassured him, "No, it's no
big deal if it gets out today . . . but it's Vegas and I don't
want them to have a problem . . . I want the people that are in,
this is very special stuff, right because it's all escrow and
it's you know, minimum a 10 timer." Prichard said, "My only
issue is that I'm a little tight on cash flow right now, when,
what's the turn around time . . . September or later than that
or . . . ." DiScala replied, "No, it'll be October when we get
started, but you're going to be starting the cash flow big time
come June first on CRPT, that's the first distribution."
Prichard asked, "June first, we'll start getting a distribution
for that?" DiScala answered, "Correct. Whatever you are
comfortable doing . . . I just want you to be a part of this so
I can then validate giving you extras. You understand. This is
the group that gets all the candy." Prichard responded, "Yeah,
let me see, I'm sure I can come up with $50,000, let me see if I
can come up with 75 or 100." DiScala told him, "By the way, 50
is fine. 50 enables me to give you candy." Prichard said,
"Right, gotcha, gotcha. I gotta sweet tooth, I need some candy
too." DiScala said, "The 75 to 100 doesn't even matter, you're

EDNY-ITEN-000000856

going to get the same amount of candy. You're gonna get well taken care of here because you were there last time. That's how I do business. . . . So just fire away 50 at Kyleen and make sure you put it for Scanbuy and just pray we get the deal, tomorrow I am in the boardroom." Based on my training, experience and knowledge of this investigation, I believe that in the beginning of this conversation, Prichard was congratulating DiScala on pumping up the stock price of a company known as Starstream ("just looked at Starstream, holy shit, nice work"), and DiScala confirmed that he expected to move the price even higher ("it'll be 2 bucks soon"), but that he needed to move slowly, otherwise other traders might realize the price was inflated and short the stock, which would drive the price back down ("I gotta let it rest, cause the shorts will come after me if I go too fast too far."). Based on my training, experience and knowledge of this investigation, I also believe that the reference to "Kyleen" is a reference to Kyleen Cane, an attorney based in Las Vegas, Nevada, who agents believe is a participant in the stock manipulation scheme. In the later portion of the conversation, agents believe that Prichard and DiScala discussed Prichard sending $50,000 to an escrow account controlled by Cane in connection with an investment in a company

28

EDNY-ITEN-000000857

known as Scanbuy. DiScala assured Prichard that sending $50,000 to the escrow account for the Scanbuy investment would allow DiScala to give Prichard some benefit ("candy"). Based on my training, experience and knowledge of this investigation, I believe that "candy" is likely a reference to stock warrants for Scanbuy stock, and DiScala and his co-conspirators hope to obtain and then later manipulate and sell the Scanbuy stock ("it'll be October when we get started"). Based on my training, experience and knowledge of this investigation, I also believe that this call illustrates, among other things, that Prichard is a member of DiScala's network of associates who assist him in manipulating the share prices of different stocks, including Cubed ("you're going to be starting the cash flow big time come June first on CRPT" and "you're gonna get very well taken care of here because you were there last time. That's how I do business").

27. On May 14, 2014, at approximately 10:09 a.m., DiScala, using the SUBJECT TELEPHONE, received a call from Craig Josephberg, who was using a telephone with number 646-442-0628. During this call, after discussing other topics, Josephberg asked, "What's the plan for, I'm just asking for myself, so is crackpot, I mean is it moving along?" DiScala replied, "No news

29

Thursday, Kyleen's taking care of it.  I'll tell you one more time and then I'm done.  Ok, over the next thirty to forty five days Kyleen's got three different groups.  It'll start trading twenty to thirty thousand a day just on her.  . . . And on top of that we will add to that, right  . . . And it'll be forty to fifty a day."  Based on my training, experience and knowledge of this investigation, I believe that in this conversation, DiScala told Josephberg that Kyleen Cane had associates ("Kyleen's got three different groups") who would coordinate daily trading of "twenty to thirty thousand" shares of Cubed.  Based on my training, experience and knowledge of this investigation, I further believe that DiScala claimed that this trading activity, in conjunction with trading by DiScala and his associates, would increase the daily volume of Cubed stock traded to "forty to fifty" thousand shares a day.  Based on my training, experience and knowledge of this investigation, I believe that, among other things, these communications evidence DiScala's and his co-conspirators' attempt to manipulate the share price of Cubed stock by making it appear that the shares were highly desirable and thus would lure unwitting investors to buy the shares.

        28.  On May 15, 2014, at approximately 9:25 a.m., DiScala, using the SUBJECT TELEPHONE, received a text message

EDNY-ITEN-000000859

from Marc Wexler, who was using a telephone with number 732-261-6430. Wexler wrote, "I thought Kyleen might have told you that part. She told Steve she was handling IR now. Don't know who she has in mind." Based on my training, experience and knowledge of this investigation, I believe that Wexler told DiScala that Kyleen Cane said she would handle investor relations ("she was handling IR now"). Based on my training, experience and knowledge of this investigation, I believe this shows that Cane is directly involved in a scheme to pump the price of a stock.

29. On May 15, 2014, beginning at approximately 9:40 a.m., DiScala, using the SUBJECT TELEPHONE, engaged in a text message conversation with Craig Josephberg, who was using a telephone with number 917-327-8411. DiScala instructed Josephberg to "Buy some SSETD now please." Two minutes later, DiScala texted again, "Please call it in." Within a minute, DiScala texted again, "ASAP please God dawn [sic] it." DiScala immediately texted again, "Wtf." Then again, "Wtf. Wtf." At approximately 9:43 a.m., Josephberg finally replied, "Buy it for u?" DiScala responded, "No. Clients. A Lil please I'm buying the sh[i]t out of it. HELP ME." In these text messages, based on my training, experience and knowledge of this investigation,

31

EDNY-ITEN-000000860

I believe that DiScala asked Josephberg, a broker at Meyers Associates, to purchase Starstream stock, which trades under ticker symbol SSETD, in order to help DiScala keep the volume and price of the stock up ("I'm buying … it. HELP ME"). Furthermore, based on my training, experience and knowledge of this investigation, I believe that, in order to hide that DiScala was behind all the stock purchases, DiScala instructed Josephberg to not buy the stock in DiScala's name but in the name of Josephberg's other clients ("Buy it for u?" and "No. Clients."). Based on my training, experience and knowledge of this investigation, I believe that, among other things, these communications evidence DiScala's and his co-conspirators' attempt to manipulate the share price of Starstream stock.

30. On May 15, 2014, beginning at approximately 4:49 p.m., DiScala, using the SUBJECT TELEPHONE, engaged in a text message conversation with Michael Wehrs, who was using a telephone with number 425-829-3227. Wehrs stated, "Hudson wants to sell. I'll get you shares, cost basis and other pertinents." DiScala stated, "Great. How many." Wehrs responded, "1,622,898 Series C Preferred Shares that convert 1:1 to common::: 7,769 AA Preferred warrants that if exercised for $1.00 each convert into 7,769 Series." A few minutes later, Wehrs added, "AA Shares

32

that convert to 7,769 common shares:.: 718,153 Common Warrants that if exercised for $0.10 each convert to the same number of common shares." Wehrs also texted, "Cost to exercise all existing warrants: $79,584.30. Cost basis for all Hudson investments: $4,668,674.00." Wehrs then wrote, "I suspect that will help." DiScala replied, "Yes sir. Low balls coming." Wehrs is the CEO of a company called Scanbuy, and based on my training, experience and knowledge of this investigation, I believe that in this conversation, Wehrs told DiScala that an individual named Hudson, a Scanbuy shareholder and board member, wanted to sell his Scanbuy shares. Based on my training, experience and knowledge of this investigation, I believe that Wehrs provided DiScala information about Hudson's holdings. Based on my training, experience and knowledge of this investigation, I further believe that, in response, DiScala told Wehrs that DiScala was going to bid low for the shares ("Low balls coming"). Based on my training, experience and knowledge of this investigation, I believe that, among other things, these communications evidence DiScala's and his Co-conspirators' plan to obtain Scanbuy stock for as cheaply as possible in anticipation of a later inflation of its share price.

31. On May 19, 2014 at approximately 7:05 a.m.,

EDNY-ITEN-000000862

DiScala, using the SUBJECT TELEPHONE, called David Skriloff, who
was using a telephone with number 646-229-3639. During the
conversation, Skriloff stated, among other things, "[W]hy don't
I sell a combination of you and Rich free trading in Medistat at
a discount and then . . . I'll take it and make the investment
into the company and in addition to that we'll get the company
to hire you guys on an IR point of view, to help get the stock
moving, so you'll be like one of the very few guys with size in
Medistat of free trading." DiScala responded, "Yea, as long as
I know what the cap table is, and as long as I know there's no
hoodlums selling against me[.]" Skriloff replied, "This is a
hard one because there really is no restricted stock at the
moment, I mean everybody's free to trade under 144, it's a pain
in the ass, but we really, there's very few guys with any real
size, and most of them are insiders, so . . . ." Later in the
call, Skriloff reiterated, "what I was thinking was selling you
guys like, I don't know, a million and a half shares at 75 to 80
cents, and then . . . stock is at a dollar 5 or whatever, 75 to
80 cents, selling you a million and a half shares, I'll then
take that and put it into the company, and get restricted for
it, plus give you another let's say 3/4 of a million shares for
IR or something, that I won't give, that'll be restricted, the

34

EDNY-ITEN-000000863

company will get you those." DiScala asked, "why don't you, obviously write up what you can of that[.]" Skriloff objected, "Right, I don't want to write up all of that." DiScala answered, "No, I understand, listen to what I said, I said write up what you can of it." Skriloff, laughing, said, "Ok, I'm gonna be a little cryptic is what I guess I'm saying, in my write-up." Based on my training, experience and knowledge of this investigation, I believe that, in this conversation, DiScala and Skriloff discussed the manipulation of the stock of Medistat. Specifically, based on my training, experience and knowledge of this investigation, I believe that in exchange for DiScala attempting to manipulate the Medistat stock ("get the stock moving"), Skriloff agreed to both sell DiScala unrestricted Medistat stock at a discounted price as well provide DiScala with additional restricted stock for purported services ("for IR [investor relations] or something") so that DiScala would control a large portion of the unrestricted stock ("you'll be like one of the very few guys with size in Medistat of free trading"). Based on my training, experience and knowledge of this investigation, I believe that DiScala expressed interest to this idea if he could control the trading in the stock ("as long as I know what the cap table is, and I

EDNY-ITEN-000000864

know that there's no hoodlums selling against me"). Based on my training, experience and knowledge of this investigation, I believe that Skriloff and DiScala illustrated their awareness of the illegal nature of this arrangement when they discussed not including all the details in a written proposal ("I don't want to write up all of that" and "write up what you can").

32. On May 21, 2014, at approximately 7:49 a.m., DiScala, using the SUBJECT TELEPHONE, called an unknown male ("FNU LNU 2") who was using a telephone with number 917-553-7049. During this call, DiScala asked, "You got a hundred yellows?" FNU LNU 2 replied, "I do not, not now. It will be Wednesday . . . get the money." DiScala said, "Ok, lock down, these are for my buddies, so what do they cost, the yellow?" FNU LNU 2 said, "Yellows, for you, I can get them for 10, I mean 10. I mean whatever you can get extra is fine. They are hard to get." DiScala replied, "Shecks, 12 bucks. Done. 12." DiScala also said, "Cialis, get me 10 of those. My wife can get a little heavy after she is pregnant." FNU LNU 2 said, "Expect an extra 250 for that. They are 40 each." DiScala replied, "No problem." FNU LNU 2 and DiScala then agreed to meet: "Thursday in the office in the city by you." Based on my training, experience and knowledge of this investigation, I believe that

36

EDNY-ITEN-000000865

in this conversation, DiScala arranged to purchase 110 prescription pills (100 "yellows" and 10 "Cialis") for a total of approximately $1450, $1200 for the "yellows" at $12 per pill plus an "extra $250" for the Cialis.  Based on my training, experience and knowledge of this investigation, I believe that "yellows" refers to Percocet, a prescription pain killer.  Based on my training, experience and knowledge of this investigation, I also believe that DiScala and FNU LNU 2 agreed to exchange the prescription pills for money on Thursday, at or near DiScala's office.

33.    On May 21, 2014, at approximately 12:53 p.m., DiScala, using the SUBJECT TELEPHONE, called Kyleen Cane, who was using a telephone with number 914-255-7892.  During this call, Cane said, "I just had a great call with my IR PR guys that are going to be doing the, the basically, the brokerage market, for us and um Cube."  DiScala said, "Great."  Cane continued, "You know they're going to be doing it, and I also just talked to two people that are probably going to put another half million into Cube, for some interim, interim money.  Do you want them to go through you?  For this?  Or do you want me . . ."  DiScala said, "No, I don't care, just do it.  . . . shit, we're a team.  I think it's wonderful, you should take the credit."

37

Cane responded, laughing, "No, I would much rather you take the credit." Later in the call, DiScala asked, "Can you do me a favor, can you just make a quick call and go 5 4 2. Because Shardon's getting mad that it's just sitting there, looks like, it just looks crazy. I'm trying to lift 'em." Cane said, "Wait who?" DiScala answered, "Just go 5 4 2. Have George go 5 4 2, not 5 4 0." DiScala explained, "He's gotta move it around a little bit. It just looks stupid." Cane replied, "Ok, alright, I don't know if we want, if we want to keep it, you know, here." DiScala said, "Go 5 4 1, 541 is fine." Cane said, "Ok, alright. I'll ask him to move it up a little." DiScala said, "Move a penny, yeah. That'd be great." Based on my training, experience and knowledge of this investigation, I believe that, in this conversation, Cane affirmed that she was involved in the planned scheme to inflate and manipulate the stock price of Cubed. Based on my training, experience and knowledge of this investigation, I believe that Cane admitted directly speaking to the investor relations/public relations people who were expected to help generate public interest in Cubed stock ("I just had a great call with my IR PR guys"), and that Cane readied individuals who would put money into Cubed on a short-term basis ("I also just talked to two people that are probably going to

EDNY-ITEN-000000867

put another half million into Cube, for some interim, interim money"). Based on my training, experience and knowledge of this investigation, I further believe that Cane directly participated in efforts to move the price of Cubed stock, agreeing to help DiScala move the price from $5.40 to $5.41 ("Ok, alright. I'll ask him to move it up a little") because DiScala thought it "looks stupid" that the price was steady at $5.40 rather than rising.

34. On May 27, 2014, at approximately 10:29 a.m., Kyleen Cane, using a telephone with number 914-255-7892, called DiScala, who was using the SUBJECT TELEPHONE. During this call, DiScala stated, among other things, "Can you have George, just cause I get flak from my seg guys, just have him move a penny, move that you know. It can't just sit there like the deep like and abyss." Cane responded, among other things, "Well it's um, it's gonna start happening, we just, I don't know if the press has even come out yet. There's gonna release today . . . we're having a conference call in about 30 minutes with the first PR that's gonna go out, the PR group." DiScala then stated, among other things, "Oh great. So no no that's wonderful. It just traded like 14 hundred shares and . . . it's just sitting there at 630. If he goes to 631 it's a big difference optically for

39

EDNY-ITEN-000000868

my guys," later adding, "He can go back to 630 later, you know, you just got to move it around." Cane replied, "Ok, alright." Based on my training, experience and knowledge of this investigation, I believe that in this conversation, DiScala instructed Cane to call her contact again ("George") to have that person bid on the Cubed shares and move the price up even just a little bit ("just have him move a penny") because unwitting public investors eyeing the stock would get suspicious seeing the share price sit in one spot for too long ("It can't just sit there like the deep like and abyss"). Based on my training, experience and knowledge of this investigation, I believe that Cane responded that the share price would move up in any case because she expected Cubed to issue a press release today ("it's gonna start happening, we just, I don't know if the press has even come out yet. There's gonna release today") and that she was coordinating this release with public relations staff ("we're having a conference call in about 30 minutes with the first PR that's gonna go out, the PR group"). I further believe that DiScala responded positively to this information ("Oh great. So no no that's wonderful") but still requested that Cane compel her contact to move the price the stock in any case ("it's just sitting there at 630. If he goes to 631 it's a

EDNY-ITEN-000000869

big difference optically for my guys," and "He can go back to 630 later, you know, you just got to move it around"), to which Cane agreed ("Ok, alright"). These beliefs are corroborated by the fact that on May 27, 2014, Cubed shares traded at a low of $6.30 per share and closed at $6.35.

35. Later that day, at approximately 10:56 a.m., DiScala, using the TARGET TELEPHONE, engaged in a text message exchange with Wexler, who was using a telephone with number 732-261-6430. In that conversation, DiScala texted: "Can u move to 630. Got a Lil action," later adding, "George is a clown[.]" Wexler responded, among other things, "I will bid 6.30. Wish George would let this move allready [sic]." DiScala replied, "I had him move to 631. My guys were pissed. He was sitting there like and [sic] idiot. I had to Cal GP[.]" Based on my training, experience and knowledge of this investigation, I believe that in this conversation, DiScala discussed with Wexler the same topic DiScala had just 30 minutes prior discussed in the telephone call with Cane, who I believe was referenced as "GP." Specifically, I believe that DiScala instructed Wexler to bid $6.30 per share on Cubed stock ("Can u move to 630") and noted that Cane's contact was not satisfactorily coordinating the movement of the share price with the other co-conspirators

41

EDNY-ITEN-000000870

("George is a clown"), to which Wexler agreed ("I will bid 6.30.") and agreed to bid as DiScala instructed ("Wish George would let this move allready").  I further believe that, similar to the earlier conversation with Cane, DiScala noted that the co-conspirators were upset because unwitting public investors eyeing the stock would get suspicious seeing the share price sit in one spot for too long ("My guys were pissed.  He was sitting there like and idiot") and that DiScala called Cane to have her contact move the share price even a little ("I had him move to 631" and "I had to Cal[l] GP").

III.  Conclusion from Investigation to Date

36.  Based on the foregoing, I believe that probable cause exists to believe that the Target Interceptees will be communicating over the TARGET TELEPHONE in furtherance of the above-described market manipulation, securities fraud and wire fraud activities, as well as the narcotics violations, and that such communications and the Target Individuals have been and will continue to facilitate and further the offenses listed in paragraph 9 above.

37.  I further believe that the continued interception of the wire and electronic communications over the TARGET TELEPHONE is essential because the goals of this investigation

EDNY-ITEN-000000871

have not yet been accomplished. For instance, the investigation has not yet identified all of the members of the conspiracy or the full nature, extent, and methods of operation of the fraudulent scheme under investigation. Further, I do not believe that the investigation has identified all accomplices, aiders and abettors, and participants in this scheme or locations used in furtherance of the scheme. Several new Target Interceptees were identified over this last interception period, and law enforcement obtained additional evidence against several individuals previously identified as Target Interceptees in the initial application. We need additional time to fully identify and locate these and other members of the conspiracy, which we will be unlikely to do without an additional period of interception of the TARGET TELEPHONE.

38. I further believe that the interception of text messages and telephone calls made or sent and received by the TARGET TELEPHONE will provide fruits and evidence of wire fraud, mail fraud and securities fraud, including information about who is publicizing the company, who is recommending the purchase of company securities and who is drafting press releases. In addition, I believe that the interception of text messages and telephone calls made or sent and received by the TARGET

43

EDNY-ITEN-000000872

TELEPHONE will provide information about other brokers and other securities manipulated by the Co-conspirators, as well as information about other victims who purchased shares in those other stocks.

## LOCATION DATA

39.  This application also seeks a search warrant for location data, including cell-site information and E-911 Phase II data (or other precise location information) for the TARGET TELEPHONE (the "Requested Location Information"), pursuant to Federal Rule of Criminal Procedure 41.  In addition, there is probable cause to believe that the location of the TARGET TELEPHONE at times determined by investigators will constitute evidence of the SUBJECT OFFENSES.  For example, Omniview has an office in Connecticut where DiScala often works and agents believe that some of the illegal activities discussed above occur while DiScala is at that location.  However, other Co-conspirators are located in New York City, Texas, and Las Vegas, Nevada.  Location evidence for the TARGET TELEPHONE, which I believe based on my training, experience and knowledge of this investigation DiScala carries on his person, would reveal DiScala's meetings with those Co-conspirators outside of Connecticut and shed more light on communications that occur

EDNY-ITEN-000000873

over the TARGET TELEPHONE during such meetings.

## ALTERNATIVE INVESTIGATIVE TECHNIQUES HAVE BEEN TRIED AND FAILED OR APPEAR REASONABLY UNLIKELY TO SUCCEED IF TRIED

40.    The goals of this investigation are set forth above.  The wiretap has already helped the investigation gather evidence and approach those goals.  The wiretap has provided evidence of the existence of a conspiracy, revealed that some of the fraud co-conspirators are also engaged in an unlawful narcotics distribution conspiracy, identified additional and previously unknown co-conspirators, and identified additional and previously unknown stocks that the Co-conspirators are manipulating such as Scanbuy and Medistat.  However, not all of the goals of the conspiracy have been achieved.  As noted above, there are yet unidentified co-conspirators (FNU LNU 1 and FNU LNU 2).  Furthermore, as the intercepted conversations to date have revealed, the Co-conspirators have been having difficulty inflating Cubed stock as compared to the success they achieved with CodeSmart stock and allowing more time for the Co-conspirators to attempt to inflate Cubed stock, while intercepting their conversations, would yield necessary evidence of the Co-conspirators' criminal intent.  Finally, as new stocks have been identified, agents need additional evidence about the manipulation of those stocks (and additional time to gather the

45

EDNY-ITEN-000000874

evidence) to fully achieve the goals of this investigation. Notably, several investigative techniques have been tried and have failed even within the already-occurring period of interception, reasonably appear likely to fail to achieve all the goals of this investigation, or are too dangerous to employ.

### Confidential Sources

41.   Agents have spoken to a number of confidential sources in the financial industry, including those working outside of New York City and those operated by agents outside of the group investigating the present case.   To date, only three confidential sources ("CS"), namely CS1, CS2 and CS3 discussed in the First Braconi Affidavit, have provided useful information.[7]   Although agents have continued seeking information from confidential sources during the period interception, the situation has not changed.   Specifically, while agents have three confidential informants who know of the Target Interceptees, the informants cannot help us meet all the goals of this investigation.   There are still no informants who are in a position to directly interact with the Target Interceptees, much less to discuss the securities at issue in this

---

7   Other confidential sources either did not know of the Target Interceptees or, might have heard of them, but otherwise had little information about them or their work in the financial industry.

46

investigation, without arousing the suspicion of the Target Interceptees. As a result, the informants do not have full access to the workings of the group of co-conspirators, its activities, or its membership.

42. Similarly, as noted in the First Braconi Affidavit, while agents have received information from victims of the fraud scheme, at the present time, none of the victims are in a position to directly interact with the Target Interceptees, much less to discuss the securities at issue in this investigation, without arousing the suspicion of the Target Interceptees. Furthermore, the victims do not have full access to the workings of the group of co-conspirators, its activities, or its membership.

43. In addition, neither the informants nor the victims are in a position to penetrate the close circle of co-conspirators fully or identify all of its members, brokers, dealers and promoters. Based upon my training and experience, I know that, in general, securities industry professionals who are engaged in fraud often compartmentalize aspects of their operations so as to impede law enforcement's ability to identify and dismantle their fraudulent enterprise. Based upon my knowledge of this case and this particular group of co-

47

conspirators, I believe that the confidential sources utilized to date cannot enable law enforcement to uncover the full scope of the criminal conspiracy. Full participation of the confidential sources in the criminal activity does not at present appear likely, and we can only use the confidential sources to gather information to a limited degree to prevent the Target Interceptees from suspecting that the confidential sources are acting at the behest of the law enforcement agents.

44. Further, the confidential informants have all indicated that they are, at present, not willing to testify regarding the information they have provided. Therefore, even if the informants were able to fully penetrate the group of co-conspirators, any information they collected would need to be confirmed by some other form of evidence that would be admissible in court.

45. As to the newly identified narcotics offenses, agents have not yet identified the source of the prescription pills and thus do not know of any confidential source of information who might have information about the source of narcotics or how the prescription pills are being obtained by the distributor.

48

EDNY-ITEN-000000877

## Undercover Agents

46.    Based on the circumstances as I know them, I believe that it would not be feasible for an undercover agent to penetrate the conspiracy in any meaningful way that would in itself achieve the goals of the investigation.  In general, it has been my experience in investigating these types of fraud schemes that securities industry professionals are apprehensive and extremely cautious about conducting business with persons other than trusted associates.  In my opinion, members of this conspiracy group are cautious and careful about possible law enforcement activity and hence an undercover agent will not penetrate very far into the group.  The same reasons that make it unfeasible for an informant to infiltrate the group at this time, make it unreasonable to expect an undercover agent to do so.

47.    Moreover, no informant or victim is currently in a position to introduce an undercover agent to the group of co-conspirators.  Based on my training and experience, I believe that members of the conspiracy would instead keep the undercover at arm's length for a significant period of time.  Furthermore, if it were possible to infiltrate this operation for sufficient time to achieve the objectives stated previously in this

49

affidavit, this would place the undercover agent in the awkward position where he or she would be allowing victims to lose money during the investigation. The undercover agent would obviously try to prevent victims from losing money and, as a result, the organization could easily determine that the undercover agent was working with law enforcement. Therefore, penetration of this group by an undercover agent is unlikely.

48. As to the newly identified narcotics offenses, again, as agents have not yet identified the source of the prescription pills, there is no way to introduce an undercover agent to the source of narcotics.

### Physical Surveillance

49. Since interception began, agents have conducted surveillance on the Target Interceptees. This has helped to identify some of the co-conspirators. For example, on May 5, 2014, agents conducted surveillance of DiScala's business location in Connecticut, and observed DiScala, Azrak and another individual exit the location, enter a car and drive away for a period, then return to the office location and re-enter the building. On May 21, 2014, agents conducted surveillance of Scanbuy's offices in New York City and observed DiScala enter and exit those premises. However, surveillance, in and of

EDNY-ITEN-000000879

itself, will not succeed in gathering comprehensive evidence of the criminal activities under investigation.  It is an investigative technique that is used to confirm meetings and other suspected, criminal activity between alleged participants but often leaves the investigators with insufficient evidence to prove the purpose of the meetings and other activity.  As the conversations detailed above make clear, the illegal activity is typically achieved through telephone interactions.  Thus, although agents observed DiScala meet with Azrak on May 5, 2014, and visit the premises of Scanbuy on May 21, 2014, without the wiretap, agents would have no knowledge of the discussions that occurred between the Co-conspirators during those meetings and the related criminal conduct that were the cause for or arose from the meetings.

50.  When physical surveillance is used in conjunction with court-authorized interception of electronic communications, the purpose of meetings takes on a new significance and may constitute admissible, persuasive evidence of criminal activity. Based on my training and experience I do not expect that surveillance will provide detailed evidence regarding the fraudulent operation in question, such as the identity and role of all accomplices, aiders and abettors, co-conspirators and

EDNY-ITEN-000000880

other participants in the operation, unless the surveillance is done in conjunction with the monitoring of electronic communications occurring over the TARGET TELEPHONE.

51.    Furthermore, based upon my experience investigating wire fraud, mail fraud and securities fraud cases and my familiarity with this investigation, I believe that the transactions engaged in by the Target Interceptees will occur in a covert manner through the use of computers and telephones, such that physical surveillance of those activities would be extremely difficult or, even if successful, would likely disclose the existence of this investigation to the Target Subjects and their associates.  Surveillance can identify participants in meetings between the Target Subjects but is unlikely to disclose any criminal activity.

52.    Similarly, with respect to the narcotics activities described above, based upon my experience, discussions with other agents who specialize in narcotics investigations, and my familiarity with this investigation, I believe that the narcotics transactions engaged in by the Target Interceptees will also occur in a covert manner, such that detection of the exchange of contraband substances -- which are small and easily hidden -- will not achieved through physical

EDNY-ITEN-000000881

surveillance alone or, even if successfully observed, would likely disclose the existence of this investigation to the Target Subjects and their associates. Again, surveillance can identify participants in meetings between the Target Subjects but is unlikely to disclose their criminal narcotics activity.

### Search/Arrest Warrants, Grand Jury and/or Witness Interviews

53.    Prior to initiation of interception, agents had obtained several search warrants for emails, and had received email evidence from victims and state regulatory agencies. However, the evidence from these emails has not been sufficient to accomplish the goals of this investigation. The Subject Interceptees showed that they were cautious when communicating via email and did not discuss the financial transactions at issue in this investigation. Notably, in one email dated May 3, 2012, from CodeSmart CEO Shapiro to business associates who were discussing plans to gain investors into CodeSmart, Shapiro explicitly stated, "We need to put an end to long emails[;] phone conversations are better", thus confirming his reluctance to discuss anything related to financial transactions via email. The interception to date, as compared to the emails previously reviewed, has confirmed that the Co-conspirators prefer to use telephonic communication to discuss their illegal activity.

EDNY-ITEN-000000882

54.  In addition, as explained in the First Braconi Affidavit describing the text messages between Bell, Wexler and DiScala, prior to interception of the TARGET TELEPHONE, agents obtained a search warrant for text messages for two of the telephones involved in the scheme, namely the Bell Telephone and the Wexler Telephone.  However, searches of text messages cannot accomplish the goals of this investigation.  As a preliminary matter, some telephone service providers do not store any text message.  Such is the case with New Cingular Wireless PCS, LLC (an affiliate of AT&T), which is the service provider for the TARGET TELEPHONE.  Thus, no text message search warrant would detail all the communications between DiScala and the co-conspirators.  Moreover, the service providers that do store text messages do not have a consistent policy on storage and have explained to agents that although there may sometimes be text messages stored from a few days, there is no guarantee that the messages will in fact be stored nor that the message data is complete.  Thus, text messages may be missing even if some text messages are stored and available for searching.  Given these storage challenges, search warrants for text messages would not allow agents to uncover the entirety of the scheme, identify all

EDNY-ITEN-000000883

the co-conspirators, or provide sufficient evidence to build a strong case against the co-conspirators.

55.  Furthermore, the results of both text and email search warrants are not received by agents in a sufficiently timely manner so as to allow agents to conduct a proactive investigation.  The text message information is received at best over a week after agents provide a search warrant to service providers, and in the case of email the evidence is often received a month later.  Since this fraud involves stock that is traded every day, receiving information over a week (at best) after an event has occurred limits agents' abilities to decipher the actions of the co-conspirators.

56.  Beyond the email and text message searches discussed above, I believe the use of search warrants, investigative grand juries and interviews of the Target Inteceptees is premature.  Moreover, arrest and/or search warrants would not likely result in the identification of all the other members of the conspiracy or the discovery of the full nature and extent of the illegal activities of the Target Subjects and their co-conspirators.  Thus, I believe that it would be premature to seek arrest warrants at this time.

EDNY-ITEN-000000884

57.   Based upon your affiant's experience and conversations with Assistant United States Attorneys Walter Norkin, Winston Paes and Shannon Jones, who have experience prosecuting violations of criminal law, your affiant believes that subpoenaing persons believed to be involved in this conspiracy and their associates before a Federal Grand Jury would not be completely successful in achieving the stated goals of this investigation.  If any principals of this conspiracy, their co-conspirators and other participants were called to testify before the Grand Jury, they would most likely be uncooperative and invoke their Fifth Amendment privilege not to testify.  It would be unwise to seek any kind of immunity for these persons, because the granting of such immunity might foreclose prosecution of the most culpable members of this conspiracy and could not ensure that such immunized witnesses would provide truthful testimony.  Additionally, the service of Grand Jury subpoenas upon the principals of the conspiracy or their co-conspirators would only alert them to the existence of this investigation, causing them to become more cautious in their activities, to flee to avoid further investigation or prosecution, to threaten the lives of the informants, or to otherwise compromise the investigation.

EDNY-ITEN-000000885

### Trash Searches

58.    Given that this fraudulent scheme is effectively perpetrated through the use of telephones and computers, as shown by the intercepted conversations, I do not believe that searches of the trash of Target Interceptees would yield significant evidence of the criminal activity.  Similarly, as to the narcotics violations, because prescription pills, unlike other narcotic substances, are easily hidden and are not manufactured, measured or altered by distributors who are liable to discard narcotic residue or "tools of the trade" for manufacturing, measuring or altering narcotics, I do not believe that searches of the trash of Target Interceptees would yield significant evidence of the unlawful narcotics activity.

59.    Furthermore, trash searches are not effective in fully identifying the participants and scope of a fraud or narcotics distribution conspiracy.  Although trash searches might reveal a telephone number of some co-conspirators, the occasional writing related to the finances behind a particular transaction, or an occasional pill bottle (which by itself is not illegal to possess), they will not fulfill the goals of this investigation.

57

EDNY-ITEN-000000886

## Location Data

60.   Although agents have utilized judicial applications to obtain historical location data for the several of the telephones in connection with this investigation, such data has still not yet been received (which highlights one of the difficulties in utilizing such data to advance the investigation) and in any case will likely be insufficient to fully identify all the participants and the scope of a fraud conspiracy or a narcotics distribution conspiracy.  Such data by itself (without a corresponding wiretap revealing the content of communications) is unlikely to fulfill the goals of this investigation because this fraudulent scheme is effectively perpetrated through the use of telephones and computers. Furthermore, agents do not yet know enough about the narcotics conspiracy to identify the telephones on which they should seek historical location data.

61.   Thus, like physical surveillance, location data will at best aid the investigation in identifying members of the conspiracy and confirming meetings between members but will not disclose any criminal activity occurring at those meetings.

58

EDNY-ITEN-000000887

## Pen Registers, Trap and Trace Devices, Toll Analysis and Subscriber Information

62.  Court orders have been issued authorizing the installation and use of a pen register and trap and trace device on the TARGET TELEPHONE and several other phones used by members of the conspiracy.  FBI agents will continue to use pen registers, trap and trace devices and toll record analysis during this investigation.  Pen register and toll information provide frequency and identifying information regarding calls made from a particular telephone.  This technique, however, will only provide agents with a list of numbers called and will not establish the identities of all the persons called or the contents of the conversations.

63.  A trap and trace device is simply a complement of a pen register device.  It identifies the telephone number of any telephone that has dialed the TARGET TELEPHONE, but it is also subject to the same limitations as a pen register.  For all the reasons stated above, pen register and trap and trace devices and toll analysis are all valuable investigative tools, but will not by themselves achieve the goals and objectives of the government's investigation.

EDNY-ITEN-000000888

### Mail Cover Requests

64.    "Mail covers" are a service provided by the United States Postal Service whereby a list of all the sender and receiver names and addresses on each piece of mail received at a particular location is obtained.  The list is compiled by the mail carrier who delivers the mail to a target location, and then the list is provided to a United States Postal Inspector, who in turn provides the list to FBI special agents.

65.    Based on my training, experience and knowledge of this investigation, as corroborated by the intercepted conversations, I do not believe that mail covers will fulfill the goals of the investigation because this fraudulent scheme is perpetrated mainly through the use of telephones and computers. Similarly, from the investigation to date, it does not appear that the narcotics violations are occurring through the use of the mail.

### Criminal Database Checks

66.    Fellow agents, analysts and I have run the names of the targets through various databases.  For example, as noted above, we have run all the names of the Target Interceptees through the Drug Enforcement Administration, FBI and Homeland Security Investigations wire surveillance indices.  Moreover,

EDNY-ITEN-000000889

those names have been run through other databases, such as NADDIS, CLEAR, UTILITIES, NCIC and DMV.  While database checks are useful in that they inform us of past investigations and to some extent the history of the Target Interceptees, to date, database checks, standing alone, are not sufficient to allow the FBI to achieve all of its objectives of the new investigation. Database checks alone cannot be expected to achieve all the goals of the instant investigation, such as identifying the employees, customers, brokers, promoters, narcotics distributors and locations where these individuals are currently located.

### Parallel Investigations

67.  The SEC is presently conducting an investigation into the DiScala and other co-conspirators to determine whether the co-conspirators have manipulated penny stocks, cheated investors and violated SEC regulations.  We have also learned that the Texas State Securities Board, having received complaints from victims in Texas, is investigating Bell.  Both of those regulatory agencies have provided information to the FBI that has been helpful in furthering this investigation and the FBI has in some instances shared certain information with the regulatory agencies.  For example, these regulatory agencies have tracked down and interviewed some of the victims of the

61

scheme. The SEC has also provided some documentation showing who was buying or selling certificates in penny stocks such CodeSmart, as well as records showing telephone contacts between certain co-conspirators while CodeSmart was actively trading during the summer of 2013. The SEC has further helped the FBI analyze the financial information in Form 8-K, 10-K and 10-Q filings by CodeSmart and Cubed, and helped agents better understand the nuances of SEC regulations. During the course of the wiretap, although FBI agents have not revealed to the SEC the contents of any conversations, agents have shared with the SEC the identities of newly identified persons (without explaining how they were identified or why they were of interest to the FBI) and asked the SEC if records showed those individuals to be trading certain penny stocks. The SEC has in turn provided information, where it has been available to the SEC, about those individuals and their stock trades. However, to date, although such information has been helpful, it has not provided sufficient information to obtain arrest warrants or even additional email search warrants. This information has been useful in identifying potential targets, as well as providing an indicia of which individuals of interest were in fact Co-conspirators versus those not involved in the fraud

EDNY-ITEN-000000891

scheme, but it has been insufficient to show any criminal intent by the targets absent the information being obtained through the wiretap. Moreover, evidence that the FBI has obtained and been able to share with the SEC regarding Cubed, such as the text messages obtained through search warrants discussed in the First Braconi Affidavit, has sometimes caused the SEC to consider using their regulatory authority to simply shut down trading of Cubed. Such an action by the SEC at this time would prevent the FBI from achieving the goals of this investigation and thus, apart from other prohibitions that restrict the sharing of information, there is a limit to how much the FBI and the SEC can help each other on the parallel investigations. Based on my training, experience and knowledge of this investigation, I do not believe that these parallel investigations by regulatory agencies will fulfill the goals of this investigation.

68. Furthermore, as to the narcotics offenses, there is no parallel investigation being conducted that can help agents further the goals of this investigation.

### CONCLUSION

Request for Permission to Intercept. Based on the allegations set forth in this affidavit and on the application of Assistant U.S. Attorney Walter Norkin, attached, the affiant

EDNY-ITEN-000000892

requests this Court to issue an order pursuant to the power conferred upon it by Section 2518 of Title 18, United States Code, authorizing the FBI to continue to intercept wire and electronic communications to and from the above-described TARGET TELEPHONE until such intercepted communications reveal the manner in which the Target Subjects, and others as yet unknown, participate in the Target Offenses and reveal the identities of their coconspirators, places of operation, and nature of the conspiracy, or for a period of thirty (30) days measured from the date this order is entered, whichever is earlier.

Authorization to Intercept. WHEREFORE, IT IS REQUESTED THAT THE COURT ORDER that FBI special agents, FBI analysts, and any such federal and local law enforcement officers participating in the investigation are authorized, pursuant to an application authorized by a duly designated official of the Criminal Division, United States Department of Justice, pursuant to the power delegated to that official by special designation of the Attorney General and vested in the Attorney General by Section 2516 of Title 18, United States Code, to continue to intercept wire and electronic communications to and from the TARGET TELEPHONE.

EDNY-ITEN-000000893

Period of Interception.  IT IS REQUESTED FURTHER THAT THE COURT ORDER that such interception shall not terminate automatically after the first interception that reveals the manner in which the Target Subjects, and others as yet unknown, conduct their illegal activities, but may continue until all communications are intercepted which reveal fully the manner in which the Target Subjects, and others as yet unknown, are committing the Target Offenses, and which reveal fully the identities of their confederates, their places of operation, and the nature of the conspiracy involved therein, or for a period of thirty (30) days measured from the date this order is entered, whichever is earlier.

Portability.  IT IS REQUESTED FURTHER THAT THE COURT ORDER the authorization given is intended to apply not only to the TARGET TELEPHONE number listed above, but also to any other telephone number or telephone accessed through the above-referenced IMSI number, and to any other IMSI number accessed through the TARGET TELEPHONE number referenced above, within the thirty day period.  The authorization is also intended to apply to the TARGET TELEPHONE number referenced above regardless of service provider.  Accordingly, it is requested that the Court's Order be binding on any subsequent service provider which

EDNY-ITEN-000000894

provides service to the TARGET TELEPHONE upon service of a certified copy of the Court's Order, without further Order of this Court required, including but not limited to: Sprint Nextel Communications, Nextel Communications, Verizon New York, Inc., Verizon New Jersey, Inc., AT&T, AT&T Wireless, New Cingular Wireless PCS, LLC (an affiliate of AT&T), Verizon Wireless, MCI Telecommunications Corp., T-Mobile, MCI WorldCom, Cingular Wireless, and metroPCS (hereafter referred to collectively as the "Other Relevant Providers"). The United States will advise the Court of the change of service provider in the periodic progress reports submitted to this Court.

IT IS REQUESTED FURTHER THAT THE COURT ORDER that in the event any of the wire and electronic communications are conducted in a language other than English and/or are in code, and there is not reasonably available during the interception period an expert in the foreign language or code, minimization shall be accomplished as soon as practicable after such interception.

IT IS REQUESTED FURTHER THAT THE COURT ORDER that the authorization apply to background conversations intercepted in the vicinity of the Target Telephone while the Target Telephone is off the hook or otherwise in use.

EDNY-ITEN-000000895

Transfer of the TARGET TELEPHONE Outside the Southern District of New York. IT IS REQUESTED FURTHER THAT THE COURT ORDER that, pursuant to 18 U.S.C. § 2518(3), in the event that the TARGET TELEPHONE is transferred outside the territorial jurisdiction of this Court, interceptions may continue within the Southern District of New York where interceptions will first be heard or read and minimized.

Providing Technical and Other Assistance. IT IS REQUESTED FURTHER THAT THE COURT ORDER that, pursuant to Section 2518(4) of Title 18, United States Code, the Service Provider and the Other Relevant Providers shall furnish and continue to furnish FBI with all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services that such providers are according the person whose communications are to be intercepted, and to ensure an effective and secure installation of electronic devices capable of intercepting wire and electronic communications over the above described telephones.

Compensation. IT IS REQUESTED FURTHER THAT THE COURT ORDER that the Service Provider and the Other Relevant Providers

EDNY-ITEN-000000896

shall be compensated by the FBI for reasonable expenses incurred in providing such facilities or assistance.

Disclosure. IT IS REQUESTED FURTHER THAT THE COURT ORDER that in order to avoid prejudice to this criminal investigation, the Service Provider, the Other Relevant Providers and their agents and employees shall not disclose or cause a disclosure of this Court's Orders or the request for information, facilities, and assistance by FBI or the existence of the investigation to any person other than those of their agents and employees who require this information to accomplish the services requested. In particular, the Service Provider, the Other Relevant Providers and their agents and employees shall not make such disclosure to a lessee, telephone subscriber, or any interceptee or participant in the intercepted communications.

Subscriber and Toll Record Information. IT IS FURTHER REQUESTED THAT THE COURT ORDER that, pursuant to Title 18, United States Code, Section 2703(c)(1)(B), the Service Provider and the Other Relevant Providers shall disclose to the applicant and FBI all published and non-published subscriber information and toll records and information relevant to this investigation, that is, all such information pertaining to the telephone

EDNY-ITEN-000000897

numbers associated with telephones, digital display devices, and mobile telephones which place calls or text messages into, or which receive calls or text messages from, the TARGET TELEPHONE, within 24 hours of said request, including weekends and holidays, there being reason to believe that the contents of the information sought are relevant and material to a legitimate law enforcement inquiry as set forth more fully above.

Pen, Register Cell Site and E911 Information. IT IS FURTHER REQUESTED THAT THE COURT ORDER that New Cingular Wireless PCS, LLC, an affiliate of AT&T, and the Other Relevant Providers shall enter the TARGET TELEPHONE number into a pen register, pursuant to Title 18, United States Code, Sections 3122 and 3123.

IT IS FURTHER REQUESTED, pursuant to Federal Rule of Criminal Procedure 41 and Title 18, United States Code, Section 2703(d), that the Court issue an Order directing New Cingular Wireless PCS, LLC (an affiliate of AT&T) and the Other Relevant Service Providers to supply originating and terminating cell site information to assist agents of FBI by providing all information, facilities and technical assistance needed to ascertain the physical location of the TARGET TELEPHONE, including but not limited to data indicating the specific

69

EDNY-ITEN-000000898

latitude and longitude (or other precise location information including E911 concerning) of the TARGET TELEPHONE (the "Requested Location Information"), for a period of thirty (30) days measured from the date of this order.

As explained in more detail in the Affidavit, there is probable cause to believe that the location of the TARGET TELEPHONE at times determined by investigators will constitute or lead to evidence of the Target Offenses.

In light of the above, the government requests that this Court direct New Cingular Wireless PCS, LLC (an affiliate of AT&T) or the other Relevant Providers to disclose the Requested Location Information concerning the TARGET TELEPHONE, and to initiate a signal to determine the location of the TARGET TELEPHONE on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed order, and to furnish the technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the user(s) of the TARGET TELEPHONE, at any time of day or night, owing to the potential need to locate the TARGET TELEPHONE outside of daytime hours.

EDNY-ITEN-000000899

IT IS FURTHER REQUESTED that, pursuant to 18 U.S.C. Section 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize delayed notice of the acquisition of the Requested Location Information for this application until such time as the inventory required under 18 U.S.C. Section 2518(8)(d) is served.

Notification of Change.  IT IS REQUESTED FURTHER THAT THE COURT ORDER that the Service Provider and the Other Relevant Providers shall notify the applicant immediately if and when the IMEI or telephone number for the TARGET TELEPHONE changes or is supplied to another service provider.

Minimization and Period of Authorization.  IT IS REQUESTED FURTHER THAT THE COURT ORDER that its Orders shall be executed as soon as practicable after they are signed and that all monitoring of wire and electronic communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to the pending investigation, in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code.  All individuals conducting the interception will be instructed concerning the steps they must take to avoid infringing upon any attorney-client privilege or

71

EDNY-ITEN-000000900

other recognized privilege.  The interception of wire and electronic communications authorized by this Order must terminate upon attainment of the authorized objectives or, in any event, at the end of thirty (30) days measured from the date this order is entered, whichever is earlier.

Monitoring of communications will immediately terminate when it is determined that the communication is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code.  Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature.  If the conversation is minimized, the monitoring agent shall spot check to insure that the conversation has not turned to criminal matters.  Special attention shall be given to minimize all privileged conversations, including those described above in footnote 4 that do not fall under the crime-fraud exception. However, should an intercepted conversation be in a code or a foreign language, and an expert in that code or foreign language

EDNY-ITEN-000000901

is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception pursuant to Title 18, United States Code, Section 2518(5).

Each text message will be reviewed over a secure system, and based on the identities of the sender and recipient and the content of the message, monitoring personnel will determine as soon as practicable after interception whether the text message appears to be relevant to the investigation or otherwise criminal in nature. If the message is not criminal in nature, the message will be marked "minimized" and not accessed by other members of the investigative team. If the message appears to be privileged, it will be marked "privileged" and secured from access by other members of the investigative team. If a text message appears to be relevant to the investigation or otherwise criminal in nature, it will be marked "non-minimized" and may be shared with the other agents and monitors involved in the investigation. If a text message is marked "minimized" or "privileged," it will not be disseminated to members of the investigative team. All intercepted text messages will be sealed with the court upon the expiration of the court's order authorizing the interception. It is anticipated that the

73

EDNY-ITEN-000000902

monitoring location will not be staffed at all times, but will
be staffed at regular hours, at which time intercepted
communications will be monitored and read (including those
intercepted at hours when the location was not staffed).
However, even when unmanned, the monitoring location will be
kept secured with access limited to only authorized monitoring
personnel and their supervising agents.

Progress Reports. IT IS REQUESTED FURTHER THAT THE
COURT ORDER that an Assistant U.S. Attorney familiar with the
facts of the case shall provide the Court with a report on or
about the tenth and twentieth days following the commencement of
interception under this order or ten (10) days after this Order
is entered, whichever is earlier, showing what progress has been
made toward achievement of the authorized objectives and the
need for continued interception. If any of the aforementioned
reports should become due on a weekend or holiday, it is
requested further that such report become due on the next
business day thereafter.

Service of Inventory/Return. IT IS REQUESTED FURTHER
THAT THE COURT ORDER that no inventory or return of the results
of the foregoing surveillance and interception is required to be
made, other than the above-required reports, before 90 days from

74

the date of the expiration of the Court's Order, or any extension of the Court's order.  It is requested further that, upon an ex parte showing of good cause to a judge of competent jurisdiction, the service of the above inventory or return may be postponed for a further reasonable period of time.

Sealing.  IT IS REQUESTED FURTHER THAT THE COURT ORDER that the application, affidavit, Orders, and all interim reports filed with the Court with regard to this matter be sealed until further order of this Court, except that copies of the Orders, in full or redacted form, may be served on the FBI, the Service Provider and the Other Relevant Providers as necessary to effectuate the Court's Orders.

Michael C. Braconi
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me,
this 30th day of May, 2014,

THE HONORABLE ALVIN K. HELLERSTEIN
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

EDNY-ITEN-000000904