JMK:SCJ/PTH/MEB
F. # 2013R01203

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -
                                Docket No. <u>14-CR-399 (S-1)(ENV)</u>

ABRAXIS J. DISCALA,
    also known as "AJ Discala,"
CRAIG JOSEPHBERG,
    also known as "Jobo,"
KYLEEN CANE and
MICHAEL MORRIS,

              Defendants.

– – – – – – – – – – – – – – – – –X

<u>MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S
MOTION TO ADMIT CERTAIN EVIDENCE AS DIRECT EVIDENCE OR,
IN THE ALTERNATIVE, PURSUANT TO RULE 404(B)</u>

BRIDGET M. ROHDE
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Shannon C. Jones
Patrick T. Hein
Mark E. Bini
Assistant U.S. Attorneys
  (Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ........................................................................................................................ 1

I.  Overview of the Charges, Defendants and Manipulated Public Companies ........................... 1

II.  The Fraudulent Market Manipulation Schemes .................................................................... 2

A.  The CodeSmart Manipulation Scheme ................................................................................ 2

B.  The Cubed Manipulation Scheme ....................................................................................... 3

C.  The StarStream and Staffing Group Manipulation Schemes ................................................ 5

ARGUMENT ............................................................................................................................. 5

I.  The Legal Standards ............................................................................................................. 5

II.  The Relevant Evidence ........................................................................................................ 9

A.  The Prior Relationship between Dicala and Cane .................................................................. 9

B.  The Comtemporanous Deals Involving Discala, Cane and Josephberg ................................ 11

C.  Trading by Cane Through Nominee Accounts ...................................................................... 13

D.  Prior Market Manipulation Trading by Cane Through BD Firm 3 and Off-shore Accounts . 14

E.  ██████████████████████████████████████████████ 20

F.  Morris's and Josephberg's History as Registered Brokers .................................................... 22

　　1.  Josephberg's Pre-Halcyon Disciplinary History .......................................................... 22

　　2.  Josephberg's and Morris's Fraud with Respect to Cell Theraputics .......................... 23

　　3.  Morris's Other Disciplinary History Reflected on the CRD Report ............................ 25

G.  Discala's Gambling ............................................................................................................. 27

CONCLUSION .......................................................................................................................... 29

PRELIMINARY STATEMENT

The government respectfully submits this motion to admit certain acts in evidence at trial as direct evidence of the charged fraud offenses, or, in the alternative, pursuant to Federal Rule of Evidence 404(b) ("Rule 404(b)") as evidence of motive, intent, knowledge, lack of mistake and common scheme and plan..

BACKGROUND

I.  Overview of the Charges, Defendants and Manipulated Public Companies

Abraxas J. Discala, Craig Josephberg, Kyleen Cane and Michael Morris (the "Defendants") have been charged with a scheme to manipulate trading in the following four microcap stocks between approximately October 2012 and July 2014: (1) CodeSmart Holdings, Inc. ("CodeSmart"); (2) Cubed, Inc. ("Cubed"); (3) StarStream Entertainment ("StarStream"); and (4) The Staffing Group, Ltd. ("Staffing Group") (collectively, the "Manipulated Public Companies").   Other individuals who were charged in the Indictment filed in July 2014, (the "Indictment") (ECF No. 1), or the Superseding Indictment filed in November 2015, (the "Superseding Indictment" or "S-1 Ind.") (ECF No. 166), and who have previously pleaded guilty are Marc Wexler, Ira Shapiro, Matthew Bell, Victor Azrak, Darren Goodrich and Darren Ofsink.

Counts One and Two of the Superseding Indictment charge Discala, Josephberg, Cane and Morris with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349, in connection with defrauding investors and potential investors in the Manipulated Public Companies.  Count Three of the Superseding Indictment charges Discala, Josephberg and Morris with securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, in connection with the stock of CodeSmart.  Count Four of the Superseding Indictment charges Discala, Josephberg, and Cane with securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, in connection with the stock of Cubed.  Counts Five

1

through Eleven of the Superseding Indictment charges wire fraud, in violation of 18 U.S.C. § 1343, in connection with certain communications regarding the Manipulated Public Companies; Discala is charged in all these counts, and Josephberg is charged in Count Ten.

Discala was the Chief Executive Officer of OmniView.  (S-1 Ind. ¶ 1).  Morris was a Managing Director of Halcyon Cabot Partners, Ltd. ("Halcyon"), a broker-dealer registered with the United States Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA").  (S-1 Ind. ¶ 8).  Josephberg was a registered broker.  (S-1 Ind. ¶ 4).  In or about and between November 2010 and October 2013, Josephberg was employed as a broker by Halcyon.  (Id.).  In or about and between October 2013 and June 2014, Josephberg was employed as a broker at another broker-dealer registered with the SEC and FINRA ("BD Firm 1").  (Id.).  Cane was an attorney and the managing partner of the law firm Cane Clark LLP ("Cane Clark").  (S-1 Ind. ¶ 5).

II.     The Fraudulent Market Manipulation Schemes

    A.     The CodeSmart Manipulation Scheme

In April 2012, First Independence, a shell public company, filed a Form S-1 with the SEC to register an offering of 3,000,000 shares of its stock, which was made effective on August 7, 2012.  (S-1 Ind. ¶ 19).  In or about January 2013, First Independence sold its entire lot of 3,000,000 shares to twenty-four shareholders for $0.0115 per share, raising $34,500 for the company.  (Id.).  From February 2013 through April 2013, there was no public trading of First Independence's stock.  (Id. ¶ 20).  On or about May 3, 2013, CodeSmart, a private company, was acquired by First Independence in a reverse merger.  (Id.).  Following the reverse merger, the new company operated under the CodeSmart name.  (Id.).

In or about May 2013, Discala, Josephberg and Morris, with others, purchased the 3,000,000 purportedly unrestricted shares of CodeSmart at $0.023 per share from the aforementioned twenty-four shareholders.  (S-1 Ind. ¶ 21).  Ofsink, an attorney who also received 125,000 shares, received the new stock certificates and enabled the co-conspirators to conceal their beneficial ownership interest in the 3,000,000 shares by distributing the shares across a number of co-conspirators and by placing them in nominee accounts designed to conceal the true beneficial owners of the shares.  (Id.).  On June 14, 2013, CodeSmart implemented a 2-for-1 forward stock split of its common stock, which caused the 3,000,000 shares controlled by Discala and his co-conspirators to double to 6,000,000 shares.  (Id.).

After gaining control of CodeSmart's unrestricted shares, Discala, Wexler, Shapiro, Bell, Josephberg, Ofsink, and Morris (collectively, the "CodeSmart Co-Conspirators"), engaged in manipulative trading, which included two separate pumps and dumps.  (S-1 Ind. ¶ 22).  The first pump and dump occurred between approximately May 13, 2013 and August 21, 2013.  (Id.).  During this first period, the CodeSmart Co-Conspirators manipulated CodeSmart's stock price by raising it from $1.77 to a high of $6.94 on July 12, 2013, before causing it to drop to $2.19 on August 21, 2013.  (Id.).  The second pump and dump occurred between approximately August 21, 2013 and September 20, 2013.  (Id.).  During this second period, the CodeSmart Co-Conspirators manipulated CodeSmart's stock price by raising it from $2.19 to a high of $4.60 on August 30, 2013, before causing it drop to $2.13 on September 20, 2013.  (Id.).

B.    The Cubed Manipulation Scheme

On March 6, 2014, Northwest, a public shell company with only nominal assets and no revenues, appointed John Doe 1, the President and Chief Operating Officer of Crackpot, Inc. ("Crackpot"), a private company, as its sole officer and director.  (S-1 Ind. ¶ 33).  A week

3

later, on March 14, 2014, Northwest filed with the SEC a Form 8-K explaining that Northwest had changed its name to Cubed.  (Id.).

On March 24, 2014, Cubed filed with the SEC a Form 8-K stating that it had entered into an intellectual property purchase agreement (the "Asset Purchase Agreement") with Crackpot pursuant to which it acquired intellectual property, specifically a "mobile-first platform," from Crackpot.  (S-1 Ind. ¶ 34).  Through this Asset Purchase Agreement, Crackpot, a private company, effectively became Cubed, a public company.  (Id.).  On March 26, 2014, Cubed's board of directors appointed John Doe 2, the original founder of Crackpot, as the new Chief Executive Officer and President, replacing John Doe 1.  (Id.).

On March 28, 2014, 200 shares of Cubed were sold at $5.00 per share.  (S-1 Ind. ¶ 35).  On April 22, 2014, after 15 days of no trading activity, Cubed's stock began trading in earnest at a price of $5.25 per share; the stock closed that day at $5.20 per share.  (Id.).

On or about and between April 22, 2014 and April 30, 2014, Discala, Wexler, Bell, Josephberg, Cane, Azrak and Goodrich, with others (collectively, the "Cubed Co-Conspirators"), were responsible for manipulating the vast majority of the trading activity in Cubed through, inter alia, wash trades and matched trades.  (S-1 Ind. ¶ 36).  Specifically, the Cubed Co-Conspirators purchased more than 50% of the total number of Cubed shares purchased during this period.  (Id.).  The Cubed Co-Conspirators used BD Firm 1, where Josephberg was then employed, and BD Firm 2, a broker-dealer where Goodrich was employed, among other firms, to execute these fraudulent trades.  (Id.).

On or about and between May 2, 2014 and June 29, 2014, law enforcement authorities conducted a wiretap of Discala's cellular telephone (the "Discala Wiretap").  (S-1 Ind. ¶ 37).  The Discala Wiretap revealed that the Cubed Co-Conspirators used wash trades and

4

matched trades to manipulate Cubed's stock price and volume.  (Id.).  Specific intercepted calls relating to the scheme are described in paragraphs 39, 41, 53(e)-(n) and 60 of the Superseding Indictment.  Rather than generating significant market interest and causing a quick pump and dump that would invite regulators' scrutiny, the Cubed Co-Conspirators engaged in a scheme that gradually increased the price of Cubed's stock to provide the appearance of a legitimate company with genuine and steady market demand for the security.  (S-1 Ind. ¶ 38).

To successfully execute their fraudulent scheme of causing a controlled rise of Cubed's stock, the Cubed Co-Conspirators used an "escrow" account maintained by Cane to manipulate the price and trading volume of Cubed's stock.  (S-1 Ind. ¶ 39).

On July 9, 2014, Cubed's stock price closed at $6.60 per share and remained in the controlled pump phase of the fraudulent manipulation scheme orchestrated by the Cubed Co-Conspirators when trading was halted by the SEC.  (S-1 Ind. ¶ 42).

C.    The StarStream and Staffing Group Manipulation Schemes

In or about and between October 2013 and July 2014, the defendants Discala, Wexler, Bell and Josephberg, together with others, agreed to fraudulently manipulate StarStream's and Staffing Group's stocks by artificially controlling the price and trading volume of StarStream's and Staffing Group's stocks through, inter alia, wash trades and match trades. (S-1 Ind. ¶ 43, 44).  Specific examples of texts relating to these schemes are described in paragraphs 43 to 48 and 60 of the Superseding Indictment.

ARGUMENT

I.    THE LEGAL STANDARDS

The Second Circuit has distinguished between evidence of other crimes or acts that are inextricably intertwined with the charged offense and those that are wholly separate violations.  See United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (allowing, under Rule

404(b), evidence that defendant added fictional items to inventory in order to rebut defendant's contention that he acted in good faith when he caused false borrowing base certificates to be submitted to a bank); United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997); United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989) (citing United States v. Weeks, 716 F.2d 830, 832 (11th Cir. 1983); United States v. Bagaric, 706 F.2d 42, 64 (2d Cir. 1983)).  Evidence of uncharged criminal activity is not considered "other crimes" evidence under Rule 404(b) "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial."  Carboni, 204 F.3d at 44 (2d Cir. 2000) (quotation omitted).  "An act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged." United States v. Concepcion, 983 F.2d 369, 392 (2d Cir. 1992); see generally 22 C. Wright & K. Graham, Federal Practice and Procedure § 5239, at 450 (1978).

Numerous cases in this Circuit permit the introduction of uncharged conduct to provide background information and to enable the jury to understand the complete story of the crimes charged.  See, e.g., United States v. Diaz, 176 F.3d 52, 80 (2d Cir. 1999) (within trial court's discretion to admit evidence of uncharged acts to show how "conspiracies evolved, and how illegal relationships and mutual trust developed between co-conspirators"); United States v. Skowronski, 968 F.2d 242, 246 (2d Cir. 1992), superseded by statute on other grounds ("The trial court may admit evidence that does not directly establish an element of the offense charged in order to provide background for the events involved in the case.").

Federal Rule of Evidence 404(b) states that evidence of "other crimes, wrongs, or acts is not admissible to prove the character of a person . . . [i]t may, however, be admissible for

6

other purposes, such as proof of . . . motive, opportunity, intent, preparation, plan, knowledge [or] identity . . ." Fed. R. Evid. 404(b). The Second Circuit has long interpreted Rule 404(b) as an inclusive rule allowing the admission of relevant "other acts" evidence if that evidence is offered to prove something other than criminal propensity and if it passes the balancing test required by Federal Rule of Evidence 403. United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984) ("[w]e have adopted the inclusionary or positive approach to the Rule; as long as the evidence is not offered to prove propensity, it is admissible"); United States v. Stevens, 83 F.3d 60, 68 (2d Cir. 1996) ("this Circuit takes an inclusive approach to prior bad act testimony: such testimony can be admitted for any purpose except to show criminal propensity"); United States v. Germosen, 139 F.3d 120, 127 (2d Cir. 1998) ("it can be admitted 'for any purpose except to show criminal propensity,' . . . unless the trial judge concludes that its probative value is substantially outweighed by its potential for unfair prejudice") (quoting Stevens, 83 F.3d at 68).)).

Such evidence is correctly admitted if: (1) it is offered for a proper purpose; (2) it is relevant to a disputed trial issue; (3) its probative value substantially outweighs any possible prejudice; and (4) the trial court administers an appropriate limiting instruction. United States v. Edwards, 342 F.3d 168, 176 (2d Cir. 2003). See also United States v. Ortiz, 857 F.2d 900, 903 (2d Cir. 1988) (evidence of uncharged "other" acts is admissible pursuant to Rule 404(b) if relevant to the issues of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident); United States v. Norris, 513 Fed. Appx. 57, at *2 (2d Cir. 2013) (affirming admission in bank fraud trial of evidence of defendant's involvement in "pump and dump" scheme under Rule 404(b) because the evidence was relevant and admissible to "show motive, intent, consciousness of guilt, and falsity of misrepresentations.").

7

In applying these principles, courts have recognized that evidence of a defendant's prior conduct may be admitted for a variety of purposes permitted by Rule 404(b), such as to establish a defendant's knowledge or intent, explain the background of the conspiracy, or complete the story of the offenses charged.  In <u>United States v. Pipola</u>, the Second Circuit set forth a few examples of appropriate 404(b) evidence:

> One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background evidence in a conspiracy case. Such proof may also be used to help the jury understand the basis for the co-conspirators' relationship of mutual trust.

83 F.3d 556, 566 (2d Cir. 1996); <u>see also</u> <u>United States v. Pitre</u>, 960 F.2d 1112, 1119-20 (2d Cir. 1992) (prior offenses admissible under Rules 404(b) and 403 to explain relationship among co-conspirators and establish the defendant's knowledge and intent).

Otherwise admissible evidence may be excluded at trial if its probative value is "substantially outweighed" by the danger of unfair prejudice.  <u>See</u> Fed. Rule Evid. 403.  This is true regardless of whether the Court considers the evidence of uncharged crimes to be direct evidence or to be governed by Rule 404(b).  The fact that evidence is highly probative does not mean it is unfairly prejudicial.  Rather, the touchstone for unfair prejudice is the extent to which the evidence creates a risk of conviction because of propensity.  "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from the proof specific to the offense charged."  <u>Old Chief v. United States</u>, 519 U.S. 172, 180 (1997).  Put another way, unfair prejudice "'means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  <u>United States v. Nachamie</u>, 101 F.Supp.2d 134, 141 (S.D.N.Y. 2000) (quoting Rule 403, Advisory Committee Notes, 1972 Proposed Rules).

8

II.     THE RELEVANT EVIDENCE

The government respectfully submits that the uncharged acts and other conduct described below are admissible because they are relevant and inextricably intertwined with the charged offenses.  The evidence is alternatively admissible, pursuant to Rule 404(b), as evidence of motive, intent, knowledge, lack of mistake and common scheme and plan.

A.     The Prior Relationship Between Discala and Cane

The government seeks to introduce evidence that Discala and Cane have known each other since at least 2010 and worked together on prior securities transactions.

Specifically, in or about and between 2010 and 2012, Discala raised investor money for a company known as Regenicin, Inc. ("Regenicin").  Discala introduced Cane to Regenicin's founders, who hired Cane to act as counsel.  SEC filings show that, on or about July 15, 2010, Windstar, Inc., a shell public company incorporated in 2007 with no assets or cash as of September 2009, acquired Regenicin's assets, replaced Windstar's CEO with Regenicin's CEO, and changed Windstar's name to Regenicin.  After it became a public company, Regenicin's stock ticker symbol was RGIN.  Cane and her law firm, Cane Clark, were responsible for preparing the SEC filings and paperwork to effect these transactions.  Cane prepared private placement documents and received investor money in the Cane Clark bank account on behalf of Regenicin.

Bank records and other documents show that companies controlled by Discala sent money directly to Regenicin and to the Cane Clark bank account beginning in September 2010.  Text messages from Cane's seized cell phone show that Cane and Discala exchanged texts about RGIN.  On November 11, 2011, Cane texted Discala: "I am doing my best to close the RGIN deal."  Certain individuals who Discala arranged to invest in Regenicin also invested in

9

CodeSmart and/or Cubed.  Both Cane and Discala received Regenicin stock, and still owned

some Regenicin stock as of early 2014, when Cane was hired to represent Cubed.

Discala told some of the charged Co-Conspirators that he previously worked with

Cane, specifically on Regenicin.  For example, on June 6, 2014, Josephberg texted Discala:

"Should I meet Kyleen [Cane] or not necessary."  Discala texted in reply: "No problem, please

get in there" and "Yes, Kyleen on RGIN."   The background relationship between Discala and

Cane is relevant because it will help the jury understand how the criminal relationship between

Discala and Cane developed over time.

During the trial, the government will present evidence that Cane, who lived and

worked in Las Vegas, Nevada, was hired to represent Cubed in or about January 2014.  Cane and

Discala were indicted in July 2014.  During the course of the Cubed manipulation, the evidence

will show that Discala and Cane met in person a couple of times between January and July 2014

and communicated over the telephone during that time period.  Without the background

information about Discala's and Cane's prior dealings, dating back until at least 2010, it may

appear to a jury that Discala and Cane may not know each other well.  However, the evidence

will also show that Discala placed a lot of trust in Cane and told certain co-conspirators that

Cane was an essential and important part of the scheme.  Among other things, Discala often

referred to Cane as "GP" for "Guardian Princess," and he trusted that Cane would hold the

unrestricted stock in Cubed in an "escrow" for the benefit of Discala and others.

The government respectfully submits that evidence regarding the background

relationship between Discala and Cane is direct evidence of the charged offense.  As described in

the Superseding Indictment, Discala entrusted Cane with control of the Cubed stock "escrow"

which was an important mechanism in the control and manipulation of the price of the Cubed

stock between May and July 2014.   Discala relied on and trusted Cane to execute the fraudulent scheme based on a longer history than just the events that occurred in 2014.   See Diaz, 176 F.3d at 80.  Should the Court disagree that prior relationship is admissible as direct evidence of the charges, the government respectfully submits that the evidence is nonetheless appropriately admitted pursuant to Rule 404(b) under the same reasoning.

B.      The Contemporaneous Deals Involving Discala, Cane and Josephberg

At trial, the government intends to prove that the Co-Conspirators, led by Discala, manipulated the stock of CodeSmart, Cubed, StarStream and Staffing Group (collectively, the "Manipulated Public Companies) as alleged in the Superseding Indictment.   The government also seeks to introduce evidence that Cane, Discala, Josephberg and others, prior to their arrest in July 2014, had identified another company ("Company A") whose stock they intended to manipulate in the future through similar tactics to those used to manipulate the stock of Cubed. In addition, Cane, Discala and Goodrich, who was a broker at BD Firm 2, discussed working together on a deal with another company ("Company B") for which Goodrich was raising money.

Specifically, during the summer of 2014, at the same time that Discala, Cane, Josephberg and others were actively manipulating the stock price of Cubed, they also actively discussed transactions and deal structures for Company A and Company B.  While these plans did not come to fruition because Discala, Josephberg and Cane were arrested in July 2014, Company A had retained Cane as counsel, and Discala already started raising money from investors.  Discala and his co-conspirators discussed Cubed, Company A and Company B in conversations that were intercepted over the Discala wiretap.

11

    1.  Company A

The government seeks to introduce evidence, including documentary evidence, witness testimony and recorded calls, to show that Discala and Cane also took steps to control and manipulate the stock of Company A using similar techniques to those used in relation to Cubed.  Specifically, certain investors were told that they could invest in an "escrow" for Company A stock which Discala and Cane would use to control the free-trading shares and the stock price.   A number of the individuals, who Discala solicited to invest in the Cubed escrow or solicited to purchase and sell Cubed stock in manipulative trades, also were solicited to invest in Company A.  In addition, Cane and Discala intended to provide a kickback to the current CEO of Company A, which was not disclosed to Company A's board of directors.  The evidence will also show that Discala planned to use Goodrich and BD Firm 2 to assist in the manipulation of Company A's stock.

    2.  Company B

The government seeks to introduce recorded calls and witness testimony regarding contemplated transactions with respect to Company B.  In 2014, Goodrich, who participated in the manipulation of the Cubed stock, was attempting to raise financing for Company B.   The intercepted calls show that Cane talked to Goodrich to explain how her "escrow" worked with respect to Cubed.  See S-1 Ind. ¶ 39 ("What did Kyleen [Cane] tell you about the Cube?" "She explained the escrows, everything.")   Intercepted calls indicated that Goodrich did not want to use Cane's escrow concept for Company B.  On June 26, 2014, Discala explained to Wexler: "And the reason we are not doing the escrow [for Company B] is because everything is going to be at [BD Firm 2] when everything is [there] you don't need one, when you have a bazillion people, yeah, but if we do our deals just us, right, and their guys…"

Discussions regarding the intended manipulation of the stock of Company A by the same co-conspirators at the same time that they were manipulating the stock of Cubed is relevant and admissible as direct evidence of the charged crime because it arose out of the same transaction or series of transactions as the charged offense and is necessary to complete the story of the crime on trial.  See Carboni, 204 F.3d at 44.   The conversations regarding the "escrow" with respect to both Company A and Company B are relevant and admissible as direct evidence because they help explain what the "escrow" was intended to do, i.e., control the stock.  Alternatively, the evidence regarding Company A and Company B is admissible pursuant to Rule 404(b) to help explain and provide context for the intercepted conversations.   Certain events and intercepted recordings will not make sense to the jury unless they understand that Cane, Discala and others were attempting to work on multiple deals at the same time with the same people, not all of which were charged in the Superseding Indictment.

     C.     <u>Trading by Cane Through Nominee Accounts</u>

The government intends to prove at trial that Cane exerted control over Cubed stock by holding unrestricted Cubed shares in the name of a nominee ("Nominee 1") in an account at a broker-dealer in California ("BD Firm 3").   Cane directed the trading of Cubed stock through a broker ("Broker 3") at BD Firm 3, directly and through Nominee 1.  The evidence presented at trial will show that the unrestricted Cubed shares that were manipulated originated from this account at BD Firm 3.

The government seeks to introduce evidence that all the trades and transactions executed in Nominee 1's account at BD Firm 3 were at Cane's direction, and evidence that stock held in Nominee 1's account includes the stock of companies that previously retained Cane as counsel, including Regenicin.

In addition, as noted below in more detail below, Skype text messages seized from Cane's cell phone indicate that she directed trading in a number of other accounts not held in her name, including trading in specific stocks that were also deposited in Nominee 1's account at BD Firm 3.

The government expects to introduce into evidence account statements from Nominee 1's account at BD Firm 3 which show the Cubed transactions, and which reflect the identity and volume of all of the stock held in that account.  That Cane was responsible for all of the trading activity Nominee 1's account at BD Firm 3 is direct evidence of the charged crime. Alternatively, this evidence is admissible pursuant to Rule 404(b) to explain the history between Cane and Nominee 1, and to show that Cane's involvement in a market manipulation scheme with respect to Cubed was not the result of a mistake or a lack of intent.

D.    Prior Market Manipulation Trading by Cane through BD Firm 3 and Off-Shore Accounts

The government will prove at trial that Cane played an active role in controlling Cubed's stock price through directing trading in Cubed at BD Firm 3.   See S-1 Ind. ¶ 41 (describing calls between Cane and Discala regarding moving the price of Cubed back down after they briefly lost control of the price).  Cane also worked on Cubed's press releases, dealt with stock promoters and found investors to put "interim money" into Cubed.  See S-1 Ind. ¶ 53(j)(l).  The government also seeks to introduce at trial text messages seized from Cane's cell phone which show that in 2012 and 2013 Cane engaged in manipulative trading in a number of stocks, including the stock of Crown Alliance Capital Ltd. ("CACL"), which traded under ticker symbol CACL, through the use of accounts at BD Firm 3 and at accounts held with a broker based in the Cayman Islands associated with an entity referenced to in the text messages as "Legacy" (the "Legacy Broker").  "Legacy" is believed to a reference to Legacy Global Markets,

14

a foreign broker-dealer headquartered in Belize.[1]   According to the seized text messages, among the accounts that Cane used to trade stock through Legacy was an account held in the name "Oxbridge."

During its case in chief, as noted above, the government intends to prove that Cane used Nominee 1's account at BD Firm 3 to manipulate Cubed stock.  However, only 267,000 shares of unrestricted Cubed stock were deposited into Nominee 1's account.  Prior to her arrest, Cane had sold more than 100,000 of those shares, generating approximately $584,000 in proceeds.  A government witness is expected to testify that Cane told him that that the next phase of trading in Cubed would be offshore.  The evidence will show that, in or about June 2014, Cane contacted the Legacy Broker via text message to discuss depositing 270,000 shares of Cubed with him, with two more tranches to come.  The evidence will also show that, in June 2014, Cane also took the initial steps to deposit 267,000 shares of unrestricted Cubed stock into an account held in the name of Oxbridge Technology Partners, Inc., with an address in Belize City, Belize.

In early February 2012, Cane exchanged Skype text messages with the Legacy Broker regarding the commissions Legacy charged.  The Legacy broker explained that the commission rate for "liquidations" was typically 6.5%, or a minimum of $225, which Cane noted was high for trades under $1,000.  The Legacy Broker responded that he was willing to work with Cane on the rate.  The Legacy Broker messaged Cane that he hoped she would be a source of referrals as she "might have the motherlode in there somewhere."  Cane texted in reply: "we can only hope. Got five more of these [deals] lined up if these work  out …"

---

[1] On September 15, 2014, the International Financial Services Commission in Belize suspended Legacy Global Market's license as a broker-dealer

Cane's Skype text messages also show Cane actively directing the trading in a number of penny stocks, at times at the direction of others, in accounts held at Legacy and at BD Firm 3. The text messages show that Cane participated in a market manipulation of CACL's stock in or about and between April 2013 and September 2013. SEC filings show that, like Cubed, CACL went public through an asset purchase by a shell company incorporated in Nevada in 2010 that purported to be a development stage metal mining company. As with Cubed, Cane's law firm filed reports with the SEC on behalf of the shell as far back as 2010. As with Cubed, Cane purported to be securities counsel for CACL. Cane exchanged a number of Skype texts about trading in CACL with, among others: (1) a third party ("TP 1") who gave Cane trading instructions; (2) Broker 3 at BD Firm 3; (3) the Legacy Broker; and (4) CACL insiders. At times, TP 1 instructed Cane to have BD Firm 3 "support" the stock.

On April 25, 2013, Cane sent the following Skype text message to the Legacy Broker: "The shares of CACL are ready to go from transfer agent into acct S10780. Can I get the passcode into this account? Also did you get [A____'s] authorization to trade on this account?" On May 6, 2013, TP 1 messaged Cane: "[Broker 3] 6k @ .67 13k @.69 support @ .64 Legacy 11k @ .68 15k @ .70" This message presents instructions to have Broker 3 execute an offer to sell 6,000 shares of CACL at $.67 per share, then 13,000 shares at $.69 per share; and then have the Legacy Broker execute an offer to sell 11,000 shares of CACL at $.68 per share, then 15,000 shares at $.70 per share, and to also have Broker 3 execute an offer to buy at $.64 per share to support the price. Cane replied: "Ok." A few minutes later, Cane messaged Legacy Broker: ". . . lets sell 11k of CACL at .68 and then move to .70 and try to sell 15k if it goes there. Thanks." Later that day, Cane received the following message from TP 1: "Ky, please make sure that [BD Firm 3] is supporting at no less than .62 - otherwise this stock will implode." A

16

few minutes later, TP 1 sent another message: "Kyleen: it is important for [Broker 3] to support at .62 not .51 Call me." Cane responded: "Done." Later that same day, Cane exchanged messages with an insider affiliated with CACL and TP 1, regarding setting up a Skype call.

In May 2013, TP 1 sent Cane numerous Skype text messages with trade instructions for CACL to be executed at BD Firm 3 and/or Legacy. Cane would then text the same instructions, or modified instructions, to the Legacy Broker. On June 17, 2013, TP 1 messaged Cane: "we should see some activity today on cacl. Today we are sending a text message and will have 6 guys hitting the phones. Not sure how much that will do but we should see something. Tomorrow we have a paid subscriber news letter …CACL: [BD Firm 3]: Support at .62, sell 10k between .69-0.71, sell 15k between .71 and .73. Legacy: Sell 15k at .72 " This text conveys the message that TP 1 was coordinating a stock promotion campaign and that Cane should try to sell stock in a manner to raise the price up to $.72, but to also have a buy order in place ("support") at $.62 so that the stock price would not drop below that floor.

On June 20, 2013, a CACL insider messaged Cane: "Hi, I…  just want to make sure [BD Firm 3] [Broker 3] isn't going to continue to give us heart attacks and push the price down - can you pls speak with him if you haven't yet?" Cane responded: "I did." On June 24, 2013, TP 1 messaged Cane: "Sell 20k: cacl between .74 and .77. If possible move support up to .70 from .67."  Approximately 30 minutes later, Cane forwarded that message to Broker 3, and then responded to TP 1: "Done. Let me know if not implemented."

On July 10, 2013, Cane exchanged emails with a CACL insider about the issuance of a press release before 8 a.m. Shortly thereafter, Cane instructed Broker 3: "for CACL, please sell unheld 100k above .72, let it run if it goes up." Approximately five minutes later, Cane instructed the Legacy Broker: "on CACL please place buy order at .71 for up to 2500

shares use [account] s10810."   Later that same day, Cane messaged the Legacy Broker to sell a
different stock from a different account.   Cane then instructed the Legacy Broker: "Let's put 25k
of CACL up from [account] 10780 at .77 or above.  For sale that is.  Make it .78."  Later that
same day, a CACL insider and Cane exchanged messages about the "promo" in CACL still
going out, "vol good price up,"  "already our second best day!"

On July 16, 2013, Cane received the following two messages from the Legacy
Broker: "cacl buy yest goes into which acct? … Oxbridge?"  Cane replied: "North Star."  On
July 18, 2013, Cane messaged the Legacy Broker: "morning, lets put in a buy order for 5000
shares of CACL at .71"  The Legacy Broker replied: "Which account?"  Cane responded: ". . .
lets buy out of Oxbridge today."   On August 6, 2013, Cane texted the Legacy Broker: "[M___]
is selling CACL and SNPD only out of OX and Northstar.  He can buy or sell anything out of
Trilogy."   On October 3, 2013, Cane messaged the Legacy Broker: "can you buy 1k shares of
CACL at the ask from Oxbridge acct."   On October 22, 2013, Cane received the following
message from Legacy Broker: "CACL halted."

Historical stock price charts for CACL show that there was <u>de</u> <u>minimus</u> trading in
CACL stock prior to April 29, 2013, when the stock started trading at $.62 per share.  Between
May 2013 and July 23, 2013, the CACL stock price per share fluctuated between a low of $.62 to
opening high of $.81 on July 11, 2013.  CACL's share price then started steadily dropping until it
reached a low of $.20 in early October 2013.  On October 22, 2013, the SEC suspended trading
in CACL due to concerns "regarding the accuracy of assertions in Crown Alliance's public
filings concerning the company's assets and shareholders and because of potentially
manipulative conduct in the trading of Crown Alliance's shares."

After October 2013, Cane did not send the Legacy Broker additional trading instructions.  In March 2014, Cane exchanged messages with the Legacy Broker who mentioned problems with being able to execute trades at Legacy, and informed Cane that he was planning a lateral move to another firm in a couple of months.  On March 18, 2014, shortly before Cubed started trading, Cane texted the Legacy Broker: "planning to start back up with several things in the near future and want to know if you can handle and when? … Can you handle trading now or should we wait a bit.  Seems like it is difficult."  The Legacy Broker responded that it was difficult.  On or about April 2, 2014, shortly after exchanging messages with Cubed Co-Conspirator Marc Wexler, Cane messaged the Legacy Broker: "it's been slow. we will be selling . . . let you know shortly."  On or about April 22, 2014, Cane messaged the Legacy Broker: "Trading just started today.  CRPT."  After some back and forth, the Legacy Broker and Cane messaged regarding whether Cane could send shares to Legacy.  The Legacy Broker asked how many shares Cane expected to trade.   Cane responded: "First traunchs [sic] will be about 500-700k."  On June 7, 2014, Cane texted the Legacy Broker, regarding CRPT: "first deposit will be 270k -- but there will be two more."

As noted above, the government expects to prove at trial that Cane planned to sell additional unrestricted Cubed stock offshore, held in the name of Oxbridge Technology Partners, and the seized text messages show that Cane intended to use the Legacy Broker to facilitate those Cubed trades.   The text messages from 2012 and 2013 between Cane and the Legacy Broker and between Cane and Broker 3 at BD Firm 3 are relevant evidence to show that once stock was deposited with those brokers, Cane actively conspired with others, including those who were directing stock promotion campaigns and issuing press releases, to coordinating manipulative trading to deceive the market.  Alternatively, the text messages from 2012 and 2013 are

19

admissible pursuant to Role 404(b) to show that Cane had the requisite intent to manipulate the Cubed stock and the means to do it. Cane's text messages undercut any argument that Discala was lying or engaging in puffery when he told Co-Conspirators that Cane was central to the scheme, she had people she worked with to promote the stock, and she could and would control the Cubed stock price.

20



███████████████████████████████████

████████████████████████████

F.   Morris's and Josephberg's History as Registered Brokers

The government seeks to introduce into evidence at trial the Central Registration Depository ("CRD") reports maintained by FINRA for Josephberg and Morris.  The CRD system primarily contains information submitted on uniform broker-dealer and agent registration forms and certain other information related to registration and licensing.  The CRD reports reflect information regarding the disciplinary history of Josephberg and Morris as described below.

1.   Josephberg's Pre-Halcyon Disciplinary History

With respect to Josephberg, there are a number of "Disclosure Events" listed on his CRD report and available to the public through FINRA's BrokerCheck website, beyond those that resulted from the allegations in this case.  As Morris testified before the SEC, Morris knew about Josephberg's history when Morris hired Josephberg, but Josephberg "convinced [me] . . . he would handle himself in a more prudent fashion . . .  so we took a chance and hired him."  2/27/25 Morris SEC Tr. at 33.  Morris also testified that Josephberg was Halcyon's biggest revenue generator before Josephberg was fired in 2013.  Id. at 220

Josephberg's CRD report reflects that, in or about July 2006, Josephberg was fined $15,000 and suspended by the National Association of Securities Dealers ("NASD"), FINRA's predecessor, from working with any registered broker-dealer for a period of 35 days for to illegal mutual fund market timing.  In or about 2007, the state of Illinois suspended Josephberg's registration status due to the same conduct.  Josephberg also withdrew from Ohio after Ohio initiated an action to revoke his registration.

Additionally, the CRD report shows that Josephberg was not registered in Florida or Texas, and was only licensed in in approximately nine states, including New York,

██

Connecticut and New Jersey while at Halcyon. If Josephberg was not registered in a state, he was not authorized to handle accounts of customers based in those states. The evidence presented at trial is expected to show that both Josephberg and Morris were well aware of this rule, and they attempted to circumvent this limitation by placing Josephberg's customer accounts in the names of other Halcyon brokers who were licensed in those particular states.

Prior to being hired at Halcyon, Josephberg worked at a number of different brokerage firms, including Prudential Securities, Inc. ("PSI") between 1999 and 2003, Maxim Group LLC ("Maxim") between 2003 and 2009, and VFinance Investments, Inc. ("VFinance") in 2010. Josephberg's CRD report reflects that six customer disputes had been settled against Josephberg prior to his arrest in this case, including one customer complaint for unauthorized trading which was settled by PSI for $3,500 in 2003, four customer complaints for unauthorized trading and/or unsuitable investments which were settled by Maxim in 2009 and 2010 for a total of approximately $100,000,[2] and one customer complaint for unauthorized trading which was settled by VFinance in 2011 for approximately $15,000.

The CRD report also reflects the Internal Revenue Service ("IRS") filed two tax liens against Josephberg, one for $204,455 in July 2009 and another for $109,936 in August 2011.

2.       Josephberg's and Morris's Fraud with Respect to Cell Therapeutics

The CRD reports also reflect that FINRA initiated a regulatory action against Halcyon, Morris, Josephberg and others due to fraudulent transactions Halcyon facilitated in connection with a stock issuance by Cell Therapeutics, a cancer drug development company.

---

[2] Josephberg's individual contribution to these four settlements is listed as totaling $19,000, $0 for two settlements, $9,000 for one, $10,000 for another.

FINRA found that Morris, Josephberg and others engaged in a fraudulent scheme to conceal a kickback of approximately 5% of a $35 million investment by a venture capital firm in Cell Therapeutics, thereby misrepresenting the price paid for the shares.[3]  Among other thing, FINRA found that, in May 2012, Halcyon executed an engagement letter with Cell Therapeutics and agreed to serve as a fake placement agent for issuance of their securities to the venture capital firm.  In May 2012, Halcyon also entered into fraudulent consulting agreements with an affiliate of the venture capital firm to disguise the kickback.

FINRA also made a number of findings, reflected on the CRD report, that resulted in Morris being barred from the securities industry in October 2015.  Among other things, FINRA found that Morris failed to establish and implement at Halcyon an adequate anti-money laundering compliance program reasonably designed to cause the detection and reporting of suspicious activities required under law.  FINRA also found that Halcyon failed to monitor customer account activity and follow up on red flags.  FINRA also found that Morris, as principal, failed to establish and implement an adequate supervisory system of the brokers who worked at Halcyon, and that Morris fostered a culture of non-compliance that resulted in widespread supervisory failures and violations of federal securities laws and FINRA rules.

Morris's and Josephberg's joint fraud with respect to Cell Therapeutics is relevant to show whether they had the requisite criminal intent to commit the charged crime.  Alternatively, it is admissible under Rule 404(b) to show knowledge and lack of mistake.

---

[3] Josephberg testified about Cell Therapeutics before FINRA in July 2013 and was represented by Maranda Fritz, Morris's current counsel.

3.     Morris's Other Disciplinary History Reflected on the CRD Report

Halcyon Broker 1 is expected to testify that, after she started working with Josephberg in the summer of 2012, accounts that previously had been held by two other brokers, Halcyon Broker 2 and then Halcyon Broker 3, were shifted into her name.  Halcyon Broker 1 is expected to testify that she understood Halcyon Broker 2 and then Halcyon Broker 3 had been terminated by Halcyon.  Halcyon Broker 1 is expected to testify that it was her understanding that some of these accounts belonged to Josephberg but they were held under other brokers' names because the customers lived in states where Josephberg was not registered.

Morris's CRD report also reflects a complaint filed in September 2012 by a Halcyon customer who alleged unauthorized trading occurred in his account by Halcyon Broker 2.  Morris, as a Halcyon principal, and Halcyon settled this complaint for $325,000 in September 2014.  Underlying documents from FINRA show that the customer complained to Halcyon as early as May 2012 about unauthorized trading in his account by Halcyon Broker 2.[4]  Halcyon Broker 2 was suspended by FINRA for a period of three months from March 5, 2012 through June 4, 2012.[5]  During the 2012 suspension period, Halcyon Broker 2's clients were shifted into the name of a junior broker, Halcyon Broker 3.  Halcyon Broker 2 continued to speak to his former customers while suspended, in violation of FINRA rules.  In addition, Halcyon Broker 2 executed a number of unauthorized trades in the complaining customer's accounts during the suspension period, which may have been facilitated by Halcyon Broker 3.  Ultimately, Halcyon fired Halcyon Broker

---

[4] Josephberg testified at a FINRA proceeding that Halcyon Broker 2 had recruited Josephberg to come work at Halcyon in 2010.

[5] Halcyon Broker 2's 2012 FINRA suspension related to prior unauthorized trading in a deceased customer's account several years earlier, while he was employed at Maxim.  Halcyon Broker 2 also had a number of negative disclosures on his CRD, including a prior termination, a number of customer disputes and regulatory actions.

3 in July 2012, and Halcyon Broker 2's suspension became a permanent bar from working in the securities industry.   This evidence is relevant as direct evidence to show why Halcyon Broker 1, a junior and inexperienced broker with a clean registration history, was paired up with Josephberg. Without Halcyon Broker 2 or Halcyon Broker 3, Josephberg needed another broker to help him retain customer account he was not authorized to handle.  This evidence is admissible under Rule 404(b) to show that Morris knew that Halcyon's procedures were not preventing brokers from engaging in unauthorized trading, and he knew that Josephberg was using other Halcyon brokers to flout regulatory prohibitions on handling certain customer accounts.  Morris helped Josephberg continue to work with his customer base after Halcyon Broker 2 and 3 were terminated by letting Josephberg pair up with Halcyon Broker 1.

### 4.    Relevance of the Regulatory Histories and Basis for Admissibility

Josephberg's and Morris's disciplinary history and Morris's supervisory failures are highly relevant information and inextricably intertwined to the charged scheme.  The evidence will show that Josephberg and Morris were registered brokers in a highly regulated industry, and that they both were well aware that market manipulation and unauthorized trading in customer accounts was illegal.  Despite being on notice of the negative information reflected on Josephberg's CRD, the evidence will show that Morris hired Josephberg anyway to come to Halcyon because of the money that Josephberg could make for Halcyon.  Furthermore, despite being aware that Halcyon Broker 1 was inexperienced and had never worked at a broker-dealer before, Morris paired her up with Josephberg after Halcyon Brokers 2 and 3 were fired for unauthorized trading to facilitate Josephberg's trading activities and allow him to generate income for Halcyon.  In addition, the tax liens reflected on Josephberg's CRD report indicated

that Josephberg had significant debt and problems managing his money, which show motive to engage in criminal activity.

Due to Josephberg's history, he was placed on "heightened supervision" at Halcyon, under the direct supervision of Morris. Instead, Morris not only failed to prevent Josephberg from engaging in fraud or unauthorized trading in CodeSmart in customer accounts or other relevant acts, but also directly participated with Josephberg both the Cell Therapeutics fraudulent transaction in May 2012 and the CodeSmart stock manipulation scheme in May 2013 through September of 2013.

The above information is highly relevant to show that Morris was motivated primarily by greed, and he knew what he was getting when he hired Josephberg. The evidence will show that Morris actually knew what Josephberg and Halcyon Broker 1 were doing with CodeSmart stock trades, or that he tried very hard not to know, as he relied on their fraud to line his own pockets. Morris's and Josephberg's prior disciplinary history, and Morris's own prior documented supervisory failures, are all relevant to Morris's knowledge and intent of the charged scheme and lack of mistake.

G.   Discala's Gambling

Multiple government witnesses are expected to testify that they, along with Discala, engaged in illegal gambling, which explains, in part, why at least one co-conspirator who is expected to testify at trial decided to step away from Discala. This participant in the Cubed stock manipulation scheme is expected to testify that he had a falling out with Discala over a $6,500 gambling debt that Discala refused to pay. Discala placed losing bets with the witness's bookie, and after Discala refused to pay, the witness had to cover the debt to the

bookie.  This information is relevant because it explains, in part, a break down in the relationship between co-conspirators during the course of the conspiracy.

* * * *

The evidence of uncharged crimes and misconduct described above should be admitted as direct evidence appropriately admitted in the case-in-chief, or, in the alternative, the evidence should be admitted pursuant to Rule 404(b).  Much of the evidence goes directly to proving that the defendants acted with the requisite criminal intent or provides necessary context and background information for the charged conspiracy.  See United States v. Brand, 467 F.3d 179, 197 (2d Cir. 2006) ("We have long acknowledged that 'prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged.'"); see also United States v. Fasciana, 226 F. Supp.  445, 455 (S.D.N.Y. 2002) (admitting evidence of other acts of fraud in mail and wire fraud case noting that "defendant does not contest that [intent, knowledge, and absence of mistake] are disputed in this case.").  Such evidence is particularly relevant where the defendant has offered a "good faith" defense to the charges. See United States v. Reddeck, 22 F.3d 1504, 1509 (10th Cir. 1994) (prior indictment for mail fraud that was similar to charged scheme was admissible pursuant to Rule 404(b) as relevant to "absence of mistake, and as rebuttal of defendant's good faith defense").

In addition to satisfying the requirements of Fed. R. Evid. 404(b), this evidence is admissible because its probative value is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence" under Federal Rule of Evidence 403.  Fed. R. Evid. 403 (emphasis added).  The evidence has substantial probative value, as noted above, and would not tend to unfairly prejudice the defendants in the eyes of the jury.

28

Testimony that the charged defendants engaged in additional acts of securities fraud, gambling, and that one had an extramarital affair is no more inflammatory than the substantial evidence that they each took part in the securities fraud offenses charged in the Superseding Indictment.

<u>CONCLUSION</u>

For the reasons stated herein, the government respectfully submits that the other acts evidence described herein should be admitted as direct evidence of the charged crimes, or, in the alternative, under Rule 404(b).

Dated:      Brooklyn, New York
            December 8, 2017

Respectfully submitted,

BRIDGET M. ROHDE
ACTING UNITED STATES ATTORNEY
Eastern District of New York
Attorney for Plaintiff
271 Cadman Plaza East
Brooklyn, New York 11201

By:      /s/ Shannon C. Jones
         Shannon C. Jones
         Patrick T. Hein
         Mark E. Bini
         Assistant United States Attorneys
         (718) 254-6379 (S.Jones)

29