**THOMAS V. SJOBLOM**
*Attorney At Law*

International Square
Suite 500
1875 I Street, N.W.
Washington D.C. 20006
(202) 429-7125
Email:  tvsjoblom@tvs-law.com
www.tvs-law.com

December 15, 2017

**By ECF and First Class Mail**

The Honorable Eric N. Vitaliano
United States District Court Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

*Re: United States v. Abraxas J. Discala, et al No. 14 CR 0399 (ENV)*

Dear Judge Vitaliano:

We write on behalf of Mr. Discala to address the issue of the blue sheet trading data on the new disc provided by the government to defense counsel just prior to the hearing on Friday, December 8, 2017, as well as to address some of the comments made by the government at the hearing.  Based on the information we provided to the Court in Mr. Discala's moving papers, during oral argument, and the information now provided to us by the government prior to the hearing, we reiterate our firm belief that a hearing is required by *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed2d 667 (1978).  The trading records, the text messages, and the information from confidential sources do not provide probable cause for the wire tap application.

**TRADING DATA**

**History of Government Production**

In his May 1, 2014 wiretap affidavit, Agent Braconi made representations about having reviewed "trading records" to support his allegations and representations to the issuing judge, Judge Castel in the Southern District.   Defense counsel reviewed the trading records it could obtain and challenged those representations in Mr. Discala's initial Motion to Suppress, which was filed on September 15, 2017.  After that filing, it became clear from the brokerage firm cover letters provided by the government that Mr. Discala's trading records were not sent to the government until May 12, 2014 and June 19, 2014 -  **after** Agent Braconi's affidavit of May 1, 2014.   Mr. Discala addressed this late production in his October 23, 2017 Supplemental Motion to Suppress because the letters proved that Agent Braconi had not received these trading records until after he submitted his affidavit to the issuing judge. (*See* "Supp. Mot.").  Through the government's November 17, 2017 Opposition Memorandum ("Opp. Mem"), defense

1

counsel next learned - for the first time - that Agent Braconi reviewed CodeSmart "blue sheet data," not trading records. Based on those representations by the government, defense counsel looked for blue sheet data among prior government productions.

Defense counsel located a letter dated January 22, 2015, which referenced blue sheet data under a single bates stamp number.  On November 30, 2017, after filing their Supplemental Motion to Suppress, defense counsel received for the first time the blue sheet data that had supposedly been made available by First Choice in January 2015 and on which Agent Braconi supposedly relied for his affidavit.  However, as discussed below, the blue sheet data referenced in the January 22, 2015 letter and the blue sheet data produced by the government on November 30, 2017 are **not** the blue sheet data Agent Braconi either possessed or relied on when he prepared his May 1, 2014 affidavit. Therefore, our review of all this blue sheet evidence reveals that Agent Braconi did <u>not</u> possess this trading data prior to filing his May 1, 2014 wiretap affidavit.  We made those arguments in our Reply Memorandum filed on December 6, 2017. ("Reply Mem.")

On Friday, December 8, 2017, just prior to oral argument on our Motion to Suppress, the government handed us a password protected disc labeled "DISCOVERY PRODUCTION ITEN Bluesheet Data Provided by SEC to FBI On February 27, 2014."  The government has now represented that this is the disc that contains the same documents and range of trading dates Agent Braconi actually reviewed and relied on prior to submitting the May 1, 2014 affidavit.

Then four days ago on December 11, 2017– again for the first time - the government provided us with a copy of the letter by which Agent Braconi had requested and was granted access on February 27, 2014 to certain SEC information, including a "DVD" containing blue sheet data received by the SEC staff.[1]  Had defense counsel known about this letter previously, it would have saved defense counsel and the Court a lot of time by ensuring that defense counsel was analyzing the correct data on which Agent Braconi purportedly relied.  Instead, the government sent defense counsel scurrying about and spending months analyzing years of trading records that supposedly supported the false allegations in Agent Braconi's affidavit, but which has now turned out to be broker data that Agent Braconi never even had, but which the government post-facto now claims in its Opposition Memorandum supports Braconi's affidavit. This sort of "addendum" by the government cannot support what he did not use or did not exist at the time Braconi sought the wire tap order.

**<u>The December 8, 2017 Disc</u>**

The CodeSmart blue sheet data contained on the December 8, 2017 disc has been the single most critical item upon which Agent Braconi relied in formulating his affidavit.

---

[1]  The last minute revelation of this letter, which raises serious doubts about what the government claims in its Opposition Memorandum to have been the blue sheets on which Agent Braconi actually relied when he prepared his affidavit, raises an important <u>Brady v. Maryland</u> issue. <u>See</u> note 3 <u>infra</u>.

Defense counsel for Mr. Discala has been insistent in its motions to suppress that they do not have it. The government has attempted to explain its behavior by stating in its December 8, 2017 cover letter that this segment of trading data was "included" in the much "longer period" blue sheet data provided to defense counsel on November 30, 2017.  However, this "longer period" of blue sheet data was not created until <u>after</u> the filing of the affidavit.   Since Agent Braconi did not possess this "longer period" data when he prepared his affidavit, there was no need for defense counsel to have analyzed this data – which, as it is now known, was created **after** Agent Braconi's claims were made.  Accordingly, this so-called inclusion of data in the "longer period" on November 30, 2017 is irrelevant.   The government's attempt to bury this important segment inside a much longer time period of blue sheet data is inexcusable.

Moreover, contrary to the government's claim that the blue sheet data provided on December 8, 2017 disc was "included" in the "longer period" blue sheet data received on November 30, 2017, there are significant and stark differences between this data and the previously produced blue sheets. Before addressing whether this disc actually supports Agent Braconi's so-called "facts" to support probable cause, we make a few preliminary observations about its content. First, the December 8, 2017 blue sheet data contains 1,681 entries that were not "included" in the November 30, 2017 data for the same June 14, 2013 to November 29, 2013 time period. Second, the new blue sheet contains numerous erroneous and duplicate entries. Third, the new blue sheet data contains entries that unexplainably reflect trade prices multiplied by a magnitude of 10. For example, an entry on June 25, 2013 shows a purchase of 1,000 shares at a price of $66.00, as well as a sale of 850 shares at a price of $65.60. These prices are 10 times higher than CodeSmart's historical price on June 25, 2013. There are over 300 entries reflecting either buy or sell prices in excess of $10, when in reality, CodeSmart's stock price never exceeded $6.94. Fourth, some entries are entirely false. For example, the new blue sheet data reflects a sale by Mr. Discala on June 25, 2013 of 150 shares at a price of $85.60 for a gross amount of $12,840.00.  If that were true, which it is not, it would dramatically alter Mr. Discala's trading history. Finally, in addition to inflating some trade prices, the new blue sheet also contains hundreds of entries with a buy and sell price of $0.00, which is clearly not possible.

Therefore, we have grave concerns about the truth of what this disc purports to reflect and whether Agent Braconi actually reviewed or could have relied on it at all.  To the extent such data is reliable, however, it confirms our previous contentions in our moving papers and our statements to the Court at the hearing. The disc simply does not support Agent Braconi's factual allegations and conjectures.  In fact, it goes more to <u>disprove</u> them than to lend support for his assertions.

It strains credulity to accept what the government claimed at oral argument:  that defense counsel could have asked for this data earlier.[2]  The single most important and isolated segment of blue sheet data needed by defense counsel to analyze Agent

---

[2]   Defense counsel have not yet to receive the transcript of the hearing and are relying on memory of what was exactly said at the hearing.

Braconi's claimed probable cause was withheld from defense counsel by the government until pressed against the wall – i.e., the DVD or disc produced on December 8, 2017 just prior to the hearing on the motion to suppress.

The government's failure to produce this evidence prejudiced Mr. Discala's ability to prepare and present a comprehensive Motion to Suppress. Prior to filing its Opposition, the government never once mentioned that Agent Braconi possessed only a small segment of CodeSmart blue sheet data prior to filing his wiretap affidavit. The government has known for over three years that the trading records on which Agent Braconi's affidavit were not the same ones the government has represented to defense counsel and to the Court. Indeed, the government and Agent Braconi have led defense counsel and Mr. Discala to believe that Agent Braconi possessed all trading data for CodeSmart, Cubed, SOUL, LBAS, and MOJO. That is not true. The government is fully aware that the disc it finally provided to defense counsel does not contain information on all of those companies and includes information never before produced for the one stock (CodeSmart) on which Braconi bases his affidavit. Instead, the disc contains exculpatory material, discredits Agent Braconi's affidavit, and impeaches the credibility of the confidential informants, which explains the probable delay by the government in producing it. [3]

---

[3]   We are awaiting disclosure of all such materials not yet provided by the government, which would include the Form 302s of Agent Braconi and the metadata for the disc provided on December 8, 2017. Due process requires pre-hearing and pretrial disclosure of all *Brady* material now - whether it is exculpatory or impeaching – in support of this *Franks* claim. It appears that the Second Circuit has not addressed the issue of whether a Brady disclosure obligation arises in the context of a pretrial suppression hearing, *United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015), though in an earlier case, it suggested in dictum that it may. See, e.g., *United States v. Nelson,* 193 Fed. App'x 47, 50 (2d Cir. 2006) ("Whether Brady and its progeny require disclosures in advance of pre-trial hearings is an open question in this circuit. . . . [But] in cases that pivot on the outcome of the suppression hearing . . . it seems clear that postponing disclosure until after that hearing will prevent the defense from having key information"). However, in *United States v. Thomas,* 981 F. Supp. 2d 229, 244 (S.D.N.Y. 2013) Judge William H. Pauley III, in the Southern District, stated that "[the court] can determine whether the Brady violation had a reasonable probability of affecting the outcome of the suppression hearing." The Ninth Circuit and Fifth Circuit both apply Brady to suppression hearings. *See United States v. Barton*, 995 F.2d 931, 935 (9th Cir. 1993) ("[W]e hold that the due process principles announced in *Brady* and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant."); *Smith v. Black*, 904 F.2d 950, 965-66 (5th Cir. 1990), vacated on other grounds, 503 U.S. 930, 112 S. Ct. 1463, 117 L. Ed. 2d 609 (1992). *See also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *United States v. Gil,* 297 F.3d 93, 101 (2d Cir. 2002).

(1)     *Lack of Pre-June 14, 2013 CodeSmart Trade Data*

The primary period of CodeSmart stock sales on which Agent Braconi relied and which has continually been the subject of debate is June 14, 2013 through November 29, 2013. (Gov't Opp. Mem, at 50).  However, Mr. Discala sold the majority of his free-trading shares in CodeSmart prior to June 14, 2013 – outside the date range relied upon by Agent Braconi. [4]  Indeed, **75%** of Mr. Discala's sales occurred earlier - from May 22, 2013 to June 13, 2013 - a date range for which Agent Braconi did not have the data when he submitted his affidavit. That made Agent Braconi's representations about this trading data false and recklessly selective.

(2)     *The Government Utilized Trade Data Not Possessed By Braconi In Supporting His Affidavit Claims*

In its Opposition Memorandum, the government conducted a detailed analysis of Mr. Discala's CodeSmart sales for an earlier period - *i.e.,* between May 22, 2013 and June 24, 2013.  Ignoring for a moment the government's inherently flawed analysis, the government concludes that the "trading data" shows that Mr. Discala sold his "free-trading CodeSmart shares at (or close to) the peak." However, the government's analysis is conducted using the "longer period" of blue sheet data supplied on November 30, 2017, rather than the blue sheet data actually possessed by Agent Braconi in February of 2014.  As the "longer period" of blue sheet data contains the 75% of Mr. Discala's sales about which Agent Braconi was not aware, the government cannot possibly offer this analysis in its opposition memorandum as support for Agent Braconi's false (an unsubstantiated) claims in his May 1, 2014 affidavit that sales occurred at CodeSmart's peak prices.

(3)     *Lack Of Trading Records In Additional Companies*

In his Affidavit, Agent Braconi claims that "Soul & Vibe Interactive ('Soul') provides another salient example of a fraudulent scheme executed by Discala and Bell." (Braconi Aff. ¶ 49, fn. 7). Agent Braconi also claims that "trading records" show that Mr. Discala and his co-conspirators "profited" from sales of a number of penny stocks, including shares of SOUL, LBAS and MOJO. (Braconi Aff. ¶ 49, fn. 7).

As evidenced by the government's December 8, 2017 disc production, however, Agent Braconi did not have trading records for these three stocks prior to his affidavit.  The fact that he stated that he had analyzed "trading records" for these three stocks is not only disingenuous but also explains his claim as to sales of these three stocks for a profit, when, in fact, Mr. Discala lost over $2 million trading these three stocks.

Agent Braconi's assertions are highly troubling and reckless because they no doubt led Judge Castel to believe there was potentially criminal conduct or schemes in

---

[4]     Mr. Discala was permitted to receive free-trading shares as part of the services Omniview provided to CodeSmart.  *See* Reply Mem., at 10.

multiple stocks.  But Agent Braconi lacked the evidence to make such an assertion and left Judge Castel with the wrong impression.  Agent Braconi's reckless and deliberate misstatements to the issuing judge cannot be condoned. The disc does not contain data about those stocks, a fact the government now concedes but seeks to dismiss as "not material."  (Opp. Mem. at 52, note 10.)  Thus, according to the government, an agent can mislead the issuing judge, but once the wire tap order is granted, it is "not material" what the agent said to the judge to get the order.

(4) _Blue Sheet Data Possessed By Agent Braconi Does Not Support Large Profits by Mr. Discala, Nor His Alleged Leadership_

In its opposition memorandum and at the oral argument, the government bases its allegation of Mr. Discala's so-called "leadership" on amount of profit made. (Opp. Mem., at 45).  However, the blue sheet data received on December 8, 2017 shows that Mr. Discala in fact lost $4.5 million trading CodeSmart during that time period.  In contrast, other parties reaped large profits in CodeSmart during that same time period.  Notably, Marc Wexler profited nearly $1.3 million, and Joe Salvani profited in excess of $1.8 million. [5] Mr. Salvani was the person who brought the pre-packaged deal for CodeSmart to Mr. Discala to arrange for restructuring and financing.  Accordingly, both Mr. Discala's absolute and relative CodeSmart profits do not add up any assertion that Mr. Discala was the "leader" of an alleged multi-million manipulation scheme, which the government now seems to allege on Braconi's behalf.  Had government used the data it had, the government could have easily made these calculations.

**Additional Comments From The December 8, 2017 Hearing**

There were additional misstatements made by the government at oral argument that should be addressed:

(1) _The CodeSmart Stock Split_

At oral argument, the government doubled-down on its faulty analysis of Discala's trading during the May 22, 2013 to June 24, 2013 time period.  It claimed that the stock split in CodeSmart on June 14, 2013 simply "doesn't matter" and that Mr. Discala could not have sold at a price of $3.48 because CodeSmart's price never reached that level.  These statements were misinformed, to say the least.  A stock split does indeed matter when analyzing historical trading. [6]

---

[5]    Salvani traded CodeSmart through his three companies: JFS Investments, Draper, Inc., and Hudson Park Capital Corp.

[6]    Links to valuable sources that explain the fundamental impact of a stock split has on pre-split data include:

- https://www.irs.gov/faqs/capital-gains-losses-and-sale-of-home/stocks-options-splits-traders/stocks-options-splits-traders-7
- https://www.investopedia.com/ask/answers/04/031104.asp

If the government had correctly accounted for the effects of the stock split, the government would have realized its error in its statement that CodeSmart never traded below $3.48.  In fact, though perhaps unwittingly, Agent Braconi even factored in the stock split when he made his claim that CodeSmart rose "291%" from May 13, 2013 to its July 12, 2013 peak price of $6.94.  This statement implies a May 13, 2013 price of $1.78, which is the correct split-adjusted closing price for that date.  However, by not disputing Agent Braconi's math (291%) while at the same time disputing its impact on Discala's trading (price never fell to $3.48), the government seems to accept this standard practice only when it works to its favor.

      (2)     *Wash Sales and Matched Trades*

To support probable cause, the government also claimed at oral argument that Agent Braconi had alleged the existence of "matched trades" in his Affidavit regarding both CodeSmart and Cubed shares.  However, the affidavit never makes any mention of "match" or "wash" trades in CodeSmart, and the disc provided on December 8, 2017 does not support any allegation of wash sales or matched trades.

      (3)     *The Alleged Private 200 Share Sale of Cubed Stock*

At oral argument, the government referred to Agent Braconi's allegations that Mr. Discala used Glendale Securities to trade Cubed. (See also Braconi Aff. ¶79). However, the disc provided on December 8, 2017 does not support any such assertion.  None of this data shows that Mr. Discala used Glendale Securities to trade either Cubed or CodeSmart stock. Therefore, the government has resorted to another fabrication of its own, including its assertion at oral argument that this trade was a "matched trade."

Although the government also argued at the hearing that the counterparties to the so-called 200 "private" share sale were Glendale Securities and a trust, Agent Braconi could not have known who the parties to this sale transaction were because he did not have any trading records for Cubed.   Moreover, Agent Braconi speculated that the private sale occurred between two Cubed "insiders," (Braconi Aff. ¶ 72), but the government stated at oral argument that it was Cane who effected or controlled this sale.  Whichever way the government wants to pitch it, Mr. Discala was not involved.   Agent Braconi possessed  no evidence to support his reckless accusation that Mr. Discala was implicated. (Braconi Aff. ¶ 74).

**TEXT MESSAGES**

Once the reckless and deliberately false statements are removed from Agent Braconi's Affidavit, the government at oral argument next resorted to text messages and what Agent Braconi surmised was might have been discussed in follow up telephone calls.

    Paragraph 82

At oral argument, the government misspoke when it made reference to Paragraph 82 of Agent Braconi's affidavit in which he described text messages between Marc Wexler and Mr. Discala concerning a discussion Mr. Discala had with a man whose initials are CM. The government misrepresented the context and text of the discussions.

Mr. Discala warned Marc Wexler to stop talking to CM because he is "using stupid words."

> Discala: Dude [meaning Wexler] stop talking to Chris. [H]e called me explaining the 8 m shares using stupid words, man. He's really dangerous.

(Braconi Aff. at ¶82).

* * *

> Discala:  He [CM] just said, "I [CM] just talked to Mark [sic]  [Wexler] "and Kyleen's [Cane] a genius. [O]ur 8 million shares we control.  I'm [referring to Discala] like what the funk are you talking about. We only get 5.5 m[illion] and gave a lot back from there. And NO ONE CONTROLS NOTHING.  THE DUDE IS SCARY, BRO. EVEN THOUGH WE DO IT ALL RIGHT, HE FREAKS ME OUT.

(Braconi Aff. at ¶82).

Contrary to the government's claim, Mr. Discala is not saying that they control 8 million shares and that Ms. Cane is a genius, but rather that it is *CM* who is making these statements. Moreover, it is not 8 million shares, but rather 5.5 million shares. These statements cannot be attributed to Mr. Discala, as the government represented at oral argument.

The 5.5 million shares referred to the shares of the public company prior to the merger.  Of that amount, they also "gave a lot back" to the participants who helped consummate the merger and take Cubed public, such as brokers, sales people, marketing people, and shares for the employee stock option plan ("ESOP").  The participants helped raised over $4.5 million, but had not received a penny of those proceeds. Instead, they were paid in shares so that the company would have full use of the $4.5 million proceeds to execute its business plan.

Further, we do not want the Court to be misled about the use of the word "control" as used in this text message.  The government knowingly misused the word.  The words in the quoted text – "no one controls nothing" – are clear and are the exact opposite of what Braconi claims they mean.  But to fit the words of text messages into his preconceived narrative, Agent Braconi turns those words on their head, even though they were spoken honestly at a time when Mr. Discala did not even know the government was reading his text messages.

8

Finally, in this text message, Mr. Discala is saying to Mr. Wexler that "even though we do it all right, he freaks me out."  Mr. Discala is stating that they have sought to do everything correctly, and CM is using "stupid words" to discuss things he knew nothing about. Therefore, the actual words - as opposed to what Agent Braconi surmised and interpreted those words to mean (Braconi Aff. ¶83) - do not support probable cause.

Paragraph 85

The government also pointed to Paragraph 85 to suggest that Cubed did not have a trading market yet because it did not have a product. Relying on Agent Braconi's own interpretation of what the words in the text meant (Braconi Aff, at 62), the government stated at oral argument that Discala and Wexler agreed to issue a press release to create interest in the stock despite the lack of a product.

That interpretation is wrong. The words of the text message actually talk about introducing the product at the same time they change the ticker symbol.  Wexler writes: "Should we get a news release moved along to coincide with the symbol change."  Marc Wexler is asking whether they should do something to get a press release "moving along" because Wexler and Discala have nothing to do with press releases.  Discala and Wexler then text each other about when the company might launch the product.  There is nothing nefarious about issuing a press release to introduce the product at the same time that the ticker symbol is changed. Moreover, beyond the fact that Mr. Discala was not involved in company press releases, no press release like that was ever issued,  a fact that Agent Braconi could easily have confirmed well before he submitted his affidavit.

Paragraph 87

Finally, at oral argument, the government turned to Paragraph 87 as proof of profit taking. In that paragraph, Wexler complains about the taxes he must pay in New York for transactions in CodeSmart stock.  Mr. Discala's comment - "88m. Next yr cubd" – was based on a realistic belief that Cubed would be the next great technology platform.[7]  It is impossible for Agent Braconi to "see" into Mr. Discala's mind, interpret what Mr. Discala could conceivably have meant, and foresee possible future conduct that Agent Braconi could deem to be potentially criminal.  Such clairvoyance does not qualify as probable cause.

---

[7]  Cubed had more than 40 contracts in the pipeline, spent years developing its technology, entered into multiple joint ventures, had a platform about to go "live," and was expecting to acquire Ping Mobile. *See* Interview w/ Crackpot Cube Founder - Steve White. - emini news blog ...

www.cfrn.net/emini-news.../4/.../interview-w-crackpot-cube-founder-steve-white.html

## CONFIDENTIAL INFORMANTS

Once the trading data and Braconi's personal interpretations of text messages are removed from the affidavit, all that remains are the statements of confidential informants. However, Braconi failed to demonstrate that the information provided by the confidential informants was reliable.

The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable. *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993). "An inquiry into the reliability of an informant's information is usually of two general types, not necessarily mutually exclusive: an inquiry into an informant's veracity and an inquiry into the quality of his sources of knowledge of the information." *Wagner*, 989 F.2d at 73. "[A]n informant's basis of knowledge … remain[s] [an] important factor in a 'totality of the circumstances' analysis." *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000). "By quality of sources [the Second Circuit] mean[s] the degree to which his information is based on reliable means, such as first-hand observations or second-hand information from reliable sources, rather than on unreliable means such as rumor or innuendo." *Wagner*, 989 F.2d at 73. Therefore, in evaluating an informant's reliability, a court must consider the totality of the circumstances, including the informant's veracity, reliability, and basis of knowledge, and "whether the information an informant provides is corroborated by independent police investigation." *United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004).

An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause, and a wholly conclusory statement fails to meet this requirement. *Illinois v. Gates*, 462 U.S. 213, 239, 103 S. Ct. 2317, 2332-33 (1983); see *Nathanson v. United States*, 290 U.S. 41 (1933) (sworn statement of an affiant that "he has cause to suspect and does believe" that liquor illegally brought into the United States is located on certain premises will not do); see also, *Aguilar v. Texas*, 378 U.S. 108 (1964) (an officer's statement that "[a]ffiants have received reliable information from a credible person and do believe" that heroin is stored in a home, is inadequate); see also, *United States v. Higgins*, 557 F.3d 381, 390 (6th Cir. 2009) (finding no probable cause for the issuance of a search warrant where the affiant lacked personal knowledge: "the affidavit [did not] contain any assertion that the informant had been inside the [suspect's] apartment or that the informant had seen drugs or other evidence in or around [the suspect's] apartment").

These standards have not been met by Agent Braconi.

## CS1

Braconi claimed that "the information provided by CS1 has been corroborated by trading records." (Braconi Aff. ¶18, fn.3). However, the newly produced DVD or disc of so-called blue sheet evidence clearly demonstrates that none of CS1's statements are corroborated by the trading records possessed by Agent Braconi prior to filing of his affidavit.   CS1 was not involved in CodeSmart.

Braconi admits that CS1 has had no contact with Mr. Discala for the last nine months. [8]  Braconi also concedes that CS1 has a history of not being truthful (Braconi Aff. ¶18, fn.3) and therefore is not reliable.  Nevertheless, based on CS1, Braconi alleges, in sum and substance, that Discala requires compensation of 40% of the new corporation. (Braconi Aff. ¶19). However, Braconi had access to share certificates and enough information about CodeSmart to understand that such an assertion was not true.

Similarly, CS1 provides no basis for the assertion that Discala enlists co-conspirators by giving them free-trading shares. CS1 stated that, in the past, Discala compensated him with "free-trading shares of stock of the companies on whose transactions CS1 has worked." (Braconi Aff. ¶s18 & 19.) However, CS1 never stated that he participated in the past with Mr. Discala in any fraudulent schemes, nor did CS1 admit to participating in any conspiracy with Discala, and CS1 had no evidence of any future improper conspiracy conduct.[9]  Therefore, CS1 has no basis on which to claim Mr. Discala ever provided free-trading CodeSmart shares of stock to co-conspirators, much less acted illegally.

CS1 also fails to demonstrate any personal knowledge or other basis on which to claim that Mr. Discala artificially inflated share prices so that he could sell the shares for a large profit. CS1 never claims he participated in any such scheme with Discala previously. CS1 never provides any basis for such a statement. In fact, the trading records possessed by Braconi demonstrate that Discala was buying CodeSmart shares during the peaks and selling the shares when prices were low. Therefore, the recently produced trading records actually ***disprove*** CS1's statements and lends further evidence to CS1's unreliability.

Braconi unreasonably applied CS1's statements to both CodeSmart and Cubed without any basis for doing so. CS1 never claimed Mr. Discala participated in any alleged manipulation scheme with regards to CodeSmart.  Rather, all of CS1's statements were general in nature.  As already demonstrated, the newly produced trading records clearly contradict the majority of CS1's statements.

---

[8] CS1 was cooperating because he had been charged in another district with committing securities fraud – a fraud that had nothing to do with Mr. Discala.

[9] CS1 is an attorney.  CS1 is not referencing anything that is unlawful. Moreover, references to what happened *in the past* do not qualify for the crime/fraud exception to the attorney-client privilege. (Opp. Mem., at  62-63, note 14.)  "Communications that otherwise would be protected by the attorney-client privilege or the attorney work product privilege are not protected if they relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." *United States v. Richard Roe, Inc.*, 68 F.3d 38, 39 (2d Cir. 1995). But "[a] party seeking to invoke the crime-fraud exception must at least demonstrate that there is probable cause to believe that a crime or fraud has been attempted or committed and that the communications were in furtherance thereof." *Id.*

Therefore, Braconi recklessly disregarded the truth of the trading records, and blindly relied on CS1's general statements and speculation.

### CS2

Agent Braconi claims that CS2 informed him that "Discala was planning to manipulate the share price of another company" and that "Discala received shares of that company at a price of 50 to 75 cents per share." (Braconi Aff. ¶61). Agent Braconi further states that CS2 "obtained this information from another individual who is a business associate of Discala." (Id). Although Agent Braconi makes a general assertion that "the information CS2 has provided has proved accurate and been corroborated by independent evidence," there is no indication or proof that the "accurate" information and corroboration by independent evidence are related to Discala or the target telephone. In fact, CS2 did not even know Discala. Therefore, Agent Braconi presents nothing more than general statements and conclusions that lack the evidentiary support required by the standards stated above.

Moreover, Braconi admits that the information provided by CS2 is hearsay.[10] But, Braconi fails to provide any substantial basis for crediting CS2's hearsay information that: (a) Discala's alleged plan to manipulate the share price of another company; and (b) Discala received shares of that company at a price of 50 to 75 cents per share. Based on the evidence produced over the last month, the government effectively proves that Agent Braconi never possessed any trading records for Cubed, and thus could not corroborate any of CS2's statements.

### CS3

As with CS2, CS3 also does not know Discala. (Braconi Aff. ¶96). CS3 - who is being financially compensated by the FBI agents (Braconi Aff. 96, fn. 13) - provides no evidence related to either CodeSmart or Cubed, much less any companies or business transactions Discala was involved in. Agent Braconi simply claims that CS3 knows one of the alleged co-conspirators, Jeffrey Auerbach, who "helped DiScala utilize the First Independence shell corporation to take over and publicly trade CodeSmart shares." (Braconi Aff. ¶96). Agent Braconi also states that "apart from potentially knowing about CS1 and CS2 being part of the financial industry, CS3 is otherwise not associated with CS1 or CS2." (Braconi Aff. 96, fn. 13).

CS3 has provided no evidence of illegal or suspicious activity – either in general or against Mr. Discala in particular. Furthermore, CS3 does not present any specific

---

[10] Hearsay may be the basis for issuance of the warrant "so long as there [is] a substantial basis for crediting the hearsay." *Jones v. United States,* 362 U.S. 257, 269 (1960). In *Jones*, the Supreme Court held that in making a warrantless arrest, an officer "may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." *Id.* at 269.

information regarding the details of the CodeSmart reverse merger or any claims as to the legality of the CodeSmart reverse merger. Thus, CS3 has provided nothing to establish probable cause of any criminal conduct.

Finally, it should be noted that none of the confidential informants are willing to testify. (Braconi Aff. ¶ 120.)

## SEARCH OF DISCALA HOME

At oral argument and in response to Your Honor's question about how many boxes were seized at the offices of Omniview, the government stated "six." The government also stated at oral argument that it seized two servers from Omniview's offices. However, the government neglected to inform the Court that they took those servers from a server room shared with the family office of governor Rick Scott of Florida, where he maintained the office of Scott Capital in Rowayton, Connecticut. In addition, the government took two servers from the governor's family office.

The government further neglected to inform the Court that Agent Braconi and his fellow agents then went to the Discala home to arrest Mr. Discala. They found Mrs. Discala at home. When searching the house, Agent Braconi discovered an additional 95 binders (15 boxes) in the basement, which concerned documents as far back as 2005, even though Omniview was not formed until August 2012. Agent Braconi gave Mrs. Discala a choice – either let the FBI take the boxes or FBI agents would remain there until Agent Braconi went to the courthouse and obtained a search warrant. Faced with that choice, Mrs. Discala, who was at home with a seven week old baby and who did not appreciate what was happening, signed a consent to seize those binders. She was no doubt terrified.

## CONCLUSION

Once the false and misleading statements are stripped from Agent Braconi's Affidavit, only the text messages and the confidential sources remain. The text messages have been misinterpreted and misused by both Agent Braconi and the government, and the confidential sources do not supply the probable cause necessary to support the wire tap application.

The government claims that "every statement in a written affidavit does not have to be true." *United States v. Martin*, 426 F.3d 68, 73 (2d Cir. 2005). However, in this case, virtually none of the statements in Agent Braconi's affidavit are true. Accordingly, Mr. Discala and his counsel respectfully request that the Court suppress the evidence obtained from the wire tap application, or at a minimum, order that a <u>Franks</u> hearing to be held.

Sincerely,

/s/ *TV Sjoblom*

Thomas V. Sjoblom
Counsel for Defendant Discala


 /s/ Charles Ross
Charles Ross
Counsel for Defendant Discala


/s/ Andrew Bowman
Andrew Bowman
Counsel for Defendant Discala


cc:  Shannon Jones
     Assistant United States Attorney