UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
UNITED STATES OF AMERICA,         :
        :
        -against-         :
        :    <u>MEMORANDUM OPINION</u>
ABRAXAS J. DISCALA,         :
     Also known as "AJ DiScala,"         :    14-cr-399 (ENV)
MARC WEXLER, IRA SHAPIRO,         :
MATTHEW BELL,         :
CRAIG JOSEPHBERG,         :
     Also known as "Jobo,"         :
KYLEEN CANE, DARREN GOODRICH,         :
DARREN OFSINK, VICTOR AZRAK, and         :
MICHAEL MORRIS,         :
        :
        Defendants.    :
-------------------------------------------------------------- x

VITALIANO, D.J.

       This memorandum opinion sets forth the Court's reasoning for the determinations it made

in its order of February 2, 2018, deciding various motions made individually or collectively by

the remaining defendants: Abraxas "AJ" DiScala ("DiScala"), Craig "Jobo" Josephberg

("Josephberg"), Michael Morris ("Morris"), and Kyleen Cane ("Cane"). The 11-count

superseding indictment charged the extant defendants and others who have pled guilty already

with engaging in a securities fraud conspiracy and committing various substantive other acts in

furtherance of it, ("Indictment"), *see* ECF Dkt. No. 166 at 1-3, to defraud investors and potential

investors in certain targeted securities in the period from October 2012 through July 2014. *Id.* at

6, ¶ 18.

       On September 15, 2017, DiScala moved to suppress the fruits of a wiretap, both as

originally ordered and then extended, and from a search warrant, or, in the alternative, granting

an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).[1]  That same day,

Morris and Cane moved for severance of their trial from the trial of other defendants and

dismissal of several counts against them.  On a separate track, Cane sought the use of a jury

questionnaire.[2]  After the motions were fully briefed,[3] the Court heard oral argument on

December 8, 2017.  *See* December 8, 2017 Hearing Transcript.  Prompted by the fulsome

argument, came a flurry of supplemental filings.[4]  The Court heard further argument on January

10, 2018.  *See* January 10, 2018 Hearing Transcript.  DiScala then followed that with an

untimely motion to suppress a warrantless search of his home.[5]  With the stated purpose of

urging counsel to proceed full bore in their preparations for the scheduled April 2, 2018 trial, and

with hope of facilitating that preparation, on February 2, 2018, the Court entered an order

deciding the fully briefed and argued pending motions[6]: DiScala's motions to suppress and for a

---

[1] *See* Dkt. No. 352 (DiScala First Motion to Suppress).

[2] *See* Dkt. Nos. 341 (Cane Motion) & 349 (Morris Motion).  Josephberg filed a letter joining in the pre-trial motions, except for the motion for a severance.  *See* Dkt. No. 345.  Cane joined DiScala's motion to suppress the wiretaps in this case, and for a *Franks* hearing.  *See* Dkt. No. 389 at 2.  DiScala orally joined in Cane's application for a severance at the January 10, 2018 status conference.  *See* January 10, 2018 Hearing Transcript at 6, 13:21.

[3] *See* Dkt. Nos. 380 (Government Omnibus Opposition), 389 (Cane Reply), 391 (Morris Reply), *and* 392 (DiScala Reply).

[4] *See* Dkt. Nos. 404 (Dec. 15, 2017 DiScala First Suppression Letter), 420 (Dec. 22, 2017 First Gov't Suppression Letter), 425 (Dec. 29, 2017 DiScala Second Suppression Letter) 429 (Jan. 3, 2018 Second Gov't Suppression Letter), 444 (Jan. 8, 2018 DiScala Third Suppression Letter), 455 (Jan. 12, 2018 DiScala Fourth Suppression Letter), 456 (Jan. 12, 2018 Gov't Letter Regarding Jury Questionnaire), 473 (Jan. 23, 2018 Third Gov't Suppression Letter), 481 (Jan. 25, 2018 DiScala Fifth Suppression Letter), 487 (Jan. 31, 2018 Fourth Gov't Suppression Letter), and 488 (Feb. 2, 2018 DiScala Sixth Suppression Letter).

[5] *See* Dkt. Nos. 458 (DiScala Second Motion to Suppress), 471 (Government Motion in Opposition to Second Suppression Motion), and 480 (DiScala Reply).

[6] DiScala also requested the issuance of a judicially-ordered subpoena regarding certain electronic metadata.  *See* Dkt. No. 448.  The government moved to quash an earlier subpoena served on 12/15/17, *see* Dkt. No. 445, but which DiScala withdrew.  As a result, the government's motion to quash that subpoena is denied as moot.  DiScala, however, renewed his

*Franks* hearing were denied; Morris's motion to sever was denied on the grounds asserted;

Morris's motion to dismiss for want of venue was denied without prejudice to renewal at the

close of the government's case-in-chief; Cane and DiScala's motion to sever was denied; Cane's

motion to dismiss the indictment was denied; and Cane's requests for the use of a juror

questionnaire to aid in voir dire was granted. This is the promised memorandum opinion that

details the bases for these determinations.

1.     Background[7]

At all relevant times, DiScala, a resident of Connecticut, was the CEO and founder of

Omniview Advisors LLC ("Omniview"), Indictment at 1, ¶s 1-2, which had its principal place of

business in Connecticut. Omniview was marketed as a merchant bank providing capital markets

seasoned advice. *Id.* at 2, ¶ 2. Shapiro was the CEO and board chair of CodeSmart and First

Independence Corporation ("First Independence"). *Id.* at 2, ¶ 3. Both Josephberg and Morris

worked for Halcyon Cabot Partners, Ltd. ("Halcyon"), which was "a broker-dealer registered

---

subpoena request for metadata, arguing that the data goes to the heart of the validity of the
affidavit supporting the wiretap application, the metadata focus of the subpoena relating to the
validity of the government's representation that it had *already* provided all the data that DiScala
requests, including the metadata. Dkt. No. 445 at 3. Specifically, to the extent that the
December 8, 2017 production made by the government that it had produced all of the trading
data reviewed by the affiant agent was altered, the government stated at the January 8 hearing
that the modification date DiScala argued was altered was "as I'm sure defense counsel knows, as
I have told them, as we all know, results when one saves data, saves an Excel spreadsheet onto a
CD such the FBI did on December 7th and brought it to us so we can bring it to the defense the
next day." January 10, 2018 Hearing Transcript at 37, 3:8. Given the totality of the
circumstances, the uncontrovertible government explanation as to the dating operations of the
Excel program and supported by the substantive reasoning, *infra* pgs. 14-30, of the denial of
suppression and for a *Franks* hearing, DiScala has not made the requisite showing under *United
States v. Nixon*, 418 U.S. 683, 94 S. Ct. 3090, 41 L.Ed.2d 1039 (1974), and, accordingly, his
request for a judicially-ordered subpoena seeking certain electronic metadata was denied.
[7] Facts are drawn mostly from the indictment with clarifications gleaned from the submissions of
the parties.

with the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority, Inc. ("FINRA"). *Id.* at 2, ¶ 4; 3, ¶ 8. Josephberg worked as a broker at Halcyon from approximately November 2010 through October 2013, then at another broker dealer from October 2013 through June 2014. *Id.* at 2, ¶ 4. Morris was a broker and managing director of Halcyon. *Id.* at 3, ¶ 8. Goodrich was a managing director and head trader at a California broker-dealer. *Id.* at 3, ¶ 6. Also ensnared in the tangled web were two lawyers, Darren Ofsink, a resident of Merrick, New York, and head of Ofsink, LLC, a law firm that served small and mid-sized corporate clients. *Id.* at 3, ¶ 7. The second, Kyleen Cane, a resident of Nevada, was the managing partner of Cane Clark LLP, which specialized in "providing corporate and securities [advice] to public companies with small capitalization." *Id.* at 3, ¶ 5.

The indictment charges an overarching scheme by connected players to manipulate the market and several discrete manipulations advancing the overall objective. Among those specifically charged, the first in these was a scheme that targeted CodeSmart. In April 2012, First Independence registered with the SEC for an offering of 3,000,000 shares of its stock. The SEC filing did not authorize any post-sale distribution of these shares to non-purchasers or to the general public. Despite poor projections, in January 2013, the company sold the initial offering to 24 shareholders "for $.0115 per share, raising $34,500 for the company." Indictment at 7, ¶ 19. Until May 2013, there was no public trading of First Independence stock, and then, on or about May 3, 2013, First Independence acquired CodeSmart in a reverse merger.[8] The resulting

---

[8] A reverse merger occurs when "[a] private operating company merges into [a] public company, usually a shell company, and [that] public shell company survives the merger with the private operating company's shareholders gaining a controlling interest in the voting power and outstanding shares of capital stock of the public company and the private operating company's management taking over the board of directors and management of the public company. The

company operated under the CodeSmart legend. *Id.* at ¶ 20.

During the same month as the CodeSmart reverse merger, DiScala, Josephberg, Ofsink, and Morris purchased 3 million "purportedly unrestricted shares [of CodeSmart] at $0.023 per share from the aforementioned twenty-four shareholders," but concealed their ownership by distributing shares "across a number of co-conspirators and by placing them in nominee accounts designed to conceal the true beneficial owners of the shares." *Id.* at ¶ 21.

In June 2013, CodeSmart approved a 2 for 1 stock split,[9] which doubled the 3 million shares owned by the co-conspirators to 6 million. *Id.* at 7-8, ¶ 21. Following the stock split, it is alleged, DiScala, Shapiro, Josephberg, Ofsink, and Morris engaged in two CodeSmart "pump and dump"[10] schemes targeting CodeSmart, with the first occurring between May 1 and August 21, 2013, and the second between August 21 and September 20, 2013. *Id.* at 8, ¶ 22. In these efforts, the defendants allegedly used a misleading Form 10-K, at least one misleading press release, three separate misleading Form 8-Ks, a misleading form 10-Q, wash trades,[11] match

---

post-merger surviving public company also has the private operating company's assets and business operations." § 3:11.10. Reverse mergers with shell companies, 11 Acquisitions & Mergers § 3:11.10 (Westlaw, November 2017.)

[9] "*Stock Split.* A stock split does not change the dollar amount of the capital stock accounts. A stock split increases the number of shares outstanding and reduces the par or stated value of the capital stock. Generally, a stock split will also reduce the market price of the stock. Shareholders must approve by a two-thirds majority any increase in authorized but unissued shares of stock. In addition, a simple majority of shareholders must approve an amendment to the Articles of Association to change the par value of the stock as would generally be required in a stock split." 2-23 Banking Law § 23.08 (LexisNexis 2017).

[10] A pump and dump is "a scheme where stock promoters gain a significant block of shares in a struggling business and inflate[] the stock price to attract investment. When the price reaches a certain level, the promoters sell or dump their shares and the market for that stock collapses. The promoters often pay brokers to recommend the stock[.]" 2-6 Federal Securities Exchange Act of 1934 § 6.02 (LexisNexis 2017).

[11] A wash trade, also known as a "wash sale," is one of the two "most common means of creating

trades,[12] and the manipulation of investor accounts to execute the pump and dumps. *Id.* at 8-12,

¶s 23-32. These defendants allegedly profited by at least $3,000,000 (DiScala's profit included

$600,000 in an account held in the name of Jane Doe); $750,000 (Josephberg); $300,000

(Ofsink); and $160,000 (Morris, which included $135,000 from an account held in his son's

name). *Id.* at 32. Morris had no further contact with the other defendants after August 2013.

*See* Dkt. No. 350 at 8-9.

Next on the conspirators' hit list, according to the indictment, was a scheme

involving StarStream and the Staffing Group, supposedly taking place between October

2013 and July 2014. Indictment at 17, ¶ 43. DiScala, Josephberg, and Cane allegedly

controlled the price and volume of StarStream's and Staffing Group's stocks artificially

through, among other methods, wash trades and match trades. *Id.* The government

proffers text messages and phone conversations as proof of coordinated action by the

involved conspirators. *Id.* at ¶ 44, 18, ¶ 47; *see, e.g., id.* at 17-18, ¶ 45; 18, ¶ 46; 18, ¶ 49;

19, ¶ 50.

After that manipulation, in March 2014, the bull's eye spotlighted Cubed. *Id.* at

---

a false appearance of market activity," and "is a sale of stock where there is no change in
beneficial ownership." 2-6 Federal Securities Exchange Act of 1934 § 6.02 (LexisNexis 2017).

[12] A match trade, also called a matched order, is the other common way to create a false
appearance of market activity, and involves "offsetting orders to buy and sell securities by
placing orders at substantially the same time, for substantially the same price and for
substantially the same quantity. For example, in *Edward J. Mawod & Co. v. SEC*, the court
affirmed an SEC order revoking the registration of a broker-dealer and its principal for driving
up the stock price of a corporation during a three month period from twenty cents to $10.00 on
the basis of trades in which the buyers and sellers were identical, or the buyers and sellers
worked together to match trades. As soon as the broker-dealer stopped directing the wash sales
and matched orders, the stock price dropped precipitously[.]" 2-6 Federal Securities Exchange
Act of 1934 § 6.02 (LexisNexis 2017).

13.  On March 6, 2014, Northwest, "a shell public company with only nominal assets and no revenues," appointed an individual who was the president and chief operating officer of Crackpot (a private company), as its sole director and officer.  *Id.* at 13, ¶ 33.  On March 14, 2014, Northwest filed a form 8-K with the SEC indicating that it had changed its name to Cubed.  *Id.*  On March 24, 2014, Cubed filed a form 8-K giving notice that it had entered into an asset purchase agreement with Crackpot, with Cubed acquiring intellectual property in exchange for $350,000 and approximately 2.5 million shares of restricted stock.  *Id.* at ¶ 34.  At the time, Cubed had zero assets and was a penny stock.  *Id.*

Two weeks later, on March 28, 2014, "200 shares of Cubed were sold at $5.00 per share."  *Id.* at ¶ 35.[13]  Based on this share price, Cubed "had a market capitalization of approximately $150 million."  *Id.* at 13-14, ¶ 35.  After these developments, between April 22 and April 30, 2014, DiScala, Josephberg, Cane, and Goodrich allegedly manipulated trading in Cubed through wash sales and matched trades, purchasing over 50% of all Cubed shares bought during that eight-day period, using the broker-dealer firms where Josephberg and Goodrich were employed.  *Id.* at ¶ 36.

It is further alleged, based on the wiretap intercepts, that the involved co-conspirators were trying to gradually increase Cubed's stock value "to give it the appearance of a legitimate company."  *Id.* at 37.  To that and other unlawful ends, it is additionally alleged that escrow accounts maintained by Cane were used to manipulate the price and volume of Cubed stock.  *Id.* at 15, ¶ 39.  For instance, during a May 20,

---

[13] The affidavit supporting the wiretap application linked this sale to Glendale Securities and DiScala.  Dkt. No. 352-2 at 52-55, ¶ 79.

2014 telephone call between DiScala and an unnamed, unindicted co-conspirator, DiScala "explained his control over Cubed's share price, and stated, in part, 'I'm the [expletive] brake and the gas, [expletive]. If I take my foot off the brake it's 55 [dollars] tomorrow (Laughter)." *Id.* at 14-15, ¶ 39 (brackets in original). The Cubed scheme continued over the next month, using the Cane escrow account, among others, resulting in a market capitalization that contradicted an April 2014 form 10-Q. *Id.* at 16-17, ¶ 42. On July 9, 2014, the SEC halted trading in Cubed. *Id.* at 17, ¶ 42.

Shadowing the litany of communal acts intoned by the indictment is the important procedural history of the authorization and reauthorization of Title III intercepts. These wiretaps were overseen by the United States District Court for the Southern District of New York. On May 1, 2014, Judge P. Kevin Castel granted the original wiretap order, which authorized the FBI to tap DiScala's cellular phone, substantively based on the affidavit of Special Agent Michael Braconi. Dkt. No. 353 at 1; Dkt. No. 380 at 35; *see also* Dkt. No. 352-2 at 1. On May 30, 2014, Judge Alvin K. Hellerstein signed a 30 day extension. The government wiretap intercepted DiScala's communications through June 30, 2014. Dkt. No. 353 at 1; Dkt. No. 380 at 36 n.8. Special Agent Braconi was the affiant on the extension application as well. Dkt. No. 353 at 1; Dkt. No. 380 at 36, 36 n.8; *see also* Dkt. No. 352-3 at 1.

Separately, on July 15, 2014, Special Agent Braconi sought and obtained a search warrant ("the Omniview warrant") from Magistrate Judge Holly Fitzsimmons, sitting in the United States District Court for the District of Connecticut, for the Omniview office, located near DiScala's residence in that district. Dkt. No. 353 at 1; *see also* Dkt. No. 352-4 at 36, ¶ 68. The warrant authorized the seizure of "evidence, fruits, and instrumentalities of violations of Title 18, [U.S.C.], Sections 371, 1341, 1343, and 1349, and Title 15, [U.S.C], Sections 78j(b) and 78(ff),

as set forth in Attachment B."  Dkt. No. 352-4 at 53.  The warrant incorporated Special Agent

Braconi's affidavit by reference.  *Id.*  Attachment B noted that the property to be seized was

"[a]ll records" relating to violations of the federal code referenced in the warrant, involving

DiScala, Wexler, Shapiro, Bell, Josephberg, Cane, and Azrak, since February 2012, and set forth

a list of items to be seized.  Dkt. No. 352-4 at 47-52.

On July 17, 2014, the FBI executed the Omniview Warrant at 6:30 a.m., searching for

three hours and seizing six boxes of paper documents and twelve electronic devices.  Dkt. No.

380 at 70-71.  The government imaged nine of the twelve devices, and all electronic devices

were returned to DiScala in May 2016.[14]  Dkt. No. 380 at 71.  Finally, FBI agents arrived at

DiScala's residence, obtained a consent waiver from Dounya DiScala, and searched the home.

Dkt. No. 458 at 1.  The agents seized 95 binders contained in seven boxes.

The resulting indictment, Dkt. No. 166 at 6, ¶ 18, charged in Count One the overarching

securities fraud conspiracy, *id.* at 19-22, while companion Count Two charged a mail and wire

fraud conspiracy.  *Id.* at 23.  Count Three was hinged to alleged securities fraud in CodeSmart

stock, *id.* at 24, with securities fraud in Cubed the focus of Count Four.  *Id.* at 25.  DiScala,

Josephberg, Wexler, and Bell were alleged to have participated during the entire scheme.

Indictment at 7, ¶ 21 (DiScala and Josephberg CodeSmart involvement), 14, ¶ 36 (DiScala and

Josephberg Cubed involvement); Dkt. No. 1 at 10, ¶ 28 (Wexler and Bell CodeSmart

involvement), 12, ¶ 32 (Wexler and Bell Cubed involvement).

---

[14] The government and defense counsel agreed upon a list of search terms, which were then used
to cull responsive documents from the vast galaxy seized.  Dkt. No. 380 at 71.

<u>Discussion</u>

2.      <u>DiScala's Motions to Suppress:</u>

DiScala's scatter-gun motion challenges the wiretap order and its extension on three grounds.  First, he contends that the government could and should have exhausted less intrusive means before resorting to wire intercepts.  Second, he contends that the government failed to comply with Title III minimization standards, invalidating the orders and their fruits.  Finally, he contends that Special Agent Braconi made material misrepresentations, at least, and omissions in his supporting affidavits, which warrant a *Franks* hearing to consider the alleged misrepresentations and omissions, and ultimately, suppression.

*Less Intrusive Means*

A wiretap application must include a statement as to whether other "investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or be too dangerous."  18 U.S.C. § 2518(1)(c).  Importantly, however, this statement required by Title III does not mean that the statute requires law enforcement officers to exhaust all investigative techniques before seeking a wiretap order.  *See United States v. Concepcion*, 579 F.3d 214, 218 (2d Cir. 2009).  Generally, this provision requires a court to consider an application under a common sense standard.  *Id.*  Indeed, the Second Circuit has reminded the criminal defense bar and the government that it has "approved of wiretaps in complex and sprawling criminal cases involving large conspiracies[.]"  *Id.*

DiScala argues that the wiretap application and extension application are defective because "the government failed to demonstrate that it had exhausted other less intrusive investigative means" under § 2518(1)(c).  Dkt. No. 353 at 2.  The argument goes on to press that "it is quite possible that [Special Agent] Braconi sought the Wiretap Warrant within as little as

30 days of learning of the supposed CodeSmart scheme[,]" which, by itself, raises § 2518 concerns. *Id.* at 3. DiScala contends that intercepting his text messages would have been less intrusive, asserting that Special Agent Braconi's affidavit makes clear that intercepting text messages "could have produced the information he sought," and that "Braconi knew he could have uncovered a significant amount of information in a less invasive Text Message Warrant." *Id.* at 3-4. In a supplemental filing, *see* Dkt. No. 363, DiScala raised the ante, arguing that the revelation that Confidential Informant 1 was Omniview's former general counsel, Adam Gottbetter, meant that Special Agent Braconi's attempts to demonstrate necessity were "irredeemably flawed[,]" *id.* at 2, given that Special Agent Braconi had stated that the FBI learned about the fraudulent scheme from CS-1, and, if that was the case, then less than two months had elapsed between Gottbetter's revelation and the date Judge Castel signed the wiretap order. *Id.*

The government made a witheringly effective reply, noting that Special Agent Braconi provided a full and complete statement of what other investigative techniques have been tried, or if not actually attempted, why they would not be likely to succeed. Dkt. No. 380 at 57. In fact, the government points out, the wiretap affidavit *exceeded* the Title III necessity requirement by describing these techniques in great detail. *Id.* at 59. Rebutting DiScala's text messages argument, the government notes that Special Agent Braconi represented to the Title III court that some text message providers simply did not retain text messages, that some did not have a consistent data storage retention policy, and that some providers would take at least a week to get text messages in response to a warrant. *Id.* at 61. Furthermore, Special Agent Braconi specifically recited that the co-conspirators were reticent to discuss plans over text or e-mail, and preferred to discuss details over the phone. *Id.* at 61-62.

Given the applicable common-sense understanding that the courts must use when determining the claimed necessity of a wiretap application, DiScala falls well short of the mark. Special Agent Braconi, most reasonably, was not required to exhaust all other means as a wiretap precondition, *see Concepcion*, 579 F.3d at 219, and moreover, his affidavit detailed the various means he had attempted, or considered, in his investigation, including the use of text message warrants, along with an explanation as to their insufficiency. In harmony with the dictates of common sense, this attack on the wiretap orders fails.

*Minimization*

Under 18 U.S.C. § 2518(5), any wiretap order must contain provisions noting that the authorization to intercept must be done as soon as practicable, and must be conducted in a manner that minimizes the interception of communications not subject to interception. 18 U.S.C. § 2518(5); *see also United States v. Ruggiero*, 928 F.2d 1289, 1302 (2d Cir. 1991). When conducting a wiretap, agents must therefore make "reasonable efforts to minimize their interceptions in light of all the relevant circumstances." *United States v. Yannotti*, 541 F.3d 112, 124 (2d Cir. 2008). A court assessing minimization must objectively review the facts and circumstances confronting the agents. *See Scott v. United States*, 436 U.S. 128, 137, 98 S. Ct. 1717, 56 L.Ed.2d 168 (1978).

The wiretap application here, DiScala protests, flunks the minimization test. Dkt. No. 353 at 6. The government, he contends, failed to "articulate or employ any meaningful yardstick for determining relevancy in service of its minimization obligation before, during, or after interception." *Id.* at 7. He calculates that the government often intercepted conversations that he had with his wife, Dounya DiScala.

Since minimization issues are present in <u>every</u> wire interception, it is hardly surprising

that the government had a ready response, highlighting pages 10 through 12 of the wiretap order, *see* Dkt. No. 380-1 at 10-12, which outlined the relatively standard procedures that law enforcement agents had to follow in order to execute the wiretap in accordance with the order.[15] Dkt. No. 380 at 66; *see also* Dkt. No. 352-2 at 106-09. The government represents in furtherance of their argument that FBI agents during the intercepts received specific instructions about Title III's minimization requirements. Dkt. No. 380 at 66. The government also points to the intercepted communications and line sheets as proof of the pudding evidence of its efforts to comply with minimization. For instance, it notes that "[b]etween May 2, 2014 and June 29, 2014, FBI agents intercepted 4,210 calls and 15,926 text message sessions made or received by the DiScala telephone." *Id.* Of all these interceptions, 1,179 calls and 9,299 text message sessions were considered pertinent, meaning that roughly 28% of all phone calls and 60% of text messages were, in fact, pertinent. *Id.* at 66-67. The government argues that, given her status as managing member of one of DiScala's companies, Fidelis, Dounya DiScala was often discussing potentially illegal activity, but when FBI agents *did* intercept wholly personal issues, the agents "properly followed minimization protocols." *Id.* at 67-68.

On the totality of circumstances, it is clear that DiScala conducted a wide swath of business pertinent to the investigation and called many of the alleged participating fraudsters using his cellphone. Given that he was the reputed ringleader of the alleged fraud, the fact that his cell phone was the phone being tapped is relevant to any review of the order authorizing it. *Scott*, 436 U.S. at 141, 98 S. Ct. at 1725. As to the lament about intercepting calls with his wife, as the government notes, Mrs. DiScala worked for her husband, and their conversations often

---

[15] DiScala makes no other specific argument about deviation from the order.

dealt with business concerns. The short of it is that the government understood the obligation to minimize non-pertinent conversations, the line agents working the intercepts were fully apprised of it and not only followed their instructions but kept contemporaneous records of what they did. The defense argument fails.

*Probable Cause*

The affidavit supporting a Title III wiretap application must "provide a full and complete statement of the facts and circumstances relied upon by the application to establish probable cause, 18 U.S.C. § 2518(1)(b)[.]." *See United States v. Rajaratnam*, 719 F.3d 139, 152 (2d Cir. 2013) (internal quotation marks omitted).[16] Probable cause is predicated on the totality-of-the-circumstances, *see Illinois v. Gates*, 462 U.S. 213, 230, 103 S. Ct. 2317, 2328, 76 L.Ed.2d 527 (1983), which means that the judge considering the application must assay all of the factual allegations set forth in the supporting affidavit, and make a "practical, common-sense decision whether" a fair probability has been established as to the existence of the proffered criminal activity. *Diaz*, 176 F.3d at 110; *see also United States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005) (quoting *Gates*, 462 U.S. at 238, 103 S. Ct. at 2332.) "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for … concluding[ing] that probable cause existed." *Gates*, 462 U.S. at 238-39, 103 S. Ct. at 2332. And, of course, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Helen v. North Carolina*, __ U.S. __, 135 S. Ct. 530, 536, 190 L.Ed.2d 475 (2014).

Concomitantly, as part and parcel of the suppression remedy, a moving defendant seeks a *Franks* hearing to attack statements in the affidavit and thereby test the existence of probable

---

[16] The probable cause standard for a wiretap order is the same as for a search warrant. *See United States v. Diaz*, 176 F.3d 52, 110 (2d Cir. 1999).

cause.  To do so, however, his attack must be more than conclusory "and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for truth," which have to be accompanied by an offer of proof.  *Franks v. Delaware*, 438 U.S. 154, 171, 98 S. Ct. 2674, 2684, 57 L.Ed.2d 667 (1978).

On such an application, the complaining defendant must point out the specific portion of the warrant application that they claim is false, which "should be accompanied by a statement of supporting reasons."  *Id.*  Affidavits and sworn (or otherwise reliable) statements of witnesses should also be provided.  *Id.*  Similarly, in order to demonstrate reckless disregard for the truth, a defendant must prove that an affiant "in fact entertained serious doubts as to the truth of his allegations."  *Rajaratnam*, 719 F.3d at 154 (quotation omitted).  Reckless disregard can be inferred from "the omission of critical information in a wiretap application."  *Id.*  The defendant, however, must also show that any misstatements or omissions were material.  *Franks*, 438 U.S. at 171-72, 98 S. Ct. at 2684.  Critically, this determination is made by setting aside any purported false statements, and determining whether what remains in the affidavit would support probable cause to issue the warrant; if so, no hearing is required.  *Id.* at 171-72, 2684-85.  The government, understandably, need not prove "the precision of every detail in a challenged search warrant affidavit, because an affiant is entitled to engage in selective storytelling."  *United States v. Lahey*, 967 F. Supp. 2d 698, 716 (S.D.N.Y. 2013).

Reaching for the last arrow in his quiver, DiScala argues that the wiretap application and extension application fall flat here for want of a probable cause showing, violating his Fourth Amendment rights.  Dkt. No. 353 at 2.  He contends that "[w]hen material omissions, mischaracterizations and misstatements are removed from [Special Agent] Braconi's submissions, the applications lack probable cause."  *Id.*  The circumstances viewed in their

totality, he claims, entitle him to a *Franks* hearing. *Id.* DiScala identifies six specific purported misrepresentations to the Title III Court.

Trading Records

Special Agent Braconi observes in his supporting affidavit that, in securities fraud cases, insiders normally sell shares after the target company's share price has peaked. Dkt. No. 353. at 10. He went on to aver that "[t]rading records show that DiScala, as well as certain individuals associated with him and his companies, received a significant amount of free-trading CodeSmart shares when the price of the shares was low and sold a large amount of the shares at times the price peaked." Dkt. No. 353-2 at 15, ¶ 20.[17] Harmoniously, he noted that CodeSmart shares declined twice, prompting the statement that after building to a peak on July 12, 2013, "the price dropped by 68 percent by August 21, 2013," then spiked on August 30, 2013, before dropping by more than 50 percent by September 20, 2013. *Id.* at 11, ¶ 15.

These statements are in the crosshairs of DiScala's argument that, since, he says, his trading records show that, rather than selling when the price peaked, he bought CodeSmart shares. *See, e.g.,* Dkt. No. 353 at 10. Undercutting whatever significance this dissonant note might have, however, DiScala uses an earlier time comparison for at least part of his argument. Specifically, in offering this point he notes that he sold more than 830,000 shares at an average price of $3.51 per share between May 22, 2013, and June 24, 2013. *Id.* at 10-11. But, then picking up his beat, DiScala asserts that, *after* the July 12, 2013 peak, he was a net purchaser of 210,000 shares of the peaked stock. *Id.* at 11. In advancing this attack on Special Agent Braconi's representations as to profits, DiScala argues that three companies that he purportedly

---

[17] In his memorandum of law, DiScala omitted the "certain individuals" language.

profited from – Soul, Location, and Mojo – were, instead, the cause of almost $2,086,000 in losses.  Dkt. No. 353 at 11; Dkt. No. 392-1 at 11, ¶ 1.  So, DiScala pushes back, his trading records, far from suggesting fraud, demonstrate that "[he] lost, literally, millions of dollars in those other efforts to finance and restructure micro-cap companies," and that Special Agent Braconi's "representations make clear that [Special Agent Braconi] did not even attempt a real analysis."  Dkt. No. 353 at 12.  Pressing ahead in his reply papers, DiScala additionally attacks a statement by Special Agent Braconi that DiScala required "compensation equal to 40 percent ownership of the new corporation[]" he restructured.  Dkt. No. 392 at 12 (citing Dkt. No. 352-2 at ¶ 19).

Intertwined with these salvos, DiScala recasts part of his misstatement argument to spotlight what he claims was Agent Braconi's misreading and subsequent misleading of the Title III court, regarding the trade data.[18]  DiScala points to his purported losses in CodeSmart, contending that he lost almost $4.5 million in CodeSmart through November 29, 2013, while Wexler profited almost $1.3 million and another investor gained more than $1.8 million.  Dkt. No. 404 at 6;[19] Dkt. No. 425 at 1.  The defense contends that Special Agent Braconi's claim that

_____

[18] DiScala also contended that Special Agent Braconi did not have access to his trading records before the May 1, 2014 wiretap affidavit.  *See* Dkt. No. 363 at 1; Dkt. No. 392 at 6-7; *and* Dkt. No. 392-1 (Exh. A).   This particular line of attack, however, has been cut off by the government's representations as to the December 8, 2017 data being the CodeSmart data that Agent Braconi relied upon.  *See, e.g.*, December 8, 2017 Hearing Transcript at 57, 10:17; January 10, 2018 Hearing Transcript at 34, 5:25, 35, 1:22.  The December 8, 2017 production of documents relied upon by Special Agent Braconi included the CodeSmart data, as represented by the government.  The absence of any other trading data from the December 8, 2017 production is irrelevant to this inquiry.

[19] In the same letter, DiScala argues that he is entitled to the Form 302s prepared by Agent Braconi and the metadata for the disc provided on December 8, 2017.  Dkt. No. 404 at 4, n.3.  He argues that this is exculpatory material under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963).  However, he concedes that the Second Circuit has not considered the issue

DiScala sold significant shares as prices peaked is contradicted by the government's "claiming DiScala sold when the 'price was rising.'" Dkt. No. 425 at 2. His argument about the contradictory nature of the government's position, DiScala claims, is buttressed by the "government's . . . theory that 'DiScala and his co-conspirators intended to profit from their fraudulent control of and trading in CodeSmart shares." *Id.* at 3. DiScala also represents that, between June 14, 2013, to July 12, 2013, he lost $675,000, Dkt. No. 455 at 1, arguing that the government "ignored certain transactions in order to arrive at the new calculations of "sales [of] more than 100,000 shares and "proceeds of over $700,000." Dkt. No. 481 at 1-2. He provides an expert report submitted by Haley Eckhart, a finance consultant, to support this conclusion, as well as his argument that the government omitted specific transactions in reaching the figure of a net loss of $328,000 in his shares. *Id.* at 2; Dkt. No. 481-1 (Eckhart Report). The Eckhart Report contends that "the Government's analysis of the Affidavit Bluesheet Data is fatally flawed," as the government appears to have ignored transactions corresponding to DiScala's account numbers "where the 'Name Address' fields in the Affidavit Bluesheet Data did not contain Mr. DiScala's name or entities (Omniview or Fidelis)." Dkt. No. 481-1 at 2, ¶¶ 11-12. Eckhart concludes that, if the Affidavit Bluesheet Data is filtered by "DiScala, Omniview, and Fidelis," the period from June 13, 2013, through July 12, 2013, shows a gain of $700,000. *Id.* at

---

of whether *Brady* obligations arise in the context of a pretrial suppression hearing, although the Fifth Circuit and Ninth Circuit have held that they do. Dkt. No. 404 at 4, n.3. The Court need not decide that question here, however, as these are the CodeSmart trading records that Special Agent Braconi relied on when swearing out the Wiretap Affidavit. *See, e.g.*, December 8, 2017 Hearing Transcript at 57, 10:17; January 10, 2018 Hearing Transcript at 34, 5:25, 35, 1:22. The Court notes that to the extent that Special Agent Braconi reviewed co-conspirators' trading data – and the government has not provided *that* data to *DiScala* – there is no issue, as he would lack standing to review that data. *See, e.g., United States v. Balon*, 384 F.3d 38, 44 (2d Cir. 2004) (collecting Second Circuit cases noting that Title III suppression must be construed in context of Fourth Amendment standing).

5, ¶ 23. By contrast, she notes that if searched by account number, the data reflects a loss of $1,401,083, resulting in a net loss of $676,538. *Id.* at 24-25. Springing back from the figuring to the narrative, DiScala complains that there is no statement in the wiretap affidavit advising that shares in the name of Marlene Goepel were actually owned by him, and that $600,000 in profits from the sale of those shares were sent to him. *See* January 10, 2018 Hearing Transcript at 24, 6:25, 25, 1.

Joining issue in what appeared more like an opening skirmish in the ultimate battle over guilt or innocence, rather than a squabble over the sufficiency of an affidavit supporting a Title III application, the government asserts that, contrary to DiScala's representation that he sold 830,000 shares at an avg. of $3.51 per share between May 22, 2013 and June 24, 2013, the trading records relied upon by Special Agent Braconi in preparing his affidavit showed that DiScala sold 498,213 shares for $2,782,944 at an average of $5.59 per share. Dkt. No. 380 at 51. Between June 14, 2013 and July 12, 2013, more specifically, the government submits that DiScala's accounts sold over 100,000 CodeSmart shares for a profit of over $700,000. Dkt. No. 420 at 4.

In line with the see-saw nature of the conduct, the government does confirm that DiScala was a net purchaser of CodeSmart shares from the July 12, 2013 peak through August 21, 2013 – selling 210,432 shares at a cost of $1,234,598. Dkt. No. 380 at 51. Then, continuing to play to the larger skirmish, the government observes that co-conspirators sold 422,563 shares for a profit of $1,312,486, earning DiScala and his co-conspirators at least a $77,888 profit. *Id.* at 51-52.

While presumably relevant at trial, the absence of any such offerings to the Title III judges makes its offering on the motion a backfill at best. The government pressed further to point out that, between August 22 and 30, 2013, "DiScala's accounts executed net sales of

253,489 shares for a profit of $615,034." *Id.* at 52. Consequently, the government contends, even if sales during the period between July 12 through August 30, 2013 did not always occur at price peaks, that fact at odds with the general story line is immaterial, as the trading data clearly demonstrates that DiScala and his co-conspirators intended to profit from their manipulation of target stock trading. Dkt. No. 420 at 4. Climbing higher on the ladder, the government challenges DiScala's representation that he lost $4.5 million during the period from June 14 through November 29, 2013, but concedes he lost approximately $328,000 in that particular time period, though with any losses coming after July 12, 2013, and while his co-conspirators simultaneously made over $2.5 million in their trades in that same stock. Dkt. No. 429 at 2 n.2. The government's backfill operation, presumably, is to show that these calculations not presented to the Title III judges reinforce the argument that the warrant applications did not materially misrepresent anything since the facts confirm that Special Agent Braconi's description of DiScala's trading scheme was "generally accurate," and, in the few instances it was not "completely accurate," any inaccuracies were harmlessly inadvertent. Dkt. No. 380 at 52-53. In any event, underscoring the complexity of the task, and DiScala's failure to make the factual showing necessary to warrant a *Franks* hearing, the government argues that *DiScala* misread his own trading data, and that the figures supplied by the government are correct. The government submits, given his reliance on the entries that he relies upon, DiScala's representations are "clearly erroneous." Dkt. No. 487 at 1.

Cutting through the fog of numbers, all that is critical on this motion to suppress the fruits of the wiretap is the harmony or disharmony between the data Special Agent Braconi represented to the Title III judges and what was shown by the Bluesheet trading data reflected in the December 8, 2017 production, which was the only trading data Special Agent Braconi says he

used in preparing the affidavit he submitted in support of the wiretap application. And, as will be discussed later, since there is plenty of other evidence to support probable cause, that urgency is only to consider whether there was so massive a misrepresentation of facts in the affidavit that the wiretap warrant cannot stand despite the showing of the other evidentiary bases upon which probable cause could rest. Dispositively, given that the Court denied the motion in its order of February 2, it comes as no surprise that there has been no such showing.

Yes, there are surely differences in what the parties claim data shows. For instance, to June 14 and July 12, 2013, DiScala says that data set shows a loss of $676,538, and, with the same limitations, the government says it shows he profited over $700,000. Ultimately, there appears to be a reasonable explanation for the discrepancy between the two figures – either the Bluesheet Data contained errors that Agent Braconi omitted in his analysis, or Agent Braconi searched for the data by name and omitted blank entries. Even DiScala concedes, if a search of his CodeSmart trading data were run only with his name and his companies' names, it would apparently show a profit. If, however, a search were run that included DiScala's various *account* numbers, then the trading records would result in a loss.

That is why the motion fails, despite the depth of detail in his papers. Those details yield no reason to believe that Special Agent Braconi's affidavit should be set aside because it made an outright misrepresentation. What matters on this suppression motion is not what the "could have" or "should have" or "might have found and shown different facts," but whether he had a good faith basis to rely on the facts he did find. The record shows that Special Agent Braconi conducted a search of the Bluesheet trading data that he had using the knowledge that he says he had about DiScala and the entities he controlled and that the search led him to the conclusion that DiScala had made a profit as reflected on the Bluesheet he had considered. Under the totality of

the circumstances, any numerical discrepancy with other data or its manipulation with more complete knowledge would amount to a mistake of fact – and a reasonable one at that. *See, e.g., United States v. Bansal*, 663 F.3d 634, 652-35 (3d Cir. 2011) (holding that mistake of fact exception applies to failure to seal under § 2518(8)(a)); *see also Helen*, __ U.S. __, 135 S. Ct. at 536. Plainly, any such discrepancy does not amount to a fundamental misrepresentation.[20]

Overall, and dispositively on this point, DiScala has not sufficiently alleged that Special Agent Braconi made deliberately false statements or acted with reckless disregard for the truth in his averments regarding DiScala's trading. He has not shown that Special Agent Braconi "entertained serious doubts" as to references regarding trading data he had sworn to in his affidavits. At best, he has alleged that Special Agent Braconi made a reasonable mistake of fact as to what DiScala's own trading records showed.

Price Fluctuations

Even less compelling is the second claimed misrepresentation that price fluctuations were evidence of the securities fraud under FBI investigation. Dkt. 353 at 12. DiScala points to paragraph 15 of the wiretap affidavit, where Special Agent Braconi noted the peaks and declines in CodeSmart trading. *Id.* In perhaps another out-of-town audition of a potential jury argument, DiScala scoffs that "[a]ny person possessing a basic understanding of the stock market understands that fluctuations in stock prices are normal in the industry[,]" which is "particularly true with new issue microcap stocks." *Id.* For purposes of this motion, the government demurs

---

[20] DiScala picks at various other misstatements or arguable misstatements regarding Special Agent Braconi's miscomprehension of various securities trading practices. None of them, individually or collectively, amount to a fundamental misrepresentation, or recklessly disregard of making a fundamental misrepresentation in the affidavit he submitted in support of his application for the wiretap order or any order granting its extension.

that Agent Braconi accurately described the fluctuations, and, more importantly, cited "a wealth of information" – confidential informants, the reverse mergers, the false statements, and DiScala's and co-conspirators' control over shares – to explain and support the conclusion that the fluctuations were a tell-tale sign of securities fraud. Dkt. No. 380 at 49-50.

The short of it is that Special Agent Braconi simply detailed the reasons <u>he believed</u> the targeted CodeSmart's stock price was being manipulated. DiScala's offer of proof comes nowhere close to the third rail of a showing that Special Agent Braconi's statements were "intentional falsehoods" or made with reckless disregard for the truth. *See United States v. Levasseur*, 816 F.3d 37, 43-44 (2d Cir. 1987).

Reverse Mergers

The objection here is that Special Agent Braconi made misrepresentations about reverse mergers by only citing self-serving portions of an SEC investor bulletin on reverse mergers, and improperly concluding "that the use of a reverse merger is an indicator of securities fraud, [and] wire fraud and [that] unlawful monetary transactions have occurred." Dkt. No. 353 at 13. In sharp response, the government states that Agent Braconi discussed reverse mergers because that, effectively, was how CodeSmart came into being, which raised red flags, Dkt. No. 380 at 42, because it was his belief that First Independence "was a shell corporation that CodeSmart used to execute a reverse merger and avoid the rigors and disclosures necessary for a typical initial public offering." Dkt. No. 352-2 at 21, ¶ 28. Certainly, and unfortunate to say, while it is uncontrovertibly true that reverse mergers have been used to perpetrate frauds, what makes this objection really mystifying is that Special Agent Braconi also twice stated in his affidavit that reverse mergers are not per se unlawful. *See* Dkt. No. 352-2 at 22, ¶s 30-31. The affidavit also gave reasons why Special Agent Braconi had concluded that the CodeSmart reverse merger was

of the unlawful variety.  Dkt. No. 380 at 43.  Here, then, DiScala has not made a sufficient

preliminary showing that these statements were either intentional falsehoods or made with

reckless disregard for the truth.  *See, e.g., United States v. Falso*, 544 F.3d 110, 128 (2d Cir.

2008).

Misleading Statements and Press Releases

The fourth group of alleged misrepresentations made to the Title III court that DiScala

identifies relates to statements and press releases issued by CodeSmart.  Specifically, Special

Agent Braconi stated in his affidavit that he believed that individuals associated with CodeSmart

"disseminated false statements in an effort to artificially inflate the price of CodeSmart shares."

Dkt. No. 352-2 at 26, ¶ 37.  The affidavit identified four documents containing the claimed false

statements.

The bottom line is simply this: there is nothing to be gained by giving an autopsy account

of each statement or press release DiScala challenges.  Suffice it to say, that having reviewed

each of the challenged representation with each of the nits DiScala would pick clearly in mind,

the Court concludes that the averments in the affidavit accurately described the subject

documents, and, to the extent there were any omissions or inaccuracies,[21] they were not

materially misleading.  Neither suppression nor a *Franks* hearing, at any rate, can be ordered on

this basis because, the Court finds, DiScala has failed to make a substantial showing that any

---

[21] For example, in May 2013, CodeSmart issued a press release touting its new partnership with
Binghamton University – but that was not true, and the press release contained a number of
misleading statements.  Dkt. No. 352-2 at 23-24, ¶ 32.  Special Agent Braconi's affidavit
attributed this release to DiScala.  What is material to probable cause was not that the statement
was attributable to DiScala but that it was misleading and attributable to someone in the
conspiracy of which DiScala was the alleged ringleader.  Whether DiScala personally was
mechanically the spokesman or not is immaterial.

misstatements or omissions Special Agent Braconi made in this regard were intentional or reckless.

The March 24, 2014, Cubed Form 8-K

Sounding more like a regulatory dispute, this point highlights whether one of the target companies filed the correct SEC form and, if it did, the significance Special Agent Braconi's statement to the contrary might have on the application for a wiretap in the context of a mountain of other evidence pointing to the existence of probable cause. At any rate, DiScala argues that Cubed properly filed its March 2014 Form 8-K.

In connection with this target company, Special Agent Braconi recited in his wiretap affidavit that two confidential informants had stated that DiScala was hunting a company named "Crackpot" or something similar. *See* Dkt. No. 352-2 at 36-37, ¶s 59-61. He swore that he had corroborated their statements by reviewing the Crackpotcube.com website, which made several representations as to a forthcoming mobile electronic device application and listed DiScala and Ofsink, who has pleaded guilty, as team members. *Id.* at 62. He further said that:

> I believe that Omniview agreed to turn Crackpot into a public company and to inflate the price of the newly public company's shares (thereby increasing the wealth of Crackpot's officers, who would also be shareholders of the newly public company) and that in exchange DiScala and his co-conspirators would receive payment in the form of a large volume of the public company's shares (thereby also enriching the Omniview co-conspirators).

*Id.*

Special Agent Braconi went on to discuss, among other filings, a Form 8-K in which Crackpot noted that "Cubed had entered into an Intellectual Property Purchase

Agreement with Crackpot," buying Crackpot's mobile device application and related intellectual property. Given that statement, Special Agent Braconi offered in his affidavit his opinion that Crackpot had effectively become Cubed, transforming from a privately held company to a publicly held company "in a way that avoided the financial disclosures that accompany a typical IPO. *Id.* at 43, ¶ 68. He stated further that, based on his experience and conversations with SEC attorneys and staff, that <u>he had concluded</u> "that Cubed evaded scrutiny further in the particular way it reported the asset purchase to the SEC." The acquired mobile device application, he opined, was a significant asset purchase which was required to be filed under a specific SEC regulation; instead, Cubed reported the asset purchase under a material agreement, which does not trigger the same SEC scrutiny. *Id.* at 44, ¶ 70.

DiScala contends that these assertions are "blatantly false[,]" because, contrary to the declaration in Special Agent Braconi's affidavit, Cubed was not required to report the purchase agreement under SEC Item 2.01, since such a report was only required after the closing of the deal, Dkt. No. 353 at 17-18, and that since the Cubed purchase agreement contemplated four installment payments, there would not be reportable acquisition under Item 2.01 until the fourth payment was made – an event that, at the time of the report had not yet been received. Dkt. No. 352-12; Dkt. No. 392-3 at 3-4, ¶¶ 10-13. The maligned 8-K form was correct. All that was required in the interim, DiScala says, is what was done – to report under Item 1.01.

The government, of course, provides chapter and verse as to why the interpretation of the rules is the correct one. But to cut to the quick of the motion, the Court will assume for purposes of argument that DiScala's reading of the regulations is

the correct one.  It still does not move the needle.  The affidavit filed by Special Agent Braconi in support of the wiretap application made plain to the Title III Court that he was offering his opinion based not only on his experience, but in reliance upon the experience and representations of SEC staff and attorneys in making the representations he had made.  In these circumstances, those representations cannot be found blatantly false or reckless, meaning, on this point, relief is not warranted.

Valuation of Crackpot's Intellectual Property

The final mischaracterization of which DiScala complains is Special Agent Braconi's valuation of the Crackpot intellectual property acquired by Cubed.  It is cut from the same cloth as most of the others and suffers the same fate.  Special Agent Braconi described the acquisition as he understood it, reports of an inflated private sale of shares to insiders, questioned Cubed's alleged capitalization value and that the sale was orchestrated by DiScala.  Dkt. No. 352-2 at 45, ¶ 71; 46, ¶ 72.  Naturally, DiScala has an alternative version of the story, arguing that Special Agent Braconi failed to include the Cubed stock in his valuation of the intellectual property, Dkt. No. 353 at 19 and Dkt. No. 392 at 19, and that the private sale was between two unrelated companies.  Dkt. No. 392 at 22.

It is ultimately for a jury to decide between the two storylines – one of market manipulation and the other of honest deal making.  Contrasting the two now, what emerges from undisputed facts and whatever inferences that may be drawn from them, there has been a robust showing that what Special Agent Braconi represented in his wiretap affidavit was neither materially false nor recklessly made.

Confidential Informants

An affidavit in support of a wiretap application containing information gleaned from confidential informants must be assessed under the totality of the circumstances, including a showing as to the veracity and basis of the knowledge of the informant. *See United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000). In considering "the practical, common-sense judgment" needed in making a probable cause determination, an informant can be corroborated by other sources of information. *See Gates*, 462 U.S. at 244, 103 S. Ct. at 2335.

DiScala, to be sure, contends that the confidential informants (CS-1, CS-2, and CS-3) were, in fact, not reliable. Dkt. No. 404 at 10. He argues that CS-1 was not involved in CodeSmart, and that none of that informant's statements were corroborated by the trading records in the December 8 production. He also asserts that CS-1 had not had contact with DiScala for nine months prior to meeting with Special Agent Braconi; had a history of being untruthful; failed to provide facts for the claim that DiScala "enlists co-conspirators by giving them free-trading shares"; and failed to demonstrate personal knowledge supporting his charge that DiScala artificially inflated share prices to sell for a profit. *Id.* at 10-11.

As to CS-2, DiScala claims that there is not any indication or proof that the information was related to DiScala or the target telephone. He also contends that Special Agent Braconi admits that CS-2's statements were hearsay. Finally, as to CS-3, DiScala argues that CS-3 provided no evidence of illegal or even suspicious activity. Dkt. No. 404 at 12. He notes that Special Agent Braconi claimed that CS-3 knew an alleged co-conspirator, Jeffrey Auerbach, who helped DiScala execute the reverse merger scheme and was a net seller of CodeSmart shares. *Id.* DiScala contends that nothing suggests CS-3 had any other information about the reverse merger. *Id.* at 13.

DiScala's sniping misses the mark. It is true that CS-1 did not have contact with DiScala for the nine months before speaking to Agent Braconi, and that he did not describe unlawful conduct. However, the information the informant did provide was, corroborated not *only* by trading records, but by "public filings, telephone toll records, victim statements, statements by other confidential sources of information, and the independent investigations of other agencies." Dkt. No. 352-2 at 13-14 n.3. It is also plainly relevant and powerful that CS-1 admitted that DiScala had, in the past, "compensated him with 'free-trading shares of stock of the companies on whose transactions CS1 has worked.'" Dkt. No. 404 at 11 (quoting Dkt. No. 352-2 at ¶¶ 18-19.). For largely the same reasons, DiScala's arguments against CS-2 and CS-3 are unpersuasive. While CS-2's information was hearsay, CS2's information as to DiScala's plan was in fact corroborated by Special Agent Braconi's own research into Cubed. Similarly, CS-3's information regarding CodeSmart was clearly relevant to the investigation. Consequently, each of these confidential informants, given corroboration, were reliable and the information they provided was appropriate for inclusion in the narrative put before the Title III court in Special Agent Braconi's affidavit. It was a narrative that sufficiently demonstrated probable cause to the judges who signed the wiretap order and order extending it.

Probable Cause Determination:

Consideration of the entire record, as required by DiScala's fusillade of objections to the wiretap order easily leads to the conclusion that the wiretap application set forth a mother load of evidence supporting a finding of probable cause, and no reason to believe that Special Agent Braconi made, or recklessly risked making, material misrepresentations or omissions to the Title III Court. Any misstatements that Special Agent Braconi made were immaterial – for instance, the squabble over the reporting mechanism for the Cubed intellectual property – and the majority

of the alleged misrepresentations were, ultimately, too insignificant to suggest that Special Agent Braconi lied or had a reckless disregard for the truth. *Levasseur*, 816 F.2d at 43-44. Even the much-ballyhooed fracas over how to slice the trading records established at day's end that Special Agent Braconi's representations were not overt misrepresentations to the Title III courts.

Indeed, assuming that DiScala had won all of those fact battles and that some or all of the statements he challenged were stripped out of the affidavit, a still considerable mountain of evidence would confront him, likely sufficient to find probable cause in the teeth of a handful of misrepresentations. For example, Special Agent Braconi submitted the balance of a detailed, 111 page affidavit that gives ample reason to believe that, even if DiScala lost money on trades, the co-conspirators sold CodeSmart stock at peaks and the conspiracy profited; he also recited other trading records, text messaging and telephone records; he noted reports from victims and excerpts from public filings; he corroborated information from confidential sources; and he described the suspicious circumstances of the way CodeSmart and Cubed were formed.

Given this Court's determination that DiScala has not made a substantial preliminary showing that Special Agent Braconi made material, intentional misrepresentations or omissions, or that he recklessly risked doing so, there is no basis to order a *Franks* hearing. Obviously, given DiScala was unable to make an even lesser showing, DiScala's offerings are insufficient to upset the finding that there was clearly more than enough evidence to show that a crime was in progress, and provide probable cause for the wiretap application. *See Rajaratnam*, 719 F.3d at 156-57; *United States v. Goffer*, 531 Fed. App'x 8, 14 (2d Cir. 2013).

<u>Challenge to the Omniview Search Warrant</u>

*Probable Cause & Request for a Franks Hearing*

The issuance of a valid search warrant depends upon finding that probable cause exists to

believe that, first, a crime has been committed, and second, that evidence or instrumentalities of the crime will be found in the place to be searched. Probable cause is determined by reviewing the totality-of-the-circumstances related to the proposed search, *see Gates*, 462 U.S. at 230, 103 S. Ct. at 2328, which means that a magistrate must consider all of the factors stated in an affidavit, and make a "practical, common-sense decision whether" a fair probability exists that "contraband or evidence of a crime will be found in a particular place." *United States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005) (quoting *Gates*, 462 U.S. at 238, 103 S. Ct. at 2332.) "[T]he duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed[.]" *Gates*, 462 U.S. at 238-39, 103 S. Ct. at 2332 (citation and internal quotation marks omitted).

As previewed earlier, a defendant moving to suppress the fruits of a warrant may be granted a *Franks* hearing to assess the bona fides of the warrant, but only if his attack is more than conclusory "and [] supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for truth," which have to be accompanied by an offer of proof. *Franks*, 438 U.S. at 171, 98 S. Ct. at 2684. The aggrieved defendants must point out the specific portion of the warrant that they claim is false, which "should be accompanied by a statement of supporting reasons." *Id.* They must also show that any misstatements or omissions were material. *Id.* at 171-72, 2684. The determination of materiality is made by setting aside any purported false statements, and determining whether what remains in the affidavit would support probable cause to issue the warrant; if so, no hearing is required. *Id.* at 171-72, 2684-85.

With regard to his first argument, DiScala again identifies a number of purportedly false or misleading representations made by Special Agent Braconi; and many duplicate his challenges

to the wiretap orders. Additionally, DiScala argues that Special Agent Braconi did not allege a connection between the Omniview Office and any false or misleading press release used to justify a search. DiScala also states that "[Special] Agent Braconi failed to inform the [search warrant court] that[,] once the reverse merger took place . . . Mr. DiScala and Omniview could not possess information about upcoming press releases issued by CodeSmart." Dkt. No. 353 at 24.

The government responds that "DiScala appears to be complaining that Special Agent Braconi did not allege that DiScala was directly involved in issuing false and misleading press releases, not that Special Agent Braconi asserted anything that was not true." Dkt. No. 380 at 81. For instance, the government notes that the Omniview warrant application added more details about the scheme than the wiretap application did. *Id.* at 82. The warrant application included information about an additional misleading press release relating to Ramapo College. It also discussed how, on August 27, 2013, co-conspirator Shapiro, who has since pled guilty, announced he bought 25,000 CodeSmart shares from the public at $3.21 per share, amounting to a cost of $80,250, but he did not pay that amount – DiScala directed transfer of $81,278 from a Fidelis account to Shapiro's account. *Id.* at 81. Another point that the government also makes is that DiScala had an inordinately "keen interest" in news released by manipulated companies. *Id.* at 82. Additionally, the government argues that a fair reading of ¶ 50 of the Omniview affidavit establishes that DiScala took credit for a Cubed press release. *Id.* at 83. Finally, the government contends that it was not misleading for it to compare the price of stock and resulting market capitalization with "contemporaneously released, but historical" data to argue that the stock price was grossly overinflated, and suggestive of fraud. *Id.*

First, there is wheat and chaff where issue has been joined on these points. The Court

agrees at the start that the Omniview affidavit fails to demonstrate a connection between Omniview and the CodeSmart press releases, at least in paragraphs 12 through 20. However, critically, the transfer of money between a DiScala company and Shapiro in connection with Shapiro's purchase of CodeSmart stock, the Court observes, strongly supports a finding of probable cause. Additionally, the Court agrees that a fair reading of ¶ 50 of the Omniview Affidavit shows that DiScala took credit for a Cubed press release and inserts him as a player in the manipulation of its stock, a fact supported by other evidence. This, too, supports probable cause.

The next round of objections includes what DiScala terms the failure to show a connection between the Omniview office and any SEC filings that might support a search. DiScala again points to the following lies or omissions by Special Agent Braconi as evidence of misleading and tenuous links to the Omniview premises: statements regarding the CodeSmart and Cubed documents; statements regarding DiScala's concealment of ownership interest in stocks, given that Omniview and Fidelis were sometimes listed as owners; statements regarding alleged trading volume and coordinated transactions; and statements purported unauthorized stock purchases through client accounts. Dkt. No. 353 at 27-32.

Regardless of DiScala's exceptions to it, it is disputable that the Omniview affidavit was detailed as to the links between DiScala, Omniview, and the alleged conspiracy. Special Agent Braconi averred that "DiScala carried out a substantial portion of the trading in the name of his administrative assistant and in the name of LLCs for which he was the CEO." Dkt. No. 352-4 at 15, ¶ 27. Significantly, he also swore that DiScala's principal place of business was Omniview, and that DiScala's assistant worked there. Dkt. No. 352-4 at 68, ¶ 68-69. Perhaps even more important, the wiretap information indicated that DiScala often referred to working out of his

Connecticut office. *Id.* at ¶ 68. The warrant affidavit also noted that many documents referring to the manipulated stocks were "generated, sent, or received from Omniview, by e-mail or other means." *Id.* at ¶ 69. Furthermore, Cubed trading was carried out by DiScala's friends and family; for instance, over an eight day period from April 22 through April 30, 2014, 32,000 out of 57,088 Cubed shares bought during this period were bought by DiScala's wife and father, Bell, Azrak, and Azrak's father. *Id.* at 22, ¶ 42. Special Agent Braconi also averred that in starting in May 2013, "DiScala and his co-conspirators used Bell's clients' accounts to dump their CodeSmart shares." *Id.* at 16-20, ¶s 28-36.

With respect to CodeSmart, Special Agent Braconi averred that "individuals and entities connected to DiScala and Wexler" had obtained 3,000,000 CodeSmart shares, which DiScala and his co-conspirators gained control of, and DiScala subsequently hid his ownership stake to avoid SEC reporting requirements. Dkt. No. 353-4 at 7, ¶ 8; 8, ¶ 11; 15, ¶ 27. At least one document that DiScala says shows that he did not hide his ownership stake – Exhibit N (Dkt. No. 352-15) – appears to be an internal Omniview Document, and does not match figures later filed with the SEC in a Form 8-K, *see* Exhibit I (Dkt. No. 352-10). Notwithstanding DiScala's arguments to the contrary, he was not listed as the owner of the Fidelis CodeSmart stock, or the stock held by Omniview. Instead, his wife and a former employee were listed. Special Agent Braconi used them as representative examples of how DiScala would conceal his stock ownership. Additionally, upon a review of the Form 8-K, it does not appear that DiScala was listed as a beneficial owner – and as the owner of Fidelis and Omniview, he was certainly an "indirect" beneficial owner of CodeSmart stock. The circumstantial evidence of coordination between DiScala, Josephberg, and Bell, along with the direct evidence of the heavily discounted CodeSmart stock purchase agreement signed by DiScala himself, also lend themselves to a

probable cause finding for the Omniview warrant.

Finally, Special Agent Braconi pointed to a loan from DiScala to Shapiro as evidence of connection, as well as a series of text messages between the two men. Dkt. No. 353-4 at 12, ¶ 21. DiScala pointed to the loan agreement as evidence that Special Agent Braconi should have been aware of, but provides no reasoning as to how Special Agent Braconi would have been aware of that promissory note when swearing out the affidavit.

Overall, there was a sufficient link between the Omniview premises and the alleged conspiracy to support a finding of probable cause. Even if Special Agent Braconi made misstatements, as perhaps with the promissory note, they were not intentionally misleading. Special Agent Braconi's detailed submissions and increased evidence lent credence to the warrant application, and Magistrate Judge Fitzsimmons clearly had probable cause to grant the application and issue the warrant.

DiScala's second argument is that the Omniview Warrant entitles him, at least, to a hearing under *Franks v. Delaware*. Given the similarities between Special Agent Braconi's wiretap affidavit and search warrant affidavit, DiScala renews many of the same arguments he made against the wiretap affidavit, and to the extent that DiScala's new submissions are applicable to the Omniview warrant, the Court construes them as such. Even setting aside any purported false statements, the warrant affidavit would clearly support probable cause. More than that, DiScala has not shown that any misstatements or omissions were intentionally misleading or recklessly risked, making any such misrepresentations inmaterial, as required by *Franks. Franks*, 438 U.S. at 171-72, 98 S. Ct. at 2684. Accordingly, the Court denies DiScala's request for a *Franks* hearing as to the Omniview warrant as well.

*Particularity and Overbreadth*

It is black-letter law that, even where a probable cause showing has been made, under the Fourth Amendment, a search warrant must "describe with particularity the place to be searched and the items to be seized." *United States v. Bershchansky*, 788 F.3d 102, 110-11 (2d Cir. 2015). A broad warrant does not necessarily lack particularity, especially where electronic records are concerned. *United States v. Ulbricht*, 858 F.3d 71, 100 (2d Cir. 2017). Breadth of a warrant "deals with the requirement that the scope of the warrant be limited to the probable cause on which the warrant is based." *United States v. Scully*, 108 F. Supp. 3d 59, 90 (E.D.N.Y. 2015) (quotations omitted).

As the Second Circuit has noted, the particularity requirement has three components. *See United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013). "First, a warrant must identify the specific offense for which the [applicant has] established probable cause." *Id.* Next, a warrant must describe the location that will be searched. *Id.* at 445-46. Finally, the warrant "must specify the items to be seized by their relation to designated crimes." *Id.* at 446 (internal quotation marks omitted). Consequently, where nothing on the face of the warrant informs searching officers for what crime the search is being conducted, courts often find such warrants insufficiently particular, especially "where [such warrants] include a general, catch-all paragraph or provision, often one authorizing the seizure of any or all records of a particular type." *United States v. Vilar*, 2007 WL 1075041, at *22 (S.D.N.Y. Apr. 4, 2007). However, when a broad range of crimes is being investigated, courts will often uphold the seizure of a broader range of document and record categories. *See, e.g., United States v. Jacobson*, 4 F. Supp. 3d 515 (E.D.N.Y. 2014). Furthermore, when there is probable cause to believe that a business is permeated with fraud, broad language in a warrant can be permissible. *United States v.*

*D'Amico*, 734 F. Supp. 2d 321, 360 (S.D.N.Y. 2010). In this light, the affidavit seeking to invoke this "all records" exception need only demonstrate probable cause from which to infer that the conduct undergirding probable cause as described in the supporting affidavits "[is] just the tip of the iceberg." *D'Amico*, 734 F. Supp. 2d at 361 (internal quotation marks omitted).

Given the treasure trove of items seized, it is certainly no surprise that DiScala argues that the Omniview warrant lacks particularity and, more pejoratively, is an overbroad, general warrant. He labels it an "all documents" warrant, which allowed agents "to indiscriminately seize every piece of paper and every electronic record at the office." Dkt. No. 353 at 38. He argues that Special Agent Braconi failed to "demonstrate probable cause to justify the seizure of the particular items he sought to seize." *Id.* DiScala complains that the warrant effectively authorized the seizure of all documents relating to himself and Omniview, contending that securities fraud charges – which he concedes were identified in the warrant and application – "do not actually provide guidance in the office of a business such as Omniview." *Id.* at 38-39. DiScala argues that the warrant application did not meet the high showing required to invoke the business fraud exception. In making these arguments, DiScala relies principally on *United States v. Zemlyansky*, 945 F. Supp. 2d 438 (S.D.N.Y. 2013), and *United States v. Wey*, 256 F. Supp. 3d 355 (S.D.N.Y. 2017).

The government retorts that, matched by the application's showing of probable cause, the warrant was sufficiently particularized. Dkt. No. 380 at 88. It argues that the warrant's illustrative list of evidence, "coupled with the reference to the crimes of which evidence is sought," offered sufficiently limiting guidance. *Id.* In any event, the government submits that the business fraud exception should apply, given that "there was a strong basis" to find that Omniview "was permeated by fraud in light of all of the evidence gathered [up to the date of

application, and because there was] little indication that it was engaged in legitimate business untainted by DiScala's fraudulent activities." *Id.* at 89. In essentially an aside, the government observes that not every document was seized, contrary to DiScala's statement. *Id.* In considering *Zemlyansky* and *Wey*, the government contends that the Omniview warrant was closer to those upheld in *United States v. Riley*, 906 F.2d 841 (2d Cir. 1990)*, United States v. Young*, 745 F.2d 733, and *Jacobson*, 4 F. Supp. 3d at 515.

The government has the better of the argument. The Omniview warrant was sufficiently particular. First, the warrant limited all searches to specified crimes: "evidence, fruits and instrumentalities of violations of" 18 U.S.C. §§ 371, 1341, 1343, and 1349, as well as 15 U.S.C. §§ 78j(b) and 78ff. Dkt. 352-4 at 53; *see Galpin*, 720 F.3d at 445. It also contained a clear time limitation, only allowing documents to be seized if they had been created or produced after January 2012. Moreover, the warrant particularly described the premises to be searched in its Attachment A. *Galpin*, 720 F.3d at 445-46. Providing further guidance, the Warrant also contained a list of illustrative items to seize, which were pertinent to the criminal statutes listed for investigation. *See Young*, 745 F.2d at 759. The warrant, plainly, did not permit "a search for evidence of crimes for which there is no probable cause." *United States v. Pugh*, 2014 WL 9450598, at *21 (E.D.N.Y. Dec. 21, 2015).

While, in isolation, the subsection (a) might be seen as circular, as DiScala claims, which authorized a search of Omniview, and allowed Omniview documents to be searched, with that isolated view, the provision could be read to authorize a search with no limitation on what Omniview documents could be seized. But, that provision is not to be read in isolation. It must be read in conjunction with the limiting provision at the top of the page making clear that subsection (a) did not allow all Omniview documents to be seized – just those that were related

to the statutory crimes listed. For example, and there is no factual suggestion by DiScala to the contrary, the agents would have been allowed to, or did, seize, Omniview's health insurance records, or Omniview's rental records, or other extraneous documents. *See, e.g., Jacobson*, 4 F. Supp. at 524 (noting that warrants which "referenced particular crimes and used illustrative lists as a means of limiting the items to be seized" were permissible); *United States v. Hernandez*, 2010 WL 26544, at *10 (S.D.N.Y. Jan. 6, 2010). The warrant was, and should have been read to also "[exclude] reference to personal documents unrelated to financial matters." *United States v. Levy*, 2013 WL 664712, at *9 (S.D.N.Y. Feb. 25, 2013).

As for the computer generated evidence, the government's search of the raw data seized has been limited by a list of search terms by agreement with defense counsel. Dkt. No. 380 at 71. Moreover, the warrant itself incorporated the search of electronic items at footnote 1, which stated that records and information "include evidence of the specified crime(s) in whatever form and by whatever means it may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data)[.]" Dkt. 352-4 at 47 n.1. Additionally, the illustrative list of items in subsections (a) through (g) limited any electronic search of items.

Plainly, in harmony with *Jacobson*, the Omniview warrant is similar in structure to the warrants in *Hernandez* and *Levy*, and *differing* in significant respects from those in *Zemlyansky* and *Wey*. In both *Zemlyansky* and *Wey*, the warrant did not indicate which crimes that were the subject of the search. *See* 945 F. Supp. 2d at 454; 256 F. Supp. 3d at 384. The *Zemlyansky* warrant did not even state which persons, entities, or what potential evidence were subjects of the search. 945 F. Supp. 2d at 457-58. The *Wey* warrant similarly failed to sufficiently link criminal conduct to the property to be searched. 256 F. Supp. 3d at 385-86. Furthermore, absent from both the

*Zemlyansky* and *Wey* warrants were temporal limitations. 945 F. Supp. 2d at 459-60; 256 F. Supp. 3d at 387-88. Here, the Omniview warrant, on the other hand, included all of the missing specifications and these limitations. Indeed, unlike the warrant that was nonetheless upheld in *Levy*, the Omniview Warrant contained a definite temporal limitation. *Levy,* 2013 WL 664712, at *9.

Putting all else aside, it is clear that Special Agent Braconi made a convincing showing for the issuance of the warrant on the "all records exception." The evidence submitted in his application showed probable cause to believe that Omniview was the vehicle through which DiScala was conducting stock manipulation and defrauding investors. Special Agent Braconi's affidavit demonstrated the manipulation of four stocks which was coordinated by DiScala and his cohorts. While Special Agent Braconi did not recite that "there was little activity for several months after signing the lease [for the premises]" or that customers never went in or out of the premises, *see, e.g., Hernandez*, 2010 WL 26544, at *10, he was not required to do so. He did provide what was required -- he provided information linking CodeSmart to Omniview, Bell to Omniview, and Cubed to Omniview, which linked them all to the crimes he was investigating.

In a parallel argument, DiScala challenges the breadth of the warrant. He contends that the "Braconi affidavit does not establish probable cause to seize everything found in the Omniview office." Dkt. No. 353 at 41. Instead, he suggests, the affidavit only establishes grounds for seeking documents relating to CodeSmart, Cubed, StarStream, and the Staffing Group. *Id.* DiScala further argues that "the warrant [improperly] described all hardware, all software, all documents and data related to [myself], and all documents and data related to the very offices that were being searched." *Id.* at 42.

The argument is not only parallel, it is equally unavailing. Yes, the Omniview warrant

did authorize a search for evidence regarding crimes relating to CodeSmart, Cubed, Staffing Group, and StarStream manipulations, but the Omniview warrant was not overbroad in allowing a search coextensive with the complex financial fraud that spawned them. As the agent in *Levy* did, Special Agent Braconi "provided a substantial basis from which" Magistrate Judge Fitzsimmons "could conclude that there was probable cause to believe the fraud allegedly perpetrated with respect to" the four stocks had possibly happened with other stocks and which could supply common scheme or plan evidence in the investigation and prosecution of manipulation in the four target stocks. *Levy*, 2013 WL 664712, at *8. A search of Omniview's complex financial and securities records for evidence of these crimes was well within the contemplation and four corners of the warrant. In direct contrast to the *Zemlyansky* warrant, the Omniview warrant "did not justify a search of [a] sweeping list of items." *Zemlyansky*, 945 F. Supp. 2d at 465. Simply, the Omniview warrant referenced particular crimes and used an illustrative list to give adequate guidance to the searching agents. *See Pugh*, 2015 WL 9450598, at *21.

### Good Faith Exception

Under the good faith rule, the government may use evidence obtained in violation of the Fourth Amendment, as long as the searching officer objectively and reasonably relied on the subsequently invalidated search warrant. *See United States v. Leon*, 468 U.S. 897, 921-922, 104 S. Ct. 3405, 3419-20, 82 L.Ed.2d 677 (1984). *Leon* teaches that the only exceptions to the doctrine of good faith reliance are situations where: "(1) where the issuing [judge] has been knowingly mislead; (2) where the issuing [judge] wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient [such as by failing to

particularize the place to be searched or the things to be seized] that reliance upon it is unreasonable." *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (citations omitted).

In this saving light, the government argues that, even if the Omniview warrant was insufficiently particularized or was overly broad, that the good faith exception should apply, and suppression should be denied. Dkt. No. 380 at 89. The Omniview affidavit, the government submits, was detailed and robust. Refreshing the record, it emphasizes that the warrant was executed *after* the wiretap order was granted and, more powerfully, *after* DiScala had been indicted in this case. *Id.* Based on those realities, the government argues that any "agent would have reasonably believed that probable cause supported seizure of the documents and records described in the Omniview Warrant." *Id.* The government also argues that the facts described "foreclose a finding of deliberate, culpable conduct on the agents' part." *Id.* at 90. Their conduct, the government offers, was not deliberate such that the exclusion of seized evidence would be warranted, and that they were not sufficiently culpable so that deterrence would be worth the cost to the justice system. *Id.*

Having none of it, by contrast, DiScala protests that no good faith can be shown. Dkt. No. 392 at 28-29. He baldly asserts that "Agent Braconi had it out for [him]." *Id.* at 29. His take is that Special Agent Braconi simply "parlayed his faulty and deficient Wiretap Warrant into the equally troubling Omniview Search Warrant[;]" misled Judge Fitzsimmons as to his role in CodeSmart; misrepresented the nature of a penny stock; presented DiScala's conversation about a press release "in the worst light possible[;]" misstated numerous financial concepts; ignored the structure of DiScala's business, including that he needed to be sell stock because he did not earn a salary otherwise; and failed to connect allegations in the warrant application to Omniview. *Id.* at 28-29.

Bluntly, even if, in the absence of the probable cause supporting issuance of the Omniview warrant, good faith execution on these facts, would certainly save the search. Nothing in the warrant application was materially false or recklessly misleading. *See Falso*, 544 F.3d at 126. Nor is there anything to suggest that Magistrate Judge Fitzsimmons abdicated her judicial role in her consideration of that application. *See United States v. Clark*, 638 F.3d 89, 100-101 (2d Cir. 2011). The agents here were surely "justified in executing the warrant." *Falso*, 544 F.3d at 128. Finally, given the broad scope of the scheme detailed in the warrant application, and the complex nature of securities fraud generally, the agents most assuredly would have reasonably presumed the warrant to be valid. At bottom, in any case, the warrant sufficiently particularized the place to be searched, and the things to be seized. *Clark*, 638 F.3d at 101. The motion to suppress the fruits of the ensuing search is denied.

<u>DiScala's Second Motion to Suppress</u>

Under the Fourth Amendment, where a person consents to a warrantless search, the government must demonstrate that the consent was voluntarily given, and not "the result of duress or coercion, express or implied." *Schneckloth v. Bustamante*, 412 U.S. 218, 248, 93 S. Ct. 2041, 2059, 36 L.Ed.2d 854 (1973). "Voluntariness is a question of fact to be determined from all the circumstances," and while a person's knowledge of the right to refuse should be taken into account, the government is not required to demonstrate that knowledge "as a perquisite to establishing a voluntary consent." *Schneckloth*, 412 U.S. at 248-49, 93 S. Ct. at 2059. In resolving a voluntariness challenge to a warrantless search, a defendant is entitled to a suppression hearing if his papers raise a "sufficiently definite, specific, detailed, and nonconjectural" factual basis for the motion to suppress. *United States v. Watson*, 404 F.3d 163, 167 (2d Cir. 2005).

DiScala moves against a warrantless search of his home conducted with the consent of his wife, Dounya DiScala, who resided there with him, principally on the ground that the consent from his wife was not voluntarily given. Dkt. No. 458 at 1-2. DiScala argues that his wife gave consent under duress, due to coercion and submission as to what she "mistakenly understood was lawful authority based on what armed agents communicated to her." *Id.* at 2. He submits that the agents told Mrs. DiScala "that if she did not consent to the search and seizure of the boxes and binders, they would station agents on the premises while they obtained a search warrant." *Id.* Because she had a 7 week old baby at home, she believed she had no other choice but to sign the consent form. *Id.* In his reply brief, DiScala emphasizes that the government did not, in their papers, formally challenge his basic factual assertions.

Whether considered a challenge or not, the government's rebuttal acknowledged that Mrs. DiScala, her child, and "another adult woman who appeared to be a childcare provider" were, indeed, all at the residence. Dkt. No. 471 at 1. The government asserts that Mrs. DiScala, after being advised of her rights, consented orally and in writing, and the government highlights the fact that the consent form she signed unequivocally advised her of her right to refuse permission to search. With that advice, the government submits that she gave permission voluntarily. *Id.* at 1-2; *see also* Dkt. No. 471-1 (consent form). The motion to suppress the warrantless search of DiScala's home is denied as to any documents after February 2012.

It is totally undisputed that Mrs. DiScala signed the written waiver consenting to the search. No affidavits are proffered from her or the child care assistant as to any facts showing there was any lack of understanding or involuntariness on Mrs. DiScala's part. Essentially, the defense relies on the advice Mrs. DiScala received that, if she did not consent, the agents would wait at the premises safeguarding the items to be searched until a warrant was secured. The

principal case upon which DiScala relies, *United States v. Munoz*, 987 F. Supp. 2d 438

(S.D.N.Y.), is patently distinguishable.  There, the police threatened to obtain a search warrant

"in the absence of consent despite knowing that a search warrant most likely would not issue."

*Munoz*, 987 F. Supp. 2d at 444.  Here, given the mass of evidence the investigation had already

developed, the advice given to Mrs. DiScala that a search warrant would be obtained was hardly

hollow.  In these circumstances, the oral and written consent to search given by Mrs. DiScala

stand.  *See Watson*, 404 F.3d at 167.

### 3.  The Severance Motions

#### Applicable Standards

Under Federal Rule of Criminal Procedure 8(b), the joinder of defendants is permitted "if

they are alleged to have participated in the same act or transaction, or in the same series of acts

or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).[22]  The Second Circuit

has read this "to mean that the acts must be 'unified by some substantial identity of facts or

participants,' or 'arise out of a common plan or scheme.'"  *United States v. Attanasio*, 870 F.2d

809, 815 (2d Cir. 1989).  Joinder may, therefore, be proper if one offense depends on or

necessarily leads to the commission of another offense, or if the proof of one act is proof of, or

depends upon proof of, another act.  *See United States v. Shellef*, 507 F.3d 82, 98 (2d Cir. 2006).

That is, to say – "one scheme stemmed from the other."  *Turoff*, 853 F.2d at 1044.  Generally, a

factually supported conspiracy charge suffices to join defendants under Rule 8(b).  *See United

States v. Nerlinger*, 862 F.2d 967, 973 (2d Cir. 1988).

---

[22] In this circuit, where a defendant in a multiple defendant case "challenges joinder of offenses,"
the motion is deemed made under 8(b).  *United States v. Turoff*, 853 F.2d 1037, 1043 (2d Cir.
1988).

There is, however, a caution against reading the rule too restrictively. The Second Circuit has noted that, in cases where any other requirements of Rule 8(b) are satisfied, "members of two or more conspiracies may be joined as defendants even where the members have not been charged as participating in one overarching conspiracy." *United States v. Rittweger*, 524 F.3d 171, 178 (2d Cir. 2008). Additionally, "where two charged conspiracies are 'intertwined with each other, they are sufficiently related to justify joinder." *United States v. Tuzman*, 2017 WL 4785459, at *3 (S.D.N.Y. Oct. 19, 2017) (quoting *Attanasio*, 870 F.2d at 815). It is also the case that – where there are two conspiracies – knowledge of the other conspiracy is not necessarily required for joinder. *United States v. Kouzmine*, 921 F. Supp. 1131, 1133 (S.D.N.Y. 1996). While it may not be required, knowledge of the other conspiracy may be "an indicator of whether or not there is a common scheme or purpose." *United States v. Ohle*, 678 F. Supp. 215, 225 (S.D.N.Y. 2010).

Proper joinder, under Rule 8(b), to be sure, is not necessarily the final decision. Under Rule 14(a), a trial court "may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires" if joinder "appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a). Yet, it must also be kept in mind that the Supreme Court has stated that "[t]here is a preference in the federal system for joint trials of defendants who are indicted together[;]" this is because joint trials promote efficiency and help avoid the problem of inconsistent verdicts. *Zafiro v. United States*, 506 U.S. 534, 537, 113 S. Ct. 933, 937, 122 L.Ed.2d 317 (1993). *Zafiro* made clear that trial courts should only grant severance under Rule 14 when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." 506 U.S. at 539, 113 S. Ct. at 938. Such risks might arise where evidence that would be

inadmissible against a defendant is admitted against a co-defendant, or, when a case is complex, defendants with "markedly different degrees of culpability" are tried. *Id.* But just because evidence may only be admissible against one defendant, and not another, severance is not necessarily warranted. *Rittweger*, 524 F.3d at 179.

Even in the case of mutually antagonistic defenses, severance may not be required. *Zafiro*, 506 U.S. at 538-39, 113 S. Ct. at 938. The Second Circuit has observed that the underlying rationale in favor of joint trials admits to the "inevitable tolerance of some slight prejudice to codefendants, which is deemed outweighed by the judicial economies resulting from the avoidance of duplicative trials." *United States v. Cardascia*, 951 F.2d 474, 482-83 (2d Cir. 1991) (citation omitted).

As a result, to succeed on a motion to sever, the movant must show that a joint trial would entail prejudice "sufficiently severe to outweigh the judicial economy that would be realized." *United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011) (quotation marks omitted). When considering this question of prejudice, a trial court must ponder: (1) the number of defendants and counts; (2) the complexity of the indictment; (3) how long the trial is estimated to last; (4) "disparities in the amount or type of proof offered against the defendants;" (5) "disparities in the degrees of involvement by defendants in the overall scheme;" (6) "possible conflict between various defense theories or trial strategies; and as noted above, (7) prejudice from evidence admissible against co-defendants but not against the movant. *United States v. Gallo*, 668 F. Supp. 736, 739 (E.D.N.Y. 1987).

<u>Morris's Motion to Sever:</u>

Severance is sought first under Rule 8(b), contending that there are two "separate and distinct criminal schemes" – one involving Morris and CodeSmart, and another involving the

other three target companies. It renders his inclusion and joinder with members of the other schemes, he argues, improper. Dkt. No. 350 at 12. Among the several factors supporting his argument, Morris points out that the schemes differ in timing, manner, and players. *Id.* at 12. He contends that nothing in the indictment connects the CodeSmart scheme and the other alleged manipulations. *Id.* at 13. Morris also contends that, because he had a "falling out" with Josephberg and DiScala before the Cubed scheme allegedly occurred, he could not be said to even have knowledge of the Cubed scheme. *Id.* at 14. In his reply brief, he insists that the government's opposition argument has not contested or walked back a prior representation that "two separate schemes [are] charged together in the superseding indictment." Dkt. No. 391 at 2. In support of severance, Morris relies, in substantial part, on *United States v. Lech*, 161 F.R.D. 255 (S.D.N.Y. 1995); *Kouzmine*, 921 F. Supp. at 1131; *United States v. Rajaratnam*, 753 F. Supp. 2d 299 (S.D.N.Y. 2010); and *United States v. Geddes*, 2015 WL 1530800 (D. Conn. Apr. 6, 2015).

Speaking to the objection, the government answers that this case appropriately charges one overarching conspiracy, where the defendants set out to manipulate the stock of multiple companies with the design to enrich each member of the overarching conspiracy. Dkt. No. 380 at 24-25. Specifically, the government argues that "this case presents a straightforward example of a case in which criminal acts are unified by some substantial identity of facts or participants," and "arise out of a common plan or scheme." *Id.* at 24. Joinder is appropriate, the government presses, because the indictment clearly alleges that Morris participated in the securities fraud conspiracy, and the wire and mail fraud conspiracy. *Id.* at 24. The government's argument principally relies on *United States v. Feyrer*, 333 F.3d 110 (2d Cir. 2003).

In evaluating Morris's Rule 8(b)-based severance claim, the Court finds *United States v.*

*Menashe*, 741 F. Supp. 1135 (S.D.N.Y. 1990) instructive. In *Menashe*, defendants Menashe, O'Toole, and St. Francis were charged with conspiring to sell military cargo planes to Iran, and O'Toole was also charged with conspiring to sell anti-aircraft missiles to another country. 741 F. Supp. at 1136. A count naming only O'Toole was severed because his plan could not be called common – he was the only one alleged to be aware of it. *Id.* at 1138. Indeed, a joint trial was found prejudicial to his co-defendants. *Id.* at 1138-39. Here, the facts differ. The contrast is stark. Unlike O'Toole, Morris is not charged alone – he is charged with acting jointly in the CodeSmart scheme. It was O'Toole's singular involvement in one count that earned the severance, not an absence from involvement with others on other counts that warranted Rule 8(b) severance.

The decisions cited by Morris are distinguishable and similarly unhelpful. In *Lech*, the defendant moving for severance, which was granted, was involved in only one of three construction bribery schemes and had no knowledge, much less involvement, in the other two. But, the critical difference is that the movant there was <u>not</u> charged in an overarching conspiracy providing the umbrella for all three. *Lech*, 161 F.R.D. at 256. There, significantly, as the government "also concede[d,] the three schemes detailed in the Indictment could not be charged in one overall conspiracy count." *Id*. at 256. The *Kouzmine* indictment alleged two separate immigration fraud conspiracies, where one conspiracy involved the lead defendant and the other four defendants. Another charged two of those other four of conspiring with each other *after* a falling out with the leader of the first scheme. *Kouzmine* held that the falling out (like the one Morris claims to have had with Josephberg) meant that the leader of the first scheme, and his two loyal co-conspirators could not be joined with the two other withdrawn conspirators. 921 F. Supp. at 1133. Again, the same critical difference appears: the government acknowledged that

"there [was] no colorable argument . . . that both conspiracies alleged [in the *Kouzmine* indictment] were part of a single overarching scheme." *Id.*  Here, not only is an overarching conspiracy count colorable, it has actually been charged by the grand jury.

Indeed, even if the CodeSmart scheme and the other three scheme or schemes targeting stocks were to be considered separate conspiracies, they would still be wired together by their grounding in Omniview.  *Kouzmine* offered an analogy, noting that "in the broadest sense, both conspiracies are part of the same series or acts or transactions constituting offenses – just as the 1995 World Series was part of the same series of acts or transactions that began with Abner Doubleday [the acknowledge creator of baseball]." *Id.*  In other words, *Kouzmine* held that, like the thread that strings together all baseball games, there is a thread that strings together all immigration fraud schemes, but the string was not strong enough to support joinder.  However, if you were a player for the 1995 Atlanta Braves but played only in the first game of the 1995 World Series, you would still be involved in the same occurrences and transactions with the rest of the Braves players suiting up for play in the 1995 Series.  The Omniview conspirators are the metaphorical equivalent of the 1995 Atlanta Braves, its alleged overarching securities fraud conspiracy is the World Series.  Morris allegedly played in the CodeSmart game.   It matters not that he played only in the first game.  Just like a Braves player who only played in game one, he still gets his Series ring.  Under Rule 8(b), having played for the Omniview conspirators only in the CodeSmart scheme, he may be charged as a participant in their World Series - the overarching conspiracy, in which Morris is properly charged as a participant.

In *Rajaratnam*, the indictment charged seven different conspiracies in seven counts, but only one count of named both defendants Rajaratnam and Chiesi.  753 F. Supp. 2d at 305.  Chiesi was not named in one of the counts.  *Id.* at 309.  Nor did the indictment charge connection

of any of the conspirators with an overarching conspiracy, or that there were two separate conspiracies with a "common plan with a substantial overlap of participants and facts." *Id.* at 310. In the absence of such connection, joinder with only one count naming both defendants was improper. *Id.* at 317. While Morris is not alleged to have had knowledge of the other Omniview-related schemes, the indictment *does* allege an overarching conspiracy as well as an overlap of plan and some of the participants in the other schemes. In these circumstances, as noted earlier, even if there were two conspiracies found here, there is alleged the substantial overlap of a combination of participants or events, and what is substantially, a common plan. In this context, *Rajaratnam* provides no refuge.

*Geddes* is also a dry hole for Morris. The moving defendant claimed misjoinder, and sought severance pegged to a demonstration of facts showing that, in an indictment alleging different conspiracies, with the use of different techniques, to achieve different goals, across several years, with some participants never meeting, *Geddes*, 2015 WL 1530800, at *5, he could not be included in an indictment that went on to allege a title insurance scheme, bankruptcy fraud, and insurance fraud. *Id.* This case, too, is distinguishable, as Morris's reliance on it stumbles because the connections missing there are present here. Here, Omniview is the mothership for <u>all</u> participants, hosting the overarching conspiracy, meaning, specifically, that there is an overarching conspiracy, with overlapping participants, similar methods, and events that occurred within a relatively short time frame.

It is this collection of factual connections that makes the difference. It gives factual succor for the government's reliance on *Feyrer*. 333 F.3d at 110. In that case, one of the indicted co-conspirators pled guilty and cooperated with the government. *Id.* at 112. A co-defendant convicted after trial assigned error for failure to sever counts of the indictment,

claiming that the indictment actually charged two conspiracies, and that the cooperating co-conspirator was named in both conspiracies. *Id.* at 114. Persuasively, while agreeing that the conspiracies were separate and that the defendants on trial were not in the same conspiracies, the misjoinder challenge was rejected and the conviction affirmed because, as the Second Circuit explicitly ruled, the charges against both, though in separate conspiracies, "were united by overlapping facts and participants and a common plan[,]" which was "to generate income for [the participants named in each count] through fraudulent stock transactions." *Id.*

Refining focus, it must also be understood that there are, indeed, facts that arguably point to the existence of two or perhaps more separate conspiracies. It is true that there is no allegation that Morris was aware of the Cubed, StarStream, or Staffing Group schemes, or, that Cane was aware of the CodeSmart scheme. It is also true that the different techniques of misrepresentation, i.e., press releases and account manipulation, used in the CodeSmart scheme, as opposed to escrow account deception. At the same time, of course, other facts point to, as the indictment alleges, an overarching conspiracy, fixed on a common purpose – to commit securities fraud by manipulating the stock price of target companies, to permit conspirators to make trades in accord with a prearranged plan that elides upon the dissemination of false information about the target companies using assorted techniques – all to make a profit at the expense of innocent market players. The fraudulent use of accounts, for example, is a common thread unifying the schemes. This commonality of operations satisfies *Attanasio*'s requirement of connectivity. *Attanasio*, 870 F.2d at 815.

To underscore its importance, the fact that there is a non-frivolous overall conspiracy charge reinforces the conclusion that joinder is proper. *Nerlinger*, 862 F.2d at 973. That the conspiracy as alleged is centered on the common participants: DiScala, Josephberg, Wexler, and

Bell, speaks loudly to a superstructure broader than any individual conspiracy.[23]  These allegations, obviously, are the bone, whether there is any meat is for the government to edduce for the jury at trial.  That the government might fail is not the equivalent of misjoinder.  Buttressed by the schemes alleged and the core common participants, and whether there be a single or multiple conspiracies, the requirements of *Attanasio* have been met, making joinder permissible here.  *Attanasio*, 870 F.2d at 815.

Notwithstanding satisfaction of Rule 8(b), Morris seeks severance under Rule 14(a).  Morris argues that the evidence "will confirm" that he was an adversary to DiScala and Josephberg, as they developed a plan that allowed DiScala to "trade *at the expense of and to the enormous detriment of Halcyon*."  Dkt. No. 350 at 7 (emphasis in original).  He also argues that he had no contact with his co-defendants after August 2013.  *Id.* at 9.  As a result, Morris says, his best defense at trial is antagonistic to his codefendants, and so he will effectively act as a shadow prosecutor, forcing DiScala and Josephberg to wage a war on two fronts.  *Id.* at 18.  Indeed, he says that he will proffer evidence at trial to establish that: he only knew DiScala through Josephberg; Josephberg "managed Halcyon's relationship with []Discala;" DiScala and Josephberg were the ones who carried out the CodeSmart scheme; they both used Halcyon to run up margin debt and then did not repay that debt; DiScala's trading through Halcyon "brought [him] and his firm, Halcyon, to financial ruin;" and finally, that he did not participate in the CodeSmart scheme.  *Id.* at 15-16.  Morris also contends that the disparity of evidence, and charges, will be prejudicial to him.  *Id.* at 18-19.

_____

[23] As the government notes, considering the existence and roles of co-defendants who have pled guilty is not unusual.  Dkt. No. 380 at 26 (citing *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003) (considering conspirator who had pled guilty in severance analysis)).

The government belittles Morris's antagonistic defenses argument, contending that "most of the facts cited by Morris, even if true, are not defenses to the charged crimes." Dkt. No. 380 at 30. On the last score, the government argues that the volume of evidence does not pose an insurmountable issue here, because a properly instructed jury would be able to clearly understand Morris's role in the conspiracy, as well as the time frame in which he participated. *Id.* at 33.

It is certainly incorrect to assert, as the government appears to do, that nothing in Morris's line of defenses amounts to a defense. If, for example, Morris proffered proof that he did not participate in the CodeSmart scheme, that would be proof of a defense. But proof that he was not involved with anything DiScala and Josephberg may have done is not "mutually antagonistic" – that is, if the jury accepts Morris's defensive proof, the jury would not necessarily have to find DiScala, Josephberg, or anyone else guilty. *See United States v. Shkreli*, 260 F. Supp. 3d 247, 254 (E.D.N.Y. 2017).

A mutually exclusive defense is generally understood to mean that "acceptance of one . . . necessarily preclude[s] acceptance of the other[.]" *United States v. Yousef*, 327 F.3d 56, 151 (2d Cir. 2003) (quoting *Zafiro*, 506 U.S. at 542, 113 S. Ct. at 939 (Stevens, J., concurring). Unlike in *Shkreli*, Morris does not identify proof tending to establish a principal "defense" that has the effect of inculpating a co-defendant. The evidentiary proffers Morris ticks off are essentially to the effect that DiScala and Josephberg committed charged crimes but, in addition to linking the proof as to the existence of the conspiracy in which he is named, do not amount to proof of a "defense." In short, even if ultimately adverse, the proof is not that of a mutually antagonistic defense. The ground on which Morris seeks Rule 14(a) severance is absent. Consequently, his

Rule 14(b) motion fails.[24]

<u>Cane's Motion to Sever:</u>

Like Morris, Cane argues that her joinder is impermissible under Rule 8(b), relying on the facts that DiScala and Josephberg are the only remaining defendants charged with involvement in all schemes, the indictment does not even allege that she and Morris even knew about each other, and that there are no allegations in any count that she had anything to do with CodeSmart, StarStream, and Staffing. Like Morris, Cane advances *Lech*, *Rajaratnam*, and *Menashe* in support of her severance argument. And, like Morris, her motion attacking joinder comes up short.

Returning to the 1995 World Series metaphor, whether playing for the Braves in the first game, like Morris (CodeSmart), or in the sixth and final game, like Cane (Cubed), both allegedly played for the same team (Omniview) in the same World Series (the overarching conspiracy). More specifically, as analyzed above, *Lech*, *Rajaratnam*, and *Menashe* are all readily distinguishable.

Cane's argument fixates on DiScala as the alleged ring leader of the overarching conspiracy, but the indictment is much broader, centering on four core defendants - DiScala, Josephberg, Wexler, and Bell. Two of them remain to be tried with Cane and Morris. Furthermore, though she is predominantly associated with the Cubed scheme, she is also alleged

---

[24] On December 28, 2017, this Court disqualified Morris's previous counsel due to a conflict with a former client, and subsequently denied his motion for reconsideration of the issue. *United States v. DiScala*, 2017 WL 6623985, at *1 (E.D.N.Y. Dec. 28, 2017), *reconsideration denied*, *United States v. DiScala*, 14-cr-399, slip. op. at 1 (E.D.N.Y. Jan. 15, 2018). In light of continuing difficulties in arranging for successor counsel, Morris renewed his motion to sever at least with respect to the trial presently scheduled to begin on April 2, 2018. That application will be resolved in a separate order.

to have been involved in both the StarStream and Staffing Group schemes. Cane does make the representation, though, "the government has assured counsel that there is no evidence to link her to the alleged scheme to manipulate the shares" of these two schemes. Dkt. No. 342 at 1 n.1. Setting aside the fact that the indictment says otherwise, her charged involvement in just one scheme orchestrated in connection with an overarching conspiracy is enough to anchor her alleged crimes in the overarching conspiracy, and makes joinder appropriate. Cane's invitation to look beyond the indictment's veil is declined. *See, e.g., Ohle*, 678 F. Supp. 2d at 225.

Again like Morris, Cane alternatively seeks severance under Rule 14(a). She presses that *Zafiro* is exactly on point, arguing that, if she is tried with DiScala and Josephberg, "she will be forced to sit through a trial at which evidence relating [to the other schemes] is admitted against her codefendants, even though that evidence is not admissible against her." Dkt. No. 342 at 8. Raising another of Morris's red flags, Cane argues that it is certain that antagonistic defenses will be used, namely, that she will take the position that all trading improprieties were at DiScala's behest, and that he in turn, will take the position that the escrow account and any improprieties are her fault. *Id.* at 9.

While the separate strategies Cane sketches out for herself would likely cause tumult at the defense table, but with evidence of a joint undertaking offered by the government, neither stratagem would provide a defense – only further evidence of each participants own guilt as well as the guilt of the others. In any event, a jury would not have to find DiScala guilty merely because she proved she was not involved in the actual trading. On the flip side, if DiScala were to point the finger at Cane as the only one involved with the escrow account, a jury could not be required to find her guilty of any crime charged.

For all the posturing about the mutual antagonism of their intended strategies, neither

Cane or DiScala have shown that "there is a serious risk that a joint trial would compromise a specific trial right" or of one that would prevent "the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539, 113 S. Ct. at 938. As for jury confusion, it is hardly a novel task for a trial court to provide a jury limiting instructions to guide the jury as to how and for what purposes they may consider evidence admitted before them. Cane's motion for a Rule 14(a) severance, accordingly, is denied.

4.      Other Challenges to the Indictment & Jury Questionnaire

Applicable Legal Standards

Generally, on pre-trial motions to dismiss, trial courts must accept all factual allegations as true. *United States v. Carnesi*, 461 F. Supp. 2d 97, 98 (E.D.N.Y. 2006). On his motion, Morris seeks dismissal for want of venue. Where an indictment charges a conspiracy, "the criminal acts in question" must have substantial contacts with the venue where the charges have been brought. *See United States v. Saavedra*, 223 F.3d 85, 93 (2d Cir. 2000). Venue must be proper for each count. *See Ohle*, 678 F. Supp. 2d at 231. This burden is satisfied when allegations are made that criminal conduct occurred within the venue, even if phrased broadly. *United States v. Murgio*, 209 F. Supp. 2d 698, 721 (S.D.N.Y. 2016); *Ohle*, 678 F. Supp. 2d. at 231. Dispositively, at the pre-trial stage, the government only has to show that the indictment alleges facts sufficient to support venue. *See United States v. Barrett*, 153 F. Supp. 3d 552, 561 n.5 (E.D.N.Y. 2015).

Cane launches a different attack. She demands dismissal on the ground that the conspiracy charged in the indictment is duplicitous. An indictment is duplicitous "if it joins two or more distinct crimes in a single count." *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992). *Aracri* makes clear that an allegation in one conspiracy count that defendants sought to

commit several underlying crimes is not duplicitous, as it is the conspiracy *itself* that is the crime. *Id.* Relatedly, the "question of whether a charged conspiracy is a single conspiracy or in fact multiple conspiracies is a 'question of fact for a properly instructed jury.'" *United States v. Chavez*, 549 F.3d 119, 125 (2d Cir. 2008). The corollary to that rule is that it is not a question for the Court to decide pre-trial. Providing guidance, the Second Circuit instructed in *Chavez*, that a single conspiracy is not changed into multiple conspiracies just because it involves two or more phases or spheres of operation, as long as "there is sufficient proof of mutual dependence and assistance." *Id.* at 125-26. Consonant with this understanding, moreover, case law is abundant that "acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as a part of a single continuing scheme." *United States v. Vilar*, 729 F.3d 62, 79 (2d Cir. 2013) (citations and internal quotation marks omitted).

Morris's Venue Motion

Against the staggering odds set for such pre-trial motions by precedent, Morris contends dismissal is warranted because the indictment does not allege any meaningful activity in the Eastern District of New York. He notes that Halcyon was located in Manhattan, the other defendants either worked in Manhattan, and/or Manhattan and Connecticut (DiScala). The indictment, he argues, fails to show that "an essential element of the alleged crimes occurred in the [Eastern District of New York.]" Dkt. No. 350 at 11.

The government first pounds the law, relying on cited precedent that, in response to a pre-trial venue challenge, the government only needs to show that the indictment alleges any set of facts, which, if accepted as true, supports venue. Dkt. No. 380 at 10-12. The allegation of any overt act in in furtherance of the charged conspiracy, for example, suffices for venue. Indeed,

many indictments which charge, generally, that the charged crime "occurred within the Eastern District of New York and elsewhere," survive for trial. *Id.* at 11. Moreover, it is also clear from the record that defendants Morris, Ofsink, and Azrak all live in the Eastern District, and several individuals allegedly took steps in the Eastern District in furtherance of the scheme. *Id.* at 11-12. For instance, DiScala made telephone calls "either to or from the Eastern District of New York in furtherance of the Cubed and StarStream schemes[,]" as relevant to counts Five - Eleven, and wire transfers were made to and sent by a Staten Island co-conspirator. *Id.* at 12.

The government's opposition, in a nutshell, has clearly marshalled a sufficient collection of contacts and facts to satisfy its pre-trial venue obligations, as discussed in *Murgio*, *Ohle*, and a host of similar decisions. Of course, the government bears the burden of establishing venue at trial by a preponderance of the evidence. *United States v. Rommy*, 506 F.3d 108, 118-119 (2d Cir. 2007). Morris may renew any good faith venue challenge at the close of the government's case-in-chief. *See Ohle*, 678 F. Supp. 2d at 231-32.

<u>Cane's Motion Based on Duplicity</u>

Cane's dismissal motion on duplicitousness travels down two avenues of attack. The first argues that the indictment is duplicitous because it charges multiple conspiracies in the guise of a single overarching conspiracy. The second she borrows from defendant Ira Shapiro, who has since pleaded guilty. The first theory specifically contends that counts One and Two "appear to allege four different conspiracies under the umbrella of a single count." Dkt. No. 342 at 10. Without alleging common objectives and methods, connecting what are separate and identifiable schemes, Cane argues that the indictment improperly merged four separate conspiracies into one for convenience and prejudicial tactical advantage. *Id.*

In retort, the government claims that Cane overlooked or ignores the fact that the

indictment clearly charges a single conspiracy, led by DiScala, who played out a series of market manipulations with a common core of participants – Josephberg, Wexler, and Bell – who took control of the target companies named in the indictment and, bluntly, "engaged in a single scheme to enrich members of the conspiracy by defrauding investors and potential investors" in those companies. Dkt. No. 380 at 13, 18, 19. The government does not dispute that there were other conspirators, like Cane, who had different and smaller roles to play. Nor does the government dispute that specific techniques or methods changed from target to target. But, ultimately, each manipulation essentially worked in the same fashion – with conspirators getting control of trading in the target, organizing a campaign to misrepresent the target's activities and trading, and to orchestrate inside trading among the conspirators to allow the conspirators to enrich themselves at the expense of non-conspirators. Furthermore, the government points out, Morris and Cane were each aware that they were part of a larger organization, with other people playing roles similar to their own in other contexts. *Id.* at 20.

The lament Cane advances on this theory of duplicitousness is foreclosed by *Aracri*. That alleged co-conspiring defendants sought to commit several separate crimes does not make one claim in a single conspiracy count duplicitous, as in such a count of a conspiracy, the conspiracy itself is the crime. *Aracri*, 968 F.2d at 1518; *see also United States v. Daugerdas*, 837 F.3d 212, 226 (2d Cir. 2016). Consequently, counts One and Two properly allege a securities fraud conspiracy and a mail and wire fraud conspiracy, respectively, complete with allegations of "mutual dependence and assistance," worked through a common core of participants. *See, e.g., United States v. Tuzman*, 2017 WL 4785459, at *10-*12 (S.D.N.Y. Oct. 19, 2017). Whether the government can prove what it has charged is a matter reserved for the jury and not for pre-trial resolution by the Court given the factual allegations now of record.

*Chavez*, 549 F.3d at 125.

Cane's second theory is borrowed from Shapiro's earlier, but now academic, motion. Dkt No. 342 at 13; *see also* Dkt. No. 347 at 24-25. Shapiro's argument was, simply, that the unit of prosecution under the securities fraud statute is a single transaction. The argument has its roots in *United States v. Dioguardi*, which held that "each transaction in a securities fraud case constitutes a separate offense." 492 F.2d 70, 83 (2d Cir. 1974). On the strength of *Dioguardi*, Cane argues that Count Four is fatally flawed as duplicitous, given that it does not specify a single securities transaction, and urges the Court to dismiss Count Four. Dkt No. 342 at 13. Dispositively, collecting cases to the contrary, the government lays out Second Circuit authority demonstrating that it is "well-settled" that acts that could be charged separately can be charged in one count, if they can be characterized as parts of one continuing scheme. Dkt. No. 380 at 20; *United States v. Tutino*, 882 F.2d 1125, 1141 (2d Cir. 1989).

To the extent that Shapiro was arguing, and that Cane picking up his lead, continues to do so, that each single transaction of securities fraud must be charged separately, that does not appear to be what *DioGuardi* stands for, especially given that it dealt with a *multiplicity* challenge. Indeed, Cane's contention does not square with the approved practice in the Second Circuit, where indictments will charge both securities fraud and a conspiracy to commit said fraud, allege a starting and ending date in the securities fraud count, and allege the means of committing the fraud. *See, e.g., United States v. Winick*, 13-cr-452, Superseding Indictment, Counts 19 & 20 (E.D.N.Y. Jul. 16, 2015); *United States v. Stitsky*, Superseding Indictment, Count 2 (S.D.N.Y. Aug. 31, 2009); *see also, Wey*, 2017 WL 237651, at *4 (concluding that conspiracy and securities fraud counts were not duplicitous). Here, Count Four alleged fraudulent and manipulate sales of Cubed Stock, in connection with a continuing fraud scheme,

which is in line with the Second Circuit's case law and practice in the district courts.

Accordingly, Cane's motion to dismiss Count Four as duplicitous is denied.[25] *Tutino*, 882 F.2d at 1141; *see also Aracri*.

### 5. Conclusion

This Memorandum Opinion fleshes out the reasons for the skeletal order the Court entered on February 2, 2018. It is on these bases that the Court resolved the following motions in the indicated manner: DiScala's motions to suppress and for a *Franks* hearing are denied; Morris's motion to sever is denied on the grounds asserted and his motion to dismiss is denied without prejudice to renewing the motion at the close of the government's case; Cane and DiScala's motion to sever is denied; and Cane's motion to dismiss the indictment is denied. Separately, Cane's motion for use of a jury questionnaire is granted.

Dated: Brooklyn, New York
      February 27, 2018

/s/ Hon. Eric N. Vitaliano
ERIC N. VITALIANO
United States District Judge

---

[25] Cane's omnibus pre-trial motion also sought the use of a questionnaire in aid of voir dire. That motion was previously granted in the Court's memorandum and order on February 2, 2018. *United States v. DiScala*, 14-cr-399, slip op. at 2 (E.D.N.Y. Feb. 2, 2018).