# EXHIBIT A

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 77997 / June 6, 2016

ACCOUNTING AND AUDITING ENFORCEMENT
Release No. 3777 / June 6, 2016

ADMINISTRATIVE PROCEEDING
File No. 3-17277

| | |
|---|---|
| In the Matter of<br><br>**SILBERSTEIN UNGAR PLLC,<br>RONALD N. SILBERSTEIN, CPA<br>JOEL M. UNGAR, CPA<br>SETH A. GORBACK, AND<br>DAVID A. KOBYLAREK, CPA**<br><br>Respondents. | **ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, PURSUANT TO SECTIONS 4C AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934, AND RULE 102(e) OF THE COMMISSION'S RULES OF PRACTICE, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER** |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted against Silberstein Ungar PLLC (or "the firm"), Ronald N. Silberstein, CPA, Joel M. Ungar, CPA, Seth A. Gorback, and David A. Kobylarek, CPA (collectively "Respondents") pursuant to Sections 4C and 21C of the Securities Exchange Act of 1934 ("Exchange Act"), and Rules 102(e)(1)(ii) and (iii) of the Commission's Rules of Practice.

II.

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these

proceedings, which are admitted, and except as provided herein in Section V, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Sections 4C and 21C of the Securities Exchange Act of 1934, and Rule 102(e) of the Commission's Rules of Practice, Making Findings and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

### III.

On the basis of this Order and Respondents' Offers, the Commission finds[1] that

### Summary

These proceedings arise out of deficient audits of financial statements of nine issuer clients by the Respondents, who issued audit reports that failed to comply with Public Company Accounting Oversight Board ("PCAOB") auditing standards.[2] During the audits in question, each of the Respondents repeatedly engaged in improper professional conduct pursuant to Exchange Act Section 4C and Rule 102(e)(1) of the Commission's Rules of Practice that resulted in violations of applicable professional standards and demonstrated a lack of competence to practice before the Commission. Specifically, the Respondents failed to comply with some or all of the following requirements in PCAOB standards: (1) obtain sufficient appropriate evidence to provide a reasonable basis for the audit opinion; (2) evaluate the reasonableness of accounting estimates made by management in the context of the financial statements taken as a whole and adequately document the corresponding audit procedures performed; (3) properly document procedures relating to the evaluation of the adequacy of disclosure in financial statements; (4) obtain appropriate engagement quality reviews; (5) properly examine journal entries for evidence of possible misstatement due to fraud and document the performance of journal entry testing; (6) document how the firm overcame the presumption to send accounts receivable confirmations; (7) perform analytical procedures related to revenue; (8) properly supervise the audit; and (9) exercise due professional care and professional skepticism.

In addition, Silberstein Ungar violated, and Silberstein, Ungar, Gorback, and Kobylarek willfully aided and abetted and caused the firm's violations of, Exchange Act Rule 2-02(b)(1) of Regulation S-X when Silberstein Ungar claimed in each of its audit reports that it complied with PCAOB standards when it had not. Based upon Silberstein Ungar's deficient audit reports being included in issuers' filings, the Respondents also willfully aided and abetted and caused issuers' violations of Exchange Act Sections 13(a) and 15(d) and Rules 13a-1 and 15d-1 thereunder.

---

[1] The findings herein are made pursuant to Respondents' Offers and are not binding on any other person or entity in this or any other proceeding.

[2] The relevant period involves audits conducted for the year ended August 31, 2012 through the year ended February 28, 2013. References to PCOAB auditing standards refer to the standards in effect during the relevant period.

## Respondents

1. **Silberstein Ungar PLLC.** Silberstein Ungar is a Michigan limited liability company and CPA firm located in Bingham Farms, Michigan. The firm previously represented that its specialties included audits of issuers and those companies planning to go public at a later date. During the relevant period, the firm was registered with the PCAOB, the Canadian Public Accountability Board, and the International Franchise Association.[3] In July 2014, Silberstein Ungar's client base was purchased by another CPA firm. Silberstein Ungar still exists but does not currently conduct work auditing public companies.

2. **Ronald N. Silberstein.** Age 59. Silberstein holds an active CPA license in Michigan and joined the firm now known as Silberstein Ungar in July 2007. Silberstein served as the engagement partner for all but one of the audits under review. Silberstein served as a non-equity partner at another CPA firm until August 2015.

3. **Joel M. Ungar.** Age 54. Ungar holds an active CPA license in Michigan and co-founded Ungar & Associates in 2003 (later known as Silberstein Ungar). He served as the engagement quality reviewer for seven of the audits under review in this investigation. Ungar served as the engagement partner for the Issuer C audit. He left the firm in November 2013.

4. **Seth A. Gorback.** Age 37. Gorback began working at Silberstein Ungar in January 2008 as a staff auditor before becoming a manager in March 2010, a non-equity partner in August 2011, and an equity partner in or around August 2012. Although Gorback was a partner in the firm at the time of the audits, he did not serve as the engagement partner in any of the relevant audits and functioned in a role more analogous to that of engagement manager on four of the audits under review. Gorback is currently self-employed.

5. **David A. Kobylarek.** Age 65. Holds an active CPA license in Michigan. Kobylarek began working at Silberstein Ungar in December 2007 as a senior accountant before becoming a manager in March 2010, a non-equity partner in August 2011, and an equity partner in or around August 2012. Although Kobylarek was a partner in the firm at the time of the audits, he did not serve as the engagement partner in any of the relevant audits, functioned in a role more analogous to that of engagement manager on six of the audits under review and prepared and reviewed certain audit work papers for one additional audit under review. Kobylarek is currently retired.

## Other Relevant Entities

6. **Issuer A** is a Nevada corporation with its principal place of business in South Africa. Issuer A's business includes the daily rental of vehicles to business and leisure customers through company-owned stores in the country of South Africa. During the relevant period, Issuer A was a reporting company pursuant to Section 15(d) of the Exchange Act and was quoted on the

---

[3] In 2015, Silberstein Ungar withdrew its registration from the PCAOB. Silberstein Ungar also withdrew from the Canadian Public Accountability Board in October 2014 and transferred its membership in the International Franchise Association to another CPA firm in 2014.

OTC Bulletin Board ("OTCBB"). Silberstein Ungar served as Issuer A's auditor as of and for the year ended February 28, 2013.

7.      **Issuer B** is a Nevada corporation with its principal place of business in Nevada. Issuer B is an exploration stage mining company with claims in Arizona and California. During the relevant period, Issuer B common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and was quoted on the OTCBB. Silberstein Ungar served as Issuer B's auditor as of and for the year ended September 30, 2012.

8.      **Issuer C** is a Nevada corporation with its principal place of business in Nevada. Issuer C is engaged in the identification, acquisition, and development of prospects believed to have mineral deposits in Nevada and Colorado. Issuer C was a reporting company pursuant to Section 15(d) of the Exchange Act and was quoted on the OTCBB. Silberstein Ungar served as Issuer C's auditor as of and for the year ended December 31, 2012.

9.      **Issuer D** is a Nevada corporation with its principal place of business in California. Issuer D owns or has exclusive licenses to various product candidates in the biopharmaceutical and diagnostic areas of the healthcare industry. Issuer D common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and is quoted on the OTCBB. Silberstein Ungar served as Issuer D's auditor as of and for the year ended December 31, 2012.

10.      **Issuer E** is a Nevada corporation with its principal place of business in Nevada. Issuer E specializes in the design, development, manufacturing, marketing and acquisition of proprietary casino table games and associated technology, platforms and systems for the casino gaming industry. Issuer E common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and is quoted on the OTCBB. Silberstein Ungar served as Issuer E's auditor as of and for the year ended December 31, 2012.

11.      **Issuer F** is a Nevada corporation with its principal place of business in Michigan. Issuer F is a technology company providing support within physician and patient web-based platforms, including Electronic Health Records and Patient Portals. Issuer F common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and is quoted on the OTCBB. Silberstein Ungar served as Issuer F's auditor as of and for the year ended December 31, 2012.

12.      **Issuer G** is a Delaware corporation with its principal place of business in New York. Issuer G is an alcoholic beverage company specializing in the development and early growth of spirits and establishing its assets as viable and attractive acquisition candidates for the major global spirits companies. During the relevant period, Issuer G common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and was quoted on the OTCBB. Silberstein Ungar served as Issuer G's auditor and audited the financial statements for the year ended December 31, 2012 included in the Form 10-K filed on April 1, 2013, and the restated financial statements for the year ended December 31, 2012 included in the Form 10-K/A filed on August 21, 2013.

13.     **Issuer H** is a Wyoming corporation with its principal place of business in California.  Issuer H's business includes audio and video streaming and advertising services to internet and terrestrial radio stations and other broadcast content providers.  Issuer H was a reporting company pursuant to Section 15(d) of the Exchange Act and is quoted on the OTCBB.  Silberstein Ungar served as Issuer H's auditor and audited the financial statements for the year ended August 31, 2012 included in the Form 10-K filed on December 14, 2012, and the restated financial statements for the year ended August 31, 2012 included in the Form 10-K/A filed on June 4, 2013.

14.     **Issuer I** is a Nevada corporation with its principal place of business in Oregon.  Issuer I is in the business of designing, developing, and marketing distributed generation, wind power systems for the small wind market as well as power management solutions.  During the relevant period, Issuer I common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and was quoted on the OTCBB.  Silberstein Ungar served as Issuer I's auditor as of and for the year ended February 28, 2013.

## The Conduct at Issue

### A.  Failure to Obtain Sufficient Evidence to Support the Audit Opinion, the Accounting Estimates Made by Management and Adequately Document the Audit Procedures Performed (AS No. 15, AU § 342, and AS  No. 3)

15.     PCAOB Auditing Standard No. 15 *Audit Evidence* requires that the auditor plan and perform audit procedures to obtain sufficient appropriate audit evidence to provide a reasonable basis for his or her opinion. As the assessed risk increases, the evidence that the auditor should obtain also increases.  For example, ordinarily more evidence is needed to respond to "significant risks."[4]  When using the information produced by the Company as audit evidence, the auditor should evaluate the evidence by testing its accuracy and completeness and evaluating whether it is sufficiently precise and detailed for the purposes of the audit.[5]  Additionally, under PCAOB Auditing Standard AU § 342 *Auditing Accounting Estimates*, the auditor's objective when evaluating accounting estimates is to obtain sufficient appropriate evidential matter to provide reasonable assurance that all accounting estimates that could be material to the financial statements have been developed; those accounting estimates are reasonable in the circumstances; and the accounting estimates are presented in conformity with applicable accounting principles and are properly disclosed.[6]

16.     PCAOB Auditing Standard No. 3 *Audit Documentation* requires an auditor to prepare and retain documentation that provides a written record of the basis for its conclusions. Audit documentation must clearly demonstrate that the work was in fact performed.  Among other items, the audit documentation must contain sufficient information to enable an experienced

---

[4]  PCAOB Auditing Standard No. 12 *Identifying and Assessing Risks of Material Misstatement* requires the auditor to determine whether any of the assessed risks of material misstatement are significant risks and provides factors that should be evaluated when determining whether a risk of material misstatement is a significant risk.

[5]  AS No. 15 at .4 –. 5, and .10.

[6]  AU § 342 .07.

auditor, having no previous connection with the engagement to understand the nature, timing, extent, and results of the procedures performed, evidence obtained, and conclusions reached. Audit documentation must also contain sufficient information to enable an experienced auditor, having no previous connection with the engagement, to determine, among other things, the person who reviewed the work and the date of such review.[7]  The following examples demonstrate some of the violations of these auditing standards.

### 1.  Issuer A Audit for the Year Ended February 28, 2013

17.    Receivables and property and equipment comprised a total of approximately 87% of Issuer A's total assets at 2/28/13 and both audit areas were classified as "significant or fraud risks" by Silberstein Ungar.  Gorback and Silberstein initialed the work papers as the respective preparer and reviewer of the documents supporting these audit areas.  These work papers were predominantly comprised of testing prepared and performed by a different accounting firm for a different Issuer A audit.  This other audit was separate and apart from Silberstein Ungar's audit of Issuer A.  The other accounting firm did not assist Silberstein Ungar in performing its Issuer A audit.  Gorback and Silberstein considered the other accounting firm's work papers as if they were prepared by Issuer A's internal accountants and placed no reliance on the testing performed by the other accounting firm.  Nevertheless, Silberstein Ungar's work papers did not contain sufficient documentation of additional audit testing performed by Silberstein Ungar.

18.    The audit work papers meant to document the audit procedures for related party transactions,[8] subsequent events,[9] and inquiries of Issuer A's management concerning the risk of fraud and material misstatement,[10] were either duplicates or near duplicates of work papers from different Silberstein Ungar audits and included the documentation of procedures performed for the other audits, not Issuer A's audit.  In addition, the audit program meant to document the subsequent event procedures, which are procedures that are designed to test for events that occur after the balance sheet date, contains dating that reflects that Gorback performed the procedures prior to Issuer A's balance sheet date.  Gorback also failed to send Issuer A the inquiries of management concerning the risk of fraud and material misstatement until the Form 10-K filing date, and did not receive them back until after the Form 10-K was filed.

### 2.  Issuer B Audit for the Year Ended September 30, 2012 and Issuer C Audit for the Year Ended December 31, 2012

---

[7]  AS No. 3 at .1, .5, and .6.

[8]  AU § 334 *Related Parties* contained the auditors' requirements at the time of this audit for identifying related party relationships and testing related party transactions.

[9]  AU § 560 *Subsequent Events* contains the auditors' requirements for performing procedures to ascertain whether transactions or events occurring in the "subsequent period" between the balance sheet date and the date of the auditor's report require adjustment or disclosure in the financial statements or notes to the financial statements.

[10]  AS No. 12 requires the auditor to perform procedures for assessing the risk of material misstatement of the financial statements, including misstatements due to fraud.  One of the required risk assessment procedures is for the auditor to make inquiries of "the audit committee, management, and others within the company about the risks of material misstatement."

19.     Issuer B and Issuer C are both mining companies whose largest assets, mining claims and mineral rights, represent almost 80% and 45% of their total assets, respectively. For Issuer B, Silberstein Ungar also identified the significant risk relating to these mining assets. However, the audit work papers meant to support the respective audit procedures and conclusion (that no impairment was necessary) mainly consisted of memos based on generally accepted accounting principles applicable to companies in the oil and gas industry, which were not applicable to Issuer B or Issuer C, since they are mining companies. Issuer B's own treasurer raised this concern in an email to Silberstein and others, stating that the accounting principles that were included in the impairment memo pertained to oil and gas wells.[11] Despite this red flag, Silberstein agreed to the use of these accounting principles by the company. These work papers did not contain sufficient documentation of the procedures performed to test the accuracy and completeness of the information in the memos, an evaluation of whether the information was sufficiently precise, or sufficient evidence supporting the company's use of the oil and gas accounting principles or the conclusion that no impairment of these assets was necessary. For example, the audit work papers do not contain evidence Silberstein Ungar reviewed, evaluated, or tested the process used by management to conclude that no impairment was necessary, or developed their own independent expectation to corroborate the results of Issuer B and Issuer C's impairment tests.[12]

20.     Issuer B's audit work papers and notes to the financial statements also reflect the existence of a derivative valued at approximately 50% of Issuer B's liabilities at September 30, 2012. The work papers did not reflect the work performed to assess whether the classification as a derivative was correct. Nor did the Issuer B work papers contain documentation of procedures performed and sufficient evidence supporting whether the information was sufficiently precise in order to determine whether the accounting treatment and disclosures related to the derivative were appropriate. For example, the work papers did not include documentation and sufficient evidence supporting whether Kobylarek and Silberstein: (1) performed auditing procedures to understand the application of generally accepted accounting principles for assertions made by Issuer B about its derivative; (2) determined whether generally accepted accounting principles specified the method to be used to determine the fair value of Issuer B's derivative; (3) evaluated if Issuer B's fair value of the derivative was consistent with the specified valuation method; or (4) evaluated if the presentation and disclosure of derivative was in conformity with generally accepted accounting principles.[13]

---

[11] The memos were prepared by the company or by an accountant engaged to assist in the preparation of the company's accounting records.

[12] AU § 342 *Auditing Accounting Estimates* states that the auditor should obtain an understanding of how management developed the estimate by either reviewing and testing the process used by management to develop the estimate or developing an independent expectation of the estimate to corroborate the reasonableness of management's estimate. AU § 342 .10.

[13] AU § 332 *Auditing Derivative Instruments, Hedging Activities and Investments in Securities* provides guidance for auditors in planning and performing auditing procedures for assertions about derivative instruments, hedging activities, and investments in securities that are made in an entity's financial statements. The auditing procedures required by AU § 332 include obtaining an understanding the application of generally accepted accounting principles for assertions about derivatives, which might require that the auditor have special knowledge because of

21.     Finally, Issuer B's audit file generally does not contain evidence of the date the audit work was completed or the dates Kobylarek and Silberstein performed their review of the work papers. Instead, the audit work papers generally contain the initials of the individual who prepared or reviewed the respective audit work along with the date the audit work was placed into the electronic audit file, rather than the date the audit work was completed or reviewed. For example, the audit work papers reflecting audit testing for the company's cash, mining claims, gold bullion loan, financing fees, related party transactions, testing of journal entries, subsequent events, and inquiries of management concerning the risk of fraud and material misstatement do not contain evidence of the date the audit work was completed or reviewed.

### 3.  Issuer G Restatement Audit for the Year Ended December 31, 2012 and Issuer H Restatement Audit for the Year Ended August 31, 2012

22.     Issuer G filed a Form 10-K/A for the year ended December 31, 2012 on August 21, 2013 and restated the respective financial statements and notes to the financial statements to correct its accounting for certain stock warrants. Issuer H filed a Form 10-K/A the year ended August 31, 2012 on June 4, 2013 and restated the respective financial statements and notes to the financial statements to report a contingent royalty liability associated with the purchase of certain assets and liabilities. Silberstein Ungar's audit documentation for Issuer G's restated stock warrants balances and for Issuer H's restated contingent liability mainly consisted of spreadsheets, memos, and/or calculations that were prepared by Issuer G or Issuer H or their representatives. Kobylarek generally initialed these documents as the "preparer." However, there is no evidence in the audit documentation that Silberstein reviewed the Issuer G work papers. These work papers do not contain sufficient evidence or documentation of procedures performed by Silberstein Ungar on the main financial model inputs and other values underlying the restated amounts in the financial statements, such as the "risk free rate," "expected life in years," and "volatility" inputs in the model chosen to calculate the restated warrant values (for Issuer G) or the discount rate used to calculate the contingent liability (for Issuer H). For example, the auditors did not document whether auditing procedures were performed to test the "volatility" value used to calculate Issuer G's restated warrant values or the discount rate used to calculate Issuer H's contingent liability.[14] Additionally,

---

the complexity of those principles. Additionally, the auditor should determine whether generally accepted accounting principles specify the method to be used to determine the fair value of the entity's derivatives and securities and evaluate whether the determination of fair value is consistent with the specified valuation method. The auditor should also evaluate whether the presentation and disclosure of derivatives and securities in the entity's financial statements are in conformity with generally accepted accounting principles. AU § 332 at .01, 05, .35, and .49.

[14] AU § 328 *Auditing Fair Value Measurements and Disclosures* establishes standards and provide guidance on auditing fair value measurements and disclosures contained in financial statements. The auditor should obtain sufficient appropriate audit evidence to provide reasonable assurance that fair value measurements and disclosures are in conformity with GAAP. The auditor should test the data used to develop the fair value measurements and disclosures and evaluate whether the fair value measurements have been properly determined from such data and management's assumptions. Specifically, the auditor evaluates whether the data on which the fair value measurements are based, including the data used in the work of a specialist, is accurate, complete, and relevant; and whether fair value measurements have been properly determined using such data and management's assumptions. The auditor's tests also may include, for example, procedures such as verifying the source of the data, mathematical recomputation of inputs, and reviewing of information for internal consistency, including whether such information

besides recalculating the company's own computations, the audit team did not perform procedures to test the process used by management to develop the "risk free rate," "expected life in years," and "volatility" inputs in the model chosen to calculate the restated warrant values (for Issuer G) or the discount rate used to calculate the contingent liability (for Issuer H) and did not develop an independent expectation of these estimates to corroborate the reasonableness of management's estimates.

23.    Kobylarek and Silberstein also failed to gather sufficient evidence and documentation supporting the performance of subsequent event testing.  For example, the audit documentation supporting Kobylarek's and Silberstein's subsequent events testing for these restatement audits was limited to a management representation letter signed by Issuer G and Issuer H management.[15]

### 4.  Other Issuer Audits

24.    Failures to comply with the above PCAOB auditing standards regarding sufficient evidence and documentation for the other issuers mainly relate to the impairment testing associated with the issuer's significant assets.  Silberstein, Gorback, and Kobylarek failed to: (1) obtain sufficient appropriate audit evidence supporting the impairment testing performed; (2) evaluate the company-prepared impairment analyses by testing the accuracy and completeness of the underlying information; (3) evaluate whether those analyses were sufficiently precise; and (4) properly document the nature, timing, and extent of the procedures performed.

25.    Issuer D's audit work papers, initialed as prepared by Gorback and reviewed by Silberstein, contained company-prepared financial and cash flows forecasts to support the impairment testing of almost 44% of the company's assets.  The financial forecasts estimated revenues of $21 – $137 million and income of $4 – $77 million from 2013 – 2015.  However, for 2012, Issuer D had no revenues and a $5.1 million loss, and the notes to the financial statements audited by Silberstein Ungar disclose, "company expects to continue to incur substantial losses over the next several years during its development phase …."  The work papers did not contain sufficient evidence to support testing the forecast or the conclusions reached from the forecast, despite the fact the notes to the financial statements contained information about the company's future prospects that conflicted with the forecast. [16]  The section of the audit documentation

---

is consistent with management's intent and ability to carry out specific courses of action. AU § 328 at .01, .03, and .39.

[15] AU § 560 ¶ 12, states the auditor should also generally perform procedures such as making certain inquiries of officers and other executives having responsibility for financial and accounting matters, read the latest available interim financial statements, read the available minutes of meetings of stockholders, directors, and appropriate committees; as to meetings for which minutes are not available, inquire about matters dealt with at such meetings and inquire of client's legal counsel concerning litigation, claims, and assessments as part of ascertaining the occurrence of subsequent events that may require adjustment or disclosure in the financial statements.

[16] "If audit evidence obtained from one source is inconsistent with that obtained from another, or if the auditor has doubts about the reliability of information to be used as audit evidence, the auditor should perform the audit procedures necessary to resolve the matter and should determine the effect, if any, on other aspects of the audit." AS No. 15 at .29.

pertaining to inquiries of Issuer D's management concerning the risk of fraud and material misstatement contained inquiries made of a CEO from a different Silberstein Ungar audit client, as opposed to inquiries made of Issuer D's CEO. This audit documentation was reviewed by Silberstein and Gorback. In addition, inquiries concerning the risk of fraud and material misstatement were sent by Gorback to the Issuer D CFO after the Form 10-K was filed, and were received back from the CFO even later.

26.     For the Issuer F audit, Gorback and Silberstein used an audit program as documentation for the impairment testing for 36% of the company's assets, which were also identified by the audit team as a significant risk. The audit program mainly contained initials and dates or "N/A" next to audit steps without further documentation of the procedures performed.[17] The audit work papers do not contain evidence Silberstein Ungar reviewed, evaluated, or tested the process used by management to test for impairment, or developed their own independent expectation to corroborate the results of Issuer F's impairment test.

27.     The Issuer I and Issuer E impairment documentation, for assets that comprised approximately 50% and 87% of the company's assets, respectively, mainly consisted of statements from management and/or company-prepared memos without further documentation of procedures performed to evaluate whether the information was sufficiently precise and accurate. The audit planning documentation also stated concerning Issuer E that, "there is minimal internal control, and the opportunity for management override exists, so risk of misstatement will be at a high level. We should be aware of the possibility of the overstatement of assets ...." Notwithstanding this red flag, and the fact that significant risks were identified by Silberstein Ungar for these assets, Silberstein, Gorback (for Issuer E), and Kobylarek (for Issuer I) did not obtain sufficient audit evidence to respond to these risks. Additionally, the audit work papers did not contain evidence Silberstein Ungar reviewed, evaluated, or tested the process used by management to test for impairment, or developed their own independent expectation to corroborate the results of Issuer I and Issuer E's impairment test.

### B. Failure to Properly Document Procedures Relating to the Evaluation of the Adequacy of Disclosure in Financial Statements (AS No. 3)

28.     In all of the audits at issue Silberstein, Ungar, Gorback, and Kobylarek failed to include documentation that clearly demonstrated they reconciled underlying accounting records to the issuers' financial statements and/or notes to the financial statements.[18] The audit work papers

---

[17] Audit programs may provide evidence of audit planning as well as limited evidence of the execution of audit procedures. The PCAOB in developing AS No. 3 specifically considered and rejected the idea that use of an audit program eliminated the need for proper documentation in the work papers. AS No. 3 at A12.

[18] "Audit documentation must clearly demonstrate that the work was in fact performed." AS No. 3 at .6. The auditor's substantive procedures must include reconciling the financial statements with the underlying accounting records. AS No. 13 *The Auditor's Response to the Risks of Material Misstatement* at .41. The auditor is required to evaluate whether the financial statements, "contain the information essential for a fair presentation of the financial statements in conformity with the applicable financial reporting framework. Evaluation of the information disclosed in the financial statements includes consideration of the form, arrangement, and content of the financial statements (including the accompanying notes), encompassing matters such as the terminology used, the amount of detail given, the classification of items in the statements, and the bases of amounts set forth." PCAOB Auditing Standard No.14 *Evaluating Audit Results* at .31.

contain lists of audit procedures within audit programs and checklists that include a general procedure for agreeing the financial statements and notes to the financial statements to the accounting records. The respective procedure includes initials and a date or a "yes" indicating the respective procedure was performed. However, there is generally no additional documentation evidencing that the work was actually completed. For example, Issuer A's audit work papers are generally in a foreign currency and the financial statements and notes to the financial statements are presented in U.S. dollars. The audit work papers did not include evidence that Gorback or Silberstein performed any procedures on the conversion of the foreign currency amounts in the work papers into the U.S. dollar amounts in the financial statements and notes to the financial statements. In addition, the Issuer A, Issuer D, and Issuer E work papers did not contain a copy of the respective Form 10-K or the financial statements and notes to the financial statements included in the Form 10-K.

### C. Failure to Comply with the Requirements for Engagement Quality Reviews (AS No. 7)

29.     PCAOB Auditing Standard No. 7 *Engagement Quality Review* requires an engagement quality review and concurring approval of issuance for each audit engagement. The objective of the engagement quality reviewer is to perform an evaluation of the significant judgments made by the engagement team and the related conclusions reached in forming the overall conclusion on the engagement and in preparing the engagement report in order to determine whether to provide concurring approval of issuance. The engagement quality reviewer should review documentation, to the extent necessary, evaluate the significant judgments that relate to engagement planning, and evaluate the engagement team's assessment and response to significant risks. The engagement quality reviewer should also evaluate whether the engagement documentation that he or she reviewed when performing the procedures indicates that the engagement team responded appropriately to significant risks, and supports the conclusions reached by the engagement team with respect to the matters reviewed.[19]

30.     The engagement quality review documentation should contain sufficient information to enable an experienced auditor, having no previous connection with the engagement, to understand the procedures performed by the engagement quality reviewer and include information that identifies: (1) the engagement quality reviewer; (2) the documents reviewed by the engagement quality reviewer; and (3) the date the engagement quality reviewer provided concurring approval of issuance.[20] In addition, PCAOB standards provide that the firm may grant permission to the client to use the engagement report in an audit only after the engagement quality reviewer has performed the review required and provides concurring approval of issuance.[21]

---

[19] AS No. 7 at .1-.2, and .9 - .11.

[20] AS No. 7 at .19.

[21] AS No. 7 at .13.

### 1. Issuer G and Issuer H

31.    Silberstein and his firm failed to comply with the engagement quality review requirements in connection with the Issuer H audit for the year ended August 31, 2012, and the restatement audits of Issuer H for the year ended August 31, 2012 and Issuer G for the year ended December 31, 2012. In each of these cases, the firm issued audit reports for these audit engagements without obtaining an engagement quality review and concurring approval of issuance. Silberstein was the engagement partner for all three audit engagements.

### 2. Issuer B

32.    For the year ended September 30, 2012, Silberstein and the firm failed to obtain an engagement quality review before issuing its audit report and granting Issuer B permission to use that report. The audit report was dated January 15, 2013 and Issuer B filed its Form 10-K, for the year ended September 30, 2012, on January 16, 2013. Ungar did not complete the engagement quality review until after the filing date.

### 3. Ungar's Performance of Engagement Quality Reviews

33.    Ungar served as the engagement quality review partner on the Issuer A, Issuer B, Issuer D, Issuer E, Issuer F and Issuer I audits. The engagement quality review checklist, completed by Ungar and included in the respective audit work papers, purportedly reflects that he performed an objective review of audit documentation relevant to significant accounting, auditing and reporting judgments made by the engagement team and the conclusions reached. It also purportedly indicates that he reviewed and evaluated the engagement team's assessment and response to significant risks, and he acknowledged in the work papers that the engagement work papers that he reviewed supported the conclusions reached by the engagement team with respect to the matters reviewed. As noted above, the audit work papers for these audits did not include sufficient appropriate evidence supporting the procedures performed and conclusions reached by the audit team and documentation of the procedures performed for significant financial statement balances and/or areas identified by the engagement team as a significant risk. Additionally, the audit documentation does not indicate the inquiries Ungar made of the engagement team, the procedures performed, documents reviewed, or whether discussions were held with the engagement team to evaluate the significant judgments related to engagement planning and the engagement team's assessment and audit responses to significant risks. The audit documentation also does not indicate all the documents reviewed by Ungar as part of the engagement quality review.

34.    AS No. 7 provides that the engagement quality reviewer may provide concurring approval of issuance only if, after performing the engagement quality review with due professional care, he or she is not aware of a significant engagement deficiency.[22] Due professional care entails possessing the degree of skill commonly possessed by other auditors and exercising it with reasonable care and diligence.[23] However, the audit areas discussed above, including audit areas

---

[22]  AS No. 7 at .12.

[23]  AU §230 *Due Professional Care in the Performance of Work* at .03-.05.

identified as significant risks, did not contain sufficient evidence and documentation, and the respective audit files do not reflect that Ungar performed his engagement quality reviews with due professional care.

### D. Failure to Properly Examine Journal Entries for Evidence of Possible Misstatement Due to Fraud and Document the Performance of Journal Entry Testing (AU § 316 and AS No. 3)

35.    Material misstatements of the financial statements due to fraud often involve manipulation of the financial reporting process through recording journal entries.[24] Accordingly, the auditor should "design procedures to test the appropriateness of journal entries recorded in the general ledger and other adjustments … made in the preparation of the financial statements."[25] For purposes of identifying and selecting specific entries and other adjustments for testing, and determining the appropriate method of examining the underlying support for the items selected, the auditor should consider factors such as the auditor's assessment of fraud risk, the effectiveness of controls over journal entries, the nature and complexity of the accounts and whether journal entries were processed outside the normal course of business.[26]

36.    "Because fraudulent journal entries often are made at the end of a reporting period, the auditor's testing ordinarily should focus on the journal entries and other adjustments made at that time. However, because material misstatements in financial statements due to fraud can occur throughout the period and may involve extensive efforts to conceal how it is accomplished, the auditor should consider whether there also is a need to test journal entries throughout the period under audit."[27]

37.    The Issuer A, Issuer D, Issuer E, Issuer F, and Issuer H audits did not include properly designed procedures to test the appropriateness of journal entries recorded in the general ledger, and Silberstein, Gorback (for Issuer A, Issuer D, Issuer E, and Issuer F,) and Kobylarek (for Issuer H) did not properly design or perform the testing. Silberstein Ungar's "standard" journal entry testing procedures were significantly different than what was actually performed during the audits and did not comply with PCAOB auditing standards. The following are examples of the deficiencies uncovered during the investigation.

#### 1. Issuer A

38.    The audit work papers did not include evidence that journal entry testing was performed by Silberstein Ungar personnel, except for initials or "yes" responses in audit programs or checklists signed off by Gorback and Silberstein.

---

[24] AU § 316 *Consideration of Fraud in a Financial Statement Audit* at .58.

[25] AU § 316 at .58.

[26] AU § 316 at .61.

[27] AU § 316.62.

### 2.  Issuer E

39.     The journal entry testing performed by Gorback and reviewed by Silberstein was based on a company-prepared report containing one line of Issuer E's journal entries and not the complete journal entries.  Gorback and Silberstein did not perform any testing to ensure the report contained all of Issuer E's journal entries or document the journal entries that were selected for testing or the methodology used for selecting journal entries for testing.  Although certain journal entries were selected in connection with testing Issuer E's account balances, such as testing of revenues and expenses, there is no evidence that Gorback or Silberstein considered factors from AU § 316 when testing the journal entries, such as their assessment of fraud risk, the effectiveness of controls over journal entries, the nature and complexity of the accounts, and whether journal entries were processed outside the normal course of business.

### 3.  Issuer H

40.     The audit work papers reflect three journal entries were selected when Kobylarek performed testing of Issuer H's account balances and transactions.  Kobylarek's initials are reflected in an audit program next to journal entry testing procedures and Silberstein reviewed these audit programs.  However, there is no evidence these journal entries were selected or tested in accordance with AU § 316 or that Kobylarek and Silberstein tested these journal entries in response to considering the assessment of Issuer H's fraud risk, the effectiveness of Issuer H's controls over journal entries, the nature and complexity of the accounts, or whether the journal entries were processed outside the normal course of business.  Additionally, Kobylarek obtained the general ledger but did not make a selection of journal entries from the general ledger in connection with fraud testing.  Nor did he obtain a listing of Issuer H journal entries.  There was no specific documentation of the following journal entry testing work steps that Kobylarek initialed as having performed:  (1) the results of the journal entry testing; (2) how he determined the journal entry population was complete; (3) who performed and reviewed the work; (4) the journal entries selected for testing; (5) the procedures performed; or (6) the conclusions reached.

### E.  Failure to Document How Silberstein Ungar Overcame the Presumption to Send Accounts Receivable Confirmations for the Issuer A Audit (AU § 330)

41.     AU Section 330 *The Confirmation Process* provides guidance concerning the audit confirmation process.  Confirmation of accounts receivable is a generally accepted auditing procedure.  AU § 330 states, "it is generally presumed that evidence obtained from third parties will provide the auditor with higher-quality audit evidence than is typically available from within the entity.  Thus, there is a presumption that the auditor will request the confirmation of accounts receivable during an audit" unless certain circumstances arise.  AU § 330 reflects that an auditor who has not requested confirmations in the examination of accounts receivable should document how he or she overcame the presumption that confirmations should be obtained.[28]  Receivables were classified as a significant risk by Silberstein Ungar and the audit work papers reflected Silberstein Ungar planned to confirm accounts receivable.  Additionally, receivables comprised a

---

[28]  AU § 330 at .01, .34, and .35.

total of approximately 7% of Earn-A-Car's total assets as of February 28, 2013. Silberstein Ungar did not request accounts receivable confirmations during the Issuer A audit and the work papers did not contain documentation concerning why accounts receivable confirmations procedures were not performed by Silberstein Ungar. The work papers contain an "audit documentation checklist" designed to "help the auditor assess the completeness of [its] documentation." Gorback initialed this document as preparer and Silberstein initialed as the reviewer. The document contains an "N/A" next to the question prompting Gorback to document how he overcame the presumption to confirm accounts receivable.

### F.  Failure to Perform Analytical Procedures Related to Revenue (AS No. 14)

42.      As part of the overall review, the auditor should perform analytical procedures, including "analytical procedures relating to revenue through the end of the reporting period."[29]  No analytical procedures were performed for the Issuer A, Issuer D, Issuer E, Issuer F, Issuer G, Issuer H, or Issuer I audits. For example, the Issuer H audit work papers include an "Audit Program for Fraud and Illegal Acts" prepared by Kobylarek and reviewed by Silberstein that reflects these revenue analytical procedures were not applicable, and no analytical procedures were performed for the Issuer H audit. For the Issuer E audit, Gorback marked these procedures, "N/A" in the "Overall Audit Program," which was also reviewed by Silberstein.

### G.  Failure to Properly Supervise the Audit (AS No. 10)

43.      PCAOB Auditing Standard No. 10 *Supervision of the Audit Engagement* states that the "engagement partner is responsible for the engagement and its performance. Accordingly, the engagement partner is responsible for proper supervision of the work of engagement team members and for compliance with PCAOB standards ...."[30]  The engagement partner should review the work of engagement team members and evaluate whether the work was properly performed and documented, the objectives of the procedures were achieved, and the results of the audit work support the conclusions reached.[31]

#### 1.  Silberstein

44.      Silberstein was the engagement partner on the Issuer A, Issuer B, Issuer D, Issuer E, Issuer F, Issuer G restatement, Issuer H, Issuer H restatement, and Issuer I audits and failed to properly supervise those audits. This failure is illustrated by Silberstein failing to detect the numerous errors noted above after reviewing work papers and authorizing the release of the

---

[29]  AS No. 14 at .5 and .7.  AS No. 14 states that analytical procedures performed during the overall review may be similar to the analytical procedures performed as risk assessment procedures.  Analytical procedures performed as part of the risk assessment procedures should be designed to:

    a.  Enhance the auditor's understanding of the client's business and the significant transactions and events that have occurred since the prior year end; and

    b.  Identify areas that might represent specific risks relevant to the audit, including the existence of unusual transactions and events, and amounts, ratios, and trends that warrant investigation. AS No. 12 at .46.

[30]  AS No. 10 at .3.

[31]  AS No. 10 at .5.

respective audit reports.  This was done even though audit evidence and documentation did not comply with PCAOB auditing standards, and procedures required by PCAOB auditing standards were not performed.  For example, and as noted previously, the Issuer A audit testing was predominantly comprised of documentation prepared and testing performed by a different accounting firm for a separate Issuer A audit, even though Silberstein considered those work papers and testing as documentation prepared by Issuer A's internal accountants.  Also, the Issuer A and Issuer D audit files contained duplicative or nearly duplicative work papers documenting procedures and testing from different audits.  For the Issuer B audit, Silberstein did not identify, or consider the impact of, the application of the wrong accounting principles for the impairment testing of Issuer B's largest asset, comprising 80% of Issuer B's total assets.  Those work papers, which Silberstein signed off as reviewing, did not contain documentation of the procedures performed or contain sufficient evidence supporting the conclusion that no impairment of those assets was necessary.  He was also responsible for the failure of the audit file to properly reflect the dates on which the Issuer B audit work papers were completed and reviewed.  Despite the completion and review dates reflected in the audit file, Silberstein confirmed that the audit documentation had been prepared in accordance with applicable auditing standards.

45.    Silberstein also failed to properly supervise the audits and review the work papers. Those failures related to:  (1) the status of engagement quality reviews performed for the Issuer G restatement, Issuer H, and Issuer H restatement audits; (2) journal entry testing performed on the Issuer A, Issuer D, Issuer E, Issuer F, and Issuer H audits; (3) the sufficiency of the audit files for Issuer A, Issuer B, Issuer C, Issuer D, Issuer E, Issuer F, Issuer G, Issuer H, and Issuer I to include documentation that clearly demonstrated the underlying accounting records reconciled to the respective issuers' financial statements and/or notes to the financial statements; (4) the inclusion of an engagement completion document for the Issuer G restatement and Issuer H restatement in the audit files; (5) maintaining a complete and final set of audit documentation for the Issuer G restatement audit; and (6) documentation explaining how Silberstein Ungar overcame the presumption to send accounts receivable confirmations for the Issuer A audit.

### 2.  Ungar

46.    Ungar was the engagement partner on the Issuer C audit and he failed to properly supervise the audit.  As noted above, Ungar failed to detect that Issuer C used the wrong accounting guidance when analyzing its largest assets for impairment, even though he reviewed the impairment analysis.  He also failed to properly supervise the audit relating to whether the work performed for the impairment testing contained documentation of the procedures performed and sufficient evidence supporting the company's conclusion that no impairment of these assets was necessary.  Additionally, Ungar was responsible for the failures of the audit documentation to clearly demonstrate the underlying accounting records reconciled to the financial statements and notes to the financial statements.

**H. Failure to Exercise Due Professional Care and Professional Skepticism (AU § 230 and AS No. 13)**

47.    PCAOB auditing standards require auditors to exercise due professional care in the planning and performance of the audit.[32] Due professional care requires the auditor to exercise professional skepticism: an attitude that includes a questioning mind and a critical assessment of audit evidence.[33] Additionally, the auditor's responses to the assessed risks of material misstatement, particularly fraud risks, should involve the application of professional skepticism in gathering and evaluating audit evidence. Examples of the application of professional skepticism in response to the assessed fraud risks are "obtaining sufficient appropriate evidence to corroborate management's explanations or representations concerning important matters, such as through third-party confirmation, use of a specialist engaged or employed by the auditor, or examination of documentation from independent sources."[34] Respondents failed to exercise professional skepticism and perform a critical assessment of the audit evidence as evidenced by the repeated deficiencies noted above.

### 1.  Silberstein

48.    For example, Silberstein authorized the issuance of audit reports even though the Issuer A audit testing was predominantly comprised of documentation prepared and testing performed by a different accounting firm for a separate Issuer A audit. Silberstein also reviewed Issuer A and Issuer D audit documentation that was duplicative or a near duplicate of audit testing from audits of other Silberstein Ungar clients, and he reviewed Issuer B audit documentation that was dated as completed and/or reviewed after the date the Issuer B 10-K was filed. The lack of engagement quality reviews performed for the Issuer G restatement, Issuer H, and the Issuer H restatement audits also illustrate Silberstein's lack of due professional care.

### 2.  Ungar

49.    Ungar failed to exercise due professional care and professional skepticism since he authorized the issuance of audit reports even though the audit documentation for the impairment analysis of Issuer C's largest asset was based on the wrong accounting guidance. The audit file also did not contain documentation of agreeing the underlying accounting records to the financial statements and notes to the financial statements. Ungar also failed to exercise due professional care and professional skepticism when acting as an engagement quality reviewer, as noted above.

### 3.  Gorback

50.    Gorback prepared and reviewed audit documentation that contained a significant lack of audit documentation and sufficient audit evidence. For example, Gorback initialed as preparer of the Issuer A audit documentation discussed above, which did not include sufficient appropriate audit evidence and documentation of the procedures he performed. Gorback included

---

[32] AU § 230.01.

[33] AU § 230.07.

[34] AS No. 13 at .7.

audit documentation in the Issuer A and Issuer D audit files that were duplicates or near duplicates of documents from other audit files for different audit clients, without updating the documents to reflect whether those respective audit procedures were performed for the Issuer A or Issuer D audits.  Gorback also acknowledged in a "Review and Approval" checklist in the Issuer A and Issuer D audit files that the audit documentation was complete and clearly demonstrated the work performed and that they had properly indexed, cross referenced, signed, and dated audit documentation even though the Issuer A and Issuer D audit documentation contained the deficiencies noted above.  Gorback also failed to include sufficient appropriate audit evidence and documentation of the procedures performed for the Issuer E and Issuer F audits, including evidence and documentation relating to the testing of assets that comprised approximately 87% and 36% of those respective entity's total assets, and which also contained significant risks identified by the audit team.

### 4. **Kobylarek**

51.    Kobylarek prepared and reviewed audit documentation that contained a significant lack of audit documentation and sufficient audit evidence.  As noted above, the audit documentation for the Issuer H and Issuer G restatement audits mainly consisted of documentation prepared by or on behalf of Issuer H or Issuer G, without sufficient appropriate audit evidence supporting the audit testing and documentation of the audit procedures performed. Kobylarek also acknowledged in the "Review and Approval" checklist in the Issuer B audit file that the audit documentation was complete and clearly demonstrated the work performed and that they had properly indexed, cross referenced, signed, and dated audit documentation even though the Issuer B impairment testing did not contain sufficient appropriate evidence and documentation of the procedures performed.  The audit file also reflects that Kobylarek reviewed most of the audit documentation after the Issuer B 10-K was filed.

### **Violations**

52.    As a result of the conduct described above, the Commission finds that Silberstein Ungar, Silberstein, Ungar, Gorback, and Kobylarek engaged in improper professional conduct pursuant to Section 4C(a)(2) of the Exchange Act and Rule 102(e)(1)(ii) of the Commission's Rules of Practice, which includes negligent conduct in the form of:

(1) A single instance of highly unreasonable conduct that results in a violation of applicable professional standards in circumstances in which an accountant, a registered public accounting firm, or associated person knows, or should know, that heightened scrutiny is warranted.

(2) Repeated instances of unreasonable conduct, each resulting in a violation of applicable professional standards, that indicate a lack of competence to practice before the Commission.

53.    As a result of the conduct described above, Silberstein Ungar willfully violated Exchange Act Rule 2-02(b)(1) of Regulation S-X, which requires that an auditor's report state

whether the audit was made in accordance with generally accepted auditing standards, including the standards of the PCAOB plus any applicable rules of the Commission.

54.    As a result of the conduct described above, Silberstein, Ungar, Gorback, and Kobylarek willfully aided and abetted and caused Silberstein Ungar's violations of Exchange Act Rule 2-02(b)(1) of Regulation S-X.

55.    As a result of the conduct described above, Silberstein Ungar, Silberstein, Ungar, Gorback, and Kobylarek willfully aided and abetted and caused the issuers discussed above to violate Exchange Act Sections 13(a) and 15(d) and Rules 13a-1 and 15d-1 thereunder, which prohibits issuers from filing annual reports with the Commission that have financial statements containing false and misleading information.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondents' Offers.

Accordingly, pursuant to Sections 4C and 21C of the Exchange Act and Rules 102(e)(1)(ii) and (iii) of the Commission's Rules of Practice, it is hereby ORDERED, effective immediately, that:

A.    Respondents shall cease and desist from committing or causing any violations and any future violations of Exchange Act Sections 13(a) and 15(d) and Rules 13a-1 and 15d-1 thereunder, and Rule 2-02(b)(1) of Regulation S-X.

B.    Respondents are denied the privilege of appearing or practicing before the Commission as an accountant.

C.    After five years from the date of this order, Respondent Silberstein may request that the Commission consider his reinstatement by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as a:

      1.    a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission. Such an application must satisfy the Commission that Respondent Silberstein's work in his practice before the Commission will be reviewed either by the independent audit committee of the public company for which he works or in some other acceptable manner, as long as he practices before the Commission in this capacity; and/or

      2.    an independent accountant. Such an application must satisfy the Commission that:

(a)    Respondent Silberstein, or the public accounting firm with which he is associated, is registered with the Public Company Accounting Oversight Board ("Board") in accordance with the Sarbanes-Oxley Act of 2002, and such registration continues to be effective;

(b)    Respondent Silberstein, or the registered public accounting firm with which he is associated, has been inspected by the Board and that inspection did not identify any criticisms of or potential defects in Respondent Silberstein or the firm's quality control system that would indicate that Respondent Silberstein will not receive appropriate supervision;

(c)    Respondent Silberstein has resolved all disciplinary issues with the Board, and has complied with all terms and conditions of any sanctions imposed by the Board (other than reinstatement by the Commission); and

(d)    Respondent Silberstein acknowledges his responsibility, as long as Respondent Silberstein appears or practices before the Commission as an independent accountant, to comply with all requirements of the Commission and the Board, including, but not limited to, all requirements relating to registration, inspections, concurring partner reviews and quality control standards.

D.    The Commission will consider an application by Silberstein to resume appearing or practicing before the Commission provided that his state CPA license is current and he has resolved all other disciplinary issues with the applicable state boards of accountancy. However, if state licensure is dependent on reinstatement by the Commission, the Commission will consider an application on its other merits. The Commission's review may include consideration of, in addition to the matters referenced above, any other matters relating to Silberstein's character, integrity, professional conduct, or qualifications to appear or practice before the Commission.

E.    After five years from the date of this order, Respondent Ungar may request that the Commission consider his reinstatement by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as:

1.    a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission. Such an application must satisfy the Commission that Respondent Ungar's work in his practice before the Commission will be reviewed either by the independent audit committee of the public company for which he works or in some other acceptable manner, as long as he practices before the Commission in this capacity; and/or

20

2. an independent accountant. Such an application must satisfy the Commission that:

   (a) Respondent Ungar, or the public accounting firm with which he is associated, is registered with the Public Company Accounting Oversight Board ("Board") in accordance with the Sarbanes-Oxley Act of 2002, and such registration continues to be effective;

   (b) Respondent Ungar, or the registered public accounting firm with which he is associated, has been inspected by the Board and that inspection did not identify any criticisms of or potential defects in Respondent Ungar or the firm's quality control system that would indicate that Respondent Ungar will not receive appropriate supervision;

   (c) Respondent Ungar has resolved all disciplinary issues with the Board, and has complied with all terms and conditions of any sanctions imposed by the Board (other than reinstatement by the Commission); and

   (d) Respondent Ungar acknowledges his responsibility, as long as Respondent Ungar appears or practices before the Commission as an independent accountant, to comply with all requirements of the Commission and the Board, including, but not limited to, all requirements relating to registration, inspections, concurring partner reviews and quality control standards.

F.     The Commission will consider an application by Ungar to resume appearing or practicing before the Commission provided that his state CPA license is current and he has resolved all other disciplinary issues with the applicable state boards of accountancy. However, if state licensure is dependent on reinstatement by the Commission, the Commission will consider an application on its other merits. The Commission's review may include consideration of, in addition to the matters referenced above, any other matters relating to Ungar's character, integrity, professional conduct, or qualifications to appear or practice before the Commission.

G.     After three years from the date of this order, Respondent Kobylarek may request that the Commission consider his reinstatement by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as:

1. a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission. Such an application must satisfy the Commission that Respondent Kobylarek's work in his practice before the Commission will

21

be reviewed either by the independent audit committee of the public company for which he works or in some other acceptable manner, as long as he practices before the Commission in this capacity; and/or

2.  an independent accountant. Such an application must satisfy the Commission that:

    (a)  Respondent Kobylarek, or the public accounting firm with which he is associated, is registered with the Public Company Accounting Oversight Board ("Board") in accordance with the Sarbanes-Oxley Act of 2002, and such registration continues to be effective;

    (b)  Respondent Kobylarek, or the registered public accounting firm with which he is associated, has been inspected by the Board and that inspection did not identify any criticisms of or potential defects in Respondent Kobylarek or the firm's quality control system that would indicate that Respondent Kobylarek will not receive appropriate supervision;

    (c)  Respondent Kobylarek has resolved all disciplinary issues with the Board, and has complied with all terms and conditions of any sanctions imposed by the Board (other than reinstatement by the Commission); and

    (d)  Respondent Kobylarek acknowledges his responsibility, as long as Respondent Kobylarek appears or practices before the Commission as an independent accountant, to comply with all requirements of the Commission and the Board, including, but not limited to, all requirements relating to registration, inspections, concurring partner reviews and quality control standards.

H.  The Commission will consider an application by Kobylarek to resume appearing or practicing before the Commission provided that his state CPA license is current and he has resolved all other disciplinary issues with the applicable state boards of accountancy. However, if state licensure is dependent on reinstatement by the Commission, the Commission will consider an application on its other merits. The Commission's review may include consideration of, in addition to the matters referenced above, any other matters relating to Kobylarek's character, integrity, professional conduct, or qualifications to appear or practice before the Commission.

I.  After three years from the date of this order, Gorback may request that the Commission consider his reinstatement by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as an accountant.

J.      Respondent Silberstein shall pay a civil money penalty in the amount of $35,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  Payment shall be made in the following installments:

1.  $12,000 within 10 days of entry of this Order;
2.  $12,000 within 180 days of entry of this Order;
3.  $11,000 plus interest on the payments described in Section IV.J(1)-(3) pursuant to 31 U.S.C. 3717 within 360 days of entry of this Order.

Prior to making the payment described in Section IV.J(3), Silberstein shall contact the Commission staff to ensure the inclusion of interest.  If any payment is not made by the date the payment is required by this Order, the entire outstanding balance of civil penalties, plus any additional interest accrued pursuant to 31 U.S.C. 3717, shall be due and payable immediately, at the discretion of the Commission staff, without further application.

K.      Respondent Ungar shall, within 10 days of the entry of this Order, pay a civil money penalty in the amount of $7,500 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

L.      Silberstein's and Ungar's payments must be made in one of the following ways:

(1)     Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)     Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)     Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Ronald N. Silberstein or Joel M. Ungar as a respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Tom Krysa, Division of Enforcement, Securities and Exchange Commission, 1961 Stout Street, Suite 1700, Denver, CO  80294-1961.

23

M.    Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents Silberstein and Ungar agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondents Silberstein's and Ungar's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents Silberstein and Ungar agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents Silberstein or Ungar by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

## V.

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the findings in this Order are true and admitted by Respondent Silberstein and Ungar, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondent Silberstein or Ungar under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Respondent Silberstein or Ungar of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

By the Commission.

Brent J. Fields
Secretary

24