1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,        : 14-CR-399(ENV)
                                 :
                                 :
                                 :
        -against-                : United States Courthouse
                                 : Brooklyn, New York
                                 :
                                 :
ABRAXAS J. DISCALA, ALSO         : Wednesday, April 4, 2018
KNOWN AS AJ DISCALA, AND         : 10:00 a.m.
KYLEEN CANE,                     :
                                 :
        Defendant.               :

- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
BEFORE THE HONORABLE ERIC N. VITALIANO
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government: RICHARD P. DONOGHUE
                    INTERIM UNITED STATES ATTORNEY
                    EASTERN DISTRICT OF NEW YORK
                         271 Cadman Plaza East
                         Brooklyn, New York 11201
                    BY:  SHANNON JONES, ESQ.
                         MARK BINI, ESQ.
                         PATRICK HEIN, ESQ.
                         Assistant United States Attorney


For Defendant       CHARLES A. ROSS & ASSOCIATES, LLC
Discala:                 111 Broadway
                         New York, New York 10006
                    BY:CHARLES A. ROSS, ESQ.
                       MATTHEW SHROYER, ESQ.

                    ANDREW B. BOWMAN, ESQ.
                         1804 Post Road East
                         Westport, Connecticut 06880

2

```
For Defendant         LAW OFFICE OF TV SJOBLOM
Discala:                  1875 I Street, NW - Suite 500
                          Washington, D.C. 20006
                      BY:THOMAS V. SJOBLOM, ESQ.

                      CHENG LAW FIRM
                          15155 Gale Avenue - Suite D
                          Whittier, California 90603
                      BY:HANWEI CHENG, ESQ.


For Defendant Cane:   SERCARZ & RIOPELLE LLP
                          810 Seventh Avenue - Suite 620
                          New York, New York 10019
                      BY:RONALD G. RIOPELLE, ESQ.
                          ROBERT CALIENDO, ESQ.




Court Reporter:       Linda A. Marino, Official Court Reporter
                      225 Cadman Plaza East/Brooklyn, NY 11201
                      lindacsr@aol.com


Proceedings recorded by mechanical stenography, transcript
produced by Computer-Aided Transcription.
```

Proceedings                                                3

1          THE COURTROOM DEPUTY:  All rise.  Court is now in

2    session.  The Honorable Eric N. Vitaliano presiding.

3          The case on the calendar is *U.S.A. versus Discala,*

4    *et al.*, Case Number 14-CR-399 on for jury trial.

5          Will the attorneys please state their appearance,

6    beginning with the government.

7          MS. JONES:  Shannon Jones, Mark Bini and Patrick

8    Hein for the United States, along with paralegal Henry

9    Ishitani and FBI Agent Elyse Morris.

10          THE COURT:  Good morning.

11          MR. ROSS:  Good morning, Your Honor.  Charles Ross

12    and Matthew Shroyer and our paralegal Scott Schwartz for

13    Mr. Discala.

14          MR. BOWMAN:  Good morning, Your Honor.  Andrew

15    Bowman also for Mr. Discala.

16          MR. CHENG:  Good morning, Your Honor.  Hanwei Cheng

17    for Mr. Discala.

18          MS. SMITH:  Good morning, Your Honor.  Thomas

19    Sjoblom for Mr. Discala.

20          MR. RIOPELLE:  Good morning, Your Honor.  Roland

21    Riopelle and Robert Caliendo for the defendant Kyleen Cane

22    this morning.

23          THE COURT:  Good morning.

24          THE COURTROOM DEPUTY:  Counsel for both sides

25    present, including defendants.

Proceedings                                          4

1      THE COURT:  Okay, good morning all.  Why don't we
2 attend to housekeeping.
3      The first matter -- I don't know how much
4 housekeeping you have, if you want to come up, we'll do
5 housekeeping.
6      Here, the first piece of housekeeping was the deputy
7 clerk this morning was advised by Alternate Juror Number 4,
8 that on reflection, that his son-in-law, three years ago,
9 Mr. Ross, actually worked for your firm.
10      MR. ROSS:  Is that right?
11      THE COURT:  Yes.  An attorney by the name of Sean
12 Campbell.
13      MR. ROSS:  Yes.
14      THE COURT:  So he wanted to bring that to the
15 Court's attention and he has and now I'm bringing it to
16 everyone else's attention, and what say you?  I don't know,
17 for example, if he worked on this case.
18      MR. ROSS:  No, Your Honor, he was a summer intern in
19 my law firm, and he's been -- I think it's been three years or
20 so since.
21      THE COURT:  Yes, that was the alternate juror's
22 recollection as well, that it was three years.
23      MR. ROSS:  So he never worked on the case, as far as
24 I know.  And I certainly would not have a problem with the
25 alternate juror.

Proceedings                                                    5

1          THE COURT:  Anyone else?

2          MS. JONES:  Your Honor, the government's position is

3     that we think that he should be excused.  He has a direct

4     connection to one of the parties here, and it's incredible

5     that it did not come up before, but we still have five

6     alternates left.

7          THE COURT:  Mr. Riopelle?

8          MR. RIOPELLE:  Your Honor, did the alternate juror

9     say anything about whether it would influence his ability to

10    fair and impartial?

11         THE COURT:  That would have been the next step if we

12    wanted to bring him in.

13         The only thing I wanted to get the sense of the

14    parties first, given that he is Alternate Number 4 out of 6,

15    if we want to go down that route or simply excuse him.

16         And one of the concerns is that, and correct me if

17    I'm wrong, Mr. Ross, I was trying to figure -- I know you

18    weren't originally in the case, but probably three years ago

19    this case was in your office; was it not?

20         MR. ROSS:  Yes, Judge.  And as I think about it,

21    although I don't know for sure, I think it could be possible

22    that he did work on the case.

23         THE COURT:  Well, that takes care of that.  So we

24    will excuse Alternate Juror Number 4 with the thanks of the

25    Court.

Proceedings                                              6

1            The deputy clerk will advise the alternate juror of

2    that before we bring him in.  He reassembled his list with the

3    alternate jurors moving up.

4            Any other housekeeping?

5            MR. ROSS:  Judge, with respect to the coconspirator

6    statements issue.  I spoke with the government, I spoke with

7    Mr. Hein last night.  If we could just have a standing

8    objection to the admission of any coconspirator statements,

9    that would be sufficient.

10           THE COURT:  You can have your objection.

11           MR. ROSS:  Thank you, Judge.

12           THE COURT:  You can have my standing overrules.

13           MR. ROSS:  Okay.

14           Anything else?

15           MR. RIOPELLE:  One other, Your Honor.  I take it

16   that, or I would like the record to reflect that if the Court

17   is willing, an objection by one defendant would be an

18   objection by all.  I don't have to stand up each time and join

19   in that objection.

20           THE COURT:  Yes, the record will reflect that.  Of

21   course, it's on each defendant's burden, to the extent they do

22   not want to be associated with an objection, to advise the

23   Court of that where ordinarily you would not have to.  Since

24   you have a standing, you know "me too," to the extent you do

25   not want to be "me too."

Proceedings                                          7

1          MR. RIOPELLE:  Understood, Your Honor.  Thank you.

2          THE COURT:  Let me know, so the record will know.

3          MR. RIOPELLE:  Thank you, Judge.

4          MS. JONES:  Your Honor, just one minor housekeeping

5    issue.  This probably was the plan any ways, but after opening

6    is finished, we are going to need about five minutes to set up

7    the laptop and the exhibits for the first witness.

8          THE COURT:  We will have to remind the court

9    reporter at that point any way.  Yes, that's not a problem.  I

10   don't know, do any estimates as to how long we anticipate?

11         MS. JONES:  Your Honor, the government --

12         MR. BINI:  The government's opening, Your Honor,

13   will be about 15 minutes.

14         THE COURT:  Mr. Ross, you're going second?

15         MR. ROSS:  Yes, sir.  My opening will be in the

16   neighborhood of 45 minutes.

17         THE COURT:  And who is opening for -- Mr. Riopelle?

18         MR. RIOPELLE:  Yes, Judge, about the same.

19         THE COURT:  Same as which?

20         MR. RIOPELLE:  Forty-five.

21         THE COURT:  I was hoping you would say the same as

22   Mr. Bini.

23         MR. RIOPELLE:  Well, remember, Judge, you cut out a

24   lot of it yesterday.

25         THE COURT:  That's frightening.  I got it down to

Proceedings                                              8

1    45?  Give me my knife.

2           MR. BINI:  Your Honor, the government can make

3    another motion in limine.

4           THE COURT:  It's okay, Mr. Bini, I don't need any

5    help.

6           All right, that being the case, sounds like we are

7    ready to go.

8           MR. ROSS:  Judge, one other thing.  We don't have to

9    deal with it now, but there is a scheduling issue with respect

10   to Mr. Sjoblom.

11          As you may recall, we were trying to have a sort of

12   by-the-piece involvement.

13          THE COURT:  Yes.

14          MR. ROSS:  And Mr. Sjoblom's only responsibility at

15   this point is the examination of Deborah Oremland, who's a

16   government expert.

17          The government anticipates putting Ms. Oremland on

18   the stand next week, early next week.  Mr. Sjoblom has an

19   argument in the Seventh Circuit.  He attempted to explain to

20   the Court of Appeals there that he needs to be here.

21          THE COURT:  That's another work.

22          MR. ROSS:  So he's there Monday evening, argues in

23   the morning on Tuesday, and could be back here on Wednesday to

24   hear the direct and do the cross of Ms. Oremland.

25          The government is trying to make some sort of

Proceedings                                                        9

1    accommodation, but they're not being able to tell us they

2    would put her on on Wednesday.  So I just wanted to bring that

3    to Your Honor's attention.

4              THE COURT:  I'm sure you will work it out, and if we

5    have to take a pause to accommodate that because the

6    government can't accommodate them, we will.

7              MR. ROSS:  Thank you, Judge.

8              THE COURT:  Anything else?  Thank you.

9              Let Alternate Juror Number 4 go.  Thank you.

10             (Jury enters the courtroom.)

11             THE COURT:  Counsel will stipulate that the jury is

12   present and properly seated.

13             MR. ROSS:  Yes, Your Honor.

14             MS. JONES:  Yes, Your Honor.

15             THE COURT:  All parties do.

16             Ladies and gentlemen, before we begin, I'm going to

17   ask everyone present in the courtroom to join the Court in a

18   moment of silent reflection on the life and contributions of

19   Dr. Martin Luther King, Jr., on this today the occasion of the

20   50th Anniversary of his assassination.

21             (Pause.)

22             THE COURT:  Thank you.  You may be seated.

23             The clerk will administer the oath to the jury.

24             (Jury was sworn.)

25             THE JURY:  I do.

Proceedings                                           10

1        THE COURTROOM DEPUTY:  Thank you.

2        THE COURT:  Ladies and gentlemen, welcome.  I'm

3    Judge Eric Vitaliano.  I'm privileged and honored to be able

4    to preside on this trial and to welcome you to my courtroom

5    and to the Eastern District of New York, and to tell you that

6    you will hear me say from time to time throughout the case and

7    certainly at its conclusion how much we appreciate your

8    sacrifice in being here and your commitment to performing an

9    enormously important act of citizenship.

10        I tell every jury, whether it's a criminal case like

11   this or civil case, that other than putting on a uniform and

12   defending your country in the time of war, there is no greater

13   act of citizenship than to put aside your own business, your

14   own work and to come to court as a juror and to make what

15   happens in the courtroom the most important business of your

16   day.

17        There are many, many places around the world that we

18   would recognize as democracies and recognize as countries

19   governed by the rule of law but will not do it the way we do

20   it.  What we do in America is that we trust every day

21   Americans to make some of the most difficult decisions that a

22   court is ever asked to make:  Bring your common sense, sit in

23   the court, observe the evidence as it comes in, listen to the

24   court's instructions on the law and make difficult final

25   determinations.  So it is a heavy responsibility and we are

Proceedings                                    11

1    grateful and pleased of your willingness to accept that chore.

2           All of us are pledged to try to make your stay with

3    us first of all as brief as possible, and to call on your

4    services only when we need them.  So there will be times when

5    we might not be sitting or there may be parts of the day that

6    we don't need you, and we will try to let you know in advance

7    when that's going to happen and just try to be as efficient as

8    we can.  I always tell the lawyers brevity is the soul of wit

9    and to get right to the point and try to make it as clear and

10   as plain as they can for the jurors.

11          The other thing I want you to know as well, don't be

12   scared by the number of lawyers that you may see seated here

13   at the respective counsel tables.  They don't get a chance to

14   talk, all of them, to ask questions of every witness.  The

15   lawyers have different responsibilities for their respective

16   parties.  Indeed some of them may not even be here every day.

17   There may be other responsibilities or planning that requires

18   them not to be in the courtroom.

19          But each side, and there are three parties, each

20   side will have an opportunity for one of their number to

21   participate with respect to a given witness, to make an

22   opening statement and a closing statement.  So that's part of

23   how we make it efficient for you as jurors and for the Court

24   as well.

25          Now, I have some formal instructions that I prepared

Proceedings                                              12

1    for you that tell you something about the beginning of the

2    case and something about what we expect from all of you as

3    jurors, and I'm going to ask my deputy clerk of court and law

4    clerk, Ben Mejia, to read those instructions to you.

5              THE LAW CLERK:  Members of the jury, we're about to

6    begin the trial of this criminal case about which you heard a

7    little bit during the process of jury selection.  Before the

8    trial begins, however, there is certain information the Court

9    will now give you which will help you understand what will be

10   presented before you and how you should conduct yourself

11   during the trial.

12             To begin with, you're here to administer justice in

13   this case according to the law and the evidence with complete

14   fairness and impartiality and without bias, prejudice, or

15   sympathy for or against the government or the defendants.

16             This is important to the defendants who are charged

17   with a crime and have the constitutional right to receive a

18   fair trial.

19             The case is also important to the government, since

20   the enforcement of the criminal laws is important.

21             There are three basic rules about a criminal case

22   that you must keep in mind.  First, the defendants are

23   presumed innocent unless and until proven guilty at the

24   conclusion of the case.  The indictment against the defendants

25   brought by the government is only an accusation, nothing more.

Proceedings                                13

1  It is not proof of guilt or anything else.  The defendants,

2  therefore, start out with a clean slate.

3          Second, the burden of proof is on the government

4  throughout the case.  The defendants have no burden to prove

5  their innocence, or to present any evidence, or to testify.

6  Since the defendants have the right to remain silent, the law

7  prohibits you from arriving at your verdict by considering

8  that the defendants may not even testify.

9          Third, the government must prove each defendant's

10 guilt beyond a reasonable doubt.  I will give you further

11 instructions on this point later, but bear in mind that in

12 this respect, a criminal case is different from a civil case.

13         The case is based on an indictment.  I will not read

14 the full indictment to you, but as Magistrate Judge Bloom did

15 during jury selection, I will summarize it for you now.  Keep

16 in mind, however, that an indictment is a document by which a

17 criminal action is commenced and is merely an accusation, a

18 charge, it is not evidence of a defendant's guilt.  The

19 indictment contains 11 counts, although Count Five will not be

20 tried at this time.

21         The first count charges that in or about and between

22 October 2012 and July 2014, both dates being approximate and

23 inclusive, within the Eastern District of New York and

24 elsewhere, the defendants, Abraxas J. Discala, also known as

25 "AJ Discala," and Kyleen Cane, together with others, did

1   knowingly and willfully conspire to use and employ

2   manipulative and deceptive devices and contrivances contrary

3   to Rule 10b-5 of the rules and regulations of the United

4   States Securities and Exchange Commission, Title 17, Code of

5   Federal Regulations, Section 240.10b-5 by:

6          A, employing devices, schemes, and artifices to

7   defraud; B, making untrue statements of material fact and

8   omitting to state material facts necessary in order to make

9   the statements made in light of the circumstances under which

10  they were made not misleading; and C, engaging in acts

11  practices and courses of business which would and did operate

12  as a fraud and deceit upon investors and potential investors

13  in the manipulated public companies in connection with the

14  purchase and sale of investments in the manipulated public

15  companies, directly and indirectly by use of means and

16  instrumentalities of interstate commerce and the mails

17  contrary to Title 15, United States Code, Sections 78j(b) and

18  78ff.

19         The second count charges that in or about and

20  between October 2012 and July 2014, both dates being

21  approximate and inclusive, within the Eastern District of New

22  York and elsewhere, the defendants, Abraxas J. Discala and

23  Kyleen Cane, together with others, did knowingly and

24  intentionally conspire to devise a scheme and artifice to

25  defraud investors and potential investors in the manipulated

Proceedings                                    15

1   public companies, and to obtain money and property from them

2   by means of materially false and fraudulent pretenses,

3   representations and promises, and for the purpose of executing

4   such scheme and artifice to cause to be delivered matter and

5   things by FedEx Corp., FedEx, and other private and commercial

6   interstate carriers according to the direction thereon

7   contrary to Title 18, United States Code, Section 1341, and to

8   devise a scheme and artifice to defraud investors and

9   potential investors in the manipulated public companies, and

10  to obtain money and property from them by means of materially

11  false and fraudulent pretenses, representations and promises,

12  and for the purpose of executing such scheme and artifice to

13  transmit and cause to be transmitted by means of wire

14  communication in interstate and foreign commerce writings,

15  signs, signals, pictures and sounds, contrary too Title 18,

16  United States Code Section 1343.

17          The third count charges that in or about and between

18  October 2012 and July 2014, both dates being approximate and

19  inclusive, within the Eastern District of New York and

20  elsewhere, the defendant, Abraxas J. Discala, together with

21  others, did knowingly and willfully use and employ one or more

22  manipulative and deceptive devices and contrivances, contrary

23  to Rule 10b-5 of the rules of regulations of the United States

24  Securities and Exchange Commission, Title 17, Code of Federal

25  Regulations, Section 240.10b-5 by:

LD        OCR        RPR

Proceedings                                    16

1       A, employing one or more devices, schemes, and

2  artifices to defraud; B, making one or more untrue statements

3  of material fact, and omitting to state one or more material

4  facts necessary in order to make the statements made in light

5  of the circumstances under which they were made not

6  misleading; and C, engaging in one or more acts, practices,

7  and courses of business which would and did operate as a fraud

8  and deceit upon one or more investors or potential investors

9  in CodeSmart in connection with the purchases and sales

10 investments in CodeSmart, directly and indirectly, by use of

11 means and instrumentalities of interstate commerce and the

12 mails, contrary to Title 15, United States Code, Section

13 78j(b) and 78ff, Title 18, United States Code Sections 2 and

14 3551.

15      The fourth count charges that in or about and

16 between March 2014 and July 2014, both dates being approximate

17 and inclusive, within the Eastern District of New York and

18 elsewhere, the defendants, Abraxas J. Discala and Kyleen Cane,

19 together with others, did knowingly and willfully use and

20 employ one or more manipulative and deceptive devices and

21 contrivances, contrary to Rule 10b-5 of the rules and

22 regulations of the United States Securities and Exchange

23 Commission, Title 17, Code of Federal Regulations,

24 Section 240.10b-5 by:

25      A, employing one or more devices, schemes and

LD        OCR        RPR

Proceedings                                                    17

1    artifices to defraud; B, making one or more untrue statements

2    of material fact and omitting to state one more material facts

3    necessary in order to make the statements made in light of the

4    circumstances under which they were made not misleading; and

5    C, engaging in one or more acts, practices, and courses of

6    business which would and did operate as a fraud and deceive

7    upon one or more investors or potential investors in Cubed in

8    connection with the purchases and sale investments in Cubed,

9    directly and indirectly, by use of means and instrumentalities

10   of interstate commerce and the mails contrary to Title 15,

11   United States Code Section 78j(b) and 78ff, Title 18, United

12   States Code, Sections 2 and 3551.

13           Counts Six through Eleven relate to alleged specific

14   instances of wire fraud which, in general terms, charge with

15   respect to those incidents that in or about and between

16   October 2012 and July 2014, both dates being approximate and

17   inclusive, within the Eastern District of New York and

18   elsewhere, the defendant, Abraxas J. Discala, together with

19   others, did knowingly and intentionally devise a scheme and

20   artifice to defraud investors and potential investors in

21   certain of the manipulated public companies, and to obtain

22   money and property from them by means of materially false and

23   fraudulent pretenses, representations and promises, and for

24   the purpose of executing such scheme and artifice, the

25   defendant, Abraxas J. Discala, together with others, did

Proceedings                                    18

1    transmit and cause to be transmitted by means of wire

2    communication for interstate and foreign commerce, writings,

3    signs, signals, pictures and sounds.

4            Since the defendants have pleaded not guilty, the

5    government has the burden of proving each of the essential

6    elements of each charge of the indictment beyond a reasonable

7    doubt.  The purpose of the trial is to determine whether the

8    government meets its burden.  I will repeat, a defendant does

9    not have to prove his or her innocence.  On the contrary, each

10   defendant is presumed to be innocent of the accusations

11   against him or her contained in the indictment.

12           The trial will proceed in the following order.

13           First, the parties will have the opportunity to make

14   opening statements.  The government will make such a

15   statement.  And then the defendants, though they're not

16   obliged to do so, may make opening statements or may defer

17   them until the end of government's case.  What is said in

18   these statements is not evidence but simply an introduction to

19   the evidence which the parties intend to produce.

20           Next, the government will introduce evidence in

21   support of the charges.  Then the defendants may present

22   evidence, but are not required to do so.  The burden is always

23   on the government to prove every element of each offense

24   charged beyond a reasonable doubt.  The law never imposes on

25   the defendant in a criminal case the burden of calling any

Proceedings                                            19

1   witnesses or introducing any evidence.

2          After all the evidence has been presented, each

3   party has the opportunity to present argument in support of

4   his or her case.  What is said in these arguments is not

5   evidence.  They simply present to you the contentions of the

6   parties as to what the evidence has shown and what inferences

7   may be drawn from the evidence.  The government has the right

8   to open and close the argument.

9          Lastly, the Court will instruct you on the

10  applicable law and you will then retire to consider your

11  verdict.  Your verdict must be unanimous.

12         You have a tremendously important task as jurors.

13  It is to determine the facts.  Our Constitution gives the

14  defendant a right to have you, who are members of the

15  community, find those facts.  You and not the Court are the

16  sole and exclusive judges of the facts, and nothing I say or

17  do should be taken by you as any indication of my opinion as

18  to the facts.

19         As to the facts, neither I nor anyone else may

20  invade your area of responsibility.  I will preside

21  impartially and not express any opinion concerning the facts.

22  Any opinions of mine on the facts would, in any event, be

23  totally irrelevant because the facts are for you to decide.

24  On the other hand, and with equal emphasis, I instruct you

25  that in accordance with the oath you took as jurors, you are

Proceedings                                              20

1   required to accept the rules of law that I give you, whether

2   you agree with them or not.  You are not to ask anyone else

3   about the law.  You should not consider or accept any advice

4   about the law from anyone else but me.

5             The evidence from which you will find the facts will

6   consist of the testimony of witnesses, as well as documents or

7   other things received on the record as exhibits in evidence.

8   Evidence also includes any facts that the lawyers agree to or

9   stipulate to or that the Court may instruct you to find.

10            There are two kinds of evidence:  Direct and

11  circumstantial.  Direct evidence is direct proof of a fact,

12  such as testimony of an eyewitness.  Circumstantial evidence

13  is proof of facts from which you may infer or conclude that

14  other facts exist.

15            I will give you further instructions on these as

16  well as other matters at the end of the case, but keep in mind

17  that you may consider both kinds of the evidence.

18            Ultimately, when it comes to the testimony of

19  witnesses, it will be up to you to decide which witnesses to

20  believe, which witnesses not to believe, and how much of any

21  witness' testimony to accept or reject.  I will give you some

22  guidelines for determining the credibility of witnesses at the

23  end of the case.

24            Certain things you may hear or see are not evidence

25  and must not be considered by you.  I will list them for you

Proceedings                              21

1    now.

2           One, statements, arguments and questions by lawyers

3    are not evidence.

4           Two, objections to questions are not evidence.

5    Lawyers have an obligation to their client to make objections

6    when they believe evidence being offered is improper under the

7    rules of evidence.  You should not be influenced by the

8    objection or by the Court's ruling on it.  These rulings deal

9    with questions of law and not fact.  Objections and rulings

10   have nothing to do with your role as jurors, they are for the

11   Court to decide.  If the objection is sustained, ignore the

12   question.  If it is overruled, treat the answer like any

13   other.  If you are instructed that some item of evidence is

14   received for a limited purpose only, you must follow that

15   instruction.

16          Three, testimony that the Court has excluded or told

17   you to disregard is not evidence and must not be considered.

18          Four, anything you may have seen or heard outside

19   the courtroom is not evidence and must be disregarded.  You

20   are to decide the case solely on the evidence presented here

21   in the courtroom.

22          There are several rules which should govern your

23   conduct during any recess; that is, when you are not in the

24   courtroom.  You will not be required to remain together while

25   court is recess, but you are required to follow these

Proceedings                                                    22

1    instructions about recesses.

2          Do not discuss the case among yourselves or with

3    anyone else.  This includes discussing the case in person, in

4    writing, by phone, or electronic means, via text messaging,

5    email, Facebook, Twitter, blogging, or any internet chat room,

6    website, or other feature.  You should keep an open mind

7    reaching your conclusion only during your final deliberations

8    after all the evidence is in and you have heard the attorneys'

9    summations and the Court's instruction on the law, and then

10   only after exchange of views with the other members of the

11   jury.

12         Do not try to do any research or make any

13   investigation on your own about the case or any individuals or

14   entities involved in the case.  Do not read, listen to, or

15   watch any accounts of this case, should it be covered by any

16   media.  The case is to be decided only by the evidence you see

17   and hear in the courtroom during trial.

18         Do not permit any other person to discuss the case

19   in your presence.  And if anyone does so, even though you tell

20   him or her not to, report that fact to me.  You should not,

21   however, discuss with your federal jurors either that fact or

22   any other fact that you feel necessary to bring to my

23   attention.

24         Though, it is a normal human reaction to talk to

25   people with whom one is thrown together in contact, please do

Proceedings                                    23

1    not talk, whether in the courtroom, in the hallways, in the

2    elevator, outside, or anywhere else with any of the parties or

3    their attorneys or any witnesses.  By this I mean not only do

4    not talk about the case, but do not talk at all, even to pass

5    the time of day.

6            Under the law, only 12 jurors will deliberate on

7    this case where it is submitted for consideration.  We have

8    selected additional jurors called "alternates."  Alternate

9    jurors are selected to serve because a regular juror may be

10   prevented from continuing to serve by some emergency such as a

11   serious illness or death.  Although this seldom happens during

12   trial, there are cases where we do call on the services of

13   alternates.  Alternates are required to pay the same careful

14   attention to the trial as the regular jurors so that if needed

15   they will be fully familiar with the case.

16           The fact that there are alternate jurors does not

17   mean that any regular juror is free to excuse himself or

18   herself from the case.  As a duly chosen jury, it is your

19   obligation to be available throughout trial.

20           The description of trial procedure, the rules

21   governing your conduct, and the legal principles governing a

22   criminal case I have just discussed with you will, I believe,

23   maker it easier for you to understand the trial as it goes on

24   and to reach a proper and just result at its conclusion.

25           THE COURT:  Thank you, Mr. Mejia.

Proceedings                                      24

1          All witnesses have been excluded from the courtroom?

2          MR. BINI:  Yes, Your Honor.

3          THE COURT:  Then we are ready to begin, ladies and

4    gentlemen.  The next building block are the opening

5    statements.  And if you listened carefully to my instructions,

6    you know that we will be hearing from the government first.

7          I call upon Assistant United States Attorney, Mark

8    Bini, to make that statement for the government.

9          MR. BINI:  Thank you, Your Honor.

10         (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        MR. BINI:  The Defendants Abraxas Discala and

2   Kyleen Cane were part of a criminal conspiracy to steal money

3   from investors by artificially inflating the price of stocks.

4   Discala claimed to be in the business of raising money for

5   companies.  Cane claimed to be a legitimate lawyer.  In

6   reality, they were both in the business of stock fraud.

7            You will learn they took over worthless companies

8   and made them seem really valuable through fraudulent stock

9   transactions made to inflate the companies' stock prices so

10  that they could sell the stock to investors who didn't know it

11  was actually worthless.  With one company called CodeSmart

12  alone, Discala stole more than $3 million from stock investors

13  that he tricked.  Kyleen Cane joined Discala's fraud

14  conspiracy to help him with a company called Cubed.  Through

15  their fraud scheme, Discala and Cane had total control over

16  Cubed's stocks price.  Discala even boasted to another

17  conspirator that he was the brake and the gas on the stock

18  price, he could set it as high as he wanted.

19            Fortunately, before Discala and Cane could sell the

20  Cubed shares that they had inflated in order to steal

21  investors' money, Discala and Cane were arrested by the FBI

22  and their scheme was stopped.  Artificially rigging the prices

23  of stocks in order to steal money from investors is a crime

24  and that is why we're here today.

25            Ladies and gentlemen, my name is Assistant United

1   States Attorney Mark Bini.  Together with assistant United

2   States Attorneys Shannon Jones and Patrick Hein, FBI Special

3   Agent Elyse Morris, and Paralegal Henry Ishitani, we represent

4   the United States in this matter.

5           The Defendants in this case committed fraud by

6   falsely inflating the price of stocks.  A share of stock is an

7   investment.  It's an ownership interest in a public company.

8   Typically, if a company has good prospects or if its earnings

9   increase, the company stock price will go up.  Microcap

10  stocks, or penny stocks, are stocks for smaller companies that

11  can cost as little as a few cents each.

12          In this case, the Defendants and their

13  co-conspirators committed what's called a "pump and dump" and

14  this fraud involved microcap stocks.  What do I mean by "pump

15  and dump"?  That's when fraudsters pump up the sales in share

16  price of a stock through corrupt means and then sell them to,

17  or dump them on, buyers who don't know.

18          How do fraudsters manipulate a stock in order to

19  execute a pump and dump?  You will learn in the pump and dump

20  in this case, the fraudsters typically gain control of a

21  company called a "shell" company that had no assets or

22  operations, they took control of almost all of the shares of

23  that shell company, and then made this company stock appear

24  very attractive to outside investors by different methods.

25  Their primary method was by trading the stock of the company

1   back and forth to make it appear popular to investors to

2   generate false trading volume.  Sometimes they did also issue

3   false press releases about the company to increase the stock

4   price.

5            What is "false trading volume"?  False trading

6   volume in a pump and dump is when fraudsters sell shares of

7   the company stock back and forth in secretly prearranged

8   trades in order to create volume and to pump up or increase

9   the stock price.

10           For example, one group might sell a hundred shares

11  and have another group buy a hundred shares at almost the same

12  time at a prearranged price.  The fraudsters control the same

13  number of shares before and after the trade but the volume of

14  the trading has increased, making the stock look popular to

15  outside investors.

16           By making these secretly prearranged trades and

17  slowly increasing or walking up the stock price, the

18  fraudsters create the appearance the stock is a desirable

19  investment pick that is actually increasing in value.  So, the

20  secret prearranged stock trades and the false press releases

21  about the company cause the pump, designed to increase the

22  stock price in sales.  And the Defendants were really good at

23  it.

24           For example, with CodeSmart, during a three-month

25  period in 2013, Discala and his co-conspirators caused the

1   stock price to double.  All of a sudden, the company seemed

2   like it was worth $86 million.  During that same three-month

3   period, Discala and his co-conspirators started to dump their

4   artificially-inflated CodeSmart shares on victim stock buyers.

5   Between two pump and dumps of CodeSmart stock, Discala made

6   about $3 million dumping his shares on unsuspecting investors.

7   Then CodeSmart's stock price tanked, going down to almost

8   nothing.

9          This case will focus on four of the companies that

10  Discala used starting in 2013 as part of the scheme:

11  CodeSmart, Cubed, and two other companies.  You'll learn that

12  Discala was most successful with CodeSmart, making about

13  $3 million.

14         But Discala wanted to do something even bigger than

15  CodeSmart.  That's when Kyleen Cane joined the conspiracy,

16  bringing with her a company called Northwest Resources.  You

17  will learn that by March of 2014, Northwest Resources was an

18  abandoned shell company that Cane's law firm had set up a few

19  years earlier.  It was on record as a mining company, but in

20  reality it had no assets and a fake CEO.

21         Discala and Cane located a mobile phone app that

22  didn't work yet called The Cube.  They purchased it for the

23  about $300,000; virtually worthless stock.  They changed the

24  name of the company from Northwest Resources to Cubed and they

25  began working to inflate Cubed's stock price.

1       You will learn that Cane brought a new innovation to

2   the fraud conspiracy, something the conspirators called the

3   "escrow" to help control the stock manipulation.  The escrow

4   was a shorthand way that the co-conspirators referred to

5   accounts that Cane controlled and that held all of the shares

6   of stock for Cubed that could be traded.

7       Cane's innovation gave Cane and Discala total

8   control over Cubed's stock price.  You see, Cane and her law

9   firm were the lawyers for both the shell company and of Cubed,

10  and, as lawyers, they picked up the stock certificates for the

11  company shareholders; however, instead of giving those stock

12  certificates to the owners of the stock, the people on the

13  stock certificates, Cane kept them.  Without the stock

14  certificates, no one could trade the stock on the market.

15  Cane controlled eight million shares of Cubed that only she

16  had access to.

17      Next, you'll learn that Cane took one shareholder

18  stock certificate and transferred more than 200,000 shares of

19  Cubed stock into the name of her friend, a man named David

20  Ben-Bassat, so that they could deposit that stock in a trading

21  account that Cane controlled.  Over the course of three months

22  in 2014, Cane used the Ben-Bassat account to slowly sell off

23  the Cubed stock for the conspirators and gradually increasing

24  prices.

25      Other members of the conspiracy kept purchasing that

1    stock at almost the same time.  As a result of their fraud,

2    Cane and her co-conspirators made Cubed stock price look like

3    the company was worth $200 million, with Cane selling most of

4    the stock and the co-conspirators buying most of it.  The

5    company had virtually no revenue.

6              Fortunately, before Discala and Cane could reap

7    millions in corrupt profits by tricking unsuspecting investors

8    into buying Cubed stocks at those jacked-up prices, the FBI

9    stepped in.  You'll learn that in July of 2014, based upon an

10   FBI investigation that included the use of court-authorized

11   wiretap of Discala's cell phone, Discala and Cane were

12   arrested.

13             As a result of their conduct, the Defendants are

14   charged with several crimes:  First, they're charged with two

15   counts of a conspiracy, which means an agreement; one count

16   for conspiracy to commit securities fraud; and another count

17   for conspiracy to commit mail and wire fraud for using

18   interstate texts and phone calls and interstate mails for the

19   purpose of executing the fraud.

20             Second, they're charged with securities fraud.

21   Discala is charged with account securities fraud for the

22   CodeSmart fraud, and Discala and Cane are charged together

23   with account securities fraud for Cubed's fraud.

24             Finally, Discala is charged with several counts of

25   wire fraud for certain telephone calls that he made furthering

1    the fraud.

2          How will the Government prove these charges to you?

3          First, through witness testimony; second, through

4    statements in recorded phone calls and text messages; and,

5    third, through documents.

6          You'll hear from a number of witnesses who will sit

7    right there to speak to you about the fraud.  These include

8    insiders, law enforcement agents and accountants and victims.

9    These people will take the witness stand and will tell you

10   about the Defendants' criminal scheme and conduct from their

11   perspective.

12         Several of the insiders that you will hear from are

13   cooperating witnesses.  These include stock brokers and other

14   co-conspirators.  They can peel away the layers of secrecy and

15   bring you inside the fraud and tell you how it worked.  They

16   he will reveal to you how they engineered or planned stock

17   trades and how the criminal crew coordinated sending out

18   deceptive press releases to control and inflate the stock

19   price of the stocks of the four companies that are involved in

20   this case.  They will also tell you about the roles that

21   Discala and Cane each played in the fraud conspiracy.

22         Now, these insiders have admitted to being a part of

23   the fraud in this case.  They're testifying pursuant to

24   agreements with the Government and are hoping to receive more

25   lenient sentences if they meet their obligations under the

1   agreements.  Listen carefully to their testimony and the other

2   evidence in the case.  When you do, you'll see that what they

3   tell you is corroborated and supported by other testimony and

4   evidence, including the intercepted phone calls, the text

5   messages that you will see, stock trading records, and bank

6   records.

7            Among the other witnesses you'll hear from are law

8   enforcement agents and accountants who followed the money

9   trail.  You'll hear from them regarding how much money the

10  Defendants made from the fraud.  You'll also hear from

11  victims, citizens who the Defendants deceived into purchasing

12  their inflated stock based upon false trading volume or phoney

13  stock prices they generated.  They will tell you what was

14  important to them when they were tricked into investing in

15  these companies and how they lost their money.

16           The second type of evidence that the Government will

17  use to prove its case will be phone calls and text messages.

18  You'll have the opportunity to hear the Defendants in their

19  own voices on recorded phone calls.  You'll get to see and

20  read text messages between the Defendants and other members of

21  the conspiracy.  You'll hear calls where the Defendants

22  brazenly talk about manipulating the stock price of Cubed.

23  For example, you'll get to hear the phone call where Discala

24  boasts to another conspirator he can make Cubed's price

25  whatever he wants because he was the brake and the gas on the

1    stock prices.

2            You'll also hear calls that make clear that Discala

3    and Cane tried to carefully control Cubed's price so that it

4    looked like it was a real stock slowly building in value.

5    You'll hear one call between Discala and Cane where Cane was

6    concerned that Cubed's stock price had come up far too quickly

7    that day.  Cane told Discala:  We need to keep it back down

8    now.  We need to keep it back down.

9            You'll get to see and read text messages where

10   Discala and co-conspirators plot how to manipulate stock

11   prices.  You'll read one text message where Discala and

12   co-conspirators talked about "rocketing" Cubed's stock price.

13   You'll have the chance to read another text message where

14   Discala discussing manipulative stock trading instructions

15   that he gave to Kyleen Cane and other conspirators about

16   Cubed.  These are just examples.

17           The third type of evidence the Government will use

18   to prove its case will be documents.  For example, you'll see

19   the trading records showing all of the trades conspirators

20   made to pump up the stock price of the manipulated company.

21   You'll see the trading of bank records showing Discala made

22   $3 million or thereabouts from the CodeSmart fraud.  You'll

23   also see trading records showing that Cane made more than

24   $500,000 selling Cubed shares from that escrow account before

25   she was stopped by the FBI.  And you'll see records showing

Opening Statement - Bini                                    34

1    that Discala and Cane stood to make millions from the Cubed

2    fraud if they hadn't been stopped in time.

3           Ladies and gentlemen, after you've seen and heard

4    all of the evidence in this case, the Government will ask you

5    to return the only verdict consistent with that evidence:

6    Guilty as to all counts.

7           Thank you.

8           THE COURT:  Thank you, Mr. Bini.

9           I now call about Mr. Charles Ross to make an opening

10   statement on behalf of Defendant Abraxas Discala.

11          MR. ROSS:  Thank you, Judge.

12          I suggest that the proof, the evidence, will show

13   that there is nothing credible beyond a reasonable doubt that

14   any of you could rely on.  There's no proof that Mr. Discala

15   agreed with anyone to act in bad faith.  The evidence will

16   show that AJ Discala had no criminal intent to manipulate any

17   stock.  There will be no credible proof that he had any intent

18   to defraud anyone or any person or any company.

19          The proof will show that everything Mr. Discala did

20   was done in good faith to protect and build real companies

21   that he believed in and that he invested in.  I know that you

22   can all use your common sense, logic, and basic math when

23   you're listening to the evidence.  And if you could do that,

24   and I know you can, I know you can, you'll see that AJ Discala

25   is not guilty of any of the charges in this indictment.

                    LD        OCR        RPR

1          I introduced myself yesterday, but I'm Charles Ross.

2    And along with the other lawyers, we have the great honor and

3    awesome responsibility of representing Abraxas J. Discala here

4    in this great court, United States District Court for the

5    Eastern District of New York.

6          AJ, could you stand up just for a second?

7          Ladies and gentlemen, this is my client Abraxas J.

8    Discala.  Everybody knows him as "AJ."

9          Please understand what an important moment it is

10   when a lawyer stands in front of a jury like you all and talks

11   about a real human being; not an idea, it's not a dispute

12   about money, but a real person, a real life.  You know, no

13   matter how many times I do this -- I have been doing it a

14   while -- my hands still shake a little bit, I have to have my

15   water up here because my mouth gets dry.  And you know why?

16   It's an awesome responsibility because it really is true that

17   the quality of the arguments that I make or the other lawyers

18   make or the questions that we ask of witnesses that will come

19   here into the courtroom have a direct effect, can have a

20   direct effect, on the life of Mr. Discala.

21         But I've got to tell you, I'm comforted, I really

22   am, because you all have agreed to be jurors in this case,

23   sworn to be impartial, sworn to take this very seriously, and

24   keep an open mind every day here in court at this trial.

25         You've all sworn to give a fair verdict, and that's

Opening Statement - Bini                         36

1    all AJ asks of you; to be fair, to use common sense, logic,

2    basic math because.  Those three things are going to guide you

3    in looking and listening to the evidence that you'll hear in

4    the court.  After you've had an opportunity to consider all

5    the evidence, common sense, logic, and basic math will lead

6    you to the conclusion that truth and justice require only one

7    verdict:  A verdict of not guilty on every single count in

8    this indictment as it relates to Mr. Discala, as it relates to

9    AJ.

10              Now, the prosecution told you about the case they

11   think they have.  We heard about the wiretapped conversations,

12   the text messages, all the documents, all the types of

13   witnesses that are coming in here.  But the evidence will show

14   that the deeper you look at what AJ Discala did, look at his

15   actions, the more you will see that he made every effort to

16   protect these companies from abuse.  The proof will show that

17   AJ Discala's actions spoke louder than any words that you will

18   hear in the evidence that the prosecution brings into this

19   courtroom.

20              And as the evidence unfolds, ladies and gentlemen,

21   I'd ask you to ask yourself these questions:  Did AJ Discala

22   intend to fraudulently manipulate the stock of any company,

23   did he have the intent to defraud anyone, or does the evidence

24   show he tried to build and protect these companies to ensure

25   success for everybody involved?

Opening Statement - Bini                                    37

1          Did AJ have the right to believe in financial and
2     other securities professionals who were advising him and who
3     he trusted?
4          If everyone he trusted did what they said they would
5     do, would we even be here?
6          Do the prosecution witnesses have motives to lie?
7          Did AJ have any idea what many of the witnesses that
8     will come in here and testify were actually doing?  Did he
9     have any idea what they were doing?
10          Is the evidence believable or does it just raise
11     doubt after doubt after doubt?
12          So, how come we're here?  Some time ago, before any
13     of you heard anything about this case, AJ came down to this
14     courthouse.  And when he was asked how he answered to the
15     charges in this indictment, he said in a loud, clear voice:  I
16     am not guilty of conspiring with anyone to violate the law, to
17     manipulate securities, to defraud anyone, or to break the law
18     in any way.
19          And as a result of AJ Discala's not guilty plea, the
20     prosecution -- this table right here -- must prove this case
21     by real evidence in this courtroom beyond a reasonable doubt.
22     I suggest the proof is going to show in this case that these
23     charges are nothing more than a rush to judgment.  Judge
24     Vitaliano will instruct you on the law at the end of the case.
25     You'll learn that under our system of justice, the prosecution

1    is required to prove each and every element of each and every

2    crime charged beyond a reasonable doubt.  It's got to be based

3    on truth and not on improperly motivated testimony.

4              At the end of the case, Judge Vitaliano will

5    instruct you all what "reasonable doubt" means.  He's already

6    told you that that's what the prosecution has to show.  And

7    he's already told you and you heard yesterday that AJ Discala

8    is presumed innocent.

9              So, for prosecutors to take you from presumed

10   innocent to guilt beyond a reasonable doubt, there's got to be

11   reliable and believable evidence beyond a reasonable doubt.

12   If there is a reasonable doubt for any element in any of the

13   crimes that are charged in this indictment, the judge will

14   tell you that you must find AJ Discala not guilty of that

15   charge.  I suggest the proof is going to show many, many, many

16   reasons to doubt the reliability and the credibility of the

17   witnesses in this case.

18             I suggest the proof will show that AJ has family and

19   friends and investors who believed in him, and they believed

20   in him because he believed in these companies.  Evidence will

21   show that these companies, far from what Mr. Bini just said,

22   are not worthless.  They will show that -- proof will show

23   that these companies are real, that they had real product,

24   that they had real services, and that they were very, very

25   strong in their potential in their industries, they had great

1   potential in their industries.  And the proof is going to show

2   that AJ did his absolute best to help these companies in the

3   next phase of their business cycles.  The proof will show that

4   AJ and OmniView intended to help these companies.  These

5   companies were hidden gems -- you're going to learn that --

6   help them so they could reach capital markets.

7          Evidence is going to show that AJ intended to help

8   these companies with financing and strategic alliances.  He

9   intended to help attract skilled management teams and future

10  investors to allow these companies to raise money so that they

11  could continue to grow.  You'll learn that these companies,

12  CodeSmart, Cubed, a company called Starstream -- and I'll tell

13  you what the proof is going to show about Starstream -- and

14  Staffing Group and other companies that will come up in the

15  course of this case, were all helped by AJ and OmniView to

16  obtain bridge loans and other financing so they could reach

17  the capital market.

18         You will see from the proof that all of these, all

19  of these, all of these companies needed a Main Street

20  approach, not a Wall Street approach.  They couldn't afford to

21  pay upfront for expensive lawyers and accountants, analysts,

22  bankers, PR firms.  They couldn't afford that.  They couldn't

23  afford these upfront expensive payments.  AJ and OmniView

24  provided the risk capital that allowed them to try and reach

25  the capital markets.

1          The proof will show that AJ did all he could to

2     provide a legal and relatively affordable way for these

3     companies to get listed and for these companies to go public

4     and reach a stock market in order to raise money to succeed.

5     Proof is going to show that that's what he and his company

6     OmniView did.

7          So, how does a promising hidden gem of a young

8     company have any chance to succeed?  The proof will show there

9     is another totally legitimate -- proof will show that

10    companies often go public with an IPO, or an initial public

11    offering.  Proof is going to show that that's superexpensive

12    and very time-consuming.  So, young companies that AJ helped

13    along, the proof will show that there's another totally

14    legitimate and legal way to have a stock listed on a market,

15    and that's called an APO, an alternative public offering.  And

16    the proof is going to show that this is exactly what AJ and

17    OmniView offered.

18         The evidence will show that APOs come in all kinds

19    of shapes and sizes.  You'll learn, and the evidence is going

20    to show, that they are a common and completely legal way to

21    take a small company public.  One way that you'll hear about

22    during this trial is called a "reverse merger."  You'll learn

23    from the proof that there's absolutely nothing wrong with a

24    reverse merger:  An early stage private company joins with a

25    company that's already public.

1           You'll learn that the public companies in this case

2    at this stage are called "shell" companies.  You'll learn that

3    these companies have gone public, these shell companies have

4    gone public, issued stock, but their business never got off

5    the ground or the business failed.

6           Proof is going to show that these public companies

7    have a structure but no business.  Evidence will show there's

8    nothing illegal about a small private company merging with a

9    public shell company that has shares of stock.

10          But the proof is going to show that this alternative

11   public offering is much easier said than done, where

12   impatience and greed of others ruined AJ's intent to protect

13   these companies that he so deeply believed in.  Proof will

14   show that OmniView and AJ employed people who believed in good

15   faith -- who he believed in good faith were capable and

16   well-respected.  The evidence is going to show that securities

17   professionals and other professionals aided OmniView and AJ in

18   this whole process.  They were supposed to be there to provide

19   what was needed to follow through on the next phase of the

20   various companies that you're going to hear about during this

21   trial.

22          Now, once trading began in these companies, the

23   evidence will further show that AJ was an active investor and

24   an energetic marketer of the various businesses because he so

25   deeply believed in these businesses.  He tried his best to get

Opening Statement - Bini                                    42

1    the word out about the businesses he believed in through

2    friends, through family, and through a network of stock

3    brokers who, in turn, presented the opportunity to their

4    clients to invest.  And that's the job of a stock broker.  The

5    proof will show that AJ did his best to bring about a stable

6    and orderly market so that companies could meet their business

7    objectives.

8             The evidence will show that these companies, that

9    the stock in these companies, began to trade, but proof will

10   show that trading presented problems.  The proof will show the

11   problem was that some of the companies, the very

12   businesspeople AJ trusted to help him with these companies,

13   betrayed their responsibilities to line their own pockets.

14   The proof will show that contrary to the prosecution's

15   charges, we suggest trading patterns will conclusively prove

16   that AJ acted in the best interests of these companies.

17            Now, let's look at some of the examples that the

18   proof will show.

19            The evidence will show that CodeSmart was a very,

20   very promising business which provided training for medical

21   coders.  The proof will show that before an insurance carrier

22   can pay a healthcare provider for medical services, that

23   service when you go to the doctor and the doctor helps you,

24   has a treatment for you, that that treatment has to be coded

25   in a bill.  It's a standardized format for billing.

1    Now, the proof is going to show that at the time

2 CodeSmart went public and entered into the alternative public

3 offering that you'll hear about, there was a mandatory change

4 in the coding system that doctors use when you go see a

5 doctor.  The coding system that had been in place was called

6 ICD-9.  And the changeover was to a much, much, more

7 complicated way of billing that had thousands more codes.

8    So, you're going to learn that the CodeSmart Group

9 offered full online, interactive training for this switchover

10 to the more complicated billing system called ICD-10.  And

11 they did this through what they propose to be CodeSmart

12 University that would train folks in doctors' offices that had

13 to deal with all these codes.  It certainly makes sense.  Pay

14 careful attention, please, pay careful attention to the manner

15 in which CodeSmart and the transactions of CodeSmart were

16 presented to AJ and OmniView.

17    The proof will show that this promising and already

18 vetted company needed a bridge loan and they needed a way to

19 access the public stock markets.  The proof will show that AJ

20 intended only to help and protect CodeSmart when he got

21 involved.  The proof will show that AJ and OmniView arranged

22 for a bridge loan and that bridge loan became something called

23 a "PIPE."  You'll learn that a PIPE means a private investment

24 in public equity, a fancy term for a situation where private

25 money is invested in the equity of a public company.

1          You'll hear testimony and other proof that AJ had

2     personal and professional contacts who became investors and

3     some who became board members.  AJ was committed to ensure

4     that CodeSmart and every other company that he worked with was

5     sound, was viable, was a workable company with a real product

6     or a real service.  The evidence will show that AJ and

7     OmniView employed professionals who took care of the entire

8     legal process of taking CodeSmart public.  I suggest the proof

9     will show that AJ believed that these professionals would do

10    their job right.

11         But once the trading started and the stock price

12    increased significantly, you'll learn from witnesses that the

13    very danger that AJ attempted to prevent in order to protect

14    these companies all but destroyed the stock of CodeSmart.

15         For example, you'll learn that AJ required investors

16    to sign agreements called lock-up leak-out agreements, or

17    LULOs.  The proof will show that these agreements were

18    designed to protect the stock of CodeSmart and to prevent the

19    dumping that the prosecution talked about in their opening

20    statements.  But the proof is going to show you, ladies and

21    gentlemen, that these agreements to protect were ignored.

22         Proof will also show that CodeSmart stock was

23    affected by the company's management.  Management in CodeSmart

24    did not deliver, the proof will show, on their promises that

25    were made.  You'll learn from testimony that there were

1   serious, serious internal management problems at CodeSmart.

2   You'll hear testimony and see documents about the trading in

3   the company and you'll learn an important fact:  AJ Discala

4   bought stock in CodeSmart when the price was going down.

5           Now, what kind of pumper and dumper would ever do

6   that, buy stock when the price is going down?  The evidence

7   will show that he bought that stock because he believed in the

8   company.  The proof will show that early on, when the stock

9   price was on the rise, AJ did make money.  He made money.

10  There's nothing wrong with making money.  But when the chips

11  were down and the stock price fell, AJ was a buyer.  The proof

12  will show that he tried to help.  And it will show that he

13  believed in the integrity of CodeSmart's business.

14          Ask yourself this:  Are these the actions of a

15  fraudster?  Are these the actions of a pumper and dumper?  I

16  suggest the evidence will show you that these actions are

17  quite to the contrary:  That AJ believed in the companies he

18  worked with.

19          The evidence will show that AJ tried to get more

20  financing for CodeSmart and arranged for two qualified

21  individuals to serve on the board of CodeSmart and found a new

22  chief financial officer for that company.  However, the proof

23  will show that CodeSmart and their mismanagement by that

24  management team blocked all of AJ's well-meaning efforts.  The

25  proof is going to show that AJ never had anything to do with

1    these press releases.  You'll hear about press releases and

2    ask yourselves:  Does the proof show that he had anything to

3    do with press releases in CodeSmart?  I suggest the proof will

4    show that the answer to that question is no.  The evidence

5    will show that AJ Discala trusted that these press releases

6    were accurate and for real.

7            Now, let's discuss two other companies in which AJ

8    is charged with manipulating the stock price.  They are

9    Starstream and Staffing Group.  The proof will show that the

10   prosecution is going to make similar claims about these

11   companies as they have with CodeSmart.  There will be no

12   question that the evidence will show that both of these

13   companies, they weren't worthless companies.  These companies

14   were very real, they had solid business models, and they were

15   backed by experienced management.

16           The proof is going to show that Starstream is a

17   movie production company that had already produced an

18   impressive list of movies.  You'll learn that these movies

19   included Oprah Winfrey's The Butler; A Life of Crime, that

20   starred Jennifer Aniston; another movie was Life After Beth,

21   which starred John C. Reilly; and then there was a movie

22   called Trouble Dolls that starred Megan Mullally.  These

23   movies had already been produced by Starstream, hardly a

24   worthless situation.

25           You'll learn that AJ believed so strongly in the

1   Starstream company that he joined the management team and

2   wanted to join the board of the company.  Ask yourself whether

3   it makes any sense that a stock manipulator would pour his

4   time and money into any company, any company, if his plan was

5   to defraud anyone.

6          So, next up is Staffing Group.  The evidence is

7   going to show you that Staffing Group is a sold business that

8   provided staffing solutions to companies.  And at this time,

9   outsourcing by companies was very, very popular, so this met a

10  demand.  The proof will show that there were just tremendous

11  possibilities for the Staffing Group.

12         All AJ Discala asks, as with the other companies in

13  this case, is that you listen carefully.  Listen carefully to

14  the prosecution's proof.  Please don't rely, please don't

15  rely, on insinuations or innuendo about reverse mergers or

16  shell companies.  The proof will show that there's nothing

17  wrong whatsoever with a reverse merger or the use of a shell

18  correspond.

19

20         (Continued on next page.)

21

22

23

24

25

1        MR. ROSS:  Just pay close attention to the actual

2   proof.

3        Now, you heard about Cubed in the prosecution's

4   opening statement.  You may also here the company Cubed

5   referred to as Crackpot.  The proof will show that Crackpot is

6   what the company was called prior to being renamed Cubed.  The

7   evidence will show Cubed's business involved the development,

8   marketing and sale of a very exciting cloud based on a three

9   dimensional functional cube that can appear, a app that can

10  appear on or smart phone on mobile phones.

11       And the evidence is going to show that Cubed's

12  technology was way out front.  It was in the forefront of what

13  was a new and up and coming global first world.  The proof

14  will further show that A.J. thoroughly researched this new in

15  vast technology and the company itself.  You'll learn that

16  information about the company and the promising product that

17  they had was presented to Omniview and to Mr. Discala.

18       The evidence will show that a team was formed to

19  conduct research and to really look at it, to do due diligence

20  on Crackpot Cubed.  The proof will show that Mr. Discala and

21  Omniview were interested in getting involved in marketing

22  Cubed.  However, you'll learn that Mr. Discala was weary of

23  how vulnerable a stock can be to short sellers and greedy

24  individuals that hurt Codesmart and other companies so badly.

25       The proof will show that Mr. Discala met with his

1   codefendant, Kyleen Cane, very well respected securities

2   lawyer who was experienced in these penny stocks, these micro

3   cap securities offerings.  The proof will show that it was

4   Ms. Cane that suggested the escrow account.  That system would

5   protect the stock legally and lawfully from greedy individuals

6   and opportunistic short sellers out there in the market and

7   the evidence is going to show that Ms. Cane set this system

8   up, nothing wrong with this system.

9           The proof will show an evolution of assistance and

10  protection to help Cubed reach its full potential.  All I ask

11  is that you please listen carefully, please listen carefully,

12  to all these tape-recorded conversations and text messages

13  that you heard about in the prosecution opening.  I suggest

14  the proof will show that that far from fraudulently

15  manipulating Cubed's stock or any other stock that A.J. was

16  simply marketing the company and its securities offerings.

17          I further suggest that the proof will show that the

18  trading in Cubed reflected a real effort, a real effort, by

19  A.J. to do the best things possible, the best things for the

20  companies and for Cubed.

21          Again, you're going to hear that A.J. went above and

22  beyond to try to help this company succeed and bridge the gap

23  to an orderly market.  The proof will show that A.J. and

24  others, including Ms. Cane, were arrested before the public

25  even had the opportunity to learn about how promising and

Opening - Ross                                    50

1    innovative and useful the Cubed app was or to learn about a

2    pipeline of very, very impressive contracts that Cubed had.

3            The proof will show that Mr. Discala took good-faith

4    efforts to invest in these companies that he believed in.  The

5    proof will show that the government just cannot prove beyond a

6    reasonable doubt that A.J. sought to defraud anyone or

7    fraudulently manipulate the stock of any company.  The proof

8    is going to show that his intent was to protect and build and

9    help the companies that he believed in.

10           I'm just about done for now.  As you consider the

11   evidence use your common sense, logic and basic

12   straightforward math.  Remember to ask yourselves and try and

13   answer during the presentation of this trial the questions I

14   asked you to think about, just ask yourselves as you listen to

15   the proof, most importantly, did the prosecution prove beyond

16   a reasonable doubt that A.J. acted with fraudulent intent or

17   did he intend to protect the viability of these companies and

18   stop illegal actions.  Ask yourselves doesn't A.J. Discala's

19   actions speak louder than any words?

20           This is an important case, a very important case for

21   A.J. Discala.  The decision that you all make in this case

22   will be the most important, the most important, of A.J.'s

23   life.

24           I ask you to treat your time here, please treat your

25   time here and approach it with the seriousness of purpose that

1    you would have in important decisions in your own lives.  We

2    all know the decisions, we know them.  Those are decisions you

3    make once or twice in a lifetime.  Treat your time here like

4    you would treat dealing with that sort of personal decision,

5    that make or break decision that you make once or twice in

6    your lives.  If you bring that seriousness to court every

7    single day as you listen to the proof for the duration of this

8    trial, if you treat it like the most important decision in

9    your life, I am confident that when all the evidence comes in

10   there will be many, many reasons to doubt that A.J. Discala

11   possessed bad faith or that he intended to manipulate any

12   stock.  I suggest that there will be clear doubt, clear doubt,

13   that he ever agreed to defraud investors or do anything

14   illegal at all.  And I'm confident that when you hear all the

15   proof in this case you will have doubts and you will return a

16   verdict of not guilty on every single charge in this

17   indictment against A.J.

18              Thank you very much.

19              THE COURT:  Thank you, Mr. Ross.

20              Now, we will hear from the defendant Kyleen Cane's

21   counsel, Mr. Riopelle.

22              MR. RIOPELLE:  Thank you, your Honor.

23   Mr. Villanueva, can we have the feed switched over to the

24   computer station here.

25              Good morning, ladies and gentlemen.  My name is

Opening - Riopelle                              52

1   Roland Riopelle and together with my colleague, Robert

2   Caliendo, I represent the defendant Kyleen Cane in this case.

3   Ms. Cane, as you may have inferred from listening so carefully

4   to the openings of my colleagues, is charged in only one of

5   the four transactions that are charged as crimes in this

6   indictment.  You'll not only hear about these four

7   transactions, I suspect that during this trial you'll hear

8   about many others as well.  The government will prove evidence

9   relating to companies like, for example, a company named

10  Regenecin and others that were precursors and perhaps

11  subsequent transactions to the ones in this indictment.

12          But the one transaction that my client is involved

13  in is the transaction involving a company called Cubed.  And

14  with respect to that company you're going to be asked to

15  decide the history  -- you'll be asked to decide effectively

16  the history of this case.  You will be historians here.

17  You're going to decide the facts as to what happened back in

18  the past and on this solemn day I would like to start with a

19  quotation from Dr. King, The arc of history is long, but it

20  bends towards justice.  And in this case that arc will bend

21  toward justice at the end of the case when you have heard all

22  the facts and sorted through them, as historians do, you'll

23  find Ms. Cane not guilty of the charges against her.

24          Now, one of the my favorite posts about history,

25  because I think it's so true, comes from an author named John

1  Gardiner.  He said History never looks like history when you

2  are living through it.  It always looks confusing and messy

3  and it always feels uncomfortable.

4        And the proof in this case is like that.  You're

5  going to have to as you sit here in 2018 and you hear about

6  things that happened as far back as 2011 or even earlier and

7  2012 and 2014, you heard those dates this morning, as you look

8  back at that you have to consider that the people who were

9  living through those events it didn't look like history to

10  them, right?  It was life.  It was coming at them quickly.

11  Decisions had to be made.

12        But you'll sort through all those facts and what

13  will be the tools that you'll use?  Well, you'll use the tools

14  of a historian.  First, as the judge reminded you this

15  morning, use your good common sense.  You don't check it at

16  the door as you come to court.  You were picked, look at

17  yourselves, a diverse jury, a jury that represents our

18  community.  Each one of you brings your own common sense, we

19  expect you to use it as you hear the facts and consider the

20  facts.

21        Second, we're going to ask you, all of us are going

22  to ask you to do a careful analysis of the evidence.  It won't

23  be like you were living it when it was whipping by you so fast

24  and you just made a decision living your life.  You're going

25  to have a chance to sit down at the end of this case, talk

Opening - Riopelle                                54

1    about the evidence, sort through it, argue through it.  You

2    were picked for that purpose, twelve people's perspectives

3    come together in that jury room and that's how a good decision

4    is made, with twelve different perspectives.

5            Now, what are the types of evidence that you'll see

6    and hear?  First you'll hear testimony.  You'll hear testimony

7    from law enforcement persons, perhaps the case agent in the

8    case, Agent Donohue.  You'll hear I believe early next week

9    from a witness from FINRA, one of the regulators, a woman

10   named Deb Oremland.  You'll hear from those who will testify

11   about their participation in the pump and dump schemes charged

12   in the indictment.  You'll hear from real pump and dumpers,

13   people who are real fraudsters, people like Marc Wexler,

14   Victor Azrak and Matthew Bell.  They'll tell you how it works

15   when you're a pump and dumper, you drive that price up by

16   buying it up and support the price.  When it gets high you

17   dump it on the market.  They'll tell you all about their

18   scheme.

19           You'll hear from ordinary people, ordinary citizens

20   like yourselves who are at the periphery of this.  You'll hear

21   from a person named David Ben-Bassat, who is a family friend,

22   practically a brother to my client for many, many years.

23   You'll hear from employees perhaps of my client's law firm and

24   you'll hear from victims, those who did buy Cubed stock and

25   ultimately lost as a result.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1           You'll get to look at the documentary evidence

2    that's relevant to the case.  You'll see the paper, the

3    account statements, bank records, filings with the Securities

4    & Exchange Commission.  All of these are relevant and you'll

5    get to look at them and you should look at them.  But I want

6    you to keep in mind these items, what you're ultimately going

7    to be deciding in this case, is what was the intent of my

8    client when she did the things that she did as the lawyer for

9    the company called Cubed.

10          What did she intend?  Was she intending a fraud?

11   Was she intending to harm people or was she intending to

12   protect the company and protect its shareholders?  The

13   documents can't tell you that unless they are interpreted as a

14   historian would do, looking at all the circumstances around

15   the transaction and what went on.

16          I'm going to ask you look not just at the paper,

17   although it's important, I'm going to ask you to look at the

18   context, what was said, who said what, when, you'll get to

19   hear some of that on tape-recordings.  I suspect the

20   government will offer a number of tape-recordings in this case

21   and you will hear Ms. Cane and others discussing the

22   transactions and what was going on at Cubed during the

23   relevant times in the indictment.

24          I do want you to keep in mind, however, that you

25   should consider both.  What the evidence shows, including, for

1   example, that Cubed was a legitimate company.  It had a

2   product.  There was a management team at Cubed and in fact a

3   well regarded team.  I want you to consider what you will see

4   and hear from the witness stand, the witnesses, the tapes and

5   the documentation that will be presented to you.

6           But I also want you to consider what is not in

7   evidence, what is not presented to you in this courtroom

8   because that too may tell you something.  You will find,

9   ladies and gentlemen, that you don't get to hear all of the

10  recordings that were made.  Some will not be played for you.

11  You will not get to see all the text messages.  Some will not

12  be shown to you.  You will have to consider the fact that some

13  evidence is not presented to you here in court and I want you

14  to consider what you do not see and hear here in court

15  including the fact that for nearly 40 years  -- I apologize to

16  my client for an age type comment  -- but in nearly 40 years

17  of experience as a lawyer you will not hear that she was ever

18  disciplined as a lawyer, that she's ever been charged with a

19  crime.  Despite 40 years in this business, you will not hear

20  from any witness from the company Cubed, the management of

21  Cubed will not come here to testify that Kyleen Cane defrauded

22  us.  They will not come here to tell you that she committed a

23  fraud and you will not hear that the part of this transaction

24  that she is principally responsible for, the filings, the very

25  public filings with the Securities & Exchange Commission, you

1    will not hear that they were false.  You will not hear that

2    there were misrepresentations there.

3           Now, there are three key allegations as to Ms. Cane

4    in this indictment.  First, that her law firm was involved in

5    the asset sale by which Cubed became a public company.  But I

6    want you to consider  -- and these are words right out of the

7    indictment itself  -- that the indictment describes how that

8    transaction happened.  It happened in Macy's window.  It

9    happened with public filings prepared by my client, who filed

10   these in a system that made them available to every member of

11   the public and I want you to consider the fact  -- and the

12   government embraces this filing by putting it right in their

13   indictment.

14          The criminal charges against Ms. Cane includes these

15   quotes right out of her public filing, that they filed

16   something that said Northwest Resources was going to become a

17   public company named Cubed and that on March 24, 2014, at a

18   time when the government claimed that there was a vast

19   conspiracy to defraud people, my client filed a public

20   document with the FTC stating that Cubed had engaged in this

21   transaction, it was doing its best to become a company:  They

22   described the amount paid and there was no hiding of what was

23   going on.  It was all out in the public.

24          So the evidence won't show that there was some

25   sneaking around behind closed doors.  It will show that what

Opening - Riopelle                              58

1   my client did was done right out in the public and indeed

2   there were further disclosures  -- again this comes right out

3   of the indictment and that public filing.  Cubed filed through

4   my client a public filing with the Securities & Exchange

5   Commission reporting that at that point in time it had less

6   than $1,500 in cash.  Zero revenue.  No revenue coming in.

7   Negative shareholders' equity and a net loss of $15,000 and

8   accrued professional fees, including the fees of my client's

9   firm, of about 131 thousand dollars.  That was told to the

10  public by my client, publicly filed where everybody could see

11  it.  There was no fraud in that filing.  Indeed the government

12  embraces it.  They quote it in their indictment in paragraph

13  4.

14          Let's take a little bit closer look at this because

15  that is not the half of it, ladies and gentlemen.  This is the

16  filing that they are talking about.  It's Cubed's 10-Q for the

17  period ending at the end of February 2014 and it was filed by

18  my client's firm, Cane Clark.  And here is the finances of the

19  company.  As you can see they have only got cash of fourteen

20  hundred and change.  They have got accrued professional fees

21  of 131 thousand and a net deficit accumulated of about 168

22  thousand dollars.

23          So this is not a company that is being touted as the

24  world's greatest company.  This disclosure, which is made to

25  the public, tells everyone that this is a company that has

1   some problems and just in case people don't like numbers,

2   there's a long description which you'll hear is typical for a

3   company in trouble called a going concern qualification, which

4   an accountant, a responsible accountant, puts into a filing

5   like this when there's real concern as to whether the company

6   can survive.

7           So just in case you don't like numbers, you can read

8   it in bold print that the company has not generated any

9   revenues, has negative working capital and has suffered a loss

10  from operations since its inception.  There's no fraud here,

11  ladies and gentlemen, not in this filing that the government

12  embraces in its indictment.

13          The second allegation as to Cane is that she

14  together with others pumped the stock of Cubed up through what

15  are called matched and wash trades.  You may recall Mr. Bini

16  described that to you where two people get together and rather

17  than really bargain and make a sale, they agree that I'll sell

18  to you at this price and you sell back to me at this price and

19  we make it look like a market is happening and all of that.

20          Paragraph 36 of the indictment, wash trades and

21  matched trades where people are getting together and doing

22  false transactions to make it appear that there's a real

23  market for these shares.  But the tape-recordings in which

24  Ms. Cane is intercepted are inconsistent with her intention to

25  participate in a pump and dump scheme.  So, again, we're not

1    running from the proof in this case.  We're embracing it.

2            Her conversations with Mr. Discala, in fact, show

3    that she is worried that someone else is manipulating the

4    price of Cubed upward.  You'll recall others have remarked on

5    these conversations this morning that suddenly the price of

6    Cubed spiked.  Nobody knows exactly why that is and my client,

7    Ms. Cane, is worried about that.

8            Now, think about that for a minute.  If you are a

9    pumper and dumper and somebody else is helping you pump the

10   stock through the roof, why would that worry you?  Why

11   wouldn't that be an opportunity to dump all your shares?  But

12   that's not what is on the table.  She's worried about it, even

13   though that's exactly what a pumper and dumper, somebody like

14   Wexler or Azrak or Bell, who will tell you that their practice

15   was to buy shares and pump the stock up and dump it back out.

16   They'll tell you going up in price like that, a spike like

17   that, that's an opportunity, that's an opportunity to dump

18   your shares.  That's not something to worry about.

19           Cane doesn't want that.  Ms. Cane was worried about

20   this spike in price.  She thought the price was too high and

21   it ought to be lower and there wasn't an explanation for why

22   it was suddenly so high and so, as quoted in the indictment,

23   she said to Mr. Discala, We need to try to get that price back

24   down.  We need to knock it back down.  We need to knock it

25   back down if we can.  Her concern about the spike in price

1  makes no sense at all if she was truly a pumper and dumper

2  because when you hear from the real pumper and dumpers, Wexler

3  and Azrak and Bell, they'll tell you that a spike like that is

4  an opportunity.  They'll tell you that's what they are looking

5  for so they can dump their shares on people.

6          And you will find, if you analyze the proof here, if

7  you listen carefully to the conversations between Cane and

8  Discala, you will find that there are no discussions with her

9  of matched orders or wash sales.  If that happened, it

10  happened away from her and she didn't know it was happening.

11          Now, you may hear that Discala discusses with my

12  client the price at which the escrow account in the name of

13  David Ben-Bassat is offering to sell some shares or the price

14  at which it is offering to buy shares.  You may hear some

15  discussion of price.  You may hear Mr. Discala say something

16  like you know you are at $5.40.  Could you offer it at $5.42

17  or something like that, a couple of pennies, you may hear

18  something like that.  But you will not hear, you will never

19  hear, on any of these tapes something like I'm putting your

20  order together with another broker.  We need to do a trade at

21  5.42 with somebody else.  You're not going to hear talk about

22  matching her prices up with anybody else's.  So there is no

23  evidence, none in the tapes that she engaged in a matched

24  trade or a wash sale or even knew that was happening.  There's

25  just no evidence of that.

1            And the third key allegation as to Ms. Cane is that

2      this escrow account which she set up in the name of David

3      Ben-Bassat was used to manipulate the price and the volume of

4      Cubed's stock.  But again the proof will not support that

5      allegation.  For one thing, the proof will show that this

6      escrow account never bought shares in.  In the months that it

7      operated it never purchased shares.  The government will show

8      you charts that demonstrate that and you will hear from real

9      pumpers and dumpers, guys like Azrak and Wexler and Bell, that

10     it's important when a share price starts to fall that you buy

11     shares in.  You support the stock.

12            You will hear that, that phrase, support the stock,

13     support it buy buying shares in to push the price up and yet

14     this account that the government is focused on never, ever did

15     that, even though the real pumpers and dumpers in the case did

16     it repeatedly.

17            You'll hear that through this account only a very

18     few of the very many free trading shares were sold during the

19     months that the account was in existence.  During the months

20     that this account was in existence there were about eight

21     million free trading shares.  But this account sold only about

22     500,000, just about six percent of those shares, a little at a

23     time, a few thousand at a time, a few hundred at a time in

24     some cases.  So there was no dumping of any stock.  There was

25     simply a leaking of it into the market as the market allowed.

1           There was no pump and there was no dump and, in

2    fact, although the government alleges that this account was

3    used to manipulate shares, but the government's own proof will

4    show that for three weeks, almost three weeks, from the end of

5    June until trading was halted on July 17, 2014, this account

6    did not sell a single share.  If there was manipulation going

7    on in the market during those three weeks  -- and I believe

8    the government's expert will tell you that three weeks is

9    plenty of time to manipulate a market in a thinly traded stock

10   like this one.  During those three weeks my client wasn't in

11   the market in any way.  This account, this Ben-Bassat account,

12   wasn't buying shares.  It was not selling shares.  It was

13   sitting there.  It played no role in any manipulation during

14   that time.

15           So, this account was used to sell a few shares into

16   the market at a time and what was effectively a real lockup

17   and a leak out of these shares.  It didn't affect the price

18   much, just sold them as the market would permit.

19           Now, I want you to consider the situation when Cubed

20   retained Ms. Cane.  I believe the proof will show that

21   Ms. Cane was retained by Cubed, that was her client, this

22   company, in March of 2014.  By that point the transaction was

23   already well on the way.  It had already begun with another

24   lawyer representing Cubed, a plan name Darren Ofsink.  So my

25   client stepped into a situation that was already in motion.

Opening - Riopelle                          64

1    Remember that chaotic history.  You're trying to live life.

2    She stepped into a chaotic situation, Omniview, Mr. Discala as

3    his investors, they were already in place.  They were

4    committed to provide funding to Cubed and it was funding that

5    Cubed desperately needed.

6          The allocation of shares between Omniview's

7    investors and Cubed insiders, those who were working for the

8    company, had already been decided when Ms. Cane came along.

9    The deal was already essentially done, where 40 percent of the

10   company was in free trading shares and they would go to the

11   investors and 60 percent would be restricted and they would go

12   to Cubed's management.

13         Keep in mind that when Kyleen Cane stepped into this

14   Cubed had no funds.  It was starved for cash.  Remember that

15   number less than fifteen hundred dollars.  And there was a

16   good reason to think it might not survive.  Remember that

17   going concern qualification in its financials which she helped

18   to file.

19         So what was the solution for this problem?  What

20   could she do?  She had to do what was best for her client,

21   Cubed.  She had to keep Omniview's investors, people like

22   Wexler, people like Azrak happy.  They were the one source of

23   cash or funding that Cubed had and Cubed could not survive

24   without it.  So she had to keep that crowd happy.  But she had

25   to find at the same time a way to protect Cubed from the vast

cascade

cascade

cascade

Opening - Riopelle                              65

1   money pumpers and dumpers, from people like Wexler and Azrak

2   and Bell and from short sellers, people who sell short and

3   destroy companies like this by dumping their shares in the

4   market.

5          And that is why she came up with the idea of the

6   escrow in David Ben-Bassat's name.  It solved these problems.

7   It didn't give the pumpers and dumpers complete control over

8   the stock.  The stock was sold into the market a little at a

9   time.  It was never dumped.  It was not bought back, so it was

10  not pumped and because there was relatively little stock

11  available in the market it protected the company from short

12  sellers.  They could not borrow the stock to sell it against

13  her.

14         You're going to hear some evidence I believe about

15  what is not in the indictment.  The government will go all the

16  way back to sometime around 2010, 2011 here and will prove

17  some facts I believe about a company called Northwest

18  Resources.  Northwest Resources is what the government will

19  call a shell company that became the public company that

20  became Cubed.  And what you'll learn that is Northwest was

21  formed in about 2011 to mine for metals in California.  You'll

22  find that it was formed by a man named Taylor Edgerton who

23  wanted to go into the mining business.  You'll hear proof that

24  Kyleen's junior partner, a man name Joe Laxague, helped

25  Edgerton form the company as a public company.  You'll hear

cascade

1   that Northwest actually bought a mining claim as a mining

2   company would do.  You'll find and hear that Northwest

3   retained an accountant and a mining engineer to engage in

4   mining and you'll hear that Edgerton found investors to become

5   shareholders of Northwest.

6          But ultimately Northwest failed.  It did not have

7   success as a mining company and ultimately did not operate as

8   a mining company.  Now that happens.  Companies are started.

9   Companies fail and ultimately, if you have a public company

10  like this, you can sell yourself to another company which

11  wants to have a try at becoming a public company and that's

12  what happened with Northwest Resources.

13         Now, here is what you will not hear about Northwest

14  Resources.  Remember I told you what's not in the evidence is

15  also important to consider.  You will not hear that Kyleen

16  Cane participated in the formation of that company.  You will

17  not hear that Mr. Edgerton or any other Northwest investor

18  ever met or spoke to Kyleen.  You will not hear that the

19  shares of Northwest were ever manipulated in any way.  You

20  will not hear that Northwest's accounting, legal and

21  engineering costs were not legitimate, were not real.  You

22  will not hear that Northwest's mining claim was not real.  In

23  fact, Northwest was a real company.  It just didn't work out

24  and ultimately it was sold as part of the process of Cubed

25  becoming a public company.

1           Now, at the end of the case I'm going to ask you to

2    consider my client, Ms. Cane's, character and the nature of

3    the law practice.  Another quote, very apt for today, is that

4    We should judge each other based on character and nothing

5    else.

6           You will find, and the evidence will show that,

7    Ms. Cane was extremely committed to her client Cubed as she

8    was to her other clients, clients like Regenecin, a prior deal

9    that she had had with Mr. Discala.  You will hear that she is

10   still Regenecin's lawyer today, many, many years later.  You

11   will hear that her law firm and her practice were those of an

12   entrepreneur, not some kind of institution.  Her firm wasn't a

13   giant Wall Street firm doing giant deals for Goldman Sachs or

14   some giant investment bank.  She represented small companies,

15   helped them get financing, had to search for business, had to

16   deal with people who might be the sources of business, had to

17   look for that next deal.  She was an entrepreneur as a lawyer.

18          I think you'll find that she was scrupulous about

19   press releases and public filings.  You may hear that in other

20   deals, deals bike Codesmart perhaps, that the government

21   contends that the press releases that she had nothing to do

22   with, she was not the lawyer in that one, were false.  You're

23   not going to hear that the press releases with respect to

24   Cubed were false and indeed you may hear that she was very

25   scrupulous about making sure that those press releases were

1   accurate.

2          You'll hear that she was a creative person, a

3   problem solver.  She was somebody who was ready to try

4   innovative solutions for Cubed's problems and that's what I

5   think you'll find is where David Ben-Bassat's account came up

6   and you'll find because the proof will show, that she was so

7   loyal to her client Cubed, she was willing to work without pay

8   for months and even advanced expenses on behalf of Cubed out

9   of her firm's own pocket.

10         Now, ask yourself whether that makes sense if you

11  are a pumper and dumper and a fraudster.  You'll hear that

12  Kyleen Cane expended uncollected fees of about 128 thousand

13  dollars through May of 2014.  They didn't collect that money.

14  They had worked without pay.  As you hear that proof think

15  about whether that is what a fraudster does.  You'll hear that

16  Kyleen Cane advanced about eleven thousand dollars in expenses

17  on behalf of Cubed out of her pocket.  Right out of its own

18  pocket.  Is that what a criminal does?  I don't think so.

19         Ladies and gentlemen of the jury, that's a quote of

20  Heraclitus.  The world's first philosopher, one of his many

21  famous sayings, Character is destiny.  I think that's true and

22  I think the evidence will show that here.  The evidence will

23  show that it was Kyleen's character that led her to small

24  companies, to want to help, to want to find solutions for

25  difficult problems.  They got her involved in this transaction

1   when maybe it would have been much smarter to say, hey, you

2   know, I make a living.  I don't need this trouble.  But her

3   character drew her into it.  She saw a company that needed

4   help and she rushed to it.

5         But if character is destiny, I think you will find

6   at the end of the case that she always acted in good faith,

7   that she never intended to harm anyone by her actions and if

8   character is truly destiny, then you will find that Ms. Cane

9   is not guilty.

10         Thank you very much for your patience.

11         THE COURT:  Thank you, Mr. Riopelle.

12         Ladies and gentlemen, we're going to take a brief

13   break at this time.  Normally our practice will be to take a

14   mid-morning break and a midafternoon break in each of our

15   session days.  We'll take about a ten or fifteen minute break

16   to give us a chance to reconfigure the courtroom as well.

17   During these breaks, you'll go back to the jury room and some

18   of those instructions that you heard read to you already snap

19   into place and that is do not discuss the case amongst

20   yourselves or with anyone else you may run into in the back

21   hallway there and to continue to keep an open mind, an open

22   mind until the case is concluded and the case is given to you

23   to be deliberated in the jury room.

24         There are also a couple of other rooms in that room

25   that you may need to refresh yourselves and we'll see you in

70

1    about ten or fifteen minutes.

2              (Jury excused.)

3              (Continued on next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                    71

1    (Continuing.)

2         THE COURT:  We'll take a break.  For planning

3    purposes, I don't know who is taking the first witness for the

4    Government.  I always like to get that first puck to the goal,

5    so we'll probably work until around 1:30 unless there comes a

6    break, if the Government's direct of the first witness is

7    concluded prior to the time.

8         See you in about 10, 15.  And plan accordingly.

9         (A chorus of thank yous.)

10        (Recess taken.)

11        THE COURTROOM DEPUTY:  Counsel for both sides are

12   present, including Defendants.

13        THE COURT:  Are we ready to resume?

14        MS. JONES:  Yes, your Honor.

15        MR. HEIN:  Your Honor, we will be reading two

16   stipulations into evidence initially and then calling the

17   witness.  I think a good break point for the witness is likely

18   around 45 minutes.  I'll just cut him off at that point.  Of

19   course, if your Honor thinks it's running too long, let me

20   know, and I'll cut it off sooner.

21        THE COURT:  You know me better than that:  If

22   somebody doesn't remind me, we'll sit here all day and never

23   have lunch.  I remember when I was on that side we were like

24   camels; didn't eat, didn't drink.

25        MR. BINI:  I always lose weight on trial.

Proceedings                                    72

1          THE COURT:  I always manage to find it.

2          (Jury enters.)

3          THE COURT:  Be seated, please.

4          Counsel will stipulate the jury is present and

5    properly seated.

6          MS. JONES:  Yes, your Honor.

7          MR. ROSS:  Yes, your Honor.

8          THE COURT:  Ladies and gentlemen, welcome back.

9    We're going to try to get our feet wet a little bit before

10   lunch.  I do promise to have a lunch break.  William promises

11   to remind me if I forget.

12         But we are now on the Government's case, where we

13   begin to hear the evidence through testimony, documents,

14   stipulations, or whatever.

15         Who is up for the Government and what do you have

16   for us?

17         MR. HEIN:  Patrick Hein for the United States, your

18   Honor.  I'd like to read two stipulations into evidence.

19         THE COURT:  Proceed.

20         MR. HEIN:  It is hereby stipulated and agreed by and

21   between the undersigned parties that Government Exhibit 121-1

22   is a true and accurate copy of the pen register data collected

23   by service provider New Cingular Wireless PCS, LLC, an

24   affiliate of AT&T, for the number 914-255-7892, a mobile

25   telephone subscribed to by Abraxas J. Discala, 30 East 21st

Proceedings                                73

1   Street, Apartment 7B, New York, New York, 10010, hereinafter

2   "the Discala cell phone," for the period February 26, 2014 to

3   June 29, 2014.

4           The pen register data included the incoming and

5   outgoing numbers transmitted to and from the Discala cell

6   phone, along with the date, time, and duration of the

7   communication, as well as whether the communication was an

8   audio call or a text message.

9           Government Exhibits 199-1 through 199-103 reflect

10  true and accurate copies of text messages that were sent or

11  received over the Discala cell phone.

12          For each exhibit, the content box accurately

13  reflects the text message and the information above --

14          (Interruption in proceedings.)

15          MR. HEIN:  For each exhibit, the content box

16  accurately reflects the text message, and the information

17  above the content box accurately reflects the session number,

18  date, time, direction, telephone number, and participant that

19  sent or received the text message.  An "incoming" text message

20  was received by the Discala cell phone.  An "outgoing" text

21  message was sent by the Discala cell phone.

22          Government Exhibits 198-1 through 198-77 are true

23  and accurate copies of audio recordings of certain

24  communications occurring over the Discala cell phone.

25          Government Exhibit 198-A is a list of the audio

Proceedings                                    74

1    recordings marked as Government Exhibits 198-1 through

2    198-77 --

3              (Interruption in proceedings.)

4              MR. HEIN:  I'll start that section again.

5              Government Exhibit 198-A is a list of the audio

6    recordings marked as Government Exhibits 198-1 through 198-77

7    and accurately reflects the session number associated with

8    each communication, the date and time of each communication,

9    the other telephone number associated with the intercepted

10   communication, the direction of each communication, incoming

11   or outgoing, the duration of each communication, and the user

12   of the other telephone number.

13             Government Exhibits 198-1-T through 198-77-T are

14   transcriptions of the conversations intercepted in Government

15   Exhibits 198-1 through 198-77.  More specifically, each

16   Government exhibit marked 198-1 through 198-77 corresponds to

17   a transcription marked with the same exhibit number and added

18   a designation of "T."  The transcriptions and excerpts of

19   those transcriptions may be used during the trial as an aid to

20   the jury if the corresponding audio recording is admitted into

21   evidence and played for the jury.

22             The first page for each of the transcripts marked as

23   Government Exhibits 198-1-T through 198-77-T accurately

24   reflects the session number associated with each

25   communication, the date and time of each communication, the

Proceedings                                          75

1   other telephone number associated with the intercepted

2   communication, the direction of each communication, incoming

3   or outgoing, the duration of each communication, and the

4   participants of the conversation.

5           Location data provided by AT&T for the Discala cell

6   phone reflects that the Discala cell phone was physically

7   located within the Eastern District of New York; specifically

8   Brooklyn, Queens, or Nassau County, when the audio recordings

9   marked as Government Exhibits 198-6, Session 3623; 198-74,

10  Session 3668; 198-9, Session 3766; 198-52, Session 17168;

11  198-77, Session 17173; 198-53, Session 17241, were placed or

12  received by the Discala cell phone.

13          This stipulation, marked as Government Exhibit

14  198-B, and the Government Exhibit 121, are admissible as into

15  evidence at trial.

16          Government Exhibits 198-A, 198-1 through 198-77, and

17  199-1 through 199-103 may be moved into evidence by the

18  Government subject to substantive evidentiary objections by

19  the defense that are not based on challenging the authenticity

20  or lack of foundation.

21          The Government moves Government Exhibit 198-B into

22  evidence.

23          THE COURT:  I presume there's no objection.

24          MR. ROSS:  No objection.

25          MR. RIOPELLE:  No objection, your Honor.

Proceedings                                    76

1          THE COURT:  There being none, it's received in

2    evidence without objection.

3          (Government Exhibit 198-B so marked.)

4          MR. HEIN:  I have one other stipulation to read,

5    your Honor.  This is Government Exhibit 125.

6          It is hereby stipulated and agreed by and between

7    the undersigned parties that Government Exhibits 127-1 through

8    127-54 are true and accurate copies of documents that were

9    obtained from the office of OmniView Capital Advisors, LLC,

10   located at 140 Rowayton Avenue, Norwalk, Connecticut.

11         Governments Exhibit 121 -- excuse me, 128-1 through

12   128-5 are true and accurate copies of documents that were

13   obtained from the home of Abraxas Discala located in Norwalk

14   connect.

15         Government Exhibits 129-1 through 129-108 are true

16   and accurate copies of text messages obtained from telephone

17   number 806-639-0042, a mobile telephone belonging to Kyleen

18   Cane.

19         Government Exhibit 132-2 is a true and accurate copy

20   of text messages obtained from telephone number 210-380-6634,

21   a mobile telephone belonging to Matthew Bell.

22         Government Exhibits 136-1 through 136-4 are true and

23   accurate copies of text messages obtained from telephone

24   number 914-255-7892, a mobile telephone belonging to Marc

25   Wexler.

Proceedings                                    77

1          This stipulation, marked as Government Exhibit 125,

2    and Government Exhibits 127-1 through 127-54, 128-1 through

3    128-5, 129-2 through 129-20, 129-86 through 129-108, 132-2,

4    and 136-1 through 136-4 are admissible as evidence at trial.

5          The Government moves Government Exhibit 125 into

6    evidence.

7          THE COURT:  Any objection?

8          MR. RIOPELLE:  No objection, your Honor.

9          MR. ROSS:  No objection, Judge.

10          THE COURT:  Received in evidence without objection.

11          (Government Exhibit 125 so marked.)

12          MR. HEIN:  The Government now calls its first

13   witness, Matthew Bell.

14          (Witness sworn.)

15          THE COURTROOM DEPUTY:  Please state your first and

16   last name and spell it for the record.

17          THE WITNESS:  Matthew Bell, M-A-T-T-H-E-W  B-E-L-L.

18          THE COURTROOM DEPUTY:  Thank you.  Have a seat,

19   please.

20          THE COURT:  Mr. Hein.

21

22

23

24

25

```
                    Bell - Direct - Hein                    78
```

1   **MATTHEW BELL**,

2           called by the Government, having been

3           first duly sworn, was examined and testified

4           as follows:

5   DIRECT EXAMINATION

6   BY MR. HEIN:

7   Q    Good afternoon, Mr. Bell.

8   A    Hello.

9   Q    How old are you?

10  A    I'm sorry?

11  Q    How old are you?

12  A    I'm 50.

13  Q    Where do you live?

14  A    I live in Boerne, Texas.

15  Q    Can you please describe your educational background?

16  A    I have a four-year college degree from San Diego State

17  University.

18  Q    How are you currently employed?

19  A    I'm a tree trimmer.

20  Q    What did you do for work between approximately 1997 and

21  2014?

22  A    I was a stockbroker.

23  Q    Were there any specific accreditations you received

24  before becoming a stock broker?

25  A    Yes.  I needed a Series 7 federal license, Series 63

Bell - Direct - Hein                    79

1    state license, and a Group 1 insurance license.

2    Q    What are each of those accreditations?

3    A    A Series 7 federal license allows you to transact

4    securities on behalf of clients; Series 63 is the equivalent

5    state license; and Group 1 insurance allows me to sell life

6    insurance.

7    Q    Why did you stop working as a stockbroker?

8    A    I was fired.

9    Q    Why were you fired as a stockbroker?

10   A    I was fired by my broker-dealer for risky transactions in

11   microcap and penny stocks.

12   Q    What is a "microcap" stock?

13   A    A Microcap stock is a stock that doesn't trade on the Dow

14   or the NASDAQ.  It's a small capitalization stock, a penny

15   stock.

16        And I put too many of that in my customers'

17   accounts.

18   Q    What do you mean by "risky transactions"?

19   A    I had overallocated microcap stocks in my customers'

20   accounts and they started to lose a lot of money.

21   Q    Directing your attention to July 17, 2014, do you recall

22   that day?

23   A    Yes, sir.

24   Q    Why do you recall that day?

25   A    I was arrested.

Bell - Direct - Hein                    80

1   Q    What did you get arrested for?

2   A    I was arrested for stock fraud, manipulating stocks.

3   Q    What do you mean by "manipulating"?

4   A    I worked with a group of people to manipulate four stocks

5   in the stock market for profit.

6   Q    And what specific stocks was your arrest in connection

7   with?

8   A    CodeSmart, which is ITEN, the symbol; the Staffing Group,

9   which was TSGL; Starstream Entertainment, which was SSET, the

10  symbol; and then Crackpot Cubed, which was CRPT.

11  Q    Did there come a time when you pled guilty to federal

12  crimes in connection with your activities in CodeSmart,

13  Staffing Group, Starstream, and Crackpot Cubed?

14  A    Yes, sir.

15  Q    What crimes did you plead guilty to?

16  A    I pled guilty to conspiracy to commit securities fraud

17  and conspiracy to commit wire and mail fraud.

18  Q    What specifically did you do wrong?

19  A    Specifically, I worked with a group of people and -- to

20  manipulate the price of stock that I also personally owned at

21  a low price to move the price of the stock upwards and sell my

22  stock at a profit.

23  Q    Who are some of the people you committed these crimes

24  with?

25  A    I committed these crimes with AJ Discala, Darren Ofsink,

Bell - Direct - Hein                    81

1   Ira Shapiro, Craig Josephberg, Marc Wexler, and Kyleen Cane.

2   Q    Did you meet everyone in person with whom you committed

3   these crimes?

4   A    No.

5   Q    Who among the people you just listed did you meet in

6   person?

7   A    AJ Discala.

8   Q    Do you recognize AJ Discala in the courtroom?

9   A    Yes, I do.  He's over there.

10  Q    Would you please identify him by something he's wearing?

11           MR. ROSS:  We'll stipulate this is AJ Discala.

12           THE COURT:  The record will reflect that it's

13  stipulated that Mr. Discala is at the table.

14  Q    Did you ever meet Kyleen Cane in person?

15  A    No.

16  Q    When did you first meet AJ Discala?

17  A    Early March of 2013.

18  Q    Where did you meet him?

19  A    I met him in the boardroom of my brokerage firm, which

20  was called Alamo Asset Advisors, located in San Antonio,

21  Texas.

22  Q    Under what circumstances did you meet AJ Discala.

23  A    AJ had come to town and met with all the brokers in our

24  firm to do what's called "roadshow."  He was there to present

25  his company OmniView Capital, what they could do.

Bell - Direct - Hein                          82

1         And specifically, my firm had invested a lot of our

2    clients' money in a small cap stock called Location Based

3    Technologies.  And he had been or was about to be hired by

4    Location Based Technologies to provide some services, and he

5    was going to tell us what specifically he was going to do for

6    LBAS -- that was the symbol -- and give a presentation as to

7    what his firm did.  And they gave us that presentation.

8    Q    What, if anything, did Discala tell you about his company

9    OmniView Capital?

10             MR. ROSS:  Judge, I'll object at this point to the

11   standing objection we discussed earlier.

12             THE COURT:  Yes.  And the standing ruling is

13   overruled.

14   Q    What, if anything, did Discala tell you about his company

15   OmniView Capital?

16   A    He said it was based on the East Coast, that it was a

17   specialized company dealing in a couple of things:  Promoting

18   microcap stocks, companies would hire them to promote their

19   company to get the price up, to raise money when money was

20   needed, and, if they were privately held, to help them go

21   public through alternative public offering system, called an

22   APO, that his company specialized in.

23   Q    What is an "alternative public offering"?

24   A    An APO, there's two ways for a company to go public.

25             Initial public offering, which is one that's

1  well-known, that's standard where a company that's privately

2  held goes public on one of the exchanges.

3          An alternative public offering is when a company

4  that's private wants to go public and there's an alternative

5  way.  And the way that works is you find a shell account, and

6  AJ mentioned that OmniView Capital was a specialist in finding

7  a shell -- I'm sorry, not shell account, shell company.  A

8  shell company is a company that is still registered with the

9  exchanges but is not actively working as a company anymore;

10  they're not producing anything, but what they've done is on

11  paper is kept the registration active.

12          They had a number of shell companies that they knew

13  about.  And with an APO, you purchase all the shares in the

14  shell company and then you do a reverse merger of the active

15  privately held company into it and then a name change, thus

16  making the company public by kind of just taking over that

17  shell.

18  Q    What is a "reverse merger"?

19  A    A reverse merger is when -- normally, a "merger" is when

20  one company eats another one.  In this case, reverse merger is

21  when a privately held company merges into a shell company to

22  become public.

23  Q    What specifically about Discala discuss at the

24  presentation at Alamo Asset Advisors?

25  A    He was there primarily to talk about Location Based

Bell - Direct - Hein                                          84

1    Technologies, which I said my firm had heavily invested in our

2    customers' accounts and our accounts personally, and that he

3    was going to get Location Based Technologies in front of a lot

4    of red chip investors -- a "red chip investor" is someone who

5    invests in small and microcap companies, instead of a blue

6    chip investor who invests in other larger companies -- help

7    them raise money and get the awareness out.  Since they were

8    already publicly trading, he didn't need to do an APO.

9            And then he spent some time explaining again what

10   OmniView Capital does and could do and telling us a little

11   about the different people that work there.

12   Q    Was Location Based Technologies a microcap stock?

13   A    Yes.

14   Q    Did you speak with Discala after the presentation he gave

15   at Alamo Asset Advisors?

16   A    I did.

17   Q    Where did you speak with him?

18   A    I invited him to come into my office and we met in my

19   office right after the general presentation.

20   Q    And was it just the two of you in the office?

21   A    Yes.

22   Q    And what did you two discuss?

23   A    Quite a bit.  Initially, since I had so much of the LBAS

24   stock in my customers' account, I was very interested -- and

25   it was trading down.  I was very interested in his specific

1    plan to help them get the price of the stock up, and he had

2    some thoughts about that.

3            As we got to talk back and forth, I mentioned to him

4    that based on what he told me about OmniView Capital's

5    abilities that I had some companies that I knew about in Texas

6    that we traded that I thought that they could use his

7    services.  And he told me that he had some other companies,

8    besides LBAS, that he was investing in and that was working

9    with OmniView Capital that I might be interested in.

10           When I say I might be interested, one, personally,

11   because I was an investor, but also to get our customers

12   involved.  And the more we talked, the more I said I was very

13   interested in it.  And he mentioned that he had a PIPE, which

14   is a private investment in a public entity, coming up on a

15   company called International Safety Group, that I could

16   personally buy some shares very inexpensively and also get

17   some for my customers and that I could assist him in helping

18   with moving the price of the stock up.

19           So, at the end of the meeting, we basically agreed

20   that we were going to help each other invest in these three

21   stocks, Towerstream, ISGI, and LBAS, and start coordinating

22   our trades, working together to get the word out.  And

23   subsequently, I did purchase in the PIPE and we started

24   coordinating our trades.

25   Q    What do you mean by "coordinating" your trades?

1   A    We communicated during the month of March and early

2   April, telling each other where we were buying our stock

3   trades at, where we wanted it to go by the end of the day,

4   what our goal was.  He would tell me:  Hey, could you bid --

5   which means could you put a stock sale in -- at this price?

6   Could you buy some shares in ISGI?  I'm buying Tower.

7              So, we started coordinating our trades really to

8   manipulate the price of the stock upwards.  We had a goal for

9   each one of the companies to try to get it up.

10

11             (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Bell - direct - Hein                    87

1   BY MR. HEIN:

2   Q     And what was the purpose of the manipulation?

3   A     In this case the purpose of the manipulation was to move

4   the price of the stock upwards.  For Location Based

5   Technologies all of my customers were under, which meant they

6   were showing a loss.  There was a certain point where I wanted

7   to get the stock so I could start selling and get everybody

8   out.  In ISGI of course I was able to purchase shares around

9   20 cents.  The goal we had was to get the stock over a dollar

10  so we could sell our shares at a large profit.

11  Q     You mentioned that you communicated with Discala during

12  March 2013, how did you communicate with Discala?

13  A     By text, e-mail, phone.

14  Q     Did you ever participate in stock price manipulation?

15  A     Yes.

16  Q     When?

17  A     Back in 1998, 1999, I worked for a firm that had its own

18  trading floor and I participated in manipulating stocks and

19  prices.

20  Q     Did you participate in any stock manipulations prior to

21  meeting Mr. Discala?

22  A     Over a 16 year career as a stockbroker I had a number of

23  complaints and some of those had to do with annuities and

24  stuff.  I had a number of complaints which included risky key

25  stock trading.

1   Q    Did there come when Mr. Discala told you about a company

2   called Codesmart?

3   A    Yes, sir.

4   Q    When approximately did Mr. Discala mention Codesmart to

5   you?

6   A    Early April of 2013.

7   Q    What if anything did Mr. Discala tell you about

8   Codesmart?

9   A    By then we had a pretty good rapport going.  We had be

10  texting, talking on an active basis and he told me that this

11  was a company, when he mentioned Codesmart was a company that

12  was involved in the medical billing training and it was very

13  timely because of what was going on with the Obamacare

14  situation.  And that he was going to sign them up pretty soon,

15  which then Omniview was going to go into some kind of

16  contractual obligation with the company, that he knew the CEO

17  and general counsel very well.  In fact, the general counsel

18  was not only the general counsel and attorney for the company,

19  but it was for his company also.  And that the  -- I would be

20  able to purchase shares in the shell, very inexpensively and

21  we would  -- a reverse merger would take place where Codesmart

22  would do a reverse merger into a shell company that we would

23  already purchase the shares from and that it would change its

24  name from the shell company to Codesmart and that using my

25  customers' accounts to purchase the shares and other brokers

Bell - direct - Hein                    89

1   that he told me he had recruited that we would manipulate the

2   price of the stock upward with an ultimate goal that we would

3   sell our shares at a higher price.

4   Q    Who if anyone else did you and Mr. Discala work with at

5   Codesmart?

6   A    A.J. and I worked on Codesmart with Darren Ofsink who is

7   the general counsel for both sides.  Craig Josephberg was

8   another stockbroker that was going to help in the

9   manipulation.  Mark Wexler I was told who was a private trader

10  and Ira Shapiro who was the CEO of the company.

11  Q    You mentioned Mr. Discala discussed doing a reverse

12  merger with Codesmart.  Did a reverse merger take place with

13  Codesmart?

14  A    Yes, sir.

15  Q    Were you involved in that reverse merger?

16  A    Yes, sir.  A shell was founded called First Independence

17  Corp. out of Florida.  It was actively listed on the exchange

18  but not having any day-to-day operations.  I was able to

19  purchase  -- turned out to be 125,000 shares.  Initially a

20  million shares that I got reverse merger.  We purchased the

21  shares in the shell account and wanted to purchase all of the

22  shares because control is very important.  That way we could

23  go ahead and help out  -- when you own all the shares and it

24  is easy do any kind of corporate governance, any kind of

25  voting, also we would control the shares in the company.

Bell - direct - Hein                    90

1   Q    You mentioned controlling the shares, how did Discala say

2   to you you were going to control the shares?

3   A    A.J. would know all the different people that owned all

4   the shares.  There was going to be about 7.5 million shares

5   outstanding after the reverse merger.  By purchasing all the

6   shares in the shell account then amongst the different players

7   whoever they were, he would know who had the shares.  Some of

8   those shares would be restricted shares and couldn't be

9   traded.  Some would be unrestricted and could be traded.  So

10  by having control of the shares we would be able to manipulate

11  the stock much easier, that way you don't have somebody that

12  has some shares you don't know about out of the blue come in

13  and mess up whatever you are doing that day by selling into

14  your plan.

15  Q    You mentioned unrestricted stock.  What is that?

16  A    So unrestricted stock is stock that is freely tradeable

17  and you could trade on the exchange and buy and sell it.

18  Q    And you also mentioned you bought unrestricted shares in

19  First Independence Corp.?

20  A    That is correct.

21  Q    Approximately how many shares?

22  A    My certificate  -- I initially bought 125,000 shares.

23  Q    At approximately what price did you buy those

24  unrestricted shares?

25  A    So I bought a million shares at 2.2 cents that got

Bell - direct - Hein                91

1   switched eight for one.  It turned out to be 125,000 shares at

2   16 cents.  So the check I wrote was 22 thousand dollars.

3   Q    How if at all did you and Discala control the shares?

4   A    A.J. knew everybody that purchased the shares and how

5   many were restricted and how many were unrestricted.  I didn't

6   know all the different players.  I just knew how many shares

7   that I had.  One of the ways that you control that is, one,

8   you have restricted shares so they cannot be sold without

9   permission from the company and Ira Shapiro was part of the

10  scheme, so we knew that those shares wouldn't be traded.  The

11  unrestricted shares though there was a gentleman's agreement

12  which is called a lock-up/leak-out and we all signed a

13  lock-up/leak-out agreement.

14  Q    What was the purpose of the lock-up/leak-out agreement?

15  A    The lock-up/leak-out agreement is kind of a standard

16  agreement in the stock market where the person who signs it

17  agrees not to sell their shares for a period of time,

18  sometimes a year.  And then once those shares are sold or once

19  that period of time is done then you can leak out a few shares

20  at a time.  That stops people from dumping huge amounts of the

21  shares on the market at one time.

22  Q    Why did Discala tell you that a lock-up/leak-out

23  agreement was used for Codesmart?

24  A    It would be necessary as we moved the stock price upward

25  to make sure that unrestricted shares wouldn't just dump

1  100,000 shares on the market because the plan was to very

2  tightly control the buys and sales and the amount of volume

3  that we sold every day.

4  Q    Did you abide by the lock-up/leak-out agreement you

5  signed?

6  A    I didn't.

7  Q    Did Discala tell you whether any other investors did not

8  abide by the lock-up/leak-out agreement?

9  A    He doled e that people were not abiding by it.

10 Q    What did you and others not abiding by the

11 lock-up/leak-out agreement have?

12 A    It ultimately affected the stock scheme adversely and

13 pushed the price of the stock down.

14 Q    You mentioned you and Discala manipulated the price of

15 Codesmart; how were you able to do that?

16 A    A.J. and I would text each other on a daily basis.  He

17 would tell me how much volume we were searching for that day,

18 didn't want too much volume because it was a brand new stock

19 trading and we didn't want a lot of attention.  He would tell

20 me where to put the bid and he was the quarterback so he was

21 coordinating with Craig and myself and a few other traders

22 that I found out about and then we would  -- he would tell us

23 where to purchase the stock, or I would tell him I have

24 $30,000 to purchase stock with today.  Where do you want me to

25 buy the stock at?  He would tell me buy it at this price.

Bell - direct - Hein                              93

1   I'll put some orders own this side.  We used to text and phone

2   call.

3   Q    During what approximate time period did you and

4   Mr. Discala coordinate trading in shares of Codesmart?

5   A    May of 2013 through September of 12013.

6   Q    What generally did the Codesmart's stock price do between

7   May and September 2013?

8   A    May, June July it went up, until the end of July and

9   starting in August the stock  -- in general it just went up

10  almost every day for that period.  End of July through August

11  it went down.  There was a brief period at the end of the

12  August where it rebounded a little bit where we had some new

13  traders come in, some new people he recruited.  Starting in

14  September it went straight down.

15  Q    What ultimately happened to the Codesmart stock price?

16  A    It went to zero.

17  Q    What role did you play in the coordination of the

18  Codesmart's stock price?

19  A    Well I purchased shares in the shell.  So I was part of

20  the control group.  I coordinated trades with A.J. on a

21  regular basis.  When the press releases were provided I went

22  ahead and promoted those press releases to my customers.  I

23  purchased shares.  I had a number of customers' accounts.  I

24  purchased shares in customers' accounts from the very smart,

25  from the shell all the way through the manipulation to

Bell - direct - Hein                    94

1    facilitate the price moving up.

2    Q    Were you typically buying in your customers' accounts

3    Codesmart stock?

4    A    Yes.  The majority of the time we were buying.  There

5    were sometimes that we sold.  But the scheme really was to

6    purchase.

7    Q    Did you have authority to buy stock in your customers'

8    accounts?

9    A    Yes.  I had discretion in my customers' accounts.

10   Q    Did you discuss purchasing Codesmart stock with any of

11   your customers?

12   A    Yes, sir.

13   Q    What, if anything, did you tell them with regard your

14   investment of their money in Codesmart stock?

15   A    I told my customers, one, I thought the company was very

16   timely with what was happening with the law change and the

17   fact that these physicians all needed the new medical billing

18   training and I met with the CEO of the company and the general

19   counsel that I felt comfortable with the governance of the

20   company.  I thought the stock was going to go up and it fit

21   into their portfolio.

22   Q    What was it that you did not share with your customers

23   about Codesmart?

24   A    I did not share that I had purchased shares before I told

25   them about the shares at a very low price.  I did not tell

Bell - direct - Hein                          95

1    them that I was going to be manipulating the price with their

2    money and I did not tell them that I was going to be selling

3    my shares at some point while I was buying shares in their

4    account.

5    Q    During your manipulation of Codesmart did you and Discala

6    discuss press releases?

7    A    Yes.

8    Q    What did you discuss about press releases?

9    A    Part of the plan was definitely to get as many press

10   release come out as possible on a regular basis and A.J. was

11   going to make sure that happened.  Sometimes he set himself as

12   the investor relations part of the company and the use of  --

13   the use of this type of information out in the general public,

14   these press releases, help shore up why we were buying the

15   company and also got more people involved that may not

16   normally be involved because there's people that are looking

17   at the markets for any kind of news worthy stocks to purchase.

18   Q    Did you discuss press releases with your clients?

19   A    Yes.

20   Q    Why?

21   A    It was important to keep my customers informed.  As a

22   standard fare I would also put out any kind of news on any of

23   the companies they owned.  I would go ahead and forward those

24   e-mails.  It also shored up the reason why I was buying it in

25   their accounts.

Bell - direct - Hein                    96

1   Q     Did you sell any of your Codesmart shares?

2   A     Yes.

3   Q     Approximately when?

4   A     I started selling my shares in June, June 26 of 2013,

5   through September.

6   Q     What approximately were your proceeds from selling your

7   Codesmart shares?

8   A     A little over $500,000.

9   Q     Directing your attention the July 2013, did Discala

10  mention another company of interest to you?

11  A     Yes.

12  Q     What company was that?

13  A     It was called The Staffing Group.  TSGL was the symbol.

14  Q     What did Discala mention to you about The Staffing Group

15  in September?

16  A     First of all it dealt in providing temporary workers for

17  companies and that he was going to be part of raising money

18  for that company because they were expanding, he had gotten

19  the contract, Omniview had gotten the contract and that I

20  would be able to get shares in the shell account inexpensively

21  and in this case my customers would be able to get shares in

22  the shell account, purchase them through Omniview, and that we

23  would be getting in the tens of pennies, ten, 20 cents and we

24  were going to manipulate the price of the stock over a dollar.

25  Q     What was the purpose of manipulating the price of the

1  stock over a dollar?

2  A    To sell our shares at a profit.

3  Q    What, if anything, did you and Discala do with respect to

4  staffing?

5  A    We purchased shares in the shell company.  The shell

6  company was called Aviana.  So before a shell changes the name

7  to the company you want it to be it has his own company name.

8  In this case it was Aviana Corporation.  We purchased shares

9  for myself and my customers through the use of what's called a

10 SPA, stock purchase agreement.  Once it started trading A.J.

11 and I coordinated our trades with other people to manipulate

12 the price of the stock upward.

13 Q    Directing your attention too August 2013 did Discala

14 mention another company?

15 A    Yes.

16 Q    What company was that?

17 A    That company's name was Starstream Entertainment.  It was

18 a movie company.

19 Q    What, if anything, did Discala mention to you about

20 Starstream?

21 A    He told me he had another shell corp called Gelia Group

22 and Omniview had been selected to provide the alternative

23 public offering to them to bring them public and that we would

24 be getting shares in Gelia Group that in this case issued to

25 me and that our plan or his plan was that we would go ahead

1  and start buying those in my customers accounts and other

2  brokers' accounts that we could manipulate the price of the

3  stock upward.

4  Q    What, if anything, did you and Discala do with respect to

5  Starstream?

6  A    We did a reverse merger with Gelia Group, received shares

7  in this case through this stock purchase agreement and traded,

8  coordinated trading to manipulate the price upward.

9  Q    Directing your attention to around January 2014, did

10 Discala mention another company of interest to you?

11 A    He did.

12 Q    What company was that?

13 A    That company was called Crackpot Cubed.

14 Q    What did Discala tell you about Crackpot Cubed?

15 A    Initially he mentioned he found this great software

16 company that had an internet product that was very timely and

17 it was going to really help us out of trouble we had gotten

18 ourselves in with the other schemes we had done.  This one was

19 going to work this time, that there was going to be another

20 pump co or shell account that we would be able to purchase in

21 and that we would also be raising money for them.  The company

22 needed money through a bridge offering and a pipe offering so

23 that we could not only buy the stock but we could help the

24 company raise money to make sure they were successful.

25 Q    You mentioned trouble you guys had gotten yourself into;

1    what was that?

2    A    Ultimately the Codesmart scheme had worked for awhile

3    until it didn't and when it fell it fell drastically and I

4    ended up getting fired because of it.

5    Q    You mentioned also a bridge and a pipe; what are those?

6    A    One of the things that Omniview Capital did for companies

7    when requested was raise money for them in what's called a

8    bridge or a pipe.  A bridge is when you are a private company

9    and you need money to buy staff or whatever it is, buy a

10   building or lease a building and you need a bridge to get

11   across until they are publicly traded.  So that bridge money

12   is raised and people, private investors invest money in the

13   company directly and in return for that they get very low cost

14   shares, usually restricted shares.  It's done quite often.

15        And then a pipe is a private investment in a public

16   entity.  After a company goes through the reverse merger if

17   they still need to raise money you can raise money and the

18   company will sell the company shares at a discounted price for

19   their money.  So we raised money and A.J. raised the money in

20   the bridge and I helped raise money in the pipe for Crackpot.

21   Q    Directing your attention to February 2014, what, if

22   anything, did Discala tell you about Crackpot?

23   A    He told me there was a going to be a change because in

24   the past we had done the scheme pretty much the same way.  But

25   in this case there was going to be a change that Darren Ofsink

1    could have been the counsel for Omniview and theses companies

2    and each time was not going to be involved any more.  And that

3    instead of us being able to purchase shares in the shell

4    account or shell company very inexpensively and sign a

5    gentleman's agreement which had not worked out because we all

6    sold our shares any way and ruined the scheme, he said in this

7    case there was going to be an escrow account set up and that

8    escrow account would purchase the shares in the shell and that

9    escrow account would be run by one person.

10   Q    Who was that person?

11   A    He told me that person would be Kyleen Cane, new general

12   counsel.  And the way the scheme would work this time we would

13   not have to worry about any of the manipulators selling their

14   own personal shares at the wrong time because one person would

15   be selling it and based on the amount of money we raised in

16   the paper and our participation in purchasing shares when it

17   was publicly held we would get a distribution from the escrow

18   account.

19   Q    What, if anything, did Discala tell you about this escrow

20   account?

21   A    So we had a phone call and he told me, he told me based

22   on what I have already told you that this was going to be the

23   best way for us to keep control of Crackpot, that in the past

24   too many people were untrustworthy and were selling their

25   shell shares.  And by having one person involved that he would

1   coordinate the trades with because when you buy a stock

2   there's a seller and in this case the seller would be the

3   escrow account and we would purchase shares in the open market

4   for our customers' accounts and the seller would be the escrow

5   account who was selling the shell shares and that money would

6   stay in the escrow account and then at some point in the

7   future we would  -- those people that raised money in the pipe

8   and also participated in the scheme would receive a check.

9   Q    What did Discala tell you was Cane's role with respect

10  the escrow account?

11  A    He told me she would coordinate the trades from that

12  side.  He would coordinate of the trades of myself purchasing

13  the shares and that he would be coordinating the shares being

14  sold in the escrow account and she would be in charge  -- he

15  and her would figure out the price that the shares would

16  initially begin selling and that any funds that I would

17  receive would come out of the escrow account and that would be

18  directed through her, her office.

19  Q    When you say that Discala and Cane would coordinate that

20  price, what do you mean?

21  A    Well, whenever you first start trading in a stock there

22  has to be a price, is it a dollar, is it $100, what are we

23  going to put it out in the market.  They said they were going

24  to figure out what the market cap was, he thought based on

25  what was going on in the internet at the time with different

Bell - direct - Hein                    102

1    companies like What's App and a few others, that the company

2    should be valued very high and told me that they had set on a

3    price at $5 a share.

4    Q    What, if anything, did he say about what he and Cane

5    would be doing with respect the trading, after setting the

6    price?

7    A    He and her would coordinate the sale of the stock.

8    Q    Did you ever meet Kyleen Cane in person?

9    A    No.

10   Q    Did you ever communicate with her otherwise?

11   A    Yes.

12   Q    In what form did you communicate her?

13   A    By e-mail and phone.

14   Q    What role did you play in the manipulation of Cubed?

15   A    I helped raise over 300 thousand dollars in a pipe and

16   that money was sent directly to Crackpot and customers

17   received restricted certificates and then when it started

18   trading in 2014 I helped coordinate, A. J. And I coordinated

19   the trades to manipulate the price of the stock going upwards.

20            (Continued on next page.)

21

22

23

24

25

1  (Continuing.)

2  BY MR. HEIN:

3  Q    Did you ever get a payment out of your involvement with

4  Cubed?

5  A    Yes.

6  Q    Approximately how much?

7  A    Around $20,000.

8  Q    Where did you understand that payment came from?

9  A    I was told by AJ that it came from the escrow account.

10  Q    Thank you.

11        MR. HEIN:  Your Honor, I think this is probably a

12  good place to stop.

13        THE COURT:  Okay, then we shall.

14        Ladies and gentlemen, we have reached the point

15  where we would for lunch, so we're going to take that lunch

16  break at this time.  That's the good news.  Bad news, no one

17  is buying your lunch, you're on your own with that.  There's a

18  cafeteria here in the courthouse.  You're free to visit some

19  of our local restaurants and cafeteria as well.

20        Wherever you choose to have your lunch, the rules

21  that we gave at the beginning of today's proceedings continue

22  to apply.  You are not to discuss the case amongst yourselves

23  or with anyone else, you're to continue to keep an open mind,

24  you're not to use the lunch break to conduct any sorts of

25  research, electronic or the old-fashioned kind, about anything

1   that touches any of the personalities, any of the names

2   involved, or any of the issues that have been presented to you

3   so far.

4           Now, there's another thing that for those of us who

5   are ancient never thought we would see this day, but

6   apparently there's some means called "social media" that

7   everybody can tell everybody else between here and Pluto what

8   it is they're doing at any given moment on these social media

9   things.  You're on radio silence during the course of this

10  trial.  So, if you are on some social media platform, you are

11  not to mention in any way that you're a juror, that you're

12  even coming to the courthouse, much less mention anything

13  about the trial itself.

14          So, with those admonitions that you'll hear me

15  repeat to you so often that by the end you'll be able to

16  repeat them back to me, we will send you out for lunch, ask

17  you to -- we're not going to squeeze you for lunch.  Because

18  we broke late, I'll ask you to come back to the central jury

19  room at around --

20          That would make it what, 2:45, William?

21          THE COURTROOM DEPUTY:  YES.

22          THE COURT:  And we'll try to start between 2:45 and

23  3 o'clock, as close as we can.

24          The other thing to keep in mind, another admonition

25  I give, a jury is like an army.  And I'm told by the generals

1    that an army can move only as fast as its slowest unit.  So,

2    we can't start without all of you being present.  So, as sort

3    of a pact amongst yourselves, try to keep yourselves promptly

4    on time, and that will help us keep everything on time and

5    reduce the amount of time that you spend here on any given day

6    and overall for the course of the trial.

7               So with all those admonitions, please go out and

8    enjoy a wonderful lunch.  We'll see you some time between 2:45

9    and 3.

10              (Jury exits.)

11              THE COURT:  Mr. Bell, you may stand down, meaning

12   you can leave.

13              As we indicated, William will lock up the courtroom.

14   So, to the extent that you want to keep anything here, please

15   feel free.  To the extent that you might need that something,

16   take it with you.

17              Is there anything we have to attend to before we go

18   on break?

19              MS. JONES:  Your Honor, there are two minor things

20   I'd like to raise with your Honor.

21              We had some people from my office listening during

22   the opening and they raised with me that Mr. Sjoblom has been

23   typing on his laptop during the Government's opening, that it

24   was very loud and very distracting.

25              So, I asked him, Could you just be a little more

1   aware of that?  Turn off the microphone, be a little bit more

2   quiet with the use of the laptop.

3           And we could still hear it during the direct.  A

4   couple times we had to turn around and say, Can you please --

5           THE COURT:  What is it?

6           MS. JONES:  He's typing on his laptop.

7           THE COURT:  I thought I heard words, thought.

8           MS. JONES:  That was the second thing I wanted to

9   raise.  We have agreed that we're splitting a daily

10  transcripts.  So, all of the parties should get the transcript

11  from today tomorrow.  But it appears that perhaps Ms. Cane is

12  recording what's going on in here and then her lap top started

13  playing back what she was recording.

14          It's my understanding that you're not permitted to

15  have a recording device in the courtroom while court is going

16  on, but it appears there was both recording going on and it

17  was getting played back when Mr. Hein was reading his

18  stipulation.

19          MR. RIOPELLE:  Your Honor, if I may, apparently she

20  had a tablet which was infected with some kind of malware that

21  gives an alert like that.

22          It's been removed from the courtroom.  It will not

23  appear back in the courtroom during the trial.  It was not a

24  recording, nothing of the kind.  That piece of equipment will

25  not appear again during the trial.

1           THE COURT:  That's fine.

2           I guess the typing has been silenced in someway.

3           MR. SJOBLOM:  At Ms. Jones' request, I didn't

4   realize the microphone was on.  I shut off the microphone.

5           Mr. Bini was still upset.  I moved it to my lap,

6   it's now sitting in my lap, so we're fine.

7           MS. JONES:  Thank you, your Honor.

8           THE COURT:  We're all squared away?

9           MR. RIOPELLE:  Yes.  Thank you, Judge.

10          THE COURT:  Everybody enjoy lunch.  We'll see you,

11  as I told the jury, between 2:45 and 3.

12

13          (Luncheon recess taken.)

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                      108

1          A F T E R N O O N   S E S S I O N

2              (In open court; Jury not present.)

3              THE COURTROOM DEPUTY:  All rise.  Court is back in

4    session.

5              Counsel for both sides are present, including

6    defendants.

7              MR. HEIN:  Your Honor, I didn't want to interrupt

8    you.

9              THE COURT:  Are we ready to go.

10             MR. HEIN:  Yes, I was going to mention that Mr. Bell

11   is back there.  Would you like him to be seated?

12             THE COURT:  Yes, I was going to tell you that

13   Mr. Bell can set up.

14             THE JURY:  Judge, I had one thing to raise with Your

15   Honor.

16             We just received from Mr. Hein excerpts of

17   tape-recorded calls that they intend, the government intends

18   to go over with Mr. Bell.

19             I'd object to excerpts.  I ask under the rule of

20   completeness to have the entire conversation played.

21             THE COURT:  You would play it on cross, right, if he

22   didn't agree.

23             MR. ROSS:  We could.  It's in evidence.  I think it

24   would be better if they were just played.

25             THE COURT:  Well, he can choose.  I would recognize

LAM        OCR        RPR

Proceedings                                    109

1    your right under the rule of completeness to have it played.

2            It seems to me, Mr. Hein, it may be easier just to

3    play it at all once.

4            MR. HEIN:  Your Honor, we are only playing a portion

5    because we believe that's the portion relevant to the charges

6    at issue.  The information we left off deal with either stocks

7    or discussions that we don't find relevant, so we do not think

8    the rule of completeness requires us to play the whole call.

9    It permits the defendants to play the whole call because, of

10   course, it would be otherwise hearsay that they wouldn't be

11   able to put in.

12           I will mention that it think it's highly unlikely we

13   will get to the calls today, so we want to --

14           THE COURT:  You do have a transcript of it?

15           MR. HEIN:  We have a transcript.  We provided the

16   calls and the transcripts in full prior to defense counsel.

17           Mr. Ross is right that we just gave them these

18   excerpts of the calls.  I think the calls, there may be six or

19   seven calls we intend to play and they're short.  So if Your

20   Honor would like, I'll be happy to walk through.

21           THE COURT:  I wouldn't waste the jury's time now

22   with that, but we can waste our time later.

23           To the extent that they are discrete, the mere

24   fact -- how do you describe them?  Are they --

25           MR. HEIN:  These are wiretap calls.

Proceedings                                    110

1          THE COURT:  The actual audio?

2          MR. HEIN:  Exactly.

3          And so we would just play the portion of the call,

4   and that's the excerpt, the transcript that we would offer to

5   the jury as an aide.

6          THE COURT:  And you say that there are other things

7   on the calls as well that don't relate to the portions that

8   you play.

9          MR. HEIN:  Exactly, Your Honor.

10         Our position would be that rule of completeness does

11  not apply here because the call itself stands for itself.

12         THE COURT:  It's not across the board, I agree with

13  you.  I don't know that I would agree with you when I can see

14  the transcript, but as a general statement, rule of

15  completeness doesn't bring in everything that was said in an

16  audio tape.

17         Best example usually is in postarrest statements.

18  There are discrete statements that are made and there are

19  other statements that are made around the same time.  Those

20  other statements don't come in, unless there's a separate

21  ground.

22         MR. ROSS:  Judge, but they're offing the

23  conversations and they can take out just a portion of it.

24         First of all, it's my understanding that the calls

25  aren't that lengthy and it would not take a huge amount of

Proceedings                                         111

1    time to play the entire call.

2              MR. RIOPELLE:  Your Honor, I have a separate

3    objection.  I am just going through those now, again, and I

4    see in transcript number two, which is brief, there is a brief

5    part of that transcript which I believe is irrelevant and

6    objectionable, and I would move to preclude that part.  So we

7    can shorten this one down even farther.

8              THE COURT:  You would like him to read the first

9    part so you don't have to get to Mr. Ross' objection.

10             MS. JONES:  Your Honor, Shannon Jones.  I just also

11   wanted to raise that for Mr. Bell some of the calls may be

12   very short.  For some of our witnesses one of these calls is

13   40 minutes long and to take things that they specifically

14   asked us to preclude from the jury hearing.

15             THE COURT:  What do they say:  We'll get to that

16   after we get through this.

17             MR. HEIN:  Your Honor, Patrick Hein here.  I would

18   agree we not waste the jury's time.  I will not be playing

19   them today, most likely, I think very likely, and perhaps we

20   can take it up after.

21             THE COURT:  Yes, I think that's the way we're

22   handling it.  We'll maximize our time and the jury's.

23             Anything else that we need to do before we bring the

24   jury in?

25             MR. ROSS:  No, Judge.

LD        OCR        RPR

1          MR. RIOPELLE:  No, Your Honor.

2          THE COURT:  Okay.  So we'll bring in the jury.

3          MR. RIOPELLE:  Thank you, Judge.

4          (Jury enters the courtroom.)

5          THE COURT:  Be seated, please.

6          Counsel will stipulate that the jury is present and

7    properly seated.

8          MS. JONES:  Yes, Your Honor.

9          MR. ROSS:  Yes, Your Honor.

10          MR. RIOPELLE:  Yes, Your Honor.

11          THE COURT:  Ladies and gentlemen, welcome back.  I

12    hope you had a chance to enjoy your lunch, and we are ready to

13    resume.

14          We'll note that Mr. Bell has resumed the stand.  We

15    are still on direct examination by Mr. Hein.

16          You may proceed.

17          MR. HEIN:  Thank you, Your Honor.

18          (Whereupon, the witness resumes the stand.)

19    DIRECT EXAMINATION (Continued)

20    BY MR. HEIN:

21    Q    Mr. Bell, what happened to you on July 17th, 2014?

22    A    I was arrested.

23    Q    Where were you arrested?

24    A    In my hometown, Boerne, Texas.

25    Q    By whom?

1    A    By the FBI.

2    Q    Did the FBI seize any items from you?

3    A    Yes.  A phone and a -- an iPhone and an iPad.

4    Q    Was the iPhone the FBI seized from you the phone you used

5    to exchange text messages with Discala?

6    A    Yes.

7    Q    What was the phone number of the phone that was seized

8    from you?

9    A    (210)380-6634.

10   Q    How do you know that number?

11   A    I had that number for many years.

12            MR. HEIN:  Your Honor, may I approach?

13            THE COURT:  You may.

14            MR. HEIN:  I'm showing the witness what has been

15   marked as Government Exhibit 132-2 and 132A through WW.  As

16   well, in addition to hard copy for him, I've also provided a

17   CD with those exhibits.

18   Q    Mr. Bell, do you recognize Government Exhibit 132-2?

19   A    Yes.

20   Q    What is it?

21   A    CD with the texts.

22   Q    And in hard copy?

23   A    Yes, sir, right here.

24   Q    Is Government Exhibit 132-2 a true and accurate copy of

25   the text messages between you and Discala extracted from your

1  phone?

2  A     Yes.

3  Q     And do you recognize Government Exhibit 132A through WW?

4  A     Yes.

5  Q     Are these excerpts from Government Exhibit 132-2?

6  A     Yes.

7  Q     And do you have the CD in front of you marked Government

8  Exhibit 132-2 and Government Exhibit 132A through WW?

9  A     Yes.

10 Q     Does that CD contain the same text message information as

11 the documents you just identified?

12 A     Yes, sir.

13         MR. HEIN:  Your Honor, the government moves

14 Government Exhibit 132-2 and Government Exhibit 132A through

15 WW in both document and CD form into evidence.

16         THE COURT:  Any objection?

17         MR. ROSS:  Judge, I do object.  May we come to

18 sidebar.

19         THE COURT:  Yes.

20         (Continued on the next page.)

21         (Sidebar conference.)

22

23

24

25

```
                              Sidebar                        115

 1              (The following occurred at sidebar.)
 2              MR. ROSS:  Judge, there doesn't seem to be any
 3    foundation that has been laid about how Mr. Bell recognizes
 4    these exhibits.  He glanced at them.  There's no questioning
 5    regarding how he recognizes them, how he went through them.
 6    They're just being admitted wholesale.
 7              MS. JONES:  Your Honor, we have a stipulation that
 8    these are true and accurate text messages that was on his
 9    phone.  We stipulated that they on CD.
10              THE COURT:  So they've been authenticated?
11              MS. JONES:  Yes.
12              MR. ROSS:  We did enter into that stipulation,
13    Judge, but there is absolutely no testimony on the record
14    about how he recognizes them or anything like that.
15              THE COURT:  You're saying how does he know this disc
16    relates to that stipulation?
17              MR. ROSS:  Yes.
18              MR. HEIN:  Your Honor, he has been through them.  I
19    can elicit that he's reviewed the text messages and he can
20    confirm that these are the text messages.
21              THE COURT:  Mr. Ross says if you want to do that on
22    the record, he'll be very happy.
23              MR. HEIN:  I'm happy to do that.
24              MR. RIOPELLE:  Your Honor, I just want to note that
25    I have no objection to these coming in.  It's right that we
```

1    have a stipulation.  There may be a text message or two to

2    which I have a substantive objection, I have not waived that

3    objection.

4             THE COURT:  Okay.

5             MR. RIOPELLE:  Thank you, Your Honor.

6             MR. HEIN:  Thank you, Your Honor.

7             THE COURT:  You're welcome.

8             (End of sidebar conference.)

9             (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; Jury present.)

2              MR. HEIN:  Mr. Villanueva, would you mind if I put

3       something on the Elmo?

4              This has been admitted as Government Exhibit 125.

5       Q    Mr. Bell, do you see on your screen paragraph 4 at the

6       bottom?

7       A    Yes.

8       Q    And does it read Government Exhibit 132-2 is a true and

9       accurate copy of text messages obtained from telephone number

10      (210)380-6634, a mobile telephone belonging to Matthew Bell?

11      A    Yes.

12      Q    And is that the number that you just told us was the

13      number of your telephone number?

14      A    Yes.

15      Q    With respect to Government Exhibit 132-2 and 133A through

16      WW that I just put in front of you, how do you recognize those

17      documents as your text messages?

18             Have you reviewed them?

19      A    Yes, sir.

20             MR. HEIN:  The government moves Government

21      Exhibit 132-2 and Government 113-2-A through WW into evidence,

22      Judge.

23             MR. ROSS:  No objection, Judge.

24             THE COURT:  Received in evidence without objection.

25             (Government Exhibit 132-2, was received in

                    LD       OCR       RPR

1   evidence.)

2           (Government Exhibit 113-2-A through WW, was received

3   in evidence.)

4           MR. HEIN:  Mr. Villanueva, if you don't mind, this

5   is what's been admitted into evidence as Government

6   Exhibit 132-2.

7           (Exhibit published.)

8   Q    Mr. Bell, looking at the top left corner of this

9   document, what date do you see there on the top?

10  A    March 18th of 2013.

11  Q    And going to the bottom left corner of the exhibit, what

12  date do you see there?

13  A    July 16th of 2014.

14  Q    And is that approximately a 16-month period?

15  A    Yes.

16  Q    And is that period covering the text messages between you

17  and Discala here in Government Exhibit 132-2?

18  A    Yes.

19  Q    So looking now at the left column, what the does this

20  column signify?

21  A    The date.

22  Q    And scroll down here from March 18th, 2013 until

23  April 9th, 2013, just before 3:44 here.

24          Is the black area redacted text messages between you

25  and Mr. Discala?

1    A    Yes.

2    Q    Did you exchange text messages with Mr. Discala between

3    March 18th, 2013 and April 9th, 2013?

4    A    Yes.

5    Q    When you testified this morning, or I should say earlier

6    this afternoon, you discussed the text messages you exchanged

7    with Mr. Discala during the March period.

8              What generally were you texting about during that

9    period?

10   A    We were texting about our coordinated trades between

11   LBAS, ISGI and TWER, the three stocks.

12   Q    And did you speak on the telephone with Mr. Discala

13   during that period?

14   A    Yes.

15   Q    Did you speak on the telephone with Mr. Discala during

16   the entire period of these text messages, March 2013 through

17   July 2014?

18   A    Yes.

19   Q    Okay.  Looking now here at April 9th, 2013.  Under the

20   time column, it states "492013, 3:44 p.m. UTC."

21             Do you know what "UTC" stands for?

22   A    Universal time.

23   Q    Do you know approximately what the difference is between

24   Universal time and Eastern time?

25   A    It's four to five hours ahead of Eastern time, depending

1  what time of year it is.

2  Q    And moving then to the third column here, it states above

3  "from slash parties."

4        What does this column signify?

5  A    It says who's texting who.  In this case, AJ was texting

6  me.

7  Q    And is that AJ Discala's phone number, the phone number

8  with whom you texted?

9  A    Yes.

10  Q    Could you read that phone number?

11  A    1(646)309-1549.

12  Q    And did you spell AJ Discala's last name incorrectly?

13  A    Yes.

14  Q    You mentioned earlier that your phone number was

15  (210)380-6634.

16        Looking here at the same column from April 10th.  Is

17  that what it states there under Matthew Bell?

18  A    Yes.

19  Q    And then scrolling here to the far right column, the body

20  column, what is in that column?

21  A    That's when we would have text to each other.

22  Q    So on April 9th, 2013 at 3:44 p.m. UTC, is this a text

23  message from AJ Discala to you?

24  A    Yes.

25  Q    And, again, these text messages are from your phone; is

1    that correct?

2    A    Yes.  Or to my phone in this case.

3    Q    Sorry.  They were extracted from your phone; is that

4    right?

5    A    Correct.

6    Q    Okay.  And so what is -- what did Mr. Discala text you on

7    April 9th, 2013 at 3:44 p.m.?

8    A    He says "Look at CodeSmart.  Unbelievable home run.  Just

9    got it yesterday."

10   Q    And how do you respond?

11   A    I said, "Yes, I want in.  Three year protection for

12   195 million."

13   Q    And how did Discala respond?

14   A    AJ says "It's off the charts, bro.  You are in.  Signing

15   them up at 1 p.m. tomorrow, or 1 tomorrow."

16   Q    What did you understand Discala to mean by "unbelievable

17   home run"?

18   A    Well, this is, according to our conversations we have on

19   the phone, he's very excited about it.  And when he says he's

20   signing him at 1 tomorrow, that means he's signing him up.  So

21   he's excited about it and so am I.

22   Q    You state that you want in.  What did you mean by "I want

23   in" in a text message from April 9th at 5:52 here?

24   A    I want to be able to buy shares in the shell.  And I want

25   to participate in the scheme.

1   Q    Here he writes, "Okay, cool, I'm excited about CodeSmart"
2   on April 10th.
3          Mr. Discala responds, "Dude, it's off the charts.
4   Truly."
5          You respond, "I am all in."
6          What was going on at this time in your
7   conversations?
8   A    Well, he was just -- I was letting him know I was excited
9   about CodeSmart.  Off the charts he thinks that it's going to
10  be a good stock and one that we can easily manipulate with the
11  program.
12         I tell him I'm all in.  In this case I mean that I
13  would be willing to participate in purchasing the shell and
14  trading the stock with him.
15         And then I...
16  Q    Looking here at the text message from April 12th at
17  7:03 p.m., Discala writes to you, "CodeSmart is best I've seen
18  in micro cap ever."
19         What is your understanding he meant there?
20  A    Well, he's telling me that based on his expert opinion,
21  because he told me he was an expert in micro cap stocks, this
22  is the best prospect he's seen as far as the company to take
23  public.
24  Q    And what is a micro cap stock again?
25  A    A company that's real small.  Doesn't trade on the Dow or

1    the NASDAQ.  Might have no earnings.  I guess that doesn't

2    really matter.  It's a very small stock.  Small company.

3    Q    You respond "Just bought 67K TWER."

4    A    Uh-huh.

5    Q    What did you mean by that?

6    A    That was a different -- I was letting him know that I had

7    also -- the same time we're having this conversation that I

8    had continued to purchase Towerstream, which is -- this is a

9    very good time where we're still manipulating Towerstream,

10   ISGI, LBAS but starting to on CodeSmart.

11   Q    And why were you letting him know that you just bought

12   67K.

13               What is "67K"?

14   A    It means I bought 60,000 -- 67,000 shares of Towerstream.

15   Q    Why are you letting him know that?

16   A    Because he and I are coordinating our trades.

17   Q    Discala responds on April 15th at 2:33 p.m. "Just bought

18   a little LBAS.  We will have that above 20 by month end for

19   you."

20               What did you understand him to mean by that?

21   A    That he was purchasing -- him and his traders were

22   purchasing LBAS, which was the stock he had originally come to

23   my firm to help us with.  And our focus at that point was

24   getting the stock to 20 cents.

25   Q    You respond, "Okay, thanks."

1           Why did you thank him?

2    A    I thank him because at that time it was one of our goals

3    was to get the stock over 20 cents.

4    Q    Why did him buying LBAS help towards that goal?

5    A    When you purchase a stock, it pushes the price up.

6    Q    And here now at April 17th, 2013 at 8:05 p.m., Discala

7    write "Ty.  You see HRAA.  Other ICD-10 play."

8           You respond, "Yep."

9           Discala responds, "We will be a dollar shortly.

10   Cleaned some peeps out today."

11          And you respond, "Okay, looks good."

12          So what's going on here?

13   A    So another stock that he had told me about that he had --

14   that OmniView was involved with manipulating, he and I also

15   traded this stock, was called HRAA, that was the symbol.  I

16   don't remember the name of the company.

17          And he says "Other ICD-10 play."  At the time ICD-10

18   stands for the coding software or the coding system that was

19   in use.

20          And so the Affordable Care Act required that people

21   be retrained on how they do the medical billing into a system

22   called ICD-10.

23   Q    When you say "other ICD-10 play," what's he referring to?

24   A    Means this is company that's in the same space as

25   CodeSmart, kind of like you got Walgreens and CVS.

1  Q    And Discala writes, "It will be a dollar shortly.

2  Cleaned some peeps out today."

3          What did you understand that to mean?

4  A    It means that he got rid of some people that were causing

5  trouble with the scheme as far as when you clean a peep out,

6  when you get -- you basically buy the shares from people that

7  are selling that are not part of your control group.

8          And he believed based on cleaning them out you'd be

9  to a dollar short.  His goal was to get the stock from

10 whatever it was in the cents area to a dollar.

11 Q    On April 17th, 8:07 p.m. Discala writes:  "One 10th of

12 the CodeSmart deal."

13          What did you understand that to mean?

14 A    That this company is basically a tenth as large as what

15 CodeSmart could be.  So we've decided not to really focus our

16 time and energy on HRAA.  We're going to completely go into

17 CodeSmart.

18 Q    Now, looking at April 22nd at 12:29 p.m., you write to

19 Discala, "I got lots of buyers for the secondary on

20 CodeSmart."

21          What do you mean by that?

22 A    I let him know that I'm going to use the full force of my

23 brokerage accounts, my clients' account.  So I have a lot of

24 buyers.

25          And the secondary is whenever you buy a stock in the

1    open market.

2    Q    And why are you letting him know that you have lots of

3    buyers for CodeSmart?

4    A    Because I want to let him know that I am invested.  That

5    I'll be a major player as far as -- he was taking care of the

6    quarterbacking and making sure all the paperwork was done.  He

7    was getting other brokers set up.  And I was going to be one

8    of his brokers on the team.

9    Q    Discala responds, "I'll let you know.  Let it be for now.

10   They got good stuff happening.  Awesome.  I'm taking everyone

11   down a tad and got you your mil.  FYI."

12          What did you understand him to mean by "I got you

13   your mil"?

14   A    So based on me telling him that I was going to be a very

15   supportive to the actual "pump" part of the scheme where we

16   push the stock price up, that he was going -- out of the

17   control shares of the seven-and-a-half-million shares or so

18   that would be left from the shell, he was taking the

19   percentage down of other participants in the scheme and

20   getting me more.

21   Q    Did you, in fact, get a million shares or something less?

22   A    So I initially got offered a million shares of the shell,

23   but because of an eight-to-one split, reverse split, it came

24   out to 125.

25   Q    125,000 shares?

1    A    Yes, sir.

2    Q    And is that unrestricted stock that you got?

3    A    Yes.

4    Q    You responded, "Yep, there will be months of support."

5         And Discala responds, "Awesome."

6         What did you mean by "months of support"?

7    A    Well, we sealed the deal right there.  He's going to give

8    me a million shares of the shell, and I told him that I would

9    be there for months providing support in the way of purchasing

10   stock.

11   Q    And by "purchasing stock," what would you enable the

12   stock to do?

13   A    The plan was to have the stock go up.

14        So obviously if you have more buyers than sellers,

15   and AJ controlled the sellers, than we can push the price of

16   the stock up.

17             (Continued on next page.)

18

19

20

21

22

23

24

25

1  (Continuing.)

2  BY MR. HEIN:

3  Q    On April 22 at 4:32 p.m., you write:  I am --

4       And what is that third word?

5  A    Defiantly, but I met definitely.

6  Q    I am definitely going to need your help with that guy on

7  LBAS and TWER or I may be of no use to you.

8       Discala responds:  Okay.  Call you in 10.  What

9  happened?

10      What were you explaining here?

11 A    One of my customers told me that he was going to file a

12 complaint if the price of LBAS and Tower didn't go up.  And I

13 was explaining to AJ during that time -- and I lived in Texas,

14 this particular guy was in New York, so it worked out

15 perfectly.

16      So, I told him:  Hey, if this guy files a complaint,

17 I might not be able to fulfill my part of the deal and trade

18 the stocks because I might get muzzled or fired.

19      So, we came up with a plan that AJ was going to meet

20 with this individual and cut him a check, buy his shares from

21 him, which he did.  So, he made the problem go away for me.

22 Q    Looking now at April 24 at 12:51 p.m., Discala writes to

23 you:  I need the name of the one million shares to go in

24 CodeSmart.

25      You respond:  Matthew Bell.

1          And then two rows below that, on April 24 at

2     12:52 p.m., you provide an address.

3          What's going on here?

4     A    He's asking me for the name and the address to put the

5     shares that I'm going to purchase because sometimes you put

6     shares in other people's names or corporations or whatever.

7     He was FedExing me the paperwork to complete.

8     Q    On April 29 at 5:19 p.m., Discala writes:  Sorry.  Been

9     lasered on CodeSmart docs and closing.

10         You respond:  All your well?

11         And Discala responds:  Yes, sir.

12         What did you understand Discala to mean by "been

13    lasered on CodeSmart docs and closing"?

14    A    AJ talked that way, he was laser-focussed on the

15    CodeSmart docs and the closing.  So OmniView had been hired to

16    do the APO, the alternative public offering, in conjunction

17    with CodeSmart, and there was some corporate governance that

18    had to happen, a closing, just like you do when you close on a

19    house or piece of property.  So he and Darren Ofsink had been

20    working on the docs and the closing.

21         I said all -- I meant all is well.

22    Q    What deal are you referring to CodeSmart closing?

23    A    The deal -- well, OmniView had to be signed up as an

24    investor relations or something, so, like I said, there was

25    some corporate governance that needed to take place.  And he

Bell - Direct - Hein                    130

1  said there was a lot of paperwork involved with Ira Shapiro

2  and a few others.

3  Q    On May 1, 2013 at 2:36 p.m., you write:  I hope your

4  closing went well.

5          Discala wrote:  Our closing, brother.  Closes Friday

6  a.m.

7          What did you understand him to mean by "our

8  closing"?

9  A    He was always talking about us being a team.  So, I said

10 I hope "your" closing went well, and he just wanted to point

11 out the fact that we were a team, that we were in this

12 together, and, also, that it closed on Friday.

13 Q    Discala writes on May 1 at 2:43 p.m.:  Also, Dan is going

14 to be great for CodeSmart and can buy LBAS, so get ready for

15 1 p.m.

16         What did you understand him to mean by that?

17 A    AJ's job was also to recruit other brokers to be part of

18 the scheme, and he had recruited, besides Craig Josephberg, a

19 guy named Dan Walsh who worked at Halcyon.  Dan said he would

20 help us out with our purchase and movement on LBAS.

21 Q    You asked at 2:44 p.m. on May 1:  Looking ago toward the

22 call.  What's the feedback on Halcyon?

23         What is "Halcyon"?

24 A    Halcyon was a brokerage firm here on the East Coast where

25 Craig Josephberg and I believe Dan Walsh worked.  So, he had

LD       OCR       RPR

1   set up a phone call for all of us to have kind of an

2   introduction.

3   Q    What was Halcyon's role supposed to be in your plan?

4   A    I just knew that these two guys worked at Halcyon as

5   stockbrokers, that they had clients' accounts that they could

6   purchase stocks in.  And AJ was going to coordinate the

7   purchasing of the stock between the three of us.

8   Q    What was your understanding of why you weren't the only

9   broker to coordinate the stock purchases with Discala?

10  A    Well, I mean, obviously, the bigger the army, the better

11  type thing.  So, you needed more people to do this than just

12  one broker.  If something were to happen to me, like I got a

13  complaint or got fired or something, that could mess up the

14  scheme.  So, the more brokers -- stockbrokers that were buying

15  stock in a coordinated fashion, the better.  I think at one

16  point we had four brokers working on it.

17  Q    Scrolling down here to May 1, 2013, 5:09 p.m., Discala

18  writes to you -- provides a phone number, 516-779-6825:  Call

19  him now.  Dan Walsh.

20       Who is Dan Walsh?

21  A    The other broker in Halcyon.  That was part of the

22  introduction call, I believe.

23  Q    On May 2, 2013 at 5:37 p.m., you write:  Should I open an

24  account with your broker-dealer to put the CodeSmart shares

25  in?

1              What did you mean by that?

2    A    I didn't want to put the shares that I purchased in the

3    shell account at the brokerage firm where I worked at because

4    my boss, my regulator, would know that I had the shares and I

5    was trying to keep it quiet.  And I wanted to put those shares

6    somewhere else, so I initially said maybe I should put them

7    over in Halcyon.  I ended up not doing that, though I did have

8    an account opened at Halcyon.

9              But initially, I was just asking him if he thought

10   it would be in our best interest if I had the shares in

11   Halcyon.  He said:  Sure.

12             I said:  Well, if it's easier.

13             Meaning if it's easier for the whole plan.  And then

14   he called Dan to open the account.

15             I ended up not doing that.  I put it locally at

16   Amegy Bank.

17   Q    When you refer to these CodeSmart shares, are these your

18   unrestricted CodeSmart shares that you received as part of the

19   deal?

20   A    True.  They're the shares I purchased at First

21   Independence Corp., the shell, which would become CodeSmart

22   shares.  Even though it was still kind of legally the shell

23   because the reverse merger hadn't taken place, we referred to

24   the company as CodeSmart.

25   Q    At what price again did you buy those shares, the 125,000

Bell - Direct - Hein                    133

1  shares?

2  A    Around two and a half cents per share.

3  Q    You ask here on May 3, 2013 at 12:44 a.m.:  What will the

4  ticker be for CodeSmart?  Just curious.

5        And you ask:  What is the lock-up for?  Are we not

6  freely traceable?  Thanks.

7        What did you mean by those two questions?

8  A    One, I was just curious because we had been operating

9  with First Independence Corporation, which had the ticker FICF

10  I was curious what the ticker would be.

11        The lock-up.  So, he had sent me that gentlemen's

12  agreement.  And I had heard of them before, I never actually

13  seen one.  So, I said are we not freely -- I meant

14  "tradeable."

15        And this -- basically, after this text, we had a

16  phone call where he explained to me why we needed everybody to

17  sign the gentlemen's agreement that I talked about earlier.

18  And I was just asking him why are we doing this, and it led to

19  a phone conversation where he explained it was to help try to

20  control the sales -- unexpected sales of stock in the middle

21  of our manipulation.

22  Q    So, on May 3, 2013 at 1 p.m., Discala responds:  Yes, we

23  are, but we all signed gentlemen's agreement.  Don't need

24  anyone hurting us.

25        What did you understand him to mean by that?

LD        OCR        RPR

1   A    He was just texting me a portion of the conversation we

2   had, basically saying that we all need to sign a gentlemen's

3   agreement not to sell our shares because by selling shares,

4   unbeknownst to everybody, it could really mess up what we are

5   trying to do.

6          And, in fact, we had a day where some shares got

7   away from us and the stock spiked unexpectedly.

8   Q    Why would not having gentlemen's agreements hurt what you

9   were trying to do?

10  A    It would allow anybody -- of the seven million shares,

11  maybe two or three million of them were freely tradeable on a

12  stock that had -- we had put the potential volume every day at

13  maybe 50,000 shares.  So, if you have individuals flooding the

14  market with a couple hundred thousand to a million shares on

15  any given day, you could send the stock down to a penny and we

16  want the stock to go the other way.

17  Q    You respond at 12:02 p.m. on May 3:  Yes.  Okay, I'll

18  tell Rusty.  He was asking.  Big day for you.  Congrats.

19         Who was Rusty?

20  A    Rusty was a customer of mine, friend of mine.

21  Q    What's his name?

22  A    Alfred Allen, III.

23  Q    Does he go by "Rusty Allen"?

24  A    Rusty Allen, that's right.

25  Q    Did Rusty Allen have a company or did you and Rusty Allen

1  have a company together?

2  A    Yeah.  Rusty and I had a joint private company that we

3  did investing in.

4        And AJ was going to let him buy some shares from

5  OmniView, and AJ wanted Rusty to sign a gentlemen's agreement

6  also.

7  Q    What was the name of the company could you had and Rusty

8  Allen had?

9  A    ECPC 2, LLC.

10 Q    Here, May 3, 12:07 p.m., you say:  Yes, I'm opening an

11 account with Dan.

12       What did you mean by that?

13 A    Rusty and I decided to open the ECPC account at Halcyon.

14 Q    Here, you discuss a FedEx tracking number and then you

15 write on May 3 at 3:32 p.m.:  I spoke with Marlene.

16       Who is Marlene?

17 A    Marlene Goebel was AJ's personal assistant.

18 Q    And what did you speak with Marlene Goebel about?

19 A    I guess we were FedExing certificates to each other.

20 Q    What do you mean by "certificates"?

21 A    Well, when you purchase shares in a shell company, it

22 doesn't just magically show up in your brokerage account.  You

23 actually get a certificate.

24 Q    What can you do with that certificate once you receive

25 it?

Bell - Direct - Hein                    136

1    A    You can stick it in a drawer, in a safe, keep it.  No one

2    needs to know you own it.  Or you can turn it into your

3    brokerage firm and they will put it in what's called "street

4    name" so that it shows up on your account statement.

5    Q    And if you put it in a brokerage account, what can you

6    then do with it?

7    A    You can trade it, sell it, unless it's restricted.

8    Q    On May 3, 2013 at 6:11 p.m., Discala writes:  Congrats.

9    We're closed.

10              You write:  Sweet.

11              He writes:  Yes, sir.

12              What company do you understand him to be

13   referencing?

14   A    "We're closed" means that FICF has been purchased and the

15   deal with CodeSmart to the start the reverse merger has taken

16   place.  Whatever corporate governance between Ira Shapiro and

17   Darren Ofsink and AJ has been accomplished.

18   Q    On May 3 at 6:45 p.m., you write to Discala:  When is

19   CodeSmart going public?

20              He responds:  It's public.  Announcement Thurs,

21   trade Fri or Monday.

22              You respond:  Okay.  Symbol?

23              He responds:  FICF.

24              He then writes:  'til we change it.  No stock in

25   system yet.

1          What did you understand was going on here?

2    A    I wanted to know when we were going to start trading.  He

3    says, well, technically it's public.  The announcement

4    Thursday, trades Friday or Monday, the announcement to the

5    general market that CodeSmart -- FICF has started trading,

6    will begin, so we can start trading the stock.

7               I asked him what symbol would it start trading under

8    in case -- because I'm going to call some friends of mine from

9    California.  And he says it's FICF until we change it, which

10   we would eventually change it.  When there was a name change

11   with the company, there was a stock symbol change.

12              And then he says there's no stock in the system yet.

13   When you buy a stock, you have to buy it from somebody.  There

14   has to be a seller.  And you can't buy stock in a company if

15   there's nobody willing to sell it.  So, what happens is the

16   seller puts stock into this system by putting the certificate

17   into their brokerage firm, the brokerage firm then transfers a

18   certificate into the computerized network and files those

19   shares, so now they're called what's in street name.  Then you

20   can be a seller so someone else can buy it.

21              At this point, AJ hadn't put the shares of the shell

22   company that were going to be sold initially into the system

23   yet.  It takes a few days.

24   Q    On May 3, 2013, at 6:52 p.m., you respond:  Cool.  My SD

25   guys got the message.  Word is going out to buy LBAS.  Let's

1   those them point 22.  They will help us with CodeSmart for

2   sure.

3           What did you mean by that?

4   A    My guys got the message that FICF would start trading on

5   Friday, Monday.  I told them also that word was going out to

6   buy LBAS.  I wanted them to see 22 on LBAS.

7           So, I have a lot of friends in San Diego that were

8   just individual stock traders.  And they were always asking me

9   for ideas, so I threw those two names out to them, trying to

10  get a little bit of awareness going.

11  Q    You write on May 3 at 7:51 p.m.:  Dude, what are we gonna

12  to do all week waiting for CodeSmart?  Get LBAS going.

13          And Discala responds:  Yes, I'm buying on close.

14  Can break nineteens today.

15          What did you understand Discala to mean?

16  A    I'm encouraging him while we can't trade CodeSmart to

17  continue focusing on LBAS because I, in particular, had a lot

18  of pressure put on me about the amount of shares I owned in

19  Location Based Technologies in my customers' accounts, and

20  every penny that that stock went up relieved that negative

21  pressure.

22  Q    What did you understand Discala to mean by "I'm buying on

23  close"?

24  A    When you buy on close -- the stock market is open until

25  4 o'clock here in New York.  So, when you buy on close, or in

1  trading terms at 3:55, the last five minutes of the market is

2  the most important.  I don't know the numbers, but a majority

3  of sales occur in the last five to ten minutes.

4         MR. ROSS:  Objection.  It amounts to expert

5  testimony.

6         THE COURT:  I didn't hear you.

7         MR. ROSS:  I'm sorry.  It amounts to expert

8  testimony, your Honor.  I don't know that he has a basis for

9  this testimony.

10        THE COURT:  I'm going to overrule it.

11  Q    What did you understand Discala to mean by "can break

12  nineteens" today?

13  A    We're trying to push it over nineteen.

14  Q    And when you say "it," LBAS is what you mean?

15  A    Yes, sir.

16  Q    Looking here now on May 10 at 6:56 p.m., you write to

17  Discala:  I tapped ISGI a little.

18        Discala responds:  Nice, but save the juice.  The

19  monster is coming.

20        What did you mean by "I tapped ISGI"?

21  A    I purchased a little bit of ISGI in one of my customer's

22  account to keep the volume going, International Safety Group,

23  that we had been buying since March.

24        He says, "Nice, but save the juice."  The "juice" is

25  money.  So, he's basically saying:  Don't buy any of the other

1  stocks we were manipulating.  Save everything for CodeSmart.

2  Q    On May 10 at 7:03 p.m., you write:  Next week?

3        And Discala responds:  TY, Bro.  Mon, Tues.

4        What did you understand Discala to mean?

5  A    I said:  Okay.  I got it covered.  Next week?

6        He says:  Thank you, brother.

7        Because I've got it covered, which means I'll quit

8  buying the other stuff.

9        And he tells me next Monday or Tuesday is when the

10  monster is coming.

11  Q    What did he mean by when the "monster" is coming?

12  A    That's when CodeSmart will start trading.

13  Q    You write:  Sweet.

14        And Discala responds:  Yes, sir.  Gonna open at

15  3.20 -- three dot two zero -- it's pre eight to one, so point

16  four zero cents.

17        What did you understand Discala to mean by that?

18  A    So, the reverse merger is taking place and now CodeSmart

19  is going to be First Independence Corp.  And part of that was

20  that they were doing eight-for-one reverse stock split.  So,

21  for every eight shares you had, you get one of the new

22  company.

23        So, in this case, FICF, or the shell, was trading at

24  40 cents.  When it becomes CodeSmart, it's going to trade for

25  $3.20, and that's where my million shares turned into 125,000

1    shares.  But it's the same thing as two 50-cent pieces or a

2    dollar.

3    Q    You write to Discala:  Nice.  I got $1 million to buy

4    first week.

5            Then you write:  When does the split happen?

6    Immediate?

7            What did you mean by that?

8    A    I wanted to know if the split was going to take place

9    before it started trading, which it did.  So, it trades at

10   $3.20, it opened at $3.20.  And I told him I had $1 million to

11   put in the stock at the very start.  So, that's what I was

12   willing to do on my end.

13   Q    You write to Discala on May 10 at 7:09 p.m.:  How much

14   other money hitting it first week?

15           Discala responds:  At least a mil.

16           What did you understand him to mean by that?

17   A    So, I've committed to a million dollars in purchasing in

18   my customers' accounts that first week.  I want to know what

19   Dan and Craig were going to be doing over here on the East

20   Coast.  He tells me at least a million.

21           But he wanted to build a base so investors get a

22   double to start.  The focus was to double the stock as quickly

23   as possible.

24   Q    Discala writes:  But want to build base so investors get

25   at least a double to start.

1           You respond:  Okay.

2           Discala responds:  When we lift it, we'll be closer

3    to trip quad.

4           You respond:  How long for that, months or weeks?

5           Discala responds:  Days.

6           What did you understand to be going on there?

7    A    We have a plan to take the stock up as far as we can; not

8    too quickly, though, so that we don't have regulators looking

9    at us.  But I'm asking him, and he says it will be closer to a

10   triple or a quadruple in price.  So, we're looking for

11   something closer to 9 to 12 dollars.

12          And I asked him how long will it take for us to get

13   it that far and he said days.  And my thing is then I need to

14   get as many of my people in as possible because I want my

15   people to make as much money also.

16   Q    You write to Discala on May 10 at 7:15 p.m.:  So, I need

17   to get my people in day one or two.

18          Discala responds:  Base will be built in two, three

19   days, then the lift.

20          What did you understand him to mean by "the base

21   will be built in two, three days, then the lift"?

22   A    We discussed trying to keep it in the 3.20, 3.30, 3.40

23   range for the first couple of days.  Don't want to have a

24   stock that opens at 3 and goes to 30 'cause it will be all

25   over the news and we don't want to do anything like that.

1        We want to create a base, and he says create a base,
2   get some people in, let it kind of show that it's trading.
3   And then the lift is when he coordinates all three of his
4   brokers to start really coordinating our trades to take it up,
5   try to get that double as soon as possible.
6   Q    On May 10 at 7:19 p.m., you write:  Pre split, how many
7   shared out.
8        Do you mean "shares"?
9   A    Yes.
10  Q    Discala responds:  This is our first baby together.  It's
11  gonna be a big winner.  Divide 60 by 8 but none away.
12       You respond:  Okay.
13       What did you understand him to mean by that?
14  A    I'm talking about control at this point.  So, there were
15  60 million shares in the shell, but after the eight-for-one
16  reference stock split, I want to know how many total shares --
17  which is called the "float" -- are in the market.  In this
18  case, he told me divide 60 by 8, which is 7 and a half
19  million, but none away.
20       That's really important.  That means that there's no
21  shares out there that we don't know who the owners are.
22  Q    Why is that important?
23  A    If you want to manipulate something or control something,
24  you need to know everything.  You don't want any X factor.
25       And he says:  If we hold a year with the hype and

1  earnings, where can this go post split?

2          That's what I asked him.  He says:  Seven to ten

3  bucks.

4          I say:  I'll wait.

5          I mean I'll wait to sell my shares.  He's selling

6  his early on because we need some shares for my buyers to buy,

7  but I'm going to wait until it hits seven to sell mine.

8  Q    Why?

9  A    Because my job was to be a buyer early on.

10 Q    With your clients' money?

11 A    Yes.

12 Q    And why do you want to wait until you sell your shares,

13 until seven to ten bucks?

14 A    I'm make the most money that way.

15 Q    On May 10, 7:26 p.m., Discala writes:  Easy.  Wait 'til

16 you see news every Tues, Wed.

17         You write back:  Okay.

18         What did you understand him to mean by "Wait 'til

19 you see news every Tues, Wed"?

20 A    AJ believes, and I agreed with him, that it's important

21 for a company to have multiple press releases on a regular

22 basis to drum up interest and support.  And he had planned on

23 having the company issue press releases every Tuesday and

24 Wednesday.

25 Q    Why would those press releases be important?

1    A     It's important because if you have a company that never

2    issues any kind of news, then nothing is happening with them.

3    A start-up company needs to be talking about all the different

4    products they're selling and all the new contracts they're

5    signing so that we can also send those news stories to my

6    customers and he can send it to the other customers that the

7    other brokers are buying to kind of support the reason we're

8    buying the stock.

9    Q     On May 13, at 10:56 a.m.:  I have decided to leave my

10   broker-dealer.  Too much hassle about what we're doing and

11   LBAS.  I am starting to look around.  Do any of your partner

12   firms clear through NFS.

13             What did you mean by that?

14   A     I'm getting a lot of pressure.  I've been flown up to

15   Dallas, where my home office is.  They are all over me about

16   the amount of shares I have in Location Based Technologies,

17   starting to get a few customers writing letters to my bosses,

18   and I know that I need to look for a new broker-dealer, a new

19   company to work for.

20             And I asked him if any of his partners firms cleared

21   through NFS, which is Fidelity, so it would be a lot easier

22   for me to move all my accounts, my customer accounts, from

23   Fidelity to Fidelity, basically.  So, I'm feeling a lot of

24   pressure from my home office.

25   Q     On May 13, 12:01 p.m., Discala writes:  You want me to

Bell - Direct - Hein                    146

1    postpone Code?

2            You respond:  I'll know more today.  80 percent of

3    my funds are at Fidelity under my RIA so I am good.  All of my

4    firepower is there.  We are good for Code.  Code makes this

5    better for me.

6            What do you understand Discala to mean by, "You want

7    me to postpone Code"?

8    A    He knows that if I get tied up and can't trade that it's

9    really gonna hurt the scheme because I've committed millions

10   of dollars to it.  So, I told him that 80 percent of my funds

11   are at Fidelity under an RIA, which meant that even if I got

12   fired I could still trade with Fidelity but the 20 percent was

13   at jeopardy of not being useful.

14   Q    Discala writes to you on May 13 at 12:03:  Code is gonna

15   go rock for us, bro.  Not a problem.  We will get you a new

16   friendly home.

17           You respond:  Okay.  Microcap friendly.  Also, let's

18   get Code going.  Did you mail the certificates?

19           Discala responds:  Messenger today to Dan.  ECPC is

20   at Craig S.

21           What's going on here with this discussion?

22   A    I just let him know that if I move to a different

23   broker-dealer that was friendly, I would have access to

24   another 20 percent, which was I think about $10 million worth

25   of purchase power.  And he told me that Code's gonna to rock

1  for us, not a problem, he was going to find me a place to

2  land.  And I reminded him I need microcap friendly, I needed a

3  broker that -- there's brokerage firms that don't allow you to

4  purchase small stocks and I needed one that would allow it.

5  And --

6  Q    You state, "Did you mail the certificates?"

7        What certificates are you referring to?

8  A    The FICF certificates.

9  Q    The shares that you received?

10 A    Yes.

11 Q    And "Messenger today to Dan.  ECPC is at Craig," who is

12 Dan and Craig that he's referring to?

13 A    Dan Walsh is the other broker who is part of the deal and

14 Craig Josephberg -- basically, he's saying ECPC is at Craig S.

15 That means the account that I own, ECPC, with Rusty Allen is

16 with another broker, so the certificates will just go straight

17 into that account?

18        MR. HEIN:  Mr. Villanueva, can I please show a

19 document just to the witness, please?

20

21        (Continued on next page.)

22

23

24

25

Bell - direct - Hein                    148

1    BY MR. HEIN:

2    Q    Mr. Vilanueva, can I please show a document?  I'm showing

3    the witness what has been marked as Government's Exhibit

4    178-2.  Mr. Bell, do you recognize this exhibit?

5    A    Yes, sir.

6    Q    What is it?

7    A    That's a stock certificate from First Independence Corp.

8    Q    Is this a true and accurate copy of the stock certificate

9    you received?

10   A    Yes.

11              MR. HEIN:  The government moves 178-2 in evidence.

12              THE COURT:   Any objection.

13              MR. ROSS:  No objection.

14              MR. RIOPELLE:  No objection.

15              THE COURT:  Received without objection.

16              (So marked.)

17   Q    If we can display it to the jury, please.

18              Mr. Bell, you see this is a stock certificate.  If

19   you can look at the top middle there, what company is this

20   stock being held in.

21   A    This is First Independence Corp., 125,000 shares, made

22   out to Matthew bell.  That's me.

23   Q    What was First Independence Corp.?

24   A    That was the shell.

25   Q    Shell for Codesmart?

1   A    Yes, sir.

2   Q    In the bottom left here of the screen, what does it say?

3   A    Ira Shapiro, CEO.

4   Q    Ira Shapiro is the CEO of Codesmart?

5   A    Yes.

6   Q    You mentioned in the top right here, 125,000 shares.

7   Those are the shares you were receiving in First Independence

8   Corp.?

9   A    Yes.

10  Q    And were those restricted or unrestricted?

11  A    They are unrestricted.  If it was restricted in this area

12  right above the CEO's name there would be a stamp that says

13  restricted legend.

14  Q    These are unrestricted shares?

15  A    Correct.

16  Q    And what does that mean on a practical level that they

17  are unrestricted?

18  A    I can sell them any time.

19  Q    And the date here?

20  A    May 7, 2013.

21  Q    On May 13 at 1:13 you write to Discala, I have some

22  outside investors that will buy code on news.  Discala

23  responds, I'm all over it.  News is coming.  You respond,

24  cool?

25           What was going on here.

1   A    I was just letting him that there were people that I

2   didn't have their accounts that I did have contact with that

3   if he shows the company's signing contracts would help us out

4   by buying stock this their own accounts.  He tells me he's all

5   over it and the news is coming.

6   Q    May 13 at 2:26 p.m., universal time, you write Codesmart.

7   Discala responds still waiting impatiently.  You respond LOL.

8   Discala responds LOL.

9         What did you understand Discala to mean by still

10  waiting impatiently.

11  A    We're waiting for the first day of the stock to start

12  trading to get going.  If it's the first day of the stock to

13  trade.  It takes awhile.  It can take hours.  In this case we

14  were waiting.

15  Q    On May 13 at 6:41 p.m., universal time, you mentioned,

16  depending on the time of year, approximately, either four or

17  five hours ahead of East Coast time, Discala writes to you

18  Nice.  I'll hold at 355, 360.  Don't go crazy.  Want vol tom.

19  You respond, OK, done.

20        What did you understand Discala to mean by I'll hold

21  at 355, 360.

22  A    He's going to coordinate us putting a cap on the stock at

23  three dollars and sixty cents.  It's opening the 3.20.  We

24  don't want it to go up too fast too soon.  He tells me don't

25  go crazy.  I want volume tomorrow.  The very first day.  A

Bell - direct - Hein                    151

1   small micro stock no one has ever heard, you don't want a big

2   spike in volume and then I say, okay, done.  He tells me 15 to

3   20 K would be perfect on volume.  And then I told him me 1,000

4   at 3.5 and done.

5          What was going on there was he's telling myself and

6   I assume he's telling Dan and Craig.

7                MR. ROSS:  Objection to assumptions.

8                THE COURT:  Don't assume.

9                THE WITNESS:   Sorry.

10               THE COURT:  If you have an understanding, you can

11  express your understanding.

12  A    I understand that we don't want the volume to go over

13  20,000 shares that day and I say me 1,000 at 3.5 and done.

14  That means I purchased a thousand shares in somebody's account

15  at three dollars and fifty cents and I'm done.  Done means

16  filled, complete and then he should be able to see the trades.

17  A.J. has what's called level two, where you can look on the

18  computer screen and see all the bids and asks.  When he sees

19  the thousand shares at 3.50 and I tell him that was me, he can

20  see my trade go through.

21  Q    You write to Discala, May 13 at 10:29 p.m., you can see

22  nice first day.  Discala respond, yes, sir, news tom.

23  A    TOM, tomorrow.

24  Q    You respond buying tomorrow.  Then you say how far?

25  Market maker called me.  Said do limits or it would go to 460.

Bell - direct - Hein                    152

1    From Knight.

2    A    What happens after the a first day of trading I received

3    a phone call from the floor of the exchange, in this case it

4    was the market maker, a person whose job is to be behind the

5    scenes and match up the buyers and sellers and he told me that

6    the stock was so new and so light volume that we put market

7    orders in the stock would explode up.  He directed me only to

8    put in limit orders.

9    Q    What's a limit order?

10   A    A limit order is where you tell the computer you are

11   willing to buy a certain number of shares at a certain price

12   and you can only buy it at that price or better but never over

13   that price.

14   Q    Why would you do a limit order instead of a market order?

15   A    Well, we got caught on this one, too.  If you put a

16   market order in and let's say there's only 500 shares for sale

17   and you buy a thousand, it's going to fill the 500 shares at

18   whatever that person's willing to sell it for but the other

19   500 shares could go up a dollar, it can go up two dollars.

20   It's whatever of the next price is available to sell at and so

21   you could get a big spike in the stock and we actually had

22   that happen to us and that created a big problem.

23   Q    Why would that create a big problem if you got a big

24   spike in the stock?

25   A    If your stock trades at four dollars and fills at four

Bell - direct - Hein                    153

1    dollars and four dollars and ten cents and six dollars, I have

2    a 50 percent spike in the stock and I've got regulators,

3    people whose job it is to watch for crazy things to happen in

4    the market and so if any of my stocks spike up ten to 20

5    percent in a morning my management team will get a report and

6    then they are supposed to investigate.  So we don't want that

7    to happen.

8    Q     Why?

9    A     Because we're manipulating the stock price and we don't

10   want anybody to know what we're doing.

11   Q     On May 13 at 10:31 p.m. you write to Discala, from

12   Knight.  What is Knight?

13   A     Knight is a market maker.  It's a guy that matches up the

14   buyers and sellers.

15   Q     On May 14, 2:17 p.m., universal time, so sometime in the

16   morning East Coast time, you write to Discala, we a go?

17   Discala responds, crazy.  I have no stock in and the guy that

18   does is at hospital.  Trying my best.  I sigh bid 5k at 370

19   for now.  Then you write take 3 K at 385 and then he writes,

20   move bid to 375.  What's going on here?

21   A     Well, we got a little issue, because when you buy stock

22   you have to have a seller and in this case A.J. says he has no

23   stock in.  That means he hasn't put any stock in the system

24   from the shares he has or he controls for my buyers to buy.

25   So it is like going to the store and there's no milk to buy.

Bell - direct - Hein                    154

1   So then you scrolled away a bit.

2   Q    Sorry.

3   A    He says he's trying his best to get stock in so we can

4   buy it in my customers' accounts.  He says to bid 5,000 at

5   375.  He knows that there's at least 5,000 shares out there

6   and tells me to take 3 K at 385.  Some stock is starting to

7   come in is now and he tells me to move the bid to 375 and he

8   gives me order buy five thousand at 370, 3,000 at 385 and move

9   my bid to 375.

10  Q    To be clear, 370, 385 and 375 are referring to 3 dollars

11  and 70 cents, 3 dollars and 85 cents and 3 dollars and 75

12  cents?

13  A    Yes.  We drop the decimal.

14  Q    You had said on May 13 Codesmart's stock had been trading

15  at what price?

16  A    It opened at 320.

17  Q    3 dollars and 20 cents?

18  A    Yes, sir.

19  Q    What did you hear on May 15, at 1:37 p.m. you write, bid

20  what, 400 or 405.  Discala responds take 415.  3500.  Bid 405.

21  A    So A.J. is coordinator.  He's the quarterback.  I'm

22  asking him what the play is.  I said is it 400 or 405.  He

23  tells my to take a 415 at 3500.  He is telling me to buy 3500

24  shares at four dollars and fifteen cents.  I put the limit

25  order in.  My customer buys it.  He sells it.  Money goes over

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1   there.  Then I'm supposed to put a bid in at 405 and what a

2   bid is where I'm telling the world that I'm willing to buy

3   stock at 405, putting a base in and he tells me to check it in

4   an hour.

5   Q    On May 15 the 248 p.m., Discala responds, Nice.  News

6   tom, tomorrow.  He then writes put bid 425 for 5k, won't get

7   it.  You write done.  Where is Halcyon.  They are in.  Discala

8   responds, For sure.  They were bid 425 before you.  And then

9   he writes, They are 6 K on bid.

10            What's going on here.

11  A    He tells me there's news coming out tomorrow, put bid in.

12  He tells me to put a bid in at 425 and I won't get it.  I put

13  a bid in saying that I am willing to buy 5,000 shares  -- I am

14  willing to sell 5,000 shares at 425.  He's coordinating with

15  Halcyon.  I don't have to worry about it being sold.  And then

16  I asked him where is Halcyon.  Are they in?  Are they

17  participating?  For sure.  They were the bid at 425 before

18  you.  I can only see what I can see.  I'm like a running back

19  with my helmet.  He's got all the players and then he tells me

20  there's 6 K on the bid.  There's 6,000 shares sitting there.

21  Q    On May 16 2013 at 1:11 p.m., Discala writes bid 427 or

22  429 this a.m.   you write, done, 5k.  Discala responds

23  awesome.

24  A    So, we're continuing to coordinate our trades here.  He

25  tells me to bid 427 or 429 this morning.

Bell - direct - Hein                156

1   Q    What did you understand Discala to mean by awesome?

2   A    Well, I said done 5k.  That means that I have done what I

3   was told and I put 5,000 shares to buy at the bid at 4 dollars

4   and 27 cents or 429 and I let him know that I have

5   accomplished that and he says awesome and then he asks am I in

6   the office, if I can buy one or two at market and I told him I

7   would be there in 30 minutes.

8   Q    What was your understanding for why Discala thought it

9   was awesome?

10  A    Because he asked me to do something and I did it Discala.

11  Q    On May 16 at 256 p.m., Discala writes, can you move bid

12  up, 434.  You respond, done.

13  A    Continued manipulation here.  He's telling plea what to

14  do, so I do it.

15  Q    ?

16  A    His job is to see the whole picture and my job is just to

17  do whatever to coordinate.

18  Q    On May 16 at 619 p.m., you write someone told nine

19  hundred and pushed it down to 438.  You write moved my base

20  bid to 5k at 436.  Discala responds yeah I saw.  We're good,

21  great.

22       What did you mean by saying sold nine hundred and

23  pushed it down to 438.

24  A    We had an unexpected sale of stock for nine hundred

25  shares when we were not ready for it.  Whatever we were

Bell - direct - Hein                    157

1   trading coordinating before we opened down nine hundred

2   shares.  We will be trading at 1,000 and 5,000 share lots.

3   Somebody sells nine hundred uncoordinated and knocks us back.

4   I'm letting him know that, you know, something didn't go

5   right.

6   Q    On May 17 at 1:17 p.m., Discala wrote bid should be 439.

7   Great if you join there.  Also offered at 441, 442, 1250 each.

8   You take open.  TY, sir.

9        What's your understanding for what Discala was

10  writing to you here.

11  A    These are orders.  These are my orders.  He's telling me

12  the bid should be 439.  So I should look and see that there

13  should be some stock at four dollars and thirty-nine cents and

14  he wants me to join in on the bid and he says it's also

15  offered and there should be 1250 shares at 441 and 442 each

16  and you take the open.  Thank you.  Which means I'm the guy

17  buying it the open of the market.  Then I tell him that's me

18  5,000 shares at 439.

19  Q    Here on May 17 at 1:39 p.m., you write to Discala, Crap.

20  It went well for the first 6 K but the last 1,000 shares

21  filled at 6.5.  Discala responds, no.  F word.  Why did

22  Discala respond that way?

23  A    This is a mini disaster.

24  Q    Why?

25  A    Well, it says to buy four and then go again in an hour or

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Bell - direct - Hein                    158

1   whatever you want, great start.  I tell him crap.  It went
2   well for the first six thousand.  I had to buy seven thousand
3   shares of stock.  The first 6,000 went well just like we
4   planned.  But the last thousand for some reason, whether it's
5   because I didn't put it in at limit or the computer didn't see
6   it that way, it filled at six dollars at fifty cents.  So the
7   first 6,000 shares are selling for four dollars and
8   seventy-five cents and then the next jumps all the way to six
9   and-a-half and he used the F word there because it is that.
10  In this situation that percentage move in the middle of the
11  day is going to set off alarms and it's going to take a lot to
12  get it fixed.  You can get it fixed and we do.
13  Q    So you write at May 17 at 1:41 p.m. lesson learned.  You
14  write then Fidelity should have caught that.  And Discala
15  writes let me see if I can get it fixed.  You say yes.
16  Discala writes to you on May 17 at 2:06 p.m., what time and
17  how many went off at 650.  You respond, 1050 shares, 9:37:53
18  a.m. eastern time, 650 a share.  Discala writes, we're going
19  to get it fixed.  You write, okay.
20         What's going on here.
21  A    Well, to get a problem like this fixed is very difficult
22  and you have to be very exact.  So you've scrolled away so I
23  can't see it.
24  Q    I'll go back.
25  A    I'm telling him exactly what happened, the exact time

1  down to the second, because we have to file a report with

2  Fidelity and the market maker which probably is Knight and

3  they'll tell us, which is they go back and fix the print which

4  fixes the graph which makes the percentage increase report go

5  away.  But I got 24 hours to get it done.  Initially I'm

6  thinking he's going to get it done and I find out that I'm the

7  one that last to do it.

8  Q     Why was it so important that you get it fixed?

9  A     Because when you have a 33 percent move in one of your

10  stocks that you are purchasing in the middle of the day it's

11  going to generate a report to my regulator, to my in-house,

12  the guy, and he's going to walk down to my office and he's

13  like, what happened?  Then they are going to start

14  investigating all the stock that you buy and everything.  So I

15  didn't need that trouble.

16  Q     On May 17 at 2:23 p.m., Discala writes to you what did

17  you buy today?  You respond, 7 K, 1250.  At 441, 2000 at 442,

18  100 at 441, 100 at 450, 2500 at 445, 1050 at 650.  Discala

19  responds Okay.  Got to get that 650 fixed.  Working on it.

20  Here on May 17 at 5:32 p.m., Discala writes, please challenge

21  the 650 trade.  We need that fixed and Knight is saying you

22  guys have to challenge before they can fix.  And then on May

23  17 at 6:49 p.m., you respond, they changed it to 5.00.

24        What's going on there.

25  A     He's telling me that I have to actually turn in the

Bell - direct - Hein                 160

1  report to have it fixed.  It's called a challenge.  So I

2  called Fidelity, put in the challenge.  They got back to me

3  and they changed the last 1050 shares from 650 to 500 which

4  was more in line with what we were trading at the time.  Made

5  the problem go away.

6  Q    Why did it make the problem go away?

7  A    Because then we didn't have a percentage increase report

8  generated.

9  Q    Discala writes, nice, what's client's name, Marc will

10  write check for difference.  TY bro.  You wrote no problem.

11  Discala writes great job, but Marc's adamant you write Racz's

12  Family trust.  What's going on here?

13  A    Marc Wexler was involved in this from A.J.'s side and

14  felt that we should compensate the customer and wanted to

15  write him a check, which I did not want that to happen.

16         MR. HEIN:  Your Honor this could be a natural

17  breaking point if you would like.

18         THE COURT:  You're reading my mind.

19         Ladies and gentlemen of the jury, I promised you a

20  midafternoon break.  We're going to take it.  I'll let you go

21  back into the jury room to refresh.  Again the rules that we

22  have been discussing continue to apply.  Do not discuss the

23  case amongst yourselves or anyone that you might run into in

24  the hallway in the back.  Continue to keep an open mind.

25  Refresh and we'll be back in about ten or fifteen minutes.

1          (Jury excused.)

2          THE COURT:  Okay.  See you in about ten or fifteen.

3          (Recess taken.)

4          (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      THE COURTROOM DEPUTY:  All rise.  Court is back in

2  session.

3      Counsel for both sides are present with the

4  defendants.  Actually, where is the defendant?

5      Mr. Ripoelle, where is your client?

6      MR. RIOPELLE:  I assume she's in the bathroom.

7      (Pause.)

8      THE COURTROOM DEPUTY:  All parties present.

9      THE COURT:  Mr. Hein, are you ready?

10     MR. HEIN:  Your Honor, do you know what time you

11  want to go today?

12     THE COURT:  Well, it's only two tracks.  If you

13  don't finish your direct before 6, we'll stop at 6.

14     MR. HEIN:  I do not anticipate finishing before 6.

15  I'll go to 6 or whenever Your Honor would like, that's fine.

16  Thank you.

17     MR. RIOPELLE:  Your Honor, with respect to tomorrow,

18  I had scheduled a meeting at Union Square in Manhattan about 6

19  assuming we would break at 5:30.

20     Is it Court's plan to break tomorrow about 5:30?

21     THE COURT:  Again, as I said to you between 5 and 6

22  normally, depending on the situation.  We are not going to

23  start a new witness at, you know, 5:15.

24     MR. RIOPELLE:  Could I impose on the Court that if

25  we're still in the middle of Mr. Bell, to break tomorrow at

```
                    Bell - Direct - Hein                    163
```

1    5:30 so I could make that 6:00 meeting?

2              THE COURT:  Just make sure you remind somebody other

3    than me.

4              MR. RIOPELLE:  Mr. Villanueva is here, Your Honor.

5    Thank you.

6              THE COURT:  You have much better shot with him.

7              MR. RIOPELLE:  Thank you.

8              THE COURT:  Are we otherwise ready to proceed?

9              MR. HEIN:  Yes, Your Honor.

10             THE COURT:  Continue.

11             (Jury enters the courtroom.)

12             THE COURT:  Be seated, please.

13             Counsel will stipulate that the jury is present and

14   properly seated.

15             MS. JONES:  Yes, Your Honor.

16             MR. ROSS:  Yes, Your Honor.

17             THE COURT:  Ladies and gentlemen, welcome back.  We

18   are ready for the second half of our afternoon session.

19             If you recall, Mr. Bell was still on direct, and he

20   remains on direct examination by Mr. Hein, and Mr. Hein will

21   continue that examination now.

22             MR. HEIN:  Thank you, Your Honor.

23   BY MR. HEIN:

24   Q    Mr. Bell, looking at the Government Exhibit 132-2.

25             On May 20, 2013 at 7:30 p.m. UTC, Discala wrote to

```
                    LDM      OCR      RPR
```

1  you "Move bid for 500 to 554.  Won't get hit."

2          You responded, "Okay, got filled at 4480 shares on

3  this bid for 4.49.  I'll move the rest to 4.54."

4          Discala responds, "Just 500 shares."

5          Mr. Bell, when you say move -- excuse me, when

6  Discala said to you "move bid for 500 to 554," what did you

7  understand him to mean by "bid?"  What is a "bid?"

8  A    A bid is -- there's two sides to a stock trade, a bid and

9  the ask.

10          So if you're willing to purchase stock, you become a

11 buyer to a seller.  You're the bid.

12          So in this case, he is telling me to -- a bid is the

13 base price of the stock on any given time.  So he's telling me

14 to move my bid for 500 shares to 554, $5.54.

15          He says I won't get hit.  That means that the other

16 guys aren't going to be selling into it.

17 Q    And you mentioned the "ask."  What is the "ask?"

18 A    The ask is the other side of the trade.

19          So if you want to buy shares, they are asking a

20 certain price.  So you have bid on this side and the ask.

21          So it might be $4, 500 shares at $4, and 500 shares

22 at 410.  If you were selling, you would get $4.  If you were

23 buying, you would pay 410.

24 Q    And when you are, as you said, you made the bid here,

25 whose money are you bidding to buy these shares of CodeSmart?

Bell - Direct - Hein                    165

1    A    Myself and my clients.

2    Q    And you mentioned earlier the 125,000-dollar shares that

3    you received, you looked at Government's Exhibit 178-2.

4         Did you tell your clients that you received the

5    125,000 unrestricted shares?

6    A    No.  I just told them that I owned shares.

7    Q    On May 21st, 2013 at 1:34 p.m., you asked the seller,

8    "Bid, question mark."

9         He responded, "455 is good."

10        You responded, "4,520 shares at 455."

11        What did you mean by that?

12   A    When I say "bid with a question mark," I'm asking him to

13   tell me what to do.  And he tells me 455 is good so -- and

14   then I tell them that I placed a bid to -- of 4,520 shares at

15   455.

16        And then I told him that I was going to be talking

17   to Joe Salvani, which was a trader on the east coast, in an

18   hour.

19   Q    And Discala responded, "Great.  He's got huge buying

20   coming in."

21        What did you understand by that?

22   A    Well, he's got -- he's a broker that's AJ's coordinating

23   with also.  And he's going to be buying also.  And huge buying

24   means he's got some buyer power, some money to throw at.

25   Q    Discala writes to you on May 21st at 1:50 p.m.,

1   "GlobeNewswire story on CodeSmart today."

2           And you responded -- excuse me, and then Discala --

3   let me correct myself, excuse me.

4           At that time, May 21st at 1:50 p.m., you write to

5   Discala, "GlobeNewswire story on CodeSmart today."

6           And Discala responded, "Yes, sir."

7           Mr. Villanueva, do you mind if I use the Elmo.

8           I'm showing a document just to the witness.  This is

9   marked as Government Exhibit 172-45.

10          Do you recognize this exhibit, Mr. Bell?

11  A    Yes.

12  Q    What is it?

13  A    That's the GlobeNewswire story that AJ had been -- or

14  that we had been talking about.

15  Q    Is it a true and accurate copy of the GlobeNewswire story

16  that you and Discala had been texting about?

17  A    Yes.

18          MR. HEIN:  Government moves Government

19  Exhibit 172-45 into evidence.

20          MR. ROSS:  Objection.

21          THE COURT:  Sidebar.

22          (Continued on the next page.)

23          (Sidebar conference.)

24

25

```
                         Sidebar                       167

1             (The following occurred at sidebar.)

2             MR. ROSS:  Judge, there's been no stipulation

3    regarding the authenticity of this government exhibit.  I

4    understand that Mr. Bell saw it, but it's not authenticated as

5    an authentic press release.

6             MR. HEIN:  Your Honor.

7             THE COURT:  Can he identify the press release?

8             MR. HEIN:  He can, Your Honor.

9             THE COURT:  That's the press release he saw?

10            MR. ROSS:  I made my objection, Your Honor.

11            THE COURT:  Overruled.

12            MR. HEIN:  Thank you, Your Honor.

13            (End of sidebar conference.)

14            (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25
```

Sidebar                                    168

1              (In open court; Jury present.)

2    BY MR. HEIN:

3    Q    Mr. Bell, is Government Exhibit 172-45 the GlobeNewswire

4    story on CodeSmart that you saw that day and texted

5    Mr. Discala about?

6    A    Yes.

7              MR. HEIN:   Government moves Government

8    Exhibit 172-45 into evidence.

9              THE COURT:   Objection is overruled, received in

10   evidence.

11             (Government Exhibit 172-45, was received in

12   evidence.)

13             MR. HEIN:   Thank you, Your Honor.

14             If we could display it for the jury, please.

15             (Exhibit published.)

16   Q    Mr. Bell, what is this -- what is the date on this

17   GlobeNewswire story?

18   A    May 21st, 2013.

19   Q    And what did the newswire story state?

20   A    It stated that the software that CodeSmart was using for

21   its medical billing training had just received an endorsement

22   from an IT company world known for reviewing that kind of

23   software.

24   Q    What was your understanding when Mr. Discala responded,

25   "yes, sir," when you mentioned the GlobeNewswire story in the

1   text?

2   A    That he knew the story was coming out.  Or that he had

3   seen it.

4              MR. HEIN:  If we can go back to the laptop, please.

5   Q    On May 22nd, 2013 at 1:30 p.m., you wrote to Discala,

6   "4,520 shared by at 4.65."

7              Discala responded, "Nice.  Gonna be nice volume

8   today."

9              What did you understand Discala to mean by "gonna be

10  nice volume today"?

11  A    That he knew between the coordinated sales and myself,

12  Craig, Dan, Joe, that we're going to have a lot of volume.

13  Q    On May 23rd at 11:45 a.m., you wrote to Discala, "I'm on

14  4.73 bid now.  5K shares.

15             Discala wrote, "Nice.  Okay.  Thanks."

16             Then Discala wrote, "More news."

17             And then he texted, "You around?"

18             And you said, "Yep."

19             And then Discala wrote, "Nice news.  Huh."

20             You responded, "Just reading it."

21             And Discala responded, "I just like that news is

22  constant.  You picking up some of a.m.?"

23             What did you understand Discala to mean by "I just

24  like news that is constant"?

25  A    The plan was to have news on a regular basis.  He had

Sidebar                                      170

1   said -- he told me Tuesday, Wednesdays.  So he must like it.

2   Q    What was your understanding for why he liked that news

3   was constant?

4   A    Because the more news that comes out that's on the Yahoo

5   news or the major newswires, the more legitimacy the stock

6   has.

7   Q    Why is that?

8   A    Because we're buying a lot of stock for a lot of

9   different people and we can sure up the reason that we're

10  buying the stock with these news stories.

11  Q    On May 23rd at 2:11 p.m., you texted to Discala "4.77 or

12  478?"

13           Discala wrote, "478."

14           You then wrote, "Nice.  Buy 500 at market.  Want to

15  go back to 81."

16           You write, "Done."

17           He writes, "Ty, sir."

18           What was your understanding of what Discala meant by

19  "500 at market, want to go back to 81"?

20  A    We were pretty exact about the trades and where we wanted

21  to trade.  So I asked him within a penny did we want 477 or

22  478?  He tells me 478.  That's buy some shares at that price.

23           And then he tells me "Nice.  Buy 500 at market.

24  Want it to go back to 81."  And that means we want it to go

25  back to $4.81.

LDM        OCR        RPR

                              Sidebar                    171

1   Q    On May 23rd, at 2:37 p.m., you wrote to Discala, "That

2   Polk news is crazy.  One university bringing 329K in revenue.

3   That is revenue growth extreme.  Wish LBAS could do a tenth of

4   that."

5            What were you referring to there?

6   A    A news story had come out from Polk University, Polk

7   County.  And the university was -- well, the press release

8   stated the university thought they were going to spend

9   $329,000 on the software that I-10 was providing.

10           MR. HEIN:  Mr. Villanueva, if I could please show

11  just to the witness, Government Exhibit 172-46.

12  Q    Mr. Bell, do you recognize this exhibit?

13  A    Yes, sir.

14  Q    What is it?

15  A    That's the news story about Polk State College.

16  Q    Is this the news story you reviewed on May 23rd, 2013?

17  A    Yes.

18  Q    Is it a fair and accurate copy of the news story you read

19  at that time?

20  A    Yes.

21           MR. HEIN:  The government moves Government

22  Exhibit 172-46 into evidence.

23           MR. ROSS:  Same objection, Your Honor.

24           THE COURT:  Same ruling, overruled.  Received in

25  evidence.

```
                        Sidebar                        172
```

1          (Government Exhibit 172-46, was received in

2    evidence.)

3          MR. HEIN:  Please display it to the jury.

4          (Exhibit published.)

5    Q    Mr. Bell, what was stated in this press release of

6    May 23rd, 2013?

7    A    That Polk State College, which had a large number of

8    position practices and picked I-10 CodeSmart's software

9    package as the exclusive partner for their training.

10   Q    Did you know at the time whether the information in this

11   press release was accurate?

12   A    No.

13         MR. HEIN:  Please return to the laptop.

14   Q    On May 23rd, 2013 at 4:30 p.m., you wrote to Discala,

15   "Last purchase at 4.82 out of California.  Getting the word

16   out."

17         Discala responded, "Nice, bro."

18         You then responded, "The CEO of CommuniCare Hospital

19   System here in SA is my buddy.  He wants someone from

20   CodeSmart to call him.  They want to sign up.  Who do I

21   contact to introduce?"

22         Discala provides phone number and states, "Ira

23   Shapiro, the CEO."

24         Who is Ira Shapiro?

25   A    He was the CEO of CodeSmart.

```
                      Sidebar                         173
```

1    Q    Do you recall whether you called Mr. Shapiro about this?

2    A    Yes, I did.

3    Q    What did you discuss?

4    A    I let him know that a friend of mine was a CEO of a small

5    local community clinic that may need their services and I put

6    them into contact with each other.

7    Q    Here on May 23rd at 7:46 p.m. you wrote to Discala, "I

8    just did 6500 at 4.86 ave. "

9              What is "AVE?"

10   A    Average.

11   Q    You write, "Clients want to do a cross trade next

12   Tuesday, 20K shares for $5 a share."

13             Discala responds, "Awesome."

14             What is your understanding of why Discala responded

15   "awesome"?

16   A    Well, a cross trade would be a private trade between an

17   individual.  That wouldn't be on the market.  So I was

18   telling -- I had a customer that wanted to spend exactly

19   $100,000, no commission, no fees, and buy 20,000 shares at $5.

20   And that's something that AJ could do with a stock purchase

21   agreement.  And he'd receive the money.

22   Q    Here on May 23rd at 7:57 p.m. Discala writes, "It will be

23   550 weed slow and study."

24             Did you understand "next weed" to be "next week"?

25   A    Yes.

1   Q    What is your understanding for how Discala knew or said

2   he knew that the stock would be at 550 next week?

3   A    AJ was quarterback, he was coordinating the trades.

4        So he had the game plan set between myself and the

5   other brokers of where he wanted it.  We'd often talk about

6   having his foot on the gas or the pedal.  He would talk about

7   having his foot on either the gas or the brake.  He was in

8   control of where it and how fast.

9   Q    Here on May 24th at 1:38 p.m., you wrote to Discala,

10  "Buying 7K total at 4.9 limit."

11       Discala writes, "Go 4.94 limit.  Stocks there."

12       You write, "Okay.  11K at 4.94."

13       What does "494 limit" mean again?

14  A    So I'm telling him I'm going to be buying 7,000 shares at

15  $4.90 limit order.  That means I won't pay a penny more.  And

16  he tells me I should go 494 limit.  That he wants me to pay 4

17  cents more than what I was going to pay.

18       He tells me the stock is there.  That means he has

19  stock to sell.

20       And I say, "Okay."  And by that time I come up with

21  another 4,000 share order from another customer.  And I told

22  him that I would buy 11,000 total at $4.94.

23       So all the purchases I threw away, the plan was to

24  make sure that all purchases, all orders went through AJ.

25  Q    Here on May 24th, at 6:47 p.m. you wrote to Discala,

Sidebar                                                    175

1    "Should I move my bid up?"

2           He responded, "Yes."

3           You were asked, "Where?"

4           He responded, "496."

5           And then Discala asks, "Want me to hit?"

6           You responded, "No, he is our floor."

7           Discala responded, "Deal."

8           What's going on there?

9    A    It's more coordinated trading.

10          You scrolled so I can't see the top.

11          So I ask him if I should move my bid up.  He said,

12   "Yes."

13          I asked where I should put it?  He tells me where to

14   put it.

15          And then I ask me if he wants me to "hit it."  That

16   means do you want me to buy some?

17          And then he said "No, he's up 4," so.

18          He's got somebody else me in the bid and he doesn't

19   want me to hit that bid for some reason.

20   Q    What does a "floor" mean?

21   A    A floor is a base.

22          So it's very important when you trade a stock like

23   this to put a large base, so that if some unknown seller

24   starts to come in, he doesn't blast through and push the price

25   of the stock way down.

LDM        OCR        RPR

```
                            Sidebar                        176
```

1        So we needed to always to make sure we had a proper

2    number of shares on the base for the bid.  Which was also

3    called a "wall."

4    Q    On May 24th at 7:51 p.m. you wrote to Discala, "When the

5    other guys coming in?"

6        He responded, "Look at the box.  We have 20 market

7    makers.  Wednesday.  Gonna rip."

8        You respond, "Okay, great.  Get the penny stock new

9    lawyers on it and bye.  Bye. "

10       Discala responds, "Agreed.  This thing is gonna

11   fly."

12       What did you understand Discala to mean by "look at

13   the box?"

14   A    When you look at level two on the computer screen --

15   Q    Level two?

16   A    Level two is a way that you can look at what's happening

17   with the stock in the stock market.  You can look at all of

18   the trades that have taken place.  It's like a ledger.  And so

19   sometimes that's called a box.  Because it looks like a box.

20       There's how much was on the bid.  How much was on

21   the ask.  So how much people were selling for.  How much they

22   were buying for.  How many shares traded at that second at

23   that volume.  And it's a history.  A ledger.  And it's in a

24   box format.

25       So when he says "look at the box," we have 20 market

```
              LDM        OCR        RPR
```

Sidebar                                                  177

1  makers, that means that a market maker is someone that follows

2  the stock that puts people together.

3          That means to me -- or it just means like Fidelity,

4  Schwab, Merrill Lynch, what -- every one of those type of

5  companies have a their known market makers to transact on

6  behalf of their customers.

7  Q    And when Discala stated, "Gonna rip" and then stated

8  "This thing's gonna fly," what did you understand that to

9  mean?

10 A    Rip.  Fly.  All that means to go up.

11 Q    On May 28th at 12:47 p.m., Discala wrote, "You ready for

12 a big week, bro?"

13         And he wrote, "Give him a minute after open to get

14 all stock in.  I bought 10K at 503.  Then 2500.  504, 505,

15 506, 507, 508, 509."

16         What's your understanding of what's going on here?

17 A    So he's layering the day.  He's gonna be selling some of

18 his stock.  And he's telling me that he put 10,000 shares at

19 $5.03.  2500 shares at 504.  2500 shares at 505.  So that if

20 we buy whatever that totals to, 27,500 shares, that we'll move

21 the stocks up to 509 and then proceeds will go to him.

22         And I say, "Doing it."

23         (Continued on next page.)

24

25

LDM       OCR       RPR

Bell - direct - Hein                    178

1   BY MR. HEIN:

2   Q    On May 28 at 2:23 p.m. you wrote to Discala, nice news

3   story on Codesmart.  Part of State U System of NY?

4           If I could show the witness a document.  Showing

5   just to the witness what has been marked as Government's

6   Exhibit 172-42.  Mr. Bell, do you recognize this.

7   A    Yes, sir.

8   Q    What is it?

9   A    That's a news story on May 28, 2013.

10  Q    Is it a true and accurate copy of the news story that you

11  reviewed and texted about on May 28, 2013?

12  A    Yes.

13          MR. HEIN:  The government moves it in evidence.

14          MR. ROSS:  Objection.

15          THE COURT:  Same ruling, overruled, received in

16  evidence.

17          (So marked.)

18          MR. HEIN:  If we can show it to the jury, please.

19  Q    Mr. Bell, what does this press release state?

20  A    It stated that Codesmart ICD ten consulting products was

21  named the exclusive partner of Binghamton University, which

22  was part of the New York system.

23  Q    Why did you text about this story, nice news story on

24  Codesmart?

25  A    Because it says they would service a distribution channel

Bell - direct - Hein                      179

1   to State University of New York schools throughout New York

2   State.  So it was a big deal, if it happened.

3   Q    May 28, 2013 at 7:52 p.m., Discala wrote to you, 11 K up

4   now at 526, in one minute and he will be loaded for ten.  He

5   writes, how much you want?  You respond, not sure.  10 K at

6   5.25 for sure.  Looking now.  You state after that, I have

7   done 11,800 at 5.25.  You state, tell your buddies to take

8   over tomorrow.  I will be long gone?

9            What's going on here.

10  A    So he's telling me he's got eleven thousand shares at

11  5.26 for sale in a minute.  It takes some time.  He's telling

12  his broker, his market maker, to put his shares into the

13  system.  Then he says he will reload it for ten.  You want to

14  by the eleven K and then that's gone and his market maker or

15  broker will reload it, put another ten into the system at that

16  same price.  He says how much do I want.  I said not sure.  I

17  said I'll take the 10,000 at five and a quarter for sure.

18  Looking now.  I then report I done eleven thousand at five and

19  quarter.  Then I let him know, tell your buddies to take over.

20  I'll be long gone tomorrow.  I have some plans.

21  Q    Who's money are you using to buy these shares?

22  A    My customers.

23  Q    Is it your understanding when you are buying these shares

24  that you are buying them from Discala?

25  A    His shares and maybe others, yes.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Bell - direct - Hein                    180

1   Q    On May 28 at 8:00 p.m., Discala writes to you, You are

2   the man.  Awesome.  We got it from here bro.  What was your

3   understanding of what he meant there?

4   A    I'm going on some trip and he's telling me that him and

5   the rest of the team will take over.

6   Q    What was your understanding of why he says you were the

7   man?

8   A    I don't know.  I'm helping out.  We're working as a team.

9   Q    Your understanding it relates to your purchases?

10  A    Yes, yes.

11  Q    On June 3 at 12:47 a.m. you wrote to Discala, okay.  I

12  got some fire power myself for Codesmart, Monday, Tuesday.

13  Discala responds, good.  Should split and run this week.  Get

14  some rest.  Okay.  Got catch you tomorrow?

15         What did you mean by fire power.

16  A    I had come into some money.  That's what I mean by I got

17  some fire power.  Fire power means money to purchase stock.

18  Q    Where did you come into the money?

19  A    I went on vacation.  I might have picked up some checks

20  from family members or something.  I don't know.

21  Q    What did you understand Discala to mean by Good, should

22  split and run this week?

23  A    He's planning a two for one stock split and start running

24  it up from there.

25  Q    What is a two for one stock split?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

A    That's when a stock let's say is trading for eight

dollars a share, it splits and goes down to four dollars a

share but you have twice as many shares.  It's the same thing.

You have a ten dollar bill or two fives.  It's the same

amount.  But in this case we don't want the stock to get into

double digits because it's only been trading for a month.  So

we needed it to stay in the four to six range so we don't get

eyes on us and one way to do is it's to split the shares.

People look at stock prices.  They don't look at how many

shares are out.

Q    Why do you not want the stock price to run into double

digits?

A    It would attract too much attention from regulators,

compliance officers.

Q    Here on June 3 at 4:46 p.m. Discala writes to you, good

day already.  Let's save powder for end of day and tomorrow?

Q    What's your understanding of what saving powder meant?

A    That's saving money to purchase more stock for the end of

the day and month.  He's basically saying don't buy any more

for today.

Q    On June 3 at 7:23 p.m., universal time, you wrote to

Discala, I hit it up to 5.75, then a print hit away from me at

566 and 571.  What did you mean by that?

A    I was letting him that I had purchased some stock at 575

and some of the prints.  That means when you buy a stock you

Bell - direct - Hein                          182

1   get an order confirmation saying, yes, you bought this stock

2   for this price on this date at this time and that's called a

3   print.  When I said the print got away from me, some of it

4   filled in at a lower price than we expected, which means

5   somebody was selling while I was buying.

6   Q    On June 4 at 11:35 a.m., you wrote to Discala, Let's rock

7   it.  Discala responded.  Yes sir, rocket man.  Where do you

8   want to open?  588.  What was your understanding of what

9   Discala meant by rocket man?

10  A    Well, we had discussed the fact that we wanted to get it

11  up close to eight collars dollars a share, so we could get the

12  split.  We need to get it moving, rock it.

13  Q    June 4 the at 1:38 p.m. you wrote to Discala, Ramapo

14  College news out.  That is all right now.  Discala responded

15  nice.

16          MR. HEIN:  If I could show the witness a document.

17  Q    I'm showing you what has been mark as Government's

18  Exhibit 172-49.  Do you recognize this?

19  A    Yes.

20  Q    What is it?

21  A    On June 34, 2013, Codesmart was named the exclusive

22  partner of Ramapo College.

23  Q    Is this an a fair and accurate copy of the press release

24  that you saw on June 4 2013?

25  A    Yes.

Bell - direct - Hein                    183

1          MR. HEIN:  The government moves Government's Exhibit
2     172-49 into evidence.
3          MR. ROSS:  Same objection.
4          THE COURT:  Same ruling.  Received in evidence.
5          (So marked.)
6          MR. HEIN:  Show it to the jury, please.
7  Q    Mr. Bell, what does Government's Exhibit 172-49 state?
8  A    It stated that the college in northern New Jersey called
9  Ramapo College had picked High Tens software program as their
10 exclusive program for medical billing.
11 Q    When you stated that Ramapo college news out, that is all
12 right now and Discala wrote, nice, what was your understanding
13 of what he meant by nice?
14 A    It helps our cause.
15 Q    On June 4 at 4:50 p.m., Discala wrote to you, can you get
16 on bid.  Show strength.  You write, where?  What price?
17 Discala writes, 497.  Excuse me, 597.  What was your
18 understanding of what a Discala meant by show strength?
19 A    He wants me to put more a than an average amount of
20 shares on the bid.  That's called showing strength.  It means
21 that there is a lot of interest in anybody that would want to
22 buy the stock.  Then I ask him where, he tells me.
23 Q    On June 5, 2013 at 1:36 p.m., you wrote to Discala, 4100,
24 6.05, Discala responds, already?  You respond, it's at 6.10.
25 Discala responds, this thing's a beast.  TY, sir?

1              What's going on here.

2    A    It's early morning and the stock is already trading at

3    605 and he seems surprised that it's already over six and then

4    I say it's actually at 610.  And he comments that it's a

5    beast.  So it could mean that we're getting some other buyers

6    in that we don't control.

7    Q    What did you understand him to mean by this thing's a

8    beast?

9    A    Keeps going up.

10   Q    What price did Codesmart stock open with on May 13?

11   A    3.20.

12   Q    Now on June 5 what price is it at?

13   A    1:41 universal time it was at 6.10.

14   Q    Does that mean it's almost doubled in that period of

15   time?

16   A    Correct.

17   Q    On June 4 at 329 p.m. you wrote to Discala, okay, top

18   615.  Discala responded cool.  Nice and easy, good stuff.

19   What's your understanding of what he meant by nice and easy?

20   A    I've got enough money and a willing buyer to pay 6.15 for

21   that day.  That's the top.

22   Q    On June 5 at 5:45 p.m. you write, watch FIFC.  Here I go.

23   On June 5 at 5:54 p.m., Discala writes, save it.  You're an

24   animal.  You write, I am a fountain.  Discala responds you're

25   the best.  What's your understanding of this back and forth?

1   A    I'm telling him I'm going to buy as a thousand shares.

2   He tells me to hold off.  Tells me I'm a animal.  Basically,

3   that I'm buying a lot of shares.  When I say I'm a fountain, I

4   just mean that I am consistently providing purchases.

5   Q    Here on June 5 at 6:59 p.m. you write Discala, 22

6   hundred.  He responds wow.  You write 15 hundred.  He respond,

7   yikes, save some for a.m.   I respond I've got more.   15

8   hundred.  And Discala responds we're a good team.  Got to do

9   well for each other.  That's a promise?

10          What's your understanding of what a Discala meant

11  there.

12  A    I take it that he sees he and I as a good team in

13  manipulating stocks and we're going to do well and make a lot

14  of money.

15  Q    Making a lot of money for each other?

16  A    Sure.

17  Q    Here on June 6 at 12:54 p.m., Discala writes to you,

18  we're a team.  You respond, yup.  And a you respond bidding

19  643?

20          June 6 at 2:04 p.m. you say moving bid to 646.

21  Discala responds, nice.  You say, watch.  Discala responds

22  you're sick, go slow.  What's your understanding of what's

23  going on here?

24  A    That I have shares to purchase at 646 and then 651 and

25  I'm telling him, when I say watch, I'm just saying I've got

1   more fire power and he said to slow down a little bit.  At

2   this point we've taken the stock from 3.20 to 6.51.  My phone

3   is starting to ring off the hook.  My customers see  -- lot of

4   them bought very early.  They are starting to make their own

5   request for purchases.  The ball is starting to roll.  I'm

6   getting new money coming in.  People are opening new accounts

7   because these other people had told their family members.

8   I've got more money and he's telling me to slow down.

9   Q    On June 6 at 3:31 p.m. you write to Discala, nice news

10  today.  Discala responds, more coming.  TY.

11          MR. HEIN:  If I could please show the witness an

12  exhibit.

13  Q    I'm showing the witness what has been marked as

14  Government's Exhibit 172-50.  Do you recognize this document,

15  Mr. Bell?

16  A    Yes, I do.

17  Q    What is it?

18  A    It's a news wire story on June 6, 2013, where Javon,

19  which is a medical billing software company has signed a

20  consulting agreement with Codesmart.

21  Q    A fair and accurate copy of a press release that you saw

22  that day and texted to Mr. Discala about?

23  A    Yes.

24          MR. HEIN:  The government moves Government's Exhibit

25  172-50 into evidence.

Bell - direct - Hein                    187

1          MR. ROSS:  Same objection.

2          THE COURT:  Same ruling.  Received in evidence.

3          (So marked.)

4    Q    Mr. Bell, what a does this exhibit state?

5    A    That Javon Partners had signed up with Codesmart.

6    Q    And you had said nice news today and Discala had said

7    more coming.  TY.  What did you understand him to mean?

8    A    He's got more news releases coming from Codesmart is

9    going to issue more news stories.

10   Q    Here on June 6 at 5:37 p.m., Discala writes to you got

11   research analyst coming in.  This thing's a rocket.  What did

12   you understand him to mean?

13   A    There was an analyst report on Codesmart coming out.

14   Q    When he said this thing's a rocket, what did you

15   understand that to mean?

16   A    It was going up quickly.

17   Q    How did you understand that to relate to the research

18   analyst's report coming out?

19   A    I think they are two separate statements that equal the

20   same thing.  You have a research analyst coming in, who is

21   going to issue a report, usually ten to twelve pages long that

22   people can read, give legitimacy to the company and also have

23   some kind of target price.  Supposed to be a third party

24   noninvolved that does this kind of analysis and this thing's a

25   rocket, that the stock is continuing to go up quickly.

Bell - direct - Hein                    188

1   Q    Did you understand him to be saying that after the

2   research analyst report comes out it will continue to rocket?

3   A    I don't know.  You normally don't get an analyst report

4   in the first month of a stock.

5   Q    On June 6 at 7:12 p.m., Discala wrote to you let's build

6   a wall on bid side.  Market makers maybe.  What's your

7   understanding of what he meant by let's build a wall on bid

8   side?

9   A    I don't know.  To build a wall on the bid side is to put

10  a lot of shares in the market so people can see it, that says

11  there are people willing to buy this company all day long at

12  this particular price.  It has a lot of support.

13  Q    On June 6 at 7:53 p.m. Discala wrote to you volume was

14  insane today.  Great day.  What's your understanding of that

15  statement?

16  A    That there was a lot of volume that day, probably more

17  than standard.

18  Q    Why does having a lot of volume mean a great day?

19  A    Because when you have more volume, just on the upside, so

20  if the stock goes way up on volume  -- let me rephrase that.

21  Q    Sorry.

22  A    When you have a lot of volume and the stock goes up, it

23  means that there's a lot of interest in the stock, there's a

24  lot of buying and selling going across.  A market is being

25  made.  There's interest.

Bell - direct - Hein                    189

1   Q     On June 10 at 8:23 p.m. you wrote to Discala, just got

2   notice in the mail of name change and stock split.  Now we can

3   have it go out in news.  Got my notice by mail.  Discala

4   responds nice.  Closed 705.  What were you referring to in

5   your text message?

6   A     So the corporate governance that took place in May

7   changing the name from First Independence Corp. to Codesmart

8   that had been adopted by the company in May, they had stated

9   that it would take place officially in a month.  So they were

10  going to put a news story out and if you were a shareholder,

11  which I was, you would receive a letter from Ira Shapiro

12  saying the new company's official name was Codesmart.  By the

13  way we are also going to do a stock split and that's what

14  happened.

15          (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

1    (Continuing.)

2    BY MR. HEIN:

3    Q    And then you state on June 10 at 8:45 p.m.:  Now that we

4    know, when does the news hit?

5             And Discala responds:  On that date, June 14, I

6    think?

7             MR. HEIN:  If I could show a document to the

8    witness, please.

9             Showing the witness Government 178-32.

10   Q    Do you recognize this document?

11   A    Yes.

12   Q    What is it?

13   A    The corporate governance letter to shareholders stating

14   that the CodeSmart had purchased First Independence and was

15   going to change its name and do a stock split.

16   Q    Did you receive this document?

17   A    I did.

18   Q    And did you review it at the time?

19   A    Yes.

20   Q    Is this a true and accurate copy?

21   A    Yes.

22            MR. HEIN:  The Government moves into evidence

23   Government Exhibit 178-32.

24            MR. ROSS:  No objection, Judge.

25            THE COURT:  Received without objection.

1          MR. HEIN:  If we could show it to the jury, please.

2          (Government Exhibit 178-32 so marked.)

3          MR. HEIN:  May we show it to the jury, please?

4          (Exhibit published to the jury.)

5    Q    You mentioned, Mr. Bell, what this letter was.  If you

6    could, just explain for the jury.

7    A    This notice is being furnished to the stockholders at

8    First Independence Corp. In connection with written consent

9    with the majority shareholder of the company, dated May 15,

10   2013, a copy of which is enclosed herein, regarding the name

11   change of the company from First Independence Corp. To

12   CodeSmart Holdings and a two-for-one forward stock split.

13          So, they're just officially telling everybody that

14   owns the stock the company has changed its name and we're

15   gonna have a stock split.

16   Q    And you mentioned this is a two-for-one forward stock

17   split.  So, what will that do to the shares and the stock

18   price of CodeSmart?

19   A    The stock on whatever date it happens will be cut in half

20   but you will have twice as many shares.

21   Q    The stock price will be cut in half?

22   A    Yes.  So, your dollar bill becomes two 50-cent pieces.

23   Q    It states here:  This will be effective as of June 14; is

24   that right?

25   A    Yes.

```
                    Bell - Direct - Hein                    192
```

1          MR. HEIN:  If we could return to the laptop, please.

2     Q    On June 10 at 8:53, Discala states:  Leave power to crank

3     up on split.

4          And you say:  I got it.

5          What did you understand Discala to mean?

6     A    He's telling me to hold off on any purchases until after

7     the stock split so we can run it up again.

8     Q    On June 13, at 5:38 p.m., Discala wrote to you:  Let's

9     build wall.  Can you bid 775?

10         And you respond:  Sure.  30 minutes.  I bought a lot

11    today.

12         And June 13 at 8:20 p.m., you stated:  Someone took

13    it down another nine cents, seven dot eight.

14         So, what is this price of CodeSmart at this point on

15    June 13?

16    A    $7.80.

17    Q    On June 13 at 8:58 p.m., Discala writes to you:  FYI, our

18    new sticker is ITEN, like ICD-10.  How awesome.

19         What do you understand him to mean there?  What's

20    the new ticker?

21    A    The new stock symbol is ITEN.

22    Q    What was it before?

23    A    FICF.

24    Q    On June 14 at 1:28 p.m., you write to Discala:  I've got

25    23K shares in at 4.15 bid.

Bell - Direct - Hein                    193

1              You just said that the stock closed at $7.80 on

2    June 13.  Your bid here is at $4.15.  Can you explain that?

3    A    You're if the stock closed at $7.80, it would split to

4    3.85, would show 3.85 in the morning.  But that's just what it

5    would the supposedly open at.  If we have buyers, which we

6    did, the stock will start going up again.

7              So, the split adjusted.  It was really 8.30.

8    Q    When the stock split took place on June 14, does that

9    mean that the stock price opened up half at what it closed the

10   day before?

11   A    Correct.

12   Q    So, instead of 7.80, approximately $3.90?

13   A    Sure.

14   Q    So now you're bidding it at $4.15?

15   A    Correct.

16   Q    You discussed the stock split earlier and your

17   understanding of the rationale behind it.  Could you explain

18   that again?

19   A    In our situation, you want to keep the stock under ten

20   bucks.  We want single digits.

21   Q    And, so, by doing the two-for-one forward stock split,

22   what did that enable you to do?

23   A    Well, I mean, the stock -- most people follow the stock

24   price, not the shares.  So, obviously, it would look a little

25   weird if stock opened in May at $3.20 and by July was trading

1    for $16.  And the idea is by doing -- in stock splits, by

2    doing a stock split like that, you can keep the price of the

3    stock looking low because people don't follow the number of

4    shares that are out.  They don't look at Facebook shares and

5    say how many shares are out, they say, What's the price?

6    Q    And when the stock split occurred and the price was cut

7    in half on June 14, does that mean that stockholders now had

8    twice as many shares?

9    A    They had twice as many shares.  It's the same amount of

10   money, you just have twice as much at half the price.

11   Q    On June 18, Discala wrote to you:  Throw 50K at market on

12   HRAA.  I'll do the same and get Dan to as well and Craig.

13             And you write:  K.  Watch me.

14             And you write:  45K more.

15             And then you write:  25K.

16             What's your understanding of what Discala's telling

17   you to do in that first text message there?

18   A    HRAA was one of those smaller deals that we started off

19   in March.  He told me to throw 50,0000 shares at market, he'll

20   buy about $10,000 worth, and he was going to get Dan Walsh and

21   Craig Josephberg to do the same at the same time.

22             And that creates what's called a "squeeze," which is

23   like having a water balloon where you push like that, a lot of

24   water comes out very quickly.  That kind of squeeze is used to

25   push the price of a stock up very quickly and very

Bell - Direct - Hein                    195

1    dramatically.

2    Q    Discala writes to you:  Great job.  I'm going now again.

3         You respond:  Ten.

4         And Discala says:  Nice.  We will rock this.  But

5    main focus CodeSmart.

6         You respond:  Nice news.  47 hospitals, 3,000

7    physicians.

8         Discala responds:  Yes, sir.  Bigger news coming.

9         MR. HEIN:  If I could please show the witness a

10   document.

11   Q    I'm showing you 172-54.

12        Do you recognize this exhibit?

13   A    Yes, sir.

14   Q    What is it?

15   A    It's the news story from June 18 about Puerto Rico.

16   Q    Did you view this news story at the time?

17   A    Yes.

18        MR. HEIN:  The Government moves Government Exhibit

19   172-54 into evidence.

20        MR. ROSS:  Same objection, Judge.

21        THE COURT:  Same ruling; received in evidence.

22        (Government Exhibit 172-54 so marked.)

23        MR. HEIN:  May I show it to the jury, please?

24        (Exhibit published to the jury.)

25   Q    Now, what did this new story state that came out on

LAM      OCR      RPR

1   June 18?

2   A    That CodeSmart had signed a deal with /SAOER /RA set,

3   which is the largest healthcare consulting firm in Puerto

4   Rico, serving 47 hospitals and 3,000 physicians.

5   Q    If you could read at the top of the second paragraph,

6   this quote here?

7   A    It states:  Our partnership with CIRACET provides the

8   CodeSmart Group with a strong advantage within the Puerto Rico

9   healthcare market base on the trust and credibility CIRACET

10  has built there, says Ira Shapiro, CEO of CodeSmart Group.  It

11  is important that all members of the healthcare industry have

12  access to solid ICD-10 training, and this partnership fills an

13  important niche in ensuring that potential experienced Spanish

14  speaking coders of Puerto Rico and within the continental U.S.

15  have access to the best training available.

16       MR. HEIN:  If we could please return to the laptop.

17  Q    You mentioned the news release.  Discala writes:  Bigger

18  news coming.

19       You write on June 18 at 2:54 p.m.:  Quick question.

20  Looks like volume is us three right now.  When is the

21  marketing push coming?  The news today, of course, was

22  stellar.  Need a bigger audience.

23       Discala responds:  Ask Dan and Joe.  Ira is doing

24  fox biz tonight.

25       What's going on in there in your text messages?

1   A    I noticed that -- I've been following the volume trend,

2   and it looks like myself, Joe Salvani, and Dan Walsh are the

3   only ones trading.  Maybe Craig Josephberg.  And AJ had been

4   promising this big marketing push through seminars and just

5   expos and stuff.  And I want to know when it's coming.

6            And I state the news today, of course, is stellar,

7   if it was true, but the company needs a bigger audience

8   because we can only do this for so long until we run out of

9   money, firepower.

10           MR. ROSS:  Judge, objection to "if it was true."

11           THE COURT:  I'll allow it.

12  Q    When you say that Ira -- when Discala said that, "Ira is

13  doing Fox Business tonight," who is Ira?

14  A    Ira Shapiro was going to be on a TV show called Fox

15  Business Tonight to talk about his company.

16  Q    Who was Ira Shapiro again?

17  A    The CEO of CodeSmart.

18  Q    On June 19, 4:43 p.m., you write to Discala:  Okay.  I

19  just smashed CodeSmart to 5.82.

20           Discala responds:  Wow.  I'm on HHRA.  You rock.

21           Discala then states on June 19 at 5:56 p.m.:  Dude,

22  we're the hottest team out there.  People are all gonna try to

23  get us.

24           You respond:  Great.  Make them pay.

25           Discala responds:  Exactly.

1              What was going on there?

2    A    He says that we're the hottest team out there and people

3    are all going to try to get to us.  Basically, OmniView

4    Capital looks really good as far as CodeSmart goes, pushing

5    the stock price up.

6              I say great, make them pay.  Make sure that we get a

7    lot of shares early on because the better we do in our job --

8    even though we're manipulating the stock, we have a goal and

9    we're accomplishing our goal.  I say, "Make them pay," and he

10   says, "Exactly."

11   Q    On June 20, 7:02 p.m., you write:  FYI, thanks to LBAS my

12   b/d and I have parted ways today.

13             What did you mean there.

14   A    I got fired that day.  I said thanks to Location Based

15   Technologies, my broker-dealer and I parted ways.

16             So, what happened was they had been on me about the

17   price of LBAS.  We were never able to get it up over 20 cents

18   consistently.  And, so, with that in mind, they fired me.

19   Q    Discala responds:  No way.  You want me to buy you one?

20             What did he mean by that?

21   A    Do you want me to buy you a broker-dealer.

22             You can start your own broker-dealer, you can go

23   independent, start your own firm whenever you wanted, it just

24   costs a lot of money.

25   Q    You write here on June 20 at 7:06 p.m.:  I may need one

1    to pick me up that is friendly microcaps.  And those WFG

2    people terminated me, but I had faxed my resignation.

3            Discala responds:  Not a problem.  Jeff Auerbach

4    will call you after close.  He knows them all and is on our

5    tram.

6            What's your understanding of that discussion?

7    A    I tell him I'm looking for a new broker-dealer.  This is

8    for the 20 percent of my work.  I'm still with Fidelity.

9            I tell him I'm not -- he says:  I'm not kidding.  I

10   know all the broker-dealers there.  He's talking about the New

11   York area.  I tell him I may need one to pick me up that's

12   friendly who microcaps, small stocks.  And I mention that even

13   though the WFG -- that was the name of my broker-dealer,

14   Williams Financial Group -- even though they fired me, I faxed

15   my resignation first.

16           In my own line of business, whoever quit first, it

17   really mattered a lot if you quit before you got fired.

18   Q    He said that Jeff Auerbach will call you after close.

19           Who is Jeff Auerbach?

20   A    A friend of his that knew a lot of broker-dealers.

21           MR. HEIN:  If I could show the witness a document,

22   please.

23   Q    I'm showing you what's been marked Government Exhibit

24   178-11.

25   A    Yes.

1    Q    Do you recognize this?

2    A    I do.

3    Q    What is it?

4    A    That's my personal brokerage account statement from

5    Amegy.

6    Q    Is this a true and accurate copy of your brokerage

7    account statement from Amegy Investments?

8    A    Yes, sir.

9         MR. HEIN:  The Government moves Government Exhibit

10    178-11 into evidence.

11         MR. ROSS:  No objection.

12         THE COURT:  Received without objection.

13         (Government Exhibit 178-11 so marked.)

14         MR. HEIN:  If we could display it for the jury,

15    please.

16         (Exhibit published to the jury.)

17    Q    Does it say Amegy Investment here in the top left?

18    A    Yes.

19    Q    Is that your name here?

20    A    Yes.

21    Q    Turning to Page 2 of 22 of this document, if you look

22    down here towards the bottom, could you describe what we're

23    seeing here in this little table?

24    A    So, the very first column, the description, Box 8, is

25    CodeSmart Holdings.  That means what the stock is; in this

1   case, CodeSmart.

2            And then the first column says "sell."

3            First in first out is for tax reasons.

4            And then third column says "quantity."  So, I sold

5   5,000 shares.

6            Date of acquisition.  So, what happened was I got

7   fired or resigned, depending on the time stamp of things, on

8   June 20.  At this point, I hadn't sold any of my own shares.

9   AJ and other people had been selling their shares.

10  Q    This is the 125,000 unrestricted shares that you got?

11  A    Yes.

12           So, I'm a little panicked.  I just got fired, I have

13  kids, I have a bunch of stuff going on.  I take my certificate

14  down to my brokerage firm and I deposit on that date.  That's

15  date of acquisition, June 20.

16           Date of sale.  Six days later is when I start

17  selling my shares.  And, so, on that day I sold -- on 6/26, I

18  sold 5,000 shares of stock that was deposited on June 20 for

19  total proceeds 33,216.  So, whatever -- I sold it somewhere

20  around $6.60, whatever that is.

21  Q    Are Pages 2 through 15 of this document here, is this a

22  table of your sales of CodeSmart shares?

23  A    Yes.  I sold through September, I believe.

24  Q    I'll return to Page 15 of 22.  Look at the date of sale.

25  What we had seen on the first page, 6/26/13.  Here it's

1    8/13/2013.  Here at the bottom, what is this number here?

2    A    506117.

3    Q    What is that number?

4    A    $506,117.

5    Q    Is that the amount of money that you made off of your

6    sale of CodeSmart shares?

7    A    Of those shares, yes.

8    Q    And at what price did you buy those shares at?

9    A    About $22,000.

10   Q    About what per share?

11   A    Oh.  Around two and a half cents.

12        So, I told AJ I was going to hold out until seven to

13   ten, and I sold around 6.60 or so.

14        MR. HEIN:  Can we please return to the laptop?

15   Q    Did you have a lock-up leak-out agreement in place?

16   A    I did.

17   Q    Did you violate it by selling these shares?

18   A    I did.

19   Q    Why didn't you buy the lock-up leak-out agreement?

20   A    One, I just got fired and I was kind of panicked.  Two, I

21   felt that my fellow conspirators were selling their shares.  I

22   knew that AJ had been selling his shares, that was part of the

23   plan, but I felt that Dan and Craig were selling because I

24   kept getting these strange sales that would come out of

25   nowhere that weren't part of the plan, and I just felt that it

1    was time to sell.

2              MR. HEIN:  Your Honor, I think this would probably

3    be a good place to stop for the day.

4              THE COURT:  Sounds good, Mr. Hein.

5              Ladies and gentlemen, that brings us to the

6    conclusion of today's trial.  I'm going to discharge you for

7    the evening.  As you understand, you're not being put up in

8    hotel.  I'm going to send you home.

9              The rules about recesses apply whether in the jury

10   room, whether at lunch, or on your way home and overnight.

11   So, I want to review them with you again, and they simply are:

12   Not to discuss the case amongst yourselves or with anyone

13   else; continue to keep an open mind; if you are on any form of

14   social media, you are on complete radio silence on anything

15   that touches upon this case; you are not to use the recess

16   period as an opportunity to do any research about anything

17   here at the courthouse, anything to do with the trial,

18   personalities of the lawyers, the issues, whether you do it

19   electronically or old-fashioned way, you're not to do it at

20   all.

21             You're also directed to disregard any media

22   accounts, whether they be on radio, TV, Facebook, newspapers,

23   or whatever, that relate to this case.  Absolutely disregard

24   them.

25             The other thing that I urge you to do is to put

1    aside the stories relating to any court proceeding for fear

2    that you may hear something in connection with that court

3    proceeding that may confuse you about what your

4    responsibilities are here.  So, I would urge you to do that.

5           Other than that, please enjoy a pleasant evening.

6    We will ask you to return to the central jury room tomorrow at

7    around 9:45 and we'll start between 9:45 and 10, when everyone

8    is assembled and the courtroom is properly configured for the

9    continuation of trial tomorrow.

10          Again, all of us appreciate your patience, your

11   cooperation, and the sacrifice that you are making.  It is

12   certainly a tribute to your own citizenship and your

13   commitment to the rule of law and is deeply appreciated.

14          With that, have a pleasant evening, I think the

15   clouds have gone away, and we'll see what tomorrow brings.

16          (Jury exits.)

17          THE COURT:  Mr. Bell, you're free to step down.

18          Any housekeeping we can handle this evening?

19          MR. RIOPELLE:  Your Honor, I have one very minor

20   point.  I believe the Government just referred to the last

21   document that was shown the witness as an account statement

22   several times.  It's actually a 1099 statement, not an account

23   statement.  If the Government could just clear that up when

24   the witness comes back in the morning, I'd appreciate it.

25          MR. HEIN:  Happy to do it.

1              THE COURT:  No problem with that.

2              MR. RIOPELLE:  Thank you, Judge.

3              THE COURT:  Anything else?

4              MR. ROSS:  Just the scheduling issue for

5    Mr. Sjoblom.  I know I've discussed this with the Government

6    and their thought was to have Ms. Oremland testify on Monday

7    and Mr. Sjoblom is just not going to be available at that

8    point.  He's going to be in Washington, D.C., flies out to

9    Chicago to argue in the Seventh Circuit, and he'll be back

10   Tuesday night and here on Wednesday morning to examine

11   Ms. Oremland.

12             THE COURT:  Why can't the Government accommodate

13   that schedule?

14             MR. BINI:  Your Honor, we can accommodate the

15   scheduled and we will put Ms. Oremland on Wednesday.

16             MR. ROSS:  Thank you.

17             THE COURT:  There's your answer.

18             MR. ROSS:  Thank you.

19             MR. HEIN:  Thank you to the Government as well for

20   the accommodation.

21             MR. ROSS:  Judge, with respect to the playing of the

22   wiretap recordings, if we can have the evening to look at that

23   and we'll be in a position tomorrow to talk about whether or

24   not the rule of completeness is violated by the excerpt.

25             MR. RIOPELLE:  Your Honor, I will be making a very

1  brief motion tonight to excise a small portion of

2  Government -- the second one, I forget what the Government

3  exhibit is, but it will take all of ten seconds for the

4  Government to do it.

5          THE COURT:  Again, Mr. Riopelle, that was on

6  relevance grounds, you said?

7          MR. RIOPELLE:  Correct, your Honor.  But it should

8  be easy to accomplish if necessary.

9          The other thing I would request, I don't know who

10 the Government's next witness is.  If we do finish with this

11 witness tomorrow, it would be good for me to know whose

12 material to bring.

13         THE COURT:  Do we have any idea?  Do you think we'll

14 finish with Mr. Bell tomorrow?

15         MR. HEIN:  I believe we will finish our direct

16 tomorrow.  Whether we finish with cross-examination, I think

17 it's probably unlikely but perhaps.  It all depends on when I

18 finish with him, but I think he'll take a good chunk of the

19 morning.

20         THE COURT:  You think you'll be through the morning

21 with Mr. Bell?

22         MR. HEIN:  I believe so, your Honor.

23         THE COURT:  And then we have made a promise to

24 Mr. Riopelle of 5:30.

25         So, they may be starting a witness briefly depending

1    on the vagaries of the day, I guess.

2            MS. JONES:  Your Honor, we'll try to give defense

3    counsel -- we'll think about it and try to give them the

4    information.  Part of the problem is that our next planned

5    witness was originally going to be Special Agent Jon Luca, who

6    was just going to testify not that long about some of the

7    events relating to the search of OmniView.  My understanding

8    is that he may not be available on Monday, so we may not want

9    to start him if he can't finish both direct and cross.  And

10   then we have to shift around to accommodate Ms. Oremland.

11           So we have to reconfigure our witness order, and

12   we'll let defense counsel know when we have that figured out.

13           THE COURT:  Yes.  It ends up saving everybody time.

14   The more they know they can prepare a little better and it

15   makes things moves more expeditiously.  We would appreciate

16   that accommodation from the Government as well.

17           MR. RIOPELLE:  Thank you.

18           THE COURT:  Again, as we discussed, to the extent

19   that you wish to leave anything overnight, Mr. Villanueva is

20   prepared to accommodate those requests.  Otherwise, we'll see

21   you tomorrow morning.  Have a pleasant evening.

22           (A chorus of thank yous.)

23           (Matter adjourned until Thursday, April 5, at

24   9:45 a.m.)

25

208

1                          <u>I N D E X</u>

2

3    <u>WITNESS</u>                                      <u>PAGE</u>

4

5      MATTHEW BELL

6          DIRECT EXAMINATION BY MR. HEIN              78

7

8                        <u>E X H I B I T S</u>

9

10     Government Exhibit 198-B                         76

11     Government Exhibit 125                           77

12     Government Exhibit 132-2                        117

13     Government Exhibit 113-2-A through WW           118

14     Government Exhibit 178-2                        148

15     Government Exhibit 172-45                       168

16     Government Exhibit 172-46                       172

17     Government Exhibit 172-42                       178

18     Government Exhibit 172-49                       183

19     Government Exhibit 172-50                       186

20     Government Exhibit 178-32                       191

21     Government Exhibit 172-54                       195

22     Government Exhibit 178-11                       200

23

24

25

                        LAM      OCR      RPR