3005

```
1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ------------------------------x
                                        14-CR-399(ENV)
3    UNITED STATES OF AMERICA,
                                        United States Courthouse
4            Plaintiff,                 Brooklyn, New York

5            -against-                  April 30, 2018
                                        10:00 a.m.
6    ABRAXAS J. DISCALA, ALSO
     KNOWS AS AJ DISCALA, AND
7    KYLEEN CANE,

8            Defendants.
     ------------------------------x
9
                  TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
10              BEFORE THE HONORABLE ERIC N. VITALIANO
                    UNITED STATES DISTRICT JUDGE
11                        BEFORE A JURY

12   APPEARANCES

13   For the Government:      UNITED STATES ATTORNEY'S OFFICE
                              Eastern District of New York
14                            271 Cadman Plaza East
                              Brooklyn, New York 11201
15                            BY:  SHANNON JONES
                                   MARK E. BINI
16                                 PATRICK HEIN
                              Assistant United States Attorneys
17
     For the Defendant:      CHARLES ROSS & ASSOCIATES, LLC
18   Abraxas J. Discala      111 Broadway
                              New York, New York 10008
19                            BY:  CHARLES ROSS, ESQ.

20                            ANDREW BOWMAN, ESQ.
                              1804 Post Road East
21                            Westport, Connecticut 06880

22                            HANWEI CHENG, ESQ.
                              15155 Gale Avenue
23                            Suite D
                              Whittier, California 90603

24

25
```

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

3006

1    A P P E A R A N C E S:   (Continued)

2    Attorney for Defendant:   SERCARZ & RIOPELLE, LLP
     Kyleen Cane               810 Seventh Avenue
3                              Suite 620
                               New York, New York 10019
4                              BY:  ROLAND RIOPELLE, ESQ.
                                    ROBERT CALIENDO, ESQ.
5

6    Court Reporter:           LINDA D. DANELCZYK, RPR, CSR, OCR
                               Phone:  718-613-2330
7                              Fax:    718-804-2712
                               Email:  LindaDan226@gmail.com
8

9    Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                    3007

1              (In open court; Jury not present.)

2              THE COURTROOM DEPUTY:  All rise.  Court is now open.

3    The Honorable Eric Vitaliano is now presiding.

4              The case on the calendar is *USA versus Discala and*

5    *Cane*, case number 14-CR-399 on for a jury trial.

6              Will counsel please note their appearance beginning

7    with government counsel.

8              MS. JONES:  Sharon Jones, Mark Bini and Patrick Hein

9    for the United States.  Along with Henry Ishitani and FBI

10   Special Agent Elyse Morris.

11             MR. ROSS:  Good morning, Your Honor.  Charles Ross

12   Matthew Shroyer and Scott Schwartz for Mr. Discala.

13             MR. BOWMAN:  Good morning, Your Honor.  Andrew

14   Bowman for Mr. Discala.

15             MR. CHENG:  Good morning, Your Honor.  Hanwei Cheng

16   Mr. Discala.

17             MR. RIOPELLE:  Good morning, Your Honor.  Roland

18   Riopelle and Robert Caliendo for the defendant, Kyleen Cane,

19   this morning.

20             THE COURTROOM DEPUTY:  Counsel for both sides are

21   present for the defendants.

22             THE COURT:  Good morning, all.  Are we ready to go?

23             MR. BINI:  Yes, Your Honor.

24             And the government will put the witness back on the

25   stand.  And if you like, I will hand out the juror transcripts

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                          3008

1    to the jury now.

2            However, one thing.  I just wanted to flag for the

3    Court, the government has prepared a letter, which we have to

4    get supervisor approval for in the next few minutes, and as

5    soon as we do, we will file it, which deals with four of the

6    witnesses, and many of the exhibits that are offered by

7    Mr. Discala.

8            Since we think our letter will crystalize those

9    issues after we file it, we will ask that we argue it at a

10   break before those witnesses are called because we believe

11   that much of the evidence offered by the defendant should be

12   precluded, either because it is irrelevant or because it calls

13   for expert testimony for which there's been no notice.

14           MR. ROSS:  Judge, we will certainly argue against

15   that.

16           THE COURT:  I would hope.  But it will be a short

17   argument if it's only one side.

18           MR. BOWMAN:  And I should just note the reason for

19   the government not filing already, is that the defense counsel

20   essentially dumped a bunch of 3500 on us on Saturday and

21   Sunday that was not previously produced.

22           MS. JONES:  Your Honor, it's not just 3500

23   materials, the defendant produced on Saturday for the first

24   time a 147-page analysis by its accountant witnesses that

25   includes over a hundred schedules, and over 4,000 pages of

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

1    backup, and the first we got this was on Saturday evening.

2             MR. ROSS:  And we can argue this at the break.  I

3    don't want to take up time, but we've been doing everything

4    that we can to gather this material.  The scope of the

5    prosecution's witness, Joan Mazella, was not known to us and

6    so we've done absolutely everything we can.  This is a very,

7    very important witness to us.  If the prosecution thinks that

8    the government thinks that they have a cross-examination to

9    expose the flaws in the analysis, then they can do that.

10            MR. RIOPELLE:  And, Your Honor, Roland Riopelle.  I

11   do have my last witness for Ms. Cane here, he's a very brief

12   witness.

13            THE COURT:  You plan to take that witness after the

14   government rests?

15            MR. BOWMAN:  Yes, he traveled from out of town.

16            THE COURT:  That's fine.

17            MR. ROSS:  Your Honor, at this point we only have

18   three witnesses.  We have three witnesses that will all be

19   ready to go today.

20            MR. BOWMAN:  Who are the witnesses?

21            MR. ROSS:  We've given you notice.

22            MR. BOWMAN:  You told us four yesterday.

23            THE COURT:  Somebody dropped out.

24            MR. ROSS:  Someone dropped out.

25            So it's Mr. Parker, Mr. Engstrom and Ms. Eckert.

PROCEEDINGS                    3010

1              THE COURT:  And the last one is the accountant?

2              MR. ROSS:  Yes.

3              THE COURT:  Okay.  Okay.  Thank you, it's a preview

4    of where we're trying to head today.

5              Other than that, we're ready?

6              MR. BOWMAN:  Yes, Your Honor.

7              THE COURT:  Okay.

8              (Whereupon, the witness resumes the stand.)

9              (Jury enters the courtroom.)

10             THE COURT:  Be seated, please.

11             Counsel will stipulate that the jury are present and

12   properly seated.

13             MS. JONES:  Yes, Your Honor.

14             MR. ROSS:  Agreed, Judge.

15             THE COURT:  Thank you, counsel.

16             Ladies and gentlemen, welcome back, especially for

17   those who survived the rail wars this morning.  We're

18   appreciative and very understanding.  We are ready to resume

19   this morning's session.

20             As you recall when we broke, that Special

21   Agent Voulgaris was on the stand.

22             I remind you, Special Agent, that you are still

23   under oath, and Mr. Bini was still conducting his direct

24   examination.

25             Mr. Bini, you shall continue.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

VOULGARIS – DIRECT – BINI                    3011

1          MR. BOWMAN:  Thank you, Your Honor.

2          (Witness takes the witness stand.)

3   CONSTANTINE VOULGARIS, called as a witness, having been

4   previously first duly sworn/affirmed, was examined and

5   testified further as follows:

6   DIRECT EXAMINATION (Continued)

7   BY MR. BINI:

8   Q    Special Agent Voulgaris, I'd like to ask you about

9   Government's Exhibit 198-41E, for excerpt.

10         And I would ask you to look in the transcript

11   binder, the juror transcript binder at Tab 18.  And this is

12   call from at June 3rd, 2014 at 11:25 a.m.

13         When you have that transcript in front of you,

14   before we play it, I just wanted to ask you to identify the

15   participants to the call.

16   A    198-41?

17   Q    Yes, sir.

18   A    Kyleen Cane and Abraxas Discala.

19   Q    Okay.

20         And is this a call that begins at 9:52 a.m.?

21   A    Yes.

22         MR. BINI:  If we can play the first clip through

23   02331.

24         (Audio recording played.)

25   Q    Now I'll ask you to listen to the clip from five minutes

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

VOULGARIS - DIRECT - BINI                    3012

1    and 56 seconds to eight minutes and 18 seconds in the same

2    call.

3              (Audio recording played.)

4    Q    Now, I ask you in the same call to listen to the clip

5    from 10:29 to the conclusion of the call.

6              (Audio recording played.)

7              MR. BINI:  Now I'd like to publish, Your Honor,

8    198-42E from beginning of the call to four minutes and 33

9    seconds.

10             THE COURT:  You may.

11             MR. BINI:  Before we do that, let me just ask the

12   witness.

13   Q    Who are the participants of this call?

14   A    Kyleen Cane and Abraxas Discala.

15   Q    And what's the time of the call?

16   A    12:33 p.m.

17             MR. BINI:  Okay, we can now listen to it.

18             (Audio recording played.)

19             MR. BINI:  Your Honor, at this time if the

20   government could publish 198-57, a voice mail call from

21   June 2014.

22             THE COURT:  You may.

23             (Audio recording played.)

24             MR. BINI:  Now if I could publish to the jury

25   129-89, Your Honor, a text message in evidence.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

VOULGARIS – DIRECT – BINI                     3013

1          THE COURT:  Please proceed.

2          (Exhibit published.)

3   Q    Agent Voulgaris, who are these messages between?

4   A    Kyleen Cane and Andy McAlpine.

5   Q    And what type of messages are they?

6   A    They're text messages.

7   Q    What are the date of these messages?

8   A    June 7th, 2014.

9   Q    What is the first message in the series?

10  A    That stock is creeping up.

11  Q    And what's the response to that?

12  A    You have a million shares; wasn't it?

13  Q    And what's the response to that?

14  A    First deposit will be 270,000, but there will be two

15  more.

16  Q    What's the next response after that?

17  A    Okay, great.

18          MR. BOWMAN:  Your Honor, if the government could

19  publish to the jury 198-51E, excerpt of a call from one minute

20  31 seconds to one minute 49 seconds.

21          THE COURT:  You may.

22          MR. BOWMAN:  I'll just ask the witness before we

23  play the call.

24  Q    Who are the participants to this phone call?

25  A    Abraxas Discala and Craig Josephberg.

VOULGARIS – DIRECT – BINI                    3014

1    Q    And what is the date of the call?

2    A    June 12th, 2014.

3    Q    The time of the call?

4    A    9:53 a.m.

5         MR. BOWMAN:  If we can now publish it.

6         (Audio recording played.)

7    Q    Now, Your Honor, if we could publish to the jury 198-52.

8         THE COURT:  You may.

9         (Exhibit published.)

10   Q    Special Agent Voulgaris, who are the participants of this

11   call?

12   A    Abraxas Discala and John Arlo.

13   Q    Who is John Arlo?

14   A    He was a junior trader, broker at BMAC securities.

15   Q    And what is the date of this call?

16   A    June 12th, 2014.

17   Q    The time?

18   A    10:02 a.m.

19   Q    Is BMAC securities where Darren Goodrich also worked?

20   A    Yes.

21        MR. BOWMAN:  If you could play the call.

22        (Audio recording played.)

23   Q    Special Agent Voulgaris, during the time that you were

24   intercepting calls pursuant to the wiretap, were you also

25   looking at stock prices?

VOULGARIS – DIRECT – BINI                          3015

1    A    Yes.

2    Q    If we can look to Government's Exhibit 196–16 in

3    evidence.

4                (Exhibit published.)

5                What did the stock price of StarStream close on

6    June 11th of 2014, the date before this call?

7    A    Forty-three cents a share.

8    Q    And where did it close on June 12th of 2014?

9    A    Fifty-nine cents a share.

10                MR. BOWMAN:  Your Honor, at this time the government

11   would ask to publish to the jury 198-77E.

12                THE COURT:  You may.

13   Q    Agent Voulgaris, what is the date of this call?

14   A    June 12th, 2014.

15   Q    And who the participants?

16   A    Abraxas Discala and Craig Josephberg.

17   Q    And if would he could now listen from the start –– I'm

18   sorry, what's the time of this call?

19   A    10:12 a.m.

20                MR. BINI:  Listen from the start to one minute and

21   three seconds.

22                (Audio recording played.)

23                MR. BOWMAN:  Your Honor, the government asks to

24   publish to the jury at this time 198-60 in evidence.

25                THE COURT:  You may.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

VOULGARIS – DIRECT – BINI                3016

1          (Exhibit published.)

2   Q     Agent Voulgaris, who are the participants to this phone

3   call?

4   A     Kyleen Cane and Abraxas Discala.

5   Q     What is the date of this phone call?

6   A     June 24th, 2014.

7   Q     What's the time of the call?

8   A     3:54 p.m.

9          MR. BOWMAN:  You may now play it for the jury.

10         (Audio recording played.)

11  Q     Special Agent Voulgaris, did there come a time that you

12  stopped intercepting phone calls?

13  A     Yes.

14  Q     And when was that approximately?

15  A     June 29th, 2014.

16  Q     When we spoke on Thursday, you spoke about your role in

17  the arrest procedures on July 17th, 2014.

18         I'd like to ask you, after you determined that AJ

19  Discala was not at his home in Connecticut, did you contact

20  other agents?

21  A     Other agents were contacted, yes.

22  Q     In what state?

23  A     Nevada.

24  Q     And did you learn that Abraxas Discala and Kyleen Cane

25  were arrested that same day?

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

1    A     Yes.

2          MR. BOWMAN:  No further questions, Your Honor.

3          THE COURT:  Thank you, Mr. Bini.

4          Any cross?

5          MR. BOWMAN:  Yes, Your Honor.

6          THE COURT:  Mr. Bowman, you may cross for

7    Mr. Discala.

8    CROSS-EXAMINATION

9    BY MR. BOWMAN:

10   Q     Agent Voulgaris, do you know who Joseph Salvani is?

11   A     Yes, sir, I recall the name from the investigation.

12   Q     And who is he?

13   A     At this time I don't know exactly what role he was or if

14   he was just an investor.

15   Q     Did you know that Joseph Salvani, Dan Walsh, Jeff

16   Auerbach and Eli Wahrsager introduced the CodeSmart

17   transaction to Mr. Discala?

18   A     In part I know some of the individuals did, yes.

19   Q     Did you know that there was a 4 million-dollar pipe that

20   had been committed to CodeSmart?

21   A     I guess, yes.

22   Q     And a 20 million-dollar student loan facility?  Did you

23   know that?

24   A     Off the top of my head, I don't recall.

25   Q     Did you know that over $2 million was previously invested

VOULGARIS - CROSS - BOWMAN                3018

1    in the company?

2    A    I don't recall that.

3    Q    Did you know that there was a committed broker network in

4    place by the time the CodeSmart was presented to Mr. Discala?

5    A    I was unaware of that.

6    Q    Did you know that there had already been an audit that

7    was required for an APO offering that had been done by the

8    time this CodeSmart transaction was presented to Mr. Discala?

9    A    I'm aware public entities required it had an audit, but

10   not in this specific case.

11   Q    So you didn't know the details of how this transaction

12   was presented to Mr. Discala?

13   A    Some of the details -- I was aware of some of the

14   details.  I would say, you know, who conducted the audit.  And

15   some other specifics details that they already had potentially

16   had a broker/dealer in place, I wasn't aware of that.

17   Q    Did you know who Ira Shapiro was?

18   A    Through the investigation, yes.

19   Q    And who was he?

20   A    He was the CEO of CodeSmart.

21   Q    And did you know that Mr. Shapiro had failed to disclose

22   to Mr. Discala OmniView and investors that there was

23   approximately $2.3 million?

24            MR. BINI:  Objection.  Hearsay.

25            THE COURT:  Sustained.

1          MR. BOWMAN:  I'm asking if he knew.  He testified to

2    his investigation, Your Honor.

3          MR. BINI:  Misstatements.  Objection.  Hearsay.

4          MR. BOWMAN:  It's cross-examination, Your Honor.

5          THE COURT:  You're asking him -- let me talk to you

6    at sidebar.

7          (Continued on the next page.)

8          (Sidebar conference.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    3020

1              (The following occurred at sidebar.)

2              MR. BOWMAN:  I'm asking him if he knew.  He's

3    testified to what he did in his investigation.  So I want to

4    go through this.  It was a 2.3 million-dollar payment that

5    Shapiro had to make to a shareholder that was not disclosed.

6              THE COURT:  That's different then asking him about a

7    conversation.  He can state that as a fact.

8              MR. BOWMAN:  So I can ask him if he knew.

9              THE COURT:  Is he aware of that.

10             MR. BOWMAN:  Right.  Sure.

11             THE COURT:  Which may or may not be true.

12             MR. BOWMAN:  I'm going to ask him if was aware of

13   it.

14             THE COURT:  If you have a good faith basis to ask.

15             MR. BOWMAN:  Yes.

16             MR. BINI:  Okay.  Thank you, Your Honor.

17             (End of sidebar conference.)

18             (Continued on the next page.)

19

20

21

22

23

24

25

VOULGARIS – Cross – BOWMAN                    3021
PROCEEDINGS

1              (In open court; Jury present.)

2    BY MR. BOWMAN:

3    Q    Were you aware that there was a 2.3 million-dollar

4    payment that was made by Ira Shapiro to acquire the remainder

5    of the outstanding shares of CodeSmart?

6    A    I don't recall.

7    Q    Did you know that Mr. Discala joined the SSET board of

8    directors?

9    A    I don't recall at this time.

10   Q    Did you know whether Mr. Discala had any stock he was

11   able to trade as a result of his joining the board of

12   directors?

13   A    In his own name?

14   Q    Yes.

15   A    I'm not certain if he had any shares in his own name.

16        If there's something that you have to present to me

17   to refresh my recollection.

18   Q    Well, as you sit here today, do you know whether

19   Mr. Discala traded any shares in SSET?

20        THE COURT:  In his own name?

21        MR. BOWMAN:  In his own name.

22   A    I can't recall him trading anything in his own name.

23   Q    And that's with respect to StarStream?

24   A    Correct.

25   Q    Did you know whether Mr. Discala sold all his

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

VOULGARIS – Cross – BOWMAN                3022
PROCEEDINGS

1    freely-tradeable shares of TSGL owned by him at 1 cent a

2    share?

3    A    As I just said, I don't recall.

4    Q    Do you know whether Mr. Discala traded any shares of TSGL

5    in his own name?

6    A    Again, unless I have the records in front of me, I don't

7    recall right now.

8    Q    You're the case agent; are you not?

9    A    At one point I was the case agent.

10   Q    And what the point was that?

11   A    At the onset I was the co-case agent.  I'd have to say a

12   year, a year and a half ago I became the case agent for this

13   investigation.

14   Q    But you conducted over 50 interviews?

15   A    That's correct.

16   Q    And you as a co-case agent had the responsibility to know

17   what was happening in the investigation?

18   A    That's correct.

19   Q    Did you think it was important for you to know whether

20   Mr. Discala made a profit or a loss trading StarStream or

21   TSGL?

22   A    Within the course of the investigation I'm sure I saw it.

23   At this time I don't recall if I came across those records.  I

24   most certainly did.  I do recall we subpoenaed those records.

25   We did receive lucent data and bank analysis regarding in

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

VOULGARIS – Cross – BOWMAN                    3023
PROCEEDINGS

1    Mr. Discala's accounts.  But I just can't recall at this time.

2    Q    Did you know that Mr. Discala lost $2 million trading

3    Soul?

4    A    I can't --

5              MR. BINI:  Objection.  Relevance.

6              THE COURT:  I'm going to allow it.

7    Q    Did you -- do you understand the question?

8    A    I understand the question.

9    Q    Were you aware that Mr. Discala lost approximately

10   $2 million trading Soul?

11   A    I was aware he did incur a loss.  But to the extent of

12   how much it was, I can't recall.

13             MR. BOWMAN:  Can we have 177-27 Government exhibit,

14   please.

15             THE COURT:  In evidence, Mr. Bowman?

16             MR. BOWMAN:  It's a Government Exhibit 177-27, Your

17   Honor.

18             THE COURT:  The question is, is it in evidence?

19             MR. BOWMAN:  Yes.  Yes.

20             THE COURT:  It's important if the jury's going to

21   see it whether it's in evidence.

22             (Exhibit published.)

23   Q    Are you able to read the names on the left side of the

24   exhibit?

25   A    Yes.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

VOULGARIS - Cross - BOWMAN                    3024
PROCEEDINGS

1    Q    Can you see the name Joseph Salvani?

2    A    Yes.

3    Q    Now, going across to the column where it says

4    "freely-tradeable stock," can you tell us what Government

5    Exhibit 177-27 says with respect to the freely-tradeable stock

6    of Joe Salvani?  How many shares did he have?

7    A    I'm sorry, are we talking about the highlighted in the

8    yellow?

9    Q    Look at the top, you'll see pre-trade, pre-split.

10   A    Okay.

11   Q    Okay?

12   A    Yes.

13   Q    Go down in that column to find Joseph Salvani.

14   A    Correct.

15   Q    And how many freely-tradeable shares did he have?

16   A    312,500.

17   Q    And how many post-split free-trade shares?

18   A    2.5 million.

19   Q    Now do you know what Mr. Salvani received that

20   freely-tradable stock for?

21   A    I don't recall.

22   Q    Did you ever know?

23   A    Possibly.  I don't know at this time.

24   Q    Did you ever interview Mr. Salvani?

25   A    Not that I recall.

VOULGARIS - Cross - BOWMAN                 3025
PROCEEDINGS

1   Q    Do you know whether any of your other agents working on

2   this case ever interviewed Joseph Salvani?

3   A    Not that I recall.

4   Q    Did you know that Mr. Discala, AJ and his family,

5   invested in these companies?

6   A    Which companies?

7   Q    CodeSmart, StarStream, TSGL, and Cubed.

8   A    Yes.

9   Q    And how did you know that?

10  A    Various bank analysis that we've done.

11  Q    So as you sit here today, you are not able to tell us

12  whether with respect to StarStream and TSGL he ever profited

13  from his own trading in those companies?

14  A    I can't recall.

15       MR. BINI:  Objection.  Asked and answered.

16  Q    And with respect to Cubed --

17       THE COURT:  I'm going to overrule the objection, but

18  that's the last time you are going to ask that question.

19  Q    With respect to Cubed, do you know what profit

20  Mr. Discala made from his own trading in Cubed?

21  A    I don't know right now exactly.  If you present me with

22  any kind of analysis or a document.

23  Q    Well, I'm asking you as the case agent --

24       THE COURT:  He doesn't recall, Mr. Bowman.

25       MR. BOWMAN:  Very well, Your Honor.

VOULGARIS - CROSS - RIOPELLE                    3026

1              Thank you very much.  That's all I have.

2              THE COURT:  All right.

3              Any cross for Ms. Cane?

4              MR. RIOPELLE:  Yes, Your Honor.

5              THE COURT:  Mr. Riopelle.

6              MR. RIOPELLE:  Yes, Your Honor.

7    CROSS-EXAMINATION

8    BY MR. RIOPELLE:

9    Q    Good morning, Special Agent Voulgaris.

10   A    Good morning, sir.

11   Q    My name is Roland Riopelle and I represent defendant

12   Kyleen Cane.  I've got some questions for you this morning.

13              If I understood your testimony correctly, during the

14   time you worked on this case, the one about which you're

15   testifying this morning, you worked in what's called unit C1

16   at the FBI?

17   A    That's correct.

18   Q    And that is a unit that specializes in investigations of

19   the type you've described here relating to the financial

20   industry, correct?

21   A    Correct.

22   Q    And there are times when your -- there are times when

23   unit C1 coordinates its investigations with other government

24   agencies that also look at the financial industry, correct?

25   A    What do you mean by "coordinate," sir?

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

1  Q    It's a little sloppy.

2           I think you did testify that there was a time when

3  you went to the Securities and Exchange Commission, correct?

4  A    Yes, sir.

5  Q    And the Securities and Exchange Commission is another

6  government agency, not the FBI, correct?

7  A    That's correct.

8  Q    They're called the SEC, right?

9  A    Yes.

10 Q    And they also investigate the financial industry from

11 time to time, correct?

12 A    Yes.

13 Q    And there are times when indeed the FBI goes to the SEC

14 and gathers information from them, correct?

15 A    Yes.

16 Q    And the same is true of an organization called FINRA,

17 F-I-N-R-A, correct?

18 A    Yes.

19 Q    FINRA is another agency that investigates certain aspects

20 of the financial industry from time to time, correct?

21 A    I'm not certain if FINRA is actually a federal agency or

22 is a privately-held entity.

23 Q    Right, it's actually a -- I think we heard from somebody

24 at FINRA during the case that it's not actually -- the witness

25 testified it's not a government agency, but it's a

VOULGARIS - CROSS - RIOPELLE                     3028

1    self-regulatory body, correct?

2    A    I believe so, yes.

3    Q    And there are times when FINRA has information that is of

4    interest to the FBI, correct?

5    A    Yes.

6    Q    And so there are times, in fact, when the FBI goes to

7    FINRA and obtains information from it, correct?

8    A    That's correct.

9    Q    Now, if I understood you correctly, during your direct

10   examination, you told us that indeed in connection with this

11   case, you and perhaps other agents from C1, spoke to the

12   FBI -- or to the SEC about it, correct?

13   A    Yes.

14   Q    And you obtained records from the SEC relating to this

15   case, correct?

16   A    Yes.

17   Q    And did you obtain records that related to some of the

18   subjects of your investigation?

19   A    From what I can recall, yes.

20   Q    And isn't it a fact, sir, that after that exchange of

21   information with the SEC, you learned that my client had never

22   been the subject of any professional discipline by the SEC?

23              MR. BINI:  Objection, Your Honor.

24              THE COURT:  I'm going to allow it.

25   Q    Did you find that my client, since we're doing findings,

VOULGARIS - CROSS - RIOPELLE                    3029

1   did you find that my client had never been disciplined by the

2   Securities and Exchange Commission?

3   A     I don't recall.

4   Q     You have no recollection then of any discipline being

5   imposed on my client as an attorney who regularly practiced

6   before the SEC; isn't that a fact?

7   A     That's correct, I don't recall.

8   Q     Now this entity, FINRA, that we testified about, they

9   have -- they create something called a CRD; is that right?

10  A     Yes.

11  Q     And you're familiar, based on your experience as an FBI

12  agent, and you told us about a little bit about experience in

13  the financial field, with that type of document, correct?

14  A     Yes.

15  Q     Tell us what a CRD is.

16  A     CRD, what aspect of it?

17  Q     Well, is a CRD, does it describe generally the employment

18  history of a person who is a registered representative?

19  A     Correct.

20  Q     And can you unpack that a little bit for those of us who

21  are not special agents who worked in C1 and tell us what that

22  means?

23  A     Sure.

24        My experience with it is strictly what I recall just

25  on C1.  Basically if you know somebody that's a registered

1   representative or that has traded before, you can go into this

2   check, I think regulated through FINRA, and see their

3   employment history, any complaints or actions against them,

4   other, you know, personal identifiers.

5   Q    And so a CRD -- a registered rep, by the way, that is a

6   broker who has passed certain examinations, correct?

7   A    Yes.

8   Q    Like, for example, a Series 7.  That's a sort of

9   introductory one, correct?

10  A    Yes.

11  Q    Right.  And if you pass your Series 7 examination, you

12  can then go work at a brokerage house, correct?

13  A    You could work in a brokerage house in another capacity.

14  Q    Right, but you can't work as a broker without passing

15  your Series 7?

16  A    Correct.

17  Q    Thank you for correcting me.

18         And once you do that and you become a registered

19  with that brokerage house, a CRD is then created, correct?

20  A    I believe so.

21  Q    Right, and then that lists your employment history for

22  the rest of the time that you work in the financial industry,

23  right?

24  A    As long as your licenses don't lapse.

25  Q    Okay.  And it also lists any disciplinary issues the

VOULGARIS - CROSS - RIOPELLE                    3031

1    particular broker might have, correct?

2    A    Yes.

3    Q    And FINRA makes these CRDs available to the general

4    public, correct?

5    A    I'm not certain.  I believe you need a special log in.

6    Q    Well, do you know that any member of the general public

7    can go into the FINRA database and go into what's called

8    BrokerCheck and look at the CRD?

9    A    I never did that myself.

10   Q    As a special agent on C1 you never did that?

11   A    No.  I've asked other support employees that we've had on

12   our squad do that for me.

13   Q    Okay.  So other support employees would have obtained

14   CRDs.  And you're telling us you don't know how they went

15   about that?

16   A    I believe they went to website and logged in using their

17   log-in information and their password and conducted a check.

18   Q    But you don't know if members of the general public,

19   ordinary mortals like Roland Riopelle, can do that?

20   A    I'm not certain.  I wasn't aware.

21   Q    Okay.  And did you obtain any CRDs in this case?

22   A    Yes.

23   Q    Because, in fact, there were some of the subjects of your

24   investigation who were, in fact, registered representatives,

25   correct?

1    A    That's correct.

2    Q    And they had CRDs that related to them, right?

3    A    Yes.

4    Q    And that would include, just an example, someone like

5    Craig Josephberg, who we heard on tape earlier today, correct?

6    A    Yes.

7    Q    He had a CRD, right?

8    A    Yes.

9    Q    Now, do you recall that at the outset of your testimony,

10   you were asked about your own employment in the financial

11   industry.

12   A    Yes.

13   Q    And you told the jury that, in fact, you worked in the

14   financial industry for about six years before becoming a

15   special agent with the FBI?

16   A    Yes.

17              (Continued on next page.)

18

19

20

21

22

23

24

25

Voulgaris - Cross - Riopelle                    3033

1    (Continuing.)

2    BY MR. RIOPELLE:

3    Q    And do you recall that you were asked where you worked

4    primarily?

5    A    Primarily, yes.

6    Q    Yes.  And you responded, if I understood you correctly,

7    that you worked primarily at BNP Paribas and Merrill Lynch,

8    correct?

9    A    Yes, uh-huh.

10   Q    And by the way, sir, there was a point in time when you

11   passed the Series 7 examination, correct?

12   A    Yes.

13   Q    And a Series 24, what is that?

14   A    I didn't receive a 24, sir.

15   Q    Oh, you didn't.  Okay.  But you did pass a Series 7.

16   A    Yes.

17   Q    And that's the sort of entry-level examination --

18   A    Yes.

19   Q    -- to become a registered representative, correct?

20   A    Yes.

21   Q    And you went to work at BNP Paribas, correct?

22   A    Yes.

23   Q    And you became registered there, right?

24   A    Yes.

25   Q    And it wouldn't surprise you to learn that there's a CRD

                    LAM      OCR      RPR

Voulgaris - Cross - Riopelle                3034

1   available online for someone named Constantine Voulgaris,

2   would it?

3   A    I'm sure there is.

4   Q    And that CRD -- by the way, what did you do at BNP

5   Paribas?

6   A    I started out working in the back office as a consultant

7   through a, I guess, hiring/staffing agency.

8   Q    Let's stop there.

9   A    Sure.

10  Q    And there you were basically making sure trades were

11  properly executed and things like that?

12         What kind of things were you doing in the back

13  office?

14  A    More kind of accountant verification.  I'm trying to

15  recall, sir; it was quite some time ago.  A lot of time going

16  to Secretary of State websites to make sure that certain names

17  were correct on the accounts, you know, their registration

18  hasn't lapsed or things like that.

19  Q    Fair to say clerk-type of work?

20  A    Yes.

21  Q    And over time, you did other work at BNP Paribas?

22  A    Yes.  I got hired full-time or -- I got hired as a

23  permanent employee.  I'm not certain how long I was at the

24  temp agency for.

25  Q    Right.

Voulgaris - Cross - Riopelle                3035

1    A    After I want to say maybe a year, I made the switch to

2    the front office.

3    Q    Okay.  And in the front office, what were you doing for

4    the front office at BNP Paribas?

5    A    I was a client service associate working with the sales

6    and trade desk.

7    Q    And what does a client service associate do with the

8    sales desk at BNP Paribas?  What did you do?

9    A    What I did, so, the sales and traders -- salesmen would

10   bring in clients, traders would book their trades on the

11   client service desk.  I, you know, was given a list of

12   clients.  Every few weeks or every month or quarterly, we'd

13   get trade requests, and I'd have to plug it into our systems,

14   see if it worked out.  Basically, day-to-day manage our

15   clients, but then when it came time for subscription monthly,

16   I'd deal with them a little more closely and pass the trades

17   on to our traders.

18   Q    Am I right, again, this was kind of clerk-type of work?

19   A    This was not clerk-type of work, no, not on the service

20   desk.

21   Q    You were not the sales trader yourself, correct?

22   A    Correct, I was not.

23   Q    You were supporting the people who were actually working

24   on the sales desk, correct?

25   A    Correct.

Voulgaris - Cross - Riopelle                    3036

1   Q    And did you get another promotion from there at some

2   point?

3   A    No.

4   Q    So, you remained in a support role on the sales desk, the

5   institutional sales desk at BNP Paribas, for the period that

6   you worked there; is that a fair statement?

7   A    That is correct.

8   Q    Now, is it correct that you worked at BNP Paribas from

9   about June 2005 to about June 2008?

10  A    As a permanent employee, I'd have to say I'm not certain

11  about the start date.  But then prior to that, again, I was

12  working through a staffing agency there for a considerable

13  amount of time.

14       Sounds correct, though.

15  Q    I'm sorry, I didn't mean to cut you off.

16  A    It sounds generally correct.  Not a hundred percent

17  certain about those dates.

18  Q    And am I correct that you left BNP Paribas in about June

19  of 2008?

20  A    Around that time, yes.

21  Q    And was that a result of the fiscal crisis that was then

22  erupting in the financial industry?

23  A    Correct.  I was laid off.

24  Q    You were laid off from BNP Paribas after working there

25  for about three years in a supporting role, correct?

*LAM        OCR        RPR*

Voulgaris - Cross - Riopelle                    3037

1      MR. BINI:  Objection, your Honor.  Relevance.

2  Q    You were a relatively junior employee and you were laid

3  off, correct?

4      THE COURT:  We've established that, Mr. Riopelle.

5  Why don't you move on?

6  Q    And then you were you unemployed for about six months; is

7  that right?

8  A    Yes.

9  Q    And it was then that you got your job at Merrill Lynch

10 that was one of your primary jobs in the financial industry,

11 correct?

12 A    Yes.

13 Q    And that was then in about December of 2008, wasn't it?

14 A    Yes.

15 Q    And what job did you have at Merrill Lynch in December of

16 2008?

17 A    The title I'm not certain about, but I was brought in to

18 work with retail clients on the brokerage side.

19 Q    And was that as a junior broker type of a person?

20 A    Yes.

21 Q    And you were trying to open accounts and things like

22 that?

23 A    At that time I wasn't trying to open accounts, I was

24 mainly doing -- studying on their products as well as trying

25 to obtain additional licenses.

Voulgaris - Cross - Riopelle                3038

1   Q     Isn't it a fact that you left Merrill Lynch in or about

2   March of 2009?

3   A     Yes.

4   Q     So, you lasted at Merrill Lynch for about four months,

5   correct?

6   A     I was laid off, correct.

7   Q     You were laid off after four months of employment at

8   Merrill Lynch, correct?

9           MR. BINI:  Objection, your Honor.

10          THE COURT:  Sustained.

11          He just told you that, Mr. Riopelle.

12  Q     Now, after being laid off at Merrill Lynch, you went to

13  work for a business called Annuity Funding, correct?

14  A     Very briefly, yes.

15  Q     You lasted at Annuity Funding for about five months,

16  right?

17  A     I wasn't a full-time employee.  I was trying to do some

18  consulting work with that company.

19  Q     Did you work with them for about five months, sir?

20  A     I'd have to say so, yes.

21  Q     And would it help you if I showed you the CRD for

22  Constantine Voulgaris?

23  A     Sure.

24          MR. RIOPELLE:  I'm going to show you what I've

25  marked Kyleen Cane CV-1.

*LAM        OCR        RPR*

Voulgaris - Cross - Riopelle                3039

1          MR. BINI:  Can I take a look at it for a second?

2          MR. RIOPELLE:  Sure.  I have a copy.

3          THE WITNESS:  Thank you, sir.

4          MR. RIOPELLE:  There you go, Special Agent.

5     Q     Having looked at this, does this refresh your

6     recollection that you were at Annuity Funding for about five

7     months?

8     A     Which page would you like to direct me to?

9               I see it right here.

10    Q     You see it?

11    A     I see it, yes.

12    Q     Thank you.

13              Is that correct?

14              THE COURT:  Does that refresh your recollection?

15              THE WITNESS:  Yes, it does.

16    Q     Can you tell us, sir, what kind of business Annuity

17    Funding was?

18    A     They tried -- I believe their manifest was to provide

19    small businesses with short-term funding solutions.

20    Q     Annuity Funding was what's known as a "hard money" type

21    lender, correct?

22    A     I'm not familiar with the term.

23    Q     Annuity Funding was a business that made loans to people

24    who couldn't get loans from banks, right?

25    A     Yes.

*LAM       OCR       RPR*

Voulgaris – Cross – Riopelle                3040

1   Q     And Annuity Funding was a business that charged an

2   interest rate higher than that charged by your typical

3   commercial bank, correct?

4   A     Yes.

5   Q     Because those loans were regarded by Annuity Funding as

6   somewhat risky, right?

7   A     Yes.

8   Q     And you were there for a little longer than you worked at

9   Merrill Lynch, correct?

10  A     Yes.

11  Q     But you didn't tell us about Annuity Funding when you

12  told us about what your primary work in the financial industry

13  was, did you?

14          MR. BINI:  Objection, relevance.

15          THE COURT:  Sustained.

16  Q     And after Annuity Funding, you went to work at a place

17  called David Lerner Associates, right?

18  A     That's correct.

19  Q     And David Lerner Associates is a brokerage out on Long

20  Island, correct?

21  A     I believe they have multiple locations.

22  Q     Did you work at the one on Long Island or the one in

23  Teaneck, New Jersey?

24  A     I was hired at the one in Teaneck, New Jersey, but I went

25  for onboarding for two days.  I didn't actually work there.

Voulgaris - Cross - Riopelle                    3041

1    Q    You didn't actually work there.

2    A    I went to the onboarding maybe a week.

3    Q    Why didn't you actually work there?

4    A    I was pursuing other potential employment opportunities.

5    Q    You never actually worked at David Lerner Associates?

6    A    I did, I was hired there; I resigned shortly after

7    onboarding.

8    Q    And what did you go to do after David Lerner Associates?

9    A    I worked at a company called Financial Tracking

10   Technologies.

11   Q    And what did Financial Tracking Technologies do?

12   A    Financial Tracking Technologies was a company that --

13   they assisted other entities track to find benefits or to find

14   contribution claims through their systems electronically.

15   Q    How long did you work at that firm?

16   A    Approximately a year, maybe just shy of a year.

17   Q    And it was after that that you went to work with the

18   Federal Bureau of Investigation?

19   A    Correct.

20   Q    And you didn't tell us about that firm when you told us

21   about your primary employment in the financial industry,

22   correct?

23        MR. BINI:  Objection, your Honor.

24        THE COURT:  Sustained.

25   Q    It's fair to say you worked at that firm considerably

*LAM        OCR        RPR*

Voulgaris - Cross - Riopelle                    3042

1    longer than you worked at Merrill Lynch, isn't it?

2    A    Yes.

3    Q    Now, at the time you went to the Securities and Exchange

4    Commission to research the background of persons who were

5    subjects of your investigation, am I correct that you looked

6    into a number of different people?

7    A    Yes.

8    Q    Did the name Hunter Adams come up during your

9    investigation?

10   A    It did.

11   Q    And at the time you went to the Securities and Exchange

12   Commission, did you ask them if they had information about

13   Hunter Adams?

14   A    I don't recall.  I do remember the name in the course of

15   the investigation; I don't recall if I asked the SEC regarding

16   Hunter Adams.

17   Q    Did you look into Hunter Adams or do you have a

18   recollection of that?

19   A    I'm not sure how in depth we did.  Again, I recall the

20   name.

21   Q    Did you learn during your investigation that Mr. Adams

22   had a prior conviction for securities fraud?

23   A    I don't recall right now.

24   Q    Did you learn during your investigation that he

25   physically threatened Marc Wexler?

*LAM        OCR        RPR*

Voulgaris - Cross - Riopelle          3043

1   A    I don't recall.  If there's a document that I can refresh

2   my recollection...

3   Q    Sure.  Let me show you what's been marked Government

4   Exhibit 3500-MW-3.

5   A    Thank you.

6   Q    It's a relatively long document, but if you look at Page

7   9, that's where I'd like to direct your attention.

8            Have you had a chance to review that.

9   A    The third paragraph, yes, I did.

10  Q    By the way, this is a report written by Special Agent

11  Braconi?

12  A    Correct.

13  Q    And Special Agent Braconi was your partner in C-1 right?

14  A    Yes.

15  Q    Because each special agent has a partner.  That's the way

16  it works, isn't it?

17  A    No.

18  Q    But he was your partner?

19  A    For this investigation.

20  Q    For this investigation, correct?

21  A    Correct.

22  Q    So, having read this report, does it refresh your

23  recollection that you learned during your investigation that

24  Mr. Adams physically threatened Marc Wexler?

25  A    I'm sure I reviewed this and learned about it.  Seeing

*LAM       OCR       RPR*

Voulgaris - Cross - Riopelle                    3044

1    this refreshes my recollection of Hunter Adams.  I don't

2    recall that specific line, but I'm sure I reviewed this

3    before.

4    Q    Did you learn that by virtue of this physical threat

5    Mr. Adams effectively extorted money from Mr. Wexler and the

6    other shareholders in Cubed?

7    A    The report says that Wexler and Discala gave Adams his

8    investment back.

9    Q    And do you know whether other investors got their entire

10   investment back in Cubed or was it just Mr. Adams?

11   A    This says Mr. Adams received his money back and that

12   potentially he had his investment in his sister-in-law's name.

13   Q    And, so, did you, when you got information like this,

14   investigate Mr. Adams further?

15   A    I don't recall.

16   Q    Let me ask you this:  Was Mr. Adams some kind of

17   informant for you in this investigation?

18   A    For me, personally?  No.

19   Q    For the FBI, to your knowledge?

20   A    To my knowledge, no.

21   Q    So, you just never looked into this conduct; is that

22   right?

23   A    I don't recall if we looked into it any further than

24   this.

25   Q    You did nothing about a physical threat to one of your

*LAM      OCR      RPR*

Voulgaris – Cross – Riopelle                    3045

1    witnesses; is that your testimony?

2    A     I don't recall.  I didn't do anything.

3    Q     Now, do you recall that the Securities and Exchange

4    Commission brought a civil complaint at the time that the FBI

5    arrested the Defendants in your case?

6    A     Yes.

7    Q     And do you recall that --

8              MR. BINI:  Objection, your Honor.  Request for

9    sidebar.

10             THE COURT:  Sure.

11

12             (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following occurred at sidebar.)

2          MR. BINI:  Your Honor, the Government objects to

3    this line of questioning because I believe that Cane counsel

4    is going to the SEC complaint, which does not include

5    Ms. Cane.  And, of course, we're not permitted to share

6    wiretaps with the SEC.  And, in any event, this is not an

7    incident where he can take advantage of Rule 408 to put in

8    evidence regarding a parallel investigation in this case.

9          So, the Government objects to this line of

10   questioning as both hearsay from the SEC, A; B, on 403 grounds

11   as confusing to the jury and irrelevant.

12         MR. RIOPELLE:  Your Honor, it is a fact that my

13   client was not named in the SEC complaint.  I think this

14   witness has indicated that he and the FBI did share

15   information with the SEC.  The SEC, of course, has a much

16   lower burden of proof to file a complaint than the Government

17   has here, so I don't see that there's any harm in pointing out

18   that the SEC never charged my client with anything.

19         THE COURT:  It's out on 403 grounds.

20         MR. RIOPELLE:  Thank you, your Honor.

21

22         (Continued on next page.)

23

24

25

Voulgaris - Cross - Riopelle                3047

1          (Sidebar ends; in open court.)

2          THE COURT:  Mr. Riopelle.

3          MR. RIOPELLE:  Yes.

4    BY MR. RIOPELLE:

5    Q     Special Agent Voulgaris, I believe you told us that you

6    and the other agents of the Federal Bureau of Investigation

7    interviewed a number of the subjects of your investigation;

8    correct?

9    A     Yes.

10   Q     You also interviewed some of the persons you thought were

11   victims of the conduct that you were investigating, correct?

12   A     Yes.

13   Q     And you also interviewed persons who you regarded as

14   simply witnesses to material events, correct?

15   A     Yes.

16   Q     You mentioned a person named George Castillo during your

17   direct examination; do you recall that?

18   A     Yes.

19   Q     And that was a name of significance to you in your

20   investigation, correct?

21   A     Yes.

22   Q     Mr. Castillo was the broker at Glendale Securities,

23   correct?

24   A     Yeah, he was a broker at Glendale.

25   Q     And he, in fact, was the broker for an account of David

Voulgaris - Cross - Riopelle                    3048

1   Ben-Bassat; am I correct?

2   A    Correct.

3   Q    And Mr. Castillo was interviewed by the FBI; is that

4   correct?

5   A    He was.

6   Q    And there was a report written by the FBI in connection

7   with that interview, correct?

8   A    There was.

9   Q    And am I correct that there was no follow-up interview

10  that you're aware of with Mr. Castillo?

11           THE COURT:  Subsequent to the report.

12           MR. RIOPELLE:  Subsequent to the report, yes.

13  A    Not that I can recall.

14  Q    Now, I think you told us that, in fact -- let me see what

15  we have here.

16           I think we looked at in your direct exam some text

17  messages between my client and George Castillo; do you recall

18  those?

19  A    Yes.

20  Q    And you had those text messages at the time you

21  interviewed Mr. Castillo, correct?

22  A    I don't recall.  If you could show me the date of the

23  interview and...

24  Q    Sure.  Let me show you what's been marked for

25  identification as Government 35-HS-1.

Voulgaris - Cross - Riopelle                    3049

1          MR. RIOPELLE:  May I approach the witness, your

2  Honor?

3          THE COURT:  You may.

4          MR. RIOPELLE:  Forgot to ask the last time.  Sorry

5  about that.

6  Q    Having reviewed this report, does it refresh your

7  recollection that the interview of Mr. Castillo occurred in

8  October of 2014?

9  A    Yes.

10 Q    By that time, you had -- the FBI had, I should say,

11 arrested my client, Kyleen Cane, correct?

12 A    Yes.

13 Q    And at that point, at the time of her arrest, the agents

14 arresting her seized her cell phone; am I right?

15 A    Yes.

16 Q    And a search warrant was obtained for her cell phone,

17 correct?

18 A    That's correct.

19 Q    And that's how the FBI got the text messages from her

20 phone, correct?

21 A    Yes.

22 Q    So, by this point, October of 2014, it's correct to say,

23 is it not, that the FBI had in its possession the text

24 messages between my client and Mr. Castillo?

25 A    I can't say with certainty that they were extracted from

LAM        OCR        RPR

Voulgaris - Cross - Riopelle                3050

1    the phone yet, that the phone was imaged at that point, but we

2    did have the phone in our possession.

3    Q    You did have the phone in your possession.

4    A    Correct.

5    Q    And is it correct to say that during your investigation,

6    the FBI's investigation, I should say, the FBI obtained

7    records relating to the Ben-Bassat account at Glendale

8    Securities?

9    A    Yes.

10   Q    And is it correct to say that the records that had been

11   obtained were in the FBI's possession when they had an

12   opportunity to interview, and they did interview,

13   Mr. Castillo?

14   A    Yes.

15   Q    And by the way, I don't remember if we saw this on your

16   direct exam, but you know, do you not, that among the records

17   at Glendale Securities is a trading authorization by which

18   Mr. Ben-Bassat gives my client, Ms. Cane, authorization to

19   place trades in his account at Glendale Securities?

20   A    I did review that document, yes.

21   Q    Okay.  And just so we're clear, that document is a

22   standard type of document, I want to say, in the securities

23   industry.  This does happen, correct?

24   A    I believe it does.  I'm not certain if this is the

25   standard document or --

Voulgaris - Cross - Riopelle                    3051

1    Q    Right, you don't know what the form is, but it is correct

2    to say, is it not, that it is not unusual for a person with a

3    securities account to give another person the authorization to

4    enter trades in that account?

5    A    I'm not certain how common it is.

6    Q    But it does happen, correct?

7    A    I believe so, yes.

8    Q    And this is not the only time in the history of the

9    securities industry it's ever happened, correct?

10   A    I wouldn't say so, yes.

11   Q    And there's nothing, by the way, illegal in one person

12   giving another person the authority to trade in their account?

13   A    As long as it's documented properly.

14   Q    And you have no reason to believe that the document in

15   this case was an improper documentation.

16   A    I don't believe so.

17   Q    Now, among the items that we have seen in evidence --

18            MR. RIOPELLE:  Could we have the Elmo on,

19   Mr. Villanueva?

20            Thank you.  I'm going to use the Elmo so we can

21   speed through this a little bit.

22   Q    Government Exhibit 149-4 in evidence, do you see this

23   item here, Special Agent Voulgaris?

24            (Exhibit published to the jury.)

25   A    Yes.

Voulgaris - Cross - Riopelle                    3052

1    Q    The top document here is something called a "trade

2    confirmation;" is that right?

3    A    Yes.

4    Q    And based on your experience working in the securities

5    industry and your experience in Squad C-1, you know what a

6    trade confirmation is, correct?

7    A    Yes.

8    Q    Tell us what a trade confirmation is?

9    A    Generally, it's just a receipt of a securities

10   transaction.

11   Q    And it tells the owner of the account what trade was

12   executed in his or her account, correct?

13   A    That's correct.

14   Q    And, indeed, these confirmations are required to be sent

15   out within a certain period of time from the trade, correct?

16   A    I'm not certain about that.

17   Q    But you will concede that this does give the owner of the

18   account notice of what's going on in his account, correct?

19   A    Yes.

20   Q    And do you understand, based on your experience, that

21   typically the confirm might come before the month end

22   statement, correct, or do you know that?

23   A    I can't say for certain.

24   Q    Now I'm just looking at the top trade here.  This

25   describes the order at issue.

Voulgaris - Cross - Riopelle                    3053

1        And when we say an "order," what are we referring

2   to, you and I?

3   A    A trade.

4   Q    The trade.  Somebody has to order a trade, right?

5   A    Yes.

6   Q    And there are many different kinds of orders, but one way

7   that an order can -- it's either solicited or unsolicited.

8   That's one characteristic of an order or a trade; correct?

9   A    That's correct.

10  Q    And a broker, do you know that brokers are required to

11  mark on their paperwork whether an order is solicited or not

12  solicited?

13  A    I believe they do.

14  Q    And the idea there is that a solicited order is one that

15  the broker is proposing to the client, correct?

16  A    Yes.

17  Q    And an unsolicited order is one that the client is asking

18  the broker to execute, correct?

19  A    Yes.

20  Q    And, so, on this one we see it's an unsolicited order,

21  correct?

22  A    Yes.

23  Q    And what that tells us is that the order has originated

24  with the client, correct?

25  A    Yes.

Voulgaris - Cross - Riopelle                    3054

1   Q    And do you know as you sit here whether all of the orders

2   relating to Cubed in the Ben-Bassat account are unsolicited?

3   A    I don't know if I can look through the trading records.

4   Q    Let me show you Government Exhibit 149-4 and just ask you

5   to flip through quickly -- it won't take you that long -- and

6   tell me whether all the orders are unsolicited.

7   A    Thank you.

8             THE COURT:  Mr. Riopelle, while he's doing that, can

9   you give me a ballpark of how long you have?

10            MR. RIOPELLE:  I probably have a good 'nother

11  half-hour to an hour, depending on how it goes, Judge.

12            THE COURT:  Then we'll do after this question --

13            MR. RIOPELLE:  Take our break.

14            THE COURT:  Yes.

15            MR. RIOPELLE:  Perfect.

16            THE COURT:  Or do you have more questions with

17  respect to this document?

18            MR. RIOPELLE:  Yes, I have a fairly long continuing

19  exam in this line, but this is a good place to break.

20            THE COURT:  After the answer to the pending

21  question.

22            MR. RIOPELLE:  Yes, he'll tell us whether the orders

23  are unsolicited or not, if he doesn't die of paper cuts

24  before.

25  Q    You've had a chance to look at them all?

*LAM      OCR      RPR*

1   A    Yes, I did.

2   Q    Am I correct that each of these orders is an unsolicited

3   order?

4   A    Yes.

5   Q    Just to tie it off, what that means is that the orders,

6   each of these orders, originated with the customer who asked

7   the broker to execute the order in a certain way rather than a

8   solicited order, which is the broker coming up with an idea

9   and pitching it to the client.

10  A    That's correct.

11           MR. RIOPELLE:  Judge, this might be a good time.

12           THE COURT:  Sounds like a plan, Mr. Riopelle.

13           Ladies and gentlemen, we'll take our first for break

14  of the day.  The usual recess rules apply.  Don't discuss the

15  case amongst yourselves or with anyone else you may run into

16  in the back.  Continue to keep an open mind.

17           Come back in about 15 minutes or so.

18           (Jury exits.)

19           THE COURT:  Special Agent, you may step down.

20           We'll see you in about 15.

21           MR. BINI:  Thank you, your Honor.

22           MR. RIOPELLE:  Thank you, Judge.

23           (Recess taken.)

24           THE COURT:  Court is back in session.  All counsel

25  are present as well as the Defendants.

1              Are you ready, Mr. Riopelle?

2              MR. RIOPELLE:  I just need the witness, Judge.

3              (Witness resumes the stand.)

4              (Jury enters.)

5              THE COURT:  Be seated, please.

6              Counsel will stipulate that the jury is present and

7    properly seated?

8              MS. JONES:  Yes, your Honor.

9              MR. ROSS:  Yes, Judge.

10             MR. RIOPELLE:  Yes, Judge.

11             THE COURT:  Thank you, counsel.

12             Welcome back, ladies and gentlemen.  Special Agent

13   Voulgaris is back on the stand and Mr. Riopelle will continue

14   his cross-examination.

15             MR. RIOPELLE:  Thank you, your Honor.  May I

16   inquire?

17             THE COURT:  You may.

18   BY MR. RIOPELLE:

19   Q    Special Agent Voulgaris, before we broke we were talking

20   about orders for securities and how some orders are solicited

21   and some orders are unsolicited; do you remember that

22   testimony?

23   A    Yes.

24   Q    Is it correct that there are other ways -- that there's

25   something called a "limit order"?  Let me just cut right to

Voulgaris - Cross - Riopelle                    3057

1    the chase.

2    A     Yes.

3    Q     And a limit order is an order given to a broker that

4    limits the broker's discretion in executing the order; is that

5    a fair statement?

6    A     I'm not certain right off the top of my head.

7    Q     Do you understand, a limit order is fairly common in the

8    securities industry; is it not?

9    A     Again, "common," depends what kind of product you're

10   dealing with.  I don't know how common it would be.

11   Q     How about trading an ordinary stock, fairly common in

12   that context?

13   A     I believe so.

14   Q     Now, a limit order can be limited in terms of the price

15   of execution, correct?

16   A     Again, off the top of my head, I can't recall, but, yeah,

17   you would set certain parameters.

18   Q     And that's all I'm trying to get at, that if a customer

19   gave his or her broker a limit order they might tell the

20   broker don't sell below a certain price, correct?

21             THE COURT:  Can a customer do that?

22   Q     Can a customer do that?

23   A     I believe so.

24   Q     In fact, it is commonly done; is it not?

25   A     Again, I don't know how common, but I'll...

*LAM        OCR        RPR*

Voulgaris - Cross - Riopelle                3058

1    Q    Would it be fair to say that it happens every day in the

2    securities industry?

3    A    I'm sure it does.

4    Q    And another way that an order might be limited would be

5    as to time, correct?

6         Sell today or don't sell, correct?

7    A    Yes.

8    Q    Now, there are also something called "market orders,"

9    right?

10   A    Yes.

11   Q    And that's when you call -- the customer calls the broker

12   and says, Just sell at whatever price the market is at,

13   correct?

14   A    I believe so, yes.

15   Q    Now, we saw that the orders in Government Exhibit

16   149-4 -- those are those trade confirmations -- were all

17   unsolicited orders, correct?

18   A    Yes.

19   Q    And I think we established that unsolicited orders are

20   those orders that are communicated to a broker by the

21   customer, correct?

22   A    Yes.

23   Q    And is there such a thing as a "standing" order?

24   A    Possibly.  I'm not familiar with the term.

25   Q    Well, it's not uncommon, is it, for a customer to give

Voulgaris - Cross - Riopelle                    3059

1   instructions to a broker that remain in place over time?

2   A    I'm not familiar with a standing order.  I don't know if

3   it's common or not.

4   Q    You've never heard of, despite your experience in the

5   securities industry, an order, for example, to, Sell these

6   shares at the best price you can get in the market over time.

7   A    I guess it's possible.

8   Q    I'm not asking to you guess.  You worked on a sales desk,

9   right?

10  A    It was a different product line.

11  Q    Okay.

12  A    I wouldn't deal with those kind of orders.

13  Q    You didn't deal with those kind of orders.

14       You worked at Merrill Lynch for three months.  Do

15  you remember ever dealing with an order like that at Merrill

16  Lynch, one that stayed open over time?

17  A    Again, I didn't deal with clients at Merrill Lynch .

18  Q    You do know based on your investigation that the trades

19  executed in the Ben-Bassat account were all executed over $5.

20  You know that, don't you?

21  A    Yes.

22  Q    And you know from your investigation that those trades

23  were executed over a couple of months of time, correct?

24  A    Correct.

25  Q    Primarily, May and June of 2014, correct?

Voulgaris - Cross - Riopelle                    3060

1    A    April through June.

2    Q    End of April through June, how about that?

3    A    Okay.

4    Q    And you know from your investigation that there were few

5    communications between Mr. Ben-Bassat and the broker at

6    Glendale, correct?

7    A    There was some, I don't what you determine a "few" is.

8    Q    There were some.

9         Is it fair to say, having now looked at -- and you

10   know there were a lot of orders in the account, correct?

11   A    Yes.

12   Q    Is it fair to say, based on your recollection of the

13   investigation that you conducted, that there was not a

14   communication between Mr. Ben-Bassat and Mr. Castillo every

15   time one of these orders was executed?

16   A    The best I can recall, not every time.

17   Q    In fact -- I don't think I have it.

18        Do you recall that there was a chart prepared that

19   showed the communications between Mr. Ben-Bassat and

20   Mr. Castillo?

21        Did you ever see that chart?

22   A    I don't think I did.

23   Q    Now, you did have my client's cell phone, correct?

24   A    Yes.

25   Q    And you did -- the FBI, not you personally, the FBI,

*LAM      OCR      RPR*

Voulgaris – Cross – Riopelle                3061

1   those guys in the IT unit or whatever they are, they extracted

2   from my client's cell phone certain text messages, correct?

3   A     They imaged the phone.

4   Q     And ultimately obtained messages from my client's phone?

5   A     As part of the image, yes.

6   Q     As part of the image.

7              And some of those text messages were communications

8   between my client and Mr. Castillo, correct?

9   A     Yes.

10  Q     But it is correct to say, is it not, that those text

11  messages do not account for all these orders; is that right?

12  A     Correct.

13  Q     There are a limited number of text messages as compared

14  to the large number of orders, correct?

15  A     Yes.

16  Q     And am I correct that during your investigation the FBI

17  obtained phone records relating to my client?

18  A     I believe so, yes.

19  Q     And I take it that you or other persons of the FBI would

20  analyze those phone records.

21  A     Yes.

22  Q     Do you recall, as you sit here now, the fact that those

23  phone records do not show a phone call from my client to

24  Mr. Castillo in connection with each one of these orders?

25  A     I don't recall.  I don't know if I even saw the raw

1    records.  I've seen the analysis, I'm sure.

2    Q    So, as you sit here today, it's fair to say, to tie off

3    this line of inquiry, that you are not aware of a contact

4    between either Mr. Ben-Bassat or my client with Mr. Castillo

5    before each one of these orders was executed?

6    A    I can't say for certain.

7    Q    Right.  And, therefore, it's true, isn't it, that these

8    confirms that we have in Government Exhibit 149-4 are

9    consistent with the notion of a single order at the beginning

10   of the trading activity which was then executed over time by

11   Mr. Castillo?

12            That's an explanation for the evidence that you

13   found in your investigation; is it not?

14   A    I didn't come to that conclusion.

15   Q    Pardon?

16   A    I didn't come to that conclusion.

17   Q    You didn't come to that conclusion despite the fact that

18   you were unable to find a phone call from my client to

19   Mr. Castillo or a text from my client to Mr. Castillo in

20   connection with each one of these orders, correct?

21   A    I would have to review the toll records to do the actual

22   analysis right now to see if there's communication, whether it

23   be voice communication or text communication, to Mr. Castillo.

24   Q    As you sit here now, you're not aware of such

25   communication?

1  A    I don't recall.

2  Q    You'd have to go back and look again at the results of

3  your investigation, correct?

4  A    Correct.

5  Q    Isn't it a fact, sir, that these confirmations are

6  consistent with a standing order to sell shares above $5?

7  A    Again, I'm not familiar with what a standing order is.  I

8  never worked with that.

9  Q    Now, we did see some texts during your direct examination

10  and we have seen some during the trial.  I'd like to show

11  you --

12         By the way, one last thing.  In Mr. Ben-Bassat's

13  account at Glendale in Cubed, is it correct, sir, that

14  Mr. Ben-Bassat did not buy any shares of Cubed during the time

15  period that his account was actively trading those shares?

16  A    He was selling shares.

17  Q    He was only selling, correct?

18  A    Yes.

19  Q    Thank you.

20         Now I'd like to show you Government Exhibit 129-105,

21  which I believe is in evidence.  And you may have even looked

22  at it during your direct exam.

23         (Exhibit published to the jury.)

24  Q    These, I believe, are texts --

25         MR. BINI:  That was not admitted.  Objection.

Voulgaris - Cross - Riopelle                     3064

1          MR. RIOPELLE:  I'll take it off.  Sorry about that.

2     Q    Do you recall, as you sit here now, that there were text

3     messages from Mr. Discala to my client requesting that she

4     order Mr. Castillo to buy stock in Cubed?

5     A    I don't recall.  I'd have to see some kind of record.

6     Q    Let me show you what's been marked Government Exhibit

7     129-05 for identification.

8               Have you had a chance to review that?

9     A    Yes.

10    Q    Does that refresh your recollection that there were

11    occasions when Mr. Discala asked my client to instruct

12    Mr. Castillo to buy shares of Cubed?

13    A    I don't recall putting my eyes on this before --

14    potentially, I did -- but, yes, it shows that Mr. Discala is

15    requesting Ms. Cane to purchase.

16    Q    And, in fact, we know from your testimony just a moment

17    ago that didn't happen, right?

18    A    Correct.

19    Q    Ms. Cane, to use the vernacular, shined Mr. Discala on

20    that one, correct?

21              MR. BOWMAN:  Objection, your Honor.

22    Q    Ms. Cane did not execute the order requested by

23    Mr. Discala, correct?

24    A    I don't know if there was direction given to George to

25    execute the order.  George would be doing the execution.

                    *LAM      OCR      RPR*

Voulgaris - Cross - Riopelle                    3065

1   Q    But you know that the request was not to execute the

2   order at a specific price, was it?

3   A    Are you talking about this specific instruction?

4   Q    Yes, sir.

5        That's simply a buy, isn't it?

6   A    Correct.  There's no price stated.

7   Q    If Mr. Castillo got that order, it's an order to buy at

8   market, correct?

9   A    I would have to see what -- determine exactly what

10  Ms. Cane told Mr. Castillo, if there was communication.

11  Q    But in any event, the findings of your investigation were

12  that Mr. Castillo never bought a share of Cubed in the

13  Ben-Bassat account; isn't that correct, sir?

14  A    As far as I can recall, yes.

15       MR. RIOPELLE:  Now I'm going to ask for some help

16  from my colleagues at the Government table.  Is this exhibit,

17  129-59, in evidence?

18       PARALEGAL ISHITANI:  Yes.

19       MR. RIOPELLE:  Henry says yes.  We have a definitive

20  ruling.  This one is in evidence.

21       (Exhibit published to the jury.)

22  Q    I'd like to show you what's Government 125-59, and this

23  one is in evidence.  And I don't recall as I sit here or stand

24  here, Special Agent Voulgaris, whether, in fact, you testified

25  about this on your direct exam.

LAM        OCR        RPR

Voulgaris – Cross – Riopelle                    3066

1      Do you recognize this to be a text message incoming
2  to my client's phone from Marc Wexler?
3  A     Yes.
4  Q     And that is a text message from Marc Wexler to my client,
5  asking her to contact Glendale, correct?
6  A     Yes.
7  Q     And "Glendale" means George Castillo, correct?
8  A     I would have to assume, yes.
9  Q     And the message reads:  Ask him about left.
10      Do you know, based on your investigation, what that
11  refers to?
12  A     The "left" would be the bid.
13  Q     The bid.
14      And just so we're clear, to make it clear for the
15  jury, a broker or market maker publishes to the market what's
16  called a "bid" and an "ask," correct?
17  A     Yes.
18  Q     And the "bid" is what you're willing to buy the stock
19  for, correct?
20  A     Yes.
21  Q     And the "ask" is what you're willing to sell the stock
22  for, correct?
23  A     Yes.
24  Q     And there's typically what's called a little spread
25  between those?

Voulgaris – Cross – Riopelle                    3067

1    A    Correct.

2    Q    So, with that in mind, what Mr. Wexler appears to be

3    asking my client to do in this case is to move the price --

4    ask Mr. Castillo to move the price at which he is offering to

5    buy shares of Cubed, correct?

6    A    I don't see any reference to asking him to move anything,

7    just asking about "left."

8    Q    There's reference to asking Mr. Castillo about his bid to

9    buy shares of Cubed, correct?

10   A    From this, I can't infer if it's his bid or just a bid.

11   Q    So, in any event, we know that the Ben-Bassat account

12   never did buy shares in Cubed, correct?

13   A    Yes.

14   Q    During your direct examination, I believe you were shown

15   a series of texts between a gentleman named Joe Laxague and my

16   client, Kyleen Cane; do you remember that?

17   A    Yes.

18   Q    And those texts related to a company called Northwest

19   Resources; am I right?

20   A    Some of them, yes.

21   Q    And I just want to review them briefly with you now.

22        (Exhibit published to the jury.)

23   Q    This is Government Exhibit 129-92, and it talks about

24   somebody named Jeff Chong and Northwest Remmington and

25   Thompson, correct?

*LAM        OCR        RPR*

Voulgaris – Cross – Riopelle                    3068

1    A    Yes.

2    Q    And Jeff Chong -- and this text, by the way, is in March

3    of 2013, correct?

4    A    Yes.

5    Q    That is almost a year before my client began working with

6    the company that became Cubed, correct?

7    A    Northwest Resources did become Cubed.

8    Q    Okay.  But how about Crackpot?  Crackpot, my client

9    didn't begin to work with Crackpot until early 2014; isn't

10   that right?

11   A    I'd have to see the records when they were for certain

12   communicating, but it was at this time.

13   Q    In any event, this fellow Jeff Chong he was not a subject

14   of your investigation in the Cubed investigation, correct?

15   A    Not that I can recall.

16   Q    And in March of 2013, the transaction that ultimately

17   resulted in Cubed had not yet begun, correct?

18   A    Correct.

19   Q    So, this text doesn't directly have anything to do with

20   Cubed, correct?

21            THE COURT:  With Cubed in mind?

22            MR. RIOPELLE:  Yes.

23   Q    There's no indication that Jeff Chong had anything to do

24   with Cubed.  You didn't find that in your investigation.

25   A    Not that I can recall.

                   *LAM      OCR      RPR*

Voulgaris - Cross - Riopelle                    3069

1    Q     Let's look at another one.

2          (Exhibit published to the jury.)

3    Q     Government Exhibit 129-93, I think you testified a little

4    bit about this one.  This is, again --

5          MR. BINI:  There was no testimony about that.

6          MR. RIOPELLE:  Okay.  We'll skip that one.

7          How about 129-94, did we have any testimony on that

8    one?

9          MR. BINI:  We did.

10         (Exhibit published to the jury.)

11   Q     Let's look at 129-94.  This, again, is a series of text

12   messages between Joe Laxague and my client, correct?

13   A     Yes.

14   Q     And if we look down, there is a reference to Northwest

15   Resources, correct?

16   A     Yes.

17   Q     And there's talk about potentially selling that company

18   to somebody named Lazar, correct?

19   A     Yes.

20   Q     And it goes on over there and there's talk about a cost

21   or a sales price of 300,000 for each of the companies

22   mentioned in the texts, correct?

23   A     For each -- if you could, scroll it.

24   Q     There's Northwest and Thompson there.

25   A     Okay, yes.

*LAM      OCR      RPR*

Voulgaris - Cross - Riopelle                    3070

1    Q    And you see the last text is 300 each.

2    A    Yes.

3    Q    And this fellow Lazar, he was -- and these texts are all

4    going on in June of 2013, correct?

5    A    Yes.

6    Q    And that is long before the transaction begins that is

7    connected to -- that results in the company called Cubed,

8    right?

9    A    Right.

10   Q    And this fellow Lazar, he is not a subject -- he was not

11   a subject of your investigation in this case, correct?

12   A    Not that I can recall.

13   Q    And am I correct that these text messages are about

14   trying to sell Northwest Resources long before it was sold in

15   connection with the transaction that resulted in Cubed?

16   A    Yeah.

17   Q    And there are texts about selling the company to somebody

18   other than a person who was a subject of your investigation

19   insofar as it related to Cubed?

20   A    In relation to Lazar and Jeff Chong, yes.

21   Q    Thank you.  I was just going to go ask, Jeff Chong is the

22   same story, right?

23   A    Yes.

24        MR. RIOPELLE:  I'm going to rely on the Government.

25        129-95, is that in evidence?

*LAM        OCR        RPR*

Voulgaris - Cross - Riopelle                3071

1          MR. BINI:  Henry says it is.

2          MR. RIOPELLE:  If Henry says it's so, it must be so.

3          (Exhibit published to the jury.)

4    Q    Agent Voulgaris, I'm showing you what's marked in

5    evidence as Government Exhibit 129-95, another text message

6    between Joe Laxague and my client, in June of 2013.  And now

7    there's a question:  Should I quote Burton 300 for NWRS too?

8          You recognize NWRS to be Northwest Resources,

9    correct?

10   A    That's correct.

11   Q    And this is, am I right, another attempt to sell that

12   company, or it sounds like it?

13   A    Burton is requesting a quote.

14   Q    And Burton, whoever he is, is asking the price for

15   Northwest Resources?

16   A    Yes.

17   Q    And Mr. Laxague is asking my client, Ms. Cane, What price

18   should I ask for it, correct?

19   A    He's asking 300.  Same price.

20   Q    And we saw that price before.

21          And am I correct that, again, this is in June of

22   2013, before my client is involved in any way in the Cubed

23   transaction?

24   A    This is before the Cubed transaction occurred, yes.

25   Q    And this fellow Burton, whoever Burton is, he was never a

*LAM        OCR        RPR*

Voulgaris - Cross - Riopelle                    3072

1    subject of your investigation in Cubed, correct?

2    A    I can't recall right now.

3    Q    So, you don't recall him being the subject of an

4    investigation.

5    A    No, I don't recall him.

6    Q    He certainly was never a defendant in this case.

7    A    That's correct.

8    Q    Burton, last name unknown or first name unknown.

9    A    Correct.

10   Q    All we have for him is "Burton" as we sit here right now.

11   A    Yes, sir.

12              MR. RIOPELLE:  Henry, how about 129-97?

13              Henry tells me this one is also in evidence.  It's

14   Government Exhibit 129-97.

15              (Exhibit published to the jury.)

16   Q    And this is, again, a reference to David Lazar.  It may

17   be the same Lazar we saw in the earlier text message, correct?

18              Could be.

19   A    Could be.

20   Q    And this one is now in October of 2013, correct?

21   A    Yes.

22   Q    And, again, it's talking about David Lazar wanting a

23   price on NWRS, Northwest Resources, correct?

24   A    Yes.

25   Q    And it appears from this text message that Mr. Laxague is

Voulgaris - Cross - Riopelle                    3073

1   letting my client know that someone wants to know what the

2   cost of Northwest Resources is, correct?

3   A     Yes.

4   Q     And this is going on in October of 2013?

5   A     Yes.

6   Q     And that, again, is before my client became involved in

7   the transaction that resulted ultimately in Cubed, correct?

8   A     I believe it is, yes.

9   Q     And this fellow David Lazar was never a subject of your

10  investigation in this case.

11  A     No, I don't believe so.

12  Q     In fact, at the time of that last text message,

13  October 13, there was a lawyer who was a subject of your

14  investigation named Darren Ofsink, correct?

15  A     Yes.

16  Q     And Mr. Ofsink was a lawyer who had been involved in a

17  series of transactions prior to the Cubed transaction,

18  correct?

19  A     Yes.

20  Q     And do you recall that during your investigation you

21  discovered that Mr. Ofsink was, in fact, the lawyer for Cubed

22  at beginning?

23  A     I believe so.

24  Q     And my client came along sort of halfway through that

25  deal; correct, or partway through it?

*LAM        OCR        RPR*

Voulgaris - Cross - Riopelle                     3074

1          Let's not quibble over "half."

2    A    I'd have to see some of the documents or some of the

3    notes.  I may have to refresh my recollection on the actual

4    date.

5    Q    Okay.  Let's take a look at Government Exhibit 182-13 in

6    evidence.

7              (Exhibit published to the jury.)

8    Q    Do you remember seeing this document during your

9    investigation?

10   A    I can't recall if I saw this exact document, but I can

11   take a look at it now.

12   Q    Okay.  Well, do you recall seeing --

13             MR. RIOPELLE:  May I approach the witness, your

14   Honor?

15             THE COURT:  You may.

16             THE WITNESS:  Thank you.

17   Q    Do you recall, sir, seeing the retainer agreement by

18   which my client was formally retained in the Cubed matter?

19   A    I'm not certain I actually saw the retainer agreement.

20   Q    So, in your investigation you're not sure you saw this?

21   A    At this moment right now.  Maybe I did.

22   Q    I'm sure you saw quite a few documents during the

23   investigation; is that fair to say?

24   A    Correct.  It was quite some time ago too.

25   Q    As we know from just a few minutes ago, I can't remember

*LAM      OCR      RPR*

Voulgaris - Cross - Riopelle                    3075

1   everything that was admitted in evidence either.  So, we're

2   not going to fault anybody for not remembering all the

3   documents.  I'd be in trouble.

4          In any event, this Government exhibit is dated

5   March 2014; is that correct?

6   A    Yes.

7   Q    And you don't dispute that this document appears to be a

8   formal retainer agreement by which Cubed retained or

9   Crackpot -- I forget which it is -- retained my client,

10  Ms. Cane, correct?

11  A    Can I look through the document?

12  Q    That document is admitted in evidence.  So, you don't

13  have any reason to believe that that document is not genuine

14  correct?

15  A    No, but I can't say either way.  I'd like to look at it

16  to...

17  Q    Take your time, take your time.

18          Have you had a chance to look at that?

19  A    Yes.

20  Q    Does that appear to you to be a formal retainer agreement

21  by which my client was formally retained?

22  A    Yes.

23  Q    And it is dated in March of 2014, correct?

24  A    Yes.

25  Q    And you have no reason to think that document is not

*LAM      OCR      RPR*

Voulgaris – Cross – Riopelle                    3076

1    genuine, correct?

2    A     I don't have a reason to believe that.

3    Q     And just to tie this off, that document is five or six

4    months after the last text message we looked at in October of

5    2013, correct?

6    A     About five months, yes.

7    Q     Now I'd like to show you another text message that is in

8    evidence.  It's Government Exhibit 129-101.

9               (Exhibit published to the jury.)

10   Q     There's three messages there.  These are messages

11   exchanged between Mr. Discala and my client, correct?

12   A     Yes.

13   Q     And the first reads:  How are we looking, GP?

14               Correct?

15   A     Yes.

16   Q     And based on your investigation, you associate "GP" with

17   my client, correct?

18   A     Yes.

19   Q     And I think we got your understanding.  You understand

20   that refers to "guardian princess."

21   A     Yes.

22   Q     And then the next message is outgoing from my client to

23   Mr. Discala, right?

24   A     Yes.

25   Q     And that reads:  Very good.  DTC fixed, name change

Voulgaris – Cross – Riopelle                    3077

1    started, split started, Doug moving in as CEO, drafting

2    licensing deal all in motion just as in plan I sent.

3              That was my client's message to Mr. Discala,

4    correct?

5    A    Yes.

6    Q    And you understand that message to refer to a series of

7    legal things that had to be dealt with; right, like the DTC?

8              You know that's the Depository Trust Company?

9    A    In order to trade securities electronically, you deposit

10   with the DTC.

11

12              (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

*LAM        OCR        RPR*

C. VOULGARIS – CROSS – MR. RIOPELLE          3078

1    CONTINUED CROSS EXAMINATION

2    BY MR. RIOPELLE:

3    Q    And this refers to DTC fixed, so something was done

4    there, right?

5    A    I presume.

6    Q    Right.  And it says, name change started, know there was

7    a name change in the company, correct?

8    A    Yes.

9    Q    Again, that's a legal thing that lawyers have to fool

10   around with, right?

11   A    I assume.

12   Q    Okay.  And then it says, split started.  There was a

13   stock split in this case, correct?

14   A    Yes.

15   Q    And that again is requires filings with the SEC and

16   places like that, correct?

17   A    Yes.

18   Q    And that's something a lawyer handles, right?

19   A    I don't know if it is required to have an attorney to

20   file it.

21   Q    But it has to be a filed, correct?

22   A    There has to be a filing.

23   Q    The next reference is the Doug moved in as CEO.  You

24   recognize that to be a reference to Doug Shinsato, correct?

25   A    Yes.

1   Q    And Doug Shinsato was a business person, right?

2   A    He was the former COO of Crackpot.

3   Q    And he -- at any point did you interview Mr. Shinsato?

4   A    Not that I can recall.  I didn't personally.

5   Q    Okay.  In any event, so far as you know Mr. Shinsato is a

6   legitimate business person, correct?

7   A    I can't make that assumption.

8   Q    Did you arrest Mr. Shinsato?

9   A    No.

10  Q    Mr. Shinsato continued to work with the company that

11  became Cubed from the time of this text until the time of the

12  arrests in this case; is that right?

13  A    I don't know the duration of his employment when it

14  ended.

15  Q    But you don't have any information that he resigned from

16  Cubed at any point prior to the arrests in this case, do you?

17  A    I can't recall.

18  Q    You don't have any information to suggest that

19  Mr. Shinsato was some kind of criminal, do you?

20  A    I'd have to look at his, any records we have pulled in

21  the past, but I can't recall a criminal history.

22  Q    Then there is a reference to drafting a licensing deal.

23  Based on your investigation you understood that there were

24  licensing deals that were done with the company that became

25  Cubed?

C. VOULGARIS – CROSS – MR. RIOPELLE                3080

1    A     I don't recall.

2    Q     Do you recall a company called Ping Mobile?

3    A     Yes.

4    Q     And do you recall a company called Wiki Technologies?

5    A     Something to that effect, Wiki Technologies, yes.

6    Q     Do you recall that there were public filings issued by

7    Cubed or filed by Cubed with the SEC from time to time?

8    A     There were filings, yes.

9    Q     And do you recall that some of those filings discussed

10   the licensing transactions between Cubed and Ping Mobile and

11   Wiki Technologies and other companies?

12   A     I don't recall the licensing aspect of those filings at

13   all.

14   Q     Do you recall that those filings disclosed transactions

15   between Cubed and Wiki Technologies and Ping Mobile?

16   A     Those specific transactions, I don't recall those.

17   Q     Very well.  I'm going to show you Government's Exhibit

18   11, which is in evidence.  This is what is called an 8K

19   report.  You're familiar in general with 8K reports, correct?

20   A     Yes.

21   Q     And an 8K report is something that a company files when

22   there is a significant event and it wishes to inform its

23   shareholders of that event; is that a fair statement?

24   A     Yes.

25   Q     And this one relates to change in name from Northwest

C. VOULGARIS - CROSS - MR. RIOPELLE          3081

1    Resources to Cubed?

2    A    Yes.

3    Q    And by the way, there is nothing -- a company is allowed

4    to change its name if it wishes to, correct?

5    A    I believe so.

6    Q    And if a public company does that, it has to file an 8K

7    report though, correct?

8    A    Yes, I would say so.

9    Q    And that's what this report was that we just looked at,

10   Government's Exhibit 11, it's an 8K that described the name

11   change?

12   A    Amongst other things, yes.

13   Q    And it's in effect telling the shareholders of the

14   company that its name will be Cubed going forward?

15   A    I'm not sure that's how they told their shareholders.

16   Q    In fact it tells the market that, correct, the public?

17   A    Yes if they filed it with the SEC it's a public filing.

18   Q    Those filings with the SEC are available to mere mortals

19   like me, correct?

20   A    Yes.

21   Q    I can go to the Edgar system on the SEC's website and see

22   filings for any company I'd like, correct?

23   A    Yes.

24   Q    When this one of these filings, like Government's Exhibit

25   11 is done, the company in question is essentially making a

C. VOULGARIS - CROSS - MR. RIOPELLE          3082

1    disclosure to the entire market, correct?

2    A    They are filing, they are filing that disclosure with the

3    SEC.

4    Q    And by doing so, it becomes available to every member of

5    the general public?

6    A    Yes.

7    Q    Or least anybody with access to the Internet?

8    A    I would say so.

9    Q    Now do you recall that during your direct examination you

10   gave us some testimony about press releases?

11   A    Yes.

12   Q    And you testified that you learned in the course of your

13   investigation or you found that there was trading going on

14   that was coordinated with press releases?

15   A    Yes.

16   Q    And those -- did those findings include the fact that

17   the -- you know who Marc Wexler is, right?

18   A    Yes.

19   Q    And he was a person who was trading in the stock of

20   Cubed, correct?

21   A    Yes.

22   Q    And indeed, he was buying and selling in Cubed from time

23   to time, correct?

24   A    I would want to see trading records to verify what he was

25   buying or selling.

C. VOULGARIS - CROSS - MR. RIOPELLE          3083

1   Q     Will you give me at least that he was trading in Cubed?

2   A     I believe so, yes.

3   Q     Now, did your findings in your investigation include the

4   fact that Mr. Wexler was frustrated with the behavior of my

5   client as it was connected to the press releases relating to

6   Cubed?

7   A     Is there communication that you can show me to refresh my

8   recollection?

9   Q     Let's look at Government's Exhibit 129-47, which I think

10  is in evidence.  Here it is, 129-47, and I'll direct your

11  attention to the top couple of text messages.  These are text

12  messages from Mr. Wexler to my client, correct?

13  A     Yes.

14  Q     And the second one is says 745 nada, correct?

15  A     Yes.

16  Q     And it's your understanding based on your experience as

17  an FBI agent, that persons who want to trade on press releases

18  want those press releases filed before the market opens?

19  A     During the course of this investigation specifically?

20  Q     Yes.  That's what they want?

21  A     In this investigation they wanted premarket.

22  Q     Premarket.  And for those of us who are not trained

23  securities professionals, premarket means before the market

24  opens, right?

25  A     Yes.

C. VOULGARIS - CROSS - MR. RIOPELLE          3084

1    Q    And the market opens 8:00 o'clock or nine?

2    A    Nine.

3    Q    And so do you understand that Mr. Wexler is complaining

4    here about the fact that a press release has not been issued

5    that morning?

6    A    From this I can't tell what he's complaining about or if

7    he's complaining.

8    Q    In any event, his next communication says, we'll call you

9    later.  AJ is going ballistic.  I'll handle it.  Correct?

10   A    That's what it says.

11   Q    He is reporting to my client, Ms. Cane, frustration or

12   irritation at least on the part of Mr. Discala, correct?

13   A    He's saying AJ is going ballistic.  I don't know, I don't

14   know what he's going ballistic regarding.

15   Q    Let's go to the next page and see if that helps.  Do you

16   see that in the text message there at the top of the page

17   Mr. Wexler is asking my client, Ms. Cane, to consider letting

18   him run the press?

19   A    That's what he's asking.

20   Q    With that text message in mind, does that remind you that

21   Mr. Wexler was often irritated at my client because press

22   releases were not issued in a way that he wanted?

23   A    Based on this I can't see if he's irritated or not.  He's

24   just answering the question.

25   Q    Can I take it over; that's what he's asking?

C. VOULGARIS - CROSS - MR. RIOPELLE          3085

1    A    Would you guys consider letting me run press.  I can't

2    say whether he's frustrated or not based on this.

3    Q    You can say he's asking to run the press himself,

4    correct?

5    A    Yes.

6    Q    He was never allowed to run the press himself, though,

7    was he?

8    A    I can't recall if he was or wasn't.

9    Q    Your findings in this investigation do not include a

10   finding that Mr. Wexler was allowed to run the press, correct?

11   A    No.  My findings was that Ms. Cane was coordinating the

12   press releases.

13   Q    Right.  And if we look down to the bottom, she reports to

14   Mr. Wexler that there is a new agent, somebody named Kirt

15   Darich who's gotten involved, correct?

16   A    Yes.

17   Q    I'm showing you now Government's Exhibit 129-42.  The

18   incoming message on the top is from Mr. Wexler to my client,

19   correct?

20   A    Yes.

21   Q    And he says, no news today, question mark, wow.  Correct?

22   A    Yes.

23   Q    Does that indicate that Mr. Wexler is frustrated with my

24   client's handling of the press releases?

25   A    I would say he's surprised.

C. VOULGARIS - CROSS - MR. RIOPELLE          3086

1    Q    Okay.  I'll take surprised.  At the bottom he sends

2    another text saying, there is real confusion developing on my

3    end.  Do you see that?

4    A    Yes.

5    Q    And my client responds, okay, talk to you then.  And

6    Mr. Wexler say thank you.  Correct?

7    A    Yes.

8    Q    And is it correct to say that after this text message

9    Mr. Wexler was still not given the job or task of running the

10   press for Cubed?

11   A    I don't recall him ever running the press for Cubed.

12   Q    Now during your testimony we heard a series of phone

13   calls in which Mr. Discala and my client discuss the price of

14   the bid or ask that is being set by George Castillo at

15   Glendale, correct?

16   A    They are talking about George and the prices, yes.

17   Q    And they are not talking, however, about prices at which

18   George will execute the securities, right, or execute the

19   orders.  They are talking about what the bid would be or the

20   ask would be, right?

21   A    They are talking about what the price should be set at.

22   Q    Right.  And we heard earlier that the price is the bid

23   and the ask, correct?

24   A    Yes.

25   Q    And do you know, as you sit here, whether in fact the

C. VOULGARIS – CROSS – MR. RIOPELLE          3087

1    price as discussed in those phone calls were in fact the

2    prices at which trades were executed?

3    A    I'd have to look at the records.

4    Q    Okay.  Now, did you find out during your investigation

5    that Mr. Wexler was also angry at my client and at Glendale

6    because they were not executing trades in a way he wanted?

7    A    I don't recall.  If you can show me something to refresh

8    my recollection.

9    Q    Do you recall that during one of the intercepted phone

10   calls Mr. Wexler said to Mr. Discala, we are supporting Cubed

11   we're not supporting fucking Glendale?

12   A    Can you show me the transcript?

13   Q    I think I can, yes.  I'm going to show you what is marked

14   Government's Exhibit 198-49T.

15             May I approach?

16             THE COURT:  You may.

17   Q    Referring you to the section that I flagged.  Does that

18   refresh your recollection that there were times when Wexler

19   was frustrated with the way in which Glendale was executing

20   its trades?

21   A    Would you give me a moment?  I'm going to read the page.

22   Q    The flag is by the exchange that I quoted.

23             (Witness reviewing document.)

24   A    Okay.

25   Q    Does that refresh your recollection, sir?  There were

C. VOULGARIS - CROSS - MR. RIOPELLE        3088

1   times that Mr. Wexler was frustrated that the trading activity

2   at Glendale was not to his liking?

3   A    From reading this it shows that he's upset that more

4   trades are not occurring.  So Glendale is trading -- Ms. Cane

5   is restricting Glendale from trading every day.  It seems like

6   she wants more a steady decline.

7   Q    Now, do you recall intercepting or listening to

8   intercepted phone calls between Mr. Wexler and Mr. Discala

9   where they discuss taking the free trading shares of Cubed

10  away from Glendale and putting them at BMAC, another broker?

11  A    I can't recall that conversation between Mr. Wexler and

12  Mr. Discala.  If you have a transcript I can refresh my

13  recollection.

14  Q    Okay.

15  A    I know that --

16  Q    Let me show you --

17        MR. RIOPELLE:  I just have a couple more questions

18  in this area, but I have a good half hour or more.  I think we

19  should take lunch when I tie this off, if I may make that

20  suggestion?

21        THE COURT:  I would accept your suggestion.  I was

22  working off your last suggestion, which said you'll be pulling

23  into the last station right around now.

24        MR. RIOPELLE:  Judge, like most lawyers, it was

25  hyperbole and inaccurate.  We'll have to go on the warning.

C. VOULGARIS - CROSS - MR. RIOPELLE          3089

1        THE COURT:  Go ahead.

2   BY MR. RIOPELLE:

3   Q    I'm going to show you what I've marked KCCB2.  I'm going

4   to direct your attention to this page.  I've written an arrow

5   in the margin, and ask you to take a look at that.  And see if

6   that refreshes your recollection that Mr. Wexler was

7   frustrated with the way that the trading was being handled at

8   Glendale and wanted to move the account to BMAC.

9        MR. BINI:  Your Honor, I am going to object to this.

10  This is a piece of trial testimony it was just handed to the

11  witness for which he was not present for trial testimony.

12       MR. RIOPELLE:  I think you can ask the witness to

13  look at anything to refresh his recollection.

14       THE COURT:  He can refresh his recollection.

15  A    In reviewing the area with the arrow, I mean I can't say

16  that I knew that he was dissatisfied before or he had

17  displeasure prior to reading this.

18  Q    Okay.  So you just don't recall as you sit here now

19  whether you knew back in the day that Wexler was frustrated

20  with the trading at Glendale?

21  A    That's correct.  I can't recall if I knew that.

22  Q    You can't recall.  Can you put that aside?

23       MR. RIOPELLE:  Judge, that's the last question in

24  this area.  I do have a series of questions that will take us

25  for a while.  I don't want the jury to go too long without

PROCEEDINGS                3090

1  eating.

2           THE COURT:  Sounds like a good idea, Mr. Riopelle.

3           Ladies and gentlemen, we'll take our luncheon break.

4           I'm going to remind you again of your instructions

5  that you received, don't discuss the case amongst yourselves.

6  Continue to keep an open mind.  Don't discuss the case with

7  anyone else.  Don't use the lunch room period as an

8  opportunity to do a research of any kind.  If you are on a

9  social media platform, please again remember to observe our

10 radio-silence rule.

11          I'm going to ask you to return to the central jury

12 room at around 2:45 and we'll start as close to that time as

13 we can.  We'll see you then.

14          (Jury exits.)

15          THE COURT:  Special Agent, you can step down.

16          (Whereupon, the witness steps down.)

17          I think it's a good time before lunch to take up the

18 matters that we were going to take up at a break.

19          MR. BINI:  Thank you, your Honor.  The Government

20 filed on ECF 602 under seal.  And we seek to preclude the

21 testimony of Neil Levine because we think it's irrelevant.

22 Before I argue that, I would just ask because I did not hear

23 his name, if defense counsel is not planning to call him I'll

24 move on.

25          MR. ROSS:  We're absolutely not calling Mr. Levine.

PROCEEDINGS                     3091

1    He will not be a defense once for us.

2              MR. BINI:  Okay.  The next topic, your Honor, are

3    the exhibits prepared by the accountant and anticipated

4    witness Haley Eckhart.  Ms. Jones is going to argue this

5    portion.

6              MS. JONES:  Your Honor, there are a couple of

7    objections that I have to the material produced by

8    Ms. Eckhart.

9              First of all, I think this is an egregious violation

10   of Rule 16 to wait until we're at the verge of the close of

11   the case, two days before the testimony, to dump this material

12   on us, on a Saturday when she's supposed to testify on Monday.

13   This material is extensive, it's like 100 schedules.  She

14   clearly has been working on this for months.  So for the claim

15   to be, oh, this came up because Joan Mazella's testimony, it's

16   simply not credible.  There are portions of those schedules

17   that I think are irrelevant and inadmissible.  It appears that

18   what Ms. Eckhart has been asked to do is to look at the net

19   cash in and out of Discala-related entities relating to both

20   the charge companies, and when it appears he's turning a

21   profit they add in these additional companies that are not

22   part of this case to include those changes loss such as Soul

23   and Vibe, LBAS, HRAA and ISGI, to include those trading

24   analysis just to show trading losses.  They are not charged in

25   our case.  They don't even show any net investments in those

PROCEEDINGS                3092

1    companies.  They show trading losses.

2              In addition, there are a couple of schedules in

3    there where the sole purpose of the schedule seems to be to

4    compare the money that Discala made in Code Smart versus the

5    money that a guy named Joe Salvani made in Code Smart, just to

6    compare this guy made more money trading Code Smart than

7    Discala did, relying on blue sheet data, no brokerage account

8    statements.  It's completely irrelevant and has nothing to do

9    with the charges in this case.

10             Finally there are portions of the analysis that do

11   not appear to have a basis and admitted Government exhibits.

12   Again, this is a lot of material that was dumped on us over

13   the weekend.  And I've been trying to go through it diligently

14   to try to identify the flaws in the analysis.  But for

15   example, for one of the charged group stocks, the Staffing

16   Group, Ms. Eckhart performed an analysis, Mr. Discala loaned

17   the company almost $800,000.  Somehow that should be factored

18   into the -- I don't know what is going on here, but that

19   should be factored into the analysis.

20             When you look into the detail, approximately half of

21   that loan is from a different company, the Broadsmoore Group,

22   back from 2012 and has no underlying documentation to show

23   that the money was actually paid.

24             So this is just a lot of stuff to be dumped on us at

25   the last minute, some of which is clearly irrelevant and some

PROCEEDINGS                          3093

1    of which clearly does not seem to have the support or even

2    belong in whatever kind of analysis she performed.

3          MR. CHENG:  I can address this issue.  Ms. Jones and

4    the Government ask us to provide all the 3500 material.  We

5    provided a draft copy of the report.  We have since condensed

6    that report, which we have also provided.  There is no way for

7    us to know what Mazella or even Wexler or any of the witnesses

8    that have testified in the last week two weeks, so while she

9    did prepare a substantially complete report, we intend on

10   condensing that based on testimony.

11         Mr. Wexler actually did plead that Mr. Discala and

12   Wexler were manipulating other companies such as TSGL, ISGI,

13   LBAS.  There are references earlier in this case to Soul,

14   which is why we're including that evidence.

15         MS. JONES:  He didn't plead to those charges, he

16   just has coverage for them -- I'm sorry to interrupt.

17         MR. ROSS:  Judge, in addition, we provided the

18   Government last week, according to your Honor's instruction,

19   that we did have an accounting witness Ms. Eckhart.  So they

20   were on notice that we intended or might call Ms. Eckhart.  We

21   have made a decision during this time period to call her.

22   There are other witnesses that we did not call.  And we're

23   trying to cut it down as many as we can.

24         Your Honor is aware that we subpoenaed many

25   witnesses.  Some of those witnesses we just were not able to

PROCEEDINGS                                        3094

1    locate because, we think, that they knew that we wanted to

2    subpoena them and they are just not available.  So with

3    respect to this particular witness, we provided the materials

4    as soon as we could.  We provided the materials in conjunction

5    with the scope of the testimony that we propose Ms. Eckhart

6    make.

7              As Mr. Cheng made references to, there are uncharged

8    crimes or uncharged companies in this Indictment or in this

9    case that your Honor has ruled come in under 404(b).  There

10   has been testimony that those companies were manipulated and

11   they were manipulated by Mr. Discala.  So that put in, that

12   put at issue the accounting information, the accounting

13   evidence, that we would like to present to this jury.

14             It's my understanding that this evidence is limited.

15   And that it is limited only to profit and loss.  That is my

16   understanding of what Mr. Cheng intends to elicit from

17   Ms. Eckhart.

18             So I would suggest that this is an extraordinary

19   remedy that the Government is asking your Honor to do.  She's

20   an important witness to us.  And to completely preclude her

21   testimony would be extraordinary under these circumstances.

22   That's what I have to say.

23             MR. CHENG:  The report includes rebuttal testimony

24   to Mazella, Ferrante and the Government's expert Oremland, and

25   also tracks, she's a forensic accountant, it tracks

PROCEEDINGS                          3095

1   Mr. Discala's trading activity as well.

2           THE COURT:  Anything further?

3           MS. JONES:  Your Honor, again, defense counsel only

4   produces material after I complain and complain several times

5   about where are the exhibits, where are the documents, where

6   is the 3500 material.  Clearly this accountant was retained

7   several months ago.  There has been no production of

8   engagement letter, no production of any information about how

9   much she's been paid or spent on this, or how much money she's

10  due.

11          Again, a lot of the schedules and information that

12  they are seeking to introduce relating to trading in companies

13  that are not part of the charged charges in this case are

14  irrelevant.  We didn't produce any testimony regarding

15  Discala's profit or loss in, if they want to do the three

16  other stocks here fine, but Soul and Vibe, LBAS, HRAA, not

17  relevant.

18          MR. CHENG:  They were raised in Ms. Eckhart's

19  charts.

20          THE COURT:  They are not coming in, Mr. Cheng.  The

21  four targeted companies, if she wants to provide accounting,

22  relevant accounting information with respect to the four

23  charged companies, she certainly will be permitted to do that.

24  To the extent that there are assumptions that she relies on

25  not rooted in evidence already been admitted before the jury,

PROCEEDINGS                    3096

1    those references are also out.

2              To the extent that these exhibits go beyond, that

3    her report, goes beyond that, she will have to whittle it down

4    and be ready to go.  And the Government will have an

5    opportunity to review it.  To the extent the Government needs

6    a continuance to the following day, I certainly am prepared to

7    grant that the continuance to give them an opportunity to

8    prepare.

9              MR. CHENG:  Your Honor, but Ms. Mazella's charts

10   actually list Mr. Discala's profit and losses in HRAA, ISGI

11   and Soul.  It references in Goepel's charge as well.  To

12   preclude as --

13             THE COURT:  Not providing, we're not going down to

14   have a mini trial on how the profit and losses arrived.

15             MR. CHENG:  Are we allowed to references Ms.

16   Mazella's charge?

17             THE COURT:  Absolutely.  If it's in evidence, she

18   can look at it and testify as to it.  Not a problem.

19             MR. CHENG:  So we can reference --

20             THE COURT:  Anything that is in evidence.  If it's

21   in evidence she can testify as to it, where she's qualified.

22   She couldn't give an opinion in an area that she's not

23   qualified.  She's here as an accountant, forensic accountant.

24             MR. CHENG:  The numbers majority of the numbers

25   relate to Soul, at least relate to evidence that has already

PROCEEDINGS                     3097

1   been admitted.

2           MS. JONES:  No, he's talking about taking the bank

3   records that are in evidence then just putting in her analysis

4   of the bank records.

5           THE COURT:  I was referring to the exhibits that Ms.

6   Mazella used in her forensic, in her testimony.  Any of the

7   exhibits that she used, obviously your witness can use those

8   exhibits.

9           MR. BINI:  Our next topic is expert testimony, and

10  with respect to David Parker.

11          THE COURT:  I thought he wasn't testifying.

12          MR. ROSS:  No, no, that's Neil Levine.  Neil Levine

13  is not testifying, Judge.  But David Parker and Eric Engstrom

14  are testifying.  We do not intend to elicit expert testimony

15  from either witness.  We discuss closed 3500 material in

16  abundance of caution, and but we do not intend to elicit any

17  expert testimony either from Mr. Parker --

18          THE COURT:  What evidence do you intend to elicit?

19          MR. ROSS:  Mr. Parker was hired to do due diligence

20  on Cubed.  So he's going to testify about his efforts in that

21  area and what he did.  When and how and why.  He's not going

22  to give an expert opinion about anything.  It is simply a fact

23  witness.  And it is relevant that Mr. Discala and Omniview

24  undertook that effort in order to make sure that this was a

25  real company, and that's relevant.  That's relevant to this

PROCEEDINGS                              3098

1   case.  And with respect to Mr. Engstrom.

2              THE COURT:  Why don't we stop there.  Mr. Bini?

3              MR. BINI:  If Mr. Parker is not going to testify as

4   to valuation, the Government doesn't have a problem with him

5   testifying regarding --

6              THE COURT:  As to what he did.

7              MR. BINI:  Yes.  The issue is there was an Excel

8   spreadsheet, if they are not seeking to put that in, it had

9   estimates regarding the business for Cubed, which the

10  Government believes goes to valuation, we think this is -- if

11  they were seeking to put that in, we would object to that.

12  Based on what has been stated on the record, the Government

13  doesn't object to that at this time.

14             MR. ROSS:  Judge, the same is true about Eric

15  Engstrom.  Mr. Engstrom was retained, has a background in

16  technology.  He's simply going to testify about what he did

17  and that was to do due diligence on the technology that was

18  available at Cubed.  That's it.  He's not going to give expert

19  testimony.

20             MS. JONES:  As long as they are not planning on

21  testifying as to their opinion as to what the value of the

22  company was.

23             For example, neither -- I don't know about Mr.

24  Parker -- Mr. Engstrom, his background is specialized in

25  working for technology companies.  It's personal to his own

PROCEEDINGS                           3099

1   experience.  My understanding is he had one meeting with Cubed

2   for three hours to discuss what he thought they should do.

3   But in terms of opining to the jury about I think this company

4   is worth X, that would be completely inappropriate.

5              THE COURT:  Apparently that's not what he's going to

6   do.

7              MR. ROSS:  No, Judge, he has personal experience in

8   this area.  He has a personal ability to evaluate technology

9   and --

10             THE COURT:  He was asked to do that.

11             MR. ROSS:  Yes.

12             THE COURT:  What his the conclusions were, are not

13   coming in.

14             MS. JONES:  His conclusions are not coming in.

15             THE COURT:  The point, as I understand it from

16   Mr. Ross, is that Mr. Discala wanted such an analysis to be

17   performed as opposed to what the analysis might have

18   concluded.

19             MS. JONES:  Okay.

20             MR. CHENG:  He independently performed his analysis

21   at the time that he was involved with the company.

22             THE COURT:  It's the performance of the analysis,

23   that's what is the object of the testimony, as I understand

24   it, as opposed to the conclusion.

25             MR. ROSS:  Simply --

PROCEEDINGS                         3100

 1              THE COURT:  As to value.

 2              MR. ROSS:  -- simply based on Mr. Engstrom's

 3     knowledge and experience and what he did, he ought to be able

 4     to state what he concluded about the technology in the

 5     company.

 6              MS. JONES:  No.

 7              THE COURT:  He can state that he came -- I'll let

 8     you go even as far as he came to a conclusion and advised

 9     Mr. Discala what the conclusion was, the rest is not relevant.

10              MR. CHENG:  Your Honor, one request, can we request

11     that we move Ms. Eckhart until tomorrow morning.  If we do

12     have --

13              THE COURT:  We're going --

14              MR. CHENG:  -- to revise the schedules.

15              THE COURT:  -- to revise the schedule provided that

16     you give that to the Government as you do it.

17              MR. CHENG:  Correct, your Honor, we'll provide.

18              THE COURT:  Which means today.

19              MR. CHENG:  Yes, your Honor.

20              THE COURT:  She should be in the business of doing

21     that now.

22              MR. CHENG:  She will be, your Honor.

23              MR. ROSS:  Judge, I just had one other thing that I

24     wanted to place on the record.  As, your Honor, knows we

25     subpoenaed a lot of witnesses here.  And we've done -- and

PROCEEDINGS                              3101

1    we've paired the number of witnesses down substantially.  At

2    this point we have three witnesses ready to go.  And their

3    testimony will be presented.

4              We had intended to call a man by the name of Diego

5    Roca.  We've given the Government notice that we intended to

6    call Mr. Roca.  Mr. Roca is the former Chief Financial Officer

7    at Code Smart.  We would proffer that he could testify about

8    Mr. Discala's efforts at refinancing Code Smart.

9              We spoke to him.  He had relevant testimony to give.

10   But over the last few days when we've tried to get in touch

11   with him about his testimony here, he's not in touch with us

12   at all.  I left a message for him saying that he was under

13   subpoena.  That under 17G that we can ask, your Honor, to hold

14   him in contempt.

15             And I don't know, the Government has with respect to

16   another potential witness that we gave notice of a man called

17   Paul Lane, who appeared on one of the transcripts and wiretap

18   conversations that they wanted.  And I understand this, that

19   they wanted to know whether or not he had a lawyer.  They

20   viewed him as an unindicted co-conspirator.  I know your Honor

21   does not want to have invocations on the witness stand, that's

22   just not, as you said, going to happen.  It's not proper.

23             But by the same token, the Government's efforts in

24   this area, and I don't know whether they went out and spoke to

25   Mr. Roca, he's an important witness to us and now he doesn't

PROCEEDINGS                              3102

1    appear to be available.  So any Government efforts at chilling

2    our witnesses I simply wanted to put on the record for, your

3    Honor, to understand and put, your Honor, on notice about

4    that.

5           Indeed just during this morning's testimony we

6    discovered, and I now have a telephone number for Dan Walsh,

7    who's name has come up in connection with this case and this

8    evidence.  And I did tell, your Honor, that it was a ongoing

9    effort that we would have to try to reach witnesses.  I don't

10   know whether we'll decide to call him.  I did want to let your

11   Honor know that we were finally able to reach what we believe

12   may be an important witness to our defense.

13          MS. JONES:  Your Honor, just to be clear, the

14   Government has not reached out to Mr. Roca.  We have not

15   reached out to any of the defense witnesses.  We are not

16   making any attempts to interfere with their defense case.

17   Frankly, this case has been going on, we're on our fifth week,

18   they should be ready, they should be ready to go.

19          THE COURT:  I totally agree with that.

20          MS. JONES:  Regarding Ms. Eckhart, if the issue is

21   redacting certain portions of the report, the Government would

22   be willing to just have them cover it up and prepare to move

23   forward today.  Then we could they could make it look nice by

24   the time we give it to the jury.  If all it is is just an

25   issue of covering up the portions that are irrelevant, we want

PROCEEDINGS                           3103

1    to move forward.

2              THE COURT:  That would make even better sense.

3    Mr. Cheng1.

4              MR. CHENG:  That's fine with us.

5              THE COURT:  That's fine with them too.

6              MS. JONES:  Great.

7              THE COURT:  Then you all can, again, with redaction

8    I have a very basic rule, allow counsel to work it out amongst

9    themselves.  Where there is a loggerhead, I break the tie.

10             MR. CHENG:  It would be impossible to redact the

11   total if we're computing including all the companies.  We'll

12   leave the total out there, but redact the companies for the

13   companies.

14             MS. JONES:  If the math is wrong, it should be

15   redacted.

16             THE COURT:  There are a million ways to redact

17   things, Mr. Cheng.  You have plenty of time to reassemble the

18   document.

19             MR. CHENG:  If the Government is asking us to

20   recompute the numbers then we would have to need time to

21   prepare the new computations for the schedules it can't just

22   be redacted.

23             THE COURT:  I don't know if, they are, how it works.

24   If you're eliminating names, the column, and that column is

25   used to compute this column.

PROCEEDINGS                    3104

1          MR. CHENG:  They are all independent.

2          THE COURT:  If they are all independent, once

3    eliminate it, it doesn't matter.

4          MR. CHENG:  There are certain totals that would

5    include the numbers --

6          THE COURT:  But to the extent that the mechanic of

7    doing the document would probably be more time consuming as

8    long as long as there is an understanding of what areas of

9    inquiry are appropriate, that seems to be a much larger

10   process in turning that around.  Then reassembling the

11   document after the testimony.

12         MR. CHENG:  Very well.

13         MR. BINI:  Thank you.

14         MS. JONES:  Thank you.

15         MR. ROSS:  Thank you.

16         THE COURT:  Anything else?

17         MS. JONES:  Your Honor, I had circulated among the

18   parties the redacted Indictment, which removed the other

19   co-defendants and removed Count Five.

20         THE COURT:  You can.  I'll tell you why it's not a

21   big deal, because I never send the Indictment in any way.

22         MS. JONES:  Oh, okay.

23         THE COURT:  It's restated in the charge, the verdict

24   sheet will be renumbered to reflect the elimination of Count

25   Five.

PROCEEDINGS                           3105

1              MR. BINI:  Thank you, Judge.

2              THE COURT:  Let me, we're at that stage of while

3     we're here, we can do it formally after the Government rests

4     or not, you tell me.  I'll let defense counsel do it now or

5     after the Government formally rests, that is to make an

6     inquiry to Mr. Discala and Ms. Cane as to whether or not they

7     are going to exercise their rights to, or exercise their right

8     to take the stand.

9              MR. ROSS:  Your Honor, I think we would like to wait

10    until after the Government formally rests.

11             THE COURT:  That's fine.

12             MR. ROSS:  We are still in the process of making

13    that decision.  I don't think that we have formally made that

14    decision yet.  We reserve our right.  If Mr. Discala wishes to

15    take the stand in his own defense, that we not be bound by any

16    sort of representation right after the Government rests.  We

17    have witnesses to put on.  And at this stage I think it would

18    be premature to get a commitment one way or the other from

19    Mr. Discala until we hear our defense witnesses.

20             THE COURT:  You can wait until the end.  Obviously

21    with the case with Ms. Cane, we'll soon be on defendant Cane's

22    last witness.

23             MR. RIOPELLE:  Your Honor, ultimately this decision

24    is her's to make, but I do not believe she will be testifying

25    in the defense case.  I'll confirm that over lunch.

PROCEEDINGS                              3106

1          THE COURT:  What I mean, I'm going to ask them

2   personally in an allocution whatever their decision is.

3          MR. RIOPELLE:  I will let her know that the Court

4   intends to proceed in that way.  I will say that I would like

5   to preserve Ms. Cane's right to testify in a rebuttal case if

6   Mr. Discala does testify and says something that I think must

7   be rebutted by her.  But I do not, it is not my present

8   intention to encourage her to take the witness stand in her

9   defense.

10          THE COURT:  And I think to the extent that things

11   change, Mr. Riopelle, I don't have a problem with that.

12   Particularly, it remains the right of the individual

13   defendant.  And to the extent that she whispers in your ear

14   and says, Tell the Judge I change my mind, please.

15          MR. RIOPELLE:  I will not conceal that fact.

16          THE COURT:  Okay.  Obviously it's her right, as it

17   is Mr. Discala's.

18          MR. RIOPELLE:  Understood, your Honor.  I just

19   wanted to make the record clear.

20          THE COURT:  A lot of times we talk about the right

21   to remain silent; there is also a right to take the stand.

22          MR. RIOPELLE:  Sure, sure.

23          THE COURT:  And equally important under the Fifth

24   Amendment.

25          MR. RIOPELLE:  Understood, your Honor.

*Rivka Teich CSR, RPR, RMR*
*Official Court Reporter*

PROCEEDINGS                                    3107

1              THE COURT:  We'll see you after lunch.  Otherwise

2    the rules remain the same.

3              (Lunch recess.)

4              (Continued following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                           3108

1              A F T E R N O O N   S E S S I O N

2              (Time noted:  2:45 p.m.)

3              (In open court; Jury not present.)

4              THE COURTROOM DEPUTY:  All rise.

5              Court is back in session.

6              Counsel for both sides present as well as

7      defendants.

8              THE COURT:  Ready to go?

9              MS. JONES:  Yes, Your Honor.

10             THE COURT:  You have the witness?

11             MS. JONES:  We're getting him, Your Honor.

12             (Whereupon, the witness resumes the stand.)

13             (Jury enters the courtroom.)

14             THE COURT:  Be seated, please.

15             Counsel will stipulate that the jury is present and

16     properly seated.

17             MS. JONES:  Yes, Your Honor, agreed.

18             MR. RIOPELLE:  So stipulated, Your Honor.

19             THE COURT:  Counsel, ladies and gentlemen, welcome

20     back.  Hope you enjoyed your lunch.  We're ready to resume.

21             As you remember, when he we broke for lunch Special

22     Agent Voulgaris was on the stand and Mr. Ripoelle was in the

23     midst of his cross-examination, which you may now proceed to

24     continue.

25             MR. RIOPELLE:  Thank you, Your Honor.

1    CROSS-EXAMINATION (Continued)

2    BY MR. RIOPELLE:

3    Q    Special Agent Voulgaris, I'd like to direct your

4    attention back to May 23rd of 2014.

5         I believe you described in your direct testimony

6    that day as a significant one in your investigation.  Is that

7    correct?

8    A    Yes.

9    Q    And it was a significant day because on that day, the

10   price of Cubed shot up, correct?

11   A    Most other things, yes.

12   Q    Yes, it increased substantially and there was a lot of

13   talk on the wire about Cubed, correct?

14   A    Generally about losing control of the stock price.

15   Q    And I wanted to get to that.

16        There was a loss, as you characterize it, as a loss

17   of control of the stock price, right?

18   A    Yes.

19   Q    And that's because someone other than my client,

20   Mr. Discala, and others whom you had identified as subjects

21   seem to have taken an interest in the stock, correct?

22   A    I'm sorry, can you restate that question.

23   Q    There was significant interest in buying the stock,

24   correct?  That day?

25   A    I can't -- I don't know if there was a significant

VOULGARIS - CROSS - RIOPELLE                    3110

1    interest in buying the stock.

2            What I can tell basically from the investigation

3    somebody that was outside the control of at Glendale made a

4    significant purchase that was not within the parameters of

5    what Ms. Cane and Mr. Discala wanted.

6    Q    So it's your testimony that the defendants lost control

7    of the price of the stock, at least for a time on that day.

8    A    Yes.

9    Q    And we listened to a phone call during your direction

10   examination, at least one in which my client and Mr. Discala

11   discussed the fact that there appeared to be activity in the

12   stock that they didn't understand, correct?

13   A    Yes.

14   Q    And indeed my client at one point expressed the view that

15   she didn't know what had happened, correct?

16   A    At one point, yes.

17   Q    And then you told us that, and we heard that there was

18   talk on the wire about making the price land at $6.35,

19   correct?

20   A    Yes.

21   Q    It's a fact, isn't it, the stock price of Cubed at the

22   end of May 23rd did not land at $6.35?

23   A    It was around there.  If you show me that document that

24   shows the stock price for the day.

25   Q    Let me ask you this:  Do you recall that the stock price,

VOULGARIS - CROSS - RIOPELLE                3111

1    and we saw some of the documents when Mr. Bini was asking the

2    question I just want to sort of speed through it, do you

3    recall that the price at the end of the day was $6.30?

4    A    Yes, I believe so.

5    Q    And I think we agree that's close to 6.35, correct?

6    A    It's within 5 cents.

7    Q    Okay.  But it's not $6.35.

8    A    No.

9    Q    So to the extent you made any findings they were that the

10   defendants could not control the price of the stock well

11   enough to make it land at $6.35, correct?

12   A    I can't come to that conclusion.  There were a lot of

13   different factors that come into it.  The stock price

14   skyrocketed above $7 a share on that day.

15            And as they stated in the telephone calls, they were

16   able to correct the price back downwards to where they wanted

17   it or within a range of where they wanted it.

18   Q    They wanted it at $6.35, correct?

19   A    At least one party mentioned that.

20   Q    That's what we heard on the telephone call we all

21   listened to in court, correct?

22   A    Yes.

23   Q    But they were not able to make it land at $6.35; isn't

24   that right?

25   A    Not exactly.

1    Q     And you talked about how on May 23rd the price shot up

2    quickly, correct?

3    A     Yes.

4    Q     And they lost control of the price then; isn't that

5    right?

6    A     Yes.

7    Q     So it's a fact, isn't it, that your findings are that the

8    defendants could not dictate the price of this security,

9    Cubed; isn't it?

10   A     I can state that basically in the investigation they were

11   able to dictate downwards again.  Maybe not to the exact point

12   that they wanted it, but they were able to correct the

13   price -- correct the large spike that they were so concerned

14   about.

15   Q     Right.  But they could not dictate the price, correct?

16         THE COURT:  Specifically.

17   Q     Yes, they could not dictate a specific price of $6.35?

18         THE COURT:  On May 23rd.

19   Q     On May 23rd?

20   A     On that day they could not achieve the $6.35.

21   Q     Now, since that day, you have reviewed, have you not,

22   text messages that Wexler, Mr. Marc Wexler, and Mr. Victor

23   Azrak sent to Mr. Discala that day, May 23rd, 2014.

24   A     If you could refresh my recollection on what I saw.

25   Q     Yes, let me show you a series of text messages, which

VOULGARIS - CROSS - RIOPELLE                    3113

1    I'll mark KCCV, and I think we're up to 3.

2              Okay, I'm showing you now what's been marked KCCV3,

3    sir, and ask you to look through those quickly.

4              (Whereupon, the witness is reviewing the document.)

5    Q    Have you had a chance to look at those?

6    A    Yes.

7    Q    Does that refresh your recollection, sir, that Mr. Wexler

8    and Mr. Azrak were texting Mr. Discala on May 23rd happy about

9    the spike in price that occurred that day?

10   A    I mean they said this is great, so I would assume that

11   they're excited about it.

12   Q    Right.  They liked the spike in price, correct?  As you

13   recollect it?

14   A    As I'm reviewing this right now.

15   Q    Yes.

16   A    Yes, it seemed that they're pleased.

17   Q    And do you recall, sir, that they wanted to keep the

18   price up high?

19   A    I can't recall.  I mean based on this document, Marc

20   Wexler says, I'll hang at 704.  Build it around me.

21   Q    Based on your experience, does that help you remember

22   that in fact they wanted to keep the price up as high as

23   possible?

24   A    I'm saying I don't remember that at the time of the

25   investigation.  Reading this right now, it appears that Marc

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

1    Wexler wants the price to be built around him at 704.

2    Q    Okay.  But that's different than what Ms. Cane wanted in

3    the phone calls we listened to, correct?

4    A    Yes.

5    Q    Now did your findings in connection with the

6    investigation include the finding that the Glendale account,

7    the Ben-Bassat account, did not sell any shares of Cubed after

8    June 30th of 2014?

9    A    I believe that's correct.

10   Q    And, in fact, they did not buy any shares of Cubed after

11   June 30th, 2014 either, correct?

12   A    You said "they".

13   Q    Glendale.  I'm sorry.

14         The Ben-Bassat account at Glendale did not buy in

15   any shares of Cubed after June 30th, 2014; is that correct?

16   A    That's correct.

17   Q    And indeed, the Ben-Bassat account at Glendale did not

18   buy shares in of Cubed at any time during the time the market

19   was active in Cubed, correct?

20   A    As far as I can recall, that's correct.

21   Q    Now, is Cubed what you would characterize as a

22   thinly-traded stock?

23   A    Yes.

24   Q    And that's a stock that typically trades a few thousand

25   shares in a day?  Or even less.

1    A    Yes.  I mean you want me to refer to the records?

2    Q    Or just give me a sense of what you mean by a

3    "thinly-traded stock," so I know we're talking about the same

4    thing.

5    A    I believe the Cubed they traded only a couple hundred

6    shares to a couple thousand shares a day.

7    Q    Okay.  And with a thinly-traded stock like that, there is

8    always a possibility that the price can spike up as it did on

9    May 23rd, correct?

10   A    I suppose, yeah, there is that possibility.

11   Q    But we've established that -- and there's also the

12   possibility in a thinly-traded stock that sales of shares can

13   cause the price to decline, correct?

14   A    That is a possibility as well.

15   Q    Because the price of a stock is set based upon how many

16   buyers and how many sellers there are at any given time,

17   correct?

18   A    Most of other factors, yes.

19   Q    The supply and demand for a particular stock are an

20   important influence on its price, correct?

21   A    I'd say so, yes.

22   Q    Now, but after June 30th, as we've established, there was

23   no trading of any kind in the Ben-Bassat account at Glendale,

24   correct?

25   A    Yes.

VOULGARIS - CROSS - RIOPELLE                    3116

1    Q     So during that point of time, it's approximately three

2    weeks then before my client is arrested, correct?

3    A     Yes.

4    Q     And so during that point in time, the Ben-Bassat account

5    is neither selling nor buying Cubed, correct?

6    A     Correct.

7    Q     So the activity of the Ben-Bassat account is not

8    influencing the price of Cubed during that three-week period;

9    is that a fair statement?

10   A     I mean I wouldn't say that.  Those are the shares that

11   are the only shares that were released out in the market.  And

12   he still held shares in that account.

13   Q     Okay, let me ask you this:

14              Were there not shares trading in the market during

15   that three-week period?

16   A     Between July 30th and the 17th?  I'm sorry.

17   Q     June 30th and the 17th?

18   A     Yeah, there were trades in the market, yes.

19   Q     Right.  In fact, there were lots of trades; weren't

20   there?  You don't know?

21   A     I don't know.

22   Q     We'd have to look at the trading records, the blue sheets

23   or whatever they're called, to be certain.  But as you sit

24   here now, you know there were trades in that three-week

25   period, correct?

1    A     Yes.

2    Q     And those trades, because the few remained of

3    thinly-traded stock during that three-week period; did it not?

4    A     Without looking at the records rightly, I can just assume

5    that it was still thinly trading, yes.

6    Q     And those trades during that three-week period could

7    influence the price of Cubed, correct?

8    A     Correct.

9    Q     But the Ben-Bassat account did not trade during that

10   period.

11   A     No, it didn't.

12   Q     Now, by the way, even when the Ben-Bassat account was

13   trading from late April to the end of June 2014, it is a fact,

14   is it not, that the Ben-Bassat account was not trading every

15   day?

16   A     Um, from the trade confirms, yes, that's correct.  It was

17   not trading every day.

18   Q     And there were sometimes days at a time where there was

19   no trade out of the Ben-Bassat account, correct?

20   A     Without reviewing the records, I can't tell you how many

21   days went by.

22   Q     Okay.  Let me see if I can help.

23         I'd like to show you what's been previously marked

24   in evidence as Government's Exhibit 196-13.

25         And, sir, just to orient you, you've never seen this

1    before; have you?

2    A    I've seen this.

3    Q    You've seen this?

4    A    Yes.

5    Q    Okay, so you have a general familiarity with it?

6    A    Yes.  If you can push it up so I can see the legend

7    underneath.  Okay.

8    Q    Yes, sorry.

9    A    Great.  Thank you.

10   Q    The source is, and it tells us that green relates to

11   Ben-Bassat, and this color relates to select accounts, buy,

12   and this is select accounts sale?

13   A    Yes.

14   Q    And you have some familiarity with this chart, correct?

15   A    Yes.

16   Q    Okay.  And if we look along the bottom, there are dates

17   listed for the dates on which the Ben-Bassat account did sell

18   Cubed, correct?

19   A    Yes.

20   Q    And so we could see that, for example, there are some

21   dates where there's a gap, if you look over here, for example,

22   there's a sale on June 13th and then no other sale until

23   June 23rd.  The chart tells us that, right?

24   A    It appears to be that.  I don't know -- without looking

25   at some of the backup data, I wouldn't be able to tell you

1   precisely if theres a ten-day gap in the trading.  But based

2   on this, there's no trades that day.

3   Q    There's no trades that day.

4                And you told us you're generally familiar with this

5   chart?

6   A    Yes.

7   Q    This looks like charts you did review when you were

8   working on the case, correct?

9   A    The records that this may have been based on I've

10  definitely reviewed.

11  Q    Okay.  And just so we're clear, the Ben-Bassat trades are

12  all shown as sales, correct, on this chart?

13  A    Yes.

14  Q    The sales are shown as under the line, correct?

15  A    Yes.

16  Q    And buys are shown as above the line, correct?

17  A    That's correct.

18  Q    And you're familiar with the concept of a match trade,

19  correct?

20  A    Yes.

21  Q    And if we look at this chart, for example, on May 28th,

22  2014, you can see that the Ben-Bassat account sells 5200

23  shares that day, correct?

24  A    Yes.

25  Q    And the select accounts that are associated with others

1   including Mr. Azrak, Mr. Bell, Mr. Wexler, et cetera, they are

2   neither buy or sell that day, correct?

3   A    Based on this chart, that's correct.

4   Q    Correct.  And so if the chart is correct, there's just no

5   chance there was a matched order that day, correct?

6   A    I mean I'd have to look at the underlying records.

7   Q    I understand.  But looking --

8   A    Based on this.

9   Q    Correct.

10  A    That's correct.

11  Q    And the same would be true, by the way, at the end where

12  everybody's selling, right?

13  A    It appears.  I can't say again definitively not looking

14  at the underlying records.

15  Q    Right.  You didn't make this chart and you'd have to

16  check the records, correct, to be sure?

17  A    That's correct.

18  Q    But if the chart indicates that everybody is selling from

19  about, I want to say June 13th, until the last sale failed by

20  the Ben-Bassat account on the 30th, correct?

21  A    Yes.

22  Q    And so there doesn't appear -- if the chart is correct,

23  there doesn't appear to be any evidence of a matched order or

24  a wash sale during that last two or three weeks, correct?

25  A    That's correct.  Based on the chart.

1    Q    Okay.  Now during your testimony earlier today on direct

2    examination, you were -- we played a phone call and there was

3    a reference to a firm called "PWC."

4              Do you remember that?

5    A    Yes.

6    Q    Do you associate PWC with a particular entity the way we

7    do the FBI and the SEC or other acronyms?

8    A    Yes.

9    Q    Who do you associate PWC with?

10   A    PricewaterhouseCoopers.

11   Q    And just so we're clear, that's a great big accounting

12   firm, right?

13   A    It's one of the big four.

14   Q    Right, one the four largest accounting firms, correct?

15   A    I can assume that, yes.

16   Q    Okay.  Now, we also heard -- I'm going to get that out of

17   the way.

18              We also heard or saw some texts about June 7th,

19   2014, and a statement that Cubed stock is creeping up.

20              Do you remember looking at a text about that this

21   morning?

22   A    Can you show it to me again?

23   Q    I don't think I have it.  I'll skip that if you can't

24   recall it.

25              Do you recall a phone call, which we listened to

Case 1:14-cr-00399-ENV   Document 665   Filed 10/20/18   Page 118 of 243 PageID #: 5956

1   earlier today, on June 12th, 2014, in which Mr. Josephberg

2   asked Mr. Discala what's going on with CRPT?

3   A    Yes.

4   Q    That one you remember.  Okay.

5            Do you know, as you sit here now, whether there was

6   any trade in the Ben-Bassat account on June 12th, 2014?

7   A    Without checking the records, I can't make that.  I'm

8   unaware.

9   Q    Okay.  But it turns out we can do that, because there

10  would be a confirm if there was a trade, right?

11  A    I assume so, yes.

12  Q    And we have the confirms, correct?  That was Government's

13  Exhibit 149-4, right?

14  A    Yes.

15  Q    And if we go through them, they're organized by date.

16  And you can see that, for example, this one is in May.  So if

17  we just flip through.  Okay, here we go.

18           You can see June 6th.  There's June 9th, three days

19  later.  There's a trade on June 11th, a couple days after

20  that.  No trade on June 10th, I guess.  And then the next

21  trade is June 13th, 2014.

22           So insofar as the confirms can tell us anything,

23  they tell us that there was no trade in the Ben-Bassat account

24  on that day, June 12th, that we heard about earlier today,

25  correct?

1    A     Yes.

2              MR. RIOPELLE:  I have no further questions, Your

3    Honor.

4              Thank you, Special Agent Voulgaris.

5              THE COURT:  Thank you, Mr. Riopelle.

6              Mr. Bini, any redirect?

7              MR. BINI:  Yes, Your Honor.

8    REDIRECT EXAMINATION

9    BY MR. BINI:

10   Q    Special Agent Voulgaris, Mr. Bowman asked you some of

11   questions about profits and losses as to StarStream and TSGL.

12   I just wanted to ask you:

13             Who's responsible for the financial analysis in the

14   FBI's investigation?

15   A    As pertaining to this investigation, it was our forensic

16   accountant.

17   Q    Okay.  And what was her role in the investigation?

18   A    She reviewed a lot of the financial support documentation

19   we received via a subpoena.  A lot of the trade analysis,

20   brokerage account analysis, bank analysis.

21   Q    So with respect to a question regarding the financial

22   analysis of those stocks, would she be the right individual to

23   ask?

24   A     Yes.

25   Q    Mr. Riopelle asked you some questions regarding your

1   employment history before you came to the FBI.

2            I just wanted to ask you:  How long have you been

3   with the FBI?

4   A    Eight years in August.

5   Q    And what you testified to this jury about, is it based

6   upon your experience in the FBI?

7   A    Yes.

8   Q    And is it based upon your investigation in this case?

9   A    Yes.

10   Q    Mr. Riopelle asked you some questions regarding 149-4

11   regarding solicited and unsolicited orders.  I just wanted to

12   ask you, sir:

13            Would those records have been prepared by Glendale?

14   A    Yes.

15   Q    The broker where George -- the brokerage house, rather,

16   where George Castillo worked?

17   A    Yes.

18   Q    And based upon your investigation, did Glendale receive

19   shares at a significantly discounted price to assist with this

20   conspiracy?

21   A    Yes.

22            MR. RIOPELLE:  Objection.

23            THE COURT:  Sustained.

24            MR. RIOPELLE:  Move to strike.

25            THE COURT:  Stricken.

VOULGARIS - REDIRECT - BINI                    3125

1    Q    Based upon your investigation, did you find that Glendale

2    had received any benefit for their work with Discala and Cane?

3              MR. RIOPELLE:  Objection.

4              THE COURT:  Why don't you link it to an account, or

5    a corporation, or whatever.

6              MR. BINI:  Okay.

7    Q    With respect to George Castillo and the David Ben-Bassat

8    account -- let me back up.

9              Did your investigation look to shares of Cubed?

10   A    Yes.

11   Q    And did you track shares of Cubed related to an

12   individual named Marche Godffrey?

13   A    Yes.

14   Q    Where, if anywhere, did you find that those shares of

15   Cubed belonging to Marche Godffrey went?

16   A    They were deposited first to Northwest Resource to Cubed

17   then to Cede & Co.

18   Q    Sorry.  I apologize.  I've confused my individuals.

19             Let me ask you about Marcus Poe, the shares of

20   Marcus Poe.

21             Did you trace where, based on the transfer records,

22   what happened to the Cubed shares held by Marcus Poe?

23   A    Yes.

24   Q    And what did you find?

25   A    That 25,000 shares were deposited with GCEF fund or

VOULGARIS – REDIRECT – BINI                    3126

1    management, and the remainder of the shares were deposited

2    with JPMorgan.

3    Q     And what did you find as to the address of GCEF

4    Opportunity Fund?

5    A     It's the same as Glendale Securities.

6    Q     And was there a check in the amount of approximately 6200

7    from a Paul Eric Flesche for those shares?

8    A     Yes.

9    Q     And did we review those in evidence during your direct

10   examination?

11   A     Yes.

12   Q     And did it indicate it was payment for 25,000 shares?

13   A     Yes.

14   Q     Is that a purchase price of approximately 25 cents a

15   share?

16   A     Yes.

17   Q     And based on that, what conclusions, if any, did you make

18   regarding what Glendale's brokerage house and specifically

19   Paul Eric Flesche had received?

20   A     25,000 shares of Cubed at a deep discount.

21   Q     At approximately 25 cents each?

22   A     Yes.

23   Q     What was the stock trading at in and around May and June

24   of 2014?

25   A     Above $6 a share.

VOULGARIS - REDIRECT - BINI                3127

1    Q    So would those shares have been worth more than $150,000?

2    A    Yes.

3    Q    That were received for only $6,000?

4    A    Yes.

5         MR. BINI:  Mr. Riopelle asked you some questions

6    regarding text messages that I wanted to briefly go through.

7         If we can show on the screen and so, William, I ask

8    to use the overhead computer.  If we could show 129-92.

9         (Exhibit published.)

10        MR. BINI:  If you can blow up the back.

11   Q    And without going through all the text messages on your

12   direct examination, did you testify regarding certain text

13   messages involving Kyleen Cane and Northwest Resources?

14   A    Yes.

15   Q    And if we can go to the next page of this.

16        Okay, if we can go to 129-93.

17        (Exhibit published.)

18        And what's the date of this text message?

19   A    June 21st, 2013.

20   Q    And who are the parties to this text message?

21   A    Joe Laxague and Kyleen Cane.

22   Q    If we go to the second page -- rather let's go to 129-94,

23   another one of these messages.

24        (Exhibit published.)

25        Do you see where the text message on June 26th, at

1    2130 between Cane and Joe Laxague?

2    A    Yes.

3    Q    And what does that one say?

4    A    Lazar wants to know asking prices for Northwest, non-DTCC

5    and Thompson.

6    Q    And then there's the next text message from Cane where it

7    talks about $300.

8    A    Yes.

9    Q    Okay, and then if we go to the second page, I'd like to

10   ask you what is that text message, who's it from?

11   A    From Kyleen Cane.

12   Q    To whom?

13   A    Joe Laxague.

14   Q    And what did Cane indicate in that text message?

15   A    The sale of each shell company would be $300,000.

16   Q    Based on your review of these text messages from 2013

17   regarding Northwest Resources, what, if any, did you find

18   Cane's role was as to the sale of Northwest Resources?

19              MR. RIOPELLE:  Objection.

20              THE COURT:  See you at sidebar.

21              (Continued on the next page.)

22              (Sidebar conference.)

23

24

25

SIDEBAR CONFERENCE                    3129

1          (The following occurred at sidebar.)

2          MR. BINI:  Your Honor, the cross-examination had

3     suggested that the text messages are irrelevant, and what I am

4     asking about is the control of the sale of the shell and why

5     it's important to the investigation.

6          I would anticipate he would say it goes to Cane's

7     control of Northwest Resources, so I think the text messages

8     are important to cross-examination.  As suggested there's

9     no --

10         MR. RIOPELLE:  It doesn't show control, it just

11    shows two people talking about what's the right price to ask.

12         THE COURT:  I think on his cross was to show that

13    there was no connection, with respect to Cubed at the time

14    this stuff was going on.

15         MR. RIOPELLE:  Yes.  Okay.  Thank you, Judge.

16         (End of sidebar conference.)

17         (Continued on the next page.)

18

19

20

21

22

23

24

25

VOULGARIS – REDIRECT – BINI                3130
PROCEEDINGS

1          (In open court; Jury present.)

2     BY MR. BINI:

3     Q    Mr. Riopelle asked you some questions regarding the

4     impact of the David Ben-Bassat account on Cubed shares after

5     June 30th, 2014.

6               Was that the last sale of stock from the David

7     Ben-Bassat into the Cubed account?

8     A    Yes.

9     Q    What did your investigation find as to the impact, if

10    any, of the David Ben-Bassat account on Cubed after that

11    point?

12    A    After June 30th?

13    Q    Yes.

14    A    There were no additional transactions in that account.

15    Q    Based upon your investigation, do you believe the

16    Ben-Bassat account was still important even after June 30th,

17    2014?

18    A    Yes.

19    Q    Why?

20    A    Those are the original shares that came out of the

21    account -- that were released into the market.  That was that

22    first I guess tranche of 267,000 shares.  They introduced the

23    shares into the market.

24    Q    Mr. Riopelle asked you some questions regarding whether

25    the ability of or -- excuse me, strike that.

1        Mr. Riopelle asked you questions regarding whether

2   Kyleen Cane's limited trading authority over the David

3   Ben-Bassat account was unusual; is that right?

4   A    Yes.

5   Q    Okay.  And I'd like to ask you, sir -- and he asked you

6   whether it was illegal to have somebody else on the account?

7   A    That's correct.

8   Q    I'd like to ask you, sir:

9        Did you find anything unusual based upon your

10  investigation about the David Ben-Bassat account?

11       MR. RIOPELLE:  Objection.

12       THE COURT:  Sustained.

13  Q    Based upon your investigation, what did you find the

14  David Ben-Bassat account was used for?

15       MR. RIOPELLE:  Objection.

16       THE COURT:  Sustained.

17  Q    Did your investigation look to sales from the David

18  Ben-Bassat account?

19  A    Yes.

20  Q    And what did you find was the sales activity from the

21  David Ben-Bassat account?

22  A    The sales of the shares were being coordinated by

23  Ms. Cane, but they were also being -- the actual prices and

24  the sales were being coordinated.

25  Q    And the sales from the account, were they at the same

VOULGARIS – REDIRECT – BINI                     3132
PROCEEDINGS

1   price throughout the April to end of June time period?

2   A    No.

3   Q    What prices were they at, sir?

4   A    So they dictated wherever Ms. Cane or Mr. Bassat actually

5   wanted the price set that day.

6   Q    And were the prices always at $5.25, or did the sales

7   change during the period from approximately the end of

8   April 2014 to the end of June 2014?

9   A    They changed.

10  Q    How so?

11  A    They increased.

12  Q    From approximately what price to what price, sir?

13  A    From which date range?

14  Q    From the end of April 2014 through the end of June 2014.

15  A    They started off about a dollar -- I'm sorry, five

16  twenty-five, and ended end of June just shy of $7 a share.

17  Q    Those were the sales prices out of the account?

18  A    From what I can recall, unless I can see a record to show

19  me otherwise.

20  Q    Okay.  And do the sales prices from that account roughly

21  match the stock price for Cubed?

22  A    Yes.

23            MR. BINI:  No further questions, Your Honor.

24            THE COURT:  Mr. Bowman, do you have any?

25            MR. BOWMAN:  Yes, Your Honor.

VOULGARIS - RECROSS - BOWMAN                    3133

1          May I have 129-101, please, government exhibit.

2     RECROSS-EXAMINATION

3     BY MR. BOWMAN:

4     Q    Agent Voulgaris, I'm going to ask you to look at what is

5     now GX129-101.  And this is a text exchange between Ms. Cane

6     and Mr. Discala that you've testified about earlier.

7     A    Yes.

8     Q    Starting with very good, ETC fixed, name change started,

9     split started, Doug moving in a CDO.

10          Do you know who Doug was?

11    A    Yes.

12    Q    Who is that?

13    A    Doug Shinsato.

14    Q    And he was a person whose name came up during the course

15    of your investigation?

16    A    Yes.

17    Q    Drafting licensing deal, all in.

18          MR. BINI:  Objection.  Outside the scope of the

19    cross-examination, or redirect examination.

20          MR. BOWMAN:  I believe that Mr. Riopelle crossed on

21    this.

22          THE COURT:  I'm going to allow it as followup.

23    Q    All in motion, just as in plan I sent.

24          THE COURT:  It's not cumulative at least, it's

25    something new.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

VOULGARIS - RECROSS - RIOPELLE                3134

1        MR. BOWMAN:  Yes.

2    Q    And Mr. Discala says, You're the best, TY, TY, truly.

3         Was Mr. Discala expressing his gratitude to Ms. Cane

4    for the work she was doing?

5    A    It appears so.

6    Q    And would you say he was very grateful based on the fact

7    that he said thank you, thank you, truly?

8         MR. BINI:  Objection.  Relevance.

9         THE COURT:  Yes.

10   Q    Did it appear that he was relying upon Ms. Cane to do the

11   tasks that she said she had accomplished?

12        MR. BINI:  Objection.

13        THE COURT:  Sustained.

14   Q    Do you recall who gave you the information as to where

15   Mr. Discala was when he -- when you went to his house?

16        MR. BINI:  Objection.  Outside the scope.

17        THE COURT:  Sustained.

18        MR. BOWMAN:  I have nothing further, Your Honor.

19        THE COURT:  Thank you, Mr. Bowman.

20        Anything from you, Mr. Riopelle?

21        MR. RIOPELLE:  Yes, just a question or two.

22   RECROSS-EXAMINATION

23   BY MR. RIOPELLE:

24   Q    Special Agent Voulgaris, as the case agent, did you ever

25   seek an arrest warrant for George Castillo?

VOULGARIS - RECROSS - RIOPELLE          3135

1    A    No.

2    Q    And so far as you know, George Castillo at Glendale

3    Securities never been arrested, correct?

4              MR. BINI:  Objection, Your Honor.

5              THE COURT:  Sustained.

6    Q    And same is true of Hunter Adams, correct?

7              MR. BINI:  Objection, Your Honor.

8              THE COURT:  You're asking if he got an arrest

9    warrant?

10   Q    Did you ever seek an arrest warrant --

11             MR. BINI:  Outside the scope.  And this was already

12   deal with on his cross.

13             THE COURT:  Yes, it is outside the scope of the

14   redirect.

15             MR. RIOPELLE:  Then I will withdraw the question,

16   Your Honor.

17             Thank you, Special Agent Voulgaris, I know you have

18   some place to go.  God speed.

19             THE COURT:  Thank you.

20             I assume, Mr. Bini, there is no redirect.

21             MR. BINI:  There is not, Your Honor.  Thank you.

22             THE COURT:  Special Agent Voulgaris, thank you very

23   much.  You are excused.

24             THE WITNESS:  Thank you, Your Honor.

25             (Whereupon, the witness was excused.)

PROCEEDINGS                    3136

1          THE COURT:  Ms. Jones.

2          MS. JONES:  Your Honor, the government rests.

3          THE COURT:  The government rests?

4          MS. JONES:  Yes.

5          THE COURT:  Ladies and gentlemen, as you will

6  recall, once you start harkening back to the instructions you

7  received way began at the beginning of trial, I would refer to

8  these various building blocks.  Well, we've come to one those

9  end of the building block.  The government has rested.

10          As you'll recall, it's not the end of the case by

11  any stretch of the imagination, it's just we reached a

12  milestone.

13          Now, sometimes when we reach milestones, the Court

14  has to get reconfigured a bit on legal issues that come up

15  that don't involve the jury, and it's around the midafternoon

16  break at any rate, so we're going to take the break.

17          We're going to have to address some legal issues, so

18  we'll make the break a little longer so that other personnel

19  can get the benefit that you're going to get.  So let's assume

20  that will be 20 to 25 minutes.  We'll send you back to the

21  jury room where you can relax there.

22          The fact that you get a little longer break doesn't

23  mean any of the rules change.  Continue to keep an open mind

24  and do not discuss the case amongst yourselves or with anyone

25  else you may run into in the back.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                                    3137

1          We'll come and get you as soon as we can.

2          (Jury exits the courtroom.)

3          (Continued on next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                                3138

1        THE COURT:  The motions at the close of the

2   Government's case in chief.

3        MR. ROSS:  Judge, I move that the Government's case

4   is insufficient for your Honor to send to the jury and I'd ask

5   it be dismissed.

6        MR. RIOPELLE:  On behalf of Ms. Cane, I move under

7   Federal Rule of Criminal Procedure 29 for a dismissal of the

8   case for insufficiency of evidence, particularly on the issue

9   of intent.

10        THE COURT:  Does the Government wish to make a

11   record on their side?

12        MS. JONES:  Your Honor, we believe that viewing the

13   evidence in the light most favorable to the Government and

14   drawing all inferences in our favor, there is more than enough

15   evidence to submit this case to the jury.

16        THE COURT:  The Court will reserve decision at the

17   close of the Government's case in chief.

18        Mr. Riopelle, you're going to be up first?

19        MR. RIOPELLE:  Yes.  I have a very brief stipulation

20   to read and then a very brief witness and we, too, will rest.

21        THE COURT:  I know based on our earlier conversation

22   Mr. Ross wants to defer on this, but since we are almost at

23   the close of Ms. Cane's case...

24        I understand from you, Mr. Riopelle, that at this

25   time, though pending what may develop on Mr. Discala's case,

*LAM        OCR        RPR*

PROCEEDINGS                          3139

1   it is Ms. Cane's intention to exercise her right to remain

2   silent.

3                MR. RIOPELLE:  That is my understanding, your Honor.

4                THE COURT:  Ms. Cane, as you probably heard me say

5   earlier on, this is such an important right.  While we

6   certainly believe that the attorneys will always represent to

7   the Court what their client has decided, it's so important

8   that I ask personally a couple of questions.

9                The first and most important thing that you must

10  understand is you have a right not only to remain silent but

11  also have the right to take the witness stand and testify in

12  your own defense.  The other thing, obviously, under the Sixth

13  Amendment, you also have a right to have competent counsel

14  represent you.

15               So the first question is:  Have you had a chance to

16  thoroughly discuss this decision of whether to remain silent

17  or to take the stand with your attorney?

18               DEFENDANT CANE:  Yes.

19               MR. RIOPELLE:  She has terrible laryngitis.

20               DEFENDANT CANE:  Sorry.

21               THE COURT:  I can hear her.  If I can't, I'll yell

22  back at her.

23               And on the basis of your discussions and advice with

24  your counsel, have you reached a decision as to whether or not

25  you will remain silent or take the stand?

PROCEEDINGS                              3140

1              DEFENDANT CANE:  I'll remain silent.

2              MR. RIOPELLE:  She said she'll remain silent.

3              She may have no other option.

4              THE COURT:  And that's not because you have

5    laryngitis.

6              DEFENDANT CANE:  That's correct.

7              THE COURT:  Thank you very much.

8              Now Mr. Discala, I'll be asking you the same

9    question, so you've gotten a preview.  In deference to

10   Mr. Ross' choice, I will wait towards the end of your case

11   before I ask you that.

12             DEFENDANT DISCALA:  Thank you, your Honor.

13             THE COURT:  Is there anything else we need to attend

14   to before we take our little break and come back?

15             MR. ROSS:  The only thing for us is that Mr. Parker

16   has a flight later on in the day.  I don't think there's going

17   to be any problem, we'll put him on first to make sure he

18   makes his flight.

19             THE COURT:  Okay.  Aside from the days I've

20   forecasted in advance we'd be leaving early, we haven't left

21   too early.  So, we'll stay until we have to.

22             MS. JONES:  Your Honor, I just wanted to ask a

23   procedural question.

24             Are we planning on sitting on Friday?  We hope so,

25   but we just wanted to confirm.

*LAM        OCR        RPR*

PROCEEDINGS                            3141

1          THE COURT:  The short answer is if for some reason

2    we're still taking testimony, the answer would be no.  And

3    under those circumstances, we will not be sitting Friday,

4    Monday, and Tuesday.

5          MS. JONES:  Okay.

6          THE COURT:  If, in fact, the jury has gotten the

7    case, we will allow deliberations to continue on Friday.

8          MS. JONES:  Okay.  Great.

9          MR. RIOPELLE:  And will deliberations then continue

10   Monday and Tuesday?

11         THE COURT:  No, not in my absence.

12         MR. RIOPELLE:  Fair enough.

13         I am worried about what happens if we start with

14   summations on Thursday and get the first couple in.  Are we

15   going to go break things up in that way, if we have to, or try

16   to just move it over?

17         THE COURT:  Today is Monday.  So, I don't know how

18   long we're going.  I'm expecting that we will start summations

19   sometime tomorrow unless there's an exceedingly long witness

20   that I am unaware of.

21         MR. RIOPELLE:  Okay.  Tomorrow or Wednesday sounds

22   sensible to me, like it could happen, but life is

23   unpredictable.

24         THE COURT:  Notwithstanding getting Mr. Parker on,

25   it is still our plan to have the charge conference this

*LAM      OCR      RPR*

PROCEEDINGS                        3142

1    evening.

2             MR. RIOPELLE:  Yes.  I have my notes and am ready to

3    go on that, Judge.

4             THE COURT:  So, that will be out of the way.

5             So we'll be wherever Mr. Ross is with his witnesses.

6    And as I understand it at this point, we're not anticipating a

7    rebuttal case, but, of course, the Government can't answer

8    that until Mr. Discala's case is finished.

9             MS. JONES:  That's correct, your Honor.  We're not

10   anticipating it, but we'll see.

11            THE COURT:  But it could be.

12            So, if, in fact, we don't have a rebuttal case and

13   Mr. Ross' witness list is pared down to where he thinks it is,

14   I would assume we will be reaching summations tomorrow.

15            MS. JONES:  Great.

16            THE COURT:  And we'll go from there.

17            And what I'll ask you and you can keep in mind and

18   think about, at some point during the charge conference or at

19   the end of the charge conference I'll ask you to give us a

20   ballpark on how long your summations are.

21            MR. ROSS:  That's fine, Judge.

22            THE COURT:  Just start to think in those terms.  We

23   will see you in about fifteen.

24            MR. RIOPELLE:  Thank you, your Honor.

25            (Recess taken.)

Proceedings                                    3143

1        THE COURTROOM DEPUTY:  Counsel for both sides are

2   present, including Defendants.

3        MR. HEIN:  I wanted to raise one point prior to

4   Mr. Riopelle's witness Mr. Baker testifying.

5        We just wanted to ensure that Mr. Riopelle does not

6   elicit any instances of specific good conduct or any hearsay

7   from his client stated to Mr. Baker.

8        MR. RIOPELLE:  I do not intend to elicit that

9   evidence, your Honor.  And he's been prepared to respond to

10   appropriate questions, so I don't think that will be a

11   problem.

12        THE COURT:  Following the methodology we used last

13   week.

14        MR. RIOPELLE:  Yes.  I suspect Mr. Hein will object

15   vociferously if we stray, which we do not intend to do, but

16   life being what it is...

17        THE COURT:  That being the case, we can get the

18   jury.

19        MR. RIOPELLE:  Thank you, your Honor.

20        MR. HEIN:  Thank you, your Honor.

21        THE COURT:  You're welcome.

22        As the wise old carpenter once told, Measure twice,

23   cut once.

24        (Jury enters.)

25        THE COURT:  Be seated, please.

*LAM        OCR        RPR*

Proceedings                          3144

1          Counsel will stipulate that the jury is present and

2    properly seated?

3          MS. JONES:  Yes, your Honor.

4          MR. ROSS:  Yes, your Honor.

5          MR. RIOPELLE:  So stipulated, your Honor.

6          THE COURT:  Ladies and gentlemen, welcome back.

7    We're ready to resume this session.  As you know, the

8    Government has rested.  Now we're shifting to the defense

9    case.  I will remind you of a couple of things I told you last

10   week.

11         Remember via accommodation -- the attorneys working

12   with each other, trying to make the case most efficient for

13   all concerned, especially you, the jury -- we began to hear

14   Ms. Cane's case last week when a couple of witnesses

15   testified.  I'll remind you what I said at that time.

16         Defendants are not required to produce any evidence,

17   none whatsoever.  And they certainly are not required to take

18   the stand.  And if they do offer evidence in the form of

19   testimony or documents, they're still not required to take the

20   stand.  And if a defendant chooses not to take the stand, a

21   jury may draw absolutely no inference whatsoever from that

22   decision.

23         So, with that, we now rejoin Ms. Cane's defense case

24   and ask Mr. Riopelle if he has another witness.

25         MR. RIOPELLE:  I do, your Honor.

Proceedings                                    3145

1          And I think the jury will be relieved to know that

2     it is a brief witness and our last witness.  But because I

3     don't want to make them completely happy, I do have a short

4     stipulation to read before we get to that witness.  So, we'll

5     start with the stipulation.

6               THE COURT:  Very good.

7               MR. RIOPELLE:  Which reads as follows:  It is hereby

8     stipulated and agreed by and between the undersigned parties

9     that Zachary Cundiff, Mr. Cundiff, is employed by Wells Fargo

10    Bank, North America, herein after "Wells Fargo," in the legal

11    order processing department and is qualified to certify the

12    authenticity of business records of Wells Fargo and to testify

13    as a custodian of Wells Fargo's records.

14               In the course of his employment and in response to a

15    subpoena, Mr. Cundiff searched the records of Wells Fargo to

16    retrieve Wells Fargo's records relating to bank accounts

17    maintained by Cane Clark, LLP, Brian R. Clark, and Kyleen Cane

18    at Wells Fargo.

19               Mr. Cundiff's search of Wells Fargo's records found

20    no reports of suspicious activity filed by Wells Fargo with

21    the federal government in connection with the Wells Fargo

22    accounts maintained by Cane Clark, LLP, Brian R. Clark, and

23    Kyleen Cane.

24               This stipulation marked, KC-ST-1 is admissible in

25    evidence at trial and it is dated April 24, 2018, and signed

                    LAM        OCR        RPR

Proceedings                           3146

1    by all parties.

2              And with that, your Honor, I offer Defendants'

3    Exhibit KC-ST-1.

4              THE COURT:  Received in evidence without objection.

5              (Defendant's Exhibit KC-ST-1, was received in

6    evidence.)

7              MR. RIOPELLE:  Thank you, your Honor.  And now

8    Ms. Cane calls David Baker to the witness stand.

9              (Witness sworn.)

10             THE COURTROOM DEPUTY:  Please state your.

11             THE WITNESS:  David Baker, D-A-V-I-D B-A-K-E-R.

12             THE COURTROOM DEPUTY:  Thank you.  Have a seat,

13   please.

14             THE COURT:  Mr. Riopelle, you may inquire.

15             MR. RIOPELLE:  Thank you, Judge.

16

17

18

19

20

21

22

23

24

25

                    LAM        OCR        RPR

1          (Witness takes the witness stand.)

2    **DAVID BAKER,**

3          called by the defense, having been first duly sworn,

4          was examined and testified as follows:

5    DIRECT EXAMINATION

6    DIRECT EXAMINATION

7    BY MR. RIOPELLE:

8    Q    Mr. Baker, where do you live?

9    A    Las Vegas, Nevada.

10   Q    And have you traveled here today to testify in this case?

11   A    Yes.

12   Q    Can you describe your education for us, sir?

13   A    Sure.  I have an undergraduate degree in political

14   science and a law degree from Golden Gate University.

15   Q    And when did you obtain your law degree from Golden Gate

16   University?

17   A    I believe 1994.

18   Q    And what industry have you worked in since that time?

19   A    The financial markets almost the entire time, less three

20   and a half years in self-storage.

21   Q    During your travels, did you ever work as an intern with

22   the Securities and Exchange Commission?

23   A    Yes, during my second year of law school for the Division

24   of Enforcement under Bob Singletary and then the Division of

25   Corporation Finance for a summer.

1    Q    And can you describe for the jury the types of work that

2    you have done in the securities industry?

3    A    Sure.  After graduating from law school, initially I was

4    a broker, then I was a hedge fund manager.  I've been a hedge

5    fund manager for two different funds and recently starting my

6    third fund.  I've been an investment banker conducting

7    alternative public transactions, I've been a proprietary

8    trader here in New York for First New York Securities.  So, a

9    variety of different securities-related roles throughout my

10   entire career.

11          I've authored two patents issued by the Patent

12   Trademark Office in connection with group and sector rotation,

13   and they were the basis of a company that was eventually a few

14   years ago acquired by Fact Set Data Systems, a large New York

15   information company.

16   Q    Was there ever a point in time when you worked at Merrill

17   Lynch?

18   A    Yes, 1992, I believe -- it's been a long time -- for

19   three years at the 580 California Street office, which now I

20   understand has moved across the street to 600 California.

21   Q    When you say California Street --

22   A    In San Francisco, I apologize.

23   Q    And what were you doing at Merrill Lynch during that

24   time?

25   A    I was a retail broker before leaving and starting my

BAKER - DIRECT - RIOPELLE                    3149

1    first hedge fund.

2    Q    Did you start your first hedge fund after leaving Merrill

3    Lynch?

4    A    Yes.

5    Q    And approximately when was that?

6    A    1994.

7    Q    Now, what sorts of investments did the hedge funds you've

8    described make?

9    A    Small cap and micro capitalization companies.  So, market

10   capitalizations initially back then from --

11            MR. HEIN:  Objection, your Honor, relevance.

12            MR. RIOPELLE:  It goes to experience with my client.

13            THE COURT:  Briefly.

14   Q    Briefly.

15   A    Investing in small and micro cap companies from

16   10 million to, let's say, 200 million.

17   Q    And have you also from time to time worked as a

18   consultant to small or micro cap companies?

19   A    Yes.  For many years.

20   Q    And did your role include helping them to raise capital?

21   A    Yes, originate transaction, structure the capitalization,

22   introduce them to capital, et cetera.

23   Q    And did some of those transactions involve something

24   called a "reverse merger"?

25   A    Yes.

BAKER - DIRECT - RIOPELLE                    3150

1    Q    And can you very briefly describe what a reverse merger

2    is?

3    A    A reference merger is a merger --

4             MR. HEIN:  Objection, your Honor.

5             THE COURT:  Again, just for background purposes?

6             MR. RIOPELLE:  Yes.

7    A    A merger whereby an acquiring company forms a subsidiary

8    company, the subsidiary company then acquires the target

9    company, and then after acquiring the target company the

10   subsidiary is absorbed by the target company.

11            And it's done instead of direct merger because,

12   number one, there's only one shareholder in the subsidiary

13   and, number two, it allows acquisitions sometimes whereby the

14   acquisition can be made where it normally wouldn't be able to

15   be made because of nontransferable assets or contracts in the

16   target company.

17   Q    With that background, did there come a time when you met

18   my client, Kyleen Cane?

19   A    Yes.

20   Q    Mr. Baker, when was it that you met Kyleen Cane,

21   approximately?

22   A    2005.

23   Q    How is it that you met my client, Kyleen Cane?

24   A    We were working on a transaction for a company called

25   Handheld Entertainment and she become issuers' counsel.

*LAM        OCR        RPR*

BAKER - DIRECT - RIOPELLE                3151

1    Q    And have you worked with her in other transactions over

2    the years?

3    A    Yes, maybe fifteen transactions, plus or minus.

4    Q    And can you tell us the sorts of transactions that you

5    have worked with Ms. Cane on?

6    A    Sure.  Reverse reference mergers and other alternative

7    going-public transactions.

8    Q    And did they require you to do intensive work with her?

9    A    Yes, frequently.  Sometimes daily, even.

10   Q    And during the time that you were involved professionally

11   with Ms. Cane, did you have an opportunity to observe her

12   behavior as an attorney?

13   A    Yes.

14   Q    And was she ever an attorney -- who did she represent in

15   the deals that you worked with her on?

16   A    Only the issuers, only the companies themselves.  Not me,

17   not other people; the company itself.

18   Q    Do you remain friendly with her today?

19   A    Very.  She's become a lifelong friend.

20   Q    And do you continue to see her socially from time to

21   time?

22   A    Yes.

23   Q    About how often do you see Ms. Cane socially?

24   A    Sometimes weekly, sometimes monthly.  Depends on our

25   travel schedules.

BAKER - CROSS - HEIN                3152

1   Q    Now, based on your experience with Ms. Cane

2   professionally, do you have an opinion concerning her honesty

3   and integrity as a professional?

4   A    Yes.

5   Q    Can you tell the jury what that opinion is?

6   A    She's the most honest, ethical, high-integrity person

7   that I've ever met.  She's also the most generous and cares

8   about everybody.

9          MR. RIOPELLE:  Thank you.  I have no further

10  questions at this time.

11         THE COURT:  Mr. Hein, do you have any cross?

12         MR. HEIN:  Yes, your Honor.

13  CROSS-EXAMINATION

14  CROSS-EXAMINATION

15  BY MR. HEIN:

16  Q    Mr. Baker, you testified that you have a close

17  relationship with Ms. Cane; is that right?

18  A    Yes.

19  Q    Is it fair to say that you wouldn't want to see her get

20  in trouble?  Is that right?

21  A    Absolutely.

22  Q    And you're here to help her?

23  A    I am.

24  Q    Mr. Baker, you didn't have any involvement with a company

25  called Cubed, correct?

                    *LAM       OCR       RPR*

BAKER - CROSS - HEIN                3153

1    A    Correct.  I don't even know who that is.

2    Q    And you didn't have any involvement with a company called

3    Northwest Resources?

4    A    Correct.  I don't know who that company is either.

5    Q    And you have not seen any of the evidence in this case,

6    right?

7    A    No, sir.  My first knowledge of the case was just getting

8    the subpoena.

9            MR. HEIN:  No further questions, your Honor.

10           THE COURT:  Thank you, Mr. Hein.

11           Any cross by Mr. Discala?

12           MR. ROSS:  No, your Honor.

13           MR. RIOPELLE:  And no redirect.

14           Thank you, Mr. Baker.

15           THE COURT:  Mr. Baker, you're excused.  Safe trip

16   back to Las Vegas.

17           THE WITNESS:  Thank you.

18           (Witness excused.)

19           MR. RIOPELLE:  With that, Ms. Cane rests her case.

20           THE COURT:  Thank you, Mr. Riopelle.

21           Another one of the building blocks, ladies and

22   gentlemen.  Ms. Cane's defense case-in-chief has rested.  We

23   now turn to Mr. Discala.

24           Mr. Ross, does Mr. Discala have a case?

25           MR. ROSS:  Yes, your Honor.  Mr. Discala will call

                    *LAM      OCR      RPR*

BAKER - CROSS - HEIN                    3154

1    David Parker to the witness stand.  Let me just go get him,

2    and Mr. Shroyer will do the direct.

3              THE COURT:  Okay.

4              MR. SHROYER:  Your Honor, Mr. Discala calls David

5    parker.

6              (Witness sworn.)

7              THE COURTROOM DEPUTY:  Please state your first and

8    last name and spell it for the record.

9              THE WITNESS:  David Parker, P-A-R-K-E-R.

10             THE COURTROOM DEPUTY:  Thank you.  Have a seat.

11             THE COURT:  Mr. Shroyer, you may inquire.

12             MR. SHROYER:  Thank you, your Honor.

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:14-cr-00399-ENV   Document 665   Filed 10/20/18   Page 151 of 243 PageID #: 5989

1          (Witness takes the witness stand.)

2  **DAVID PARKER,**

3          called by the Government, having been first duly sworn,

4          testified as follows:

5  DIRECT EXAMINATION

6  DIRECT EXAMINATION

7  BY MR. SHROYER:

8  Q     Good afternoon, Mr. Parker.

9  A     Good afternoon.

10  Q     Mr. Parker, where do you live?

11  A     I currently live in Las Vegas.

12  Q     So, did you come into town to provide testimony in this

13  case?

14  A     Yes, sir, I did.

15  Q     And can I ask you, Mr. Parker, about your educational

16  background?

17  A     My educational background?

18  Q     Yes.

19  A     I was originally in a trade school for my first -- what I

20  consider my first career.  And then after that, near the end

21  of that career, I went to college.  I completed all but I

22  think the last three classes of a bachelor's degree.

23  Q     Okay.  And what did you do after college?

24  A     I retired as a career police officer and I converted over

25  and started working in marketing and internet with our family

PARKER - DIRECT - SHROYER                           3156

1   business.

2   Q    I apologize, do I have it right, then, that you had a

3   career as a police officer and after you retired from that you

4   took courses in college?

5   A    I began college about two years -- two or three years

6   before I retired and started working part-time for our family

7   business, which they had a marketing business.

8   Q    Okay.  Before you went into the marketing business, what

9   was your career up to that point?

10  A    Up to the marketing business?

11  Q    Before you got into marketing, what did you do?

12  A    I was a police officer in Indianapolis for 20 years.

13  Q    Can you tell me about the marketing company you're

14  involved with now?

15  A    The marketing company I'm involved with now, I have a

16  consultancy called Thinks Network, which is a derivative of

17  our family business, which was Creative Direction out of

18  Indianapolis.  The Thinks Network consultancy, which I do,

19  handles the one-on-one interactions with people to help them

20  prepare things for their marketing efforts.

21  Q    So, do I have it right that it's a marketing consulting

22  company?

23  A    Yes, sir.

24  Q    Are there any other services that Thinks Consulting

25  provides?

PARKER - DIRECT - SHROYER                3157

1    A    We do due diligence and research on emerging products and

2    start-ups, usually when they have to do with technology.

3    Q    Sir, in your business dealings with Thinks Consulting,

4    did you ever meet an individual named Max Khan?

5    A    Yes.

6    Q    About when?

7    A    Probably about 2010, something like that.

8    Q    And what kind of work did you do, if any, for Mr. Khan?

9    A    For Mr. Khan, I would typically go in and do what I call

10   a due diligence, which I don't think that really is the

11   appropriate term but it's what I call it.  I know due

12   diligence has another meaning in the business world, but I

13   would go in and I would research start-up companies that had a

14   technical aspect to them and issue a report to him on what I

15   found.

16   Q    And to your knowledge, did Mr. Khan have a relationship

17   with an Abraxas Discala?

18   A    Yes.

19   Q    And I'd like to turn now to a company called Cubed.  Are

20   you familiar with that company?

21   A    Yes, I am.

22   Q    And when did you become familiar with it?

23   A    I received a phone call from Max Khan in October of 2013,

24   asking me if I would check a technology start-up company that

25   he and some business affiliates were thinking about investing

PARKER – DIRECT – SHROYER                    3158

1   in.

2   Q    And did you do that?

3   A    Yes, I did.

4   Q    And how were you involved initially with doing this

5   research on Cubed?

6   A    Initially, I took a look at -- initially, I looked at the

7   base product and the presentation to see what they had said

8   about the product.  And then I looked at the social media

9   aspects and did some research on the back-end programming of

10  the product, which is a lot of what I'm really familiar with,

11  especially at that time.  And then I interviewed the -- their

12  head of IT or the person that ran their IT team about how they

13  were programming the product and how it could expand, how it

14  could be handled on the internet, things of that nature.

15  Q    Did there come a time that you went to Las Vegas?

16  A    Yes.

17  Q    And when did you go to Las Vegas?

18  A    I engaged in a phone conversation with Steve White, who I

19  believe at that time was the president of Cubed, and agreed to

20  fly to Las Vegas to meet with him and his initial team to

21  discuss going onboard with them.

22  Q    Did you meet Mr. White and his team?

23  A    Yes, I did.

24  Q    And at that time, how did you -- did you understand that

25  Mr. Discala had a relationship with the company?

*LAM        OCR        RPR*

PARKER - DIRECT - SHROYER                    3159

1   A    Yes, I did.

2   Q    And was that with the group of Mr. White and his team

3   with Mr. Khan on the investment end or something else?

4   A    No.  Mr. Discala -- as I understood, Mr. Discala was with

5   the Omni investor group in New York.

6   Q    So, to your knowledge, at that time, they were not --

7   Mr. Discala was not an insider at the company?

8   A    No, not at all.

9   Q    And you mentioned that you prepared a report after your

10  initial research into the company; is that right?

11  A    I'm sorry, could you say that again?

12  Q    Sure.  I'll speak in the microphone a little.

13  A    Thank you.

14  Q    Sure thing.

15        You said you prepared a report after looking into

16  the company.

17  A    Yes.

18        MR. SHROYER:  If I could show to the witness what's

19  been premarked as Defendants' Exhibit 3500-DP-3.

20        THE COURT:  You may.

21  Q    And Mr. Parker, if I can have you take a look at the

22  screen there, is this the report that you prepared?

23  A    Yes, it is.

24        MR. SHROYER:  And it might be easier, your Honor, if

25  I approach and hand him a copy.

1        THE COURT:  I don't know where the purpose is going,

2   Mr. Shroyer.  He identified the report that he made.

3        MR. SHROYER:  That's correct.

4        I'd move to put it into evidence at this time.

5        THE COURT:  Is there any objection?

6        MR. BINI:  No objection, your Honor.

7        THE COURT:  No objection, received in evidence

8   without objection.

9        MR. SHROYER:  May I approach, your Honor?

10       THE COURT:  Sure.

11       (Defendant's Exhibit 3500-DP-3, was received in

12   evidence.)

13  Q    Mr. Parker, the document that I just handed up to you, is

14  that the same document that appears on your screen?

15  A    I believe so, yes.

16  Q    Take a look -- it's probably easier for you to look at

17  the it that way -- to see if that's the report that you

18  prepared, if it is, indeed.

19  A    Okay.  I'm familiar with this now.

20       MR. SHROYER:  If we could publish to the jury.

21       THE COURT:  How many pages is it?

22       MR. SHROYER:  Ten pages, your Honor.

23       THE COURT:  Okay, publish.

24       (Exhibit published to the jury.)

25  Q    If we look at the top here, Mr. Parker, what does that

PARKER - DIRECT - SHROYER                    3161

1    say there?

2    A    Executive summary.

3    Q    All right.  And above that?

4    A    Crackpot/Cubed Marketing Plan.

5    Q    Why was it that you came to create a marketing plan for

6    Cubed?

7    A    It was agreed upon in my discussions with Steve White --

8         MR. BINI:  Objection to discussions with Steve

9    White.

10        THE COURT:  He said that's when it was, it came as a

11   result.  He didn't tell us what the discussions are.

12        This resulted from a discussion with Steve White.

13   That question, the objection is overruled.

14   Q    You can continue, Mr. Parker.

15   A    As a result of business meetings, it was determined that

16   I would engage with Cubed to create a marketing plan and

17   marketing documents for them based upon the opinion that I

18   submitted to Mr. Khan and then, ultimately, to the rest of the

19   investors in New York.

20   Q    Great.  And just briefly, I just want to get a flavor of

21   what this document is about.  If I could point you to the

22   section number two where it says "targeted users;" do you see

23   that?

24   A    Yes, sir.

25   Q    And under that, you put there "in the USA;" is that

PARKER - DIRECT - SHROYER                    3162

1    accurate?

2    A    Yes.

3    Q    And, so, this is a portion of the marketing plan about

4    how to target individuals in the USA; is that right?

5    A    At the point this document was used, yes.

6    Q    Okay.  And below that, there's another section for

7    abroad, right?

8    A    Yes.

9    Q    And turning to Page 2, there's a specific area about the

10   Asia-Pacific region?

11   A    Yes.

12   Q    And Mr. Parker, this marketing plan that you devised,

13   this was a marketing plan for the actual product; is that

14   right?

15   A    That is correct.

16   Q    So, this marketing plan had nothing to do with securities

17   of the company or shares of stock or anything like that; is

18   that correct?

19   A    That is correct, sir.

20   Q    Did there come a time that you earned a salary from the

21   company known as Cubed?

22   A    I received a monthly -- I was 1099.

23   Q    And were you living in Las Vegas at the time?

24   A    I was traveling back and forth between my original

25   hometown Indianapolis and Las Vegas.  I was living out of a

                    LAM        OCR        RPR

1    hotel for several weeks at a time.

2    Q    And who was taking care of your costs and your expenses

3    in making that commute?

4    A    The Crackpot/Cubed company.

5    Q    And about when was it that you began working on that 1099

6    basis for the company as opposed to for Mr. Khan?

7    A    As I recall, I began actually working for them on the

8    first of December, 2013.

9    Q    And when you started working there, can you tell us

10   approximately how many people were working at the Cubed

11   office?

12   A    I believe three to four.

13   Q    So, there were approximately three to four people working

14   in the office, but, based on your understanding, were there

15   other people based anywhere else that were working for the

16   company?

17   A    Yes, the IT people, the people actually building the

18   product.

19   Q    To your knowledge, approximately how many of those people

20   were there?

21   A    To my recollection, it was about 40 developers in

22   Macedonia.

23   Q    And other than the individuals who are working actually

24   in the Cubed office, were you aware of any contract work that

25   the company had, any relationships that the company had to

PARKER - DIRECT - SHROYER                    3164

1   other individuals who were working for the company on a

2   contract basis?

3   A    I did not have personal knowledge of that other than

4   myself and the -- I actually saw the contract for the IT

5   people, their monthly contract.

6   Q    All right.  So, to your knowledge, there was such a

7   contract?

8   A    With the IT people?  Yes.

9   Q    And that was separate from the team of engineers in

10  Macedonia?

11  A    No, that is the Macedonia people.

12  Q    Understood.

13  A    Initially, yes.

14          MR. SHROYER:  And if I could show something just to

15  the witness, please.

16          THE COURT:  You may.

17  Q    Showing you another document, Mr. Parker, do you

18  recognize this document?

19  A    Yes, I do.

20  Q    And can you just describe what it is?

21  A    Yes.  Not in much --

22          MR. BINI:  I'm going to object to the relevance of

23  this additional document, which is cumulative of the last one.

24          THE COURT:  Sustained.

25          MR. SHROYER:  Your Honor, the timeframe and the

1    continuing work that Mr. Parker was doing for the company

2    would be the relevance of the document.

3         THE COURT:  You can ask him if he continued his

4    work.  The document itself -- frankly, I would have sustained

5    the objection to the original one, but go ahead ask him if he

6    continued.

7         MR. SHROYER:  Sure thing.  Thank you, your Honor.

8    Q    Mr. Parker, did you continue to work for Cubed?

9    A    Yes.

10   Q    For approximately how long?

11   A    Officially until February 27.

12   Q    During that time --

13        THE COURT:  Of what year, Mr. Parker?

14        THE WITNESS:  I'm sorry, sir.  February 27 of 2014.

15   Q    During that time, did you take part in preparing any

16   documents that would be presented to investors?

17   A    Yes, I did.

18        MR. SHROYER:  If I could show just to the witness.

19   Q    Do you recognize this document?

20   A    Not by the size that's showing up on the screen.

21   Q    It is zoomed in a bit.

22        Does that help you recognize this document?

23   A    Yes.  I believe I played a part in putting that together.

24        MR. BINI:  Your Honor, I'm going to object to

25   relevance now to 3500-DP-8.

1           THE COURT:  I concur.

2           MR. SHROYER:  Your Honor, this document is going

3   to -- I believe that the testimony will show that there were

4   revenue projections, contracts that were being contemplated by

5   the company, by the insiders in the company, by the CEO that

6   show --

7           THE COURT:  If you want to ask him -- the best

8   evidence of what he found is what he's going to tell you.

9           MR. SHROYER:  Okay, your Honor.

10          At this point, based on this testimony, I would ask

11  that 3500-DP-8 be moved into evidence?

12          MR. BINI:  Objection, relevance.

13          THE COURT:  Sustained.

14  Q    Mr. Parker, did you --

15          THE COURT:  Do you want to talk to me at sidebar,

16  Mr. Shroyer?

17          MR. SHROYER:  Yes, your Honor.

18          (Continued on the next page.)

19

20

21

22

23

24

25

SIDEBAR                                    3167

1              (The following occurred at sidebar.)

2              MR. SHROYER:  Your Honor, this document --

3              THE COURT:  Why do you think it's relevant?  To

4     what?

5              MR. SHROYER:  A large portion of the Government's

6     case is based on the proposition that these businesses aren't

7     real businesses, that they're empty shells, they never had any

8     value, and, A, this witness is on the stand to show that

9     that's not true, and, B, he can also help to show that even if

10    the Government's proposition is true, that there were steps

11    taken by the company insiders to hide that fact not just from

12    the public but individuals on the outside, such as

13    Mr. Discala.

14             THE COURT:  The "shell."

15             MR. SHROYER:  They made the argument -- I shouldn't

16    use the word "shell," that these companies after they went

17    through the reverse merger --

18             MR. BINI:  This wasn't a reference merger.  It's

19    intellectual property purchase.

20             MR. SHROYER:  Semantics.

21             That these companies, after they came out of the

22    transactions that turn them into public entities, that those

23    entities, Cubed, CodeSmart, the Staffing Group, were not real

24    companies.  Now, Mr. Parker has already demonstrated to

25    whatever extent that that's not true, that there was a real

1    company with a real product doing a real business.

2           Now, this next portion of testimony will demonstrate

3    that even if that was true, that there were steps taken by the

4    insiders, the CEO of the company and the people who were based

5    in Las Vegas, to hide the fact that these were empty companies

6    from individuals on the outside, such as Mr. Discala.

7           MR. BINI:  Your Honor, the Government has not argued

8    that Crackpot is not a real company.  We've argued that

9    Northwest Resources had fake shareholders that were used and

10   then became Cubed fake shareholders so that the conspirators

11   had complete control of the stock because of this market

12   manipulation.  That was the focus of the inquiry and facts.

13          THE COURT:  As I understood the proof, there's never

14   been a question in the Government's case that that application

15   has potential.

16          MR. SHROYER:  There's certainly been argument that

17   the company was overvalued and that the stock price --

18          THE COURT:  We're not getting into value.  We're not

19   getting into value.  We're not going to have a mini on the

20   value of the Cubed.

21          MR. SHROYER:  Understood.

22          THE COURT:  Okay.

23          MR. SHROYER:  Thank you.

24          THE COURT:  That's why I was surprised that the

25   first document wasn't objected to.

SIDEBAR                                    3169

1          MR. BINI:  I should have objected to that.  Sorry,

2    your Honor.

3

4          (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:14-cr-00399-ENV   Document 665   Filed 10/20/18   Page 166 of 243 PageID #: 6004

1          (Sidebar ends; in open court.)

2     BY MR. SHROYER:

3     Q    Did you play any part in creating revenue projections for

4     Cubed?

5     A    Yes, I did.

6     Q    And to your knowledge, did Mr. Discala play any part in

7     creating revenue projections for Cubed?

8     A    Creating revenue projections?  No.

9     Q    Shifting gears just a little bit, when you first started

10    at Cubed, to your knowledge, was there anybody at the company

11    who was overseeing the financials of the company?

12    A    To my knowledge, no.

13    Q    At some point, did that change?

14    A    Yes.

15    Q    And who was the individual who was brought in to oversee

16    the financials of the company, if you know?

17    A    Yes, I do.  The person -- I'm trying to stick to what

18    I -- just what I know.

19          The person that was actually selected to come in and

20    handle the day-to-day financials, her name was Celeste Jolie

21    (phonetic).

22    Q    And it was -- as you sit here now, sir, do you know the

23    impetus for bringing that individual into the company?

24          Why was she brought in?

25    A    She was brought in because she was a friend of Steve

Case 1:14-cr-00399-ENV   Document 665   Filed 10/20/18   Page 167 of 243 PageID #: 6005

1    White.

2    Q    Now, did there come a time that you left the company?

3    A    Yes.

4    Q    And why did you leave the company?

5    A    I left the company because I felt that -- I felt that

6    they -- I felt that they could not --

7    Q    I don't mean to cut you off.

8         Could you just define "they"?

9    A    Yes.  I thought that I could not work with the Whites or

10   their group in Las Vegas.

11   Q    And why was that?

12   A    I felt that they were dishonest.

13   Q    Mr. Parker, when you left the company, did you have any

14   chance or did you tell AJ Discala about your feelings about

15   the way the company was being run internally?

16   A    No.

17   Q    And, sir, how many times, if at all, have you met

18   Mr. Discala?

19   A    I met Mr. Discala by -- in a phone conference, I believe,

20   before I -- when the product was being introduced.  He was on

21   a phone conference.  And I met him I believe one time at the

22   Downtown Grand when everybody was coming in for, like, a

23   product launch meeting.

24   Q    Is it fair to say you don't have a personal relationship

25   with Mr. Discala?

PARKER – CROSS – BINI                 3172

1    A     No, I do not.

2              MR. SHROYER:  Thank you.  Nothing further.

3              THE COURT:  Who is handling for the Government?

4              MR. BINI:  Mr. Bini for the Government.

5              THE COURT:  Okay, Mr. Bini.

6    CROSS-EXAMINATION

7    CROSS-EXAMINATION

8    BY MR. BINI:

9    Q     Mr. Parker, you worked for Crackpot from, if I understand

10   it, sometime in 2013 until was it February 27, 2014?

11   A     I believe it was February 27, 2014, yes.  I believe, as I

12   recall, sir, I made a verbal agreement with Steve White on

13   November 24 of 2013 to start the following week and then I

14   ended up officially leaving February 27.

15   Q     Okay.  And you were paid as a 1099.  You were a

16   contractor.

17   A     Yes, sir.

18   Q     But Max Khan had brought you in; is that right?

19   A     Yes.

20   Q     And how much were you paid, approximately, during that

21   period?

22   A     I was paid by the Cube.  I was paid $6,000 a month.

23   Q     And you testified earlier you had a background in law

24   enforcement, right?

25   A     Yes.

PARKER - CROSS - BINI                    3173

1   Q    In fact, you had some background in white collar crime,

2   right?

3   A    Yes, sir.

4   Q    And did you come across pump and dumps in your training

5   as a police officer in white collar crime?

6   A    You know, no.  Most of the white collar crime training,

7   it was kind of before that time period.

8   Q    Okay.  But fair to say, sir, you really know nothing

9   about the trading of Cubed, right?

10  A    That is correct.  Nothing at all.

11  Q    In fact, when the defense first contacted you, that's why

12  you told them you're not sure you'd be a good witness in this

13  case, right?

14  A    That is correct.

15  Q    And, sir, you don't know anything about Northwest

16  Resources, right?

17  A    The original Cubed company?  No.

18  Q    And you don't know about the 30 shareholders that

19  controlled all the free-trading shares of that company, right?

20  A    No, I do not.

21  Q    And you don't know about the 30 or so shareholders who

22  control all the free-trading shares of Cubed, correct?

23  A    True.

24  Q    Fair to say you really know nothing about the facts in

25  this case?

*LAM       OCR       RPR*

PARKER - CROSS - BINI                    3174

1           MR. SHROYER:  Objection, your Honor.

2           THE COURT:  Sustained.

3    Q    Sir, you haven't heard any of the evidence that's been

4    presented to this jury, right?

5           MR. SHROYER:  Objection, your Honor.

6           THE COURT:  Overruled.

7    Q    That means you're allowed to answer.

8    A    Sorry, I don't hear well.

9    Q    I'll ask again.  You don't know any of the evidence

10   that's been presented to this jury in this case, correct?

11   A    That is correct.

12          MR. BINI:  No further questions.

13          THE COURT:  Any cross by Ms. Cane?

14          MR. RIOPELLE:  No, your Honor.

15          THE COURT:  No further redirect.

16          MR. ROSS:  Your Honor, at this time, we'll call --

17          THE COURT:  Mr. Parker, you're excused.  Thank you

18   very much.  Safe trip back to Las Vegas.

19          THE WITNESS:  Thank you.

20          Your Honor, should I leave this here?

21          THE COURT:  You can leave it there.  Mr. Shroyer

22   will pick it up.

23          (Witness sworn.)

24          THE COURTROOM DEPUTY:  Please state your first and

25   last name.

PARKER – CROSS – BINI                    3175

1          THE WITNESS:  George Eric Engstrom, G-E-O-R-G-E

2     E-R-I-C  E-N-G-S-T-R-O-M.

3          THE COURTROOM DEPUTY:  Thank you.  Have a seat,

4     please.

5          THE COURT:  Mr. Shroyer.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ENGSTROM – DIRECT – SHROYER                3176

1          (Witness takes the witness stand.)

2   **ERIC ENGSTROM,**

3          called by the defense, having been first duly sworn,

4          was examined and testified as follows:

5   DIRECT EXAMINATION

6   DIRECT EXAMINATION

7   BY MR. SHROYER:

8   Q    Good afternoon, Mr. Engstrom.

9   A    Good afternoon.

10  Q    Mr. Engstrom, can I ask you, what's your educational

11  background?

12  A    Certainly.  I graduated from high school when I was 16

13  from a Baptist Christian school.  I then went to a community

14  college for a year before I graduated with a general studies

15  degree.  And from there, I went to a university in pursuit of

16  a bachelor's degree but I dropped out.  I transferred as a

17  junior and I dropped out midway through my junior year because

18  I was making more money in my profession than my instructors

19  were.

20          THE COURT:  That's a safe commentary about our

21  society, I think.

22          THE WITNESS:  It was still probably a mistake, your

23  Honor.

24  Q    Mr. Engstrom, can you describe for us your professional

25  background?

ENGSTROM – DIRECT – SHROYER                3177

1    A    Yes.  After leaving college I worked in Eastern

2    Washington mostly as a software contractor, and then I was

3    recruited to Western Washington, which would be the Seattle

4    area; actually Redmond, but you might as well think of it as

5    Seattle.  I turned down a job from Microsoft, who had

6    recruited me to come there because they offered me stock

7    options in lieu of $3,000 of extra salary.  That was the first

8    time I lost lots of money by not taking stock options.

9            Two and a half years later, they offered me a job

10   again and I took it, as an evangelist, because they wanted

11   somebody who could write code and, in their words, had a

12   personality.  I'm not sure how to take that either.  But one

13   thing led to another, and I ended up co-inventing a thing

14   called Direct X, which turned into the Xbox and now is the

15   technology behind HoloLens.  So, myself and two other

16   individuals made that from the beginning.

17           As a result of that success, I was put in charge of

18   what was called at the time multimedia at Microsoft.  You

19   would probably think of that mostly as DVD playback on

20   Windows.  I was the person that thought that people would want

21   to watch movies on planes.  I know that sounds kind of amazing

22   today that anyone thought that was heretical.  I made a

23   browser from there that would allow you to do NFL-style visual

24   effects on the web in 1998.

25           That led me to -- well, it was called Netscape

1    Killer, and that was the anti-trust trial time.  So, between

2    that and wanting to make sure that any movie you had could

3    play on your PC, I wasn't -- "invited" would be the word I

4    would use, to become a witness for Microsoft in the anti-trust

5    trial.

6         MS. JONES:  Objection, relevance.

7         THE COURT:  Just giving his background.

8    A    So, I quit Microsoft largely after that.  I did some due

9    diligence for Microsoft.  Probably the one you'd know the most

10   is Hotmail, and I was responsible for stopping a $3 billion

11   acquisition that Mr. Steve Ballmer, the CEO, still thanks me

12   for today.

13        I then started several companies, but the one that I

14   think is most interesting is the Wildseed company, which was

15   the first consumer-based smartphone.  It was designed to be

16   entertaining more than just a phone that got your e-mail.

17   That was in 2000.

18        We sold the company to AOL in 2005 for about

19   $280 million.

20        I then went back into the -- I was SVP at AOL for a

21   couple of years and then rejoined Microsoft in 2009, after the

22   2008 conditions in the market left there no -- there was no

23   venture capital to fund start-up companies.

24        And since leaving Microsoft in 2014, I have been

25   building internet of things, technologies, for my various

ENGSTROM – DIRECT – SHROYER                    3179

1    companies.

2

3              (Continued on next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ENGSTROM – DIRECT – SHROYER                    3180

1   CONTINUED DIRECT EXAMINATION

2   BY MR. SHROYER:

3   Q    Okay.  And at some point around that time that you

4   mentioned you stopped working for Microsoft, maybe a bit

5   earlier, did you become aware of a company known as Scanbuy?

6   A    Yes.  I need to pop back a little back.  The CEO was Mike

7   Wehrs at the time.  Mike Wehrs I knew from Microsoft.  He was

8   also an associate partner of the company that invested

9   Wildseed.  And I had subsequently hired him when I was at AOL

10  to help me with mobile marketing, that was his expertise.  He

11  eventually became the president, I think, of the mobile

12  marketing association.

13       I needed some technology that Scanbuy had, mostly

14  for my wife's company, so I called Mr. Wehrs and asked him if

15  he would help me.  He said yes.  So we started talking about

16  that.

17       And I subsequently changed groups at Microsoft, this

18  was while I was at Microsoft, and ended up with a technology

19  called Microsoft hag (ph), which was a scanning technology

20  different from bar codes and QR codes.  Microsoft research had

21  invented it and no longer wanted it, but we had critical

22  corporate customers who relied on it.  Mike Wehrs and I worked

23  out a deal where Microsoft would have transfer it to him if he

24  would agree to take care of those customers.  And in exchange

25  for that, I became an adviser on -- not an adviser, I need to

ENGSTROM - DIRECT - SHROYER                3181

1    be very accurate -- I was a board observer in my capacity as a

2    Microsoft general manager.

3    Q    Approximately when was that that you took on that role

4    with Scanbuy?

5    A    2013, it might have been as early as the fall of 2012.

6    It didn't seem very significant at the time, I'm sorry.

7    Q    Did there come a time through your involvement with

8    Scanbuy that you met an individual named AJ Discala?

9    A    Yes.  Mr. Wehrs said I should meet AJ who was helping him

10   put together a funding rep.  I was invited by Mr. Wehrs to

11   dinner with Mr. Discala.  And there were three or four other

12   gentlemen, I'm terrible with names and I'm face-blank, please

13   forgive me.  One of them was a Ford trustee, that's the only

14   thing I remember about the other four.

15   Q    Did you learn of a company called Cubed?

16   A    I did.  Mr. Wehrs knew about Cubed.  And perhaps that was

17   the reason he brought me to dinner, as much as anything.  The

18   browser I spoke of in 1998 was a 3D powered browser that did

19   things very much like the Cube did.  We have a much larger

20   development team, so it did more things than that, but it had

21   a lot of web-based 3D graphical user interfaces.  AJ said,

22   Wow, you know something about that.  And I said, I know a lot

23   about 3D.

24            MS. JONES:  Objection.

25            THE COURT:  Sustained.

ENGSTROM – DIRECT – SHROYER                    3182

1    Q    Leave out things that other people said.

2    A    I'm sorry.

3    Q    Did there come a time that you became involved with the

4    company known as Cubed?

5    A    Yes.  As a result of that dinner, I was asked to do some

6    due diligence.

7    Q    And did you do that due diligence?

8    A    I flew to Las Vegas and met with the team.  And let's

9    see, in that process I met Steve White, his son, a man named

10   JT, and his brother, and an attorney named Kyleen Cane helped

11   me with all the MBAs and et cetera, stuff I'm supposed to sign

12   before I look at a company.

13   Q    Did you have a chance to review the product?

14   A    I did, and the team.

15   Q    And what was your feeling about the company after those

16   meetings?

17   A    My feeling was that the team was green, but that was an

18   easy problem to solve.  That's something I do all the time.

19   Their passion for their product and the user interface inside

20   was quite exciting, especially from my experience in mobile.

21   One of the most interesting things is phone numbers are unlike

22   static, unlike URLs, everyone can say whatever they want about

23   you on your phone number --

24            MS. JONES:  Objection.  Relevance.

25            THE COURT:  I'm going to allow that answer.  Move

*Rivka Teich CSR, RPR, RMR*
*Official Court Reporter*

E. ENGSTROM - CROSS - MS. JONES                3183

1    on, Mr. Shroyer.

2    BY MR. SHROYER

3    Q     How long did your engagement with Cubed last?

4    A     All day, and then I subsequently wrote a report.

5    Q     And based on your interaction with Cubed was there any

6    potential for synthesis these or any deal with the company

7    that you were involved in before Scanbuy?

8    A     Yes.  It was my understanding that Scanbuy and the Cubed

9    were interested in doing something together.  It is my

10   understanding that the number of installed users, installed

11   applicants, that Scanbuy had and their number of active users,

12   if they could drive up the engagement, would have been worth a

13   substantial amount of money.

14   Q     Was there some potential benefit that Cubed would have

15   had for standby and Scanbuy may have had for Cubed?

16          MS. JONES:  Objection.  Relevance.

17          THE COURT:  Sustained.

18          MR. SHROYER:  Nothing further, your Honor.

19          THE COURT:  I guess, Ms. Jones.

20          MS. JONES:  Yes, your Honor.

21          THE COURT:  You may inquire.

22          MS. JONES:  Thank you, your Honor.

23   CROSS-EXAMINATION

24   BY MS. JONES:

25   Q     Good afternoon, Mr. Engstrom.  So is it accurate to say

1    you met Mr. Discala for the first time in or about May 2014?

2    A    I met him at the dinner, that may have been May or June,

3    sorry, but yes.

4    Q    At that time what were you doing for a job?

5    A    I was interviewing.  I was trying to decide at the moment

6    whether I should go back into start ups, I was actually

7    interviewing Bloomberg at the time.

8    Q    So you may have met Mr. Discala you said in May or June

9    of 2014?

10   A    Yes.

11   Q    And isn't it correct that by June of 2014 you were

12   referring to Mr. Discala as your new partner in an e-mail to

13   Ted Stockwell?

14   A    Probably.

15   Q    And isn't it true that you indicated to Mr. Stockwell

16   that Mr. Discala was going to help you with your Microsoft

17   situation, correct?

18   A    He did say that, yes.

19   Q    And that situation was that Microsoft had fired both you

20   and Mr. Stockwell at the end of 2013, correct?

21   A    Actually they fired me on January 15, 2014; but no reason

22   to quibble.

23   Q    And by early July 2014, your opinion expressed in an

24   e-mail was that Mr. Discala and Mr. Wexler were great men and

25   you were pleased to be dealing with them?

E. ENGSTROM - CROSS - MS. JONES                    3185

1   A    That was absolutely my impression at the time, yes.

2   Q    By July of 2014 Mr. Discala is trying to get you on the

3   Board of Cubed, correct?

4   A    Yes, and Scanbuy.

5   Q    Mr. Discala offered you stock options to be on the board

6   of Cubed?

7   A    Yes, that is normal for me.

8   Q    Do you know if these were stock options for free-trading

9   stock or restricted stock?

10  A    So to be pedantic, in my world restricted stock would

11  mean that I actually got the shares.  And when I heard stock

12  options, that would be like what I got at Microsoft, which was

13  an option to buy in the future at the strike price that they

14  were branded at.  The difference being restricted stock is

15  granted at a price of zero.

16  Q    So what was your understanding as to what you would get

17  if you went on the board of Cubed?

18  A    He used the word options, so I took it as my strike price

19  at the time.

20  Q    That you would be able to buy unrestricted stock at a

21  strike price?

22  A    Over a vesting schedule in the future.

23  Q    Had you negotiated the amount of stock options you were

24  going to get?

25  A    No.

E. ENGSTROM - CROSS - MS. JONES                3186

1    Q    Had you negotiated the strike price?

2    A    The strike price is never negotiated.  In my -- I don't

3    know, I can't say never.  Strike prices for options are

4    generally some day in the future the market is at.  In my

5    case, it was October 1st, 1991, for Microsoft.

6    Q    Isn't it correct that in the middle of approximately

7    middle July 2014 you traveled to Connecticut and spent the

8    night at Mr. Discala's house?

9    A    Yes, because the hotel situation in the town he lives in

10   is terrible.  I arrived at midnight.

11   Q    Because you had a meeting planned with Mr. Discala,

12   correct?

13   A    Yes.

14   Q    This was within days of Mr. Discala being arrested,

15   correct?

16   A    I'm not sure which side of the days it was.  But I'm not

17   disputing that I saw him very soon before and after he was

18   arrested.

19   Q    When Mr. Discala was arrested, you had known him for

20   maybe six weeks?

21   A    Yes.

22   Q    And after Mr. Discala was arrested, you served as the

23   interim CEO of Omni View?

24   A    Yes.  In an attempt to -- everyone was afraid --

25   Q    Mr. Engstrom, it's a yes or no question.

1  A    Well, I feel like it requires some explanation.  Because

2  I wasn't just the interim CEO, it was limited specifically to

3  doing things necessary to get the investors' cash back.  I

4  couldn't do anything else for Omni View, only work to get

5  their cash back.  Because no one would touch the cash.  And

6  those investors should have gotten the money back, and they

7  got their money back.

8  Q    You're talking about Scanbuy investors?

9  A    Yes.

10  Q    Not Cubed?

11  A    I had nothing to do with Cubed investors.

12  Q    And not all Scanbuy investors got their money, correct?

13  A    That is correct.  Some of them refused take their money

14  back.  And others I couldn't get it back because the

15  Government took it back in a civil forfeiture.

16  Q    There wasn't money to pay the investors back, is that

17  what you're saying?

18  A    One set of investors -- there are three sets.  One set of

19  investors got three-and-a-half million dollar for them to take

20  back.  Another set chose to leave their money in Scanbuy

21  because they were already invested in Scanbuy.  The third set

22  didn't get the money back because the Government took it in a

23  civil forfeiture.

24  Q    From Omni View.

25  A    Yes, that's where the money was sent to, to go to

E. ENGSTROM - CROSS - MS. JONES                3188

1    Scanbuy.

2    Q     Mr. Engstrom, you also had been the CTO of Dounya

3    Discala's company, bevRage, correct?

4    A     I'm -- one of the things Circle does is it provides a CTO

5    as a service.  So yes, I was the CTO in the form of a service

6    to, not really Dounya, Dounya Discala was -- it's a Loeb

7    Enterprise Company.  I still work for them.  They changed the

8    name to 3x3 Insights.

9    Q     You refer to them, the Discalas, as your virtual family,

10   correct?

11   A     Yes.

12   Q     You're here to help Mr. Discala, correct?

13   A     I'm here to tell the truth, ma'am.

14   Q     And you had no involvement in any of these stock trades

15   that went on with respect to Cubed; is that correct?

16   A     Absolutely correct.

17   Q     And were you aware that Kyleen Cane held all the

18   free-trading shares of Cubed?

19   A     No, I was only aware she was counsel.

20   Q     You're not aware of any of the evidence that's been

21   presented to the jury in this case?

22   A     No.

23         MS. JONES:  No further questions.

24         THE COURT:  Any cross by Mr. Riopelle?

25         MR. RIOPELLE:  No questions for Ms. Cane.

E. ENGSTROM – CROSS – MS. JONES                3189

1          THE COURT:  Mr. Shroyer, any redirect?

2          MR. SHROYER:  No, your Honor.

3          THE COURT:  You're excused.  Let's see counsel at

4    sidebar.

5          (Whereupon, the witness was excused.)

6          (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    3190

1          MR. CHENG:  Ms. Eckhart is available, but we have

2    revised the schedules and we just don't have the ability to

3    the print them.  I was going to suggest we start with her

4    first thing in the morning.  I could provide within the

5    next -- the electronic, provide what we're going to use that's

6    been revised.  We can just move to the jury charge conference.

7          MS. JONES:  Why don't we get started, if we can.

8          THE COURT:  Why don't you figure on to about 20

9    minutes to 30 minutes?

10          MR. CHENG:  We can go through her background.

11          MR. HEIN:  How long do you anticipate the witness?

12          MR. CHENG:  Taking out the schedules, say an hour

13   maybe a little less.

14          MS. JONES:  How many exhibits are you planning on

15   introducing through her?

16          MR. CHENG:  I reduced it down to, I don't recall the

17   number, 12 to 15.

18          MS. JONES:  Do you have print outs?

19          MR. CHENG:  I revised them so I have don't have the

20   ability to print, which is why I'm asking to move to tomorrow.

21          MS. JONES:  We can start and I guess we'll do the

22   rest tomorrow morning.

23          THE COURT:  Why don't we do this.  Why don't you

24   start and then when you get to the point where you you're

25   going want to use the substantive exhibit down the road you'll

SIDEBAR CONFERENCE                     3191

1    say, we reached a break point.

2              (End of sidebar conference.)

3              (Continued on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H. ECKHART - DIRECT - MR. CHENG                    3192

1              (In open court.)

2              THE COURT:  Is there another witness?

3              MR. ROSS:  Mr. Discala is going to call Haley

4    Eckhart.

5              (Witness takes the witness stand.)

6    HALEY ECKHART, called as a witness, having been first duly

7    sworn/affirmed, was examined and testified as follows:

8              THE WITNESS:  I do.

9              COURTROOM DEPUTY:  State your first and last name.

10             THE WITNESS:  Haley Eckhart, H-A-L-E-Y,

11   E-C-K-H-A-R-T.

12             THE COURT:  Mr. Cheng, you may inquire.

13             MR. CHENG:  Thank you, your Honor.

14   DIRECT EXAMINATION

15   BY MR. CHENG:

16   Q    Good morning.

17   A    Good morning -- good afternoon.

18   Q    Good afternoon.  Can you tell us what your occupation is?

19   A    I'm a CPA and I do forensic accounting and economic

20   damages calculations.

21   Q    With where is your place of employment?

22   A    I'm work at Freeman and Mills, Incorporated.  I am Vice

23   President and a shareholder of the firm.

24   Q    How long have you held that position?

25   A    I've had that position since 2005, but I've been with the

H. ECKHART – DIRECT – MR. CHENG                3193

1    firm mostly since 1996, so it's going on 22 years.

2              THE COURT:  Where what is the firm located?

3              THE WITNESS:  In Los Angeles California.

4    Q    Where did you work prior to that?

5    A    I worked at Ernst & Young, also in Los Angeles,

6    California.

7    Q    Can you briefly describe the subject matter of your

8    specialty?

9    A    As I mentioned, I do forensic accounting and expert

10   witness work.  And I work on litigation matters, both civil

11   and criminal, for companies and individuals.  Companies as

12   small as a sole proprietor mom-and-pop company, to Fortune 500

13   companies, doing consulting and expert witness work.

14   Q    What academic degrees do you hold and where and when were

15   they obtained?

16   A    I graduated in 1992 from the University of California at

17   Santa Barbara.  And my degree was a Bachelor's of Arts in

18   business economics with an emphasis in accounting.

19   Q    Are you licensed in any fields?

20   A    As a CPA licensed by the State of California to practice

21   as a CPA, or Certified Public Accountant.  I'm also licensed

22   in the state of Arizona, I had lived there for a few years.

23   Q    How long have you held those licenses?

24   A    My California my licensed I got that in 1997, I believe.

25   In Arizona it's sometime in the early 2000s.

1    Q     Do you have any other credentials?

2    A     I'm also a Certified Fraud Examiner or CFO.  That's a

3    credential I obtained through the Certified Fraud Examiners, a

4    world-wide organization.

5    Q     What are the duties and functions of your current

6    position?

7    A     As I mentioned, I do litigation consulting and expert

8    witness work doing forensic accounting and damage

9    calculations.

10   Q     Are you a member in any professional associations or

11   organizations?

12   A     I'm a member in the American Institute of Certified

13   Public Accountants, AICPA.  As well as the California Society

14   of CPAs, and the Arizona Society of CPAs.  I'm also a member

15   of the Association of Certified Fraud Examiners.  And with the

16   California Society of CPAs, I'm the recent past Chair of its

17   economic damages section.

18   Q     What type of matters do you consult on or have you

19   consulted on?

20   A     I've worked on matters, as I mentioned, in both civil and

21   criminal cases.  In civil cases it could be anything from a

22   personal injury, to a huge business interruption case for a

23   Fortune 500 company that sustained huge losses after hurricane

24   Katrina.  I've also done consulting work both for and working

25   for the Government, the SEC, and the DOJ in certain criminal

1    matters back in the early 2000s and/or middle 2000s.  And also

2    criminal cases defending the individuals in those, I guess,

3    stock option, back dating cases, and revenue recognition

4    cases.

5    Q     Have you ever testified as an expert in forensic

6    accounting before?

7    A     Yes, I have.

8    Q     How many times?

9    A     I've testified 34 times, 11 of those have been at trial.

10         MR. CHENG:  Do you think this would be a nice time

11   to take a brake?

12         THE COURT:  Yes.  We've reached a break point in

13   this examination, ladies and gentlemen.  I had ask Mr. Cheng

14   to alert me to when we would get to that break point and he

15   has, and I'm grateful for that.

16         We are going to recess for the evening.  The usual

17   recess rules apply.  And I will review them again for you.

18   Continue to keep an open mind.  Don't discuss the case amongst

19   yourselves or with anyone else.  Do not do over the recess

20   period any research, electronic or otherwise, touching on

21   anything related to the case, penalties, the issues, the

22   names.  Do not, if you're on a social media platform, do not,

23   you're on radio silence.  You're not to mention anything about

24   the case, your service as a juror, that you come to the

25   courthouse in Brooklyn, or anything that relates to directly

H. ECKHART – DIRECT – MR. CHENG                     3196

1    or obliquely to the case.  And lastly, to the extent there is

2    any media coverage, using that broad definition of media,

3    you're to shut it out.  If it relates to this case, keep your

4    eyes, mind, ears closed to.  I also urge you, as I do every

5    end of day, urge you to tune out any media accounts of other

6    proceedings for fear that you may hear something there that

7    might confuse you as to what your responsibilities are here.

8              All of those continued admonitions and with our

9    continued appreciation for your sacrifice and your patience,

10   we will bid you a pleasant evening.  We'll see you tomorrow.

11   Return to the central jury room around 9:45 a.m. and we'll get

12   started as close as we can.

13             (Jury exits the courtroom.)

14             THE COURT:  Ms. Eckhart, you may stand down.  See

15   you tomorrow.  Take a ten-minute break.  Then we'll return and

16   distribute the hard copies of the charge as proposed, which

17   the clerk will mark as Court Exhibit 1.  And the proposed

18   verdict sheet which the clerk will mark as Court Exhibit 1A.

19             (Whereupon, the witness steps down.)

20             (Continued next page.)

21

22

23

24

25

PROCEEDINGS                    3197

1          THE COURTROOM DEPUTY:  All rise.

2          Court is back in session.

3          Counsel for both sides are present, including the

4  defendants.

5          THE COURT:  Okay, ready to go.

6          MR. RIOPELLE:  Yes, Judge.  Because this is a

7  conference that deals with the charge and legal matters, I've

8  discussed with my client whether she would like to be excused,

9  and I think she can be excused under the rules, and I'd ask

10  that she be excused from the conference.

11          THE COURT:  I absolutely agree, particularly with

12  the laryngitis.

13          MR. RIOPELLE:  Thank you, Your Honor.

14          THE COURT:  That applies to you, too, Mr. Discala.

15  It's up to you.

16          Okay.  You can be seated.  What we're going to do is

17  we're just going to go -- first we deal with the charge as

18  proposed, and to the extent that there's something else, by

19  the time we get to the end of the first part of the process

20  that has to be attended to, then we go to that.

21          Now what is the first part of the process?  We will

22  go from front to back and without celebration or celebrity

23  side of the courthouse, whatever, whoever's got the first

24  objection on the lowest page, that's where we go, and then

25  we'll go to the next lowest page objection and we'll go from

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                    3198

1    there.

2              Just sing out if you an objection.

3              MR. RIOPELLE:  Yes.

4              And, Your Honor, I will note that I had submitted

5    written proposals to the Court, which I see some of which are

6    incorporated, some of which are not.  I have gone back to

7    those proposals, compared them to what we have here.  And so

8    I'm ready to yodel about those.

9              THE COURT:  Yes.  So there was some minor

10   modifications from the exposure draft, so it's not like some

11   of your suggestions were incorporated into this draft that we

12   actually are holding the charge conference on.

13             MR. RIOPELLE:  Right.

14             MR. BINI:  Your Honor, Mark Bini for the government.

15             One note that I did not submit and I should have

16   submitted, but in reviewing ECF 601, I notice that there is no

17   aiding and abetting charge.

18             We had requested that because our substantive

19   counts, counts now Three through Ten, all charge 18 U.S.C. 2,

20   the aiding and abetting statute.  So that's government's

21   request number seven in ECF 541 where we ask for the standard

22   aiding and abetting charges.

23             So I'll just -- I guess when we get to after Count

24   Three, the first substantive count, I'll just note it at that

25   point.

PROCEEDINGS                          3199

1           THE COURT:  Okay.  I always charge the Sands anyway.

2           MR. BINI:  Thank you, Judge.

3           THE COURT:  But who has the lowest page of

4    objection?

5           What's your lowest page on the government side?

6           MR. BINI:  So we would take aiding and abetting.

7           THE COURT:  No, no, I mean with respect to the

8    charge as proposed, anything that's already in it, what's your

9    lowest page?

10          MR. BINI:  We have no objections, Your Honor.

11          Oh, I'm sorry, I apologize.  We actually do have a

12   couple of things where Mr. Riopelle has raised where we don't

13   disagree with the instructions that don't apply.

14          MR. RIOPELLE:  I was going to say my first objection

15   is on page 29.

16          THE COURT:  Anybody lower than 29?

17          MR. RIOPELLE:  Anybody beat 29?

18          THE COURT:  Sounds like 29 it is.

19          MR. CHENG:  Come on down.

20          THE COURT:  Do you have something before 29?

21          MR. BINI:  No, I don't.

22          THE COURT:  Let's everybody start at 29.

23          MR. RIOPELLE:  Your Honor, I had proposed at the end

24   of this charge the following language, which I think in

25   fairness should be included as follows:

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                    3200

1          "In addition, I remind you that the government did

2    not play all of the wiretaps that were intercepted in the

3    case, and they played only excerpts from some of the wiretaps

4    that it did play.  The law does not allow the defendants to

5    play wiretaps or excerpts from wiretaps, however, the law does

6    permit the defendants to argue that the wiretaps were played

7    by the government are insufficient to establish their guilt

8    beyond a reasonable doubt, and you may consider whether the

9    government has played all of the wiretaps, or produced all of

10   the text messages on a particular subject when deciding

11   whether the government has proven a particular defendant's

12   guilt beyond a reasonable doubt."

13          I think, Your Honor, in fairness that language

14   should be included.  I note that you did not include it.  I

15   will expect that you will adhere to that ruling.

16          THE COURT:  Well, let me hear from the government.

17          MR. RIOPELLE:  But I've made my objection.

18          MR. BINI:  Your Honor, the government does object to

19   that additional language because it's in direct conflict with

20   no specific investigative techniques are required and that not

21   all evidence need be produced.  And so the government would

22   request the instruction that Your Honor has proposed.

23          THE COURT:  And, Mr. Riopelle, you didn't, I don't

24   recall and refresh me, you didn't have a *Sands* site for the

25   language, correct?

PROCEEDINGS                    3201

1          MR. RIOPELLE:  That is correct.

2          Your Honor, the reason I think it is fair to include

3  some kind of language like this, is that, as the Court knows

4  from our first in limine motion, we were desperate to play

5  some of the wiretaps that the government did not want played.

6          You know, I recognize that as a general matter the

7  hearsay rule does not allow the defendants to offer this

8  evidence, and it does seem unfair to me to keep the fact that

9  the defense cannot offer this evidence from the jury.

10         The jury knows because they've heard it testified to

11 that there were thousands of calls intercepted and yet they've

12 heard only a couple of dozen here and they've heard only

13 excerpts from the calls.

14         I do not -- you know, I'm afraid that if the

15 government -- if the jury is not told that the defendants

16 cannot offer this evidence, that they will shift the burden to

17 us and hold us responsible for not offering that evidence.

18         And so for that reason, I think it's only fair to

19 instruct them that you can't do it.

20         THE COURT:  You have your exception, of course,

21 Mr. Riopelle, but my charges, if anything, I know that the

22 government mudders I'm sure across the street of the number of

23 times I tell the jury that the defendant has absolutely no

24 burden.

25         MR. RIOPELLE:  Yes.  And I thank you for that,

1   Judge.

2              THE COURT:  After page 29.

3              MR. RIOPELLE:  My next objection is on 31.

4              THE COURT:  Okay, you have to make your record.

5              MR. RIOPELLE:  Well, you know, I did note --

6              THE COURT:  And it's good for the court reporter.

7   Gives her more pages.

8              MR. RIOPELLE:  31, I think the charts and summaries

9   not admitted as evidence is not applicable in this case,

10  Judge.  The charts and summaries that the Court has are all

11  admitted as evidence.

12             THE COURT:  That was my recollection as well.

13             MR. BINI:  Yes, Your Honor, the government agrees.

14             MR. RIOPELLE:  So we can take that out?  It's one

15  less thing to do, Judge.

16             THE COURT:  Yes.  Again, remember which sometimes if

17  you put "if applicable" probably should have an if applicable

18  there.  In my mind, I didn't want to trust my mind.

19             MR. RIOPELLE:  Exactly.

20             THE COURT:  That was my recollection as well.  If

21  it's easier to take it out than to try to put it in, I guess

22  we're going to find out in spades here, when we have to inject

23  the aiding and abetting one.  Much easier to be over inclusive

24  in the first round.

25             MR. RIOPELLE:  Agreed, Your Honor.

PROCEEDINGS                              3203

1            MR. BINI:  Page 67 is my next --

2            MR. RIOPELLE:  I'm at 43.

3            MR. BINI:  Okay.

4            MR. RIOPELLE:  I'm running at the score now, Judge.

5            THE COURT:  That's okay.

6            You know they get you in the playoffs.

7            MR. RIOPELLE:  On page 43, the grammarian in the

8     proposes is that the words "he or she is" be substituted for

9     "they are presumed to be innocent," because I think you have a

10    bad verb agreement there in the charge.

11           THE COURT:  That's probably makes sense.

12           MR. BINI:  No objection from the government, Your

13    Honor.

14           THE COURT:  Evan is the scrivener, so he's going to

15    make this all...

16           We try to catch -- a couple of those I caught

17    myself.

18           MR. RIOPELLE:  Well, you know, I taught grammar at

19    one point.

20           THE COURT:  Wow.  Does anybody teach grammar today?

21           MR. RIOPELLE:  Yeah, I used to be able to diagram a

22    sentence.

23           THE COURT:  You have to be on Medicare to know what

24    that means.

25           MR. RIOPELLE:  Or if you went to Catholic school.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                    3204

1          THE COURT:  I went to public school.

2          MR. RIOPELLE:  I did time.

3          MR. BOWMAN:  Your Honor, page 43, I wonder if the

4    Court would consider saying "because he and she are presumed

5    to be innocent."  We don't we can speak in the abstract.

6          THE COURT:  I'm listening.  This is Mr. Bowman's

7    amendment.

8          MR. BOWMAN:  It's a small point but...

9          THE COURT:  Anybody have a problem with it?

10         MR. RIOPELLE:  Give me that one, again, Mr. Bowman?

11         MR. BOWMAN:  "Because he and she are presumed to be

12   innocent."

13         MR. RIOPELLE:  Yes, I have no problem with that.

14         MR. BINI:  No objection from the government, Your

15   Honor.

16         THE COURT:  Okay.  Done.

17         MR. RIOPELLE:  That takes us to 46.

18         THE COURT:  Okay.

19         MR. RIOPELLE:  Your Honor, where I propose that we

20   add language to the sentence about one third down the page

21   that ends with the word "information."  This is about specific

22   investigative techniques are not required.

23         Where you say "the government need not utilize

24   specific investigative techniques or exhaustively pursue every

25   piece of information," I would add a comma and then insert the

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                          3205

1   language "or call every witness that was interviewed, or play

2   every call that was recorded, or admit every text message

3   seized, period."

4              That sort of draws the jury's attention to specific

5   evidence in this case, and that was why I thought it would be

6   useful.

7              THE COURT:  The government?

8              MR. BINI:  We prefer it as proposed.  I think this

9   is the *Sands,* and I'm just looking to see.

10             THE COURT:  I usually adhere very closely to *Sands*.

11  Very, very rarely do I deviate, but sometimes when all counsel

12  in a particular case think a slight modification is

13  appropriate, I yield to that.

14             MR. RIOPELLE:  The modification here was simply

15  meant to draw the jury's attention to some of the facts that

16  they have heard in the case, and what some of the evidence

17  that is really key to the case.

18             THE COURT:  The government?

19             MR. BINI:  Your Honor, the government believes this

20  excess verbiage in what I know is going to be a long reading

21  for your clerk, and I think it's captured in the *Sands*

22  instruction, so we would ask for a *Sands* instruction.

23             MR. RIOPELLE:  I'm being accused of excess verbiage.

24             THE COURT:  Shocked.  By the inspector of the ever

25  like.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                    3206

1          Well, as I say I usually adhere to *Sands*, and once I

2    get some yield...  It covers what you're concerned about, and

3    that's why I'm going to yield.

4          MR. RIOPELLE:  I think you have the general in the

5    charge as drafted, and I want to be a little more specific.

6          THE COURT:  Yes, I hear you.

7          MR. RIOPELLE:  Okay.  My next one is on 52 of the

8    Court as proposed charge.

9          The Court had listed seven items that the jury might

10   wish to consider in determining the credibility of the

11   witnesses that it saw.

12         I had proposed the addition of a eighth paragraph,

13   which reads as follows, paragraph 8:

14         "Did the witness tell a falsehood to a law

15   enforcement agent about matters relevant to this case when the

16   witness was interviewed?"

17         We had a lot of testimony from witnesses in this

18   case, Your Honor, who admitted or testified that they told a

19   lot of lies to law enforcement agents when they were first

20   interviewed.

21         Obviously, that is something that I will argue at

22   some length to the jury.  It goes to the credibility of the

23   witness.  Given the fact that so many of the witnesses in this

24   case are in that position, it seems to me only correct to

25   highlight that as something that the jury may wish to

PROCEEDINGS                              3207

1    consider.

2            MR. BINI:  Your Honor, the government prefers the

3    same instruction as you had proposed it.

4            There is, in fact, an instruction regarding prior

5    inconsistent statements.

6            THE COURT:  That is correct.

7            MR. BINI:  And there's also an instruction regarding

8    cooperating accomplice testimony and immunized witnesses.

9            THE COURT:  Yes, I'm going not going to accept your

10   invitation, Mr. Riopelle.

11           MR. RIOPELLE:  Fair enough.

12           THE COURT:  It's in the nature of another thing you

13   will note is that I try to steer away as studiously as I can

14   from marshaling evidence in any case, whether a civil case or

15   a criminal case.  That is in the nature of marshaling the

16   evidence.

17           I think that these non sort of case-related tests of

18   credibility of generic tests are what this charge was supposed

19   to capture, and I think the government is correct, unless you

20   have any other charges that will yield quite expressly with

21   the credibility of people who come here either immunized or a

22   cooperation agreement having lied to the government at some

23   point prior to obtaining that protection.

24           MR. RIOPELLE:  Okay, I will take care of it in the

25   defense argument.

PROCEEDINGS                           3208

1          THE COURT:  Yes, I'm sure you will, as is

2    appropriate.

3          MR. RIOPELLE:  Okay, that takes me to 59.

4          Mr. Bini, am I you still ahead of you?

5          MR. BINI:  Yes, you are.

6          MR. RIOPELLE:  On page 59, Your Honor, we reach what

7    I think is a interesting issue about the Court's charge for

8    the testimony of immunized witnesses.

9          There are a number of immunized witnesses in this

10   case, but interestingly enough, these witnesses are merely

11   all, with the exception of David Ben-Bassat, testifying about

12   other acts, similar acts, predecessor acts to the acts charged

13   in the indictment.

14         So the Court's charge, which is the standard charge

15   reads that you can convict these defendants on that testimony

16   alone, but that testimony does not go to the charges in the

17   indictment.

18         And even Mr. Ben-Bassat's testimony does not

19   directly go to the charge -- you know, he doesn't say, I know

20   the market was manipulated.  I did wrong and I did it with

21   others.  His testimony was different.  In fact, I believe his

22   testimony was that he didn't think he had done anything wrong.

23         So it would be my position that in this unique

24   circumstance of this case, the testimony of the immunized

25   witnesses is not alone enough to convict the defendants of

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

1    guilt beyond a reasonable doubt, because these witnesses are

2    not testifying directly about the issues charged as per the

3    events, charged as the crimes.

4          Most of the immunized witnesses are testifying about

5    the creation of Northwest Resources some years before the

6    conspiracy in the indictment is charged, and so I think this

7    language needs to be adjusted.  I have my proposal here, and

8    that is the nature of my objection.  It's kind of an

9    interesting one.

10          So I don't know what the Court makes of that.

11          THE COURT:  Yes, I think -- I agree.  I think it's a

12    very interesting one.

13          MR. RIOPELLE:  Yes.

14          THE COURT:  Does anyone on the government's side

15    disagree with Mr. Riopelle's analysis that the subject matter

16    of testimony of the immunized witnesses do not relate directly

17    to the charged conduct, and that testimony alone indeed would

18    not be enough to convict?

19          MR. BINI:  I think the testimony of David Ben-Bassat

20    would be enough.

21          But in any event, Judge Sand and the imponent wisdom

22    of the Sand instruction has realized this in the instruction

23    where they say:  "Like the testimony of cooperating witnesses,

24    you may convict the defendant on the basis of such witness'

25    testimony alone, if you find that the testimony proves that a

PROCEEDINGS                                  3210

1    defendant is guilty beyond a reasonable doubt."

2              So I think that goes to that.  If the testimony

3    proves them guilty beyond a reasonable doubt, I think that

4    with respect to Wesley Smith, Taylor Edgerton, while we think

5    that the testimony was very important, and if you believe

6    them, I would concede that that does not establish guilt

7    beyond a reasonable doubt.

8              THE COURT:  What would you change, Mr. Riopelle?

9              MR. RIOPELLE:  My change was -- in the first

10   paragraph, I would change that first sentence to read -- it's

11   the first sentence really of the instruction:

12             "As you were informed during the trial, comma, some

13   of the testimony before you came from witnesses who were

14   assured by the government that in exchange for testifying

15   truthfully, completely and fully, they would not be

16   prosecuted," and then I've stricken the phrase "based on their

17   testimony for any crimes that they may have admitted to the

18   government, comma, or here in the court."

19             Then the next paragraph I would have it read as

20   follows:

21             Like the testimony of cooperating witnesses, the

22   testimony of a witness who has been -- "Like the testimony of

23   cooperating witnesses, comma, the testimony of a witness who

24   has been promised that he will not be prosecuted, should be

25   examined by you with greater care than the testimony of an

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

1    ordinary witness.  You should scrutinize it closely to

2    determine whether or not it is colored in such a way as to

3    place guilt upon the defendant in order to further the

4    witness' own interest.  You must consider whether such a

5    witness was motivated to make up testimony in the hope or

6    belief that such was more likely to ensure the witness' own

7    freedom from prosecution, or ask yourselves did the witness

8    believe his interests would be best served by testifying

9    truthfully, it is for you to decide based on your own

10   perceptions and common sense to what extent, if at all, the

11   witness' interest has been affected or colored -- or has

12   affected or colored his testimony, you should carefully

13   scrutinize all the evidence."  And then I've got "in

14   connection with the witness' testimony."  And what is what I

15   propose, Judge.

16           MR. BINI:  Your Honor, the government does not

17   oppose the changes to the first paragraph that are proposed by

18   defense counsel, however, after that the government would

19   prefers the *Sands* instruction.

20           THE COURT:  How much of that second paragraph did

21   you change?  What words did you take out and what words --

22           MR. RIOPELLE:  I took out the words as follows.  The

23   paragraph in *Sands* I believe reads:

24           "Like the testimony of cooperating witnesses, comma,

25   you may convict the defendant on the basis of such witness'

PROCEEDINGS                              3212

1    testimony alone if you find that the testimony proves the

2    defendant guilty beyond a reasonable doubt," period.

3              THE COURT:  And that's the --

4              MR. RIOPELLE:  That's the piece I took out.

5              THE COURT:  And you added to replace that in that

6    sentence with what?

7              MR. RIOPELLE:  I then just continued on with the

8    next sentence in *Sands* which is:

9              "The testimony of a witness who has been promised

10   that he will not"...

11             THE COURT:  In other words, you added nothing new?

12             MR. RIOPELLE:  I added nothing new.  I just took out

13   the bit about "you can convict him on that testimony alone."

14             THE COURT:  Yes, I will accept the change.

15             MR. RIOPELLE:  Thank you, Your Honor.

16             My next objection is on 62, so I think Mr. Bini --

17             MR. BINI:  No.

18             MR. RIOPELLE:  Okay.  This is the Court's similar

19   act charge.  It is the standard charge from *Sands*.  But we

20   have a case in which the similar acts are really prior acts,

21   background-type proof rather than modus-operandi-similar act

22   type proof.  So I have proposed a change to this charge as

23   well just to make it more, tighten the applicable to the

24   circumstances of this case, Your Honor.

25             What I have done is proposed an amended charge which

1    would read as follows:

2              "During this trial, you have heard evidence that on

3    other occasions a defendant engaged in conduct that was

4    similar in nature to the conduct charged in the indictment, or

5    was background to the conduct charged in the indictment.

6    Evidence of prior or similar acts was admitted as background

7    evidence to show the development of the relationships of trust

8    between the defendant Discala and the government's witnesses,

9    and to provide background evidence of the charged crimes and

10   how they developed.  However, I caution you that a defendant

11   is on trial only for committing the acts alleged in the

12   indictment.  You may not consider evidence of any previous or

13   similar acts as a substitute for proof that any defendant

14   committed the crimes charged in this case, nor may you

15   consider this evidence as" -- evidence as -- I'm having

16   difficulty reading my draft.  "You may consider it only for

17   the limited purpose of providing you with the background of

18   the offense charged in the indictment."

19             So what I'm really trying to get at, Judge, is I

20   think that, for example, the Northwest Resources proof, which

21   is a very big part of the case here, is, you know, Ms. Cane is

22   really not a direct actor in that proof, she's not somebody

23   who is dealing with the witnesses at all.  And I think it's

24   important that the jury understand that this is admitted as

25   sort of background to the proof in the case.  It is not

PROCEEDINGS                           3214

1   admitted as a prior similar act to what happened in the case,

2   and I think by amending the charge in this way, it emphasizes

3   that it's admitted as background makes the purpose of the

4   Court's admission of the evidence clearer to the jury.

5          MR. BINI:  Your Honor, the government believes that

6   we should have the standard *Sands* instruction here, because,

7   among other things, there was admission during the testimony

8   of Matt Bell of manipulation of other stocks, precisely for

9   404(b) purposes -- manipulation with Discala with other stocks

10  precisely for 404(b) purposes to show the absence of mistake.

11  So that we believe that's classic 404(b) evidence, so we would

12  ask for the standard same instruction.

13         MR. RIOPELLE:  Yes, the strange case where the

14  evidence as it relates to Ms. Cane is really background, and

15  there may be some other 404(b) evidence as to Mr. Discala, you

16  know, some of those other transactions that are not charged.

17         MR. BINI:  And the government doesn't believe that

18  the evidence regarding Northwest Resources is not at all just

19  background evidence.  The government believes it goes to the

20  heart of control of the 8 million shares of Cubed as we just

21  showed with our the witnesses where we put on basically

22  recruiter, the fake CEO, and then Marche Godffrey one of the

23  fake shareholders.

24         THE COURT:  I'm going to adhere to the *Sands* charge.

25  We tried to de-pluralize this as best we could.

1              MR. RIOPELLE:  Thank you, Your Honor.

2              THE COURT:  Try to get the jury to focus separately

3    with respect to each defendant.

4              MR. RIOPELLE:  Okay.  That takes me to 66, it looks

5    like.  Yes, I have sort of a small quibble with what's on

6    page 66.

7              THE COURT:  Okay.

8              MR. RIOPELLE:  It's a quibble with the *Sands* charge,

9    I'll note.

10             The charge there talks about:  "If you find a

11   reasonable doubt has been created, you must acquit him or her

12   of all charges."

13             The reason I worry about that languages is it sounds

14   almost like burden shifting to the defendant requiring the

15   defendant to create a reasonable doubt.

16             I would proposes that if you -- and this is in

17   connection with the character evidence, which, of course, my

18   client has offered, I would proposes that the Court amend the

19   charge to read that:

20             "If you find you have a reasonable doubt as to the

21   defendant's guilt, you must acquit him or her of all the

22   charges," rather than saying:

23             "If you find that a reasonable doubt has been

24   created by the character evidence," because that sounds like

25   the burden shifting to me.  But that may be a quibble that is,

PROCEEDINGS                              3216

1    you know, academic.

2              THE COURT:  Does the government have any position?

3              MR. BINI:  The government thinks the *Sands*

4    instruction is appropriate, and it does not shift the burden.

5              THE COURT:  Yes, I will adhere to *Sands*, given the

6    number of times I make it clear that you have no burden.

7              MR. RIOPELLE:  Thank you, Your Honor.  That takes me

8    to page 67.

9              MR. BINI:  And the government agrees with Ms. Cane

10   that this particular charge was envisioned -- I think we had

11   proposed it because Mr. Morris was in the case, and there was

12   no SEC testimony that remains in this case.

13             THE COURT:  All right.

14             MR. RIOPELLE:  Very good.  So that's out.

15             THE COURT:  So that's out.

16             Okay.  Next lowest number?

17             MR. RIOPELLE:  Oh, on the defendant's right not to

18   testify -- I'm up to page 68 or 69 of the Court's charge.

19             I had proposed to insert into the standard *Sands*

20   charge a little bit of language that appears at the end of the

21   chapter in *Sands* about the defendant's right not to testify;

22   that, you know, there may be any number of reasons why a

23   defendant chooses not to testify, and you should not -- and

24   that language is important I think given my client's gender

25   status to include.

PROCEEDINGS                                3217

1          And then at the end I had inserted some additional

2    language from that blurb in *Sands*, which reads as follows:

3          "In other words, you should simply put the whole

4    matter of the defendant not testifying out of your mind, "and

5    period there.

6          And I think there is a list and a little blurb in

7    *Sands* which somehow didn't come through on my notes here of

8    the reasons why -- the any number of reasons why the defendant

9    might not testify.  It talks about she might stutter or, you

10   know, that kind of thing.

11         I think that language would be good in this

12   particular case, Your Honor, to add, and I will note that the

13   chapter in *Sands* does indicate that it can be appropriate to

14   add that language.

15         (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

Proceedings                              3218

1    (Continuing.)

2            MR. BINI:  We will oppose and ask for the Sand

3    instruction because, among other things, besides your Honor

4    has always stressed the burden, there was actually a

5    questionnaire regarding gender status.  I think this issue has

6    been really vetted and, in fact, there has not been any

7    testimony relating to this topic during the course of the

8    entire trial.

9            THE COURT:  I'm going to adhere to the Sand charge.

10           And I will say this, Mr. Riopelle, this is my view

11   on this:  What I think is important here is for the jury not

12   to think about this at all, to view this in only one fashion:

13   That they have been ordered by the judge not to consider the

14   fact that a defendant hasn't testified, not that I have to

15   give them a reason.

16           MR. RIOPELLE:  Okay.

17           THE COURT:  That it is absolutely prohibited because

18   I say so.  And I've told them that twice already, first in the

19   connection with the defense case and the sooner they think of

20   nothing other than "put it out of my mind," I think it's

21   better, frankly, for the defendant.

22           MR. RIOPELLE:  Okay.  Thank you, Judge.

23           That takes me to the next page which is the

24   testimony of the defendant, if applicable, and it looks like

25   that's not going to be applicable.

1          THE COURT:  Still pending.

2          MR. RIOPELLE:  We're not done yet.

3          THE COURT:  That may change.  So, it will be this

4    one or that one or, in the odd situation where Mr. Discala

5    testifies and Ms. Cane doesn't, both.

6          MR. BOWMAN:  Your Honor, with respect to Page 70,

7    the interest in the outcome of the case portion of the charge

8    I object to.

9          There's no real reason to tell the jury that the

10   defendant has an interest in the outcome of the case because,

11   of course, everybody in the courtroom knows it.  And by

12   singling this out, you're saying that the defendant is the

13   only person who has an interest in the outcome when nobody

14   gives that kind of a charge to, for example, an FBI agent who

15   has devoted weeks or months or years to an investigation.

16         So, I would object to the portion of the charge, and

17   just omitting the words with an interest in the outcome of the

18   case.

19         MR. BINI:  Your Honor, if a defendant chooses to

20   testify, the Government would ask for the standard charge that

21   the defendant, of course, is the most interested of any

22   witness and it's appropriate for the jury to consider.

23         THE COURT:  If either defendant testifies, I'll give

24   the standard charge.

25         MR. RIOPELLE:  My next comment is on Page 76.

Proceedings                              3220

1          THE COURT:  Anything between 70 and 76?  No.

2          MR. BINI:  Not from the Government.

3          MR. RIOPELLE:  Judge, on Page 76, I think we are

4   missing a verb.  I think after the word "weight," which is

5   four lines up from the bottom of that paragraph, we need to

6   insert either "is" or "should."

7          The sentence reads:  It is exclusively your duty,

8   based upon all the evidence and your own good judgment, to

9   determine whether the prior statement was inconsistent and, if

10  so, how much, if any, weight to be given to the inconsistent

11  statement in determining whether to believe all, part, or none

12  of the witness' testimony.

13         I think that sentence should read:  And, if so, how

14  much, if any, weight is to be given.

15         Or:  If so, how much, if any, weight should be

16  given.

17         I think there's a missing "to be" in that sentence.

18         THE COURT:  Sounds like you're right.

19         MR. BINI:  No objection to "should" be given.

20         MR. RIOPELLE:  The Government prefers "should," so

21  we agree on "should."

22         THE COURT:  You got that, Mr. Mejia?

23         THE LAW CLERK:  Yes, sir.

24         MR. RIOPELLE:  I have my notes if Mr. Mejia needs

25  them.

Proceedings                                  3221

1          THE COURT:  After 76?

2          MR. RIOPELLE:  I'm up to 81.

3          THE COURT:  81.

4          MR. RIOPELLE:  Okay.  I propose that we add a

5  sentence at the bottom of that charge.  That is the charge

6  about the use of conjunctive and disjunctive in the

7  indictment.

8          I propose that the charge have a sentence added at

9  the bottom:  However, I remind you that the defendants are on

10 trial only for committing the acts alleged in the indictment

11 and you may not consider evidence of any previous or similar

12 act as a substitute for proof that a defendant committed the

13 crimes charged in this case.

14         We had a great deal of proof of prior and similar

15 acts, Judge, and it seems to me a good idea to focus the jury

16 on the fact that they need to focus on the evidence of the

17 crimes charged in this case rather than conduct that was

18 admitted as background.

19         MR. BINI:  Your Honor, the Government would ask for

20 the standard conjunctive and disjunctive charge.  And the

21 language here doesn't really relate to the proposed --

22         THE COURT:  And I think it's covered in other parts

23 of my charge.

24         MR. RIOPELLE:  Okay.  Thank you, Judge.  My next

25 comment is on Page 100, so we're making progress.

*LAM      OCR      RPR*

Proceedings                                    3222

1          Mr. Bini, do you have anything before Page 100?

2          MR. BINI:  I do not.

3          MR. RIOPELLE:  On Page 100, the Court cautions the

4    jury that a defendant's mere presence at the scene of an

5    alleged crime doesn't make the defendant guilty of being a

6    member of the conspiracy.

7          This cautionary instruction is given in the midst of

8    the conspiracy instruction.  I would propose that rather than

9    have the phrase "at the scene of the alleged crime" I would

10   say "during an alleged conspiracy," so it would read as

11   follows:  I want to caution you, however, that a defendant's

12   mere presence during an alleged conspiracy does not by itself

13   make him or her a member of the conspiracy.

14         And then you could strike the first word of the next

15   line, "similarly," and just go on to read:  Mere association

16   with one or more members of the conspiracy does not

17   automatically make a defendant a member.

18         That is my proposal for page 100?

19         THE COURT:  Anybody have a problem with that?

20         MR. BINI:  Your Honor, the Government prefers the

21   Sand instruction as given because the mere presence at the

22   scene -- excuse me, "mere presence during a conspiracy" is

23   different than the being at the scene of an alleged crime.

24         The Sand instruction, I think, classically is more

25   of like the drug context or the robbery context, where there's

1   someone literally at the scene of the crime and you're in the

2   wrong place at the wrong time sort of situation is what it

3   envisions.  However, if you change it to the defendant's mere

4   presence during a conspiracy, well, conspiracy is for a long

5   period of time, particularly as charged here.  I think that's

6   different and suggest that if a defendant, for example, keeps

7   being involved in something, that that is not something the

8   jury should consider and the Government thinks it's much the

9   opposite.

10          So, we would ask for the mere presence at the scene

11  of alleged crime does not by itself make him or her a member

12  of the conspiracy, which is the standard instruction.

13          THE COURT:  The change, I'm afraid, Mr. Riopelle,

14  may create more confusion than is intended by you, first of

15  all.  And I don't particularly like the charge, but I don't

16  particularly think the remedy makes it any better.

17          MR. RIOPELLE:  Okay.

18          MR. BOWMAN:  Your Honor, may Mr. Discala be excused?

19          THE COURT:  Absolutely.

20          DEFENDANT DISCALA:  Thank you, your Honor.

21          THE COURT:  Please.

22          As long as they know they have a right to stay.

23  With no jury here, they can go.

24          MR. RIOPELLE:  Okay.  That takes me up to Page 101,

25  I believe.

*LAM        OCR        RPR*

Proceedings                                    3224

1            THE COURT:  Okay.

2            MR. RIOPELLE:  I would like to add the phrase "if

3    you find unanimously that the" after the words "in sum," so

4    that the first line at the bottom paragraph reads:  In sum, if

5    you find unanimously that the defendant had an understanding

6    of the unlawful character of the conspiracy, and then:

7    Intentionally engaged, advised, assisted in it or for the

8    purpose of furthering the illegal undertaking.

9            I would like to add the concept of unanimity there

10   in that phrase on 101.

11           THE COURT:  Any objection from the Government?

12           MR. BINI:  You want:  In sum, if you find

13   unanimously defendant...

14           MR. RIOPELLE:  In sum, if you find unanimously that

15   a defendant, with --

16           MR. BINI:  And it goes on with the rest of the

17   charge?

18           MR. RIOPELLE:  Yes.

19           MR. BINI:  No objection, your Honor.

20           THE COURT:  So be it.

21           MR. RIOPELLE:  And then my next comment is on Page

22   102.  I would like to add the following sentence to the end of

23   this charge:  And I remind you that the burden remains on the

24   Government at all times to prove each and every element of the

25   crime charged beyond a reasonable doubt.

1          THE COURT:  You don't think I say that enough?

2          MR. RIOPELLE:  It can never be said enough.

3          THE COURT:  Moving right along, what's your next

4    one?

5          MR. RIOPELLE:  That one is overruled.  Okay.

6          My next one is on Page 109.  And I want to add the

7    word at the bottom of the paragraph that ends "find the

8    defendant guilty," I want to add the word "unanimously."

9          You see that line that begins, Fact that all of you

10   find to be false in order to find the defendant guilty, I want

11   to add that they have to find it unanimously there.

12         So, I want that sentence to read as follows:  There

13   must be at least one specific pretense, representation, or

14   promise about a material fact that all of you find unanimously

15   to be false in order to find a defendant guilty.

16         THE COURT:  That's even a better "unanimously" than

17   the last one.

18         MR. RIOPELLE:  There you go.  A winner, I think.

19         THE COURT:  Yes.

20         MR. RIOPELLE:  My next objection appears on Page

21   114.  I object to the conscious avoidance language there that

22   appears in the paragraph beginning:  In determining whether a

23   defendant acted knowingly, et cetera.

24         I don't believe this is an appropriate case for a

25   conscious avoidance charge.  I think that the Government's

Proceedings                                3226

1    theory is that my client was a wrongdoer and knew darn well

2    what was going on.  And the problem with the conscious

3    avoidance charges is they dilute the burden of proof, and I

4    don't think that the defendant has challenged the issue of

5    knowledge in any great way in the case.

6            MR. BINI:  Your Honor, the Government thinks that

7    the Defendant Cane has challenged the issue of knowledge and

8    Defendant Discala has as well from the opening statements.

9            Defendant Discala's opening statement was that he

10   relied on all these people around him and that everybody

11   betrayed him, in substance.  And while Ms. Cane has both in

12   her opening and during cross-examination presented the jury

13   repeatedly that the use of this Ben-Bassat account was

14   innocent, that she just did selling from that account, and

15   that she did not participate deliberately in the fraud scheme,

16   the Government has presented evidence, including call after

17   call where Discala is informing her of what he's doing and

18   there's also text messages from other co-conspirators.

19           So, the Government believes that Defendant Cane and

20   Defendant Discala both have claimed to not be aware of the

21   pump and dump that was happening right around them.  And for

22   this reason, we think that this instruction is appropriate.

23           In looking at the case law, I was looking at *United*

24   *States v. Ebbers*, 458 F. 3rd 110, Second Circuit decision from

25   2010, where the Second Circuit affirmed giving the conscious

*LAM        OCR        RPR*

Proceedings                                    3227

 1   avoidance/willful blindness instruction with respect to Bernie

 2   Ebbers, where he had indicated that he signed 10-Ks and -Qs

 3   and just didn't look at them.  I think similarly here we have

 4   testimony and evidence that suggests that Cane had to know

 5   based on the use of the Ben-Bassat account, and, so, she was

 6   closing her eyes between the Ben-Bassat account and the other

 7   evidence to the fraud scheme.

 8          THE COURT:  I think a conscious avoidance charge is

 9   warranted on the evidence and the argument and I'm going to

10   overrule the objection.

11          MR. RIOPELLE:  Thank you, your Honor.  I'm now up to

12   Page 116 of the charge.

13          THE COURT:  116.  Okay.

14          MR. RIOPELLE:  I would like to add the following

15   language after the phrase "caused by him and her," which is in

16   about the middle of the page where a paragraph ends.

17          I would change the period to a comma and add the

18   phrase:  If you find the proof establishes beyond a reasonable

19   doubt that such actions were taken or such representations

20   were made with an intent to defraud.

21          MR. BINI:  Your Honor, the Government would ask for

22   the standard instruction because, among other things, this

23   would add practically another sentence to this.  This is kind

24   of the no alternate harm instruction and the Government would

25   ask for the standard instruction.

1          THE COURT:  I'm going to adhere to the Sand standard

2    instruction.

3          MR. RIOPELLE:  That takes me to Page 132, your

4    Honor.  There again, the Court has included a reference to

5    conscious avoidance.  I have objected to that inclusion, and I

6    just make my objection again for the purposes of the record.

7          THE COURT:  Absolutely.

8          MR. RIOPELLE:  That takes me to Page 134, where,

9    again, there is the same phrase "representations caused by him

10   or her," and I have requested and do request that the same

11   phrase we just discussed be included.

12         I have the sense that Mr. Bini objects --

13         MR. BINI:  Yes.

14         MR. RIOPELLE:  -- and I know how that comes out.

15         THE COURT:  Same objection, same ruling.

16         MR. RIOPELLE:  Right.  Okay.

17         That takes me to Page 158, Judge.

18         THE COURT:  158, you said?

19         MR. RIOPELLE:  158, yes, sir.

20         At 158, at the end of this charge, there is the

21   following sentence:  Each specific use of a telephone or the

22   mail in furtherance of the scheme to defraud constitutes a

23   separate and distinct criminal offense.

24         That's in connection with the conspiracy charge, and

25   I don't think this instruction needs to be given in connection

Proceedings                                    3229

1    with a conspiracy charge.  There are separate and distinct

2    mailings and wires that are charged as such for crimes and the

3    Court will instruct the jury as to those.  But I think saying

4    every time you use a telephone, that's a crime too in the

5    context of the conspiracy charge is unfair to the defendant.

6              MR. BINI:  I think your Honor made that change

7    because I don't see it on 158 of 601.

8              MR. RIOPELLE:  Maybe he didn't make that change.

9              MR. BINI:  You won already.

10             MR. RIOPELLE:  Now I'm giving the Court a chance --

11             MR. BINI:  Take it back, Judge.

12             MR. RIOPELLE:  Sorry, I'm not reading my own notes

13   well at 6:30 at night.

14             MR. BINI:  The Government requests a change to Page

15   163.

16             MR. RIOPELLE:  I'm at 159.

17             MR. BINI:  I'm sorry.

18             MR. RIOPELLE:  I'd like to add the language at the

19   bottom --

20             THE COURT:  What page are we on, gentlemen?

21             MR. RIOPELLE:  159.  That last sentence on 159, it

22   says:  Second, that a defendant knowingly and intentionally

23   became a member of the conspiracy.

24             I would like to amend that sentence to read:

25   Second, that the Defendant whom you are considering knowingly

Proceedings                          3230

1   and intentionally became a member of the conspiracy.

2          Emphasizing the individuality of guilt as to each

3   defendant.

4          MR. BINI:  No objection, your Honor.

5          THE COURT:  Yes, you got that one.

6          MR. RIOPELLE:  Fantastic.

7          And on 163, Mr. Bini?

8          MR. BINI:  Yes.

9          On 163, Overt Act D, the Government did not present

10  evidence regarding Overt Act D, so the Government would ask

11  that that be removed.

12         THE COURT:  No objection?

13         MR. BINI:  That's on or about October 17, 2013,

14  Ofsink caused an e-mail to be sent to Shapiro, which e-mail

15  attached a sham consulting agreement.  And it goes on.

16         THE COURT:  All accord in deletion?

17         MR. BOWMAN:  Yes.

18         MR. RIOPELLE:  No objection.

19         THE COURT:  Make sure that Ben has that, Mr. Bini.

20         MR. RIOPELLE:  I can give him my copy.  Thank you,

21  Ben.

22         Judge, I'm pleased to report I have no further

23  comments on the charge.

24         THE COURT:  How about you, Mr. Bini?

25         MR. BINI:  Your Honor, I was just pulling up --

1    Ms. Jones had a redacted indictment -- I know you're not

2    sending it back, but where we had proposed changing some of

3    the names that are set out in the indictment.  I just want to

4    pull that up, if I could, because it affects the overt acts.

5              THE COURT:  Okay.  You want to delete them?

6              MR. BINI:  Well, we've presented evidence on the

7    rest other than D, which we asked to remove.  But with respect

8    to some of the individuals named, some of the

9    co-conspirators -- give me one moment.  Ms. Jones is just

10   zooming ahead to the portion of the indictment where we put in

11   the names.

12             THE COURT:  Oh, the days of black felt marker, how

13   to make it appear and disappear in the ether.

14             MR. BINI:  So, on Overt Act F, the Government would

15   ask to take out "Co-conspirator 2" and put in instead "Victor

16   Azrak."

17             THE COURT:  Any objection?

18             MR. ROSS:  No objection.

19             MR. RIOPELLE:  No objection, Judge.

20             MR. BINI:  It appears twice on Overt Act F, and I'll

21   give my hand-changed to Mr. Mejia after.

22             Then on Paragraph G, the Government would ask that

23   "Co-conspirator 3" be changed to "Marc Wexler."

24             THE COURT:  I assume again no objection.

25             MR. ROSS:  No objection.

Proceedings                      3232

1        MR. RIOPELLE:  No objection, Judge.

2        MR. BINI:  Paragraph I, the Government would ask to

3   change "Co-conspirator 2" to "Victor Azrak."

4        MR. ROSS:  No objection.

5        MR. RIOPELLE:  No objection.

6        MR. BINI:  In Paragraph N, the Government would ask

7   to change "Co-conspirator 3" to "Marc Wexler."

8        MR. ROSS:  No objection.

9        MR. RIOPELLE:  No objection.

10        MR. BINI:  The Government would ask to insert the

11   aiding and abetting instruction wherever your Honor think it

12   appropriate.  Perhaps it would be after the first substantive

13   count, securities fraud, Count Three, which ends on Page 184.

14        THE COURT:  Any objection?

15        MR. ROSS:  No objection.

16        MR. RIOPELLE:  No objection.

17        THE COURT:  We'll add it there.

18        MR. BINI:  And then the other objection, the request

19   to change the jury charge the Government has, begin on Page

20   199, where, again, we would just like to fill in with respect

21   to the counts the names of the individuals as the evidence has

22   come in.

23        On Page 199, Count Six indicates telephone call from

24   Discala to Broker 1.  The Government would request to put in

25   the name "Jamie Sloan" instead of "Broker 1."

*LAM      OCR      RPR*

Proceedings                                        3233

1             MR. ROSS:  No objection.

2             MR. RIOPELLE:  No objection.

3             THE COURT:  Okay.

4             MR. BINI:  On Page 200, with respect to Count Seven,

5     telephone call from Discala to instead of "Co-conspirator 2"

6     the Government would ask for "Victor Azrak."

7             MR. ROSS:  No objection.

8             MR. RIOPELLE:  No objection, Judge.

9             THE COURT:  Okay.

10            MR. BINI:  With respect to Page 201, Count Eight,

11    telephone call from Discala to instead of "Trader 1," to "a

12    trader at BNA."

13            MR. ROSS:  No objection.

14            MR. RIOPELLE:  No objection, your Honor.

15            THE COURT:  Okay.

16            MR. BINI:  On Page 202, Count Ten, telephone from

17    Discala to Co-conspirator 3, the Government would ask to put

18    "Marc Wexler" in for "Co-conspirator 3."

19            MR. ROSS:  No objection.

20            MR. RIOPELLE:  No objection, your Honor.

21            THE COURT:  Okay.

22            MR. BINI:  In addition, with respect to that call,

23    the Government put in the evidence -- the excerpt the

24    Government included did not include reference to CodeSmart or

25    StarStream, so the Government would ask to change that to

LAM        OCR        RPR

1    state:  Telephone call from Discala to Marc Wexler discussing,

2    among other things, the manipulation of Cubed stock.

3              MR. ROSS:  No objection.

4              MR. RIOPELLE:  No objection.

5              MR. BINI:  That's it from the Government.

6              The Government had one issue with respect to the

7    verdict sheet.

8              THE COURT:  Let's finish the charge and then we'll

9    go with the verdict.

10             MR. BINI:  Sure.

11             MR. SHROYER:  We do have something to raise, your

12   Honor.

13             On Page 206 at the end of the good faith charge is

14   where we would insert a reliance on counsel charge.  We've

15   provided the language of that charge to the Court previously

16   in a letter.  It's hard for me to remember if it was earlier

17   this week or last week.

18             THE COURT:  And we have it.

19             MR. SHROYER:  This is where we think it would be

20   appropriate.  We think that the evidence demonstrates with all

21   the various accusations about actions that were taken, about

22   understanding of the security law, that it's appropriate here

23   for Mr. Discala to have that charge, particularly given that

24   we're not sure yet exactly how the Government is going to be

25   spinning all these different background acts and 403(b) acts,

Proceedings                                           3235

1    et cetera.

2            MS. JONES:  Your Honor, we had briefed this issue

3    earlier and it's abundantly clear that the defendant has not

4    met any of the prerequisites to get that charge.  It's not

5    even clear what attorney he's talking about, what information

6    was applied to that attorney, what advice was given to that

7    attorney -- from that attorney and whether or not in

8    Mr. Discala actually followed that advice.  So, there's

9    clearly no basis for this charge.

10           MR. SHROYER:  I would disagree with that

11   characterization of the evidence, your Honor.

12           There has been evidence that Mr. Discala suffered

13   losses in some of the -- in particular, during certain time

14   frames on all of the three securities that were traded prior

15   to Cubed, that he sought advice about the construction of the

16   escrow accounts, that some of the various text messages and

17   phone calls demonstrate that he expressed thoughts and

18   feelings about the way the escrows were being carried out.

19   And there's no question based on the evidence that that

20   arrangement was devised by an attorney who was an expert in

21   the securities field.

22           THE COURT:  There's clearly no evidence that

23   warrants the charge up to now.  So, unless you have another

24   witness that you haven't told us about yet, there's no basis

25   for it.

Proceedings                    3236

1          MR. SHROYER:  We've disclosed our witnesses at this

2    point.

3          THE COURT:  Then there is no basis in the evidence

4    for that charge --

5          MR. SHROYER:  Thank you.

6          THE COURT:  -- given the applicable case law.  So, I

7    will not charge it on the basis of the evidence that's been

8    adduced so far.

9          MR. SHROYER:  The other point that I would want to

10   make about that is that it is our belief, based on the case

11   law, that it's not the same analysis as the attorney-client

12   privilege analysis, whereby there needs to be a personal

13   attorney-client relationship that's established; that this

14   defense, this attack, on the intent element, as opposed to it

15   being an affirmative defense, simply requires good faith based

16   on representations that are made.

17          And, so, we do think that the argument that -- I

18   think Ms. Jones was alluding to a higher standard that's

19   necessary than the case law allows for, so I'd like to make

20   that clear as well.

21          THE COURT:  Our analysis of the case law applied to

22   the facts that I've listened to.  There's no basis for that

23   charge.

24          MR. SHROYER:  Understood.  Thank you, your Honor.

25          THE COURT:  Anything else on the charge?

1              MR. BINI:  Not on the charge.

2              THE COURT:  Okay.  That's Court Exhibit 1.  Now

3      we'll address Court Exhibit 1-A, which is the verdict sheet.

4              (Court Exhibit 1 and 1-A, were received in

5      evidence.)

6              MR. RIOPELLE:  Yes, Judge.  For Ms. Cane, I just

7      noticed and note that the only issue is that there appears to

8      be some sort of word processing glitching on, How do you find

9      a particular defendant, it then says not guilty and the guilty

10     is sort of under.  We just need to straighten that out so it's

11     on one line.

12             THE COURT:  Yes, it will be on one line.

13             MR. RIOPELLE:  I notice it's kind of glitchy there.

14     I'm sure Mr. Mejia will know how to fix that up.

15             Other than that, Ms. Cane does not have any comments

16     on the verdict sheet.

17             MR. BINI:  Your Honor?

18             THE COURT:  Mr. Bini?

19             MR. BINI:  We had one request, which is that with

20     respect to the overt acts, there's sort of a special jury

21     instruction here, and I apologize because I should have

22     submitted a proposed verdict sheet.  I know --

23             THE COURT:  You allegedly did.  Everybody allegedly

24     did.  We couldn't find any.

25             MR. BINI:  We did not.

Proceedings                                    3238

1          I know when I was part of the trial team before your

2   Honor in October/November 2015, the verdict sheet we proposed

3   included such a special verdict format as to which specific

4   overt acts were found in *United States v. Kirschner, et al.*

5   However, since that time, I know in our unit, in revisiting

6   this and looking at the 371 charge, we have requested to just

7   have the guilty or not guilty because the charge itself, the

8   371, the charge regarding the 18 U.S.C. 371 charge, makes

9   clear that the jury must unanimously find one overt act.  So,

10  the Government believes that is sufficient and that the

11  special verdict sheet is not required.

12         I would note that since I had the opportunity to try

13  that case before your Honor in at least two other trials I'm

14  aware of in the district; in *United States v. Petrossi,*

15  16-CR-234 before Judge Cogan, and I know in the *Shkreli* and I

16  believe in *Greebel*, I believe that was 371 charge as well, in

17  both of those trials before Judge Matsumoto the verdict sheets

18  did not have the specific overt acts.

19         So, we would request it without the overt acts if

20  your Honor agrees.

21         MR. RIOPELLE:  I like it with the overt acts.

22         THE COURT:  They come from you ultimately, Mr. Bini.

23         MR. BINI:  That's true, your Honor, and we bear the

24  burden.

25

Proceedings                                    3239

1              (Continued on next page.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                          3240

1    (Continuing.)

2              THE COURT:  They need to find one to convict, so

3    I'll leave it in.

4              MR. ROSS:  We have no November other comments on the

5    verdict sheet.

6              THE COURT:  Okay, good.  So night court is almost

7    over.

8              MS. JONES:  Your Honor --

9              THE COURT:  Maybe not.

10             MS. JONES:  There are two brief issues that I'd like

11   to raise with you regarding the current witnesses on the

12   stand, Ms. Eckhart.  My understanding was that she was going

13   to testify along similar lines like the Government's witness

14   Joan Mazella, that she reviewed certain bank records, she

15   reviewed certain brokerage records, and based on her review

16   and analysis she prepared reports that summarized those

17   records, that that is what she was going to testify about.

18             Assuming that we're talking about the charged stocks

19   in this case, that's fine.  However, based on the questioning

20   to date in which Ms. Eckhart has stated that she's been

21   qualified as an expert in forensic accounting over 34 times, I

22   want to be clear that we are not okay with qualifying this

23   person as an expert.  There has been no expert notification

24   provided to the Government.  There has been no summary of her

25   opinions or any of that.  So to the extent that there is

1    intending to be testimony of a forensic accounting expert

2    nature that goes beyond her review of just summarizing the

3    bank records and brokerage records, we're going to object.

4    And I just want to make that clear.

5            THE COURT:  I thought it was clear.  It's that line

6    that, I frankly considered what -- she's not an agent -- what

7    Ms. Mazella did, that's in the nature of specialized

8    knowledge, so it's in that middle field.  And we don't declare

9    them expert witnesses, but we allow that specialized knowledge

10   in.  I assumed that's what we would hear from Ms. Eckhart as

11   well.

12           MS. JONES:  That's fine.  The second issue, is that

13   I want tomorrow to go quickly and smoothly so we can move on

14   and get to closings as quickly as possible.  I don't want

15   there to be back and forth or delay, but I do want to make it

16   clear that it's the burden of the defense counsel to lay the

17   foundation for these charts and make sure that the charts are

18   based on admitted evidence.

19           Defense counsel has asked me twice if I would just,

20   if the Government is prepared to stipulate that the binders of

21   4,500 pages that they gave me as the underlying analysis if I

22   wanted to stipulate that that's admissible.  I'm not going to

23   do that.  I do not have the time to sit down and match up what

24   is an admitted Government's Exhibit and what is not; what is a

25   business record and what is not.

Proceedings                                    3242

1          To the extent that there are discreet, specific

2     documents that they want admit as business records and we can

3     agree that they are authentic, that's fine.  But the burden

4     should be on the defense counsel to lay the foundation based

5     on admitted exhibits that have been produced to date.  We have

6     a business records certification and we've moved into evidence

7     all the bank records we have for Discala, all the brokerage

8     records that we have for Discala.

9          I asked Mr. Cheng, are these brokerage and bank

10    statements the same as what has been admitted into evidence

11    and he said he wasn't sure, he didn't know.  The burden should

12    be on them, not me, to figure that out.

13              THE COURT:  I agree.

14              MR. ROSS:  Judge, Mr. Cheng is not here.  I

15    understand what the Government is saying and --

16              THE COURT:  They have to be within, rooted in the

17    evidence.

18              MR. ROSS:  We understand, your Honor.

19              THE COURT:  Okay.  Ms. Eckhart has got to be

20    prepared to say that.

21              MR. HEIN:  I just wanted to raise a logistical

22    matter for tomorrow.  Obviously, we don't know how long this

23    witness will last or whether the Government will put on a

24    rebuttal case.  But assuming the witness lasts an hour,

25    hour-and-a-half, around noon, the Government estimates our

Proceedings                           3243

1   closing is probably around three hours.  If we were able to

2   break for lunch earlier than we normally do, perhaps at noon,

3   and reconvene at one to commence.  I think that would probably

4   be best, at least for the Government timing wise.  I wanted to

5   mention that to your Honor.

6            I also wanted to mention to, your Honor, that given

7   we estimate it will be three hours, to see if we can take a

8   short break about halfway through, just a bathroom break.

9            THE COURT:  Yes, I don't have a problem with that

10  either.

11           MR. RIOPELLE:  Your Honor, Roland Riopelle for the

12  defendant Kyleen Cane.  What is the Court's practice with

13  respect to the defense closings?  Do we go from the bottom of

14  the caption up, or top of the caption down?

15           THE COURT:  Here is normally what I do, allow the

16  defendants to decide first among themselves as to who is going

17  to go first.  If there is a disagreement strategy-wise, then I

18  usually take the first named defendant first.

19           MR. ROSS:  That's fine, Judge.

20           THE COURT:  Just the way, Mr. Riopelle, you went

21  first on with your case.  That was on agreement.  It's not a

22  problem.

23           MR. RIOPELLE:  Okay.

24           THE COURT:  If you guys agree, that's fine.  If not,

25  it will be Mr. Discala who will go first.

Proceedings                                    3244

1          With respect to defense, so we can time it out, with

2     respect to defense closings do we have any estimates?

3          MR. ROSS:  Judge, my estimate would be an

4     hour-and-a-half perhaps two.

5          MR. RIOPELLE:  I think mine will be similar in

6     length, your Honor.

7          THE COURT:  Okay.  The Government is to be also on

8     notice for their rebuttal close, it has to be linked to the

9     something that one of the these guys said.  We are not going

10    to have another round two of round one.

11         MS. JONES:  Okay, your Honor.

12         THE COURT:  So it's plain to me.

13         MR. RIOPELLE:  I would like to ask a question in

14    that regard.  Are there tape recordings that have been

15    admitted in evidence that have not been played during the

16    trial?

17         MS. JONES:  I don't think so.  I think our intent

18    was to only admit the items that we wished to play.

19         MR. RIOPELLE:  The reason I ask, your Honor, is with

20    my failing memory I recall the sting of the ones played during

21    the trial but I don't -- there were so many marked as

22    exhibits, I don't recall all of them.  And every lawyer's

23    worse nightmare is to stand up and sum up based on what they

24    heard in the courtroom and then have something flying from out

25    of space that we haven't really dealt with in the courtroom.

Proceedings                                3245

1    And I don't want to be, I'm not accusing the Government of

2    doing anything wrong, I don't want to be sandbagged.

3            THE COURT:  I think in that regard you worked fairly

4    well amongst all of you.

5            MR. RIOPELLE:  As the Court saw today, I don't

6    remember all that was admitted.

7            THE COURT:  That's why we have Henry.

8            MR. RIOPELLE:  And he's not here.

9            THE COURT:  We're in trouble.  We'll do the best we

10   can.

11           MS. JONES:  Your Honor, I think we played everything

12   all the calls.  I think we played all the calls we admitted

13   into evidence.  That was the intent, to only move into

14   evidence things that we actually intended to play.

15           MR. RIOPELLE:  Okay.  That may be right, I just want

16   to make sure that if I sum up -- I've got the notebooks that

17   the Government gave me with the calls that were played.  And I

18   want to make sure that that's what I should focus on tonight

19   as I gather my thoughts.  I just don't want to have something

20   come out of the blue tomorrow that I haven't anticipated;

21   although, that will certainly happen regardless.

22           THE COURT:  I'm just trying to think in my own mind

23   how -- timing, it should work.  We'll keep refining it as we

24   go.  That sounds like an operational plan, as Mr. Hein

25   commented, about the length and codicils from the defense.  I

Proceedings                                    3246

1    think it works.

2                MR. HEIN:  Thank you, your Honor.

3                MR. BINI:  Your Honor, other thing that I should

4    have mentioned with respect to the verdict sheet is that I

5    would ask for the same changes, the overt acts, that I asked

6    in the overt acts as in the instructions.  So I'll give those

7    to -- I'll show them to defense counsel.

8                THE COURT:  That will be good.

9                MR. RIOPELLE:  As long as none of the names filled

10   in are Kyleen Cane, I'm good with that, Judge.

11               THE COURT:  Anything you say.  Anything else before

12   we end night court?

13               MS. JONES:  Not for the Government.

14               MR. ROSS:  Not for Mr. Discala.

15               MS. JONES:  One thing, Mr. Discala did promise

16   copies of the redacted exhibits that they want to use

17   tomorrow.  So hopefully I will get copies of those within the

18   next hour or so.

19               THE COURT:  That's what I understood from Mr. Cheng

20   when you talked about it at lunch time.

21               MS. JONES:  I haven't received them yet.

22               THE COURT:  Hopefully he's not here right now

23   because that's exactly what he and the witness are doing.

24   We'll see you all in the morning.

25               MS. JONES:  Thank you.

3247

1            MR. ROSS:  Thank you.

2            MR. RIOPELLE:  Thank you, your Honor.

3            (Proceedings adjourned at 7:10 p.m. to resume on

4    May 1, 2018 at 9:45 a.m.)

5                        I N D E X

6    WITNESS                                PAGE

7    CONSTANTINE VOULGARIS

8    DIRECT EXAMINATION      BY MR. BINI        3011
     CROSS-EXAMINATION       BY MR. BOWMAN      3017
9    CROSS-EXAMINATION       BY MR. RIOPELLE    3026
     REDIRECT EXAMINATION    BY MR. BINI        3123
10   RECROSS-EXAMINATION     BY MR. BOWMAN      3133
     RECROSS-EXAMINATION     BY MR. RIOPELLE    3134

11
     DAVID BAKER
12
     DIRECT EXAMINATION      BY MR. RIOPELLE    3147
13   CROSS-EXAMINATION       BY MR. HEIN        3152

14   DAVID PARKER

15   DIRECT EXAMINATION      BY MR. SHROYER     3155
     CROSS-EXAMINATION       BY MR. BINI        3172
16
     ERIC ENGSTROM
17
     DIRECT EXAMINATION      BY MR. SHROYER     3176
18   CROSS-EXAMINATION       BY MS. JONES       3183

19   HALEY ECKHART

20   DIRECT EXAMINATION      BY MR. CHENG       3192

21                     E X H I B I T S

22   DEFENDANT                  PAGE
     KC-ST-1                    3146
23   3500-DP-3                  3160

24   COURT                      PAGE
     1 and 1-A                  3237
25

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*