3248

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------x
                                        14-CR-399(ENV)
3   UNITED STATES OF AMERICA,
                                        United States Courthouse
4            Plaintiff,                 Brooklyn, New York

5            -against-                  May 1, 2018
                                        9:45 a.m.
6   ABRAXAS J. DISCALA, ALSO
    KNOWS AS AJ DISCALA, AND
7   KYLEEN CANE,

8            Defendants.
    ------------------------------x
9
                 TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
10             BEFORE THE HONORABLE ERIC N. VITALIANO
                    UNITED STATES DISTRICT JUDGE
11                       BEFORE A JURY

12  APPEARANCES

13  For the Government:      UNITED STATES ATTORNEY'S OFFICE
                             Eastern District of New York
14                           271 Cadman Plaza East
                             Brooklyn, New York 11201
15                           BY:  SHANNON JONES
                                  MARK E. BINI
16                                PATRICK HEIN
                             Assistant United States Attorneys
17
    For the Defendant:       CHARLES ROSS & ASSOCIATES, LLC
18  Abraxas J. Discala       111 Broadway
                             New York, New York 10008
19                           BY:  CHARLES ROSS, ESQ.
                                  MATTHEW SHROYER, ESQ.
20
                             ANDREW BOWMAN, ESQ.
21                           1804 Post Road East
                             Westport, Connecticut 06880
22
                             HANWEI CHENG, ESQ.
23                           15155 Gale Avenue
                             Suite D
24                           Whittier, California 90603

25

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

```
1   A P P E A R A N C E S:   (Continued)
    Attorney for Defendant:  SERCARZ & RIOPELLE, LLP
2   Kyleen Cane              810 Seventh Avenue
                             Suite 620
3                            New York, New York 10019
                             BY:  ROLAND RIOPELLE, ESQ.
4                                 ROBERT CALIENDO, ESQ.

5
    Court Reporter:          LINDA D. DANELCZYK, RPR, CSR, OCR
6                            Phone:  718-613-2330
                             Fax:    718-804-2712
7                            Email:  LindaDan226@gmail.com

8

9   Proceedings recorded by mechanical stenography.  Transcript
    produced by computer-aided transcription.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PROCEEDINGS                          3250

1          (The following takes place out of the presence of

2    the jury.)

3          THE CLERK:  Case on the calendar is USA versus

4    Discala and Cane, case number 14-CR-399, on for jury trial.

5          Will the attorneys please note your appearances

6    beginning with government counsel.

7          MS. JONES:  Shannon Jones and Mark Bini and Patrick

8    Hein for the United States, who stepped out to the bathroom,

9    along with Special Agent Elyse Morris.

10          THE COURT:  Good morning.

11          MR. ROSS:  Good morning, Judge, Charles Ross,

12   Matthew Shroyer and Scott Schwartz for Mr. Discala.

13          THE COURT:  Good morning.

14          MR. BOWMAN:  Good morning, Your Honor, Andrew Bowman

15   for Mr. Discala.

16          THE COURT:  Good morning.

17          MR. CHENG:  Good morning, Your Honor, Hanwei Cheng

18   for Mr. Discala.

19          THE COURT:  Good morning.

20          MR. RIOPELLE:  Good morning, Your Honor, Roland

21   Riopelle and Robert Caliendo for the defendant Kyleen Cane

22   this morning.

23          THE COURT:  Good morning.

24          THE COURTROOM DEPUTY:  Counsel for both sides are

25   present including the defendants minus one attorney for the

PROCEEDINGS                           3251

1    government.

2              THE COURT:  We don't have an attorney for the

3    government, we can miss one for a while.

4              Do we have any housekeeping we need to attend to

5    before we resume.

6              MS. JONES:  Yes, Your Honor.  I have some objections

7    I wanted to raise to the schedules that I was given last night

8    by defense counsel.

9              THE COURT:  Yes.

10             MR. RIOPELLE:  I didn't hear what you had.

11             MS. JONES:  Objections to accounting schedules.

12             MR. RIOPELLE:  Oh, well, then I'll go back to where

13   I was.

14             THE COURT:  Mr. Cheng.

15             MS. JONES:  Okay, Your Honor, so last night I was

16   given I think the potential exhibits for the accountant, Haley

17   Eckhardt.  So, they gave me 15 schedules; of those schedules,

18   I think five of them were brand new, I hadn't seen before, but

19   my objections really relate to six of them.  So, of the other

20   ones, I'm not really prepared to stipulate anything but I

21   don't expect to object to the admissions of those other

22   schedules but the ones that I do object to I wanted to raise

23   with you now.

24             First, there is Schedule 1, that purports to be a

25   cash outflow, a net cash flow from public trading, and then

PROCEEDINGS                                    3252

1    other cash outflows. I raised this yesterday, that for the

2    other cash outflows there is a deduction of $767,500 for the

3    Staffing Group. When I looked at that underlying schedule,

4    more than half of that relates to a transaction from 2012

5    relating to the Broadsmoore Group. As far as I know, there's

6    nothing in evidence about the Broadsmoore Group. So, I object

7    to Section 3 of that schedule. So, it has three sections, a

8    cash outflow section which is fine, a net cash flow which is

9    fine, but the other cash outflows, because it primarily makes

10   up this transaction, that doesn't seem to have anything --

11   since it's not inn evidence I object to that one.

12            THE COURT: Well, let's go one at a time.

13            MS. JONES: Okay.

14            THE COURT: It is much easier.

15            Mr. Cheng.

16            MR. CHENG: Your Honor, Schedule 1 was revised per

17   the Court's ruling to remove any of the collateral companies,

18   so I don't know about the other ones yet but I will tell you

19   that Schedule 1, that's probably the reason why. All

20   schedules that I provided to counsel last night were provided

21   to counsel prior and the only differences would be the

22   revisions to redact anything or just to recompute her claims

23   based only on the manipulated companies.

24            THE COURT: So, Baltimore Group (sic), whatever it

25   is, is not there.

PROCEEDINGS                           3253

1          MS. JONES:  No, it is there.

2          MR. CHENG:  That was there.  I wasn't aware that

3   that was Broadsmoore included and I'm fine with redacting

4   that, the Section 3.

5          MS. JONES:  Okay.  So, we take out that Section 3,

6   then otherwise Schedule 1 is fine.

7          I have an objection to Schedule 4.3.  So, Schedule

8   4.3 is -- it's a pie chart and it basically compares public

9   trading net cash flow for AJ Discala versus cash flow for Marc

10  Wexler, and there are two reasons why I object to this

11  comparison; first, for the AJ Discala amount, it does not

12  include the money that he obtained from -- that was generated

13  in the Marleen Goepel account which Ms. Marche Goepel (sic)

14  testified belonged to Mr. Discala and there was $600,000 in

15  proceeds that's not included in this pie chart here.

16          And the other reason why I object to this is that

17  for that $1.8 million figure that they have listed for

18  Mr. Discala, this is based on a calculation of trading net

19  cash flow that the accountant has done herself.  So, in our

20  realized net profit and loss statement we used a figure of

21  2.2, she has her reasons why she doesn't want to follow that,

22  that's fine, but then she's using the net profit and loss for

23  Marc Wexler to make that comparison.  So, it's like she's

24  accepting our number when it's higher for Marc Wexler but

25  using the lower number for AJ Discala because that's more

PROCEEDINGS                                    3254

1    favorable to him.  So, it is kind of like an apples to oranges

2    comparison which I think is misleading particularly since it

3    doesn't include the Goepel transactions.

4              MR. CHENG:  Your Honor, we're using Mr. Ferrante's

5    number.  We did not calculate Mr. Wexler's number at all.  She

6    computed her number and it was actually very similar to the

7    numbers that were then presented by the government.  She's

8    welcome to address that issue on cross.

9              THE COURT:  Well, why is it the same chart if --

10             MR. CHENG:  I'm sorry, Your Honor?

11             THE COURT:   Why are they in the same chart if the

12   numbers are not computed the same way?  It's a misleading

13   chart.

14             MR. CHENG:  My understanding is the --

15             THE COURT:  You have one set of numbers computed off

16   one set of raw data and another set -- and worked through by a

17   formula I presume that she would support and then there's

18   another number that's supported by raw numbers and a different

19   formula.  Why would they be on the same chart?

20             MR. CHENG:  My understanding is that it is the same

21   number, that it is the same net cash flow.

22             MS. JONES:  Your Honor, no, because I don't think

23   the -- with the Wexler chart we didn't do a calculation of net

24   cash flow.  We did that for Marlene Goepel and we did that for

25   AJ Discala.  So, we have like the net profit and loss that was

PROCEEDINGS                           3255

1    calculated on the first in/first out method that resulted in

2    the 2.2 million number and then we did the -- I think the net

3    cash which is -- that number is close to this number but it is

4    like a 1.8 million, I think there's like a slight variation in

5    the numbers that Mr. Ferrante came up with and this net cash

6    flow analysis that the accountant came up, with what their

7    accountant came up with.

8          But then for Mr. Wexler, we didn't do that, like

9    that net cash in and out analysis for him, we just did the

10   realized profit and loss.  That's the number we have there and

11   they're not using the same comparison number that we have in

12   our charts.

13         THE COURT:  Tell me if I'm misunderstanding; your

14   position, Ms. Jones, is that the Wexler number on this chart

15   is computed in a fashion different from the Discala number on

16   the same chart?

17         MS.  JONES:  That's my understanding, that we have a

18   net profit loss number and then we have like a net cash -- a

19   cash number that we calculated for Mr. Discala and they're

20   basically using one of the other numbers anyway.  Again, I

21   think that it is a misleading comparison and particularly

22   since it doesn't include the Goepel --

23         THE COURT:  Well, that goes to the weight of the

24   chart.  I'm more concerned that there's a different formula

25   used for something that on the chart, something that's not in

PROCEEDINGS                          3256

1    the chart at all.  That's a weight of it issue.

2              MR. CHENG:  Your Honor, my understanding is it was

3    calculated the same way as Mr. Ferrante placed it in his Excel

4    sheets; he listed three numbers, one was realized profit and

5    loss, one was net cash flow, and then he had another number.

6    So, we actually pulled those numbers later on and we examined

7    his analysis as to how he reached that number, so we pulled

8    this directly from the Government Exhibit 195-3.

9              MS. JONES:  Your Honor, I'm going to open up 195-3

10   so we can get on the same page about this.

11             MR. CHENG:  I mean we can have our witness explain

12   it.

13             MS. JONES:  I don't want to do this with the witness

14   on the stand.  If I'm mistaken, then we can get it all sorted

15   out, but I want to look at the notes and summary; for Marc

16   Wexler, the only calculation we have is net profit and loss

17   and that number is 2.236343, net profit and loss.

18             For Mr. Discala in the chart that we have, 195-1, we

19   have a net realized profit and loss which is $2.2 million, and

20   then we have net of buys and sales as $1.8 million.

21             So, for Mr. Discala we have two different columns

22   and for Mr. Wexler we only have one.

23             MR. CHENG:  I'm not understanding what the argument

24   is here, that Mr. Wexler's number is wrong or is it

25   Mr. Discala's number is wrong?  Because we pulled exactly the

PROCEEDINGS                        3257

1   number she said, 2.2, from Ferrante's sheet.

2           MS. JONES:  That's right and if you want to use 2.2

3   from the Discala sheet from the same column, that would be

4   fine but that's not what they did.

5           MR. CHENG:  It is a summary of the underlying data

6   which she reviewed which is bank statements --

7           THE COURT:  You can't compare -- to put it in

8   generic terms, if the chart compares for Discala a number from

9   column one and if for Wexler a number from column two, then

10  the chart is not fairly comparing the numbers.

11          MR. CHENG:  They're both net cash flow, Your Honor.

12  It just so happens that Mr. Discala's net cash flow doesn't

13  add up to Mr. Ferrante's because of the reasons that the

14  numbers that Mr. Ferrante testified to, because the

15  computations were not done properly and used documents which

16  had errors in them, so that's what she's going to testify

17  which is why that number is different than the number that

18  they have.

19          MS. JONES:  Your Honor, they have another chart that

20  makes that argument which, again, I have an objection to for a

21  different reason, but that's chart -- Schedule 6.4 and

22  that's -- Schedule 6.4, that is a schedule that they want to

23  introduce that makes that argument that the realized net

24  profit and loss in that column is -- and it compares

25  Government Exhibit 195-1 which has the $2.2 million and their

PROCEEDINGS                                    3258

1    number, the 1861, and that explains why there's this $300,000

2    difference.  So, they have a different schedule that makes

3    that point, they don't need to put these one column -- I think

4    the pie chart is not fair considering that she did not go back

5    and do this analysis for the Wexler accounts to see what his

6    number would be.

7              THE COURT:  But the other chart performs the

8    analysis, Mr. Cheng, that you're talking about?

9              MR. CHENG:  Correct, Your Honor.

10             THE COURT:  Showing the errors?

11             MR. CHENG:  Correct, Your Honor, and there's another

12   chart, which I expect her to object to as well based on the

13   same basis, which also does show -- shows the work detail

14   which went into creating this pie chart and that's the

15   following one which is 4.1A.  So, 4.1 is the actual pie chart,

16   4.1A explains how she arrived at that number.

17             Then there's a subsequent summary schedule which

18   addresses the difference between her calculation and

19   Mr. Ferrante's calculation.

20             THE COURT:  Of Mr. Discala?

21             MR. CHENG:  Of Mr. Discala, correct, based on the

22   same computations that Mr. Ferrante used.

23             THE COURT:  My concern is the inclusion of

24   Mr. Wexler in the pie chart, not her disagreement with the

25   computation for Mr. Discala.  I think that's fair game.

PROCEEDINGS                          3259

1          MR. CHENG:  Fair game as to be allowed?

2          THE COURT:  To be allowed, yes.

3          MR. CHENG:  Yes.

4          THE COURT:  But not the Wexler piece.

5          MR. CHENG:  That was pulled from the government

6   exhibit based on the same calculations.

7          MS. JONES:  It is not.

8          THE COURT:  It's not and so I'm not going to allow

9   the pie chart in.  The other ones where the witness is

10  expected to testify that her number is different because the

11  government made a mistake in their computation I'm going to

12  allow.

13         MS. JONES:  Okay.  So, with that chart, the one

14  objection to that chart that I have, that's Schedule 6.4, the

15  analysis like -- and she can testify about it, but I do object

16  to the argument in the title which is:  Government's Analysis

17  is Overstated and Misleading (Christopher Ferrante).  That's

18  the title of the chart and I think that's argument and I don't

19  think it belongs on the summary chart.

20         MR. CHENG:  I'm fine with redacting it, Your Honor.

21         THE COURT:  Redact it.

22         MR. CHENG:  That was an oversight based on

23  yesterday's ruling, Your Honor.

24         MS. JONES:  So, that addresses that one.  I also

25  have an objection to Chart 6.1.  Okay.  So, Chart 6.1 is

1    titled:  Government Blue Sheet Data is Incomplete (Christopher

2    Ferrante) and it describes all these instances on the blue

3    sheet data for StarStream and Soul where apparently the

4    accountant believes that there were transactions on the blue

5    sheets that were missing from the -- there were brokerage

6    account transactions that are missing from the blue sheets.

7              This is completely irrelevant because Christopher

8    Ferrante testified that, one, he only did an analysis of

9    CodeSmart for Mr. Discala and, two, he relied on the brokerage

10   statements and did not rely on the blue sheet data for his

11   analysis.  So, this is completely irrelevant, so I object to

12   6.1.

13             THE COURT:  Mr. Cheng.

14             MR. CHENG:  Your Honor, Mr. Ferrante did testify to

15   that, he used the disk that was marked as an exhibit and the

16   data within there.

17             THE COURT:  But only for CodeSmart.

18             MS. JONES:  And -- I'm sorry.  He did not --

19   Mr. Ferrante was on the stand for two purposes; one, to admit

20   into evidence the blue sheet data as a custodian from the SEC

21   because defense counsel was unwilling to stipulate to the blue

22   sheet data coming in.

23             MR. CHENG:  Because it was incorrect.

24             MS. JONES:  Second of all, Mr. Ferrante testified

25   for his analysis he did not rely on blue sheet data, he only

PROCEEDINGS                                    3261

1    relied on brokerage statements and clearing firm records that

2    he obtained and he checked each transaction.

3              THE COURT:  That chart is out.

4              MR. CHENG:  Your Honor, it contains missing data

5    from the blue sheet data.

6              THE COURT:  The chart is out.

7              MR. CHENG:  Ms. Oremland might have used it.  One of

8    their experts used it.

9              THE COURT:  The chart is out.

10             MS. JONES:  Then 6.5 is fine.  All right.

11             Then my last two objections relate to there's a

12   chart, Schedule 6.6; this schedule is not an analysis of bank

13   records or brokerage records.  It's called --

14             MR. CHENG:  We're not using that chart.  I handed

15   her the exhibits we are using this morning and that's not

16   included.

17             MS. JONES:  I'm sorry.

18             MR. CHENG:  That was out.

19             THE COURT:  Self-removed.

20             MR. CHENG:  Yes.

21             MS. JONES:  All right.  And then the last one, are

22   you using 6.8?

23             (Pause while counsel confer.)

24             MR. CHENG:  Yes.

25             MS. JONES:  All right.  The last one is -- this

1    again appears to be -- it's entitled, Schedule 6.8, it's:

2    Government Selected One Account for Flow Chart (Joan Mazella)

3    and what this appears to be is just a highlight of all the

4    different trading accounts that Mr. Discala had with a box

5    drawn around the one account that we introduced a flow chart

6    for.  So, it seems to be just an argument that of all these

7    schedules and charts, we prepared a pictorial graph of just

8    one.  So, I don't understand why this summary witness would

9    testify as to that.

10             MR. CHENG:  Your Honor, we picked the one -- we

11   picked the information from the flow chart that, you know,

12   from the data that Ms. Mazella produced and it was just the

13   single account.  We just compiled all the data from the

14   accounts that -- based on the bank statements, the brokerage

15   statements that are introduced into evidence and which we're

16   also going to offer into evidence under 806 and we redacted

17   the companies that Your Honor precluded from using in this

18   which are Soul, HRAA, LBAS and ISGI.  We left in the four

19   manipulated companies which is ITEN, SSET, TSGL and CRPT.

20             So, I believe this chart just lays out what the data

21   is.

22             MS. JONES:  They take out the data for each of these

23   companies like Soul, HRAA, LBAS, ISGI and those stocks were

24   included in that flow chart for Ms. Mazella because she was

25   showing the flow of cash and she had to calculate all the

PROCEEDINGS                     3263

1   sources of cash to show which cash was transacted to Omniview

2   from that account.  I think this chart is nothing more than to

3   argue, oh, look, this calculation was not included in these

4   other charts for these other stocks and we did it for this one

5   account.  There doesn't seem to be any argument about the

6   numbers, it is just an argument that this chart is the only

7   one that includes these other trading losses.

8                MR. CHENG:  We pulled data that's admitted into

9   evidence and put it along --

10               THE COURT:  What is the point of the proffer?  What

11  are you trying to establish?

12               MR. CHENG:  That calculations were not done for all

13  the accounts.

14               MS. JONES:  In these other stocks?

15               MR. CHENG:  No, not the other stocks, there's 21

16  accounts and Mazella did one account despite the fact they're

17  claiming that Discala owns multiple entities and they're

18  related, so our chart is actually more complete based on their

19  legal argument.

20               THE COURT:  No, the chart is out.  The argument

21  obviously is in, you heard all of these things, he's been

22  involved and they only showed you this one account, and that

23  ties into the charge, the evidence that's here, the evidence

24  that's not here.

25               MR. CHENG:  Ms. Mazella only showed the one account,

1    the other accounts were raised by Ferrante and Oremland.  Are

2    you precluding --

3              THE COURT:  And what is it that you want to show

4    about the other accounts, other than that they're there?

5              MR. CHENG:  No, the data that shows why he --

6              THE COURT:  What is the relevance of the data?

7              MR. CHENG:  What he profited and lost in the

8    manipulated accounts, so it's just the profit and loss for

9    these companies.

10             MS. JONES:  That's included in Chart 3.1 that they

11   have this calculation that they did where they looked at all

12   of his accounts in ITEN and they calculated what his profit

13   was in -- they have -- the charts that I'm not objecting to is

14   they prepared a summary of public trading, they did one for

15   CodeSmart that they want to introduce, one for StarStream they

16   want to introduce, one for Staffing Group that they want to

17   introduce and one for Cubed that they want to introduce.  I

18   don't object to those charts.  Each chart shows what their

19   accountant calculated, that the money he made on public

20   trading in those stocks.  That's already included in these

21   other charts.

22             THE COURT:  Is that true, Mr. Cheng?

23             MR. CHENG:  I'd have to double-check the numbers but

24   what it does is separate -- the other one is separated by

25   company by ticker symbol, this one has a total number for each

PROCEEDINGS                           3265

1    account and a total number for all of the counts combined for

2    the manipulated companies which comes out to about 1.7 million

3    and so there's no other chart in here which reflects the total

4    amount that Mr. Discala profited or lost in all of the

5    companies in all of his accounts.

6              MS. JONES:  That's not true, that's point 2 on

7    Schedule 1.  Point 2 on Schedule 1 shows net cash flow from

8    public trading as follows:  CodeSmart, StarStream, Staffing

9    Group, Cubed, total $1.7 million.

10             THE COURT:  It is cumulative and out.

11             MS. JONES:  So, I think, unless there are any

12   additional charts that are new that I did not get from

13   yesterday, then I think that covers my objections to the

14   charts that I received last night.

15             THE COURT:  So, we anticipate them coming in without

16   objection?

17             MS. JONES:  That's correct, Your Honor.

18             MR. CHENG:  The other issue is, Your Honor, we were

19   going to move for -- move into evidence bank statements and

20   brokerage statements which were not admitted into evidence as

21   well as Hylan (ph) stock transfers and so I asked for a

22   stipulation, I haven't gotten a response.  I wanted to deal

23   with that issue now.

24             MS. JONES:  I don't have the time to review all

25   those additional records.  As I said, I'm not objecting to the

PROCEEDINGS                                    3266

1    admission of these charts which I assume the admission of that

2    evidence is to support these charts.

3              MR. CHENG:  Correct, Your Honor, it is under 806.

4              MS. JONES:  I don't think we need to move those into

5    evidence and I can't --

6              THE COURT:  She's not objecting to the charts

7    without the foundation so we don't need it.

8              MR. CHENG:  Okay.  I mean she's not objecting to the

9    charts is based on the underlying date, that's fine.

10             THE COURT:  She is basically not objecting, she's

11   assuming that the proffered evidence that was in to support

12   that is included among other things that perhaps are not

13   admissible.

14             MR. CHENG:  Perfect.  Makes my life easier.

15             THE COURT:  Makes all of our lives easier,

16   Mr. Cheng.

17             MS. JONES:  Okay.

18             THE COURT:  Anything else?

19             MS. JONES:   Not from the government.

20             MR. CHENG:  No, Your Honor.

21             THE COURT:  Mr. Ross, you're over there?

22             MR. ROSS:  I'm sorry?

23             THE COURT:  I wanted to just make sure you were

24   there, Mr. Ross.

25             MR. ROSS:  I'm here.

PROCEEDINGS                        3267

1          THE COURT:  I promised yesterday as we got to the

2    end, now we've had Ms Cane's case complete and this witness

3    was the last identified witness, I haven't had a chance to

4    allocute Mr. Discala yet on his decision with respect to

5    testifying or not testifying.

6          Have you had a chance to discuss that with

7    Mr. Discala?

8          MR. ROSS:  Yes, both Mr. Bowman and I have spent a

9    good amount of time, many hours discussing this decision with

10   Mr. Discala.

11         MR. BOWMAN:  He is going to testify, Your Honor.

12         THE COURT:  Okay.

13         Mr. Discala, again, you heard me do this yesterday

14   with Ms. Cane, you have an absolute constitutional right to

15   take the stand and testify in your own behalf; you have an

16   absolute constitutional right not to take the stand and stand

17   mute and I would instruct the jury that they could not hold

18   your silence against you.  Have you had a full and fair

19   opportunity to discuss your decision with your attorneys?

20         THE DEFENDANT:  I have, Your Honor.

21         THE COURT:  And have you made a decision?

22         THE DEFENDANT:  I have.

23         THE COURT:  And what is your decision?

24         THE DEFENDANT:  My decision is to testify.

25         THE COURT:  You will take the stand?

PROCEEDINGS                                    3268

1          THE DEFENDANT:  I will take the stand.

2          THE COURT:  That's fine.  Then we will proceed with

3   that understanding.  Up until the time you're called it

4   remains your decision, you understand that?

5          THE DEFENDANT:  I appreciate that.  Thank you, Your

6   Honor.

7          THE COURT:  Very good.

8          All right then, there being nothing else, we should

9   fetch Ms. Eckhardt and we can resume direct examination.

10          (Pause.)

11          (Jury enters courtroom.)

12          (Witness resumes the stand.)

13          THE COURT:  Please be seated.

14          Counsel will stipulate that the jury is present and

15   properly seated.

16          MS. JONES:  Yes, Your Honor.

17          MR. ROSS:  Agreed, Judge.

18          MR. RIOPELLE:  So stipulated.

19          THE COURT:  Thank you, counsel.

20          Ladies and gentlemen, welcome back.  We are ready to

21   resume.

22          I want to recall for you some of the remarks I had

23   made to you on the very first day that we had the pleasure of

24   having you in our courtroom and you sitting as a jury in this

25   case and I said to you then that other than putting on a

PROCEEDINGS                                    3269

1    uniform and defending your country in a time of war, there was

2    no greater act of patriotism and citizenship than to put aside

3    your own business and sit as a member of a jury because it was

4    critical to the rule of law and a society that doesn't have a

5    healthy respect for the rule of law and for the people who

6    participate in the process is doomed to see their freedom and

7    their society destroyed.  Men and women across the decades of

8    our country's existence have shed their blood and their lives

9    to protect the rule of law from foreign enemies and they

10   return home and they turn the rule of law over to the courts.

11           Today is a day we celebrate the rule of law; in the

12   United States it's Law Day.  It celebrates the rule of law,

13   our country's commitment to the law and to honor the men and

14   women who toil in the vineyards of law to ensure that the rule

15   of law is preserved.  Judges and jurors are certainly part of

16   those who toil, preserve the rule of law but the men and the

17   women out there in the trenches are the people who do it every

18   day.  The lawyers vigorously represent their clients, whether

19   it be the government or a defendant, these are the men and

20   women that keep faith what the soldiers who have lost their

21   lives defending the rule of law.

22           So, in a special way we celebrate the men and women

23   that you see before you and their colleagues and all of our

24   colleagues at the bar on this very special day.  So, ladies

25   and gentlemen of the bar, thank you for your preservation,

PROCEEDINGS                               3270

1    your conduct, your vigorous advocacy all which preserves for

2    all of us the rule of law.

3            We are ready to resume our trial.  Ms. Eckhardt has

4    resumed the stand and Mr. Cheng will resume his direct

5    examination.

6            MR. CHENG:  Thank you, Your Honor.

7            May I begin.

8            THE COURT:  You may.

9            MR. CHENG:  Your Honor, may I approach with a

10   binder?

11           THE COURT:  Yes.

12           MR. CHENG:  Your Honor, at this time the defense

13   would like to move into evidence HE-1, HE-3.1, HE-3.1A,

14   HE-3.2, HE-3.2A, HE-3.3, HE-3.3A, HE-3.4, HE-3.4A, HE-4.1A,

15   HE-6.2, HE-6.4, and HE-6.5.

16           (Defense Exhibit HE-1, was received in evidence.)

17           (Defense Exhibit HE-3.1, was received in evidence.)

18           (Defense Exhibit HE-3.1A, was received in evidence.)

19           (Defense Exhibit HE-3.2, was received in evidence.)

20           (Defense Exhibit HE-3.2A, was received in evidence.)

21           (Defense Exhibit HE-3.3, was received in evidence.)

22           (Defense Exhibit HE-3.3A, was received in evidence.)

23           (Defense Exhibit HE-3.4, was received in evidence.)

24           (Defense Exhibit HE-3.4A, was received in evidence.)

25           (Defense Exhibit HE-4.1A, was received in evidence.)

PROCEEDINGS                        3271

1          (Defense Exhibit HE-6.2, was received in evidence.)

2          (Defense Exhibit HE-6.4, was received in evidence.)

3          (Defense Exhibit HE-6.5, was received in evidence.)

4          THE COURT:  Any objection?

5          MS. JONES:  Your Honor, the government doesn't have

6    any objections under the parameters that we had discussed

7    earlier.

8          THE COURT:  Right, and they're admitted and there

9    are a couple of redactions I guess will have to be made.

10         MS. JONES:  Yes, that's correct, Your Honor.

11         THE COURT:  Mr. Cheng is aware of that.

12         MR. CHENG:  Let me just point out that the

13   redactions, I'm not sure if we've had time to make the

14   redactions.

15         THE COURT:  Make sure before you show an exhibit,

16   Mr. Cheng.

17         MR. CHENG:  Will do, Your Honor.

18         THE COURT:  Show it privately to the government

19   counsel.

20         MS. JONES:  I am sorry, the government had objected

21   to 4.1A, I think we had discussed that.

22         THE COURT:  Yes, consistent with our prior ruling,

23   if that was one that's out, it's out.

24         MR. CHENG:  Side-bar, Your Honor?

25         THE COURT:  Sure.

SIDE BAR                                    3272

1              (The following takes place at side-bar.)

2              THE COURT:  I don't know which one this is.

3              MS. JONES:  Your Honor, I should have clarified

4    this, 4.1 is that pie chart that we agreed was not -- well,

5    you ruled it was not coming in.  Then 4.1A is like the

6    underlying data that backs it up, again, comparing the 1

7    number.

8              THE COURT:  Yes, the whole thing is out.

9              MS. JONES:  Okay.

10             MR. CHENG:  Well, the computation wasn't out, my

11   understanding was Wexler was redacted from that one.

12             MS. JONES:  Oh, you were just going to redact

13   Wexler?

14             MR. CHENG:  That was my understanding.

15             MS. JONES:  All right, that's fine.

16             THE COURT:  Okay, as long as Wexler is out.

17             (End of side-bar.)

18             (Continued on next page.)

19

20

21

22

23

24

25

PROCEEDINGS                                    3273

1          THE COURT:  Mr. Cheng.

2          MR. CHENG:  Just making sure of the redactions.

3          THE COURT:  Yes.

4          Ladies and gentlemen, a redaction sounds like a

5    funny word and really what it means is that sometimes on an

6    exhibit there are things that are admissible and things that

7    are inadmissible, so when we redact something, we'll sort of

8    black out the part that's inadmissible so the jury can only

9    see the part that is admissible.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Witness takes the witness stand.)

2    H A L E Y   E C K H A R T, called as a witness, having been

3    previously duly sworn, was examined and testified as follows:

4    DIRECT EXAMINATION (Continued)

5    BY MR. CHENG:

6    Q    Good morning, Ms. Eckhardt.

7    A    Good morning.

8    Q    Now, yesterday you mentioned -- just to refresh my memory

9    and the Court's memory, yesterday you mentioned you've done

10   work for other agencies; is that correct?

11   A    Yes, I have, I have done some consulting work as well as

12   other members of my firm for the SEC and the Department of

13   Justice.

14   Q    And you've been compensated in this case to provide your

15   services; is that correct?

16   A    It's my firm that's compensated but yes.

17   Q    How do you charge?

18   A    Hourly.

19   Q    And was your compensation contingent on a result?

20   A    Absolutely not.

21   Q    And when you consulted for the government, did they

22   compensate you as well?

23   A    Yes, they do.

24   Q    Now, let's go to Schedule 1 or HE-1.

25          MR. CHENG:  May I publish this, Your Honor?

1      THE COURT:  Yes.

2  Q    Ms. Eckhardt, can you explain Section 1?

3  A    Section 1 is a summary of some detailed analysis I did to

4  identify and determine the amount of money that Mr. Discala

5  and his entities, being Omniview Capital, Fidelis Holding and

6  Bridge Venture, paid to obtain initial investments in these

7  four companies.

8  Q    Let's star with the first one, CodeSmart, what is the

9  bridge/PIPE number?

10  A    Bridge/PIPE is an accumulation of different amounts that,

11  I'll call them Mr. Discala's entities or the Discala entities,

12  so whether it is Mr. Discala and/or Omniview and/or Fidelis,

13  and it's sometimes Bridge Ventures, paid to the company in

14  terms of notes, promissory notes for bridge notes to help the

15  company through this transaction, to get through the share

16  exchange transaction.  So, for CodeSmart, the Discala entities

17  paid or financed $260,000 and for that financing the Discala

18  entities received restricted shares in CodeSmart.

19  Q    And what about the number reflected under free trading

20  shares for CodeSmart?

21  A    For free trading shares, the Discala entities paid for

22  shares -- they purchased shares from the shell company and I

23  can run through those numbers if you like.  So, Mr. Discala

24  personally purchased 68,760 shares from the shell company,

25  those are free trading shares, and I believe he paid just over

1    $1,500 for those shares.  The price of those shares was .023

2    or 2 and a 1/3 cents per share.  Omniview Capital purchased

3    362,500 free trading shares from the shell paying around

4    $8,000, a little over $8,000.  And Fidelis Holding purchased

5    312,500 shares from the shell at .023 cents and I think that

6    was about $7800 for a total of $17,107.

7    Q    And Fidelis, those were free trading shares, correct?

8    A    Those were all free trading shares and the total of the

9    free trading shares was 743,000 shares, maybe a little more

10   than that.

11   Q    Do you know what happened to those shares?

12   A    I do.  So, first of all, the shares obtained for

13   financing the bridge and the PIPE, those were restricted

14   shares so we never saw those shares go into the brokerage

15   statements.  Those shares were held by Mr. Discala and his

16   entities and not traded on the open market.  The free trading

17   shares we saw, the 68,750 shares that Mr. Discala personally

18   purchased were put into his brokerage account at Halcyon

19   Cabot, I think it is his brokerage account 4813 if I'm not

20   mistaken, and those shares were all sold on the open market

21   beginning May 22nd, 2013, and they were all sold before the

22   shares split on June 14th, 2013.

23   Q    And then the total column, what does that reflect?

24   A    Let me go through the others.  So, that was Mr. Discala's

25   shares.  The shares that Omniview got, Omniview purchased

1    362,500 shares and put those in its brokerage account at

2    Halcyon Cabot, I believe that's Halcyon Cabot 1377, and of

3    those 362,000 shares, Omniview sold 263,000 or 261,000 before

4    the split leaving 100,837 shares at the time of the split

5    which were doubled and eventually sold on the open market.

6            And then Fidelis purchased 312,500 shares

7    originally.  Those all went into Fidelis's Halcyon Cabot

8    brokerage account, it's brokerage number 7544, and those

9    shares were not sold, they were held on to by Fidelis until

10   after the shares split and then those shares were doubled

11   during the 2-for-1 stock split, so the 312,500 became 625,000

12   shares which were then transferred out of the brokerage

13   account and sold privately for pennies.

14   Q    So, the trade records don't show Mr. Discala sold the

15   Fidelis shares in the market; is that correct?

16   A    Mr. Discala sold no Fidelis shares in the open market,

17   those were sold privately, they were doubled and then sold

18   privately.

19   Q    And let's just move down to the next company, StarStream;

20   under free trading shares, what does that number reflect?

21   A    So, free trading shares, that 27,295, that is the cost of

22   the free trading shares that were purchased by Bridge Venture

23   in this instance and it was 159,404 free trading shares at I

24   believe it was 17 cents, maybe .1712 in the column per share,

25   and those shares were never deposited into the brokerage

1    accounts, never sold on the open market.

2    Q    And let's move down to Staffing Group; the free trading

3    shares, what does that number reflect?

4    A    That reflects the purchase of I believe it was 75,000

5    free trading shares, 50,000 by Omniview and 25,000 by Fidelis

6    at a penny a share, so that's 880 rounded.

7    Q    What was the total number that Mr. Discala invested in

8    these four companies?

9    A    The total amount including bridge, PIPE and free trading

10   is $1,169,282.  I have to -- let me correct myself because the

11   math doesn't make sense.  There are a few other shares that

12   were bought that were included in the 880, so it was the 750

13   plus I think there might have been 80 shares bought by

14   Mrs. Discala to get up to the 880.

15   Q    Let's move to Section 2, can you explain what that

16   represents?

17   A    Section 2 is a very brief summary of a very detailed

18   analysis of the public trading through all of the brokerage

19   accounts that we reviewed and there were 23 brokerage accounts

20   we reviewed, we found trading for these four companies in 21

21   brokerage companies over the period of May 2013 through

22   July 2014.  And so we did a very detailed analysis, it's many

23   pages long and this is the culmination, the summary of that

24   analysis.

25   Q    What was your result with regards to Mr. Discala's net

1    cash flow for CodeSmart?

2    A    For CodeSmart Mr. Discala had positive cash flow of

3    $1,861,386.

4    Q    And for StarStream?

5    A    For StarStream it was negative cash flow, it was

6    effectively a loss, a cash loss of $36,987.

7    Q    And for Staffing Group?

8    A    Staffing Group also was a loss, negative cash flow of

9    $124,404.

10   Q    And for Cubed?

11   A    For Cubed it was a positive cash flow of $856.

12   Q    I'm going to move to HE-4.1A.  Can you explain what this

13   chart shows?

14   A    This chart shows the initial capitalization of CodeSmart

15   and it shows the total stock that the -- what I call the

16   Discala entities obtained or purchased in that initial

17   capitalization.  These numbers include the free trading and

18   the restricted shares, that's why they're a little bit higher

19   than the numbers I was just explaining moments ago.  And it

20   shows on the bottom that other investor's number, it excludes

21   a party that's been redacted now so the totals don't make

22   sense, but it shows how -- what percentage Mr. Discala's

23   capitalization was of the total capitalization on the left

24   side; on the right side is another recap of the net shares

25   bought and sold by Mr. Discala and the Omniview, Fidelis

1    entities, as well as the net cash flow that occurred in the

2    trading, the public trading by each of those entities.

3    Q     So, how many shares did the Discala entities receive in

4    free trading and restricted shares?

5    A     In free trading and restricted, it is 828,125 shares.

6    Q     Did he sell more or less than what he received?

7    A     Well, this is the initial capitalization and then there

8    was the stock split, so he sold a good portion of these

9    before, he sold about half of these -- he sold about half of

10   the free trading stock before the stock split and then after

11   the stock split the remaining shares were in -- mostly in

12   Fidelis, those doubled and those were sold privately.  There

13   was about 100,837 shares at Omniview's brokerage account.

14   Those doubled also to 216,000 shares or so and those were

15   eventually sold in the public market.

16   Q     Let's move to Schedule 6.4.  Can you explain what this

17   chart reflects?

18   A     What 6.4 is intending to reflect is the number of

19   different brokerage accounts, you see on the left-hand side,

20   that were trading the CodeSmart stock by Mr. Discala or

21   Omniview and Fidelis, and the first numerical column is kind

22   of marked with an A or it has the red GX, Government

23   Exhibit 195-1, that is what the government's accountant,

24   Mr. Ferrante, testified to was the realized net profit and

25   loss from Mr. Discala's trading of CodeSmart stock but I

1   wanted to show that that is -- it's not a true number because

2   we're talking here about cash flow.  In order to sell stock,

3   you have to buy stock.  I've never seen that Mr. Discala got

4   stock for free, sure, stock split and there's no cash effect

5   to a split but in order to sell stock, you have to buy it; in

6   order to transfer stock out of your account to a third party,

7   you have to buy that stock, have that stock in your account,

8   and Mr. Ferrante's testimony was only accounting for the

9   profit from stock that was specifically sold if that stock had

10  a previous buy.  So, if it was transferred in, he assumed that

11  the cost basis was zero.  That's not really true.  It had to

12  be purchased somehow.

13          So, what I'm trying to do in this schedule is

14  reconcile Mr. Ferrante's $2.2 million cash flow or what he

15  calls an ITEN realized net profit and loss number to my ITEN

16  in net cash flow number which I have to say is very similar,

17  it is $4,000 similar, close to Mr. Ferrante's own net cash

18  flow number.  He called it net of buys and sells or something

19  like that, I call it net cash flow, but we're only $4,000

20  apart.  He's $4,000 higher, I'm lower.  But the real

21  difference between Mr. Ferrante's realized profit and loss

22  schedule is that he did not attribute -- and this is actually,

23  if we can go back to the footnotes at the bottom, the first

24  footnote describes how 100,000 shares were transferred from

25  Mr. Discala's Raymond James account to a company called

ECKHART - DIRECT - CHENG                    3282

1    Iroquois Master Fund as repayment of shares of CodeSmart that

2    were borrowed by Mr. Discala from another party.  And that's

3    basically a sale, you're transferring those stock out of your

4    own brokerage account to a third party, you no longer have

5    those stock to ever sell.  So, your proceeds from that

6    transfer are zero.  And it cost Mr. Discala -- I calculated it

7    cost him $333,823 to buy enough CodeSmart stock to transfer

8    out 100,000 shares to Iroquois Master Fund.  That's a real

9    accounting event, that's a real profit and loss event that

10   Mr. Ferrante did not account for.  And that's how we bring his

11   inflated profit and loss number of $2.2 million back to his

12   cash flow number -- my cash flow number of $1.861 million.

13   Q    Let's move to Schedule 6.5.  What does this schedule

14   reflect?

15   A    Well, this schedule reflects two things -- well, it

16   reflects one thing and then I have additional comment or

17   observation.  Mr. Ferrante, Christopher Ferrante was

18   testifying, and we have the references here under the REF

19   column which exhibit he was testifying to and what page along

20   with what day he was testifying, what the realized profit and

21   loss was in each of these stocks for each of these individuals

22   and it occurred to me that for Mr. Discala, he only calculated

23   realized profit and loss in CodeSmart, that's what the blue

24   box shows.  He didn't offer any testimony, any calculation for

25   Staffing Group or StarStream or Cubed just like he had done

1    for the four parties at the bottom, Marc Wexler, Matthew Bell,

2    Garper, Kim Josephberg and David Ben-Bassat.  So, that was

3    striking to me that that was -- whether it was overlooked, you

4    know, I don't know.

5              MS. JONES:  Objection.

6              THE COURT:  Sustained.

7    A    The second thing is by looking into the schedules marked

8    as exhibit -- Government Exhibit 195-2, 3, 4, 5 and 9 for the

9    individuals other than Mr. Discala, I noticed that what the

10   government captions as Realized Profit and Loss was really the

11   same number that he calculated as net of buys and sells, it

12   was really just net cash flow.  So, for every individual

13   except for Mr. Discala the government just did a net cash flow

14   calculation.  For Mr. Discala, only for Mr. Discala did the

15   government show a realized profit and loss where, as I've

16   discussed before, he neglected to incorporate the cost of

17   100,000 shares that were transferred out of Mr. Discala's

18   account which accounted for the $333,000 difference.  Those

19   are my two points on this schedule.

20   Q    Can we move to Schedule 3.2.  Tell me what this schedule

21   reflects please?

22   A    This schedule reflects a summary by brokerage account

23   summarized by entity or by party of the period of trading and

24   the net cash flow that was realized in each brokerage account.

25   So, this is for StarStream and it shows that the overall

1    trading between Omniview, Fidelis and Bridge Venture resulted

2    in a negative cash flow or a loss, cash loss of $36,987.

3    Q    And that was all of Mr. Discala's public trading,

4    correct?

5    A    That was all of it, yes.

6    Q    Let's move to Schedule 3.2.

7    A    I also should note too, as I mentioned before, the free

8    trading shares that Mr. Discala purchased at the outset and

9    the initial investment were never moved into this account, so

10   this has nothing to do with those initial free trading shares,

11   this is just all him buying in the open market and selling in

12   the open market.

13   Q    We'll move to HE-3.2A.

14        Now, those free trading shares that you discussed,

15   are they reflected on here?

16   A    No, and the way I can tell that they're not reflected is

17   that there's two columns towards the right called Transfer in

18   and Transfer Out; Transfer in would show one account having at

19   least 159,404 shares being transferred in, those would have

20   been those free trading shares, but none of those accounts

21   have an initial transfer in of 159,000 or more shares.

22   Q    So, those shares were never traded on the market,

23   correct?

24   A    Correct.  I mean we specifically looked at that, this is

25   just a summary schedule, that is an easy way to show that we

1   did not identify that, did not find those shares transferred

2   in.

3   Q    Now, can you explain this bottom line of the total and

4   what each of those numbers represent?

5   A    Sure, the total under the purchase column is the total

6   number of shares that were bought among these brokerage

7   accounts for StarStream.  The sale is the total number of

8   shares that were sold.  The split is the number of shares that

9   were obtained by virtue of a split, stock split.  The transfer

10  in and transfer out, those in this case equal zero because

11  there were no shares transferred in or out of third-party

12  non-Discala brokerage accounts.

13         So, the total number here I should caution you is if

14  shares are moved back and forth and back and forth, there

15  could be some overlap, it could be counted going in and out

16  and in and out but it does help us match up where shares were

17  moving to and from.

18         And then the ending balance is key, this is the

19  number of shares that Mr. Discala is holding or in this case

20  Omniview is holding at the end of our analysis.  So, as of --

21  see, in this account I can tell you specifically it is as of

22  July 17, 2014, he was still holding 5,000 shares of

23  StarStream.

24  Q    And what period of time does this chart reflect?

25  A    It could be a little bit different by brokerage account,

1    for some brokerage accounts we had more statements than

2    others, but if we look at Schedule 3.2, I can direct you to

3    where that is.  So, the period of trading -- when I say period

4    of trading, that would -- I'll explain that after, but period

5    of trading here for the Omniview account was May 30, 2014

6    through July 17, 2014.

7            And then for Fidelis, the accounts were trading

8    between October 2013 and February 2014, January 2013 and

9    October 2013, February 2014 and some period in 2014 after

10   February, we have a year end statement there so we weren't

11   able to identify the specific ending of that trading.

12           And then for Bridge Venture, it was May 2014 through

13   July 2014.  For CodeSmart, the period of trading just -- that

14   links to a very detailed page that lists the first transaction

15   in our schedule and the very first transaction in CodeSmart

16   would be the free trading shares being put into the account,

17   so those would typically say May 13th was the first period --

18   the first date in the period of trading but in fact I know

19   that by looking at the subsequent actual trading after that

20   initial transfer in, Mr. Discala didn't start selling his

21   CodeSmart shares until May 22nd for Omniview and then -- or

22   I'm sorry, it was May 22nd for his personal account and

23   May 28th for the Omniview account, so it wasn't right away.

24   Q    Let's go to Schedule 3.3.  Now, this is the same type of

25   schedule as you did for StarStream except this one is for

1    Staffing Group; is that correct?

2    A    That's correct and there's more accounts that were

3    trading Staffing Group.

4    Q    And what was the net cash flow Mr. Discala made in

5    Staffing Group?

6    A    Well, for Mr. Discala alone it was $23,111 loss, cash

7    loss.  For overall between Mr. Discala, Omniview and Fidelis,

8    what I call the Discala entities, was negative $124,404 or --

9    so, a loss of $124,000.

10   Q    That's based on all his public trading in Staffing Group,

11   correct?

12   A    In Staffing Group among ten brokerage accounts.

13   Q    Let's go to Schedule 3.3A.  Can you just explain what

14   this schedule reflects?

15   A    So, this is similar to the schedule for StarStream except

16   there's more accounts to account for, more brokerage accounts

17   to account for.  It shows that the number of shares that were

18   purchased among all of these accounts was 317,000 shares, the

19   number of shares sold was 43,000, there was a split of 6,600

20   shares or 6,600 shares were obtained as the result of a split

21   or this one might have been a dividend, a stock dividend, and

22   there were an equal number of shares transferred in,

23   transferred out, that means that they just moved around within

24   Mr. Discala's -- in his entities' accounts; there weren't any

25   transfers in or out from third parties, other parties, and at

ECKHART – DIRECT – CHENG                    3288

1   the end of the day Mr. Discala was holding 280,747 shares of

2   Staffing Group.

3   Q    So, the ending balance is Mr. Discala still possesses

4   280,747?

5   A    Well, as of the end of trading, the brokerage accounts

6   that we have -- so, I can tell you specifically the first one

7   where he's still holding 43,100, that was as of May 30th,

8   2014; 24,500 was still being held as of also May 30th, 2014;

9   and 213,147 shares were still being held as of June 27, 2014.

10  That's the last data that we have as far as looking at the

11  brokerage accounts and even the blue sheet data.

12  Q    And he never sold those shares, based on the data you

13  reviewed?

14  A    Based on the period of the data I reviewed, that's

15  correct.

16  Q    Go to Schedule 3.4.  What does this schedule reflect?

17  A    This is a very similar analysis but for Cubed.  There was

18  very, very limited public trading of Cubed.  Mr. Discala, as

19  we saw in my very first schedule, got no free trading shares

20  in Cubed so whatever he bought and sold was just on the open

21  market, and this shows that over a period of April to -- well,

22  one account was through November 2014, he had trading positive

23  of $856.

24  Q    So, this reflects all the trading that you've seen?

25  A    All the trading that we've seen in the government blue

1  sheets and the brokerage statements, yes.

2  Q    Schedule 3.4A please.

3       Now, what does this schedule reflect?

4  A    This schedule reflects the quantity of shares that were

5  purchased and then ultimately sold and Mr. Discala is no

6  longer holding Cubed or as of the period that we looked at was

7  no longer holding Cubed or CRPT stocks.

8  Q    So, how many shares did he purchase in the open market?

9  A    He purchased 12,732 and sold the same number.

10 Q    What period of time was that, based on the records you've

11 seen?

12 A    Based on the records we've seen, it was -- he made $6,042

13 from April 2014 through July 14, 2014, but he also lost $5,185

14 from May 2014 through -- through sometime in November 2014 is

15 what the records show.

16 Q    Move to Schedule 3.1 please.

17      Now, is this the same type of analysis that you did

18 for StarStream, Staffing Group and Cubed, only for CodeSmart?

19 A    That's correct.

20 Q    And how many accounts are listed here?

21 A    Sixteen that traded CodeSmart.

22 Q    And did he make a profit in all those accounts?

23 A    Oh, no.

24 Q    How many accounts did he make a profit in?

25 A    I count that he made a profit in seven accounts.

ECKHART - DIRECT - CHENG                    3290

1    Q    In how many accounts did he incur a loss?

2    A    So, he would have incurred a loss in nine accounts.

3    Q    Now, can you tell me what row 15 represents?

4    A    Row 15, so this is the Fidelis holding account 7544 at

5    Halcyon Cabot that received Fidelis Holdings' initial free

6    trading shares of 312,500 initial free trading shares that

7    were purchased from the shell and those shares, as I

8    mentioned, were held through the stock split and transferred

9    out.  At one point there was another company that Mr. Discala

10   was trading on that incurred substantial losses, it was --

11             MS. JONES:  Objection.

12             THE COURT:  Sustained.

13   Q    We'll move to Schedule 3.1A.

14             Can you tell me what this schedule reflects?

15   A    This schedule reflects the same total positive cash flow

16   that Mr. Discala made in trading CodeSmart on the open market

17   of $1,861,000 but split out between what he made before the

18   stock split on June 14th, 2013 and what he made after.  And

19   you can see the big dollar amounts in the pre-split column,

20   the 327,700, that was the Halcyon Cabot account that received

21   Mr. Discala's initial free trading shares, he sold them before

22   the split and he made 327 -- $327,000.  Under the second

23   grouping down under Omniview he made $1,518,000 before the

24   split, that was as he was selling the initial free trading

25   shares he received from the -- purchased from the shell.  He

1    received I think it was 200 -- or he received 362,000, sold

2    about 261,000 before the split and this is the profit that he

3    made before the split.

4           And as I mentioned, down in the Fidelis account,

5    7544, he had not sold any of those before the split.  After

6    the split, however, he moved a number of CodeSmart shares into

7    the Fidelis account, borrowed a number of CodeSmart shares

8    from another individual into that same Fidelis 7544 account,

9    so he moved over about 121,000 shares of CodeSmart from his

10   personal and Omniview accounts into Fidelis's account,

11   borrowed 300,000 from another individual, 300,000 shares of

12   CodeSmart, and sold a good portion of those to generate

13   profit, proceeds of $531,000 that were needed in that account.

14   Q    Do you know when the split was?

15   A    The split was June 14th, 2013.

16   Q    Do you recall when was his first day of trading for

17   CodeSmart?

18   A    His first day of trading from his personal account was

19   May 22nd and from Omniview wasn't until May 28th.

20   Q    So, in a period of about 22 days what was his profit?

21   A    So, during the whole pre-split period?

22   Q    Correct?

23   A    His profit was $1,836,000 and change.

24   Q    And all his trading afterwards resulted in how much?

25   A    $25,300.

1    Q    And how long was that period?

2    A    That was a much longer period, that was from effectively

3    middle of June through the following -- I think he traded

4    CodeSmart through December 24th, 2013, so about six months.

5              MR. CHENG:  Scott, can you put 196-3 side-by-side.

6    Q    Now, this chart on the left, can you indicate where the

7    split is?

8    A    Well, it says in the bottom right corner the government

9    indicates the split was June 14th, 2013.

10   Q    And on the chart is that where the straight line comes

11   down?

12   A    I can't really see it but -- it is I think further to the

13   left, and the dates are covered.  It's probably where that

14   straight line is going down because for 2-for-1 split the

15   price would have to be cut in half so you have the same value,

16   more shares just lower value.

17   Q    So, in that period of time Mr. Discala made a little over

18   1.8 million, correct?

19   A    That's correct.

20   Q    And then --

21             MR. CHENG:  Scott, come back up.

22   Q    In the remaining amount of time how much did he make?

23   A    $25,304.

24             MR. CHENG:  No more questions, Your Honor.

25             THE COURT:  Thank you, Mr. Cheng.

1        Ms. Jones, any cross?

2        MS. JONES:  I do, thank you.

3    CROSS-EXAMINATION

4    BY MS. JONES:

5    Q    Good morning, Ms. Eckhart.

6    A    Good morning.

7    Q    So, you were hired by the defendant, AJ Discala?

8    A    Yes, by counsel.

9    Q    Yes.  And what is your hourly rate?

10   A    My hourly rate is $425.

11   Q    Is that the same for both testimony and general work?

12   A    Yes.

13   Q    So, how much have you been paid to date by Mr. Discala's

14   defense team?

15   A    My bills have been about $90,000 in total and I've been

16   paid in full.

17   Q    You've been paid in full you said?

18   A    My firm has been paid in full, I don't get paid, my firm

19   does.

20   Q    So, you've been paid $90,000 for this work product and

21   your testimony?

22   A    Well, there was a lot more work product behind what we've

23   shown.

24   Q    Right.

25   A    But we've been paid, my firm has been paid $90,000.

Eckhart - CROSS - JONES                    3294

1   Q    Okay, great.  And who provided you with the records that

2   you reviewed in this matter?

3   A    We were initially provided by counsel with the

4   government's blue sheet data and then brokerage statements

5   followed up after that and additional information as we

6   requested it, bank statements and so forth.

7   Q    So, if we can take a look at -- if we can look at

8   Schedule 1 and I'm going to have to ask defense counsel to

9   bring this up since I don't have an unredacted copy.  Okay.

10  All right.

11           So, Ms. Eckhardt, this schedule purports to show the

12  amount that was sent out of what's been characterized as the

13  Discala entities versus the net cash flow from public trading,

14  correct?

15  A    Correct.

16  Q    And so, for -- and you looked at the four stocks that

17  were charged in this case, CodeSmart, StarStream, Staffing

18  Group and Cubed, correct?

19  A    I'm sorry, what was your question?

20  Q    You looked at the four stocks that are charged in this

21  case, CodeSmart, StarStream, Staffing Group and Cubed in this

22  chart?

23           THE COURT:  With respect to this chart.

24  A    With respect to this chart.

25  Q    Yes, with respect to this chart.

Eckhart - CROSS - JONES                3295

1          And your analysis shows that the total cash outflow

2    was approximately $1.1 million and the net cash in flow from

3    public trading under your analysis was $1.7 million, is that

4    correct?

5    A     That's what the numbers show, yes.

6    Q     What is the difference there between out and in based on

7    your analysis?

8    A     The difference is that Mr. Discala invested $1,169,282 in

9    the company -- in these four companies and on trading the

10   stocks in the public market he made $1,700,851.

11   Q     So, more than half a million dollars more in than out?

12   A     Just about a half a million dollars, right.

13   Q     Under your analysis, correct?

14   A     Well, I wouldn't note those two together but if you're

15   trying to do the math, the math is just about half a million,

16   just over half a million.

17   Q     All right, thank you.

18          So, you talked about you took a look at the

19   disposition of the stock that Mr. Discala received in all

20   these different companies, correct?

21   A     My detailed analysis is where I looked at the disposition

22   of those stock, yes.

23   Q     All right.  I'd like to show just the witness right now

24   what's been marked as Government Exhibit 190-4, just the

25   witness.

1          Ms. Eckhardt, do you recognize this chart?

2     A    This was a draft that we prepared.

3     Q    A draft that you prepared, a draft of what?

4     A    A draft of financial results of trading for CodeSmart,

5     StarStream, Staffing Group, Cubed and Soul and Vibe.

6     Q    There's just -- you just have totals there for

7     StarStream -- totals there for the stocks that we discussed,

8     CodeSmart, StarStream, Staffing Group and Cubed, correct?

9     A    That's right, on this draft schedule, yes.

10    Q    This shows -- what transactions are reflected in this

11    chart?

12         THE COURT:  The question is about the chart that's

13    in front of her?

14         MS. JONES:  Yes, the chart in front of her 190-4.

15    A    This isn't anything I just testified about but this is a

16    summary of certain private transactions.

17    Q    Okay.

18    A    Private sale transactions.

19    Q    When you refer to a private transaction, what do you mean

20    by a private transaction?

21    A    That stock is taken out of the public -- out of brokerage

22    accounts and sold privately between individuals.

23    Q    Okay.

24    A    Usually by a stock purchase agreement.

25    Q    And you testified about all the stock that Mr. Discala

Eckhart – CROSS – JONES                    3297

1    received from the various companies for his initial

2    investments and stock that he purchased on the open market,

3    correct?

4    A    Correct.

5    Q    And talked about what he did with that stock, what did he

6    sell and what –– what did he sell in the open market and what

7    he did not sell in the open market, correct?

8    A    Correct.

9    Q    And your firm also took a look at what did he sell in

10   private transactions to other people, correct?

11   A    We wanted to understand the whole story.

12   Q    Okay.  And as part of that analysis, you determined that

13   in private transactions Mr. Discala sold $358,997 worth of

14   stock in private transactions, correct?

15   A    I don't know if these numbers are correct anymore; as I

16   mentioned, this was a draft.

17   Q    I see.  So, you had all the numbers memorized before but

18   not these numbers; are you saying that these numbers are not

19   accurate?

20           MR. CHENG:  Objection.

21           THE COURT:  Sustained.

22   Q    Are you saying these numbers are not accurate?

23   A    I'm saying they're a draft, I don't know if they are

24   accurate, they haven't been finalized, approved.

25   Q    But doesn't the draft indicate that Mr. Discala made

Eckhart – CROSS – JONES                3298

1    $1.4 million in private sales of Cubed stock?

2    A    And that's not accurate.

3    Q    Okay, how is that not accurate?

4    A    Because he didn't specifically sell Cubed stock.

5    Q    Okay.  Well, let's take a look at what's been marked as

6    Government Exhibit 190.3.  Do you recognize this document?

7    A    I do, this is another draft.

8    Q    And it's a draft of what?

9    A    It's a draft summarizing private transactions with

10   respect to profit participation interests.

11   Q    And this was a draft prepared by your firm, correct?

12   A    Correct.

13   Q    And it's a draft prepared based on information that you

14   reviewed that was provided to you by defense counsel?

15   A    I'm sorry, can you reask?

16   Q    This draft was prepared based on information provided to

17   you by defense counsel?

18   A    Yes.

19          MS. JONES:  Your Honor, the government moves

20   Government Exhibit 193 into evidence.

21          THE COURT:  Any objection?

22          MR. CHENG:  Yes objection, incomplete.  Side-bar?

23          THE COURT:  Yes.

24          (Continued on the next page.)

25

1          (The following takes place at side-bar.)

2          MS. JONES:  Your Honor, I think this should come in,

3     this is the work product that was provided to us as part of

4     this woman's 3500 material.  She's testifying as to the money

5     that Mr. Discala and his entities made from these transactions

6     limited to just his public trading and his initial investment.

7     They also did an extensive analysis on his private

8     transactions showing how much money he made based on sales to

9     individual people which, among other things, reflect that they

10    sold -- he received $1.4 million from selling these, whatever

11    they were, Spa PPAs that went into his account, so I think

12    that this should come in.

13         MR. CHENG:  Your Honor, this is a draft.  We were

14    under a time crunch to provide this information and she was

15    under a time crunch to compile this information.  Ms. Jones

16    demanded that we provide 3500 material at which time we did

17    provide that material, we provided incomplete material.

18         MS. JONES:  This is nonsense, they don't want to

19    admit it because it is not helpful for the defendant because

20    it shows he earned so much more money than they're reflecting

21    on their charts, so their charts are misleading without

22    looking at this part of the analysis that they did and they're

23    trying to keep this out by saying, oh, it is a draft and we

24    didn't testify about it.  It is part of her analysis.

25         MR. CHENG:  If Ms. Jones wants to open the door into

SIDE BAR                                    3300

1    this, we're glad to bring in all the private transaction

2    information.

3              MS. JONES:  All the private transactions on these

4    four stocks, sure.

5              MR. CHENG:  Okay, then we'll bring in all the

6    information.

7              THE COURT:  About these four stocks.

8              MS. JONES:  About these four stocks.

9              MR. CHENG:  Any evidence that she introduces, I

10   believe it opens the door.

11             THE COURT:  To what?

12             MR. CHENG:   To addressing the information that's on

13   the exhibit.

14             THE COURT:  Which is sales?  You have different

15   sales information?

16             MR. CHENG:  I don't know what other exhibit she's

17   going to introduce that are drafts.

18             THE COURT:  This is only talking about in this

19   document.

20             MR. CHENG:  Which document is it?

21             MS. JONES:  It is Schedule 4.4 in the draft that I

22   was sent on Sunday, the draft analysis I was sent on Sunday.

23             (Pause.)

24             MR. CHENG:  We're going to argue that that's

25   incomplete, it wasn't finished.

SIDE BAR                                    3301

1          THE COURT:  That goes to its weight.

2          MR. CHENG:  Okay.

3          MS. JONES:  Okay, great.

4          THE COURT:  Right?

5          MS. JONES:  Yes.

6          (End of side-bar.)

7          (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. JONES:  The government moves Government

2     Exhibit 193 into evidence.

3          THE COURT:  Received in evidence.

4          (Government Exhibit 193, was received in evidence.)

5          MS. JONES:  Can we publish to the jury?

6          THE COURT:  You may.

7     BY MS. JONES:

8     Q    Ms. Eckhardt, can you explain what is reflected in this

9     chart?

10    A    Well, first off I'll explain what is not reflected, this

11    has nothing to do with free trading shares.

12    Q    That is correct but that's not what I asked you.  I asked

13    you to explain what is reflected in this chart?

14    A    This has to do with profit participation interests.

15    Q    And what does this chart show in terms of profit

16    participation interests and private transactions in Cubed for

17    Mr. Discala's entities?

18    A    This shows that Omniview had the right to sell profit

19    participation interests of Cubed.

20    Q    It shows it has a right to sell -- or that it actually

21    did?

22    A    That it did sell them, my understanding was they had the

23    right to sell them, but that it did sell profit participation

24    interests.

25    Q    So, under Titan Investor List Buyer, what's reflected

ECKHART – DIRECT – CHENG                    3303

1    here?

2    A     These are names of individuals who purchased profit

3    participation interests in Cubed.

4              (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   CROSS-EXAMINATION (Continued)

2          MS. JONES:  Your Honor, the government moves

3   Government Exhibit 190-3 into evidence.

4          THE COURT:  Received in evidence.

5          (Government Exhibit 190-3, was received in

6   evidence.)

7          MS. JONES:  Can we publish it to the jury?

8          THE COURT:  You may.

9   BY MS. JONES:

10  Q    Ms. Eckhart, can you explain what is reflected in this

11  chart?

12  A    Well, first of all, I will explain what is not reflected.

13  This has nothing to do with free-trading shares.

14  Q    That is correct, but that's not what I asked you.  I

15  asked you to explain what's reflected in this chart.

16  A    This has to do with profit participation interest.

17  Q    And what does this chart show in terms of profit

18  participation interest and private transactions in Cubed for

19  Mr. Discala's entities?

20  A    This shows that that OmniView has the right to the sell

21  profit participation interests of Cubed.

22  Q    You shows it has a right, or that it actually did?

23  A    That it did so.  My understanding was they had the right

24  to sell them.  But that it did sell profit participation

25  interests.

ECKHART - CROSS - JONES                    3305

1  Q    So under Titan investor list buyer, what's reflected

2  here?

3  A    These are names of individuals who purchased profit

4  participation interests in Cubed.

5  Q    And under the date, what is the date -- what's the

6  significance of the date that's listed there?

7  A    That's the date of the stock purchase agreement or profit

8  participation agreement that we looked at.

9  Q    And when you -- under the deposit -- payment deposit

10 reference, what is indicated there?

11 A    There's a lot of information.  Do you want me to describe

12 the whole thing?

13 Q    I just want you to describe what does it mean when you

14 have an amount and a date and a deposit.  What do those

15 headings mean?

16 A    So, the amount that was -- the amount is the dollar

17 amount that we were looking for in the deposit records;

18 whether we found it to be a wire transfer in or a transfer of

19 funds, or some other kind of thing, transaction.  What account

20 it was deposited in.  And the date.  And the deposit amount in

21 case that amount we are looking for was part of a larger

22 deposit.

23 Q    And so looking at, for example, if we can look, for

24 example, for number six, Bryan and Kelly Hagen, where it shows

25 a 10,000-dollar -- a 10,000 share participation interest.

ECKHART – CROSS – JONES                3306

1          What does this chart reflect in terms of the amount

2   of money deposited in to -- where did that money go?

3   A    So that -- this reflects that Bryan and Kelly Hagen had a

4   profit participation agreement for 10,000 shares of Cubed and

5   they paid 1 dollar per share.  So $10,000.  And $10,000 was

6   wired to OmniView, Chase account ending in 7494 on March 7th,

7   2014.

8   Q    And if we can look at the entry for number 49.  What does

9   that reflect?

10  A    That reflects that the Titan investor list lists a buyer

11  named Chris Mara.  And we do not have a stock purchase

12  agreement or -- profit participation agreement for him.

13          But we also looked to see that there -- whether

14  there was any payment for 125,000 shares of profit

15  participation interest.  And I think this footnote 7, which I

16  can't see, but I think -- if I recall correctly, that might

17  indicate that there was an understanding that Mr. Mara would

18  pay for his profit participation interests once he sold his

19  shares.

20  Q    Okay.  And what's reflected for number 67 for Igor

21  Gefter?

22  A    That the Titan investor list shows he purchased a

23  25,000 -- or participation interest in 25,000 shares.  That

24  there is an SPA or PPA, and that there is a wire to OmniView

25  7474 account on April 3rd in the amount of $25,000.

ECKHART - CROSS - JONES                    3307

1   Q    And does this chart indicate that if there is an account

2   number, an account and a date and a deposit number, that

3   someone actually checked to see if this deposit was made into

4   that bank account?

5   A    If -- on our schedule it has a deposits reference, then,

6   yes, that was verified in the bank statements.

7   Q    Okay.  So when you go to the sale subtotal after number

8   99, what does that sale subtotal indicate?

9   A    It indicates that OmniView based on the Titan investor

10  list had sold participation interests to 7,921,000 -- or

11  7,921,000 shares in Cubed.

12  Q    For a total amount that was deposited -- for a total

13  amount of money that was -- how much money was deposited into

14  Discala-related bank accounts?

15  A    You mean before the profit sharing with Mr. Wexler?

16  Q    That's correct.

17  A    So a total amount was deposited of $1,731,000.

18  Q    And then you have a payment to Marc Wexler sharing the

19  proceeds, correct?

20  A    Yes.

21  Q    How was it determined that those were a share of

22  proceeds?

23  A    I was informed by Mr. Discala that his agreement with

24  Mr. Wexler was to share in the proceeds of selling the profit

25  participation interests in Cubed.  So we looked for checks or

ECKHART – CROSS – JONES                      3308

1    payments from OmniView to Mr. Discala, and these are the ones

2    we identified.

3    Q     Thank you.  So these are -- so you net that out and you

4    show, according to this calculation, that there was 1,412,125

5    in net cash flow to Discala entities from the sale of Cubed

6    profit participation interests?

7    A     That's right.  Based on this chart, yes.

8    Q     And there were similar private shares relating to

9    CodeSmart, correct?  In that there were private sale

10   transactions where Mr. Discala or his entities sold CodeSmart

11   shares to private individuals, correct?

12   A     I mentioned there were 625,000 that were sold to private

13   entities, yes, for private transactions.

14   Q     For a total of proceeds of $358,997?

15   A     I don't recall without all my schedules in front of me.

16   Q     All right.  And now I wanted to take a look at --

17   A     I know he sold them for pennies on the dollar.  So there

18   was a small amount.

19   Q     I'm sorry, $358,000 is a small amount; is that what

20   you're saying?

21           MR. CHENG:  Objection.

22           THE COURT:  Sustained.

23   A     Compared to the market price of them, yes.

24           MR. BOWMAN:  Can we have a sidebar please, Judge.

25           (Sidebar conference.)

SIDEBAR CONFERENCE                         3309

1              (The following occurred at sidebar.)

2              MR. BOWMAN:  My client needs a convenience break.

3              THE COURT:  I was going to ask Ms. Jones where we

4    were.

5              MS. JONES:  Fine.  Okay.

6              THE COURT:  How much longer?

7              MS. JONES:  I have probably like maybe 15, 20 more

8    minutes.

9              THE COURT:  Okay.  Thank you.

10             Thank you, Mr. Discala.

11             (End of sidebar conference.)

12             (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

ECKHART – CROSS – JONES                    3310

1          (In open court; Jury present.)

2          THE COURT:  Ladies and gentlemen, we had one of our

3  scheduling discussions and it was determined now is a good

4  time to take the mid-morning break, so that's what we'll do,

5  we will take our mid-morning break.

6          The recess rules apply.  Do not discuss this case

7  amongst yourselves or with anyone else.  Keep an open mind.

8          (Jury exits the courtroom.)

9          THE COURT:  You may stand down.  We will see you

10 after the break.

11         (Whereupon, a recess was taken at 11:59 a.m.)

12         THE COURTROOM DEPUTY:  All rise.  Court is back in

13 session.

14         Counsel for both sides are present, including the

15 defendants.

16         THE COURT:  Ready to resume?

17         MS. JONES:  Yes, Your Honor.

18         (Whereupon, the witness resumes the stand.)

19         MR. BINI:  Your Honor, I have one matter that I

20 wanted to raise outside of presence of this witness.  May I

21 briefly raise it, or we can do it at sidebar.

22         THE COURT:  We can do it at sidebar because the jury

23 is already on their way in.

24         Wait for the jury to come in.

25         (Jury enters the courtroom.)

ECKHART – CROSS – JONES                    3311

1          THE COURT:  Be seated, please.

2          Counsel will stipulate that the jury is present and

3    properly seated.

4          MS. JONES:  Yes, Your Honor.

5          MR. ROSS:  Agreed, Judge.

6          THE COURT:  Thank you, counsel.

7          Ladies and gentlemen, welcome back.  We're almost

8    ready to proceed.  I neglected to take care of one matter,

9    unfortunately at sidebar, which we're going to do right now.

10          (Continued on the next page.)

11          (Sidebar conference.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following occurred at sidebar.)

2          MR. BINI:  Your Honor, I just wanted to make sure to

3    put it on the record.  I think generally it goes without

4    saying which is it's crystal clear, that when the defendant

5    testifies and handed by defense counsel a number of exhibits

6    he's going to go through, they are not voluminous, although I

7    understand Mr. Bowman anticipates will be a few hours, that

8    the cross-examination of the government is going to go into

9    all aspects of this case, because all of it relates to

10   credibility.

11          And so I wanted to be clear to the defense counsel,

12   and I'm sure he's aware, that even if he goes into six or

13   seven emails, the cross-examination is going to include

14   documents from throughout the case.

15          MR. BOWMAN:  I appreciate of comments of Mr. Bini.

16   I understand.

17          MR. BINI:  Okay.

18          MR. BOWMAN:  I know what the rules are.

19          MR. BINI:  I know you do.  I just wanted to make

20   sure it's on the record.  Thank you.

21          MR. RIOPELLE:  And for the Court's information, I

22   had a late thought about the charge, which it's very simple,

23   so we can raise it later.  I don't want to hold the jury up.

24          THE COURT:  Yes, no.  We have time.

25          MR. RIOPELLE:  We do now.

1          (In open court; Jury present.)

2          THE COURT:  All right, Ms. Eckhart has resumed the

3     stand.

4          And, Ms. Jones, you may now resume her cross.

5          MS. JONES:  Yes, Your Honor, thank you.

6     CROSS-EXAMINATION (Continued)

7     BY MS. JONES:

8     Q    Ms. Eckhart, during your direct exam, you testified about

9     Schedule 6.5.

10         Do you have that in front of you?

11    A    Yes, I do.  Yes.

12    Q    So on Schedule 6.05, this is a description of realized

13    profit loss based on the charts of Christopher Ferrante,

14    correct?

15    A    Correct.

16    Q    And on your Schedule 6.5, under the totals you noted the

17    totals that are listed on the Ferrante schedules, correct?

18    A    I believe I listed the totals he testified to, but I

19    think they comported with the totals on his schedules, yes.

20         MR. ROSS:  Can we take a look the -- going to take a

21    we're look at the government's totals which are already in

22    etched.

23         Henry, can you pull up Government's Exhibit 195-1.

24         (Exhibit published.)

25    Q    Looking at the summary page.  Ms. Eckhart, do you see

ECKHART – CROSS – JONES                3314

1     that there are two columns here; ITEN and realized net profit

2     and loss, and net applies and sells, correct?

3     A     That's right.

4     Q     And in your analysis of the net cash flow from public

5     trading, your calculation was that the net cash flow should be

6     $1,861,386, correct?

7     A     That's right.

8     Q     And under net of buys and sells that is about a

9     4,000-dollar difference between your calculation and

10    Christopher Ferrante's from the SEC, correct?

11    A     That's what I site to, yes.

12    Q     And in here we have an ITEN realized the net profit loss

13    column that you have taken issue with, correct?

14    A     That's right.

15    Q     And when you did your calculation of net cash flow from

16    public trading, did you use a first-in/first-out methodology?

17    A     Net cash flow from public trading, you don't need to --

18    Q     I just asked you:  Did you used a first-in/first-out

19    methodology?

20    A     There would be no reason to.

21          THE COURT:  The question is did you?

22          THE WITNESS:  Of course not.

23    Q     Okay.

24          So your complaint is that in the -- your primary

25    complaint is that Mr. Ferrante did not include a 300,000

1    share -- or a 100,000 share transfer out of that account to

2    another account, correct?

3    A    To an outside third-party account, effectively a sale.

4    Q    Well, is there any sale amount reflected on the brokerage

5    statement?

6    A    The proceeds would be zero, but the shares move outside

7    of his control.  So...

8    Q    That's right.  But on the brokerage statement, it said

9    proceeds are reflected as a zero, correct?

10   A    Well, the brokerage statement just reflects the transfer

11   of shares.

12   Q    With no proceeds associated with that.

13            MS. JONES:  Okay, can we go to 195-2.

14            (Exhibit published.)

15   Q    Ms. Eckhart, this is Christopher Ferrante's calculation

16   of the ITEN realized net profit for Marleen Goepel, and it

17   also has set of buys and sells that's the same amount,

18   correct?

19   A    That's right.

20   Q    And you did not include this $619,000 when determining

21   Mr. Discala's net cash flow from public trading, correct?

22   A    Right.  Because he's a different individual.

23            And I understand that there's been no testimony that

24   she ever transferred these proceeds to Mr. Discala.

25   Q    Ms. Eckhart, I didn't ask you about the testimony, I

ECKHART – CROSS – JONES                3316

1    asked you if you included this in your analysis.

2    A    Okay.  I'm sorry.  I gave you my reason why I didn't.

3              THE COURT:  You have to wait for a question.

4              THE WITNESS:  Got it.

5              THE COURT:  You're not here to volunteer

6    information.

7    Q    Okay, can we take a look at -- can we take a look at

8    Government Exhibit 195-3.

9              (Exhibit published.)

10             Looking at the summary page.

11             Ms. Eckhart, what is column F called?

12   A    The title is "ITEN realized net profit loss."

13   Q    Can we take a look at the -- do you have your chart in

14   front of you, Schedule 6.5?

15   A    I do.

16   Q    So under ITEN CodeSmart, in Mr. Ferrante's chart for ITEN

17   realized net profit and loss, he has $2,236,300.43 and 42

18   cents.  And what do you have on your chart?

19   A    I have $2,236,243.

20   Q    Okay.  So instead of $343, you have $243?

21   A    Correct.  As I mentioned, I took this from his testimony,

22   so maybe he misspoke.  Or maybe I mis-answered it, but I do

23   have a footnote that there was a hundred dollar difference

24   between the total that he testified to and the total I saw.

25   Q    And so you didn't actually double check these numbers?

ECKHART – CROSS – JONES                3317

1   A     Well, my point was to go from what the government was

2   testifying to.  So that's why I referenced his testimony page.

3   Q     You also referenced a government exhibit, right?

4   A     I did.  He was testifying from that exhibit at that page.

5   Q     All right, let take a look at Government Exhibit 195-5.

6         (Exhibit published.)

7   Q     Now what is called J -- the title in this column?

8   A     J says "total realized net profits."

9   Q     And under SSET, what is a total realized net profit on

10  this chart?

11  A     The highlighting says $2,960.94.

12  Q     And what do you have on your chart on Schedule 6.5?

13  A     That's a good catch.  That was from the testimony.  I was

14  reading from the testimony.  So I did not check that box.

15  Q     But you have $2,900,000 on Mr. Josephberg's SEC on

16  Schedule 6.5.

17  A     Based on what the testimony, the transcript I read, yes.

18  That's a mistake.

19         MS. JONES:  One minute, Your Honor.

20         If we could pull up, again, we need to use the

21  redacted defense exhibit, Schedule 1.  The defense needs to

22  pull that up because I don't have the redacted one.

23         (Exhibit published.)

24  Q     Ms. Eckhart, you have under here for cash outflow for

25  initial investment, you have a description of what was -- what

ECKHART – CROSS – JONES                    3318

1   was paid for each -- invested in each company, correct?

2   A    That's right.

3   Q    And for Cubed, what do you have as the initial

4   investment?

5   A    $569,000.

6   Q    And you also prepared underlying schedules to support

7   that the number of $569,000, correct?

8   A    I did.

9        MS. JONES:  I'd like to just show the witness what

10  I've marked as Government Exhibit 198.  I have to do it on

11  and.  I ask it be put up on the Elmo.

12  Q    Ms. Eckhart, do you recognize that?

13  A    I do, yes.

14  Q    What is that?

15  A    This is my schedule showing the proof of payment for the

16  initial investment in Cubed.

17  Q    And does this you come -- you reached that $569,000

18  figure?

19  A    Yes.

20       MS. JONES:  The government moves Government

21  Exhibit 198 into evidence.

22       MR. CHENG:  Objection.

23       THE COURT:  Counsel, I'll hear you at sidebar.

24       (Continued on the next page.)

25       (Sidebar conference.)

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE                              3319

1          (The following occurred at sidebar.)

2          MR. CHENG:  The same objection is they're incomplete

3    drafts.  That weren't provided.  If she's going to introduce

4    an incomplete portions of it, I would say -- I would offer the

5    entire report.

6          THE COURT:  The entire report.  She's going to ask

7    about all of this information.

8          MR. CHENG:  It links to other schedules.

9          THE COURT:  It's her cross-examination of the

10   methods of the numbers that appear on the chart that you put

11   into evidence.  So ideally you can ask her and if she has a

12   failure of recollection --

13         MS. JONES:  Okay.

14         THE COURT:  -- then you can, you know, correct the

15   report.  Because you have all the information you want out of

16   the witness.

17         MS. JONES:  Okay.

18         THE COURT:  The best evidence is in her testimony.

19         MS. JONES:  Okay.

20         MR. CHENG:  There's a number schedules throughout

21   the entire report that reference each other, including the

22   support.

23         THE COURT:  It doesn't matter.  She's testing the

24   information --

25         MR. CHENG:  I'm objecting to the introduction.

SIDEBAR CONFERENCE                              3320

1          THE COURT:  She's not introducing it, she's going to

2     ask her a question.

3          MR. CHENG:  That was an objection.

4          THE COURT:  Now, she is going to do it.  In other

5     words, your objection is sustained.

6          MR. CHENG:  Thank you.

7          THE COURT:  Is that the word you wanted to hear?

8          MR. CHENG:  That's the only word I understand.

9          (End of sidebar conference.)

10         (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ECKHART – Cross – JONES                    3321

1              (In open court; Jury present.)

2    BY MS. JONES:

3    Q    Ms. Eckhart, can you please describe how you arrived at

4    that 569,000-dollar figure, specifically?

5    A    Specifically.  I looked through the bank statements to

6    identify payments that seemed like they would be in connection

7    with a Cubed transaction.  And I identified one, two, three,

8    four -- five payments to Cane Clark LLP escrow.

9              I also identified.

10   Q    You're reading off this chart, do you remember the

11   specifics without the chart?

12   A    Sure.  Okay.

13   Q    Can you testify what were each of the wire transfers and

14   how you identify it in that amount?

15   A    Well, I haven't memorized the chart, I can't do that.

16   Q    So you need the chart to refresh your recollection?

17   A    Of course, that's why I'm looking at it.

18   Q    Okay.

19   A    Okay, thank you.

20             THE COURT:  In other words, we have to follow the

21   rules closely.  So you can refresh your recollection, but that

22   doesn't mean you're going to read aloud the charts, okay.

23             THE WITNESS:  Okay, well I'm having wording, this

24   chart doesn't --

25             THE COURT:  You can refresh your recollection by

1    looking at the chart in answering the questions.

2    Q    Ms. Eckhart, is it your understanding that this chart is

3    accurate?

4    A    I believe so.

5              (Continued on next page.)

ECKHART – CROSS – JONES                 3323

1    CROSS-EXAMINATION

2    BY MS. JONES:

3    Q    And this chart was based on information that was provided

4    to you by defense?

5    A    It was based on bank statements that were provided.

6    Q    And this is the detail that underlies the number that you

7    included on schedule 1 as the initial investment in Cubed?

8    A    That's right.

9            MS. JONES:  The government moves Government Exhibit

10   198 into evidence.

11           MR. CHENG:  No objection.

12           THE COURT:  With that foundation, it is in.  Now you

13   can read it.

14           MS. JONES:  Okay.  Now we can read it.

15           (Government Exhibit 198, was received in evidence.)

16   BY MS. JONES:

17   Q    Can you please explain what's reflected on 190,

18   Government Exhibit 190-8.

19   A    Would you like me to explain it line by line or in

20   general terms?

21   Q    Let's do it by category.  So first under category 1, what

22   is that -- what does that reflect?

23   A    That reflects a payment of $100,000 for 100,000

24   restricted shares purchased by -- in connection with a Cubed

25   subscription.

ECKHART - CROSS - JONES                    3324

1    Q     For a purchase of 100,000 restricted shares?

2    A     Yes.

3    Q     Okay.  And what's under category two?

4    A     Category two is -- are three wire transfers to Cane Clark

5    Escrow LLP -- or Cane Clark LLP escrow, during February and

6    March 2014 that were payments to help go towards purchase of

7    the shell company.

8    Q     So you have it described as funding for shell purchase,

9    correct?

10   A     That's my understanding, yes.

11   Q     And for 3, 4, and 5?

12   A     The first one, the $25,000 item, was an item that we

13   found in the bank statement.  It was a wire transfer to Indus

14   Consulting, and it had a memo that said buyout Indus Bridge,

15   or buyout bridge, Crackpot, and so we found some additional

16   business records that described that Indus Consulting wanted

17   OmniView to buyout their bridge in Crackpot.

18         We also found a promissory note from OmniView to

19   Crackpot, for the total of $144,000, and we also found $75,000

20   were -- was a payment for a subscription for 75,000 restricted

21   shares by OmniView into Cubed.

22   Q     And when you add those all up, that's how you reach the

23   $559,000 figure for an investment in Cubed?

24   A     I believe so, if the math is correct.

25         MS. JONES:  I would like to take a look at

1    Government Exhibit 197-38.  That is going to be on Henry's

2    laptop.

3              THE COURTROOM DEPUTY:  Is it in evidence?

4              MS. JONES:  Yes, it is.

5              THE COURTROOM DEPUTY:  Okay.

6              MS. JONES:  And I would like to look at the first

7    account tab, and I would like to go down to lines 331.

8    BY MS. JONES:

9    Q    Ms. Eckhart, as part of your analysis you reviewed the

10   bank account for OmniView Capital?

11   A    Yes, I did.

12   Q    And you included the time period of --

13   A    Which bank account are you asking about, actually?

14   Q    I'm asking by the JPMorgan Chase account ending in 7494.

15   A    Yes.

16   Q    And you also reviewed that account for the period of May

17   of 2013?

18   A    For that month of May, and other months, yes.

19   Q    Okay.  So on your analysis, I wanted to ask you, you did

20   not include in terms of cash inflow to OmniView amounts paid

21   by other investors to purchase free trading shares of ITEN,

22   did you?

23   A    I don't think that was something that I was looking at in

24   the schedules I was provided.

25   Q    Okay.  Well, you see this line right here, May 1, 2013,

ECKHART - CROSS - JONES                    3326

1   credit of $28,000, and can you see what it says in the memo

2   address form?

3   A    That looks like -- I don't know if that's a complete

4   statement, but it says for Draper, Inc., all for CodeSmart

5   shares, Staten Island.  I didn't write that.  This isn't my

6   work product.

7   Q    No, I know, it's the government's.  But you did prepare a

8   schedule of all the investors who purchased free trading

9   shares in ITEN in May of 2013, correct?

10  A    I believe so, yes.

11  Q    And when you made that calculation, you used the share

12  price of .02 cents that they paid the shell shareholders for

13  their shares, correct?

14  A    I think it was .023.

15  Q    .023.  That's the amount that you used to calculate what

16  they paid for shares, correct?

17  A    I believe so, yes.

18  Q    And so you did not include any additional sums that they

19  paid to OmniView to buy those shares, did you?

20  A    I did not, no.

21  Q    So please go down two more to -- go down to line 342, you

22  didn't include this 49,281 from Michael Morris or 49,281 for

23  Matt Morris?

24  A    Well, I have to say, I wouldn't know why I would include

25  them.  I don't know --

ECKHART - CROSS - JONES                    3327

1    Q    You see the memo from the bank records, CodeSmart, First

2    Independence?

3    A    So -- okay.  I haven't looked at that, so I don't --

4    Q    It wasn't included in your analysis?

5    A    No, it wasn't.  I don't know what that means.

6    Q    Ms. Eckhart, during your analysis of the bank records,

7    you did look at the bank records o Bridge Ventures and

8    OmniView, and Fidelis, correct?

9    A    Correct.

10   Q    And you could see in those bank records that numerous

11   third parties were depositing money into those bank accounts,

12   correct?

13   A    At various times, yes.

14   Q    And you could see that there were lots of transfers back

15   and forth between the Fidelis and OmniView and Fidelis and

16   Bridge Ventures and personal accounts of Mr. and Mrs. Discala

17   and those entities, correct?

18   A    There were transfers, yes.

19   Q    Did you make any effort in your analysis to determine how

20   much money Mr. and Mrs. Discala took out of those entities?

21   A    No.

22   Q    Ms. Eckhart, in your analysis calculated how much the net

23   cash flow of the public trading in CodeSmart, StarStream, the

24   Staffing Group, and Cubed for Mr. Discala, correct?

25   A    For Mr. Discala, and OmniView, and Fidelity, and Bridge.

ECKHART – CROSS – JONES                    3328

1   Q     The entities.

2         Did you make any effort to calculate what investor

3   losses were in the market in those stocks?

4   A     No, I didn't.

5   Q     And we saw in the exhibit regarding the private

6   transactions of Cubed stock that approximately $1.4 million

7   was the deposited into the OmniView account from those private

8   transactions, correct?

9   A     Over a period of time, yes.

10  Q     Did you see any evidence that any of those investors were

11  refunded any of that money?

12  A     That might have been the -- Indus Consulting might have

13  been one that was reflected.

14  Q     The $25,000 you are talking about?

15  A     That might have been.  Without being able to see it,

16  nothing occurs to me.

17        MS. JONES:  Okay.  No further questions at this

18  time.

19        THE COURT:  Thank you, Ms. Jones.

20        Does Ms. Cane have any cross-examination?

21        MR. RIOPELLE:  No, Your Honor, no cross-examination

22  of this witness.

23        THE COURT:  Mr. Cheng, any redirect?

24        MR. CHENG:  Yes.  You want me to start now?

25        THE COURT:  Yes.  Absolutely.

1          MR. CHENG:  Can you pull schedule 1, please.

2    CROSS-EXAMINATION

3    BY MR. CHENG:

4    Q    Ms. Eckhart, Ms. Jones asked you to calculate the

5    difference between the total in section 1 and the total in

6    section 2.  Why would that be improper?

7    A    That would be improper because it is only part of the

8    story.  It's like apples and oranges.  There was -- these are

9    just two individual pieces of the transaction, of a number of

10   transactions that happened.  There were --

11         MS. JONES:  Objection.

12         THE COURT:  There's no pending question.  So, again,

13   you have to wait for a question, Ms. Eckhart.

14         THE WITNESS:  I was explaining why that would be

15   improper.

16         THE COURT:  You weren't asked to explain that.  You

17   were asked a question; you answered it.

18         THE WITNESS:  Okay.

19         MR. CHENG:  If we can pull 190-4, please.  Thank

20   you.

21         MS. JONES:  Your Honor, I don't believe this is in

22   evidence.

23         MR. CHENG:  I think this is the wrong one.  190-3.

24   Yes.

25   BY MR. CHENG:

Case 1:14-cr-00399-ENV   Document 666   Filed 10/20/18   Page 83 of 220 PageID #: 6164

1   Q     Ms. Eckhart, can you tell me how much these private

2   transactions were?

3   A     The price?

4   Q     Yes.

5   A     Was one dollar per share.

6   Q     And then?

7   A     About -- there were some for 75 cents.

8   Q     And around what date were these transactions made?

9   A     I see one in January of 2014, I see them as late as May

10  2014.  The view that I see.

11          MR. CHENG:  Can you pull 196-11, please.

12  BY MR. CHENG:

13  Q     And row 1, Ms. Eckhart, what's the date on that and the

14  closing price?

15  A     March 28, 2014, and the closing price is five dollars.

16  Q     Now, did you -- how many pages was your full analysis

17  that was done?

18          MS. JONES:  Objection.  Not relevant.

19          THE COURT:  Sustained.

20  BY MR. CHENG:

21  Q     Out of the charts the government provided, were there

22  more -- was there more support for that?

23  A     There's a fairly thick binder and support binder that's

24  part of my analysis, yes.

25  Q     And the government shared just a couple pages?

1           MS. JONES:  Objection.

2           THE COURT:  Sustained.

3    BY MR. CHENG:

4    Q    Did you finish your analysis for the private

5    transactions?

6    A    No.

7    Q    And that was just a draft, right?

8    A    That's correct.

9    Q    Now, were you given the exhibits that were admitted into

10   evidence so far in this case?

11   A    Yes, I believe so.

12   Q    And was that sufficient to perform your analysis on this?

13   A    I think -- well, I was given the list of exhibits that

14   the government had listed, I guess.  I don't know if they were

15   admitted.  But even within their brokerage statement exhibits,

16   it was a limited scope, they didn't go through the entire

17   period in question, and not all the accounts were available in

18   the government's exhibits.

19           MR. CHENG:  Can we go to 197-38.  And the tab for --

20   yes.  Thank you.  Whichever row that one was.  The orange row.

21   I don't remember what row it was.  Yes.

22   BY MR. CHENG:

23   Q    Now, Ms. Eckhart, do you see Hudson Park, Capital,

24   Draper, and JFS?

25   A    Yes.

1    Q     Did you do analysis on their CodeSmart trading?

2    A     I did.

3              MS. JONES:  Objection.  Not relevant.

4              THE COURT:  She did.  Overruled.

5    BY MR. CHENG:

6    Q    Do you remember how many shares those three companies

7    received, approximately?

8    A    I just remember it was a smaller percentage than

9    Mr. Discala and his entities.

10   Q    Do you remember how much profit they made?

11             MS. JONES:  Objection.  Not relevant.

12             MR. CHENG:  Your Honor, they purchased these shares.

13             THE COURT:  Might we go to sidebar and you tell me

14   why it is relevant.

15             (Sidebar conference.)

16             (Continued on the next page.)

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    3333

1          (WHEREUPON, the following proceedings were had at

2     sidebar, out of the hearing of the open courtroom, to wit:)

3          THE COURT:  Address the objection of why it is not

4     relevant, and then we will have you respond.

5          MS. JONES:  Your Honor, I think this is -- as we

6     discussed yesterday, this is an effort to compare the profits

7     earned by Mr. Discala and the ITEN shares versus the profits

8     earned by someone named Salvani and three entities and ITEN

9     shares.  And the testimony was just when she was doing her

10    calculation of net cash in and net cash out, for these shares,

11    she did not include the amounts that were paid by some of

12    these individuals to OmniView to purchase those shares.  That

13    doesn't have anything to do with what their profit was when

14    they later sold their shares, which is not relevant.

15         MR. CHENG:  My only question is, what they were

16    received for, that money.

17         THE COURT:  And --

18         MR. CHENG:  My only -- one question, and it is

19    regarding what they received in value of that.

20         MS. JONES:  How many shares they received or what

21    profit they made.

22         MR. CHENG:  That's the value of the shares.

23         THE COURT:  At the time that they were received.

24         MS. JONES:  May 3.

25         THE COURT:  The same as the -- it is at the time

SIDEBAR CONFERENCE                    3334

1    they were received.

2              MR. CHENG:  That's --

3              THE COURT:  You can do it.

4              MR. CHENG:  Accounting principles, especially

5    with -- as testified to, that's not the cost basis for what

6    the shares are.  It is when they are sold, and that's how you

7    determine value.

8              MS. JONES:  She just testified that she thought

9    first in and first out was inappropriate.

10             THE COURT:  That's what she said.

11             (Sidebar conference ends.)

12             (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (Open court.)

2     BY MR. CHENG:

3     Q    Ms. Eckhart, what was the value of the shares that

4     Draper, JFS, Hudson Park, received?

5               MS. JONES:  Objection.  Time scope.

6               THE COURT:  At the time they were received.

7     BY MR. CHENG:

8     Q    At the time they were received, if you know?

9               THE COURT:  How much they paid for them.

10              THE WITNESS:  I don't think I have that in the

11    schedule given to me.

12    BY MR. CHENG:

13    Q    That's fine.  Withdrawn.

14              Now, Ms. Eckhart, you did a full analysis on

15    Mr. Discala's brokerage accounts, across all his trading,

16    correct, based on the statements that you had?

17    A    Yes.

18    Q    And he did lose $500,000 over all --

19              MS. JONES:  Objection.  Relevance.

20              THE COURT:  Sustained.

21              MR. CHENG:  No further questions.

22              MS. JONES:  Nothing further from the government,

23    Your Honor.

24              THE COURT:  Ms. Eckhart, thank you very much.  You

25    are excused.

ECKHART – CROSS – CHENG                    3336

1          (WHEREUPON, the witness was excused.)

2          THE COURT:  Let's take a scheduling sidebar.

3          (Sidebar conference.)

4          (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                3337

1          (WHEREUPON, the following proceedings were had at

2   sidebar, out of the hearing of the open courtroom, to wit:)

3          THE COURT:  Tell me what you have, Mr. Bowman.

4          MR. BOWMAN:  He's going to testify.

5          THE COURT:  Okay.  How long is direct going to take?

6          MR. BOWMAN:  It will take a few hours.

7          THE COURT:  Hours, okay.

8          MR. BOWMAN:  Yeah.

9          MS. JONES:  Maybe we should start.

10          THE COURT:  I think we can do -- I was going to say,

11   certainly we can go to 1:30.  I don't have a problem with

12   that.

13          MR. BOWMAN:  That's fine.

14          THE COURT:  Okay.

15          (Sidebar conference ends.)

16          (Continued on the next page.)

17

18

19

20

21

22

23

24

25

DISCALA – DIRECT – BOWMAN                    3338

1           (Open court.)

2           MR. BOWMAN:  Your Honor, we call Mr. Discala.

3           THE COURTROOM DEPUTY:  Raise your right hand.

4           (Witness takes the witness stand.)

5    **ABRAXAS J. DISCALA**, called as a witness herein by the

6    Defendant, having been first duly sworn, was examined and

7    testified as follows:

8           THE COURTROOM DEPUTY:  State your first and last

9    name, and spell it for the record.

10          THE WITNESS:  Abraxas J. Discala.  A-b-r-a-x-a-s,

11   D-i-s-c-a-l-a.

12          THE COURTROOM DEPUTY:  Thank you.

13          THE COURT:  Mr. Bowman, you may inquire.

14          MR. BOWMAN:  Thank you, Your Honor.

15   DIRECT EXAMINATION

16   BY MR. BOWMAN:

17   Q    Good afternoon, Mr. Discala.

18   A    Good afternoon.

19   Q    How old are you, sir?

20   A    47.

21   Q    Could you tell us where you live?

22   A    In Norwalk, Connecticut.

23   Q    And for how many years have you lived in the Norwalk

24   area?

25   A    Practically my whole life.

DISCALA – DIRECT – BOWMAN                    3339

1   Q    I take it there were times when you didn't live in the

2   Norwalk area, but I am asking generally if you have lived in

3   that area your entire life?

4   A    Yes.

5   Q    Please speak right into the microphone.

6   A    Okay.

7   Q    Okay.  Can you tell us how much education you've had?

8   A    I had three years of college, no degree.

9   Q    And are you married?

10  A    I am.

11  Q    And do you have children?

12  A    I do.

13  Q    How old are they?

14  A    Sorry.  My youngest is one today, and I have a four year

15  old.

16  Q    When did you start OmniView?

17  A    2012.

18  Q    Did you start it with anybody else?

19  A    I did not.

20  Q    And what was OmniView formed for?

21  A    Financial advisory.

22  Q    And is there any particular kind of financial advisory

23  that OmniView was formed to do?

24  A    Deal structuring, funding young companies, early stage

25  companies, that needed value add, whether it be management

DISCALA – DIRECT – BOWMAN                  3340

1   gaps, board members, M&A, joint ventures.

2   Q     What's M&A?

3   A     Mergers and acquisitions.  So we put two companies

4   together that would benefit each other.

5   Q     Okay.  Have you ever heard of a company called CodeSmart?

6   A     Yes.

7   Q     And can you tell us how you first learned about

8   CodeSmart?

9   A     I received an e-mail on April 8 from a gentleman by the

10  name of Jeff Auerbach, and he said that there were two

11  gentlemen that had just dropped the ball, and there was a

12  pre-packaged transaction that had -- that was in the ICD-9,

13  ICD-10 space, and that I should look at it.  They wanted to do

14  a reverse merger.

15  Q     And that person's name was?

16  A     Jeff Auerbach.

17  Q     How long had you known Mr. Auerbach?

18  A     A couple of years.

19  Q     And did he do work similar to what OmniView was doing?

20  A     He was an investment banker, broker.  He had his Series 7

21  and all the licenses.  I never did.

22  Q     Now, you recall receiving notification from him, and what

23  kind of notification did you receive from him?

24  A     The initial e-mail had a presentation, it had a completed

25  audit, and due diligence work.

DISCALA - DIRECT - BOWMAN                          3341

1   Q    And is this the normal way in which you had up to that

2   time received information regarding people interested in

3   starting an alternative public offering?

4              MR. BINI:  Objection to the question.

5              THE COURT:  The form is bad, Mr. Bowman.

6              MR. BOWMAN:  I will rephrase.

7              Can I have the ELMO just for the witness, please.

8   BY MR. BOWMAN:

9   Q    I am going to show you what's been marked as Defendant's

10  PA for identification.  Do you recognize that?

11  A    I do.

12  Q    And what is it?

13  A    It is an e-mail from Jeff Auerbach on April 8.

14  Q    Of what year?

15             MR. BINI:   No objection to its admission.

16             MR. BOWMAN:  I will offer it as a full exhibit.

17             THE COURT:  Received in evidence without objection.

18             (Defense Exhibit PA, was received in evidence.)

19  BY MR. BOWMAN:

20  Q    So this was the first notification you received from

21  Mr. Auerbach, regarding --

22             MR. BINI:  Objection to the form of the question.

23             THE COURT:  Try not to lead, Mr. Bowman.

24             MR. BOWMAN:  I will do my best.

25             THE COURT:  You are on direct now.

DISCALA – DIRECT – BOWMAN                    3342

1          MR. BOWMAN:  I am aware, Judge.  Thank you,

2     Your Honor.

3     BY MR. BOWMAN:

4     Q    Was this the first notification that you described from

5     Mr. Auerbach?

6     A    First notification –– first time I ever heard of

7     CodeSmart.

8     Q    So what did you do in response to this?

9     A    Forwarded the e-mail to my attorney, Darren Ofsink, and I

10    said, let's take a look at this and meet with the company.

11    Q    And was there a subsequent meeting?

12    A    There was a meeting that afternoon.

13    Q    And where was the meeting?

14    A    At Darren Ofsink's office, 900 Third Avenue.

15    Q    And who else attended?

16    A    Best of my recollection, it was Jeff Auerbach, Michel

17    Graichen, Ira Shapiro, Joe Salvani, and that was it –– and

18    Darren Ofsink.

19    Q    Now, who was Joe Salvani?

20    A    Joe Salvani was the advisor and the gentleman that had

21    put the transaction together.

22    Q    Was that prior to your involvement?

23    A    Yes.

24    Q    Now, how long did the meeting take?

25    A    The meeting on the 8th was an hour, hour and a half.

DISCALA - DIRECT - BOWMAN                    3343

1   Q    And were there any decisions made as a result of that

2   meeting?

3   A    No decisions made, but we wanted to move forward, so I

4   think we met again the next day, after asking to exchange all

5   due diligence materials.  They had already had -- when I say

6   pre-packaged, the transaction was at the 12th hour.  There was

7   a request for a $500,000 bridge loan in a public vehicle or

8   shell.  And everything else was complete.  Normally, a

9   transaction, when we look at a company, takes anywhere from

10  four to six months prior to getting it public.

11  Q    So why was it that this suddenly took a matter of weeks?

12  A    It was, as I stated, pre-packaged.  Everything was done.

13  Q    What is due diligence?

14  A    Due diligence is hiring people to go in, cross Ts, dot

15  Is, make sure that everything is what it is supposed to be.

16  Q    So as I understand it, the only thing they needed was a

17  bridge in a public vehicle; is that right?

18  A    That is correct.

19  Q    Okay.  So what happened next?

20  A    We met the next day, Eli Wahrsager, Dan Walsh, Salvani,

21  to the best of my recollection, Joe, the attorney that was on

22  the transaction that had done all the paperwork and drafted

23  documents.  And, again, they're four to five months into the

24  process, and they lost their shell in a public vehicle and

25  they lost their $500,000 bridge loan, and we were stepping

DISCALA – DIRECT – BOWMAN                    3344

1    into those shoes.

2    Q    Now, was Marc Wexler in attendance at any of these

3    meetings that you described?

4    A    I don't believe on the 9th, I think -- if you can -- I am

5    sure there's an e-mail that says when he -- maybe the --

6    within the next couple of days he was brought in to -- he was

7    just coming off of a really bad experience with a company

8    called Jala.

9    Q    And can you tell us whether you ever even knew about

10   CodeSmart during the year 2012?

11   A    I first learned, as you can tell by this e-mail, about

12   CodeSmart on April 8, 2013.

13   Q    So when Mr. Wexler testified that he learned about

14   CodeSmart in 2012, he was mistaken?

15   A    Mr. Wexler testified to a lot of things.

16   Q    Okay.  All right.  So did you proceed with the bridge

17   loan?  And who was responsible for obtaining the public

18   vehicle?

19   A    Darren Ofsink.  That's how these transactions work.  You

20   find a company, you do your due diligence, you see what value

21   added you can bring to them, check in the public markets to

22   see if the sector trades well, and you do everything you can

23   prior to going public to make sure that these companies can

24   execute on their business plan.  And this particular

25   transaction, the due diligence was quick because they had a $4

1    million commitment from an investment bank.

2    Q    What was the bank's name?

3    A    Aegis, I believe.

4    Q    Okay.

5    A    Aegis or Axiom, I'm not sure.  There was a $20 million

6    student loan financing that was put together by Joe Salvani

7    and Sam Shannon, and there was a broker network that had

8    reportedly been put together by Dan Walsh and Joe Salvani.

9    Dan Walsh was a market maker, broker.

10   Q    With a particular brokerage firm?

11   A    Garden State Securities.  And Joe Salvani was his

12   partner, and Joe Salvani's business was stock promotion.  And

13   he put this deal together, and it looked great.  I mean, it

14   was --

15   Q    What did you understand CodeSmart was in the business

16   for?

17   A    It was an online education plan.

18   Q    What made it -- what did it focus on in terms of what it

19   was offering to the public?

20   A    It was -- it was taking -- it was an online education to

21   teach coders to transition from ICD-9 to ICD-10.  ICD-9 had

22   13,000 codes.  I think ICD-10 was going to 70,000 codes.  From

23   a common sense perspective, I knew that hospitals wanted to

24   get paid.  And the only way they get paid is if their codes

25   are done properly on their insurance forms.  And I had looked

DISCALA - DIRECT - BOWMAN                    3346

1    at the space prior, and you had a college and FIU that had

2    done all the content and education.  You had a bank that

3    committed $4 million to the PIPE.  You had a student loan

4    facility for people that couldn't afford the $4,000.  And you

5    had a broker network together by Joe and Dan, and it just

6    seemed like this had fallen into our lap and they needed two

7    things that we could facilitate.  I could facilitate the half

8    a million dollars and Darren Ofsink could facilitate the

9    public vehicle.

10   Q    And did that happen?

11   A    It did.

12   Q    Okay.  What was the name of the public company?

13   A    First Independence Corp.

14   Q    And can you tell us whether eventually there was what we

15   call an alternative public offering?

16   A    There was.

17   Q    What is that?

18   A    The easiest way to explain it is draw a triangle, and if

19   the triangle is a shell, you have a company over here, money

20   over here, and simultaneously the company is audited, BCAO

21   would be audited, the same as any public offering, IPO, or

22   APO.  The company goes in and the money goes in, and this

23   company, board members and shareholders, become that public

24   company.  And then it becomes public, and there is shares that

25   can be traded on the market.

DISCALA - DIRECT - BOWMAN                3347

1    Q     And did that happen?

2    A     It did.  25 days after the meeting.  Fastest deal we have

3    ever done.

4    Q     All right.  So in less than a month, CodeSmart went

5    public; is that fair to say?

6    A     That is correct.

7    Q     Now, what happened to the shares -- withdrawn.

8          What are the two kinds of shares that were available

9    to investors?

10   A     There's freely tradeable stock that is in a deal because

11   these companies do not have a ton of money, they need money to

12   execute on their business plan.  So people take stock in lieu

13   of services.  So be marketing people, deal people,

14   salespeople, banking people, would receive stock in lieu of

15   cash because you want the companies to have the capital to

16   execute on a business plan.

17   Q     What's the difference between free trade stock and

18   restricted stock?

19   A     Freely tradeable stock is able to be sold as soon as the

20   transaction is complete, and restricted stock has a waiting

21   period of six months or a year.

22   Q     Now, have you ever heard the term that we have heard in

23   the courtroom during this case, lock-up/leak-out agreement?

24   A     I have.

25   Q     What is it?

DISCALA - DIRECT - BOWMAN                    3348

1    A    It is a document that is used by people to stop people

2    from dumping their stock.  And I made sure that everybody that

3    we didn't -- everybody in this transaction that I didn't

4    trust, had a lock-up/leak-out agreement, and it was filed in

5    the 8K.  So this transaction had everybody before they picked

6    up their shares at Darren Ofsink's office, they had to pick up

7    their certificate, they had to write a check for their shares,

8    and they had to get a third party legal opinion in order to

9    deposit their shares in the brokerage statements.

10        My orders to Stephanie Lin, who handled this at

11   Ofsink's office, was no one would get their certs unless they

12   signed the lock-up/leak-out agreement.

13   Q    What's a cert?

14   A    It is a certificate, it's a -- in a reverse merger APO,

15   when you partner with these companies, there is freely

16   tradeable stock and there's restricted stock.  And the reason

17   you go public, right, is to form supply.  Because if you don't

18   have freely tradeable stock and you create demand, then

19   there's going to be no accretion in your currency.  And that's

20   the real reason you go public.  You want to go public, get the

21   capital that you need, go out, execute on your business plan,

22   what I call hit milestones or inflection points, and as your

23   currency is getting stronger, as you are executing, you can

24   then access the capital markets for any growth capital that

25   you need.  That's the purpose of going public.

1    Q    You mentioned that the lock-up/leak-out agreement was to

2    prevent something.  What was it to prevent?

3    A    Dumping.

4    Q    What's dumping?

5    A    In the microcap space there's a lot of people that do

6    these type of transactions, to do a pump and dump.  And a pump

7    and dump is pretty normal in these transactions.  Mr. Wexler,

8    prior to getting involved with OmniView, was involved in a

9    very bad pump and dump in Jala --

10              MR. BINI:  Objection, Your Honor, to this.  This is

11   not responsive to the question.

12              MR. BOWMAN:  We will get back to it, Your Honor.

13   BY MR. BOWMAN:

14   Q    All right.  So what is the concern about a pump and dump?

15   What is the concern?

16   A    The concern is that people that don't care about the

17   company will sell their stock just to get money.  And a

18   lock-up/leak-out agreement is supposed to protect from that

19   happening.  So if a lock-up/leak-out agreement says that you

20   can sell 5 percent of the previous week's volume, then that

21   would stop anybody from hurting the market, depressing the

22   market from -- it allows the supply to come into the

23   marketplace without hurting the company.

24   Q    So what would happen if somebody sold all -- if there was

25   a precipitous sale of a large quantity of stock?  What would

DISCALA – DIRECT – BOWMAN                    3350

1   happen to the price?

2   A    Stock would go down, and not because of the company, but

3   because someone was being impatient or greedy.

4   Q    So it wouldn't have to do with Main Street, it wouldn't

5   have to do with Wall Street; is that correct?  In other words,

6   it wouldn't have anything to do with the value or the future

7   of the actual company?

8              MR. BINI:  Objection to leading, Your Honor.

9              THE COURT:  It is leading.

10  BY MR. BOWMAN:

11  Q    Would it have anything to do with the value, the actual

12  value of what the company was trying to do?

13  A    No.

14  Q    Who drafted the lock-up/leak-out agreement?

15  A    Darren Ofsink.

16  Q    Did you rely upon Mr. Ofsink at that time to do things

17  correctly?

18  A    Absolutely.

19  Q    Did you provide him with all the information that you had

20  at your disposal at the time that you did the bridge and the

21  APO with Mr. Ofsink?  Did you provide him with all the

22  information that you had at your disposal?

23  A    He was involved in everything from start.  I relied --

24  the way that I did my transactions is I would take a company

25  that I liked, I would have my due diligence team look at it,

1    we would decide together if we wanted to do the transaction,

2    and I would introduce them to an attorney at this -- this was

3    Mr. Ofsink.  He then would do all the due diligence, legal due

4    diligence, filings, disclosures, everything, cap tables, would

5    all be done at his office, and then he would become SEC

6    counsel for the company.  And my logic behind that was if he's

7    crossing Ts and dotting Is for me, and doing all the legal

8    work --

9              MR. BINI:  Objection.  This is not responsive to the

10   question.

11             MR. BOWMAN:  It was responsive, Your Honor.

12             THE COURT:  The question is what did he -- what did

13   he -- as I recall the question, is whether he gave Mr. Ofsink

14   all of the information that he had.

15             THE WITNESS:  I am explaining --

16   BY MR. BOWMAN:

17   Q    Did you?

18             THE COURT:  You weren't asked.

19             THE WITNESS:  Sorry.

20   BY MR. BOWMAN:

21   Q    You can answer it yes or no.

22   A    Sorry.

23   Q    Did you give Mr. Ofsink all of the information that you

24   had at your disposal?

25   A    Yes.

DISCALA – DIRECT – BOWMAN                    3352

1   Q    And how was he compensated?

2   A    With cash and stock.

3   Q    And how much stock do you recall Mr. Ofsink received as

4   counsel for OmniView in this transaction?

5   A    A hundred -- best of my recollection, you can pull up the

6   cap table, is 125,000.

7   Q    And these are free trading shares?

8   A    Those were freely trading stock.  But he signed a

9   lock-up/leak-out agreement.

10  Q    Right.  So he, like other people -- like certain other

11  people, also was required to sign a lock-up/leak-out

12  agreement?

13  A    That is correct.

14  Q    But is it -- in accordance with that agreement, would it

15  be possible for him to sell some of his freely tradeable

16  stock?

17  A    You would assume everybody -- that's how we got paid.  No

18  one took cash fees.  So everybody was able to sell.  The

19  lock-up/leak-out agreement was to prevent them from selling

20  and hurting the company, not from making money.

21          MR. BOWMAN:  Your Honor, I note that it is 1:30.

22          THE COURT:  Thank you very much, Mr. Bowman.  Yes.

23          We try to schedule things, ladies and gentlemen of

24  the jury, and Mr. Bowman is correctly advised that we are at

25  that 1:30 point where we are going to break for lunch.

DISCALA – DIRECT – BOWMAN                  3353

1     The usual rules apply.  Do not discuss the case

2  amongst yourselves or with anyone else.  Continue to keep an

3  open mind.  Do not use the lunch period as an opportunity to

4  do any legal -- any other kind of research, electronic or

5  otherwise that touches upon or relates to the case.  And if

6  you are on a social media platform, you remain on radio

7  silence.

8          So we will take a break, ask you to come back to the

9  central jury room around 2:30, and we will start as close to

10  that time as we can.  Enjoy it, what seems to be a nice day.

11          (WHEREUPON, at 1:31 p.m., the jury exited the

12  courtroom.)

13          THE COURT:  Okay.  Mr. Discala you can step down.

14          So we will see you at 2:30, thereabouts.  Usual

15  rules.

16          (WHEREUPON, a recess was had from 1:30 p.m. to 2:30

17  p.m.)

18

19

20

21

22

23

24

25

PROCEEDINGS                                    3354

1              A F T E R N O O N   S E S S I O N

2              (Time noted:  2:50 p.m.)

3              (In open court; Jury not present.)

4              THE COURTROOM DEPUTY:  All rise.  Court is back in

5    session.

6              Counsel for both sides are present, including

7    defendants.

8              THE COURT:  Ready to go?

9              MR. BOWMAN:  Yes.

10             (Jury enters the courtroom.)

11             THE COURT:  Be seated, please.

12             Counsel, stipulate that the jury is present and

13   properly seated.

14             MS. JONES:  Yes, Your Honor.

15             MR. ROSS:  Agreed, Judge.

16             THE COURT:  All agreed.  Thank you, counsel.

17             Ladies and gentlemen, welcome back.  Hope you had a

18   chance to enjoy a semi-spring day, you had a nice lunch,

19   you're ready to resume.

20             You recall when we broke Mr. Discala was on the

21   stand and Mr. Bowman had started his direct examination.  And

22   he will now continue, Mr. Bowman.

23             MR. BOWMAN:  Thank you, sir.

24             May I have just the witness, please.

25

DISCALA – DIRECT – BOWMAN                    3355

1    DIRECT EXAMINATION (Continued)

2    BY MR. BOWMAN:

3    Q    I'm going to show you what's been marked as PC for

4    identification.

5              Are you able to see that?

6              MR. BINI:  No objection to its admission.

7              MR. BOWMAN:  Sure.  May I publish it, Your Honor?

8              THE COURT:  Yes.  Just PC; was it?

9              MR. BOWMAN:  PC, yes.  It's an email dated April 9,

10   2013.

11             THE COURT:  What is that first letter again?

12             MR. BOWMAN:  P, as in Peter.

13             THE COURT:  P, as in Peter.

14             MR. BOWMAN:  Right.

15             THE COURT:  Yes, you may.  It's been received,

16   without objection, you may publish it.

17             THE PROSPECTIVE JUROR:  Thank you, Your Honor.

18             (Exhibit published.)

19   Q    Mr. Discala, do you recall receiving this email from

20   Gracie Lin Zhou?

21   A    Yes.

22   Q    And who is Ms. Zhou.

23   A    I think she was a lawyer at Darren Ofsink's office.

24   Q    And who was Joe Lucosky?

25   A    Joe Lucosky was the lawyer that Mr. Salvani and Shapiro

1    had hired prior to them losing their public vehicle and bridge

2    loan.

3            And now I can see all the people that were in that

4    meeting after first meeting on --

5    Q    All right, we've gone through some of this already.

6            Who is Michael Graichen?

7    A    Jeff Auerbach's partner.  Jeff Auerbach was the deal

8    finder.

9    Q    And Edward Wahrsager?

10   A    He was part of the Joe Salvani, Dan Walsh, Eli Wahrsager,

11   were the ones that put the transaction together.

12   Q    Okay.  And was there a meeting the next day?

13   A    There was.

14   Q    Okay.  So you met on what date, the 8th or the 9th?

15   A    The morning of the 8th was when I was introduced to the

16   email by Jeff Auerbach.  We met the afternoon of the 8th.

17   Like he said, it was prepackaged, then we met on the 9th,

18   again.

19   Q    All right.  What are "press releases"?

20   A    Press releases are announcements from a company about

21   communication to the investors about an execution of their

22   business.

23   Q    Okay.  And who has access to press releases after they're

24   released?

25   A    Everybody.

DISCALA – DIRECT – BOWMAN                3357

1    Q    "Everybody" meaning whom?

2    A    It's put out on the newswire so that people can see if

3    the company's doing well or if they're doing what they said

4    and executing on their business plan.

5    Q    Okay.  Did you have any part in the creation, drafting,

6    or preview of any press releases from CodeSmart?

7    A    One that I -- when I became the adviser in September,

8    late September, I believe I had to -- per the contract, I had

9    to review it.  So it was sent to me and I forwarded it to

10   Darren Ofsink.  It's not my thing.

11   Q    Prior to that, did you have anything to do with any other

12   press releases prior to September of 2013?

13   A    Never a press release that I had.  I think, when I loaned

14   Mr. Shapiro money at Darren's office, I saw that press

15   release.  But other than that, no.

16   Q    Did you have any input into the Ramapo press release?

17   A    No.

18   Q    Did you have any input into the Binghamton press release?

19   A    No.

20   Q    So when did CodeSmart start trading?

21   A    May 13th, I think, it went public.

22        MR. BOWMAN:  May I have 196-3, please.  Government

23   exhibit.

24        (Exhibit published.)

25   Q    So when did CodeSmart start trading?

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

1   A     May 13th.

2   Q     And what's the first spike?  What is that?

3   A     That's the --

4   Q     Approximately the beginning of June.

5   A     -- the first spike is the -- May?

6   Q     Yes, the first peak.  Do you know what caused that first

7   peak?

8   A     Demand.

9   Q     Okay.  So CodeSmart was a new commodity on the market.

10  A     Right.

11          MR. BINI:  Objection.

12          THE COURT:  Overruled.

13  Q     And that was just a function of what you were observing

14  at the time?

15  A     It's a function of what I believed at the time of

16  Mr. Salvani and Mr. Walsh's broker network that they had

17  brought with the transaction.

18  Q     Now, after that first peak, the stock goes down.

19  A     That's a split.

20  Q     Okay.  So once again what's a "split"?

21  A     It's when you get two shares for every one, in this

22  particular instance.

23  Q     Now were you selling your shares at this time?

24  A     I sold the majority of my shares I think I was -- I think

25  I had sold 1.8 million shares on the way up, and I had -- then

1    the split happened, and I had made two point -- a little under

2    $2.6 million through July 12th.  And then started to coming --

3    there were some pressures on the market, and my belief was

4    that Mr. Salvani and Mr. Walsh were playing games.

5    Q    Okay.  When you sold, was the market falling or was the

6    market rising?

7    A    I put orders in above market.  I'm not going to hurt the

8    company that I have my family and friends in.

9         So that's what a -- it's what a lock-up/leak-out is

10   supposed to do.  So if you want to sell -- we're in the

11   business of creating supply.  We release it, that's how we

12   make our living.

13        What I did was make sure that my orders were that I

14   would sell into the demand that the awareness brokers were out

15   there creating awareness for the company.

16   Q    And did your selling cause the market for CodeSmart

17   shares to fall?

18   A    No.

19   Q    There's a peak at July 12th, 2013 at $6.94.

20        Do you see that?

21   A    I do.

22   Q    And what were you doing at this time with respect to your

23   own shares?

24   A    As I said, trading, I had been done selling.  I had made

25   $2.6 million.

DISCALA — DIRECT — BOWMAN                3360

1   Q    So you were no longer selling?

2   A    No.

3   Q    Now, as the stock decreased in value, after July 12th of

4   2013, what were you doing, if anything, with respect to your

5   shares?

6   A    I was still trading the company, so there was buying and

7   selling.  But obviously math will say from that point on, I

8   lost $800,000 making investments into the company, buying the

9   stock.

10  Q    So you were buying at that time; is that correct?

11  A    That is correct.  I was buying because I believe the

12  company and I believed Joe was selling.

13  Q    All right.  So were you buying or selling when the stock

14  was rising?

15  A    I was selling when the stock was rising.

16  Q    And when the stock was falling, were you buying or

17  selling?

18  A    I was buying.

19  Q    Now, as the months went on in CodeSmart shares into the

20  summer, what were you doing?  Were you buying or selling?

21  A    I was trading.

22  Q    And when you say you were "trading," what do you mean?

23  A    Buying and selling.

24  Q    Okay.  Now, did there come a time when you suffered

25  losses in another company's shares?

SIDEBAR CONFERENCE                    3361

1    A     Yes.

2    Q     All right, and what company was that?

3              MR. BINI:  Objection to the relevance.

4              MR. BOWMAN:  It's relevant, Your Honor, because

5    there is a --

6              THE COURT:  Do you want to come and discuss it, come

7    over here?

8              (Continued on the next page.)

9              (Sidebar conference.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    3362

1              (The following occurred at sidebar.)

2              MR. BINI:  Your Honor, this case is not Soul and

3       Vibe.

4              THE COURT:  The discussion's going to be about the

5       target stock?

6              MR. BOWMAN:  Yes, it is.

7              THE COURT:  Soul and Vibe.

8              MR. BOWMAN:  The second dump was a forced sale that

9       Cor Clearing did when he lost money and sold --

10             THE COURT:  What company?

11             MR. BOWMAN:  CodeSmart.

12             THE COURT:  You want to ask him about CodeSmart.

13             MR. BOWMAN:  Yes, but he's going to testify that it

14      was a forced sale.

15             This was the transaction, Your Honor, you may recall

16      where he had to the borrow 300,000 shares from Chris

17      Herghelegiu because Halcyon was notified that Cor Clearing

18      that they weren't going to honor any more buys.  So he had to

19      come up with additional shares, and they forced sold his

20      CodeSmart stock.

21             MR. BINI:  I see no reason to the bring out the Soul

22      agent and sale.  He needed to raise money.

23             THE COURT:  If you go down any roads, retail roads,

24      we have four targets now.

25             MR. BOWMAN:  All right.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

DISCALA – DIRECT – BOWMAN                    3363

1              (In open court; Jury present.)

2    BY MR. BOWMAN:

3    Q    With respect to CodeSmart stock, on or about August 23 of

4    2013, what happened to your shares of CodeSmart stock?

5    A    I had significant losses in my account; some were mine

6    and some were placed there by a broker-dealer and they had

7    threatened, the clearing firm had threatened to force sell not

8    only mine, but the people that I knew, the CodeSmart stock, if

9    I didn't come up with $1.8 million.

10   Q    So did you?  What did you do?

11   A    I had losses of $2.1 million spread in accounts.  I was

12   away on vacation visiting my in-laws.  I came back, this

13   particular company had perpetrated a pump and dump on me.

14              MR. BINI:  Objection as to the other company.

15              THE COURT:  You're not here to give any of the

16   reasons, Mr. Bowman.

17   Q    Okay, just tell us what you did as a result of your

18   losses with respect to CodeSmart?

19   A    I had a choice.  Let them force sell all of the CodeSmart

20   shares, or come up with the money so that the CodeSmart shares

21   were not dumped on the market by Cor Clearing.

22   Q    So what happened?

23   A    I went to the brokerage firm, went to my lawyers and we

24   all had a meeting at the broker-dealer and we figured out a

25   way to insure that these losses didn't affect CodeSmart as bad

DISCALA - DIRECT - BOWMAN                    3364

1    as they were already affected.

2    Q     So what happened?

3    A     I had to borrow 300,000 shares from --

4    Q     Of what?

5    A     Of CodeSmart.

6          -- from Christopher Herghelegiu who was the lead

7    generation gentleman on the CodeSmart team, and those were

8    sold.  And I told the brokerage firm that they can't just

9    crushed this company.  They have clients in it.  Since it's my

10   baby, I'm not going to allow them to just crush it, so I went

11   out and borrowed money, I borrowed stock, and I did what I had

12   to do to take care of my obligations and obligations that were

13   not mine, just so I could protect CodeSmart.

14   Q     How much CodeSmart's stock got sold?

15   A     Hundreds of thousands of shares.

16   Q     And that was in August of 2013?

17   A     On or about, yes.  August 21, I believe.

18   Q     Was it your choice that those shares be sold?

19   A     No.

20          MR. BOWMAN:  Can I have 196-4, please.

21          Showing you Government Exhibit 196-4.  What is it?

22   A     Daily closing prices and share volume of ITEN and

23   CodeSmart, Inc., 5/13/13 to 6/13/14.

24   Q     What was the range of CodeSmart starting with its opening

25   price on May 13?

DISCALA – DIRECT – BOWMAN                    3365

1   A    I don't believe this chart shows the opening price, it

2   shows closing price.

3   Q    Okay.  Do you remember what the opening price was?

4   A    I thought the pipe was done at a dollar fifty, maybe a

5   dollar seventy, around.  A dollar eighty that day.

6   Q    All right, if you go to the bottom of the first page,

7   you'll see on July 12th the closing price was 694.

8        Do you see that?

9   A    I do.

10  Q    And that was the peak that we saw on the earlier exhibit;

11  is that correct?

12  A    That is correct.

13  Q    And from July 15 -- the second page, please -- from

14  July 15 through August 20, what was happening with the stock?

15  A    It was coming down.

16  Q    Had you sold a large quantity of stock during that

17  period?

18  A    No, I was a net buyer from after July 12th.

19  Q    And with respect to the 21st of August, what was the

20  volume on the 21st of August?

21  A    335,000.

22  Q    And on the 22nd?

23  A    382,000.

24  Q    And on the 23rd?

25  A    226,000.

DISCALA - DIRECT - BOWMAN                    3366

1    Q     And the price range was from what to what?

2    A     253 to -- I'm sorry, 219, 225, and $3.

3    Q     Did you voluntarily sell any stock during that period?

4    A     I borrowed stock and sold it so that Cor Clearing

5    wouldn't dump the shares on the market.

6    Q     And those are the only shares that were sold of yours?

7    A     Of mine.

8    Q     Did you feel you had a choice if you wanted to pay the

9    people --

10              MR. BINI:  Objection.

11              THE COURT:  Sustained.

12   Q     And why did you sell the 300,000 shares?

13              MR. BINI:  Objection, Your Honor, asked and

14   answered.

15              THE COURT:  Asked and answered.

16   Q     So after August, what were you doing with respect to

17   CodeSmart?

18   A     I was --

19              THE COURT:  The entire month, Mr. Bowman, or?

20              MR. BOWMAN:  Let's take the first -- until probably

21   September 20th.

22              THE COURT:  From August 21st to September 20th?

23              MR. BOWMAN:  Yes.

24   Q     What were you doing with CodeSmart?

25   A     I was talking with Max Khan and Bob Jacobs about what

1    they thought was going on with the company.

2          They ran OmniView's due diligence team, and Max had

3    done a lot of work with CodeSmart.  And I didn't like the fact

4    that Mr. Shapiro was hanging out with Dan Walsh and Joe

5    Salvani.  I heard that from the street.  And I wanted to

6    figure out a way to make sure that what was going on in the

7    company was right.

8    Q    All right.  So what, if anything, did you do about that?

9    A    People came to me for money.  I know Ira needed more

10   dollars to execute on all this business that was purportedly

11   coming in, and Max, Bob, and myself went to Darren Ofsink and

12   we noticed that -- Max had noticed press releases were coming

13   out and numbers weren't.

14         So they were executing on the business their plan

15   and communicating to the street, but the numbers weren't

16   hitting the bottom line.  So Max asked me to go to Darren

17   Ofsink and say we need to get a CFO in this company right away

18   and figure out what's going on.

19   Q    Did that happen?

20   A    I became the adviser to OmniView on September 25th.  I'm

21   sorry, to CodeSmart.  OmniView became the adviser to

22   CodeSmart.

23         And in the public markets, you can't go into a

24   company if you're trading stock.  You can't go in and say

25   what's going on?  I want to see numbers.  I want to see this.

DISCALA - DIRECT - BOWMAN                3368

1    It's called going "over the wall."

2              MR. BINI:  Objection.  This is not a question.

3    Q    Sorry, Your Honor, my question is:

4              What did you do?

5    A    OmniView became the adviser, and Max, Bob and I, on

6    September 25th, became the adviser on October 6th, I believe,

7    or I had a conversation with one of Darren Ofsink's dear

8    friends named Diego Roca.  Diego Roca was a public company CFO

9    and...

10   Q    What was the plan for him?

11   A    The plan for him was to go into CodeSmart and figure out

12   why there's this huge discrepancy from all of these contracts

13   to the numbers that were coming in to the bottom line.

14   Q    What was the discrepancy?  What did you understand the

15   problem was?

16   A    If you look at the deal that was presented to us in -- on

17   the 8th, the colleges and all the contracts that they were

18   getting with the hospitals and colleges, it didn't make sense

19   that they were getting all of these contracts and they weren't

20   making money.

21             It wasn't driving enough revenue so it didn't make

22   sense to us.  So we wanted to put a CFO in place.  Contacted

23   Darren, we needed a CFO.  He introduced to us a gentleman by

24   the name of Diego Roca.

25             The company needed money, so we were going to

DISCALA - DIRECT - BOWMAN                3369

1   utilize -- contractually we have two board seats that we can

2   put on the company.  We were going to utilize those two boards

3   seats to put two people on the board, and that was going to be

4   Max Khan and Bob Jacobs.

5           We were going to take Diego Roca, who Ira was

6   getting along with, I was not, and offer them the money that

7   they needed to continue to execute on the business plan, put

8   the term sheet stated that the money would get one board seat.

9           So we hired a law firm.  Bob Jacobs referred to us a

10  gentleman by the name of Joe Pastore in Connecticut, and Max

11  started doing all the diligence.

12          We put Max and Bob on the board, and we offered, I

13  think the original term sheet was two-and-a-half-million

14  dollars.  And with that financing of an additional

15  two-and-a-half-million dollars, they would have to give us

16  another board seat.

17          It was a five-member board.  So if the plan were to

18  take place, we would then take control of the company.

19          MR. BOWMAN:  I just want to go to the Elmo just for

20  the witness.

21  Q    I'm going to show you what's been marked as PE for

22  identification.

23          Is that basically the term sheet you just testified

24  about?

25  A    This is November 16th.  That plan was put in place way

DISCALA - DIRECT - BOWMAN                    3370

1    before that.  But, yeah, that's the term sheet that...  Yes.

2              MR. BOWMAN:  I'm going to offer it as an exhibit.

3              MR. BINI:  No objection, Your Honor.

4              THE COURT:  Received without objection.

5              (Defense Exhibit PE, was received in evidence.)

6              (Exhibit published.)

7    Q    All right, so --

8    A    Can I just -- oh, sorry.

9    Q    Please.

10             This is an email from Max Khan to you and others,

11   which basically states, and I'm quoting here, dumb down

12   comment please, Ira, Diego.

13             MR. BINI:  Objection, as to leading, Your Honor.

14             MR. BOWMAN:  I'm reading.

15   Q    As per my earlier call, here is the 2.5 million-term

16   sheet.  We are ready to sign immediately.  Let's get the due

17   diligence out of the way quickly so we can close the first

18   600,000 quickly.

19             Was that -- that was the state of the negotiations

20   as of November 16th?

21   A    They needed money and we were utilizing this -- I was not

22   getting along with Ira at all.  So I was behind the scene and

23   Max and Bob --

24   Q    Was the offer accepted?

25   A    For a day.

DISCALA – DIRECT – BOWMAN                3371

1    Q    But then what happened?

2    A    They released it into the market.  They said they would

3    take it and then Ira used what he -- what Darren told me was

4    super voting rights to remove Max and Bob off the board and

5    fire OmniView.

6    Q    So when was it that Ira Shapiro fired OmniView?

7    A    November 22nd.

8    Q    Of 2013?

9    A    Correct.

10   Q    What happened then with respect to CodeSmart?  For the

11   rest of the year?

12   A    They announced, I believe that same day, that they hired

13   Garden State Securities.

14   Q    Who was Garden State Securities?

15   A    Dan Walsh.

16   Q    And what was the rest of their announcement?

17   A    I believe it's a public filing.  They did a short term

18   what we call in the business "toxic financing."

19   Q    What is toxic financing?

20   A    Our offer was at the market.  It was a straight common

21   deal.  Toxic financing.

22            MR. BINI:  Objection as to relevance, Your Honor.

23            MR. BOWMAN:  Well, I mean CodeSmart is what we

24   are --

25            THE COURT:  The question was whether or not they

DISCALA - DIRECT - BOWMAN                 3372

1    took this deal.  The answer was "No".

2              MR. BOWMAN:  All right.  I was just asking

3    Mr. Discala what happened next with respect to CodeSmart.  I

4    can move along.

5              THE COURT:  Yes.

6    Q    Okay, what, if anything, did OmniView do with respect to

7    CodeSmart after November 22nd?

8    A    We paid Joe Pastore $25,000 as a retainer to continue to

9    do the diligence, and we then interviewed two other law firms

10   to file a lawsuit against Ira Shapiro and CodeSmart for

11   defrauding us and our investors.

12   Q    When did you begin to hear, what was the first time you

13   heard about StarStream?

14   A    Chris Herghelegiu, who was the lead generation guy on the

15   CodeSmart team, had invested with StarStream, and I heard

16   about it, best of my recollection, April or May -- maybe May

17   or June.  I'm not sure.  If you can show me something.

18             THE COURT:  What year?

19             THE WITNESS:  2013.

20   Q    Okay.  And who did you -- you heard it from Chris

21   Herghelegiu, and do you recall whether you ever met in Darren

22   Ofsink's office after that?

23             THE COURT:  In connection with StarStream?

24             MR. BOWMAN:  Yes.

25   A    Chris Herghelegiu introduced me to Charles Bonan.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

DISCALA - DIRECT - BOWMAN                     3373

1   Charles Bonan was the chairman of StarStream over the phone.

2   He lived in Monterey, California.  And he was interested in --

3   he was initially interested in investing in CodeSmart, and

4   then asked if we could meet with his movie production company

5   to do some financing and do a reverse merger.

6   Q    All right.  So who was the CEO of StarStream?

7   A    Kim Leadford.

8   Q    And where did you meet with her?

9   A    Darren Ofsink's office.

10  Q    And how long was the meeting?

11  A    The original meeting?  Couple of hours.

12  Q    And what did StarStream want from OmniView?

13  A    I think a couple of million dollars and a credit facility

14  against at the time three movies that were what they called

15  "in the can," already produced.

16  Q    What were the movies?

17  A    The Butler.  Life of Crime.  Jennifer Aniston, Life After

18  Beth.  I think those were the three that were in the can.  But

19  I'm happy to go through the presentation.

20  Q    All right.  So they wanted money from you, correct?

21  A    Correct.

22  Q    So what happened?

23  A    We did our homework.  We did some due diligence.  We had

24  Darren Ofsink call CAA, who was their representative.

25  Q    What is CAA?

DISCALA - DIRECT - BOWMAN                3374

1    A    Creative Arts Agency.

2              And there were also -- I had relationship with

3    Lionsgate films, and CAA represented both, Lionsgate and

4    StarStream, so Darren had a call with their rep.

5              We really liked the transaction because Lionsgate

6    films was an actual reverse merger into a public shell out of

7    Canada and -- a long, long time ago and it's doing pretty well

8    now.

9    Q    So was there a plan that had to be action executed?

10   A    Yes.  Chris Herghelegiu said he had a bunch of investors

11   and Marc and I really liked the transaction.

12   Q    So what did you do?

13   A    We signed a term sheet, 65/35 bridge/PIPE.  And I liked

14   the company so much.  A previous life I was -- I understood

15   that business, and I became interim president and joined the

16   board.

17   Q    Did you invest in the company?

18   A    Yes.

19   Q    How much money did you invest in StarStream?

20   A    I think personally, 375,000 -- around 375,000, and Bridge

21   Ventures put another 800,000 into it.  I think around a

22   million dollars.

23   Q    Now, you said you went on the board at StarStream?

24   A    I did, for a short time.

25   Q    And could you trade your freely-tradeable stock when you

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

Case 1:14-cr-00399-ENV   Document 666   Filed 10/20/18   Page 128 of 220 PageID #: 6209

1    were on the board?

2    A    I never took my freely-tradeable stock.  I had given up

3    the rights to the freely-tradeable stock to investors that had

4    invested in previous transactions and...

5    Q    So you had an investment of over a million dollars

6    between yourself and Bridge Ventures.

7    A    Uh-huh.

8    Q    And you didn't trade any stock.

9    A    No.  I traded StarStream after I went off the board and

10   management, but I never traded any -- I never put any

11   freely-tradeable stock in the market.

12            MR. BOWMAN:  Can I have the Elmo for the witness

13   only.

14            All right, I'm going to show you what's been marked

15   PF for identification.  It's an email from Kim Leadford dated

16   February 4, 2014 with a chain on the first page.

17            MR. BINI:  No objection.

18            MR. BOWMAN:  I'll move it into evidence, Your Honor.

19            THE COURT:  Received without objection.

20            (Defense Exhibit PF, was received in evidence.)

21            MR. BOWMAN:  Okay, may I publish it.

22            THE COURT:  You may.

23            (Exhibit published.)

24   Q    All right.  Now, this is an email dated February 4, 2014,

25   and from the bottom from Gracie Lin Zhou.

DISCALA – DIRECT – BOWMAN                    3376

1         And she is who again?

2   A    An attorney at –– I believe it was an attorney at Darren

3   Ofsink's office.

4   Q    Okay.  And it says:  "Dear all:  Please review the board

5   consent regarding appointment of Chris and resignation letter

6   of AJ.  Please let us know if you have any comments.

7         And then at the top there is a note from Jennifer

8   Post.

9         Who is that?

10  A    Jennifer Post was StarStream's new attorney out in Los

11  Angeles.

12        Kim Leadford did not get along at all with

13  Mr. Ofsink and wanted to replace him with Jennifer Post, so ––

14  and they were out in Los Angeles most of the time.

15  Q    Okay.  And then there was remark from Kim Leadford saying

16  that she was sad.

17        How long were you on the board of StarStream?

18  A    I really don't recall.  Couple of months.  Three months.

19  I don't...

20  Q    But in any event, did you ever trade any of your

21  freely-tradeable shares?

22  A    I gave up the right to investors that had been good to

23  me.  I had lost in previous transactions.  I did not take any

24  of my freely-tradeable stock in StarStream.

25  Q    Do you know whether StarStream was having difficulty with

DISCALA - DIRECT - BOWMAN                3377

1   the value of its shares in the market?  In other words --

2   A    I was really working with the company and they constantly

3   needed money.  Movie production -- I do remember hiring

4   RedChip, Kim Leadford and Jennifer Post.  We hired a lot of

5   brokers to get the word out.

6              So there was RedChip.  There was this guy Tom

7   Nelson.  There was -- in the business you like stock to get

8   the word out to -- it's called awareness, and...

9              MR. BOWMAN:  Scott, do you have Exhibit GD.

10             All right, I'm showing you what's in evidence

11  already.  It's Exhibit GD.

12             (Exhibit published.)

13  Q    Who is ITEN Associates?  Or TEN Associates.  TEN

14  Associates.

15  A    This particular TEN Associates is a friend of Marc

16  Wexler's friend, Tom Malawi, who introduced Tom Nelson.

17  Q    And who was Tom Nelson?

18  A    One of the many brokers that were hired to do awareness

19  campaigns.

20  Q    What is an awareness campaign?

21  A    IR or awareness is a person that can go out to a network

22  of potential investors and present the opportunity to their

23  network.

24  Q    And was this consultant agreement with TEN Associates,

25  Mr. Nelson, was that something that you negotiated or took any

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

DISCALA – DIRECT – BOWMAN                3378

1   part in?

2   A     Took no part at all.  It was introduced to Kim Leadford

3   and Darren Ofsink and Jennifer Post.

4   Q     I want to you turn to the third page, please.

5          There's an addendum to the consultant agreement

6   dated 12/20/13.

7          Do you see that?

8   A     Yes.

9   Q     And there's a list of services to be provided?

10  A     Uh-huh.

11  Q     Can you tell us what the services that were to be

12  provided were?

13  A     Can you make it a little bigger?

14         List of services:  Write and distribute a short

15  corporate profile of on StarStream Entertainment.  Use social

16  media such as Facebook, Twitter, and other social media

17  outlets to get aware necessary out.  Make introductions to our

18  broker network.  Produce a CEO interview in order to provide

19  insight discussion with our team management and future

20  direction.  Assist in research and prepare target list of

21  relevant investor conferences.  Meet with investment bankers

22  to strategize and collaborate on investor outreach and align

23  messaging.  Review and make recommendations to IR section of

24  website.  Reach out to expected investor conference

25  coordinators.  Assist in placement of news and feature

1    articles showcasing company's achievements.  Leverage

2    publicity by posting on website and distributing to

3    shareholders.  Introduce investors to target list to

4    StarStream Entertainment via mail.  Email of investor fact

5    sheet.  Assist in bid support.  Assist in locating financing

6    if needed.

7    Q    And who signed it?

8    A    KL.  I would assume it's Kim Leadford, the CEO.

9    Q    So you had no part in this agreement?

10   A    None.

11   Q    Did you see -- have you ever seen it before?

12   A    Yes.

13   Q    Did you see that item 11 is assist in bid support?

14   A    Yes.

15   Q    Did you ever discuss anything with Mr. Nelson about bid

16   support?

17   A    I never talked to Mr. Nelson.  I don't believe I

18   talked -- I know that Kim was very -- I think one of the

19   problems with StarStream was that they --

20           MR. BINI:  Objection.  He don't respond to any

21   question.

22           THE COURT:  There is no pending question.

23           THE WITNESS:  I'm sorry.

24   Q    Do you recall the question?

25           THE COURT:  There is no pending question.

DISCALA - DIRECT - BOWMAN                    3380

1   Q    Do you know whether Mr. Nelson was paid -- was

2   compensated in shares of common stock?

3   A    I think he received stock from the company, and he also

4   received stock from our investor group.

5              MR. BOWMAN:  Can I have the Elmo for the witness

6   only.

7   Q    I'm asking you to look at Exhibit PH for identification.

8   It's a letter to Island Stock Transfer from StarStream

9   Entertainment referencing --

10             MR. BINI:  Objection.  Characterizing.

11             Request for a sidebar.

12             (Continued on the next page.)

13             (Sidebar conference.)

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                3381

1              (The following occurred at sidebar.)

2              MR. BINI:  Mr. Discala does not appear to be on this

3     document.  I'm not sure why we're talking about it.

4              MR. BOWMAN:  It's the compensation paid to TEN

5     Associates for awareness and bid support that StarStream

6     negotiated.

7              MR. BINI:  He already said that he didn't know

8     anything about this agreement with Mr. Nelson.

9              MR. BOWMAN:  Yes, but it is an agreement that shows,

10    consistent with his testimony, that brokers get paid in

11    shares.

12             THE COURT:  It's hearsay.  It's outside.  How is it

13    here?

14             MR. BOWMAN:  That's my claim.

15             THE COURT:  Okay.  The document wasn't admitted for,

16    correct?

17             MR. BINI:  No.

18             THE COURT:  He doesn't know about it.

19             (End of sidebar conference.)

20             (Continued on the next page.)

21

22

23

24

25

DISCALA - DIRECT - BOWMAN                3382

1              (In open court; Jury present.)

2    Q    Tell us about TSGL.

3              When were you first introduced to TSGL?

4    A    I wasn't introduced TSGL.  We put TSGL together.

5    Q    What was the private company in TSGL?

6    A    That was Cubed.

7    Q    And what were those companies?

8    A    I think The Safety Group was one, and EmployUs was the

9    other.

10             The TSGL was a replacement for a company called ISGI

11   that we had taken out.  International Safety Group.  And it

12   was a roll-up in the staffing business.

13             Because of ObamaCare, there was -- people couldn't

14   afford to take on employees, so there was some -- the staffing

15   business had gotten exciting and it was very fragmented, so we

16   thought about rolling up the staffing business, and reverse

17   merger's a pretty good tool to roll companies up with.

18             So we attempted it with ISGI and it had some

19   problems with the CEO and we were in litigation with the CEO.

20   And I think by 2000 -- 2012, then mid-2013, I think we decided

21   to take out EmployUs, which was a company that I owned a piece

22   of that was in the staffing business, and we put Safety Group

23   in and the company was doing, I think, just under $2 million

24   in revenue on a monthly basis.

25             And I didn't think it was fair that people lost

DISCALA - DIRECT - BOWMAN                    3383

1   money in ISGI, so I took, I think, 99.5 percent of my

2   freely-tradeable stock and replaced the entire cap table of

3   ISGI and gave them those shares.  So I didn't have any, very

4   few shares of TSGL.

5   Q    Did you trade TSGL shares?

6   A    I did trade TSGL.  In the open market, I did.

7   Q    And how much did you make from trading TSGL shares?

8   A    I lost a little over $139,000.

9   Q    When was the first time you heard of the company called

10  Crackpot or Cubed?

11  A    Mid-October of 2013.  2013.

12  Q    And how was it -- how did it come to your attention?

13  A    A gentleman by the name of Al Reppetti, Michael Caridi

14  and Max Khan.

15  Q    And what did they tell you about this company?

16  A    Al Reppetti sent me projections and a pipeline of

17  contracts and said you should take a look at this or you

18  should invest in this personally.  And I responded to the

19  email that I don't make investment decisions, Bob and Max do,

20  but I don't know much about technology.

21  Q    All right.  So were you initially interested in becoming

22  involved with Crackpot or Cubed?

23  A    No, I was at that point contemplating getting out of the

24  business.  I was pretty desolate.  I didn't have any money, I

25  had just been defrauded for over $2 million.

DISCALA - DIRECT - BOWMAN                          3384

1          MR. BINI:  Objection, Your Honor.

2          THE COURT:  Sustained.

3          The answer is stricken.

4    Q    And what happened then after Reppetti and Max Khan came

5    to you and presented this company to you for further

6    consideration, what did you do then?

7    A    It was an evolution.  Max had really started to do his

8    deep dive in due diligence, and he really liked the company.

9    And he set up a meeting probably.

10         This is -- Max had hired some -- a couple of

11   business people in order to take a look at the technology and

12   the pipeline and the contracts.  He sent someone out to Las

13   Vegas, and I think three weeks later we had our initial

14   meeting at my attorney's office in Newark.

15         (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

1    (Continuing.)

2    BY MR. BOWMAN:

3    Q    Okay.  Who came to the meeting?

4    A    Max Khan, Bob Jacobs, Michael Caridi, Stephen and Joe

5    White.

6    Q    What happened at the meeting?

7    A    We -- and Darren Ofsink was there as well, as always.

8         We just talked about the company.  We talked about

9    what the contracts were, we talked about what Max Khan's due

10   diligence was, we talked about the market, the social media

11   market, what the potential was for this product and how much

12   money had been invested previously, and Al Reppetti was

13   talking about how he has all this money already raised.

14        And it was just our first meeting.  It wasn't -- Max

15   really wanted me to meet Steve, is what the initial meeting

16   was about.

17   Q    What did Steve White want?  What did he want?

18   A    Steve White wanted money, but he wanted to be the next

19   Steve Jobs.

20        He was a creative founder and he believed he had

21   caught this paradigm shift from web to mobile.  And he's a

22   very nice guy, very charismatic guy, seems very intelligent.

23   But I didn't know technology, and, so, in that meeting, I said

24   we would continue to take a look at it but if we're going to

25   do this deal, it's Max's deal.

Discala – Direct – Bowman                    3386

1          MR. BOWMAN:  Can I have the Elmo for the witness

2     only, please?

3     Q    Let me ask you this:  Have you ever seen what's been

4     marked as P-I for identification?

5     A    Yes.  Can you make it a little less blurry?

6     Q    I don't know.

7          Does that help you at all?

8     A    Yes.

9     Q    Have you ever seen it before?

10    A    This was part of the e-mail that was sent to me by Al

11    Reppetti in mid October.

12         This came along with --

13         THE COURT:  You've answered the question,

14    Mr. Discala.

15         THE WITNESS:  Sorry.

16    Q    Just generally, what was it?  Without giving us the

17    details, just tell us generally what it is.

18    A    It was a cash flow positive in four months pitch with the

19    backup pipeline --

20         MR. BINI:  Objection to testifying about the

21    document when it's not in evidence.

22         Are you offering it?

23         MR. BOWMAN:  Yes.

24         May we publish this?

25         THE COURT:  Counsel, are both taking advantage of

                    *LAM      OCR      RPR*

Discala – Direct – Bowman                3387

1   law day, ladies and gentlemen.  I guess the document is

2   admitted without objection, and, yes, you may publish.

3              (Defense Exhibit P-1, was received in evidence.)

4              MR. BOWMAN:  Thank you, your Honor.

5              (Exhibit published to the jury.)

6   Q    Now, tell us what this is.

7   A    This was in Al's e-mail trying to get me to invest or

8   seriously take a look at the Crackpot transaction, and I

9   responded to him sending this, which is a four-month

10  projection to cash flow positive along with all the backup of

11  the pipeline and the contracts.  I send it to Max and told Al

12  that I do not make investment decisions, Max and Bob do.

13  Q    So, I'm going to ask you to look at the exhibit, P-I, and

14  just tell us for the months of October, November, December,

15  and January what the projected net profit or loss was by

16  month.  That would be the bottom line.

17  A    Negative 412,500.

18  Q    For what month?

19  A    October.

20  Q    And the next month?

21  A    213,700.

22  Q    Negative or positive?

23  A    Negative.

24  Q    For November?

25  A    16,500.

1   Q    I'm sorry, you may be having some trouble reading it.

2   It's in very fine print.

3            For October, $412,500 in net loss; in November, it

4   was $213,700 for net loss; in December, it was projected

5   $16,500; and in January of 2014, it was projected at $257,650.

6            Is that accurate?

7   A    That is accurate.

8   Q    And that was four months to buy; is that right?

9   A    That's what it says.

10  Q    So, red means you're losing money or it's cash flow

11  negative and black means that you're either making money or

12  cash flow positive.

13  A    Correct.

14  Q    But, in fact, this says it was net profit, which means

15  earnings, profit, as opposed to cash flow.

16           So, what was Mr. White telling you would happen from

17  October of 2013 to January of 2014?

18  A    This was an e-mail from Mr. Reppetti.

19  Q    So, what was this -- what did this e-mail represent to

20  you?

21  A    He wanted to present me with the Crackpot transaction.

22  So, he gave this plus the backup and the pipeline, and I

23  forwarded it on to Max.

24  Q    Was it an optimistic or pessimistic view?

25  A    It's the tech business.  To be cash flow positive in the

Discala - Direct - Bowman                    3389

1    tech business is unheard of.

2    Q    Why was that?

3    A    It's expensive.  It's the burn rate.  We call the monthly

4    expenses "burn."  So, it's expensive to -- technology space is

5    expensive.

6         MR. BOWMAN:  Can we have GX 178-31?  It's in

7    evidence.

8         (Exhibit published to the jury.)

9    Q    Do you recognize 178-31, A Crackpot Guide to a Cubed

10   World?

11   A    A lot of different drafts, yes.

12   Q    Okay.  Did you receive this after your meeting with

13   Stephen White in Mr. Ofsink's office?

14   A    My original meeting was in November, so, yes, this is

15   December.

16   Q    So, what was happening on OmniView's end with respect to

17   the Cubed?

18   A    Michael Caridi and Max and Bob were digging into the due

19   diligence, the contracts, and seeing what type of capital was

20   needed to get them to the next phase.

21   Q    Did you understand from Mr. White what he was looking for

22   in terms of funding?

23   A    Funding is always based off of use of proceeds.  And in

24   their projections, they needed a million dollars, and that's

25   what Max and Steve requested from OmniView to start.

*LAM        OCR        RPR*

Case 1:14-cr-00399-ENV   Document 666   Filed 10/20/18   Page 143 of 220 PageID #: 6224

1   Q    And who was representing you at this time?

2   A    Darren Ofsink.

3   Q    From October to the end of the year in 2013, how many

4   times had you met with Steve White?

5   A    I met him personally?  Face-to-face?

6   Q    Yes, personally.

7   A    Four times, three or four times.

8        But I spoke to him constantly.

9   Q    On the phone?

10  A    Uh-huh.

11  Q    What was happening in January with respect to the

12  decision on whether to move forward and fund Crackpot?

13  A    We decided to fund the Crackpot I believe in December, if

14  I recall correctly.

15  Q    And what were the terms?

16  A    $250,000 as a bridge and the $750,000 pipe, which was

17  committed, to my understanding, by Douglas Elliman, the real

18  estate firm in Manhattan that wanted the exclusive to utilize

19  the Cubed.

20       And that came in through Michael Caridi.

21  Q    Did that ever happen?  Did Elliman ever put up the

22  $750,000?

23  A    Steve rejected the terms, did not want to give up the

24  exclusive.

25  Q    What was the basis for him rejecting Elliman's $750,000?

Case 1:14-cr-00399-ENV   Document 666   Filed 10/20/18   Page 144 of 220 PageID #: 6225

1  A     My understanding is he didn't want to give up the

2  exclusive.  They wanted the exclusive for the real estate

3  business in Manhattan.

4  Q     So, what happened to the remaining $750,000 that Elliman

5  was going to put up?

6  A     We facilitated through friends and family.

7  Q     So, the total amount initially invested in the Cubed was

8  how much?

9  A     Just over a million dollars.

10 Q     In January, did there come a time when you went out to

11 Las Vegas?

12 A     Yes.

13 Q     And was January the first trip you made to Las Vegas or

14 had you gone earlier?

15 A     I believe I had gone earlier, but this was a -- call it

16 conference, but a large meeting that was being put on by

17 Stephen and the Crackpot/Cubed team.  They had people coming

18 in from everywhere.

19 Q     How many people attended the meeting?

20 A     50 to 75, a hundred.

21 Q     Where was the meeting?

22 A     At a conference room in a hotel, like a banquet room.

23 Q     And who chaired the meeting?

24 A     Stephen White.

25 Q     And what happened at the meeting?

Discala - Direct - Bowman                    3392

1    A    We Skyped with the Macedonian tech people, they talked

2    about the product, we had -- there was a lot of talk of the

3    business in Asia and India.  Just people very, very excited

4    about the Cubed.

5    Q    Did they talk about contracts that they were in

6    negotiation for?

7    A    That had been in talks since October.

8    Q    What were some of those contracts, to your knowledge?

9    A    SkyTail India, Yellow Pages, Ford Motor, Honda, Lexus,

10   political -- there was a big push in India.  There was a

11   political campaign.  I remember sending -- having my brother

12   send over a laptop with the Cubed on it.  He's a courier.

13        There's a list behind that cash flow.  I'd love to

14   have everybody see it.

15   Q    So, you had looked at the contracts, you had heard the

16   presentation from Stephen White, you were in Las Vegas.  And

17   had the decision already been made?

18   A    I didn't look at the contracts.  Max Khan and his

19   diligence team and -- well, the decision for what?

20   Q    The decision to invest.

21   A    Yeah, we had given them a million dollars in December.

22   We were moving on to financing too.

23        MR. BOWMAN:  Your Honor, it's 4 o'clock.  Did you

24   want to break now or did you want to --

25        THE COURT:  Keep going.

                    LAM      OCR      RPR

Discala - Direct - Bowman                 3393

1    Q    Did there come a time when you met Kyleen Cane in Las

2    Vegas?

3    A    On this trip?

4    Q    Yes.

5    A    After the conference, went to have a drink, and ran into

6    Kyleen Cane.  I had known her previously.

7    Q    And did you talk to her?

8    A    I did.

9    Q    Did you understand who she was, what she did for a

10   living?

11   A    Absolutely.  I had done business with her.

12   Q    What was that?

13   A    Very well-respected, maybe the most well-respected,

14   attorney in the microcap space.

15   Q    And did you have a conversation with Ms. Cane?

16   A    I did.  I had -- we had a drink, we were talking about --

17            MR. RIOPELLE:  Objection, hearsay.

18            THE COURT:  It is hearsay.

19   Q    What did you tell Ms. Cane?

20            MR. RIOPELLE:  Objection.

21            THE COURT:  Conversation is hearsay.

22            MR. BOWMAN:  State of mind, your Honor.

23            Can we go to sidebar?

24            THE COURT:  Sure.

25            (Continued on the next page.)

Sidebar                                                    3394

1          (The following occurred at sidebar.)

2          MR. BOWMAN:  He has a conversation with Ms. Cane,

3    tells her about his problems in the microcap space, and she

4    tells him that she may have something that can protect them.

5    That's the conversation.

6          MR. BINI:  Anything she says is hearsay.

7          THE COURT:  Unless it's advice later on.  I don't

8    know where he's going.

9          MR. BINI:  Is it advice?

10         MR. BOWMAN:  Our claim is it is advice.

11         THE COURT:  Then get right to the advice:  Did you

12   ever ask Ms. Cane for advice?

13         MR. BOWMAN:  Will do.

14         THE COURT:  What was it?  That's state of mind.

15         MR. RIOPELLE:  I'm going to object because -- I'm

16   going to object to it, Judge.

17         MR. BINI:  Your Honor, the thing I would note here

18   is Ms. Cane was not representing him.  Ms. Cane was

19   representing Cubed.  I don't know how he could --

20         THE COURT:  He hadn't retained Ms. Cane.

21         MR. BINI:  I think he has to lay some foundation to

22   get any advice he got from Ms. Cane.

23         THE COURT:  Did he retain Ms. Cane to render advise

24   to him, not Cubed?

25         MR. BOWMAN:  I can't represent he'd say he retained

*LAM        OCR        RPR*

Sidebar                                    3395

1   her.

2              MR. BINI:  I think it's irrelevant and should be --

3              THE COURT:  The only way it gets in, if he's

4   retained Ms. Cane or anybody else to give advice with respect

5   to one of the target stocks and he says that, that he retained

6   her, she was aware of the retainer, I received the following

7   advice, it comes in as to his state of mind and to no other

8   purpose.

9              MR. BOWMAN:  Okay.

10             THE COURT:  If he doesn't say that, then it's

11  hearsay.

12

13             (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Discala - Direct - Bowman                    3396

1              (Sidebar ends; in open court.)

2     BY MR. BOWMAN:

3     Q     How long was your meeting with Ms. Cane that evening?

4     A     It's a long time ago.  30 minutes, 45 minutes, an hour?

5     Q     And did you subsequently see her again in Las Vegas?

6     A     The next day, I introduced her to Stephen White.

7     Q     And where was that?

8     A     I don't recall if it was at a breakfast or we met at

9     Steve -- I think it was breakfast, but I don't...

10    Q     Without telling us what was said, how long was the

11    meeting?

12    A     Hour and a half.

13    Q     And subsequent to that meeting, do you know whether

14    Ms. Cane took on the representation of Mr. White and the

15    Cubed?

16    A     She replaced -- Stephen White wanted everybody that

17    worked for the Cubed --

18              THE COURT:  The question was:  Did she take on the

19    representation of Mr. White and the Cubed?

20              THE WITNESS:  She replaced Darren Ofsink.  Not Mr.

21    White, the Cubed.

22              THE COURT:  Just the Cubed.

23    Q     Okay.  What happened to Mr. Ofsink?

24    A     Stephen White wanted all services, all management, legal

25    representation, accounting, everything, to be out of -- I

*LAM        OCR        RPR*

Discala - Direct - Bowman                3397

1    think the IP attorneys, everything out of Las Vegas, so

2    Mr. Ofsink was let go by Stephen White and Cubed.

3    Q    Was Mr. Ofsink representing OmniView at that time?

4    A    Yes.

5          Before a company goes public, we get representation.

6    We're represented before the company goes public.

7    Q    And when did Cubed go public?

8    A    April.

9    Q    Of what year?

10   A    2014.

11   Q    Now, did you get any freely-tradeable shares in the

12   Cubed?

13   A    Ms. Cane advised --

14          THE COURT:  The question was:  Did you get any?

15          THE WITNESS:  Did I get any?  No.

16   Q    Do you know what happened to the freely-tradeable shares?

17   A    They were put in escrow or escrows.

18   Q    What did you understand the escrows to be?

19   A    A way to protect the company and its investors from all

20   the bad things that happen in microcap space and what had

21   happened to me previously in 2003.

22   Q    What was your understanding of how many escrows there

23   would be?

24   A    It was explained to me and others that there would be

25   five to seven different escrows that were traded by people

*LAM      OCR      RPR*

1  that do not know each other and that it was a lock-up/leak-out

2  agreement, basically, that people had to abide by.  So, as

3  demand came into the marketplace, the escrows were --

4          MR. BINI:  Objection, not responsive.

5          THE COURT:  Going beyond the question.

6  Q   Would you have any control over the escrows?

7  A   No.

8  Q   Were any of the investors given stock, shares of stock,

9  when the Cubed went public?

10          THE COURT:  Can you distinguish between freely

11  trading and restricted?

12  Q   Freely tradeable?

13  A   Freely tradeable, no; restricted, yes.

14  Q   What did they get?

15  A   Originally, they got stock purchase agreements until we

16  met with some very good friends of mine that were large hedge

17  fund -- two of the largest hedge funds in the microcap space.

18          THE COURT:  The question is:  What did they get --

19          THE WITNESS:  SPAs, I'm sorry?

20  A   SPAs and PPAs.

21  Q   What does "SPA" stand for?

22  A   Stock Purchase Agreement.

23  Q   And what does "PPA" stand for?

24  A   Profit Participation Agreement.

25  Q   And how many people were in the -- withdrawn.

Discala - Direct - Bowman                    3399

1          What else was done with respect to individuals who

2     had invested in the Cubed?

3          What else was set up for their benefit as a

4     recipient of the proceeds of any stock traded?

5               MR. BINI:  Objection, form of the question.

6               THE COURT:  Yes, I'm having difficulty with that

7     one.

8     Q    Was there a special purpose vehicle?

9     A    Titan Investments.

10    Q    Who was Titan Investments?

11    A    Titan Investments was the entity that was to receive the

12    proceeds from the sale of the stock.

13    Q    And were you a member of Titan Investments.

14    A    I don't -- profit participation, so yes.

15    Q    Who ran it?  Who ran Titan?

16    A    Dave Wolfson and Marc Wexler.

17    Q    What's a "cap table"?

18    A    A cap table is the equity loaned in an entity.

19    Q    And was there a cap table prepared for the Cubed?

20    A    Yes.

21              MR. BOWMAN:  May I have 127-2, please?

22              (Exhibit published to the jury.)

23    Q    Now, is that the cap table?

24    A    Not for the Cubed.

25    Q    What is it a cap table for?

1   A    This looks to me like an old draft of the SPAs and PPAs.

2   Q    Does it list the individuals who had invested?

3          THE COURT:  In Cubed?

4          MR. BOWMAN:  In Cubed.

5   A    Yes.

6          Can you scroll down?  Because I don't know what

7   date -- do we know what date this was?

8   Q    Sure.  There are three pages.  If you can, go back to

9   Page 1.

10         Does it look like the number of people who had

11  invested in the Cubed?

12  A    Yes, these are people that invested into the SPAs, PPAs

13  or people that we were taking care of for services or people

14  that had -- that I had put on the list that had suffered

15  losses.

16  Q    And were these individuals to be recipients of

17  distributions from the sale of Cubed free-trading shares?

18  A    On the escrow, yes.

19  Q    And this was the way that you kept track of all the

20  people -- among other things, that you kept track of all the

21  people who invested?

22         MR. BINI:  Objection, your Honor, leading.

23         THE COURT:  It is leading.

24         That's the last question, I suppose, Mr. Bowman.

25         MR. BOWMAN:  It's the last question.

Discala – Direct – Bowman                    3401

1        THE COURT:  Overruled.

2   Q    And this was the list of people who had invested in the

3   Cubed?

4   A    It was a rolling draft, but, yes, this looks like it,

5   yes.

6   Q    It's a pretty fair representation of that, correct?

7        MR. BINI:  Objection, your Honor.

8        THE COURT:  Sustained.

9   Q    Did you have any control whatsoever over the trading of

10  shares from the escrow?

11  A    No.

12  Q    Could you tell anybody when to release shares into the

13  market from the escrow?

14  A    I'd suggest it, but no.  I realized --

15       THE COURT:  That's the answer.

16  Q    To your understanding, who controlled the escrow?

17  A    There was only one escrow that had been released.  There

18  was eventually going to be five to seven escrows that were all

19  managed and traded by different traders.

20       So, who controlled the first release of the escrow?

21  Q    Yes.

22       MR. BINI:  Objection, your Honor.  This is not

23  responsive.

24       THE COURT:  I'm going to allow him to answer, if he

25  knows.

*LAM        OCR        RPR*

Discala – Direct – Bowman                    3402

1    A    George Castillo.

2    Q    And where did George Castillo get the authorization to

3    trade the shares from?

4    A    Kyleen Cane.

5    Q    What was your understanding about the legality of the

6    escrow?

7              MR. BINI:  Objection, your Honor.

8              THE COURT:  Sustained.

9    Q    Did you ever intend to defraud in any of these four

10   companies any of your investors?

11   A    No.

12   Q    Did you ever intend to defraud the public?

13   A    No, no; actually, the opposite.

14   Q    Did you ever intend to cause anybody harm with respect to

15   your trading in any of these four companies or anything else

16   you did?

17   A    No.

18             MR. BOWMAN:  I have no further questions.

19             THE COURT:  Thank you, Mr. Bowman.

20             That will bring us to a midafternoon break.  Ladies

21   and gentlemen, you want to take that midafternoon break?

22             Whether it's morning or afternoon, makes no matter,

23   same rules apply:  Do not discuss the case amongst yourselves

24   or anyone else you may run into in the back, continue to keep

25   an open mind, enjoy the 15-minute break, and we'll see you

1    when you return.

2                (Jury exits.)

3                MR. BOWMAN:  We'll see you in about 15.

4                MR. RIOPELLE:  Judge, I have a couple issues to

5    raise.  One I think Mr. Discala should not be in the courtroom

6    for.

7                THE COURT:  Okay.  It doesn't relate to the charge.

8                MR. RIOPELLE:  There is the one with the charge.  I

9    figured I'd raise that --

10               THE COURT:  At the end.

11               MR. RIOPELLE:  At the end.

12               I have an issue with respect to possible

13   cross-examination of Mr. Discala.

14               THE COURT:  I'd do that at sidebar because he's

15   here.

16               DEFENDANT DISCALA:  I can go out.

17               THE COURT:  No, you can stay and we can do it at

18   sidebar.

19               (Continued on the next page.)

20

21

22

23

24

25

1            (The following occurred at sidebar.)

2            MR. RIOPELLE:  Your Honor, it is my view that the

3    direct examination of Mr. Discala and the answers given where

4    he describes a prior relationship with Ms. Cane prior to the

5    transaction in Cubed opens the door to my cross-examination of

6    Mr. Discala about the Regenecin transaction.  And as your

7    Honor knows, I regard the experience that Ms. Cane had with

8    Mr. Discala in that transaction as the basis for why she

9    created this escrow arrangement.

10           And I have to think about it, but I raise it now,

11   Judge, because, you know, if I decide to go that direction, I

12   don't want to stand up and have you throw the gavel at me; you

13   can do it now.  But I do think it's appropriate.  I think it's

14   a viable area of cross-examination given the testimony to a

15   prior relationship.  I don't like the idea of the jury

16   speculating about what that was.

17           THE COURT:  I think we have your point.  Let's have

18   everybody else state theirs.

19           MR. BINI:  Your Honor, the Government is not going

20   to inquire of the prior relationship with Regenecin.

21           THE COURT:  Mr. Bowman, do you want to be heard?

22           MR. BOWMAN:  I would object to it.

23           THE COURT:  Yes, you're not going to do it.

24           MR. RIOPELLE:  All right.

25           THE COURT:  To the extent that he opened the door,

Sidebar                                                    3405

1    he opened the door to say based on his prior dealings with

2    him, that she's the finest securities lawyer around.

3              MR. RIOPELLE:  Okay.

4              THE COURT:  That's opening the door?

5              MR. RIOPELLE:  I think he had testified to a prior

6    relationship.  I think it's fair to want to get into what that

7    relationship was.

8              THE COURT:  No.  403.

9              MR. RIOPELLE:  Okay.

10

11             (Continued on the next page.)

12             (Sidebar ends; recess taken.)

13

14

15

16

17

18

19

20

21

22

23

24

25

DISCALA – CROSS – BINI                    3406

1              THE COURTROOM DEPUTY:  Court is back in session.

2      Counsel for both sides are present, including defendants.

3              THE COURT:  Ready to resume?

4              MR. BINI:  Yes, your Honor.

5              (Jury enters.)

6              THE COURT:  Be seated, please.

7              Counsel will stipulate that the jury is present and

8      properly seated?

9              MS. JONES:  Yes, your Honor.

10             MR. ROSS:  Agreed, Judge.

11             THE COURT:  All concur.

12             Ladies and gentlemen, we are ready to resume.  You

13     will recall Mr. Discala was on the stand, Mr. Bowman just

14     finished his direct, and now we're ready for Mr. Bini on

15     cross.

16             MR. BINI:  Thank you, your Honor.

17     CROSS-EXAMINATION

18     CROSS-EXAMINATION

19     BY MR. BINI:

20     Q    Mr. Discala, fair to say you don't want to get convicted

21     in this case, right?

22     A    Fair to say I want the truth to come out.

23     Q    My question was:  Fair to say you don't want to get

24     convicted, right?

25     A    That is fair to say.

DISCALA - CROSS - BINI                3407

1  Q     Okay.  And you mentioned on your direct that in a

2  previous life you had some involvement in the acting world; is

3  that right, sir?

4  A     That is not what I said in my direct.

5  Q     You made some mention about some involvement in the

6  entertainment industry, I believe.

7  A     That's the entertainment industry, not acting.

8  Q     You had some involvement in the entertainment industry?

9  A     I was married to an actress.

10 Q     And in preparation for your testimony, you've been here

11 the entire time, right?

12 A     In preparation for my testimony?

13 Q     You've been at the entire trial; is that right, sir?

14 A     Yes, I have.

15 Q     And you've seen and heard all the evidence, right?

16 A     Yes.

17 Q     And you testified on direct, sir, that you knew what a

18 pump and dump was, right?

19 A     Pump and dump is you take --

20       THE COURT:  No, the question is -- we have to do it

21 in steps, Mr. Discala.

22       Did you testify that you knew about what a pump and

23 dump was on direct?

24       THE WITNESS:  I believe I testified that Marc

25 Wexler --

*LAM        OCR        RPR*

DISCALA – CROSS – BINI                    3408

1    Q    I'm asking a yes-or-no question:  Did you testify on

2    direct regarding whether you knew what a pump and dump was?

3    A    Can I see the testimony?  I believe I said that Marc

4    Wexler had --

5    Q    Wait a minute.  You don't recall your testimony from 30,

6    40 minutes ago that you said you knew what a pump and dump

7    was?

8    A    You just stated that I said I was an actor and I said I

9    was in the entertainment business.

10   Q    I appreciate that.

11   A    So --

12         THE COURT:  Let's not -- I'm going to sustain an

13   objection to the second question, just answer the first.

14         And maybe the better way to do it is, do you know

15   what a pump and dump is?

16         THE WITNESS:  Yes.

17   Q    And a pump and dump, sir, is when a group of individuals

18   artificially manipulate the price of a stock, right?

19   A    No.

20         A pump and dump is when people do a reverse merger

21   and get stock at pennies, right, and do a fake promotion and

22   never buy a stock, never add value to a company, never worry

23   about their board seats, and sell their stock in a promo, just

24   like Jala.  And I'm sure you did your homework on

25   Mr. Wexler's --

                    LAM        OCR        RPR

1          MR. BINI:  I would ask that the answer --

2          THE COURT:  That part is stricken.

3   Q    Mr. Discala, you testified on your direct regarding

4   artificially manipulating the stock price being part of a pump

5   and dump.

6          Would you agree with me that that's part of a pump

7   and dump?

8   A    I did not testify to that.

9          THE COURT:  Ask the question without the preamble,

10  Mr. Bini, and it will get you through with this a lot quicker.

11         MR. BINI:  Thank you, your Honor.

12  Q    Would you agree with me that artificially manipulating

13  the price of a stock is part of a pump and dump?

14  A    Define "artificial."

15  Q    Inflating the price of the stock not based on market

16  forces, would you agree that's part of a pump and dump?

17  A    Does Jeff Bezos do that every day marketing his company?

18         Define your words and I'll answer the question, but

19  do not put words in my mouth.  I've spent the last four years

20  being falsely --

21         THE COURT:  The answer is stricken.

22         The witness doesn't ask questions in this courtroom,

23  Mr. Discala.

24         THE WITNESS:  Sorry, sorry.

25         THE COURT:  The witness doesn't make statements in

DISCALA - CROSS - BINI                    3410

1    this courtroom, Mr. Discala.

2            THE WITNESS:  Sorry.

3            THE COURT:  If there's an objectionable question,

4    one of your attorneys will object.

5            THE WITNESS:  Sorry.

6    Q    Mr. Discala, you heard Matt Bell testify during this

7    case, right?

8    A    Yes.

9    Q    And he was a broker who you worked with closely for some

10   time, right?

11   A    Registered investment advisor.

12   Q    He was also a registered broker; isn't that right, sir?

13           He worked at an investment advisor, right?

14   A    I think a registered investment advisor -- I believe a

15   registered investment advisor is above a broker.  You have

16   more licenses --

17   Q    Let me ask you this, sir:  Did you work with Matt Bell

18   for some period of time?

19   A    I did.

20   Q    And you heard him testify here, right?

21   A    I did.

22   Q    And he said that he was part of a securities fraud

23   conspiracy, right?

24   A    No.

25           He said he was part of a pump and dump.

1   Q    And did he indicate during his testimony that he had

2   committed a crime with respect to CodeSmart?

3   A    I believe he said he sold stock that he shouldn't have

4   sold to his clients.

5   Q    Well, sir, I would just ask you, did he not testify --

6   did you hear him testify that he was part of a fraud with

7   respect to CodeSmart?

8   A    He testified that he sold stock he shouldn't have to his

9   clients.

10  Q    And he testified that he was also part of a fraud with

11  respect to the Staffing Group; is that right, sir?

12  A    I believe that's what he testified to.

13  Q    And he testified that he was also a part of a fraud with

14  respect to StarStream; is that right, sir?

15  A    That's what he testified to.

16       He also --

17  Q    And he also testified that he was part of a fraud with

18  respect to Cubed; is that correct, sir?

19  A    I believe he testified that he put clients, his clients,

20  into the publicly-traded stock of the Cubed, which we know

21  from the blue sheets --

22       MR. BINI:  Your Honor, I would ask to strike.

23       THE COURT:  It's stricken.

24  Q    Did Matthew Bell testify that he was part of a fraud with

25  respect to Cubed?

DISCALA - CROSS - BINI                    3412

1   A     Yes, he testified.

2   Q     And he said he committed the fraud of those stocks with

3   you, sir; isn't that right?

4   A     After his original --

5   Q     What did he testify in court?

6         He said he did it with you, sir; is that right?

7   A     He testified in court after 21 meetings with you.

8         MR. BINI:  Your Honor, I would object.

9         THE COURT:  The answer is stricken.

10        It will be a lot easier, Mr. Bini, if you just ask

11  him the questions about him.  You can argue what everyone

12  everybody else said at a later point in the trial.

13  Q     Mr. Discala, you indicated that part of a pump and dump

14  is to receive stock at pennies, right?

15  A     No, I did not.

16  Q     When you testified at the beginning --

17        THE COURT:  Mr. Bini, just ask the question.

18  Whether he testified to it or not, just ask him.  It's

19  cross-examination.

20        MR. BINI:  Yes, your Honor.

21        THE COURT:  Isn't it a fact?

22  Q     Isn't it a fact that part of a pump and dump is to

23  receive stock at pennies?

24  A     I don't think that that's part of a pump and dump.  You

25  can receive stock in pennies and what you --

DISCALA - CROSS - BINI                              3413

1          THE COURT:  That's not the question, Mr. Discala.

2          THE WITNESS:  Okay.

3          THE COURT:  The question is:  Receipt of stock at

4     pennies, is that something that is common in pump and dump

5     schemes, if you know?

6          It doesn't mean that it can't be received for other

7     purposes, but is it common in pump and dump schemes?

8          THE WITNESS:  It is common in pump and dump schemes.

9   Q    And that's what happened with you and First Independence,

10    right?

11  A    No.

12  Q    You received shares at approximately two cents a share,

13    right?

14  A    Point two three cents a share, stock --

15         MR. BINI:  If we could go to Government Exhibit

16    177-23 in evidence.

17         (Exhibit published to the jury.)

18  Q    And, sir, do you recall this exhibit regarding the

19    shareholders and First Independence?

20  A    I do.

21  Q    And do you recall, sir, that First Independence is the

22    company that would become CodeSmart?  Right?

23  A    Yes.

24  Q    And Marleen Goepel, your secretary, testified regarding

25    this, correct?

1    A    She testified that she received this from the lawyers,

2    yes.

3    Q    And this sets out who was to receive shares in this

4    shell, right?

5    A    Yes.

6    Q    And each of the individuals who were going to receive

7    shares at a little more than two cents per share, right?

8    A    That is correct.

9    Q    And, in fact, Marleen Goepel, your secretary, purchased

10   156,000 shares at your direction, right?

11   A    That's not correct.

12        The document, that came from the lawyers --

13        THE COURT:  The question is -- forget about the

14   document.  Answer the question.

15   A    There was a set of pool shares put in Marleen Goepel's

16   name.

17   Q    And, in fact, she did that because you told her you

18   didn't want to have more than five percent of the shares in

19   your name, right?

20   A    That is incorrect.

21        MR. BINI:  If we can go to 177 --

22   Q    You'd agree with me, though, sir, that was her testimony

23   on that, correct?

24   A    Correct.  But if you --

25        THE COURT:  That's all.

1             THE WITNESS:  Okay.

2             MR. BINI:  If we go to 177-22 in evidence, if we can

3    blow up the portion that shows OmniView and Fidelis.

4             (Exhibit published to the jury.)

5    Q    And this document was another document we saw during this

6    case, right?

7    A    Yes, we saw this, it has an exhibit number, but I don't

8    know where it came from.

9    Q    Well, sir, do you recall, directing your attention to the

10   bottom left, that OmniView and Fidelis had 657,000 shares of

11   CodeSmart?

12   A    I recall this document came from the lawyers and this was

13   added on the bottom.

14            But if you were to take the 253,000 shares into the

15   total shares of 7.925, which is almost 8 million --

16            MR. BINI:  I would ask to strike the answer.

17            THE WITNESS:  Oh, sorry.

18            THE COURT:  You have to answer the question,

19   Mr. Discala.  He's asking you whether you recall --

20            I can't remember what the number was.

21   Q    You had 657,000 shares in OmniView and Fidelis?

22            THE COURT:  That was the question.

23   A    That is correct.

24   Q    And then you, personally, had 253,000 shares in

25   CodeSmart, right?

DISCALA - CROSS - BINI                3416

1   A    That is incorrect.

2   Q    This document indicates that, right?

3   A    Where did this document come from?

4        THE COURT:  It doesn't matter where the document

5   comes from.

6   A    This document states that.

7   Q    And it says in total you had 910,000 shares, right?

8   A    That's what that total says.

9   Q    And as of 5/21/13, those shares were worth approximately

10  $5.47 each; is that right, sir?

11  A    As of when?

12  Q    Do you see how it says, Cap table final, 5/21/13, at the

13  bottom?

14  A    Yes.

15  Q    And it indicates that those shares were worth in total

16  almost $5 million; would you agree with me, sir?

17  A    That's what this document says.

18       MR. BINI:  And if we can go to the stock price for

19  CodeSmart, 196-3 in evidence.

20       (Exhibit published to the jury.)

21  Q    You were asked some questions on direct regarding this

22  stock chart, and I just wanted to ask you, sir, as of July 12,

23  2013, what was the price of CodeSmart, sir?

24  A    Topping at 6.94.

25  Q    And that was the highest price for CodeSmart, right?

DISCALA – CROSS – BINI                    3417

1    A    Yes, because of the split, yes.

2    Q    What would that price have been –– you're referring to

3    the stock split that is noted down here, the June 14, 2013,

4    stock split, sir?

5    A    Yes.

6    Q    Okay.  And from June 14, 2013, after the stock split, the

7    price climbed from approximately $4 to $6.94 on July 12; is

8    that right, sir?

9    A    Yes.

10   Q    And what would that $6.94 be if you hadn't done the

11   reverse stock split?

12   A    You're asking me to multiply it by two?

13   Q    Yes, sir.

14   A    $13.88.

15   Q    So, would you agree with me, sir, that the stock price

16   went from a little more than $4 all the way up to

17   approximately $13.88 in the space of a month, sir?

18   A    The new–issue stock, yes.

19   Q    And after that, would you agree with me that after this

20   first period the stock price dropped precipitously?

21   A    Yes, I would.

22   Q    And then after that ––

23   A    And I was a buyer there.

24        MR. BINI:  Well, that wasn't my question.  I would

25   ask to strike that.

1        THE COURT:  Correct, stricken.

2    Q    And, sir, after that time, from August 21 -- what was the

3    low that it hit on August 21, if you can tell, 2013.

4    A    Could you blow it up a little bit?

5    Q    Would you say it's somewhere between three and two?

6         About $2 on August 21, 2013?

7    A    Yes.

8         MR. BINI:  And from there, if we can back out,

9    Henry, so we can kind of see the chart.

10   Q    Would you agree with me, sir, that the stock price

11   rocketed up to about $4.60?

12   A    Rocketed?

13        MR. BOWMAN:  Object to the characterization.

14        THE COURT:  It's a word.

15        Rose?  Did it rise?

16        THE WITNESS:  It did rise.

17   Q    Well, "rocketed" is a word that you used with Matthew

18   Bell several times, right?

19   A    Yes, he --

20   Q    To talk about rocketing stocks.

21   A    No, I didn't talk about rocketing stocks.

22   Q    Let me ask you, sir, from August 21, 2013, to August 30,

23   2013, would you agree with me that the stock price of

24   CodeSmart more than doubled?

25   A    It looks like it doubled.

DISCALA – CROSS – BINI                    3419

1    Q    And after that, it started dropping again, right?

2    A    It did.

3    Q    And eventually, it went down to virtually nothing.

4    A    I was fired when this --

5    Q    I didn't ask if you were fired.

6         THE COURT:  You have to respond only to the

7    questions, Mr. Discala.

8    A    Yes.

9    Q    And would you agree with me, sir, that this stock price

10   chart sure looks like the up and down for a pump and dump?

11   A    No.  A pump and dump --

12        THE COURT:  The answer is no.

13   A    No.

14   Q    And, sir, would you agree with me with respect to

15   CodeSmart that from the period from May to approximately July,

16   you were typically selling your shares of CodeSmart; is that

17   right, sir?

18   A    May to June, I sold.  Prior to the split, I sold the

19   majority of my stock.

20   Q    And during that time, you were speaking to individuals

21   like Matthew Bell, right?

22   A    I was speaking to a lot of individuals that were creating

23   awareness that got paid to create awareness and do IR.

24   Q    And you were texting and speaking to Matthew Bell during

25   that period on a nearly daily basis; is that fair to say, sir?

*LAM        OCR        RPR*

DISCALA - CROSS - BINI                    3420

1    A     And many others.

2    Q     And you were coordinating prices with him, right?

3    A     Not coordinating prices.  Chasing the prices, chasing the

4    shorts, chases Joe Salvani who was dumping on us.

5    Q     You would agree with me that Mr. Bell testified that you

6    and he would speak every day about how much volume you wanted

7    in the stock; isn't that right, sir?

8    A     That's what he testified to.

9    Q     And he also testified that you were acting as the

10   quarterback in the relationship between him and you, right?

11   A     That's what he testified to.

12   Q     He also testified that you and he would talk about where

13   he should purchase the stock; isn't that right, sir?

14   A     Please pull up the testimony.  I don't...

15              MR. BINI:  If we could look at Page 92 of the

16   transcript, if you can pull that up for us.

17              If we can go to Line 16, the answer on Line 16 to

18   25.

19              (Transcript published to the jury.)

20   Q     Do you see, sir, it says:  AJ and I would text each other

21   on a daily basis.  He would tell me how much volume we were

22   searching for that day and didn't want too much volume because

23   it was a brand new stock trading and we didn't want a lot of

24   attention.  He would tell me where to put the bid.  He was the

25   quarterback, so he was coordinating with Craig and myself and

*LAM        OCR        RPR*

DISCALA – CROSS – BINI                    3421

1    a few other traders that I found out about and then we

2    would -- he would tell us where to purchase the stock or I

3    would tell him I have $30,000 to purchase stock with today --

4            MR. RIOPELLE:  I object to reading testimony to

5    refresh recollection.

6            THE COURT:  I concur.  I sustain the objection.

7            Just ask the question.

8            MR. RIOPELLE:  If you're going to do it, do it

9    right.

10           THE COURT:  Whether Mr. Bell testified to that or

11   not, just ask him the question.  You can make an argument

12   about it later.

13           MR. BINI:  Okay.

14   Q    You were coordinating prices with Mr. Matthew Bell; isn't

15   that right, sir?

16   A    No.

17           MR. BINI:  Let's go to Government Exhibit 132-H in

18   evidence.

19           (Exhibit published to the jury.)

20

21           (Continued on next page.)

22

23

24

25

DISCALA – CROSS – BINI                3422

1    CROSS-EXAMINATION

2    BY MR. BINI:

3    Q    You know what, before we go there, let's go to 132-D.  I

4    want to ask you, sir, at the text -- are these texts between

5    you and Mr. Bell, sir?

6    A    They look to be.

7    Q    Okay.  And do you see the text on May 10, 2013, at

8    6:56:42; do you see that, sir?

9    A    Yes.

10   Q    And is that Matt Bell writing you, I tapped ISGI a

11   little?

12   A    I bought some ISGI.

13   Q    And then you responded, nice, save the juice.  The

14   monster is coming.

15        Is that what you wrote, sir?

16   A    Nice, save your money, the big one is coming.

17   Q    And you were referring to CodeSmart, right?

18   A    Yes.

19   Q    Because CodeSmart was going to first start trading or did

20   first start trading on May 13, 2013, right?

21   A    I believe I first started trading CodeSmart the 27th or

22   28th.

23   Q    If we can look at Government Exhibit 196-4.  If you can

24   blow up the front part of that, or top part of that, rather.

25        Would you agree with me, sir, that CodeSmart started

1    trading on May 13, 2013?

2    A    I would.

3    Q    Okay.  If we can go back to 132-2-D, on May 10, 2013, we

4    can look at the e-mail that's at 7:09:07.  Do you see the

5    e-mail from Matt Bell, how much other money hitting it first

6    week?

7    A    How much other awareness that's out there, buying that's

8    coming in.

9    Q    I just wanted to ask you, is that what the text says,

10   sir?

11   A    Yes.

12   Q    Okay.  And did you respond, at least a mil?

13   A    I did.

14   Q    Meaning a million, right?

15   A    Meaning at least a million.

16   Q    Okay.  And did you then respond, but want to build base

17   so investors get at least double to start, right?

18   A    Correct.  You want your investors to win.

19   Q    And you wanted investors to double their money on the

20   stock, to start, right?

21   A    Well --

22   Q    Is that what you are saying there?

23   A    Release supply, yes.

24   Q    And further down, did you text, when we lift, it will be

25   closer to a trip, quad?

DISCALA - CROSS - BINI                    3424

1   A     When we lift, when the -- when the awareness kicks in, it

2   will go.

3   Q     And you're saying that you hope to triple the stock,

4   right?

5   A     It is all based on where you take the valuation at.

6   Q     No, I am just asking you, in that text you are saying you

7   are hoping to triple the stock price of CodeSmart, that's what

8   you are telling Bell, right?

9   A     I'm hoping.

10  Q     Or to quadruple it, right?

11  A     I'm hoping.

12  Q     And Bell responds to you, how long for that, months or

13  weeks; is that right, sir?

14  A     Yes.

15  Q     How did you respond?  If we can go to the next page.  How

16  long was it going to take to triple or quadruple the price,

17  sir?

18  A     Days.

19  Q     And, by the way, on direct you testified about not being

20  in control of the news; is that right?  Were you in control of

21  the news for CodeSmart?

22  A     No, I was not in control of the news.

23  Q     Let's look to your text message on May 10, 2013, at 7:26

24  in this string, from you to Matthew Bell.

25          Did you write there, sir:  Easy.  Wait to you see

DISCALA - CROSS - BINI                3425

1    news, every Tuesday, Wednesday?

2    A    Yes, I did write that, and I just spent 25 days every day

3    doing due diligence on --

4    Q    Sir, I would just ask you to answer my questions, if you

5    could.

6         You wrote to Matthew Bell that news was coming out

7    everybody Tuesday, Wednesday, right?

8    A    I wrote, yes, I wrote that --

9         THE COURT:  That's the answer, is yes.

10        THE WITNESS:  Yes.

11   BY MR. BINI:

12   Q    Okay.  If we go down to an e-mail on May 13, at 1:13:08

13   in this string.  And what happened on May 13, 2013, sir?

14   A    What do mean, went public?

15   Q    It went public, right?  The stock was trading.

16        And did Matthew Bell text you:  I have some outside

17   investors that will buy code on news?

18   A    Most investors will buy on news.

19   Q    I am just asking you, sir, is that what he texted you?

20   A    Yes.

21   Q    And you responded, I'm all over it, news is coming,

22   right?

23   A    Correct.

24   Q    If I can now show you Government Exhibit 132I.  I am

25   sorry.  Let's go to -- before we go to 132-I, let me look at

DISCALA - CROSS - BINI                    3426

1    132-H with you for a moment.

2              These are additional text messages between you and

3    Matthew Bell?

4    A    Yes.

5    Q    If we can go to the text message, if we can go down to

6    May 28, 2013, at 12:47:03.  Do you see this text message from

7    you to Matthew Bell:  You ready for a big week, bro?

8    A    Yes.

9    Q    And what did you write next?

10   A    I can't read because the green is in the way.

11             Give him a minute after open to get all stock in.  I

12   put 10K at 503, and then 2,500, 504, 505, 506, 508, 509, above

13   market.

14   Q    Okay.  And would you agree with me, sir, that you are

15   telling Mr. Bell the bids that you are putting in, right?

16   A    That's not a bid, that's an offer.

17   Q    Oh, your offers.  I'm sorry.

18   A    Yes.

19   Q    You are telling him the offers you are putting in, right?

20   A    Above market.  If it hits, it hits.  If it doesn't, if it

21   goes down, it goes down.  So.

22   Q    So my question to you, sir, was, you are telling him the

23   offers?

24   A    The question was the bids.  So I should have said no.

25   Q    You corrected me, and now I am asking you for the offers,

DISCALA - CROSS - BINI                     3427

1    you put in the -- you are telling him the offers you are

2    putting in; is that right?

3    A    That is correct.

4    Q    And they are at ascending prices, right?

5    A    They are above the market.

6    Q    Okay.  And what was the next response?

7    A    Doing it.

8    Q    And then what did you write?

9    A    Go.

10   Q    And what did he write next?  What did Matthew Bell write

11   to you next?

12   A    Got to 507.

13   Q    And did you then next -- did you write 509, if you want,

14   next?

15   A    509, if you want.  If you have investors that want it at

16   509, 509 is there.

17   Q    I was asking you just to answer my question, sir.

18        And did Matthew Bell then write to you, just sent

19   15K shares of 509, right?

20   A    Correct.

21   Q    And next, you wrote, nice?

22   A    Correct.

23   Q    And then he wrote to you, 511, right?

24   A    Correct.  Must have traded through me and off to somebody

25   else.

1   Q    And then Matthew Bell said, fill my 511.  I got 6300

2   shares to -- he wrote, full.  Did he mean "fill"?  Is that

3   what you understood him to mean?

4   A    I would assume so.

5   Q    And if we can go back to the stock price chart of

6   CodeSmart.

7              MR. BINI:  Henry can we go to the supporting

8   document for this.  I believe it's 196-4.

9   BY MR. BINI:

10  Q    What did the stock price close at on the last day of

11  trading before May 24?

12  A    502.  And 61,200 shares of volume.

13  Q    Okay.  And how did it close at the end of the day on

14  May 28, 2013?

15  A    526 on 157,990 shares of volume.

16  Q    And the volume increased that day from 61,000 to more

17  than 157,000, right, the day before?

18  A    Yes.  I must have told Mr. Bell.

19  Q    Well, I am just asking about the volume.  The volume --

20  A    Volume is very heavy.

21  Q    Okay.  And it more than doubled, right?

22  A    Almost tripled.  One seven, tops.

23  Q    And if you can look at Government Exhibit 132-5, in

24  evidence.  Look on the first page, from June 4, 2013.  Do you

25  see this text from Matt Bell to you at the very top of this

DISCALA - CROSS - BINI                    3429

1    portion?

2    A    Yes.

3    Q    And what did he text you, sir?

4    A    Let's rock it.

5    Q    How did you respond?

6    A    Yes, sir, rocket man.  Where do you want to open?  588?

7    Q    And you are talking about the price of CodeSmart, right?

8    A    I'm actually probably asking him where he's got his

9    customers, where's he --

10   Q    Your 588 refers to the price of CodeSmart; is that right,

11   sir?

12   A    I am sure, if we're talking.

13   Q    And if we look down to the next text message, did you --

14   did he write you:  Yes?

15   A    Yes.  Any buyers this morning besides me.

16   Q    How did you respond, sir?

17   A    Deal.

18   Q    And what did you write next?

19   A    Yes.

20   Q    And what did you write at 1:14:37?

21   A    Tons on name change and ticker.

22   Q    And you are talking about CodeSmart again, right?

23   A    I am.

24   Q    And the response is, I'll be in ten minutes after the

25   open, for Matt Bell; is that right, sir?

DISCALA - CROSS - BINI                    3430

1    A    Yes.  He will be in ten minutes after the open.

2    Q    Okay.  And you responded, deal; is that right?

3    A    Okay.  Yes.  Deal.

4    Q    And then he wrote you, news out now, right?

5    A    He would do that frequently.

6    Q    And he was talking about the Ramapo press release that we

7    heard about during this case, right?

8    A    I don't recall what news release was on 6-4-2013, but I

9    am sure you can pull it up.

10   Q    If we can.

11        MR. BINI:  I will ask my colleagues.  172-41.

12   That's not it.

13   BY MR. BINI:

14   Q    I will ask you to look at 172-49.  Is that a June 4, 2013

15   press release from CodeSmart regarding Ramapo?

16   A    Yes.

17   Q    And you heard from Rosa Diaz Mulryan that this press

18   release was not accurate, right?

19   A    Yes, I think she testified it was not yet accurate,

20   right.

21   Q    Well, my question to you, she testified it was not

22   accurate; isn't that right, sir?

23   A    I think her testimony was it was not yet accurate.

24   Q    If we can go to Government Exhibit 132-2-DD.  I want to

25   go to August of 2013.  By August of 2013, you were now buying

1   CodeSmart stock, right?

2   A     Can you pull up the chart, and I can tell you?

3   Q     Which chart?

4   A     The CodeSmart chart that --

5   Q     Do you recall that at some point you started buying

6   shares of CodeSmart in order to try and increase the price?

7   A     No, I was buying CodeSmart because Joe Salvani was

8   dumping, and I thought once we bought all of his stock --

9   Q     Was that in approximately August 2013 that you were

10  buying shares of CodeSmart?

11  A     No, I was buying way before that.  So if you'd like to

12  pull up the chart, I will tell you when.

13  Q     Let me ask you, sir, did you continue to coordinate with

14  Matthew Bell as you were purchasing during this later period

15  CodeSmart stock?

16  A     Mr. Bell and I talked about Joe Salvani dumping against

17  his LULOs, 600,000 shares.

18  Q     I am going to ask you to look at this e-mail -- or text

19  message, series of text messages, at 4:54:15.  And is that a

20  text message from you to Matthew Bell?

21  A     Yes.

22  Q     And would you agree with me, sir, that you wrote to him,

23  watch for letter, then buy buy?

24  A     8-26.  What is --

25  Q     I am just asking you, is that what you wrote to Matthew

DISCALA - CROSS - BINI                    3432

1   Bell?

2   A     Yes.

3   Q     And you are telling him to buy shares of the stock,

4   right?

5   A     Yes.  I'm marketing to a registered investment advisor so

6   he can market to his clients.

7              MR. BINI:  I would ask you to answer my question.

8              THE COURT:   Again, Mr. Discala, you're not here to

9   volunteer answers.

10             THE WITNESS:  I'm sorry.

11  BY MR. BINI:

12  Q     And then he wrote to you, letter tomorrow.  Did you

13  understand him to mean later tomorrow?

14  A     It says letter tomorrow.

15  Q     Okay.  Letter tomorrow.  And you responded, now, buddy,

16  right?

17  A     At 4:57:26?  What time is that?  Is that 57 minutes after

18  the market closes?

19  Q     UTC, right?  Do you recall that that -- it is about four

20  hours, if the minus four hours, to give the time?

21  A     So 157 -- okay.

22  Q     And did you write on August 26, 2013, at about 512 down

23  here, to Matthew Bell, to move bid up and buy some at market?

24  A     I did.  And --

25  Q     Would you agree with me, sir, that would have the effect

DISCALA - CROSS - BINI                    3433

1  of increasing the price of CodeSmart?

2  A     I need to see the chart.

3  Q     Would you agree with me, sir, that if you moved your bid

4  up, that that, generally speaking, will increase the price of

5  the stock?

6  A     Moving a bid up doesn't move anything.  Moving a bid up

7  is -- a bid is the intent to purchase a stock.  It -- a bid

8  doesn't -- does nothing, Mr. Bini.

9  Q     Well, that was something you were concerned with

10 throughout your involvement with these stocks, right, was what

11 the level two optics looked like; isn't that right, sir?

12 A     You want to build a box of buyers.  So -- but you bid --

13 you asked if a bid would move --

14        THE COURT:  The question now was about the level two

15 box.

16 BY MR. BINI:

17 Q     And, sir, throughout the -- your involvement in the

18 stocks that are at issue in this case, you were concerned with

19 how that level two box looked, right?

20 A     Absolutely.

21 Q     You called it optics, right?

22 A     Optics to move markets.

23 Q     And you wanted the bid and the ask to be close in price;

24 is that right, sir?

25 A     You always want a tight spread in a bid and ask market.

DISCALA – CROSS – BINI                3434

1    Q    Because it looks more attractive to the market, right?

2    A    No.  If the bid and the ask is separate, that means

3    whoever's wanting to sell the stock is not selling it.  So --

4    Q    You want the prices to be close; is that correct, sir?

5    A    No, no, no.  You don't want them -- if a bid is bid here,

6    and there's an ask here --

7         THE COURT:  Problem with that is the reporter can't

8    get that down.

9         THE WITNESS:   Oh, I'm sorry.

10        So if a bid is 535, and the ask is 565, that means

11   there's two parties that don't want to make a transaction.

12   They have to meet in the middle.  So you can move your bid up,

13   because you have an intent to purchase, unless you don't have

14   an intent to purchase.  You move your bid up until either

15   someone comes in and you buy the stock --

16   BY MR. BINI:

17   Q    Sir, do you recall during the case, and do you recall, I

18   should ask, during your involvement with CodeSmart that there

19   came a time in about September 2013 where Ira Shapiro issued a

20   press release indicating he was investing in the company; is

21   that right, sir?  Do you recall that?

22   A    Do I recall -- do I recall loaning the money through

23   Darren Ofsink to Ira Shapiro, or do you recall --

24   Q    I am going to get there.  First I want to ask you about,

25   do you recall the press release by Ira Shapiro indicating that

DISCALA - CROSS - BINI                           3435

1    he was investing his own money in CodeSmart, in substance?

2    A    No, I don't recall any -- I recall that he --

3            THE COURT:  The answer is you don't recall.

4    BY MR. BINI:

5    Q    Do you recall a press release indicating that he was

6    putting -- he was purchasing stock in the company because of

7    his belief in the company?

8    A    Yes.

9    Q    And if we look to 177-16, in evidence, and if we look to

10   the entry on September 3, that's a wire out for $81,278,

11   right?

12   A    Proceeds from a loan, personally guaranteed loan --

13           THE COURT:  Again, Mr. Discala.  He asked you if it

14   was a wire out.

15   BY MR. BINI:

16   Q    Is that a wire out that you made to Mr. Shapiro?

17   A    That I made?  I am sure somebody made it on my behalf.

18   Q    Okay.  And that was so that he could purchase the stock

19   that he was indicating in the press release, right?

20   A    Took a personal loan because he didn't have any money.

21   That was drafted by our attorney.  And bought the stock.

22   Q    And would you agree with me, sir, that that press release

23   was designed to give investors confidence in the company?

24   A    Ruben Azrak thought it would be a good idea.

25   Q    Isn't it correct, sir, that that press release was

1    designed to give investors confidence in the company?

2    A    That a CEO would take a loan?

3           THE COURT:  The question is, yes or no, or you don't

4    know.

5    BY MR. BINI:

6    Q    Isn't it correct, sir, that the press release that Ira

7    Shapiro was purchasing stock in the company was designed to

8    give investors confidence in the company?

9    A    It wasn't designed for that.  It should give investors

10   confidence.

11   Q    Sir, can we look at Government Exhibit 196-8 in evidence.

12   I just want to ask you about the trading in CodeSmart.  And I

13   am going to ask you, sir, would you agree with me that your

14   name is in the bottom right of this slide?

15   A    My name, Wexler, Goepel, Marlene, Michael Morris,

16   Christopher Herghelegiu, and Robert Josephberg.  I don't know

17   who that is.

18   Q    Okay.  And you recall that this slide compares the

19   activity by you and these other individuals versus the

20   activity by Alamo and certain Halcyon clients; isn't that

21   right, sir?

22   A    I don't have -- I would love to see the underlying data

23   here, but that's what the chart says it compares.  Select

24   people at Alamo and select accounts at Halcyon, doesn't

25   really --

DISCALA – CROSS – BINI                    3437

1   Q    And would you agree with me, sir, that for several of the

2   days shown, the blue bar and the red bar look to be at the

3   same size?

4   A    Define "several."  Look at your next one.  It doesn't

5   look so pretty, but this is select data.  Anybody can take

6   select data and make it look how they want.  You have taken

7   select data, and you totally missed the second one.  One, two,

8   three --

9   Q    I am asking you, the two days that I circled, do those

10  appear to be pretty similar, the size of the red bar versus

11  the blue bar?

12  A    I would love to see the data underneath this.

13  Q    Well, I would ask you for these two days that I have

14  circled, on August 28, 2013 --

15  A    So you are going to take select data that you --

16            THE COURT:  Mr. Discala.

17            THE WITNESS:  Yes.

18            THE COURT:  You don't control either the courtroom

19  or the examination.

20            THE WITNESS:  Sorry.

21            THE COURT:  Answer the questions.  You don't offer a

22  running commentary.

23            THE WITNESS:  Sorry, Your Honor.

24  BY MR. BINI:

25  Q    They look substantially the same size, sir?

1   A    They look similar.

2   Q    Okay.  If I can go to 195-1 in evidence.  I just want to

3   ask you, sir, did you make on ITEN, did the various accounts

4   you hold make more than $2 million in sales?

5   A    No, they did not.  Made 1.86 million.

6   Q    Okay.

7   A    Which would be --

8   Q    Your testimony is you made more than 1.8 million?

9   A    Trading CodeSmart or investing?  CodeSmart is a

10  different --

11  Q    Did you make more than 1.8 million on CodeSmart?

12  A    No, I did not.

13  Q    On this trading?

14  A    On this chart, I made more than $1.8 million trading.

15  Q    Okay.  If we look to 195.2, in evidence.  Would you agree

16  with me, sir, that Marlene Goepel made more than 600,000 in

17  trading in CodeSmart?

18  A    I do not agree at all.

19  Q    Well, would you agree with me this chart shows she made

20  more than $600,000 trading in CodeSmart?

21  A    I would agree that it says she made 600,000.  Money

22  didn't go anywhere.

23  Q    Sir, I would like to ask you some questions -- oh, before

24  I ask you about Cubed, let me ask you, with respect to

25  CodeSmart, is it fair to say, sir, that any trading that was

DISCALA - CROSS - BINI                    3439

1    done in Goepel's account was controlled by you?

2    A    Absolutely not.

3    Q    Would you agree with me that was her testimony?

4              MR. ROSS:  Objection to testimony, Judge.

5              THE COURT:  Sustained.

6    BY MR. BINI:

7    Q    I am asking you, did you control the trading in Goepel's

8    account?

9    A    Absolutely not.

10   Q    And now I would like to ask you some questions about

11   Cubed.  Sir, you testified regarding meeting Kyleen Cane.  She

12   was not your attorney; is that right?

13   A    When I met her -- sorry.  Can you --

14   Q    Kyleen Cane represented Cubed, right?

15   A    You asked when I met Kyleen Cane.  I assume you were

16   referring to our meeting in Las Vegas.

17   Q    She didn't represent -- she represented Cubed; isn't that

18   right, sir?

19   A    One of her clients was Cubed.

20   Q    And you were not her client, right?

21   A    Me, personally?  She advised the structure.

22             THE COURT:  The question is, did you retain Ms. Cane

23   as your lawyer.

24             THE WITNESS:  Personally?

25             THE COURT:  Yes, personally.

DISCALA - CROSS - BINI                    3440

1              THE WITNESS:  No.

2    BY MR. BINI:

3    Q    And Darren Ofsink wasn't your attorney on Cubed either,

4    right?

5    A    Yes, Darren Ofsink was my attorney.

6    Q    At this time, I would like to play a short clip for you

7    from 198-3 in evidence, and I have a question regarding it.

8    It's an excerpt of an excerpt.  This is from May 5, 2014.

9              MR. BINI:  If you can display it, because I have a

10   question regarding the transcript.

11             (Audio played.)

12   BY MR. BINI:

13   Q    That's you, sir, right?

14   A    Yes.

15             (Audio played.)

16   BY MR. BINI:

17   Q    And Craig is Craig Josephberg, right?

18   A    I can't tell from this, but I would assume so.  It says

19   Goodrich.

20   Q    Okay.  You are speaking to Goodrich, but you said, get

21   Craig on the phone.  You were referring to another broker

22   Craig Josephberg, right?

23   A    I can't tell from --

24   Q    Okay.  If you continue playing.

25             (Audio played.)

DISCALA - CROSS - BINI                              3441

1    BY MR. BINI:

2    Q    And Darren Goodrich was a broker at BMAC, right?

3    A    Was my broker, and I was placing a bid with my money.

4    Q    Okay.  And when you were referring to the box, you were

5    referring to how the level two looks, right?

6    A    Correct.

7    Q    And you were upset that -- you wanted to get somebody off

8    the 451, $4.51?

9    A    No, that was me.  He was -- BMAC was me.  That was my

10   money, my bid.

11   Q    Okay.  If we can go to 198-4, in evidence.  I just want

12   to play you a short clip from a call with John Turino.  Who's

13   John Turino, sir?

14   A    An advisor.

15        MR. BINI:  Okay.  This is from May 6, 2014, right?

16   You can go ahead and play it.

17        (Audio played.)

18   BY MR. BINI:

19   Q    Fair to say, sir, in that call you said, you will be out

20   before anyone finds out if the Cubed work, right?

21   A    No.  The way that --

22   Q    Did you say that in that call?

23   A    We don't control the stocks, so --

24   Q    No, no.  I am asking you, sir, in that call we just

25   listened to, did you say, because we will be out before the

1   F-ing company will even see if the Cubed works?

2   A    Did I say that?  Am I allowed to explain what --

3              THE COURT:  No.  It is -- this is examination.

4              THE WITNESS:  Yes, I said that.

5              THE COURT:  Cross-examination.

6   BY MR. BINI:

7   Q    If we can go to 198-6-T in evidence.  And this is a call

8   between you and Darren Goodrich.  I would like to play a clip

9   for you.

10             (Audio played.)

11             MR. BINI:  You can stop.

12  BY MR. BINI:

13  Q    Let me just ask you, sir, when you referred to the 267,

14  you were referring to the 267,000 free trading shares in the

15  David Ben-Bassat account, right?

16  A    I was referring to the release of the first of five to

17  seven escrows.

18  Q    Okay.  You are referring to 267 free trading shares of

19  stock, right?

20  A    Correct.

21  Q    Okay.

22  A    And Rich and Bruce were --

23  Q    No.  I'm just asking if 267 --

24             MR. ROSS:  Objection, Your Honor.  Can we have a

25  sidebar?

DISCALA – CROSS – BINI                    3443

1          THE COURT:  Objection is overruled, but we can have

2     a sidebar.

3              (Sidebar conference.)

4              (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR                                    3444

1          (WHEREUPON, the following proceedings were had at

2     sidebar, out of the hearing of the open courtroom, to wit:)

3          MR. ROSS:  Judge, if Mr. Bini is just going to have

4     Mr. Discala simply read from transcripts and from tape

5     recordings that are already in evidence, it is cumulative, and

6     it is duplicative.  He should be permitted to explain what he

7     means and what he's saying.  He should not be cut off.

8          THE COURT:  It is called redirect examination.

9          MR. ROSS:  But if he has an explanation that does --

10         THE COURT:  He has an explanation about things that

11    have nothing to do with the conversation itself.

12         MR. ROSS:  But, Judge, it is just simply unfair.

13    The government takes their witnesses through and asks them

14    what is meant.  They ask Mr. Discala about the same exact

15    conversation --

16         THE COURT:  They couldn't do that.  They would love

17    to do that on direct.  But he's on cross.

18         MR. ROSS:  But, Judge, he should be permitted -- my

19    objection is that Mr. Discala should be permitted to explain,

20    and he can't yet answer yes or no.

21         THE COURT:  And to the extent that there's something

22    to be said, that's what redirect examination is all about.  If

23    you want him to play the tapes again, on redirect we will play

24    the tapes again.

25         MR. ROSS:  Okay, Judge.

SIDEBAR                                3445

1              THE COURT:   It is his examination.   It is

2     cross-examination.

3              MR. ROSS:   I understand.   But if Mr. Discala --

4              MR. BINI:   I don't want to waste the jury's time.

5     May I resume the questioning?

6              THE COURT:   Where are you in the cross-examination.

7              MR. BINI:   I am almost done.   I'm trying to finish

8     by 6:00, if that's okay.

9              THE COURT:   That's fine.   We will go over, if we

10    have to, if you are almost done.

11             MR. BINI:   Yes.

12             (Sidebar conference ends.)

13             (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

DISCALA – CROSS – BINI                    3446

1          (Open court.)

2   BY MR. BINI:

3   Q    Sir, the 267 referred to 267,000 free trading shares of

4   stock, right?

5   A    Yes.

6   Q    And when you said, BDs, you mean broker-dealers, right?

7   A    Yes.

8   Q    And when you said, but yesterday she mentioned, you are

9   talking about Kyleen Cane, right?

10  A    Yes.

11  Q    And you are saying that she mentioned she wanted to give

12  one of her BDs, you know, what we pay, 25,000 at 25 cents.

13          You meant 25,000 shares of Cubed at 25 cents a

14  share, right?

15  A    I never --

16  Q    You are saying that she never, Kyleen Cane, wanted to

17  give one of her BDs, 25,000 shares at 25 cents each; isn't

18  that what you are saying, sir?  Is that the meaning of it?

19  A    Yes.

20  Q    Okay.  And you responded, hey, in substance, hey, Kyleen

21  Cane, if you are going to do that, then I want to do the same

22  for Darren, right?

23  A    What do you mean in substance?

24  Q    Did you say, if you said you are doing it for them, you

25  have to do it for Darren?

DISCALA – CROSS – BINI                              3447

1   A     Yes.

2   Q     And you meant you have to give Darren Goodrich, the

3   broker at BMAC, 25,000 shares at 25 cents each, right?

4   A     Those were my shares, and I could --

5   Q     I just want to ask you --

6              THE COURT:  That's what that meant.

7              THE WITNESS:  Oh.  Yes.

8   BY MR. BINI:

9   Q     And that would be approximately a purchase price of

10  $6,000 for those shares of Cubed, right?  If you bought 25,000

11  shares at 25 cents each?

12  A     25,000 --

13  Q     About a quarter, 25,000, and would you agree with me

14  that's a little bit more than $6,000, right?

15  A     Uh-huh.

16  Q     And, sir, at this time, is it fair to say that the stock

17  price of Cubed was more than five dollars a share, right?

18  A     What's the date?

19  Q     May 9, 2014.

20  A     Yes.

21  Q     So 25,000 shares would be worth more than $125,000,

22  right?

23  A     They are not worth anything until the company executes on

24  its business plan.

25  Q     25,000 shares, if the stock is trading at five dollars,

DISCALA - CROSS - BINI                    3448

1   would be worth more than $125,000, right?

2             THE COURT:  At that moment.

3             THE WITNESS:  Would be valued?

4             THE COURT:  Valued.  Valued in the market at that

5   price.

6             THE WITNESS:  Correct.  If they were freely

7   tradeable.

8   BY MR. BINI:

9   Q    Sir, you had conversations during the course of your

10  involvement in these stocks with Victor Azrak, right?

11  A    I did.

12  Q    And, in fact, you had conversations with him where you

13  talked about schtupping investors, right?

14  A    No.  He -- that is incorrect.  He talked, was his words,

15  he called Joe Salvani schtup-alvani, he called Dan Walsh, Scam

16  Walsh.

17  Q    For screwing investors, right?

18  A    He talked about, yes, Joe Salvani and Dan Walsh, screwed

19  a lot of investors.

20  Q    You talked about it, too, right, sir?

21  A    We joked around a lot, but those were not my nicknames.

22  Those are his nicknames for Joe Salvani and Dan Walsh.

23  Q    Let's listen to your words, and then I will have a few

24  questions for you.  If we can go to 198-13-E in evidence, a

25  call from May 12, 2014.

DISCALA – CROSS – BINI                    3449

1          (Audio played.)

2          MR. BINI:  You could stop there.

3    BY MR. BINI:

4    Q    I am going to ask you, "Jobo" refers to Craig Josephberg,

5    right?

6    A    Yes.

7    Q    And Azrak was telling you, in substance, to send more

8    morons to Craig Josephberg, right?

9    A    No.  He didn't say "more morons."  Please stop putting

10   words in my mouth.  You are not even letting me answer --

11         THE COURT:  The question -- your answer was, no,

12   that's not what he said.

13   BY MR. BINI:

14   Q    Okay.  Did you see where he says, we should start sending

15   him morons?

16   A    I see how he's joking, and then says we should buy

17   Twitter options.

18   Q    Okay.  But he said in that sentence then, we should start

19   sending him morons, right?

20   A    He said we should start sending him morons, laughing.  It

21   says laughing in the beginning.

22   Q    And that's Craig Josephberg that he's referring to,

23   right?

24         THE COURT:  The "him."

25         THE WITNESS:  We should start sending him morons.

DISCALA - CROSS - BINI                    3450

1    Yes.

2    BY MR. BINI:

3    Q    And, by the way, with respect to CodeSmart, you had given

4    Craig Josephberg about a million dollars worth of CodeSmart

5    stock, right?

6    A    No.  He was one of about seven brokers that received

7    stock.  He received 125,000 shares.  It is on the cap table.

8    And that would be like saying I received ten and a half

9    million dollars of CodeSmart.  Because if you take your math,

10   right, and you say --

11              MR. BINI:  I am going to ask the answer be stricken.

12              THE COURT:  You have to just answer the questions,

13   Mr. Discala.

14              THE WITNESS:  Sorry, Your Honor.

15   BY MR. BINI:

16   Q    And, in fact, the 125,000 shares went to Josephberg at

17   just a few cents a share, right?

18   A    We all received --

19              THE COURT:  Again.  Can you answer that question yes

20   or no?

21              THE WITNESS:  Yes.

22   BY MR. BINI:

23   Q    And that was so that he would stuff CodeSmart into his

24   client's accounts, right?

25   A    So that he would present -- he would do what a broker is

1    supposed to do, present to his clients an opportunity.  That's

2    what he does for a living.  Just like Matt Bell was supposed

3    to do, just like the 15 brokers that we have had throughout

4    these.

5    Q    And, by the way, you joked about Josephberg's regulatory

6    history being so bad it was like a crime scene, right?

7    A    I did joke a lot.

8    Q    Okay.  And that was because Josephberg couldn't trade in

9    a number of states because of all the regulatory problems he

10   had, right?  He couldn't have clients in several states,

11   right?

12   A    I don't think that that's the case.  I think he couldn't

13   trade in a couple of states.  I did joke a lot.

14   Q    Okay.  Let's listen to some more with you and Mr. Azrak.

15   I want to ask you about screwing investors afterwards.

16             (Audio played.)

17   BY MR. BINI:

18   Q    And you were talking with Azrak there, when you told him

19   about the bull --

20   A    The joke?

21   Q    You were talking about investors, right?

22   A    It is May 12, 2014.  I just did SSET and TSGL.  Didn't

23   trade a stock, freely tradeable stock in either.  So I told a

24   joke that's probably been told a million times about patience.

25   And if you are going to sit here and say that me telling a

DISCALA - CROSS - BINI                    3452

1   joke --

2   Q    Just answer the question.

3         MR. BINI:  Move to strike, Your Honor.

4   BY MR. BINI:

5   Q    In your joke, you are referring to investors; isn't that

6   right, sir?

7   A    I am telling a joke.

8   Q    In your joke, were you referring to investors?

9   A    I told a joke.  Doesn't say investors here at all.  I

10  told a joke.

11  Q    Okay.  I would like to ask you to listen to Government

12  Exhibit 198-21, in evidence.  Another call between you and

13  Mr. Azrak, and I have a few questions about that.

14        Fair to say, sir, you had questions with Mr. Azrak

15  about how high CRPT's price would go, right?

16  A    Fair to say.

17        MR. BINI:  213.

18        (Audio played.)

19        (Continued on the next page.)

20

21

22

23

24

25

DISCALA – CROSS – BINI                    3453

1   CROSS-EXAMINATION (Continued)

2   BY MR. BINI:

3   Q    You're talking about the stock price of CRPT there, with

4   55, right?

5   A    I'm joking around.

6   Q    Are you referring to the stock price of CRPT, sir; yes or

7   no?

8   A    Am I referring to -- yes, I'm joking around about that.

9   Q    Okay.  If we can continue playing the call.

10         (Audio recording played.)

11   Q    And in that call we just listened to when you said you

12   were the brake and the gas you meant on CRPT stock price,

13   right?

14   A    I was joking.  If I was the brake and the gas, I think

15   there would be more than a couple hundred shares of volume.

16         MR. BINI:  Your Honor, I move to strike the answer

17   as nonresponsive.

18         THE COURT:  It's nonresponsive.  It's stricken.

19   Q    When you spoke about the brake and the gas in that call,

20   you were talking about Cubed stock price, right?

21   A    I was joking with victor Azrak about Cubed price and

22   being the brake and the gas.

23   Q    I'd like to ask you about May 23rd, 2014.

24         Was that a day that the stock price of Cubed spiked?

25   A    I think on a couple of hundred shares of volume, yes.

DISCALA - CROSS - BINI                    3454

1   Q    And the price went from in the 5-dollar range to over $7

2   for a short period of time; is that right, sir?

3   A    I think it was for...

4   Q    196-11?

5   A    When you say a "short period of time," what?

6   Q    During the trading day it went over $7; is that right,

7   sir?  Is that your recollection?

8   A    I recall it going over $7.

9   Q    Okay.  So if we can look then to -- can we show the price

10  here on May 22nd, 2014?

11       What was the closing price on May 22nd, 2014, sir?

12  A    May 22nd?

13  Q    Yes.

14  A    542 on 1500 shares of volume.

15  Q    And on May 23rd, 2014, was the closing price $6.30, sir?

16  A    Yes, it was.

17  Q    Okay.  If we can just go to the transcript for 198-28.

18  And I don't want to play this call, I just want to ask you

19  some questions about the transcript to expedite this.

20       Do you have certain calls with Kyleen Cane that day?

21  A    I'm sure I did.

22  Q    And were they regarding the stock price of Cubed?

23  A    Yes.

24  Q    And if we can go to where Cane indicates a sentence:  We

25  need to keep it back down.

1          Do you see that line, sir?

2     A    I do.

3     Q    Do you agree with me that she was referring to the stock

4     price of Cubed?

5     A    I do.

6     Q    And if we continue on that day to Government

7     Exhibit 198-29, and I'll just look at the transcript, again,

8     to expedite the proceedings, and we listened to this call.  If

9     we can go to the portion of the call where Cane says:  Where

10    do you want it to land?

11         Do you see that, sir?

12    A    I do.

13    Q    And would you agree that she was referring to the stock

14    price of CRPT or Cubed?

15    A    Yes.

16    Q    And you indicated $6.35, right?

17    A    I did.  On the supply, 635.

18    Q    And we saw on the previous chart that the stock price

19    ended that day at $6.30, right?

20    A    Yes.

21    Q    You solicited investments from a number of people via

22    stock purchase agreements in Cubed; isn't that right, sir?

23    A    Prior to two hedge funds going through the legalities of

24    escrow and the stock purchase agreement and speaking with

25    Ms. Cane going --

DISCALA - CROSS - BINI                    3456

1          MR. BINI:  I would ask to strike the answer as

2     nonresponsive?

3          THE COURT:  It's nonresponsive.  Stricken.

4          MR. ROSS:  Objection.

5     Q    And Mr. Zupnick was one of the people who you solicited

6     for investment via stock purchase agreement, right?

7     A    I didn't solicit.

8     Q    If we can look to Government's Exhibit 201-9 in evidence.

9          You didn't solicit Eliezer Zupnick?  You didn't meet

10    with him to ask him to invest?

11         THE COURT:  Sustained.

12    Q    Did you meet with Eliezer Zupnick, sir?

13    A    I believe his testimony was --

14    Q    No, I'm just asking you.

15         THE COURT:  He's asking you now.

16         Did you meet with him?

17         THE WITNESS:  I did, yes.

18    Q    Okay.  And at some point you asked him to invest in the

19    Bridge Venture Club, right?

20    A    No.

21    Q    Okay.  Well, you'd agree that's what he says, right?

22         MR. ROSS:  Objection.

23         THE COURT:  Sustained.

24    Q    And you received in total, you received about $50,000

25    from Zupnick for the Bridge Venture Club; is that right?

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

DISCALA - CROSS - BINI                    3457

1    A    He invested, along with my family and friends, in Bridge

2    Venture Club, yes.

3    Q    And he also invested in CodeSmart, right?

4    A    I believe he did.

5    Q    And he also invested in Cubed when he purchased stock

6    from EJA Capital; isn't that right, sir?

7    A    Yes.

8    Q    And he paid $10,000 to EJA Capital, right?

9    A    Yes.

10   Q    And if we can look to -- and you never provided the

11   shares to Mr. Zupnick; isn't that right, sir?

12   A    He was told that no one got shares, and we moved his SPA

13   to the escrows prior to participation.

14   Q    He never got any shares, right?

15   A    Everybody that purchased the shares was moved to the

16   escrows.

17   Q    If we can look to Government Exhibit 202-3 in evidence.

18        You had a stock purchase or there was a stock

19   purchase agreement involving Bryan Hagen; is that right, sir?

20   A    Yes.

21   Q    And if we look to the second page of this exhibit, on

22   this April 2nd, 2014, stock purchase agreement, Kelly and

23   Bryan Hagen were purchasing $30,000 worth of stock in Cubed,

24   Crackpot, rather, for OmniView Capital; isn't that right, sir?

25   A    On April 2nd, 2014, yes.

DISCALA - CROSS - BINI                    3458

1    Q    And you never delivered any shares to Kelly and Bryan

2    Hagen, right?

3    A    We delivered a check from the profit participation and

4    his parents actually.

5    Q    But you never delivered any stock certificates, right?

6         THE COURT:  What I understood is, what the prior

7    answer correctly, and we can expedite this.

8         Mr. Discala, correct, me if I'm wrong, did you say

9    that with respect to all of the stock purchase agreements in

10   connection with Cubed, they were moved to participation

11   agreements and that none of those contracting parties received

12   certificates?

13        THE WITNESS:  That's correct, Your Honor.

14   Q    You said that with respect to Mr. Zupnick, right?

15        THE COURT:  He said with respect to all of them.

16   Q    Okay.  Well, what about Mr. Hagen.  I'm going to ask you

17   about paragraph 4 of this agreement.

18        Would you agree with me, sir, that it says that:  On

19   the closing of the transaction, the seller, here, OmniView,

20   shall deliver the buyer the shares?

21   A    All the stock purchase agreements stated that.  And when

22   we thought we were going to do a traditional transaction,

23   until it was moved over, I never spoke to Mr. Hagen.  Andrew

24   Prichard did.  Andrew Prichard was in the profit

25   participation.

DISCALA - CROSS - BINI                    3459

1    Q    And Mr. Hagen, there was no participation agreement with

2    Mr. Hagen; isn't that right, sir?

3    A    There was with Andrew Prichard, who communicated with

4    Mr. Hagen.

5    Q    But there was none with Mr. Hagen, right?

6    A    He didn't -- I never spoke to Mr. Hagen, so...

7    Q    Okay.  And there was no stocks delivered to Michael

8    Kellner, right?

9    A    I don't know who Michael Kellner is.

10   Q    The individual who testified before you and this jury

11   regarding losing approximately $40,000 on his investment in

12   Cubed.

13         Do you remember him?  The individual who could no

14   longer afford daycare.  Do you remember him?

15         MR. RIOPELLE:  Objection.

16         MR. BINI:  That was his testimony.  I'm reminding

17   the witness.

18   A    Every one of the investors received their...

19   Q    I'm sorry, what was the answer, sir?

20   A    Every one of the investors was moved to the escrows,

21   including my friends and my family and myself.

22   Q    You'd agree with me that there's no participation

23   agreement for Mr. Hagen in evidence in this case?

24   A    I never spoke to Mr. Hagen, and there isn't one in

25   evidence.

DISCALA - CROSS - BINI                    3460

1   Q    Okay.  And there's no participation purchase agreement in

2   evidence for Michael Kellner, right?

3   A    I would have to check.  I can go down every person in

4   that list of the PPAs and about...

5   Q    That's not my question.  I ask you about Michael Kellner.

6        He didn't have a participation purchase agreement

7   right?

8   A    You asked me.  I don't know.

9   Q    Okay.  There's not one in evidence; isn't that right,

10  sir?

11            MR. ROSS:  Objection.

12  A    There's not one in evidence.

13            THE COURT:  Sustained.

14            Move on, Mr. Bini.

15  Q    And Rae Falcon invested, with her clients, more than

16  1.4 million in Cubed, right?

17  A    I think it was 1.7 million and very, very smart woman,

18  University of Chicago, six months of due diligence.  Met with

19  the CTO.

20        So, you know, from a due diligence perspective, I

21  think Rae Falcon probably knows better than anybody about what

22  this product could have done, if you hadn't come and shut down

23  the company.

24  Q    So, sir, would you agree with me, sir, that Rae Falcon

25  lost all her money?

PROCEEDINGS                                    3461

1   A    I never met Rae Falcon.  But I was very pleased to see

2   that she did six months of due diligence with the CTO and

3   wrote a very large check and got her friends and clients in.

4   Q    And would you agree with me, sir, that she lost all her

5   money?

6   A    I don't know what kind of deal you have with her.  If

7   there's restitution with all this money taken from people

8   that -- so I don't know if she's lost all her money.

9   Q    Would you agree with me, sir, that the loses on CodeSmart

10  were approximately $10 million?

11  A    Losses in CodeSmart were approximately $10 million.  I

12  would have no -- I have no -- I have no -- the losses were

13  significant.

14            MR. BINI:  No further questions, Your Honor.

15            THE COURT:  Thank you, Mr. Bini.

16            Ladies and gentlemen, that brings us to the end of

17  the day.  We went into overtime.  Probably got to the 14th

18  inning instead of our usual 10th or 11th inning.

19            You may recall that I indicated to you at an earlier

20  point in the proceeding that sometime by going over and

21  finishing, we save more time because otherwise we have to back

22  up and go forward again.  So that's why we stayed the extra

23  time.

24            But we have come to the end of the day.  I'm sure

25  you will be grateful, thankful to hear that.  We certainly are

PROCEEDINGS                           3462

1    grateful and thankful to all of you for all the sacrifices

2    that you make, the patience that show us, your attentiveness,

3    and particularly on this law day celebration that you are

4    emblematic of what it means to be good citizens sacrificing

5    for the rule of law, and applaud you on that.

6           We also remind you of our usual admonitions to say

7    as many times as you hear them.  You hear them many times

8    because they are important.

9           The first is to keep an open mind.  Do not discuss

10   the case amongst yourself or with anyone else.  Do not use the

11   recess period as an opportunity to do research, electronic or

12   any kind about anything touching on the case; the

13   personalities, the issues.

14          Also, to the extent that there may be any media

15   coverage of the events that transpired here, you're directed

16   to shut them out completely of your mind and eyes and ears.

17   Totally disregard them.

18          Again, I urge you, to the extent that you can, to

19   shut yourself away from media accounts, and one definition of

20   media about any proceeding for fear that you may hear

21   something there that confuses you about your role here.

22          And lastly, of course, whether you're here or coming

23   or going from here or home, with respect to what happens here,

24   with respect to your service as a juror, the fact that you're

25   involved in this as jurors in this case, or come to the

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                                3463

1    courthouse, you will remain on radio silence with respect to

2    any social media platform you may be on.  So that's without

3    saying discussing the case with other people.  So you remain

4    on radio silence.

5              And with all of that, again, with our thanks, enjoy

6    a pleasant evening.  We will see you tomorrow, at around 9:45.

7              (Jury exits the courtroom.)

8              THE COURT:  You may step down, sir.

9              (Whereupon, the witness was excused.)

10             THE COURT:  I know we have housekeeping from

11   Mr. Riopelle.

12             MR. RIOPELLE:  Yes, Your Honor.

13             THE COURT:  That doesn't involve everybody, not just

14   Mr. Riopelle.

15             MR. RIOPELLE:  Well, I can speak loud enough.

16             THE COURT:  Okay.

17             MR. RIOPELLE:  First of all, Your Honor, with

18   respect to Mr. Discala's testimony, I would just ask the court

19   to give me overnight to think about whether I might like to

20   come examine Mr. Discala.

21             THE COURT:  Yes.

22             MR. RIOPELLE:  I want to talk to my better half,

23   Mr. Caliendo, and see what he thinks, and I just want to

24   reserve that right.  I'm leaning against it, but we'll see if

25   I feel differently in the morning.

PROCEEDINGS                            3464

1          The one issue I want to raise with respect to the

2    charge is a simple one, and I think that, I would submit, it

3    makes sense.

4          I went back and reread the charge today while things

5    were going on and were not of much interest to me in the

6    courtroom, and there is not in the charge sort of the standard

7    *Sands* charge about evidence of motive and how that is relevant

8    for the jury to consider, but not itself an element of the

9    crime.  And I think this might be a case where that charge is

10   appropriate.

11         The reason I say that, is there has been a lot of

12   proof and a lot of back and forth amongst the parties about

13   the money that was earned, or was not earned, or who got what

14   out of all this scheming.

15         And, of course, whether the scheme was successful or

16   not is not an element of the charge, but it is relevant to the

17   motive.  I think -- I'm sure the Court left is out because

18   everybody understands what the motive is in a financial crime.

19   But given that there's been so much dialogue on the issue of

20   money in the case, and who got money, and when they got money,

21   it seems to me that I couldn't find it in the charge, if it's

22   in there --

23         THE COURT:  I don't think it is.

24         MR. RIOPELLE:  Yes, I couldn't find it.  It seems to

25   me it's an appropriate charge to include.

PROCEEDINGS                                3465

```
 1              THE COURT:  We'll cut to the chase.

 2              To the extent that no one has a problem with it, I'm

 3    happy to put it in.  To the extent people want to think about

 4    it and let us know tomorrow.

 5              MR. RIOPELLE:  That would help.

 6              MR. BINI:  Your Honor, it was at page 209 of

 7    document 601, so using motive for intent.

 8              MR. RIOPELLE:  Okay.

 9              MR. BINI:  It is in the instruction already.

10              THE COURT:   It is now?

11              MR. BINI:  It is, Your Honor.  This is ECF 601 at

12    page 209.

13              THE COURT:  Here it is.  It's crystal clear.

14              People of our age have to rely on people of

15    Mr. Bini's age.

16              MR. BINI:  It was actually Mr. Hein who pointed it

17    out.

18              THE COURT:  Mr. Hein.  Same difference.

19              MR. RIOPELLE:  There it is.  There it is.  Mr. Bini

20    wins that one hands down.

21              THE COURT:  He's giving credit to Hines.

22              MR. RIOPELLE:  And you hit me below the waterline

23    with that "people of our age."

24              THE COURT:  I know you're a lot younger than I am.

25              MR. RIOPELLE:  Probably not that much.
```

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

1          THE COURT:  Once you're on Medicare, it's all at

2     same.

3          MR. RIOPELLE:  I'm almost there, Judge.

4          THE COURT:  We'll make sure it's there for you when

5     you get there.

6          MR. RIOPELLE:  When I was U.S. Attorney in a trial

7     in front of Judge Martin in the Southern District, I once

8     referred -- I referred to a witness in his 60s as an avuncular

9     older man, and the judge sent the jury out and informed me

10    that if I refer to somebody the 60s as an older man again,

11    he'd have the marshals put on the in shackles and take me

12    away.

13         THE COURT:  You were well advised.  All right.

14         MR. RIOPELLE:  All right.  Thank you.

15         THE COURT:  We will see you all tomorrow.

16

17              *     *     *     *     *

18         (Proceedings adjourned at 6:20 p.m. to resume on

19    May 2, 2018 at 9:45 a.m.)

20

21

22

23

24

25

3467

1                          I N D E X

2    WITNESS                                   PAGE

3    HALEY ECKHART

4    DIRECT EXAMINATION     BY MR. CHENG       3274
     CROSS-EXAMINATION      BY MS. JONES       3293
5    CROSS-EXAMINATION      BY MS. JONES       3323
     CROSS-EXAMINATION      BY MR. CHENG       3329
6
     ABRAXAS J. DISCALA
7
     DIRECT EXAMINATION     BY MR. BOWMAN      3338
8    CROSS-EXAMINATION      BY MR. BINI        3406
     CROSS-EXAMINATION      BY MR. BINI        3422
9

10                       E X H I B I T S

11   GOVERNMENT            PAGE
     193                   3302
12   190-3                 3304
     198                   3323
13   DEFENSE               PAGE
     HE-1                  3270
14   HE-3.1                3270
     HE-3.1A               3270
15   HE-3.2                3270
     HE-3.2A               3270
16   HE-3.3                3270
     HE-3.3A               3270
17   HE-3.4                3270
     HE-3.4A               3270
18   HE-4.1A               3270
     HE-6.2                3271
19   HE-6.4                3271
     HE-6.5                3271
20   PA                    3341
     PE                    3370
21   PF                    3375
     P-1                   3387
22

23

24

25