3656

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------x
                                    14-CR-399(ENV)
3   UNITED STATES OF AMERICA,
                                    United States Courthouse
4            Plaintiff,             Brooklyn, New York

5            -against-              May 3, 2018
                                    10:00 a.m.
6   ABRAXAS J. DISCALA, ALSO
    KNOWS AS AJ DISCALA, AND
7   KYLEEN CANE,

8            Defendants.
    ------------------------------x
9
             TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
10        BEFORE THE HONORABLE ERIC N. VITALIANO
              UNITED STATES DISTRICT JUDGE
11                  BEFORE A JURY

12  APPEARANCES

13  For the Government:      UNITED STATES ATTORNEY'S OFFICE
                             Eastern District of New York
14                           271 Cadman Plaza East
                             Brooklyn, New York 11201
15                           BY:  SHANNON JONES
                                  MARK E. BINI
16                                PATRICK HEIN
                             Assistant United States Attorneys
17
    For the Defendant:       CHARLES ROSS & ASSOCIATES, LLC
18  Abraxas J. Discala       111 Broadway
                             New York, New York 10008
19                           BY:  CHARLES ROSS, ESQ.
                                  MATTHEW SHROYER, ESQ.
20
                             ANDREW BOWMAN, ESQ.
21                           1804 Post Road East
                             Westport, Connecticut 06880
22
                             HANWEI CHENG, ESQ.
23                           15155 Gale Avenue
                             Suite D
24                           Whittier, California 90603

25

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

3657

```
1   A P P E A R A N C E S:   (Continued)
    Attorney for Defendant:  SERCARZ & RIOPELLE, LLP
2   Kyleen Cane                810 Seventh Avenue
                               Suite 620
3                              New York, New York 10019
                               BY:  ROLAND RIOPELLE, ESQ.
4                                   ROBERT CALIENDO, ESQ.

5
    Court Reporter:            LINDA D. DANELCZYK, RPR, CSR, OCR
6                              Phone:  718-613-2330
                               Fax:    718-804-2712
7                              Email:  LindaDan226@gmail.com

8
    Proceedings recorded by mechanical stenography.  Transcript
9   produced by computer-aided transcription.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PROCEEDINGS                            3658

1              (In open court; Jury not present.)

2              THE COURTROOM DEPUTY:  All rise.

3              The court is now in session.  The Honorable Eric

4    Vitaliano presiding.  The case on calendar is *U.S.A. versus*

5    *Discala and Cane,* Case Number 14-CR-399 on for jury trial.

6              Would the attorneys please note their appearances

7    beginning with the government.

8              MS. JONES:  Shannon Jones, Mark Bini, Patrick Hein

9    for the United States, along with Henry Ishitani and FBI

10   Special Agent Elyse Morris.

11             THE COURT:  Good morning.

12             MR. ROSS:  Good morning, Judge, Charles Ross Matthew

13   Shroyer and Scott Schwartz for Mr. Discala.

14             THE COURT:  Good morning.

15             MR. RIOPELLE:  Good morning, Your Honor.  Roland

16   Riopelle and Robert Caliendo for defendant Kyleen Cane.

17             THE COURT:  Good morning.

18             Counsel for both sides are present, including

19   defendants.

20             Good morning, all.  Any housekeeping?

21             MR. BINI:  Your Honor, some quick housekeeping from

22   the government, if I could raise.

23             One thing in looking at the jury instructions last

24   night one last time, I noticed in 601 on page 89, the object

25   of Count Two indicated was wire fraud, and I believe it should

PROCEEDINGS                                      3659

1    say "mail fraud and wire fraud."  So I wanted to raise that.

2            THE COURT:  No one disagrees with that?

3            MR. ROSS:  No disagreement.

4            THE COURT:  I'll email that to Mr. Mejia.

5            MR. BINI:  The second issue was, there was a request

6    from the media, and I've relayed this to counsel for

7    Mr. Discala, for several of the wiretap calls that were

8    admitted, three wiretap call excerpts, from 198-4, 198-21 and

9    198-28, specifically for the audio that was admitted into

10   evidence.  And so I raise it for Your Honor.  Our office take

11   no position, but we wanted to raise it so that the Court could

12   give permission or not give permission.

13           MR. ROSS:  Judge, I'd certainly opposed that.  The

14   media was here in court, they listened to the wiretap

15   conversations.  They were --

16           THE COURT:  You can save your breath, Mr. Ross.

17   Nothing's going out until this trial is over, until after the

18   jury verdict.

19           MR. ROSS:  Thanks, Judge.

20           MR. BINI:  Thanks, Judge.

21           THE COURT:  Anything else?

22           MR. ROSS:  No, Judge.

23           MR. BINI:  No, Judge.

24           THE COURT:  Mr. Ross, give us a report on

25   Mr. Bowman's wife.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                    3660

1          MR. ROSS:  Mr. Bowman's wife is fine.  She was in a

2   car accident, and apparently the injury was just an abrasion

3   burn from the seat belt.

4          THE COURT:  And she was released?

5          MR. ROSS:  Oh, yes.

6          THE COURT:  Okay.  Tell him we were asking for him

7   in case he doesn't get here.

8          MR. ROSS:  I shall.  Thank you, Judge.

9          THE COURT:  Then we're ready for the jury.

10         Mr. Riopelle, I remember your last estimate that

11  your close was about two hours?

12         MR. RIOPELLE:  I believe that's correct, Your Honor.

13  I have 71 slides, and I typically go at the 30, to 35 slides

14  pace.

15         MS. JONES:  I assume, Your Honor, that we would take

16  our the morning break after Mr. --

17         THE COURT:  Yes, the plan would be to make sure we

18  don't interrupt Mr. Riopelle, take a 15-minute break, and then

19  come back for your rebuttal.

20         Which you Ms. Jones, right?

21         MS. JONES:  Yes.

22         MR. RIOPELLE:  If Ms. Jones would like, I can

23  stretch it out a little bit, maybe she will get the whole

24  lunch hour.

25         THE COURT:  I don't like that.

PROCEEDINGS                              3661

1              (Jury enters the courtroom.)

2              THE COURT:  Be seated, please.

3              Counsel will stipulate that the jury is present and

4    properly seated.

5              MS. JONES:  Yes, Your Honor.

6              MR. ROSS:  Agreed.

7              MR. RIOPELLE:  So stipulated, Your Honor.

8              THE COURT:  Ladies and gentlemen, welcome back.

9    It's a little hotter out there than I would prefer, but at

10   least it's dry and sunny.

11             Let me just briefly sketch out for you what our plan

12   is for today.  We will hear the closing arguments on behalf of

13   Ms. Cane.  They will be followed by the rebuttal arguments on

14   behalf of the government.

15             We will be sneaking lunch in.  As I told you, we

16   purchased lunch for you, so you definitely are going to get

17   that.

18             There will be final instructions that the Court will

19   the give you on the law, and then hopefully we'll be able to

20   begin deliberations.

21             There are no time limits on deliberations.  The jury

22   is encouraged to take as much time as they need to deliberate

23   and ponder the issues that have been presented to them.  We

24   probably won't work past 6:30.  If deliberations are

25   continuing beyond that, we will return tomorrow and begin anew

1   and continue thereafter from day to day as need be.  But

2   that's generally the plan to give you that plan as we begin.

3          So we're going to -- I said we would start.  We do

4   have closing argument on behalf of Ms. Cane being offered by

5   Mr. Roland Riopelle.

6          Mr. Riopelle.

7          MR. RIOPELLE:  Thank you, Your Honor.

8          May it please the Court, my colleagues.

9          Good morning, ladies and gentlemen.  I'd like to

10  begin, before I launch into my slides, picking up on the

11  Judge's remarks a couple of days ago on Law Day.

12         He told you how important a day that is for all of

13  you in the legal profession.  And it is an important day, and

14  he thanked you for your service, and my client and I thank you

15  for your service.  And he likened you to those who as citizens

16  serve in our armed forces, and the duty that you've undertaken

17  is a very serious one like that.

18         But you know, that's always made me a little nervous

19  when a court or a litigant compares a jury to the armed

20  services, because I want you to keep in mind that you are like

21  soldiers.  But you're not shoulders for me, and you're not

22  soldiers for the government, you're not ultimately soldiers

23  for the court, you are soldiers for the community.

24         It is your duty to take the law as the judge gives

25  it to you and decide the facts of this case as the diverse

1    that you are.  We trust in our community, which is diverse,

2    diversity will lead us to the best possible decision, and that

3    is a decision that will be only yours.  Only yours.  You're

4    not here to fight for the government.  You're not here to

5    fight for Ms. Cane.  You're here to render a decision of the

6    community.

7              And there's one other thing I want to pick up on,

8    it's a little more personal.  Law Day for me this year was a

9    sad day.  Because on Law Day last year, Brooklyn lost its

10   greatest criminal defense lawyer, a man named Gus Newman, who

11   I knew well, and who practiced the law until he was nearly 90

12   when he died.  He died at 90.  Tried his last case at 86 to an

13   acquittal, and had many notorious cases, some of them right

14   here in this courthouse.

15             He represented Floyd Flake.  That's a name you may

16   know.  Got an acquittal for Reverend Flake.  And Gus was a

17   mentor of mine, and I loved him.  Everybody who knew him loved

18   him.  And so for me Law Day is little bit sad, and but it

19   helps me remember Gus.

20             And I you'll hope you forgiven me if I tell a few of

21   those old Brooklyn criminal defense lawyer stories that I

22   learned from Gus, when I was like Mr. Caliendo at the table

23   and watched Gus try cases.

24             They're stories that illustrate legal principles.

25   They're fun.  And, frankly, they're a crutch, I know now, at

SUMMATION - MR. RIOPELLE                    3664

1    almost 60, for a failing memory.  So I hope you forgive me if

2    I tell a few of those and try to entertain you a bit as we go

3    through that process.

4           Now, I'd like to begin with some of the bedrock

5    principles that the judge will tell you about that apply in

6    trials like this.

7           The first, and you've heard this many times from the

8    judge, I just want to remind you, is that the burden of proof

9    throughout this case remains on the government.  At all times

10   it is on the government, as I speak to you now, and it is the

11   government's burden to prove each defendants guilt beyond a

12   reasonable doubt.

13          That the burden never shifts to the defendant.  The

14   defendant in a criminal case is never required to prove

15   anything, is never required to provide any evidence.

16          Now, of course, in this case we did cross-examine

17   witnesses.  We did bring out facts that I think are important

18   for you to know.  And we did call four witnesses, four brief

19   witnesses at the end of the case, so we did bring out some

20   facts, but at no point never do we have any burden.

21          The law presumes each defendant in this case to be

22   innocent.  That presumption attaches to Ms. Cane now.  It will

23   stay with her as you go in to the jury room to deliberate on

24   her fate.  That presumption stays with her unless and until

25   you decide the government has proved its case beyond a

1    reasonable doubt.

2            And beyond a reasonable doubt, that is the highest

3    burden of proof imposed by the law.  It is not probably.  It

4    is not I'm pretty sure.  It is not clear and convincing

5    evidence, which is a burden of proof less than reasonable

6    doubt.  It is proof of such character that a reasonable person

7    would rely on it to make a decision in their lives.  And we'll

8    talk a little bit more in detail about that a little bit

9    later.

10           And finally, and this is a really important

11   principle in any multi-defendant case.  Each defendant's guilt

12   is individual and personal.  You've got to decide Ms. Cane's

13   case based on only the evidence that applies to her.  It's as

14   if there are two trials going on in this courtroom at one

15   time; one relating to Mr. Discala, one relating to Ms. Cane,

16   and you must consider the defendants individually.  And this

17   is one of the most ancient principles in our law.  It comes to

18   us, like so much, from the bible.

19           In the Book of Exodus, you will remember that back

20   in the days when there were real lawyers, Father Abraham got

21   into an argument with God about the city of Sodom.

22           God wanted to wipe the city of Sodom out because

23   there were a lot of bad people there.  But Abraham argued to

24   God:  You can't wipe out the whole city of Sodom, there are

25   some good people there.  What if there are 50 good people?

1    What if there are 20 good people?  What if there are ten good

2    people, God?  You can't wipe out the whole city.

3            Guilt is individual and personal.  And that

4    principle comes down to us these thousands of years later from

5    that part of the bible.  This is all important in the charge.

6    You will hear it later.

7            Here is another one.  The fact that one side calls

8    one or more witnesses and puts in more evidence than the other

9    does not mean that you should find that the facts in favor of

10   deciding who called more witnesses, or who put in more

11   documents, is a winner.  It's not like bridge, length over

12   strength, okay?  It's not -- you know, the government put in

13   piles of documents.  The government called most of the

14   witnesses.  Of course, much of their testimony was

15   cross-examination.  So that goes on our ledger.

16           But we will show you today, and we've tried to show

17   you during the trial, the ways in which the government's own

18   documentation favor my client; favor my client and show that

19   she didn't have the intent to commit any crime.

20           And remember, my client had no burden to present any

21   evidence.  Indeed, one of the most famous trials of all time,

22   conducted by the greatest trial lawyer of the 18th Century,

23   Lord Erskine, in London, involved about 50 witnesses,

24   eyewitness who all saw the defendant commit the crime.

25           Lord Erskine didn't cross-examine any of them.

 1   Lord Erskine put on no evidence on behalf of the defendant.

 2   But by gosh he stood up and gave a humdinger of a closing

 3   statement and established a principle of law that got his

 4   client acquitted.  So keep that in mind.  A person who puts in

 5   the most evidence isn't necessarily satisfying any burden.

 6           The verdict that you return must be based solely on

 7   the evidence or the lack of evidence.  You've got to look to

 8   the lack of evidence as well as the evidence in the case.

 9           Here's a very important one.  Lawyer's arguments are

10   not evidence.  My argument to you now is not evidence.  I will

11   try to point you to what I think is the relevant evidence in

12   the case.  I will try to raise the profile of the evidence I

13   want you to consider in that jury room.  But whatever I say to

14   you now, just like whatever Mr. Hein said to you yesterday,

15   whatever Ms. Jones may say when I sit down, that is not

16   evidence.  The evidence is what you heard from the witness

17   stand, and what you will see in the documentary evidence in

18   the case.

19           So don't be misled.  Don't be misled by clever

20   arguments by me, Mr. Hein or Ms. Jones or anybody.  You, if

21   you have a question about the evidence, if you have a question

22   about a particular exhibit, you can ask us to find the

23   relevant testimony in the record for you, if you need it, and

24   you can ask us to try to help you find the relevant documents

25   that you need.  Don't be afraid to ask for our help as you

SUMMATION - MR. RIOPELLE                3668

1   deliberate.

2          Now, a really important fact about this case that I

3   want you to keep in mind is that Kyleen Cane, Kyleen, my

4   client, is not charged with most of the conduct in the case.

5   The indictment charges four separate schemes.  Schemes in

6   CodeSmart.  Schemes in StarStream.  Schemes in Staffing Group

7   and Cubed.

8          She is charged only with participating in the

9   alleged fraud in Cubed.  And she is alleged to have entered

10  that scheme when it was already started.  She came along

11  halfway through it.  The government's charge is that she

12  joined it after it began.

13         Keep this in mind.  Most of Kyleen's work in

14  connection with Cubed was the work of a lawyer, ordinary work

15  that lawyers do creating the forms that were filed with the

16  SEC, disclosing the purchases of Northwest Resources and other

17  transactions such as Ping Mobile, WikiTechnologies.  Those

18  kinds of deals.  That's most of what she did.

19         Keep in mind that a great deal of what she's charged

20  with here she was doing simply as a lawyer.  She was not

21  involved in other conduct described by the witnesses.

22         Cane had nothing to do with Location Based

23  Technologies.  She had nothing to do with Soul and Vibe.  She

24  had nothing to do with some of these other illegal

25  transactions that are described by the government's witnesses.

SUMMATION - MR. RIOPELLE                    3669

1        She had nothing to do with the creation of Northwest

2   Resources, about which we heard a great deal during the trial.

3        The three witnesses that the government called about

4   Northwest Resources, you'll remember them, Taylor Edgerton,

5   Wesley Smith and Marche Godffrey, never dealt with Kyleen

6   Cane.  They never spoke to her.  They never told you they even

7   knew who she was.  Indeed, much of that conduct went in Reno

8   when Kyleen Cane was down in Las Vegas.  It's about the same

9   distance as North Carolina from here.  So there's -- and there

10  is no evidence, no testimony that Joe Laxague told Kyleen Cane

11  what was going on when he created Northwest Resources.  Keep

12  that in mind, please.

13       So why did we hear all about that stuff?  Why sit

14  through hours of testimony about things that had nothing to do

15  with Kyleen, and that's particularly true of the formation of

16  Northwest Resources.  Because there was so little evidence, so

17  little evidence of Kyleen Cane's involvement in Cubed.

18       This is what happens when there's no evidence really

19  of wrongdoing.  We start to go out and look at all kinds of

20  things like, well, the creation of Northwest Resources by Joe

21  Laxague in 2011, when the conspiracy in this case charges

22  conduct in 2014.  What are we doing talking about something

23  three years earlier?  Got nothing to say about 2014.

24       Here is some of the documentary evidence presented

25  by the government.  It's just Kyleen doing ordinary lawyer

1   stuff; emails, transmitting documents, filings with the SEC,

2   some of which are quoted by the government in the indictment,

3   which the judge will read to you, because the government

4   apparently wants you to rely on it.

5          That's the stuff that Kyleen was really doing.  The

6   documents really don't prove anything about Kyleen's intent,

7   because what they show is that she was acting as a lawyer.

8          And, you know, we had the experience this morning

9   here in this courtroom that I think will show you that the

10  documents don't confirm or don't corroborate any of the

11  testimony from the government's witnesses.

12         Now, I'm here to tell you, that just this morning,

13  Kim Kardashian appeared here in court in a string bikini, and

14  she sat right here in seat number two.  And it was very

15  exciting, at least for me, and I can prove it.  You're looking

16  at me like you don't believe me.  I can prove it.  There's the

17  seat right there that she sat in.  That's the proof.

18         Well, that's what the government is trying to do

19  with all these ordinary documents that a lawyer creates.

20  There's the documents.  She was involved.  The documents don't

21  prove Kyleen's guilt any more than the seat that Juror

22  Number 2 is sitting in to prove that Kim Kardashian was down

23  here in a string bikini this morning, unfortunately.

24         You need to consider all of the facts and

25  circumstances in deciding what happened in this case, deciding

SUMMATION - MR. RIOPELLE                    3671

1    what Kyleen Cane's intent truly was.  Don't hesitate to look

2    at all the facts.  It's not always easy to figure out what

3    somebody intended when they filled out a form that any lawyer

4    would fill out.

5           Now, the indictment, as I told you in my opening

6    statement, has three key allegations as to Kyleen.

7           First, that her law firm was involved as the

8    attorneys for Cubed in an asset sale, for example, by which

9    Cubed became a public company.

10          But keep in mind about that.  The proof, now

11   admitted, shows how Kyleen's work on behalf of Cubed was done

12   out in the open.  It's not as though she was acting like some

13   kind of secret agent.  Her firm filed these documents with the

14   SEC where anybody could get them.  Remember we heard that from

15   several witnesses, when you file something with the SEC,

16   anybody with internet access can get to the documents.

17          And, in fact, you know, for example, they filed a

18   document disclosing how Cubed had purchased Northwest

19   Resources.  How it was changing its name.  All these things

20   were done out in the open by Kyleen and her firm.

21          And as you heard, the documents to show that at a

22   key point in time, the spring of 2014, the company had only

23   $1500 on hand.  The company had accrued professional fees by

24   that point of already $130,000.  The company was operating at

25   a loss.

SUMMATION - MR. RIOPELLE                3672

1          So these are documents that are filed in public.

2     These are documents filed by Kyleen's firm.  They're not

3     hiding it.  And here's the allegation right in the indictment,

4     which the judge will read to you later, all out in the open.

5     Ask yourself as you think about the evidence, is that how

6     people conduct a fraud when indicted?

7          Here's an example of one of the filings.  The

8     evidence doesn't show Kyleen committed a fraud.  I submit to

9     you, it shows just the opposite.  She's right out front in

10    this transaction, like anybody is here.  In fact, what the

11    evidence shows is that she's acting as a responsible and an

12    effective lawyer.

13         Think about the testimony of Marc Wexler.  He

14    thanked her for her hard work as a lawyer on Cubed.  This is

15    to remind you that he thanked her for her hustle in buttoning

16    up the work in getting the filing done for Cubed.  He

17    answered:  Yes.  And that's the filing that he was

18    complimenting her on in the background.

19         The evidence also shows, however, that Kyleen did

20    not do whatever Wexler wanted in connection with his fraud.

21    Remember this testimony that Mr. Wexler had conversations with

22    Mr. Discala about moving the account of Glendale away from

23    Glendale and to BMAC.  Because they were unhappy.  Wexler was

24    unhappy with the things -- the way things were going at

25    Glendale.  Kyleen wasn't doing what he wanted.  For the most

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

1    part, she wasn't doing what he wanted.

2             Ask yourselves as you think about this case, is that

3    a conspiracy?  Is that a conspiracy when Kyleen was not doing

4    what Mr. Wexler wanted?

5             Now, here's the second allegation as to Kyleen.

6    That the defendants pumped the stock of Cubed up through match

7    and wash trades.  Here's the allegation in paragraph 36 of the

8    indictment.

9             The defendants, together with others, manipulated

10   the vast majority of the trading activity, inter alia, wash

11   trades and match trades.  But the government's own evidence,

12   the evidence they put on, shows that that didn't happen.

13   Let's look at it now.

14            Here's one of the tapes, I think it was played

15   yesterday, when Mr. Discala tells Kyleen:  541.  Have the

16   broker at Glendale put in a bid at 541.  541 is fine.  Kyleen

17   says:  All right.  I'll ask him to move it up a little.

18            But if you look at Government's Exhibit 196-13, and

19   this is a chart that was prepared by the government's own

20   expert, Deborah Oremland, what you see here, and if you look

21   at that day, the day of that phone call, is that, in fact,

22   there is no wash trade.  Because remember the way to read this

23   chart is that buys go up and sales go down.

24            So if you look at this chart, there's no buys to

25   support the sales, there's no buys that match up with the

SUMMATION - MR. RIOPELLE                3674

1    sales that Kyleen and Glendale is making out of its account

2    that day.  In fact, the alleged co-conspirators, people like

3    Wexler, Bell, and Azrak they're selling, too, that day.  So

4    there are no matched orders.  There are no wash trades that

5    day in that conversation.  And the government's own evidence,

6    their expert's chart proves that it is so.  Everyone is

7    selling.  So there can't be any wash trade for a matched

8    order.

9           Here's another one Discala says:  Let's leave it at

10   635.  This is on May 23rd, 2014.  You'll recall there was

11   testimony about how the defendants allegedly lost control of

12   the price of Cubed stock that day and it shot up for reasons

13   unattributed to them, and they had to do something about it.

14          So according to the tape recording, which I think we

15   heard, Mr. Discala said:  Let's just leave it at 635.  Cane

16   asks at one point:  Where do you want it to land?

17          And you'll remember there is some confusion in these

18   calls, Ms. Cane, Kyleen, doesn't really understand exactly

19   what's going on, but she asks Mr. Discala:  Where do you want

20   it to land?  $6.35.

21          But let's take a look at this.  This is an excerpt

22   from Government's Exhibit 149-4.  These are the confirmations,

23   the trade confirmations for every trade in the Glendale

24   account.  And this is the confirmation for that day, May 23rd,

25   2014.  The price at which Glendale trades is not 635.  It's a

SUMMATION - MR. RIOPELLE          3675

1    nickel less, $6.30.  Well, the government wants to go on about

2    how, you know, well, that's pretty close.  It's pretty close.

3          But it's not 635.  It is the government's theory

4    that Mr. Discala and Ms. Cane could control the price by

5    arranging a trade at any price they wanted.  If Discala said

6    635, they could trade at 635.  Well, that didn't happen.

7          True, it's close.  And you know what?  Close is good

8    for horseshoes.  You get a point in horseshoes for being

9    close.  And close is good for kissing.  But close is not proof

10   beyond a reasonable doubt of controlling the price of the

11   stock.  Close is not enough to prove that Ms. Cane and

12   Mr. Discala could dictate the price of this stock.  So you go

13   for close in horseshoes.  Go for close in kissing.  But don't

14   go for close in a courtroom where the government is held to

15   the highest burden of proof in the law, proof beyond a

16   reasonable doubt.  Close is not good enough.

17         So the government's own proof, ladies and gentlemen,

18   it demonstrates that Kyleen was not a part of any conspiracy

19   to control the price of Cubed.  Indeed, she could not control

20   the price of Cubed and the government's own proof,

21   Government's 149-4, that exhibit, proves that fact.

22         It did not make the price land at $6.35, as Mr. Cane

23   wanted, she could not make the price land at $6.35, because

24   she could not control the price.  She was just kind of yes'ing

25   Mr. Discala in that conversation.  And you've heard enough of

Case 1:14-cr-00399-ENV   Document 668   Filed 10/20/18   Page 21 of 208 PageID #: 6510

1    these conversations to know that Mr. Discala could be pretty

2    insistent, he could be pretty persistent, he could be pretty

3    on her about things, and sometimes she just had to kind of yes

4    him to get him off the phone.

5              Again, let's look at this chart, 196-13.  Matched

6    orders and wash trades.  Remember, that's the government's

7    theory here.  Look at the days that are in these boxes.  Those

8    are days where virtually every trade is a sale.  There are no

9    wash trades.  No matched orders for these days, primarily, or

10   principally.

11             So if that's the government's theory, that

12   Mr. Discala and Ms. Cane were matching up orders, it doesn't

13   pan out.  Look at the government's own proof.  If you look at

14   that last box in June, there's only one day in the last three

15   weeks in June right there where there's actually some buying

16   on the side of the transaction in the stock by Ms. Cane and

17   her alleged co-conspirators.  Every other day is a day when

18   everyone is selling.

19             And as Ms. Oremland told from you from that witness

20   stand, those are days when it's just impossible for there to

21   have been matched orders or washed sales that controlled the

22   price of the stock.  So you know that it didn't happen the way

23   the government claims.

24             And I want you to remember a very crucial part of

25   Ms. Oremland's testimony.  She's the government's expert

1   witness, the woman from FINRA, that agency or that -- the

2   self-regulatory agency, I should say, down in Washington that

3   regulates broker-dealers.

4           She tried to analyze every trade, every trade in

5   Cubed.  And you know what she found?  She found that after

6   June 30th, there wasn't a single sale out of the Glendale

7   account.  There wasn't a single purchase in the Glendale

8   account for a good three weeks or so before the arrest went

9   down, the Glendale account was entirely dormant.  That's the

10  account the government associates with my client.

11          If there was no trading in the Glendale account for

12  three weeks before the arrest happened, there could not

13  possibly have been any market manipulation during those weeks.

14  There wasn't a buy.  There wasn't a sell.  There was nothing.

15  Nothing attributable to Ms. Cane.

16          And so when the government alleges that she and

17  Mr. Discala controlled the market with washed sales and

18  matched orders, it breaks down after June 30th.  There's just

19  no way that this theory makes any sense, even during the

20  period Glendale was, in fact, trading.

21          Here's one of the phone calls again.  Mr. Discala --

22  and I think, again, you heard this one yesterday.  Mr. Discala

23  says:  We looked into Glen for 5,000 just now and they didn't

24  budge.  If they move a penny, I'm happy.  You cannot budge.

25          Now that language, what does that mean?

1   Mr. Discala, I think the government's theory is, is telling

2   Ms. Cane that he and his co-conspirators, according to the

3   government, of course, the people like Wexler and Azrak and

4   that bunch, they went and bought 5,000 shares from Glendale,

5   and Glendale didn't move its price at all.  And that,

6   according to the government, that sounds suspicious.

7            Okay.  Let's look at that day.  Because we've got

8   the government's chart.  We've got the government's chart.

9   Does it show, take a good look at it, does it show that any of

10  the co-conspirators, the people in blue, bought 5,000 shares

11  from anybody?  From anybody?  Let alone, the Glendale account?

12  It does not.  It does not.

13           That's the government's proof.  That's their expert

14  witness who analyzed every trade ticket.  It shows you that

15  Mr. Discala is just kind of BS'ing.  They didn't buy 5,000

16  shares from Glendale.  They didn't buy 5,000 shares from

17  anybody.  He is just blowing smoke at Kyleen.

18           And there were no discussions at any time on any

19  government wiretap of actual wash trades.  This is another

20  one.  You heard something like Discala said:  Can you do me a

21  favor?  Can you just make a quick call and go to 542, cause

22  Chardan is getting mad, it's just sitting there.  Kyleen says:

23  Wait, who?  What?  Half the time she doesn't even understand

24  what Discala is saying to her and he needs to explain.

25           He says:  Just go to 542.  Have George go to 542,

 1   not 540.  Oh, 542.  She's kind of overwhelmed there.

 2            What you don't hear there, what Mr. Discala is

 3   asking her to do is:  Call George.  Get George move his bid up

 4   to 542.  Can you do that for me?  It will look better if it's

 5   at 542.  Move your bid up.

 6            What you don't hear, what you don't hear is

 7   Mr. Discala saying:  I'm matching your orders with another

 8   broker.  We need to do a trade at 542 with another broker to

 9   set the price, to control the price of Cubed.  You don't hear

10   an explanation like that from Mr. Discala.  All he asks my

11   client to do is to keep in touch, get the broker, George

12   Castillo, at Glendale, and move the bid a little bit.  That's

13   all he asks her to do.

14            So there's no evidence, no evidence at all in a call

15   like this of my client, Kyleen Cane, being told that when the

16   bid moves, we're going to have another broker buy it and take

17   it and set the price for the stock in that way.  There is no

18   evidence at all in these phone calls of my client being told

19   about a wash trade or a match trade, it's just not there.

20            Keep in mind that moving your bid, or moving your

21   ask, as a broker may do, is not illegal.  There's nothing

22   wrong with that.  Every day brokers move their bids and asks

23   all over the place all the time for all kind of reasons.  If

24   they do it for the purpose of executing a wash trade or a wash

25   order, that can be bad.  But just moving your bid or your ask,

1    it's a nothingburger.  It's a nothingburger.

2            Okay.  Here's the third allegation, the investor

3    escrow account.  You heard a lot about that.  That's the

4    account at Glendale Securities where the stock was held that

5    Ms. Cane was trading or that George Castillo was trading with

6    the knowledge of Ms. Cane.

7            The allegation in the indictment is that this escrow

8    account, the only one that actually traded any shares, was

9    used to control and manipulate the price and volume of Cubed

10   stock.

11           I want you to keep in mind, Glendale, that account,

12   managed by George Castillo, always sold shares, dribbled them

13   into the market a little at a time.  It never bought shares.

14           And you heard a lot of testimony from the

15   government's witnesses, real market manipulators, people like

16   Wexler, people like Azrak, people like Bell, the real

17   criminals.  You heard that you drive the price up by buying

18   shares in.  That's one way to do it.

19           Glendale never did that.  Glendale always sold.  It

20   never bought.  Glendale, again, did not sell for almost three

21   weeks the court case resulted; it didn't sell, it didn't buy,

22   it didn't do anything from June 30th until the time of

23   Ms. Cane's arrest on or about July 17th.  For that period,

24   Glendale had no effect on the market.  None whatsoever.

25   Didn't sell.  Didn't buy.  Whatever was happening in the

1   market had nothing to do with my client.

2          Glendale, for the most part, except for the first

3   few days, and we'll look at the chart in a moment, sold a few

4   shares into the market at a time at the prevailing market

5   price.  It was the equivalent of a lock-up/leak-out agreement,

6   those types of agreements you heard, where people don't sell

7   too much stock at a time because they don't want to collapse

8   the price of the stock.  That's what happened at Glendale.

9   The stock was leaked into the market.  The proof shows, this

10  is the government's own proof, that Kyleen and Glendale did

11  nothing to control the price of Cubed.

12         What is it the one day, the one day during the

13  relevant period in this case when the price of stock

14  skyrocketed.  The government's own proof shows you that it was

15  May 23rd, 2014.  Well, what does the government concede about

16  that?  Kyleen had nothing to do with that, right?  That's the

17  one day the price shot up.  The one day that the stock got

18  pumped was a day that Kyleen Cane and Mr. Discala had nothing

19  to do with the rise in the stock price.  Indeed, you've heard

20  the phone calls where Kyleen is scratching her head and trying

21  to figure out what the heck happened?  What do we do about

22  this?  They had nothing to do with that jump in price.

23         And it didn't happen because my client did anything,

24  it happened for reasons we simply don't know.  The government

25  never proved exactly why that stock went up, but it did.  It

1    didn't have anything to do with Kyleen.  And keep in mind,

2    that Glendale didn't sell any shares the last three weeks.

3            In fact, I submit to you that this spike in price

4    that my client had nothing to do with, proves, proves that she

5    had no ability to control the price of the stock.  This is the

6    government's own proof.  It shows that she didn't control the

7    stock, that it spiked on a day she had nothing to do with it.

8    She did not control the price of Cubed, and the government's

9    own proof demonstrates that.

10           And, in fact, ladies and gentlemen, the government's

11   proof shows that Kyleen was not even trying to pump up Cubed

12   stock in the way that Cubed was traded out of Glendale.

13           Remember, for the most part, the stock is leaked out

14   of Glendale a few hundred, a few thousand shares at a time

15   over the time that Glendale is trading.  The first few days

16   there are large sales out of Glendale because there's real

17   market interest in this new stock.  And after that, it kind of

18   bumps along and keeps leaking the stock out a little bit at a

19   time.

20           And we heard from Mr. Azrak about this kind of

21   trading pattern.  I don't know if you remember it, I want you

22   to recall what he told you about that, and I want you to look

23   at this exhibit, Government's Exhibit 138-1.  You'll recall

24   that Mr. Azrak told you that there came a point in time when a

25   large chunk of shares that he owned in a company called Excel

SUMMATION - MR. RIOPELLE                3683

1    Corporation became free trading.  Free trading, with a hyphen

2    I guess.  Became free trading.

3           So now he could trade them.  Now he's got

4    two-and-a-half-million shares that he can sell, if he wants

5    do.  And what does he do?  If you look at this exhibit,

6    Government's 138-1, he sells a little bit at a time.  He

7    doesn't sell every day.  He sells a few thousand here, a few

8    thousand there.  And this pattern goes on for several months.

9    He sells it off a little bit at a time.  And here's what he

10   told us about that.

11          "QUESTION:  You're selling them off a little at a

12   time, right?

13          "ANSWER:  Correct.

14          "QUESTION:  You did that because you knew if you

15   sold all 2,600,000 at once, the share price would go down to

16   nothing, right, or close to it?

17          "ANSWER:  Yes, right.  He didn't want to collapse

18   the price of stock.

19          "QUESTION:  When you traded in this way, you weren't

20   intending to commit any kind of fraud; were you?

21          "ANSWER:  No.

22          "QUESTION:  And the government has never asked you

23   to plead guilty in connection with your trading in Excel; has

24   it?

25          "ANSWER:  No.

SUMMATION - MR. RIOPELLE                    3684

1          "QUESTION:  There's nothing illegal in the way that

2     you traded your Excel shares; is there?

3          "ANSWER:  Not that I know."

4          That's Mr. Azrak's testimony.  He traded his shares

5     just the way that the shares were traded at Glendale.  In

6     exactly the same way.  Sold off a little bit at a time so that

7     the price of the stock was not crushed by too much selling all

8     at once.

9          And the government, which had Mr. Azrak in its

10    offices confessing to everything he could think of, and they

11    are looking to punish him for everything they could think of,

12    it never occurred to the government to charge Mr. Azrak with

13    that crime.  It never occurred to the government that there

14    was something criminal in selling off a few shares at a time

15    so that you don't crush the price of the stock.  That's --

16    that's a correct way to sell when you have a big wad like

17    that.

18          Again, look at the -- look at the chart, 196-13.

19    Except for the first few days, when there was a lot of market

20    interest in the stock, and, indeed, I want to direct your

21    attention to the very second day there.  You see April 23rd,

22    you can see that there's a lot more selling out of Glendale

23    than there is buying by the alleged co-conspirators.  So those

24    are not even really match wars.  There's real in this stock in

25    the market.  Glendale sells a few shares at a time.  Not every

1  day.  They don't sell every day.  They're trying to keep the

2  price from collapsing.  Because if they dumped all those

3  shares at once on the market, they would kill the price of the

4  stock.  So they sell a little bit at a time; a few hundred, a

5  few thousands shares every time they sell and, again, they

6  don't sell every day.  They sell them off just the way

7  Mr. Azrak sold off his shares in Excel.  And there's nothing

8  illegal in that.

9          Let's consider Mr. Ferranti's analysis, because it

10  tells us something about the alleged conspiracy in Cubed and

11  whether my client's trading activity and the trading activity

12  at Glendale was a bad thing.

13          This is Mr. Wexler's trading accounts and the

14  profits he made when he got involved in the alleged conspiracy

15  to manipulate all these different stocks, a whole bunch of

16  stocks.

17          First there's CodeSmart.  According to Mr.

18  Ferranti's analysis, Mr. Ferranti, you may recall, was the

19  financial analyst from the FBI.  On CodeSmart alone, Wexler

20  made well over $2 million in profits manipulating the trade.

21  On the Staffing Group, he made $50,000.  On StarStream, he

22  made almost $300,000.

23          What happened with Cubed?  He lost $800.  He lost

24  $800.  How did that happen?  It was because when the

25  government shut down the trading in that company, there were

1    still the many shares held in escrow that hadn't been sold,

2    because they were being sold into the market a little bit at a

3    time, a little bit at a time, a little bit at a time.  And

4    when those shares went to zero, after the government shut down

5    the company, Mr. Wexler was left holding the bag.  He was left

6    with those shares stuck, and he took a loss, like everybody

7    did on Cubed, after the company was shut down.

8            And that tells you something.  It tells you that

9    Ms. Cane was not dumping those shares out in the market as

10   fast as she could to try to earn a quick buck, she was selling

11   them a little bit at a time, and as a result everybody got

12   left holding the bag when the government shut down the

13   company.

14           Mr. Ferranti's analysis demonstrates for you that

15   the Glendale escrow account was used to protect Cubed.  It was

16   used to protect the company from predators, like Mr. Wexler,

17   who wanted to dump those shares all at once.  He never got the

18   chance to dump his shares the way he liked to and, therefore,

19   he took a loss in that one, unlike the other transactions with

20   which my client has absolutely no connection, by the way.

21   When my client was around, Mr. Wexler could make a good buck.

22   When she was there, he lost $800.  Nor, nor did my client,

23   Kyleen Cane, pump the stock up through IR/PR.  Remember you

24   heard a little bit about that, industrial relations, public

25   relations.  You heard Mr. Wexler and others tell you that they

1    really loved these press releases because that might cause the

2    stock to spike a little bit and they could trade on that and

3    make a profit.

4            But this is one of the government's exhibits, a text

5    message between -- a series of text messages between

6    Mr. Wexler and my client.  Here we have one that says:  No

7    release today, wow?  He's upset because these press releases

8    are not coming out the way he liked, so he can trade on the

9    stock.  He's upset that he's not getting the chance to trade

10   the way he'd like with big spikes in the price, according to

11   these press releases, and he tells my client:  Well, I'll try

12   to manage this on my end.  And this was a question about this.

13           "QUESTION:  And this is one where you complained

14   that there was no news today, wow?

15           "ANSWER:  Yes.

16           "QUESTION:  And, in fact, you were hoping for news

17   on this particular day, May 20th, correct?

18           "ANSWER:  Expecting.

19           "QUESTION:  You were expecting news and it didn't

20   come out, right?

21           "ANSWER:  Correct.

22           "QUESTION:  And you were disappointed when she --

23   and that's a reference to my client, Ms. Cane -- and the group

24   she was working with -- that's a reference to the professional

25   IR/PR people -- did not do what you were expecting, correct?

1          "ANSWER:  Correct.

2          "QUESTION:  Do you know as you sit here today,

3    Mr. Wexler, whether any shares were actually sold out of the

4    Glendale account on that day, May 20th, 2014?

5          "ANSWER:  From me sitting here, no."  He doesn't

6    remember.

7          But you know, you've got the evidence.  You'll have

8    the evidence.  Let's find out.  Here it is, 196-13.  Let's

9    take a look.

10         If you look, the dates below are the dates when

11   trades occurred.  There were no trades in the Glendale account

12   between May 16th and May 21.  So there was no manipulated

13   trading by my client, or George Castillo, or anyone else from

14   that account, the Glendale account, on May 20th, 2014, because

15   there was no trading at all.  There was no attempt by my

16   client to trade through the Glendale account on the press

17   releases that Mr. Wexler was so anxious would come out.  None

18   at all.  And the government's own proof, Government

19   Exhibit 196-13, the government's own proof, demonstrates the

20   testimony.

21         Keep in mind, I have no burden.  I have no burden to

22   prove any evidence.  I have no burden to prove anything.  I

23   could, if I was as good a lawyer as Lord Erskine, I could just

24   sit silent during the whole trial and give a great summation

25   and all that stuff.  You probably know that's not my style,

1    but I could do that.

2          But the government's own evidence, even when I have

3    no burden at all, proves that Ms. Cane was not involved in

4    some scheme to manipulate this stock, Cubed, the only stock my

5    client's accused of, the news, the press releases the

6    government rely on, the government's own chart, their expert

7    prepared it, proves it.

8          And let's consider it.  On May 21, 2014, the next

9    day, Discala says:  Moves the price to 541.  However, if you

10   look at this chart here, there's no matched trade that day.

11         So if Mr. Discala is asking my client to move her

12   bid or move the bid at Glendale up to 541, he's apparently not

13   doing it for any reason to create a matched order or a washed

14   trade to try to get the type of manipulative activity that is

15   charged in the indictment.

16         And keep in mind that is what is charged in the

17   indictment.  And the government must be held to what is

18   charged in the indictment.  They do not get to argue to you

19   now that there is some other theory that is not charged in the

20   indictment, and that's why my client is guilty.

21         We have a process, the grand jury has to return a

22   indictment that gives the defendant notice of what the charges

23   are.  The charges here are matched trades and wash orders --

24   wash trades and matched orders.  And there's no such thing on

25   May 21st.  On that day, everybody's selling again.  So

Case 1:14-cr-00399-ENV   Document 668   Filed 10/20/18   Page 35 of 208 PageID #: 6524

1    Mr. Discala's request that my client move her bid up to 541 is

2    not part of any scheme to manipulate the market by wash trades

3    and matched orders.  I'll get that right hopefully by the end.

4             So any change is not an attempt to influence the

5    market.  It didn't happen.  It just didn't happen the way the

6    government alleges, and the government's own evidence shows us

7    as much.

8             In fact, all the trades that day are sales.  So they

9    couldn't push the market up.  You heard that sales tend to

10   push the market down.  This wasn't a pump, just selling off

11   the shares that in an orderly way so you don't crush the

12   market.  It wasn't much of a pump-and-dump scheme at all.  It

13   just wasn't.  And the government's own proof -- the

14   government's own proof demonstrates it.

15            The contents that day show that shares were traded.

16   This is the Ben-Bassat account.  There it is, May 23rd, 2014.

17   It shows shares were traded a little below 541, just didn't

18   get up to 541.  So we know that there was no rigged trading at

19   541 that day.  Again, close is good for kissing.  You get a

20   point in horseshoes for close, but close is not proof beyond a

21   reasonable doubt.  It just isn't.

22            Let's consider the evidence concerning these press

23   releases and the SEC filings.  There is no evidence whatsoever

24   that any press release issued in connection with Cubed or any

25   SEC filing was false.  You have not heard any witness come in

1   here, the witness from Ramapo College, the witness from

2   Binghamton came in and said, you know, those press releases

3   about how to use CodeSmart those are not accurate.  Nobody

4   said that about any Cubed press release.

5          There is no evidence whatsoever that any press

6   release issued in connection with Cubed was false.  And the

7   SEC filings, which the government quotes, quotes in its

8   indictment, the SEC filing prepared by my client with the

9   assistance of an accounting firm that the government quotes in

10  its indictment are not alleged to be false.  The government

11  relies on them.  There's none.  Nada.  Zilch.  No false in

12  connection with those items.

13         In fact, the only overt acts asserted against Kyleen

14  Cane in the indictment, and the judge will read them to you,

15  listen up when he reads, listen to the judge, it is very

16  important.  The only overt acts asserted against Kyleen Cane

17  in the indictment are two phone calls between her and

18  Mr. Discala in which she reports that she is actually in the

19  process of getting a more professional IR/PR firm involved in

20  the Cubed deal.  She is doing what a lawyer does to protect

21  her client.  She is being professionally involved.  And the

22  only phone calls charged against her as overt acts are her

23  doing her job as a lawyer to get good professionals involved.

24         And that's -- that's the best the government can do

25  in terms of overt acts against my client, even though they

SUMMATION - MR. RIOPELLE                3692

1   can't prove any press release is false.  My client's charged

2   with just being a lawyer.  Now I'm nervous.

3          Let's talk a little bit about the witnesses in this

4   case.  First there are the cooperating witnesses and the

5   immunized witnesses.  Those are the ones that have these

6   deals, and you've seen a lot of those deals.  You'll get a

7   chance to examine them, a number of them they have been

8   admitted into evidence, and we can talk about it a little bit

9   in a minute.

10          I'm talking about the folks, Matthew Bell, Marc

11  Wexler, Victor Azrak and Jamie Sloan.  Those are the

12  witnesses, the cooperating witness whose pled guilty and are

13  up there on the witness stand testifying hoping for a reduced

14  sentence.

15          You also heard from Taylor Edgerton and Marche

16  Godffrey.  Those are the three witnesses, all of whom have

17  immunity deals, all of whom have been promised immunity in

18  exchange for their testimony.  All of whom can never be

19  prosecuted for their activities in connection with the

20  Northwest Resources.

21          Those are the witnesses who testified about,

22  according to them, their wrongdoing in connection with the

23  formation of Northwest Resources in 2011, years before my

24  client got involved with Cubed.  And they testified that they

25  dealt with Joe Laxague, not my client.  Don't even know her.

1          MR. RIOPELLE:  These witnesses, I submit to you,

2    this bunch of folks are walking, talking, reasonable doubts.

3    They are untrustworthy.  Every one of them.  Every one I

4    believe has told you that when they were first interviewed,

5    according to them now, according to them now, they lied their

6    faces off.  Right.  Every one of them has told you that they

7    lied over and over and over again.  They kept meeting with the

8    Government and eventually their story improved and eventually

9    the Government decided, okay, we'll buy that one.  Here is

10   your deal, sign up, you don't get prosecuted.  Take the

11   witness stand, figure everyone out.

12          Of course the problem with some of them is they

13   never met Kyleen Cane, never spoke to Kyleen Cane, didn't know

14   Kyleen Cane's name.  But we can talk about nefarious deal now

15   that you're willing to tell us it was a nefarious deal.

16          Think about all the lies these people have told and

17   ask yourself, would you rely on them, these serial liars in

18   some important aspect of your life.  If Mr. Wexler arrived and

19   said, I'd like to marry your daughter, that's an important

20   aspect of your life, would you be happy about that?  I don't

21   think so.

22          How about if you had your rent money or your

23   mortgage money and you needed to go to a bank and get a money

24   order to pay your rent or mortgage, that's an important thing

25   in all our lives.  Would you ask Victor Azrak to take that

SUMMATION - MR. RIOPELLE                3694

1    money to the bank and get you that money order.  No, I don't

2    think so.  I don't think so.

3            If tomorrow you come to court, and we've all have

4    seen how seriously you take your jobs, if you were to come to

5    court tomorrow and you were walking into the courthouse and

6    Marc Wexler walked out and said, oh, don't worry there is no

7    court today.  You don't have to do any deliberation, you just

8    turn around and go home.  Would you rely on that?  I think

9    you'd come and ask Mr. Villanueva, do we have court today or

10   not.  If you would come ask Mr. Villanueva about that, you've

11   got a reasonable doubt about Marc Wexler.  Think about that,

12   would you trust them in a important aspects of your life?

13   That's a reasonable doubt, something important to you, really

14   important to you.

15           Now here is one of the cooperation agreements, they

16   are more or less the same.  It's a form agreement, the

17   language is the same in all of them, but I think it is worth

18   looking at some of these things so you know what you're

19   dealing with.

20           This the cooperation agreement that relates to Marc

21   Wexler.  You'll recall he pled guilty to two different

22   charges, Count One and Count Three in an Indictment against

23   him charging him with a total maximum term of imprisonment of

24   25 years, 25 years.  And then the really key language of this

25   Indictment appears here in paragraph 14 -- or at least the key

SUMMATION - MR. RIOPELLE                    3695

1    language to Mr. Wexler I should say -- if the Office

2    determines that the defendant has cooperated fully, provided

3    substantial assistance to law enforcement authorities, and

4    otherwise complied with the terms of this agreement, the

5    office will file a motion pursuant to 5K1.1 with the

6    sentencing court setting forth the nature and extent of his

7    corporation.

8              You heard from the witness stand how these witnesses

9    who have pled guilty, people like Marc Wexler, are counting on

10   getting that letter, that 5K letter.  It will take away their

11   sentencing guidelines.  It will give them a chance at a

12   probationary sentence where otherwise they would be going to

13   jail for sure.  They want that letter like nothing else.  They

14   need that letter more than they need anything.  And they must

15   do whatever they need to do to get it.

16             And most of these agreements also include a criminal

17   forfeiture term.  In this one for Marc Wexler, he agreed to

18   forfeit $1,400,000, which sounds like a ton of money, until

19   you think about Mr. Ferrante which showed that he made about

20   two-and-a-half million dollars out of this scheme.  So he

21   actually got a pretty good deal.

22             Here are some things to consider, every one of these

23   witnesses claims that he or she lied the first time they were

24   interviewed.  So they are not afraid to lie when they think it

25   will help them, right.  Think about that.  They will lie when

Case 1:14-cr-00399-ENV   Document 668   Filed 10/20/18   Page 41 of 208 PageID #: 6530

1    they think they will help themselves.  Every one of them has

2    changed their story considerably, almost 180 degrees.  In many

3    cases they said I don't know who Kyleen Cane is, or I thought

4    Cubed was a legitimate deal.  The other ones were that Cubed

5    was real.  Every one of these witnesses, every one of them,

6    changed their story after they began interviewing with the

7    Government, after they began interviewing with the Government.

8    Knowing because of all their wrongdoing they desperately

9    needed this 5K letter.  They desperately needed a way to get

10   this agreement.  They desperately needed to be able to testify

11   against someone else, climb out of their hole over someone

12   else's back.  That's what they needed.

13            You know, Bismarck, the great German diplomat once

14   said, "Legislation is like sausage, you're betting sticking to

15   the end product and not knowing exactly how it's made.

16   "That's sort of true in these agreements too.

17            You heard how these people met with the Government

18   over and over and over.  You got the questions they were asked

19   over and over and over.  They were desperate for these

20   agreements and they changed their stories.  Why?  Why?  Why

21   did they do that?

22            Mr. Azrak said it best, he was terrified, terrified

23   to go to jail.  Terrified of incarceration.  I want you to

24   consider this when you go back to that jury room, if there is

25   someone, anyone, who ought to be terrified to go to jail or

1   look for a deal to get out of jail and terror it would be my

2   client.  But she didn't meet with the Government.  She didn't

3   have anything to say about others.  She didn't point the

4   finger because she was on the outside.  She would be as

5   frightened as anybody, but she did not seek to cooperate

6   because she had nothing to say.

7            Let's look at the cooperation agreement, requires

8   substantial assistance.  They have got to do something for the

9   Government to get their deal.  It's the Government, by the

10  way, that decides whether they've told the truth and whether

11  they've provided substantial assistance.  It's the Government

12  who decides that.  Because if the Government decides that they

13  haven't told the truth, they get no deal.  They get no letter.

14  Wexler goes to jail for 25 years.  The Government makes that

15  decision.

16           And consider this, here is another point to think

17  about, none of those witnesses, not one of them, was ever

18  charged with a crime for lying to the Government in their

19  first interview.  They all acknowledge that they knew that was

20  a crime, the Government never charged them for that.  It gave

21  them a pass, at least for now, on that criminal activity.

22           But consider this, if you look at those deals

23  closely, all of these witnesses have gotten immunity for their

24  securities fraud.  They have not gotten any immunity for the

25  lies they told in those first interviews.  And that means,

SUMMATION - MR. RIOPELLE                3698

1   that if they were to go back and stick to their first story, I
2   didn't know Kyleen Cane, I thought Cubed was legit, I thought
3   that was a real deal.  That's the type of testimony Matt Bell
4   gave in his original interview with the FBI, it's in the
5   record, you can ask for it.  If they go back and say, you know
6   having thought about it, Cubed is a real deal.  They will be
7   charged first with their false statement in their first
8   interview because they've gotten no immunity for that.  And
9   then charged with a new false statement for going back on what
10  came out of all their meetings with the Government.  And then
11  their agreements will be torn up and they'll have to face
12  their 25 years or more in jail.  So the fact that they never
13  got immunity for those false statements and the fact that they
14  haven't pled guilty to any of that is very important here.

15          There is some circumstantial evidence along the way.
16  You'll remember that Matt Bell promised to pay a forfeiture he
17  can't possibly afford.  Wexler agreed to pay a million four in
18  forfeiture, but he made two-and-a-half million, he snookered
19  the Government.  Azrak's father, Ruben, who was involved in
20  all this trading activity, he never got charged, they left him
21  alone.

22          Here is how the Government's cooperation agreement
23  really works.  We heard it in Matthew Bell's testimony.
24  Question, if you tell a lie and the Government decides it's
25  the truth, you'll still get your 5K letter, right?  Answer, I

Case 1:14-cr-00399-ENV   Document 668   Filed 10/20/18   Page 44 of 208 PageID #: 6533

1   don't know how that works.  But I guess so.

2            If he lies but it's a lie that will fly, it's a lie

3   that the Government likes, he'll still get his 5K letter.  He

4   knows that.

5            It's for you, ladies and gentlemen, to decide

6   whether this agreement that the Government will argue for you

7   is sort of a truth serum.  They got the cooperation agreement

8   and they'd never dare lie to you.  You'll decide whether it's

9   a truth serum for the Government witnesses who had a long

10  career of lies, or is it really a set of shackles that binds

11  these witnesses to a version of the story that the Government

12  wants to hear.  You'll have to decide that.

13           Consider the testimony of Wexler and Sloan about the

14  bribe that Wexler paid Sloan.  If you lie to the Government

15  and it's a lie that the Government likes, it's okay.  Was it

16  10,000 or 15,000, the way Wexler remembers?  Or was it 4,000

17  the way that Sloan remembers it?  That's a big difference.

18  It's a big difference.  You know what, there are a little

19  moments in every trial that kind of illustrate an important

20  fact about the case.  And this is one.  When Wexler is paying

21  a bribe he pays an enormous amount because that makes it

22  important, he's trying to impress the Government.  He's paying

23  a big bribe $10,000, could be $15,000.  He's trying to impress

24  what a big crime it was.  He knows that will help him to get

25  Jamie Sloan in trouble, more trouble, by exaggerating the

Case 1:14-cr-00399-ENV   Document 668   Filed 10/20/18   Page 45 of 208 PageID #: 6534

1    describe.  When Jamie Sloan tells about the bribe, it's only

2    about 4,000, that's all it.  She's minimizing her role.

3            So that tells you about these witnesses.  They

4    exaggerate.  They minimize.  They don't tell the truth.  Maybe

5    it was neither.  Wexler exaggerates the conduct and Sloan

6    minimizes it.

7            And consider the lies told on the witness stand.  A

8    couple of these witnesses who just sat up there and lied

9    directly to you as you sat here in court.  Remember the

10   testimony of Matthew Bell, certain firms allow naked shorts

11   where you just short it without borrowing it.  Question,

12   that's illegal, isn't it?  No, not if the firm allows it.

13   Page 553 of the transcript.

14           The next witness, Ms. Oremland, the Government's

15   expert on securities trading.  In your opinion as a securities

16   expert are naked shorts permitted by the Securities and

17   Exchange Commission.  No.

18           So Bell just lied right to your face on that one.

19           And listen to the Court's charge on this point.  If

20   any witness is shown to have willfully lied about any material

21   matter, you have the right to conclude that the witness also

22   lied about everything.  You can either pick and choose out of

23   the witness's testimony what you like, throw the rest out, or

24   you can throw it all out.

25           You know, ladies and gentlemen, I had an experience

SUMMATION - MR. RIOPELLE                    3701

1   just this morning that I think will guide you how to consider

2   this and these lying witness who's have long careers lying.

3            I woke up early this morning before it was light, as

4   I typically do.  I went into my kitchen.  I turn the light on.

5   I could barely see at that hour.  Poured my Raisin Bran into

6   my bowl, got out my milk, poured the milk on the Raisin Bran.

7   Don't you know those raisins started to move.  It wasn't at

8   all a raisin; it was a bug.  Now, I could have just taken my

9   spoon and thrown the bug out and ate the cereal, but I didn't.

10  And I recommend to you that you do not accept any part of the

11  testimony of these witnesses who are demonstrated liars.

12           Consider the law enforcement witnesses,

13  Ms. Oremland, the FINRA career expert and chart maker.  Whose

14  charts for all the Government's efforts don't show know wash

15  trades or market control, they just don't.  We saw that

16  earlier.

17           Consider Joe Laxague and Christopher Ferrante, the

18  FBI financial analysis, proved that Wexler was the liar and

19  the thief, the $2.5 million man.  Even though he told you he

20  didn't make anything like that kind of money.  They analyzed

21  their records.  They knew what he made.  He made

22  two-and-a-half million dollars.  No, no, I didn't make.  Oh,

23  common, common, he's a thief.  Up there testifying like that,

24  it's insulting.

25           Or Constantine Voulgaris, he came at the very end of

SUMMATION – MR. RIOPELLE                3702

1    the case.  That was the FBI agent who was the Government's

2    summary witness.  You'll recall there was a great deal about

3    the case that he couldn't remember.  He was a witness who was

4    an FBI agent who couldn't be bothered to follow up on

5    allegations of threats against his own witnesses.  Remember

6    that?  Remember that Marc Wexler testified that a man named

7    Hunter Adams threatened him and terrified him during the

8    transactions, the Cubed transaction.  And Agent Voulgaris

9    apparently couldn't be bothered to follow up on that and

10   figure out about Hunter Adams.  Ask yourself, is that the kind

11   of work we expect in a criminal case?

12           It was a low point when we got a little good,

13   old-fashion resume fraud from Agent Voulgaris.  I don't know

14   if you remember that testimony.  Question, now you do you

15   recall at the outset of your testimony you were asked about

16   your own employment in the financial industry.  Yes.  You told

17   the jury that in fact you worked in the financial industry for

18   about six years before becoming a Special Agent with the FBI.

19   Yes.  And do you recall that you were asked where you worked

20   primarily?  Primarily, yes.  And you responded, if I

21   understood you correctly, that you worked primarily at BPP

22   Paribas and Merrill Lynch, correct.  Yes, uh-huh.

23           Well, he made it sound like he was some big shot at

24   Merrill Lynch and BNP Paribas.  By the way, what did you do at

25   BPP Paribas?  I started working at a back office as a

1   consultant through a, I guess, hiring staff agency.  He was a

2   temp, yet he has the gall to sit up there on the witness stand

3   to talk you to you how he was a big shot in the securities

4   industry.  Fair to say clerk-type work?  Yes.  There is no

5   shame in that.  There is no shame in being a clerk, but there

6   is shame in sitting on the witness stand and testifying to you

7   that he worked at Merrill Lynch when in fact, he left the BNP

8   Paribas because he was laid off.  He was at Merrill Lynch for

9   all of about three months before he was laid off there as

10  well.  And he didn't even tell you about this business called

11  Annuity Funding, a payday-lender type of place that charges

12  high interest rates to clients who can't get bank loans.  He

13  was there twice as long as he was at Merrill Lynch.  He didn't

14  tell you about that.

15        Consider the witnesses the Government didn't call,

16  didn't offer these immunity agreements, didn't obtain

17  evidence, Hunter Adams.  This guy who stuck up Marc Wexler,

18  threatened him, scared him.  The Government didn't call him.

19  Didn't give him an agreement.  Didn't even find out about that

20  threat.  What kind of investigation is that?

21        George Castillo, you heard they interviewed him.

22  They talked to him.  They spoke to him.  They could offer him

23  one of these deals, come on in here and finger Kyleen Cane,

24  tell us all the bad stuff you know, you won't be prosecuted,

25  you'll get the immunity just like the rest of them.  They

1    didn't call him.  You wonder if maybe he didn't have anything

2    bad to say.

3            Joe Laxague, the guy the Government claims was

4    involved in creating all the Northwest Resources, the problems

5    there.  We had the three witnesses tell us that was a dirty

6    deal from the very beginning.  They didn't charge Joe Laxague

7    and bring him in here as a cooperator.  They didn't offer him

8    an immunity deal to tell us about that.

9            I think it's fair for to you conclude that he would

10   not have agreed with those witnesses who changed their story

11   and decided they better testify that Northwest Resources was

12   from the outset.  They didn't call Joe Laxague.  Think about

13   that.

14           How about Steve White or Joe White, the executives,

15   two of the guys who founded Cubed, or Doug Shinsato, or any of

16   the people who worked at the company.  It was a real company.

17   Why didn't we hear about any of them?  Why didn't they come

18   and testify?  Because they would tell you that Kyleen Cane was

19   a good lawyer, they didn't know anything bad about her.  Why

20   didn't the Government call them?

21           And there were so many unplayed tapes and unexamined

22   text messages.  Now, look, I of all people feel we heard

23   plenty of evidence and saw plenty of evidence during this

24   case.  But the truth is, that there were thousands of calls

25   and texts that were not played or admitted in evidence.  And I

1   submit to you that's because there are so many that are in

2   fact exculpatory.  They don't show any kind of evil

3   wrongdoing.  But if the Government has got evidence that

4   somehow will smear Kyleen or put up a stink in the courtroom,

5   they'll put it on.

6            That's the evidence that relates to the formation of

7   Northwest Resources, they had to call three witnesses about

8   that.  None of them had ever heard of Kyleen.  They didn't

9   know who she was.  They dealt only with Joe Laxague.

10           We heard about later conversations that Kyleen had

11  with Joe Laxague about selling Northwest Resources in 2013,

12  two years after it was formed, and a year before the Cubed

13  transaction.  That's really what this case is about, we had to

14  hear about that.  But we didn't hear from Joe Laxague.

15           We heard how NPMC (sic) got restricted shares in

16  Cubed.  We heard from an awful lot of victims.  There were a

17  lot of people hurt by this, a lot of people.  There is nobody

18  that disputes that people were hurt, and badly, by this.

19           The Government wanted to call armies of them because

20  they want to point to the harm that was done when Cubed was

21  shut down in the hope that you will make a decision about my

22  client's fate with your emotion rather than what are the

23  facts.

24           What are the facts?  Northwest Resources, it sounded

25  terrible.  All this stuff that went on 2011 in Reno, 450 miles

SUMMATION - MR. RIOPELLE                    3706

1   from my client's office.  Sounded terrible.  But my client

2   wasn't involved.  None of this stuff, by the way, none of it,

3   has anything to do with wash trades or matched orders, which

4   is what is the allegation in the Indictment.  And none of the

5   calls or texts with Kyleen Cane had to do with wash trades or

6   matched orders either.  That's the allegation of market

7   manipulation in the Indictment.

8           The Government may well have convicted Joe Laxague,

9   ladies and gentlemen, maybe, but he's not on trial here.  They

10  haven't convicted Kyleen Cane of any wrongdoing in connection

11  with Northwest Resources.  She wasn't in Reno.  These people

12  didn't know her.  They never said she had anything to do with

13  that company.  There is just no proof connecting her to what

14  those witnesses Taylor Edgerton, Wesley Smith, Marche Godffrey

15  now claim after two or three interviews was wrongdoing.  She's

16  not connected to it in any way.

17          There is just no wrong against selling a shell

18  company.  There is no evidence, none at all, that Kyleen Cane

19  was anything wrong with the way Joe Laxague created Northwest

20  Resources.  There is no evidence of that.

21          There is no evidence that Kyleen Cane made any

22  improper trade either.  Because talking about raising your bid

23  or lowering, your ask, is not matching orders.  Right.  Look

24  at all this these days when there is all sales in Cubed and no

25  corresponding buys.  As we've said before, coming close to a

1   price is not control.

2          Let's take a look at this exhibit, Government's

3   Exhibit 196-12, another one of those charts prepared by their

4   expert Ms. Oremland.  If you look at last few days of trading

5   in June, and indeed in the month of June in total there is no

6   way, there is just no way that the Glendale account, the

7   Ben-Bassat account, dictate the price of Cubed.  Remember his

8   trading is shown by the green bars, right; the other trading

9   in the market is shown by the blue bars.  So he is a small

10  part of the volume of the trades in Cubed during June.  He

11  doesn't have the market power.  He's not pushing the stock.

12  Indeed during the last three days, it's all blue.  He's not

13  really any significant part of the market for those days.

14         So the Government's own proof shows that by June

15  David Ben-Bassat's account at Glendale was such a tiny part of

16  the trading volume it couldn't force the price, it couldn't

17  set the price, and it didn't set the price.

18         Here is the Government's argument you heard

19  yesterday, those Cubed shares in the Ben-Bassat account were

20  worth millions of dollars.  If that was so, why didn't Kyleen

21  just dump them and run into the sunset with a quick fortune?

22  Because she was protecting the company.  If she had dumped

23  those shares she would have destroyed the share value.  She

24  was acting in the best interest of the company in the trading

25  activity, in the Glendale account, which simply leaked a few

1    shares to the market and the market will allow it.  The there

2    was no dump in this case.

3           Here is another one that we heard yesterday.

4    Occasionally you'll see a text message from my client saying

5    let's have a telephone call, let's not text.  According to the

6    Government she was concealing things.  Look, really this is

7    heads I win and tails you lose.  They put on a bunch of my

8    client's texts claiming that she made important admissions in

9    these texts when talking to Wexler.  But, boy, when she says

10   let's not text about this, give me a call, now she's hiding

11   the facts she's really being evil.

12          No, no, that's not what is happening.  If there is

13   something complicated to talk about -- and I can say this as a

14   person of a certain age -- you're not used to typing with your

15   thumbs, you don't text about something that is complicated and

16   important, you have a phone call.  Now look, I get excoriated

17   by my wife trying to call our children.  She tells me that

18   children don't have telephone calls anymore, you must text,

19   stop being an old dinosaur, an idiot.  The way I was raised

20   you call when you have something to say, you don't text it.

21          And that's all that is happening when she and

22   somebody else are talking about some important, market

23   activity, she says, call me don't text.  Texting takes time,

24   it's easier to explain on the phone.  That's all that is

25   happening.

SUMMATION – MR. RIOPELLE                3709

1          You certainly did see plenty of texts.  The

2    Government doesn't think she's refusing to text all together.

3    She simply wanted, Kyleen wanted to explain things in detail,

4    you can't do that in a text.

5          This is a situation where the Government, which has

6    spent so much time with people like Wexler and Azrak and Bell

7    and Sloan that anything looks guilty to them.  Anything looks

8    guilty.  They are convinced that the minute they hear

9    hoofbeats it's a zebra.  We know it's a zebra because they've

10   sat with these people for so long and anything, anything at

11   all seems guilty to them.  They've spent too much time with

12   people like that, Wexler and Bell, Azrak and Sloan, everything

13   looks dirty and wrong to them.  Because with Wexler, Bell,

14   Azrak and Sloan, everything pretty much was.  But that's not

15   true of everyone.

16         In 35 years of law practice, you'll recall there is

17   no evidence at all, at all, that my client, Kyleen Cane, was

18   ever disciplined, ever charged with anything.  Indeed one

19   thing Agent Voulgaris did do was he went to the SEC and looked

20   everybody up, tried to figure out who had problems with the

21   SEC and what they could learn from looking at those documents.

22   There was no evidence that my client, who practiced before the

23   SEC for many, many years, had ever had any problem before this

24   case.

25         Let's talk about David Ben-Bassat and the Glendale

1   account.  You heard that David and Kyleen were close.  They'd

2   done business together, of all kinds real estate, securities

3   business, all kinds of things for many years.  They were

4   practically siblings or family members.  David was Kyleen's

5   mother's boyfriend for years, many years, they were very

6   close.  And keep in mind that my client had a perfectly legal

7   authority to give Glendale orders for Mr. Ben-Bassat's

8   account.  This was not hidden.  It wasn't hidden that Kyleen

9   Cane could enter orders in Ben-Bassat's account.  There it is

10  in a Government exhibit signed by my client, Governments

11  142-4.  That's in the records.

12          Nobody is hiding the fact that she entered orders in

13  Mr. Ben-Bassat's account.  The trading in Mr. Ben-Bassat's

14  account, I submit to you, was consistent with an order to

15  George Castillo to sell the stock at a price of $5 or better

16  as the market permitted.  There is no evidence, we have not

17  seen texts between Kyleen and Mr. Castillo, we don't have

18  phone records or intercepted phone calls between my client and

19  Mr. Castillo demonstrating that she was on the phone with him

20  every day about this account.  Far from it.  She was a busy

21  lawyer doing many things for Cubed and many other clients

22  during this period.

23          Take a look at the trade confirms.  You'll see that

24  every one of the orders that is executed by Mr. Castillo is

25  unsolicited.  And that means it has to be consistent with the

1   client's order.  It's an order that Mr. Castillo got from

2   either Mr. Ben-Bassat or my client.  And it didn't come from

3   Mr. Castillo.  There is no evidence of contact with Kyleen or

4   Ben-Bassat for each trade or adjustment in this, the bid and

5   ask, in this particular group of documents.  So what these

6   show you are that an order was given at the outset and that

7   Mr. Castillo simply sold the shares off as the market gave him

8   an opportunity to do so.

9            And this is a perfect example, these confirms are a

10  perfect example of what is called circumstantial evidence,

11  where you see facts and infer other facts from them.  Later on

12  I want you to listen closely to the Judge's charge about

13  circumstantial evidence.  He'll tell you about coming to court

14  and see a guy walk into the courtroom with umbrella and a wet

15  rain coat and how from that evidence you can infer that it's

16  raining outside even though you can't see it.  That's an old

17  story.  Anybody who tries cases in this courthouse or any

18  other courthouse has heard it many times.  It's a standard

19  jury charge.

20           There is a story that illustrates circumstantial

21  evidence perfectly.  It's a story every one of you knows.  I

22  want to recall it to your minds now.  It is the story of that

23  evil felon Goldilocks and the Three Bears.  You will recall in

24  that story the bears go out for a walk, leaving some porridge

25  on the table to cool down a little bit while they walk.  And

SUMMATION – MR. RIOPELLE                3712

1  that burglar, the breaker and enterer Goldilocks goes to the

2  bears' home, tastes the porridge, eats some of it.  Sits in

3  Baby Bear's chair and break it is, goes up and lays down in

4  Baby Bear's bed.

5          The bears return home.  They discover that someone

6  has eaten the porridge because there is not as much porridge

7  in the bowl, that's circumstantial evidence.  They discover

8  that someone has sat in Baby Bear's chair because the chair is

9  broken, that is circumstantial evidence.  And then they go

10 upstairs and Baby Bear see Goldilocks in his bed and says,

11 there she is.  That's direct evidence, Baby Bear sees

12 Goldilocks.  And that's the difference.  That's the

13 difference.

14         I submit to you that what Kyleen Cane wanted to

15 accomplish with the Ben-Bassat account by leaking these shares

16 into the market a little bit at a time was to keep predators

17 like Bell and Wexler, Josephberg and Azrak away from the free

18 trading shares.  You heard telephone calls where she doesn't

19 want to discuss this account with these people too much.  None

20 of them testified that they knew who David Ben-Bassat was.

21 She wanted to keep the group of free trading shares away from

22 the predators like that because she knew what they were

23 capable of.  They would crush the stock if they were given a

24 chance to do it.  She wanted to sell the shares of Cubed into

25 the market a little bit at a time to allow the market to

SUMMATION - MR. RIOPELLE                3713

1    develop and avoid a collapse.

2            She made sure she had the money to pay Ben-Bassat's

3    taxes and give him money to pay for an attorney when the

4    Government came calling.  She looked after Mr. Ben-Bassat.  He

5    was her friend, he's still her friend.  And she told him, you

6    heard him testify, she told him to tell the truth.  She was

7    not afraid of the truth.  She and Mr. Ben-Bassat, as you

8    heard, remain very close friends, and even business partners,

9    even now.  He continues to trust her.  That's something you

10   should think about, ladies and gentlemen.

11           Don't be distracted.  Don't be distracted by a whole

12   lot of irrelevant testimony about whether Mr. Ben-Bassat

13   signed one document or another himself.  This case is not a

14   forgery case.  Nobody is charged with signing some document

15   with Mr. Ben-Bassat's name when they shouldn't have.  It's not

16   a forgery case.

17           This case is about the trading activity.  The

18   trading that went on in that Ben-Bassat account that kept

19   Cubed stock price from being crushed.  That's what this case

20   is about.

21           Now look, again, we submitted very few pieces of

22   paper in this case.  We're relying primarily on the

23   Government's evidence, but one, I think our only paper exhibit

24   submitted, KCBB1, Kyleen Cane and Ben-Bassat one.  This is a

25   series of documents.  Remember we got into a whole rigmarole

SUMMATION - MR. RIOPELLE                3714

1    with Mr. Ben-Bassat, did you sign this, did you sign that,

2    what did your signature look like.  This is a series of

3    documents.  I'm going to show you just a few that

4    Mr. Ben-Bassat acknowledges are his signature.

5           Take a look at the first one, then I'll direct your

6    attention to the last letter in his name, this is KCBB1.  Here

7    is the next one, the T looks different there, doesn't it.

8    Here is the third one, that's also his signature he says.  So

9    that looks a lot different than the first two.  Here is the

10   fourth one, that looks more like the second, but it doesn't

11   look like the first or the third.  These are all documents

12   that Mr. Ben-Bassat acknowledges are his genuine signature.

13   He clearly signs his name a little differently at different

14   times.  So he's not, and that is not something we should be

15   concerned about frankly.  It is not part of this case.

16          He got one of those immunity deals ultimately,

17   right.  He got a deal that kept him out of any trouble here.

18   And he got a deal after he ultimately said that a couple of

19   the documents with his signature on them weren't signed by

20   him; but this isn't a forgery case.  This isn't a forgery

21   case.

22          You're free to infer that that's the way to get a

23   deal.  This was the testimony about my client.  Were you

24   shocked by her arrest?  Very much so.  Why?  Answer, I never

25   dreamt that she is even capable of being in a position where

SUMMATION - MR. RIOPELLE                    3715

1   she needs to be arrested.  She had always been honest with

2   you?  Answer, very much, yes.  Very much yes.

3            Here is some more.  And after meeting with the

4   Government you got immunity agreement that we saw earlier

5   today, yes?  Yes.  That's a fact, you got the agreement even

6   though you didn't feel you did anything wrong.  Yes.  But you

7   went ahead and insisted on getting an immunity agreement

8   before you testified, correct?  I didn't ask for it, they

9   offered it.  You took it, right?  Answer, yes, yes according

10  to my lawyer's advice I did.  Question, because you knew that

11  even an innocent person can be accused of a crime, correct?

12  Yes.  Question, and you don't look good in orange, right?  I

13  hate that color.  That was Mr. Ben-Bassat's testimony.

14           How do you write that history book we talked about

15  at the beginning?  How do you figure out what people intended,

16  what people want to do, what people understood at any point in

17  time?  History books continue to be written about folks like

18  Julius Caesar.  Historians continue to debate did Julius

19  Caesar cross the Rubicon because he was a narcissistic, crazy

20  person who was going to be the first version of a tyrant, was

21  that what he did?  Or was he in fact representing the

22  interests of the ordinary citizens of the Roman Republic when

23  he crossed the Rubicon to try to restore order to the Senate?

24  What was Brutus up to when he stabbed Caesar?  What he was up

25  to?  Was he trying to kill a tyrant or his own ambition that

1    led him, together with others on the floor of the Roman

2    Senate, which is maybe the most famous murder in history.

3    Historians continue to debate these topics 2,000-plus years

4    later.  I hope you don't spend 2,000-years on this case.

5            You'll decide what did Kyleen Cane intend?  What did

6    she really intend in this case?  How should you decide that?

7            Don't be distracted by the proof of motive, the

8    cash, proof about cash in the case and shares that went to

9    NPNC and all that stuff.  Proof of motive, the Court will tell

10   you, is not a necessary element of the crimes with which the

11   defendants are charged.  Proof of motive does not establish

12   guilt.  It is immaterial what the motive for the crimes may

13   be.  But the presence or absence of motive is a circumstance

14   which you may consider and bearing on the intent of a

15   defendant.  You can consider it, but it's not itself a part of

16   the crime.  It's not itself something that you must decide.

17           Don't be distracted by the Government's bogus

18   allegations of concealment.  Here is that trading

19   authorization that my client had for the David Ben-Bassat

20   account.  It's signed by her.  It's in the account records,

21   nobody is hiding anything there.

22           How about the checks she signed for NPNC, we heard

23   about those yesterday.  Her signature is on there.  That's an

24   entity associated with her.  Nobody denies that.  She signed

25   all those check.  She's not exactly Mata Hari with her

SUMMATION - MR. RIOPELLE                    3717

1    signature.  Nobody is concealing.

2              Businesses do have names, NPNC was a business.  It

3    had a name NPNC, so what?  By the way, here is some for this

4    allegation of concealment in NPMC, here are the corporate

5    filings with the authorities in Nevada.  They show Kyleen Cane

6    as a member of the corporation.  They show Bryan Clark, her

7    partner of Cane Clark, as a member of the corporation.  It's

8    all filed with the Government.  Nobody is hiding anything.

9              There is her electronic signature at the bottom.  So

10   nobody is hiding that she's associated with NPMC.

11             Here is another one NPMC Management LLC, Bryan

12   Clark, there is Bryan Clark's signature.  Nobody is hiding

13   what that company is.  It's a company that Kyleen and her

14   partner owned and worked with together.

15             And consider Ms. Mazella's testimony.  Remember, she

16   was the FBI financial analysis who looked at a lot of the

17   financial records in the company.  She showed that Cane Clark

18   paid a lot of funds into the Cubed taken in from investors.

19   They turned it over to Cubed, just as lawyers do.  Nothing

20   suspicious about that.  But Cane Clark was never paid for its

21   actual legal work.  Lots of other firms were, Clyde Snow and

22   Sessions got theirs, Malone Bailey got theirs.  Lots of

23   lawyers got paid in this case, but not Cane Clark.

24             I ask you what is consider what is missing from

25   Ms. Mazella's charts.  She told you how $265,000 came out of

SUMMATION - MR. RIOPELLE                    3718

1   Mr. Ben-Bassat's account and into these two LLC companies that

2   are associated with my client, $265,000 went there.  The chart

3   does not account for the $300,000 that Cane Clark advanced to

4   Cubed to pay for Northwest Resources on June 11, 2014.  Once

5   that payment is accounted for Cane, Clark is still short

6   $35,000.  It's not as though this $265,000 was some kind of

7   theft, right.

8           There were two payments out, we heard about this

9   yesterday, out of this account.  The first 300,000 was a

10  payment that ultimately made its way to Titan investors, paid

11  out to the investors in Cubed.  This was that first

12  distribution that guys like Mr. Wexler complained about wasn't

13  big enough, they weren't too happy it was only 300,000 but

14  that's what they got.  This $300,000 is also offset by the

15  300,000 advanced by Cane Clark for the purpose of Northwest

16  Resources.  And remember another 300,000 went to Titan.

17          And then there is the $225,000.  This $225,000

18  payment is just about equal to 39 percent, the total Cubed

19  trading which was 570 in the Glendale account.  There is a

20  little bit of money that is left behind in the Glendale

21  account that is not transferred over to this U.S. bank

22  account.

23          The 225 that is paid to Mr. Ben-Bassat is actually

24  paid to him so he can pay the taxes that are associated with

25  the trades in the Glendale account.  And then you can actually

1   see him paying his taxes, here is his federal tax payment

2   $190,000.  Ms. Mazella agreed with me that a payment to the

3   U.S. Treasury is likely a payment for tax.  That's what

4   happened here.

5           So some of these charts don't include all the

6   information.  But it's out there.  You can find it.  Take a

7   look at it.

8           You'll find that at the end of the day NPMC -- at

9   the end of the day you're not going to find that Kyleen Cane

10   is some sort of greedy, evil-grasping person.  The shares that

11   this company NPMC got the company, that she is a partner in

12   with Bryan Clark, those are restricted shares.  They couldn't

13   be sold for a year.  They had to be held.  That tells you

14   Kyleen and her firm believed in Cubed.  They wanted it to

15   succeed.  They wanted it to survive.  The last thing Kyleen

16   Cane would want is a pump and dump scheme to destroy this

17   company.  Because those shares would really be worth something

18   in a year, if the company survived and thrived.  Kyleen Cane

19   and her partner Bryan Clark were not in it for the quick buck.

20   That's what you can infer from that.

21           Then there is this document, remember?  Right before

22   the arrest her firm, Cane Clark, was issued what are called SH

23   shares to pay for the legal work that they had done for months

24   at that point.  It was this filing $128,000 of legal work as

25   of the end of May that had never been paid.  The firm went

1   months without getting a check from Cubed because Cubed didn't

2   have any money.  And ultimately the firm agreed to take shares

3   in the hope that the shares would stay afloat, would stay

4   worth something.  If you're taking shares for payment of work

5   you've done for months before, the last thing you want to do

6   is see the company collapse in a pump and dump scheme.

7   Instead you make sure that a little bit is sold into the

8   market at a time so the price doesn't collapse.

9            Finally, I want you to consider the testimony of the

10  witnesses we did call right at the end of the case.  We called

11  four separate character witnesses for Ms. Cane, four

12  successful businessmen, four gentlemen who had known Ms. Cane

13  for ten years, 15 years, a long period of time.  They had all

14  done transactions with her.  They all testified that based on

15  their extensive experience with her she is honest, she has

16  great integrity.  You know what, despite all of this, she

17  still represents them now.  They are loyal to her.

18           I think what you'll find if you consider her

19  character, and remember what Heraclitus told us, Character is

20  destiny.

21           What you'll find is that my client, Ms. Cane, was

22  very committed to Cubed, as she was to her other clients, like

23  Regenecin, Randy McCoy and John Weber.  They testified as

24  character witnesses.  She's a committed person who wants to do

25  all she can to help her clients.  You'll find that she was an

1   entrepreneur.  She's not an institution, not a giant law firm

2   with 500 people.  She's someone who represents smaller

3   companies, help them survive, help companies like Regenecin

4   get on their feet.  She is not representing Citibank and

5   institutions like that.

6           I'm sure you will find that she was scrupulous about

7   the press releases and the public filings that Cubed made,

8   because you have heard no evidence that there was some

9   egregious fraud in connection with them.  She was a creative

10  person, a problem-solver, ready to try innovative solutions

11  for Cubed's problems, including something like the David

12  Ben-Bassat account.  That's a creative solution to the problem

13  of leaking stock in the market to prevent the type of pump and

14  dump that ruined companies like Code Smart and Star Stream.

15  She wanted to protect Cubed from people like Wexler and Azrak

16  and Bell.  She was loyal to her clients, very loyal.  And

17  committed to helping Cubed succeed and protecting its share

18  price to the extent she could.

19          That's what the trading shows.  That's what the

20  evidence shows.  That's what these character witnesses show.

21          I want you to consider carefully the Court's

22  instruction on character evidence.  You should consider this

23  evidence together with all the other evidence you've heard in

24  the case.  This evidence may alone by itself convince you that

25  it is improbable that a person like Ms. Cane would commit the

SUMMATION - MR. RIOPELLE                         3722

1    offense charged.  And if considering this evidence together

2    with all the other evidence in the case a reasonable doubt has

3    been created, then you must acquit this defendant of all the

4    charges.

5             Ladies and gentlemen, at this point our rebels all

6    have ended to, quote Shakespeare.  In a short while you'll

7    deliberate on my client's fate.  You will decide whether she

8    will suffer the brand of a felony conviction in this case or

9    whether she will walk out without that indignity.

10            In a few days all that's happened here over the last

11   few weeks will fade like a dream in your mind.  You'll

12   remember a few things, maybe something one of the witnesses

13   said, some part of your deliberations, hopefully you've made

14   some friends amongst your fellow jurors, but what has happened

15   over the last five weeks will fade for you.  You'll go back to

16   your lives.  You'll go on to whatever is next, your jobs, your

17   families, you devoted so much time to this here.  I will go on

18   to my next case, right.  The Government lawyers will go on to

19   their next case.  Mr. Caliendo will go on to his next case,

20   but interestingly enough, he won't leave the courtroom.  His

21   next case is right here; my partner has the next case before

22   Judge Vitaliano on trial.  I get to leave.  But hopefully

23   he'll move up on the front of the table.

24            But for you this will all fade.  It will be, I hope,

25   a very interesting experience.  One you found very fulfilling

1    as citizens of our country.  But it will fade.  It will become

2    one more interesting thing to talk to people about.

3              The same really isn't true for Ms. Cane.  She spent

4    the last four years branded a felon by the Indictment in this

5    case.  That kind of thing is not good for a law practice.

6    She'll never be able to completely get out from under the

7    damage that's been done to her by this, by this prosecution.

8    But she can be spared a felony conviction.  You could do that

9    for her.

10             I've tried to show you this morning the reasons why

11   you should do that, why the Government's proof has fallen

12   short.  And I submit to you that you should do that.  You

13   should spare her that felony conviction.

14             So I ask you, I ask you, ladies and gentlemen, to do

15   your duty.  In the Old Bailey in London, which is the oldest

16   continuously functioning criminal court in the

17   English-speaking world, there is a carving on the wall that

18   reads, "In these hallowed halls the crown always wins."  And

19   what that means is that an acquittal or a conviction, it's all

20   the same to society, the crown in England, it's the same.  The

21   crown/society always wins if you do the right thing.  If you

22   do the right thing, society wins.

23             And in this case if you do what Lincoln encouraged

24   the population to do back in the Second Inaugural -- and by

25   the way, Lincoln was a pretty good darn trial lawyer before he

1   became a politician -- if you go ahead with malice toward not,

2   with sympathy and charity for all.  If you well and truly

3   consider the evidence in this case, as you are bound to do by

4   your oath, I submit to you that you will reach the right

5   verdict, the only verdict for my client, Kyleen Cane, which is

6   not guilty.

7           Thank you very much for listening so patiently to

8   me.

9           One more thing.  I want you to know this is

10  absolutely the worst moment for any lawyer in any case.  I

11  will sit down, and the minute I sit down I will think to

12  myself, oh, my God I forgot to tell them about this evidence.

13  I forgot to tell that great story that Gus Newman taught me 25

14  years ago.

15          The Government will get to stand up and make its

16  rebuttal argument, and that's right, that's the way it should

17  be, because they have such a heavy burden of proof.  And

18  Ms. Jones I'm sure will give a excellent rebuttal argument.  I

19  want you to be thinking as you go back in the jury room,

20  because I won't get to talk to you again, I want you to be

21  thinking as you deliberate all the great arguments Ms. Jones

22  will make, what would Mr. Riopelle say about that.  What is

23  the other evidence in the case that rebuts that.

24          If the presumption of innocence that will travel

25  with my client into that jury room with you and the great

SUMMATION – MR. RIOPELLE                    3725

1  burden in this case are to mean anything, are to mean

2  anything, they require that of you, they require you to look

3  at the Government's arguments and think what the counter

4  arguments must be.

5          Again, I think if you do that, if you carry out your

6  oath as jurors will find that Ms. Cane is not guilty.  Thank

7  you very much.

8              (Continued following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                    3726

1          THE COURT:  Thank you, Mr. Riopelle.

2          Ladies and gentlemen, we'll be taking our

3    mid-morning break; a little late but, nonetheless, we will be

4    doing that.  As you know, the next thing you will hear will be

5    the rebuttal argument of the Government.

6          All of that means that the case is not over, so the

7    usual recess rules continue to apply:  Continue to keep an

8    open mind; do not discuss the case amongst yourselves or with

9    anyone else you may run into in the back; and we'll see you in

10   about 15 minutes.

11         (Jury exits.)

12         MR. BISHOP:  Your Honor, may I be heard?

13         I'm the member of the media who requested the

14   wiretap recordings.

15         THE COURT:  Yes.

16         MR. BISHOP:  My name is Stewart Bishop.  I'm with

17   Law360.

18         I just wanted to -- I respect your decision but just

19   wanted to cite some Second Circuit authority that there is a

20   presumption in favor of public inspection and copying of any

21   item entered into evidence at a public trial.

22         The Second Circuit said it would take the most

23   extraordinary circumstances to justify restrictions on the

24   opportunity of those not physically in attendance in the

25   courtroom to see and hear the evidence.

*LAM        OCR        RPR*

Proceedings                                      3727

1              I respect your decision, your Honor, but just ask

2     that you reconsider.

3              THE COURT:  I hear your argument.  I have not

4     prevented you from taking and getting the opportunity to have

5     that evidence, just delayed when you can have it; not until

6     after the jury verdict has been returned.

7              What was said in those excerpts is already in the

8     public record.  And if you want to communicate those excerpts,

9     you're free to do so.  So, the information is in the public

10    record.

11             What's not in the public record is the audio.  The

12    rules of this court generally prohibit the transmission of

13    audio or video.  And when this case is over, you'll be more

14    than free to do that.

15             MR. BISHOP:  Thank you.

16             See you in fifteen.

17             MR. BINI:  We have one other issue Ms. Jones will

18    raise.

19             MS. JONES:  There's one thing I wanted to discuss

20    before I give my rebuttal about a point of law.

21             Yesterday during Mr. Ross' closing, he argued to the

22    jury that unless they found that the Government had proven

23    beyond a reasonable doubt that Mr. Discala manipulated all

24    four companies, CodeSmart and Cubed and Staffing Group and

25    StarStream, then they have a basis to find him not guilty.

Proceedings                                    3728

1    They're putting this extra burden on us that because we

2    charged schemes involving all four stocks, we have to prove

3    all four stocks.  Clearly, that's not the law, that's not the

4    case.  Ms. Cane has only been charged with the Cubed,

5    participating in that part of the conspiracy.

6              The Government plans to argue during my rebuttal

7    that what we need to prove is that a conspiracy existed and

8    that the charged defendant became a knowing member of that

9    conspiracy.  So, for the securities fraud conspiracy, all we

10   need to prove is that the conspiracy to defraud involved at

11   least one security and at least one overt act has been proved.

12   And as for Count Two, the unlawful act charges a scheme to

13   defraud involving use of mails or wire.

14             MR. ROSS:  Judge, I think I went through those

15   elements in the beginning of my closing argument.

16             THE COURT:  I guess the point is she's only

17   inquiring do you have any problem with her articulation of

18   what the law is?

19             MR. ROSS:  No, absolutely not.

20             MS. JONES:  Then we're good.

21             THE COURT:  That's what I thought.  The jury will be

22   reminded what either have you said means nothing because it

23   only counts what I said.

24             See you in fifteen.

25             (Recess taken.)

1          THE COURTROOM DEPUTY:  Court is back in session.

2     Counsel for both sides are present, including Defendants.

3          THE COURT:  Ms. Jones, are you ready?

4          MS. JONES:  I am, thank you.

5          THE COURT:  Okay.

6          (Jury enters.)

7          THE COURT:  Be seated, please.

8          Counsel will stipulate that the jury is present and

9     properly seated?

10         MS. JONES:  Yes, your Honor.

11         MR. SHROYER:  Yes.

12         MR. RIOPELLE:  So stipulated.

13         THE COURT:  Thank you, counsel.

14         Ladies and gentlemen, welcome back.  I hope you had

15    a chance to refresh.  We are now ready to hear the closing

16    argument, which will be the last of the arguments that you

17    will hear by counsel, and it will be given to you by Assistant

18    United States Attorney Shannon Jones.

19         MS. JONES:  Thank you, your Honor.  May I proceed?

20         THE COURT:  You may proceed.

21         MS. JONES:  Thank you.

22         Good afternoon, everyone.  For the last five weeks,

23    you have heard overwhelming evidence that Abraxas Discala and

24    Kyleen Cane manipulated the stock of securities.  And

25    particularly, Discala and Cane manipulated the price of Cubed

1   together.  And this was just one part of the conspiracy led by

2   Discala to manipulate the stock of the manipulated public

3   companies.  Those are CodeSmart, the Staffing Group,

4   StarStream, and Cubed.

5          And why did they do this?  To enrich themselves at

6   the expense of others.

7          The overwhelming evidence presented to you proves it

8   beyond a reasonable doubt.  Defense counsel have stood up and

9   have done everything they can to distract you from the

10  evidence of this case.  I'm here to bring you back to the

11  evidence, to the witness testimony that you heard, the

12  exhibits that you've seen.

13         And the judge will instruct you it's the evidence

14  that matters, not what the lawyers tell you.  The lawyers'

15  words are not evidence.  Just because a lawyer says something

16  in its closing doesn't make it so.  The evidence is the

17  testimony, the documents, the recordings.  And the lawyers

18  don't tell you what the law is, the judge does.  And I submit

19  to you that after you hear the judge's instruction on what the

20  law is, it will be clear to you that each defendant is guilty

21  beyond a reasonable doubt on all counts.

22         Now, you've heard four hours of summary yesterday

23  from AUSA Patrick Hein about the evidence presented in this

24  case.  I'm not going to go through all that again.  You heard

25  it yesterday.  You'll have the exhibits; you can take a look

1    at them.  But I'm here to just address some of the key defense

2    points that were raised so that you can think about them when

3    you go back to your deliberations.

4            The Government has to prove the Defendants' guilt

5    beyond a reasonable doubt.  We understand that.  We embrace

6    that burden.  And I submit to you we have done that in spades.

7            The judge will explain to you what that term

8    "reasonable doubt" means.  A reasonable doubt is a doubt that

9    a reasonable person would have after carefully considering all

10   the evidence and applying common sense.  It's not based on

11   speculation, it's not based on a whim.  And I submit to you

12   that after you hear all the evidence -- you have heard all the

13   evidence, but after you consider the evidence, it will be

14   clear to you we've met that standard for each defendant for

15   each count.

16           Now, I want to start briefly talking about the

17   Government's witnesses, the serial liars.  Both Mr. Ross and

18   Mr. Riopelle called the Government's witnesses, basically all

19   of them -- the agents, the cooperators, the people who got

20   immunity -- liars.  Now let's talk about that.

21           You heard from Matt Bell, Marc Wexler, Victor Azrak,

22   and Jamie Sloan.  Discala even said that his former secretary

23   Marleen Goepel was lying to you.

24           Why did the defense counsel call these people liars?

25   Because, as the judge will instruct you, the testimony of even

SUMMATION - MS. JONES                    3732

1    just one accomplice is enough to convict as long as you find

2    that testimony credible and it establishes guilt beyond a

3    reasonable doubt.

4          But we are not asking you to do that.  We are not

5    asking you to rely on the word of just one cooperator; you

6    heard from several.  And it's not -- this case is not about

7    the cooperators.  You've heard from the cooperators.  They

8    explained to you what the text messages meant, they explained

9    to you what the wiretap calls meant.

10         But let's keep in mind Victor Azrak, arrested on

11   July 17; Marc Wexler, arrested on July 17; Matt Bell, arrested

12   July 17.  You know who else was arrested on July 17?  AJ

13   Discala and Kyleen Cane.

14         This case is not built on cooperating witness

15   testimony.  This is built on the wiretap recordings and the

16   text messages and the trading records and the bank records and

17   that mountain of evidence that was presented to you that

18   clearly shows that these two defendants are guilty beyond a

19   reasonable doubt.

20         But those cooperators, they came in and they

21   testified and they provided some helpful, I think, testimony

22   about what do certain text messages mean -- what do certain

23   text messages mean, what do certain wiretap recordings mean,

24   to help explain what the evidence is to you.

25         Now, these cooperating witnesses, they did plead to

1    serious crimes.  You should scrutinize their testimony

2    carefully.  And you've heard defense counsel say if someone

3    has lied even once in the past, if they lied when they were

4    arrested and they were terrified and they didn't have counsel,

5    then you should disregard everything they say.

6              But, no, witness credibility is for you to decide.

7    You decide if someone was telling you the truth on the stand

8    or not.  When you make that determination, think about:  Did

9    what they say make sense?  Did what they say, was that

10   corroborated by other evidence?  Is it consistent with

11   everything else that you learned in that case?

12             Because when you think about it, you've got to think

13   to yourself:  What were the lies here?  Who lied to you and

14   what did they lie about?

15             Let's think about that.  Like Victor Azrak, what did

16   he say to you?  He said, I engaged in coordinated trades with

17   AJ Discala and I was aware that Kyleen Cane was controlling

18   this escrow and that was helping to control the stock price.

19             You saw the text messages.  You heard the wiretap

20   recordings.  Is there any reason for you to doubt that what he

21   was telling you was the truth?

22             Because what if he was lying?  That basically means

23   he lied about committing a crime that implicated himself.

24             If those things weren't true, then what did he do

25   wrong?

SUMMATION - MS. JONES                    3734

1          The only thing that Victor Azrak did in this case

2    that resulted in him being guilty of stock fraud was

3    coordinating trades with AJ Discala.  If that's a lie then

4    what is he doing here?

5          Let's talk about Matt Bell.  Matt Bell, he said he

6    wasn't completely honest when he first got arrested.  He

7    minimized.  He was scared.  He had his reasons.  But you have

8    to think about those text messages, those text messages day

9    after day after day after day with Mr. Discala where they're

10   sending bids and putting in market orders and talking about

11   ITEN and talking about StarStream and talking about Staffing

12   Group and talking about Cubed and ask yourself when you

13   consider that evidence and you consider the wiretap calls and

14   you consider and the bank records and the trading records, do

15   you have any doubt that he was telling you the truth?

16         And, again, let's talk about Marc Wexler.  Marc

17   Wexler, what did he do?  He coordinated trades with

18   Mr. Discala and he coordinated the manipulation of Cubed with

19   Kyleen Cane and Mr. Discala.  And, again, he had the wiretap.

20   We had the wiretap calls and we had the bank records and we

21   had the trading records.  And you could see whether or not

22   what he was saying to you made sense or not.

23         And to the extent that defense counsel complied or

24   argued that these witnesses were coached or that they have

25   some motive to lie to please the Government, ask yourself:

1    Does that make sense?

2              You saw their cooperation agreements.  Their

3    cooperation agreements require them to tell the truth.  And if

4    they don't tell the truth, then they don't get those 5K1

5    letters.  And there's so much evidence that's corroborating

6    them including them, including each other, that I think it

7    would be fairly obvious to anyone if they were not telling the

8    truth.

9              And you did hear about one discrepancy between Marc

10   Wexler an Jamie Sloan.  Mr. Riopelle brought that up.  He

11   talked about that bribe.  Marc Wexler mentioned testified that

12   he recalled it was a $10,000 bribe, Jamie Sloan said I think

13   it was a $4,000.

14             You have to decide for yourself, do you think one of

15   them was lying or do you think one of them made a mistake?

16   Because it's one other or the other.

17             When you think about did they make a mistake or did

18   they intentionally lie, why would they lie?  I don't think it

19   makes sense that someone is going to pretend to pay a bigger

20   bribe than they did to seem like a big shot.  That seems

21   ridiculous.

22             You have to think about the witnesses and their

23   testimony.  Marc Wexler, what did he say?  He said, I paid her

24   $10,000, that's what I recall, I don't recall where I got that

25   money, I don't recall -- like, you know, he didn't recall any

LAM        OCR        RPR

SUMMATION - MS. JONES                    3736

1    of the other details.  Ms. Sloan testified it was $4,000, she

2    remembered there was talk about $10,000 but she didn't get

3    that money.

4              Again, why would either of these people lie about

5    this?  What matters is do you think that their testimony about

6    the guilt of the defendants was corroborated?  Did it make

7    sense?  And I submit to you that it did.

8              Now, you also heard Mr. Riopelle attack the

9    credibility of those Northwest Resources shareholders.  You

10   heard from Taylor Edgarton, Wesley Smith, and Marche Godffrey.

11   And he's telling you that because these men at first were not

12   completely honest with agents when they were questioned, that

13   you should disregard their testimony.

14             But ask yourself, when they came in here and

15   testified did what they say make sense or were they lying

16   about that?

17             Did Taylor Edgarton lie to you about being a fake

18   CEO of a company?

19             Do you really think that man, who was a former

20   dishwasher and warehouse worker, decided to wake up one day

21   and open his own mining company?

22             Do you think that guy got $20,000 out of his own

23   pocket and formed this mining company?

24             Do you think any of these investors, like Marche

25   Godffrey -- these fake investors, Marche Godffrey, the Smith

SUMMATION – MS. JONES                    3737

1    family, that they would invest $600 in a mining company run by

2    someone like Taylor Edgarton?

3           Of course not.  The Northwest Resources mining

4    company was ridiculous from the outset.  There's no way that

5    anyone was going to spend any money of their own to form that

6    company to actually be a mining company.

7           And Marche Godffrey, you heard him.  What did he lie

8    about?  What was the big lie with Marche Godffrey?

9           His lie was he didn't tell agents who gave him that

10   $40 to sign the papers.  He said it was some guy outside of

11   the supermarket, but when he came in here to testify he said:

12   You know what?  That wasn't true.  I'm here in court, I'm

13   under oath, I'm going to tell the truth.  And the truth was it

14   was my barber, Gary Scoggins.

15          Why would somebody -- I'm sorry, he said:  It was my

16   barber, Fat Matt.  He didn't even know the guy's name, but he

17   identified the picture.

18          Why would anyone lie about that?  It just doesn't

19   make any sense.

20          Is it more plausible that he was paid 40 bucks to

21   sign these papers or is it more plausible that he actually

22   invested $600 of his own money in a mining company and then

23   never followed up about where his stock certificate was?

24   Absolutely not.

25          Why do we care about this?

1          Why do we care about Northwest Resources?

2          Why did we have these witnesses come in here and

3     talk to you about these events that happened in 2011?

4          The reason why we did that is because this is how

5     Kyleen Cane got control over those Cubed shares.  This is

6     where it started.  And you have to think to yourself:  Why did

7     they go through this process?  Why did Cane Clark round up

8     these 30 fake investors?  Why did they invest this money?  Why

9     did they, you know, buy this mining claim that no one had any

10    intention of using?

11         They did it because these were the steps that they

12    needed to do to get the stock registered with the SEC so then

13    it would be free-trading shares so then they could sell the

14    shell company.

15         And ask yourself:  Is it really plausible that this

16    was all Joe Laxague?  That he was running around on his own,

17    handing out $40,000 to pay off Taylor Edgarton to pay for that

18    initial investment that paid for the big mining claim and the

19    geologists?

20         And to pay those investors, someone had to come up

21    with that $600.  Somebody had to come up with that total of

22    $18,000 to deposit in the bank account to make this look real.

23         And why were they trying to make this look real?

24    Because this is what you needed to do to register this company

25    with the SEC and get those shares to a point where they could

1    be free-trading.

2              And then what did they do?  They sold that shell.

3              And who is in charge of that firm?  Kyleen Cane.

4              And who was paid $325,000 when that shell was sold

5    to AJ Discala and Marc Wexler?  Cane Clark, to the bank

6    account that she controls.

7              That's why this matters.

8              And what you have when Cubed goes public is you have

9    Kyleen Cane in control of all of those share certificates.

10   All of those share certificates from those fake shareholders

11   who supposedly invested in this company in 2011.

12             That's how she got control over this company.  And

13   it was all based on lies.  All the SEC filings about Northwest

14   Resources, about who was really in charge of this company,

15   where did the money come from, who actually invested into this

16   company, it was all lies.  It was all lies to create a shell.

17             And you heard what Cane Clark does.  You heard what

18   Kyleen Cane does:  She sells shells.

19             Now, there's nothing necessarily illegal about

20   selling a shell.  But it's not legal to make a fake company

21   with fake shareholders and file things with the SEC that are

22   not true to get that shell.  And that's what happened here.

23   And, so, now you have a fake shareholder, a fake company, a

24   shell company, that now can be sold and be used in one of

25   these alternative public offerings to take a company public.

SUMMATION - MS. JONES                    3740

1        And that's what happened here and that's why we care

2   about Northwest Resources.

3        Now, I'm going to come back to some of Cane's

4   arguments later, but first I want to turn to a couple of

5   arguments that Mr. Discala's counsel raised yesterday about

6   SSET and TSGL.

7        I think we're going to need the Elmo, William.

8        Now, most of the evidence, not all, but most of the

9   evidence in this case that was presented to you related to

10  CodeSmart and Cubed.  And I submit to you there was

11  overwhelming evidence with respect to Discala as to both of

12  those counts, both of those stocks, and with respect to

13  Ms. Cane as far as Cubed goes.

14       But Mr. Ross brought up those other two stocks.

15  First of all, he brought up some other companies that have

16  nothing to do with this case, they're not relevant, I don't

17  even know why he was mentioning them.  But that's not what

18  this case is about.  This case is about the four stocks that

19  are the manipulated cover companies charged in the indictment:

20  CodeSmart, StarStream, the Staffing Group, and Cubed.

21       So, let's talk about StarStream and the Staffing

22  Group.  Mr. Ross argued that we failed to prove that Discala

23  conspired to commit fraud with respect to those two stocks.

24  Well, that's not correct.

25       First off, what did both Jamie Sloan and Marc Wexler

SUMMATION - MS. JONES                          3741

1    tell you?  That Marc Wexler paid Jamie Sloan a bribe so she

2    would stuff StarStream stock into her clients' accounts.

3              And Wexler told you he told Discala about it.  Of

4    course he did.  They were partners and they were friends and

5    they talked on the phone, as you saw, all the time.

6              So, now let's look at some of that evidence of the

7    StarStream and Staffing Group manipulation.  First, look at

8    some of those Bell texts from Government 132-2.

9              First there are these text messages on January 10.

10   And what do they say?

11             Can you have someone buy a bit of SSET?  If you can,

12   5,000 at 1.33.

13             Nice.

14             TY.

15             I'm on the bid for TSGL for point three.

16             Smart.

17             Don't chase, just showing support.

18             Let's take a look at another set of text messages

19   from January 13, 2014.  AJ Discala to Matt Bell.

20             Need TSGL and SSET.  I'm focusing on bridge too all

21   day.

22             Great.  Sounds good.  Bid for size on TS.

23             On it.  At 34.

24             Okay.

25             And then let's look at January 30, 2013 -- sorry,

SUMMATION – MS. JONES                    3742

1    2014.

2              I know tomorrow I'm blasting SSET.

3              Okay.  I'll provide support.

4              I put in a bid at 70 on SSET.  7,000 shares.

5              We're gonna rip it.

6              I moved my bid up to point eight five.

7              Nice.

8              Bid 97 for 1K.

9              Try to take VFIN out for 1K.

10             Back and forth, back and forth, back and forth.

11   These two are coordinating on both SSET and TSGL.

12             Also, let's look at the transcript from 198-74.

13   Remember, this is also Count 7.  You saw this yesterday during

14   Mr. Hein's presentation.  This one is from May 9 of 2014.

15             Mr. Discala says to Mr. Azrak:  Oh, do you own any

16   SSET?

17             No.

18             Okay.  We're going to buy this effer back.  I'm

19   going to pound it.

20             Really?

21             Yeah.  I'm gonna buy it, I'm gonna pound it.  I'm

22   gonna get the price down.

23             He wants to push the price down on this stock to 11

24   cents.

25             On that second page:  Where is it?  Where is it at

*LAM      OCR      RPR*

1  right now?

2          Eleven cents.

3          We're gonna buy the shit out of it.  Me, Marc, you,

4  we're gonna buy it and then we're gonna rip it back up.

5          This is manipulation.  They're working together to

6  try to push that price down and then they want to jack it back

7  up.

8          You heard Mr. Ross yesterday give this long

9  discussion about how these were real companies that

10 Mr. Discala really cared about.

11         Mr. Discala cares about himself.  He cares about his

12 pocketbook.  He doesn't care about these companies.

13         There was also a lot of discussion yesterday from

14 Mr. Discala about these are real companies with real products.

15 This case is not about whether or not these are real companies

16 with real products, this case is about was the stock

17 artificially manipulated to deceive investors?  And it's clear

18 that it was.

19         What happens when stock is manipulated?  When the

20 stock is manipulated, that means that it's at an artificially

21 high price that does not reflect the merit of the company.

22         You heard that's what happened with CodeSmart.

23 There was text after text after text between AJ Discala and

24 Matt Bell about walking up the price and selling it.

25         You heard Mr. Discala on the stand.  You can make

SUMMATION - MS. JONES                    3744

1   your own assessment about his credibility and what he said.

2          But what did he tell you about this text with Matt

3   Bell?  He told you first:  Oh, I didn't sell any CodeSmart

4   until May 23.

5          So ask yourself, what was going on with all those

6   texts between May 13 and May 23 about buy this, bid that, do

7   this, do that?  They're coordinating the sells.

8          And you have to also ask yourself:  What is going on

9   here?  Mr. Discala is a seller.  He's not a client of Matt

10  Bell's.  Matt Bell's clients are his Alamo customers, those

11  customers that relied on him to make investment decisions for

12  them and buy stock that was appropriate for their portfolios.

13         And what did he do?  He bought a ton of CodeSmart

14  and stuck it in their accounts.  And at gradually increasing

15  prices.

16         This is not the way the market is supposed to work.

17  When you want to buy something, you want to buy it for as

18  cheap as you can.  When you want to sell something, you want

19  to get as much money as you can.  Between those two competing

20  desires of I don't want to pay more than I have to and I don't

21  want to sell it for less than I have to, that's where the

22  price is supposed to be.

23         What are Mr. Discala and Matt Bell doing?

24         Mr. Discala is saying:  Go point eight, go point

25  nine, go point ten.

                    LAM       OCR       RPR

SUMMATION - MS. JONES                    3745

1      And Matt Bell is like:  Filling it, filling it,

2  filling it.

3      He was getting his clients to pay more and more

4  money so Mr. Discala can sell it at higher and higher prices.

5      This is not how the market is supposed to work.

6  This is stock fraud and that's what they were doing.

7      Now, what else did Mr. Ross argue to you about

8  StarStream and the Staffing Group?  He suggested to you that

9  we must find Mr. Discala guilty of conspiring to manipulate

10  all four stocks beyond a reasonable doubt to convict him of

11  either of the conspiracy counts.

12      I suggest to you that Mr. Ross misrepresented a lot

13  to you if that's what he was trying to imply.

14      The judge will explain the law to you.  And I will

15  believe he will tell you what the Government needs to prove

16  for the conspiracy counts are that:  One, a conspiracy

17  existed, meaning that at least two people agreed to commit an

18  unlawful act charged in that conspiracy count; and, two, the

19  charged defendant became a knowing member of that conspiracy.

20      For Count One, the unlawful act charged is

21  securities fraud, so we need to prove that a conspiracy to

22  defraud involved at least one security and that at least one

23  over the act has been proved.

24      And what's an overt act?  An overt act is some step

25  that any member of the conspiracy takes in furtherance of that

SUMMATION – MS. JONES                    3746

1    conspiracy.

2              And, so, for Count Two, the unlawful act charged is

3    a scheme to defraud involving the use of mail or the wire.

4              The Judge will describe the elements of the crimes

5    to you at length.  Listen to him, not the lawyers, about what

6    law must be proved.

7              Now, let's take a step back and think about the

8    arguments that have been made here in the last two days.

9              Let's be clear about one thing:  It is against the

10   law to artificially control and manipulate stock prices.  The

11   judge is going to explain this to you in his instruction.

12             Matt Bell, Marc Wexler, Jamie Sloan, Victor Azrak,

13   they've all told you that they worked together to artificially

14   manipulate stock prices and that's why they pled guilty.  And

15   those witnesses told you they committed their crimes with AJ

16   Discala an Kyleen Cane.

17             In this case, you have heard so much evidence of

18   blatant stock fraud; hundreds of text messages, explicit phone

19   calls.  Both Discala and Cane are caught on tape committing

20   the crimes.

21             And the defense counsel argued:  Oh, no.  Oh, no.

22   Nothing wrong here, they didn't do anything wrong.  They were

23   just trying to protect the company.  They were just trying to

24   keep the stock price up.

25             Keeping the stock price up artificially by working

SUMMATION - MS. JONES                    3747

1    with other people, that's stock fraud.  It's not okay.

2            You know, the judge will explain the law to you.

3    What he's going to make clear to you is that no, it's not okay

4    to artificially manipulate the stock price of these stocks.

5            Let's get back to reality here and talk about the

6    facts and the evidence and the law, not the defense theories

7    about how clearly illegal conduct is somehow okay just because

8    they say so.

9            Mr. Riopelle argued with respect to Ms. Cane that

10   everything with the company was done out in the open.

11           Are you kidding me?  They concealed everything.

12   Kyleen Cane hid the fact that she controlled all the

13   free-trading stock.  That's not disclosed anywhere; that's not

14   in any SEC filings, that's not in the private placement

15   memorandum given to investors.

16           There are eight million free-trading shares.  Those

17   original Northwest Resources shareholders, those shareholders

18   that are described in the original Northwest Resources SEC

19   filings, you can see that that stock is out there.  You can

20   see that that is the free-trading stock.  Nowhere is anyone

21   told outside of this conspiracy that Kyleen Cane controls all

22   that stock.

23           Why not?  Because no one would buy this stock if

24   they knew one person was controlling and setting the price.

25   That's ridiculous.  You want to invest in a tech company where

*LAM      OCR      RPR*

SUMMATION - MS. JONES                    3748

1    they're saying, oh, this stock is worth $5, $5.50, $6, but, by

2    the way, it's all being controlled by one person who's leaking

3    that out as the market demands.

4          No, this is not about what the market demands, this

5    is about artificially keeping that price up where they want

6    it.  They want it up above $5 and that's what Kyleen Cane

7    does.  She keeps that price up and she does it by controlling

8    the supply.  That's her job.  If she doesn't sell it, the

9    price can't drop.

10         That's not how the free market is supposed to work.

11   She doesn't own that stock and, yet, she is controlling it and

12   she's controlling the price.  And she's hiding it and you know

13   she's hiding it.  No one is told about it.  It's not in her

14   name, it's in her good friend David Ben-Bassat's name.

15         Why is that?  Why is that?

16         Mr. Riopelle is like, There's nothing wrong with

17   letting someone else trade stock in your account.

18         Yeah, but there's also nothing preventing Ms. Cane

19   from opening up her own account in her own name and doing this

20   trading out in the open and telling everyone that she's doing

21   it so everybody knows what the situation is when they make

22   that decision to buy the stock.  And they hid it.  Because

23   they did not want the market to know.

24         So, what happens when you don't control the price?

25   What happens when you just let normal market conditions apply?

SUMMATION - MS. JONES                    3749

1          What happens is that the stock price is based on

2     what the company is worth.  It's not based on some fantasy

3     idea of someday this will be really great and will be worth

4     this so it's okay to keep it up here.  No.  The price is

5     supposed to be what it's worth at that moment based on what

6     people are willing to sell it at and what people are willing

7     to buy it at.

8          Let's talk about a couple of the other stocks here.

9          What happens when the control doesn't work?

10          What happens when you can't keep that price

11     artificially up?

12          Well, you heard with CodeSmart it started off at $3,

13     went up to $6, went back down, went back up.  And then, when

14     the control was done, when it's just based on the merits of

15     the company and there's no artificial inflation of the stock

16     price, where is that the stock trading in the summer of '14?

17     It's like ten cents.

18          Let's talk about StarStream.  You heard Marc Wexler

19     testify.  He wanted to manipulate that stock price.  He wanted

20     to get it up.  He tried to get people to stuff it in people's

21     accounts.  No one would do it.

22          And what happened to that stock price?  It gets

23     deposited into his account and there's like -- it starts with

24     a price of $5 and it immediately drops.  He can't sell that

25     stock to save his life.  He gets a couple of sales out, $1.50,

*LAM        OCR        RPR*

1    $1.40, $1.30.  And you heard in that transcript that by the

2    summer it's trading at 11 cents, 75 cents.

3              It doesn't matter that it was a real company that

4    had some association with The Butler.  What matters is what

5    people were willing to pay for that stock.  And what people

6    were willing to pay was almost nothing.

7              And that's the same thing with the Staffing Group.

8    Sure, it might have been a real company, it might have had

9    some business, but where was it trading in the summer of 2014?

10   25 cents, 30 cents.  You heard Victor Azrak testify he paid,

11   like, almost 50 cents for that stock and it lost half of its

12   value.

13             That's what happens when you don't manipulate a

14   stock price:  Its value reflects what the company is worth.

15             And if the company is not worth much, the stock

16   price should be low.

17             Kyleen Cane knew she controlled all the shares.  She

18   knew that control was illegal and that's why she was hiding

19   it.

20             You heard Mr. Riopelle argue, Oh, she said no

21   texting because she's older and doesn't like to text.

22             You guys, you saw the text messages.  The people who

23   are texting her are AJ Discala and Marc Wexler.  Those two --

24   she keeps telling them:  No texting; let's call.  No texting;

25   let's talk on the phone.

SUMMATION - MS. JONES                    3751

1            And they keep texting her.  It's like she can't stop

2    them.  She knows that is not the smart way to commit a fraud

3    scheme.  She knows you shouldn't have it in writing, and they

4    can't seem to help themselves because they keep texting her.

5            And those texts show that they are working together.

6    They are intentionally coordinating their trades and

7    concealing that control.

8            For example, on April 19, you saw that text in

9    Government Exhibit 129-25, Discala writes:  Make sure there's

10   enough at 5.25.  Don't want it going higher.

11           And what does she respond?

12           This is what we should talk about, not text.  I'll

13   call you tomorrow.  Very important.

14           On June 6, 2014, Government Exhibit 129-57, there's

15   a text exchange between Marc Wexler and Kyleen Cane.  He texts

16   her about the Titan distributions:  I'll call you Monday with

17   the account detail.

18           She writes back:  Please call.  No more texting.

19           On June 10, from Wexler, again regarding the Titan,

20   distribution:  Speak in ten?  Sorry for the text.

21           She's like:  Okay, but no texts.

22           She doesn't want to talk about this in text messages

23   because she knows what she's doing is clearly illegal.

24           Let's look at some of the other texts that show she

25   working with AJ Discala and Marc Wexler.

SUMMATION - MS. JONES                3752

1          Look at Government Exhibit 129-31 again:  Aloha,

2    Kyleen.  Do you think we could take it up to at least 5.30

3    tomorrow?  If so, would you give direct or give permission to

4    Glendale?  We have demand but need a good visual, especially

5    because we have so much news opportunity tomorrow.  Please,

6    please.  Thanks so much.  Everything is great.

7          And what does she do?  She texts.

8          In Government Exhibit 129-107, she texts:  Here's

9    George's number, George at (818) 907-1505.

10          And she texted him:  CRPT between 5.25 and 5.30.

11          Let's look at Government Exhibit 129-46:  Kyleen,

12    can we just ease into $6.35?  We have some buying.

13          Okay.

14          Ky, is everything okay?  Still on track?

15          Yes.  Call me.  No texts.

16          What does this show?  This shows that she is

17    participating in the conspiracy to manipulate the stock.  She

18    is working with AJ Discala and others to control the price.

19          Now, there was a lot of discussion about, oh,

20    putting in a bid.  Putting in a bid is not a deceptive act.

21    But talk to yourself, think to yourself:  AJ Discala talked

22    about his box nonstop.  He wanted the bids and the asks to not

23    be too far apart.  He wanted the bids at all the different

24    market makers:  Glendale, VFIN, NITE, CDEL.  He wanted to see

25    bids in the price ranges where he thought the stock should be

1    all sort of in the same area.

2              So, when he's telling someone put in a bid at this

3    price, don't worry, you won't get hit, what is he saying?

4    He's saying:  I want it to look like someone wants to buy the

5    stock at that price and I want it to show up on the market

6    makers in the Level 2 so people can see that, so people can

7    see that there's interest in buying this stock at that price.

8              That is intended to deceive people into thinking

9    that there's more demand for the stock than there is.

10             And it does more than provide prove optics.  What

11   happens when the price drops?  What happens when the price

12   goes down to where the bid is?  The bid gets hit and the

13   person ends up buying the stock at that price.

14             A bid is an offer to buy.  If the price hits your

15   bid, you buy it.  You heard that from Victor Azrak.  You heard

16   many times he put in a bid -- he didn't want to buy the stock,

17   but he put in the bid, the bid got hit, and then he owned the

18   stock.

19             What does that do?  That helps support the price.

20   That keeps the price from dropping too low so it can keep that

21   artificial control going.

22             Now, you've heard arguments about the press

23   releases.  You heard Discala argue that press releases were

24   mostly true and if they were false not it's his fault because

25   he didn't write them.  And Mr. Riopelle argued that Cane

1    actually wasn't working to coordinate prereleases.

2              Now, why are press releases important?  Press

3    releases are important because they suggest to the market

4    something is happening; something is happening that justifies

5    this price going up.

6              We issue a press release and then Discala would say:

7    This thing's gonna fly.

8              You need to have something to justify the price

9    walking up.  Because if it's just going up, up, up, up, up,

10   and there's no news and nothing is happening, people say:  Why

11   is this stock going up?  What's going on that would justify

12   this price going up?

13             So, they'd work together.  And Mr. Riopelle

14   suggested that Cane wasn't part of that, that she didn't

15   understand that, that she wasn't coordinating with him.

16             Well, let's take a look at Government Exhibit

17   198-41.  They're talking about the press releases.  And, yes,

18   the press releases were not as often as they wanted, they were

19   not -- Mr. Wexler and Mr. Discala were dissatisfied about how

20   often they were coming out.  Kyleen Cane's fixing it, she's

21   getting a new press person onboard who is going to take care

22   of it.

23             And they talk about this.  She tells them:  Yeah,

24   we're working on it.

25             She's like:  We're working on it.  It's coming twice

SUMMATION - MS. JONES                    3755

1   a week.  It's a lot more than you could possibly hope for.

2           And Discala is complaining:  Twice a week is great,

3   but when did we get twice a week?

4           She says:  Yeah, there's an announcement today.  It

5   hasn't come out yet.  There's another one coming out later in

6   the week.

7           She understands what's going on and she is working

8   with Discala and Wexler to make this happen.

9           Now, Mr. Riopelle argued that if a match trade

10  didn't happen every day, then somehow there's no evidence of

11  securities fraud.

12          That's a ridiculous argument.  We have to show that

13  they conspired to commit securities fraud, that they conspired

14  to commit mail and wire fraud.  We don't have to prove that

15  they actually did it, although in this case there is ample

16  evidence that they did it over and over and over again.

17          Ladies and gentlemen, I submit to you that you guys

18  can convict Mr. Discala and Ms. Cane based on the calls from

19  May 23 alone.

20          Because what do those calls show?  Those calls show

21  that they are coordinating the stock price, working together,

22  and making it happen.  That stock price jumps up.

23          Why does it jump up?  Mr. Riopelle argued oh,

24  Ms. Cane had nothing to do with that, it just happened and she

25  was not responsible for that.

Case 1:14-cr-00399-ENV   Document 668   Filed 10/20/18   Page 101 of 208 PageID #: 6590

1          What did the calls show you?  What did you hear?

2     You heard that the stock price jumped up because her broker,

3     her broker at Glendale, George Castillo, who had been

4     releasing the stock at a certain price at her direction was on

5     vacation.  And because he was on vacation, the person who was

6     filling in was not selling, was not providing the supply that

7     was needed to keep the price at where they wanted it to be.

8          So what happens?  The price spikes.

9          And this is bad.  Everybody knows this is bad.

10    Because there's no explanation for the spike.  It goes from

11    five something to up to seven.

12         Although Mr. Wexler is kind of like:  Oh, maybe

13    we'll make some money.  Maybe this is a good thing.

14         The people who understand what's going on, like

15    Ms. Cane and even Mr. Discala, they're like:  Oh, this is not

16    good.

17         Mr. Discala said:  This is going to ruin my box.

18    This is going to ruin my chart.  It kills me that they did

19    this.

20         And Ms. Cane and Mr. Discala talk about it and

21    they're like:  We've got to bring it down.  We've got to bring

22    it down.

23         They're in agreement about this.  They're in

24    agreement that this price, which they both know is fake from

25    the get-go, needs to come back down; not because that's the

Case 1:14-cr-00399-ENV   Document 668   Filed 10/20/18   Page 102 of 208 PageID #: 6591

1    real price, but it will make it look better, it will make the

2    chart look better.

3           So, they agree to do that and they work together to

4    make that happen.  And it's not just Mr. Discala and Kyleen

5    Cane who are doing this.  AJ Discala calls Darren Goodrich, he

6    calls Marc Wexler, he calls Victor Azrak.  He has everybody

7    putting in bids and having Ms. Cane sell so they can get that

8    price down.

9           And where do they get it?  They get it to $6.30.

10          And what had Ms. Cane said where they wanted to

11   land?  $6.35.

12          Mr. Riopelle argues:  They said 6.35.  It ended at

13   6.30.  That shows that there was no control, there was no

14   coordination.

15          That is ridiculous.  They brought it back down.

16   They exercised that control.

17          And what did Mr. Discala tell Mr. Azrak later in the

18   same day?  He said:  You want to get it back down to $6.35,

19   $6.30, whatever.

20          It didn't matter.  What matters is they worked

21   together and they brought it back down and did that together

22   because they both knew this looks bad.  This is going to set

23   off alarms and we can't have that.  We need to bring it back

24   down.

25          And they did.  She did what she needed to do:

1    Called George Castillo, he started releasing the stock, the

2    price came down, and they got it basically where they wanted

3    it.  That is control.

4            Now, there's also been arguments that it's

5    significant that there wasn't selling from the David

6    Ben-Bassat account on certain days.

7            First of all, we don't have to prove that they

8    committed stock fraud every single day from whenever it

9    started trading until the day they were arrested.  What

10   matters is, were they working together to artificially control

11   the price?  And you can see that they were based on what stock

12   price was doing.  It never dropped down, it was up and up and

13   up and up, based on nothing other than market manipulation.

14           And how did Ms. Cane help keep that price up and

15   going up?  She wasn't selling.  She had most of the supply and

16   she was not releasing that stock and the price was not going

17   down and it was still going up and it was all part of the

18   coordinated effort.

19           There's also arguments that it was significant that

20   there were no -- there's no trading in the David Ben-Bassat

21   account after June 30.

22           Well, what do you know what's coming?  What was

23   still yet to come?  There were more traunches of stock coming.

24   You heard that.  And you saw that in evidence.

25           On June 2, Cane Clark, Kyleen Cane's law firm, drops

1    off that Marche Godffrey Cubed stock certificate.  You heard

2    from Marche Godffrey, he knew nothing about that stock

3    certificate.  And they instructed the stock agent to transfer

4    that money -- that stock into an account at JPMorgan Chase

5    that they claimed was associated with Ostrich Technology

6    Partners, a company in Belize.

7            And it took some time for that to happen.  That

8    transaction didn't actually occur until June 20.  And then the

9    first trade that's associated with that account -- you heard

10   from the JP Morgan Chase representative the first trade in

11   that account was July 17.

12           They weren't done.  She wasn't finished she was

13   moving on to the next traunch of stock.

14           Let's look at Government Exhibit 129-89, June 7.

15   This is between that broker who is identified as being Cayman

16   Maniac, and he's texting with Kyleen Cane in June; early June,

17   June 7.  He's watching that stock:  All that stock is creeping

18   up.

19           She writes back with a smiley face.

20           And he writes:  You have a million shares, wasn't

21   it?

22           She says:  The first deposit will be 270K but there

23   will be two more.

24           Okay.  Great.

25           And what deposit is she talking about?  I submit to

1    you she's talking about that deposit of those Marche Godffrey

2    shares that finally got deposited in JPMorgan Chase in a

3    foreign UK brokerage account on June 20 and then first

4    targeted the first trade on June 15.  The first and only

5    trade.

6            Because what happened on July 17?  Kyleen Cane was

7    arrested.

8            And what was also happening at that time?  Well,

9    Kyleen Cane was getting her own free-trading shares.  You saw

10   that in Government Exhibit 147-21.  Cubed agreed to give

11   Kyleen Cane 300,000 free-trading shares of Cubed stock.

12           And in that board resolution, what did they value

13   that stock at?  This was free-trading stock.  This is supposed

14   to be free-trading stock that she was getting at the end of

15   June 2014.  And what value did they put on that stock?  $1,

16   the same price that people who were investing in the private

17   placement paid.

18           But there was a big difference between Kyleen Cane's

19   300,000 shares and those restricted shares that people were

20   buying for a dollar a share:  Those restricted shares were

21   going to be restricted for a year.  Those people had to hold

22   on to that stock for a year before they could sell it.

23           So, they knew they were taking some risk that maybe

24   the stock wouldn't be worth $5, $6 in a year from now.  Keep

25   in mind, they were not taking the risk that this was an

1   artificially inflated stock that was a complete fraud, they

2   just thought normal market conditions might mean that a year

3   from now this stock is not worth what it is.

4          But she's getting 300,000 shares of free-trading

5   stock the end of June and it's valued at $1 per share.  But

6   according to the stock mark, the stock market that Ms. Cane is

7   controlling, that stock is worth between $6 and $7 a share at

8   that time.  So, she's paying herself, like, $1.8 million in

9   stock if you believe that that stock price was a real price.

10  And it wasn't.  She knew that.  But that is what she was

11  telling the market and that is what she was putting in her

12  pocket.

13

14          (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

1          MS. JONES:  Now, what happened to those stock

2    certificates, two days later she was arrested.  Her markers

3    were restricted.  She can't do anything with them.

4          You have heard arguments that the way that Kyleen

5    Cane held and sold stock was not to commitment fraud, but to

6    protect the company or to protect the investors.  It is not

7    good for investors to have a stock price be artificially high.

8    The stock price is supposed to reflect the true demand for the

9    stock, based on the value of the company.  Because if it

10   doesn't, sooner or later, it is going to come crashing down.

11         Deb Oremland from FINRA told you prices are supposed

12   to be set by normal market conditions of supply and demand,

13   and market manipulation is any sort of interference with

14   normal market conditions.

15         Jamie Sloan, she told you the stock price is

16   artificially high.  That's not good because it is going to

17   come crashing down if it is not based on the value of the

18   company.

19         You are going to hear from the Judge that illegal

20   stock fraud includes techniques that are intended to mislead

21   investors by artificially affecting market activity.  Here,

22   Cane and Discala worked together to set the price of Cubed so

23   it was not based on the real value of stock, but on

24   coordinated trading activity.

25         Motive alone is not enough to establish guilt, but

1    you can consider it.  And you can use your own common sense.

2    It is clear here that AJ Discala and Kyleen Cane manipulated

3    the stock, and she had 7 million reasons to do so.  She had

4    one million shares of restricted NPNC stock in her account,

5    plus 300,000 shares of free trading stock that she got from

6    Cubed.

7            Let's not also forget other ways she made money.

8    She made money from selling the shell.  Mr. Riopelle made some

9    argument about how she advanced money to Cane through Cubed.

10   That's not what the evidence shows.  The evidence shows that

11   Marc Wexler and AJ Discala wired her $325,000 in February of

12   2014 to pay for the shell.  And that makes sense.  This is

13   what she does.  She sells shells.  She is not giving it away

14   for free.

15           So they paid her that 325.  So, instantly, she's

16   made a profit off of what she had done with Northwest

17   Resources.  And then she represents the company and is

18   participating in this scheme to control the stock price.  And

19   why is this control important to everyone who invests in this

20   company?  Let's take a moment and think about Rui Falcon.  Rui

21   Falcon, who Mr. Discala thought was a wonderful witness for

22   himself, actually told you something very different about her

23   investment decisions.  She told you she thought this company

24   had promise, she thought the technology was something that

25   maybe had potential.  And she was willing to take that risk of

REBUTTAL SUMMATION - MS. JONES          3764

1  investing in that company and seeing if it could actually make

2  a profit.  And how much money did she invest?  She invested

3  over $1.4 million of her own money and her investors.

4          And what was an important factor in her investment

5  decision, which is obvious and totally makes sense?  She

6  considered that the stock was already trading at over 6

7  dollars a share.  When you are making a decision to buy a

8  stock for a dollar a share, even if you have to hold it for a

9  year, the fact that it is already trading at over 6 dollars a

10  share makes you think, okay, this is a pretty good bet.  I

11  think that this is going to be profitable, the company looks

12  okay, the stock price really suggests that there's some value

13  here.  I am going to make that investment.

14          Does she know that Kyleen Cane controlled almost all

15  of the free trading shares and was leaking those shares out to

16  meet market demand?  Of course not.  She told you she didn't

17  know that.  And would that have been important for her to

18  know?  Absolutely.  She said she would have run away screaming

19  and reported them to authorities.

20          And Ms. Cane and Cubed are not the only ones who

21  benefitted from that fraudulent high price, okay.

22          Let's talk about AJ Discala.  AJ Discala makes, you

23  know, he had a lot of talk about how much money did he make,

24  and how much money did he lose.  He made a lot of money in

25  ITEN, in CodeSmart.  Even his own accountant came in and said

1    she thought he made $1.8 million.  And that's not including

2    the $600,000 that Marlene Goepel made in her account because,

3    as she said, she was told that was not his.  That's not what

4    Marlene Goepel told you, that's not what common sense would

5    tell you.

6              So he made over $2 million on ITEN.  StarStream,

7    kind of a bust.  The Staffing Group didn't really work out

8    because they couldn't exercise that control.  They didn't have

9    Matt Bell any more to stuff his clients full of CodeSmart

10   stock because he got fired.  That stock crashed, his other

11   stock that he was playing around with crashed, and he lost his

12   clients a lot of money, and he was out.

13             So he could not provide that artificial demand for

14   that stock to walk the price up.  They didn't have that for

15   the Staffing Group, they didn't have that for StarStream.  So

16   what happened with those stocks?  The attempt, and it was an

17   attempt, they wanted to manipulate that stock.  They wanted to

18   get that price up.  But they couldn't do it because they

19   didn't have the means to do it.

20             So Ms. Cane comes along and she provides them with

21   the ability and the method to get that stock price up over

22   five dollars.  Without her, that stock price may not have been

23   that high, it would not have moved that far up, and it would

24   not have been able to exercise the level of control that they

25   did over that price.

1          And what was Mr. Discala able to do based on that

2    stock price, Mr. Discala and Mr. Wexler?  He goes running

3    around selling stock purchase agreements or participation

4    purchase agreements in that 8 million shares that Kyleen Cane

5    held.  You heard that from his own accountant.  His own

6    accountant had prepared this draft schedule that she's like,

7    oh, it is not done, it is just a draft.  But that draft

8    schedule showed that AJ Discala had $1.7 million deposited

9    into the OmniView account from people like Bryan Hagen and

10   Michael Kellner, and Igor Gefter, who thought they were buying

11   Cubed shares.  That they were buying, I don't know what.  But

12   they sent him $1.7 million because they could see the stock is

13   trading between 5 dollars, 6 dollars, 7 dollars.  It looks

14   like a good value to buy it at a dollar, because that's what

15   he was doing.  Mr. Discala was selling interest in those

16   shares that she was holding at a dollar a share, and taking in

17   another $1.7 million.

18         This is stock fraud.  The defendants have tried to

19   argue that they are the victims here, that Kyleen Cane was

20   deceived by her associate Joe Laxague, if, in fact, he's the

21   one who did this and these people aren't lying about how they

22   came to be fake Northwest Resources shareholders.

23         Remember, she worked at a four person law firm.

24   What's that law firm called?  Cane Clark.  Where is that law

25   firm located?  Las Vegas.  Where are all those fake

1   shareholders located?  Las Vegas.  Taylor Edgarton was in

2   Reno.  He says Joe Laxague flew down, met with him, had him

3   sign those papers, and at some point later in time, Joe

4   Laxague was based in Reno, but everything else was based in

5   Las Vegas.  Cane Clark was based in Las Vegas.

6          You saw the text messages between Kyleen Cane and

7   Joe Laxague.  She told him what to do.  She told him what that

8   shell was worth.  And he reported to her.  It is her law firm.

9   And she's the one who got the money when the shell was sold.

10  That was the provident to the Cane Clark law firm.  She's the

11  one that signed the checks to Taylor Edgarton, and she signed

12  that $10,000 check to Wesley Smith, who helped find the fake

13  shareholders when this company went public with Cubed.  Wesley

14  Smith had no direct connection to this company.  The only

15  thing Wesley Smith did was he rounded up those fake

16  shareholders, and she paid him $10,000 at the same time that

17  Taylor Edgarton got his $20,000.

18         She knew exactly what was going on.  But she wants

19  to argue that somehow she's the victim here.

20         Same thing with Discala.  He's completely surrounded

21  by fraudsters, serial liars, all of them.

22         Are these the two unluckiest people in the world, or

23  are they leading a stock price conspiracy?  Common sense tells

24  you that these two knew exactly what was going on, and that

25  the facts are as they have been presented to you in this case,

1   through all the evidence and all the witness and all the

2   documents.

3           The securities laws at issue here are not about

4   protecting companies or protecting a stock price.  They are

5   about protecting people from fraud.  The real victims here are

6   people who bought those stocks at artificially high prices

7   that were not based on reality.  Like all the Bell clients who

8   got stuffed with CodeSmart, and the Halcyon clients who were

9   stuck with CodeSmart and Staffing Group and StarStream and

10  Cubed.  And people like Stephanie Conti, who bought CodeSmart

11  stock on the open market.  And let's not forget the people who

12  gave money to Discala to participate in escrow, like Igor

13  Gefter, the doctor, and Eliezer Zupnick and Bryan Hagen and

14  Michael Kellner.

15          Discala made millions of dollars from CodeSmart and

16  Cubed, the Cubed scheme.  Millions of dollars that came

17  directly out of the pockets of the defrauded investors.  And

18  please don't forget, Discala cannot do this alone.  And with

19  respect to Cubed, he was only able to commit this fraud thanks

20  to Kyleen Cane who set up the secret undisclosed escrow and

21  tightly controlled the price so it would walk up from five

22  dollars to over six when they were all arrested.

23          Ladies and gentlemen, we ask you to hold Abraxas

24  Discala and Kyleen Cane accountable for the crimes that they

25  committed.  Find them guilty because the evidence has shown

PROCEEDINGS                          3769

1    beyond a reasonable doubt that they are guilty.  Thank you.

2              THE COURT:  Thank you, Ms. Jones.

3              Ladies and gentlemen, that brings us to the end of

4    the argument.  It does not mean the case is over.  You have

5    not yet heard the Court's instructions on the law.  So when we

6    take our lunch break, the usual rules apply.  And, that is,

7    don't discuss the case amongst yourselves or with anyone else,

8    and continue to keep an open mind since you will -- again, you

9    won't be going out, you will be here in the jury room, but

10   don't use the opportunity of the hour break that we will take

11   to do any research, electronic or otherwise.  And to the

12   extent that you may be on some social media platform or some

13   other form of communication, you are to remain on radio

14   silence.

15             So we will see you in about between 45 minutes to an

16   hour, and we will hear the Court's instructions on the law.

17             (WHEREUPON, at 2:02 p.m., the jury exited the

18   courtroom.)

19             (Open court; no jury present.)

20             THE COURT:  We will try to get back between 2:45 and

21   3:00, and we will start as close to 3:00 as we can.

22   Otherwise, the usual rules.  If you need it, take it.  If you

23   don't, we'll lock it up.

24             (WHEREUPON, a recess was had from 2:02 p.m. to

25   3:00 p.m.)

1          THE COURTROOM DEPUTY:  Court is back in session.

2   Counsel for both sides are present, including defendants.

3          THE COURT:  Are we ready for the jury?

4          MS. JONES:  Yes, Your Honor.

5          MR. BOWMAN:  Your Honor, the only thing that I

6   wanted to raise earlier, and it is just a very brief matter,

7   and I discussed it with the government.  I had a question

8   about paragraph 13 of the indictment, which charged the

9   schedule 13D issue, and I understand it is not in your charge,

10  so.

11         THE COURT:  Right.

12         MR. BOWMAN:  Thank you.

13         (WHEREUPON, at 3:14 p.m., the jury re-entered the

14  courtroom.)

15         THE COURT:  Be seated, please.

16         Counsel will stipulate that the jury is present and

17  properly seated.

18         MS. JONES:  Yes, Your Honor.

19         MR. BOWMAN:  Agreed.

20         MR. RIOPELLE:  Agreed.

21         THE COURT:  Thank you, Counsel.

22         All right.  Ladies and gentlemen, as you know from

23  what I have told you already, and counsel referred to it

24  during the cross of some of their closing arguments, the next

25  and last building block before deliberation is the

1   instructions of the Court on the law that you must apply to

2   the case.

3            I have prepared those instructions for you, and I am

4   going to have my deputy clerk of court and law clerk Benjamin

5   Mejia read them to you.  I want you to pay careful attention

6   to them.

7            Mr. Mejia.

8            THE LAW CLERK:  Members of the jury, now that they

9   the evidence in this case has been presented, and the

10  attorneys for the government and each defendant has concluded

11  their closing arguments, it is my responsibility to instruct

12  you as to the law that governs this case.  Before I do so, I

13  want to thank you for your patience and cooperation.

14           My instructions will be in three parts.  First, I

15  will instruct you regarding the general rules that define and

16  govern the duties of a jury in a criminal case.  Second, I

17  will instruct you as to the legal elements of the crimes

18  charged in the indictment, that is, the specific elements that

19  the government must prove beyond a reasonable doubt to warrant

20  a finding of guilt, and, third, I will give you some general

21  rules regarding your deliberations.

22           You have heard now all of the evidence in the case,

23  as well as the final arguments of the lawyers for the parties.

24  It is your duty to find the facts from all the evidence in

25  this case.  You are the sole judges of the facts, and it is,

1    therefore, for you and you alone to pass upon the weight of

2    the evidence; to resolve such conflicts as may have appeared

3    in the evidence; and to draw such inferences as you deem to be

4    reasonable and warranted from the evidence or lack of evidence

5    in this case.

6          With respect to any question concerning the facts,

7    it is your recollection of the evidence that controls.  To the

8    facts as you find them, you must apply the law in accordance

9    with my instructions.  While the lawyers may have commented on

10   some of these legal rules, you must be guided only by what I

11   instruct you about them.  You must follow all the rules as I

12   explain them to you.  You may not follow some and ignore

13   others; even if you disagree with or do not understand the

14   reasons for some of the rules, you are bound to follow them.

15         I express no view whether a defendant is guilty or

16   not guilty or as to any fact.  You should not draw any

17   inference or reach any conclusion as to whether a defendant is

18   guilty or not guilty from anything I may have said or done.

19   You will decide the case solely on the facts you find and the

20   law as I give it to you.

21         In reaching your verdict, you are to perform the

22   duty of finding the facts without bias or prejudice as to any

23   party.  You must remember that all parties stand equal before

24   a jury in the courts of the United States.  The fact that the

25   government is a party and the prosecution is brought in the

1   name of the United States does not entitle the government or

2   its witnesses to any greater consideration than that accorded

3   to any other party.  By the same token, you must give it no

4   less consideration.  Your verdict must be based solely on the

5   evidence or lack of evidence.

6            For the same reasons, the personalities and the

7   conduct of counsel are not in any way in issue.  If you formed

8   reactions of any kind to any of the lawyers in this case,

9   favorable or unfavorable, whether you approved or disapproved

10  of their behavior, those reactions must not enter into your

11  deliberations.

12           During the course of the trial, I may have

13  admonished an attorney.  You should draw no inference against

14  the attorney or the client.  It is the duty of the attorneys

15  to offer evidence and press objections on behalf of their

16  side.  It is my function to cut off counsel from an improper

17  line of argument or questioning and to strike answers when I

18  think it is necessary.  But you should draw no inference from

19  that.

20           The indictment that was filed against the defendants

21  is the means by which the government gives the defendants

22  notice of the charges against them and brings them before the

23  court.  The indictment is an accusation and nothing more.  The

24  indictment is not evidence, and you are to give it no weight

25  in arriving at your verdict.

JURY CHARGE                                    3774

1          The defendants, in response to the indictment,

2    pleaded not guilty.  A defendant is presumed to be innocent

3    unless his or her guilt has been proven beyond a reasonable

4    doubt, and that presumption alone, unless overcome, is

5    sufficient to acquit him or her.  Each defendant is on trial

6    for the crimes charged against him and her in the indictment

7    and not for anything else.

8          The government has the burden, that is, the

9    obligation, of proving guilt beyond a reasonable doubt.  This

10   burden never shifts to a defendant.  A defendant does not have

11   to prove his or her innocence; he or she need not submit any

12   evidence at all.

13         Since in order to convict a defendant of a given

14   charge, the government is required to prove that charge beyond

15   a reasonable doubt, the question then is, what is reasonable

16   doubt?  The words almost define themselves.  It is a doubt

17   based upon reason.  It is a doubt that a reasonable person has

18   after carefully weighing all of the evidence or lack of

19   evidence.  It is a doubt that would cause a reasonable person

20   to hesitate, to act in a matter of importance in his or her

21   personal life.

22         Proof beyond a reasonable doubt must therefore be

23   proof of a convincing character that a reasonable person would

24   not hesitate to rely upon in making an important decision.  A

25   reasonable doubt is not caprice or whim.  It is not

1    speculation or suspicion.  It is not an excuse to avoid the

2    performance of an unpleasant duty.  The law does not require

3    that the government prove guilt beyond all possible doubt.

4    Proof beyond a reasonable doubt is sufficient to convict.

5              If, after fair and impartial consideration of the

6    evidence, you have a reasonable doubt as to a defendant's

7    guilt with respect to a particular charge against him or her,

8    you must find that defendant not guilty of that charge.  On

9    the other hand, if after a fair and impartial consideration of

10   all the evidence you are satisfied beyond a reasonable doubt

11   of a defendant's guilt with respect to a particular charge

12   against him or her, you should find that defendant guilty of

13   that charge.

14             I wish now to expand on the instructions I gave you

15   at the beginning of the trial as to what is evidence and how

16   you should consider it.  Evidence comes in several forms,

17   including sworn testimony of witnesses, both on direct and

18   cross-examination, and regardless of who called the witness,

19   exhibits that have been received in evidence by the court, and

20   facts to which all the lawyers have agreed or stipulated.

21             The parties have stipulated to certain facts in this

22   case.  Such a stipulation is an agreement among the parties

23   that a certain fact is true.  You must consider such

24   stipulated facts as true.

25             Certain things are not evidence and are to be

1    disregarded by you in deciding what the facts are.  They are

2    as follows.  First, arguments or statements by lawyers are not

3    evidence.  Questions put to the witnesses are not evidence.

4    It is the question combined with the answer that is evidence.

5            In addition to the lawyer's questions, I

6    occasionally may have asked questions for purposes of

7    clarification.  Please do not assume that the questions are

8    evidence or that I hold any opinion on the matters to which

9    any question may have related.  I do not.  Those questions

10   were asked solely in an effort or attempt to make something

11   clearer.  Similarly, objections to questions or to offered

12   exhibits are not evidence.  In this regard, attorneys have a

13   duty to their clients to object when they believe evidence

14   should not be received.  You should not be influenced by the

15   objection or by the Court's ruling on it.  If the objection

16   was sustained, ignore the question.  If the objection was

17   overruled, treat the answer like any other answer.  Of course,

18   testimony that has been stricken or that you have been

19   instructed to disregard is not evidence and must be

20   disregarded.  Equally obvious, anything you may have seen or

21   heard outside the courtroom is not evidence.

22           Finally, it would be improper for you to consider,

23   in reaching your decision, as to whether the government

24   sustained its burden of proof, any personal feelings you may

25   have about a defendant's race, religion, national origin,

1    ethnic background, sex, gender orientation, or age.  All

2    persons are entitled to the presumption of innocence, and the

3    government has the same burden of proof.  In addition, it

4    would be equally improper for you to allow any feelings you

5    might have about the government or the United States, or the

6    nature of the crimes charged, to interfere with your decision

7    making process.  To repeat, your verdict must be based

8    exclusively upon the evidence or the lack of evidence in this

9    the case.

10           The government has offered evidence in the form of

11   recordings of telephone calls and transmitted text messages

12   involving the defendants.  Some of those were obtained without

13   the knowledge of the parties to these communications, but with

14   the consent and authorization of the Court of the Eastern

15   District of New York.  These so-called wire taps were lawfully

16   obtained.  The use of this procedure to gather evidence is

17   perfectly lawful and the government has the right to use such

18   wiretaps in this case.

19           With respect to these recordings, the government was

20   permitted to provide transcripts containing its interpretation

21   of what was said on English language recordings that were

22   received into evidence.  The transcripts were provided to you

23   as aids or guides to assist you in listening to the

24   recordings.  However, they are not, in and of themselves,

25   evidence.  They were not admitted into evidence.  The

1    recordings are the primary and best source of evidence.

2              When the recordings were played, I advised you to

3    listen to very carefully to the recordings themselves.  For

4    recordings in English, you should make your own interpretation

5    of what appears on the recording based on what you heard.

6              If you think you heard something differently than

7    the way it appeared on the transcript, what you heard is

8    controlling.  You, the jury, are the sole judges of the facts.

9              Some of the exhibits that were admitted into

10   evidence were in the form of charts and summaries.  I decided

11   to admit these charts and summaries in place of and, at times,

12   along with the underlying documents that they represent in

13   order to save time and avoid unnecessary inconvenience.  You

14   should consider these charts and summaries as you would any

15   other evidence.

16             I told you that evidence comes in various forms,

17   such as the sworn testimony of witnesses, exhibits, and

18   stipulations.  There are, in addition, different kinds of

19   evidence, direct and circumstantial.

20             Direct evidence is the communication of a fact by a

21   witness, who testified to the knowledge of that fact as having

22   been obtained through one of the five senses.  So, for

23   example, a witness who testified to knowledge of a fact

24   because she or he saw it, heard it, smelled it, tasted it, or

25   touched it, is giving evidence, which is direct.  What remains

1    is your responsibility to pass upon the credibility of the

2    testimony that witness gave.

3              Circumstantial evidence is evidence which tends to

4    prove a fact in issue by proof of other facts from which the

5    fact in issue may be inferred.

6              The word "infer," or the express to draw an

7    inference, means to find that a fact exists from proof of

8    another fact.  For example, if a fact in issue is whether it

9    is raining at the moment, none of us can testify directly to

10   that fact sitting as we are in what is essentially a

11   windowless courtroom.  Assume, however, that as we are sitting

12   here, a person walks into the courtroom, wearing a raincoat

13   that is dripping wet and carrying an umbrella that is dripping

14   water.  We may infer from those facts that it is raining

15   outside.  In other words, the fact of rain is an inference

16   that could be drawn from the wet raincoat and the dripping

17   umbrella.  However, from the direct evidence of your

18   observation of a person entering the courtroom wearing a wet

19   raincoat and carrying a wet umbrella alone, you could not

20   infer exactly when the rain had started or for how long it had

21   rained.

22             An inference is to be drawn only if it is logical

23   and reasonable to do so.  In deciding whether to draw an

24   inference, you must look at and consider all the facts in the

25   light of reason, common sense, and experience.  Whether a

1    given inference is or is not to be drawn is entirely a matter

2    for you, the jury, to decide.  Please bear in mind, however,

3    that an inference is not to be drawn by guesswork or

4    speculation.

5         I remind you once again that you may not convict a

6    defendant unless you are satisfied of his or her guilt beyond

7    a reasonable doubt, whether based on direct evidence,

8    circumstantial evidence, or the logical inferences to be drawn

9    from such evidence.

10        Circumstantial evidence does not necessarily prove

11   less than direct evidence, nor does it necessarily prove more.

12   You are to consider all the evidence in the case, direct and

13   circumstantial, in determining what the facts are and in

14   arriving at your verdict.

15        I will now instruct you further about inferences.

16   During the trial, you may have heard the attorneys use the

17   term "inference," and in their arguments they may have asked

18   you to infer on the basis of your reason, experience, and

19   common sense, from one or more proven facts, the existence of

20   some other facts.

21        An inference is not a suspicion or guess, it's a

22   logical conclusion that a disputed fact exists that we reach

23   in light of another fact, which has been shown to exist.

24   There are times when different inferences may be drawn from

25   facts, whether proved by direct or circumstantial evidence.

1   It is for you, and you alone, to decide what inferences you

2   will draw.  Keep in mind that the mere existence of an

3   inference against a defendant does not relieve the government

4   of the burden of establishing its case beyond a reasonable

5   doubt.

6           In considering inferences, keep in mind that you may

7   not infer that a defendant is guilty of criminal conduct

8   merely from the fact that he or she associated with other

9   people who were guilty of wrongdoing, or that he or she was

10  present at the time that criminal conduct was being committed,

11  or that he or she had knowledge that it was being committed.

12          The fact that one side or the other called more

13  witnesses or introduced more evidence does not mean that you

14  should find the facts in favor of the side who called more

15  witnesses.  You must not permit the number of witnesses or

16  documents supplied, or the amount of time taken in examining a

17  witness, to overwhelm your judgment.  The weight of the

18  evidence is by no means determined by the number of witnesses

19  or the length of their testimony or the quantity of documents.

20  You must keep in mind that the burden of proof is always on

21  the government, and a defendant is not required to call any

22  witness or offer any evidence because a defendant is presumed

23  to be innocent.

24          By the same taken, you do not have to accept the

25  testimony of any witness who has not been contradicted or

1    impeached, if you find the witness not to be credible.

2              You also have to decide which witnesses to believe

3    and which facts are true.  To do this, you must look at all

4    the evidence, drawing upon your own common sense and personal

5    experience.  But, again, you must keep in mind that the burden

6    of proof is always on the government and a defendant is not

7    required to call any witnesses or offer any evidence because

8    he or she are presumed to be innocent.

9              The law does not require any party to call as

10   witnesses all persons who may have been present at any time or

11   place involved in the case, or who may appear to have some

12   knowledge of the matter at issue in this trial.  Nor does the

13   law require any party to produce as exhibits all papers and

14   things mentioned during the course of the trial.  And, of

15   course, a defendant in a criminal case is not required to call

16   any witnesses or produce any evidence at all.

17             During the course of trial, you heard testimony that

18   attorneys interviewed witnesses when preparing for and during

19   the trial.  You must not draw any unfavorable inference from

20   that fact.  On the contrary, attorneys are obliged to prepare

21   their case as thoroughly as possible, and in the discharge of

22   that responsibility, properly interview witnesses in

23   preparation for the trial and from time to time as may be

24   required during the course of trial.

25             During the trial you may have heard testimony of

1  witnesses and argument by counsel that the government did not

2  utilize specific investigative techniques or exhaustively

3  pursued every piece of information.  You may consider these

4  facts in deciding whether the government has met its burden of

5  proof, because, as I told you, you should look at all of the

6  evidence or lack of evidence in deciding whether the

7  government has proven a particular charge beyond a reasonable

8  doubt.

9           However, you are also instructed that there is no

10  legal requirement that the government use any specific

11  investigative techniques or pursue every investigative lead to

12  prove its case.  Law enforcement techniques are not your

13  concern.  Your concern is to determine whether or not, based

14  upon all the evidence presented in the case, the government

15  has proven that the defendant is guilty beyond a reasonable

16  doubt.

17           In addition to the evidence about the involvement of

18  cooperating accomplices, who testified at trial, evidence has

19  also been introduced as to the involvement of certain other

20  individuals in the crimes charged in the indictment.  You may

21  not draw any inference, favorable or unfavorable, toward the

22  government or the defendants on trial from the fact that

23  certain persons were not named as defendants in this

24  indictment.  You should draw no inference from the fact that

25  any other person is not present at this trial.  Your concern

1   is solely the defendants on trial before you.  That other

2   individuals are not on trial before you is not a matter of

3   concern to you.  You should not speculate as to the reasons

4   these individuals are not on trial before you.  The fact that

5   these individuals are not on trial before you should not

6   control or influence your verdict with reference to the

7   defendants who are on trial.  You must only consider whether

8   the government has proved beyond a reasonable doubt that

9   either of the defendants is guilty of a crime.  The fact that

10  these individuals are not on trial before you should not

11  control or influence in any way your verdict with reference to

12  either of the defendants.

13          In deciding what the facts are, you must decide

14  which testimony to believe and which testimony not to believe.

15  In making that decision, you should use the same reason you

16  would employ in making determinations important in your own

17  affairs that are based on information given to you by others.

18  There are a number of factors you may take into account in

19  determining whether the testimony of a witness is believable,

20  including the following.

21          Did the witness impression you as honest?  Did the

22  witness have any particular reason not to tell the truth?  Did

23  the witness have a personal interest in the outcome of the

24  case?  Did the witness seem to have a good memory?  Did the

25  witness have the opportunity and ability to observe accurately

1    the things he testified about?  Did the witness appear to

2    understand the questions clearly and answer them directly?

3    Did the witness' testimony differ from the testimony of other

4    witnesses?  People sometimes forget things.  A contradiction

5    may be an innocent lapse of memory, or it may be an

6    intentional falsehood.  Consider, therefore, whether the

7    contradiction, if there was one, has to do with an important

8    fact or only a small detail.

9           Different people observing an event may remember it

10   differently, and, therefore, testify about it differently.

11   But if any witness is shown to have willfully lied about any

12   material matter, you have the right to conclude that the

13   witness also lied about other matters.  You may either

14   disregard all of that witness' testimony or you may accept

15   whatever part of it you think deserves to be believed.

16          You may consider the factors I have just discussed

17   with you in deciding how much weight to give to testimony.

18          You have heard from witnesses who each testified

19   that they were actually involved in planning and carrying out

20   the crimes charged in the indictment.  Indeed, it is the law

21   in federal courts that the testimony of an accomplice may be

22   enough in itself for conviction, if the jury finds that the

23   testimony is credible and establishes guilt beyond a

24   reasonable doubt.  However, it is also the case that

25   accomplice testimony is of such nature that it must be

1    scrutinized with great care and viewed with particular caution

2    when you decide how much of that testimony to believe.

3          I have given you some general consideration on

4    credibility, and I will not repeat them all here.  Nor will I

5    repeat all of the arguments made on both sides.  However, let

6    me say a few things that you may want to consider during your

7    deliberations on the subject of accomplices.

8          You should ask yourself whether any of these

9    so-called accomplices would benefit more by lying or by

10   telling the truth.  Was the testimony of any made up in any

11   way because he or she believed or hoped that he or she would

12   somehow receive favorable treatment by testifying falsely, or

13   did any believe that his or her interests would be best served

14   by testifying truthfully?

15         If you believe that any of the witnesses was

16   motivated by hopes of personal gain, was the motivation one

17   which would cause him or her to lie, or was it one which would

18   cause him or her to tell the truth?  Did this motivation color

19   his or her testimony?  In sum, you should look at all of the

20   evidence in deciding what credence and what weight, if any,

21   you will want to give to any of the cooperating accomplice

22   witnesses.

23         Finally, the cooperating witnesses have pled guilty

24   to charges arising out of the same facts as this case.  You

25   are instructed that you are to draw no conclusions or

1   inferences of any kind about the guilt of a defendant on trial

2   from the fact that a prosecution witness pled guilty to

3   similar charges.  That witness' decision to plead guilty was a

4   personal decision about his or her own guilt.  The fact that a

5   cooperating witness pleaded guilty may not be used by you in

6   any way as evidence against or unfavorable to a defendant on

7   trial here.

8          As you were informed during the trial, some of the

9   testimony before you came from witnesses who were assured by

10   the government that, in exchange for testifying truthfully,

11   completely, and fully, they would not be prosecuted for any

12   crimes that they may have admitted to the government or here

13   in court.

14          Like the testimony of cooperating witnesses, the

15   testimony of a witness who has been promised that he will not

16   be prosecuted should be examined by you with greater care than

17   the testimony of an ordinary witness.  You should scrutinize

18   it closely to determine whether or not it is colored in such a

19   way as to place guilt upon the defendant in order to further

20   the witness' own interest.

21          You must consider whether such a witness was

22   motivated to make up testimony in the hope or belief that such

23   was more likely to ensure the witness' own freedom from

24   prosecution.  Or, ask yourselves, did the witness believe his

25   interests would be best served by testifying truthfully?  It

1    is for you to decide, based on your own perceptions and common

2    sense, to what extent, if at all, the witness' interest has

3    affected or colored his testimony.  You should carefully

4    scrutinize all the evidence in deciding whether you believe an

5    immunized witness and what weight, if any, his testimony

6    deserves.

7           During this trial, you have heard evidence that on

8    other occasions a defendant engaged in conduct that was

9    similar in nature to the conduct charged in the indictment.

10   Evidence of prior similar acts was admitted as background

11   evidence to show the development of relationships of trust

12   between a defendant and the government's witnesses and to

13   provide back ground evidence of the charged crimes.  In

14   addition, if you determine that a defendant committed the acts

15   charged in the indictment, and the similar acts as well, then

16   you may, but need not, draw an inference that in doing the

17   acts charged in the indictment, a defendant acted knowingly

18   and intentionally and not because of some mistake, accident,

19   carelessness, or other innocent reasons.

20          However, a defendant is on trial only for committing

21   the acts alleged in the indictment.  You may not consider

22   evidence of any similar acts as a substitute for proof that

23   any defendant committed the crimes charged in this case.  Nor

24   may you consider evidence as proof that any defendant has a

25   criminal propensity or bad character.  The evidence of other

1    similar acts was admitted for limited purposes, and you may

2    consider it only for those limited purposes.

3            The defendants called witnesses who gave their

4    opinions of the defendant's good character.  This testimony is

5    not to be taken by you as the witness' opinion as to whether

6    any defendant is guilty or not guilty.  That question is for

7    you alone to determine.  You should, however, consider this

8    character evidence together with all the other facts and all

9    the other evidence in the case in determining whether a

10   defendant is guilty or not guilty of the charges.

11           Such character or reputation evidence alone may

12   indicate to you that it is improbable that is person of such

13   character or reputation would commit the offense charged.

14   Accordingly, if after considering all the evidence, including

15   testimony about a defendant's good character, you find a

16   reasonable doubt has been created, you must acquit him or her

17   of all the charges.  On the other hand, if after considering

18   all the evidence, including that of a defendant's character,

19   you are satisfied beyond a reasonable doubt that any defendant

20   is guilty, you must not acquit him or her merely because you

21   believe him or her to be a person of good character.

22           One of the defendants did not testify in this case.

23   Under our constitution, the defendants have no obligation to

24   testify or to present any other evidence because it is the

25   prosecution's burden to prove a defendant guilty beyond a

1    reasonable doubt.  That burden remains with the prosecution

2    throughout the entire trial and never shifts to a defendant.

3    A defendant is never required to prove that he or she is

4    innocent.

5              You may not attach any significance to the fact that

6    a defendant did not testify.  No adverse inference against her

7    may be drawn against you because she did not take the witness

8    stand.  You may not consider that against that defendant in

9    any way in your deliberations in the jury room.

10             In a criminal case, the defendant cannot be required

11   to testify, but if the defendant chooses to testify, he is, of

12   course, permitted to take the witness stand on his own behalf.

13   In this case, a defendant decided to testify.  You should

14   examine and evaluate the defendant's testimony just as you

15   would the testimony of any witness with an interest in the

16   outcome of this case.  You should not disregard or disbelieve

17   the defendant's testimony simply because he is charged as the

18   defendant in this case.

19             In this case, I have permitted a witness, Deborah

20   Oremland, to express opinions about certain matters that are

21   in issue.  A witness may be permitted to testify to an opinion

22   on those matters about which she has special knowledge, skill,

23   experience, and training.  Such testimony is presented to you

24   on the theory that someone who is experienced and

25   knowledgeable in the field can assist you in understanding the

1    evidence or in reaching an independent decision on the facts.

2              In weighing this opinion testimony, you may consider

3    the witness' qualifications, opinions, the reasons for

4    testifying, as well as all of the other considerations that

5    ordinarily apply when you are deciding whether or not to

6    believe a witness' testimony.  You may give the opinion

7    whatever weight, if any, you find it deserves in light of all

8    the evidence in this case.  You should not, however, accept

9    opinion testimony merely because I allowed these witnesses to

10   testify concerning that opinion.  Nor should you substitute it

11   for your own reason, judgment, and common sense.  The

12   determination of the facts in this case rest solely with you.

13             During this trial, you have heard the testimony of

14   active law enforcement employees.  The fact that a witness is

15   a law enforcement employee does not mean that his or her

16   testimony is entitled to any greater weight.  By the same

17   token, the testimony of such a witness is not entitled to less

18   consideration for that reason.

19             At the same time, it is quite legitimate for defense

20   counsel to try to attack the credibility of a law enforcement

21   witness on the grounds that his or her testimony may be

22   colored by a personal or professional interest in the outcome

23   of the case.

24             You should consider the testimony of a law

25   enforcement employee just as you would any other evidence in

1    the case and evaluate his or her credibility just as you would

2    that of any other witness.  After reviewing all the evidence,

3    you will decide whether to accept the testimony of a law

4    enforcement employee, and what weight, if any, that testimony

5    deserves.

6             You have heard evidence that a witness made a

7    statement on an earlier occasion which counsel argues is

8    inconsistent with the witness' trial testimony.  Evidence of

9    what is arguably a prior inconsistent statement was placed

10   before you for the limited purpose of helping you decide

11   whether to believe the trial testimony of the witness who

12   contracted himself or herself.  If you find that the witness

13   made an earlier statement that conflicts with his or her trial

14   testimony, you may consider that fact in deciding how much of

15   his or her trial testimony, if any, to believe.

16             In making this determination, you may consider

17   whether the witness purposely made a false statement or

18   whether it was an innocent mistake; whether the inconsistency

19   concerns an important fact, or whether it had to do with a

20   small detail; whether the witness had an explanation for the

21   inconsistency, and whether that explanation appealed to your

22   common sense.

23             It is exclusively your duty, based upon all the

24   evidence and your own good judgment to determine whether the

25   prior statement was inconsistent, and, if so, how much, if

1    any, weight should be given to the inconsistent statement in

2    determining whether to believe all, part, or none of the

3    witness' testimony.

4            I will now turn to the second part of this charge,

5    and will, as I indicated at the outset, instruct you as to the

6    specific elements of the crimes charged that the government

7    must prove beyond a reasonable doubt to warrant findings of

8    guilt in this case.

9            The defendants are formally charged in an

10   indictment.  As I instructed you at the beginning of this

11   case, an indictment is a charge or accusation.  The indictment

12   in this case contains a total of ten counts.

13           There are two defendants on trial before you.  You

14   must, as a matter of law, consider each defendant -- each

15   count of the indictment and each defendant's involvement in

16   that count separately, and you must return a separate verdict

17   on each defendant for each count on which he or she is

18   charged.

19           In reaching your verdict, bear in mind that guilt is

20   personal and individual.  Your verdict of guilty or not guilty

21   must be based solely upon the evidence about each defendant.

22   The case against each defendant on each count stands or falls

23   upon the proof or lack of proof against that defendant alone,

24   and your verdict as to any defendant on any count should not

25   control your decision as to any other defendant or any other

1    count.  No other considerations are proper.

2             The indictment charges three counts as to both

3    defendants.  One count of conspiracy to commit securities

4    fraud, one count of conspiracy to submit mail and wire fraud,

5    and one count of securities fraud.  In addition, the

6    indictment charges Abraxas Discala with one count of

7    securities fraud and six counts of wire fraud.

8             The indictment charges on or about certain dates.

9    It does not matter if the indictment charges that a specific

10   act occurred on or about a certain date, and the evidence

11   indicates that, in fact, it was on another date.  The law only

12   requires substantial similarity between the dates alleged in

13   the indictment and the date established by testimony or

14   exhibits.

15            One or more counts of the indictment may accuse the

16   defendant of violating the same statute in more than one way.

17   In other words, the indictment may allege that the statute in

18   question was violated by various acts, which are in the

19   indictment joined by the conjunctive "and," while the statute

20   and the elements of the offense are stated in the disjunctive,

21   using the word "or."  In these instances, it is sufficient for

22   a finding of guilt if the evidence established beyond a

23   reasonable doubt the violation of the statute by any one of

24   the acts charged.

25            During these instructions on the elements of the

1    crimes charged, you will hear me use the words "knowingly" and

2    "intentionally" from time.  Before you can find a defendant

3    guilty, you must be satisfied that the defendant was acting

4    knowingly and intentionally.

5         A person acts knowingly if he or she acts

6    intentionally and voluntarily, and not because of ignorance,

7    mistake, accident, or carelessness.  Whether a defendant acted

8    knowingly may be proven by his or her conduct and by all of

9    the facts and circumstances surrounding the case.

10        A person acts intentionally if he or she acts

11   deliberately and purposely.  That is, the acts must have been

12   the product of his or her conscious objective decision rather

13   than the product of a mistake or accident.

14        These issues of knowledge and intent require you to

15   make a determination about a defendant's state of mind,

16   something that can rarely be proved indirectly.  A wise and

17   careful consideration of all the circumstances before you may,

18   however, permit you to make a determination as to a

19   defendant's state of mind.  Indeed, in your every day affairs,

20   you are frequently called upon to determine a person's state

21   of mind from his or her words and actions in given

22   circumstances.  You are asked to do the same here.

23        You have been instructed that in order to sustain

24   its burden of proof, the government must prove that the

25   defendant acted willfully.  To act willfully means to act with

1   knowledge that one's conduct is unlawful and with an intent to

2   do something the law forbids.  That is to say, with bad

3   purpose, either to disobey or to disregard the law.

4           For the sake of clarity, I will first address

5   Count 2 of the indictment, then Count 1, and then the

6   remaining counts.

7           Count 2 of the indictment charges both defendants

8   with the conspiracy to commit mail and wire fraud.

9   Specifically, Count 2 states, in pertinent part, in or about

10  and between October 2012 and July 2014, both dates being

11  approximate and inclusive, within the Eastern District of New

12  York and elsewhere, the defendants Abraxas J. Discala and

13  Kyleen Cane, together with others, did knowingly and

14  intentionally conspire to devise a scheme and artifice to

15  defraud investors and potential investors in the manipulated

16  public companies, and to obtain money and property from them,

17  by means of materially false and fraudulent pretenses,

18  representations and promises, and for the purpose of executing

19  such scheme and artifice, to cause to be delivered matter and

20  things by FedEx Corporation, FedEx, and other private and

21  commercial interstate carriers, according to the direction

22  thereon, contrary to Title 18, United States code, Section

23  1341, and to devise a scheme and artifice to defraud investors

24  and potential investors in the manipulated public companies,

25  and to obtain money and property from them by means of

JURY CHARGE                                    3797

1    materially false and fraudulent pretenses, representations and

2    promises, and for the purpose of executing such scheme and

3    artifice, to transmit and cause to be transmitted by means of

4    wire communication in interstate and foreign commerce

5    writings, signs, signals, pictures and sounds, contrary to

6    Title 18, United States Code, Section 1343.

7              I will first explain the crime of conspiracy

8    generally before turning to the alleged objects of the charged

9    conspiracy, that is, of mail fraud and wire fraud.

10             (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JURY CHARGE                                    3798

1          THE LAW CLERK:  (Cont'g.)  A conspiracy is an

2    offense separate from the commission of any offense that may

3    have been committed pursuant to the conspiracy.  That is

4    because the formation of a conspiracy, of a partnership for

5    criminal purposes, is in and of itself a crime.  Thus, if a

6    conspiracy exists, even if it should fail in achieving its

7    unlawful purpose, it is still punishable as a crime.  The

8    essence of the charge of conspiracy is an understanding

9    between or among two or more persons, that they will act

10   together to accomplish a common objective that they know is

11   unlawful.

12          In order to prove the crime of conspiracy, the

13   government must prove two elements beyond a reasonable doubt:

14          First, the first element is that two or more persons

15   entered into the charged conspiracy;

16          Second, the second element is that the defendants

17   became members of the conspiracy with knowledge of its

18   criminal goal or goals and intending by their actions to help

19   it succeed.

20          The first element that the government must prove

21   beyond a reasonable doubt to establish the offense of

22   conspiracy is that two or more persons entered into the

23   charged conspiracy.  One person cannot commit the crime of

24   conspiracy alone.

25          In order for the government to satisfy this element,

1   you need not find that the alleged members of the conspiracy

2   met together and entered into any express or formal agreement.

3   Similarly, you need not find that the alleged conspirators

4   stated, in words or writing, what the scheme was, its object

5   or purpose, or every precise detail of the scheme or the means

6   by which its object or purpose was to be accomplished.

7   Indeed, it is sufficient for the government to show that the

8   conspirators came to a mutual understanding, either spoken or

9   unspoken, between two or more people to cooperate with each

10  other to accomplish an unlawful act.

11          You may, of course, find that the existence of an

12  agreement to disobey or disregard the law has been established

13  by direct proof.  However, since conspiracy is, by its very

14  nature, characterized by secrecy, you may also infer its

15  existence from the circumstances of a given case and the

16  conduct of the parties involved.

17          In the context of conspiracy cases, actions often

18  speak louder than words.  In determining whether an agreement

19  existed here, consider the act and statements of all of those

20  you find to be participants as proof that a common design

21  existed on the part of the persons charged to act together to

22  accomplish an unlawful purpose.

23          The second element that the government must prove

24  beyond a reasonable doubt to establish the offense of

25  conspiracy, is that a defendant became a member in the charged

1    conspiracy with knowledge of its criminal goal or goals and

2    intending by his or her actions to help it succeed.

3           If you are satisfied that the conspiracy charged in

4    the indictment existed, you must next ask yourselves who the

5    members of that conspiracy were.  In deciding whether either

6    defendant was, in fact, a member of the conspiracy, you should

7    consider whether, based upon all of the evidence, it appears

8    that a defendant knowingly and willfully joined the

9    conspiracy.  Did the defendant participate in it with

10   knowledge of its unlawful purpose and with the specific

11   intention of furthering its business or objective as an

12   associate or worker?

13          Now, it has been said that in order for either

14   defendant to be deemed a participant in a conspiracy, he or

15   she must have had a stake in the venture or its outcome.  You

16   are instructed that, while proof of a financial interest in

17   the outcome of a scheme is not essential, if you find that a

18   defendant had such an interest, that is a factor that you may

19   properly consider in determining whether or not a defendant

20   was a member of the conspiracy charged in the indictment.

21          As I mentioned a moment ago, before either defendant

22   can be found to have been a conspirator, you must first find

23   that he or she knowingly joined in the unlawful agreement or

24   plan.  The key question, therefore, is whether either

25   defendant joined the conspiracy with an awareness of at least

1    some of the basic aims and purposes of the unlawful agreement.

2          It is important for you to note that a defendant's

3    participation in the conspiracy must be established by

4    independent evidence of his or her own acts or statements, as

5    well as those of the other alleged co-conspirators, and the

6    reasonable inferences which may be drawn from them.

7          A defendant's knowledge is a matter of inference

8    from the facts proved.  In that connection, I instruct you

9    that to become a member of the conspiracy, a defendant need

10   not have known the identities of each and every other member,

11   nor need he or she have been apprised of all of their

12   activities.  Moreover, a defendant need not have been fully

13   informed as to all of the details or the scope of the

14   conspiracy in order to justify an inference of knowledge on

15   his or her part.  Furthermore, a defendant need not have

16   joined in all of the conspiracy's unlawful objectives.

17          The extent of a defendant's participation has no

18   bearing on the issue of that defendant's guilt.  A

19   conspirator's liability is not measured by the extent or

20   duration of his participation.  Indeed, each member may

21   perform separate and distinct acts and may perform them at

22   different times.  Some conspirators play major roles, while

23   others play minor parts in the scheme.  An equal role is not

24   what the law requires.  In fact, even a single act may be

25   sufficient to draw a defendant within the ambit of the

JURY CHARGE                                    3802

1    conspiracy.

2              I want to caution you, however, that a defendant's

3    mere presence at the scene of an alleged crime does not, by

4    itself, make him or her a member of the conspiracy.

5    Similarly, mere association with one or more members of the

6    conspiracy does not automatically make a defendant a member.

7    A person may know, or be friendly with, a criminal, without

8    being a criminal himself or herself.  Mere similarity of

9    conduct or the fact that they may have assembled together and

10   discussed common aims and interests does not necessarily

11   establish proof of the existence of a conspiracy.

12             I also want to caution you that mere knowledge or

13   acquiescence, without participation, in the unlawful plan is

14   not sufficient.  Moreover, the fact that the acts of a

15   defendant, without knowledge, merely happen to further the

16   purposes or objectives of the conspiracy, does not make the

17   defendant a member.  More is required under the law.  What is

18   necessary is that a defendant must have participated with

19   knowledge of at least some of the purposes or objectives of

20   the conspiracy and with the intention of aiding in the

21   accomplishment of those unlawful ends.

22             In sum, a defendant, with an understanding of the

23   unlawful character of the conspiracy, must have intentionally

24   engaged, advised or assisted in it for the purpose of

25   furthering the illegal undertaking.  He or she thereby became

JURY CHARGE                                    3803

1    a knowing and willing participant in the unlawful agreement;

2    that is to say, a conspirator.  Again, an act is done

3    willfully if done voluntarily and intentionally, and with the

4    specific intent to do something the law forbids; that is to

5    say, with a bad purpose either to disobey or disregard the

6    law.  These are findings you must make separately and

7    unanimously with respect to each defendant.

8              To determine whether the government has proved

9    beyond a reasonable doubt that either defendant engaged in an

10   illegal conspiracy, you must also understand the crimes that

11   Count Two charges them with agreeing to commit.

12             The crimes alleged to be the objects or purposes of

13   the conspiracy, the thing that Count Two charges the

14   defendants with agreeing to commit are mail and wire fraud.  I

15   will first discuss mail fraud, and then turn to wire fraud.

16             First, that there was a scheme or artifice to

17   defraud or to obtain money or property by materially false and

18   fraudulent pretenses, representations or promises;

19             Second, that the defendants knowingly and willfully

20   participated in the scheme or artifice to defraud, with

21   knowledge of its fraudulent nature and with specific intent to

22   defraud; and

23             Third, that, in execution or in furtherance of that

24   scheme, the defendant used or caused the use of the mails.

25             I will now explain each of these elements further.

1          The first element the government must prove beyond a

2    reasonable doubt is the existence of a scheme or artifice to

3    defraud or to obtain money or property by means of false or

4    fraudulent pretenses, representations or promises.

5          A scheme or artifice is merely a plan for the

6    accomplishment of an objective.  Fraud is a general term which

7    embraces all the various means that an individual can devise

8    and that are used by an individual to gain an advantage over

9    another by false representations, suggestions, or deliberate

10   disregard for the truth.

11         A scheme to defraud is any pattern or course of

12   conduct designed to obtain money or property by means of

13   trick, deceit, deception or by false or fraudulent

14   representations or promises.  A representation or statement is

15   fraudulent if it was falsely made with the intent to deceive.

16   Half-truths, the concealment or omission of material facts, or

17   the expression of an opinion not honestly entertained may also

18   constitute false or fraudulent statements under the statute.

19   The fraudulent representation must relate to a material fact

20   or matter.  A material fact is one which would reasonably be

21   expected to be of concern to a reasonable and prudent person

22   in relying upon the representation or statement in making a

23   decision.

24         The deception need not be premised upon spoken or

25   written words alone.  The arrangement of the words, or the

1    circumstances in which they are used may convey a false and

2    deceptive appearance.  If there is intentional deception, the

3    manner in which it was accomplished does not matter.

4            The government is not required to establish that

5    either defendant himself or herself originated the scheme to

6    defraud.  Nor is it necessary that either defendant actually

7    realized any gain from the scheme, or that the intended victim

8    actually suffered any loss.  Success is not an element of the

9    crime charged.  That is because only a scheme to defraud, and

10   not actual fraud, must be proved to sustain a conviction.

11           A scheme to defraud need not be shown by direct

12   evidence, but may be established by all of the circumstances

13   and facts in the case.

14           It is also not necessary that the government prove

15   each and every misrepresentation or false promise that the

16   government alleges.  It is sufficient if the government

17   proves, beyond a reasonable doubt, that one or more of the

18   material misrepresentations was made in furtherance of the

19   scheme to defraud.  You must, however, all agree on at least

20   one misrepresentation that is proved to be false.  That is,

21   you cannot find a defendant guilty if only some of you think

22   that misrepresentation A is false, while others think that

23   only misrepresentation B is false.  There must be at least one

24   specific pretense, representation or promise about a material

25   fact that all of you unanimously find to be false in order to

1    find a defendant guilty.

2              If you find that the government has sustained its

3    burden of proof that a scheme to defraud, as charged, did

4    exist, you next should consider the second element of the

5    offense of mail fraud.

6              The second element that the government must prove

7    beyond a reasonable doubt is that a defendant executed the

8    scheme knowingly, willfully, and with specific intent to

9    defraud a victim.

10             Again, to act knowingly means to act voluntarily and

11   deliberately, rather than mistakenly or because of ignorance

12   or accident.

13             To act willfully means to act knowingly and

14   purposely, with an intent to do something the law forbids;

15   that is to say, with a bad purpose to disobey or disregard the

16   law.

17             To act with intent to defraud means to act knowingly

18   and with the specific intent to deceive, for the purpose of

19   obtaining money or property from another.

20             How someone acted, his or her state of mind, is a

21   question of fact for you to determine.  Direct proof of

22   knowledge and fraudulent intent is not always available, nor

23   is it required.  The ultimate facts of knowledge and criminal

24   intent may be established by circumstantial evidence, which I

25   explained to you earlier.  Circumstantial evidence, if

Case 1:14-cr-00399-ENV   Document 668   Filed 10/20/18   Page 152 of 208 PageID #: 6641

1    believed, is of no less value than direct evidence.

2              Since an essential element of the mail fraud crime

3    charged is intent to defraud, it follows that good faith on

4    the part of a defendant is a complete defense to a charge of

5    mail fraud.  A defendant, however, has no burden to establish

6    a defense of good faith.  The burden is on the government to

7    prove fraudulent intent and consequent lack of good faith

8    beyond a reasonable doubt.

9              Under the mail fraud statute, even false

10   representations or statements, or omissions of material facts,

11   do not amount to a fraud unless done with fraudulent intent.

12   However misleading or deceptive a plan may be, it is not

13   fraudulent if it was devised or carried out in good faith.  An

14   honest belief in the truth of the representations made by or

15   on behalf of the defendant is a complete defense, however

16   inaccurate the statements may turn out to be.

17             In determining whether a defendant acted knowingly,

18   you may consider whether that defendant deliberately closed

19   his or her eyes to what otherwise would have been obvious to

20   him or her.  You may only infer knowledge of the existence of

21   a particular fact if a defendant was aware of a high

22   probability of its existence, unless that defendant actually

23   believed that it did not exist.  If you find beyond a

24   reasonable doubt that a defendant acted with a conscious

25   purpose to avoid learning a highly probable truth, then this

1    element may be satisfied.  However, guilty knowledge may not

2    be established by demonstrating that a defendant was merely

3    negligent, foolish, careless, or mistaken.

4              There is another consideration to bear in mind in

5    deciding whether or not the defendant acted in good faith.

6    You are instructed that if a defendant participated in the

7    scheme to defraud, then a belief by that defendant, if such a

8    belief existed, that ultimately everything would work out so

9    that no one would lose any money does not require you to find

10   that that defendant acted in good faith.  No amount of honest

11   belief on the part of a defendant that the scheme would, for

12   example, ultimately make a profit for investors, will excuse

13   fraudulent actions or false representations caused by him or

14   her.

15             As a practical matter, then, in order to sustain a

16   charge of mail fraud, the government must prove beyond a

17   reasonable doubt that a defendant knew his or her conduct as a

18   participant in the scheme was calculated to deceive and,

19   nonetheless, he or she associated himself or herself with the

20   alleged fraudulent scheme for the purpose of causing some

21   financial loss to another or to deprive another of their

22   interest in property.

23             To conclude with this element, if you find the

24   government has established beyond a reasonable doubt that a

25   defendant was a knowing participant and acted with intent to

Case 1:14-cr-00399-ENV   Document 668   Filed 10/20/18   Page 154 of 208 PageID #: 6643

1   defraud, you should consider the third element of the mail

2   fraud charge.

3           The third and final element that the government must

4   prove beyond a reasonable doubt is the use of the mails in

5   furtherance of the scheme to defraud.  The use of the mails,

6   as I have used it here, includes material sent through either

7   the United States Postal Service or a private or commercial

8   interstate carrier.

9           The mailed matter need not contain a fraudulent

10  representation or purpose or request for money.  It must,

11  however, further or assist in the carrying out of the scheme

12  to defraud.  It is not necessary for a defendant to be

13  directly or personally involved in the mailing, as long as the

14  mailing was reasonably foreseeable in the execution of the

15  alleged scheme to defraud in which that defendant is accused

16  of participating.

17          In this regard, it is sufficient to establish this

18  element of the crime if the evidence justifies a finding that

19  a defendant caused the mailing by others.  This does not mean

20  that that defendant must specifically have authorized others

21  to do the mailing.

22          When one does an act with knowledge that the use of

23  the mails will follow in the ordinary course of business or

24  where such use of the mails reasonably can be foreseen, even

25  though not actually intended, then he or she causes the mails

JURY CHARGE                                    3810

1    to be used.

2              With respect to the use of the mails, the government

3    must prove beyond a reasonable doubt the particular mailing

4    charged in the indictment.  However, the government does not

5    need to prove that the mailings were made on the exact date

6    charged in the indictment.  It is sufficient if the evidence

7    establishes beyond a reasonable doubt that the mailing was

8    made on a date substantially similar to the date charged in

9    the indictment.

10             The elements of wire fraud are as follows:

11             First, that there was a scheme or artifice to

12   defraud or to obtain money or property by materially false and

13   fraudulent pretenses, representations or promises;

14             Second, that the defendants knowingly and willfully

15   participated in the scheme or artifice to defraud, with

16   knowledge of its fraudulent nature and with specific intent to

17   defraud; and

18             Third, that, in execution or in furtherance of that

19   scheme, the use of an interstate or foreign wire occurred.

20   This would include the use of a landline telephone or cell

21   phone or a fax machine, or the transmission of electronic data

22   via the radio, television or the internet.

23             I will now explain each of these elements further.

24             The first element the government must prove beyond a

25   reasonable doubt is the existence of a scheme or artifice to

1    defraud or to obtain money or property by means of false or

2    fraudulent pretenses, representations or promises.

3           A scheme or artifice is merely a plan for the

4    accomplishment of an objective.  Fraud is a general term which

5    embraces all the various means that an individual can devise

6    and that are used by an individual to gain an advantage over

7    another by false representations, suggestions, or deliberate

8    disregard for the truth.

9           A scheme to defraud in any pattern or course of

10   conduct designed to obtain money or property by means of

11   trick, deceit, deception or by false or fraudulent

12   representations or promises.  A representation or statement is

13   fraudulent if it was falsely made with the intent to deceive.

14   Half-truths, the concealment or omission of material facts, or

15   the expression of an opinion not honestly entertained may also

16   constitute false or fraudulent statements under the statute.

17   The fraudulent representation must relate to a material fact

18   or matter.  A material fact is one which would reasonably be

19   expected to be of concern to a reasonable and prudent person

20   in relying upon the representation or statement in making a

21   decision.

22          The deception need not be premised upon spoken or

23   written words alone.  The arrangement of the words, or the

24   circumstances in which they are used may convey a false and

25   deceptive appearance.  If there is intentional deception, the

1    manner in which it is accomplished does not matter.

2              The government is not required to establish that

3    either defendant himself or herself originated the scheme to

4    defraud.  Nor is it necessary that either defendant actually

5    realized any gain from the scheme, or that the intended victim

6    actually suffered any loss.  Success is not an element of the

7    crime charged.  That is because only a scheme to defraud, and

8    not actual fraud, must be proved to sustain a conviction.

9              A scheme to defraud need not be shown by direct

10   evidence, but may be established by all of the circumstances

11   and facts in the case.

12             It is also not necessary that the government prove

13   each and every misrepresentation or false promise that the

14   government alleges.  It is sufficient if the government

15   proves, beyond a reasonable doubt, that one or more of the

16   material misrepresentations was made in furtherance of the

17   scheme to defraud.  You must, however, all agree on at least

18   one misrepresentation that is proved to be false.  That is,

19   you cannot find a defendant guilty if only some of you think

20   that misrepresentation A is false, while others think that

21   only misrepresentation B is false.  There must be at least one

22   specific pretense, representation or promise about a material

23   fact that all of you find to be false in order to find a

24   defendant guilty.

25             If you find that the government has sustained its

1   burden of proof that a scheme to defraud, as charged, did

2   exist, you next should consider the second element of the

3   offense of wire fraud.

4          The second element that the government must prove

5   beyond a reasonable doubt is that a defendant executed the

6   scheme knowingly, willfully, and with specific intent to

7   defraud a victim.

8          To repeat, to act knowingly means to act voluntarily

9   and deliberately, rather than mistakenly or because of

10  ignorance or accident.

11         To act willfully means to act knowingly and

12  purposely, with an intent to do something the law forbids;

13  that is to say, with a bad purpose to disobey or disregard the

14  law.

15         To act with intent to defraud means to act knowingly

16  and with the specific intent to deceive, for the purpose of

17  obtaining money or property from another.

18         How someone acted, his or her state of mind, is a

19  question of fact for you to determine.  Direct proof of

20  knowledge and fraudulent intent is not always available, nor

21  is it required.  The ultimate facts of knowledge and criminal

22  intent may be established by circumstantial evidence, which I

23  explained to you earlier.  Circumstantial evidence, if

24  believed, is of no less value than direct evidence.

25         Since an essential element of the wire fraud crime

1    charged is intent to defraud, it follows that good faith on

2    the part of a defendant is a complete defense to a charge of

3    wire fraud.  A defendant, however, has no burden to establish

4    a defense of good faith.  The burden is on the government to

5    prove fraudulent intent and consequent lack of good faith

6    beyond a reasonable doubt.

7            Under the wire fraud statute, even false

8    representations or statements, or omissions of material facts,

9    do not amount to a fraud unless done with fraudulent intent.

10   However misleading or deceptive a plan may be, it is not

11   fraudulent if it was devised or carried out in good faith.  An

12   honest belief in the truth of the representations made by or

13   on behalf of the defendant is a complete defense, however

14   inaccurate the statements may turn out to be.

15           In determining whether a defendant acted knowingly,

16   you may consider whether that defendant deliberately closed

17   his or her eyes to what otherwise would have been obvious to

18   him or her.  You may only infer knowledge of the existence of

19   a particular fact if a defendant was aware of a high

20   probability of its existence, unless that defendant actually

21   believed that it did not exist.  If you find beyond a

22   reasonable doubt that a defendant acted with a conscious

23   purpose to avoid learning a highly probable truth, then this

24   element may be satisfied.  However, guilty knowledge may not

25   be established by demonstrating that a defendant was merely

1   negligent, foolish, careless, or mistaken.

2          There is another consideration to bear in mind in

3   deciding whether or not the defendant acted in good faith.

4   You are instructed that if a defendant participated in the

5   scheme to defraud, then a belief by that defendant, if such a

6   belief existed, that ultimately everything would work out so

7   that no one would lose any money does not require you to find

8   that that defendant acted in good faith.  No amount of honest

9   belief on the part of the defendant that the scheme would, for

10  example, ultimately make a profit for investors, will excuse

11  fraudulent actions or false representations caused by him or

12  her.

13         As a practical matter, then, in order to sustain a

14  charge of wire fraud, the government must establish beyond a

15  reasonable doubt that a defendant knew that his or her conduct

16  as a participant in the scheme was calculated to deceive and,

17  nonetheless, he or she associated himself or herself with the

18  alleged fraudulent scheme for the purpose of causing some

19  financial loss to another or to deprive another of their

20  interest in property.

21         To conclude with this element, if you find the

22  government has established beyond a reasonable doubt that a

23  defendant was a knowing participant and acted with intent to

24  defraud, you should consider the third element of the wire

25  fraud charge.

1    The third and final element that the government must

2   prove beyond a reasonable doubt is the use of an interstate

3   wire communication in furtherance of the scheme to defraud.

4   The wire communication must pass between two or more states,

5   or it must pass between the United States and a foreign

6   country.  A wire communication includes a wire transfer of

7   funds between banks in different states, and telephone calls,

8   emails, and facsimiles between two different states.

9    The use of the wires need not itself be a fraudulent

10   representation.  It must, however, further or assist in the

11   carrying out of the scheme to defraud.  It is not necessary

12   for a defendant to be directly or personally involved in the

13   wire communication, as long as the communication was

14   reasonably foreseeable in the execution of the alleged scheme

15   to defraud in which that defendant is accused of

16   participating.

17    In this regard, it is sufficient to establish this

18   element of the crime if the evidence justifies a finding that

19   a defendant caused the wires to be used by others.  This does

20   not mean that that defendant must specifically have authorized

21   others to make the call.

22    When one does an act with knowledge that the use of

23   the wires will follow in the ordinary course of business or

24   where such use of the wires reasonably can be foreseen, even

25   though not actually intended, then he or she causes the wires

1    to be used.

2           Count One also charges a conspiracy, though of a

3    different type.  Count One of the indictment charges both

4    defendants with conspiracy to commit securities fraud.

5           Specifically, Count One states, in pertinent part:

6           In or about and between October 2012 and July 2014,

7    both dates being approximate and inclusive, within the Eastern

8    District of New York and elsewhere, the defendants Abraxas J.

9    Discala, also known as AJ Discala, and Kyleen Cane, together

10   with others, did knowingly and willfully conspire to use and

11   employ manipulative and deceptive devices and contrivances,

12   contrary to Rule 10b-5 of the rules and regulations of the

13   United States Securities and Exchange Commission, Title 17,

14   Code of Federal Regulations, Section 240.10b-5, by (A)

15   employing devices, schemes and artifices to defraud; (B)

16   making untrue statements of material fact and omitting to

17   state material facts necessary in order to make the statements

18   made, in light of the circumstances under which they were

19   made, not misleading; and (C) engaging in acts, practices and

20   courses of business which would and did operate as a fraud and

21   deceit upon investors and potential investors in the

22   manipulated public companies, in connection with the purchase

23   and sale of investments in the manipulated public companies,

24   directly and indirectly, by use of means and instrumentalities

25   of interstate commerce and the mails, contrary to Title 15,

United States Code, Sections 78J(B) and 78FF.

The relevant statutes for this charge are 18 U.S.C. Section 371, which provides, in relevant part:

If two or more persons conspire either to commit any offense against the United States, and one or more of such persons do any act to effect the object of the conspiracy, each shall be punished.

And, 15 U.S.C. Section 78J, which provides in relevant part that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange.

To use or employ, in connection with the purchase or sale of any security any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

I have already instructed you as to the elements the government must establish to prove either defendant's participation in a conspiracy.  However, as with Count Two, to determine whether the government has proved beyond a reasonable doubt that either defendant engaged in an illegal conspiracy, you must also understand the crimes that Count One charges him or her with agreeing to commit.

1        As I noted, the alleged object of the conspiracy

2   charged in Count One is securities fraud.  The elements of

3   securities fraud are as follows:

4            First, that in connection with the purchase or sale

5   of a security, the defendant did any one or more of the

6   following:

7            (1) employed a device, scheme or artifice to

8   defraud, or

9            (2) made an untrue statement of a material fact or

10  omitted to state a material fact, which made what was said,

11  under the circumstances, misleading, or

12           (3) engaged in an act, practice or course of

13  business that operated, or would operate, as a fraud or deceit

14  upon a purchaser or seller;

15           Second, that the defendant acted willfully,

16  knowingly and with the intent to defraud;

17           And third, that the defendant knowingly used, or

18  caused to be used, any means or instruments of transportation

19  or communication in interstate commerce or the use of the

20  mails in furtherance of the fraudulent conduct.

21           I will now go through these elements in greater

22  detail.

23           The first element that the government must prove

24  beyond a reasonable doubt is that, in connection with the

25  purchase or sale of a security, the defendant did one or more

JURY CHARGE                                    3820

1   of the following:

2             (1) employed a device, scheme or artifice to

3   defraud, or

4             (2) made an untrue statement of a material fact or

5   omitted to state a material fact necessary in order to make

6   the statements made, in the light of the circumstances under

7   which they were made, not misleading, or

8             (3) engaged in an act, practice or course of

9   business that operated, or would operate, as a fraud or deceit

10  upon a purchaser or seller.

11            It is not necessary for the government to establish

12  all three types of unlawful conduct in connection with the

13  sale or purchase of a security.  Any one will be sufficient

14  for a conviction, if you so find, but you must be unanimous as

15  to which type of unlawful conduct you find to have been

16  proven.

17            A device, scheme or artifice to defraud is merely a

18  plan for the accomplishment of any objective.  Fraud is a

19  general term which embraces all efforts and means that

20  individuals devise to take advantage of others.  This includes

21  techniques, such as wash trades or match trades, that are

22  intended to mislead investors by artificially affecting market

23  activity.  Wash trades are prearranged purchases and sales of

24  securities that match each other at a specified price, volume

25  and time of execution, so as to involve no change in

1    beneficial ownership.  Match trades are similar to wash trades

2    but involve a related third person or party who places one

3    side of the trade.  The law which the defendants are alleged

4    to have violated generally prohibits practices such as wash

5    sales, matched orders or rigged prices that are intended to

6    mislead investors by artificially affecting market activity.

7              The fraudulent or deceitful conduct alleged need not

8    relate to the investment value of the securities involved in

9    this case.

10             You need not find that the defendant actually

11   participated in any securities transaction if the defendant

12   was engaged in fraudulent conduct that was in connection with

13   a purchase or sale.  The in connection with aspect of this

14   element is satisfied if you find that there was some nexus or

15   relation between the allegedly fraudulent conduct and the sale

16   or purchase of securities.  Fraudulent conduct may be in

17   connection with the purchase or sale of securities if you find

18   that the alleged fraudulent conduct touched upon a securities

19   transaction.

20             It is no defense to an overall scheme to defraud

21   that the defendant was not involved in the scheme from its

22   inception or played only a minor role with no contact with the

23   investors and purchasers of the securities in question.  Nor

24   is it necessary for you to find that the defendant was the

25   actual seller or offeror of the securities.  It is sufficient

JURY CHARGE                                    3822

1    if the defendant participated in the scheme or fraudulent

2    conduct that involved the purchase or sale of stock.  By the

3    same token, the government need not prove that the defendant

4    personally made the misrepresentation or that he or she

5    omitted the material fact.  It is sufficient if the government

6    establishes that the defendant caused the statement to be made

7    or the fact to be omitted.  With regard to the alleged

8    misrepresentations and omissions, you must determine whether

9    the statement was true or false when it was made, and, in the

10   case of alleged omissions, whether the omission was

11   misleading.

12          If you find that the government has established

13   beyond a reasonable doubt that a statement was real or

14   omitted, you must next determine whether the fact misstated

15   was material under the circumstances.  A material fact is one

16   that would have been significant to a reasonable investor's

17   investment decision.  This is not to say that the government

18   must prove that the misrepresentation would have deceived a

19   person of ordinary intelligence.  Once you find that there was

20   a material misrepresentation or omission of a material fact,

21   it does not matter whether the intended victims were gullible

22   buyers or sophisticated investors, because the securities laws

23   protect the gullible and unsophisticated as well as the

24   experienced investor.

25          Nor does it matter whether the alleged unlawful

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

1    conduct was successful or not, or that the defendant profited

2    or received any benefits as a result of the alleged scheme.

3    Success is not an element of the crime charged.  However, if

4    you find that the defendant did profit from the alleged

5    scheme, you may consider that in relation to the third element

6    of intent, which I will discuss in a moment.

7           The second element that the government must

8    establish beyond a reasonable doubt is that the defendant

9    participated in the scheme to defraud knowingly, willfully and

10   with intent to defraud.

11          Those terms have the same meanings that I previously

12   provided to you.

13          The third and final element that the government must

14   prove beyond a reasonable doubt is that the defendant

15   knowingly used, or caused to be used, the mails or any means

16   or instrumentalities of transportation or communication in

17   interstate commerce, including telephones, in furtherance of

18   the scheme to defraud.

19          It is not necessary that a defendant be directly or

20   personally involved in any mailing or telephone calls.  If the

21   defendant was an active participant in the scheme and took

22   steps or engaged in conduct which he or she knew or reasonably

23   could foresee would naturally and probably result in the use

24   of the mails or telephone lines, then you may find that he

25   caused the mails or instrumentality of interstate commerce to

JURY CHARGE                    3824

1    be used.

2              When one does an act with the knowledge that the use

3    of interstate means of communication will follow in the

4    ordinary course of business, or where such use reasonably can

5    be foreseen, even though not actually intended, then he causes

6    such means to be used.

7              Nor is it necessary that the items sent through the

8    mails or communicated by a telephone contain the fraudulent

9    material, or anything criminal or objectionable.  The matter

10   mailed or communicated by telephone may be entirely innocent.

11             The use of telephones or the mail need not be

12   central to the execution of the scheme, and may even be

13   incidental to it.  All that is required is that the use of

14   telephones or the mail bear some relation to the object of the

15   scheme or fraudulent conduct.

16             In fact, the actual offer or sale need not be

17   accompanied or accomplished by the use of telephones or the

18   mail, so long as the defendant is still engaged in actions

19   that are a part of a fraudulent scheme.

20             I have already instructed you on conspiracy

21   generally.  Those same instructions apply to Count One.  As a

22   reminder, the government need not prove that a defendant

23   actually committed the unlawful acts charged as the objects of

24   the conspiracy in Count One, that is, securities fraud.

25   Rather, the government must prove, beyond a reasonable doubt,

1    the following:

2              First, that two or more persons entered into an

3    agreement to commit securities fraud; and

4              Second, that the defendant whom you are considering

5    knowingly and intentionally became a member of the conspiracy.

6              There are two additional elements that the

7    government must prove beyond a reasonable doubt in order to

8    establish that a defendant is guilty of the conspiracy alleged

9    in count one.

10             The first additional element the government must

11   prove is that one of the members of the conspiracy knowingly

12   committed at least one of the overt acts charged in the

13   indictment.

14             The Indictment alleges:

15             In furtherance of the conspiracy and to effect its

16   objects, within the Eastern District of New York and

17   elsewhere, the defendants, together with others, committed and

18   caused to be committed, among others, the following:  OVERT

19   ACTS.

20             A.  On or about June 4, 2013, Shapiro cause an

21   e-mail to John Doe 3, a representative of Ramapo College of

22   New Jersey whose identity is known to the grand jury, copying

23   two of Shapiro's colleagues, whose identities are known to the

24   grand jury, and stated, in part, my apologies on behalf of

25   CodeSmart.  We did not know about that language you [sic] were

1   allowed to use and certainly will consult with you next time

2   we do a promotion.  This is all done in a spirit of promoting

3   business opportunities for you as a partner.

4            B.  On or about August 15, 2013, Discala signed a

5   purchase agreement on behalf of Fidelis whereby he sold 25,000

6   shares of CodeSmart common stock to Victim 1, an individual

7   whose identity is known to the grand jury, for $3,500 at a

8   purchase price of 14 cents per share.

9            C.  On or about August 27, 2013, Shapiro filed with

10  the SEC a Form 8-K on behalf of CodeSmart and stated that he

11  had purchased 25,000 shares of the company's stock from the

12  public market at the market value of $3.21 per share for a

13  cost of $80,250.

14           D.  On or about May 6, 2014, during a telephone call

15  between Discala and Goodrich discussing the trading of Cubed

16  shares, Discala inquired, in part, can you get your trader off

17  that 451?  He's killing the box.  Adding, it's 526, he's in

18  the middle of the 5's at 451.  And Goodrich responded, in part

19  Where do you want him?  I'll call him right now.

20           E.  On or about May 12, 2014, during a telephone

21  call between Discala and Victor Azrak, Victor Azrak stated, in

22  part, we should start sending Josephberg morons by the way.

23  We could trade for free, you know, send him a moron, you know,

24  a guy you don't know and then we'll just buy stocks and if

25  they don't go up by the end, we'll buy, like, options Twitter

JURY CHARGE                                    3827

1    options that expire in, like, a day.  Either we'll make like

2    twenty times or we'll just give him the stock.

3              F.  On or about May 17, 2014, during a telephone

4    call between Discala and Marc Wexler, Discala stated, in part,

5    so our deal is going to pay the cube 250, cause these guys

6    can't generate revenue, so I'm going to generate it myself.

7              G.  On or about May 20, 2014, during a telephone

8    call between Discala and Goodrich about the escrow account and

9    Cubed trading, Goodrich stated, in part, you did a perfect

10   job.  Hearing it out of Cane's mouth, that makes sense.

11             H.  On or about May 20, 2014, during a telephone

12   call between Discala and Victor Azrak, Discala stated, in

13   part, right, because I'm the expletive brake and the gas

14   expletive.  If I take my foot off the brake it's $55 tomorrow

15   (laughter).

16             I.  On or about May 21, 2014, during a telephone

17   call between Discala and Cane, Cane stated, in part, the

18   investor relations/public relations guys are going to be doing

19   it and I also just talked to two people that are gonna

20   probably going to put in another half a million into Cubed for

21   some interim, interim money.

22             J.  On or about May 22, 2014, during a telephone

23   call between Discala and Josephberg, Josephberg stated in

24   part, I don't want to be the only one buying today.  I heard

25   it looks very bad for a broker to be the only one buying,

JURY CHARGE                          3828

1    that's what I heard.

2            K.  On or about May 27, 2014, during a telephone

3    call between Discala and Cane, Cane stated, in part, well,

4    it's um, it's gonna start happening.  I don't know if the

5    press has even come out yet.  There's gonna be a release today

6    on the acquisition.  We're having a conference call in about

7    30 minutes with the first PR that's gonna go out the PR group.

8            L.  On or about May 29, 2014, during a telephone

9    call between Discala and Goodrich, Discala stated, in part,

10   no, just buy 100 and stay under 43.  I'll have the other guys

11   move up.

12           M.  On or about June 6, 2014, during a telephone

13   call between Discala and Marc Wexler, Marc Wexler stated, in

14   part, we don't need to go up every expletive day, but the

15   bottom line is, you know, we're expletive supporting the

16   stock.

17           In order for the government to satisfy this element,

18   it is not required that all of the overt acts alleged in the

19   indictment be proven or that the overt act was committed at

20   precisely the time alleged in the indictment.  It is

21   sufficient if you are convinced beyond a reasonable doubt that

22   it occurred at or about the time and place stated.  Similarly,

23   you need not find that either defendant himself or herself

24   committed the overt act.  It is sufficient for the government

25   to show that one of the conspirators knowingly committed an

1    overt act in furtherance of the conspiracy, since, in the eyes

2    of the law, such an act becomes the act of all of the members

3    of the conspiracy.

4            The second additional element the government must

5    prove beyond a reasonable doubt is that the overt act or acts

6    you find were committed, were done specifically to further

7    some objective of the conspiracy.

8            In order for the government to satisfy this element,

9    it must prove, beyond a reasonable doubt, that at least one

10   overt act was knowingly and willfully done, by at least one

11   conspirator, in furtherance of some objective or purpose of

12   the conspiracy as charged in the indictment.  In this regard,

13   you should bear in mind that the overt act, standing alone,

14   may be an innocent, lawful act.  Frequently, however, an

15   apparently innocent act sheds its harmless character if it is

16   a step in carrying out, promoting, aiding or assisting the

17   conspiratorial scheme.  Therefore, you are instructed that the

18   overt act does not have to be an act which, in and of itself,

19   is criminal or constitutes an objective of the conspiracy.

20           In sum, in order to prove that either defendant is

21   guilty of Count One, the government must prove, beyond a

22   reasonable doubt:

23           1) that the purpose of the conspiracy was to commit

24   securities fraud;

25           2) that that defendant knowingly and intentionally

1    joined the conspiracy;

2              3) that at least one of the overt acts alleged in

3    the indictment was committed by at least one member of the

4    conspiracy; and

5              4) that the overt act was committed specifically to

6    further some objective of the conspiracy.

7              I have explained to you the elements the government

8    must prove beyond a reasonable doubt as to Count One.  The

9    government must also prove venue.  As I explained to you

10   earlier, the government must prove venue only by a

11   preponderance of the evidence.  I remind you that to establish

12   a fact by a preponderance of the evidence means to prove that

13   the fact is more likely true than not.

14             To establish venue for a conspiracy to commit

15   securities fraud as charged in Count One, the government must

16   prove that it is more likely than not that an overt act in

17   furtherance of the conspiracy was committed in the Eastern

18   District of New York.  The overt act does not have to be an

19   overt act that is charged in the indictment in furtherance of

20   the conspiracy.  In this regard, the government need not prove

21   that the crime charged was committed in the Eastern District

22   of New York or that the defendant or any alleged

23   co-conspirator was even physically present here.  It is

24   sufficient to satisfy the venue requirement if an overt act in

25   furtherance of the conspiracy occurred within the Eastern

1    District of New York.  This includes not just acts by the

2    defendants or their co-conspirators, but also acts that the

3    conspirators caused others to take that materially furthered

4    the ends of the conspiracy.

5           Therefore, if you find that it is more likely than

6    not that an overt act in furtherance of the conspiracy took

7    place in the Eastern District of New York, the government has

8    satisfied its burden of proof as to venue as to Count One.

9    Again, I caution you that the preponderance of the evidence

10   standard applies only to venue.  The government must prove

11   each of the elements of all the counts beyond a reasonable

12   doubt.

13          In sum, if you find that the government has failed

14   to prove any one of the elements for Count One as to either

15   defendant, beyond a reasonable doubt, then you must find that

16   defendant not guilty of securities fraud conspiracy for

17   Count One.  To find the defendant guilty of conspiring to

18   commit securities fraud as charged in Count One, you must find

19   that the government has proven, beyond a reasonable doubt,

20   each element of the conspiracy to commit securities fraud, and

21   that the government has also established venue for the count

22   by a preponderance of the evidence.

23          Count Three charges Abraxas Discala with securities

24   fraud in connection with the security CodeSmart.  That charge

25   reads:

JURY CHARGE                                          3832

1              In or about and between October 2014 and July 2014,

2     both dates being approximate and inclusive, within the Eastern

3     District of New York and elsewhere, the defendant Abraxas J.

4     Discala, together with others, did knowingly and willfully use

5     and employ one or more manipulative and deceptive devices and

6     contrivances, contrary to Rule 10b-5 of the rules and

7     regulations of the United States Securities and Exchange

8     Commission, Title 17, Code of Federal Regulations,

9     Section 240.10b-5

10             (a) by employing one or more devices, schemes and

11    artifices to defraud;

12             (b) making one or more untrue statements of material

13    fact and omitting to state one or more material facts

14    necessary in order to make the statements made, in light of

15    the circumstances under which they were made, not misleading;

16    and

17             (c) engaging in one or more acts, practices and

18    courses of business which would and did operate as a fraud and

19    deceit upon one or more investors or potential investors in

20    CodeSmart, in connection with the purchases and sales

21    investments in CodeSmart, directly and indirectly, by use of

22    means and instrumentalities of interstate commerce and the

23    mails, contrary to Title 15, United States Code,

24    Sections 78J(B) and 78FF, Title 18, United States Code,

25    Sections 2 and 3551.

Case 1:14-cr-00399-ENV   Document 668   Filed 10/20/18   Page 178 of 208 PageID #: 6667

1          I have already provided you with the elements of

2     securities fraud and you should apply those elements here.  To

3     summarize, securities fraud has the following elements:

4          First, that in connection with the purchase or sale

5     of a security, specifically CodeSmart in the case of

6     Count Three, the defendant did any one or more of the

7     following:

8          (1) employed a device, scheme or artifice to

9     defraud, or

10         (2) made an untrue statement of a material fact or

11    omitted to state a material fact which made what was said,

12    under the circumstances, misleading, or

13         (3) engaged in an act, practice or course of

14    business that operated, or would operate, as a fraud or deceit

15    upon a purchaser or seller.

16         Second, that the defendant acted willfully,

17    knowingly and with the intent to defraud.

18         Third, that the defendant knowingly used, or caused

19    to be used, any means or instruments of transportation or

20    communication in interstate commerce or the use of the mails

21    in furtherance of the fraudulent conduct.

22         If you find that the government has not proved each

23    of those three elements beyond a reasonable doubt with respect

24    to Discala's conduct in connection with the security

25    CodeSmart, you must find him not guilty.

1              Count Three, which I have just read and charges one

2      defendant, Abraxas Discala, with securities fraud, also

3      charges him with aiding and abetting the commission of

4      securities fraud.  Count Four, which I will read shortly and

5      charges both defendants with securities fraud, also charges

6      them with aiding and abetting the commission of securities

7      fraud.  Finally, Counts Five through Ten of the indictment,

8      which charge the defendant Abraxas Discala with wire fraud,

9      also charge him with aiding and abetting the commission of

10     wire fraud.

11             Aiding and abetting is defined under federal law in

12     Title 18, U.S.C. Section 2 which provides, in pertinent part,

13     the following:

14             Whoever commits an offense against the United States

15     or aids, abets, counsels, commands, induces or procures its

16     commission, is punishable as a principal.

17             Under the aiding and abetting statute, it is not

18     necessary for the government to show that the defendant

19     himself or herself physically committed the crime with which

20     he or she is charged in order for you to find the defendant

21     guilty.  A person who aids or abets another to commit an

22     offense is just as guilty of that offense as if he committed

23     it himself.

24             Accordingly, you may find the defendant guilty of

25     the offense charged if you find beyond a reasonable doubt that

1    the government has proven that another person actually

2    committed the offense with which the defendant is charged, and

3    that the defendant aided or abetted that person in the

4    commission of the offense.

5           As you can see, the first requirement is that you

6    find that another person has committed the crime charged.

7    Obviously, no one can be convicted of aiding and abetting the

8    criminal acts of another if no crime was committed by the

9    other person in the first place.  But if you do find that a

10   crime was committed, then you must consider whether the

11   defendant aided or abetted the commission of that crime.

12          In order to aid or abet another to commit a crime,

13   it is necessary that the defendant willfully and knowingly

14   associate himself or herself in some way with the crime, and

15   that he or she participate in the crime by doing some act to

16   help make the crime succeed.

17          Participation in a crime is willful if done

18   voluntarily and intentionally, and with the specific intent to

19   do something which the law forbids or with the specific intent

20   to fail to do something the law requires to be done; that is

21   to say, with a bad purpose either to disobey or disregard the

22   law.

23          The mere presence of a defendant where a crime is

24   being committed, even coupled with knowledge by the defendant

25   that a crime is being committed, or merely associating with

1   others who were committing a crime, is not sufficient to

2   establish aiding and abetting.  One who has no knowledge that

3   a crime is being committed or is about to be committed but

4   inadvertently does something that aids in the commission of

5   that crime is not an aider and abettor.  An aider and abettor

6   must know that the crime is being committed and act in a way

7   which is intended to bring about the success of the criminal

8   venture.

9          To determine whether the defendants aided or abetted

10  the commission of the crime with which they are charged, ask

11  yourself these questions:

12         Did he or she participate in the crime charged as

13  something he or she wished to bring about?

14         Did he or she associate himself or herself with the

15  criminal venture knowingly and willfully?

16         Did he or she seek by his or her actions to make the

17  criminal venture succeed?

18         If a defendant did, then that defendant is an aider

19  or abettor, and therefore guilty of the offense.  If, on the

20  other hand, your answer to any one of these questions is no,

21  then that defendant is not an aider and better, and you must

22  find him or her not guilty.

23

24         (Continued on next page.)

25

JURY CHARGE                                          3837

1          THE LAW CLERK:  Count Four charges Abraxas J.

2    Discala and Kyleen Cane with securities fraud in connection

3    with the security Cubed.

4          Count Four reads:  In or about and between

5    March 2014 and July 2014, both dates being approximate and

6    inclusive, within the Eastern District of New York and

7    elsewhere, the defendant Abraxas J. Discala and Kyleen Cane,

8    together with others, did knowingly and willfully use and

9    employee one or more that manipulative and deceptive devices

10   and contrivances, contrary no Rule 10B-5 of the Rules and

11   Regulations of the United States Securities & Exchange

12   Commission, Title 17, Code of Federal Regulations, Section

13   240.10B-5 by (A) employing one or more devices, schemes and

14   artifices to defraud; (B) making one or more untrue statements

15   of material fact and omitting to state one or more material

16   facts necessary in order to make the statements made in light

17   of the circumstances under which they were made not

18   misleading; and (C) engaging in one or more acts, practices

19   and course of business which would and did operate as a fraud

20   and deceit upon one or more investors and potential investors

21   in Cubed in connection with the purchases and sales

22   investments in Cubed, directly and indirectly, by use of means

23   and instrumentalities of interstate commerce and the mails,

24   contrary to Title 15, United States Code Sections 17J(B) and

25   17FF, Title 18, United States Code Section 2 and 3551.

1          You should apply the elements of securities fraud to

2     this charge.  To summarize for the final time, securities

3     fraud has the following elements.

4          First, that in connection with the purchase of a

5     sale or security, specifically Cubed, the defendants did any

6     one or more of the following.

7          One, employed a device, scheme or artifice to

8     defraud.

9          Or, two, made an untrue statement of a material fact

10    or omitted to state a material fact, which made what was said

11    under the circumstances misleading.

12         Or, three, engaged in an act, practice or course of

13    business that operated, or would operate, as a fraud or deceit

14    upon a purchaser or seller.

15         Second, that the defendants acted willfully,

16    knowingly and with the intent to defraud.

17         Third, that the defendants knowingly used or caused

18    to be used any means or instruments of transportation or

19    communication in interstate commerce or the use of the mails

20    in furtherance of the fraudulent conduct.

21         If you find that the Government has not proved each

22    of the three elements of securities fraud beyond a reasonable

23    doubt with respect to Discala and/or Cane's conduct in

24    connection with the securities Cubed, you must find him and/or

25    her not guilty.

1          I have explained to you the elements the Government

2     must prove beyond a reasonable doubt as to the securities

3     fraud charge in Counts Three and Four.  The Government must

4     also prove venue for each count.  Unlike the elements I just

5     implemented to you that the Government must prove beyond a

6     reasonable doubt, the Government must prove venue by a

7     preponderance of the evidence.

8          To establish a fact by a preponderance of the

9     evidence, means to proof that the fact is more likely true

10    than not.  A preponderance of the evidence means the greater

11    weight of the evidence, both direct and circumstantial.  It

12    refers to the quality and persuasiveness of the evidence, not

13    to the quantity of evidence.

14         To establish venue for securities fraud as charged

15    in Counts Three and Four, the Government must prove that it is

16    more likely than not that (1) the defendant intentionally and

17    knowingly caused an act or transaction constituting a

18    securities fraud to occur at least, in part, in the Eastern

19    District of New York, which consists of the counties of Kings,

20    also known as Brooklyn, Queens, Richmond, also known as Staten

21    Island, Nassau and Suffolk, or (2) that it was foreseeable

22    that such an act or transaction would occur in the Eastern

23    District of New York, and it did.  The Government need not

24    prove that the defendant personally was present in the Eastern

25    District of New York.  It is sufficient to satisfy the venue

1   requirement if the defendant intentionally and knowingly

2   caused an act or transaction constituting a securities fraud

3   to occur at least, in part, within the Eastern District of New

4   York.  The Government also must prove that the act or

5   transaction must be a part of the actual crime of securities

6   fraud and not merely a step taken in preparation for the

7   commission of the crime.

8            Therefore, if you find that it is more likely than

9   not that an act or transaction in furtherance of the

10  securities fraud took place in the Eastern District of New

11  York, the Government has satisfied its burden of proof as to

12  venue as to Counts Three and Four.

13           Again, I caution you that the preponderance of the

14  evidence standard applies only to venue.  The Government must

15  prove each of the elements of securities fraud in Counts Three

16  and Four beyond a reasonable doubt.

17           In sum, to find a defendant guilty of securities

18  fraud in as charged in Count Three and Count Four you must

19  find that the Government has proven beyond a reasonable doubt

20  each element of securities fraud for that count and that the

21  Government has also established venue for that count by a

22  preponderance of the evidence.

23           Counts five through ten each charge wire fraud.

24  Each individual wire in furtherance of a fraudulent scheme is

25  a separate crime.  Counts Five through Ten charge six separate

1    crimes relating to six separate uses of the wires in

2    furtherance of one scheme.

3           Counts Five through Ten read:  In or about and

4    between October 2012 and July 2014, both dates being

5    approximate and inclusive, within the Eastern District of New

6    York and elsewhere, the defendant, Abraxas J. Discala,

7    together with others, did knowingly and intentionally devise a

8    scheme and artifice to defraud investors and potential

9    investors in certain of the manipulated public companies, and

10   to obtain money and property from them by means of materially

11   false and fraudulent pretenses, representations and promises.

12          On or about the dates set forth below for the

13   purpose of executing such scheme and artifice, the defendant,

14   Abraxas J. Discala, together with others, did transmit and

15   cause to be transmitted by means of wire communication and

16   interstate and foreign commerce writings, signs, signals,

17   pictures and sounds, as set forth below.

18          Count five, approximate date May 9, 2014.  Telephone

19   call from Discala to Goodrich discussing, among other things,

20   the manipulation of Cubed stock.

21          Count Six, with the approximate date of May 9, 2014,

22   telephone call from Discala to Jamie Sloan, an individual

23   whose identity is known to the Grand Jury, discussing among

24   other things the manipulation of Cubed stock.

25          Count Seven, with the approximate date of May 9,

1  2014, telephone call from Discala to Victor Azarak discussing

2  among other things, the manipulation of Cubed's and Star

3  Stream's stocks.

4          Count Eight, with an approximate date of June 12,

5  2014, telephone call from Discala to a trader at BNA, an

6  individual whose identity is known to the Grand Jury,

7  discussing, among other things, the manipulation of Star

8  Stream's stock.

9          Count Nine, with the approximate date of June 12,

10 2014, telephone call from Discala to Josephberg discussing,

11 among other things, the manipulation of Star Stream's stock.

12         Count Ten, with the approximate date of June 12,

13 2014, telephone call from Discala to Marc Wexler discussing,

14 among other things, the manipulation of Cubed's stock.

15         I have already described the elements of wire fraud,

16 those elements apply to these charges as well.

17         Notably with respect to the use of the wires, the

18 Government must prove beyond a reasonable doubt the particular

19 use charged in the Indictment.  However, the Government does

20 not have to prove that the wires were used on the exact date

21 charged in the Indictment.  It is sufficient if the evidence

22 establishes beyond a reasonable doubt that the wires were used

23 on a date substantially similar to the dates charged in the

24 Indictment.

25         I have already given you certain instructions

1    regarding the defense of good faith.  I now want to impress

2    upon you that good faith is a complete defense to the charges

3    in this case.  As I've already told you, some of the charges

4    in this case deal with false statements.  A statement made

5    with good faith in its accuracy does not amount to a false

6    statement and is not a crime.  This is so even if the

7    statement is in fact erroneous.

8              Other of the charges in this case deal with fraud.

9    If a defendant believed in good faith that he or she was

10   acting properly, even if he or she was mistaken in that

11   belief, and even if others were injured by his other her

12   conduct, there would no crime.

13             The burden of establishing lack of good faith and

14   criminal intent rests on the Government.  A defendant is under

15   no burden to prove his or her good faith.  Rather, as I have

16   charged you, the Government must prove bad faith or knowledge

17   of falsity, as appropriate, beyond a reasonable doubt.

18             Not every deceitful statement is a basis for fraud,

19   for fraud requires more than just deceit.  A lie can support a

20   fraud conviction only if it is material; that is, if it would

21   affect a reasonable person's evaluation of a proposal.  In

22   general, a false statement is material if it has a natural

23   tendency to influence or is capable of influencing the

24   decision of the decision-maker to which it was addressed.

25             In addition to being material, the deceit must also

1    be coupled with a contemplated harm to the victim.  It is not

2    sufficient that the defendant realizes that the alleged scheme

3    is fraudulent and it has the capacity to cause harm to its

4    victims, but, instead proof must demonstrate that the

5    defendant had conscious, knowing intent to defraud, and that

6    the defendant content tamed or intended some harm to the

7    property rights of the victim.

8            Proof of motive is not a necessary element of the

9    crimes with which the defendants are charged.  Proof of motive

10   does not establish guilt, nor does lack of motive establish

11   that a defendant is innocent.  If the guilt of the defendant

12   is shown beyond a reasonable doubt, it is immaterial what the

13   motive for the crimes may be, or whether any motive may be

14   shown, but the presence or absence of motive is a circumstance

15   which you may consider as bearing on the intent of the

16   defendant.

17           You are about to go into the jury room, members of

18   the jury, to begin your deliberations.  That brings us to the

19   third and final part of my charge, which provides some general

20   rules regarding your deliberations.

21           In order that your deliberations may proceed in an

22   orderly fashion, first, you should have a Foreperson.

23   Traditionally juror one acts as Foreperson.  Of course, his or

24   her vote is the entitled to no greater weight than that of any

25   other juror.

1         Keep in mind that nothing I have said in these

2    instructions is intended to suggest to you in any way what I

3    think your verdict should be.  That is entirely for you to

4    decide.

5         By way of reminder, I charge you once again that it

6    is your responsibility to judge the facts in this case from

7    are the evidence presented during the trial and to apply the

8    law as I have given it to you as to the facts as you find them

9    from the evidence.

10        When you retire, it is your duty to discuss the case

11   for the purpose of reaching agreement, if you can do so.  Each

12   of you must decide the case for yourself, but should only do

13   so after considering all the evidence, listening to the views

14   of your fellow jurors, and discussing it fully.  It is

15   important that you reach a verdict if you can do so

16   conscientiously.  You should not hesitate to reconsider your

17   opinions from time to time and to change them if you are

18   convinced that they are wrong.  However, do not surrender an

19   honest conviction as to weight and effect of the evidence

20   simply to arrive at a verdict.

21        Any verdict you reach must be unanimous.  That is,

22   with respect to each count for each defendant you must all

23   agree as to whether your verdict is guilty or not guilty as to

24   that count.

25        Deliberations are to take place only in the jury

1   room.  You will not discuss this case with anyone outside the

2   jury room, and that includes your fellow jurors.  You will

3   only discuss the case when all 12 deliberating jurors are

4   together in the jury room with no one else present behind the

5   closed door.  At no other time is there to be any discussion

6   about the merits of the case.  Period.

7          Finally, you cannot allow consideration of the

8   punishment which may be imposed upon a defendant, if

9   convicted, to influence your verdict in any way or to enter

10  into your deliberations.

11         Regardless, the duty of imposing a sentence rests

12  exclusively with me.  Your duty is to weigh the evidence in

13  the case and to determine whether the Government has proven

14  every element beyond a reasonable doubt solely upon such

15  evidence and upon the law without being influenced by any

16  assumption, conjecture, sympathy or inference not warranted by

17  the facts.

18         As I'm sure you can imagine, it is very important

19  that you not communicate with anyone outside the jury room

20  about your deliberations or about anything touching this case.

21  There is only one exception to this rule.  If it becomes

22  necessary during your deliberations to communicate with me,

23  you may send a note through the Marshal, signed by your

24  foreperson or by one or more members of the jury.  No member

25  of the jury should ever attempt to communicate with me except

1   by a signed writing.  And I will never communicate with any

2   member of the jury on any subject touching the merits of the

3   case other than in writing or orally here in open court.  If

4   you send any note to the Court, do not disclose anything about

5   your deliberations.  Specifically, do not disclose to anyone,

6   not even to me, how the jury stands numerically or otherwise

7   on the question of the guilt or innocence of the defendant

8   until after you have reached a unanimous verdict on each

9   counted or have been discharged.

10          Keep in mind too, that in deliberations the jury's

11   recollection governs, nobody else's.  It's not the Court's --

12   if I have made references to the testimony -- and not

13   counsel's recollection.  It is your recollection that must

14   govern during your deliberations.  If necessary, during those

15   deliberations you may request by jury note a reading from the

16   trial transcript that may refresh your recollection.

17          Please, as best you can, try to be as specific as

18   possible in your requests for read backs.  In other words, if

19   you are interested only in a particular part of a witness's

20   testimony, please indicate that to us.  It may take sometime

21   for us to locate the testimony in the transcripts, so please

22   be patient.  And as a general matter, if there is ever a delay

23   in responding to a jury note, please understand there is a

24   reason for it.  None of us goes anywhere.  As soon as the jury

25   note is delivered to the Court by the Marshal, we turn our

1    attention to it immediately.

2              In the same way, if you have any questions about the

3    applicable law or you want a further explanation from me, send

4    me a note.  We will provide a response as soon as we can.

5              I have provided the jury with a verdict sheet, which

6    is self-explanatory.  Needless to say, however, if you have

7    any questions about the verdict sheet, do not hesitate to send

8    the Court a note asking for further instructions.  With

9    respect to each count, you're to resolve individually the

10   issue of whether the Government has established beyond a

11   reasonable doubt the essential elements of the offense, as

12   I've described them to you.  That is, you must all agree

13   unanimously as to whether your verdict is guilty or not

14   guilty.

15             When you have reached a decision, have the

16   Foreperson record the answers, sign the verdict form, and put

17   the date on it, and notify the Marshal by note that you have

18   reached a verdict.  Bring the completed verdict sheet with you

19   when summoned by the Court.

20             You must not be influenced by sympathy, present, or

21   public opinion.  I remind you at the outset that each of you

22   has undertaken a solemn obligation, a sworn obligation, to

23   decide this case solely on the evidence.  You much carefully

24   and impartially consider the evidence, follow the law as I

25   state it, and reach a just verdict, regardless of the

1    consequences.

2             As you begin your deliberations, remember your oath

3    sums up your duty, and that is, without fear or favor to any

4    person or party, you will well and truly try the issues in

5    this case according to the evidence given to you in court and

6    the laws of the United States.

7             In a few minutes I am going to excuse our alternate

8    jurors.  As I told you before, your are services were required

9    as a safeguard against the possibility that one of the regular

10   jurors might be unable to complete his or her service.  I

11   commend the alternate jurors for their faithful attendance and

12   attention on behalf of the Court and parties, I thank you for

13   your service.

14            Members of the jury, I ask your patience for a few

15   moments longer.  It may be necessary for me to spend a few

16   moments with counsel and the reporter at the sidebar.  If so,

17   I will ask you to remain patiently in the box without speaking

18   to each other and we will return in just a moment to submit

19   the case to you.

20            Thank you again for your time and attentiveness.

21            (Continued on the next page.)

22            (Sidebar conference.)

23

24

25

SIDEBAR CONFERENCE                        3850

1          THE COURT:  Any objections or exceptions to the

2    charge as given?

3          MS. JONES:  Not from the Government.

4          MR. ROSS:  Judge, just objections that we previously

5    made and.  We join in co-counsel's objections as well.

6          MR. RIOPELLE:  I have no objections other than those

7    stated at the charge conference.

8          THE COURT:  Thank you.

9          (End of sidebar conference.)

10          (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                                    3851

1              (In open court.)

2              The clerk will mark as Court Exhibit 2 the charge

3     that was just read to you, ladies and gentlemen of the jury.

4     That charge, the written charge, will accompany you into the

5     jury room.  You'll have access to that throughout your

6     deliberations.

7              You will also receive a copy of the verdict sheet

8     that was referenced for you to complete as you complete your

9     deliberations.

10             Now, you were told in the charge that to the extent

11    that you have a failure of recollection about something, you

12    can send us a note and we'll try to find that testimony in the

13    record and read it back to you.  In addition to that, I don't

14    have to tell you there were a lot of documents that were

15    received, papers that were received in evidence.  Not all of

16    the papers that we saw during the trial were received in

17    evidence, but those that were received in evidence are

18    available to you in the jury room if you need them.  Just send

19    us a note, try to describe what document it is that you need,

20    and we will endeavor to find it and send it in.  It doesn't

21    mean you have to ask for read backs or documents, but if you

22    want them, they are there for us to provide them to you.

23             We'll work until probably 6:30, quarter to seven

24    today.  To the extent there is no verdict, we will return, as

25    I indicated to you, tomorrow, and work a regular business day

PROCEEDINGS                                    3852

1    and go from there.  There is no time pressure put on you.  You

2    take as much time as you need to apply the law as I've given

3    it to you to the facts that you find them.

4              I'm going to ask all the jurors to retire after we

5    swear the Marshal.  And then ask the three alternate jurors to

6    pick up any belongings that they may have and return to the

7    courtroom.

8              (Marshal sworn.)

9              THE WITNESS:  Yes, I do.

10             THE COURT:  Thank you, Marshal.

11             (Jury exits the courtroom.)

12             (Time 5:10 p.m.)

13             MR. RIOPELLE:  Judge, I am wondering whether the

14   Court requires us to be in the courtroom during deliberations

15   or just give William our phone number?

16             THE COURT:  As longs with we can track you down.

17             MR. RIOPELLE:  Somewhere in the courthouse, Judge.

18             THE COURT:  If we have your cellphone, even if

19   you're in the park.

20             Counsel, we're going to discharge the alternates

21   from the courtroom.

22             (Alternates enter.)

23             Alternate jurors, thank you again.  We thanked you

24   formally in the charge, and everything that we said there

25   certainly we will reenforce.  We do very much appreciate your

PROCEEDINGS                                    3853

1    service, your attentiveness, your patience.  And if you

2    thought you were escaping, I got news for you, you're not.

3            I'm not going to keep you here, but the realities

4    are, and we know it from this very case, that because of

5    circumstances beyond the control of a juror, sometimes we need

6    alternates; in fact, that's exactly what happened in this

7    case.  So no one can know as the deliberations wear on in this

8    case whether or not one of our deliberating jurors may not be

9    able to complete his or her service.  So therefore, we have to

10   have the ability to vouch in and restart deliberations with

11   one of the alternates.

12           What does that mean practically to you.  It means

13   you can return to work tomorrow, but you must be prepared to

14   return to the courthouse in case that circumstance eventuates.

15           That means all the instructions that you've been

16   receiving over the course of the trial continue to apply to

17   each of you.  So you still have to keep an open mind, you're

18   not back there deliberating yet.  You are not to not talk to

19   each other about the case or to anyone else about the case.

20   If you're on a social media platform or other means of

21   communication, you remain on radio silence.  No references to

22   the fact that you had been a juror or you may have to come

23   back and be a juror, or anything that touches upon the case.

24           To the extent that there is any media coverage of

25   the case, you're directed to close your mind, eyes and ears to

PROCEEDINGS                           3854

1    it.  I encourage you, again, to do the same with respect to

2    other matters for fear it may confuse you now with the

3    instructions that you just received.

4         Of course, to use the period of recess for you is

5    not an opportunity to do any kinds of research, electronic or

6    otherwise.

7         You heard me indicate to the jury that again, for

8    your planning purposes, that we do have a session tomorrow.

9    To the extent, however, that deliberations aren't completed by

10   tomorrow, we will not be in session again until Wednesday.  So

11   in no circumstances will your services be needed Saturday,

12   Sunday, Monday or Tuesday.

13        So either we won't see you again, or we may see you

14   tomorrow, or we may see you on Wednesday but nothing in

15   between.  William will stay in touch with you and advise you

16   if a verdict has been reached or if there has been any other

17   disposition of the matter.  From that point on, all of the

18   rules that I've given to you no longer apply.  But until you

19   get that call from William, they all still apply.

20        Also still applying is our gratitude for your

21   patience and cooperation your sacrifice and your

22   attentiveness.  And we certainly appreciated having you part

23   of the trial.  Have a pleasant evening, maybe we'll see you

24   again.

25        (Alternates exit.)

PROCEEDINGS                                    3855

1          THE COURT:  As long as William has your cellphones,

2    he will give you a ring.  We'll bring the jury back in at a

3    certain point, 6:30, 6:45, whatever, and discharge them for

4    the night.  Come back around 6:30, that probably makes sense.

5          (Recess.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                                    3856

1        THE COURTROOM DEPUTY:  All rise.  Court is back in

2    session.

3        Counsel for both sides are present, including the

4    defendants.

5        THE COURT:  We got a note from the jury, which is

6    marked as Court Exhibit Number 3.

7        (Court Exhibit 3, was received in evidence.)

8        THE COURTROOM DEPUTY:  Dated 5/3/18.  Can we please

9    get Count Five, Count Six, Count Seven, Count Eight, Count

10   Nine, and Count Ten, call transcripts, please.  Signed by

11   William Williamson.

12       MS. JONES:  Your Honor, the government's position is

13   that we should play the calls.

14       THE COURT:  Yes, it's the Court's position.  The

15   calls are in evidence, the transcripts are not.

16       MR. ROSS:  Judge, may I just be heard briefly.

17       The jury did have the transcripts, they are a guide.

18   Your Honor can recharge the jury.

19       THE COURT:  They wanted to hear wires, they will

20   hear them.

21       MR. ROSS:  And we just think that it would be fairer

22   if they had the transcripts that they follow.

23       THE COURT:  Yes.

24       MS. JONES:  We're going to put them on the screen,

25   because we do not have paper binders for all the jurors right

1   now, but we can put them on the screen.

2              MR. ROSS:  And we just prefer the paper that the

3   jury had during the playing of the exhibits.

4              THE COURT:  Do you want us to wait, Mr. Ross, or do

5   you want us to use the things on the screen?

6              MR. ROSS:  We think it's fairer.  We ask -- I

7   understand it wouldn't take very long to get the actual

8   transcripts in the courtroom.

9              MS. JONES:  Your Honor, that seems like a waste of

10  the juror's time.

11             THE COURT:  Yes.  They were there for an aid to the

12  jury.  We'll get them the second best, which is on the screen,

13  that what's in evidence is what's in their ears.  That's what

14  they're entitled to.

15             MR. ROSS:  Understood.

16             (Pause.)

17             (Jury enters the courtroom.)

18             THE COURT:  Be seated, please.

19             Counsel will stipulate that the jury is present and

20  properly seated.

21             MS. JONES:  Yes, Your Honor.

22             MR. ROSS:  Agreed, Judge.

23             THE COURT:  Thank you, ladies and gentlemen.  We

24  have gotten your note.

25             As you will recall, when you heard the tapes during

PROCEEDINGS                                    3858

1   the trial itself, I indicated to you that what you were

2   hearing is in evidence, and what you were seeing was only an

3   aid.  But when you ask for the those wire transcripts to be

4   provided to you, we will put the wire transcripts up on the

5   screen, but we have to play the tapes, because that is what is

6   in evidence, not the transcripts.

7            So who is playing that now?  Is that you, Ms. Jones?

8            MS. JONES:  Yes, Your Honor.

9            We're going to start with Count Five, which is

10  Government Exhibit 198-16, a May 9th, 2014 call.  And it's an

11  excerpt that's has admitted into evidence from zero two

12  minutes 437.

13           (Audio recording played.)

14           MS. JONES:  Next call is Count Six, which is

15  Government Exhibit 198-9, a May 9th, 2014 call from Discala to

16  Jamie Sloan for the BMAC stock.

17           (Audio recording played.)

18           MS. JONES:  The next call for Government Exhibit --

19  for Count Seven, is Government Exhibit 198-74, a May 9th, 2014

20  telephone call from Discala to Victor Azrak discussing, among

21  other things, manipulation of Cubed and StarStream stock.

22           (Audio recording played.)

23           MS. JONES:  Okay, for Count Eight, Government

24  Exhibit 198-52, a June 12th, 2014 call -- telephone call from

25  Discala to a trader at BMA, an individual whose identify is

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                        3859

1    know to the grand jury, discussing, among other things, the

2    manipulation of StarStream stock.

3              (Audio recording played.)

4              MS. JONES:  Count Nine is Government Exhibit 198-77.

5    We have an excerpt, which is a June 12th, 2014 telephone call

6    from Discala to Josephberg, discussing, among things, the

7    manipulation of StarStream stock.  We're going to play from

8    zero to one minute and three seconds, which is the excerpt in

9    evidence.

10             (Audio recording played.)

11             MS. JONES:  Okay, and Count Ten is Government

12   Exhibit 198-53E.  It's a June 12, 2014 telephone call from

13   Discala to Marc Wexler discussing, among things, the

14   manipulation of Cubed stock.  There are two excerpts in

15   evidence.  The first one goes from a second 23 to three

16   minutes and 52 seconds, and the second one is from a minute

17   812 to ten minutes and zero five seconds.

18             (Audio recording played.)

19             THE COURT:  All right, ladies and gentlemen,

20   those --

21             MS. JONES:  Your Honor, we have -- I'm sorry,

22   there's still an excerpt that hasn't been played yet.

23   Actually it's a very short one and then it would pick up

24   again.

25             We have two more excerpts to play.  Eight minutes

PROCEEDINGS                                    3860

1    and 12, first excerpt.

2              (Audio recording played.)

3              MS. JONES:  827.

4              (Audio recording played.)

5              MS. JONES:  That's the end of that call.

6              THE COURT:  Now, thank you, Ms. Jones.

7              Ladies and gentlemen, that completes the excerpts we

8    think you wanted.  If there's something else, please let us

9    know, otherwise we'll send you back to the jury room for

10   another 15 or 20 minutes to continue your deliberations and

11   we'll catch up with you after that.

12             (Jury exits the courtroom.)

13             THE COURT:  See you in another 20, unless we get

14   another note.

15             (Whereupon, a recess was taken at 6:39 p.m.)

16             THE COURTROOM DEPUTY:  All rise.  Court is back in

17   session.

18             Counsel for both sides are present, including

19   defendants.

20             THE COURT:  We received a note from the jury which

21   is marked as Court's Exhibit Number 4, which the clerk will

22   read.

23             (Court Exhibit 4, was received in evidence.)

24             THE COURTROOM DEPUTY:  Your Honor, we're at a good

25   stopping break.  Is it okay if he we return at 9:45 a.m.

PROCEEDINGS                           3861

1    tomorrow.  Signed by William Williamson.

2              THE COURT:  Sounds like a plan.

3              Fetch the jury.

4              (Jury enters the courtroom.)

5              THE COURT:  Be seated, please.

6              Counsel will stipulate the jury is present and

7    properly seated.

8              MS. JONES:  Yes, Your Honor.

9              MR. ROSS:  Agreed, Judge.

10             THE COURT:  Thank you, counsel.

11             Ladies and gentlemen, we have gotten your note and

12   it certainly is a wonderful time to break, and we shall do

13   that.  We concur in your suggestion that you return at

14   9:45 tomorrow morning.

15             Report to the central jury room.  When all 12 of you

16   are here, the marshal or William will bring you up and you can

17   return to the jury room and you can go directly back to your

18   deliberations and we'll look forward to hearing from you

19   thereafter.

20             Our plan will be, again, there's certainly no time

21   limit on what you have to do.  What you have to do is very

22   important.  There is no time limit.  We will work a regular

23   day.

24             To the extent you still haven't completed your

25   deliberations, for your planning purposes, we will not be in

PROCEEDINGS                              3862

1   session on Monday and Tuesday, but we would return on

2   Wednesday, in case you have to advise any employers of what

3   planning is.

4            So, again, we appreciate your attention, your

5   patience, your sacrifice.  And you are not discuss the case

6   amongst yourselves, because as you heard in my instructions,

7   even though you're a deliberating jury, the only place you can

8   discuss the case is when all 12 of you are in the jury room

9   and under the custody of the marshals.  Even though you're

10  deliberating now, you're not to discuss the case with your

11  fellow jurors or with anyone else.

12           Again, to the extent there are any media accounts of

13  this case, you're directed to disregard them.  I urge you to

14  disregard the accounts of any courts proceedings via possible

15  confusion about what your responsibilities are here.

16           You are not to do any legal research about anything

17  that touches on the case, any of the personalities, the laws,

18  the issues.

19           And, again, if you on social media or any other form

20  of communication, you are on radio silence.  Don't mention the

21  fact that you are juror or you come to the courthouse or

22  anything that remotely touches upon the case.

23           Again we appreciate your service and we look forward

24  to seeing you tomorrow.  Have a pleasant evening.

25           (Jury exits the courtroom.)

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

3863

1          THE COURT:  Okay, our plan, for counsel and the

2     whole bunch of you, I have a relatively full calendar

3     tomorrow.  Sadly, Judge Townes' courtroom is available, so if

4     we can work it out, what I will try to do is call my regular

5     calendar in Judge Townes' courtroom, this way all of you can

6     continue to do whatever it is that you have to do without

7     being disturbed in this courtroom.

8          (Discussion was had off the record.)

9          THE COURT:  We're not sure, but we're trying to do

10    that between now and tomorrow morning.

11          Other than that, we will see you in the morning.

12

13                    *     *     *     *     *

14          (Proceedings adjourned at 7:10 p.m. to resume on

15    May 4, 2018 at 9:45 a.m.)

16

17                         I N D E X

18

      SUMMATION              BY MR. RIOPELLE    3662
19
      REBUTTAL SUMMATION     BY MS. JONES       3729
20
      JURY CHARGE                               3771
21                         E X H I B I T S

22    COURT                      PAGE
      3                          3856
23    4                          3860

24

25

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*