2274

1             UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK
2    - - - - - - - - - - - - - - X
      UNITED STATES OF AMERICA,    :    14-CR-00399(ENV)
3                                  :
                                   :
4                                  :    United States Courthouse
          -against-               :    Brooklyn, New York
5                                  :
                                   :
6                                  :    April 23, 2018
                                   :    10:00 a.m.
7      ABRAXAS J. DISCALA, ALSO    :
       KNOWN AS AF DISCALA, AND    :
8      KYLEEN CANE,                :
9          Defendant.
      - - - - - - - - - - - - - - X
10
          TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
11           BEFORE THE HONORABLE ERIC N. VITALIANO
            UNITED STATES SENIOR DISTRICT JUDGE
12
13                  A P P E A R A N C E S:

14   For the Government:      RICHARD P. DONOGHUE, ESQ.
                              Acting United States Attorney
                              Eastern District of New York
15                            271 Cadman Plaza East
                              Brooklyn, New York 11201
16
                        BY:  SHANNON JONES, ESQ.
17                           MARK BINI, ESQ.
                             PATRICK HEIN, ESQ.
18                           Assistant United States Attorneys
19
     For the Defendant:      CHARLES A. ROSS & ASSOCIATES, LLC
20   (Discala)               111 Broadway
                             New York, New York 10006
21
                        BY:  CHARLES A. ROSS, ESQ.
22                           MATTHEW SHROYER, ESQ.
23
                             ANDREW B BOWMAN, ESQ.
24                           1804 Post Road East
                             Westport, Connecticut 06880
25

2275

A P P E A R A N C E S: (Continued)

CHENG LAW FIRM
    15155 Gale Avenue - Suite D
    Whittier, California 90603

BY:  HANWEI CHENG, ESQ.

For Defendant:          SERCARZ & RIOPELLE LLP
(Cane)                      810 Seventh Avenue - Suite 620
                            New York, New York 10019

BY:  RONALD G. RIOPELLE, ESQ.
     ROBERT CALIENDO, ESQ.

Court Reporter:         Denise Parisi, RPR
                        Official Court Reporter
                        United States Courthouse
                        225 Cadman Plaza East
                        Brooklyn, New York 11201
                        Telephone: (718) 613-2605
                        E-mail: DeniseParisi72@gmail.com

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

                *    *    *    *    *

        (In open court; jury not present.)

        THE COURTROOM DEPUTY:  All rise.

        The Court is now open.  The Honorable Eric N.
Vitaliano is presiding.  The case on the calendar is USA
versus Discala and Cane, Case No. 14-CR-399 on for a jury
trial.

        Would attorneys please note their appearances
beginning with Government counsel.

        MS. JONES:  Shannon Jones, Mark Bini, and Patrick

Proceedings                                    2276

1   Hein for the United States, along with Henry Ishitani and FBI

2   Special Agent Elyse Morris.

3          THE COURT:  Good morning.

4          MR. ROSS:  Good morning, Judge.  Charles Ross,

5   Matthew Shroyer, and Scott Schwartz for Mr. Discala.

6          THE COURT:  Good morning.

7          MR. BOWMAN:  Good morning, Your Honor.  Andrew

8   Bowman for Mr. Discala.

9          MR. CHENG:  Good morning, Your Honor.  Hanwei Cheng

10  for Mr. Discala.

11         MR. RIOPELLE:  Good morning, Your Honor.  Roland

12  Riopelle and Robert Caliendo for Kyleen Cane this morning.

13         THE COURT:  Good morning.

14         THE COURTROOM DEPUTY:  Counsel for both sides are

15  present, including defendants.

16         THE COURT:  All right.  Good morning, all.  The jury

17  is not entirely here yet.  A lot of them are here, but not all

18  of them.

19         We do have one issue with respect to Juror No. 10.

20  She had put us on alert at the end of last week that the

21  grandmother who was caring for her year-and-a-half-old son

22  while she's been with us for the last three weeks has been

23  hospitalized, so caregiver is no longer available.  She tried

24  to make, at our urgent, other arrangements unsuccessfully, so

25  she cannot be with us today or in the near future, for that

Proceedings                                          2277

1    matter, so the Court has excused Juror No. 10.  We are simply

2    waiting on another juror since there seemed to be an awful lot

3    of letters in the alphabet soup this morning that were

4    scrambled by the Transit Authority, so we assume that there's

5    nothing untoward there other than fighting their way into the

6    courthouse, so we'll keep you posted on that.

7              William advises me that there are some other

8    housekeeping matters that need to be attended, so we figured

9    we would come down early before the jury is here to accomplish

10   those things, to the extent that we can.

11             MS. JONES:  Yes, Your Honor, there are a couple

12   of -- there is a motion in limine by both sides.

13             THE COURT:  By both sides.  I understand that there

14   are in limine's that have been received over the weekend that

15   we haven't looked at but that are un-responded to in writing

16   by the opposite side.

17             MS. JONES:  I think --

18             MR. RIOPELLE:  Yes.  The Government filed its motion

19   last night, Your Honor, after I left my office, so --

20             THE COURT:  Right.  It's very simply this:  To the

21   extent that it doesn't involve the witness, witnesses we

22   anticipate hearing from today, until opposite sides have had a

23   chance to respond in writing, we will wait.  To the extent

24   that we have something that relates to today or something

25   other than those two in limine's that were filed over the

Proceedings                           2278

1   weekend, then we can take them up now.

2          MR. BINI:  Your Honor, we can wait -- this is Mark

3   Bini for the Government -- but Mr. Hein filed ECF No. 594,

4   which relates to Marche Godfrey and Constantine Voulgaris, who

5   we'd anticipate tomorrow, so if we have the opportunity to

6   argue that either at the end of the day or tomorrow morning

7   after -- that is briefed, because I think the motions have

8   been --

9          THE COURT:  By the both sides?

10          MR. HEIN:  Yes, Your Honor.

11          MR. BINI:  Yes.

12          MR. RIOPELLE:  Not the Marche Godfrey, but I can

13   say, Your Honor, they are seeking to preclude

14   cross-examination on ancient criminal convictions of

15   Mr. Godfrey.  I don't anticipate a need to cross examine him

16   on those.  We have, in fact, moved in limine to preclude his

17   testimony altogether, as it is cumulative, so that will need

18   to be resolved before he takes the witness stand, but I

19   understand he won't get on until tomorrow, at the earliest.

20          THE COURT:  Is he a victim?

21          MR. RIOPELLE:  Yes, he is -- well, no.  He is a

22   Northwest Resources shareholder who never met even Joe

23   Laxague, let alone Kyleen Cane.  He is simply someone who was

24   apparently induced to make an investment in Northwest

25   Resources by a fellow named Gary Scoggins, I think he was

Proceedings                                    2279

1    given $40 or something to do it, but never dealt, I don't

2    believe, with Joe Laxague, and certainly not with my client.

3    We've heard a lot about Northwest Resources already.  It is my

4    view that this is cumulative and unnecessary.

5              MR. HEIN:  And, Your Honor, just on that note, with

6    respect to Mr. Godfrey, this witness at issue, Your Honor

7    previously held, in your March 19, 2018, order, that his

8    testimony is admissible, so this was already briefed in a

9    prior motion in limine and Your Honor had that as admissible.

10             Furthermore --

11             MR. RIOPELLE:  That's not accurate, Your Honor, but

12   I will respond when I get my chance.

13             MR. HEIN:  Well, it appears that we're, to some

14   degree, arguing now, and I think that's fine, Your Honor.  We

15   did brief it yesterday, but just to cite more specifically,

16   it's ECF 539.  This is Your Honor's March 19, 2018, order on

17   page 14 in which Your Honor stated, and I quote:  As the

18   Government asserts, the testimony is probative and goes to the

19   heart of whether Cane controlled free-trading stock held in

20   the name of others.  The proposed testimony from Edgerton

21   Godfrey -- and that's the witness at issue here, Your Honor --

22   Scoggins, and Washington is relevant and probative of Cane's

23   place in the Cubed scheme.  The testimony is not, as the

24   Government correctly observes, unfairly prejudicial.  Cane's

25   motion to preclude their testimony is denied.

Proceedings                                         2280

1          And as we note in our response to this seventh

2    motion in limine from Cane, this testimony expected from

3    Mr. Godfrey is also not cumulative.  Mr. Edgerton and

4    Mr. Smith testified previously.  Mr. Smith testified that Joe

5    Laxague, a lawyer at Cane Clark, had paid him to find sham

6    investors in Northwest Resources.  Mr. Smith also testified

7    that he had sought his barber, Gary Scoggins, to also recruit

8    investors.

9          Mr. Edgerton testified that he had been paid to

10   become a sham CEO of the company.  Mr. Godfrey is one of the

11   investors that the barber, Carey Scoggins, recruited; and why

12   his testimony is highly relevant and not cumulative is that he

13   is, of the three of them -- Smith, Edgerton, and Godfrey --

14   the only one who signed up for free-trading shares, and those

15   free-trading shares he never received, he never received a

16   stock certificate for them.  It's those free-trading shares

17   that Ms. Cane controlled, and, as we've already shown through

18   evidence with the JPMorgan Chase witness, transferred to trade

19   on the open market.

20         So he is different from Smith and Edgerton and is an

21   important witness.

22         THE COURT:  We will take a look at it.  As I

23   understand Mr. Riopelle's argument, he accepts everything

24   except you say it's cumulative.

25         MR. RIOPELLE:  That's correct.  That's our argument

Proceedings                                    2281

1   now.  Our argument before --

2            THE COURT:  It would not be -- I don't think

3   anything you are arguing now is contradictory to my March 19th

4   order.

5            MR. RIOPELLE:  That's exactly correct.

6            THE COURT:  He's raising the -- now that we've

7   heard -- sum and substance, we've heard the other fellows, now

8   it's cumulative, he says.

9            MR. RIOPELLE:  That's the argument, Your Honor,

10  you're right, and it was not argued before.

11           THE COURT:  Ben and I will take a look at it.

12           MR. RIOPELLE:  Thank you, Judge.

13           MR. BINI:  Thank you, Your Honor.

14           THE COURT:  Anything else?

15           MR. BINI:  No, Your Honor.

16           MR. RIOPELLE:  There are motions about the summary

17  witness they want to call, but that's -- again, he's not on

18  until tomorrow.

19           THE COURT:  Right.

20           Now we will find out -- you can sit down.  I don't

21  know who is here yet.

22           (Pause in proceedings.)

23           THE COURT:  We have reason to believe the jury is

24  here, we believe.

25           Mr. Wexler will be on the stand?

1          MS. JONES:  Yes.  We can put him on whenever --

2          THE COURT:  I know you want to test my memory,

3    Ms. Jones, but I think you said you had 15 minutes left.

4          MS. JONES:  About that.  I mean it.

5          THE COURT:  Did it grow over the weekend?

6          MS. JONES:  No, it did not.

7          THE COURT:  Okay.  Be true to your word.  You know I

8    can't see the clock.

9          (Pause in proceedings.)

10         THE COURT:  The jury is present in the courthouse.

11   They will be coming up, they're in the back, and so we might

12   as well get Mr. Wexler while Mr. Villanueva fetches the jury.

13         MS. JONES:  Your Honor, I think we need, like --

14   we're having a technical issue.  We need, like, a minute to --

15   so we can get everything up and working.

16         THE COURT:  Do you want him to hold the jury up?

17   What do you think?

18         MS. JONES:  I think that -- you know what, I think I

19   can -- I'm just going to use the ELMO, Your Honor.

20         THE COURT:  You can go?

21         MS. JONES:  Yes.

22         THE COURT:  Remember we used to do this without

23   ELMOs and computers and stuff?

24         MR. BINI:  We're spoiled, Judge.

25         THE COURT:  Apparently.

1          You got more exercise walking back and forth to the

2     witness stand, the more sedentary litigation style.

3          (Jury present.)

4          (Witness resumes stand.)

5          THE COURT:  Be seated, please.

6          Counsel will stipulate that the jury is present and

7     properly seated.

8          MS. JONES:  Yes, Your Honor.

9          MR. SHROYER:  Agreed, Your Honor.

10         MR. RIOPELLE:  So stipulated.

11         THE COURT:  Thank you, Counsel.

12         Ladies and gentlemen, welcome back.  We're ready to

13    start our fourth week of trial.  We, again, appreciate your

14    continued sacrifice, your patience, and cooperation.  We are

15    going to resume this morning with Mr. Wexler taking the stand

16    again.

17         Mr. Wexler, I remind you you are still under oath.

18    We are still on direct examination by Ms. Jones, and Ms. Jones

19    may proceed.

20         MS. JONES:  Thank you, Your Honor.

21    DIRECT EXAMINATION

22    BY MS. JONES:

23    Q    Good morning, Mr. Wexler.

24    A    Good morning.

25    Q    Mr. Wexler, I would like to show --

1           MS. JONES:  I would like to show the witness what's

2   been marked for identification Government Exhibit 179-30 using

3   the ELMO.

4           THE COURTROOM DEPUTY:  It should be ready.  Is this

5   in evidence?

6           THE COURT:  Is it in evidence, Ms. Jones?

7           MS. JONES:  Not yet.

8           THE COURTROOM DEPUTY:  Okay.

9   Q    Mr. Wexler, do you see the exhibit number?

10  A    Yes.

11  Q    And the Bates numbers?

12  A    Yes.

13  Q    And this is the first page, the second page, the third

14  page, and the fourth page.

15          Do you recognize these documents?

16  A    Yes.

17  Q    And what are they?

18  A    They are FedEx receipts for ship -- for delivery to

19  shareholders, checks from distribution from Mr. Wilson's

20  office.

21  Q    And where did these FedEx slips come from?

22  A    My records.

23          MS. JONES:  Governments moves 179-30 into evidence.

24          THE COURT:  Any objection?

25          MR. BOWMAN:  No objection.

Wexler - Direct - Jones                          2285

1          MR. RIOPELLE:  No objection.

2          THE COURT:  Received in evidence without objection.

3          (Government's Exhibit 179-30 marked in evidence.)

4          MS. JONES:  Your Honor, may I publish?

5          THE COURT:  You may publish.

6          (The above-referred to exhibit was published.)

7    Q    So, Mr. Wexler, looking at this first page here, what is

8    Schulman Lobel?

9    A    That's the name of the office of my accountant or the

10   accountant who did the distributions through Titan.

11   Q    And the ship date on this particular FedEx is?

12         MR. RIOPELLE:  Judge, my screen is not on.  Can we

13   have this on so I can follow along?  Is there a way to turn

14   that on?

15         THE COURTROOM DEPUTY:  Do the jurors have it on?

16         THE JURY:  Yes.

17         MR. RIOPELLE:  Thank you.

18         THE COURT:  Monday is always exciting.

19   A    June 25th, 2014.

20   Q    Okay.  And who is Clifton McDonnell, if you know?

21   A    I don't particularly recall him individually.

22   Q    Okay.

23         Mr. Wexler, on this last FedEx here, do you know

24   either Bryan or Kelly Hagen?

25   A    I recall the names.

Wexler - Direct - Jones                    2286

1    Q    And what do you recall about them?

2    A    As being shareholders in the escrow account.

3    Q    I would like to show the witness Government

4    Exhibit 129-69, which is in evidence.

5              Mr. Wexler, we are back to text messages from

6    Ms. Cane's cell phone.

7              Can you read the date, the direction, and the text?

8    A    July 16, 2014, from Ms. Cane to myself:  Are you coming

9    in today?

10   Q    And what did you respond?

11   A    Yes.  Later flight.

12   Q    Again, can you read the direction, the date, and the

13   text?

14   A    July 16th, 2014, from Ms. Cane to myself:  When do you

15   arrive?

16   Q    And the response from you?

17   A    7:00, 7:20, not exactly -- not exact.  My tickets in car

18   heading to airport in hour.

19   Q    And, again, the direction, the date, and the text.

20   A    7/16/2014 from myself to Ms. Cane:  Kyleen, we're

21   scheduled for 7:20 arrival.

22   Q    And her response to you?

23   A    7/16/14, we are having a barbecue in your honor at 6:00.

24   Q    And the next text from her to you.

25   A    7/16/2014:  LOL.

1   Q    Mr. Wexler, did you fly to Las Vegas on July 16, 2014?

2   A    Yes.

3   Q    Did you see Ms. Cane that night?

4   A    Yes.

5   Q    Did you have an opportunity to have a substantive

6   conversation or not?

7   A    No.

8   Q    Was it just a party?

9   A    Correct.

10  Q    What happened on July 17, 2014?

11  A    We were arrested and charged.

12  Q    When you were arrested, where were you?

13  A    In Las Vegas in the hotel.

14  Q    Were you by yourself or were you with anyone else?

15  A    I was accompanied by Mr. Discala.

16  Q    And were you both arrested at the same time?

17  A    Yes.

18  Q    Later that day, did you see Ms. Cane at the court

19  proceedings?

20  A    Yes.

21  Q    Had she been arrested also?

22  A    I believe so, yes.

23  Q    Mr. Wexler, other than the securities and -- other than

24  the charges in this case, have you ever been arrested before?

25  A    No.

Wexler - Direct - Jones                    2288

1  Q    Have you been involved in any other criminal conduct?

2  A    Yes.

3  Q    What has that -- what is that other conduct?

4  A    Illegal gambling.

5  Q    During what time period were you involved in illegal

6  gambling?

7  A    Various times between 2002 and 2014.

8  Q    When you say "illegal gambling," what do you mean?

9  A    Like, through a bookie.

10 Q    Anything else?

11 A    Illegal drug abuse.

12 Q    What kind of drugs?

13 A    Unprescribed painkillers.

14 Q    During what time period?

15 A    2012 and 2014.

16 Q    And anything else?

17 A    Solicited prostitution.

18 Q    During what time period?

19 A    2012 to 2014.

20 Q    Approximately how many times?

21 A    One.

22 Q    Mr. Wexler, did you enter a guilty plea pursuant to

23 written agreement with the Government?

24 A    Yes, I did.

25        MS. JONES:  Your Honor, may I approach?

1           THE COURT:  You may.

2   A    Thank you.

3   Q    Mr. Wexler, is that your plea agreement?

4   A    It's my cooperation agreement.

5   Q    And did you sign it on the last page?

6   A    Yes.

7           MS. JONES:  Your Honor, the Government moves this

8   document into evidence.

9           THE COURT:  Any objection?

10          MR. RIOPELLE:  No objection, Your Honor.

11          MR. BOWMAN:  No objection.

12          MR. RIOPELLE:  What was the exhibit number?

13          MS JONES:  I need to take it back to look at it.

14          It's 179-60.

15          Your Honor, may I accomplish?

16          MR. RIOPELLE:  Thank you.

17          THE COURT:  Received and you may publish.

18          (Government's Exhibit 179-60 was received in

19  evidence.)

20          (The above-referred to exhibit was published.)

21  Q    Mr. Wexler, what is the date of this agreement?

22  A    October -- October 15, 2014.

23  Q    Is that when you entered your guilty plea?

24  A    Yes.

25  Q    Does this document contain the entirety of your agreement

1    with the Government?

2    A    Yes.

3    Q    And what do you understand you have to do under the terms

4    of this agreement?

5    A    First and foremost is tell the truth, hand over any of my

6    personal documents regarding the case, be available for trial

7    at any time, and to meet with the prosecution team when

8    necessary.

9    Q    And if you comply with the terms of cooperation

10   agreement, what has the Government agreed to do in exchange?

11   A    Potentially reduce my sentence.

12   Q    By -- what's the mechanism for that to happen?  What does

13   the Government -- if you comply with the terms of the

14   Government, what does the Government agree to do?

15   A    To analyze my cooperation.

16   Q    And do what?

17   A    And decide at sentencing what my sentence will be.

18   Q    I'm sorry, who decides what your sentence will be?

19   A    The judge.

20   Q    Has anyone made you any promises in terms of what your

21   sentence will be?

22   A    No.

23   Q    And what does the Government tell the judge about your

24   cooperation, if you've complied with the terms of your

25   agreement?

1   A    They provide a 5K letter that describes my involvement
2   and my cooperation.
3   Q    Does the Government make any recommendation as to what
4   your sentence will be?
5   A    No.
6   Q    Has anyone made you any promises about what your sentence
7   will be?
8   A    No.
9   Q    Under your cooperation agreement, have you also agreed to
10  a forfeiture judgment?
11  A    Yes.
12  Q    And you also agreed to forfeit certain bank accounts and
13  brokerage accounts?
14  A    Yes.
15  Q    Have you paid the entire amount due under your forfeiture
16  money judgment?
17  A    No.
18  Q    Why not?
19  A    I haven't been able to afford to.
20  Q    What's your current net worth?
21  A    My liquid net worth is zero.
22  Q    What happened to the money that you had when you started
23  this?
24  A    The majority of it was lost during this involvement and
25  some investments, including the Retina, which I had to

Wexler - Cross - Bowman                          2292

1  continue to fund, which failed, and to continue to support my

2  family as best as I could.

3  Q     What happened to your Morgan Stanley accounts?

4  A     They were frozen.

5  Q     What happened to your bank account?

6  A     Frozen.

7  Q     By who?

8  A     The Government.

9           MS. JONES:  No further questions at this time.

10          THE COURT:  Thank you, Ms. Jones.

11          Any cross?

12          MR. BOWMAN:  Yes, Your Honor.

13          THE COURT:  It's going to be Mr. Bowman?

14          MR. BOWMAN:  Thank you, Your Honor.

15          THE COURT:  And for Mr. Discala, it's Mr. Bowman.

16  CROSS-EXAMINATION

17  BY MR. BOWMAN:

18  Q     Good morning, Mr. Wexler.  My name is Andrew Bowman.  I

19  represent Mr. Discala.

20          How was your 1.4 million forfeiture arrived at?  Do

21  you know?

22  A     I believe that it was the net gains on the CodeSmart, the

23  first stock that we traded, I-10.

24  Q     Have you ever reviewed any of the profit computations

25  that the Government has made with respect to your investments?

Wexler - Cross - Bowman                                2293

1   A    Nothing any time but years ago.

2           MR. BOWMAN:  All right.  May I have 195-3, please?

3           (Pause in proceedings.)

4           MR. BINI:  Our computer is not working.

5           MR. BOWMAN:  Can we switch monitors?

6   Q    Can you see that, Mr. Wexler?

7   A    Yes.

8   Q    All right.  Now, you've never seen it before.  Can you

9   see that the screen shows profit and loss for I-10?  That's

10  CodeSmart.

11          Do you see that?

12  A    Yes.

13  Q    Tell us what the profit is in CodeSmart.

14  A    $1,645,971.69.

15  Q    Go to the bottom.  What is the figure at the bottom?

16  A    $2,236,340 -- I'm sorry.  $2,236,343.42.

17  Q    And for TSGL?

18  A    $50,298.74.

19  Q    And for SSET?

20  A    $289,721.52.

21  Q    And for CRPT?

22  A    $808.92.

23          MR. BOWMAN:  Can we move the screen over, please?

24  Q    What's the total profit from all four -- trading in all

25  four companies?

Wexler - Cross - Bowman                          2294

1    A      $2,575,554.76.

2    Q      All right.  What is I-10?

3    A      I-10 is CodeSmart.

4    Q      What is TSGL?

5    A      It's a stock, The Safety Group.

6    Q      Staffing Group?

7    A      Staffing Group, I'm sorry.

8    Q      SSET?

9    A      StarStream.

10   Q      And CRPT?

11   A      Cube.

12   Q      So you made a total of $2,575,000 trading in all four

13   companies; is that correct?

14   A      I'm not sure where this document comes from; I'm not sure

15   who put it together.

16   Q      Well, it was a document that was compiled by --

17              MS. JONES:  Objection.

18              THE COURT:  Sustained.

19   Q      You don't dispute that you had profit in the amount of

20   $2.5 million, do you, from trading in all four companies?

21   A      Yes, I do.

22   Q      And, your dispute is that you didn't make $2.2 million in

23   CodeSmart?

24   A      I'm not sure this reflects initial investments into the

25   company.

Wexler - Cross - Bowman                    2295

1   Q    Well, if I were to ask you simply, does it reflect your

2   profit from trading in CodeSmart --

3            MS. JONES:  Objection.

4            THE COURT:  That number, that amount.

5            MR. BOWMAN:  Yes.  $2.2 million.

6            THE COURT:  Without respect to the chart, is that

7   what you made in trading in CodeSmart?

8            THE WITNESS:  Well, net profit, from my

9   understanding, means including my cost, so I think it may be

10  more of a gross profit number, but I'm not sure.

11  Q    Can you see the chart, sir?  Does it say net profit at

12  the top?

13  A    Yes.

14  Q    All right.  So as I understand your testimony, you are

15  disputing the $2.2 million profit number for CodeSmart?

16  A    I didn't say I was disputing.  I said just looking at

17  these numbers, I cannot tell if my costs are in these numbers

18  as well.

19  Q    Do you know what profit is --

20  A    Yes.

21  Q    -- simply?

22            What is it, Mr. Wexler?

23  A    That's the amount of money made from revenues minus

24  expenses.

25  Q    All right.  So it's gains minus losses; is that fair to

Wexler - Cross - Bowman                    2296

1   say?

2   A    Correct.

3   Q    So profit would include your gains and losses, wouldn't

4   it?

5   A    That's correct.

6   Q    But the amount that you agreed to forfeit was only

7   1.4 million; is that true?

8   A    Yes.

9   Q    Not 2.5 million.

10  A    That's correct.

11  Q    Did you think you'd receive some kind of a benefit from

12  the Government when they --

13  A    No.

14  Q    Let me finish my question.

15  A    Sorry.

16  Q    Did you think you received a benefit from the Government

17  when you only were required to forfeit $1.4 million?

18  A    No, sir.

19  Q    When did you first meet Mr. Discala?

20  A    I recall meeting Mr. Discala in the summer of 2012.

21  Q    And how did you meet him?

22  A    My partner from Skinny Cow Ice Cream and Jala Ice Cream

23  had kind of introduced me to him.

24  Q    Who was your partner?

25  A    Sam Pugliese.

Wexler - Cross - Bowman                    2297

1    Q    Who else was involved in Jala?

2    A    Myself, Sam Pugliese, and David Wolfson.

3    Q    Was Joe Rienzi involved?

4    A    After I resigned.

5    Q    Now, what was Jala?

6    A    Jala was a probiotic ice cream brand that we started.

7    Q    And what year did you start it?

8    A    Approximately 2010.

9    Q    Had you ever been in the ice cream business before?

10   A    Yes.

11   Q    And what was that?

12   A    Silhouette Brands incorporated in 1992.  It was an ice

13   cream company that -- we branded Skinny Cow ice cream.

14   Q    What was Skinny Cow?

15   A    Skinny Cow was a ice cream product that was low calorie,

16   low fat.

17   Q    And who was your partner there?

18   A    Sam Pugliese.

19   Q    Same gentleman who you became involved with Jala?

20   A    Yes.

21   Q    Now, how did you initially fund Skinny Cow?

22   A    Skinny Cow was funded by ourselves and one family member

23   lent us money to start.

24   Q    And did Skinny Cow ever go public?

25   A    Skinny Cow went public, yes.

Wexler - Cross - Bowman                    2298

1   Q    And what were the terms of the public offering?

2   A    It was a 504 offering, raise of up to a million dollars,

3   non-SEC reporting.

4   Q    Did you have to give away part of your company to the

5   entity that lent you money?

6   A    Yes.

7   Q    How much of your company did you give away?

8   A    Approximately 42 percent of the company.

9   Q    So how long were you in business with Skinny Cow?

10  A    From 1990, incorporated in 1992, sold the company in 2002

11  and had a consulting agreement for two years to 2004.

12  Q    Where was Skinny Cow marketed?

13  A    Across the country.

14  Q    And who did you eventually sell?  I guess it was

15  Silhouette Brands; is that right?

16  A    Yes.

17  Q    That was -- and Skinny Cow was the trade name.

18  A    Yes.

19  Q    And who did you sell it to?

20  A    Nestlé.

21  Q    For how much money?

22  A    Approximately 75 million.

23  Q    And how much of that 75 million did you net?

24  A    Personally or as --

25  Q    Personally.

Wexler - Cross - Bowman                                    2299

1   A    -- as a partner?

2   Q    Personally.

3   A    Approximately 14 to 15 million after tax.

4   Q    So you were able to put between 14 and 15 million in your

5   pocket?

6   A    Yes.

7   Q    So subsequently you became involved with Jala; is that

8   right?

9   A    Yes, sir.

10  Q    Another ice cream venture.  And this was with

11  Mr. Pugliese?

12  A    Yes.

13  Q    And who was Dave Wolfson?

14  A    Dave Wolfson was our accountant in Skinny Cow from day

15  one, and we had a continued relationship with him throughout

16  the years after selling Skinny Cow and starting into Jala.

17  Q    And, in fact, you had a continuing relationship with

18  Mr. Wolfson right through Cubed, correct?

19  A    That's correct.

20  Q    And he was your accountant?

21  A    He was my personal accountant until 2014, and he was the

22  company's accountant with Jala and Skinny Cow, as well as

23  another company that we bought on his advice.

24  Q    All right.  So you became involved with Jala and you

25  became the CEO and the chairman; is that true?

1   A    Yes.

2   Q    And how long were you with Jala?

3   A    Approximately two and a half years.

4   Q    And when did you leave Jala?

5   A    I don't recall the exact date of my resignation, but I

6   believe it was 2013.

7   Q    And why did you leave Jala?

8   A    Multiple reasons.  The main reason being that I wasn't

9   getting along with my partner at that point.

10  Q    Were you afraid that they were doing something illegal?

11  A    No.

12  Q    Did you ever e-mail Mr. Discala and say to him:  These

13  guys are really getting dangerously close to an SEC shutdown?

14  A    Possibly.

15  Q    Well, you are not denying you sent hem that e-mail, are

16  you?

17  A    I don't have it in front of me, I don't know, but it is

18  possible.

19          MR. BOWMAN:  May I, Your Honor?  May I approach?

20          THE COURT:  Yes.

21          MR. BOWMAN:  (Handing.)

22  Q    Take a look at the second page, Mr. Wexler.

23          THE COURT:  Is there an exhibit number on that,

24  Mr. Bowman?

25          MR. BOWMAN:  There isn't yet, Your Honor.  It would

1   be, I think, G -- GA.

2              MS. JONES:  Your Honor, may we have a sidebar?

3              THE COURT:  Sure.

4              (Sidebar.)

5              (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                        Sidebar                        2302
```

1           (Sidebar conference held on the record out of the

2    hearing of the jury.)

3           MS. JONES:  Your Honor, we don't have -- I don't

4    want to argue in front of the jury.  We don't have any

5    objection if he wants to use this to refresh his recollection,

6    but if he's going to try to move it into evidence, we're going

7    to object on the grounds that it's hearsay.

8           THE COURT:  It is.

9           MS. JONES:  Okay.

10          (Sidebar concludes.)

11          (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Wexler - Cross - Bowman                     2303

1    BY MR. BOWMAN:

2    Q    Mr. Wexler, does that refresh your recollection --

3    A    Yes.

4    Q    -- as to whether you e-mailed Mr. Discala?

5    A    Yes.

6    Q    And you did e-mail him and say, These guys are really

7    getting dangerously close to an SEC shutdown?

8    A    Yes.

9    Q    And you wanted out.

10   A    I wanted out, yeah.

11   Q    Okay.

12            And, subsequently, did you eventually resign?

13   A    Yes.

14   Q    Do you remember when you resigned?

15   A    Not exactly.

16   Q    Well, if this e-mail was March 15, 2013, was it close in

17   time to this e-mail?

18   A    It seems like it, yes.

19   Q    So it would have been in March of 2013.

20   A    Around that time in 2013.

21   Q    Now, had Mr. Scala ever been involved in any way with

22   Jala?

23   A    At the beginning when I first met him, we discussed

24   raising money for Jala.

25   Q    And, in fact, did Omniview spend time and effort trying

Wexler - Cross - Bowman                    2304

1   to present to you a way in which money could be raised for
2   Jala?
3   A    I'm not sure what they spent or didn't spend.
4   Q    Was there a company who you eventually went forward with
5   in terms of funding Jala?
6   A    I wasn't involved in Jala when they took the company
7   public.  I hadn't been working with Jala at that point.
8   Q    Did you know that Omniview was involved?
9   A    No.
10  Q    Then why were you e-mailing Mr. Discala about getting
11  out?
12  A    Because I was telling Mr. Discala what I was doing with
13  Jala?
14  Q    And that was because he had previously spoken to you
15  about raising money for Jala?
16  A    In that summer, he had spoken to me about that, yes.
17          THE COURT:  Being 2012?
18          THE WITNESS:  Yes, sir.
19  Q    All right.  So in the end, do you know whether there was
20  a settlement agreement between Omniview and Jala with respect
21  to time and effort spent by Omniview on trying to raise money
22  and propose a way to raise money from Omniview to Jala?
23  A    Not that I was aware of.
24  Q    How long after March of 2013 did you begin to discuss
25  CodeSmart with Mr. Discala?

Wexler - Cross - Bowman                           2305

1   A    Our discussions regarding CodeSmart started way earlier
2   than that in the summer of 2012.
3   Q    And where were you when you had these discussions with
4   Mr. Discala in the summer of 2012 with respect to CodeSmart?
5   A    I first met Mr. Discala in 2012 in that summer at
6   Mr. Wolfson's office regarding a potential capital raise for
7   Jala and a stock photography company that we invested in
8   called Retina.  Soon after that died down, there were phone
9   conversations regarding potential to invest in CodeSmart.
10  Q    Was it a company that you felt had potential financially?
11  A    I thought if they had -- were able to raise money, that
12  it might have potential.
13  Q    So when was it that you first had a meeting with
14  Mr. Discala and others regarding the potential for your
15  investing in CodeSmart?
16  A    I recall my first contact regarding specifically just
17  CodeSmart was via phone in the summer, early fall 2012.
18  Q    Do you recall ever meeting somebody by the name of Darren
19  Ofsink?
20  A    Yes.
21  Q    And who is Darren Ofsink?
22  A    Darren Ofsink was an attorney that Mr. Discala introduced
23  me to.
24  Q    And the first -- the first time you ever met Mr. Ofsink
25  was when Mr. Discala made the introduction?

1  A    Can you repeat, please?

2  Q    The first time you ever met Mr. Ofsink was when

3  Mr. Discala made the introduction?

4  A    From what I recall, yes.

5  Q    And where was that?

6  A    In Mr. Ofsink's office.

7  Q    And do you recall when that was?

8  A    Not specifically.

9  Q    Was it in March of 2013?

10  A    It was before then.

11  Q    February?

12  A    We had our first meeting at Mr. Ofsink's office, I

13  believe, that fall, of 2012.

14  Q    And who else was there?

15  A    Myself -- from what I remember, it was myself,

16  Mr. Discala, Mr. Ofsink, a Jeff Auerbach, a Michael Caridi,

17  Mr. Koons, Christopher Herg, Ira Shapiro, and a few other

18  people who I wasn't aware who they were.

19  Q    And what was discussed at the meeting?

20  A    The discussion of the meeting was to show and discuss the

21  structure of the capital raise for CodeSmart.

22  Q    Who was Jeff Auerbach?

23  A    I had just met him at that time.  I don't specifically

24  know who he was, but I found out at that time that he was

25  involved in the capital raise.

Wexler - Cross - Bowman                    2307

1   Q    And who was Ira Shapiro?

2   A    Ira Shapiro was the owner of CodeSmart.

3   Q    And how long was the meeting?

4   A    Approximately two hours maybe.

5   Q    And at the conclusion of the meeting, what was your

6   impression of CodeSmart?

7   A    Positive.

8   Q    Did you ever review any promotional material or what they

9   call a dec for CodeSmart?

10  A    I don't recall.

11           MR. BOWMAN:  May I approach, Your Honor?

12           THE COURT:  You may.

13           MR. BOWMAN:  (Handing.)

14  Q    I'm going to ask you to take a look at an e-mail from

15  Marleen Goepel.

16           THE COURT:  Does that have an exhibit number?

17           MR. BOWMAN:  It's actually -- yes.

18  Q    An e-mail from Marleen Goepel on April 9, 2013, and ask

19  you if it refreshes your recollection as to whether you ever

20  saw the CodeSmart dec?

21           THE COURT:  And that is exhibit --

22           MR. BOWMAN:  This will be Exhibit GA.

23  A    Yes.

24           THE COURT:  The immediate prior one is GA, so this

25  is GB?

1          MR. BOWMAN:  We didn't offer the other one, Your

2    Honor.

3          THE COURT:  You didn't offer it, it still has to be

4    marked for identification.  You used it.

5          MR. BOWMAN:  GB.

6          THE COURT:  GB.  All right.

7    Q    Do you recall receiving the e-mail from Marleen Goepel on

8    April 9th at 9:16 a.m.?

9    A    Yes.

10   Q    And if you would, please, take a look at the dec for the

11   CodeSmart group.

12          Is that the dec that you received in April of 2013?

13   A    This would be considered a dec, yes.

14   Q    What is a dec?

15   A    My understanding is it's a basic explanation about the

16   company.

17   Q    And had you ever reviewed any other decs during the

18   course of your investing experience?

19   A    Yes.

20   Q    And did you take the time to review the dec?

21          THE COURT:  Referring to GB?

22          MR. BOWMAN:  GB.

23          THE COURT:  When you received it.

24   Q    Did you take the time to review it when you received it?

25   A    No.

1   Q    But it was sent to you?

2   A    Yes.

3   Q    But your testimony is you never read it?

4   A    Not specifically enough, no.

5   Q    Well, when you say "not specifically enough," did you

6   read it?

7   A    Yes.

8   Q    And you received it?

9   A    Yes.

10           MR. BOWMAN:  I'm going to offer it, Your Honor.

11           MS. JONES:  Your Honor, government objects.

12           THE COURT:  To the declaration?

13           MS. JONES:  Your Honor, in the documents that were

14   handed, there is a one-page e-mail which references a dec, and

15   then there's another e-mail which does not appear to have

16   Mr. Wexler on it that has an attached dec, so it's not clear

17   that the dec that he's talking about is the one that was

18   attached.

19           THE COURT:  Right.  Then that's a voir dire issue.

20   He can establish, if you can, Mr. Bowman, that this is the

21   declaration that you put before him is the one that he recalls

22   receiving.

23           MR. BOWMAN:  Mr. Wexler, is this the deck that

24   Marleen Goepel sent to you?

25   A    Yes.

Wexler - Cross - Bowman                    2310

1                MR. BOWMAN:  All right.  I offer it.

2                MS. JONES:  No objection to the dec.

3                THE COURT:  Received in evidence with respect only

4    to the declaration, not the covering e-mail, Defendant

5    Discala's GB.

6                MR. BOWMAN:  Thank you, Your Honor.

7                (Defendant's Exhibit Discala GB was received in

8    evidence.)

9    Q    With respect to the dec and your understanding of what

10   CodeSmart was, what was it that CodeSmart intended to do or

11   was doing when you met in March and April of 2013?

12   A    Offering an opportunity for people to become educated and

13   certified in medical coding.

14   Q    And did you have a family member who was involved in

15   medical coding?

16   A    Yes.

17   Q    And who was that?

18   A    My mother.

19   Q    So you knew what medical coding was?

20   A    Yes.

21   Q    Did you understand that there had to be a transition

22   between ICD-9 and ICD-10?

23   A    Yes.

24   Q    Did you understand that the coding differences were very

25   substantial in that people would need educational opportunity

Wexler - Cross - Bowman                    2311

1   to be able to be coded?

2   A    Yes.

3   Q    And did you think there was a market for a company like

4   CodeSmart that provided the educational content for

5   perspective coders?

6   A    Potentially.

7   Q    And did you think that based upon the information that

8   you had, financial information, and the content, did you think

9   it was a good investment opportunity for you?

10  A    I didn't base my -- my investment or opportunity on this

11  dec.

12  Q    What did you base it on?

13  A    The fact that our free-trading shares on the open market

14  would be bought out.

15  Q    When you say ours, you mean yours?

16  A    Yes.

17  Q    How many free-trading shares did you get?

18  A    Approximately in the 200,000 plus range.

19  Q    And how much did you pay for them?

20  A    I recall 1,2,3 cents -- point 023 cents, I'm sorry.

21  Q    Two and a half -- almost two and a half cents a share.

22  A    Yes.

23  Q    And how much did you invest in CodeSmart?

24  A    I believe the overall amount was approximately 350,000.

25  Q    So you didn't invest over a million dollars in CodeSmart?

Wexler - Cross - Bowman                              2312

1    A    No.

2    Q    So did you sell your shares?

3    A    Some of them, yes, the majority of them.

4    Q    And do you recall how much you sold them for?

5    A    Various ranges of price.  Originally, I believe, it went

6    public at $3.

7    Q    And the profit number that we looked at earlier on

8    195-3?

9         MR. BOWMAN:  May I have that again, please?

10   Q    The profit number of $2.2 million, you're telling us

11   today that you didn't make $2.2 million trading CodeSmart?

12        MS. JONES:  Objection.  Asked and answered.

13        THE COURT:  Yes.  He's already told you that he

14   doesn't recognize that number, Mr. Bowman.

15   Q    So your best estimate of how much you think you made in

16   CodeSmart was what?

17   A    Without having specific information in front of me to

18   review, I thought it was more in the range of a million six.

19   Q    Profit?

20   A    Somewhere around there.

21   Q    And you were pretty focused on how much money you were

22   going to make from trading, weren't you?

23   A    No.

24   Q    Well, as I understand your testimony, that you were

25   focused on free trading, you were interested in how much money

Wexler - Cross - Bowman                    2313

1    you could make, correct?

2    A    I was focused on the fact that we had free-trading shares

3    that we were releasing into the open market that had demand on

4    the other side preset up.

5    Q    Well, I'm asking you about your main concern, and your

6    main concern was making money for yourself, wasn't it?

7    A    Correct.

8    Q    Were you the first possessor of shares to release into

9    the open market?

10   A    Yes.

11   Q    So there were no shares in the open market before you

12   released yours; is that true?

13   A    I believe that to be true.

14   Q    So unless or until you released your shares, there was no

15   trading?

16   A    Correct.

17   Q    Because there were no shares?

18   A    Correct.

19   Q    Did you know somebody by the name of Joe Salvani?

20   A    I recall the name.

21   Q    And who did you understand Mr. Salvani to be?

22   A    I understand Mr. Salvani and somebody else he was with to

23   be the IRPR team for CodeSmart.

24   Q    Was that Dan Walsh?

25   A    Yes, sir.

Wexler - Cross - Bowman                    2314

1    Q    What is IRPR?

2    A    Investor relations and public relations.

3    Q    What is investor relations?

4    A    My novice explanation would be press releases and that

5    sort of thing, I guess.

6    Q    So investor relations was press releases?

7    A    Press releases and potentially write-ups in magazines or

8    articles.  That's how I look at it.

9    Q    And PR?

10   A    Public relations are basically the same thing.

11   Q    Well, would it be fair to say that public relations

12   involves press releases, and investor relations is in relation

13   to people who could potentially buy stock; is that right?  Is

14   that fair to say?

15   A    Yes.

16   Q    So did you understand Salvani and Walsh to be involved in

17   both, or just investor relations?

18   A    I understood them to be both.

19   Q    How many other people owned free trading I-10 shares?  Do

20   you know everybody?

21   A    No.

22   Q    Do you know how many shares of I-10 were traded in the

23   market during the period in which you traded shares?

24   A    No, sir.

25   Q    So you don't know if there were ten or 10,000 or a

1   million shares?  You don't know?

2   A    It's a higher number based on what I had myself.

3   Q    And how many shares did you have?

4   A    In the range of 200,000 plus, and then received

5   restricted shares further on.

6   Q    And -- but the restricted shares could not be traded; is

7   that true?

8   A    Correct.

9   Q    So your main concern was free-trading shares so you could

10  sell your shares as quickly as possible?

11  A    Yes.

12  Q    And who was your broker at the time?

13  A    David Sasso.

14  Q    And where was Mr. Sasso?

15  A    Morgan Stanley.

16  Q    And you traded at Morgan Stanley for how long a period of

17  time?

18  A    Previous to CodeSmart or including it, and before then?

19  Q    Well, let's talk about before.

20  A    I have known Mr. Sasso since I grew up.  There's a

21  little -- as little kids.  We started a brokerage agreement --

22  a brokerage investor agreement around the days when I sold

23  Skinny Cow.

24  Q    So how long had you been trading with Mr. Sasso prior to

25  CodeSmart?

1   A     Approximately 12 to 14 years.

2   Q     So you knew each other well?

3   A     Yes.

4   Q     And how long did you continue to trade with Mr. Sasso at

5   Morgan Stanley?

6   A     Until 2014.

7   Q     At which point you changed and went where?

8   A     At one point I changed, but still had active accounts

9   with Mr. Sasso, but I changed some of the shares that I had in

10  there into both Hallmark and Stern Agee.

11

12              (Continued on following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. BOWMAN:

2   Q    Stern Agee was also known as Meyers; is that true?

3   A    Yes.

4   Q    So you went Hallmark, and who is the broker there?

5   A    Mr. Koons.

6   Q    And how long did you stay at Hallmark?

7   A    Not very long.

8   Q    And the reason that you didn't stay very long was what?

9   A    There was -- the main reason was that after I deposited

10  StarStream shares into an account with Mr. Koons, with the

11  understanding that they would be traded out to the open market

12  for me, his boss, or whoever it may be, called me and almost

13  demanded that I make an investment into something that he was

14  doing.

15  Q    And how much did he want from you?

16  A    I believe it was up to somewhere in the million dollar

17  range, might have been less.

18  Q    And you refused to do that?

19  A    Yes.

20  Q    Before we get to StarStream, were you aware of what was

21  going to be required if Omniview raised money or raised

22  anything for CodeSmart?  Did you understand what the

23  requirement was of Omniview?

24  A    Not specifically.

25  Q    Did you recall that Omniview was required to provide a

WEXLER - CROSS-EXAMINATION - BOWMAN                    2318

1   bridge?  Do you recall that?

2   A    Yes.

3   Q    Do you recall whether there was ever any financing in

4   place at the time of the meeting from another source?

5   A    I wasn't aware of any.

6   Q    Were you aware that Axiom was going to provide a $4

7   million PIPE?

8   A    I don't recall.

9   Q    Were you aware that this was basically --

10          MS. JONES:  Objection.

11  BY MR. BOWMAN:

12  Q    -- pre-packaged deal --

13          MS. JONES:  Your Honor, he said he didn't know any

14  of this.  Mr. Wexler already answered he doesn't know any of

15  this.

16          THE COURT:  I'll -- overruled.  Finish your

17  question, Mr. Bowman.

18  BY MR. BOWMAN:

19  Q    So you were not aware of Axiom, you were not aware of the

20  curriculum?  Were you aware that Florida International had

21  provide the curriculum for CodeSmart?

22  A    I was aware and told that that's what was in place, yes.

23  I don't recall anything to do with Axiom at this point.

24  Q    Okay.  Did you recall that there was also a mechanism for

25  student financing at CodeSmart?

1  A    I remember discussions to try and get that set up.  I am

2  not sure it ever did.

3  Q    Do you recall whether there was anybody prior to Omniview

4  at CodeSmart?

5           THE COURT:  At CodeSmart?

6           MR. BOWMAN:  At CodeSmart.

7  BY MR. BOWMAN:

8  Q    Anybody who was raising money or had made a proposal at

9  CodeSmart prior to Omniview?

10  A    Not that I recall.

11  Q    Let's talk about SSET.  What was SSET?

12  A    SSET was a movie production company.

13  Q    And do you recall any of the movies that SSET was

14  producing?

15  A    The Butler was the first one.

16  Q    And who brought this to you?

17  A    This was brought to us by a gentleman who is in -- at the

18  first CodeSmart meeting as well, Chris Herg.  I'm not sure

19  that's his accurate name.

20  Q    This is Mr. Herghelegiu?

21  A    Yes.

22  Q    And where was the meeting?

23  A    The meeting was in Darren Ofsink's office.

24  Q    And do you know why the meeting was in Darren Ofsink's

25  office?

WEXLER - CROSS-EXAMINATION - BOWMAN                    2320

1   A    Because he was going to be the attorney on this deal.

2   Q    Do you know who brought -- withdrawn.

3            Do you know who brought Darren Ofsink into this

4   deal?

5   A    No.

6   Q    Do you know if it was Mr. Discala?  Do you know if it was

7   Mr. Discala?

8   A    Not specifically.

9   Q    Who else was present at the meeting?

10  A    Mr. Koons, Mr. Auerbach, Mr. Ofsink, myself, Mr. Discala,

11  Mr. Herg, and a couple people from StarStream.

12  Q    Do you remember their names?

13  A    Kim Leadford, and I forgot the other gentleman's name.

14  Q    Charles Bonan?

15  A    Yes, sir.

16  Q    What was Mr. Koons doing there?

17  A    No idea.

18  Q    Who was he?

19  A    I understood him at that time to be a broker.

20  Q    So there were executives from StarStream, there was

21  Mr. Ofsink, you, Mr. Discala?

22  A    And others.

23  Q    And others.  And what was the purpose of the meeting?

24  A    The purpose of the meeting, and there were multiple

25  meetings, the first, from what I recall, was setting up the

1    structure for the capital raised for them.

2    Q    And do you recall what the structure was going to be?

3    A    It was basically going to be a mirror of ITEN CodeSmart

4    where it would be a 60/40 type split, free trading shares,

5    restricted shares.

6    Q    And who made the presentation?

7    A    Mr. Discala.

8    Q    Did you hear from Ms. Leadford or Mr. Bonan?

9    A    At that meeting?

10   Q    Yes.

11   A    Yes.

12   Q    Did they talk about their plans for StarStream?

13   A    Yes.

14   Q    I mean, that was the purpose of the meeting, wasn't it?

15   A    Yes.

16   Q    Do you recall ever seeing a StarStream deck?

17   A    Again, I do not, no.

18   Q    You don't --

19   A    I don't recall again, no.

20            MR. BOWMAN:  May I approach?

21            THE COURT:  You may.  It's GC, Mr. Bowman?

22            MR. BOWMAN:  Sorry.

23            THE COURT:  GC?

24            MR. BOWMAN:  GC.  Thank you.

25            THE COURT:  Next exhibit, GC, for identification.

1    BY MR. BOWMAN:

2    Q    Do you know what that is?

3    A    Confidential deck.

4    Q    For?

5    A    StarStream.

6    Q    Do you recall reviewing it?

7    A    I don't necessarily recall reviewing it, no.

8    Q    But you received it?

9    A    I'm sure I did.

10            MR. BOWMAN:  I'll offer it, Your Honor.

11            THE COURT:  Any objection to receiving the deck.

12            MS. JONES:  No, Your Honor.

13            THE COURT:  That portion of the exhibit is received

14   in evidence without objection.

15            (Defense Exhibit GC, received in evidence.)

16   BY MR. BOWMAN:

17   Q    What is the deck?  Specifically what is the StarStream

18   deck you have in front of you?

19   A    An explanation about the company and what it does and

20   what the potential projections are and capital raised and that

21   type of thing.  All -- a lot of them are different.

22   Q    Now, based on the deck and everything else you heard at

23   the meeting, did you make a decision as to whether or not you

24   wanted to invest in StarStream?

25   A    Yes.

1  Q     How much did you invest?

2  A     Overall, I think my total investment in StarStream was

3  approximately 800,000.

4  Q     So you had confidence in the company?

5  A     I did at the beginning, yes.

6  Q     That's what we're talking about here, the beginning.

7  A     Yes.

8  Q     And why did you have confidence in the company?

9  A     Because we had our meetings, and I met the team, and I

10 went to the preview of the Butler with them.

11 Q     And the Butler was previewed here in New York City?

12 A     Yes.

13 Q     And who was the producer of the Butler?

14 A     There were many producers.

15 Q     Do you know whether there were any big names involved in

16 the Butler?

17 A     Producers?

18 Q     In any capacity.

19 A     A lot of actors and actresses, yes.

20 Q     Do you recall who the actors were?

21 A     Oprah Winfrey.

22 Q     Forest Whitaker?

23 A     Forest Whitaker.

24 Q     These were well known --

25 A     Yes.

1  Q      -- movie actors, correct?

2  A      Yes.

3  Q      And did that influence your decision in making your

4  investment?

5  A      Yes.

6  Q      And when you saw the movie, were you impressed?

7  A      Yes.

8  Q      So did there come a time when you received free trading

9  shares?

10 A      Yes.

11 Q      And why did you receive free trading shares?  Was it

12 because of your investment?

13 A      It was because of my investment with the group of people

14 who I was with.

15 Q      Now, did there come a time when you tried to sell your

16 StarStream shares when you were at Morgan Stanley?

17 A      Yes.

18 Q      And were you successful or not?

19 A      No.

20 Q      So did you change brokerages?

21 A      Yes.

22 Q      And where did you go?

23 A      I changed brokerages because I was expecting to have

24 demand set up at the beginning when they first went public,

25 the same as CodeSmart.  I then moved to Hallmark where

1    Mr. Koons was the broker, put those into that account.

2    Q    And you didn't have much better luck?

3    A    No.

4    Q    So did you change again?

5    A    Yes.

6    Q    And where did you go?

7    A    Stern Agee.

8    Q    What we also known as Meyers?

9    A    Yes.  Meyers.

10   Q    And who did you deal with at Meyers?

11   A    Craig Josephberg and Jaime Sloan.

12   Q    Do you recall how much money Kim Leadford said she needed

13   at StarStream?

14   A    No, sir.

15   Q    Was it a million and a half to $2 million?

16   A    It would be in that range, with the expectation of, also,

17   I remember some type of loan.

18   Q    Do you recall what the structure would be of the bridge

19   and the PIPE?  Do you recall that?

20   A    I recall the process of the whole thing, yes.

21   Q    And what did Omniview do?

22   A    Omniview raised capital.

23   Q    How much capital, do you know?

24   A    I don't know specifically.

25   Q    Were you part of Omniview at the time?

WEXLER - CROSS-EXAMINATION - BOWMAN                    2326

1   A    Theoretically, yes.

2   Q    Well, it was more than theoretical, wasn't it?  It was

3   actual?

4   A    Yes.  I had an e-mail address.

5   Q    And when you went to Meyers, you met with Ms. Sloan?

6   A    Yes.

7   Q    And you met with Mr. Josephberg?

8   A    Yes.

9   Q    And did you express to either one of them that you were

10  concerned because you couldn't sell your StarStream shares?

11  A    Yes.

12  Q    Why was that a concern for you?

13  A    Because I wanted to make the money back that I invested.

14  Q    So you were concerned about your own financial welfare at

15  that point?

16  A    Correct.

17  Q    And did you communicate your earnestness in terms of

18  needing your shares sold to Ms. Sloan and Mr. Josephberg?

19  A    Yes.

20  Q    And you have testified that you paid Ms. Sloan $10,000 in

21  cash, correct?

22  A    Approximately, yes.

23  Q    And that was to give her incentive to sell your shares?

24  A    Correct.

25  Q    Now, was this solicited by her or did you offer it?

1  A    Can you be more specific what was solicited, the meeting

2  or the money?

3  Q    The money.

4  A    It was commanded.

5  Q    It was commanded by whom?

6  A    Sloan.

7       THE COURT:  You are referring to the 10,000?

8       THE WITNESS:  Yes, Your Honor.

9  BY MR. BOWMAN:

10  Q    And what else?  What else did she want?

11  A    Stock in one of her family member's name from what I had.

12  Q    Did she tell you why it had to be in another family

13  member's name?

14  A    I don't specifically recall.

15  Q    Well, did you ask her, why don't you want it in your

16  name?

17  A    No.

18  Q    But you understood why she didn't want it in her name,

19  didn't you?

20  A    Yes.

21  Q    And what was that?

22  A    Because she didn't want it on record as her name.

23  Q    Because what she was commanding was illegal, correct?

24  A    Correct.

25  Q    She was essentially soliciting a bribe from you?

1    A    Correct.

2    Q    And you were paying it?

3    A    Correct.

4    Q    So after you paid her the money, and you gave her the

5    shares, did things improve for you at SSET?

6    A    No.

7    Q    So what did you do?

8    A    Moved the shares back to Morgan Stanley.

9    Q    And that would be with Mr. Sasso?

10   A    Yes.

11   Q    Now, SSET shares were not selling, correct, nobody was --

12   or not nobody, but people weren't buying, is that true?

13   A    It is all relative.

14   Q    Well, as far as you were concerned?

15           THE COURT:  He needs the time frame, sir,

16   Mr. Bowman.

17   BY MR. BOWMAN:

18   Q    This is summer of 2013.

19   A    Not at the velocity that ITEN was done at, or the

20   velocity that I expected.

21   Q    And you were so concerned that you moved from Morgan

22   Stanley to Hallmark to Meyers, now back to Morgan Stanley,

23   correct?

24   A    That's correct.

25   Q    Now, did you suggest to Kim Leadford that she enter into

1   a consultant arrangement with a fellow named Tom Nelson?

2   A    I recall the name.

3   Q    Well, who's Tom Mullolly?

4   A    Tom Mullolly is a person that I knew from Long Island who

5   was involved in the stock market and investing and trading,

6   may or may not have had brokers.

7   Q    And did he suggest to you when you were having trouble

8   with marketing StarStream shares, that you engage an

9   individual name Tom Nelson?

10  A    Yes.

11  Q    Did you ever meet him?

12  A    No.

13  Q    Was he from Phoenix, Arizona?

14  A    Out west.

15  Q    And when you got this information from Mr. Mullolly about

16  Mr. Nelson, who did you give it to?  Did you give it to Kim

17  Leadford?

18  A    I don't recall.

19  Q    Do you recall whether StarStream ever engaged Mr. Nelson

20  to assist in marketing or investor relations with respect to

21  StarStream stock?

22  A    I don't recall what happened with Mr. Nelson.

23  Q    Do you recall that he was engaged?

24  A    I recall he may have been compensated by somebody and

25  never did anything.

WEXLER - CROSS-EXAMINATION - BOWMAN                    2330

1   Q     Do you recall the name of his company?

2   A     No, sir.

3   Q     Does Ten Associates ring a bell?

4   A     No.

5              MR. BOWMAN:  May I approach, Your Honor?

6              THE COURT:  You may.  Is that a new exhibit?

7              MR. BOWMAN:  Yes, Your Honor.  GD for

8   identification.

9              THE COURT:  GD?

10             MR. BOWMAN:  Yes, Your Honor.

11  BY MR. BOWMAN:

12  Q     Now, I am going to ask you to look at what's been marked

13  as Defendant's GD, and ask you whether that refreshes your

14  recollection as to whether StarStream ever entered into an

15  agreement with Tom Nelson?

16  A     It does a bit, but I am looking at the address, and it

17  looks almost like OmniView's address as opposed to StarStream.

18  Q     All right.  So the consulting agreement is between

19  StarStream at OmniView's address in Mr. Nelson's company,

20  correct?  Take a look at it.  Take your time.

21  A     It is StarStream Entertainment at OmniView's address.

22  Meaning, to me, it was more Omniview than anything, but, yes,

23  I'm looking at a consulting agreement here.

24  Q     Okay.  And that's with Mr. Nelson; is that true?

25  A     Yes.

1   Q    And does that refresh your recollection as to whether

2   there was an agreement that was entered into between

3   StarStream and Tom Nelson with respect to marketing StarStream

4   shares?

5   A    That's what it looks like, yes.

6              THE COURT:  Do you remember --

7              THE WITNESS:  Yes.

8              THE COURT:  -- is the question.

9              THE WITNESS:  Yes, sir.

10             MR. BOWMAN:  I will offer it.

11             THE COURT:  Any objection?

12             MS. JONES:  No objection, Your Honor.

13             THE COURT:  Received without objection.

14             (Defense Exhibit GD, received in evidence.)

15  BY MR. BOWMAN:

16  Q    I ask you to look at the addendum to the agreement.  Does

17  it list what Mr. Nelson was going to do for StarStream?

18  A    Yes.

19  Q    Can you read for us what it was that Mr. Nelson was going

20  to do for StarStream?

21  A    Write and distribute a short corporate profile of

22  StarStream Entertainment, use social media such as Facebook,

23  Twitter and other social media outlets to get awareness out,

24  make introductions to our broker network, produce a CEO

25  interview in order to provide insight into StarStream

WEXLER - CROSS-EXAMINATION - BOWMAN                    2332

1    management and future direction, assist in research and

2    prepare a target list of relevant investor conferences, meet

3    with investment bankers to strategize and collaborate on

4    investor outreach and align messaging, review and make

5    recommendations to IR section of web site, reach out to

6    respective investor conference coordinators, assist in

7    placement of news and feature articles showcasing company's

8    achievements, leverage publicity by posting on web site and

9    distributing to shareholders, introducing -- introduce

10   investors on target list to StarStream Entertainment via

11   e-mail, via mail and e-mail and investor fact sheet, assist in

12   bid support, assist in locating financing, if needed.

13   Q    What happened with Mr. Nelson, as far as you know?

14   A    As far as I know, he got his shares, and he didn't do

15   anything.

16   Q    Do you know how many shares he got?

17   A    According to this, it says 30,000.

18   Q    And those were --

19   A    Oh, I'm sorry.  There's actually a few more on there.

20   Q    How many total?

21   A    He was promised 180,000 shares, in total.

22   Q    And he was unsuccessful?

23   A    Yes.

24   Q    Was Mr. Ofsink an attorney associated with SSET?

25   A    Yes.

1  Q    Was he -- did he continue with SSET as the attorney, or

2  was he replaced?

3  A    I recall him being the attorney throughout the whole

4  process.

5  Q    So you don't recall that Mr. Ofsink was replaced?

6  A    No.

7  Q    And, Mr. Discala, did he go on the board at SSET?

8  A    I believe he was supposed to.  I am not sure how that

9  actually even ended out.

10  Q    Well, did that impact his free trading shares at SSET?

11          THE COURT:  Almost going on the board?

12          THE WITNESS:  I don't know.

13  BY MR. BOWMAN:

14  Q    So you don't know whether Mr. Discala actually went on

15  the board or didn't go on the board?

16  A    That's correct.

17  Q    Did you ever recall having a discussion with him with

18  respect to whether he could have free trading shares if he

19  went on the board?

20  A    No.

21  Q    Do you know whether he ever traded SSET free trading

22  shares?

23  A    No.

24  Q    So you don't know or you know that he did or he didn't?

25  A    I don't exactly know if he traded free trading shares of

1    StarStream.  I understood him to have free trading shares and

2    that we would be releasing them into the open market.

3    Q    But as you sit here under oath, can you say that he did

4    trade free trading shares in StarStream?

5    A    No.

6    Q    What was TSGL?

7             THE COURT:  Are you going to begin a new company,

8    Mr. Bowman?

9             MR. BOWMAN:  Yes.

10            THE COURT:  Sounds like you are shifting to a new

11   company.

12            MR. BOWMAN:  I am.  It is a good time, Your Honor.

13            THE COURT:  All right.

14            MR. BOWMAN:  Thank you.

15            THE COURT:  You got the hint.

16            MR. BOWMAN:  I got the hint.

17            THE COURT:  Very good.

18            Ladies and gentlemen, we are going to take our mid

19   morning break.  Again, the recess rules apply.  Do not discuss

20   the case amongst yourselves or with anyone else.  Continue to

21   keep an open mind, and we will see you in about 15 minutes.

22            (WHEREUPON, at 11:48 a.m., the jury exited the

23   courtroom.)

24            (Continued on the next page.)

25

*PROCEEDINGS* 2335

1              (Proceedings continue in open court; no jury

2       present.)

3              THE COURT:  You may step down, Mr. Wexler.

4              MR. BINI:  Your Honor, one quick housekeeping thing,

5       if I can just raise it.  I will wait until the witness is out

6       of the room.

7              THE COURT:  Mr. Bini.

8              (WHEREUPON, Witness Wexler exited the courtroom.)

9              MR. BINI:  We had asked defense counsel for

10      Mr. Discala to send us electronically any exhibits that they

11      had admitted.  I just wanted to repeat the request since we

12      are winding down the case and they hadn't done so so far.

13             MR. ROSS:  Judge, we will do that.  We sent 3500

14      material to the government.  We are continuing to gather that.

15      Any exhibits we want to introduce, we will certainly provide.

16             MR. BINI:  I also mean the exhibits they already

17      have introduced.  So all the press releases they put in, for

18      example, we had asked for them contemporaneously, and we never

19      got them, and the additional exhibits that are coming in now,

20      we have paper copies, but we had asked for them electronically

21      as well.

22             MR. ROSS:  We will do our best, Judge.  We will try

23      to provide them.

24             THE COURT:  You have quite a team over there,

25      Mr. Ross.  I am sure you can spring somebody to do that.

PROCEEDINGS                                      2336

1            MS. JONES:  Your Honor, it'd also be helpful if they

2      were marked with exhibit stickers.

3            THE COURT:  That's clear.  That would be extremely

4      helpful.

5            MR. BINI:  Thank you.

6            THE COURT:  It will save time.

7            MR. RIOPELLE:  Your Honor, Roland Riopelle.

8            One additional thing that I just want to put on the

9      record.  This morning we got a piece of 3500 material for a

10     person whom the government may call, yet another Cubed

11     investor.  I would also like to move in limine to preclude

12     that testimony, as what appears to be cumulative as well.

13           Other than that, Judge, you have a great haircut

14     over the weekend.  I didn't have time.  I needed one badly,

15     but --

16           THE COURT:  I had my ears lowered.  But thank you.

17     My barber will be very pleased with you.

18           (WHEREUPON, a recess was had from 11:51 a.m. to

19     12:15 p.m.)

20           (Continued on the next page.)

21

22

23

24

25

Wexler - Cross - Bowman                    2337

1              THE COURTROOM DEPUTY:  All rise.  Court is back in

2    session.

3              Counsel for both sides are present.

4              THE COURT:  Ready to go?

5              (Jury enters the courtroom.)

6              THE COURT:  Be seated, please.

7              Counsel will stipulate that the jury is present and

8    properly seated.

9              MS. JONES:  Yes, Your Honor.

10             MR. ROSS:  Agreed, Your Honor.

11             MR. RIOPELLE:  So stipulated.

12             THE COURT:  Counsel, I hope you had a chance to

13   refresh and you're ready to resume.  We are still with

14   Mr. Wexler still being cross-examined by Mr. Bowman.

15             You may continue.

16             MR. BOWMAN:  Thank you, Your Honor.

17             CROSS-EXAMINATION (Continued).

18   BY MR. BOWMAN:

19   Q    Mr. Wexler, did you invest in TSGL, the Staffing Group?

20   A    Yes.

21   Q    Do you recall how much you invested?

22   A    No.

23   Q    Would $30,000 refresh your recollection?

24   A    Potentially, yes.

25   Q    Can you tell us whether Mr. Discala ever traded

Wexler - Cross - Bowman                            2338

1    free-traded shares in TSGL?

2    A    Mr. Discala at times discussed trading on the open

3    marketed and coordinated trades.

4    Q    I'm asking you if ever traded free-trading stock?

5    A    I can't answer that.

6    Q    Because you won't or you don't know?

7    A    Oh, I don't know.

8    Q    Do you know whether he gave away all of his free-trading

9    shares?

10   A    No.

11   Q    Do you know whether he transferred 3.6 million restricted

12   shares to EJA?

13   A    I don't recall.

14   Q    What's EJA?

15   A    EJA is a company that Mr. Discala formed.

16   Q    And what do the initials stand for?

17        Are they your children's first names?

18   A    With the exception of "E," yes.

19   Q    So J and A are your children, and E is his child,

20   correct?

21   A    I believe so.

22   Q    And the purpose of this company was what?

23   A    The company was basically a vehicle to own shares of

24   free-trading stock or restricted stock or to collect capital

25   from investors to raise, and that's about it.

1  Q     After TSGL, was there another company that you invested

2  in?

3  A     There were multiple companies.

4  Q     How about Cubed.  Let's talk about Cubed.

5        Did you invest in Cubed?

6  A     Yes.

7  Q     Do you recall how much you invested?

8  A     Approximately 200,000.

9  Q     Was it approximately 275,000?

10  A     It could have been.

11  Q     Do you know how much Mr. Discala invested in StarStream?

12  A     No.

13  Q     After StarStream, did he have money to invest in Cubed

14  initially?

15        Didn't you have to advance $50,000 in his behalf for

16  Cubed?

17  A     I put down a hundred thousand dollars of my own money.

18  And I may have advanced $50,000 for Mr. Discala.  It's

19  possible.

20  Q     Well, you're not disputing that; are you?

21  A     No.

22  Q     So when was it you were first introduced to the Cubed as

23  a possible investment?

24  A     Around December of 2013.

25  Q     And how did you become aware of the Cubed?

Wexler - Cross - Bowman                    2340

1   A    I was introduced to them at Mr. Ofsink's office.

2   Q    So who else was present?

3   A    Myself.  Mr. Discala.  Mr. Koons.  A Max Khan.  Robert

4   Jacobs, what I recall.  A Mr. White and his son were the

5   principals of the Cubed.

6   Q    Who was Max Khan?

7   A    Max Khan brought in this group to bring them to

8   Mr. Discala and myself to see if we would invest.  And I

9   believe he did due diligence on the company.

10  Q    What was Mr. Jacobs doing at the meeting?

11  A    Mr. Jacobs and Mr. Khan were basically together.

12  Q    All right.  So they were going to do due diligence; is

13  that right?

14  A    They may have already started to do.

15  Q    By the time you became involved?

16  A    The day I met them, yes.

17  Q    What is "due diligence"?

18  A    As far as I understand it to be is basically just a

19  background check of the company and the people, and to see who

20  they are, describe who they are, describe what the company

21  does and see if it's a worthwhile investment.

22  Q    How long was the meeting?

23  A    From what I recall, about maybe an hour.

24  Q    And who were the Whites?

25  A    The Whites are the father and son team who came up with

1    the Cubed, the company.

2    Q    Do you know who the inventor was?

3    A    No.

4    Q    As between the Whites?

5          Who had the technical knowledge about the Cubed?

6    A    The son.  As far as I can see.

7    Q    That would be Joe?

8    A    Yes.

9    Q    So you don't know whether Stephen, his father, was the

10   actual inventor of the Cubed?

11   A    No.

12   Q    And forgive me, I wasn't precise.

13         Are you saying that it wasn't Stephen who was the

14   actual inventor of the Cubed?

15   A    I don't know.  I don't know which, father or son.  I

16   don't know.

17   Q    Did you care at the time?

18   A    No.

19   Q    So you were at Ofsink's office once again, correct?

20   A    Correct.

21   Q    And he's an attorney?

22   A    Yes.

23   Q    Where is his office?

24   A    In Manhattan.

25   Q    And he was the attorney involved in the CodeSmart?

Wexler - Cross - Bowman                        2342

1    A    Yes.

2    Q    And was Omniview involved in CodeSmart?

3    A    Yes.

4    Q    And was he involved in StarStream?

5    A    Yes.

6    Q    As an attorney?

7    A    Yes.

8    Q    And was Omniview involved in StarStream?

9    A    Yes.

10   Q    And he was at the meeting as an attorney, and was

11   Omniview there at the meeting?

12   A    Yes.

13   Q    So after the hour-long meeting, did you make any

14   decisions about whether you were going to invest in the Cubed

15   or not?

16   A    Yes.

17   Q    And how long did it take you between the time of the

18   meeting to make a decision whether to invest?

19   A    Maybe an hour.

20   Q    When was the next time that you saw the Whites?

21   A    I don't specifically recall.

22   Q    Was it within a matter of weeks or was it a month?

23   A    It could have been a matter of a month back in New York.

24   Q    So the Whites made another trip.  Do you know where they

25   were from?

Wexler - Cross - Bowman                    2343

1   A    Las Vegas.

2   Q    What was the purpose of the second meeting?

3   A    It would have been just to discuss continuation of the

4   capital raise and the business itself.

5   Q    Do you remember what the capital raise was going to be?

6   A    A 60-40 split.

7   Q    And how much money?  How much did Cubed need?

8   A    Over a million.

9   Q    And who was going to raise the money?

10  A    Myself and Mr. Discala.

11  Q    When was the next meeting that you attended where the

12  Whites were present?

13  A    I don't exactly recall.  I met them again in Newark.  I

14  eventually met them in Las Vegas.

15  Q    When was that, Mr. Wexler?

16  A    I believe it was in the springtime.  Early spring, late

17  fall.  I'm sorry, late winter.

18  Q    Of 2014?

19  A    Yes.

20  Q    And who was present when you met with the Whites in Las

21  Vegas?

22  A    Myself.  Mr. Discala.  I met Mr. Stephen White.  I met --

23  I think I met the son.  He may or may not have been there at

24  that time.  We had gone to the office where they were in

25  Vegas.

Wexler - Cross - Bowman                      2344

1   Q    And did you participate in the meeting?

2   A    Not specifically.

3   Q    What were you there for?

4   A    To farm out the company.  To check on the office.  To see

5   what they were doing.

6   Q    What did you see?

7   A    Basically an empty office.

8   Q    Did you see the Cubed?

9   A    I had seen the Cubed from the beginning.

10  Q    Was Max Khan there when you met with the Whites?

11  A    The first time?

12  Q    Any time.

13  A    The first time I recall him meeting there.

14  Q    How about when you were out in Las Vegas?

15  A    I don't recall.

16  Q    Mr. Jacobs was he there in Las Vegas?

17  A    I don't recall.

18  Q    So it was you and Mr. Discala and Stephen White, and who

19  else?

20  A    Those are the gentlemen that I remember the most.  There

21  were some workers around and that was it.

22  Q    Did you have any understanding at this time what the

23  application for the Cubed would be?

24  A    Yes.

25  Q    What was that?

Wexler - Cross - Bowman                    2345

1   A    It was a six-sided cube that would go on to your phone.

2   And you could basically tap each side and there would be

3   content on each side of the cube facing.

4         When you tap it, it would open up and there would be

5   sometime of content.

6   Q    Were you aware of any contracts that Crackpot had entered

7   into by the time you were out there?

8   A    I recall a conversation about a real estate company in

9   New York having potentially hired them.  But I didn't know if

10  it was real or not.

11  Q    Did you ever look at any lists of contracts that Cubed

12  had?

13  A    No.

14  Q    And was that because you just weren't interested in it?

15  A    No.

16  Q    Did you have meet with Mr. Gjorcevski who was the

17  technology guy at Crackpot?

18  A    I don't recall the name.

19  Q    Branislav, you don't recall that?

20  A    No.

21  Q    How long did you spend at Crackpot?

22  A    Not long.  Couple of hours.

23  Q    Did you participate in any conversation?

24  A    Not me.

25  Q    What month would this have been?

Wexler - Cross - Bowman                    2346

1   A    Maybe February or March.

2   Q    Well, they wanted $1.5 million, and your testimony is

3   that you really didn't participate much in conversations or

4   learning a whole lot about it; is that fair to say?

5   A    In regard to what?  The company itself or the people

6   involved?

7   Q    The company itself.

8   A    No, I was involved in conversations regarding the

9   company.

10  Q    What concerned you at the time?  What did you want to

11  know for the $1.5 million?

12  A    What the company was doing.  What success rate they had.

13  What contracts they may or may not have had.

14  Q    What else?

15  A    What they needed capital for.

16  Q    Did they answer your questions?

17  A    Not specifically.

18  Q    Did they give you any reason to believe that you

19  shouldn't invest $1.5 million?

20  A    I wasn't investing $1.5 million myself, so I was not that

21  concerned.

22  Q    So you weren't really concerned about anybody else other

23  than yourself; were you?

24  A    Not true.

25  Q    How long Darren Ofsink remain as the attorney involved

Wexler - Cross - Bowman                    2347

1    for the Cubed?

2    A    Couple months.

3    Q    So this is the same Darren Ofsink who had been with

4    Omniview on CodeSmart and StarStream; is that correct?

5    A    That's correct.

6    Q    And what happened to Mr. Ofsink?

7    A    Mr. Ofsink was let go.

8    Q    And did anybody take his place?

9    A    Eventually, yes.

10   Q    Who was that?

11   A    Ms. Cane.

12   Q    Who did you understand Ms. Cane to be?

13   A    Securities attorney.

14   Q    Did you eventually meet with Ms. Cane?

15   A    Yes.

16   Q    Where?

17   A    In Las Vegas.

18   Q    Where in Las Vegas?

19   A    Casino, hotel.

20   Q    And do you recall what was said at the meeting?

21   A    It was more of an introduction.

22   Q    It was just like a meet and greet?

23   A    Mostly.

24   Q    And what did you understand Ms. Cane was going to do?

25   A    I had understood that Ms. Cane would be taking over the

1   legal part of the document -- of the company.  For the Cubed.

2   Q    Did she tell you what her plans were?

3   A    Not at that time, no.

4        I understood we had a plan.

5   Q    Did you ever learn that there was going to be a different

6   way of handling free-traded shares?

7   A    Yes.

8   Q    When was that?

9   A    A couple months into the capital raise and after meeting

10  Ms. Cane.

11  Q    And where was that?

12  A    It was in a discussion with Mr. Discala.

13  Q    So what did you understand was going to be different

14  about the way free-trading shares were going to be handled

15  with the Cubed that was different from other entities that you

16  had been involved in previously?

17  A    My understanding was that the free-trading shares would

18  not be issued to individual investors.

19  Q    And what would happen to them?

20  A    They would be controlled by Ms. Cane.

21  Q    And what was the mechanism?

22  A    Could you more specific, please.

23  Q    Well, do you understand how there would be -- how the

24  shares would be handled?  Can you tell us, you were at the

25  meetings.  Tell us how the shares were to be handled?

1  A    Specifically?  I had no idea who the shareholders names

2  would be in, but I understood that my share -- my investors

3  would not have shares in their name of free trading shares.

4  Q    And so that would be true of everybody, correct, who had

5  free-trading shares?

6  A    As far as I knew, yes.

7  Q    So that this mechanism would be -- would include all the

8  free-trading shares for Crackpot.

9  A    As far as I understood, yes.

10 Q    When I say "Crackpot," I mean and Cubed.

11 A    Yes.

12 Q    Did you ever have a discussion with Ms. Cane about it?

13 A    Yes.

14 Q    And I specifically referring to how this would work and

15 what the reason was for it.

16 A    Yes.  I understood the discussion was to how it would

17 work.

18 Q    What was the concern that motivated all of you to agree

19 to this mechanism, as distinguished from the prior way in

20 which free-trading shares were handled?

21 A    The concern was first off that I was told that it was

22 being done that way.  I wasn't involved in those discussions.

23 And the concern was that no shareholders who invested money

24 would be getting shares in their name.

25 Q    What was the reason for that?

1  A    They were going to be controlled on the open market by

2  Ms. Cane.

3  Q    And what was the concern about that?  Why would it be

4  necessary for the shares to be initially controlled on the

5  open market?

6  A    It wasn't necessary.  That was the way it was

7  restructured to be all the free-trading shares could be held,

8  controlled on the open market by Ms. Cane, and no shareholders

9  would receive stock certificates in their names of

10 free-trading shares.  That was the concern.

11 Q    Well, wasn't the concern that in a microcap, in a

12 thinly-traded stock, that there was the danger of people

13 dumping shares into the market and driving the price to zero?

14 Wasn't that the real reason?

15 A    No.

16 Q    Have you ever heard of that happening?

17 A    Yes.

18 Q    Is that always a concern when you're doing free-trading

19 shares in a microcap stock?

20 A    I wouldn't know.  I haven't done enough deals to know.

21 Q    How many deals did you do?

22 A    Three, where I funded them.

23 Q    And additional deals also?

24 A    The other companies, I did not actually invest in startup

25 part.

Wexler - Cross - Bowman                    2351

1  Q     So the companies where you had invested were, tell us.

2  CodeSmart?

3  A     CodeSmart, StarStream and the Cubed.

4  Q     And TSGL for a lesser amount.

5  A     TSGL was not a startup, it was already an existing

6  company.

7  Q     Okay.  And an existing company which did what?

8  A     Traded on the open market.

9  Q     What was the function of the company?

10  A     The Staffing Group I knew minimal about.

11  Q     Did you know they had $2 million a month in revenue?

12  A     I recall seeing something go by, yeah.

13  Q     So that looked like a good viable company to you when you

14  looked at it.

15  A     It's not the reason why I bought it.

16  Q     I didn't ask you that.

17        It looked like a viable company?

18  A     I didn't enough research on it.

19  Q     But you are aware that they had $2 million a month in

20  revenue?

21  A     I remember seeing something about that.

22  Q     Let's get back to Cubed.

23        Did you understand what the mechanism would be in

24  which the shares were to be held?

25  A     I understood the mechanism.  I'm not -- I understood the

Wexler - Cross - Bowman                    2352

1  mechanism of the structure of the way the shares were issued

2  and the way the free-trading shares were not issued in peoples

3  names.

4  Q    And was there a name for that mechanism?

5  A    Not that I recall.

6  Q    You don't know?

7  A    No.

8  Q    What was Titan?

9  A    Titan was the distribution company that distributed the

10 funds or proceeds from the shares sold on the open market for

11 the Cubed.

12 Q    And who was Titan?

13 A    Myself.

14 Q    So you had a pretty important role in the trading of

15 shares and the remittance to investors.

16 A    Yes.

17 Q    Who else worked with you in Titan?

18 A    Mr. Wolfson.

19 Q    Who is Mr. Wolfson again?

20 A    He was the accountant.

21 Q    He's been with you for 25 years?

22 A    Yes.

23 Q    So Titan was to receive what?

24 A    Funds from liquidation of the free-trading shares of

25 Cubed out in the open market.

Wexler - Cross - Bowman                    2353

1   Q    And Mr. Wolfson accounted for all of that; is that true?

2   A    Mr. Wolfson was involved in the distribution of the funds

3   to the shareholders on the list.

4   Q    So Mr. Wolfson and you made sure that funds were

5   distributed to investors.

6   A    That's correct.

7   Q    Did Mr. Discala ever tell you that he liked the way this

8   was set up?

9   A    Yes.

10  Q    And did he say -- did he say to you it was a good setup

11  because it was legal based on Cane's word as an attorney?

12          MS. JONES:  Objection.

13          THE COURT:  Yes, sustained.

14  Q    Do you recall him telling you that?

15          MS. JONES:  Objection.

16          THE COURT:  Sustained.

17  Q    Did you tell the FBI what I just questioned you about?

18          MS. JONES:  Objection.  Hearsay.

19          THE COURT:  Sustained.

20  Q    Isn't it true that that's exactly what you told the

21  FBI --

22          THE COURT:  Sustained.

23  Q    What was the next time you met with Kyleen Cane?

24  A    The night before we were arrested.

25  Q    Did you speak with her about the structure of Cubed and

Wexler - Cross - Bowman                          2354

1   Crackpot, and how free-trading shares were being distributed?

2   A    Not that night.

3   Q    Sorry?

4        THE COURT:  Are you referencing that meeting,

5   Mr. Bowman?

6        MR. BOWMAN:  Yes, Your Honor.

7        THE COURT:  Not that evening.

8   Q    When did you have conversations with Ms. Cane about the

9   structure?

10  A    We didn't.

11  Q    Did you participate in the decision of who would get

12  distributions from the sale of Cubed shares?

13  A    Yes.

14  Q    How many people did you put into Cubed?  As investors?

15  A    Approximately 12 to 15 people, maybe.

16  Q    Family and friends?

17  A    Yes.

18  Q    Including your bookmaker?

19  A    Yes.

20  Q    Did you ever hear of a company called Scanbuy?

21  A    Yes.

22  Q    And did you hear about Scanbuy in relation to Cubed?

23  A    Yes.

24  Q    And what was the functional relationship between Cubed

25  and Scanbuy?

1  A    I actually wasn't that involved nor educated enough to

2  really understand completely.  But there was some type of deal

3  going on where Scanbuy might be able to produce results or

4  profit for the Cubed in some conjunction together.

5  Q    Did you have the sense that there was a certain economic

6  relationship that Scanbuy and Cubed had shared or could share

7  in the future?  A certain synergy?

8  A    Myself in particular, no.

9  Q    Did you ever hear of a company called Soul?

10  A    Yes.

11  Q    When did you first hear the name Soul?

12  A    Sometime I believe in the fall of -- or early spring of

13  2013 possibly.  My dates are unsure.  But we went to a horse

14  race and flew together on a plane and one of the persons on

15  the plane was trading Soul and Vibe.

16  Q    And as a result of that conversation, do you know whether

17  Mr. Discala ever invested in Soul?

18  A    Yes.

19  Q    And did you invest in Soul?

20  A    Yes.

21  Q    And were you successful in trading Soul?

22  A    I only did minimal amount.

23  Q    And how would you describe Mr. Discala's experience in

24  trading Soul?

25  A    Not good.

Wexler - Cross - Bowman                    2356

1    Q    Disastrous, correct?

2    A    I'm not exactly sure.

3    Q    But it was not good?

4    A    From what I understand.

5    Q    That he lost $2 million?  Is that your understanding?

6              MS. JONES:  Objection.

7              THE COURT:  Do you know how much Mr. Discala lost?

8              THE WITNESS:  No, Your Honor.

9    Q    Was it more than a million?

10             MS. JONES:  Objection.

11             THE COURT:  Does that refresh your recollection?

12   Q    Does it refresh your recollection?

13   A    No.

14   Q    Let's turn to the fall of 2013.

15             What was happening with CodeSmart?  Specifically in

16   November of 2013.

17   A    I believe it was still trading and there were many

18   attempts by us, myself and Mr. Discala, to support the price

19   of the stock.

20   Q    What was happening with respect to the company?

21   A    I don't know.

22   Q    Are you familiar with Max Khan and others presenting a

23   refinance package to CodeSmart of two and a half million

24   dollars?

25   A    It's possible.

1   Q    When you say "it's possible" --

2   A    It was not my decision to make.

3   Q    I didn't ask you whether it was your decision.

4        Were you aware of it?

5        THE COURT:  Of such a proposal.

6   A    No.

7   Q    Showing you what's been marked as Defense Exhibit GE.

8   It's an email from the Max Khan, November 16th, 2013, to you.

9        MS. JONES:  Objection.

10  Q    Do you recall it?

11  A    No.

12  Q    Never received it?

13  A    I may have received it.  I don't recall it.

14  Q    Does it refresh your recollection as to whether there was

15  a proposal to refinance CodeSmart with $2.5 million that was

16  ready to be signed on November 16th of 2013?

17        THE COURT:  He's asking you if that document

18  refreshes your recollection.

19        THE WITNESS:  It doesn't refresh my recollection,

20  but it's certainly possible.

21        THE COURT:  He didn't ask you whether it was

22  possible.

23  A    It does not.

24  Q    So at least from your memory, there was such a proposal?

25  A    There could have been.

Wexler - Cross - Bowman                                    2358

1          THE COURT:  Do you remember?

2          THE WITNESS:  Specifically, no.

3    Q    Do you remember anything about a proposal to refinance

4    CodeSmart in November of 2013?

5    A    No.

6    Q    But it was possible?

7    A    It was possible.

8          THE COURT:  Sustained.

9          He didn't ask about possibility.  Certainly not --

10   he had asked about it three times.

11   Q    Is it true, Mr. Wexler, that you invested $1.1 million in

12   CodeSmart, $30,000 in TSGL, $793,000 in StarStream, and

13   $275,000 in Cubed?

14   A    I don't believe those are accurate numbers, no.

15   Q    So you're telling us that you did not give this

16   information to the FBI during the course of your 21

17   interviews?

18   A    That's not what I'm saying, sir.

19   Q    So the information is not accurate?

20   A    No, sir.  Alls I'm saying is I don't recall investing

21   $1.1 million into CodeSmart.

22   Q    And you don't recall receiving a profit of over

23   $2 million from your trading in CodeSmart?

24         MS. JONES:  Objection.  Asked and answered.

25         THE COURT:  Asked and answered.

1          MR. BOWMAN:  Thank you, Your Honor.

2          I have nothing further at this time.

3          THE COURT:  Thank you, Mr. Bowman.

4          You may retrieve your exhibits if they're still up

5     here.

6          Who is inquiring of this person on the stand?

7          MR. RIOPELLE:  I am, Your Honor.  It's about five

8     minutes to 1, would you like me to get started?

9          THE COURT:  Yes, get started.

10    BY MR. RIOPELLE:

11    Q    Good afternoon, Mr. Wexler.

12    A    Good afternoon, sir.

13    Q    My name is Roland Riopelle.  I represent the defendant

14    Kyleen Cane.

15         We've never met before; have we?

16    A    No, sir.

17    Q    Now, by the time you invested in Cubed, you had been an

18    investor in other microcap deals; is that right?

19    A    Yes, sir.

20    Q    And, in fact, we heard a little bit about it this

21    morning, you invested in CodeSmart, correct?

22    A    Yes.

23    Q    Staffing Group, right?

24    A    Yes.

25    Q    We heard about a company called Soul and Vibe.  You

Wexler - Cross - Riopelle                    2360

1   invested in that?

2   A    Yes.

3   Q    You also -- did you invest in a company called Location

4   Based Technologies?

5   A    Yes.

6   Q    And am I correct, sir, that my client, Kyleen Cane, had

7   nothing to do with any of those deals that you had invested in

8   prior to Cubed?

9   A    Yes, sir.

10  Q    Now, in each one of those deals prior to your investment

11  in Cubed, there was a deal struck in which there were both

12  free-trading shares issued by the company, correct?

13  A    I'm sorry, are you talking about Cubed?

14  Q    I'm talking about all of these deals.

15       THE COURT:  Including Cubed?

16  Q    Including Cubed, yes.

17       There's both free-trading and restricted shares in

18  every one of these deals that you were a part of, correct?

19  A    Yes.

20  Q    And some investors get free-trading shares, correct?

21  A    Yes.

22  Q    And some get restricted shares; am I right?

23  A    Yes.

24  Q    And typically those that get restricted shares are not

25  permitted to sell them for a year or more, correct?

1  A    Yes, sir.

2  Q    And when you invested in these deals, the various ones

3  that you talked about, you were focused on getting, if at all

4  possible, free-trading shares, correct?

5  A    Yes.

6         And the companies were structured differently from

7  the get-go.

8  Q    Each one was structured a little differently, right?

9  A    Correct.

10  Q    But in each one there was free-trading shares, correct?

11  A    Yes.

12  Q    And restricted shares, right?

13  A    Yes.

14  Q    And to the extent you could, you wanted to get

15  free-trading shares; am I right?

16  A    Yes.

17  Q    And the reason you wanted free-trading shares is that if

18  you could get them, you could have a kind of instant success;

19  is that right?

20  A    Yes.

21  Q    Because you would buy them at a discount, if possible,

22  correct?

23  A    Yes.

24  Q    And be able to sell them right away and make an instant

25  profit, correct?

1  A     Potentially, yes.

2  Q     Yes.  And we're all looking for a deal like that.  Me

3  too.  I'm not -- that's no criticism of you for that.  Okay,

4  sir.

5           And so you wanted to make a profit as fast as

6  possible in these deals that you were invested in, correct?

7  A     Yes.

8  Q     And one way to do that was to get free-trading shares and

9  sell them right away, correct?

10  A     Yes.

11  Q     The problem with that, though, is that if you and the

12  other investors who got the free-trading shares sold them

13  right away, that could drive the price of the stock of the

14  company down, correct?

15  A     Depending upon the amount of shares on the open market,

16  yes.

17  Q     Yes.  And if you sold -- if too many shares were

18  available on the open market and everybody sold them all at

19  once, the free-trading shares, that could drive the price

20  down, right?

21  A     Yes.

22  Q     And that's because a price of a stock, like the price of

23  anything, according to economists any way, depends on supply

24  and demand, right?

25  A     Yes.

1   Q     And if those who are selling all their free-trading

2   shares are putting too much supply on the market, that drives

3   the price down, correct?

4   A     Yes, sir.

5   Q     And this kind of quick profiteering can, in fact, destroy

6   the stock price of a microcap company, correct?

7   A     Yes.

8   Q     And if the stock price of a microcap company is

9   destroyed, that may make it impossible for the company to get

10  more financing in the future, correct?

11  A     Yes.

12  Q     And it may make it impossible, in fact, for the company

13  to survive, correct?

14  A     Yes.

15  Q     And so there are always ways that are looked for to sort

16  of prevent this huge sell-off type of behavior; aren't there?

17  A     To me?

18  Q     That's not a very good question.

19          Not specific to you.  I'm talking to you now as

20  someone who's invested in a number of these deals.  Have you

21  ever heard of a lock-up, a leak-out agreement?

22  A     Yes.

23  Q     And a lock-up/leak-out agreement is one mechanism that

24  can be used in a situation like this so that the stock price

25  of a microcap company is not destroyed, correct?

1    A    Yes.

2    Q    And the idea of a lock-up/leak-out agreement is that

3    those who hold the free-trading shares agree amongst each

4    other not to sell them all at once, right?

5    A    Yes.

6    Q    But the problem, of course, is you have to rely on the

7    people who are agreeing with you not to sell their shares,

8    correct?

9    A    Yes.

10   Q    And in your experience in these deals, sometimes the

11   folks who shake your hand are not very trustworthy, correct?

12   A    I can't make that judgment.

13   Q    Okay.  But you have had experience, have you not, where

14   lock-up/leak-out agreements don't actually work, correct?

15   A    Potentially, yes.

16   Q    Because people break their agreements to sell all their

17   shares and make their quick profit, right?

18   A    I don't know.

19   Q    Well, you've had lock-up/leak-out agreement situations

20   where too many shares are sold too early in a deal, correct?

21   A    I haven't personally, no.

22   Q    Okay.  Have you heard of that kind of thing?

23   A    Yes.

24   Q    And that too could destroy the price of a stock, correct?

25   A    I believe so.

Proceedings                                    2365

1         MR. RIOPELLE:  Your Honor, this might be a good

2    place to stop.  It's 1:00.

3         THE COURT:  Hungry, obviously.

4         MR. RIOPELLE:  I do have a vowel at the end of my

5    name, Judge.  You know what's that means.

6         THE COURT:  And it's Monday.

7         MR. RIOPELLE:  Mr. Bini will tell the Court.

8         THE COURT:  All right, ladies and gentlemen,

9    Mr. Ripoelle wants lunch, so we're going to accommodate him.

10        MR. RIOPELLE:  Thank you, Your Honor.

11        THE COURT:  Ladies and gentlemen, we will take the

12   luncheon break.  The recess rules continue to apply.

13        Don't discuss the case amongst yourselves or with

14   anyone else.  Continue to keep an open mind.  To the extent

15   that you are on social media platforms, please, you're still

16   on radio silence entirely.

17        What that means, no mention or direct about anything

18   that touches on the case, your service as a juror, or even

19   that you're coming to the courthouse.

20        Do not use the recess period as an opportunity to

21   conduct research of any kind, electronic or otherwise.

22   Otherwise enjoy -- at least when we came in it was a beautiful

23   day.  Hope it continues that way.  And we will ask you to come

24   back to the central jury room somewhere between 1, 1:15 --

25   pardon me, 2 and 2:15, and we will get started as close to

Proceedings                                    2366

1    that as we can.

2                 (Jury exits the courtroom.)

3                 THE COURT:  You may step down.

4                 THE WITNESS:  Thank you, Your Honor.

5                 (Whereupon, the witness steps down.)

6                 THE COURT:  Anything before we go to lunch?

7                 MR. CALIENDO:  Your Honor, Robert Caliendo.  I just

8    had a quick scheduling question.

9                 Was there any days this week where the Court had

10   reserved it would break early?

11                THE COURT:  Yes, I gave you two for sure.  One was

12   tomorrow.  We won't work past around 4.  And the same is true

13   on Thursday.  One of those days is sort of nondescript at the

14   moment.

15                MR. CALIENDO:  So we won't go past 4 on Tuesday or

16   Thursday.

17                Thank you, Judge.

18                THE COURT:  Yes.  Anything else?

19                MS. JONES:  Nothing from the government, Your Honor.

20                THE COURT:  Again the usual rules.  If you need it

21   take it with you, otherwise William will lock it up.

22                (Whereupon, a recess was taken at 1:00 p.m.)

23

24

25

1          (In open court; jury not present.)

2          THE COURTROOM DEPUTY:  All rise.

3          The Court is back in session.  Counsel for both

4  sides are present, including defendants.

5          THE COURT:  Mr. Riopelle, did you finish eating?

6          MR. RIOPELLE:  I did.  I did, Your Honor.  I had an

7  excellent bowl of Ramen on Henry Street for lunch, just in

8  case the Court was interested.

9          THE COURT:  And you spent your entire time making

10  your cross even more concise.

11          MR. RIOPELLE:  Mostly I was thinking about the

12  noodles.

13          THE COURT:  Let's bring the jury in rather than

14  worry about the noodles.

15          (Witness resumes the stand.)

16          (Jury present.)

17          THE COURT:  Be seated, please.

18          Counsel will stipulate the jury is present and

19  properly seated.

20          MS. JONES:  Yes, Your Honor.

21          MR. ROSS:  Agreed, Judge.

22          MR. RIOPELLE:  So stipulated, Your Honor.

23          THE COURT:  Thank you, Counsel.

24          And, ladies and gentlemen, welcome back.  I hope you

25  had a wonderful lunch, it's wonderful weather.

Wexler - Cross - Riopelle                    2368

1          And I want to let you know, in case I forget later,

2    for your planning purposes we will tomorrow, Tuesday, we will

3    not be working past 4:00 p.m., so if you need any planning to

4    make in late afternoon, you will have a heads-up right now.

5          That being the case, Mr. Wexler has resumed the

6    stand and Mr. Riopelle is going to continue his

7    cross-examination.

8    BY MR. WEXLER:

9    Q    Good afternoon, Mr. Wexler, before we broke we were

10   talking a little bit, you and I, about lock-up/leak-out

11   agreements and issues of selling of shares in a microcap stock

12   and how that might collapse the price of the stock.

13         Do you recall that testimony?

14   A    Yes.

15   Q    And we haven't had a chance, by the way, to talk further

16   about that over the lunch break, right, we didn't talk to each

17   other?

18   A    No.

19   Q    Did you talk to anybody other than your counsel over the

20   lunch break?

21   A    I didn't talk to anybody, no.

22   Q    Okay.  Very good.

23         Now, in fact, some of the deals that you were

24   involved in prior to Cubed had a problem when there was a lot

25   of selling and the share price collapsed, correct?

1   A    Yes.

2   Q    And one example of that was this stock we've heard a

3   little bit about called StarStream, right?

4   A    Correct.

5   Q    And that is one of the deals that we established right at

6   the outset of your testimony, my client, Ms. Cane, had nothing

7   to do with, correct?

8   A    Correct.

9   Q    Right.

10          Now, it's -- these lock-up/leak-out type agreements,

11  the point of those is to control the way in which stock is

12  sold into the market, right?

13  A    Yes.

14  Q    And without some degree of control, there's this big risk

15  of losing your shirt when everybody sells at once, correct?

16  A    Yes.

17  Q    Now, you, as a holder of free-trading shares, in a

18  typical deal of this kind, would not want to be left holding

19  those shares if there was a big sell off and the market

20  collapsed, right?

21  A    Correct.

22  Q    You would want to sell your shares before the market

23  collapsed, if possible, right?

24  A    Correct.

25  Q    Now, during your involvement in microcap stocks, you

1  have, in fact, bribed at least one stock broker to help you

2  get rid of your shares quickly, correct?

3  A    Correct.

4  Q    And that was a Jamie Sloan; is that right?

5  A    Correct.

6  Q    I think we had it in your direct testimony that you paid

7  her some cash; is that right?

8  A    Yes.

9  Q    Was that about 10 to $15,000?

10  A    Around there, yes.

11  Q    And you paid that to her in green cash, right?

12  A    Yes.

13  Q    Did you go to the bank to get that money?

14  A    I don't recall.

15  Q    And the idea was to pay her so that she would take your

16  stock and sell it, correct?

17  A    Correct.

18  Q    And you also gave her some shares of StarStream to sell

19  for herself, correct?

20  A    For a family member.

21  Q    And that was part of the bribe, too, right?

22  A    Yes.

23  Q    And the idea was that if you paid her in green cash and

24  the shares of StarStream, she would take some of your shares

25  and sell them to your customers -- or to her customers, sorry

1    about that?

2    A    Correct.

3    Q    And you would get rid of this stock before the market --

4    before it collapsed, right?

5    A    Correct.

6    Q    But, in fact, she took your money and didn't do what you

7    asked; is that right?

8    A    Correct.

9    Q    And ultimately the market did collapse in StarStream,

10   correct?

11   A    Yes.

12   Q    And you were left holding those shares, which you had

13   tried to get her to sell, correct?

14   A    Correct.

15   Q    And is the word stuffing accounts, is that a term that's

16   familiar to you?

17   A    Yes.

18   Q    And that is what you were asking Ms. Sloan to do,

19   correct?

20   A    Correct.

21   Q    And stuffing accounts, just so we're clear, is putting

22   stock into a broker's -- the accounts of a broker's customer,

23   right?

24   A    Yes.

25   Q    Whether they want it or not, right?

Wexler - Cross - Riopelle                          2372

1   A    Within the limits, I'm sure, yes.

2   Q    And the idea is the broker is going to put it in the

3   client's accounts, to the extent he or she has discretion to

4   do so, right?

5   A    Yes.

6   Q    And the idea is they're not going to make any judgment as

7   to whether it's a good investment or a bad investment, they're

8   just going to stuff it in their client's accounts, correct?

9   A    Correct.

10  Q    Now, another broker that you gave some money to was a

11  fellow named Matthew Bell, correct?

12  A    Correct.

13  Q    And you gave about $5,000 to his favorite charity?

14  A    Correct.

15  Q    And that was to convince him to take some CodeSmart off

16  your hands?

17  A    That was the ultimate payment, what it was for, yes.

18  Q    To -- to help -- to convince him to take CodeSmart and

19  sell it for you, correct?

20  A    Correct.

21  Q    And, again, the idea was to get him to sell your shares

22  as fast as possible so you wouldn't be left holding the bag at

23  the end, correct?

24  A    Correct.

25  Q    Now, in connection with -- and, again, my client had

1    nothing to do with CodeSmart, right?

2    A    That's correct.

3    Q    Now, in connection with Cubed, and that's the one of

4    these transactions that my client did have something to do

5    with, correct?

6    A    Yes.

7    Q    In connection with Cubed, you understood that there was a

8    broker who was acting as a market maker for the account where

9    the free-trading shares were held; is that correct?

10   A    I didn't differentiate the broker or the market maker in

11   any specific form.  I just knew there was a market-maker.

12   Q    Okay.  We'll go with that.

13        You knew there was a market-maker for the account in

14   which the free-trading shares in Cubed were held, correct?

15   A    That's what I understood, yes.

16   Q    And did you know that broker's name?

17   A    The company would be listed as Glendale.

18   Q    Glendale.

19        All you knew was Glendale, right?

20   A    Yes.

21   Q    You were never given the name of the broker, the specific

22   broker at Glendale that was handling that account, correct?

23   A    That's correct.

24   Q    And you were never given the name of the person whose

25   name was on the account either, right?

1  A    Correct.

2  Q    You've never heard the name David Ben-Bassat, correct?

3  A    Correct.

4  Q    Now, during the time that the Cubed transaction was

5  occurring, you understood that my client, Ms. Cane, was in

6  touch with the broker at Glendale, correct?

7  A    Correct.

8  Q    And you understood that it was her desire not to have

9  anybody else be in touch with him, correct?

10  A    I don't remember any such conversation.

11  Q    But you, yourself, were never in touch directly with a

12  broker at Glendale?

13  A    No.

14  Q    You had to go through Ms. Cane if you wanted to express a

15  view as to what should happen with that account at Glendale,

16  correct?

17  A    Correct.

18  Q    Now, am I correct that you never heard anything about

19  anyone paying a bribe to the broker at Glendale in connection

20  with that account?

21  A    Correct, I have not.

22  Q    And was it your understanding that the broker at Glendale

23  would be effectively leaking the shares into the market as the

24  market allowed?

25  A    Yes.

Wexler - Cross - Riopelle                    2375

1  Q    He was going to sell them a little bit at a time,
2  correct?
3  A    As far as I understood, yes.
4  Q    And the idea was by doing that he wouldn't collapse the
5  price, like what had happened in StarStream, right?
6  A    Correct.
7  Q    And it was your understanding was that he was not going
8  to sell it to his own customers, like stuff it in his
9  accounts, he was going to sell it into the market?
10  A    I have no idea about that.
11  Q    Okay.
12  A    Or no information.
13  Q    Okay.  You had no information about that one way or the
14  other?
15  A    Correct.
16  Q    And did it occur to you that the fact that my client
17  never gave you the name of the broker at Glendale, did it
18  occur to you that she kept that information from you to
19  protect the broker from you?
20  A    There was no indication, no.
21  Q    Now, you are familiar, based on your experience as a
22  trader in securities, with the concept of short selling,
23  correct?
24  A    Minimal.
25  Q    Okay.  You know a little bit about it?

Wexler - Cross - Riopelle                    2376

1    A    Little bit.

2    Q    Have you ever done a short sale yourself?

3    A    No.

4    Q    Okay.  In that case, I'm going to skip that topic.

5    A    Okay.

6    Q    Okay.

7              It is fair to say, though, that by the time you got

8    involved in the transaction Cubed, you had experience that

9    made you feel a leak-out/lock-up agreement was not going to

10   work?

11   A    Could you repeat, please?

12   Q    Did you have a belief by the time you got involved in the

13   Cubed transaction that a lock-up/leak-out agreement would not

14   work for a transaction like that?

15   A    Most likely.

16   Q    And by the way, with respect to restricted shares, by the

17   time you got involved with Cubed had you had experience with

18   people -- holders of restricted shares -- you had some

19   restricted shares yourself?

20   A    Yes.

21   Q    And you knew of other persons who held restricted shares

22   in various deals?

23   A    Minimal.

24   Q    Okay.  You were aware by the time you got to the Cubed

25   transaction that holders of restricted shares might go to an

Wexler - Cross - Riopelle                 2377

1    unscrupulous lawyer and get that person to write kind of a

2    bogus opinion to get those restrictions off the shares,

3    correct?  That could happen.

4    A    I don't know.

5    Q    You don't know, okay.

6          In any event, it was your experience that a

7    lock-up/leak-out agreement was unlikely to work to protect

8    Cubed's share price, correct?

9    A    I don't know if I can make a judgment, but I would say

10   it's not the best.

11   Q    It's not the best.

12         And it seemed to you, did it not, that the

13   escrow-type arrangement in Cubed was more likely to be

14   successful in protecting Cubed's share price?

15   A    No.

16   Q    But you understood that the escrow account was set up to

17   help protect the share price, didn't you?

18   A    No.

19   Q    Didn't you tell us that you believed that setting up the

20   escrow account in this way would protect the investors in

21   Cubed from others dumping their stock on the market?

22   A    The escrow account was specifically just for distribution

23   of funds to the shareholders on record, basically a piece of

24   paper.

25   Q    Maybe I'm confusing the terms then.  I meant the account

1    at Glendale.

2    A    Okay.

3    Q    The use of that account, the purpose of that was to

4    protect the persons participating in it from a situation where

5    the share price would collapse, correct?

6    A    Potentially.

7    Q    Did you understand at any point that the use of the

8    account at Glendale might also protect Cubed's shareholders

9    from a short selling wave -- a wave of short sellers in the

10   stock?

11   A    I -- I don't have enough knowledge of short sale to give

12   an answer.

13   Q    Now, there came a point in time when some fairly

14   sophisticated investors associated with hedge funds actually

15   invested in the Cubed deal, correct?  Richard Abbey?

16   A    Some of the gentlemen on the list did not actually put

17   capital into the company.  They were on the list for other

18   reasons.

19   Q    Okay.  But they were sophisticated persons?

20   A    I don't know them well enough.

21   Q    Did you have the impression or were you told that they

22   had had this escrow-type arrangement reviewed by their

23   internal counsel?  Anybody tell you that?

24   A    I believe Mr. Discala did tell me that.  Mr. Abbey had

25   had it.

1   Q     Had it reviewed?

2   A     Yes.

3   Q     And that it was legal?

4           MS. JONES:  Objection.  Hearsay.

5           THE COURT:  Sustained.

6   Q     Was there also an individual named Scott Baron who was an

7   investor in Cubed?

8   A     Yes.

9   Q     And he was an attorney, correct?

10  A     Correct.

11  Q     He never expressed the view that this arrangement --

12          MS. JONES:  Objection.  Hearsay.

13          THE COURT:  Yes, sustained.

14  Q     Did you hear any investor in Cubed express the view that

15  the arrangement with Glendale Securities was inappropriate?

16          MS. JONES:  Objection.  Hearsay.

17          THE COURT:  Sustained.

18          MR. RIOPELLE:  Your Honor, can I have a sidebar on

19  that?

20          THE COURT:  Sure.

21          (Sidebar.)

22          (Continued on next page.)

23

24

25

```
                        Sidebar                    2380
```

1          (Sidebar conference held on the record out of the

2     hearing of the jury.)

3          MR. RIOPELLE:  Your Honor, I believe the answer to

4     the question is no one ever said this was bad, so there's no

5     statement, so it's not hearsay.

6          MS. JONES:  I think he's trying to elicit statements

7     that so-and-so said this is legal.  He's trying to get him to

8     say that someone told him that this was legal.

9          MR. RIOPELLE:  Nobody told him it was illegal.

10    That's what -- nobody ever said --

11         THE COURT:  It's still a statement.

12         MR. RIOPELLE:  But nobody ever made that statement,

13    Judge, so there's no statement.  It's no -- I never heard that

14    from anybody.  It's not hearsay.

15         THE COURT:  What is the question?

16         MR. RIOPELLE:  Did Mr. Baron tell you --

17         THE COURT:  Lay a foundation that someone had a

18    discussion about it with him, and if he says yes, then you can

19    ask him.

20         MR. RIOPELLE:  Okay.

21         MR. BINI:  Your Honor, one other point on this, and

22    that is, if we had some concern that basically that -- and I

23    understand that because I think it's Government's case, and I

24    know I'm bias, but I think the Government's case is very

25    strong on this one; however, the cross-examinations by defense

Sidebar                                          2381

1    are suggesting somehow that manipulating stock to prevent

2    short selling is legal and that is illegal as a matter of law,

3    and I think that cross-examination of this type should be

4    curtailed because it can only call for jury nullification.

5    And it's a 403 problem because you're going to confuse this

6    jury by suggesting, going down this line of questioning that I

7    know is featured in the opening, this theme, that somehow it

8    is legal and permissible to do this.

9            When Deb Oremland was on the stand, it was not a

10   problem for the Government because she knows what the rules

11   are and so we elicited it briefly in redirect.  We certainly

12   don't want her to testify about the law.  That comes from you,

13   Your Honor.  If the cross-examinations are going to suggest to

14   the jury that this is legal conduct, at some point we're going

15   to have to ask for instruction from the Court about

16   manipulative trading is never legal.

17           THE COURT:  We're going to get that in the charge,

18   aren't you?

19           MR. BINI:  Yes, Your Honor, I hope so, but if they

20   suggest to the jury -- they confuse them with this area of

21   cross-examination, we may ask you to give it as well, some

22   sort of limiting instruction to the jury so they don't get

23   confused on this point, but I guess we will address it if that

24   becomes an issue.

25           MR. RIOPELLE:  The whole issue is my client's

Sidebar                                                      2382

1    intent.  If the intent was to manipulate the market, yeah,

2    she'll be convicted.  If the intent was to protect --

3             THE COURT:  No, no, no.  You can protect the share

4    price by manipulating the market for a lot of purposes and

5    manipulation of the market is not permitted.

6             MR. RIOPELLE:  Understood.

7             (Sidebar concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. RIOPELLE:

2   Q    Mr. Wexler, I think we established earlier that a

3   gentleman named Scott Baron was an investor in the Cubed deal,

4   correct?

5   A    Correct.

6   Q    And you understood that Mr. Baron was a lawyer, correct?

7   A    Correct.

8   Q    Were there --

9          THE COURT:  Did you ever seek Mr. Baron's advice?

10         THE WITNESS:  No, Your Honor.

11         THE COURT:  As a lawyer?

12         THE WITNESS:  No, Your Honor.

13  Q    Did you have discussions with Mr. Baron about his

14  investment and your investment in Cubed?

15  A    Yes.

16  Q    During those discussions, at any time, did Mr. Baron

17  express to you a concern that the account at Glendale was

18  illegal in some way?

19         MS. JONES:  Objection.  Hearsay.

20         THE COURT:  Express a view about the legality of the

21  account at Glendale.  Did you ever express a view one way or

22  the other about the legality of the account at Glendale?

23         THE WITNESS:  So am I answering that question?

24         MR. RIOPELLE:  Yes, the judge asked it, you have to

25  answer it.

1           THE WITNESS:  Oh, I'm sorry.

2           Mr. Baron did not.

3    Q    And, in fact, you, I think, told us that you brought in

4    investors in Cubed yourself, correct?

5    A    Correct.

6    Q    About a dozen of them?

7    A    Around that.

8    Q    And am I correct that the general nature of the account

9    at Glendale was not hidden from you, correct?

10          That's a lousy question.

11          You knew that the account at Glendale was going to

12   hold the free-trading shares, correct?

13   A    I knew the -- I knew that Glendale would be the vehicle

14   to release the shares into the open market.

15   Q    Okay.  And you knew that the shares at Glendale would be

16   released into the open market a little at a time, as we've

17   discussed before, right?

18   A    Based upon demand.

19   Q    Based upon demand.

20          And you knew that that was going to be the only

21   place that shares were going to be released into the market

22   from, correct?

23   A    At first they would have to be released there.

24   Q    Okay.  And it's fair to say, isn't it, that you -- when

25   you spoke to investors, the investors you brought to Cubed,

1  did you explain this setup to them?

2  A    No.

3  Q    Did the persons that you brought to Cubed and who were

4  paid by Titan understand that their shares were held in this

5  one account?

6  A    No.

7  Q    So you never explained that to people; is that right?

8  A    Not to my people, no.

9  Q    But this was not -- this setup was not hidden from you in

10 any way?

11 A    No.

12 Q    And in fact, did it sound like a good idea to you in some

13 respects?

14 A    No.

15 Q    Well, you didn't tell any of the people that you got

16 involved in Cube that this was a fraud, did you?

17 A    No.

18 Q    You brought along 12 investors knowing that this was the

19 setup at Cube, correct?

20 A    At the beginning, it wasn't the setup.  It became the

21 setup.

22 Q    But did you bring in investors after this became the

23 setup?

24 A    Possibly.

25 Q    And you didn't tell them that you were getting them

Wexler - Cross - Riopelle                    2386

1    involved in some kind of fraud, did you?

2    A     No.

3    Q     Now, in connection with these various deals that you were

4    involved in over time in the microcap market, you needed to

5    find buyers for these stocks, correct?

6    A     Yes.

7    Q     And the idea was to find buyers to buy in the stock and

8    support the stock at times when it was beginning to decline,

9    correct?

10   A     The buyers would be supporting the stock by buying it --

11   myself and Mr. Discala supported the stock in the opening

12   market.

13   Q     And you would do that at times when the stock would start

14   to decline, correct?

15   A     Correct.

16   Q     And the idea was to try to keep the price up, right?

17   A     Sometimes.

18   Q     And in fact, you did bring some friends in to buy stock

19   in -- stock like CodeSmart when it was starting to go down,

20   correct?

21   A     Yes.

22   Q     A fellow named Ricky Chaffelli?

23   A     Yes.

24   Q     You convinced him to buy stock in CodeSmart as it was

25   declining?

1   A     Myself and Mr. Discala, yes.

2   Q     And how about David Levine, is that someone you convinced

3   to buy stock as it was declining?

4   A     Yes.

5   Q     He was actually your bookmaker that you mentioned

6   earlier, correct?

7   A     Yes.

8   Q     And Mr. Levine's brother and father were also people you

9   convinced to buy CodeSmart stock when it was declining,

10  correct?

11  A     No.

12  Q     Now, did you have other friends that you brought in to

13  buy CodeSmart stock when it was declining?

14  A     Wasn't necessarily declining, but yes.

15  Q     Support the stock?

16  A     Buy the stock.

17  Q     Yeah, to support it, correct?

18  A     Not specifically.  Nonspecific.

19  Q     Did you tell these individuals that you brought in to buy

20  CodeSmart stock that you were trying to sell your CodeSmart

21  stock at the same time you were getting them to buy it?

22  A     No.

23  Q     And, in fact, you were trying to sell your CodeSmart

24  stock at the same time you were convincing these friends to

25  buy it, correct?

1   A     Not specific on the timing with other people.

2   Q     Well, were you selling your CodeSmart stock whenever you

3   could?

4   A     Yes.

5   Q     And when you found buyers there was demand for it, wasn't

6   there?

7   A     That's correct.

8   Q     And you would sell it when there was demand for the

9   stock, correct?

10  A     If possible, there are other people selling as well.

11  Q     Right.

12        But if you could beat them to the punch, you would

13  sell yours, wouldn't you?

14  A     Sure.

15  Q     So it's -- at the same time you were bringing your

16  friends into this CodeSmart stock, you were selling it

17  whenever you could, correct?

18  A     Yes.

19  Q     Did you tell that to him?

20  A     No.

21              (Continued on following page.)

22

23

24

25

1   BY MR. RIOPELLE:

2   Q     You cheated them, didn't you?

3   A     Yes.

4   Q     Because you wanted to get rid of it, in case the market

5   collapsed, right?

6   A     That's correct.

7   Q     And, in fact, you told them that it was a good

8   investment, right?

9   A     That's correct.

10  Q     Even though you were selling it?

11  A     That's correct.

12  Q     Because you didn't want to use your own money to support

13  CodeSmart, if you could avoid it, right?

14  A     No.

15  Q     And, in fact, we heard earlier that you made about a

16  million six, $1,600,000, selling your shares of CodeSmart,

17  correct?

18  A     That's correct.

19  Q     Did Mr. Levine make that kind of money selling his shares

20  in CodeSmart?

21  A     I don't know.

22  Q     Did he ever complain to you that he had lost money in

23  CodeSmart?

24  A     No.  Not that I recall.

25  Q     Did you ever tell your friends to sell their CodeSmart

1  stock while they could?

2  A    I might have.

3  Q    Do you recall if any of them were left holding the bag in

4  CodeSmart stock?

5  A    I don't know.

6  Q    Now, I think you told us that you began working on the

7  Cubed deal at the latter part of 2013; is that correct?

8  A    Yes.

9  Q    And I believe we had it on your direct examination that

10  at that time, my client, Ms. Cane, was not involved with

11  Cubed, correct?

12  A    Correct.

13  Q    Mr. Ofsink, a lawyer named Darren Ofsink, he was the

14  lawyer for Cubed at that point, correct?

15  A    Yes.

16  Q    And you had worked with him in prior deals, correct?

17  A    Yes.

18  Q    He had worked on the CodeSmart deal, right?

19  A    Yes.

20  Q    And he had worked on the StarStream, deal, correct?

21  A    Yes.

22  Q    And the Staffing Group deal, right?

23  A    No.

24  Q    No?

25        Had he worked on the Soul and Vibe deal?

1   A    No.

2   Q    Okay.  But he had worked on the two we talked about,

3   correct?

4   A    Yes.

5   Q    And at the time Mr. Ofsink was involved, am I correct

6   that Omniview, essentially negotiated its financing deal with

7   Cubed?

8   A    Could you repeat, please.

9   Q    At the -- sure.

10          When Mr. Ofsink was involved, that is the point at

11  which Cubed and Omniview negotiated the terms under which

12  Omniview would provide financing to Cubed, correct?

13  A    Yes.

14  Q    And as you understand it, the deal was that Omniview, in

15  exchange for the various financings it would provide, would

16  get about 40 percent of the Cubed stock, right?

17  A    Correct.

18  Q    And management at Cubed would retain about 60 percent of

19  the Cubed stock, right?

20  A    Yes.

21  Q    And Cubed, in exchange for this, through several

22  transactions, would get a total of about a million five in

23  financing?

24  A    I believe so.

25  Q    And the 40 percent of Cubed -- and this was all

1   negotiated by Mr. Ofsink, correct?

2   A     No, sir.

3   Q     It was negotiated by you and Mr. Discala and Cubed?

4   A     Mostly Mr. Discala.

5   Q     But what I'm trying to get at is, this was put into place

6   when Mr. Ofsink was the attorney, correct?

7   A     That's correct.

8   Q     And the deal was that the 40 percent that Omniview would

9   get of Cubed would be free trading shares, correct?

10  A     I believe it was a mix of free trading and a combination

11  of restricted.

12  Q     Okay.  So the 40 percent would include both free trading

13  and restricted shares, correct?

14  A     Correct.

15  Q     And the management of Cubed would get restricted shares,

16  correct?

17  A     Correct.

18  Q     And that was the deal?

19  A     Correct.

20  Q     And that -- am I correct that all those terms were

21  basically negotiated before my client Ms. Cane came along?

22  A     Yes.

23  Q     And, in fact, the paperwork for this deal was executed in

24  Ofsink's office wasn't, Mr. Ofsink's office?

25  A     Yes.

1  Q    And it was only sometime after that that Ms. Cane took

2  over the deal -- the representation of Cubed, correct?

3  A    Yes.

4  Q    And, by the way, Ms. Cane came in, and she was the lawyer

5  for the company, correct?

6  A    That was the representation, yes.

7  Q    Yeah.  And, in fact, did you ever see her retain her

8  agreement?

9  A    No, sir.

10 Q    So you don't know who her retainer agreement was signed

11 by, correct?

12 A    Correct.

13 Q    It's true, isn't it, that she and her firm did not

14 represent Omniview, correct?

15 A    I believe that's an accurate statement.

16 Q    And, in fact, they did not represent you, personally,

17 correct?

18 A    Correct.

19 Q    And they did not represent Mr. Discala personally,

20 correct?

21 A    Correct.

22 Q    And, in fact, you never actually met my client until

23 about March of 2014, correct?

24 A    Yes.

25 Q    And by that point, the deal relating to Cubed had been

1   moving along for four or five months, correct, end of 2013 to

2   March 2014?

3   A    Correct.

4   Q    Now, I think you testified on your direct examination

5   that press releases can be important in these microcap stock

6   deals; is that correct?

7   A    Yes.

8   Q    Can you tell us again in what way the press releases are

9   important to the stock?

10  A    Press releases show the ability of the company and

11  confirm that the company is doing business or doing good

12  things or whatever it is.

13  Q    It is actually doing something, correct?

14  A    Correct.

15  Q    Now, am I right that after Ms. Cane got involved, there

16  were complaints about the fact that she was standing in the

17  way of issuing press releases?

18  A    I don't know if it would be standing in the way or just

19  not releasing press when it was expected or we were told.

20  Q    Now, you do know, do you not, that Ms. Cane and her firm

21  did the filings at the Securities and Exchange Commission for

22  Cubed?

23  A    I believe to get the stock listed.

24  Q    And then there were periodic filings after that, correct?

25  A    Yes.

1  Q    And, in fact, there were also a number of things going on

2  at Cubed in terms of Cubed acquiring other companies, during

3  the time she worked for Cubed, correct?

4  A    Yes.

5  Q    Do you remember that they acquired a company called Ping

6  Mobile?

7  A    I didn't have any knowledge of anything being done

8  contractually or finished through or seen through or anything.

9  Q    Okay.  But you are familiar with the name Ping Mobile,

10  right?

11  A    I am familiar.

12  Q    And there was also a company called Wiki Technologies,

13  does that name mean anything to you?

14  A    That's another part of -- yes.

15  Q    And this was another deal that Cubed had during the time

16  Ms. Cane was there?

17  A    Supposedly.  Supposedly.

18  Q    And was there also a deal -- there was a deal with Ping

19  Mobile?

20  A    I don't know if the deal ever went through, but it was

21  spoken about, yes.

22  Q    It was spoken about.

23       And as the lawyer for the company, these are things

24  she was involved in at some level, correct?

25  A    I don't know her level of participation regarding those

1    deals.

2    Q    Okay.  Fair enough.

3         Am I correct that after -- at about the time

4    Ms. Cane got involved, the company, Cubed, employed a new

5    round of management, including a man named Douglas Shinsato?

6    A    I do recall, yes.

7    Q    And as the lawyer for the company, did you know that she

8    was involved in that?

9    A    No.

10   Q    Now, Cubed also at one point after she became involved

11   hired a man named Paul Turino; is that right?

12   A    Yes.

13   Q    And, of course, do you know as you sit here whether she

14   was involved in that transaction?

15   A    I don't know.

16   Q    And am I correct that after she became involved, the

17   company changed its IRPR group?

18   A    That was my understanding.

19   Q    And just so the jury's clear, what is an IRPR group, as

20   you understand it?

21   A    Investor relations public relations for a company.

22   Q    And so this was a group of individuals that were hired to

23   help create press releases and things like that, correct?

24   A    Yes.

25   Q    And get the news out about the company, correct?

1    A    Yes.

2    Q    And yet it was your understanding that there was some

3    friction over the fact that press releases weren't being

4    issued quick enough and things like that, correct?

5    A    Yes.

6    Q    And, in fact, isn't it a fact that Mr. Turino complained

7    about my client not getting press releases issued quick

8    enough?

9    A    Can you repeat, please.

10   Q    Did Mr. Turino ever complain to you that my client was

11   not issuing press release -- not having press releases issued

12   often enough or quick enough?

13   A    He might have.  There was a lot of misunderstanding.

14   Miscommunication, I should say.

15   Q    And for someone like you, the press releases are an

16   opportunity to trade, correct?

17   A    Potentially.

18   Q    Because if there's good news coming out about the

19   company, it might cause the stock to bounce up, correct?

20   A    It could.

21   Q    Right.  And if it bounces up, somebody who holds it can

22   sell it at a profit, correct?

23   A    It could happen that way, yes.

24   Q    And isn't it a fact that that is one of the hopes that

25   you had, as a holder of Cubed stock, was that the press

1   releases would bring interest in the company, correct?

2   A    Yes.

3   Q    And that the interest in the company would cause the

4   price of the company to rise, correct?

5   A    The press releases would bring buyers to the market,

6   which would allow liquidation of shares.

7   Q    Right.  I'll take that.

8        They would give you an opportunity to sell some of

9   the shares that you held, correct?

10  A    I didn't hold shares in Cubed.

11  Q    It would give the account at Glendale an opportunity to

12  sell some of the shares in that account, correct?

13  A    Correct.

14  Q    Because it was your understanding that the shares at

15  Glendale were intended to be sold only as the market allowed,

16  correct?

17  A    That was my understanding.

18  Q    And isn't it a fact that there were times when

19  Mr. Discala was upset at the fact that press releases were not

20  being issued as promptly or as often as he might have liked?

21  A    Yes.

22       MR. RIOPELLE:  Now, if we could display for the

23  witness and the jury, Government Exhibit 129-31, in evidence.

24  BY MR. RIOPELLE:

25  Q    And, Mr. Wexler, I believe this is a text that you have

1  testified about earlier.  Just take a moment to read it and

2  let me know if you recollect it.

3  A     Yes.

4  Q     And this is a text you sent to Ms. Cane, correct?

5  A     Yes.

6  Q     And you begin the text with the words, "Aloha, Kyleen,"

7  correct?

8  A     Yes.

9  Q     And she was in Hawaii at the time, correct?

10  A     I believe so.

11  Q     And in this text, you say to her, at the top part of the

12  text, do you think we can take to up to at least 5.30

13  tomorrow.

14        I take it that is a request by you to her to have

15  the account at Glendale sell shares at at least 5 dollars and

16  30 cents, correct?  Is that what you were asking her to do?

17  A     No.  I was requesting to have Glendale move the price up

18  to $5.30, however it gets done.

19  Q     However it gets done, okay.

20        You were asking for Glendale to raise its price to

21  $5.30?

22  A     Correct.

23  Q     In the hopes that Glendale would sell its shares at

24  $5.30, correct?

25  A     Glendale would only be able to sell the shares if there

1   was buying.  So I believe so, but it looked like it was a

2   pre -- prepress release expectation as well.

3   Q    And that's the rest of the message, down near the bottom,

4   there's some talk about a press release, right?  And that

5   press will come out tomorrow, correct?

6   A    Yes.

7   Q    So you were hoping that Glendale would raise its price a

8   little in the hope that the press release would increase

9   demand for the stock, correct?

10  A    Yes.

11  Q    And, by the way, was Ms. Cane in Hawaii recuperating from

12  surgery when you sent her this text?  Did you know that?

13  A    No.

14  Q    Okay.  I would like to -- can we -- is it possible

15  through the miracle of technology to put this on one side of

16  the screen and put another exhibit on the other side.  I am

17  looking for Government Exhibit 180-1.

18        Are you able to read that exhibit on the right,

19  Mr. Wexler?  The print is a little small.

20  A    Yeah, that's better, yes.

21  Q    Okay.  You can see that that is an account at Glendale

22  Securities, correct?

23  A    Yes.

24  Q    I'd like to go to page -- hold on.  I have it in my notes

25  here.  The page that corresponds to April 23 and 24.  And I

1   think it is well into this exhibit.  I should have it here

2   somewhere.  It is way down toward the end.  April 23 and 24.

3   That's the one.  There we are.

4           Okay.  And looking at this page, Mr. Wexler, we can

5   sell -- we can see the prices at which this account at

6   Glendale sold shares on April 23 and April 24, correct?

7   A    Yes.

8   Q    And we can see that on April 23 it sold shares at $5.25,

9   correct?

10  A    Yes.

11          MS. JONES:  Objection, Your Honor.  There's no

12  foundation for this witness to testify about this document.

13          THE COURT:  Come to sidebar and explain.

14          (Sidebar conference.)

15          (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

1      (WHEREUPON, the following proceedings were had at

2  sidebar, out of the hearing of the open courtroom, to wit:)

3      MS. JONES:  Your Honor, he's showing him the David

4  Ben-Bassat account statement, which has an aggregate of all

5  the stocks sold on that day, at a particular price.  It does

6  not have individual sales like by price by price by price.

7  This witness has never seen this document before, he never

8  knew about it, and it's like Mr. Riopelle is doing a bit of

9  his closing or argument this witness, which is inappropriate.

10      MR. RIOPELLE:  Your Honor, if you sustain this one,

11  I hope you keep their case agent off the stand.  I am doing

12  with this witness exactly what they will do with the case

13  agent, as soon as they can put him on, which is to show, to

14  the extent we have circumstantial evidence in the form of this

15  account statement, which relates to the account at Glendale,

16  it shows that Ms. Cane did not follow this witness' request to

17  raise the price about $5.30.

18      MS. JONES:  This document -- all this document shows

19  is for that day the average price of all the stock sold.  And

20  this is a fact witness.  This is not a summary agent, it is

21  not a case agent.  He's supposed to be testifying about what

22  his firsthand knowledge is.

23      THE COURT:  Well, if he can -- if he's familiar --

24  if he establishes he's familiar with this document, then you

25  can ask him questions.

1            MR. RIOPELLE:  Your Honor, I can't.  He says he

2    doesn't know the name David Ben-Bassat.

3            THE COURT:  Well --

4            MR. RIOPELLE:  Okay.  We will do it with the case

5    agent.  Thank you.

6            (Sidebar conference ends.)

7            (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (Open court.)

2   BY MR. RIOPELLE:

3   Q    Mr. Wexler, am I correct that you have no knowledge as

4   you sit here today whether Ms. Cane instructed the broker,

5   whoever that was, at Glendale, to raise his or her price to

6   $5.30 or better, as you requested on April 23?

7   A    I requested -- I don't have any way of knowing

8   specifically, no.

9   Q    What she did, correct?

10  A    Correct.

11  Q    I would like to put up on the screen now Government

12  Exhibit 129-42.

13            This is another text message, correct?

14  A    Yes.

15  Q    And this is one where you complained that there was no

16  news today, wow?

17  A    Yes.

18  Q    And, in fact, you were hoping for news on this particular

19  day, May 20, correct?

20  A    Expecting.

21  Q    You were expecting news.  And it didn't come out, right?

22  A    Correct.

23  Q    So -- by the way, you were expecting that from Ms. Cane

24  and her group of people that she was working with?

25  A    Yes.

1   Q    And you were disappointed when she and the group she was

2   working with did not do what you were expecting, correct?

3   A    Correct.

4   Q    Do you know as you sit here whether any shares were sold

5   from the Glendale account on May 20, 2014?

6   A    Can you repeat, please.

7   Q    Do you know as you sit here today, Mr. Wexler, whether

8   any shares were actually sold out of the Glendale account on

9   this day, May 20, 2014?

10  A    From me sitting here, no.

11  Q    Yeah.  You don't know that, you haven't gone back to look

12  at the records or anything like that, correct?

13  A    That's correct.

14  Q    But it would be your hope, would it not, that if press

15  releases were issued, the broker at Glendale would take

16  advantage of market interest to sell shares from that Glendale

17  account, correct?

18  A    If there was market interest.

19  Q    Yeah.  If there was market interest, you were hoping

20  those shares would be sold, right?

21  A    Correct.

22  Q    Because it was your understanding you had an interest in

23  those shares, right?

24  A    Yes.

25  Q    And any sale that yielded a profit would be a profit you

1  would participate in, correct?

2  A    Correct.

3  Q    I would like to put on the screen another one of the text

4  messages, Government Exhibit 129-47.  And I would like to get

5  the bottom -- the last two of them are actually -- there we

6  go.  Okay.

7        Your first text message there says, at 7:45 nada,

8  right?

9  A    Yes.

10 Q    And that, too, is a complaint about a lack of a press

11 release, correct?

12 A    I can't tell strictly from this, but I don't --

13 Q    Okay.  I think if we go down and read a couple of the

14 press releases on the next page, too, it will become clearer.

15 Sorry.  Does that help you recall?

16 A    Yes.

17 Q    Yeah.  And so if we can go back up to 7:45 nada.  Thank

18 you.

19        At 7:45, it says, nada, and that's a complaint at

20 the fact that a press release was not issued before the market

21 opened, correct?

22 A    Correct.

23 Q    And underneath that one, my client -- or no, you say,

24 will -- I think it is, call you later, right?

25 A    Yes.

1  Q    That's just fat thumbs, like I got?

2  A    Yes.

3  Q    I suffer the same problem.  I know, I can read that.

4  A    Yes.

5  Q    Will call you later.  AJ's going ballistic.  I will

6  handle.

7         What did you mean to communicate to Ms. Cane by

8  that?

9  A    That Mr. Discala and myself were upset that there was no

10  press release, and I would call her later.

11  Q    All right.  And, again, the hope was, with the press

12  release, before the market opened, it would prompt market

13  interest in the stock, correct?

14  A    Correct.

15  Q    And that would be a sales opportunity for the broker at

16  Glendale, correct?

17  A    Potentially.

18  Q    Because the instructions, as you understood them, to the

19  broker at Glendale, were to sell shares as market interest

20  permitted, correct?

21  A    Repeat, please.

22  Q    Because your understanding was that the instructions to

23  the broker at Glendale were to sell shares as the market

24  interest allowed, correct?

25  A    That was my interest, yes.

1    Q    Yeah.

2         And you wanted him or her to sell those shares as

3    market interest developed in the stock, correct?

4    A    Correct.

5    Q    Now, do you know as you sit here now, that there was no

6    sale of stock at Glendale for several days after this set of

7    text messages between you and Ms. Cane?

8    A    No.

9    Q    Looking at the next page, page 2, we can see that you

10   volunteer to run press, correct?

11   A    Yes.

12   Q    And that is you, asking if you can be in charge of taking

13   care of the press releases; is that right?

14   A    Yes.

15   Q    And you are doing that partly because you know that

16   Ms. Cane is very busy with the acquisitions and the like and

17   all that's going on at Cubed because she's their lawyer,

18   right?

19   A    I'm not sure what she was doing with the Cubed.

20   Q    But she wasn't doing enough with press releases to make

21   you happy, correct?

22   A    The press releases were not coming out as we were told.

23   Q    And she wasn't doing enough with press releases to make

24   Mr. Discala happy either, correct?

25   A    Correct.

1    Q    If we go down to the next one below these, this is her

2    response to you.  Did you know who Kurt Divich was?

3    A    No.

4    Q    Isn't she telling you that this man, Kurt Divich, is now

5    handling the press releases?

6    A    Yes.

7    Q    And he delivers just before market opens, she says,

8    correct?

9    A    Yes.

10   Q    So this text messages indicates to you, does it not, that

11   Ms. Cane was not in favor of you taking over the press release

12   function, correct?

13   A    That was obvious from every angle.

14   Q    That she did not want you taking that over, correct?

15   A    Yes.

16   Q    Now, if we can also look at Government Exhibit 129-55.

17   And the top one there.  Yes.  Thank you.

18        This, again, is a message from you to Kyleen Cane on

19   June 5, 2014, correct?

20   A    Yes.

21   Q    And this is, again, is you complaining about the timing

22   of a particular press release, right?

23   A    Yes.

24   Q    It didn't go out early enough in the morning to generate

25   the market interest that you were hoping for, correct?

1    A    Yes.

2    Q    And you were complaining to Ms. Cane about that, right?

3    A    Yes.

4    Q    And the reason you were complaining is that if a press

5    release is issued in the middle of the day, it is not likely

6    to give you that bounce in share price that you are hoping

7    for, correct?

8    A    Correct.

9    Q    And so by issuing this press release in the middle of the

10   day, the person in charge of the press release at Cane did not

11   give you the sales opportunity for Cubed shares you were

12   hoping for, correct?

13            MS. JONES:  Objection.  Your Honor, may we have a

14   sidebar.

15            (Sidebar conference.)

16            (Continued on the next page.)

17

18

19

20

21

22

23

24

25

1          (WHEREUPON, the following proceedings were had at

2    sidebar, out of the hearing of the open courtroom, to wit:)

3          MS. JONES:  Your Honor, it is not -- this exhibit is

4    not in evidence, the government didn't admit it into evidence.

5    Mr. Riopelle is not permitted to admit it into evidence

6    because it is --

7          THE COURT:  No one told me it wasn't in evidence.

8          MS. JONES:  I didn't -- just assumed it was because

9    he was showing it.

10          MR. RIOPELLE:  Sorry.  I withdraw it.

11          THE COURT:  Okay.

12          (Sidebar conference ends.)

13          (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1   (Open court.)

2   BY MR. RIOPELLE:

3   Q    In any event, Mr. Wexler, you do recall frequently

4   complaining to my client about --

5             THE COURT:  You should tell the that exhibit --

6             MR. RIOPELLE:  That exhibit is withdrawn, Your

7   Honor.

8             THE COURT:  It wasn't in evidence.  Disregard it.

9             MR. RIOPELLE:  Too many exhibits to keep track of,

10  and I apologize for that.

11  BY MR. RIOPELLE:

12  Q    Now, in any event, having looked at these items, you do

13  recall that complaints were frequently made to my client,

14  Ms. Cane, about the way that press releases were handled at

15  the company, correct?

16  A    Occasionally, yes.

17  Q    Well, on more than one occasion, right?

18  A    Yes.

19  Q    Now, you told us a bit on your direct examination and

20  your cross-examination, by my able codefendant's counsel, that

21  the distributions were made in connection with the Cubed stock

22  from an account called Titan; is that right?

23  A    Yes.

24  Q    And the idea was that you and your long-term accountant

25  Mr. Wolfson would take care of making sure that the

1   distributions were made to those who had an ownership interest

2   in the Cubed shares, right?

3   A     That was the intent.

4   Q     Uh-huh.

5             And am I correct that you were upset that the

6   distributions were lower than you expected?

7   A     Yes.

8   Q     And you understood that my client was withholding from

9   the distributions about 39 percent to pay for the taxes

10  associated with the sales of Cubed in the account at Glendale,

11  right?

12  A     That was part of what I was told.

13  Q     And you were told that and that upset you, correct?

14  A     Yes.

15  Q     Because that money was not, in fact, paid over to this

16  account at Titan, right?

17  A     Correct.

18  Q     Now, this account at Titan was set up by you, right?

19  A     Yes.

20  Q     And it was managed by you, correct?

21  A     Yes, myself and Mr. Discala.

22  Q     And together with Mr. Wolfson, too, right?

23  A     Yes.

24  Q     And when you complained to Ms. Cane about this tax issue,

25  she told you that in the future she would arrange to have the

1   sales made from an account offshore, correct?

2           MS. JONES:  Objection.  Hearsay.

3           THE COURT:  Sustained.

4   BY MR. RIOPELLE:

5   Q    Did you understand that Ms. Cane offered to you to make

6   the sales in a way where tax would not need to be withheld?

7   A    No.

8   Q    Now, you were asked some questions about a -- what's

9   called a cap table.  Do you remember that?

10  A    Yes.

11  Q    And the cap -- there's been several versions.  I'd like

12  to show you first Government Exhibit -- and I can do it here,

13  if you like.

14          I am showing you Government Exhibit 127-11, which

15  the first page of it is this e-mail that says please see

16  attached the finalized cap table.

17          And then you were asked some questions about the

18  attachment, which shows a series of names, including my

19  client's name, right there, somewhere in the middle, right?

20  Do you remember that?

21  A    Yes.

22  Q    Okay.  And there are other -- and at the top, it says, 75

23  cents or a dollar, correct?

24  A    Yes.

25  Q    And is that the price at which the various persons on

1    this list were getting their shares?

2    A    Some people or some names or some entities didn't put

3    anything and were issued shares.

4    Q    Okay.  And, indeed, there were some people whose names

5    didn't even appear on this list, right?

6    A    That's correct.

7    Q    Now, there's another list that I think we looked at,

8    Government Exhibit 127-22.  And I have highlighted it, sorry,

9    just to keep myself oriented.  This is dated July 7, correct,

10   or appears to be?

11   A    Yes.

12   Q    And this e-mail, 127 -- sorry about that.  This is

13   127-11, this is dated March 17, 2014, correct?

14   A    Yes.

15   Q    And so there are some differences between these lists in

16   terms of the participants on the list, at 127-22, are

17   different than the participants on 127-21, correct?  By then

18   the list had evolved a little bit?

19   A    The one from March to July you mean?

20   Q    Yes.

21   A    Yes.

22   Q    For example, Brian Daley, I don't think he's on the other

23   list, right?  I'm sorry.  This is kind of confusing.

24        But, in any event, you would agree with me that

25   there are names on 127-22 that are different from the names on

1  127-21, correct?

2  A    Yes.  As far as I can see, yes.

3  Q    And this is the one, 127-22, that lists "Kyleen tarder,"

4  correct?

5  A    Yes.

6  Q    And you're not sure what that refers to; am I correct?

7  A    I believe it is supposed to say Kyleen's trader, but I'm

8  not sure.

9  Q    Do you know if this list, 127-22, has an entry for Kyleen

10  Cane?

11  A    Can you just tell me the date of that document?

12  Q    July 7.

13  A    Okay.

14  Q    Updated July 7.

15  A    Okay.  So I can't -- can you show me the list to see if

16  the name -- her name is on there?

17  Q    Yes.  It's probably be easier for me just to hand it to

18  you, right?

19  A    Yes.

20       MR. RIOPELLE:  May I approach the witness,

21  Your Honor.

22       THE COURT:  You may.

23  BY MR. RIOPELLE:

24  Q    There you go.  Just flip through it.

25  A    Thank you.

1   Q     Okay.  You have been through it?

2   A     Yes, sir.

3   Q     No reference to Ms. Cane herself, correct?

4   A     No.

5   Q     Now, just to orient ourselves, this list refers to the

6   free trading shares, correct?

7   A     Correct.

8   Q     That were held in the account at Glendale, right?

9   A     Correct.

10  Q     Now, and you have told us, I think, that there were

11  persons who were not even listed on either one of these lists

12  who had an interest in those shares, correct?

13  A     I believe so.

14  Q     And there came a time, did there not, when Titan was

15  basically just kind of an entity from which payments were

16  subsequently disbursed, correct?

17  A     Collected and disbursed.

18  Q     Collected and disbursed.

19          And it would collect the proceeds of the

20  transactions at Glendale, right?

21  A     Yes.

22  Q     And then it would -- you and Mr. Wolfson would disburse

23  those proceeds to the persons on this list, correct?

24  A     Depending upon, yes, if they put money in or not put

25  money in first, but, yes.

1  Q    Right.

2         And you would even disburse some money to people who

3  weren't on the list, correct?

4  A    I don't know.

5  Q    Okay.  Well, let me ask you this.  There was a time in

6  June, was there not, of 2014, when the Titan -- Titan bank

7  account received a transfer of $300,000?

8  A    Yes.

9  Q    And that was the first distribution of funds from the

10 Glendale account to Titan, correct?

11 A    Yes.

12 Q    And then it became your job, together with Mr. Wolfson,

13 to split that money up and send it out to those who were

14 entitled to it, correct?

15 A    Yes.

16 Q    And, in fact, there -- we had an exhibit, Government

17 Exhibit 163-16, this is the checks that were sent out from

18 Titan after it got that 300,000; do you know that?

19 A    I can't see the top part.  Yes.

20 Q    Yeah.

21        And I am going to -- may I approach the witness

22 again, Your Honor?

23             THE COURT:  You may.

24 BY MR. RIOPELLE:

25 Q    I will take back that last one, sir, and if you could

1  just flip through there, and let me know if you recognize any

2  of the checks written from Titan to be checks written to

3  Kyleen's trader, somebody associated with Kyleen Cane as a

4  trader.

5  A    No.

6  Q    Thank you, sir.  I will just take that back from you.

7         And if you don't mind, I will just keep going to get

8  you out of here as quick as possible.

9         There is not a check for Kyleen Cane in here,

10  either, is there?

11  A    No.

12  Q    The first check is written to somebody named Sara Adams;

13  is that right?

14  A    Yes.

15  Q    Sara Adams was not on any of the lists we saw, was she?

16  A    There was multiple lists and updates, so I am not exactly

17  sure if she was on there, or not, or someone related to her,

18  possibly.

19  Q    Her husband is a man named Hunter Adams?

20  A    I believe so.

21  Q    In fact, Hunter Adams, was a person whose name was not on

22  the list, 127-11, correct?

23  A    On which date?

24  Q    That's March of 2014?

25  A    Not on the list.

1  Q    Not on the list.

2         And do you recall, sir, he wasn't on the other list

3  we looked at either, right?

4  A    I didn't see his name, no.

5  Q    Nor was Sara Adams on either one of those lists, was she?

6  A    I don't believe so.

7  Q    And yet Sara Adams, although her name was not on either

8  one of those lists, got $100,000 of the 300,000 that was paid

9  into Titan, correct?

10  A    That's correct.

11  Q    And the next check was to somebody named Jill Strauss,

12  correct?

13  A    Correct.

14  Q    And that's $50,000, correct?

15  A    That's correct.

16  Q    Was she also associated with Hunter Adams in some way?

17  A    Yes.

18  Q    How was that, sir?

19  A    Not exactly sure.  I don't know what the relation is.

20         (Continued on the next page.)

21

22

23

24

25

1    CROSS-EXAMINATION

2    MR. RIOPELLE:

3    Q    Okay.  Did Hunter Adams direct you to write these checks

4    to Sara Adams and to Jill Strauss?

5    A    Yes.

6    Q    And am I correct that he did that in a way that

7    frightened you?

8    A    Myself and Mr. Discala, speaking for myself, somewhat.

9    Q    In fact, he was a very threatening person, wasn't he?

10   A    I don't know him that well.

11   Q    But you were frightened, and you wrote these checks,

12   correct?

13   A    We just wrote the check 'cause he requested it and might

14   have been on a little bit of the frightened side.

15   Q    Yeah.  Did you know, sir, at the time you wrote these

16   checks that Mr. Adams had been convicted of securities fraud

17   in the courtroom right across the hall before Judge Garaufis?

18   A    Not specifically, no.

19   Q    Did you know that he had a criminal history?

20   A    Yes.

21   Q    Now after Mr. Adams made you frightened and caused you

22   write these checks, did you tell Ms. Cane that Hunter Adams

23   had threaten you, frightened you?

24   A    No.

25            MS. JONES:  Objection.  Hearsay.

Wexler - Cross - Riopelle                    2422

1           THE COURT:  Overruled.

2    Q    Did you tell Ms. Cane that Hunter Adams had a prior

3    conviction?

4    A    No.

5    Q    But you knew those things, correct?

6    A    I didn't know the specifics on Hunter Adams' history.

7    Q    But you knew he was a criminal?

8    A    I had heard.

9    Q    And you didn't share that information with Ms. Cane, did

10   you?

11   A    No.

12   Q    And the reason you didn't share that information with

13   Ms. Cane is you knew she'd have nothing to do with such a

14   person; isn't that right?

15   A    No.

16   Q    Is it that you were frightened of Hunter Adams, is that

17   why you didn't share it?

18   A    No.

19   Q    Just never crossed your mind?

20   A    Nonspecific.

21   Q    Now I'd like to direct your attention to --

22           MR. RIOPELLE:  You know what, Judge, this might be a

23   good place to take our break because I'm moving on to another

24   topic.

25           THE COURT:  Keep going.

Wexler - Cross - Riopelle                    2423

1  Q    Okay.  I'd like to direct your attention then to

2  May 23rd, 2014.

3            Do you recall that date, sir?

4  A    Yes.

5  Q    And am I correct, sir, that on that date a spike in the

6  price of Cubed stock occurred?

7  A    I don't recall that on that date.

8  Q    Do you recall a date on which the price of Cubed stock

9  rose 20 percent or something like that?

10 A    Yes.

11 Q    And you don't recall it was May 23rd?

12 A    Not specifically.

13 Q    Okay, let me see if I can show you something.  Do you

14 recall it happened in and around May?

15 A    Yes.

16 Q    And do you -- let me just show you, I'm going to approach

17 the witness, Your Honor, is that okay?

18            THE COURT:  You may.

19 Q    I'm going to show you Government's Exhibit 196-14 just

20 for the purpose of finding a date.  Tell me if looking at that

21 exhibit refreshes your recollection that on or about May 23rd

22 was the time when the price of Cubed spiked up?

23 A    Yes.

24 Q    And do you recall that that spike had nothing to do with

25 your trading, correct, you had not been buying Cubed in to

1  drive the price up?

2  A    No, I -- no.

3  Q    And do you recall that morning being very happy to see

4  the price of Cubed rise in that way?

5  A    I would suppose so, yes.

6  Q    And do you recall texting back and forth with Mr. Discala

7  about how great this was?

8  A    I don't recall specifics, but I'm sure we spoke.

9  Q    Okay.  I'm sorry, Your Honor.

10         I'm going to show you what I'm going to mark as

11  KCMW-1 for identification.

12         MR. RIOPELLE:  May I approach the witness, Your

13  Honor?

14         THE COURT:  You may.

15  Q    Here you go, Mr. Wexler.

16  A    Thank you.

17  Q    Having reviewed that document, sir, does it refresh your

18  recollection that you were happy about the spike in the price

19  of Cubed stock?

20  A    Yes.

21  Q    Does it refresh your recollection that you communicated

22  your happiness to Mr. Discala?

23  A    Yes.

24  Q    Is it true that you had a number of text messages with

25  Mr. Discala that morning of May 23rd in which you were happy

1    about this change in price, this spike in price?

2    A    Most likely, yes.

3    Q    Are you -- you don't remember those text messages?

4    A    Not specifically.

5    Q    Let me mark the rest of them as KCMW-2.

6              I'm just going to show you a group of text messages

7    now that I've marked KCMW-2 for identification, and ask you to

8    just flip through those quickly.

9    A    Yes.

10   Q    Isn't it a fact, sir, that you texted Mr. Discala a

11   number of times on May 23rd happy at the fact that this price

12   had risen, the price of Cubed had risen?

13   A    A couple of times, yes.

14   Q    Well there's more than two, they're on your lectern,

15   isn't there?

16   A    Two, three, yes.

17   Q    And there was one we looked at before, correct?

18   A    Yes.

19   Q    Okay.  So you said things like -- do you remember saying

20   things like, holy shit bro?

21   A    Yes.

22   Q    And do you remember saying that this is visually awesome?

23   A    Yes.

24   Q    Can you translate that for me, what did you mean visually

25   awesome?

1  A    When the price of the stock moves up, it looks good to

2  people buying and selling and owning on the open market.

3  Q    And you also -- do you remember saying, I hope she's

4  going to feed the supply?

5  A    Yes.

6  Q    And when you said that, I take it that you meant you

7  hoped that the account at Glendale would sell into this market

8  demand, is that what you meant by that?

9  A    I meant she meaning Miss Cane?

10  Q    Yes.

11  A    Yes.

12  Q    And do you remember also saying that you would hate to

13  see it pull off this?

14  A    Yes.

15  Q    What did you mean by that phrase, sir?

16  A    The price come back down.

17  Q    You wanted it to stay high, correct?

18  A    Yes.

19  Q    Because that would give you an opportunity to sell any

20  shares you owned at a profit, correct?

21  A    I didn't have any physical shares to sell.

22  Q    But you were hoping that the account at Glendale would

23  sell a bunch of shares at a profit, correct?

24  A    Yes.

25  Q    And were you, yourself, entering orders in the market

Wexler - Cross - Riopelle                          2427

1   that day?

2   A    I don't recall.

3   Q    Do you recall saying to Mr. Discala I'm going $7 and 4

4   cents?

5   A    Yes.

6   Q    And what did you mean by I'm going $7 and 4 cents?

7   A    Putting in a bid at $7 and 4 cents to support the price.

8   Q    And this was a bid as is an offer to buy stock, correct?

9   A    Right.

10  Q    So was the price above $7 and 4 cents at that time, or do

11  you know?

12  A    I don't have a chart, but it was around there or below it

13  a little bit --

14  Q    Okay.

15  A    -- or at it or higher either way.

16  Q    Right.  And do you recall also saying, I'll hang at $7

17  and 4 cents?

18  A    Yes.

19  Q    And what did you mean by that?

20  A    Keep my bid at $7 and 4 cents.

21  Q    And did you say to Mr. Discala build it around me?

22  A    Yes.

23  Q    And what did you mean by build it around me?

24  A    To build the bid side above and/or below where my bid was

25  to protect the price of the stock in case anyone sold it.

Wexler - Cross - Riopelle                2428

1  Q    So there would be multiple bids around $7 and 4 cents,

2  correct?

3  A    Yes.

4  Q    And did you also express the view in one of the texts

5  that you recall saying this is great?

6  A    Yeah.

7  Q    And the fact is you thought it was great, this bounce in

8  at the price, correct?

9  A    Yeah.

10 Q    And you did with this bid, coordinated bids, did all that

11 you could to keep the price of the stock high that day,

12 correct?

13 A    Correct.

14 Q    In fact, you were trying even to push it higher if you

15 could, right?

16 A    Possibly, yeah.

17 Q    And that's because to you, as long as the price kept

18 going up, it was a good opportunity for the account at

19 Glendale to sell shares at a profit, right?

20 A    That's correct.

21 Q    And you, as a participant in that account, would profit

22 as long as the price kept going up, correct?

23 A    Correct.

24 Q    And that's ultimately why you got into this deal, to make

25 a profit, correct?

1    A     Correct.

2              MR. RIOPELLE:  Your Honor, this might be a good

3    place to stop.

4              THE COURT:  How much longer do you have,

5    Mr. Riopelle?

6              MR. RIOPELLE:  Probably another hour.

7              THE COURT:  Then it's probably a good place to stop.

8              MR. RIOPELLE:  Thank you, Judge.

9              THE COURT:  Ladies and gentlemen, we will take our

10   mid-afternoon break.  As I told you we will probably be

11   working late this session, so please refresh up again and

12   continue to keep an open mind and not discuss the case amongst

13   yourselves or anyone else you might run into in the back.

14   We'll see you in about 15 minutes.

15             (Jury exits courtroom.)

16             THE COURT:  Mr. Wexler, you may stand down.

17             THE WITNESS:  Thank you, Your Honor.

18             (Witness stepped down.)

19             (Recess.)

20             THE COURTROOM DEPUTY:  All rise.  Court is back in

21   session.  Counsel for both sides are present including the

22   defendants.

23             THE COURT:  Ready, Mr. Riopelle?

24             MR. RIOPELLE:  I am, Judge.

25             THE COURT:  Let's have the jury.

1          (Jury enters courtroom.)

2          THE COURT:  Be seated, please.  Counsel will

3    stipulate the jury is present and properly seated.

4          MR. BOWMAN:  Agreed, Your Honor.

5          MR. RIOPELLE:  So stipulated, Your Honor.

6          THE COURT:  Looks like you all agree you are all

7    here.  Welcome back.  Ready to resume, Mr. Wexler remains on

8    the stand, Mr. Riopelle remains on his cross-examination.

9    Please continue.

10         MR. RIOPELLE:  Thank you, Your Honor.

11   Q    Mr. Wexler, it's fair to say, is it not, that there were

12   times when you were frustrated with Ms. Cane?

13   A    Yes.

14   Q    And you were frustrated because she was not doing what

15   you expected her to do, correct?

16   A    Yes.

17   Q    For example, there were occasions when you expected her

18   to give instructions to the broker at Glendale about the price

19   of Cubed and she did not do what you expected her to do,

20   correct?

21   A    Yes.

22   Q    And the jury heard a tape earlier, and it corresponds to

23   this exhibit, Government's Exhibit 198-49T.  Do you recall

24   having -- could you just read that, it's in evidence, see if

25   that refreshes your recollection.

1          THE COURT:  It's not in evidence.

2          MR. RIOPELLE:  Well right 149T is not in evidence,

3    but this is a call that was played.

4          THE COURT:  So he can look at it.

5          MR. RIOPELLE:  He can look at this.  I think the

6    jury has seen this too.  Should I just give it to the witness,

7    Judge, is that the best way to proceed.

8          THE COURT:  Give it to the witness to refresh his

9    recollection.

10          MR. RIOPELLE:  Yes.  Let me do that.  Sorry.

11    Q    Okay.  Just take a moment and read that, it won't take

12    too long.

13          (Witness reviewing document.)

14    Q    Yes.

15          Do you recall we played that call a few days ago

16    during your direct examination, do you recall that?

17    A    Yes.

18    Q    And in this call, this is a call in which you express

19    some frustration over the way that the Glendale account is

20    being handled, correct?

21    A    Yes.

22    Q    They're not moving their bid up the way that you'd like,

23    correct?

24    A    That's correct.

25    Q    And at one point you say we're supporting the stock not

Wexler - Cross - Riopelle                        2432

1    f'ing Glendale, right?

2    A    Yes.

3    Q    In fact, there were a number of discussions you had with

4    Mr. Discala like this where you and he would discuss your

5    displeasure with the way that the Glendale account was being

6    handled, correct?

7    A    Yes.

8    Q    Do you recall that you and Mr. Discala often talked about

9    moving the account at Glendale away from Glendale and to a

10   place called BMAC or B-M-A-C?

11   A    Yes.

12   Q    And that was to a friendly broker named Darren Goodrich,

13   correct?

14   A    Yes.

15   Q    You felt you would get a lot better cooperation, for lack

16   of a better word, from Mr. Goodrich, correct?

17   A    I didn't know Mr. Goodrich personally.

18   Q    But did Mr. Discala indicate to you that you would get

19   better results with Mr. Goodrich --

20   A    Possible.

21   Q    -- than you were getting with Ms. Cane?

22   A    Possibly, yes.

23   Q    So you and he talked about moving everything away from

24   Ms. Cane and over to Mr. Goodrich at BMAC, correct?

25   A    That's correct.

Wexler - Cross - Riopelle                    2433

1    Q      'Cause you were unhappy with the way things were going at

2    Glendale, right?

3    A      Yes.

4    Q      Ms. Cane was not doing what you wanted in terms of the

5    way the stock was being traded at Glendale, correct?

6    A      For the most part, yes.

7    Q      However, you were happy with her performance as a lawyer,

8    correct?

9    A      Can you repeat, please.

10   Q      You were happy with Ms. Cane's performance as a lawyer,

11   correct?

12   A      I don't think I experienced enough to give a judgment.

13   Q      Let me ask you this, you testified a couple of hours ago

14   that you recall that she was involved in preparing various

15   filings for the company, correct?

16   A      Yes.

17   Q      And the company being Cubed, right?

18   A      Yes.

19   Q      And do you recall that one of these filings was a form 8K

20   that was filed in March of 2014?

21   A      I believe so, yes.

22          THE COURT:  Did you have any involvement at any time

23   in any of the filings made by Cubed?

24          THE WITNESS:  No, Your Honor.

25   Q      You were aware of them though, correct?

Wexler - Cross - Riopelle                    2434

1   A    Not all of them, no.

2   Q    Do you recall whether you were aware of this filing in

3   March of 2014 of the 8K specifically on March 24th?

4   A    Not specifically.

5   Q    Okay.  Let me show you --

6        THE COURT:  He's had no involvement in the filings,

7   Mr. Riopelle.

8        MR. RIOPELLE:  I'm asking if he's aware.

9        THE COURT:  Okay, move on.

10  Q    Isn't it a fact, sir, that you thanked Ms. Cane for her

11  hustle and buttoned up work in connection with that filing in

12  March of 2014?

13       MS. JONES:  Objection.

14       THE COURT:  Is it in one of these wires that was

15  played.

16       MR. RIOPELLE:  One of the filings.  It's in an

17  email, Your Honor.

18       THE COURT:  It's in an email?

19       MR. RIOPELLE:  Yes.

20       THE COURT:  Why don't you ask did he recall sending

21  an email.

22  Q    Do you recall sending an email to Ms. Cane thanking her

23  for the hustle and buttoned up work associated the filing of

24  an 8K report for Cubed?

25  A    I don't recall.

1  Q    I'd like to show you what I'll mark KCMW, I think we're

2  up to three, for identification.

3  A    Okay.

4  Q    Having reviewed that document, do you recall thanking

5  Ms. Cane for her hustle and buttoned up work in getting a

6  particular filing on March 24th, 2014 filed for Cubed?

7  A    Yes.

8  Q    Do you recall, sir, that there were times when she had

9  difficulty understanding exactly what it was you were asking

10  her to do?

11  A    No.

12  Q    Do you recall there was a Cubed investor named Sarah

13  Foltz?

14  A    No.

15  Q    Let me show you what I'm going to mark KCMW-4 for

16  identification.

17          MR. RIOPELLE:  May I approach, Your Honor?

18          THE COURT:  You may.

19  Q    Show you that and I'll ask you to review it.

20          (Witness reviewing document.)

21  A    Okay.

22  Q    Do you recall now there was an investor in Cubed name

23  Sarah Foltz?

24  A    Yes.

25  Q    Do you recall that an issue arose with respect to

1   Ms. Foltz's investment?

2   A    Yes.

3   Q    And do you recall that the issue was that Ms. Foltz

4   wanted to liquidate some part of her investment and take her

5   money back out of Cubed?

6   A    Yes.

7   Q    And do you recall that the problem was that since she was

8   a participant in the Glendale account, it wasn't supposed to

9   work that way, right?

10  A    Correct.

11  Q    And do you recall forwarding your emails about this issue

12  to Ms. Cane?

13  A    Yes.

14  Q    And isn't it a fact that she responded to this by telling

15  you she didn't understand what was going on?

16        MS. JONES:  Objection, hearsay.

17        THE COURT:  Sustained.

18  Q    Now, sir, I think we had it on your direct examination

19  that you were arrested in July of 2014, correct?

20  A    Correct.

21  Q    And at the time of your arrest, you knew that you had

22  participated in a pump and dump of CodeSmart stock, correct?

23  A    Yes.

24  Q    And you knew that you had participated in a pump and dump

25  of the Staffing Group, correct?

1   A     Not so sure specifically but -- to that stock

2   individually, but, yes.

3   Q     How about Starstream, did you know that was a bad deal

4   and you participated in a pump and dump there?

5   A     Yes.

6   Q     Did you know that you had participated in a pump and dump

7   in connection with that stock called Soul and Vibe?

8   A     No.

9   Q     You knew, though, at that point in July of 2014, that you

10   had paid a bribe to Jamie Sloan, correct --

11   A     That's right.

12   Q     -- of about 10 to $15,000?

13   A     Yes.

14   Q     And you knew, did you not, in July of 2014 that you'd

15   paid a bribe to Matthew Bell, correct?

16   A     No.

17   Q     Well, you had given $5,000 to his favorite charity,

18   hadn't you?

19   A     Yes.

20   Q     And you knew at that point in July of 2014 that you had

21   made a series of misrepresentations to the persons you had

22   gotten involved in the various deals we've just mentioned,

23   correct?

24   A     Yes.

25   Q     And you knew, in fact, that you had made

Wexler - Cross - Riopelle                     2438

1  misrepresentations as well to the friends and family that you

2  got involved in Cubed, correct?

3  A    Yes.

4  Q    Indeed, you had told them that they would all be invested

5  in a single account and would share in that account in an

6  amount equal to the amount of their investment, correct?

7  A    Can you repeat, please.

8  Q    Yeah, it's a complicated question.

9         You told the people that invested in Cubed, that

10 they would get paid back on their investment, right?

11 A    After the deal changed when I went to Ms. Cane, yes.

12 Q    That's right.  And you told them that they would get paid

13 back based on how much they put in, correct?

14 A    Correct.

15 Q    And you told them that they would get paid back as the

16 shares were sold out of the Glendale account, right?

17 A    I told them that they would be part of an escrow account.

18 Q    Right.  And that they would be paid -- they would get

19 money out of the account as the shares were sold, right?

20 A    Correct.

21 Q    And you told them that, you know, somebody who invested

22 more money would get more of that money back out, correct?

23 A    No.

24 Q    Did you tell them that Hunter Adams would get half of the

25 first $300,000 --

1  A    No.

2  Q    -- that went to that account?

3  A    No.

4  Q    In fact, Hunter Adams got cashed out entirely for his

5  investment, right?

6           MS. JONES:  Objection.

7           THE COURT:  I'm not understanding the -- that he's

8  being asked about what the account did.

9           MS. JONES:  Your Honor, that question was asked and

10 answered.

11          THE COURT:  I'm going to allow the question.

12 BY MR. RIOPELLE:

13 Q    In fact, Hunter Adams cashed out his entire investment,

14 right?

15 A    That's right.

16 Q    On that very first payment from Glendale, correct?

17 A    Yes.

18 Q    And of that $300,000, he got 150, right?

19 A    Correct.

20 Q    And did he put any money into the investment?

21 A    Yes.

22 Q    And he put that much money, a hundred and 50?

23 A    Yes.

24 Q    So he got 100 percent of his money back, right?

25 A    Yes.

Wexler - Cross - Riopelle                    2440

1  Q    He was the only investor who was treated in this way,

2  right?

3  A    Yes.

4  Q    So, effectively, the other people that you put into the

5  investment were ripped off by Hunter Adams, correct?

6  A    Incorrect.

7  Q    Well, were they ripped off by you?

8  A    Yes.

9  Q    And you knew that if the government analyzed the trading

10 records they'd find that problem, right?

11        THE COURT:  What problem?

12 Q    The problem of Hunter Adams being paid 100 cents on the

13 dollar while everybody else got much less.

14 A    The way the whole thing was set up was not the right way

15 to have it done and when we went to Las Vegas the second time

16 we were about to have a conversation with Ms. Cane about that.

17        MR. RIOPELLE:  Your Honor, I move to strike that as

18 unresponsive.

19        THE COURT:  Yes, it wasn't responsive to a question

20 so it's stricken.  The jury will disregard it.

21 Q    You'll do better if you just respond to my questions, all

22 right, sir?

23        Now after your arrest, you knew that the special

24 agents of the FBI who arrested you had you cold for securities

25 fraud in connection with CodeSmart, Staffing Group,

1    Starstream, and Soul and Vibe, correct?

2    A    Not when I was arrested, no.

3    Q    But you understood that within days, correct?

4    A    When I was charged.

5    Q    When you got a look at the indictment in this case, you

6    knew they had you, correct?

7    A    Yes.

8    Q    And in short order you told the government that you

9    wanted to cooperate with the government, correct?

10   A    It didn't quite work that way.

11   Q    Well, you were arrested on or about July 17th of 2014,

12   correct?

13   A    That's correct.

14   Q    Isn't it a fact that you had your first meeting with the

15   government on August 18th?

16   A    I don't recall.

17   Q    Let me show you what's been marked Government's

18   Exhibit 3500MW-2 for identification, see if that helps

19   recollect when your meeting in August was with the government.

20             Have you had a chance to review that?

21   A    Yes.

22   Q    That's what we call a proffer agreement, you've heard it

23   referred to in those terms?

24   A    Yes.

25   Q    That's the agreement you get when you go to sit down with

1    the government, correct?

2    A    Correct.

3    Q    Before you have a cooperation agreement, right?

4    A    Correct.

5    Q    And it warns you this isn't a cooperation agreement and

6    this is the only agreement you can get though for those

7    meetings, right?

8    A    That's correct.

9    Q    And that agreement is dated August 18th, isn't it?

10   A    Yes.

11   Q    And that is the date when you had your first meeting with

12   the government, isn't it?

13   A    Yes.

14   Q    Just a few weeks after your arrest, correct?

15   A    Yes.

16   Q    Now when you sat down with government that day you had

17   already decided to cooperate with the government's

18   investigation, right?

19   A    Yes.

20   Q    You had decided that that was the best strategy for you

21   in this case, correct?

22   A    Yes.

23   Q    And you were committed to telling the government the

24   truth at that meeting, right?

25   A    Yes.

Wexler - Cross - Riopelle                    2443

1  Q    Because you were warned by the representatives of the
2  government in the meeting and others that telling a lie in
3  that meeting could itself be a separate crime, right?
4  A    Yes.
5  Q    And so -- and you understood that this proffer agreement
6  wouldn't protect you from that crime, correct?
7  A    Yes.
8  Q    So that if you lied you would potentially, at least, be
9  prosecuted for yet another problem, right?
10 A    Yes.
11 Q    So you tried to tell -- by the way, this first meeting in
12 August, it went on for a number of hours, correct?
13 A    Yes.
14 Q    It was an all-day type of thing?
15 A    I don't recall.
16 Q    But it was more than we've spent together this afternoon,
17 fair enough?
18 A    Yes.
19 Q    And you tried during that first meeting to tell the
20 government everything you could remember about your career
21 involved in pump and dump type schemes, correct?
22 A    About my career in -- I'm not sure I understand the
23 question.
24 Q    You tried to tell them everything you could recollect
25 about the crimes you'd been involved in?

Wexler - Cross - Riopelle                    2444

1   A    Yes.

2   Q    You knew it was important to be as forthright as possible

3   with them, right?

4   A    Yes.

5   Q    And you understood that your value as a witness would be

6   based on how much information you had, correct?

7   A    Potentially.

8   Q    And you did have some information to give them, correct?

9   A    Yes.

10  Q    And in that first meeting you told them about your

11  participation in the transactions relating to CodeSmart,

12  correct?

13  A    I believe so.

14  Q    And you told them also about your participation in the

15  transactions relating to Soul and Vibe, do you recollect that?

16  A    Yes.

17  Q    And you told them about your participation in the

18  transactions relating to Staffing Group, correct?

19  A    Yes.

20  Q    And you also told them about what you'd done in

21  connection with Starstream, right?

22  A    Yes.

23  Q    And you even told them a little bit about the bribe that

24  you had paid to Jamie Sloan, right?

25  A    Yes.

Wexler - Cross - Riopelle                    2445

1   Q    But isn't it a fact that you didn't tell them about my

2   client, Kyleen Cane, in that first meeting?

3   A    I don't recall.

4   Q    You don't have any recollection of discussing Kyleen Cane

5   with the government in that meeting?

6   A    I don't have any recollection of not discussing Kyleen.

7   Q    Let me show you, if I have a cleaner copy.  Let me show

8   you what's been marked as Government's Exhibit 3500MW1.

9            Can I approach the witness, Your Honor?

10           THE COURT:  You may.

11  Q    I'm going to ask you to take a look at that.

12           (Witness reviewing document.)

13  Q    Have you had a chance to review that, sir?

14  A    As much as possible.

15  Q    Yes, it's 15 pages or so?

16  A    Yes.

17  Q    On that meeting, by the way, when you met with the

18  government in August, how many people were on the government's

19  side of the table?

20  A    I don't recall.

21  Q    You don't recall?

22  A    No.

23  Q    There was somebody taking notes?

24  A    Yes.

25  Q    And you understood that a report would be prepared of

1    that meeting, correct?

2    A    I assumed.

3    Q    Having reviewed Government's Exhibit 3500MW1, does that

4    refresh your recollection that you did not tell the government

5    about Kyleen Cane in that first meeting with them in August of

6    2014?

7    A    Based on what I see here, I don't see Cubed here.

8    Q    And, by the way, they didn't offer you a deal after that

9    meeting, did they?

10   A    No.

11   Q    So you had to go back for a second meeting; is that

12   right?

13   A    Yes.

14   Q    And do you recall that you went back for that second

15   meeting on or about September 3rd of 2014, a few weeks later?

16   A    Yeah.

17   Q    You were interviewed again a few weeks later, correct?

18   A    Correct.

19   Q    And, again, that meeting lasted multiple hours, right?

20   A    Correct.

21   Q    And there were several representatives of the government

22   across the table from you, right?

23   A    Yes.

24   Q    Some of them were taking notes, correct?

25   A    Yes.

1  Q    Do you recall that you mentioned again to them your

2  bribery of Jamie Sloan?

3  A    Yes.

4  Q    And do you recall that you told them again about the

5  transaction in Starstream?

6  A    Yes.

7  Q    And do you recall that you told them again about Soul and

8  Vibe?

9  A    Most likely, yes.

10 Q    And do you recall that you explained to the government in

11 this meeting, the second one, that Darren Ofsink was the

12 lawyer involved in Starstream?

13 A    Most likely, yes.

14 Q    Because he was, in fact, the lawyer involved in

15 Starstream, right?

16 A    Correct.

17 Q    And you were doing your best, by the way, at this meeting

18 to be as accurate as possible?

19 A    Yes.

20 Q    And you also told them in this meeting about a man named

21 Craig Josephberg, correct?

22 A    Correct.

23 Q    And you knew Mr. Josephberg, correct?

24 A    Yes.

25 Q    From several of these deals?

1   A    Yes.

2   Q    And he was a broker, correct?

3   A    Correct.

4   Q    And he worked with Jamie Sloan, right?

5   A    That's correct.

6   Q    And he was another guy that was going to help stuff

7   accounts with the shares of the various companies involved,

8   correct?

9   A    Possibly.

10  Q    Now during this meeting a few weeks after your first

11  meeting, do you recall that you told the government that

12  Darren Ofsink was the first lawyer on the Cubed deal?

13  A    Most likely.

14  Q    And that's because he was, in fact, the first lawyer on

15  the Cubed deal, right?

16  A    That's correct.

17  Q    And I think we've established that it was Ofsink who cut

18  the deal where 40 percent of the shares would go to Omniview

19  and its investors, correct?

20  A    I think we cut the deal.

21  Q    You cut the deal but Ofsink was the lawyer at the time?

22  A    Correct.

23  Q    He papered it up?

24  A    I believe so.

25  Q    And did you tell the government in that second meeting, a

1  few weeks after the first one, that Ms. Cane explained to you

2  that she had set up the account at Glendale to protect the

3  price of Cubed shares?  Did you tell that to the government?

4  A    I don't recall.

5  Q    I'm going to show you now a copy --

6         MR. RIOPELLE:  May I approach the witness, Your

7  Honor?

8         THE COURT:  You may.

9  Q    -- a copy of Government's Exhibit 3500MW3 and I will

10  refer you, for the sake of moving things along, to page 8,

11  Mr. Wexler.  But you are welcome to review any part of this

12  document, but I'll direct your attention to page 8 and ask you

13  to review that.

14         (Witness reviewing document.)

15  A    Page 8?

16  Q    Page 8, yeah?

17  A    I'm on page 8.

18  Q    You've had a chance to look at that?

19  A    A little bit, yes.

20  Q    Does that refresh your recollection, sir, that you told

21  the government in this meeting that Ms. Cane told you that she

22  had set up the escrow account to protect the price of Cubed

23  stock?

24  A    Yes.

25  Q    And is it fair to say that what you meant by that is that

1    the account at Glendale was set up to prevent dumping of the

2    shares?

3    A     No.

4    Q     Now do you recall that during this meeting you told the

5    government that another attorney named Scott Baron had been

6    informed about this account at Glendale?

7    A     I don't recall that, no.

8    Q     But it's a fact, isn't it, that after this second meeting

9    the government still didn't offer you any kind of deal,

10   correct?

11   A     That's correct.

12   Q     So you went back a third time, do you remember that?

13   A     Yes.

14   Q     And you were interviewed again for a third time a few

15   weeks later, correct?

16   A     Yes.

17   Q     And that meeting again lasted for several hours, right?

18   A     Yes.

19   Q     And it was only after that third meeting of multiple

20   hours that you finally got the deal that you pled guilty to,

21   correct?

22   A     Correct.

23   Q     And that deal, just to be clear, requires you to plead

24   guilty to a conspiracy to commit securities fraud, right?

25   A     Yes.

Wexler - Cross - Riopelle                    2451

1    Q    And it requires you to plead guilty to the crime of

2    securities fraud in connection with your activities in

3    CodeSmart, right?

4    A    Yes.

5    Q    And you have pled guilty to those two counts, right?

6    A    Yes.

7    Q    And they carry a maximum possible penalty of 25 years of

8    incarceration, correct?

9    A    Yes.

10   Q    In exchange for that guilty plea in your agreement to

11   provide evidence to the government, you got immunity from

12   further prosecution of certain crimes, correct?

13   A    I'm not sure.

14   Q    Do you understand what the concept of immunity is?

15   A    Not specifically, no.

16   Q    Do you understand that the government promised you they

17   wouldn't prosecute you further in connection with certain

18   transactions?

19   A    It's an inaccurate statement, no.

20   Q    Did you understand that this was going to wrap up your

21   securities fraud prosecution?

22   A    No.

23   Q    Let's take a look at -- what's the exhibit tab for the

24   one in evidence, it's 179 something or other, isn't it?

25            MR. BOWMAN:  179-16?

Wexler - Cross - Riopelle                    2452

1        MR. RIOPELLE:  179-60.

2            I'm going to show you, Mr. Wexler, a document that's

3   been marked Government's Exhibit 179-60, 6-0, which is in

4   evidence and I've turned to the page I want you to look at

5   because I'd like to ask you some questions about that.

6   Specifically, I'd like to direct your attention to

7   paragraph 12 of this agreement.

8            Do you have that before you?

9   A    Yes.

10  Q    And you can see here that the United States Attorney's

11  Office is agreeing to something; isn't that correct?

12  A    Yes.

13  Q    And that is part of your agreement with them, this term,

14  right?

15  A    Yes.

16  Q    And that agreement provides that no -- except for the

17  charges that you're agreeing to plead guilty to, correct --

18  A    Yes.

19  Q    -- you will not be charged further in connection with

20  previously disclosed participation in criminal activity

21  involving the fraudulent manipulation of the stock of publicly

22  traded companies as set forth in the indictment, and then

23  there's some others as well, correct?

24  A    Yes.

25  Q    So do you understand that the U.S. Attorney's Office was

Wexler - Cross - Riopelle                    2453

1  agreeing that you'll plead guilty to these two charges that
2  carry 25 years potentially as a sentence, right?
3  A    Right.
4  Q    But we won't prosecute you further for the other stocks
5  in the indictment, correct, because there were others?
6  A    Right.
7  Q    Including Starstream, correct?
8  A    Yes.
9  Q    And Safety Group, correct?
10 A    Yes.
11 Q    And then in addition to those, they are also agreeing
12 here not to prosecute you further for a series of stocks not
13 listed in the indictment, correct?
14 A    Yes.
15 Q    And those stocks include something called Location Based
16 Technologies, Inc. Correct?
17 A    Yes.
18 Q    Is it your testimony today that you were involved in some
19 kind of scheme with respect to that company?
20 A    Trading.
21 Q    A trading scheme?
22 A    Related.
23 Q    Yes, a trading scheme?
24 A    Yes.
25 Q    They were giving you a pass on that, right?

1   A    Uh-huh, yes.

2   Q    And then there's that Soul and Vibe Interactive, Inc.,

3   that's that Soul and Vibe company we talked about, right?

4   A    Yes.

5   Q    And you got a pass on that one too, right?

6   A    Yes.

7   Q    And then there was a company called Cachet, correct?

8   A    Yes.

9   Q    And they are giving you immunity from prosecution on that

10  one, right?

11  A    Yes.

12  Q    And then there is International Safety Group, Inc.

13  Correct?

14  A    Yes.

15  Q    And then there is one called Regenecin, Inc.; is that

16  right?

17  A    Yes.

18  Q    Can you tell me what the scheme was in Regenecin that

19  you, with your lawyer, got immunity for?

20  A    Regenecin was already a publicly traded company and there

21  were coordinated trades made between myself and others.

22  Q    And that was after, long after it had gone public,

23  correct?

24  A    Yes.

25  Q    And so you insisted on and got immunity for that too,

1   right?

2   A     Yes.

3   Q     And then there is another one, Health Revenue Assurance

4   Holdings, Inc., correct?

5   A     Yes.

6   Q     And that's another securities fraud that the government

7   agreed not to prosecute you for, correct?

8   A     Yes.

9   Q     That's a total of about 10 different stocks altogether,

10  correct?

11  A     Yes.

12  Q     Now in connection with your agreement to plead guilty to

13  two counts relating to your conduct and getting coverage for

14  these 10 different stocks that you were involved in, you

15  agreed, I think you told us, to forfeit a grand total of

16  1 million $400,000, correct?

17  A     Correct.

18  Q     And by your own testimony that's a little less than you

19  actually gained in the trading of CodeSmart alone, correct?

20  A     It's close, yes.

21  Q     Because you had told us earlier that you got -- or you

22  made a million six on your scheme in CodeSmart, right?

23  A     Correct.

24  Q     So you're agreeing to forfeit $200,000 less than you

25  actually -- than you acknowledge making in CodeSmart, correct?

1   A    Right.

2   Q    And you're effectively not agreeing to forfeit anything

3   in connection with the other nine stocks listed here, correct?

4   A    Correct.

5   Q    So you sort of snookered the government on that one,

6   didn't you?

7              MS. JONES:  Objection.

8              THE COURT:  Sustained.

9   Q    Well, isn't it a fact that the government agreed to let

10  you keep most of what you got from these schemes?

11  A    There was an overall loss on all of them.

12  Q    And we have your testimony on that, correct?

13  A    That's what I believe, yes.

14  Q    And I think you told us you haven't paid the full million

15  four at this point, have you?

16  A    That's correct.

17  Q    You agreed to forfeit certain accounts however?

18  A    Yes.

19  Q    Did that include accounts that were held for the benefit

20  of your sons?

21  A    Yes.

22  Q    How much was in them when you forfeited them to the

23  government?

24  A    I don't recall.

25  Q    But you did forfeit those accounts?

1   A    Yes.

2   Q    And there were some accounts in the name of your wife

3   that you agreed to forfeit?

4   A    Yes.

5   Q    Do you recall how much was in those accounts?

6   A    No.

7   Q    Do you know how much you've paid to the government out of

8   the million four you agreed to forfeit so far?

9   A    Not exactly.

10  Q    Isn't it true that one of the accounts you agreed to

11  forfeit to the government in your wife's name had a grand

12  total of $367 and 80 cents in it?

13  A    Possibly.

14  Q    Now your agreement with the government provides that you

15  don't actually have to pay them anything on this forfeiture

16  judgment until 30 days after your sentencing, correct?

17  A    Could you repeat, please.

18  Q    Didn't this agreement provide that this amount, the

19  $1.4 million is not fully due until 30 days after your

20  sentencing occurs?

21  A    Possibly.

22  Q    Okay.  And that -- you signed this agreement in 2014?

23  A    Correct.

24  Q    And it is now 2018?

25  A    Correct.

1    Q    And you haven't been sentenced yet, have you?

2    A    No, sir.

3    Q    So, effectively, you've had an interest free loan on this

4    amount for the last four years, correct?

5    A    If that's the way you want to look at it.

6    Q    Well it doesn't matter what I think, we'll just leave

7    that out there.

8             Now you filled out a financial disclosure form at

9    the time you entered into this agreement; is that correct?

10   A    Yes.

11            MS. JONES:  Objection.

12            THE COURT:  I'm going to sustain the objection.

13   Move on, Mr. Riopelle.

14   Q    Well, do you recall in that financial disclosure report

15   you were told not to leave any blanks?

16   A    No.  I don't recall.

17   Q    Let me show you --

18            MS. JONES:  Objection, Your Honor.

19            THE COURT:  Sustained.

20   Q    Do you recall that in that financial disclosure --

21            MS. JONES:  Objection.

22   Q    -- report?

23            THE COURT:  Sustained.  You're not reviewing a

24   sidebar deal on financial disclosure forms.

25            MR. RIOPELLE:  Very well, Your Honor.

1  Q    Do you recall or do you know that your plea agreement

2  with the government provides that the United States Attorney's

3  Office will write what's called a 5K letter for you in certain

4  circumstances?

5  A    Yes.

6            (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. RIOPELLE:

2    Q    And those circumstances include substantial assistance

3    from you, correct?

4    A    More than just that I am.

5    Q    But that is a key part of your agreement with the

6    Government; is it not?

7    A    Tell the truth, yes.

8    Q    And by telling the truth, you hope to provide substantial

9    assistance to the Government, correct?

10   A    Yes.

11   Q    Because the agreement provides that if you -- if you,

12   Marc Wexler, provide the Government substantial assistance in

13   its prosecution of others, you will get that 5K letter,

14   correct?

15   A    Yes, amongst other things.

16   Q    Amongst other things.

17        And they also have to find before they write that

18   letter, that you have cooperated fully with them; isn't that

19   right?

20   A    Yes.

21   Q    And if you do not cooperate fully, or if you do not

22   provide substantial assistance, you will get no 5K letter,

23   correct?

24   A    Yes.

25   Q    And if you get no 5K letter, you will not get a reduction

1   in the sentence you will ultimately receive, correct?

2   A    Correct.

3   Q    So it's fair to say you hope to get a 5K letter, right?

4   A    Yes.

5   Q    It's fair to say, isn't it, that you hope that the 5K

6   letter will impress the judge so much that he -- he or she,

7   whoever sentences you, will not impose a jail sentence.

8   A    No, sir.

9   Q    Isn't it true that you are hoping to get a probationary

10  sentence?

11  A    I'm hoping to get a reduced sentence.

12  Q    Well, wouldn't you prefer a probationary sentence?

13  A    We'll see.

14  Q    Wouldn't you like a probationary sentence, sir?

15  A    The judge will decide.

16  Q    And --

17          THE COURT:  He's asking you what you would like.

18  Not what the judge would like.

19          THE WITNESS:  I would like --

20          THE COURT:  Would you object to a probationary

21  sentence if it was offered, Mr. Wexler?

22          THE WITNESS:  No.

23  Q    You don't want a probationary sentence?

24          THE COURT:  He would not reject it.

25  Q    You would not reject it.

Wexler - Cross - Riopelle                    2462

1          And, indeed, you would prefer it to a stretch in the

2    federal penitentiary, correct?

3    A    Yes.

4    Q    And you understand that to get there -- to get to that 5K

5    letter, you've got to give complete and truthful information

6    to the Government, right?

7    A    Yes.

8    Q    And if they find that you have not been truthful at any

9    point, they can refuse to give you a 5K letter, right?

10   A    Yes.

11   Q    And if they refuse to give you a 5K letter, you will not

12   get any reduction in your sentence, correct?

13   A    Yes.

14   Q    And you understand that without a reduction in your

15   sentence, you will go to the federal penitentiary for sure,

16   correct?

17   A    Yes.

18          MR. RIOPELLE:  I have no further questions, Your

19   Honor.

20          THE COURT:  Thank you, Mr. Riopelle.

21          MR. RIOPELLE:  But I do have something I would like

22   to raise at sidebar.

23          (Sidebar.)

24          (Continued on next page.)

25

Sidebar                                                      2463

1          (Sidebar conference held on the record out of the

2     hearing of the jury.)

3          MR. RIOPELLE:  Your Honor, I just want to make my

4     record.  If I had been permitted to, I would have gone into

5     the financial disclosures he made to the Government where he

6     did leave blanks, he did not make full disclosure, and I think

7     this is a measure of his relationship to the Government and

8     their willingness to give him benefits without insisting on

9     him fulfilling the exact terms of his agreement.  It's worth

10    the jury knowing, but I know Your Honor's ruling, I simply

11    want to make my record so that it's present.

12         MS. JONES:  Your Honor, the Government's -- well, in

13    addition to being repetitive and duplicative, the question was

14    actually very, very misleading because the financial affidavit

15    was not entered into before or at the time of the cooperation

16    agreement.  The cooperation agreement was not contingent on

17    him filling out the financial affidavit.  That is something

18    that happened after the fact, I think, months later.

19         THE COURT:  Which is not established on the record.

20    I would not allow it to be established on the record because

21    it is a total -- confusing to the jury, has nothing to do with

22    the merits of the case.  It is a sidebar issue.

23         MR. RIOPELLE:  Hold on, now, Judge.  The Government

24    has just told us that this was entered -- that this was

25    submitted to the Government long after his cooperation

Sidebar                                            2464

1  agreement.  If there are misrepresentations on it, and I

2  believe there are, then those are violations of his

3  cooperation agreement, which the Government has countenanced.

4  The jury has a right to know that.

5           MS. JONES:  He hasn't established that, Your Honor,

6  and it is a collateral issue.

7           THE COURT:  It's collateral, total collateral.

8           MS. JONES:  This is dated January 26, 2016.  He

9  entered his plea agreement in October of 2015.

10          MR. RIOPELLE:  And he was told don't leave blanks

11  and he left blanks.

12          THE COURT:  It's up to the Government to ask him to

13  fill in the blanks.  Obviously, the Government was satisfied

14  regardless of what was on the form.

15          MR. RIOPELLE:  That's a point the jury ought to

16  know.

17          THE COURT:  That's your opinion.  It is totally

18  collateral.

19          MR. RIOPELLE:  Okay.  Thank you, Your Honor.

20          THE COURT:  You have made your point that he's --

21  the forfeiture was there and he hasn't paid it.

22          MR. RIOPELLE:  Okay.  Thank you, Judge.

23          (Sidebar concludes.)

24          (Continued on next page.)

25

1            MR. RIOPELLE:  At this time, Your Honor, I have no

2     further questions.

3            THE COURT:  Yes, I understood that.

4            Ms. Jones, do you have any redirect?

5            MS. JONES:  I do.  Thank you, Your Honor.

6     REDIRECT EXAMINATION

7     BY MS. JONES:

8     Q    Mr. Wexler, who suggested to you that you invest in

9     CodeSmart?

10    A    Mr. Discala.

11    Q    And TSGL?

12    A    Mr. Discala.

13    Q    And StarStream?

14    A    Mr. Discala.

15    Q    And Cubed?

16    A    Mr. Discala.

17           MR. RIOPELLE:  Objection.  Move to strike the "thank

18    you," Your Honor.  She's not a witness.  I must have misheard

19    what she said.  I'm sorry.

20           THE COURT:  She was just asking Cubed.  Who

21    suggested that he invest in Cube was my understanding of the

22    question.

23           Was that your question?

24           MS. JONES:  Yes, Your Honor.

25           THE COURT:  And your answer?

Wexler - Redirect - Jones                    2466

1              THE WITNESS:  Mr. Discala.

2   Q    And in these investments, you were only interested in

3   getting free-trading shares, correct?

4   A    That's correct.

5   Q    And for I-10, if you were not going to get free-trading

6   shares, you were not interested in investing.

7   A    That's correct.

8   Q    And that's also true for StarStream?

9   A    That's correct.

10  Q    And when you initially invested in Cubed, your

11  understanding was it was going to work that same way.

12             MR. BOWMAN:  Objection, Your Honor.  It's leading

13  the witness.

14             THE COURT:  It is leading.

15  Q    Mr. Discala, you were shown investor decs for CodeSmart

16  and Cubed by Mr. Bowman.  Do you know who prepared those decs?

17  A    I do not.

18  Q    When you were showed the investor deck for StarStream,

19  you noticed that the address -- you recognized the address.

20  What address was that?

21  A    It was the Omni address in Connecticut.

22  Q    Was StarStream based in the Omniview address in

23  Connecticut?

24  A    No.

25  Q    Why was Omniview's address listed on the dec?

1  A    I don't know.

2         THE COURT:  If you know.

3         THE WITNESS:  I don't know.

4  Q    Mr. Wexler, for Omniview, did you have control over

5  Omniview's bank accounts?

6  A    No.

7  Q    Did you have any control over Omniview's trading

8  accounts?

9  A    No.

10 Q    Did you review -- did you have access to all of

11 Omniview's records?

12 A    No.

13 Q    As far as you know, who did control Omniview's bank

14 accounts?

15 A    Mr. Discala.

16 Q    And who controlled Omniview's trading accounts?

17 A    Mr. Discala.

18 Q    Mr. Wexler, when we discussed IRPR, when those -- when

19 those terms were used, did you understand them to mean an

20 effort to get buying going in the stock?

21 A    I understood them to lead to buying and selling in the

22 stock.

23 Q    And that was the purpose of IRPR, as far as you

24 understood it, was to get people to buy the stock.

25 A    Correct.

Wexler - Redirect - Jones                    2468

1    Q    You were asked questions about your accounts at Hallmark

2    and Meyers.  Did someone recommend that you open an account at

3    Hallmark?

4    A    Yes.

5    Q    Who was that?

6    A    Mr. Discala.

7    Q    Did someone recommend that you open an account at Meyers?

8    A    Yes.

9    Q    Who was that?

10   A    Mr. Discala.

11   Q    When you paid that bribe to Jamie Sloan, who set that

12   meeting up?

13   A    Mr. Discala and Mr. Josephberg.

14   Q    And you paid Ms. Sloan in both cash and stock; is that

15   correct?

16   A    Yes.

17   Q    Do you recall where you got that cash?

18   A    I do not.

19   Q    What would have been the options?

20   A    Cashing a check at the bank or having cash on hand.

21   Q    Did you tell Mr. Discala about this bribe?

22   A    Yes.

23   Q    Mr. Wexler, before you purchased the free-trading I-10

24   stock, what was your understanding as to who was going to buy

25   that stock?

1  A    Matt Bell's accounts and clients.

2  Q    So that was set up before you even bought it.

3  A    That's correct.

4  Q    And when you started selling your I-10 stock, did you

5  have an understanding that -- were you the only one who had

6  free-trading stock, or did you know if anyone else had

7  free-trading stock?

8  A    At the very beginning, I did, and eventually Mr. Discala

9  and others did.

10 Q    Did you have any discussions with Mr. Discala about who

11 would and would not have free-trading stock with I-10 in the

12 beginning?

13 A    No.

14 Q    With the I-10 stock, when you started selling it, who was

15 your understanding as to who was buying it?

16 A    Matt Bell and his clients.

17 Q    And did you engage in coordinated trading to walk up the

18 price?

19 A    Yes.

20 Q    And as you were walking up the price, who was buying that

21 stock?

22 A    Mr. Bell's clients.

23 Q    And eventually, what happened to -- what happened to the

24 demand for the stock?

25 A    It ended.

1  Q    And then you started buying it?

2  A    Bought, yes.  Bought and sold, yes.

3  Q    And why were you buying it?

4  A    To try and keep the price of the stock elevated.

5  Q    And when you stopped supporting that stock, what happened

6  to the stock price?

7  A    The price went down.

8  Q    So the price going up, that was artificially created by

9  you and Mr. Discala, correct?

10  A    That's correct.

11        MR. BOWMAN:  Objection.

12        THE COURT:  Sustained.

13  Q    What was your -- what was your expectation as to what was

14  going to happen with the StarStream stock?

15  A    The same as CodeSmart.

16  Q    And why didn't it work?

17  A    Because there was no demand from the other side on the

18  purchase side.

19  Q    Because in the market, no one wanted to buy that stock,

20  correct?

21  A    Correct.

22  Q    So when the Cube came up, you mentioned Mr. Ofsink, and

23  what was Mr. Ofsink's role?

24  A    He was the attorney to do all the paperwork and filings

25  for the Cube.

Wexler - Redirect - Jones                          2471

1    Q    And he did do some paperwork for the Cube, correct?

2    A    Yes.

3    Q    And that was the Bridge loan paperwork, correct?

4    A    Correct.

5    Q    And at that time, was Cubed a public company or a private

6    company?

7    A    Private.

8    Q    And when Ms. Cane became involved, was Cubed still a

9    private company, or was it a public company?

10   A    It became a public company.

11   Q    Who helped it become a public company?

12   A    Ms. Cane.

13   Q    Who found the shell for that company to go public?

14   A    Ms. Cane.

15   Q    Who did the paperwork with the SEC to allow that company

16   to go public?

17   A    Ms. Cane.

18   Q    And who got all the free-trading stock when that company

19   went public?

20   A    Ms. Cane.

21   Q    Did Ms. Cane's control of all the free-trading stock

22   allow you and others to control the stock price?

23   A    Yes.

24   Q    And you worked together to walk the stock price up?

25   A    Yes.

1          MS. JONES:  I would like to show Mr. Wexler 199-98.

2   Can we go to page 9 and 10 -- first page 9 and 10.

3   Q    Mr. Wexler, do you recall this text exchange you had with

4   Mr. Discala?

5   A    Yes.

6   Q    And you were talking about the escrow distribution?

7   A    Yes.

8   Q    What did Ms. Cane say about the amount that was going to

9   be distributed?

10  A    Ms. Cane was saying there are 70,000 worth of buys and

11  that 39 percent would be deducted for taxes from the escrow.

12  Q    What did she say about taking from the escrow for

13  herself?

14  A    That she was going to take it from the escrow account.

15  Q    For herself, correct?

16  A    Correct, and did not want to be on the list.

17  Q    So she didn't want to be on that Crackpot master list.

18  A    That's correct.

19          MR. RIOPELLE:  Objection.  Leading.

20          THE COURT:  Sustained.

21  Q    After this point in time, was she taken off that list?

22  A    Yes.

23  Q    Mr. Wexler, do you recall Ms. Cane telling you that the

24  Glendale account had generated approximately $525,000 in

25  proceeds?

Wexler - Redirect - Jones                     2473

1          MR. RIOPELLE:  Objection.  Leading, Judge.

2          THE COURT:  Did you have the conversation?

3    Q    Did you have a conversation about how much money was

4    actually received in the escrow account -- I mean, in the

5    Glendale account from the sales of the stock?

6    A    Yes.

7    Q    And what do you recall her telling you about that?

8    A    That there would be a distribution made out of that

9    account to be distributed amongst the shareholders and that

10   she was to -- going to take her cut out of that amount that --

11   of the first distribution, plus taxes.

12   Q    And how much do you recall did Titan get?

13   A    300,000, approximately.

14   Q    And the remaining she kept.

15   A    That's correct.

16   Q    Mr. Wexler, do you recall whether or not Ms. Cane told

17   you she was going to get 1 million shares of restricted stock?

18   A    Do not recall.

19   Q    Do you recall whether or not Ms. Cane told you she was

20   going to get 300,000 shares of free-trading Cube stock?

21   A    I do not recall.

22   Q    Okay.

23         Mr. Wexler, you didn't tell your -- the Cubed

24   investors that -- the people you got to invest in Cube that

25   you were manipulating the stock price, correct?

Wexler - Redirect - Jones                    2474

1   A    Yes.

2   Q    But you were, in fact, manipulating the stock price,

3   correct?

4   A    Yes, we were.

5   Q    And Ms. Cane assisted in that process?

6   A    Yes.

7   Q    And that's why you pled guilty to the manipulating the

8   Cube stock, correct?

9   A    Yes.

10  Q    Mr. Wexler, what do you have to do to get your 5K.1

11  letter?

12  A    First and foremost to tell the truth, to hand over any

13  documents in my possession regarding the case, to be available

14  to meet at any request to discuss the case, and to be

15  available for court.

16  Q    What's the most important thing you need to do?

17  A    Tell the truth.

18  Q    Do you get any benefit if a particular defendant gets

19  convicted?

20  A    No.

21          MS. JONES:  No further questions.

22          THE COURT:  Thank you, Ms. Jones.

23          Mr. Bowman, do you have any recross?

24          MR. BOWMAN:  Briefly.

25

1    RECROSS-EXAMINATION

2    BY MR. BOWMAN:

3    Q    Mr. Wexler, this morning, I recall you testified that

4    Jamie Sloan demanded the 10,000 from you.  That was her idea,

5    correct?

6    A    Correct.

7    Q    And when this happened, Mr. Discala was not present; is

8    that also correct?

9    A    That's correct.

10   Q    And now you're testifying that Mr. Discala somehow set

11   this up --

12   A    Yes.

13   Q    -- is that your testimony?

14   A    Yes.

15   Q    This was your colleague at Omniview?

16   A    Yes.

17   Q    The person who invited you to become --

18               MS. JONES:  Objection.

19               THE COURT:  Sustained.

20               Do you have a question --

21               MR. BOWMAN:  Yes, Your Honor.

22               THE COURT:  -- that's not cumulative?

23               MR. BOWMAN:  I'm sorry?

24               THE COURT:  He already told you it was Mr. Discala.

25   Do you have another question?

1               MR. BOWMAN:  I do.

2    Q    Was he the same person who invited you to invest in

3    CodeSmart?

4    A    Was who the same person?

5    Q    Mr. Discala.

6    A    Yes.

7    Q    And the same person who invited you to invest in SSET?

8    A    Yes.

9    Q    And the same person who invited you to invest in TSGL?

10   Was he the same person?

11   A    Yes.

12   Q    And Cubed.

13   A    Yes.

14   Q    And he was the same person that you formed EJA with?

15   A    Yes.

16   Q    And now you are testifying that somehow he was involved

17   in this solicitation of a bribe with Jamie Sloan?

18               MS. JONES:  Objection.

19               THE COURT:  Sustained.

20               MR. BOWMAN:  May I have 179-33?

21               (Pause in proceedings.)

22   Q    Are you able to see that, Mr. Wexler?

23   A    Yes.

24   Q    All right.  And that is a Bank of America account --

25   A    Yes.

Wexler - Recross - Bowman                    2477

1   Q     -- in the name of Titan Investors, correct?

2   A     Yes.

3            MS. JONES:  Objection.  Your Honor, this is beyond

4   the scope of my redirect.

5            THE COURT:  I don't see where you are going with

6   this that connects to redirect.

7            MR. BOWMAN:  There was recross.  I believe

8   Mr. Riopelle questioned him on Titan and all of the

9   distributions and deposits into the escrow account and

10  distributions to Titan.

11           THE COURT:  Just go directly to what you are -- I

12  think you have thoroughly exhausted this area, but go ahead.

13           MR. BOWMAN:  I have just two questions, Your Honor.

14           Can we go to page 3, please?

15  Q     At the top you will see deposits and other credits.

16           Do you see that, sir?

17  A     Yes.

18  Q     And if you go down to the last entry under deposits, what

19  do you see?

20  A     Fee refund.

21  Q     Above fee refund.

22  A     25,000.

23  Q     And who is that from?

24  A     From Mrs. Discala.

25  Q     From Dounya Discala?

Wexler - Recross - Bowman                          2478

1   A    Yes.

2   Q    And it is listed as a loan?

3   A    It's listed as a loan, yes.

4   Q    So that was a loan from the Discalas to Titan; is that

5   correct?

6   A    Yes.

7   Q    And was that because there was a large distribution made

8   from Titan to Hunter Adams?

9   A    I don't believe so.

10  Q    Isn't it true that --

11          MS. JONES:  Objection.

12  Q    -- you said that the --

13          MS. JONES:  Objection.  There's no foundation.

14          MR. BOWMAN:  May I finish the question?

15  Q    -- that the account was light because of the distribution

16  to Hunter Adams?

17          THE COURT:  Do you recall saying that?

18          THE WITNESS:  I may have said it.

19  Q    And you e-mailed that to Mrs. Discala; did you not?

20  A    Correct.

21  Q    So when you needed money for Titan, the Discalas put in

22  25,000; is that correct?

23  A    I'm not sure if that's accurate.

24  Q    You're not sure if the bank statement is accurate?

25          THE COURT:  That's not what he said.  He said he's

1  not sure what the reason is.

2          MR. BOWMAN:  May I have 127-20, please?

3  Q    Going to the middle of the page, it says on June 13,

4  2014, Marc Wexler wrote:  We went by Kyleen's instruction, and

5  due to the distribution amount in the Adams Group requesting

6  original investment back, we're on the light side.

7          Did you send that e-mail, sir?

8  A    Yes.

9  Q    And in response to that, is that why Dounya Discala sent

10  in the 25,000 to Titan?

11  A    I'm not sure.

12          MR. BOWMAN:  I have no further questions, Your

13  Honor.

14          THE COURT:  Thank you, Mr. Bohm.

15          Mr. Riopelle?

16  RECROSS-EXAMINATION

17  BY MR. RIOPELLE:

18  Q    Mr. Wexler, at the time you understood my client, as we

19  have it in your testimony, was going to withhold 39 percent of

20  the proceeds in the Glendale account to pay taxes, was it your

21  understanding that about $525,000 were available there?

22  A    No.

23  Q    What was the number?

24  A    I didn't know the exact number.

25  Q    Just didn't know the number, okay.

1           MR. RIOPELLE:  Thank you.  I have nothing further.

2           THE COURT:  Thank you.

3           Ms. Jones, I assume you have nothing.

4           MS. JONES:  We're done.  Thank you.

5           THE COURT:  Thank you.

6           Mr. Wexler, thank you.  You're excused.

7           THE WITNESS:  Thank you, Your Honor.

8           (Witness excused.)

9           THE COURT:  Let me see counsel at sidebar for a

10   moment.

11           (Sidebar.)

12           (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                    2481

1          (Sidebar conference held on the record out of the

2   hearing of the jury.)

3              THE COURT:  I lost track of the batting order.

4              MS. JONES:  We have Merlin Feratovic.

5              THE COURT:  Who?  Don't you have any Browns?

6              MS. JONES:  So he is a -- he works in the FBI and he

7   did the pen register analysis.  I think he would be relatively

8   short, assuming there's not much cross-examination.

9              MR. ROSS:  I'm doing the cross, Judge, and I don't

10  have much.

11             THE COURT:  I'm raring to go.

12             MS. JONES:  All right.

13             (Sidebar concludes.)

14             (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

Feratovic - Direct - Jones                    2482

1          MS. JONES:  The Government calls Merlin Feratovic.

2     Sorry, Feratovic.  Merlin Feratovic.

3          THE COURTROOM DEPUTY:  Raise your right hand.

4     **M E R L I N   F E R A T O V I C**,

5               called as a witness, having been first duly

6               sworn/affirmed, was examined and testified as.

7               follows:

8          THE COURTROOM DEPUTY:  Please state your first and

9     last name and spell it for the record.

10          THE WITNESS:  Sure.  First name Merlin, M-E-R-L-I-N,

11    last name F-E-R-A-T-O-V-I-C.

12          THE COURTROOM DEPUTY:  Thank you.  Have a seat.

13          THE COURT:  You can begin, Ms. Jones.

14          MS. JONES:  Thank you, Your Honor.

15    DIRECT EXAMINATION

16    BY MS. JONES:

17    Q    Who are you employed by?

18    A    FBI.

19    Q    And what is your title with the FBI?

20    A    Staff operation specialist.

21    Q    And are you in a specific division at the FBI?

22    A    Yes.  I'm at the intelligence division, but I'm assigned

23    to the Securities and Commodities Fraud Squad.

24    Q    And what squad is that?

25    A    C1.

Feratovic - Direct - Jones                          2483

1    Q    And how long have you been employed by the FBI?

2    A    Approximately two years.

3    Q    And what are your general duties?

4    A    My job is to support the operational squad by providing

5    background, research, and analysis on subjects, entities,

6    persons of interest, and to provide full analysis.

7    Q    Okay.  So do your duties include providing a pen

8    analysis?

9    A    Yes.

10   Q    And can you explain, what is pen data?

11   A    Pen is realtime incoming and outgoing phone records,

12   which includes calls and texts.

13

14                (Continued on following page.)

15

16

17

18

19

20

21

22

23

24

25

1   BY MS. JONES:

2   Q     And is it for -- is pen data usually associated with a

3   specific phone number?

4   A     Yes.

5   Q     And how is that collected?

6   A     The phone records itself?

7   Q     Yes.  The pen data.  How is that collected by the FBI?

8   A     Usually we send the subpoena or court order, court order

9   to the service provider, and we receive the records from them.

10  Q     So the records come directly from the service provider?

11  A     Yes.

12          MS. JONES:  Your Honor, the parties already have

13  entered into a stipulation regarding Government Exhibit 121-1,

14  that it is a true and accurate copy of the pen register data

15  collected by New Singular Wireless PCS, for number

16  914-255-7892, a mobile telephone subscribed to Abraxas

17  Discala, for the period of February 26, 2014 to June 29, 2014.

18          So I would like to pull up right now Government

19  Exhibit 121-1.  May I show it to the jury?

20          THE COURT:  You may.

21          MS. JONES:  First of all, let me make sure.  The

22  government moves that into evidence.

23          MR. ROSS:  No objection.

24          MR. RIOPELLE:  No objection.

25          THE COURT:  If we didn't before, we are doing it

1    again.  Received in evidence.

2            MS. JONES:  Sorry.

3            (Government Exhibit 121-1, received in evidence.)

4    BY MS. JONES:

5    Q    121-1.

6            Mr. Feratovic, so this pen data is collected

7    pursuant to a court authorization, correct?

8    A    Correct.

9    Q    And what time period is covered?

10   A    I believe February 26, 2014 up to June 29, 2014.

11   Q    And during the period that the pen data was collected,

12   approximately how many texts or calls are reflected in the

13   data?  Just asking for a general estimate.

14   A    About 50,000.

15   Q    And were you asked to analyze this data and prepare a

16   summary chart?

17   A    Yes.

18           MS. JONES:  So I am now going to show the witness

19   what's been marked for identification as Government Exhibit

20   121-2.  Just for the witness.

21   BY MS. JONES:

22   Q    Mr. Feratovic, do you see 121-2?

23   A    Yes.

24   Q    And what is this?

25   A    This is the summary of my work that I have done on the

1  pens.

2  Q    Okay.  So let's look at the first tab, all the way over

3  to the left.

4  A    Okay.

5  Q    What is that?

6  A    That is a target number.

7  Q    What I'm asking, that's the raw pen data from 121-1?

8  A    Yes.

9  Q    Okay.  And the next tab over is called a working copy?

10  A    Yes.

11  Q    What's a working copy?

12  A    It is a copy of the raw data, and then with the working

13  copy, I filtered out and deleted duplicates to simplify the

14  data.

15  Q    What types of things did you filter out?

16  A    Such as, obviously, duplicates, international numbers,

17  and numbers that were less than ten digits, numbers that

18  didn't have area codes.

19  Q    And why did you sort those calls out?

20  A    Just to simplify the data.

21  Q    Did you add any data?

22  A    No.

23  Q    And then what is contained in the remaining tab of this

24  workbook?

25  A    Our frequency reports.

1  Q    And do these frequency reports accurately summarize the

2  information in Government Exhibit 121-1, to the extent that

3  the numbers are included in the analysis?

4  A    Yes.

5         MS. JONES:  The government moves Government Exhibit

6  121-2 into evidence.

7         MR. ROSS:  No objection.

8         MR. RIOPELLE:  No objection.

9         THE COURT:  Received without objection.

10         (Government Exhibit 121-2, received in evidence.)

11         MS. JONES:  May I publish, Your Honor?

12         THE COURT:  You may.

13  BY MS. JONES:

14  Q    All right.  Let's go to the far right, to the last tab

15  that's called pivot table.  Starting with the pivot table,

16  what's reflected in the pivot table?

17  A    It is a list of numbers that the target telephone number

18  was in contact with.

19  Q    And if you go all the way down to the bottom, where

20  there's a grand total, what does that reflect?

21  A    The total number of texts and calls from the working

22  copy.

23  Q    The grand total is what?

24  A    57,728.

25  Q    So during that time period, that's the number of calls

1   and texts combined?

2   A    Yes, from the working copy.

3   Q    And then let's look at the phone of interest texts.  And

4   what is -- what does this tab summarize?

5   A    It is a frequency -- sorry.  It is a frequency report

6   between the target cell phone number and the phone numbers of

7   interest, text only.

8   Q    So, for example, looking at the top, where it says Marc

9   Wexler, what's that first number, 7,243?

10  A    That's the number of text between the target telephone

11  number and Marc Wexler.

12  Q    Okay.  And when it says, incoming, outgoing, what does

13  that indicate?

14  A    Incoming means that the target cell phone number received

15  the text, outgoing means that the target telephone number made

16  the text.

17  Q    Okay.  And so during this time period, how many texts

18  were exchanged between Mr. Discala over this target phone and

19  Mr. Wexler?

20  A    7,243.

21  Q    And then with Mr. Josephberg?

22  A    5,711.

23  Q    The Dounya Discala cell phone?

24  A    1,677.

25  Q    And Victor Azrak?

1  A     1,364.

2  Q     Matt Bell?

3  A     1,115.

4  Q     Kyleen Cane?

5  A     306.

6  Q     Darren Goodrich?

7  A     263.

8  Q     And Jaime Sloan?

9  A     198.

10  Q     Down a bit more.

11        Okay.  Then let's go over to the next tab, which is

12  phone of interest.  What is this?

13  A     Similar to the last tab reviewed, it's a frequency report

14  between the target telephone number and the phone numbers of

15  interest, voice calls only.

16  Q     Okay.  And so I also wanted to ask you about -- on this

17  one, it has a column called su of duration what does that

18  mean?

19  A     Just how long they spoke with each other.

20  Q     So, for example, for Marc Wexler and Mr. Discala, during

21  this time period over this phone, how long did they speak?

22  A     For 45 hours, 18 minutes, and 59 seconds.

23  Q     And what about Craig Josephberg?

24  A     18 hours, 50 minutes, 44 seconds.

25  Q     And Victor Azrak?

FERATOVIC - DIRECT - JONES                    2490

1   A    43 hours, 14 minutes, 44 seconds.

2   Q    Dounya Discala cell?

3   A    7 hours, 7 minutes, 33 seconds.

4   Q    And the phone attributed to Kyleen Cane?

5   A    15 hours, 9 minutes, 47 seconds.

6   Q    Go down some more.

7         And Darren Goodrich?

8   A    6 hours, 20 minutes, 30 seconds.

9   Q    Matthew Bell?

10  A    2 hours, 30 minutes, 58 seconds.

11  Q    Jaime Sloan?

12  A    48 minutes, 55 seconds.

13  Q    And the -- what's indicated as the Dounya Discala phone

14  number?

15  A    26 minutes and 16 seconds.

16  Q    And a Cane Clark LLP number?

17  A    Ten minutes, 35 seconds.

18  Q    Okay.  And then if we go to the next tab, which is phone

19  of interest, voice and text, what is this?

20  A    It's a frequency report between the target telephone

21  number and phone numbers of interest, including voice calls

22  and texts combined.

23  Q    So it just combines those last two tabs that we looked

24  at?

25  A    Right.

1   Q     If we can go over to analysis.

2         And what does this show?

3   A     Just a summary of contact between the target telephone

4   numbers and the phone numbers of interest.

5   Q     And the phone numbers of interest, how are those

6   identified?

7   A     The government identified those numbers.

8   Q     And then it asks you to look at those numbers?

9   A     Correct.

10  Q     Okay.  So the what was -- so this pivot table includes

11  all the numbers that were called or texted on this telephone,

12  correct?

13  A     Can you repeat the question?

14  Q     The pivot table includes all the numbers, not just the

15  ones of interest, correct?

16  A     Oh, the pivot table, yes.

17  Q     So according to this analysis, what is the number that

18  the cell phone was the most frequent contact in, was within

19  most frequent contact with?

20  A     Mr. Wexler.

21  Q     So if we go over to the voice calls received by, like the

22  incoming calls, what are the two numbers indicate in that

23  column?  Like first for Mr. Wexler it says 661 and then 378

24  answer.  Can you explain what that means?

25  A     Yes.  So the target telephone received 661 calls from

1  Mr. Wexler, and approximately 378 were answered.

2  Q    And how do you distinguish between an answered call and a

3  not answered call?

4  A    In the pen data they have -- they identify phone calls in

5  four different phone directions.  You have incoming, incoming

6  answered, outgoing and outgoing answered.

7  Q    So that information came from a service provider?

8  A    Yes.

9  Q    And then for the outgoing calls, it's the same -- the

10  same for Mr. Wexler, again, it indicates what was -- what was

11  dialed and what was answered?

12  A    Correct.

13  Q    And then the total number of voice calls is a summary of

14  both the answered and unanswered calls?

15  A    Correct.

16  Q    We can go more to the right.

17        And the total duration here is for what?

18  A    All the calls incoming and outgoing.

19  Q    Okay.  And then the text, again.  And these are just

20  summaries of the tabs that we looked at, correct?

21  A    Correct.

22  Q    If you also keep going, we have date of most recent voice

23  communication.  What does that indicate?

24  A    With the pen records we have, it indicates that they were

25  last in communication June 29, 2014, with the records that we

1    have.

2    Q    And the records that we have end on what date?

3    A    June 29, 2014.

4    Q    We go all the way back to the left, please.

5              So what's the second most frequent number of the

6    contact number?

7    A    Craig Josephberg.

8    Q    And the 17th most frequent contact on this number?

9    A    Kyleen Cane.

10   Q    So can we go over to the date of the most frequent --

11   most recent voice communication.

12   A    Between the target and Ms. Cane?

13   Q    Uh-huh.

14   A    June 26, 2014.

15   Q    Go back.

16             Going back down to the tabs, we go to the next tabs,

17   and the next tab left.

18             And what does aggregated text show?

19   A    It is just a frequency report between the target

20   telephone number and all of its contacts from February 26,

21   2014, up to June 29, 2014.  Text only.

22   Q    Text only?

23   A    Yes.

24   Q    And can we go down to see how many texts were exchanged

25   between Mr. Discala and Kyleen Cane?

1  A    306.

2  Q    Go one more over.

3        And, again, this is aggregated voice call shows

4  what?

5  A    Frequency report between the target telephone number and

6  the number -- and the target telephone number's contacts from

7  February 26 up to June 29, 2014, voice calls only.

8  Q    Okay.  And if we go one more tab over.  And what is the

9  frequency, this main frequency report?

10  A    Again, it is just a frequency report between the target

11  cell phone number and its contacts, between February 26, 2014

12  and June 29, 2014, voice and text calls combined.

13  Q    Okay.  One more over.

14        Now we are at the working copy.  So, Mr. Feratovic,

15  this only shows the contacts, it doesn't actually show any

16  content, correct?

17  A    Correct.

18            MS. JONES:  Okay.  No further questions.

19            THE COURT:  Thank you, Ms. Jones.

20            Cross?

21            MR. ROSS:  May I inquire, Judge.

22            THE COURT:  Yes.

23                        CROSS-EXAMINATION

24  BY MR. ROSS:

25  Q    Good evening, Mr. Feratovic.

1  A    Good evening.

2  Q    My name is Charles Ross, and I just have a couple of

3  questions for you.

4  A    Sure.

5  Q    How long have you worked for the FBI?

6  A    A little over two years.

7  Q    And you are not available to work for defense lawyers;

8  isn't that right?

9  A    That's correct.

10 Q    So if I wanted to hire you to do an analysis, you'd turn

11 me down, right?

12 A    Yeah.

13 Q    So, now, in the analysis that you just told us all about,

14 you focused on certain names; isn't that right?

15 A    That's correct.

16 Q    And you got those names from the government; isn't that

17 right?

18 A    Correct.

19 Q    And you analyzed frequency of texts and voice calls; is

20 that correct?

21 A    Correct.

22 Q    And those types of frequencies on voice calls and text

23 calls, you got those analyses -- those were suggested by the

24 government, right?

25 A    The phone numbers of interest, correct.

1   Q    Yes.  And the texts and the individuals of interests, on

2   frequency, you got those from the government, right?

3   A    Correct.

4              MR. ROSS:  Thank you, Judge.  Nothing further.

5              THE COURT:  Thank you, Mr. Ross.

6              Any cross of Ms. Cane?

7              MR. RIOPELLE:  Just very briefly, Your Honor.

8                        CROSS-EXAMINATION

9   BY MR. RIOPELLE:

10  Q    Good evening, Mr. Feratovic.

11  A    Good evening.

12  Q    Mr. Feratovic, if we could look together for a moment

13  at -- this is the summary of all call types.  There we go.

14         That's a document you prepared, correct?

15  A    That's correct.

16  Q    And I think you told us you had been working with the

17  commodities and securities fraud unit at the FBI now for a

18  couple of years?

19  A    I've been with the bureau for two years, I have been

20  working with the securities and commodities unit for 18

21  months.

22  Q    And during that time, have you become familiar with the

23  fact that brokers often speak in a kind of lingo?  Do you know

24  that?

25             MS. JONES:  Objection.  This is beyond the scope.

1          THE COURT:  I think you have to -- why don't you lay

2     a foundation, Mr. Riopelle, if he is aware of --

3     BY MR. RIOPELLE:

4     Q    Do you sometimes listen to intercepted phone calls?

5     A    I have not.

6     Q    You do not.

7          You simply analyze phone records; is that correct?

8     A    Not just that, but --

9     Q    That's what you did today?

10    A    Yes.

11    Q    Okay.  We will stick to that then, all right.

12         Looking at this document, which is your analysis of

13    contacts, and when it says call type, all refers to both text

14    and phone calls, regular phone calls?

15    A    Correct.

16    Q    Okay.  And what this analysis shows is that there are a

17    certain number of contacts or calls and texts, correct?

18    A    Correct.

19    Q    And then a sum of duration is the total amount of time

20    that the phone was either being called or dialling out or

21    being used for a phone call or used for a text message,

22    correct?

23    A    Correct.

24    Q    Okay.  Now, we can see, for example, in this analysis,

25    that Mr. Wexler has a total number of contacts with

1    Mr. Discala's phone, of 8,408, correct?

2    A    Correct.

3    Q    And the total duration there is 45 hours and almost 19

4    minutes, correct?

5    A    Correct.

6    Q    As compared to Ms. Cane, who has a total of 615 contacts,

7    correct?

8    A    Correct.

9    Q    And her contacts, only 615, that's a fraction of the

10   total contacts with Mr. Wexler, correct?

11   A    Correct.

12   Q    Even though she only has 615, her duration is about a

13   third of Mr. Wexler's duration, correct?

14   A    Correct.

15   Q    And did you know that Ms. Cane is a lawyer?

16   A    Excuse me?

17   Q    Did you know that Ms. Cane is a lawyer?

18   A    Yes.

19   Q    And does it make sense to you that the contacts between a

20   lawyer and others may be a little longer in duration?

21              MS. JONES:  Objection.

22              THE COURT:  Sustained.

23   BY MR. RIOPELLE:

24   Q    Now --

25              THE COURT:  Save your argument for later,

1   Mr. Riopelle.

2           MR. RIOPELLE:  Okay.

3   BY MR. RIOPELLE:

4   Q    We can also see that there are some calls are answered

5   and some are not, correct?

6   A    Correct.

7   Q    And in Ms. Cane's case, the incoming calls from the

8   target phone are answered about half the time, correct?  It's

9   198 total, and the answer is 104; am I right?

10  A    Incoming could also refer to texts.

11  Q    Okay.  So in any event, there's a total incoming of 198

12  calls or texts, correct?

13  A    Correct.

14  Q    And they are responded to 104 times, correct?

15  A    They are responded 104 times to the call.

16  Q    Okay.

17          MR. RIOPELLE:  I have no further questions,

18  Your Honor.

19          THE COURT:  Thank you, Mr. Riopelle.

20          Is there any redirect at all?

21          MS. JONES:  Just one brief question.

22                      REDIRECT EXAMINATION

23  BY MS. JONES:

24  Q    Mr. Feratovic, in the two exhibits that we looked at

25  121-1 and 121-2, these are Excel spreadsheets, correct?

1   A      Correct.

2   Q      And the working copy and the raw data include all the

3   numbers on it, correct?

4   A      Correct.

5   Q      And so you could search for any number and select any

6   number if you wanted to sort for a number, correct?

7   A      That is correct.

8   Q      Thank you.

9          THE COURT:  That was three questions.

10         MS. JONES:  Sorry.

11         (Laughter.)

12         MR. ROSS:  No recross, Judge.

13         THE COURT:  Mr. Riopelle?

14         MR. RIOPELLE:  No further questions, Your Honor.

15         THE COURT:  Okay.  Mr. Feratovic, you are excused.

16         THE WITNESS:  Thank you, Your Honor.

17         THE COURT:  Thank you.

18         (WHEREUPON, the witness was excused.)

19         THE COURT:  I think at this hour it's probably more

20  productive to -- unless counsel disagrees, to break for the

21  evening.  Or do we have another brief witness?

22         MS. JONES:  No, our next witness is going to be at

23  least a couple hours.

24         THE COURT:  Okay.  That being the case, we will take

25  the break.

1            Ladies and gentlemen, again, thank you for your

2    patience, cooperation, and continued sacrifice.  We, again, at

3    the end, a reminder again tomorrow we will be stopping no

4    later than 4:00, so you can plan accordingly.

5            But in the period -- the recess period, the recess

6    instructions, I repeat them, you may be tired of hearing them,

7    but they are important, which is why I repeat them.

8            Again, continue to keep an open mind.  Do not

9    discuss the case amongst yourselves or with anyone else.  You

10   remain on radio silence as far as all social media and other

11   communications forms are concerned.  You are not to use the

12   recess period as an opportunity to do any research, electronic

13   or otherwise, that remotely touches on this case.

14           To the extent there's any media accounts, in that

15   broader definition of media that we have come to know, that

16   relate to this case, you are directed to shut it all out,

17   eyes, mind and ears, totally disregard it.  Again, I urge you

18   to disregard media accounts of any court proceeding, for fear

19   that you will hear things there, all these millions of talking

20   heads that populate the television, hear things there that

21   have confused you, might confuse you about what your

22   responsibilities are here.

23           Again, we do appreciate your sacrifice and

24   cooperation, and we will see you tomorrow, down in the central

25   jury room at around 9:45.  And MTA permitting, we will start

1   as close to that time as we can.  Again, thank you.

2            (WHEREUPON, at 5:50 p.m., the jury exited the

3   courtroom.)

4            (Proceedings continue in open court; no jury

5   present.)

6            THE COURT:  Okay, Ms. Jones.  Who do we have in the

7   rotation tomorrow.

8            MS. JONES:  Your Honor, we have Mr. Azrak, who would

9   be our next witness, who will be -- who won't be as long as

10  Mr. Wexler, but who may be a lengthy witness.

11           I also wanted to raise, we have two shorter

12  witnesses on for tomorrow, assuming that our -- Mr. Riopelle's

13  motion in limine, as to Marche Godfrey and David Roncaioli

14  are -- is denied, those are both short witnesses.  So we may

15  want to try to get them on and off tomorrow because they have

16  traveled and we would like to get them out of here.

17           THE COURT:  Well, did you want to do them before

18  Mr. Azrak?

19           MR. HEIN:  I think potentially we can start with

20  Mr. Godfrey first, before Mr. Azrak, and then maybe break with

21  Mr. Azrak, if we need to, to get Mr. Roncaioli on, who should

22  be brief, before 4:00, if that would work with Your Honor.

23           MR. BINI:  He's not arriving until midday tomorrow.

24           MR. HEIN:  He's not arriving until around 1:00 p.m.

25           THE COURT:  And, again, what does he do?

1            MR. BINI:  Mr. Roncaioli is another victim investor,

2    Your Honor.  He was a Cubed investor.  The significance of him

3    is that -- of his testimony, rather, besides that we have --

4            THE COURT:  Forget about the significance.  What's

5    the noncumulative aspect of this?

6            MR. BINI:  He bought on the open market, Your Honor.

7    So he bought Cubed on the very first day it started trading on

8    April 23.  And so we think that's important to put in as part

9    of the case.  Not only were there people buying private sales,

10   but people were buying on the open market as well.

11           MR. RIOPELLE:  I don't think there's any dispute

12   about that, Your Honor.  That's a fact we don't dispute.  I

13   see no additional reason why that fact is important.  I don't

14   think there's going to be any dispute about that when we get

15   to the end of this case.  He's totally cumulative and

16   unnecessary.

17           THE COURT:  I am going to take a look at it between

18   now and then, but I am leaning -- I always like to give

19   counsel where I am leaning, if I haven't finally decided,

20   which means I can be tilted the other way.  But I am leaning

21   toward Mr. Riopelle's argument with that.

22           MR. BINI:  Your Honor, we believe he's like a

23   15-minute witness.  We think he's very short.  We are not

24   putting him on for a lengthy period of time.  And none of

25   the -- we have had someone who invested in Cubed, who then

1    purchased in a private sale, and then purchased some on the

2    open market, but this is an individual who exclusively

3    purchased on the open market because the stock price was going

4    up.

5              MR. HEIN:  And, Your Honor, if I can just add to

6    that as well, that his purchase -- we expect his testimony to

7    be that his purchase in Cubed followed a conference call that

8    he had with Mr. Discala, in discussion of the company Scanbuy.

9    And then subsequent to that, he -- based on that meeting and

10   his conversation with Mr. Discala, he learned of Cubed and

11   grew interested in Cubed and purchased over $20,000 in Cubed

12   stock on the open market, with the understanding that the

13   price was rising.

14             So he is differently situated than our other Cubed

15   victims.  And his connection in conference call with

16   Mr. Discala leading to his investment we do think is important

17   and not cumulative.

18             THE COURT:  But the -- is the relevance here

19   ultimately that he's the victim?

20             MR. HEIN:  It is, Your Honor.

21             THE COURT:  We have heard from victims.

22             MR. RIOPELLE:  Lots of them.

23             THE COURT:  If that's the relevance, I'm finding it

24   hard to see --

25             MR. RIOPELLE:  Including one the government admits

1    bought on the open market.

2          THE COURT:  Yeah, I mean, the other folks that were

3    victims have a different kind of connection to the case.  This

4    is an open market guy.

5          MR. BINI:  But he spoke directly to Mr. Discala,

6    Your Honor.

7          THE COURT:  But not about -- not about Cubed.

8          MR. HEIN:  Well, our understanding is that Cubed

9    arose in that conversation, or he learned of Cubed from the

10   connection to Mr. Discala.  So he met with him about Scanbuy,

11   Mr. Discala aimed to entice him into that deal, but he instead

12   decided to invest in Cubed because he learned of it through --

13         THE COURT:  Is he going to testify that Mr. Discala

14   encouraged him to buy Cubed?

15         MR. BINI:  That's what we anticipate, Your Honor.

16   It was a conference call, not a meeting, but there was a

17   conference call with Mr. Discala, and that he spoke about

18   Cubed, and that after that he was interested in purchasing.

19         THE COURT:  After that.  The question that I have

20   for you is that is he going to put words in Mr. Discala's

21   mouth that talk -- that encourage him to buy Cubed.

22         MR. HEIN:  Your Honor, to be frank, that is

23   something that we need to ask him further about, because I

24   don't want to state now that that's precisely what we expect

25   his testimony to be.  If Your Honor would permit, we intend,

1   obviously, to speak with him again to prepare him for his

2   testimony.

3             THE COURT:  Your witness.  It's your witness.

4             MR. HEIN:  And we can let Your Honor know with

5   respect to precisely what led to that.

6             THE COURT:  Let counsel know -- well, it may become

7   more -- it is more significant if there's -- if there's a link

8   to his free market conduct, specifically to one of the

9   defendants.

10            MR. HEIN:  Understood.

11            THE COURT:  As of right now, you're touting him as a

12  free market guy, with the implication being that he comes

13  about this as any investor might, hearing something or seeing

14  something in the media, and decided that the -- to buy Cubed,

15  and he falls victim like everybody else.

16            MR. HEIN:  To be clear, Your Honor, that is not our

17  understanding.  Our understanding is he learned of Cubed

18  because of Mr. Discala and his connection.  What I want to get

19  to the bottom of and make sure we understand correctly is

20  whether Mr. Discala on that conference call suggested to him

21  to buy Cubed specifically.  But we do understand for him that

22  Cubed, he learned of Cubed because of Mr. Discala and the

23  connection, and that's why he bought it.  But I will clarify

24  that.

25            THE COURT:  You make an offer of proof tomorrow that

 1    he's going to testify that Mr. Discala encouraged him to buy

 2    Cubed, we may have a different situation.

 3                MR. BINI:  Thank you, Your Honor.

 4                MR. HEIN:  Understood.

 5                THE COURT:  Anything else?

 6                MR. HEIN:  With respect to Mr. Godfrey, Your Honor,

 7    I don't know if you want --

 8                THE COURT:  I am leaning your way.

 9                MR. HEIN:  Okay.  Would you -- given that we likely

10    would put him on first tomorrow morning, would you like for us

11    to further argue it before Your Honor or --

12                THE COURT:  No.  I am -- I have heard you both.  I

13    am leaning your way.  I am going to button up a few things.

14                MR. HEIN:  Can I make one additional comment to this

15    morning's comment?

16                THE COURT:  Sure.  As long as it is not ex parte,

17    you can make any comment you want.

18                MR. HEIN:  I did want to add, and this is to the

19    point of it being allegedly cumulative, which Mr. Riopelle

20    said.

21                There are 30 sham shareholders who held free trading

22    shares in Northwest Resources originally.  We have shown the

23    chart.  Mr. Godfrey is the only one of them that we would be

24    calling.  We haven't called any of them on that list thus far.

25                The other important point is that he became a Cubed

1  shareholder because his shares transferred into Cubed, and

2  then not only that, but then Ms. Cane transferred a portion of

3  his shares to DTC to trade in them.  So he along with David

4  Ben-Bassat, and then a man named Marcus Po, where Ms. Cane

5  started taking the steps, are the three Cubed shareholders

6  that she moved to trade on the open market.  That is why he is

7  an important witness and also not cumulative of Mr. Smith or

8  Mr. Edgerton.

9          THE COURT:  As I say, based on what I've seen

10  already, I am certainly leaning in your direction, so that he

11  did appear to me different than the other -- and he seemed to

12  fit, sort of like a third -- the third side of the triangle.

13          MR. CALIENDO:  Judge, Robert Caliendo for Ms. Cane.

14          If that's what the government wants, then that's

15  already in the record.  All the document's saying that where

16  his shares are, that's already in the record, and the fact

17  that he --

18          THE COURT:  I hear you, Mr. Caliendo.

19          MR. CALIENDO:  Fair enough.

20          MR. HEIN:  Just, can I have one --

21          THE COURT:  I will stay here all night, I don't

22  mind.

23          MR. HEIN:  Well, we would anticipate --

24          THE COURT:  I like all of you people.

25          MR. HEIN:  The final point to that is, Your Honor,

1   that we would anticipate that, in closing, Mr. Riopelle could

2   argue that, well, you haven't heard from any of these

3   shareholders as to whether they really received stock

4   certificates.  And that is what Mr. Godfrey serves the purpose

5   of.  And what Mr. Caliendo is describing as in the record is

6   not the testimony that he would get.  So that's why we think

7   he's important.

8            THE COURT:  Okay.  Anybody else?

9            MR. BINI:  Your Honor, I just wanted to raise, Agent

10  Voulgaris, I know that with the pace of cross-examinations and

11  the pace of our case, perhaps he won't get on tomorrow, but in

12  case he does, I just wanted to raise that.  I know they moved

13  to preclude his testimony, or at least a large portion of it,

14  and the government --

15           THE COURT:  Well, we haven't answered yet.  So

16  tomorrow we may have another baptism.

17           MR. BINI:  Thank you, Your Honor.

18           THE COURT:  Okay.

19           MR. RIOPELLE:  Thank you, Your Honor.

20           THE COURT:  Have a good evening, everybody.

21

22           (WHEREUPON, at 6:00 p.m., the proceedings were

23  adjourned until 10:00 a.m., April 24, 2018.)

24

25

2510

1              I N D E X

2

3    M A R K   W E X L E R                    2283

4    DIRECT EXAMINATION                       2283

5    BY MS. JONES

6    CROSS-EXAMINATION                        2292

7    BY MR. BOWMAN

8    REDIRECT EXAMINATION                     2465

9    BY MS. JONES

10   RECROSS-EXAMINATION                      2475

11   BY MR. BOWMAN

12   RECROSS-EXAMINATION                      2479

13   BY MR. RIOPELLE

14

15   M E R L I N   F E R A T O V I C          2482

16   DIRECT EXAMINATION                       2482

17   BY MS. JONES:

18   CROSS-EXAMINATION                        2494

19   BY MR. ROSS

20   CROSS-EXAMINATION                        2496

21   BY MR. RIOPELLE

22   REDIRECT EXAMINATION                     2499

23   BY MS. JONES

24

25

2511

| | | |
|---|---|---|
| 1 | Government Exhibit 179-30 | 2285 |
| 2 | Government Exhibit 179-60 | 2289 |
| 3 | Government Exhibit 121-1 | 2485 |
| 4 | Government Exhibit 121-2 | 2487 |
| 5 | | |
| 6 | | |
| 7 | Defense Exhibit GB | 2310 |
| 8 | Defense Exhibit GC | 2322 |
| 9 | Defense Exhibit GD | 2331 |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |