UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

UNITED STATES OF AMERICA                    :

                                                       :     S1 14 Cr. 399 (ENV)

                      v.                             :

ABRAXAS J. DISCALA, et al.,                 :

                      Defendants.             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X


**<u>SENTENCING MEMORANDUM ON BEHALF OF DEFENDANT ABRAXAS J.
DISCALA</u>**


PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036

*Counsel for Defendant Abraxas J. Discala*

12756927

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................1

BACKGROUND ....................................................................................................................3

I.   Abraxas Discala's Personal History.................................................................................3

     A.   Mr. Discala's Childhood .....................................................................................3

     B.   Mr. Discala's Unstable Educational and Employment History ............................6

     C.   Mr. Discala's History of Substance Abuse and Addiction ...................................7

     D.   Mr. Discala's History of Mental Illness and Concussions...................................8

     E.   Mr. Discala's Recovery and Personal Transformation .......................................10

ARGUMENT .......................................................................................................................22

I.   Section 3553(a):  The Non-Guidelines Factors Support A Variance ..............................22

     A.   The Non-Guidelines Factors Should Predominate In This Sentencing ...............22

     B.   The Sentence Should Not Be Longer Than Necessary To Achieve The
          Ends of Sentencing ...........................................................................................23

     C.   The Nature and Circumstances of the Offense and the History and
          Characteristics of the Defendant.......................................................................25

     D.   A Short Custodial Sentence Adequately Reflects the Seriousness of the
          Offense, Provides Just Punishment, Affords Adequate Deterrence, and
          Protects the Public.............................................................................................29

     E.   A Lengthy Term of Imprisonment Would Create Unwarranted Sentencing
          Disparities Among Other Defendants in Similar Cases......................................32

II.  The Sentencing Guidelines Offer No Useful Guidance for Determining the
     Appropriate Sentence in This Case................................................................................37

III. The Court Can Also Impose A Lengthy Term of Supervised Release, Including
     Appropriate Conditions of Release................................................................................38

IV.  The Court Should Defer Determining the Appropriate Amount of Restitution ...............39

CONCLUSION.....................................................................................................................43

APPENDIX A:  Objections to the Presentence Investigation Report's Sentencing
          Guidelines Calculation................................................................................ A-1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aleutian Capital Partners, LLC v. Scalia*,
    975 F.3d 220 (2d Cir. 2020)...................................................................................... A-3

*Gall v. United States*,
    552 U.S. 38 (2007)...........................................................................................................38

*Hughey v. United States*,
    495 U.S. 411 (1990)........................................................................................................42

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019)........................................................................................... *passim*

*Pepper v. United States*,
    562 U.S. 476 (2011)........................................................................................................27

*Stinson v. United States*,
    508 U.S. 36 (1993)....................................................................................................... A-2

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006), *aff'd*, 301 Fed. App'x 93 (2d Cir. 2008).............23, 37

*United States v. Ageloff*,
    809 F. Supp. 2d 89 (E.D.N.Y. 2011), *aff'd sub nom. United States v.
    Catoggio*, 698 F.3d 64 (2d Cir. 2012)...................................................................................35

*United States v. Amico*,
    416 F.3d 163 (2d Cir. 2005)...................................................................................... A-6

*United States v. Bello*,
    No. 08-CR-801 (JBW), 2009 WL 1310791 (E.D.N.Y. May 5, 2009)...................................32

*United States v. Block*,
    16 Cr. 595 (JPO) (S.D.N.Y.)........................................................................................31

*United States v. Brown*,
    11-cr-449 (SJ) (RER), 2016 WL 11263165 (E.D.N.Y. Dec. 2, 2016) ..................................40

*United States v. Caspersen*,
    No. 16 Cr. 414 (JSR) (S.D.N.Y. Nov. 4, 2016) ......................................................27

*United States v. Catoggio*,
    326 F.3d 323 (2d Cir. 2003)........................................................................................39

*United States v. Cavera*,
   550 F.3d 180 (2d Cir. 2008)................................................................24

*United States v. DeSilva*,
   No. 08 Cr. 332, 2010 WL 532987 (E.D.N.Y. Feb. 8, 2010)..............................27, 32

*United States v. Dorvee*,
   616 F.3d 174 (2d Cir. 2010)................................................................24

*United States v. Ebbers*,
   458 F.3d 110 (2d Cir. 2006)............................................................... A-1

*United States v. Faibish*,
   12 Cr. 265 (ENV) (E.D.N.Y. March 10, 2016) ............................................23, 37

*United States v. Fofanah*,
   765 F.3d 141 (2d Cir. 2014)............................................................... A-5

*United States v. Greenfield*,
   44 F.3d 1141 (2d Cir. 1995)............................................................... A-6

*United States v. Harding*,
   No. 05 Cr. 1285-02 (RWS), 2006 WL 2850261 (S.D.N.Y. Sept. 28, 2006) ..................26, 27

*United States v. Hatfield*,
   No. 06 Cr. 550 (JS) (AKT), 2015 WL 13785926 (E.D.N.Y. Mar. 27, 2015).........................34

*United States v. Kloda*,
   133 F. Supp. 2d 345 (S.D.N.Y. 2001).......................................................24

*United States v. Levy*,
   No. 11 Cr. 62 (PAC) (S.D.N.Y.)...........................................................35

*United States v. Lieberman*,
   No. 17 Cr. 96 (JAM) (D. Conn.)...........................................................36

*United States v. Linares*,
   No. 10 CR 996-01 (RWS), 2012 WL 176183 (S.D.N.Y. Jan. 19, 2012)...............................28

*United States v. Morales*,
   232 F.R.D. 166 (E.D.N.Y. 2005) ......................................................28, 32

*United States v. Mulholland*,
   No. 14 Cr. 476 (ILG) (E.D.N.Y.)..........................................................34

*United States v. Nasir*,
   982 F.3d 144 (3d Cir. 2020)............................................................... A-4

*United States v. Obracanik*,
    No. 17 Cr. 144 (RA) (S.D.N.Y. July 27, 2017) ..................................................27

*United States v. Oppenheim*,
    No. 15 Cr. 548 (AT) (S.D.N.Y. Mar. 8, 2016) ..................................................28

*United States v. Parris*,
    573 F. Supp. 2d 744 (E.D.N.Y. 2008) ...................................................... 33, A-4

*United States v. Patzer*,
    548 F. Supp. 2d 612 (N.D. Ill. 2008) ..................................................................27

*United States v. R.V.*,
    157 F. Supp. 3d 207 (E.D.N.Y. 2016) ................................................................28

*United States v. Reifler*,
    446 F.3d 65 (2d Cir. 2006)..............................................................39, 40, 41

*United States v. Riccardi*,
    989 F.3d 476 (6th Cir. 2021) ................................................................... A-4

*United States v. Rosado*,
    254 F. Supp. 2d 316 (S.D.N.Y. 2003)................................................................27

*United States v. Rutkoske*,
    506 F.3d 170 (2d Cir. 2007)..................................................................... A-4

*United States v. Schwamborn*,
    467 Fed. App'x 35 (2d Cir. 2012).................................................................41

*United States v. Schwamborn*,
    No. 06 Cr. 328 (SJF) (E.D.N.Y.) ..................................................................35

*United States v. Shkreli*,
    No. 15 Cr. 637 (KAM) (E.D.N.Y.) ................................................................36

*United States v. Skelly*,
    No. 02 Cr. 986 (RMB) (S.D.N.Y) ................................................................33

*United States v. Surgent*,
    No. 04 Cr. 364 (JG) (E.D.N.Y.).....................................................................34

*United States v. Winick*,
    No. 13 Cr. 452 (ENV) (E.D.N.Y) ..............................................................33, 37

*United States v. Wynn*,
    854 Fed. App'x 63 (2d Cir. 2021).............................................................. A-4

iv

*United States v. Zimmerman*,
No. 10-CR-598 (JG), 2012 WL 3779387 (E.D.N.Y. June 19, 2012) ...............................25, 29

**Statutes**

18 U.S.C. § 3553(a) ............................................................................................ *passim*

18 U.S.C. § 3553(a)(1) ...............................................................................................24

18 U.S.C. § 3553(a)(2) ...........................................................................................23, 24

18 U.S.C. § 3553(a)(3) ...............................................................................................38

18 U.S.C. § 3353(a)(6) ...........................................................................................24, 32

18 U.S.C. § 3553(a)(7) ...............................................................................................39

18 U.S.C. § 3661 ......................................................................................................24

18 U.S.C. § 3663A .................................................................................................39, 41

18 U.S.C. § 3664 ...................................................................................................39, 43

U.S.S.G. § 2B1.1 ................................................................................................ *passim*

U.S.S.G. § 3B1.1 ....................................................................................................... A-6

U.S.S.G. § 5F1.3 .......................................................................................................39

**Other Authorities**

Judge Jose A. Cabranes & Professor Kate Stith, *Fear of Judging: Sentencing
Guidelines in the Federal Courts* (1998) ...............................................................22

Sandra M. Meier et al., *Attention-Deficit Hyperactivity Disorder and Anxiety
Disorders as Precursors of Bipolar Disorder Onset in Adulthood*, 213 Brit. J.
Psychiatry 555 (2018) .................................................................................................9

Raymond Paternoster, "How Much Do We Really Know About Criminal
Deterrence?," 100 Journal of Criminal Law and Criminology 765 (2010) ...........................31

Judge Jed. S. Rakoff, "Why The Federal Sentencing Guidelines Should Be
Scrapped," 26 Fed. Sent. Rptr. 226 (Oct. 2013) .............................................................22, 31

12756927

Defendant Abraxas J. Discala respectfully submits this sentencing memorandum in advance of his sentencing, which is scheduled for June 17, 2021, and requests that the Court consider the information below and in the attached exhibits in determining an appropriate sentence. For the reasons discussed below, a sentence of not longer than four years' imprisonment is sufficient to achieve the objectives of sentencing in Section 3553(a).

## PRELIMINARY STATEMENT

Mr. Discala stands convicted, after trial, of securities fraud and mail and wire fraud offenses arising out of the price manipulation of four over-the-counter stocks. When Mr. Discala first appeared before this Court nearly seven years ago, he was addicted to illicit narcotics and prescription pain killers and suffering from undiagnosed, untreated medical and psychological ailments. Seven years later, much has changed.

The actions for which Mr. Discala is to be sentenced occurred long ago, between 7 and 9 years prior to his sentencing. It is perhaps cliched to cite the aphorism that "no man ever steps into the same river twice," and yet it is also plain that these legal proceedings have catalyzed a larger and much-needed personal transformation for Mr. Discala. From his earliest days, and even at the lowest points in his life, Mr. Discala has touched those around him with his outsized generosity, compassion, and prodigious work ethic, but these characteristics historically competed with his addictions and lifelong mental health issues. Since Mr. Discala's indictment, he has fought successfully to achieve and maintain sobriety, sought out therapy for mental illness, renewed his religious commitment, and started a family. Mr. Discala has thrived in the role of stay-at-home dad to his two young daughters, ███████.[1] The crisis in his life created by

---

[1] ██████ was born just weeks before Mr. Discala's arrest; ███, three years later.

the indictment and the subsequent criminal process led Mr. Discala to harness his best qualities for good.

Mr. Discala's work with STAR, Inc., Lighting the Way . . . ("STAR"), a Connecticut non-profit that provides support services to special-needs children and adults, epitomizes this transformation.  Since 2017, Mr. Discala has devoted much of his time to STAR, by leading fitness classes for young adults with significant intellectual and physical disabilities. STAR's leadership describes Mr. Discala's work as "extraordinary" and "irreplaceable," with his fitness classes among the organization's most in-demand offerings (including during the COVID-19 pandemic, when Mr. Discala began leading hugely popular Zoom courses).  Countless students have gained strength, confidence, and self-esteem through Mr. Discala's motivation and support. Mr. Discala hopes to expand these classes to reach a wider pool of students, and he has collaborated with other coaches to create a curriculum that can be replicated outside of his Connecticut community.  Aware that he will soon be serving his sentence, Mr. Discala has recruited several other coaches in order to ensure that his students can receive continued instruction in his absence. Mr. Discala and those who have seen him coach believe that he has finally found his calling.  He intends to resume his work with adults with special needs when he is released from prison.

This side of Mr. Discala is doubtless new to the Court.  It is familiar, however, to those who have known Mr. Discala in contexts outside of these legal proceedings.  A total of 46 individuals—family members, childhood friends, neighbors, and acquaintances from community and recreational organizations—have written letters on Mr. Discala's behalf, which have been submitted along with this motion.[2]  These letters depict a man that this Court, despite its long

---

[2] All letters not specifically cited in this sentencing memorandum are attached as Exhibit 44.  Mr. Discala has also submitted a letter to the Court, attached as Exhibit 45.

familiarity with the instant case, has not yet had the opportunity to observe. He is a man who regularly places his own troubles aside to care for ailing neighbors or to lend counsel to others struggling with the addictions he overcame; who is utterly devoted to his wife and daughters; and who has made it his mission to support individuals with special needs. Mr. Discala respects the jury's verdict in this case, and knows that he will be punished for his offenses. We submit that a lengthy custodial sentence in this case serves no one's interest—not the judicial system's, the community's, Mr. Discala's, nor his family's. For these reasons, Mr. Discala respectfully requests that this Court impose the minimum sentence necessary to accomplish the purposes of sentencing, and not more than four years' imprisonment.

## BACKGROUND

### I.  Abraxas Discala's Personal History

#### A.  Mr. Discala's Childhood

Abraxas Discala was born in Stamford, Connecticut, in 1971, to Joseph Discala and Amber Wols van der Wel. (Presentence Investigation Report ("PSR" or "Presentence Report") ¶ 91). He has a sister, Sasha, who is three years younger, and two older half-brothers from his mother's first marriage, Dennis and Clement Kamoen. (*Id.* ¶ 92).

Mr. Discala now is close with his family, but this is in spite of, not because of, his upbringing. Although his parents were able to provide for him and his siblings financially, they did little more than that. Mr. Discala's childhood years were marked by instability and neglect. His father, who inherited a successful real estate company, was a ███████████████████. (PSR ¶ 93; Ex. 1 (Joseph Discala Letter)). Even during periods when he attempted to swear off ████████, Joseph Discala "was consumed by his own work, women, and partying." (Ex. 2 (Georgette Discala Letter)). His mother, an aspiring actress and model, was "very narcissistic"

3

and was "hardly around when [Mr. Discala] was little." (*Id.*; PSR ¶ 91). ████████████

████████████████████. Mr. Discala's older half-brother Dennis recalls their mother

████████████████████ before Mr. Discala's fifth birthday. (Ex. 3 (Dennis Kamoen

Letter)). ████████████████████████████████

████████████████████████████████████

████████ ████████████████████████████

████████████████████████████████████

████████████████.

The relationship between Mr. Discala's parents was tumultuous, and their

household rife with ████████, yelling, name calling, and infidelity. (Ex. 1 (Joseph Discala Letter);

Ex. 5 (Francis Discala Letter)). When Mr. Discala was about five years old, his parents separated

and then divorced approximately two years later. (*See* PSR ¶ 93; Ex. 6 (Report of Deena Graber)

at 2). A bitter custody battle ensued, during the course of which Mr. Discala began seeing a

psychotherapist. ████████████████████████████ ████████

████████████████ ████████████████████. (*See* Ex. 6 (Report of Deena Graber) at 3).

████████████████████████████████████

████████████████████████████ until more than a decade later (Ex. 1 (Joseph

Discala Letter)), and only through his current therapy has Mr. Discala begun to process the effects

of ████████. (Ex. 6 (Report of Deena Graber) at 3-5).

Following the separation and divorce of his parents, Mr. Discala and his siblings

lived for several years with their mother and her new husband, Duke van Kalken. (*See* Ex. 3

(Dennis Kamoen Letter)). Mr. Discala's mother and stepfather, who ████████████████

4

12756927

██████████████████████████████████████████████████████

████████████████. (*Id.*; Ex. 6 (Report of Deena Graber) at 2).

   When Mr. Discala was about eleven years old, he and his brothers moved to his father's home; Sasha, his little sister, joined them as well when Ms. Wols van der Wel and her husband later moved out of the country.  (*Id.*; Ex. 1 (Joseph Discala Letter)).  Although with their father the children were ████████████████████████████████, Joseph Discala's home was not a suitable environment in which to raise children.  To the contrary, Joseph Discala often was absent, and when he was around, he would "throw[] huge decadent parties" rather than look after his children.  (Ex. 7 (Connor Kilbourn Letter); *see also* Ex. 5 (Francis Discala Letter) (explaining that Joseph Discala was "surrounded by women, country clubs, and parties with movie and music stars" during Mr. Discala's youth); Ex. 8 (Nick DeLuca Letter) (recalling the "superficial and inappropriate" "high-flying lifestyle" to which Mr. Discala was exposed at his father's home)).  Joseph Discala himself recalls with regret that he "neglected to give [his children] what they really needed:  guidance, attention, supervision, and positive role modeling"; instead, he "was often on the road, entertaining customers" and reverting "to ██████████████████."  (Ex. 1 (Joseph Discala Letter)).  Indeed, when Mr. Discala was a teenager, he once returned home to discover his father ██████████████████████████████████████████████████████ ████████████████████. (Ex. 8 (Nick DeLuca Letter); *see also* PSR ¶ 93; Ex. 1 (Joseph Discala Letter) (acknowledging the "terrible effect[]" on his son of "████████████████████ ████████████████████).

   Unsurprisingly, Joseph Discala's children did not reside with him for very long: when Mr. Discala was about twelve years old, his father sent Mr. Discala and his siblings to boarding schools.

12756927

### B.      Mr. Discala's Unstable Educational and Employment History

School did not provide Mr. Discala with an alternate source of stability.  Even before Joseph Discala sent him and his siblings away for schooling, Mr. Discala had already cycled through five local schools:  Saugatuck Elementary School, Kings Highway School, Fairfield Country Day School, Hills Point, and Bedford Middle School.  The same pattern repeated itself at boarding school:  Mr. Discala was shuffled from one institution to another—first the Bement School, then the Northwood School, then Milford Academy, then St. Luke's High School—never remaining longer than a brief two-year stint.  (PSR ¶ 111).

After ultimately graduating from St. Luke's, Mr. Discala attended Northeastern University for approximately a year.  A frightening event early in his freshman year marred his experience at the school and contributed to his transfer.  While he and a group of friends were socializing outside of their dormitories, a young man from the neighborhood bordering the campus attacked one of the group, Brooks Renwick—a close friend and high school classmate of Mr. Discala's—with a knife, stabbing him multiple times.  Mr. Discala managed to protect Brooks, who ultimately recovered from the injuries.  (*See* Ex. 9 (David Cavanaugh Letter)).  The attacker was tried, and Mr. Discala and others from the group testified at his lengthy trial.  As one of those individuals, David Cavanaugh, recalls, "[t]his experience was so traumatic to [them] that when the trial was over, [he and Mr. Discala] both left Northeastern University."  (*Id.*; *see also* Ex. 4 (Sasha Zolik Letter)).  Mr. Discala moved to live with a relative in California and transferred to attend Orange Coast College, in California, but did not graduate.  (PSR ¶ 110).

Between 1992, when Mr. Discala left college, and 2012, when he founded Omniview Capital, Mr. Discala engaged in a number of different business ventures, ranging from

real estate to talent management to investment and entrepreneurship.  (*See* PSR ¶¶ 113-23).  Most of these efforts were short-lived; none were entirely successful.

### C. Mr. Discala's History of Substance Abuse and Addiction

Mr. Discala began abusing alcohol and drugs at a young age.  This is perhaps unsurprising, given his exposure at home to such substances and the trying emotional and psychological circumstances of his childhood.  He first began drinking when he was only eleven or twelve years old.  (PSR ¶ 104).  Around this time, Mr. Discala became severely ill after consuming so much alcohol that he fell unconscious in a snowbank outside of a neighborhood liquor store.  After being discovered, he was hospitalized for three days.  (PSR ¶ 104; *see also* Ex. 1 (Joseph Discala Letter)).  Just after his thirteenth birthday, he was suspended from school for "involvement with alcohol."  (Ex. 10 (February 15, 1984 Letter from The Bement School)).  These events did not discourage his drinking.

Mr. Discala began experimenting with narcotics in his teens; by his mid-twenties, he regularly abused cocaine and ecstasy, as well as steroids (initially prescribed for low testosterone) and opiates (initially prescribed to treat pain resulting from a back injury).  (PSR ¶ 104; Ex. 6 (Report of Deena Graber) at 4).  Although Mr. Discala sporadically attended Narcotics Anonymous meetings, he continued to use these substances—as well as others, like Xanax and Dilaudid, prescribed by doctors for different conditions—during the time period of the offenses at issue in this case.  (PSR ¶ 105; PSR Addendum ¶ 104).  His drug abuse was at its most severe around the time of his arrest.  (*See* Ex. 11 (Tim Doran Letter)).  It is not hard to imagine the extent to which his narcotics addiction impaired his functioning.

In addition to his drug and alcohol addictions, Mr. Discala also struggled with gambling, a problem that began when he was only seventeen years old.  He would place bets using

enormous sums of money:  his cousin remembers Mr. Discala "betting $5000 on the coin toss of a football game" in his early twenties.  (Ex. 8 (Nick DeLuca Letter)).  As a young adult, Mr. Discala was admitted to Silver Hill Hospital, in New Canaan, CT, where he was treated for gambling addiction.  (Ex. 12 (October 13, 2020 Letter from Silver Hill Hospital); *see also* PSR ¶ 107).  The treatment did not stop his gambling, however, which continued until his arrest in this case.

### D.   Mr. Discala's History of Mental Illness and Concussions

Throughout his life, Mr. Discala also has struggled with several psychiatric conditions, which can impair judgment.  He was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") as a child (*see* PSR ¶ 101), a condition that appears to have been undertreated.

███████████████████████████████████████████████████████████

███████████████████████

█████████████████████████████████████████████.  (*See* Ex. 13 (Report of Dr. Mark J. Mills) at 2-3 & n.4).  ████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████.  (*Id.* at 5).  Mr. Discala additionally suffers from an anxiety disorder; he was diagnosed with General Anxiety Disorder over a decade ago and was ████████████████████████████████████████.  (*See* PSR ¶ 101).

████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

8



Only after his arrest and prosecution in this case did Mr. Discala begin to seek out treatment for these conditions.

Whether because he was unusually accident-prone, as his father suggests (*see* Ex. 1 (Joseph Discala Letter)), or because he lacked adequate supervision, Mr. Discala also suffered a disturbing number of serious head injuries throughout his childhood and young adulthood.  (*See* Ex. 4 (Sasha Zolik Letter) ("[Mr. Discala's] life has truly been punctuated by . . . near-death accidents.").  When he was eight years old, Mr. Discala was in a car accident while being driven by his mother: he was not wearing a seatbelt, and his head smashed through the car's windshield.

This was the first of many concussions and other head injuries.  (Ex. 6 (Report of Deena Graber) at 2).  In each of the subsequent two years, sports injuries—first football, then baseball—resulted in Mr. Discala's second and third concussions.  (*Id*.). The fourth concussion proved particularly gruesome, so that family and friends remember it well:  when he was eleven or twelve years old, Mr. Discala attempted to operate a boat himself, unsupervised.  He fell off the boat, and the boat's propeller struck him in the head—cutting through the bone, causing significant

---

[3] *See also, e.g.*, Sandra M. Meier et al., *Attention-Deficit Hyperactivity Disorder and Anxiety Disorders as Precursors of Bipolar Disorder Onset in Adulthood*, 213 Brit. J. Psychiatry 555 (2018) (finding that "[t]he combination of ADHD and anxiety increase[s] the risk of bipolar disorder 30-fold").

9

blood loss, and knocking Mr. Discala unconscious.  (Ex. 3 (Dennis Kamoen Letter); Ex. 1 (Joseph Discala Letter)).  This was a traumatic injury; Mr. Discala recalls his father's panicked plea to him, before he lost consciousness, that he not go to sleep.  The injury required 97 stitches; his brother Dennis remembers helping him dress the wound for the next two months.  (Ex. 3 (Dennis Kamoen Letter); Ex. 6 (Report of Deena Graber) at 3).   And Mr. Discala was concussed for a fifth time when, at a construction site, he fell backwards from a second story ladder, hitting his head.  (*See* Ex. 4 (Sasha Zolik Letter)**).**  Only a month ago, Mr. Discala was struck in the head with debris while transporting construction materials to build an obstacle course for his gym training students. He was knocked unconscious and determined to have suffered yet another concussion.  Likely as a result of these injuries, Mr. Discala has long experienced regular, severe headaches, and other physical and psychological symptoms, such as difficulty thinking clearly and concentrating.

### E.     Mr. Discala's Recovery and Personal Transformation

Mr. Discala's 2014 arrest marked a personal nadir:  facing criminal prosecution, addicted to opioids, financially broke, and with a new daughter at home, he was inspired him to begin a transformation that has made him a better member of his family and the larger community. In his cousin Francis's words, Mr. Discala "[s]omehow . . . turned what would be an insurmountable blow to most people, into an opportunity to grow his family and his community." (Ex. 5 (Francis Discala Letter); *see also* Ex. 14 (████████████████) ("[Mr. Discala] has channeled humility, remorse, and probably embarrassment to become a catalyst to . . . improving the lives of others.")).  Francis is "truly amazed by the positive changes" he has witnessed (Ex. 5 (Francis Discala Letter)), and he is not the only person who harbors that sentiment.

For example, Reverend Landon Reesor, who has served as Mr. Discala's pastor and spiritual advisor since 2015 and who meets with Mr. Discala and his family regularly in that

capacity, explains that Mr. Discala "has been humbled by the events of the past several years and is committed to living a life reflective of . . . mercy and compassion" (Ex. 15 (Rev. Landon Reesor Letter); *see also* Ex. 16 (Sasa Mahr Batuz Letter) ("I am witness to the newfound peace and acceptance [Mr. Discala] is working on embracing.")). Mr. Discala's struggle for sobriety was renewed by his commitment to church. (*See, e.g.*, Ex. 15 (Rev. Landon Reesor Letter) ("It was my privilege to baptize [Mr. Discala] several years ago and to see his spiritual awakening and transformation continue to this day."); Ex. 17 (Mark Andrews Letter) (explaining that Mr. Discala attends the weekly 7:00 A.M. Bible Study Group he leads, and that Mr. Discala "has candidly discussed with me mistakes he has made in his life and, yet, the thankfulness that he feels as his failures have led him to a real relationship with God"). Alexandra Perlin, a friend of many years, observes: "[s]ince his conviction [Mr. Discala] has been looking for his own hope and a greater clarity of purpose and I believe he is finding it." (Ex. 18 (Alexandra Perlin Letter)).

### 1. Marriage and Fatherhood

Mr. Discala's wife and children are the center of Mr. Discala's world. Mr. Discala met Dounya Irrgang in 2010; they were introduced by mutual friends when Dounya, then living and working in Europe, came to New York on a business trip. The connection was instant; they married in February 2011, and in the decade since Mr. Discala has proved a "loving, adoring, and generous husband." (Ex. 19 (Alyson McGrath Letter); Ex. 20 (Dounya Discala Letter)). Together, Mr. Discala and his wife are raising two daughters, ███████, who, now seven years old, was born just weeks before Mr. Discala's arrest, and ███, who is four. (PSR Addendum ¶ 96.)

Fatherhood has profoundly affected Mr. Discala's personal priorities. Perhaps the single most remarked-upon theme running through the dozens of letters submitted on Mr. Discala's behalf is his "complete[] devot[ion] to ██████████." (Ex. 2 (Georgette Discala Letter); *see*

11

12756927

*also* Ex. 20 (Dounya Discala Letter) ("[H]e relishes being able to be the primary parent for our girls and cherishes every minute he gets to spend with them, and they are the blessed recipients of a doting and loving father."); Ex. 16 (Sasa Mahr Batuz Letter) ("I have never seen a more involved and beloved father and husband."); Ex. 21 (Kaitlyn Skloss Letter) ("Words can't describe the obvious love [he] has for his two daughters.")).  As a childhood friend puts it, Mr. Discala "strives to be the kind of parent he did not have and wish[ed] he had."  (Ex. 22 (Kelly Brewer Letter)).

By all accounts, he is succeeding:  friends and family have witnessed Mr. Discala "become a doting, responsible, and 'head over heels' in love father" (Ex. 19 (Alyson McGrath Letter)), and they "love to watch him with his girls."  (Ex. 23 (Jennifer Kamoen Letter)). ███████ and ███ "adore and worship their father" (Ex. 21 (Kaitlyn Skloss Letter)), and they are "the suns in his universe."  (Ex. 24 (Jill Sell Letter)).  A stay-at-home dad since his arrest, Mr. Discala "is the first person [██████████████] see when they wake up in the morning, who they go to if they have a nightmare or a toothache."  (Ex. 2 (Georgette Discala Letter)).  If they need reassurance or comfort, Mr. Discala is the one they turn to.  (Ex. 20 (Dounya Discala Letter)).  Mr. Discala has "happily embraced the responsibilities of parenting full time" (Ex. 25 (Thomas Juterbock Letter)); indeed, even the "mundane aspects of parenthood are sacred to him."  (Ex. 5 (Francis Discala Letter); *see also* Ex. 43 (Justin Hokin Letter) (noting that Mr. Discala "find[s] joy in his job as a 'stay-at-home dad'")).   "He dresses them, gives them their baths, does art projects with them, plays sports with them, bakes with them."  (Ex. 2 (Georgette Discala Letter)).

He and Dounya have worked to instill in their young daughters the values that Mr. Discala's own parents failed to model: he "continually reminds [them] to be grateful and to give back," advice the girls act upon by, for example, volunteering at community food banks on Thanksgiving and Christmas.  (Ex. 11 (Tim Doran Letter); *see also* Ex. 23 (Jennifer Kamoen

Letter) (recalling that when she gave Mr. Discala's daughter a birthday present, "she quickly went and chose an older toy to give to 'kids that don't have as much'"); Ex. 27 (Jennifer Thompson Letter) (noting that ██████████ accompany Mr. Discala to the volunteer fitness classes their father coaches, and "treat every [student] to an ice cream or bring a special cake when it's their birthday")). Mr. Discala knows that he soon will be separated from his wife and children, and he "cherishes each day he has with his family." (Ex. 5 (Francis Discala Letter)).

### 2. Sobriety and Counsel to Others Struggling with Addictions

Mr. Discala was able to become the husband and father that he is in part because, after his arrest, he finally addressed his addictions. Timothy Doran, who runs alcohol and drug detoxification centers and is a long-standing acquaintance of Mr. Discala's, explains that after Mr. Discala's arrest, Mr. Discala "chose[] to fight every day to remain clean." (Ex. 11 (Timothy Doran Letter)). Achieving and maintaining sobriety, of course, is no easy task. Dounya, ██████, and ████ are his primary motivations, but Mr. Discala has benefitted from additional sources of support, including his religious commitment, which has helped him come to terms with both his past struggles and the uncertainty of his impending sentence. (*See, e.g.*, *id.*; *see also* Ex. 17 (Mark Andrews Letter); Ex. 25 (Thomas Juterbock Letter); Ex. 18 (Alexandra Perlin Letter)).

Now, Mr. Discala "not only remains sober but has set new priorities." (Ex. 11 (Timothy Doran Letter)). High on that list is to help others who are struggling with addiction. Many friends and family members have benefitted from his advice, friendship and support. ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

13

████████████████████████████████████████████████████

███████████████████████████████

      Justine Stewart, who has known Mr. Discala for five years through their attendance at the same gym and who holds a degree in social work, recounts that Mr. Discala began "mentoring a troubled young man" at the gym who "ha[d] repeatedly entered rehab for alcohol abuse." (Ex. 30 (Justine Stewart Letter)). Mr. Discala was "there by his side when he struggled," and "has not given up on this young man, even when the young man gives up on himself." (*Id.*)

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████. Mr. Discala has assisted numerous additional individuals through a "Sober Sunday" support group he started for others struggling with addiction. (*See, e.g.*, Ex. 15 (Rev. Landon Reesor Letter); Ex. 32 (Bill Gallagher Letter)).

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

14

12756927



Mr. Discala's work to get and remain sober and his fierce commitment to providing comfort, encouragement, and assistance to others is just one indication of his capacity to reflect upon past failings, correct his behavior, and transform his mistakes into service.

### 3.     Mr. Discala's Remarkable Volunteer Work with Special-Needs Adults

Nothing represents how powerfully Mr. Discala has changed his life more than his work over the past several years with STAR, a Connecticut-based non-profit serving individuals with intellectual and developmental disabilities.

During a trip to the gym in 2017, Mr. Discala observed Bill Gallagher, the gym's owner, leading a fitness session with a class of special needs students.  These students were participants in programming offered through STAR.  As Mr. Gallagher explains, Mr. Discala "came up to [him] to ask about the program and how he could help" and thereafter began coaching himself—first assisting Mr. Gallagher, and then running his own classes and building a program of physical education.  (Ex. 32 (Bill Gallagher Letter); Ex. 33 (██████████)).  Mr. Discala states that he was also partly inspired by the experience of his minister, Pastor Landon, who adopted and is raising special needs children and has discussed with Mr. Discala the challenges faced by parents and caregivers.  (*See* Ex. 15 (Rev. Landon Reesor Letter)).

15

While other volunteers, perhaps intimidated by the students' disabilities and behavioral issues, struggled to lead these courses, Mr. Discala has proved a "natural," able to motivate his students, to bring out the best in them and nurture their own self-worth.   Indeed, according to a longtime special needs teacher in the Darien public schools, "there is no one better at helping others to find their strength . . . .  [Mr. Discala] opens his heart and embraces each and every participant . . . while also teaching valuable skills that will ensure more independence and more confidence."  (Ex. 18 (Alexandra Perlin Letter)).

Through his efforts, STAR clients "who typically sat on the sidelines" were "jumping in place, jogging and using a treadmill."  (Ex. 14 (███████████)).  Mr. Discala fostered his students' commitment by, for example, providing them athletic apparel "so that they feel special . . . and good about themselves."  (*Id.*; Ex. 27 (Jennifer Thompson Letter)).  STAR's fitness classes—initially undersubscribed—soon were so popular that STAR had to create additional weekly courses for Mr. Discala to lead.  (Ex. 14 (███████████; Ex. 33 (████ ████)).

Mr. Discala's commitment to his students is unwavering.  Indeed, ████████ ████████ "can't think of a time when [he] was even a minute late or missed a class or a commitment with the organization."  (Ex. 33 (███████████)).  In 2019, he received STAR's "Volunteer of the Year" award, and was recognized with another award in 2020.  (*Id.*).[4]  And last year, when gym facilities closed due to the COVID-19 pandemic, Mr. Discala moved his classes to Zoom:  he leads three, and sometimes four, fitness classes per week (and, since COVID-19 restrictions have loosened, additional in-person classes) for STAR, attended by an unprecedented

---

[4] *See* "Community Fund of Darien honors 'Unsung Heroes,'" The Darien Times (Apr. 27, 2020) (recognizing Mr. Discala as an "outstanding adult volunteer" for his work with STAR), *available at* https://www.darientimes.com/news/article/Community-Fund-of-Darien-honors-Unsung-15228894.php  (last visited May 31, 2021).

12756927

50 to 65 students per class.  (*Id.*).  Mr. Discala estimates that he has taught over 500 classes between Zoom and in-person instruction for STAR, reaching at least 125 different students.[5]

Mr. Discala knows each and every one of these students, "call[ing] on each one individually to acknowledge their efforts and offer encouragement and praise."  (Ex. 27 (Jennifer Thompson Letter); *see* Ex. 33 (███████████) (explaining that Mr. Discala references "details . . . such as where [students] live or things they like to do . . . in his workout.  These special touches mean a lot to our participants")).  As ███████████████████████████, explains, Mr. Discala's classes "ha[ve] been extremely important both mentally and physically" for STAR's clients. (Ex. 34 (███████████).

STAR's leadership is effusive in describing Mr. Discala's contribution to their program and clients. ███████████████████████, maintains that Mr. Discala "is the most extraordinary volunteer [STAR] ha[s] had.  [He] appears to have developed a deep appreciation and caring for our participants," while his coaching has been "life changing for [those] participants."  (Ex. 33 (███████████)). ███████ emphasizes that Mr. Discala's "ability to connect with individuals with disabilities (even those with behavioral issues) is truly remarkable and . . . quite frankly irreplaceable."  (*Id.*)

Unsurprisingly, STAR has looked specifically to Mr. Discala to try to help those clients most in need of support and mentorship.  Jennifer Thompson, a development associate with the organization, recalls that STAR ███████████████████████████████ ███████████████████████████████ (Ex. 27 (Jennifer Thompson Letter)). ███████████████████████████████████████

---

[5] Mr. Discala also conducts one-on-one personal training sessions five days per week for a student in need of individualized assistance, similar to the daily sessions described for another such student *infra* at 17-18.



(*Id.*; *see also* Ex. 33 (███████████)

(███████████████████████████████████

██████████████████████)).  Some of Mr. Discala's students are non-verbal,

or have aggression issues, and Mr. Discala has worked patiently through scores of sessions to help

his students develop.  Mr. Discala recently designed and constructed an obstacle course for his

students; others involved in caring for STAR's students have told him that this is the greatest thing

that STAR has seen yet.

　　　　Mr. Discala's work with STAR has affected him just as much as it has affected

those he coaches: it is "hard to know who [is] getting more out of the program, [him] or his

students."  (Ex. 35 (Georgette Yacoub Letter); *see also* Ex. 36 (Kerry & Ted McFarlin Letter)

("[T]he smiles on the faces of these [class] participants uplift everyone's spirits.  The only person

smiling or laughing more is [Mr. Discala].")).   As a fellow gym-goer who watches Mr. Discala

teach puts it, "[t]his is truly what [he] is meant to be doing."  (Ex. 35 (Georgette Yacoub Letter);

*see also* Ex. 27 (Jennifer Thompson Letter) (stating that Mr. Discala "has found his true happiness"

through his teaching and coaching)).  In fact, Mr. Discala hopes to extend his services to an even

wider group, and to one day provide fitness instruction to individuals with special needs

nationwide.   Knowing that he will soon begin serving a prison sentence, Mr. Discala has worked

to identify a stable of dedicated coaches to work with current and future students in his absence,

although to be sure his absence will be a great loss to his students.  Mr. Discala intends to return

to this work upon his release from prison:  this is his life's passion.

### 4.    Mr. Discala's Compassion To Others

Mr. Discala's assistance to special needs adults or to those struggling with addiction does not surprise those who have known him longest.  Those individuals attest to his remarkable kindness and generosity, even in the face of his own personal demons—his extensive family troubles, history of abuse, addictions, and medical issues.  (*See* Ex. 2 (Georgette Discala Letter) (stating that while Mr. Discala "grew up with significant challenges that could have turned him . . . selfish and cruel," he "instead . . . always was and still is a kind, caring, and deeply empathetic person"; Ex. 7 (Connor Kilbourn Letter) (recalling that throughout high school, Mr. Discala "was affable, humble, warm, true and fiercely loyal . . . a protective brother of sorts," despite "such a chaotic home life")).  Indeed, his "love and support of the people in his life"—a group that extends far beyond his own family, to a broad array of friends, neighbors, even casual acquaintances—"is his purpose."  (Ex. 37 (Catherine Futoma Letter)).  One family friend since childhood, Frederick Allen, echoes a familiar theme when he explains that he and his wife have "shared strife, family break-ups, funerals, sicknesses, and hardships" with Mr. Discala, and that "[d]uring those times he has never shied away from being supportive.  He shows up at the darkest and most stressful times to lend a hand and offer his shoulder to cry on."  (Ex. 38 (Frederick Allen Letter)).

The number of individuals who have shared stories of Mr. Discala's compassion, and their reliance on him in the most trying of times, is astounding.  Beau Taylor, who grew up knowing Mr. Discala through his friendship with her parents, and who calls him "Uncle A.J.," explains: "I have a very large extended family, yet Abraxas Discala—who has no blood relation to me—is one of the first people [I'd] turn to if I ever needed advice or help."  (Ex. 39 (Beau Taylor Letter)).  She describes two experiences that illustrate his support.  First, when she was a high school junior in 2012, Beau suddenly fell ill ████████████████████████

19

████████████████████████, A.J. called my dad at least twice a day to see how I was doing . . . and there was nothing [he] wouldn't do as long as it put a smile on my face.  He made a huge difference during that tough time."  (*Id.*).  Second, when three years later Beau's mother became sick, Beau—then a nineteen-year-old struggling to balance college coursework, a job, and caring for her parent—found herself "unable to function."  (*Id.*).  Mr. Discala "immediately offered [his] guest room and house to me any and every night I needed" and "made it clear that if I needed anything . . . I could come to him 24/7."  (*Id.*).

Norene Hartog, Mr. Discala's neighbor since 2013, recalls that her husband Gary—who passed away in the summer of 2020—was very ill for the last few years of his life, and was frequently hospitalized or in need of intensive care at home.  Mr. Discala "made himself available to help drive Gary to doctor appointments and the hospital," and "was always visiting and lifting his spirits." (Ex. 40 (Norene Hartog Letter)).  Indeed, Mr. Discala's assistance was so notable that another neighbor remarked upon it, commenting that he "would see [Mr. Discala] going across the street to [the Hartogs'] house several times a day" while Gary Hartog was sick, and that Mr. Discala seemed to "become [Gary's] main caregiver whenever [Norene] had to be away from home." (Ex. 28 (Frank DeLuca Letter)).  Mr. Discala recalls spending 2-3 days a week with Gary and even helped with the renovation of his house.  Mr. Discala's assistance not only improved Gary's quality of life in his final years, but also helped Ms. Hartog, who wrote that "hav[ing] another person to care for Gary with the compassion and diligence [Mr. Discala] showed meant so much." (Ex. 40 (Norene Hartog Letter)).

Kathleen Mancuso likewise recalls that as her husband Lou battled cancer in 2019, ultimately succumbing to his illness, Mr. Discala "was front and center helping Lou and me" during that "dreadful year."  He was "at the hospital during Lou's numerous admissions";

20

"physically carried Lou to and from his hospital bed" when he was too weak to stand, and set up a physical therapy plan and volunteered to work with Lou at the Mancuso's home when he was discharged from the hospital.  (Ex. 41 (Kathleen Mancuso Letter)).  And Tim Gaylord remembers that when he returned from his mother's home after the unexpected death of his father in 2017, he found Mr. Discala waiting to console him.  Mr. Gaylord writes: "Not only was he there for me on this terrible day, but he was there for me every day during the dark months that followed.  I will never forget the love, support, friendship and kindness [Mr. Discala] provided not only for me, but also for my remaining family."  (Ex. 42 (Tim Gaylord Letter)).

Such accounts are familiar to Mr. Discala's family members, as well, several of whom recall his commitment to his Aunt Kay, who suffered a stroke that severely compromised her speech and cognition and who passed away in 2019.  Mr. Discala "was one of only a few [family members] who visited her regularly" (Ex. 2 (Georgette Discala Letter)); Aunt Kay's daughter remembers: "[He] was with us every day, only leaving to go home to take care of his family, and then returning for hours to support me and my sister. . . .  It was the most painful time in our lives and [Mr. Discala] made sure we were taken care of."  (Ex. 37 (Catherine Futoma Letter)).

That spirit of generosity and compassion reveals itself not only in the "darkest and most stressful times" (Ex. 38 (Frederick Allen Letter)); it is part of Mr. Discala's attitude and approach to the world.  His pastor describes "a man with huge heart for others driven constantly by compassion for their needs and a spirit of selflessness that often leaves [him] in awe."  (Ex. 15 (Rev. Landon Reesor Letter)).  Inspired by his faith, Mr. Discala has worked with the Darien Pantry to help provide for families in his community who do not have enough food on their tables, even through COVID.  A number of letters submitted on Mr. Discala's behalf attest to myriad quotidian

acts of kindness, largely unseen or unnoticed by anyone apart from the recipient.  As a neighbor

of seven years explains, whenever he or a friend "needs help with moving, fixing up their house,

coaching, or simply watching our kids," Mr. Discala "always says 'yes, no problem.'"  (Ex. 26

(Peter Stuart Letter); *see also* Ex. 2 (Georgette Discala Letter) ("He is the first person any of us

call and the one person who will never disappoint. . . .  He is the first to lend a helping hand and

the last to think of himself.")).  In short, Mr. Discala is and always has been "someone you can

always rely on and for whom no favor is too big to ask."  (Ex. 22 (Kelly Brewer Letter)).

## ARGUMENT

**I.      Section 3553(a):  The Non-Guidelines Factors Support A Variance**

**A.      The Non-Guidelines Factors Should Predominate In This Sentencing**

The Presentence Report states that the Sentencing Guidelines range in this case is

a sentence of 1740 months' imprisonment—in other words, 145 years' imprisonment.  The fact

that the Sentencing Guidelines recommend a sentence of life imprisonment for a scheme that

involved the manipulation of four penny-stock securities and lasted roughly one year is further

evidence of the "irrationality of the Guidelines, which leads to unjust results in case after case after

case[.]"  Jed. S. Rakoff, "Why The Federal Sentencing Guidelines Should Be Scrapped," 26 Fed.

Sent. Rptr. 226, 229 (Oct. 2013).  In sentencing a co-defendant in this matter, this Court explained

that "the guidelines of economic crimes . . . [reflect] mindless acceleration of penalties so

disconnected from reality to almost become useless and particularly in this subject of intended

loss."  *United States v. Goodrich*, 14 Cr. 399 (ENV), Dkt. 708, Tr. at 33 (E.D.N.Y. July 12, 2018)

(describing the futility of making a calculation of intended loss in a bank robbery hypothetical);

*see also* Judge Jose A. Cabranes & Professor Kate Stith, *Fear of Judging: Sentencing Guidelines*

*in the Federal Courts* (1998) (presenting similar hypothetical to indicate the imprecision and unfairness of the Guidelines).

For these reasons, we begin our discussion with the non-Guidelines factors in Section 3553(a).  Where the Court is "confronted with an absurd guideline result" driven by the Sentencing Guidelines' "inordinate emphasis . . . in fraud cases on the amount of actual or intended financial loss," the Court may instead "focus its primary attention on the non-guidelines factors set forth in § 3553(a), including both those of general applicability and those that ha[ve] special relevance to [the defendant's] particular circumstances."  *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006), *aff'd*, 301 Fed. App'x 93 (2d Cir. 2008) (summary order); *see also United States v. Faibish*, 12 Cr. 265 (ENV), Dkt. No. 271, Tr. at 23 (E.D.N.Y. March 10, 2016) ("I subscribe to the views of a whole host of judges who have said so publicly . . . that the guidelines, even with its slight revisions, are just mindlessly accelerated once you have numbers of any size added in the loss or gain table.").  Considering the non-Guidelines factors and looking at the other sentences actually imposed by judges in analogous cases, we submit that a variance is appropriate.  A sentence of not longer than four years' imprisonment is sufficient to achieve the purposes of sentencing in this case.

**B.   The Sentence Should Not Be Longer Than Necessary To Achieve The Ends of Sentencing**

Pursuant to the "parsimony" clause of 18 U.S.C. § 3553(a), this Court must impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in Section 3553(a)(2).  Section 3553(a)(2) states that the sentence imposed needs to achieve the following objectives:

A.  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
B.  to afford adequate deterrence to criminal conduct;

C. to protect the public from further crimes of the defendant; and

D. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). The sentence imposed must be "'the least severe sentence sufficient to accomplish the[se] goals of sentencing.'" *United States v. Kloda*, 133 F. Supp. 2d 345, 347–48 (S.D.N.Y. 2001) (quoting *United States v. DeRiggi*, 893 F. Supp. 171, 182 (E.D.N.Y. 1995)). That is to say, where the Court "conclude[s] that two sentences equally serve[] the statutory purposes of § 3553, it c[an] not . . . impose the higher" sentence. *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (internal quotation marks and citation omitted).

In applying the parsimony clause and § 3553(a)(2), the Court also considers the other § 3553(a) factors, including "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," *id.* § 3553(a)(6). In formulating the appropriate sentence, the Court may consider any fact it deems relevant to sentencing. *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information . . . which a court . . . may receive and consider for the purpose of imposing sentence."); *see also, e.g.*, *United States v. Cavera*, 550 F.3d 180, 190-91 (2d Cir. 2008) (stating that for purposes of sentencing, no "factor concerning the background, character, and conduct of the defendant" is prescribed) (internal quotation marks and citation omitted)).

12756927

### C.       The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

Mr. Discala was found guilty of offenses relating to the manipulation of four penny stocks between May 2013 and July 2014.[6]  To be sure, this is a serious charge and Mr. Discala was convicted after a jury trial; he will soon be ordered to pay significant restitution to his victims.  He respects the jury's verdict.   When considering the nature and circumstances of the offense, however, it is important to understand that it was during this time period that Mr. Discala was at the apex of his drug addiction and was suffering from untreated or insufficiently treated medical conditions—bipolar disorder and ADHD among them.  Significant childhood trauma, with which Mr. Discala had not then grappled, exacerbated both his addictions and mental health problems.

Despite this toxic history, Mr. Discala has no prior criminal history (apart from an arrest for an unpaid speeding ticket), and even in the throes of his addictions and personal and medical problems, he continuously demonstrated generosity and compassion for those around him. Mr. Discala was always "someone you can always rely on and for whom no favor is too big to ask" (Ex. 22 (Kelly Brewer Letter)), even with "such a chaotic home life."  (Ex. 7 (Connor Kilbourn Letter)).  Since his arrest and indictment, Mr. Discala has made tremendous strides in addressing his weaknesses, while harnessing the best parts of himself to be of assistance and support to those around him.  This Court should consider as well his significant efforts to change and to become a productive, contributing member of society in the many years since his arrest.

"[P]ost-arrest conduct 'constitutes a critical part of the "history and characteristics" of a defendant that Congress intended sentencing courts to consider.'"   *United States v. Zimmerman*, No. 10-CR-598 JG, 2012 WL 3779387, at *7 (E.D.N.Y. June 19, 2012) (quoting

---

[6] We observe that while the Superseding Indictment alleges a longer time period, the first illegal trades are alleged to have happened in May 2013.

12756927

*Pepper v. United States*, 562 U.S. 476, 492 (2011) (considering that at time of sentencing defendant "had been drug free for nearly five years . . . , was a top employee . . . , and was married and supporting his wife's daughter")).  In the seven years since Mr. Discala's arrest, he has successfully sworn off drugs and has devoted himself utterly to his wife and two daughters, ██████ and ██. He has renewed his religious faith and become a beloved, committed coach and trainer for young adults with special needs. In short, Mr. Discala "has felt the repercussions of the past and has refocused his life as a person who just keeps on giving . . . with heart, spirit, and compassion." (Ex. 14 (██████████████)).  These factors weigh in favor of a short sentence, nothing like the Guidelines range in the Presentence Report.

1. **Mr. Discala's Sobriety, Mental Health Status and Prior Gambling Addiction Support a Lesser Sentence**

While Mr. Discala will be held responsible for his offense conduct, his addictions and medical conditions—largely undiagnosed and untreated until after his arrest—help explain much of his past conduct.  We respectfully ask that the Court consider this as part of his history and characteristics relevant to his sentence.  *See, e.g.*, *United States v. Harding*, No. 05 Cr. 1285-02 (RWS), 2006 WL 2850261, at *5 (S.D.N.Y. Sept. 28, 2006) (explaining that "[d]efendant has suffered both [a substance abuse problem and mental health conditions] without adequate treatment" and stating that "[t]hat these conditions likely contributed to the defendant's participation in the instant offense and may be ameliorated . . . through adequate treatment weighs in favor of" a short sentence).

As Dr. Mills and Ms. Graber explain, ████████████████████████ ████████████████████████████.  (*See* Ex. 13 (Report of Dr. Mark Mills) at 5-7; Ex. 6 (Report of Deena Graber) at 4-5).  With psychological treatment, a renewed purpose, and support from his family and friends, Mr. Discala's addictions are now under

26

control.  Mr. Discala "chose[] to fight every day to remain clean" (Ex. 11 (Timothy Doran Letter))

and has dedicated himself to helping others do the same, becoming "a life saver in the truest sense."

(Ex. 28 (Frank DeLuca Letter)).   Sentencing courts routinely consider a defendant's success

overcoming addiction in evaluating his history and characteristics.  *See, e.g.*, *Pepper*, 562 U.S. at

492; *Harding*, 2006 WL 2850261, at *5; *United States v. Rosado*, 254 F. Supp. 2d 316, 321

(S.D.N.Y. 2003).  Mr. Discala's mental health, a driving cause behind the actions that led to his

indictment, is now much improved; he attends regular therapy sessions and understands his

diagnoses and the attendant risks they pose to him, making him less likely to engage in future

misconduct.  *United States v. DeSilva*, No. 08 Cr. 332, 2010 WL 532987, at *2 (E.D.N.Y. Feb. 8,

2010) (considering defendant's history of psychiatric problems, including at least two nervous

breakdowns and bipolar disorder); *United States v. Patzer*, 548 F. Supp. 2d 612, 617-18 (N.D. Ill.

2008) (noting that where defendant's new "accurate medical diagnosis of his mental health

problem[,] ADHD" helped to explain his aberrant behavior, and that the "diagnosis gives hope that

[defendant's] condition can be treated and his incentive to commit crimes decreased without  . . .

a lengthy sentence" (internal quotation marks and citation omitted)).

In addition, courts have recognized that a gambling addiction can "seriously

impact[]" a defendant's "exercise of rational control and rational decision-making" and justify a

variance from the Guidelines.  *See United States v. Caspersen*, No. 16 Cr. 414 (JSR) (S.D.N.Y.

Nov. 4, 2016) (Dkt. No. 37) (imposing a sentence of 48 months' imprisonment, a downward

variance from a Guidelines range of 168-210 months, due in part to a serious gambling disorder,

where the restitution imposed exceeded $27 million, with the victims including a charitable

foundation); *United States v. Obracanik*, No. 17 Cr. 144 (RA) (S.D.N.Y. July 27, 2017) (Dkt. No.

25) (imposing a sentence of a year and a day's imprisonment, a downward variance from a

27

Guidelines range of 51-63 months, in light of, *inter alia*, the "destructive effect [of the defendant's] gambling addiction . . . and the role it played in his decision to commit the crime"); *United States v. Oppenheim*, No. 15 Cr. 548 (AT) (S.D.N.Y. March 8, 2016) (Dkt. No. 42) (imposing a sentence of 60 months' imprisonment, a downward variance from a Guidelines range of 97-121 months' imprisonment, where the defendant, who "struggled for much of his adult life with a severe [gambling] addiction," "used his position of trust and authority as an investment advisor at JPMorgan to steal more than $19 million belonging to clients whose investment accounts he managed" over a seven-year period).

### 2. Mr. Discala's Commitment to His Wife and Children Support a Lesser Sentence

Mr. Discala is now a "doting, responsible, and 'head over heels' in love father" of two young girls. (Ex. 19 (Alyson McGrath Letter)). While his wife works to support the family financially, Mr. Discala is their daughters' primary caregiver, whom his children adore. (Ex. 28 (Frank Deluca Letter)). "Removing [Mr. Discala] from his family" for an extended period of incarceration "will not further the interests of justice; it will cause serious harm to his young children by depriving them of a loving father . . . and will strip [him] of the opportunity to heal through continued sustained treatment and the support of his close family." *United States v. R.V.*, 157 F. Supp. 3d 207, 267 (E.D.N.Y. 2016); *see also United States v. Linares*, No. 10 CR 996-01 (RWS), 2012 WL 176183, at *7 (S.D.N.Y. Jan. 19, 2012) (deeming downward departure appropriate where defendant "appears to be a devoted husband and father whose incarceration will be a severe hardship for both his children and his spouse"); *United States v. Morales*, 232 F.R.D. 166, 167 (E.D.N.Y. 2005) (considering that "[t]o imprison [defendant] for an extended period of time would be unnecessarily destructive to him and to [his] family").

### 3. Mr. Discala's Service to Special-Needs Adults Supports A Lesser Sentence

Mr. Discala has proved a tremendous asset to the community through his work over the past four years leading fitness classes for young adults with special needs, after being introduced to the STAR program. He is "the most extraordinary volunteer" that STAR has ever had, evincing a "unique gift" to motivate his students to live a healthier and fuller life, and an "irreplaceable" ability to connect with those with disabilities. (Ex. 33 (█████████); Ex. 35 (Georgette Yacoub Letter)). Mr. Discala has instilled not only literal strength, but pride and self-worth, in the countless young men and women he has met through STAR, and has proved a much-needed source of stability to them, particularly during the COVID-19 pandemic. (Ex. 34 (████████████████)).

The program has changed Mr. Discala as well as his students; he has discovered "truly what [he] is meant to be doing." (Ex. 35 (Georgette Yacoub Letter). Mr. Discala has much more to offer, to many more potential students. A lesser sentence would permit Mr. Discala to extend his "unique gift" to a wider group of deserving individuals, sooner. *See Zimmerman*, 2012 WL 3779387, at *7 (opting against "a more onerous . . . punishment" that "would pose an undue risk of wiping all of [defendant's] hard work away, disserving not only him and his family but the community as well").

### D. A Short Custodial Sentence Adequately Reflects the Seriousness of the Offense, Provides Just Punishment, Affords Adequate Deterrence, and Protects the Public.

### 1. Seriousness of the Offense and Providing Just Punishment

Mr. Discala recognizes that the conduct for which he has been convicted is serious and that his conviction will lead to punishment. Mr. Discala understands that some purchasers of penny stocks are not sophisticated investors, but men and women who can ill afford to lose their

12756927

investments.  Indeed, some of Mr. Discala's own family and closest friends are among those who lost money investing in the securities at issue in this case.  Mr. Discala also understands that the system itself is harmed by securities fraud, as public mistrust of the securities market is caused by cases like this one.  Even while his current financial status reflects that this case was nothing like the "$300 million case" that the government reported in its press release at the time of Mr. Discala's arrest, it is still a serious case.

Mr. Discala understands that he must pay a price for his conviction; he is paying and will continue to pay a steep price.  His reputation is in tatters.  The home in which he hoped to raise his daughters was foreclosed upon.  (PSR ¶ 127).  Of course, Mr. Discala has not been involved in the securities markets since his arrest and never will again.  According to the Presentence Report, his net worth is a deficit of more than $2.3 million.  While the amount of forfeiture (likely to exceed $2.4 million) and restitution to be imposed is not yet settled, the financial penalties will be immense, and will hang over Mr. Discala and his family for the rest of his life.  His precious family, faith and newfound sobriety are his assets.  He will be sentenced to a period of incarceration despite this being his first contact with the criminal justice system.  Even a punishment of 41 months—the sentence imposed on one of his co-defendants—would be more than most people could bear.  No one will look at Mr. Discala when he is sentenced and conclude that he has "beaten the system."  A lengthy period of incarceration—anything longer than four years—is not necessary to reflect the seriousness of this case or to provide just punishment.

## 2.  Deterrence and Protecting the Public

A sentence of not longer than four years would serve both general and specific deterrence.  As to general deterrence, even without considering the previously detailed combination of financial punishment, public humiliation, and harm to Mr. Discala's family (which

12756927

would, in themselves, discourage others from engaging in similar conduct), imposition of some period of incarceration would persuade someone who is considering engaging in market manipulation that this would be a terrible mistake. The general deterrent value of a longer prison sentence is minimal. *See United States v. Block*, 16 Cr. 595 (JPO) (S.D.N.Y) (Dkt. No. 169 at 71) (recognizing that "a sentence of seven years versus two years versus three years does not make a huge difference in general deterrence"); Rakoff, "Why The Federal Guidelines Should Be Scrapped," at 227 ("There is a considerable body of literature that suggests that even small amounts of prison time can achieve substantial deterrence in the case of nonviolent crimes (whether they be 'white-collar' crimes or just modest instances of theft, fraud or embezzlement)."); *see generally* Raymond Paternoster, "How Much Do We Really Know About Criminal Deterrence?," 100 Journal of Criminal Law and Criminology 765, 822 (2010) ("When we think we are greatly enhancing deterrent effects by doubling the length of sentences, then, we likely have a far lessened impact on the offending calculus of offenders.").

As to specific deterrence and protection of the public, there is no risk that Mr. Discala will commit a similar offense in the future. This is Mr. Discala's first conviction—he has no criminal history. As a practical matter, he will never work in the securities industry or business world again. More importantly, the changes in Mr. Discala's life in the past seven years—including his renewed faith, his sobriety, his devotion to his wife and daughters, his commitment to community service, and his ongoing work in therapy—make it extremely unlikely he will reoffend.

This proposition is supported by his exemplary behavior while on bond in this case. The Court has been able to see how Mr. Discala would adjust to supervised release. Far from posing any risk to the public, Mr. Discala has helped improve his community since his conviction.

31

12756927

See, e.g., *Morales*, 232 F.R.D. at 167 (stating that "an extended period" of imprisonment is "unnecessary for the specific deterrence of this defendant" where the defendant "has abided by all the conditions imposed by Pretrial Services[,] . . . has demonstrated a strong motivation to begin rehabilitating himself" and "has been a stabilizing influence in the lives of his wife and children and the children in his extended family"); *DeSilva*, 2010 WL 532987, at *2 (reasoning that "[s]pecific deterrence is not necessary" because it was "unlikely that [the defendant] will engage in further criminal activity in light of [defendant's] family responsibilities, remorse, and substantial efforts at rehabilitation"); *United States v. Bello*, No. 08-CR-801 (JBW), 2009 WL 1310791, at *2 (E.D.N.Y. May 5, 2009) (stating that "[t]he need for specific deterrence . . . is less significant . . . in light of [defendant's] remorse, his devotion to his family, and the support that his family will provide him during his imprisonment and upon release"). This factor supports a variance and the imposition of a shorter, non-Guidelines sentence.

### E.  A Lengthy Term of Imprisonment Would Create Unwarranted Sentencing Disparities Among Other Defendants in Similar Cases

In fashioning an appropriate sentence, this Court must be mindful of "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3353(a)(6). A lengthy prison sentence here would be inconsistent with sentences imposed upon similarly situated defendants.

Sentencing courts, to be sure, have imposed significant terms of incarceration on defendants found guilty in connection with "pump and dump" or market manipulation schemes. For defendants who, like Mr. Discala, have been alleged to be the orchestrators of such schemes,

32

these sentences typically have ranged between two and a half and six and a half years'

imprisonment:[7]

- *United States v. Winick*, No. 13 Cr. 452 (ENV) (E.D.N.Y) (Dkt. Nos. 413, 427) (imposing 78-month sentence upon defendant who "controlled two serious and complex [international] fraud schemes that involved thousands of victims," including a pump-and-dump scheme).

- *United States v. Kershner*, No. 13 Cr. 452 (ENV) (E.D.N.Y) (Dkt. No. 578) (imposing 30-month sentence upon "a very important cog" in the same pump-and-dump scheme, involving "victims in 37 countries").

- *United States v. Sahachaisere*, No. 13 Cr. 452 (ENV) (E.D.N.Y.) (Dkt. Nos. 469, 510) (imposing 27-month sentence upon defendant described by the government as the "control person" and "quarterback" of the same pump-and-dump scheme).

- *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) (imposing 60-month sentences each for defendants Lennox and Lester Parris, who controlled a pump-and-dump scheme through which they personally gained more than $2.5 million and who additionally were convicted of witness tampering offenses and obstructed justice by providing forged documents and false testimony to the SEC).

- *United States v. Skelly*, No. 02 Cr. 986 (S.D.N.Y) (RMB) (Dkt. No. 241) (imposing 57-month sentences each for defendants Frank James Skelly and Craig Gross, co-owners of a brokerage firm who engaged in a pump-and-dump scheme involving several securities).

As these prior sentencings demonstrate, a sentence between two and half years and

six years is "not . . . unusually lenient," *Parris*, 573 F. Supp. 2d at 745.  Rather, it constitutes a

serious and appropriate measure of punishment.  By way of comparison, Darren Goodrich, Mr.

Discala's only co-defendant to be sentenced thus far, received a sentence of 41 months'

---

[7] Counsel can provide the cited decisions and docket entries for all of the cases cited on pages 33-36 upon request from the Court or the government.

imprisonment (less than the 60-month cap negotiated by the government) for his participation in the Cubed market manipulation. Mr. Goodrich was a managing director and head trader of a securities firm, qualified by FINRA to trade Cubed as a market maker. His conviction in this case is one of his two securities fraud convictions—this Court also sentenced him to an unrelated securities fraud case arising out of conduct in the District of New Jersey. Mr. Discala, with no other convictions and no professional licensing, should not receive a sentence that is disproportionate to that of Mr. Goodrich.

By contrast, longer sentences, particularly sentences of seven or more years' imprisonment, generally have been reserved for cases involving aggravating circumstances not present here:

- *United States v. Hatfield*, No. 06 Cr. 550 (E.D.N.Y) (JS) (AKT) (imposing 17-year sentence upon defendant David H. Brooks, who engaged in "a number and diversity of . . . fraudulent schemes [that] strains belief," including a pump-and-dump scheme, and who "smuggl[ed] drugs in open court, s[ought] to impeach a witness with a fabricated e-mail, and attempt[ed] to procure 'memory erasing' drugs (presumably to poison a government witness)" in the course of eight-month trial, *see Hatfield*, 2015 WL 13385926, at *2 (E.D.N.Y. Mar. 27, 2015)).

- *United States v. Surgent*, No. 04 Cr. 364 (E.D.N.Y.) (JG) (Dkt. Nos. 148, 169) (imposing 168-month sentence upon defendant who (1) previously had been convicted of and served lengthy prison term for securities fraud and suborning perjury; (2) previously had been disbarred for ethics violations in connection with separate manipulation of over-the-counter stocks; and (3) was involved in other stock manipulations and fraudulent activities for which he was not charged or convicted).

- *United States v. Mulholland*, No. 14 Cr. 476 (ILG) (E.D.N.Y.) (Dkt. Nos. 178, 194) (imposing 144-month sentence on defendant who previously had been charged by the SEC for involvement in pump-and-dump scheme, where

34

defendant orchestrated "one of the largest market manipulation schemes ever charged in this district," acting as "the leader" of a group of individuals engaged in interrelated securities fraud, tax fraud, and money laundering conspiracies by "systematically manipulat[ing] the shares of more than forty publicly-traded companies over a four-year time period through a sophisticated offshore operation and brokerage firm network" that defendant largely created, which operation profited defendants to the tune of more than $250 million).

- *United States v. Schwamborn*, No. 06 Cr. 328 (SJF) (E.D.N.Y.) (Dkt. Nos. 35, 131, 143 (minute entry)) (imposing 121-month sentence on defendant who previously served a 55-month prison sentence in connection with a RICO scheme involving the Genovese crime family and previously had been charged for conspiring to distribute cocaine and launder the drug proceeds).

- *United States v. Hardy*, No. 17 Cr. 372 (JS) (E.D.N.Y.) (Dkt. Nos. 507, 527) (imposing 120-month sentence upon defendant who engaged in scheme to artificially control the price and volume of traded shares in at least five companies over three-year period by, *inter alia*, setting up accounts in others' names, creating companies to generate false invoices and evade taxes, and communicating with victim investors using fake names, lies, and high-pressure sales tactics, causing losses—among victims who contacted the Probation Office alone—of over $10 million, and where the SEC previously had barred the defendant from the securities industry for lying to clients and making unauthorized trades in client accounts).

- *United States v. Levy*, No. 11 Cr. 62 (PAC) (S.D.N.Y.) (Dkt. Nos. 347, 355) (imposing 108-month sentence upon pump-and-dump defendant who had multiple prior fraud-related arrests, was the subject of an FTC action involving a prior mass-marketing scheme, and was involved in a separate fraud scheme for which he was not prosecuted).

- *United States v. Ageloff*, 809 F. Supp.2d 89, 91-92 (E.D.N.Y. 2011) (explaining that defendant in RICO action predicated in part on pump-and-dump scheme, who was sentenced to 96 months' imprisonment, "was both architect and enforcer" of a "relentlessly predatory and remarkably effective" scheme spanning seven years and "earned the

largest share of the tens of millions of dollars in illegal profits generated by the scheme"), *aff'd sub nom. United States v. Catoggio*, 698 F.3d 64 (2d Cir. 2012).

- *United States v. Lieberman*, No. 17 Cr. 96 (JAM) (D. Conn.) (Dkt. Nos. 32, 45) (imposing 84-month sentence where defendant's fraud spanned 6 years; court received victim impact statements from over 800 victims; and "[t]he means by which [defendant] perpetrated his crime were egregious," including by "forg[ing] signatures, falsif[ying] bank records and other documents, finag[ling] dozens of fraudulent opinion letters").

- *United States v. Shkreli*, No. 15 Cr. 637 (KAM) (E.D.N.Y.) (Dkt. No. 621) (imposing 84-month sentence on defendant who, over five-year period, engaged in four different fraud schemes involving an "egregious multitude of lies, . . . repeated breaches of trust in people that [defendant] knew and looked at face-to-face" and who, following his trial, both "solicited violence against . . . a public figure [where] there was a heightened risk of violation against her given [defendant's] tens of thousands of social media followers and his history of making offers to people to take [a]ction in exchange for money," resulting in his remand; and authored emails shortly before his sentencing that "call[ed] into question the sincerity of his remorse").

Mr. Discala's record and conduct do not fall into the same category as those defendants. His conduct is less serious than that of defendant Sandy Winick, whom this Court sentenced to a 78-month prison term. Without detracting from the seriousness of Mr. Discala's case, Mr. Winick engaged in more prolonged, extensive, and egregious criminal conduct. The government alleged that Mr. Winick (1) "was at the apex" of an international criminal organization that, for a period of six years, "fraudulently inflated and attempted to inflate the shares and trading volumes of certain penny stocks"; "used stolen and invented identities to promote" those stocks; "conceal[ed] [co-conspirators'] control and distribution of the stocks from regulators and investors"; and "coordinated trading activity with the issuance of false and misleading press releases"; and (2) controlled a separate "advance fee" scheme by which he and others "fraudulently

36

solicited investors in penny stocks to pay advance fees that purportedly would enable the victims to sell their nearly worthless penny stocks at a profit," which scheme involved "invent[ion of] non-existent businesses . . . includ[ing] fake law firms that solely existed to serve this scheme" and calling centers around the globe.  *See Winick*, No. 13 Cr. 452 (ENV), Dkt. No. 382.  A penalty for Mr. Discala that is similar to or longer than the 78-month sentence imposed on Mr. Winick would create unwarranted disparities.

## II.    The Sentencing Guidelines Offer No Useful Guidance for Determining the Appropriate Sentence in This Case

As this Court has recognized, the Sentencing Guidelines are "almost useless" when it comes to economic offenses, because they "mindlessly accelerate[]" the penalties for such offenses based on loss amount and thus "do[] not provide a reasonable way to achieve the kind of sentencing objectives [they] are supposed to achieve."  *See Faibish*, Dkt. No. 271 at 23; *see also Adelson*, 441 F. Supp. 2d at 512.[8]  Such is the case with the Guidelines calculation in Mr. Discala's case.  Mr. Discala objects to the Guidelines calculations in the Presentence Report and submits that the methodology employed therein is faulty.

The Presentence Report and the government have characterized this as a $300 million case, an attention-catching calculation that is based on a number that the Court already has described as "impossible. . . .  a useless number."  (Dkt. No 708 at 34 (Goodrich sentencing)).  The government asks the court to assume that all 29 million Cubed shares traded at a peak price, when

---

[8] This "mindless[] accelerat[ion]" is exacerbated when the government employs different loss calculation methodologies in different cases, resulting in vastly different loss amounts, from case to case, for arbitrary reasons. For example, the prosecutor explained to this Court at the sentencing of a defendant in a prior penny stock manipulation case that the defendant's loss amount of $2.3 million was based on the "the sales during the dumps of the stock," and that this loss amount was "not the most aggressive posture that [the government] often take[s] in market manipulation cases where we seek the entire market capitalization of the sham stocks, which here, across the entire conspiracy, would be around $95 million." *Kershner*, Dkt. No. 578 at 9-10.  Had the government employed the "most aggressive posture" in that case, the defendant's advisory Guidelines range would have more than doubled.  We see no reason for why the government's decision about whether to be more or less "aggressive" should have anything at all to do with the sentences that are imposed in this or other cases.

in reality the daily trading volume for Cubed only exceeded 10,000 shares on four days.  Even the government's calculation of gain—approximately $2.4 million in the trading of one of the four securities at issue—does not take into account any of the expenses incurred by Mr. Discala or his losses on the other securities.  We know from trial evidence that co-defendant Marc Wexler had a total gain of $2.575 million (GX 195-3) and yet due to apparent offsets for direct costs, the government only sought to forfeit $1.4 million from Mr. Wexler (Dkt. No. 85-1).  This is nothing like a $300 million case.

In short, this case is a poster-child for the irrelevance of the Guidelines to sentencing in fraud cases.  Our objections to the Guidelines calculations in the Presentence Report are set out in Appendix A to this brief, which we incorporate by reference herein.  Moreover, even a properly calculated Guidelines range—with a reduced loss amount enhancement based on Mr. Discala's gain and no enhancements for "sophisticated means" or for role in the offense—still would be 70 to 87 months, far longer than similarly situated defendants have received and well beyond what is necessary under section 3553(a).  We ask the Court instead to look to the non-Guidelines factors in Section 3553(a) and to impose a sentence not longer than four years, consistent with what other defendants have received in similar cases.

## III. The Court Can Also Impose A Lengthy Term of Supervised Release, Including Appropriate Conditions of Release

In addition to some period of incarceration, the Court can sentence Mr. Discala to a lengthy term of supervised release to make certain that his transformation is real and lasting.  *See* 18 U.S.C. § 3553(a)(3) ("the kinds of sentences available").  Supervised release, like probation, is a "substantial restriction of freedom."  *See Gall v. United States*, 552 U.S. 38, 48 (2007).

The Court can also fashion conditions of release, as it has for the period of Mr. Discala's pre-trial supervision, that will make sure that he is continuing to make worthwhile

38

contributions to society and staying out of trouble.  For example, the Court can prohibit Mr. Discala from working in the securities industry again or from serving as an executive of a public company—it is not likely that he will be hired for this type of work, in any event, and he has focused his attention on other endeavors, specifically, working with adults with disabilities on a volunteer basis for hundreds of hours.  He also can be required to undergo drug treatment and psychological treatment, and to continue to perform public service without compensation.  *See* U.S.S.G. § 5F1.3 (suggesting that community service conditions of as long as 400 hours are appropriate).  Mr. Discala has done well during his long period of supervision by the Court and the Pretrial Services Agency.  A shorter period of incarceration followed by a lengthy term of supervised release with a community service condition—of whatever duration the Court deems appropriate—will better achieve the purposes of sentencing here than would the reverse.

## IV.    The Court Should Defer Determining the Appropriate Amount of Restitution

A final consideration under § 3553(a) is "the need to provide restitution to any victims of the offense."  18 U.S.C. § 3553(a)(7).  Mr. Discala stands convicted of offenses covered by the Mandatory Victims Restitution Act ("MVRA"), set forth at 18 U.S.C. § 3663A(c)(1)(A)(ii) ("an offense against property"); *see United States v. Catoggio*, 326 F.3d 323, 327-28 (2d Cir. 2003).

Restitution should be calculated in accordance with the legal principles laid down in the MVRA and by the Second Circuit.  The government bears the burden of properly identifying the victims of the offense and the amounts that are subject to restitution.  *See* 18 U.S.C. § 3664(e); *United States v. Reifler*, 446 F.3d 65, 121 (2d Cir. 2006).  Only victims that are "directly and proximately harmed as a result of the commission of [the] offense" may receive restitution.  18 U.S.C. § 3663A(a)(2).  The restitution award should not exceed what a victim would be permitted

39

to recover in a civil securities fraud action. *See Reifler*, 446 F.3d at 136-37. The government is required to show that individual investors bought or sold the stock as a result of misrepresentations made by the defendants. *Id.*; *United States v. Brown*, 11-cr-449 (SJ) (RER), 2016 WL 11263165 (E.D.N.Y. Dec. 2, 2016) (reasoning that the Second Circuit "has consistently considered the alleged victim's knowledge and reliance in awarding restitution").

   The government provided Mr. Discala with its revised calculations of victim loss in CodeSmart stock on April 21, 2021 and estimates that the total victim losses are approximately $12.5 million. Unlike in most securities fraud cases, the government has not obtained affidavits from the investors who are alleged to be victims, which would allow the parties to assess both the question of reliance and whether particular victims are in fact victims of the offense. Nor has the government collected account records for the individual investors alleged to be victims. Rather, the government has instead decided to proceed on restitution based on FINRA's analysis of bluesheet data. The government provided the defense with its revised figures, which lower the claimed restitution amount by over $550,000, only after learning of significant double-counting errors identified by Mr. Discala's prior counsel (who compared account records to which he had access with the bluesheets and took other steps to look for duplication).

   Since receiving the government's revised victim loss calculations, the defense has retained an expert consultant to review the government's calculations. This review is ongoing and has not been completed. Thus far, the expert has identified a number of concerns about the government's method of determining restitution:

> • The government seeks restitution for investors who purchased CodeSmart stock ***after*** the "pump and dump" periods identified by the government in the superseding indictment, the latter of which ended on September 20, 2013, at which point the trading price of CodeSmart was $2.13 per share. (Ex. 29 (Lowry Decl.) ¶¶ 5-6). It is not clear how

these investors' losses were "directly and proximately" caused by the offenses of conviction given that they occurred after the offenses were committed. 18 U.S.C. § 3663A(a)(2).

- The government's estimation of restitution does not appear to identify offsetting sales for all of the purchases of CodeSmart. (Ex. 29 (Lowry Decl.) ¶ 7). This leaves open the question of what value the shares had after the conclusion of the offenses of conviction or whether any decline in share price after September 20, 2013 was due to the offenses of conviction or something else. *See Reifler*, 446 F.3d at 136 ("Although the government contends that [] shareholders were damaged because their unsold shares became worthless, Rule 10b-5, so far as we are aware, has not been extended to allow suits by persons who were neither buyers in reliance on a defendant's material misrepresentations/omissions nor sellers at all, but rather were persons who simply held their stock until it became worthless.").

- The government's production of data relevant to restitution includes bluesheets (GX 143-1 and 143-2) and a total summary of losses attributable to individual victims. It does not include any explanation, affidavit, or supporting documentation of how it converted the bluesheet data into victim loss amounts. (Ex. 29 (Lowry Decl.) ¶ 8). Bluesheets often contain multiple entries for a single trade, as the trades are reported by each participant in the transaction, thus resulting in apparent trading volume that far exceeds the actual trading volume. In order to convert the bluesheet data into victim loss amounts, the government would have been required to remove duplicate entries and cancelled trades. The government has not thus far produced the underlying analysis that reflects this work or otherwise supports its calculations.

As the foregoing demonstrates, the current record does not support the imposition of the restitution sought by the government for CodeSmart. *See United States v. Schwamborn*, 467 Fed. App'x 35, 38 (2d Cir. 2012) (reversing where it was "impossible to determine from the affidavits submitted by the government whether the losses alleged represent anything more than rough estimates"). Restitution should therefore not be imposed at this time.

41

12756927

The government seeks approximately $3.8 million in restitution relating to Mr. Discala's conviction for market manipulation in Cubed.  (PSR ¶ 34).  Of this amount, $2,060,000 relates to what the Presentence Report refers to as "private placement losses."  (*Id.*).  With respect to this issue, we note that co-defendant Darren Goodrich filed an appeal in which he challenged this aspect of the restitution award in his case as being incorrectly imposed.  One of the arguments presented by Goodrich is that imposition of restitution for the losses associated with the private placement of Cubed stock is outside of the scope of this Court's authority because the Indictment does not mention, let alone charge, a private placement scheme.  *United States v. Goodrich*, 19-208, Dkt. No. 35 at 15-17 ("The court thus erred because it imposed restitution for losses stemming from an uncharged offense."); *see Hughey v. United States*, 495 U.S. 411, 413 (1990) ("Congress[] inten[ded] to authorize an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction.").

This appeal was argued in the Second Circuit on January 10, 2020 and remains pending.  It is likely that the legal rule announced by the Second Circuit in connection with this appeal will impact the determination of Mr. Discala's restitution obligation.  We respectfully submit that this Court should not impose restitution with respect to Cubed right now, while the *Goodrich* appeal is pending, especially when a decision from the Second Circuit seems at hand.

In light of these issues raised by the government's restitution calculations with respect to CodeSmart and the legal uncertainty concerning Cubed restitution, Mr. Discala respectfully requests that the Court set a date for final determination of restitution amounts and victims after sentencing, as permitted by statute, to provide Mr. Discala with adequate time to complete its review of the government's new restitution figures and to permit further submissions by the parties specific to restitution.

42

12756927

Unless a reduction of Mr. Discala's loss amount would impact the Court's assessment of the correct term of imprisonment to impose, this question of how restitution should be calculated need not delay Mr. Discala's sentencing, which we understand has been pending for some time. The Court has the authority to sever the issue of restitution from the other aspects of sentencing. *See* 18 U.S.C. § 3664(d)(5) (permitting court to "set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing"). This is the procedure that the Court employed in the sentencing of one of Mr. Discala's codefendants. (Dkt. 708 at 35-36). We ask that the Court do likewise here and set a schedule for further proceedings with respect to restitution.

## CONCLUSION

A letter submitted on Mr. Discala's behalf puts it best: since this case began, Mr. Discala has become "a productive part of society, a loving family man, and an asset to his community. . . . He is a work in progress, but he will not disappoint this Court" if given a second chance. (Ex. 11 (Tim Doran Letter)). Mr. Discala respectfully requests that the Court consider the circumstances described above in determining the appropriate sentence, which we submit should not be more than four years' imprisonment pursuant to Section 3553(a).

Dated:     New York, New York
           June 3, 2021

Respectfully Submitted,

By: _____

Harry Sandick

Bonita Robinson
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Counsel for Defendant Abraxas J.*
*Discala*

44

## <u>APPENDIX A</u>

**Objections to the Presentence Investigation Report's Sentencing Guidelines Calculation**

   *Loss amount*.  The Presentence Report, as amended, calculates Mr. Discala's total offense level as 43, a figure that is driven primarily by a 28-level enhancement for loss amount— an "intended loss" figure that the government and the Probation Department contend is $286 million ($86 million for CodeSmart and $200 million for Cubed).  This number is determined by taking the peak price of each stock and multiplying it by the number of that stock's outstanding shares.  (*See, e.g.*, PSR ¶ 37).

   For several reasons, we object to this loss calculation.  First, the government and the Probation Department stand by this calculation despite the Court's statement in the *Goodrich* sentencing that "it is impossible" for this intended loss to occur, thereby rendering the "intended loss amount . . . a useless number."  Dkt. 708 at 34.  The government's theory of the loss amount is at war with the government's theory of this prosecution; it is impossible for the defendants to have controlled a large block of outstanding shares in order to manipulate trading, and also for the defendants to have sold all of those shares at an inflated price.

   The Second Circuit has explained that this type of market capitalization-based approach is too "simplistic" to provide an accurate measure of loss, as it assumes that a defendant intended that every single share of stock would trade at its peak price.  *See United States v. Ebbers*, 458 F.3d 110, 127 (2d Cir. 2006).  This inference is also unwarranted based on the facts at trial.  This is not the type of case in which the government offered evidence of a plan to dump the CodeSmart shares at a specific price and at a specific time.  Rather, there was evidence that Mr. Discala tried to sustain the value of CodeSmart stock after it peaked:  buying $1 million of shares in the open market and providing money to Codesmart CEO Shapiro to buy additional shares.

A-1

12756927

These actions are inconsistent with a planned dump at a specific price.  The $200 million Cubed intended loss is likewise incorrect and misleading:  the government's own trial evidence demonstrated that the escrow account maintained by Kyleen Cane was intended precisely to prevent flooding the market with Cubed stock at one time (and, indeed, sold only just over 100,000 shares of such stock, with a total value under $570,000, in the three months in which the stock was publicly traded before defendants' arrests).  (*See, e.g.*, Trial Tr. 1383, 1495; GX 197-32).  The daily share volume for Cubed during that period only exceeded 10,000 shares on 4 days—far from the 29,965,455 outstanding Cubed shares by which the government multiplied Cubed's peak price to reach its loss amount.  (*See* GX 196-11).  Expressed differently, the government contends that the intended losses from Cubed trading ($200 million) is more than 417 times the actual trading losses ($479,007) alleged by the government.

Finally, the use of "intended loss" at sentencing is not only inconsistent with common sense.  It is also irreconcilable with a recent decision of the Supreme Court.  In particular, reliance on the Guidelines commentary provisions relating to intended loss is no longer appropriate after the Supreme Court's decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019).

Before *Kisor*, the Supreme Court held that commentary to the Guidelines should be treated as binding unless it is "inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993).  The *Stinson* Court analogized the Guidelines commentary to an administrative agency's interpretation of its own regulations and held that such commentary "must be given 'controlling weight unless it is plainly erroneous or inconsistent" with the applicable guideline.  *Id*. at 45 (internal quotation and citation omitted).  *Kisor* overruled *Stinson*, and held that courts could defer to an agency's interpretation of one of its rules only if the

regulation was "genuinely ambiguous" after the court has "exhaust[ed] all the 'traditional tools' of construction.'" *Kisor*, 139 S. Ct. at 2415 (citation omitted).

In light of *Kisor*, courts should no longer accord automatic deference—sometimes called *Auer* deference—to agency commentary. *See, e.g.*, *Aleutian Capital Partners, LLC v. Scalia*, 975 F.3d 220, 232 (2d Cir. 2020) (noting that under *Kisor*, "a court should apply *Auer* deference only after having exhausted all of the 'traditional tools of construction' to determine that a rule or regulation is 'genuinely ambiguous,'" and declining to defer to agency interpretation of unambiguous text). The entire subject of intended loss is never mentioned in the text of the Sentencing Guidelines, which only refer to "loss." U.S.S.G. § 2B1.1(b)(1) ("If the *loss* exceeded $6,500, increase the offense level as follows[.]") (emphasis added). It is only the non-binding commentary to the Guidelines that even refers to intended loss. U.S.S.G. § 2B1.1, comment. (n.3) ("[L]oss is the greater of actual loss or intended loss.").

After *Kisor*, it is error for a court to treat this commentary as binding. The very concept of "intended loss" is contradictory to the unambiguous meaning of the text of Section 2B1.1 itself. There is nothing ambiguous about the meaning of "loss," the only word used in the text of the Guidelines. The word term "loss" means "deprivation," "harm or privation," "an instance of losing," or "an amount that is lost." Loss, Merriam-Webster's Dictionary, *available at* https://www.merriam-webster.com/dictionary/loss. It does not mean "intended loss."

The government already has conceded that *Kisor* applies to Guidelines commentary. Brief for the United States in Opposition at 15, *Tabb. v. United States*, No. 20–579 (U.S. Feb. 16, 2021) ("The government has accordingly taken the position, including in this case, that *Kisor* sets forth the authoritative standards for determining whether particular commentary is entitled to deference." (internal quotation marks omitted)), *available at* https://bit.ly/3b60HmX.

In light of *Kisor*, courts should no longer consider anything other than actual loss when determining the appropriate Guidelines range.  *See United States v. Riccardi*, 989 F.3d 476 (6th Cir. 2021); *United States v. Nasir*, 982 F.3d 144, 158 (3d Cir. 2020).[9]

In light of the foregoing, the Court should use either actual loss or gain as the measure for determining Mr. Discala's offense level.  Even taking the government's loss calculation as accurate, Mr. Discala would receive a 20-level enhancement, rather than a 28-level enhancement.  *Compare* U.S.S.G. § 2B1.1(b)(1)(k) ($9.5 million loss) *with* U.S.S.G. § 2B1.1(b)(1)(o) ($250 million loss).  Nor is there any reason to accept that the government's calculation of actual loss is accurate.  For example, the government contends—without any support or evidence—that all losses incurred by buyers and sellers of Codesmart who are not alleged to be members of the conspiracy were caused by Mr. Discala and the other members of the conspiracy. This type of methodology was specifically rejected by the Second Circuit, which has held it is the government's burden to prove that losses were caused by the alleged fraud rather than by market forces or other factors.  *See United States v. Rutkoske*, 506 F.3d 170, 180 (2d Cir. 2007) (holding that it is insufficient for the government to show that the price fell when "the scheme unraveled."). Here, CodeSmart's price fell months before any fraud was disclosed to the public.  (*See* GX 196-3; Ex. 29 (Lowry Decl.) ¶ 6).

Finally, in the absence of a reliable calculation of loss, the Guidelines calculations can be based on Mr. Discala's gain.  *See United States v. Parris*, 573 F. Supp. 2d 744, 746-48 (E.D.N.Y. 2008) (using the gain in a "typical pump and dump scheme" as an alternative measure

---

[9]  Whether courts may still consider intended loss when making Guidelines calculations after *Kisor* is an issue of first impression in the Second Circuit.  The Second Circuit has not yet ruled on this issue in a published opinion.  In an unpublished, non-precedential summary order, the Court rejected the applicability of *Kisor* in the context of the career offender guideline.  *See United States v. Wynn*, 854 Fed. App'x 63 (2d Cir. 2021).  However, the panel in *Wynn* relied upon pre-*Kisor* decisional law specific to the construction of the career offender guideline.

of loss due to the "difficulties inherent in calculating loss to the market in this case").  The government's estimation of Mr. Discala's gain is approximately $2.48 million, which would lead to a 16-level enhancement.  *See* U.S.S.G. § 2B1.1(b)(1)(I).

*Sophisticated means*.    The Presentence Report recommends a two-level enhancement for "sophisticated means."    U.S.S.G.  § 2B1.1(b)(10)(C).    The non-binding Guidelines commentary provides that "sophisticated means" refers to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1, cmt. 9(B).  Examples of sophisticated means in the commentary are "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts [] ordinarily indicates sophisticated means."  This case involved no fictitious entities, corporate shells or offshore accounts and the Probation Office does not contend otherwise, instead saying that the defendant "caused the conduct involving his use and direction of nominee accounts in an effort to hide the criminal conduct."  (PSR ¶ 37).

There is nothing at all "sophisticated" about the use of nominee accounts.  To the extent the commentary here is relevant after *Kisor*, the conduct alleged to be sophisticated here is not among the examples identified in the Guidelines commentary and provides no basis for imposition of this enhancement.  Here, the nominee account most relevant to the offenses of conviction was one in the name of Marleen Goepel, Mr. Discala's administrative assistant; the government offered evidence to show that the account was Mr. Discala's and not Ms. Goepel's. It is impossible to see how putting an account in your assistant's name is a "sophisticated means" of committing a crime or how it will impair the government's detection of a criminal scheme.  The facts here are nothing like those in which this enhancement is ordinarily applied. *See United States v. Fofanah*, 765 F.3d 141, 146-47 (2d Cir. 2014) (affirming enhancement where defendant created

A-5

and used false documents to conceal offense conduct and also disabled security systems to prevent law enforcement from recovering stolen property); *United States v. Amico*, 416 F.3d 163, 169 (2d Cir. 2005) (affirming enhancement where scheme involved creation of false bank documents, false appraisals, false blueprints). In short, this prosecution involved nothing that can be described as "sophisticated means" and the enhancement should not be applied.

   *Role in the offense*. The Presentence Report recommends a four-level enhancement for Mr. Discala based on his role in the offense pursuant to U.S.S.G. § 3B1.1. This recommendation should be rejected. Although the government describes Mr. Discala as a ringleader of the offense, this characterization ignores the sophistication and special skills of the other participants in the offense. A scheme like the one charged by the government here requires more than a single promoter to carry out. It requires the involvement of attorneys (Ofsink), stockbrokers and investment advisors (Bell, Josephberg, Goodrich, Morris, Sloan), and financial advisors (Azrak). In addition, Mr. Discala's partner at Omniview (Wexler) and the Chief Executive Officer of Codesmart (Shapiro) are equally culpable to Mr. Discala. All of these individuals played integral roles; none of them was controlled or directed by Mr. Discala in the way contemplated by U.S.S.G. § 3B1.1, and it is not appropriate to impose a four-level enhancement for Mr. Discala. *See United States v. Greenfield*, 44 F.3d 1141, 1146 (2d Cir. 1995) (holding that a role enhancement is not appropriate where the participants were equally culpable).

   *Amended Guidelines range.* With a base offense level of 7, an increase of 16 offense levels based on Mr. Discala's gain, and a 2-level increase for the use of mass marketing, Mr. Discala's offense level would be 25. If the Court elects to impose a 2-level increase for obstruction of justice, then Mr. Discala's total offense level would be 27, and with a Criminal

A-6

12756927

History Category of I, Mr. Discala's resulting Guidelines range would be 70 to 87 months' imprisonment.

A-7