DCP:SCJ
F. # 2013R01203

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -                  Docket No.  14-CR-399 (S-1)(ENV)

ABRAXIS J. DISCALA,

            Defendant.

– – – – – – – – – – – – – – – – –X


## THE GOVERNMENT'S SENTENCING SUBMISSION


MARK J. LESKO
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Shannon C. Jones
Patrick T. Hein
Mark E. Bini
Assistant U.S. Attorneys
  (Of Counsel)

TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................... 3

**BACKGROUND** ...................................................................................... 4

I.   The Offense Conduct ........................................................................... 4

    A.  Overview ........................................................................................ 4

        1.  The CodeSmart Scheme .............................................................. 6

        2.  The Cubed Scheme ..................................................................... 8

        3.  The StarStream and Staffing Group Manipulation Schemes ................ 13

    B.  The Indictment, S-1 Indictment and Trial ............................................ 13

II.  The Applicable Sentencing Guidelines Calculation ...................................... 19

    A.  The Applicable Intended Loss is $250 Million ....................................... 21

    B.  The Court Should Apply a Four-Level Victim Enhancement ..................... 23

    C.  The Sophisticated Means Enhancement is Applicable .............................. 23

    D.  The Sentencing Enhancement for Discala's Role as an Organizer/Leader with Five or More Participants is Warranted ................................................................. 24

**THE APPROPRIATE SENTENCE** .............................................................. 25

I.   A Sentence of No Less Than 180 Months Is Appropriate in Light of 18 U.S.C. § 3553(a) Considerations ................................................................................ 25

    A.  The Applicable Law ......................................................................... 25

    B.  The Nature and Circumstances of the Offense Warrant a Substantial Term of Incarceration .................................................................................. 26

    C.  Discala's History and Characteristics Warrant a Substantial Term of ............. 28

        1.  Discala's Has Shown No Genuine Remorse for His Actions ................ 28

        2.  Alleged Childhood Neglect and Mental Health Issues ........................ 29

        3.  Various Addictions to Drugs and Gambling ..................................... 30

        4.  Post-Arrest Rehabilitation Efforts ................................................. 31

D.  The Need for Deterrence .............................................................................. 32

E.  Avoiding Unwarranted Sentencing Disparities .......................................... 33

Restitution ................................................................................................................ 35

I.   The Applicable Law ..................................................................................... 35

II.  The Government's Actual Loss and Restitution Calculation ....................... 37

III. Disputes Regarding Actual Loss and Restitution Should Be Resolved Prior to Discala's Sentencing Hearing ................................................................. 38

Forfeiture ................................................................................................................. 40

**CONCLUSION** ........................................................................................................ 41

## PRELIMINARY STATEMENT

The government respectfully submits this letter in advance of the defendant Abraxas J. Discala's sentencing hearing, set for June 17, 2021, and in response to Discala's sentencing submission filed on June 4, 2021 ("Discala Mem."; ECF No. 768).  Between 2013 and 2014, Discala orchestrated a sophisticated scheme to manipulate the price of a number of stocks which led to over $16 million in investor losses and generated more than $3 million in ill-gotten gains for the defendant.  For the reasons set forth below, the government submits that a term of imprisonment of no less than 180 months, a sentence which is substantially lower than the applicable advisory range as provided by the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), is the appropriate sentence.  The government further submits that the Court should order the defendant to pay $16,428,234.40 in restitution to the victims and to forfeit $2,484,873.19 in illicit trading profits from CodeSmart.   The parties have stipulated to the forfeiture amount.  (ECF No. 767).

In addition, the government opposes Discala's request to bifurcate his sentencing. Discala requests that the Court impose Discala's sentence of imprisonment on the scheduled sentencing date of June 17, 2021, but postpone the determination of the appropriate restitution amount to a later undetermined date.  Discala has also objected to both the government's intended and actual loss calculations.  While the government respectfully submits that each of these issues can and should be resolved at the June 17 sentencing hearing, if the defendant insists on separating restitution from sentencing, the government respectfully requests that the Court determine the victim's loss amounts and restitution at the same time, even if that requires a brief adjournment of the current sentencing date.  This would ensure that there is an actual loss amount determination prior to sentencing and that the restitution order is entered within the time constraints set forth in 18 U.S.C. § 3664.

3

## BACKGROUND

I.    THE OFFENSE CONDUCT[1]

    A.    Overview

Discala was the Chief Executive Officer of OmniView Capital Advisors LLC ("OmniView"), a company held in the name of Discala's wife and assistant but that Discala founded and controlled.  (PSR ¶ 10; Trial Tr. at 977-79, 984 (Goepel)).   Between 2012 and 2014, Discala led a scheme to manipulate the stocks of multiple microcap or "penny" stocks, including the stock of CodeSmart Holding, Inc. ("CodeSmart"), which traded under ticker symbol ITEN, The Staffing Group, Ltd. ("Staffing Group"), which traded under ticker symbol TSGL, StarStream Entertainment Inc. ("StarStream"), which traded under ticker symbol SSET, and Cubed, Inc. ("Cubed"), which traded under ticker symbol CRPT, (collectively the "Manipulated Public Companies").  (PSR ¶¶ 12-32).  Discala purported to raise capital for start-up private companies and to take them public through reverse mergers with public shell companies in exchange for obtaining control of a large portion of the free trading or unrestricted stock.   Discala and his co-conspirators then artificially inflated that stock through manipulative trading and promotional campaigns, generating large profits for themselves at the expense of unwitting investors.  Id.

To execute his scheme, Discala cultivated close relationships with corrupt brokers, such as co-defendants Matthew Bell, Craig Josephberg, Jaime Sloan[2] and Darren Goodrich, who engaged in manipulative and fraudulent trading at Discala's direction.  In

---

[1] The description of the Offense Conduct is drawn from the Presentence Investigation Report dated June 23, 2020 ("PSR"), trial transcript ("Trial Tr."), and the government's trial exhibits ("GX.").

[2] Sloan was charged in a separate information. 14-CR-509 (ENV).

particular, Bell, Josephberg and Sloan bought the fraudulently inflated stock in their customers'
and clients' brokerage accounts.  Discala also befriended wealthy individuals, such as Marc
Wexler and Victor Azrak, who were willing to help fund his schemes and engage in
manipulative trading at his direction.  Finally, Discala solicited numerous individuals to buy the
inflated stock of the Manipulated Public Companies, and, as described below, also had investors
send money directly to him via OmniView to invest in his schemes.

          Discala was the ultimate confidence man -- brash, egotistical, charismatic, and
persuasive -- who perpetrated multiple frauds on both the market and specific victim investors
with no concern about the harm his actions ultimately caused.  In his sentencing submissions,
Discala attempts to paint the portrait of a changed man who has embraced sobriety, religion,
fatherhood, mental health treatment and volunteer work.  In support of his claim that he is not the
same man who was arrested in 2014, Discala cites to numerous letters of support from friends,
family, and people he has met through church and volunteer work, as well as recent mental
health evaluations, and a letter he has authored.  However, these letters show that Discala is
essentially unchanged, he is always the overly self-confident hero of the story who is able to
persuade people to believe in his ability to master his passion of the day, regardless of whether
he is touting his investment acumen or his role as a spiritual or mental health guide.  Despite his
supporters describing him as "compassionate," Discala showed no compassion for the victims of
the pump-and-dump scheme he orchestrated when he testified under penalty of perjury before
this Court.  For example, when asked at trial about victim Michael Kellner, Discala claimed,
incredibly, to not know who he was despite Kellner testifying just twelve days prior.  (Trial Tr. at
3459).  Kellner had testified that as a result of the losses he suffered, he couldn't afford daycare
for his young daughter.  (Trial Tr. at 1870 (Kellner)).  While the government believes that

Discala's claim that he didn't remember Kellner was simply false, whether Discala's response was false or not, Discala showed and continues to show a complete lack of remorse for the victims of the stock fraud scheme.  Discala consistently chosen to put his need to cultivate the image of success above all else.   Rather than relying on testimonials submitted in support of his request for leniency, the Court should rely on Discala's own words and actions, both of which the Court had ample opportunity to assess during Discala's five-week trial, as the best guide in rendering an appropriate sentence.

      1.    <u>The CodeSmart Scheme</u>

Discala and others, including attorney Darren Ofsink who acted as counsel to both CodeSmart and Discala, arranged a reverse merger between CodeSmart and a public shell company, which occurred on or about May 3, 2013.  Discala and his co-conspirators, including Josephberg, Wexler, Ofsink, Bell, and Michael Morris, as well as others selected by Discala, obtained all the unrestricted CodeSmart stock at pennies per share.[3]  (PSR ¶ 13; Trial Tr. at 1157-67 (Goepel); GX 177-22)).  After gaining control of CodeSmart's unrestricted shares, the co-conspirators engaged in two separate pump and dump schemes.  (<u>Id.</u> ¶¶ 14-17).  In both schemes, CodeSmart's Chief Executive Officer, Ira Shapiro, issued numerous press releases, some of them containing false information, to generate interest in CodeSmart stock.  (<u>Id.</u> ¶ 15; Trial Tr. at 718-19 (Yarosh), 855 (Oremland), 1195-96 (Goepel); GX 172-42, 177-12, 195-6).

The first CodeSmart pump and dump scheme occurred between approximately May 13, 2013 and August 21, 2013.  (PSR ¶¶ 14-17).  During this first period, the co-conspirators manipulated CodeSmart's stock price by raising it from $1.77 per share to a high of

---

[3] A number of these individuals paid Discala in order to obtain their unrestricted CodeSmart shares.  For example, on or about May 3, 2013, Morris paid OmniView $50,000 so that he could buy unrestricted CodeSmart stock for $719.

$6.94 per share, before causing it to drop to $2.19 per share. (Id.). Much of the early trading of CodeSmart in May and June 2013 was coordinated trading involving Discala and Wexler, who sold their free trading stock, and Bell and Josephberg, who purchased large amounts of CodeSmart stock at increasing prices for their clients. (Id.; Trial Tr. at 2028, 2039-40 (Wexler)). For example, between May 13, 2013 and August 7, 2013, the co-conspirators sold approximately 859,226 shares of CodeSmart in brokerage accounts they controlled while Josephberg and Bell purchased 813,577 shares of CodeSmart in their customers' and clients' brokerage accounts. (PSR ¶ 19).

The second CodeSmart pump and dump scheme occurred between approximately August 21, 2013 and September 20, 2013. (PSR ¶ 14, 17). During this second period, the co-conspirators manipulated CodeSmart's stock price by raising it from $2.19 per share to a high of $4.60 per share, before causing it to drop to $2.13 per share. (Id.). By approximately December 30, 2013, after both active pump and dump schemes were complete, CodeSmart stock was trading at $0.66 per share, and on or about July 9, 2014, CodeSmart stock closed at $0.01 per share. (Id.).

Discala, Josephberg, Morris, Wexler, Bell and Ofsink made significant profits from selling their CodeSmart stock, totaling approximately $6.5 million. Discala earned approximately $2.4 million, Wexler earned approximately $2.2 million,[4] Josephberg earned approximately $700,00, Bell earned approximately $560,000, Morris and his son earned in

---

[4] Wexler also made $289,721.52 from selling his StarStream stock. (GX 195-3).

excess of $400,000, and Ofsink earned approximately $290,000.[5]  (PSR ¶20;[6] Trial Tr. at 925-951 (Ferrante); GX 195-1-195-5).  A member of the Criminal Prosecution Assistance Group at the Financial Industry Regulatory Authority ("FINRA") would be prepared to testify about their analysis that shows that the hundreds of investors who purchased CodeSmart stock in the public market suffered approximately $12.6 million in losses.

2.   The Cubed Scheme

Following the CodeSmart scheme, the defendant moved on to another scheme to manipulate the stock of Cubed, which was described at length at the defendant's trial.  (PSR ¶¶ 23-30).  In that scheme, all of the free-trading stock of Cubed was controlled by Cane, an attorney that Discala brought into the scheme.  (Id.; Trial Tr. at 2084-90 (Wexler)).  Cane, who had a prior relationship with Discala, controlled Northwest Resources, Inc. ("Northwest"), a shell public company set up by Cane's law firm.  (Id.; Trial Tr. at 1516-1521 (Smith)).   In March 2014, Cane was hired by Crackpot, Inc., a private company that Discala had agreed to take public in exchange for control of its free trading stock.  Northwest changed its name to Cubed and acquired Crackpot's assets.  (PSR ¶¶ 23-24).  With the exception of a single shareholder, all of Northwest's shareholders who held unrestricted stock had new unrestricted Cubed stock certificates issued in their name, and Cane's law firm took physical control of all those

_____

[5] There were at least a dozen additional entities and individuals who also received free-trading CodeSmart shares in May 2013 at the same time as these defendants, including Discala's father, all in amounts in excess of the amounts received by Morris.  (Trial Tr. at 1157-67 (Goepel); GX 177-22).  While everyone except Discala and Wexler were subject to Lock Up, Leak Out agreements (Trial Tr. at 1171-72 (Goepel), 2046 (Wexler)), Bell testified that he and others sold their stock in violation of those agreements.  (Trial Tr. at 92, 202 (Bell)).

[6] The PSR contains a typographical error regarding Wexler's CodeSmart's profit.  (Compare PSR ¶20 with GX 195-3).  Also, the PSR gain calculations are net realized profits (GX 195-1-195-5).

unrestricted stock certificates from the transfer agent.  (Trial Tr. at 620-626 (Mokros)).  One Northwest shareholder had all his unrestricted shares transferred to David Ben-Bassett, a close friend of Cane's.  (Trial Tr. at 1707-98, 1739-55 (Ben-Bassett)).  After Ben-Bassett was issued an unrestricted Cubed stock certificate, Cane deposited that certificate into a Ben-Basset's trading account that Cane controlled.  (Id.).  Almost all the free-trading Cubed stock that was sold, purchased, and resold on the stock market between March 28, 2014 and July 17, 2014, originated from the Ben-Bassett account.[7]  (See Trial Tr. at 869-876, 880-884, 888, 1142-43 (Oremland), GX 196-21).  Cane remained in control of the Ben-Basset account and kept custody of the unrestricted Cubed stock certificates which, according to Discala, Cane was holding in "escrow" and would sell into the market in a way that would enable the co-conspirators to control Cubed's stock price.

On March 28, 2014, 200 shares of Cubed were sold at $5.00 per share.  (PSR ¶ 25).  Based on the $5.00 share price and its outstanding common stock, Cubed had a market capitalization of approximately $150 million.  (Id.).  On April 22, 2014, after 15 days without trading activity, Cubed's stock began trading in earnest at a price of $5.25; the stock closed that day at $5.20.  (Id.).  On or about and between April 22, 2014 and April 30, 2014, Discala and his co-conspirators were responsible for manipulating the vast majority of the trading activity in Cubed through, inter alia, wash trades and matched trades.  (Id.).  Goodrich, Josephberg and Sloan, as well as others, entered buy orders for Cubed stock at specific prices at Discala's

---

[7] The Cubed stock certificate for Marche Godfrey was transferred to an entity known as Oxbridge Technology Partners and deposited into an account with J.P. Morgan Chase, but only 500 shares were transferred out of this account.  (Trial Tr. at 888 (Oremland), 1902-1903 (Albanese)).  Godfrey testified that he was paid $40 to sign the paperwork to become a Northwest shareholder, he did not pay for the stock, never received a stock certificate and was unaware that he ever owned Cubed stock.  (Trial Tr. at 2529-38 (Godfrey)).

direction to make it look like there was more demand for the stock than actually existed.

Between April 22, 2014, and June 23, 2014, Discala and the other conspirators engaged in

manipulative trading to walk the price of the Cubed stock up to its peak price of $6.75 per share.

(Id.).  At $6.75 per share, Cubed's market capitalization was approximately $200 million.  (PSR

¶ 29).  Over the next month, the co-conspirators continued to fraudulently manipulate Cubed's

stock.  On July 9, 2014, Cubed's stock price closed at $6.60 per share and was still in the

controlled pump phase of the fraudulent manipulation scheme when trading was halted by the

SEC after Discala was arrested.  (Id.).

        During the trial, the government played a number of wiretap calls that were

intercepted between May and June 2014, during the time period that the stock of Cubed was

being actively manipulated, and it was clear that Discala was coordinating the manipulative

trading.  There were multiple calls where Discala explained the scheme and directed others to

enter a bid or ask price on the Cubed stock.  For example, on May 5, 2014, Discala called

Goodrich and stated, "Yeah, … can you get him off that 451, he's killing my box here."

Goodrich responded, "So where do you want him, I'll call him right now."  Discala said, "525,"

and Goodrich replied, "525, you got it."  (GX 198-3).   In another example, on May 6, 2014,

Discala sent a text message to Josephberg, stating, "Go 531.  Please."  (Ind. S-1 ¶ 38).  That day,

Cubed's stock closed at $5.32 per share.  (Id.).  On May 9, 2014, during a telephone call with

Azrak, Discala bragged about his control over Cubed's share price, and stated, in part, "I'm the

[expletive] brake and the gas, [expletive].  If I take my foot off the brake it's 55 [dollars]

tomorrow (Laughter)."  (PSR ¶ 27; GX 198-21; Trial Tr. at 2614 (Azrak)).  On May 22, 2014,

Discala and Josephberg had the following conversation about Discala's efforts to control the

price of Cubed stock prior to a promotional campaign that Cane was expected to start shortly,

and Discala directed Josephberg to buy Cubed stock in various accounts that he had access to as broker, including the trading accounts of Azrak and Discala's father.

DISCALA: Is that you selling?

JOSEPHBERG: Where?

DISCALA: Uh, the only thing that should matter to you in your life right now, but, uh, CRPT? Is it someone at Knight, 541?

JOSEPHBERG: I was the bid, how would I sell?

DISCALA: Knight bought 100. I think they're just sitting there with 100 trying to fuck with us.

\*\*\*

DISCALA: Alright, so have, uh, buy 200 for Victor [Azrak].

JOSEPHBERG: 200 for Victor [Azrak].

DISCALA: He sold 300 yesterday, I told him and he fucked it all up, so just 200 for Victor. He had a bris. Or, or, or you know what, try 100, and see if they move, they move outta the way, and then, and then put 100 on the bid. [U/I] show some, I gotta show some depth on the, on the—

JOSEPHBERG: But who else is buying?

DISCALA: It's—ok, you gotta slow the fuck—I'm telling you, you gotta, things are happening. Did you not talk to Kyleen? Did you not—

JOSEPHBERG: Then who else is buying today? I don't want to be the only one buying today. I heard it looks very bad for a broker to be the only one buying, that's what I heard.

DISCALA: You heard—ok, now you're worried about being, ok, I will, I will buy, I wi—is my Dad there, does my Dad have any in there?

JOSEPHBERG: I don't care about 100, I'll leave it in the average [price account]. I left it 17 yesterday, so what'd I buy? I bought 2 more today, so 19, so I'll buy 100, then I'll have 2 in the average [price account]. I could probably do, I could probably leave, you know, they look at the amount.

11

DISCALA: Ok, so let me—

JOSEPHBERG: So I could probably leave like 10 to 15 there. I don't care if it doesn't trade today, I'll buy another 100.

DISCALA:  No, no, I'll get some other people in today, but I mean it's not really gonna, Kyleen says it's not really gonna happen until next week, I'm just trying to get, I can't have the, the zeroes on the board cause Knight's starting to look. You understand? It's [U/I], you don't, you don't really—

JOSEPHBERG: I know but Jeff, Jeff G just goes—I didn't say you did dude, but like Jeff G's like give me a call, if everyone wants to sell, I can't, I'm not, I'm not saying he wants to sell.

DISCALA: You can call, you can call Jeff. Jeff says, Jeff says, I, I, I won't put any emails in if, uh, if he calls me back or picks up the phone. So pick up the phone and say Jeff, if you want to sell, talk to AJ, okay?  Period.  Ridiculous.  That's all you have to say. That's all you have to say.

(GX 198-24 (5/22/14, Session 8658)).

On May 30, 2014, Discala again directed Josephberg to buy Cubed stock so that it would look like there was more demand for the stock than truly existed.  In this instance, Discala was interested in impressing potential participants in another deal by pointing to his success with Cubed.

 DISCALA: Do me a favor, cause this is a ScanBuy thing, can you do five hundred CRPT five times every five minutes.

JOSEPHBERG: CRPT a hundred every five minutes.

DISCALA: Yeah just for up until five hundred.

…

JOSEPHBERG: Won't that look weird than just buying five hundred.

DISCALA: No, it looks better, do a hundred then two hundred then a hundred you know it looks better we are in a big, big meeting right now to buy that other company for forty million so I just need to see some um … board meeting is right now.

JOSEPHBERG: Alright.

(GX 198-37 (5/30/14; Session 12368)).

Based on its stock's performance in the stock market, Cubed was also able to raise approximately $2,060,000 from approximately 18 investors in a private placement handled by Cane.  In exchange for $1 per share, private placement investors received restricted Cubed stock.  Separate from the private placement, Discala and Wexler also persuaded approximately 40 investors to deposit over $1.2 million into bank accounts they controlled between March 2014 and May 2014 pursuant to "Stock Purchase Agreements" or "Participation Purchase Agreements" for unrestricted Cubed "escrow" stock – the unrestricted stock that was controlled by Cane, held in nominee names and Discala had no legal right to sell.

     3.     The StarStream and Staffing Group Manipulation Schemes

In addition to manipulating CodeSmart's and Cubed's stock, between October 2013 and July 2014, Discala also worked with his co-conspirators to fraudulently manipulate StarStream's and Staffing Group's stocks through, inter alia, engaging in wash trades and match trades.  Specific instances of the defendant engaging in such trading for StarStream and Staffing Group are described in the Indictment and PSR.  (Ind. S-1 ¶¶ 44-50; PSR 31).

B.     The Indictment, S-1 Indictment and Trial

Discala, Shapiro, Cane, Wexler, Bell, Josephberg and Azrak were indicted and arrested in July 2014.   Goodrich, Ofsink and Morris were added to the case in a superseding indictment in November 2015.   Marlene Goepel, one of Discala's assistants, and Sloan both pleaded guilty to informations.

On April 2, 2018, almost four years after he was arrested, the trial against Discala and Cane began and lasted approximately five weeks.  A number of co-conspirator witnesses, including Wexler, Bell, Goepel, Azrak and Sloan, testified about their participation in the stock

manipulation schemes, and the roles of the various co-conspirators, including Discala.  It was

clear from each witnesses' testimony that Discala was the scheme's organizer and leader, and

they each came to participate in the fraud through Discala.  For example, Bell testified about

Discala's role in the CodeSmart scheme:

> A.J. and I would text each other on a daily basis.  He would tell me how
> much volume we were searching for that day, didn't want too much
> volume because it was a brand new stock trading and we didn't want a lot
> of attention.  He would tell me where to put the bid and he was the
> quarterback so he was coordinating with Craig [Josephberg] and myself
> and a few other traders that I found out about and then we would -- he
> would tell us where to purchase the stock, or I would tell him I have
> $30,000 to purchase stock with today. Where do you want me to buy the
> stock at?  He would tell me buy it at this price.  I'll put some orders own
> this side.  We used to text and phone call.

(Trial Tr. at 91 (Bell)).   Sloan testified about Discala's role as follows:

> AJ Discala dictated everything we were supposed to do with the stock,
> including which market makers we were to use, which price we were to
> enter orders at, as well as how much stock we were supposed to buy for
> retail clients.

(Trial Tr. at 1350-51 (Sloan)).

A number of investor victims testified at the trial that they would not have

invested in any of the stocks had they been aware of that the stock market price was being

artificially manipulated.  They also testified about the impact that their investment loss had on

them.  Stanley Craig, a 71-year old retiree who was cold-called by Josephberg to invest in

CodeSmart testified,

> I lost $7,000 of money that I had earned and saved over a long
> period of time. It takes a while to save that kind of money.  So it
> didn't take food off my table and it didn't stop me from paying my
> rent, but it did prevent me from taking a vacation, that, you know,
> with the wife and my son. So, I couldn't put -- whatever she
> wanted done for -- I just didn't have -- it took $7,000 out of
> whatever income that I could have had.

(Trial Tr. at 968 (Craig)).  Stephanie Conti, a married mother of three, invested $28,600 in

CodeSmart stock after being solicited by Shapiro and lost it all.  She testified that she wouldn't

have invested in CodeSmart had she known the price was artificially inflated because:

> This was my kids' future. I have -- my oldest son right now has
> college debt, my middle son has college debt, and my daughter
> who is not yet in school will have college debt. … [regarding the
> financial impact of the loss]  It meant everything. It was money
> that, you know, I worked, like I said, since I was 14. And when
> able to participate in a company Vanguard or 401(k), I saved. And
> it was going towards my children and it was basically for nothing.

(Trial Tr at 1932:9- 1933:3 (Conti)).  Bryan Hagen testified about his investment losses, which

included $40,000 he wired directly to OmniView for Cubed "escrow" stock,[8] and he stated of his

total loss of approximately $52,000:

> A: This represents a very significant amount of money to our
> family. I mean, that amount of money could have potentially
> funded one of our kid's college fund, you know. From a personal
> standpoint, obviously, caused stress in the household, stress on my
> marriage, and it is -- obviously, I don't believe we've made any
> investments since that weren't retirement savings.
>
> Q: Was this a large part of your savings, sir?
>
> A: Absolutely.

(Trial. Tr. at 1999 (Hagen)).  Victim Michael Kellner, testified about the impact of the loss of

approximately $46,000 on him and his family, which included $40,000 wired to OmniView for

Cubed "escrow" stock plus additional purchases of Cubed stock on the stock market.  (Trial Tr.

at 1861-68 (Kellner)).  Kellner stated, "It was big. It was my life savings and if I had that money

now and maybe returns from another investment, I could probably afford a new car which I need.

---

[8] Hagen received back approximately $1,455 from Wexler as Cubed "escrow"
"distributions," and he also lost $7,500 in StarStream, and another $7,500 for an investment in
Scanbuy.

I could probably afford to send my kid to daycare which I can't do right now." (Trial Tr. at 1870 (Kellner)).  Dr. Igor Gefter testified that he lost approximately $55,000 that he invested in Cubed, including approximately $5,000 purchased on the stock market, $25,000 wired directly to OmniView for Cubed stock, and an additional $25,000 wired to Cane to invest in the Cubed private placement. (Trial Tr. at 1953-1956, 1965 (Gefter)).

In addition to Dr. Gefter, a number of investors also were fraudulently induced to invest in Cubed's private placement at $1 per share for restricted stock based on Cubed's fraudulently inflated market price of over $5 per share.  Rui Falcon, an owner of an investment management company, testified that the market price for Cubed stock was an important factor in the investment decisions she made on behalf of herself and her clients with respect to Cubed stock; that she was unaware that the stock price was being manipulated; and that had she known, neither she nor her clients would have purchased Cubed stock through the private placement. (Trial Tr. at 1812-1827 (Falcon)).  Falcon was responsible for a large portion of the investor funds that were raised through the private placement, including all the investors who invested in the private placement on June 17, 2014, totaling $1,440,000.  Falcon testified that she and her investors lost their entire investment.  (Id. at 1812-1827).

After the government rested its case, Discala testified and committed perjury. Among other things, Discala claimed he did not coordinate stock prices with Bell (Trial Tr. at 3421),[9] denied that he controlled Goepel's trading account (Trial Tr. at 3438-39)[10], and

---

[9] At trial, the government introduced numerous text messages between Bell and Discala which prove that Discala committed perjury.  (See Trial Tr. at 3422-29 (Bell)).

[10] Both Goepel and Sloan testified that Discala controlled the trading in Goepel's Halcyon account.  (Trial Tr. at 1184, 1275 (Goepel), 1373, 1377 (Sloan)).

incredibly disputed the plain meaning of the intercepted wiretap calls.  For example, Discala argued that his effort to "build a box," where Discala coordinated with others to show bid and ask prices for Cubed stock on a stock trading platform, was not stock manipulation.  (Trial Tr. 3431-34).  Discala was also non-responsive and argumentative on the stand regarding what it means to artificially manipulate a stock price.  (Trial Tr. 3408-3409).  Discala also attempted to deny the meaning or pass off as "jokes" particularly devastating wiretap calls.  For example, Discala was intercepted talking to Azrak about Josephberg stuffing his client's account with stock as follows:

> DISCALA: We got to get him more clients, if we get him more clients, we're going to be rolling in it. [laughing]
>
> AZRAK, V.: [laughing] That's what I'm thinking. We need to do [U/I], that's what we need to do, get him clients. [U/I] fifty-fifty on the shtup. We're going to buy Twitter—
>
> DISCALA: No, no, no, no, no! That's wrong—see, you still don't know the game! I'm teaching you, listen. OK listen, I'm Yoda, you're Obi-Wan, OK?
>
> AZRAK, V.: Yeah.
>
> DISCALA: You don't get him clients and look for the shtup on the ten thousand, OK? You fucking take things out, and let him buy the shit out of 'em, OK?
>
> AZRAK, V.: No, of course!
>
> DISCALA: And that's how you make money. That's how you make—
>
> AZRAK, V.: Ok, so he's buy EXCC?[11]
>
> DISCALA: Exactly. [laughing]
>
> AZRAK, V.: [laughing]

---

[11] Azrak testified that he owned over two million shares of EXCC, another penny stock, that he wanted to sell.  (Trial Tr. at 2586, 2606-07 (Azrak)).

DISCALA: [laughing] Exactly. Now you're—now you're getting it. Instead of ten, let's think about a million, you understand? I—I got to teach you. The father bull and the son bull, you know that story, right?

AZRAK, V.: No.

DISCALA: They're sitting on top of the hill, and Victor, the son bull, looks up to the dad bull, AJ. He says, "Look, Dad—Dad, look at all those calves down there. Look at all of them. Let's run down and fuck that hot one." And the father bull, AJ, says to Victor, "Say, son, let's walk down and fuck 'em all." [AZRAK laughs] OK? So you don't rush. You don't want to—you don't want to spend all your energy. Let's walk—let's not run down and fuck one.

AZRAK, V.: I got it, I got it, I got it.

DISCALA: So let's, let's, OK? We ain't looking for the short side. We want the long side, brother.

(GX 198-13).  Azrak testified that the "calf" in this call is "an unsuspecting investor."  (Trial Tr. at 2607 (Azrak)).  Discala inexplicably and incredibly denied that he was talking about investors during this call.  (Trial Tr. at 3452).

At the conclusion of the trial, Discala was convicted of conspiracy to commit securities fraud (Count One), conspiracy to commit mail and wire fraud (Count Two), securities fraud (Counts Three, Four), and wire fraud (Counts Six, Seven, Eight, and Eleven).[12]  Cane, who argued at trial that her acknowledged control of Cubed's unrestricted stock was actually intended to protect Cubed and market from Discala, was acquitted of all counts.

---

[12] Prior to trial, the government informed the Court by letter that it would not proceed on Count 5, a substantive wire fraud count.  (ECF No. 529).  The Indictment was redacted and jury verdict sheet were renumbered starting at Count 5.  Discala was acquitted of  two wire fraud counts, Counts 9 and 10 (renumbered 8 and 9 in references at the trial and on the verdict sheet).  (ECF No. 629).  Counts 8 and 9 related to intercepted calls where Discala discussed manipulating StarStream stock.

II.    THE APPLICABLE SENTENCING GUIDELINES CALCULATION

On June 20, 2021, the Probation Department ("Probation") issued the Presentence Report (the "PSR") in this case.   Probation determined that the total offense level under the Guidelines was level 43, based on a base offense level of 7, a 28-level enhancement for an intended loss in excess of $250 million, a two-level increase for mass marketing, a two-level increase for the use of sophisticated means, a four-level enhancement for being an investment advisor, a four-level leadership role adjustment, and a two-level obstruction of justice enhancement.  (PSR ¶¶ 71, 73-83).  Probation also determined that Discala fell within Criminal History Category I (PSR ¶ 86), which resulted in a total offense level of 49, treated as a level 43 (PSR ¶ 83), with an applicable advisory Guidelines range of imprisonment of 1,740 months. (PSR ¶ 131).

In a letter to the Probation Department dated December 8, 2020 ("Discala PSR Objections"), Discala raised a number of objections to the PSR, including an objection to the intended loss calculation, the characterization of Discala as a leader or organizer of criminal activity involving five or more participants, and the inclusion of the investment advisor enhancement pursuant to Section 2B1.1(b)(20), as well as a number of objections to the facts.  In its letter to the Probation Department dated March 4, 2021, the government disagreed with Discala's objections to the Guidelines calculation except the government agreed that the enhancement for acting as an investment advisor should not apply.   In Discala's sentencing submission, Discala reiterates his objections to the PSR's Guidelines Calculations, including his objection to the use of the government's intended loss calculation and the leadership role enhancements.  The defendant also has raised additional objections to the PSR Guidelines calculation, including challenging to the government's actual loss calculation, specifically the

19

calculation of the CodeSmart trading losses and the inclusion of the Cubed private placement

losses, and he objects to the sophisticated means enhancement.  (Discala Mem. App. A).

The government also has one additional objection to the PSR.  As noted above,

Probation included a two-point enhancement for mass-marketing pursuant to Section

2B1.1(b)(2)(A).  While Discala participated in mass marketing,[13] the mass marketing

enhancement is in the same subsection of the Guidelines as the victim enhancement, and the

Guidelines indicate that the greater of the two enhancements should be applied (rather than

both).  See U.S.S.G. § 2B1.1(b)(2).  As a result, the government requests that the Court apply the

four-level enhancement for substantial hardship to five or more victims rather than the mass-

marketing enhancement.

Based on these objections, the government submits that the following is the

applicable Guidelines calculation:

| | | |
|---|---|---|
| Base Offense Level (§ 2B1.1(a)(1)) | | 7 |
| Plus: | Loss More than $250,000,000 (§ 2B1.1(b)(1)(O)) | +28 |
| Plus: | Substantial Financial Hardship to Five or More Victims (§ 2B1.1(b)(2)(B)) | +4 |
| Plus: | Sophisticated Means (§ 2B1.1(b)(10)(C)) | +2 |

---

[13] The mass marketing enhancement would otherwise apply as Discala and others engaged in promotional campaigns to encourage investors to buy the manipulated stocks.  For example, on August 27, 2013, CodeSmart announced that Shapiro had purchased 25,000 shares of the company's stock from the public market at the market value of $3.21 per share for a cost of $80,250.  In an SEC 8K filing and related press release, Shapiro extolled his purchase of CodeSmart stock and stated that his "stock purchase [was] symbolic of [his] confidence in the Company and its mission."  This purchase was executed through a Halcyon account with Josephberg.  In reality, Shapiro did not pay for the 25,000 CodeSmart shares.  On September 4, 2013, the same day that Shapiro paid $81,278 from his personal bank account to Meyers for the 25,000 shares of CodeSmart, Discala directed the transfer of $81,278 from a bank account he controlled to Shapiro's personal bank account.

| | | |
|---|---|---|
| Plus: | Leadership Role (§ 3B1.1(a)) | +4 |
| Plus: | Obstruction of Justice (§ 3C1.1) | + 2 |
| Total | | 47, capped at 43 |

Given that the defendant is in Criminal History I and the applicable statutory maximums, Discla's applicable Guidelines range is 1,740 months.  U.S.S.G. § 5G1.2(b)).

A.    The Applicable Intended Loss is $250 Million

Both the government's and Probation's loss calculation included a 28-level enhancement based on an intended loss amount of more than $250,000,000.  The actual amount lost by CodeSmart and Cubed investors was approximately $16.4 million.[14]   The intended loss amount was calculated based on CodeSmart's and Cubed's peak manipulated stock price multiplied by the total number of shares issued by each company.  Discala was involved in the manipulation of each stock from inception, before either company went public, and both stocks were worthless before and after the manipulation.

Application Note 3(A) to U.S.S.G. § 2B1.1 explains that loss under § 2B1.1 is the "greater of actual loss or intended loss."  Intended loss means "(I) the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claimed exceeded the insured value)."  U.S.S.G. § 2B1.1, Application Note 3(A)(ii).  The Second Circuit has indicated that, under this amendment, there is a rebuttable presumption that the defendant intended for his victims to lose the entire face value of the object of the fraud.  United States v. Jean, 647 Fed. Appx. 1, 3 (2d Cir. April 22, 2016).

---

[14] This is a conservative calculation which does not include victim losses associated with stock purchases of StarStream and Staffing Group, although certain victims who testified at Discla's trial had also invested in those stocks.

Application Note 3(F)(ix) to U.S.S.G. § 2B1.1, titled the "Fraudulent Inflation or Deflation in Value of Securities or Commodities," sets out a rule for use in calculating loss in securities fraud cases.  Application Note 3(F)(ix) explains in pertinent part:

> In a case involving the fraudulent inflation or deflation in the value of a publicly traded security or commodity, the court in determining loss may use any method that is appropriate and practicable under the circumstances.  One such method the court may consider is a method under which the actual loss attributable to the change in value of the security or commodity is the amount determined by—

> (I)  calculating the difference between the average price of the security or commodity during the period that the fraud occurred and the average price of the security or commodity during the 90-day period after the fraud was disclosed to the market, and

> (II)  multiplying the difference in average price by the number of shares outstanding.

U.S.S.G. § 2B1.1, Application Note 3(F)(ix).

Here, the intended loss amount was appropriately calculated.  The government calculated intended loss based on the fraudulent increase in the stock price of both CodeSmart and Cubed from $0 per share and to each stock's peak stock price, multiplied by outstanding shares.  CodeSmart's market capitalization at its highest closing price of $6.94 per share on July 12, 2013 was approximately $86 million.  (PSR ¶ 14).  On June 23, 2014, Cubed reached its highest closing price of $6.75 per share, with a market capitalization was approximately $200 million.  (PSR ¶ 29).

Finally, the government notes that the Cubed scheme was interrupted in the middle of the pump phase of the scheme due to the arrest of Discala, Josephberg and others, and that actual victim trading losses for Cubed would have been much higher had the scheme succeeded as intended by the co-conspirators.

22

B.    The Court Should Apply a Four-Level Victim Enhancement

There are close to a thousand victims in this case, including, as described above, a number of victims who testified at Discala's trial that they suffered financial hardship due to their losses.  FINRA, through an analysis of the trading data, identified over nine hundred investors who purchased CodeSmart and/or Cubed stock on the open market who were victimized by the scheme and lost, in aggregate, approximately $13 million dollars.  In addition, Cubed investors who invested in Cubed's private placement lost an additional approximately $2.1 million, and Cubed investors who forwarded money directly to Discala and Wexler pursuant to a "Stock Purchase Agreement" or a "Stock Participation Agreement" lost an additional approximately $1.27 million.   The total victim losses are estimated to be approximately $16.4 million.  Because five or more victims suffered a substantial financial hardship as a result of the defendant's actions, a four-point enhancement pursuant to 2B1.1(b)(2)(B) is appropriate.

C.    The Sophisticated Means Enhancement is Applicable

A sophisticated means enhancement pursuant to Section 2B1.1(b)(10)(C) is appropriate, despite Discala's objection.  (See Discala Mem. App. A-5).  Discala and his co-conspirators were only able to commit fraud on the market in multiple stocks through a coordinated and complex effort to manipulate the stock price.  Among other things, Discala engineered the reverse merger of multiple companies to take those companies public in a manner that the free trading stock was consolidated into the hands of himself and others, and then used nominee accounts to help hide that control.  For example, Discala held a portion of his CodeSmart stock in an account under Goepel's name.  Also, Discala coordinated the selling of the CodeSmart stock by himself and others, at gradually increasing prices, while the unwitting customers and clients of Josephberg and Bell were either made to or persuaded to purchase that

23

stock.  Finally, the escrow arrangement for the control of the free trading Cubed stock created by

Cane was complex and the price manipulation of the Cubed stock was only successful because of

the coordinated efforts of Discala and his corrupt brokers, including Josephberg and Goodrich, to

make it appear that demand existed for that stock at gradually increasing prices over several

weeks' time.  Discala was the architect of these schemes and coordinated the manipulative

trading with numerous individuals on a daily basis.

D.    The Sentencing Enhancement for Discala's Role as an Organizer/Leader with
       Five or More Participants is Warranted

Discala has also objected to Probation's determination that a four-level role

enhancement was applicable pursuant to U.S.S.G. § 3B1.1(a).   (Discala Mem. at A-6).

Specifically, Discala claims that evidence was not sufficient to show that he controlled or

directed anyone other than his assistant, Goepel.  Discala claims that attorneys (Ofsink),

stockbrokers and investment advisors (Bell, Josephberg, Goodrich, Morris, and Sloan), and his

wealthy associates (Wexler and Azrak) did not act as his direction.  Discala also claims that

Wexler, as his "partner," was equally culpable as him in the scheme.  The government strongly

disagrees with this characterization of the evidence that was presented at trial.  As discussed

above, multiple witnesses testified that Discala directed their actions, particularly with respect to

the manipulation of the stock price.

## **THE APPROPRIATE SENTENCE**

I.   A SENTENCE OF NO LESS THAN 180 MONTHS IS APPROPRIATE IN LIGHT OF 18 U.S.C. § 3553(A) CONSIDERATIONS

   A.   The Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented."  Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A)   to reflect the seriousness of the offense, to promote respect   for the law, and to provide just punishment for the offense;
>>
>> (B)   to afford adequate deterrence to criminal conduct; [and]
>>
>> (C)   to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2)(D).  "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in

determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation."  18 U.S.C. § 3582(a).

It is well-settled that, at sentencing, "the court is virtually unfettered with respect to the information it may consider."  United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988).  Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

As discussed above, the government's position is that the applicable advisory Guidelines range is based on a total offense level of 43, resulting in a range of imprisonment of 1,740 months.  (PSR ¶ 131).  While the government agrees that a below Guidelines sentence is called for here, the governments submits that a lengthy period of incarceration of no less than 180 months is appropriate.

B.   The Nature and Circumstances of the Offense Warrant a Substantial Term of Incarceration

As set forth in detail above, Discala orchestrated and led a widespread and aggressive series of market manipulation schemes that continued for more than a year, until he was finally arrested.  It is without dispute that Discala's conduct was serious in nature and broad in scope, designed to reap ill-gotten profits at the expense of unwitting investors.  His conduct deceived both individual investors and the investing public via the manipulation of multiple publicly traded stocks, and caused more than $16 million in actual investor losses with

staggering amounts of intended losses amounting to nearly a quarter of a billion dollars.  See 18

U.S.C. §§ 3553(a)(1), (2)(A).  Despite the egregious nature of his crimes, however, Discala

maintains that his crimes do not warrant a custodial sentence beyond four years.  Discala argues

that the Guidelines calculation in this case grossly overstates his criminal culpability.  While the

government agrees that a Guidelines sentence of 1,740 months would be too severe, the

government believes a sentence of no less than 180 months' imprisonment is appropriate.

However, Discala is wrong to suggest that the Guidelines' calculation grossly overstates his

culpability.  While the government is cognizant that the Court has previously expressed

skepticism about the utility of the government's intended loss figure when it determined the

appropriate custodial sentence for Goodrich and determined actual loss to be more relevant in the

imposition of that sentence (ECF No. 708 at 34), more than half of the Guidelines offense level

points that accrued to Discala in connection with his Guidelines calculation are due to the

specific, egregious nature of his criminality.  For example, Discala orchestrated and led a scheme

involving numerous participants, he harmed hundreds of victims, used sophisticated means to

execute his crime, and perjured himself at trial.  Thus, the nature and seriousness of Discala's

offenses warrant a substantial sentence of incarceration.

27

C.    Discala's History and Characteristics Warrant a Substantial Term of
      Incarceration[15]

As described below, the defendant's history and characteristics demonstrate that
he has failed to demonstrate any acceptance of responsibility for his crimes and lacks genuine
remorse for his conduct.  Discala argues that his neglected childhood, drug, and gambling
addictions, as well as post-arrest efforts at rehabilitation indicate that a lenient custodial sentence
is appropriate.  The government strongly disagrees and respectfully urges the Court to impose a
substantial sentence of incarceration.

1.    Discala's Has Shown No Genuine Remorse for His Actions

Since the time that he was arrested through the present, Discala has failed to show
any genuine remorse for his actions.  Despite the overwhelming evidence of his guilt, including
hundreds of intercepted wiretap calls where Discala directed manipulated trading in multiple
stocks for the specific and explicitly acknowledged purpose of deceiving the market, Discala has
yet to acknowledge any intentional wrongdoing.  Instead, at trial, Discala falsely testified that he
did not commit any crimes.  The government understands and respects that the defendant wishes
to preserve his appellate rights.  But his sentencing memorandum fails to adequately
acknowledge the effect his crimes had on his victims.  Instead, Discala paints himself as the

---

[15] The version of Discala's sentencing submission that has been filed on the public docket
is heavily redacted and many exhibits are either also heavily redacted or filed under seal. While
the government agrees with some of Discala's redactions—for example, the names of minors,
the names of participants in the STAR program, PII of individuals submitting letters on Discala's
behalf and medical records — the government does not agree with all of Discala's redactions,
such as redacting certain references to his upbringing and filing entirely under seal three letters
from STAR leadership (Discala Mem. Exs. 14, 33, and 34) that Discala relies on heavily in
support of his submission.  As an initial step, the government has redacted its sentencing
memorandum to mirror redactions in Discala's sentencing memorandum, but submits that the
Court should review the parties' submissions and determine if any of the redactions should be
lifted.

victim.  He focuses on his childhood and mental health issues to argue that he is the damaged

victim here, but also has filed numerous letters which depict Discala as holding himself out as a

community role model, someone who will interject himself in other people's life to guide them

in their personal struggles.  It is these characteristics, a failure to respect or acknowledge the law,

as well as an ability to convince people that his own advice should be respected, which

facilitated Discala's ability to engage in stock fraud without remorse.

2.      Alleged Childhood Neglect and Mental Health Issues

In the PSR, Discala acknowledged that he had a good relationship with both of his

parents, was close to all three of his siblings and was raised in an intact family under upper

middle-class economic circumstances, although his parents divorced when Discala was 7 and he

began to attend boarding school when he was 12.  (PSR ¶¶ 91-93, 111).  In the Discala PSR

Objections, Discala stated that he lived at home for two years in high school.  (Discala PSR Obj.

at 5).  Discala's wife confirmed Discala had a strong and close relationship with his extended

family.  (PSR ¶ 97).  While the PSR notes that Discala's father ███████████████████

████████████████████████████████████████████████████████

██████████████████████.  Discala's father was interviewed and stated that he "loves his son

more now than he ever have."  (PSR ¶ 94).  There is no mention of any childhood abuse in either

the PSR or Discala's objections to the PSR.

Discala's sentencing submission and in the many letters submitted on his behalf

by friends and family paint an entirely different picture.  Discala's father was described as an

absent and uninvolved parent, albeit a wealthy one, ████████████████████████

████████████████████████████████████████████████████████

███████ ████████████████████████████████████████████

29



. See Discala Mem, Ex. 6 at 3.

.  The PSR notes

that Discala was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and

general anxiety, both of which were treated with medication.  (PSR ¶ 101).   There is no mention

of any other mental health diagnosis, although Discala had been attending talk therapy for

numerous years

        While the government does not intend to minimize trauma suffered by any child,

Discala is 50 years old, grew up in a very affluent family, has had access to financial resources

and support from various family members, and, most importantly, has the support and love of his

family to this day.  He thus has more advantages than most criminal defendants who have come

before the Court and his assertions do not provide a reason to impose the sentence that Discala

advances.

            3.      Various Addictions to Drugs and Gambling

        Discala argues that he has struggled with addictions to drugs and gambling for

many years, and these addictions are factors that the district court should consider in imposing a

lenient sentence.  (Discala Mem at 26-27; see also PSR ¶¶ 104-108).  While the Court may

consider Discala's substance abuse and gambling problems as part of the 18 U.S.C. § 3553(a)(1)

"history and characteristics" factor in arriving at a sentence that is "sufficient but not greater than

necessary" to promote the proper objectives of sentencing, the government submits that these

addictions should not be a reason to provide a lenient sentence in this case.  See United States v.

30

Regensberg, 635 F.Supp.2d 306 (S.D.N.Y. 2009) (district court considered defendant's gambling addiction in a fraud case but concluded "such an affliction does not outweigh the egregious nature of his fraud").  Moreover, Guidelines Policy Statement Section 5H1.2 states, "Drug or alcohol dependence or abuse is not a reason for a downward departure.  Substance abuse is highly correlated to an increased propensity to commit crime[,] and "Addiction to gambling is not a reason for a downward departure[.]"   U.S.S.G. § 5H1.2.   The relation between various addictions and the offense conduct is unclear, other than a heightened willingness to break the law and engage in risky behavior to make money.

4. <u>Post-Arrest Rehabilitation Efforts</u>

Discala argues that his post-arrest rehabilitation efforts have been substantial and merit a more lenient sentence.  Discala primarily points to: (1) getting treatment for his various addictions and mental health problems; (2) devoting himself to his children as a stay at home father; and (3) volunteer work leading physical fitness classes for special needs adults.  (Discala Mem. at 25-29).  While these are all good things, there is nothing out of the ordinary about obtaining mental health or substance abuse treatment or being a loving parent.  Moreover, it is clear that the prospect of a lengthy jail term has motivated Discala like nothing else to reform his image.  There is no guarantee that, once he is sentenced, the defendant will not immediately return to his prior ways, particularly since Discala has not acknowledged any culpability for the crimes for which he was convicted.

In addition, the defendant's volunteer work should not qualify for a downward departure.  Guidelines Section 5H1.11 provides that "[c]ivic, charitable or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted."   Cases within the Second Circuit also indicate that a defendant's charitable works and good deeds must be truly extraordinary to warrant a

departure.  For example, in <u>United States v. Greene</u>, the court found that the defendant was entitled to a downward departure for his charitable works because his "contributions [we]re distinctly different" from the typical white-collar defendant.  249 F. Supp. 2d 262, 264 (S.D.N.Y. 2003).  Greene—who, as a file clerk at a law firm, was at "the lowest end of the scale" among white collar employees—had long volunteered as a foster father and eventually adopted six underprivileged children.  <u>Id</u>.  The court found that Greene had "devoted his entire life, all day every day, to parenting very disturbed and hard to place orphaned children. Greene's level of commitment to good works is truly extraordinary."  <u>Id</u>.  Discala's volunteer work as a fitness instructor for disabled adults only began approximately four years after he had been arrested in this case.

     D.    <u>The Need for Deterrence</u>

     The Court should also aim to impose a sentence that furthers the goals of general and specific deterrence.  U.S.S.G. §§ 3553(a)(2)(B) & (a)(2)(C).  Discala claims that specific deterrence is not necessary here because he will never work in the securities industry or business world again.  (Discala Mem. at 31, 39).  As an initial matter, there is simply no assurance that this is true, as the Court knows from any white-collar case involving a recidivist.  There is nothing to stop Discala from engaging in similar conduct in the future as long as he can find victims and/or willing co-conspirators.  Discala was well aware that the brokers he was dealing with were shady characters, but he embraced their willingness to bend the law to further his own schemes.  As Discala noted to Azrak regarding Josephberg's checkered regulatory history, "[y]gou ever see his broker book [i.e., FINRA broker check]?  It looks like a murder scene. There's crime scene tape around it."  (GX 198-21 (5/20/14; Session 8040)).  In addition, specific deterrence is particularly important in this instance as Discala testified at length that he believed his conduct was not criminal and has refused to express any remorse or acknowledge any

wrongdoing.  A lengthy sentence of incarceration will do what the trial did not – let the defendant know that his conduct was wrong and will not be tolerated.

Also, there is a greater need for general deterrence for fraud schemes than other crimes because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."  See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (internal quotation marks omitted)); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").  Thus, Discala is more likely to recidivate absent a strong punishment for his conduct.

A lengthy term of imprisonment would send a strong deterrent message to Discala and to those who engage in similar conduct that such crimes are serious offenses that come with appropriate consequences.  Additionally, such a sentence would reflect the seriousness of the offense, as reflected by the magnitude of the harm to investors.

E.      Avoiding Unwarranted Sentencing Disparities

As the Court is aware, one of the factors the Court is required to consider pursuant to § 3553(a) is the need to avoid unwarranted sentencing disparities.  See 18 U.S.C. § 3553(a)(6). Co-defendant Darren Goodrich was involved in manipulating only the stock of Cubed, made

33

little to no money from the scheme and he received a 41-month sentence, only seven months less than the sentence that Discala now argues is appropriate.[16]  (ECF No. 659).  While Josephberg has yet to be sentenced, in its sentencing submission, the government has asked for the Court to impose a sentence in excess of 96 months.  (ECF No.742).   While Goodrich and Josephberg both received a Guidelines enhancement for being registered representatives, Discala orchestrated and led the scheme and is the most culpable of all the charged defendants. Goodrich and Josephberg, like Discala, claimed to be devoted fathers and both have claimed significant post-arrest rehabilitation efforts.  Goodrich and every other charged defendant in this case, with the exception of Cane, pleaded guilty.  Discala has failed to accept responsibility for his actions, testified falsely at his trial, and made the most money of any of the charged defendants.  Accordingly, Discala should receive the longest incarceratory term, well in excess of the sentence imposed on Goodrich and the 96-month sentence that the government has requested that the Court impose on Josephberg.

Other defendants in this District who have committed securities fraud offenses that resulted in millions of dollars in victim losses have typically received substantial custodial sentences.  For example, in a boiler room[17] case involving a scheme to manipulate the stock of

---

[16] Goodrich's 41-month sentence was imposed along with a consecutive 41-month sentence in an unrelated securities fraud scheme charged in the District of New Jersey and consolidated with this case for sentencing purposes.

[17] The Securities and Exchange Commission defines boiler room schemes as follows: "Boiler room schemes are large-scale operations designed to lure in as many investors to an investment scam as possible, often using high-pressure sales tactics. Boiler room scheme operators may cold call investors or solicit investors through emails, text messages, social media, and other means. Boiler room scheme tactics may be used to perpetrate microcap fraud, binary options fraud, advance fee fraud, and other investment scams." (https://www.sec.gov/fast-answers/answersboilerhtm.html, visited April 7, 2019).

five publicly traded companies which resulted in approximately $14 million in investor losses, defendant Ronald Hardy, a boiler room manager/account executive, was sentenced to 120 months imprisonment, Dennis Verderosa, a boiler room cold caller/account executive, was sentenced to 72 months imprisonment, and MacArthur Jean, another boiler room cold-caller/account executive, was sentenced to 48 months imprisonment.  See United States v. Chartier et al., Criminal Docket No. 17-372 (JS), ECF Nos. 527, 530, 452.[18]  Substantial terms of imprisonment also have been imposed even where the ultimate losses suffered by the victims were much more limited than here.  Martin Shkreli, who was convicted of securities fraud and conspiracy to commit securities fraud related to several connected fraud schemes, including a scheme to manipulate the stock of one publicly traded company, and ordered to pay approximately $388,000 in restitution and forfeit approximately $7.3 million, was sentenced to 84 months imprisonment even though most of his victims had recouped their losses.  United States v. Shkreli, Criminal Docket No. 15-Cr-37 (KAM), ECF No. 566.

For each of these reasons, the government's recommended sentence of not less than 180 months' imprisonment is both warranted and appropriate.

## RESTITUTION

### I.   The Applicable Law

The Mandatory Victims Restitution Act ("MVRA") applies in this case and, provides, in part, that in sentencing a defendant convicted of a felony committed through fraud or deceit, the court must order the defendant to pay restitution to any identifiable person directly and proximately harmed by the offense of conviction.  See 18 U.S.C. § 3663A(a)(2); see, e.g.,

---

[18] Sixteen defendants were charged in the Chartier case.  To date, only four have been sentenced.

United States v. Gushlak, 728 F.3d 184, 194 (2d Cir. 2013) (MVRA applied to defendant convicted of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371); United States v. Catoggio, 326 F.3d 323, 327–28 (2d Cir. 2003) (MVRA applicable to a defendant convicted of conducting a RICO enterprise in violation of 18 U.S.C. § 1962(c) to perpetrate frauds against the investing public in connection with the purchase and sale of certain stocks by creating artificial market demand for those stocks and then selling them at inflated prices).  The procedures to be followed in determining whether, and to what extent, to order restitution pursuant to the MVRA are those set out in 18 U.S.C. § 3664.  See id. § 3663A(d).  Section 3664 provides that "[i]n each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant."  Id. § 3664(f) (1)(A).

Disputes as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence.  Id. § 3664(e).  "[I]n the context of contested issues regarding the propriety of a restitution award, . . .  the sentencing procedures employed to resolve such disputes are within the district court's discretion so long as the  defendant is given an adequate opportunity to present his position [as to matters in dispute]."  Gushlak, 728 F.3d at 194 (internal quotation marks omitted).   Although the MVRA "does not authorize the court to order restitution to victims in excess of their losses," United States v. Pescatore, 637 F.3d 128, 139 (2d Cir. 2011), a district court is only required to ascertain by a preponderance of the evidence "a reasonable approximation of losses supported by a sound methodology" before imposing restitution.  Gushlak, 728 F.3d at 196; see also United States v. Reifler, 446 F.3d 65 (2006) (applicable MVRA amount not limited to jury findings or admissions by defendant).  Courts have relied on calculations prepared from electronic blue sheet trading data collected from the

brokerage firms, which reflect purchases and sales by the victims of a stock fraud, in order to calculate victim loss in a securities fraud case.  See Gushlak, 728 F.3d 184; United States v. Ageloff, 809 F.Supp.2d. 89, 97 (E.D.N.Y. 2011).

II.     The Government's Actual Loss and Restitution Calculation

The government has determined that the total victim loss in this case is $16,428,234.40.  The victim losses were calculated as follows: (1) $12,619,744.30 in CodeSmart trading losses by hundreds of individuals and entities that occurred between May 2013 and July 2014, based on a FINRA analysis of blue sheet trading data; (2) $479,007.05 in Cubed trading losses by more than 80 individuals and entities that occurred between April 2014 and July 2014, based on a FINRA analysis of blue sheet trading data; (3) approximately $2,060,000 in losses by approximately 18 individuals and entities who purchased restricted stock directly from Cubed at $1 per share by wiring money to a bank account controlled by Cane pursuant to a private placement of Cubed stock;[19] (4) approximately $1,269,483 in losses by approximately 40 individuals who deposited money into accounts controlled by Discala between March 2014 and May 2014 pursuant to "Stock Purchase Agreements" or "Participation Purchase Agreements" for Cubed "escrow" stock as reflected in Government Exhibit 190-3, an analysis by Discala's retained accountant who testified at Discala's trial.

The government respectfully submits that Discala should be held joint and severally liable for the entire restitution amount.

---

[19] Cane forwarded this money to Cubed, and directed the transfer agent to issue stock certificates for restricted Cubed stock to these investors.  Approximately $260,000 was deposited in Cane's bank account prior to April 22, 2014, and $1,875,000 was deposited into Cane's bank account after April 22, 2014.

III.     Disputes Regarding Actual Loss and Restitution Should Be Resolved Prior to Discala's
         Sentencing Hearing

         Discala has asked that the Court bifurcate Discala's sentencing hearing to address

the issue of actual loss and restitution at a later date, possibly after a Second Circuit appeal by

Goodrich is decided.  The government objects to such a procedure and requests that, if necessary,

the Court hold any hearing necessary to determine actual loss and restitution at the same time or

prior to imposing sentence on Discala.  While the government asserts that these can be decided at

the scheduled sentencing date, if Discala believes that it is impossible to argue restitution at

sentencing, the defendant's sentencing should be briefly adjourned until they are prepared.  It is

important to note that the government's initial loss and restitution figures, which included

CodeSmart trading losses calculated using the blue sheet data set forth in GX 143-1 (trade dates

5/13/13-6/13/13) and GX 143-2 (trade dates 6/14/13-5/9/2014)), were made available to Discala

well over a year ago.  Discala's prior counsel, upon review of the information provided, drew the

government's attention to the fact that some duplicate trades had not been removed from the blue

sheet data and that the loss calculation did not incorporate certain off-setting sales by victims that

were reflected in GX 143-6 (trade dates 5/12/14-7/18/14).  The government asked FINRA to

review the analysis to remove duplicate trades and incorporate any additional data in GX 143-6

that would impact the loss calculation for any previously identified victim, and a revised

CodeSmart figure was provided to Discala's current counsel on April 21, 2021.  Discala's

complaints now come on the eve of sentencing and appear designed to unnecessarily put the

Court and the government on a 90-day clock to try and obtain a more favorable restitution

calculation.  These disputes should be solved in connection with sentencing.

         Furthermore, the government has provided a roadmap to its analysis.  The blue

sheet analysis involved taking the electronic format blue sheet data, which has been provided to

defense, and performing the following steps: (1) FINRA eliminated all non-customer transactions (i.e. trades conducted by broker-dealer proprietary trading accounts), (2) determined whether each account lost money (a "loss account") or generated proceeds (a "profit account") upon subtracting any sales transaction amount from an original purchase transaction amount using the functions available in Microsoft Excel; (3) where an investor traded through multiple accounts, FINRA calculated a single loss or profit amount based on all the available trading; and (4) all profit accounts were removed from the analysis.   Discala's retained expert, Robert Lowry, has indicated that he is familiar with blue sheet data, and he should be able to review this analysis with the data that has been provided.  The complaints raised to date about that analysis are without merit.  Cancelled trades were not included in the victim loss calculation, and the loss figure for each victim included off-sets for sales of purchased stock.  Any disputes can be solved following a hearing.

On a final related note, there is one issue that Discala has raised with regard to loss calculation that the Court will have to determine prior to sentencing the defendant.  It relates to whether it was appropriate for the government to include within the loss calculation CodeSmart purchases made after September 2013.  Although Discala disputes the government's calculation, he has not indicated whether excluding post-September 2013 purchases would materially alter the government's victim loss calculation for CodeSmart if he is correct.  (See Discala Mem. at 42).  The government's position is that all individuals who purchased CodeSmart stock prior to the stock manipulation scheme being exposed when the Indictment was unsealed in July of 2014 were victims of Discala's fraud on the market because CodeSmart would not have been a publicly-traded company but for Discala's fraud and false information was disseminated into the market that was never corrected.  Another potential issue is that

Discala implies, but does not necessarily argue, that he, like Goodrich, plans to object to the inclusion of the private placement Cubed losses in his restitution calculation.  (Discala Mem. at 42).  Each of these disputes should be decided at or prior to sentencing and the government is prepared to argue these at sentencing or at the Court's convenience.

<u>FORFEITURE</u>

The parties have entered into a stipulation with respect to the forfeiture, which would require Discala to forfeit the profits he received from trading in the stock of CodeSmart, totaling $2,484,873.19.  (ECF No. 767).  The government requests that the Court orally pronounce the forfeiture amount, and that the forfeiture order be entered and attached to the Judgment.

## **CONCLUSION**

Based on the foregoing, the government respectfully requests that the Court impose a term of imprisonment no less than 180 months, restitution in the amount of $16,428,234.40 and enter the order of forfeiture in the amount of $2,484,873.19.

Dated:      Brooklyn, New York
            June 11, 2021

Respectfully submitted,

MARK J. LESKO
ACTING UNITED STATES ATTORNEY
Eastern District of New York
Attorney for Plaintiff
271 Cadman Plaza East
Brooklyn, New York 11201

By:     _____/s/_____
        Shannon C. Jones
        Patrick T. Hein
        Mark E. Bini
        Assistant United States Attorneys
        (718) 254-6379

cc: Defense Counsel (by ECF)
    U.S.P.O. Victoria Main (by email)